# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

Appvion, Inc. Retirement Savings and
Employee Stock Ownership Plan, by and
through Grant Lyon in his capacity as the
ESOP Administrative Committee of Appvion,
Inc.,

                             Plaintiff,

              v.

Douglas P. Buth and Gayle Buth, husband
and wife; Paul J. Karch and Anne Karch,
husband and wife; Mark Richards and Jeanne
Richards, husband and wife; Tom Ferree and
Carol J. Ferree, husband and wife; Rick
Fantini and Debra L. Fantini, husband and
wife; Dale E. Parker and Debrah Parker,
husband and wife; Angela Tyczkowski and
John Doe Tyczkowski, husband and wife;
Kerry Arent  and Timothy Arent, husband and
wife; Kent Willetts and Jane Doe Willetts,
husband and wife; Susan Scherbel and
Thomas Scherbel, husband and wife; Ronald
Pace and Teresa Pace, husband and wife;
Stephen Carter and Jane Doe Carter, husband
and wife; Kathi Seifert and Stephen Seifert,
husband and wife; Andrew Reardon and
Michele Reardon, husband and wife; Terry
Murphy and Jane Doe Murphy, husband and
wife; Mark Suwyn and Patricia Suwyn,
husband and wife; Kevin Gilligan and Angela
Gilligan, husband and wife; Louis A. Paone
and Jane Doe Paone, husband and wife;
Houlihan Lokey Capital, Inc. (f/k/a Houlihan
Lokey Howard & Zukin Capital), a California
corporation, State Street Bank and Trust
Company, a ___Massachusetts trust company;
State Street Global Advisors/State Street
Corporation, a __Massachusetts corporation;
Kelly Driscoll and Arthur Driscoll, husband
and wife; Sydney Marzeotti and Stephen
Marzeotti, husband and wife; Argent Trust
Company, N.A., a Tennessee corporation;

Civil Action No.:  _____

Demand For A Jury Trial

Reliance Trust Company, a Georgia )
corporation; Howard Kaplan and Wendy )
Kaplan, husband and wife; Stephen Martin )
and Jane Doe Martin, husband and wife; )
David Williams and Jane Doe Williams, )
husband and wife; Willamette Management )
Associates, Inc., an Oregon corporation; )
Scott D. Levine and Debora Levine, husband )
and wife; Aziz El-Tahch and Ayelish M. )
McGarvey, husband and wife; Robert Socol )
and Lynn Socol, husband and wife; Stout )
Risius Ross, LLC., a Michigan limited )
liability company; Stout Risius Ross )
Advisors, LLC, an Michigan limited liability
company, DOES 1 through 50, ABC
Corporations 1-5, DEF Partnerships 1-5, GHI
Limited Partnerships 1-5, and JKL Limited
Liability Companies 1-5,

Defendants.

# COMPLAINT

Plaintiff, the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP Plan"), by and through the ESOP Administrative Committee of Appvion, Inc. (the "ESOP Committee"), and for its Complaint against the Defendants allege as follows:

## I.  INTRODUCTION.

### A.  The Defendants Participated in "Fraud or Concealment" Regarding the True Value of the PDC Stock.

1.      This Complaint seeks to recover damages suffered by the ESOP Plan and ultimately by its employee participants ("Employee Participants"), most of whom were union members.  When the operating paper company, Appvion, Inc. ("Appvion") filed bankruptcy in October 2017, the stock in its parent company, Paperweight Development Corp. ("PDC"), which was 100% owned by the ESOP Plan, became worthless.  As a result, the ESOP Plan and its

Employee Participants suffered hundreds of millions in damages, including what they had invested in the ESOP Plan.

2.    As described in this Complaint, these and other damages were caused by, among others, the Defendants' breaches of fiduciary duties and fraudulent misrepresentations to the ESOP. These breaches of fiduciary duty and misrepresentations included:

(a)    Inducing Appvion employees to take money saved in their 401(k) plans and use it to provide the $106 million down payment needed to fund the ESOP Plan's purchase of 100% of PDC's stock in November 2001. Included in these fraudulent misrepresentations was that Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") had acted independently in connection with its expansive role in the ESOP Plan; and

(b)    By inflating the appraised value of the PDC stock in each semi-annual appraisal from 2001 through the 2017 Appvion bankruptcy by, among others, failing to make deductions for as much as $175.5 million in pension/postretirement related liabilities.

3.    Because the Defendants engaged in fraud or concealment that prevented the ESOP Plan and its Employee Participants from learning of the Defendants' breaches of fiduciary duties, the Employee Participants were unable to discover the fiduciary breaches until at least 2017, after an independent party was appointed to the ESOP Committee and they were able to investigate the ESOP's finances. For example, the ESOP appraisal reports were not made available to the Employee Participants.

**B.** **Appvion Management and Professional Advisors Fraudulently Persuaded Appvion's Employees to Buy PDC Stock.**

4.      In early 2001, Appvion management, spearheaded by CEO Douglas Buth and general counsel Paul Karch, proposed an employee buyout of the company using money from Appvion employees' individual 401(k) retirement funds.  Appvion employees had accumulated the funds over time by directing portions of their paychecks into their retirement accounts.

5.      Appvion management, including Buth and Karch, and professional advisors, including Houlihan Lokey, Willamette, State Street and Principal proposed the ESOP Plan to the Appvion employees.  They engaged in various road shows to sell the scheme to the employees. A video of a road show on 2 August 2001 shows Buth and Karch side-by-side with purportedly "independent" ESOP professionals, Louis Paone (Houlihan Lokey), Kelly Driscoll (State Street), and Rick Braun (Willamette) making repeated misrepresentations to Appvion's employees in order to convince them that they should seize upon this "unique one-time opportunity" to transfer money out of their 401(k) plans to buy PDC stock.  They explained that if the employees came up with at least $100 million, the company could borrow the rest (almost $700 million) to buy 100% of PDC's stock.

6.      Referring to the employees' opportunity to invest in PDC's stock, Buth explained: "[I]t just does not happen more than once in a lifetime and we're very fortunate to be employees here at this time."  Describing the financial return, he represented:  "For every dollar that we pay down in debt, it turns into our equity.  So the $100 million that we put down on this deal will grow by $500 million in less than five years if we achieve our Base Case plan. …  The upside you guys can figure out because my management team is only focused on one thing, beating that Base Case.  That's what we are paid to do."  And the professional advisors agreed.

7.     Houlihan Lokey's retainer agreement, signed by Paone himself, documents its central role in orchestrating virtually all elements of the ESOP Plan including the negotiations of the stock purchase price and the selection of the "ESOP Team," one member of which was the ESOP Trustee, State Street Global Advisors.

8.     In an earlier (25 July 2001) letter to Appvion employees, Buth, fraudulently represented that Houlihan Lokey's Paone would present an "independent validation" of the ESOP Plan.  At the road show, Karch again fraudulently introduced Paone as being independent and instrumental in negotiating the price at which the ESOP Plan would buy the company from the seller:  "The first person who is going to provide an independent view and validation of our deal here is Lou Paone, our investment banker from Houlihan Lokey Howard and Zukin. … He helped us negotiate with AWA [the seller] and arrange financing."  However, no one disclosed to employees that Houlihan was not actually independent – instead, its fee was contingent on the deal closing and it was structured as a percentage of the final purchase price (ultimately, over $8 million).

9.     Under the fraudulent pretext of being an independent professional, Paone then pushed the deal:  "Paul had mentioned that one of the things that I'm going to do this evening is help validate the purchase price of the transaction and the financial aspects as to why they are so attractive and why you're getting such a good deal."  Paone explained that while recent transactions of paper related companies had sold at an average of 9.1 times EBITDA—a measure of the company's operating cash flow, the Appvion ESOP Plan was buying Appvion for the "attractive price" of "a little over four times your company's year 2000 operating cash flow." Paone concluded:  "I think in the coming slides and the discussion that you are going to hear,

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 5 of 138   Document 1

you're going to feel just like me that this is an extraordinary opportunity and one that could generate significant value for all of you."

10.     Karch then introduced Kelly Driscoll from State Street Global Advisors which he described as "a very large and successful financial institution which manages money for lots of people in different ways, but specifically acts as trustee for many ESOP's."  As the ESOP Plan Trustee, Driscoll then represented that it was her team's job to "represent the ESOP from an investment perspective. . . . [W]e want to make sure we analyze this investment, we really understand the business of Appleton Papers. . . . [W]e are very comfortable with the valuation. . . . So, we are very pleased, quite frankly, on the price we were able to get with the seller.  We think we got a very good price."

11.     State Street was supported in its opinion of value by the appraisal firm Willamette.  Driscoll explained:  "[Rick Braun from Williamette] had a whole team who was really looking at the financial aspects and the valuation aspects of this transaction … ."  She then represented:  "So, we had a lot of people, a lot of experts looking out for the interests of the ESOP."

12.     In their roadshow presentation, Buth, Karch and Paone downplayed the risks and appropriateness of transferring funds from an existing employment retirement plan to a new, highly-leveraged, undiversifiedESOP.  The ESOP Plan was analogized to a mortgage on a home even though the risks of a home mortgage are not at all comparable to a leveraged buyout transaction.  They even compared the opportunity of owning Appvion stock to the benefits of owning shares of Microsoft.

13.     The Appvion employees were convinced by the fraudulent representations.  They cashed out over $106 million from their individual 401(k) plans to invest in the ESOP Plan,

investing their life savings, earned paycheck by paycheck, in a very risky transaction in which every dollar the employees invested was encumbered with approximately $6.60 in debt. The average size of ESOP investment made from each employee's 401(k) account was $50,000 of hard-earned dollars earned over substantial time periods. The money went from diversified, liquid, marketable 401(k) investments to an ESOP Plan from which they would be unable to access their money prior to retirement, termination, death, or disability, except under limited circumstances. And then, only if the stock had a positive market value.

      **C.**     **PDC's Stock Valuation Rises from $10 to $33.62 And Management Sells its Stock.**

14.    Following the 2001 buyout, Appvion employees continued to defer a portion of their paychecks to the ESOP to buy PDC stock, instead of investing in more reliable, diversified, marketable and liquid 401(k) accounts. Appvion also made ongoing matching contributions of PDC stock to the ESOP instead of paying cash to the employees' 401(k) accounts. These ongoing employee contributions to the ESOP were used to meet share repurchase obligations under the ESOP, and any excess would be used to provide cash to Appvion. Appvion management, including Buth, Karch and others urged continued employee investment in the ESOP Plan. For example, Buth represented to the ESOP Plan and the Employee Participants that it was achievable for the PDC stock price to reach $100 from its initial price of $10.

15.    For the next six years, Appvion fraudulently reported strongly increasing semi-annual stock valuations that seemed to support the road show recommendation to participate. From December 2001 through June 2004, based in Willamette's initial determination of stock value, Plaintiff believes that, although Plaintiff has no access to the valuation reports, that Willamette generated fraudulent semi-annual appraisals. In 2004, Willamette employees joined

SRR, and SRR took over the appraisals beginning in December 2004. The ESOP Trustee was at all times responsible for approving the appraisals and releasing the semi-annual stock price.

16.     The appraised stock price rose from $10 at the ESOP formation in November, 2001, to $33.62 in December 2006. At the same time, management also implemented, and Appvion Board of Directors approved, various incentive programs that awarded themselves phantom stock and deferred compensation tied to the value of PDC's stock.

17.     For example, on 8 August 2006, Appvion fraudulently reported that the Company stock had risen 9,5% for the period, for a 213% increase since the ESOP formation:



8/8/2006

Company Stock Value Increases Over 9 Percent for First Half 2006

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2006 and determined the per share value to be $31.27. That means the share value increased 9.5% for the period January 1, 2006 through June 30, 2006. The previous value of PDC stock was $28.56 per share

As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $156,500, an increase of 213% since the November 2001 buyout.

18.     During this period (2005 – 2007) when Appvion's fraudulently appraised value was at or near its highest, virtually all of Appvion's top management, including Buth and Karch, armed with inside information about Appvion's true financial condition, left the company and

began the process of cashing out of their personal investment in PDC stock, as well as phantom stock and deferred compensation rights. For example, Buth left on 1 July 2005, retiring at the age of 49. He was able to capture a gain of more than $852,000 for his stock. Karch left in March 2007, his gain was $304,000. These departures, timed to coincide with the fraudulently high stock valuations, caused the ESOP Plan and Appvion to drastically overpay these executives and drained Appvion's critical cash reserves. The Defendants' inside information regarding the true value of the PDC stock was withheld from the ESOP Plan and its Employee Participants.

### D. Appvion Ultimately Files for Bankruptcy

19. From December 2007 until June 2010, PDC's stock values declined from $33.41 to $12.03. The decline was blamed on the impact of the Great Recession and other factors. In December 2010, the fraudulently appraised stock values began to climb again, reaching $17.85 as of June 2013. In an effort to convince employees to continue investing in the ESOP, when management announced the PDC stock values to the ESOP Plan and the Employee Participants, the highlighted selected financial data that supposedly justified the increasing valuations. Unaware of undisclosed material deficiencies that caused every one of the stock appraisals to be fraudulently overstated, Employee Participants continued to contribute a portion of their salaries to the ESOP Plan as retirement savings.

20. Knowing Appvion's true (but concealed) financial condition, management shifted the manner in which they were compensated. They changed the method of how their stock was valued from one which rewarded the increase in PDC stock price to one that guaranteed their results independent of an increase in stock value. For example, CEO Mark Richards lost money from his ESOP account when Appvion went bankrupt; however, his salary and bonus

compensation was so high that he made millions per year in the years leading up to his retirement, regardless of Appvion's income or stock value:

| Year | Salary/Bonus | Synthetic Equity | Non-Equity Incentive Plan Compensation | Pension Value and Deferred Compensation | Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2012 | $1,176,000 | $1,409,200 | $1,224,000 | $255,610 | $ 148,516 | $4,213,326 |
| 2013 | $ 800,000 | $1,294,020 | $ 102,400 | $126,139 | $ 497,210 | $2,819,769 |
| 2014 | $ 815,385 | $1,366,385 | $ 492,800 | $420,646 | $ 86,709 | $3,181,925 |
| 2015 | $ 800,000 | $1,388,772 | $ - | $124,408 | $2,995,387 | $5,308,567 |

21.    The Employee Participants had no similar way to protect themselves from declines in the PDC stock values.

22.    The stock price declined to $6.85 as of June 2017.  In October 2017, Appvion filed for bankruptcy protection, completely wiping out the PDC stock value held by the ESOP Plan for the benefit of the Employee Participants.

23.    The primary ESOP beneficiaries were Buth, Karch and other senior management or directors who rewarded themselves by either cashing out at periods of fraudulently high stock prices or who received excessive compensation packages pre-bankruptcy, all at the individual Employee Participant's expense.  The other beneficiaries included Houlihan Lokey, the ESOP Trustees and the ESOP appraisers.

**E.    Grant Lyon Discovers that Each of PDC's Stock Valuations Are Fraudulently Overvalued.**

24.    In August 2017, Grant Lyon was appointed to replace the entire Appvion ESOP Committee.  Having a forensic accounting background and training, he began an analysis of Appvion's financial statements and PDC's stock valuations.  He learned, for the first time, that the appraisals fraudulently overvalued PDC's stock value and concealed Appvion's true financial condition.

25.    Mr. Lyon learned that the Appvion appraisals were materially and fraudulently overstated for at least the following reasons:

(a)    Each of the semi-annual appraisals from 2001 through 2017 failed to account for material liabilities. For example, unfunded pension/postretirement liabilities alone exceeded $73 million in 2001 and reached as high as $175.5 million in 2012. Each year, these liabilities were prominently displayed in Appvion's PWC-audited financial statements. For example, the relevant portion of the 2012 balance sheet (which is just like every other year) looks as follows. On information and belief, the Williamette appraisals prior to 2004 likewise make no deduction for these pension/postretirement liabilities:

| **"LIABILITIES, REDEEMABLE COMMON STOCK, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME** **(dollars in thousands)** | | |
| --- | --- | --- |
| | December 29, 2012 | December 31, 2011 |
| *** | | |
| Long-term debt | 511,624 | 510,533 |
| Postretirement benefits other than pension | 38,440 | 41,611 |
| Accrued pension | 137,081 | 125,245 |
| Other long-term liabilities | 32,165 | 7,379 |
| Commitments and contingencies (Note 19) | - | -" |

Had the PDC appraised values deducted just these pension/postretirement liabilities, the PDC stock would have had a negative value as early as 2009. Yet the written appraisal reports have no discussion of the pension/postretirement liabilities and no one referred to them at the road shows.

(b)     The appraisals continue to rely heavily on projections of future earnings created by Appvion's management, even after the appraisers knew that Appvion consistently missed these projections.

(c)     The appraisals inflated Appvion's terminal value by purporting to capitalize a declining income stream into perpetuity. Although it may be appropriate to capitalize (reduce to present value) an income stream that is assumed to continue into perpetuity, a declining income stream, by definition, cannot continue. Therefore, recognized appraisal theory does not allow its capitalization in this manner.

(e)     The 30 June 2015 appraisal changed valuation methods. Up until that date, SRR relied upon both multiples of revenue and EBITDA. With a dramatic decline in EBITDA in Appvion's thermal paper division, SRR relied *only* on a multiple of revenue.

(f)     In order to justify their numbers, the 2012 SRR appraisal failed to subtract losses from the closure of Appvion's West Carrollton Mill and the associated severance costs.

(g)     The appraisals failed to include all overhead costs in the projections by breaking Appvion out into business segments, thus failing to account for overhead costs not allocated to individual business segments.

(h)     The appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

(i)     The appraisals improperly applied a 10% control premium in their valuations where the ESOP Plan and its Employee Participants had no

practical ability to control the affairs of PDC or Appvion under the Plan Document or the Security Holder's Agreement. Further, when the PDC Stock was sold upon a triggering event, only small units of stock were sold, thus not commanding a control premium.

26.    In order to understand the appraisal deficiencies, it was necessary to have both the financial statements and the appraisal reports. While all members of the ESOP Committee, the ESOP Trustees and the Appvion Board of Directors had access to the appraisal reports, the Employee Participants had no such access. Even though union members specifically asked to see the appraisal report, they were denied access. Thus, the Employee Participants had no basis to conclude that the appraised stock values did not properly analyze the factors affecting Appvion's value. The most glaring and obvious deficiency was the appraisals' failure to make a deduction for pension/postretirement liabilities and also for the "other liabilities" recorded on each balance sheet.

27.    Lyon reported his finding to Appvion's Board of Directors by 1 September 2017. As a result of the deficiencies Lyon identified, each of the fraudulent appraisals, from 2001 through 2017, masked and concealed the fundamental weaknesses in Appvion's true financial condition and prevented the ESOP Plan and its Employee Participants from being able to understand PDC stock's true value. As a result, the ESOP Plan (on behalf of the Employee Participants) overpaid for PDC stock from the beginning of the ESOP Plan through bankruptcy.

28.    In the fall of 2018, Lyon discovered that Houlihan Lokey was not "independent" as had been fraudulently represented by Buth, Karch and Paone, but in fact stood to gain a contingent fee of as much as 1% of the $810 million purchase price (over $8 million), but only if the ESOP transaction closed. Here is the relevant contingent fee paragraph from the engagement

contract signed by Buth on behalf of PDC and Paone, as the Managing Director of Houlihan Lokey:

> 2.     In consideration of the foregoing financial advisory services, the Company agrees to pay Houlihan Lokey a non-refundable retainer fee of $100,000 upon the execution of this letter agreement. The Company also agrees to pay Houlihan Lokey a transaction fee at a Transaction closing equal to 1.0% of the "Aggregate Consideration" paid for the stock of the Company with respect to an ESOP Acquisition. Aggregate Consideration shall mean the sum of the fair market values of any consideration

Engagement Ltr. to Douglas Buth from Louis Paone (Houlihan Lokey) 14 Feb 01, pp. 1-2.

29.     This lack of independence is particularly disturbing because Buth, who together with Paone, negotiated the ESOP stock purchase price from the seller, also had a conflict of interest. As disclosed in the 23 July 2001 Prospectus, for example, those employees who "assisted in the acquisition" receive a total "sale incentive" of $2.46 million—"40% to Mr. Buth and the balance will be distributed by Mr. Buth in his discretion among other employees who assisted with the acquisition."

30.     Therefore, Buth and Houlihan Lokey, the two parties who negotiated the ESOP stock purchase price, were both conflicted because they each stood to gain millions of dollars, but only if the transaction closed. And, the higher the purchase price they negotiated, the greater their contingent payment would be.

31.     Because the Prospectus disclosed Buth's conflict of interest, it was critical that Buth and Karch presented Houlihan Lokey (Paone) at the ESOP road show as being "independent." And even though the Prospectus reported that Houlihan Lokey "rendered its preliminary opinion to Paperweight Development's Board of Directors that the purchase price that Paperweight Development is paying for the acquisition is "fair," it likewise fraudulently conceals Houlihan Lokey's conflict and that the price, by any reasonable standard, was not fair.

32.     In other words, the Prospectus fails to disclose that if Houlihan Lokey were to determine the purchase price was *not* fair, it stood to lose as much as $8.1 million.

33.     This may explain why Buth and Paone were willing to negotiate an $810 million purchase price even though the Prospectus indicates that the seller was willing to pay Buth and other Appvion management a sale incentive for anything over $700 million.

34.     Rather than being a unique, once-in-a-lifetime opportunity for Appvion's employees, the fraudulently concealed conflicts of interest and the fraudulent PDC stock overvaluations allowed Buth, Karch and others the time and resources to benefit themselves, by receiving large employment compensation packages that they used to enrich themselves before Appvion's collapse into bankruptcy.  And, in the process, they convinced the employees to transfer their investment out of a traditional, diversified, liquid, marketable, unleveraged retirement fund into this fund which lacked all of those characteristics.

35.     This Complaint seeks to recover damages suffered by the ESOP Plan (and indirectly by the Employee Participants), including those resulting from the fraudulently inflated appraisals and stock price and the undisclosed conflict of interest.

36.     It also seeks to recover the amounts paid to the management insiders and ESOP Plan fiduciaries who sold their stock at inflated values and who took other inflated compensation facilitated by the overvaluation.  It seeks to recover from management and directors for the waste of corporate assets caused to Appvion when it approved the payment of over $57 million for the purchase of overvalued stock.  It also seeks to recover all fees paid to Houlihan Lokey.

37.     The Defendants include (1) Williamette and SRR, who performed the false appraisals, (2) the Appvion ESOP trustees who had a fiduciary duty to the ESOP Plan to, among other things, put processes in place to make sure the stock was properly valued and to conduct an

independent and objective analysis of the appraisals, (3) members of the Appvion ESOP Committee and Board of Directors who owed a fiduciary duty to the ESOP Plan and who had access to the full appraisal reports, to the company projections and to Appvion audited and unaudited financial information; and (4) Houlihan Lokey for its role in fraudulently misrepresenting its independence, thus facilitating and orchestrating the entire ESOP transaction.

## II.   <u>NATURE OF THE ACTION</u>

38.    This action arises in part under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. and is brought by the ESOP Administrative Committee on behalf of the Appleton Papers Retirement Savings and Employee Stock Ownership Plan (the "ESOP Plan") and the Employee Participants to restore losses to the ESOP Plan, obtain equitable relief to remedy violations of ERISA and/or breaches of fiduciary duty, and to obtain damages.

39.    This action seeks relief against the fiduciary Defendants for violations of ERISA's statutory and fiduciary provisions, including recovery to the ESOP Plan of any losses resulting from the breaches, disgorgement of profits of any fiduciary which have been made through the use of assets of the ESOP Plan, and other appropriate equitable and remedial relief pursuant to ERISA § 502(a)(2) (29 U.S.C. § 1143(a)(2)), ERISA § 502(a)(3) (29 U.S.C. § 1132(a)(3)), ERISA § 404 (20 U.S.C. § 1104), ERISA § 405 (20 U.S.C. § 1105), ERISA § 406 (20 U.S.C. § 1106) and ERISA § 410 (29 U.S.C. § 1110).

40.    This action also seeks relief against the non-fiduciary Defendants for fraud, negligent misrepresentation, Wisconsin securities fraud, federal securities fraud, and breach of fiduciary duty.

## III.    PARTIES, JURISDICTION, AND VENUE

41.    Non-Party Appvion, Inc. (f/k/a Appleton Papers, Inc., and Appleton, Inc.[1]) ("Appvion") is a Delaware corporation with its principal place of business in Appleton, Wisconsin.   Appvion established and maintained the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP Plan") to provide retirement benefits for its eligible employees.   The ESOP Plan consists of an employee stock ownership component (the "ESOP Component") which holds shares of Paperweight Development Corp ("PDC"), the direct parent of Appvion, Inc., and a 401(k) component (the "Non-ESOP Component").   The ESOP Plan is an employee benefit plan within the meaning of ERISA § 3(3) (29 U.S.C. § 1002(3)) and the ESOP Component is intended to meet the requirements of ERISA § 407(d)(6) 29 U.S.C. § 1107(d)(6)).

42.    The ESOP Administrative Committee of Appvion, Inc. (the "ESOP Committee") is a fiduciary of the ESOP Plan pursuant to ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)).   The members of the ESOP Committee are appointed by the Board of Directors of Appvion.   Grant Lyon is the sole member of the ESOP Committee by appointment of Appvion's Board of Directors, effective August 9, 2017, in conjunction with an ESOP Plan amendment allowing the Committee to consist of one member.

43.    The ESOP Committee has standing to bring this action on behalf of the ESOP Plan under ERISA § 502(a) (29 U.S.C. § 1132(a)).   Additionally, the August 14, 2018 Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation (the "Liquidation Plan") states that nothing in the Liquidation Plan impairs any claim held by the ESOP Committee.   The Liquidation Plan also states that "Grant Lyon, in his

---

[1] Appleton Papers, Inc. changed its name to Appvion in May 2013.  For simplicity, it is referred to throughout this Complaint as Appvion.

capacity as an ESOP Committee member, shall have standing to prosecute the ESOP Claims and other ESOP Preserved Claims…"  ESOP Preserved Claims are defined as "(i) any Claim held by the ESOP, the ESOP Committee or its members, or ESOP participants…, arising from or relating to the ESOP or any Interest in any Debtor, against any Person other than the Debtors."

44.     Defendant Douglas P. Buth ("Buth") and Gayle Buth are husband and wife and United States citizens who currently reside in Appleton, Wisconsin.  During his tenure at Appvion, from November 9, 2001 through July 2005, Buth served as Chairman, CEO, President, and Director.  Buth was also a member of the ESOP Committee from 2001 until approximately May 2005 when he retired from Appvion.  Buth retained Houlihan Lokey and knew about the approximately $8 million Houlihan Lokey stood to gain if the ESOP buyout was approved.  Buth was instrumental in persuading employees into voting on the buyout.  Buth made affirmative misrepresentations and omissions to induce the employees to approve the buyout and place their money into the ESOP Plan at the employees' expense.  Buth was paid for his shares on an installment basis, and he had a gain of over $850,000 on his ESOP Investment (not including any payments under various compensation plans related to the value of the stock) upon his departure.

45.     Defendant Paul Karch ("Karch") and Anne Karch are husband and wife and United States citizens who currently reside in Madison, Wisconsin.  During his tenure at Appvion, from 2001 through 2007, Karch served as Vice President of Human Services and Law, Secretary, General Counsel and Vice President of Administration.  Karch was a member of the ESOP Committee from 2001 through late 2006.  Karch also served on the Board of Directors from 2001 to 2006.  Karch left Appvion in March 2007.  Karch made affirmative misrepresentations to employees in order to induce them to approve the buyout and place their

money into the ESOP Plan at the employees' expense. Karch left the company on 2 March 2007 with a gain of over $300,000.

46.     Defendant Mark Richards ("Richards") and Jeanne Richards are husband and wife and United States citizens who currently reside in Appleton, Wisconsin. During Richards' tenure at Appvion, Richards served as Chairman, CEO, President and Director. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. Richards received excessive compensation under various incentive plans set up by Appvion.

47.     Defendant Tom Ferree ("Ferree") and Carol J. Ferree are husband and wife and United States citizens who, upon information and belief, currently reside in Solon, Iowa. During his tenure at Appvion, Ferree served as Treasurer and Vice President of Finance. Ferree was a member of the ESOP Committee from late 2006 until April 2017. Ferree received excessive compensation under various incentive plans set up by Appvion. Ferree not only had access to the Appvion financial statements, but because of his position, was intimately familiar with them. He also had access to the PDC stock appraisals and participated in the generation of the financial projections used in the appraisals.

48.     Defendant Rick Fantini ("Fantini") and Debra L. Fantini are husband and wife and United States citizens who, upon information and belief, currently reside in Denver, Colorado. During his tenure at Appvion, Fantini served as Vice President of Operations. Fantini was the Chair of the ESOP Committee from 2001 to 2005. Fantini was present when the ESOP Committee recommended the retention of Willamette. As a member of the ESOP Committee, he used fraudulent appraisals to set PDC share prices above fair market value for his own benefit. When Fantini left Appvion in 2005, he had a gain of over $577,000 from his ESOP investments.

49.     Defendant Dale E. Parker ("Parker") and Debrah Parker are husband and wife who currently reside in Rocky Mount, North Carolina.  During his tenure at Appvion, Parker served as Vice President of Finance and CFO from 2001 to June 2006.  Parker was a member of the ESOP Committee from 2001 to June 2006.  Parker also served on Appvion's Board of Directors from 2001 to 2006.  As a member of the ESOP Committee and Board of Directors, Parker knew the true financial health of the Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.

50.     Defendant Angela Tyczkowski ("Tyczkowski") and John Doe Tyczkowski are husband and wife who currently reside in Appleton, Wisconsin.  During her tenure at Appvion, Tyczkowski served as Secretary, General Counsel and Chief Compliance Officer.  Tyczkowski sat on the ESOP Committee from September 2006 to June 2008.  As a member of the ESOP Committee, Tyczkowski knew the true financial health of the Appvion,  yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.

51.     Kerry Arent ("Arent") and Timothy J. Arent are husband and wife who currently reside in Grand Chute, Wisconsin.  During her tenure at Appvion, Arent served as Senior VP Human Resources.  Arent sat on the ESOP Committee from July 2008 through 2015.  As a member of the ESOP Committee, Arent knew the true financial health of the Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.

52.     Kent Willetts ("Willetts") and Jane Doe Willetts are husband and wife who currently reside in Appleton, Wisconsin.  During his tenure at Appvion, Willets served as Senior Vice President.  Willets sat on the ESOP Committee from July 2008 through June 2013.  As a member of the ESOP Committee, Willetts knew the true financial health of the Appvion, yet

used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.

53.     Buth, Karch, Richards, Ferree, Fantini, Parker, Tyczkowski Arent, and Willetts are collectively referred to herein as the "Prior Committee Defendants."

54.     Susan Scherbel ("Scherbel") and Thomas Scherbel are husband and wife who currently reside in Hancock, Maine.  Scherbel was an Outside Independent Director of Appvion from 2001 through 2011.  Scherbel served on the Board of Directors' Audit Committee from 2001 through 2011 and the Board of Directors' Compensation Committee from 2001 through 2006. Scherbel was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Scherbel, as a member of the Board of Directors, knew the true financial condition of Appvion but, upon information and belief, repeatedly allowed the release of statements that failed to fully disclose Appvion's true financial condition.

55.     Ronald Pace ("Pace") and Teresa Pace are husband and wife who currently reside in Cedarburg, Wisconsin.  Pace was an Outside Independent Director of Appvion from 2002 through 2010.  Pace served on the Board of Directors' Audit Committee from 2002 through 2008 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Pace knew the true financial condition of Appvion but, upon information and belief, repeatedly allowed the release of statements that failed to fully disclose Appvion's true financial condition.

56.     Stephen Carter ("Carter") and Jane Doe Carter are husband and wife who currently reside in Rockford, Illinois.  Carter was an Outside Independent Director of Appvion

from 2004 through 2015.  Carter served on the Board of Directors' Audit Committee from 2004 through 2012 and again from 2014 through 2016 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  Carter was also considered an audit committee financial expert by the Board of Directors.  As a member of the Board of Directors, Carter knew the true financial condition of Appvion but, upon information and belief, repeatedly allowed the release of statements that failed to fully disclose Appvion's true financial condition.

57.     Kathi Seifert ("Seifert") and Stephen Seifert are husband and wife who currently reside in Appleton, Wisconsin.  Seifert was an Outside Independent Director of Appvion from 2003 through 2016.  Seifert served on the Board of Directors' Audit Committee from 2004 through 2006 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Seifert knew the true financial condition of Appvion but, upon information and belief, repeatedly allowed the release of statements that failed to fully disclose Appvion's true financial condition.

58.     Andrew Reardon ("Reardon") and Michele Reardon are husband and wife who currently reside in Marco Island, Florida.  Reardon was an Outside Independent Director of Appvion from 2007 through 2014.  Reardon served on the Board of Directors' Audit Committee from 2009 through 2011 and in 2013 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Reardon knew the true financial condition of Appvion but,

upon information and belief, repeatedly allowed the release of statements that failed to fully disclose Appvion's true financial condition.

59.     Terry Murphy ("Murphy") and Jane Doe Murphy are husband and wife who currently reside in Naples, Florida.  Murphy was an Outside Independent Director of Appvion from 2004 through 2016.  Murphy served on the Board of Directors' Audit Committee from 2012 through 2017 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  Murphy also served as Chairman of the Audit Committee in 2016.  As a member of the Board of Directors, Murphy knew the true financial condition of Appvion but, upon information and belief, repeatedly allowed the release of statements that failed to fully disclose the true financial health of Appvion.

60.     Mark Suwyn ("Suwyn") and Patricia Suwyn are husband and wife who currently reside in Bonita Springs, Florida.  Suwyn was an Outside Independent Director of Appvion from 2011 through 2016.  Suwyn served on the Board of Directors' Audit Committee in 2016 and 2017 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Suwyn knew the true financial condition of Appvion but, upon information and belief, repeatedly allowed the release of statements that failed to fully disclose the true financial health of Appvion.

61.     Kevin Gilligan ("Gilligan") and Angela Gilligan are husband and wife who currently reside in Appleton, Wisconsin.  Gilligan was a Director of Appvion from 2015 through 2016.  Gilligan also served as President and CEO beginning in January 2016 and was a member

of the ESOP Committee in 2016 and 2017. Gilligan attended ESOP Committee meetings where Appvion's financial performance and the ESOP Plan's ERISA compliance was discussed. As a member of the ESOP Committee, Gilligan knew the true financial health of the Appvion, but yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.

62. Buth, Parker, Richards, Scherbel, Pace, Carter, Seifert, Reardon, Murphy, Suwyn, Karch, and Gilligan are collectively referred to herein as the Director Defendants.

63. Defendant Houlihan Lokey Capital, Inc., formerly known as Houlihan Lokey Howard & Zukin Capital, Inc. (together with Houlihan Lokey Howard & Zukin Financial Advisors, Inc., "Houlihan Lokey") is a California corporation with its principal place of business in Los Angeles, California.

64. Defendant Houlihan Lokey Howard & Zukin Financial Advisors, Inc. is a California corporation with its principal place of business in Los Angeles, California.

65. Defendant Louis A. Paone ("Paone") and Jane Doe Paone are husband and wife who currently reside in or near Charlotte, North Carolina. Paone was Managing Director of Houlihan Lokey in 2001. Paone attended the road shows with Appvion Management and, among other things, represented that Houlihan Lokey was providing an "independent review and validation" of the proposed buyout transaction. However, Houlihan Lokey was not independent. It would receive as much as $8.1 million if the ESOP transaction closed.

66. Defendant State Street Bank and Trust Company, N.A. is a nationally chartered trust company with its principal place of business in Boston, Massachusetts. State Street was the trustee of the ESOP component of the Plan from 2001 through approximately April 1, 2013.

67.     Defendant State Street Global Advisors, Inc. ("SSGA") is a Delaware corporation with its principal place of business in Boston, Massachusetts.  SSGA served as trustee of the ESOP component of the ESOP Plan along with State Street Bank and Trust from 2001 through approximately April 1, 2013.

68.     Defendant State Street Bank and Trust and Defendant SSGA are collectively referred to as "State Street."

69.     Defendant Kelly Driscoll ("Driscoll") and Arthur Driscoll are husband and wife who currently reside in or near Boston, Massachusetts.  Driscoll served as Senior Managing Director of State Street 1997 to 2008 and is currently a Senior Vice President for State Street.  Driscoll made affirmative representations to induce the employees to approve the buyout and place their money into the ESOP Plan at the employees' expense.

70.     Defendant Sydney Marzeotti ("Marzeotti") and Stephen Marzeotti are husband and wife who currently reside in Lynnfield, Massachusetts.  Marzeotti served as Vice President of State Street Global Advisors from 2002 to present.  Upon information and belief, Marzeotti was responsible for overseeing the independent appraiser selected by State Street.

71.     State Street, Driscoll and Marzeotti are collectively referred to as the "State Street Defendants."

72.     Defendant Argent Trust Company, N.A. ("Argent") is a Tennessee corporation with its principal place of business in Ruston, Louisiana.  Argent became the trustee of the ESOP Component of the ESOP Plan beginning in 2014.  [Argent Trust Company is the party to the trust agreements—is that a separate entity or a d/b/a?]

73.     Defendant Reliance Trust Company ("Reliance") is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Reliance was the trustee of the ESOP

Component of the ESOP Plan from approximately April 1, 2013 to June 30, 2014. Reliance was purchased by Argent in 2014.

74. Defendant Howard Kaplan ("Kaplan") and Wendy Kaplan are husband and wife currently living in Jasper, Georgia. Kaplan served as Senior Vice President of Reliance from 2001 to 2014, and then for Argent from 2014 through present. Upon information and belief, Kaplan was responsible for overseeing the independent appraiser approved by Reliance. Kaplan was present when Scott Levine of Stout Risius Ross presented on the valuations to the ESOP committee.

75. Stephen Martin ("Martin") and Jane Doe Martin are husband and wife who currently resided in or near Atlanta, Georgia. Martin served as Senior Vice President of Reliance and later for Argent. Upon information and belief, Martin was responsible for overseeing the independent appraiser approved by Reliance. Martin was present when Scott Levine of Stout Risius Ross presented on the valuations to the ESOP committee and appears to have done nothing to address the flaws Lyon later identified.

76. David Williams ("Williams") and Jane Doe Williams are husband and wife currently living in or near Atlanta, Georgia. Williams served as Senior Vice President of Reliance and later for Argent. Upon information and belief, Williams was responsible for overseeing the independent appraiser approved by Reliance.

77. Reliance, Kaplan, Martin, and Williams are collectively referred to as the "Reliance Defendants," depending on the time period, Kaplan, Martin, and Williams are also collectively referred to herein as the "Argent Defendants."

78. The Argent Defendants, the Reliance Defendants, and the State Street Defendants are collectively referred to herein as the "Trustee Defendants."

26

79.     Defendant Willamette Management Associates, Inc. ("Willamette") is an Oregon corporation with its principal place of business in Chicago, Illinois. Willamette served as financial advisor to State Street as ESOP trustee and valued the share price of PDC stock from 2001 through 2004.

80.     Defendant Stout Risius Ross, Inc. is or was a Michigan corporation with offices around the United States. SRR served as financial advisor to the ESOP trustees and valued the share price of PDC stock from 2004 through 2017.

81.     Defendant Stout Risius Ross, LLC is a Michigan limited liability company with offices around the United States. SRR served as financial advisor to the ESOP trustees and valued the share price of PDC stock in 2017.

82.     Defendant Stout Risius Ross, Inc. and Defendant Stout Risius Ross, LLC are collectively referred to as SRR.

83.     Scott D. Levine ("Levine") and Debora Levine are husband and wife currently living in Oakton, Virginia. Levine served as a Managing Director of Willamette from 2004 through present. Levine also served as a Managing Director of SRR from 2004 through present. Levine was the primary individual, at both Willamette and SRR, responsible for valuing Appvion. In 2004, when Levine moved from Willamette to SRR, Appvion's account moved as well. Under Levine's direction and supervision, Willamette, on information and belief, and SRR produced fundamentally flawed appraisals from 2001 through 2017. Additionally, Levine attended ESOP Committee meetings to explain the valuations. Appvion's financial performance was also discussed at those meetings.

84.     Aziz El-Tahch ("El-Tahch") and Ayelish M. McGarvey are husband and wife currently living in New York, New York. El-Tahch served as a Managing Director of

Willamette from at least 2001 through 2004. El-Tahch also served as a Managing Director of SRR from 2004 through December 2016. In 2004, when El-Tahch moved from Willamette to SRR, Appvion's account moved as well. Under El-Tahch's direction and supervision, Willamette, on information and belief, and SRR produced fundamentally flawed valuations from 2001 through 2017. Additionally, El-Tahch attended ESOP Committee meetings to explain valuations. The financial performance of Appvion was also discussed at those meetings.

85. Robert Socol ("Socol") and Lynn Socol are husband and wife currently living in Glencoe, Illinois. Socol was a Managing Director of Willamette from 1992 to 2004 while Willamette was conducting Appvion's early stock valuations. Socol moved to SRR in 2004 at or around the same time that Levine and El-Tahch moved to SRR. Upon information and belief, Socol was responsible for the valuation of Appvion with Levine and El-Tahch.

86. Plaintiff is uncertain of the true names and capacities of certain individuals or entities that may be liable for the damages alleged herein and therefore sues them by fictitious names of Does 1-50, ABC Corporations 1-5, DEF Partnerships 1-5, GHI Limited Partnerships 1-5, and JKL Limited Liability Companies 1-5. Plaintiff will amend its Complaint by asserting their true names, capacities, and appropriate charging allegations when they are ascertained.

87. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for jurisdiction of actions brought under Title I of ERISA.

88. This Court has supplemental jurisdiction over the state law claims in this action subject to 28 U.S.C. § 1367.

89. This Court also has diversity jurisdiction over the state law claims against the out-of-state Defendants because they did or are doing business in the State of Wisconsin, the acts

complained of herein occurred in the State of Wisconsin, Plaintiff represents a Wisconsin-based employee stock ownership plan and the Employee Participants, and the amount in controversy herein exceeds $75,000.

## IV.   NON-PARTIES IN INTEREST

90.    Non-Party Appvion, Inc. is a Delaware corporation with its principal place of business in Appleton, Wisconsin.

91.    Non-Party Paperweight Development Corp. ("PDC") is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin.  PDC is Appvion's parent company, and the ESOP Plan was the sole shareholder of PDC.

92.    Non-Party Benefits Consultants, Inc. ("BCI") is a Florida corporation with its principal place of business in Tampa, Florida.  BCI was purchased by Principal Financial Group ("Principal") in 2003.  BCI, and later Principal, acted as the administrator for the ESOP Plan.

93.    Non-Party Principal Financial Group ("Principal") is an Iowa corporation with its principle place of business in Des Moines, Iowa.

## V.   DEFINED TERMS

94.    "AWA" is defined as Arjo Wiggins Appleton.

95.    "ESOP Committee" is defined as employee stock ownership plan administrative committee of Appvion, Inc.

96.    "Houlihan Lokey Defendants" is defined as Houlihan Lokey and Louis Paone.

97.    "LTIP" is defined as Appvion's Long Term Incentive Plan which became effective on or about December 1, 2001.

98.    "PDC" is defined as Paperweight Development Corporation.

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 29 of 138   Document 1

99. "ESOP Plan" is defined as Appleton Papers Retirement Savings and Employee Stock Ownership Plan as amended in 2001 and from time to time thereafter.

100. "Employee Participants" is defined as employees of Appvion who chose to transfer funds from their 401(k) accounts into the ESOP Plan proposed in 2001 and those that invested in the ESOP Plan various times thereafter.

101. "RSU" is defined as the long-term restricted stock unit plan adopted by Appvion effective January 3, 2010.

102. "SERP" is defined as Supplemental Executive Retirement Plan.

103. "SRR Defendants" is defined as SRR, Levine, El-Tahch, and Socol.

104. "State Street Defendants" is defined as State Street, Driscoll and Marzeotti.

105. "Willamette Defendants" is defined as Willamette, Levine and El-Tahch.

## VI. FACTUAL BACKGROUND

106. Appvion was formed in 1907 in Appleton, Wisconsin as The Appleton Coated Paper Company.

107. It operated as an independent company until 1970, when it merged with the NCR Corporation ("NCR").

108. In 1971, NCR merged Appleton Coated with Combined Paper Mills into Appleton Papers, Inc., with headquarters in Appleton.

109. In 1978, NCR sold Appleton Papers to B.A.T. Industries P.L.C. In 1990, B.A.T. spun off Appleton Papers and another subsidiary, Wiggins Teape into an independent company called Wiggins Teape Appleton.

110. In December 1990, Wiggins Teape Appleton merged with French paper company Arjomari-Prioux, and the new entity became AWA.

111. Appvion has historically had two primary business lines—carbonless paper and thermal paper.

112. Carbonless paper was invented by Appleton Papers in 1954, and is a type of coated paper designed to transfer information written on the top sheet onto sheets beneath it.

113. While Appvion had approximately 60% of the carbonless paper market in the late 1990s, the market was declining by 8% to 9% per year due to the advent of computers.

114. Appvion invented thermal paper in 1969; thermal paper is used for receipts, lottery tickets, and other similar applications.

A. **AWA and Buth Agreed To An Employee Buyout That Created a Conflict of Interest for Appvion Management.**

115. In 1998, Buth was named as CEO of Appleton Papers.

116. In approximately November 2000, Buth presented the idea of an employee buyout to AWA.

117. AWA agreed to the employee buyout.

118. Effective November 26, 2000, AWA spun off the assets and operations of two of Appleton Papers' business lines into new entities, Appleton Coated LLC and Appleton Leasing LLC.

119. On February 12, 2001, AWA signed a letter of intent to sell Appleton Papers to Paperweight Development Corporation ("PDC") for $843,000,000. PDC would be owned entirely by employees as an S corporation, which meant it was tax exempt. In July 2001, the purchase price was adjusted to $810,000,000.

120. Also on February 12, 2001, AWA signed a letter agreeing to pay Buth and other executives of Appleton Papers bonuses if they were able to complete a sale of Appleton Papers;

the bonuses would only be available if the sale was completed in 2001. The bonuses consisted of two main components:

- A "Value Related Completion Bonus" which created a bonus pool of up to $10 million depending on the sale price. Based on the $843 million sale price in the letter of intent, the pool would be $2.9062 million. If the ultimate sale price was $700 million or less, there would be no bonus pool.

- "Loyalty Payments" totaling $4.403 million, payable only if the sale price was greater than $759.403 million. Each individual who would receive a Loyalty Payment agreed to defer 30% of the payment for between 5 and 10 years. Under the Deferred Compensation Plan, the value of the deferred portion of this payment was tied to the increase in the value of stock.

121.    These incentive payments were to be recorded as obligations of Appleton Papers prior to closing of the Transaction.

122.    Buth retained Houlihan Lokey to develop a plan for the employee buyout.

123.    According to Houlihan Lokey's 14 February 2001 engagement letter, signed by Louis A. Paone, Managing Director of Houlihan Lokey, Houlihan Lokey was to act as PDC's "exclusive financial advisor with respect to the possible acquisition… by a to-be-formed Employee Stock Ownership Plan ("ESOP")…"

124.    Also in that letter Houlihan Lokey was to receive a transaction fee at "Transaction closing equal to 1.0% of the 'Aggregate Consideration' paid for the stock of the Company with respect to an ESOP Acquisition."

125.    An addendum to that later indicates that Houlihan Lokey was to complete two phases of work which included, among other things:

(a)     Corporate due diligence ;

(b)     Transaction value parameters;

(c)     ESOP transaction model construction;

(d)     Financing assessment and capital tranche sources and terms;

(e)     Management deferred compensation and option/stock roll overs;

(f)     Use of pension plans over-funded balances;

(g)     Management bonus participation as ongoing investment tool;

(h)     Assist Management in negotiations regarding a purchase of PDC;

(i)     Advise management on the selection of the "ESOP Team" including independent trustee, ESOP Counsel, ESOP Financial Advisor and negotiate engagement terms;

(j)     Advise on the structure of management performance warrants as part of bonus/incentive plans;

(k)     Prepare materials to be presented to employees; and

(l)     Assist in the documentation of transaction terms.

126.    The letters between Houlihan Lokey and Buth were not disseminated to the ESOP Plan or the Employee Participants so they did not know about Houlihan Lokey's contingent transaction fee.

127.    The plan developed by Houlihan Lokey was to use at least $100 million from the employees' 401(k) retirement plans to fund a portion of the buyout, with the rest of the sale price coming from bank debt, bonds and seller financing.

128.    After agreeing to the employee buyout in February 2001, Buth then announced the plan to the employees.

129.    On July 20, 2001, James Waldo, Director of Houlihan Lokey and Douglas Buth executed another retainer agreement, which engaged Houlihan Lokey to "render an opinion as to the fairness to the Shareholder of the Company, from a financial point of view of the consideration to be paid by the Company … in connection with the Transaction and that such consideration is not more than the fair market value of Appleton."  Houlihan Lokey charged $100,000 for this fairness opinion, which would be credited toward the 1% transaction fee Houlihan Lokey was entitled to under the February 2001 retainer agreement.

**B.     Appvion Management Pitched the Buy Out to Appvion Employees.**

130.    The Appleton Papers Retirement Savings Plan was established effective January 1, 1985 (the "Original Plan").  This plan consisted primarily of a 401(k) component.  As of July 2001, Appvion employees had approximately $155 million in their 401(k) accounts through the original Plan.

131.    In order to implement the deal as structured by Houlihan Lokey, at least $100 million out of the approximately $155 million in Appvion employee 401(k) accounts would need to be contributed to carry out the buyout.

132.    Without the employee's $100 million, the deal could not go forward.

133.    Appvion management and the ESOP professionals therefore had to pitch the transaction to employees and convince them to transfer a substantial portion of their 401(k) funds to the ESOP.

134.    Appvion management circulated a prospectus dated July 23, 2001 to employees. The prospectus included the following statements:

(a)    Paperweight Development's financial advisor, Houlihan Lokey Howard & Zukin, and the CEO team believe that the purchase price as negotiated is fair to the buyers.

(b)    Houlihan Lokey has rendered its preliminary opinion to Paperweight Development's board of directors that the purchase price that Paperweight Development is paying for us in the acquisition is fair, from a financial point of view, to the ESOP, as the sole shareholder of Paperweight Development. Houlihan Lokey's preliminary fairness opinion was based on a number of facts and assumptions, including financial information through the end of April 1, 2001. Its preliminary opinion was rendered to the board of directors of Paperweight Development and may not be relied upon by any other person. Houlihan Lokey has been asked to render a fairness opinion to the Board of Directors of Paperweight Development effective as of the closing of the transaction to the effect described above.

135.    The Prospectus did not disclose that the majority of Houlihan Lokey's ees were contingent on the deal closing or that they were structured as a percentage of the purchase price. In other words, Houlihan Lokey did not disclose it stood to gain millions but only if its fairness opinion supported the stock purchase and only if Houlihan Lokey could convince the ESOP Plan and its participants to support the ESOP purchase.

136.    In a July 25, 2001 letter to employees, Buth represented that the ESOP buyout "offers all employees not only a unique ownership opportunity, but also the potential for extraordinary rewards for initial investors and greater control of our company's future." He also stated that "[d]uring the past few months we have made every effort to educate you about

employee stock ownership. This package of materials includes more detailed information about our KSOP plan as well as a complete prospectus."

137.    Buth stressed that Houlihan Lokey's Lou Paone and State Street's Kelly Driscoll would provide "independent validation of the deal": "I also encourage you to attend a KSOP Road Show meeting where I will discuss our KSOP opportunity. You will also receive independent validation of the deal from Lou Paone, our investment banker, and Kelly Driscoll, the ESOP trustee."

138.    In order to convince employees to contribute to the ESOP, Appvion executives Douglas Buth, Paul Karch, and Kerry Arent, along State Street's Kelly Driscoll, Houlihan Lokey's Louis Paone, BCI's Pete Prodoehl, and Willamette's Rick Braun, held a series of meetings they referred to as road shows to present the buyout to Appvion's employees.

139.    The road shows included at least two visits to each of Appvion's major facilities.

140.    During the road shows, BCI's Pete Prodoehl told employees, among other things, that the buyout opportunity was a once in a lifetime opportunity to get rich by concentrating your investment in one stock.

141.    Everyone at the road show used and built on the house analogy which analogized the ESOP Plan contribution to a down payment on a mortgage and said they would be able to pay off the company's debt in five years.

142.    Houlihan Lokey's Louis Paone, the same individual that executed the retainer letter giving Houlihan Lokey a 1.0% transaction fee, provided employees with what was misrepresented as an "independent view and validation" of the buyout.

143.    Louis Paone showed the employees a slide titled "fairness of purchase price" while telling them that they were getting such a good deal.

144.    Similarly, Buth told employees that they were paying the right price for the transaction and that they were getting a good deal.  For example, Buth stated that the deal they were offering was "lucrative" and a "wonderful opportunity."  Buth also stated that Kelly Driscoll from State Street would not overpay for stock and that Kelly would tell the employees that the employees underpaid for the transaction.

145.    No one disclosed to any of the employees considering the buyout that Houlihan Lokey would receive a fee contingent on the success of the deal amounting to as much as $8.1 million dollars if the employees agreed to the buyout.

146.    Employees ultimately approved the transaction, contributing approximately $107 million from their 401(k) accounts in order to complete the buyout.

147.    The Transaction closed on November 9, 2001.

**C.    Appvion Amended the Existing Employee Retirement Savings Plan Into the Appleton Papers Retirement Savings and Employee Stock Ownership Plan.**

148.    In anticipation of the buyout transaction, the Plan was amended in 2001. Under the amendments, the Plan added an ESOP component while retaining the traditional 401(k) component.

149.    Under the terms of the Plan, as amended, Employee Participants would be eligible to make a one-time irrevocable election in 2001 to transfer a portion of their non-ESOP accounts under the Plan to an ESOP account.  The ESOP account funds would then be invested in the stock of PDC Acquisition Corporation which would become PDC stock after the Transaction closed.

150.    After the initial election in connection with the 2001 Transaction, participants in the ESOP Plan could elect to contribute a portion of their wages on an ongoing basis to either the Non-ESOP Component or the ESOP Component (as defined below) of the Plan.  Initially

37

participants could contribute up to 15% of their salary to the ESOP Component, but in January 2002 the ESOP Committee voted to allow deferrals of up to 50% of their salary.

151.    Deferrals or contributions to the ESOP Component would be invested in the stock of PDC, and the ESOP was the sole shareholder of PDC. PDC, in turn, owned all of PDC's stock. Shares owned by the ESOP would be allocated to the ESOP accounts of participants, who were the beneficial owners of PDC/Appvion.

152.    In theory, the share repurchase obligations would be funded from employee contributions to the ESOP Plan. Under the terms of the ESOP Plan, Appvion would also make matching contributions on behalf of employees with contributions of PDC stock.

153.    If net repurchases exceeded contributions to the ESOP, repurchases were funded through a loan from Appvion to PDC, which PDC loaned to the ESOP.

154.    Share repurchases would reduce the total number of shares in circulation. For example, if there were 10,000,000 shares issued and the ESOP repurchased 1,000,000, the total share count would be reduced to 9,000,000.

155.    Withdrawals from a participant's ESOP account were limited to statutory diversification, additional diversification, participant loans, retirement, disability, death, termination or employment and hardship distributions.

156.    Any sales or purchases of PDC stock were required to be for fair market value.

        1.    **Fiduciaries of the ESOP**

           a.    **The ESOP Committee**

157.    The ESOP Plan authorized the creation of the ESOP Committee, which was to consist of at least three members.

158. Appvion's Board of Directors had the sole authority to appoint members of the ESOP Committee.

159. Pursuant to the ESOP Plan, the ESOP Committee was "the named fiduciary with respect to the financial management of the ESOP Plan and the control or management of the assets of the Plan[.]"

160. Also pursuant to the ESOP Plan, the ESOP Committee had the following powers:

(a)     to establish and carry out, or cause to be established and carried out by those persons (including without limitation, any investment manager or trustee) to whom responsibility or authority therefore has been allocated or delegated in accordance with this ESOP Plan or the Trust Agreement, funding and investment policies and methods consistent with the objectives of the ESOP Plan and the requirements of ERISA. For such purposes, such Committee shall, at a meeting duly called for the purpose, establish funding and investment policies and methods that satisfy the requirements of ERISA, and shall meet at least annually to review such policies and methods. All actions taken with respect to such policies and methods and the reasons therefore shall be recorded in the minutes of the meetings of such Committee;

(b)     to appoint a trustee or trustees to hold the assets of the ESOP Plan, and who, upon acceptance of being appointed, shall have authority and discretion to manage and control the assets of the ESOP Plan, except to the extent that the authority to manage, acquire or dispose of assets of the

ESOP Plan is delegated to one or more investment managers pursuant to paragraph (3) below; and

(c)     to appoint an investment manager or managers, as defined in Section 3(38) of ERISA, to manage (including the power to acquire, invest and dispose of) any assets of the ESOP Plan.

161.    The ESOP Committee also had the right to delegate its responsibilities under the ESOP Plan to third parties and had authority to establish nondiscriminatory rules relating to the Additional Diversification right.

162.    In January 2008, the ESOP Committee adopted a Charter.  According to the Charter, the ESOP Committee's primary responsibilities were, among other things:

(a)     To oversee the administration and enforcement of the Appleton Employee Stock Ownership Plan;

(b)     To direct the activities of the Trustee of the Plan;

(c)     Appoint Trustee or Trustees to hold the assets of the Plan;

(d)     **Review stock price calculations as soon as practical after the Trustee establishes the stock price**;

(e)     **Review current/forecasted company financial performance and covenant compliance**;

(f)     Review status of the Plan in relation to ERISA to ensure compliance;

(g)     Review performance of the record keeper for the ESOP;

163.    A May 13, 2015 presentation to Appvion's Board of Directors described the ESOP Committee's responsibilities, including the "**Semi-annual review and approval of stock price calculations** with Trustee and Stout Risius Ross."

### b. __The Trustee__

164. Consistent with the ESOP Plan, Appvion, through its Board of Directors, appointed State Street as the trustee for the ESOP Component of the ESOP Plan effective as of June 1, 2001.

165. State Street was empowered to retain an Independent Appraiser to value the shares of PDC's stock.

166. In March 2013, State Street stepped down as ESOP Trustee and Appvion, through its Board of Directors, retained Reliance Trust to serve as the trustee effective April 1, 2013.

167. In 2014, Reliance Trust sold its ESOP business unit to Argent, and Argent took over as trustee pursuant to a trust agreement effective July 1, 2014.

168. Pursuant to a May 2015 engagement letter and an Amended and Restated Trust Agreement effective August 3, 2015, Appvion, through its Board of Directors designated Argent as a discretionary trustee.

169. The trust agreements and the May 2015 engagement letter are collectively referred to herein as the "Trust Documents."

### 2. __The ESOP Plan Did Not Have Control That Would Justify the Control Premium.__

170. Under ¶ 14.1(a)(1) of the ESOP Plan and the 2006 KSOP and Me document, Employee Participants were only entitled to vote on corporate matters that involved extraordinary transactions. For example, "the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets of a trade or business, or such other transactions that may be prescribed by regulation…" However, the ESOP Committee had "the sole responsibility for determining when a corporate matter has arisen that involves the voting of Company Stock under this provision."

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 41 of 138   Document 1

171. However, the ESOP Plan provided that "In all other circumstances, the Trustee shall vote all shares of Company Stock as directed by the Committee."

172. On November 9, 2001, the Appleton Papers Inc. Employee Stock Ownership Trust, through State Street as Trustee, entered into a Security Holders Agreement with PDC.

173. Under § 1.2(a) of that agreement, State Street and PDC agreed that they were to nominate the seven members of Appvion's Board of Directors as follows:

    (a)    Prior to January 1, 2003, the Trustee and Appvion's CEO would each nominate three individuals to the Board and the Trustee and CEO would jointly nominate one individual;

    (b)    In 2003, the Trustee would nominate two individuals to the Board, the CEO would nominate three individuals to the Board, and the Trustee and CEO would jointly nominate two individuals;

    (c)    In 2004, the Trustee would nominate one individual to the Board, the CEO would nominate three individuals to the Board, and the Trustee and CEO would jointly nominate three individuals;

    (d)    After January 1, 2005, the CEO would nominate four individuals to the Board and the Trustee and CEO would jointly nominate three individuals.

174. Under § 1.2(b) of the Security Holders Agreement, votes to remove any director were subject to 1.2(a), and jointly nominated directors could only be removed by mutual agreement of the Trustee and the CEO.

175. Under Section 2.2 of the Security Holders Agreement, PDC and Appvion were authorized to engage in acquisitions of other companies for less than $100 million without permission of the Trustee.

176. The terms of the ESOP Plan and the Security Holders Agreement severely limited the ESOP Plan's ability to control the affairs of PDC or Appvion.

**D.** **Trustee Defendants Retain an Independent Appraiser.**

177. Under the Trust Documents, the Trustee Defendants were responsible for retaining the independent appraiser and for reviewing and approving the valuations.

178. Appvion told the ESOP Plan and the Employee Participants that the independent appraiser would consider, among other things, the following in determining Appvion's fair market value:

> In determining a company's fair market value, the appraiser must consider all facts considered relevant.
>
> * * *
>
> The appraiser looks at a variety of factors to determine the business risk facing the company being valued compared to risks facing the guideline companies.
>
> If the company being valued is determined to be more or less risky than the public companies, that risk would generally have an impact on value.
>
> The discounted future cash flow approach utilizes the company's outlook for the future in order to determine fair market value.
>
> * * *
>
> First, the appraiser determines the amount of cash the company should generate in the future to pay its bills, invest in equipment and facilities, conduct research and development, and pay its debts as they become due.
>
> Cash that is left after the company meets its obligations, known as free cash flow, generally would be available for distribution to the owners of the company, even though the company may determine to retain this cash flow for reinvestment in the future.
>
> * * *
>
> In summary, a company's fair market value is determined by a wide variety of both internal and external factors. Decreasing

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 43 of 138   Document 1

profits or revenues or increased expenses generally have a negative impact on a company's fair market value. …

All other things being equal, factors that result in improved profitability for a company, such as increased revenues or decreased expenses, typically have a favorable impact on a company's fair market value.

"Employee Ownership at Appleton," Appleton KSOP & Me, Section 6.

179. The ESOP Plan and its Employee Participants were never told that the Defendant appraisers were not fully considering these factors.

180. Under the ESOP Committee Charter, as adopted January 1, 2008, the ESOP Committee had a duty to "review stock price calculations as soon as practical after the Trustee establishes the stock price."

181. State Street retained Willamette to issue a valuation opinion at the time of the 2001 Transaction.

182. Willamette validated the initial stock value on the close of the 2001 Transaction as $10 per share.

183. This share price was used in the initial allocations and was also used to grant phantom stock to executives under the Long Term Incentive Plan (discussed below) in December 2001.

**E.** **After the 2001 Transaction, the Share Price Increased Dramatically.**

184. At a January 8, 2002 meeting, the ESOP Committee recommended that that the Trustee retain Willamette as the valuation firm for the December 31, 2001 and June 30, 2002 valuations.

185. Accordingly, State Street retained Willamette to conduct the valuations for the years 2001 through mid-2004.

186.    Scott Levine was the primary Willamette employee responsible for Appvion's valuations.

187.    Willamette reached the following determinations of share value:

| Valuation Date | Share Price |
|---|---|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 6/30/2002 | $ 18.58 |
| 12/31/2002 | $ 21.92 |
| 6/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 6/30/2004 | $ 26.09 |

188.    In 2004, Levine, the principal individual handling the Appvion account, left Willamette and went to work for SRR.

189.    At the January 14, 2005 meeting of the ESOP Committee, the Committee recommended that the Trustee retain SRR for the December 2004 valuation and subsequent valuations.

190.    SRR conducted the valuations from late 2004 through 2017. Levine continued to be the primary SRR employee responsible for the valuations and responsible to meet with the ESOP Committee. Indeed, Levine presented valuations at ESOP Committee meetings, often in the presence of El-Tahch, Martin and Kaplan.

191.    SRR reached the following determinations of share value as financial advisor to State Street:

| Valuation Date | Share Price |
|---|---|
| 12/31/2004 | $ 26.36 |
| 6/30/2005 | $ 27.77 |
| 12/31/2005 | $ 28.56 |
| 6/30/2006 | $ 31.27 |
| 12/31/2006 | $ 33.62 |
| 6/30/2007 | $ 32.89 |
| 12/31/2007 | $ 33.41 |

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 45 of 138   Document 1

| Valuation Date | Share Price |
|----------------|-------------|
| 6/30/2008 | $ 26.64 |
| 12/31/2008 | $ 21.43 |
| 6/30/2009 | $ 18.87 |
| 12/31/2009 | $ 13.26 |
| 6/30/2010 | $ 12.03 |
| 12/31/2010 | $ 12.84 |
| 6/30/2011 | $ 14.10 |
| 12/31/2011 | $ 15.01 |
| 6/30/2012 | $ 16.45 |
| 12/31/2012 | $ 17.55 |

192. In March 2013, State Street stepped down as ESOP Trustee and the ESOP Plan retained Reliance Trust to serve as the trustee. Reliance Trust agreed to retain SRR to determine the value of PDC stock.

193. SRR reached the following determinations of share value as the financial advisor for Reliance:

| Valuation Date | Share Price |
|----------------|-------------|
| 6/30/2013 | $ 17.85 |
| 12/31/2013 | $ 16.25 |

194. When Argent took over Reliance's ESOP business unit in 2014, Argent continued to employ SRR to conduct the valuations.

195. SRR reached the following determinations of share value as financial advisor to Argent:

| Valuation Date | Share Price |
|----------------|-------------|
| 6/30/2014 | $ 16.30 |
| 12/31/2014 | $ 11.00 |
| 6/30/2015 | $ 12.90 |
| 12/31/2015 | $ 12.30 |
| 6/30/2016 | $ 13.70 |
| 12/31/2016 | $ 10.35 |
| 6/30/2017 | $ 6.85 |

196. In connection with the appraisals, Appvion released the resulting share price to the ESOP Plan and its participants with a brief explanation.

1. **The Share Price As Determined By Willamette/SRR and Approved By The Trustees Was Inflated.**

197. Willamette's valuations, based on Willamette's initial determination of stock value and Plaintiff's belief, although Plaintiff does not have access to the other valuation reports, and SRR's valuations intentionally and fraudulently overstated the fair market value of PDC stock and concealed the failure to appropriately consider material factors.

198. Mr. Lyon learned that the Appvion appraisals were materially and fraudulently overstated for at least the following reasons:

    (a)    Each of the semi-annual appraisals from 2001 through 2017 failed to account for material liabilities. For example, unfunded pension/postretirement liabilities alone exceeded $73 million in 2001 and reached as high as $175.5 million in 2012. Each year, these liabilities were prominently displayed in Appvion's PWC-audited financial statements. For example, the relevant portion of the 2012 balance sheet (which is just like every other year) looks as follows. On information and belief, the Williamette appraisals prior to 2004 likewise make no deduction for these pension/postretirement liabilities:

| **"LIABILITIES, REDEEMABLE COMMON STOCK, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME** | | |
|---|---|---|
| **(dollars in thousands)** | | |
| | December 29, 2012 | December 31, 2011 |
| * * * | | |
| Long-term debt | 511,624 | 510,533 |
| Postretirement benefits other than pension | 38,440 | 41,611 |
| Accrued pension | 137,081 | 125,245 |
| Other long-term liabilities | 32,165 | 7,379 |
| Commitments and contingencies (Note 19) | - | -" |

Had the PDC appraised values deducted just these pension/postretirement liabilities, the PDC stock would have had a negative value as early as 2009. Yet the written appraisal reports have no discussion of the pension/postretirement liabilities and no one referred to them at the road shows.

(b)   The appraisals continue to rely heavily on projections of future earnings created by Appvion's management, even after the appraisers knew that Appvion consistently missed these projections.

(c)   The appraisals inflated Appvion's terminal value by purporting to capitalize a declining income stream into perpetuity. Although it may be appropriate to capitalize (reduce to present value) an income stream that is assumed to continue into perpetuity, a declining income stream, by definition, cannot continue. Therefore, recognized appraisal theory does not allow its capitalization in this manner.

(e)   The 30 June 2015 appraisal changed valuation methods. Up until that date, SRR relied upon both multiples of revenue and EBITDA. With a

dramatic decline in EBITDA in Appvion's thermal paper division, SRR relied *only* on a multiple of revenue.

(f)     In order to justify their numbers, the 2012 SRR appraisal failed to subtract losses from the closure of Appvion's West Carrollton Mill and the associated severance costs.

(g)     The appraisals failed to include all overhead costs in the projections by breaking Appvion out into business segments, thus failing to account for overhead costs not allocated to individual business segments.

(h)     The appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

(i)     The appraisals improperly applied a 10% control premium in their valuations where the ESOP Plan and its Employee Participants had no practical ability to control the affairs of PDC or Appvion under the Plan Document or the Security Holder's Agreement. Further, when the PDC Stock was sold upon a triggering event, only small units of stock were sold, thus not commanding a control premium.

## 2.     The ESOP Committee Took An Active Role in The Valuations.

199.     Beginning in January 2008, minutes of the ESOP Committee show that SRR and the Trustee presented the valuations to the ESOP Committee after each valuation had been completed.

200.     For example, at the January 10, 2008 ESOP Committee meeting, SRR's Levine participated in the meeting telephonically and explained the valuation "as prepared by Stout Risius Ross and approved by State Street Global Advisors."

201.    The ESOP Committee requested edits to SRR's valuation presentation to State Street, including removing a reference to insurance settlement litigation and adding additional carbonless competitors to the presentation.

202.    Similarly, the July 7, 2008 minutes of the ESOP Committee show that the ESOP Committee "accepted the valuation" after discussion with SRR and State Street.

203.    In a July 7, 2009 ESOP Committee Meeting, the ESOP Committee reviewed the June 30, 2009 stock valuation prepared by SRR and approved by State Street, and requested adjustments to the share price.

204.    According to the minutes of the meeting:

> The Committee reviewed the June 30, 2009 stock valuation prepared by Stout Risius Ross and approved by state Street Global Advisors.  Mr. Levine described the process used to arrive at the June 30, 2009 valuation.  **Following a detailed discussion, it was determined that the stock price needed to be adjusted.  The ESOP Committee accepted the adjusted valuation**.  A revised valuation report will be forwarded to the ESOP Committee.

205.    Thereafter, representatives from SRR and the trustees participated in ESOP Committee meetings to review each of their valuations with the ESOP Committee.

**3.    The Inflated Share Price Caused the ESOP Plan to Repurchase Shares For More Than Fair Market Value.**

206.    SRR conducted these valuations knowing that the Trustee Defendants and the ESOP Committee would use the valuation to set the share price to be used for ESOP Plan transactions, including deferrals to the ESOP Plan and repurchases of shares.

207.    As a result of the fraudulently inflated valuations, the ESOP Plan repeatedly purchased shares from the Employee Participants at a price above the share's fair market value and repeatedly bought shares on behalf of Employee Participants at a price above the share's fair market value.

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 50 of 138   Document 1

208.   Since PDC had no assets other than Appvion, Appvion loaned cash to PDC to fund the ESOP's repurchase obligations.

209.   Because of the inflated stock valuations, Appvion was required to loan significantly more cash to PDC than it should have.  This reduced the cash Appvion had available to repay its debt and make capital improvements, which further damaged its value and ability to operate as a going concern.

210.   Yet, Appvion management continued to reassure employees that the valuations were correct.  For example, in 2001, Defendant Driscoll from State Street stated that she and State Street were appointed to make sure that the employees would not be paying more than fair market value during the buyout.  In a 2007 publication titled "Appleton: Applying Technology for Performance," Appvion Management represents that Driscoll stated that State Street was "appointed the fiduciary to make sure the transaction was fair from a financial perspective to the ESOP.  And it was.  Employees would not be paying more than the fair market value to buy Appleton Papers."

211.   In reliance upon accurate share valuations, employees continued contributing funds to the ESOP.

212.   As an added inducement, Appvion made matching contributions of PDC stock to employees' contributions.

213.   Unbeknownst to the employees, the Company contributions were effectively worthless.

F.   **The Executives Responsible For the 2001 Transaction Left Appvion While the Share Price Was High.**

214.   As part of the 2001 Transaction, Appvion management represented that its fourteen-member executive team was putting 100 percent of their 401(k) plans into the ESOP.

215.     However, certain Appvion management had inside financial information about the status of the Company and its true value; therefore, they knew when to pull their money out of stock or out of management incentive plans.

216.     Immediately after the 2001 Transaction, the named executive officers reported holding 4.2% of the shares in the ESOP.

217.     However, as the share price rapidly increased, members of the executive team at the time of the 2001 Transaction began leaving the company and receiving distributions of their ESOP accounts for a combined gain of over $7.2 million.

218.     In 2004, Doug Buth, Appvion's CEO, announced that he would be retiring in early 2005 at age 49.

219.     Buth was paid for his shares on an installment basis, and he had a gain of over $850,000 on his ESOP Investment (not including any payments under various compensation plans tied to the value of the stock).

220.     Rick Fantini, the Vice President of Operations, left the company in 2005 and had a gain of over $577,000 from his ESOP investments.

221.     By November 2006, Paul Karch was the only remaining member of the executive team from the 2001 Transaction who was still with Appvion.  However, Karch left the company on 2 March 2007 with a gain of over $300,000.

222.     These departures, timed while the share price was artificially high, added to the liquidity strain on the Company and therefore the value of the ESOP.

223.     Also during the departures, senior management reported owning decreasing amounts of company stock through the ESOP.  By 31 December 2006, the top executives held only 1.59% of the ESOP shares, and by 31 December 2010, they held only 0.93% of the ESOP

shares. Instead, management became increasingly dependent on incentive plans (discussed below), which were not limited to the distribution and diversification options available under the ESOP Plan Documents.

224. Unlike the employees, this shift to separate incentive plans away from the ESOP shares allowed management to reduce reliance on the ESOP for their retirement funds.

## G. **Management Compensation Was Excessive And Drained Cash From Appvion.**

225. In conjunction with the 2001 Transaction, Appvion Director Defendants implemented additional incentive plans for management employees and senior executives.

226. Following the 2001 Transaction, Appvion Director Defendants continued to add additional incentive programs to reward executives and directors.

### 1. **Long Term Incentive Plan ("LTIP") Allowed the Board of Directors to Award Phantom Stock Units.**

227. Appvion's Long Term Incentive Plan ("LTIP") was effective on or about December 1, 2001.

228. Under the LTIP, the Compensation Committee of Appvion's Board of Directors had the authority to award employees with phantom stock units.

229. Under the terms of the LTIP:

(a) The Compensation Committee could award up a number of units equal to 3% of total stockholders' equity in the Company each year;

(b) Phantom stock units were to be awarded the first day of the Plan Year (defined as the Company's fiscal year);

(c) Phantom stock units vested over 3 years and expired after 10 years, or upon leaving the company;

(d)    On exercise of the phantom units granted under the LTIP, participants would receive a cash bonus equal to the increase in the value of the stock from the date of issue until the exercise date.

230.    In 2016, the LTIP was renamed the Long Term Stock Appreciation Rights Plan.

231.    On information and belief, when Buth left the company in July 2005, he received significant payments under the LTIP.

### 2. The Deferred Compensation Plan Allowed Employees to Defer Their Salary and Bonuses.

232.    In addition to the LTIP, Appvion established a Deferred Compensation Plan (the "New Deferred Compensation Plan") effective July 1, 2000, which allowed eligible employees to defer all or a portion of their salary and/or bonus.

233.    In addition, the deferred portions of the loyalty payment made to executives as part of the 2001 Transaction were included in this plan. However, the deferred loyalty payments were tied to increases in the value of PDC common stock.

234.    The New Deferred Compensation Plan was terminated in the first quarter of 2005 based on the recommendation of the independent directors of the Compensation Committee "because they viewed the crediting of the loyalty payment portions of the Plan based on increases in PDC common stock as an expensive form of company capital." On termination, beneficiaries were paid $2.7 million.

### 3. The Executive Nonqualified "Excess" Plan Allowed Executives to Defer Compensation on a Pre-Tax Basis.

235.    Effective February 1, 2006, Appvion created the Executive Nonqualified "Excess" Plan (the "Excess Plan") for executives and non-employee directors, which allows them to defer compensation on a pre-tax basis, with the value of the deferrals linked to the

performance of selected mutual funds.  Like the Deferred Compensation Plan, the Excess Plan provided for matching contributions.

236.    Appvion did not actually set aside any funds to pay for this deferred compensation obligation.

237.    As of January 2, 2016, this plan included $5.4 million of deferred compensation.

### 4.    The Non-Employee Director Deferred Compensation Plan Awarded Phantom Stock to Non-Employee Directors.

238.    Also in 2006, Appvion established the Non-Employee Director Deferred Compensation Plan, which awarded non-employee members of the Board of Directors with phantom stock units.  The value of the stock awarded under this plan was to be paid in five equal annual cash installments following a director's conclusion of service on the board of directors.

239.    By December 31, 2015, there were nearly 122,000 phantom units outstanding under this plan, valued at $1.5 million.

240.    This plan gave the non-employee directors an incentive to agree to the inflated stock valuations as appraised by Willamette and SRR and approved by the Trustee Defendants.

### 5.    The Long-Term Performance Cash Plan Provided Bonuses to Management.

241.    Effective January 1, 2008, Appvion created the Long-Term Performance Cash Plan which provided for bonuses if Appvion met certain financial goals over three-year cycles. Mark Richards, Thomas Ferree, and Kent Willetts received payments under this plan for the 2009-2011 cycle.

### 6.    The Long-Term Restricted Stock Unit Replaced LTIP in Order to Ensure Management Received Additional Compensation.

242.    When the share price went down in 2009, it rendered the LTIP phantom stock units worthless until the share price went back up.  In order to continue providing incentive

payments to senior executives, the Company adopted a long-term restricted stock unit ("RSU") plan effective January 3, 2010.

243.    The RSU plan awarded key management employees with future cash payments based on the full fair market value of Appvion common stock. All units vest three years after the award date and the cash value of the stock was paid to the employee on the vesting date, based on the valuation as of the vesting date (as determined by SRR and the Trustee Defendants).

244.    After implementing the RSU Plan, the Compensation Committee of Appvion/PDC's Board of Directors decided whether to award units under the LTIP or the RSU Plan.

### 7.    The Annual Incentive Plan Provided Another Method to Give Management Bonus Compensation.

245.    Appvion also had an Annual Incentive Plan which paid out based on company and business segment performance and other factors as determined by the CEO and the Compensation Committee of the Board of Directors. In addition, Appvion paid discretionary bonuses under the Annual Incentive Plan.

### 8.    The Supplemental Executive Retirement Plan Also Provided Benefits to Management.

246.    In addition to these compensation plans, executives and certain other management employees also received additional benefits including pension benefits under the Supplemental SERP. The SERP provided retirement benefits for management and other highly compensated employees whose benefits are reduced by the tax-qualified plan limitations of the pension plan for eligible salaried employees. Effective as of December 1, 2014, the SERP was amended to provide for payment of the supplemental benefit in the form of a single life annuity.

### 9. The Termination Protection Agreements Provided Management Additional Compensation Upon Termination.

247. In addition, Appvion management had Termination Protection Agreements or Enhanced Severance Agreements in place which gave them substantial benefits on termination. These agreements only provided for payments if Appvion terminated the employee other than for misconduct or disability or the employee terminated employment other than for "Good Reason." Good Reason is defined in the agreement as 1) prior to a change of control, a reduction in salary of more than 25%; or 2) after a change of control, a decrease in the executive's responsibilities, a material reduction in the executive's pay, relocation of the executive without consent, or refusal to agree to comply with requirements for assignment of the termination protection agreement.

248. The various incentive plans and termination protection agreements also included change in control provisions allowing for significant payments on a change in control.

### 10. The Various Incentive and Compensation Plans Resulted in Excessive Compensation for Management.

249. The LTIP, Non-Employee Director Deferred Compensation phantom stock units, and Restricted Stock Units all served to create synthetic equity owned by executives and directors. By the end of 2014, SRR calculated that this synthetic equity accounted for 25.3% of the equity ownership of Appvion. SRR's valuation analysis estimated a valuation for this synthetic equity and subtracted it from the equity value of the company.

250. These incentive and retirement plans were amended several times to increase benefits due to beneficiaries under these Plans, even while Appvion was losing money, while its stock price was grossly overstated and while it was unable to meet its repurchase obligations under the ESOP. On information or belief, these amendments substantially increased the amounts paid to executives under the plans. For example, in August 2015 the Company filed an

Amendment to the Appvion, Inc. Long Term Incentive Plan with the SEC; the amendment provided that "Retirements on December 31 of any given Plan Year would be treated as a full year of employment for vesting purposes." When Richards retired from Appvion effective December 31, 2015, this provision allowed him to receive partial payment for LTIP units that were granted in 2015; the units were treated as 33.3% vested.

251. Under the numerous incentive and compensation plans described above, management compensation was at all times excessive, especially compared to company performance and true stock price. For example, in 2012, Appvion had a net loss of over $148 million. However, Richards received total compensation of over $4.2 million, including his $800,000 salary, a discretionary bonus of $376,000, incentive plan compensation of $1.2 million, as well as awards under the LTIP program, Restricted Stock Units, and various other compensation.

252. Excessive compensation paid to Richards and other executives (including but not limited to Thomas Ferree and Kerry Arent) caused significant harm to the corporation and was a breach of fiduciary duty toward the shareholders and was not justified by the true stock price.

### H. **Appvion's Finances Became Increasingly Dire.**

#### 1. **Appvion Refinanced its Substantial Debt.**

253. In June 2013, Appvion refinanced its debt through a $435 million senior secured credit facility, which included a $335 million first lien term loan facility and a $100 million revolving credit facility. This was used to pay off $305 million in fixed-rate debt, an existing revolving credit facility, and pay related fees and expenses.

254. In November 2013, Appvion raised $250 million through the sale of second lien senior secured notes; Appvion used the proceeds to pay off existing debt, including related fees and expenses.

255. This refinancing increased Appvion's overall debt.

### 2. Appvion Sold its Most Profitable Unit.

256. Appvion's Encapsys segment encompassed Appvion's chemical microencapsulation activities; microencapsulation is the process of putting a microscopic wall around a core substance.

257. This process was developed in the 1950s and was part of Appvion's carbonless paper process, but Appvion had worked to develop other applications for the process over the years.

258. In 2007, Appvion signed a multiyear supply agreement with Proctor & Gamble and expanded its microencapsulation business significantly.

259. By 2010, Encapsys was a driving factor in SRR's valuations. According to a January 2011 employee communication, "The rapid and consistent growth of the Encapsys business was the single biggest contributor to share price growth in H2 2010. The Encapsys division continues to increase its contribution to shareholder value with each recent valuation."

260. Similarly, a July 18, 2011 employee communication about Encapsys stated that "The continued growth of the Encapsys business was the single biggest contributor to share price growth in H1 2011, as it was for the H2 2010 valuation."

261. By 2012, Appvion was divided into two primary operating units—the Technical Papers unit (which included the Carbonless and Thermal divisions) and Encapsys.

262.    In the years 2010 through 2013, the Encapsys unit accounted for approximately 6 percent of Appvion's net sales but in 2014 it accounted for approximately 8 percent of Appvion's net sales.

263.    Additionally, Encapsys had room for significant growth going forward and was Appvion's most profitable division.

264.    In April 2015, SCH submitted a proposal to acquire the Encapsys unit and related assets for $205 million, which was later revised to $208 million.  Appvion agreed to sell the Encapsys unit to SCH, and the sale was completed in August 2015.

265.    On May 8, 2015, Appvion amended its Executive Nonqualified Excess Plan to allow deferral of compensation received under The Encapsys Long Term Performance Cash Plan.  This Encapsys Long Term Performance Cash Plan is not described in any of the 10-K filings and it was not filed with the SEC.  On information and belief, Appvion management may have received compensation from this plan as part of the sale of Encapsys.

266.    Appvion management stated that it was selling Encapsys as a way to "1) support and expand its thermal and carbonless/specialty papers business segments; 2) fund the continued growth of Encapsys; and 3) continue to reduce the company's debt. The sale of Encapsys helps the company achieve all three objectives."

267.    Employees were not told about the sale of Encapsys ahead of time - the sale was approved by the Board of Directors of Appvion without a vote by employees.

268.    The Board considered the impact of the sale on the ESOP and asked the ESOP trustee (at the time, Argent) to review and approve the transaction.  According to a Q&A released by Appvion management:

> The sale of Encapsys required approval from the Appvion board of
> directors. **<u>The board must consider the value of the transaction</u>**

**to the Appvion shareholders who are, ultimately, the ESOP plan participants**. The board must also consider the impacts of the transaction to the Appvion business. To assist the board in analyzing the transaction, **the board sought a fairness opinion about the transaction from an independent valuation firm** as well as advice from outside legal counsel as the basis for its decision.

**The board also asked our independent ESOP trustee (Argent** Trust Company) **to review and approve the transaction**, even though approval from the ESOP trustee was not required for this transaction. To assist the ESOP trustee in analyzing the transaction, **the trustee sought a separate fairness opinion about the transaction from an independent valuation firm as well as advice from separate outside legal counsel**. Based on the analyses, fairness opinions and advice from legal counsel, **the Appvion board and Argent Trust Company concluded the transaction is fair to and in the best interest of Appvion**.

269. The sale of Encapsys closed in August 2015.

270. While the sale of Encapsys allowed Appvion to pay off some debt, Appvion's financial performance over the following years suffered.

### 3. Richards and Other Executives Left in 2015 and Received Large Bonuses.

271. Richards retired from his role as President and CEO of Appvion and PDC on August 4, 2015. He stayed on as Chairman and Director of Appvion until on December 31, 2015, when he fully retired.

272. Even though Richards retired and did not leave Appvion for "Good Reason" as defined in his Termination Protection Agreement, he received a payment of $1.2 million as if he had left for Good Reason.

273. Richards also received a payment of $30,000 in outplacement services and over $900,000 in SERP payments, as well as payments of LTIP and Restricted Stock Units.

274. Richards received total compensation in 2015 of over $5 million.

275. Kerry Arent, Appvion's Senior Vice President of Human Resources, also retired in 2015 and received payments under her Termination Protection Agreement as if she had left for "Good Reason" or in connection with a change in control.

276. Arent received $427,500 in Termination Protection Payments and $5,000 in outplacement services payments.

**I.     At the Summer 2017 Road Show, Appvion Said It Would Be Able to Turn The Company Around.**

277. At the summer 2017 road show, the company reported it was going to be able to turn around, it was doing great, that it had hired an outside consultant to find refinancing and they'd be back on their feet.  There was no indication that the company had trouble finding financing.

**J.     Appvion Filed for Bankruptcy Protection In 2017.**

278. On October 1, 2017, Appvion and certain of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

279. On August 14, 2018, the Bankruptcy Court for the District of Delaware issued a Conformation Order that included a reservation of rights stating that the order did not "operate as a waiver or release or otherwise impair in any respect (i) any claim held by the ESOP, the ESOP Committee or its members, or ESOP participants … ."  It also confirmed that Grant Lyon, in his capacity as an ESOP Committee Member, has standing to prosecute claims on behalf of the ESOP Plan and the Employee Participants.

### K. **Fraud or Concealment Extends the Statue of Limitations for Plaintiff's Claims**

280.    Defendants committed fraud or concealed nearly two decades of wrong doing from the ESOP Plan and Employee Participants.  As a result of Defendants' actions, the ESOP Plan and Employee Participants could not and did not discover the wrongdoing until approximately August 2017.

281.    Each of the prior Committee Defendants, Director Defendants, and Trustee Defendants had a duty and responsibility to ensure the information provided to the ESOP Plan and its Employee Participants was accurate.

282.    The unfunded pension/postretirement liabilities were reported on Appvion's balance sheet in each of the PWC audited financial statements.  This means that the liabilities were both probably and estimable.  Because of the sheer magnitude of these liabilities, and, therefore, their high level of materiality to Appvion's financial condition, each ESOP fiduciary (board member, ESOP member and ESOP Trustee) who all had access to the semi-annual appraisals, participated in fraud or concealment by not requiring that the liabilities be explicitly addressed.

### 1. **Buth, Karch, Arent, Driscoll, Paone, and Braun Represented to the Potential Employee Participants that Houlihan Lokey Defendants Provided Independent Validation of the 2001 Buyout.**

283.    During the 2 August 2001 road show Buth, Karch and Arent, side by side with purportedly "independent" ESOP professionals, went to work convincing Appvion's employees (most of whom were union members) that they should seize upon this "unique one-time opportunity" to transfer money out of their 401(k) plans to buy PDC stock.

284.    During the 2 August 2001 road show, Karch stated that Houlihan Lokey's Paone was "going to provide an **independent view** and **validation**" of the buyout transaction.  Karch

also stated that Paone was "**our** investment banker" from Houlihan Lokey, insinuating that Paone represented the interest of the employees – the people to which he ultimately gave advice.

285.   Also during the 2 August 2001 road show Louis Paone stated, among other things:

> This is, in my opinion, an extraordinary opportunity and over the next few slides I hope to make clear why I feel so strongly about this.  Paul had mentioned that one of the things that I'm going to do this evening is **help validate the purchase price of the transaction and financial aspects as to why they are so attractive and why you're getting such a good deal**.

> **2.      Management and State Street Defendants Urged the ESOP Plan and Employee Participants to Trust Willamette Defendants and SRR Defendants at the Road Show and Beyond.**

286.   At the 2 August 2001 road show, Kelly Driscoll of State Street stated that:

> [A]n ESOP can't pay a parent company more than the fair price of the asset and that is really critical to us and that's why we, in the end have **to make sure that we're not paying more than the fair market valu**e.   And [Rick Braun from Willamette] does a lot of work helping us with that to determine what that fair market value is and **make sure he can give us an opinion that we aren't paying more than fair market** value and that the transaction, as a whole, is in the **best interest of the plan** from a financial perspective.

287.   In a January 14, 2002 email to employees, Paul Karch addressed the recent Enron collapse and stressed that the valuation of stock by an independent appraiser would protect employees:

> The value of our company stock will be determined twice per year by an independent, third party appraiser according to the methodology established by the Department of Labor.   This valuation process provides another level of scrutiny of the company's accounting practices.   Enron stock is publicly traded and its value, including its overvalue, was and is determined by speculators in the stock market.

288.    Similarly, in an August 2002 email about the June 30 stock valuation, Appvion's

Bill Van Den Brandt stressed reliance on Willamette's professional judgment:

> Some employees have wondered how the June 30 stock value was calculated.
>
> Remember that our trustee, State Street Global Advisors, conducts the valuation.   SSGA relies upon Willamette Management Associates to perform an appraisal of Appleton Papers and PDC to assist in determining the value of PDC stock.   **Willamette considers both income and market factors to determine stock value**.   The stock value is the product of a rigorous and complicated process that ultimately requires professional judgment to complete….

289.    31 March 2004, the KSOP Guide and Summary Plan Description stated:

> In order to comply with the Department of Labor requirements that **all stock purchases be made at no more than current fair market value**, the trustee must wait until the next valuation date before investing your deferrals in company stock.

290.    In a May 3, 2004 email about Doug Buth's planned departure from Appvion, Paul

Karch reminded employees that "no one at Appleton determines our stock price; Willamette and

our trustee State Street Global Advisors do."

291.    After SRR took over for Willamette on the December 31, 2004 valuation, a

February 24, 2005 internal communication from Bill Van Den Brandt assured employees that

SRR could be trusted, stating:

> The latest valuation of Paperweight Development Corporation was conducted by Stout Risius Ross (SSR [sic]), not Willamette Management Associates as I reported below.  Many key members of the Willamette Management ESOP valuation team including Bob Socol and Scott Levine have joined SRR.
>
> Our trustee, **State Street Global Advisors (SSGA), selects the firm to conduct the appraisal** that helps SSGA determine the value of PDC stock.  **SSGA chose Stout Risius Ross because of the qualifications and experience of Socol, Levine and their colleagues as well as their knowledge of our company**.  The

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 65 of 138   Document 1

Willamette team had conducted all of our company's prior valuations.

**SRR is a full-service financial advisory firm with over 125 professionals** and offices in Chicago, Detroit, Cleveland and Washington DC. With the addition of Socol, Levine and others, **SRR has strong expertise in ESOP and ERISA advisory services**.

292.    An October 2006 publication titled "Take Ownership of Your Future KSOP

Guide" explained the methods the valuation firm used to determine fair market value:

When an ESOP owns stock in a private company, **an independent appraiser approved by the ESOP trustee must determine the fair market value of the company stock** at least once per year. Appleton has made the decision to value stock twice a year, June 30 and December 31.

The term fair market value means **the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company** and that neither one has an obligation to buy or sell the stock.

In determining a company's fair market value, **the appraiser must consider all facts considered relevant.** While a lot of "number crunching" goes into an appraisal, fair market value is ultimately the result of an appraiser's informed judgment. That makes it especially important to have an appraiser who is independent, knowledgeable, and experienced in such matters.

The complete list of factors that may impact a company's value is too long to be included here. However, **factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks** relating to its business. The company's customers, suppliers, management, workforce, and facilities relative to their competitors may also be considered. Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.

To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach…

293. Even the November 2015 KSOP Guide states:

> When an ESOP owns stock in a private company the ESOP trustee **must determine the fair market value of the company stock** at least once per year. To do this, **the trustee hires an independent appraiser.**
>
> * * *
>
> In determining a company's fair market value, the appraiser must consider all fact considered relevant.
>
> * * *
>
> To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach…

294. With nearly every communication about stock value, Appvion management assured employees that that the appraisals were conducted by Willamette or SRR using the market approach and an income approach. However, SRR failed to properly take into account the standards outlined in these publications and did not disclose its failure.

### 3. Buth, Karch, Ferree, Driscoll, Argent Defendants and Reliance Defendants Encouraged the ESOP Plan and Employee Participants to Rely on and Have Confidence in the Trustee Defendants.

295. In a 25 July 2001 letter to employees, Buth stressed that employees would receive "independent validation of the deal from … Kelly Driscoll, the ESOP trustee."

296. At the August 2001 road show, Karch then introduced Kelly Driscoll from State Street Global Advisors which he described as "a very large and successful financial institution which manages money for lots of people in different ways, but specifically acts as trustee for many ESOP's."

297. Driscoll from State Street stated that she and State Street were appointed to make sure that the employees would not be paying more than fair market value during the buyout.

298.    Driscoll then represented that it was her team's job to "represent the ESOP from an investment perspective. . . . [W]e want to make sure we analyze this investment, we really understand the business of Appleton Papers. . . . [W]e are very comfortable with the valuation. . . . So, we are very pleased, quite frankly, on the price we were able to get with the seller.  We think we got a very good price."

299.    Also at the August 2001 road show, Buth stated that Kelly Driscoll from State Street would not overpay for stock and that Kelly would tell the employees that the employees underpaid for the transaction.

300.    On 27 March 2013, in an internal communication to Employee Participants, Ferree stated:

> [We] are pleased to welcome Reliance Trust Company as the new trustee. Reliance Trust is one of the largest independent trust companies in the country with more than $109 billion in assets under management and administration, and over 24,000 retirement plans administered.   The company is a highly-qualified, independent fiduciary accustomed to serving ESOPs of all sizes.

301.    On 27 March 2013, Reliance Defendants sent a letter to the Employee Participants stating "[w]e are confident that you will soon recognize Reliance Trust as a highly regarded ESOP professional, a prudent fiduciary with a diligent process, and a qualified partner."

302.    On 30 June 2014, after Argent agreed to stay on as the ESOP Plan's trustee, Ferree touted Argent's experience.  Specifically he stated that Argent has "grown a successful business over its existence" and that Argent "currently has responsibility for more than $6 billion in client assets."

303.    Also on 30 June 2014, Steve Martin of Argent sent a letter to Employee Participants stating that they could be "confident that [they] will continue to be serviced by the

same professional team that is familiar with your company and your ESOP, and also by Argent, a company focused on providing the highest quality fiduciary services."

304. The letter continues: "We understand the importance of safeguarding our clients' assets. For us, the responsibility and the approach are personal."

**4. Defendants Did Not Disclose Houlihan Lokey Defendants' Contingent Compensation Interest in Ensuring the Buyout Closed.**

305. As described above, the Houlihan Lokey Defendants committed fraud or concealment by:

(a) Representing to the ESOP Plan and employees that it provided an "independent review and validation" of the buyout transaction

(b) Failing to disclose to the ESOP Plan and employees that on 14 February 2001 it entered into an engagement with PDC which stated that Houlihan Lokey would receive "a transaction fee at a Transaction closing equal to 1.0% of the "Aggregate Consideration" paid for the stock of [Appvion] with respect to an ESOP Acquisition.

(c) Failing to disclose that the transaction fee that Houlihan Lokey anticipated receiving was as much as $8.1 million.

(d) Allowing Prior ESOP Committee Defendants and Director Defendants to represent to the ESOP Plan and the Employee Participants that Houlihan Lokey was providing independent validation of the Appvion buyout during the 2 August 2001 road show.

### 5. Prior Committee Defendants and Director Defendants' Communications Did Not Disclose the Valuation Process.

306. From December 2001 through June 2004, Willamette performed semi-annual appraisals establishing stock value. In 2004, Willamette employees joined SRR, and SRR took over the appraisals beginning in December 2004.

307. The Prior ESOP Committee Members, Director Defendants and the Trustee Defendants never released the valuation reports by Willamette and SRR to the ESOP Participants. Indeed, Union representatives for the Employee Participants specifically requested to view the valuation reports and were denied access.

308. Accordingly, there was no way for the ESOP Plan or the Employee Participants to look at the processes that Willamette and SRR employed and verify that key financial information was not being omitted despite the representations that all relevant information was being considered. They were led to believe all relevant factors had been appropriately considered.

309. The communications to employees did not fully disclose the methods Willamette and SRR used – rather, they selectively discussed factors that influenced the share price. For example, the communications did not disclose that the valuations improperly applied a control premium or that the valuations did not account for unfunded pension liability or postretirement benefits other than pension liability. However, numerous press releases and other communications between 13 August 2002 and 14 July 2009 to Employee Participants state that Willamette and SRR were using "an income approach and a market approach to value stock."

### 6. Willamette Defendants and SRR Defendants Produced Fraudulent Valuations that Were Fundamentally Flawed.

310.    From December 2001 through June 2004, Willamette performed semi-annual appraisals establishing stock value.

311.    On 9 November 2001, Willamette Defendants validated the initial stock value on the 2001 buyout transaction at $10 per share.

312.    During the 2 August 2001 road show, Braun stated:

> We were trying to keep the value as low as possible we spent a lot of time over the last few months telling everybody how little this company was worth because we were trying to help you folks buy it at the cheapest possible price, or have the ESOP buy it at the cheapest possible price.

313.    On 31 December 2001, Willamette Defendants valued the stock at $12.81 per share. The share price continued to rise as described above.

314.    While the share price was disclosed to the ESOP Plan and the Employee Participants, the content of the appraisals was not.

315.    Upon information and belief, Willamette produced seven valuations between 9 November 2001 and 30 June 2004 that failed to account for fundamental flaws. For example, they failed to account for the unfunded pension/postretirement liabilities.

316.    Each share price calculation misrepresented the value and the health of Appvion to the detriment of the ESOP Plan and Employee Participants.

317.    In 2004, Willamette employees, including Levine, El-Tahch, and Socol, joined SRR, and SRR took over the appraisals beginning in December 2004.

318.    Consistent with Willamette Defendants' actions, SRR produced 18 valuations between 31 December 2004 and 31 December 2012 as described above.

319. SRR Defendants' valuations failed to account for fundamental flaws as described above.

320. In particular, the unfunded liability was a substantial, material liability. Appvion's unfunded liabilities consisted of at least three components: 1) pension liability under several defined benefit and defined contribution pension plans; 2) the Supplemental Executive Retirement Plan, which provided retirement benefits for management and other highly compensated employees; and 3) postretirement benefits other than pensions, which included medical, dental, and life insurance for certain retirees and eligible dependents.

321. These liabilities were included in Appvion's audited financial statements. However, they were inexplicably not included in any of the valuations.

322. From 2001 to 2017, Appvion's unfunded pension and postretirement benefits other than pension liabilities totaled:

| Year | Pension/Postretirement Liabilities |
|------|-------------------------------------|
| 2001 | $73,132 |
| 2002 | $69,221 |
| 2003 | $99,165 |
| 2004 | $108,505 |
| 2005 | $114,139 |
| 2006 | $101,638 |
| 2007 | $64,293 |
| 2008 | $154,896 |
| 2009 | $151,921 |
| 2010 | $133,716 |
| 2011 | $166,856 |
| 2012 | $175,521 |
| 2013 | $96,748 |
| 2014 | $124,656 |
| 2015 | $128,331 |
| 2016 | $132,805 |

323. However, other evidence indicates that SRR, the Prior Committee Defendants, and the Director Defendants knew that pension liabilities, in particular, were material to a valuation.

324. For example, in December 2003, the Board approved Appvion's acquisition of BemroseBooth, a printing business based in the United Kingdom, for $61.7 million. However, BemroseBooth did not perform as expected and in in 2008, Appvion began making efforts to sell BemroseBooth.

325. Although Appvion received expressions of interest and offers, SRR noted in its 30 June 2008 valuation of Appvion that the bids Appvion received "effectively value BemroseBooth at an equity of zero after considering the assumptions of debt and [BemroseBooth's] **unfunded pension liability** which exceeds… $36 million, based on current estimates."

326. At a May 26, 2016 ESOP Committee meeting, the ESOP Committee:

> (a)    discussed its unfunded pension liability and whether SRR should be including the pension funding in its valuations, and

> (b)    reviewed financial projections prepared for SRR.

327. The minutes indicated that Ferree would discuss the pension funding issue with SRR on June 6, 2016. However, SRR never adjusted the valuation to add in unfunded pension/postretirement liabilities nor did they adjust the valuation.

### 7. The Prior Committee Defendants, Director Defendants and State Street Defendants Reassured Employees That the Valuations Were Correct.

328. In addition to reassuring employees that the valuations had been conducted by trusted professionals, the Director Defendants and the Prior Committee Defendants sometimes released statements that selectively discussed Willamette and SRR's valuation analysis in order to justify the share price. These discussions failed to provide a full disclosure of the valuation analysis and affirmatively concealed the fact that the valuations were inflated.

329. For example, in the December 31, 2001 valuation, less than 2 months after the 2001 Transaction closed, Willamette valued the shares at $12.81 (a 28.1% increase over a tow month period).

330. However, Appvion management assured employees that the valuation was correct and to trust Willamette's valuation.

331. On 14 February 2002, Karch emailed Employee Participants and stated that "The value of our company stock will be determined twice per year by an independent, third party appraiser according to the methodology established by the Department of Labor. This valuation process provides another level of scrutiny of the company's accounting practices."

332. In a 12 March 2002 internal communication, Appvion's Bill Van Den Brandt announced the share price and stated that "Willamette's valuation considers such factors as the purchase price we paid, company performance in November and December 2001 and comparable market factors to determine our company's fair market value and, in turn, the stock value."

333. The communication also included a quote from Buth indicating that the increase in share value was because of better than expected financing—"'We got a good deal, we

arranged a strong financing package and we were able to keep the cash at closing so we borrowed less than we expected,' said Buth, "Those were the foundations of the appraiser's valuation."

334.    In addition, "Buth emphasized that future valuations primarily will reflect our repayment of debt, which depends on our earnings and cash flow, and any changes in valuation as we grow and transform our company."

335.    To explain the December 31, 2001 valuation to employees, Buth went on an employee road show in March 2002 with Willamette's Scott Levine, Pete Prodoehl from BCI Group (now Principal).  The purpose of the road show was to "explain the valuation process, how it differs from the fairness opinion issued at the deal closing, and how it determines stock value."

336.    For the June 30, 2002 valuation, Willamette valued the shares at $18.58.  In an August 13, 2002 email to employees Appvion's Bill Van Den Brandt issued a communication stating that "the stock value is the product of a rigorous and complicated process that ultimately requires professional judgment to complete."  The email also attempted to explain key financial data underlying the valuation.  Buth again went on a road show in September 2002 to explain the valuation.

337.    The Company continued to hold road shows approximately twice a year to present the share price to employees and discuss company performance.

338.    Additional employee communications include the following:

> (a)    For the June 30, 2003 valuation, Willamette valued the shares at $22.42.
> Bill Van Den Brandt informed employees that "the new stock price
> reflects the performance of our core businesses offset by our debt

repayment in the first half of the year and the improved valuations of comparable publicly traded companies."

(b)     The December 31, 2003 valuation increased further to $23.36. A February, 19, 2004 email from Doug Buth to employees highlighted double digit growth in the inkjet product line and the thermal, security and performance packaging businesses. The February 24, 2004 email to employees communicating the share price also again stressed SSGA's reliance upon Willamette.

(c)     For the June 30 2005 communication, Van Den Brandt informed employees, via email on 23 August 2005, that SRR "uses both an income approach and a market approach and to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions."

(d)     The valuation of PDC stock peaked at $33.62 with the December 31, 2006 valuation. Richards released a communication touting the share price and stating that "by all market measures we are exceeding expectations."

(e)     In a 2007 publication titled "Appleton: Applying Technology for Performance," Appvion Management represents that Karch said "we had our legal and financial advisors there to make sure everything we disclosed was appropriate and in compliance." According to the document, Prodoehl stated that employees "essentially had all the information they needed to make an informed decision whether or not to

invest in the company."  That document also represented that Driscoll stated that State Street was "appointed the fiduciary to make sure the transaction was fair from a financial perspective to the ESOP.  And it was. Employees would not be paying more than the fair market value to buy Appleton Papers."

(f)     For the December 31, 2007 valuation, SRR valued the shares at $33.41. An internal communication explained the valuation, stating that the carbonless segment exceeded expectations.   The communication also stated that "the year was even tougher for BemroseBooth and its results in the second half of 2007 along with increased pension liabilities for the company produced a significant decrease in share value."   The communication continues: "Three factors that helped to offset those reductions in value.   For the first time SRR recognized value in our developing microencapsulation business.   Second, we reduced the company's debt including repurchasing some of our most expensive bonds.  Third, SRR recognized value in our pending insurance claims and expected judgment for certain litigation expenses.  In general, those three factors along with the performance of our paper business accounted for the $.52 increase in the PDC stock value."  Additionally, Mark Richards held road shows in January 2008 along with representatives from State Street and Scott Levine of SRR to explain the valuations.

(g)     For the 30 June 2008 valuation, an internal communication dated 7 July 2008 stated that "Bemrose Booth has struggled with difficult economic

conditions and tough markets for its products.  [Bemrose Booth] has a big pension liability with future funding requirements.  Those two factors have hampered Appleton's efforts to sell BemroseBooth and have resulted in a dramatic write down of its value."

(h)     For the December 31, 2010 valuation, SSR valued the shares at $12.84, an increase from $12.03 per share on June 30, 2010.  Appvion pointed to "increased demand for its products and market share gains driven by strong sales of its carbonless sheet product and its BPA-free thermal receipt paper.  Results were also positively affected by numerous price increases the company implemented during the year to offset the impact of rising pulp prices.  The increase in the value of the thermal business essentially offset the value of the carbonless business.  The rapid and consistent growth of the Encapsys business was the single business contributor to share price growth in h2 2010.  The Encapsys division continues to increase its contribution to shareholder value with each recent valuation."

(i)     In 2012, Appvion explored a merger with a third party which would have resulted in the ESOP being a minority shareholder.  The employees voted to approve the merger; however, ultimately it fell apart and the proposed merger was terminated. Appvion management said the deal fell apart due to volatile market conditions.  According to Mark Richards and Tom Ferree, Appvion had received positive feedback from potential investors about the fundamental strength of Appvion.

(j)     For the 31 December 2012 valuation, an internal communication dated 5 February 2013 stated "Key contributors to the increase in share price were strong sales and earnings growth from our thermal papers segment, savings delivered by the strategic supply agreement with Domtar, a significant reduction in working capital, and strong improvement in adjusted operating income."

(k)     For the June 30, 2013 valuation, SRR valued the shares at $17.85, an increase from $17.55 on December 31, 2012.  Appvion management indicated that SRR was actually being conservative, noting that the market analysis would produce a significant increase in stock value but that "Historically SRR has been cautious about immediately applying those changes in value (up or down) to PDC stock.  SRR chose to discount the H1 2013 performances of comparable companies until the associated stock values prove to be sustainable."

(l)     In 2015, SRR's valuation increased from $11 a share on December 31, 2014 to $12.90 a share on June 30, 2015 and $12.30 a share on December 31, 2015.  This increase was in spite of the fact that Appvion announced to employees that its 2015 earnings were not enough to cover the fixed expenses for interest, pension, ESOP distributions, maintenance, and environmental liability obligations.  However, Prior Committee Defendants and Director Defendants reiterated that the same approaches were being used.  Specifically, they explained:

**Valuation process**

Argent relies upon Stout Risius Ross (SRR), an independent valuation firm, to conduct appraisals of Appvion and PDC to assist in determining the value of PDC stock. SRR uses an income approach and a market approach to value stock.

### 8. Argent Defendants Acknowledged Critical Issues with SRR's Valuations but Rubberstamped Them Anyway.

339. Grant Lyon was appointed as the sole member of the ESOP Committee in August 2017.

340. Less than a month after Lyon's appointment, he had identified specific deficiencies with the PDC stock appraisals.

341. He then met with Argent's Steve Martin about the issues he had uncovered. Following that discussion he proposed a report to Appvion's board dated 1 September 2017 (the "Lyon Report").

342. Lyon gave Martin an opportunity to review the Lyon Report before Lyon gave it to the Appvion Board.

343. Argent admitted that it had never run a review process for SRR and that it used SRR because the predecessor trustee, State Street, used them. Argent said it had used SRR in other engagements.

344. Argent acknowledged that Appvion had consistently missed their financial projections during Argent's time as trustee.

345. Argent acknowledged that it had questioned SRR's low (5%) discount for lack of marketability, but SRR had not changed the discount percentage.

346. Argent acknowledged that it has not been involved in explaining SRR's valuations or Appvion's financial condition to the Employee Participants. Rather, Argent

Defendants allowed Appvion management and board to take the lead in communicating the stock price and financial information to Employee Participants.

347.    Argent acknowledged that unfunded pension and postretirement benefits other than pension amounts were never included in the SRR valuation, even though the pension liabilities and postretirement benefits other than pension were included in the audited financial statements.

348.    Argent Defendants never disclosed these problems with the valuations to Employee Participants, but  instead provided stock prices as described earlier.

        **9.**     **Prior Committee Defendants and Director Defendants Took the PositionLed the ESOP Plan and the Employee Participants to Believe that the Executive Team had the Same Level of Risk as the Potential Employee Participants.**

349.    In the 2001 KSOP and the Prospectus, Appvion management represented that the money they would receive under the defined compensation plans was "subject to the same important risk and return profile as the ESOP equity investment."

350.    At the 2 August 2001 road show, Buth told the employees that he and his "management team have already committed 100% of [their] funds.  Of the 14 of [them] that [was] $5 million dollars…"

351.    In a January 14, 2002 email to employees, Paul Karch distinguished Appvion's ESOP from Enron's, in order to reassure employees that the Appvion ESOP was safer than Enron's plan:

> Control
>
> Our ESOP holds 100 percent of the company's stock.  **Our ESOP trustee, as the legal shareholder, is the sole shareholder, and thus has control of the company**.  In Enron's case, their qualified plan held less than 10 percent of the company's total outstanding stock, so the trustee was a minority shareholder who could not

influence or affect the governance structure and protect participants' holdings.

Diversification

**Our plan design prevents company executives or other employee group from selling their stock sooner than any other employee since all our stock is in the ESOP**. In Enron's situation, company executives owned stock that was not held in their qualified plans. That stock was not subject to the same restrictions on sales as the stock in the qualified plans.

352. However, plan design only prevented executives or employees from selling their stock while remaining with Appvion; instead, all of the Appvion executives left the company by March 2007, and they all withdrew their funds either on a lump sum basis or over the five years after leaving Appvion. Further, executives received significant incentive compensation that was not part of the ESOP and therefore they were not dependent on the ESOP in the same way that other employees were.

353. When Buth left Appvion in 2004, Karch sent an internal communication dated 3 May 2004 that stated:

Since Doug's leaving the company is voluntary, he **will not receive any severance payments nor are there any special deals that apply**. Doug has the same options as any other employee who terminates his or her employment. He may choose to leave his investment in company stock or request a distribution. **My understanding is that Doug intends to leave his money invested in company stock.**

354. Buth received significant funds on his departure. Specifically, Buth received compensation under the various incentive and bonus plans discussed above.

355. However, Prior Committee Defendants and Director Defendants knew the true financial condition of Appvion and knew when to pull their money out of stock and/or management incentive plans. Indeed, at least Buth, Karch, Fantini, and Parker timed their exit to

ensure they received gains from the sale of their shares. Specifically, Buth, Karch, Fantini, and Parker gained:

| Individual | Gains |
|---|---|
| Buth | $851,972 |
| Karch | $303,566 |
| Fantini | $577,365 |
| Parker | $156,493 |

### 10. Employees Were Unable To Get Additional Information About the Valuations.

356. After the 2001 Transaction, there was a committee of hourly and salaried personnel that met with the Company and the Board of Directors on behalf of the Employee Participants. However, when committee members retired or left the committee, the Company did not replace them. The committee was eventually disbanded in around 2006.

357. Also around 2006, the Company stopped meeting with Union members quarterly to discuss the ESOP by negotiating it out of the bargaining agreement.

358. During the road show presentations, employees would ask questions about the SEC filings, the Company's debt, and the valuations. When faced with these questions, CFO Tom Ferree would typically respond that he could not answer because it would be considered insider trading.

359. Employees who requested more information about the stock valuation and the company's finances were shut down.

360. Employees were prohibited from talking directly to the ESOP Trustee to get more information about the valuations.

## COUNT I
### BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AND BREACH OF THE DUTY TO MONITOR AGAINST THE TRUSTEE DEFENDANTS

361. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

362. ERISA § 404(A)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

363. The Trustee Defendants are plan fiduciaries.

### The Trustee Defendants Have a Duty to Act in the Best Interest of Plan Participants and a Duty to Act Prudently

364. The duty of loyalty under ERISA § 404(a)(1)(A) and duty of prudence under ERISA § 404(a)(1)(B) requires a fiduciary to undertake an appropriate investigation to determine that the Plan and its participants receive adequate consideration for the assets of the Plan and the participants' accounts in the Plan.

### The Trustee Defendants Have a Duty to Thoroughly Investigate

365. The Trustee Defendants were responsible for hiring the independent appraisers who conducted the semi-annual valuations of PDC's stock price.

366. ERISA § 404 requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." This requires a fiduciary to not only analyze the merits of a proposed transaction or valuation but also to thoroughly investigate a proposed transaction or valuation.

367. In order to comply with their fiduciary obligations, the Trustee Defendants must investigate the independent appraisers' qualifications, provide the independent appraisers with complete and accurate information, and make certain that reliance on the independent appraisers' advice was reasonably justified.

368. The Trustee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with their duties to act in the best interest of the plan and to act prudently. Specifically, the Trustee Defendants cannot rely on other persons in order to make a good faith determination that the sale or purchase of Appvion stock was for fair market value and that the appraisals received actually reflect the health of the company for the purpose of valuing the stock.

**The Trustee Defendants Have a Duty to Ensure Plan Participants Receive Adequate Consideration and to Ensure that the Plan Does Not Pay More Than Fair Market Value For Stock**

369. The duty of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the Plan and its participants receive adequate consideration for the assets of the Plan and the participants' accounts in the Plan.

370. Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

85

371.    In order for the trustee or other named fiduciary to make a good faith determination of fair market value relying on an independent appraiser consistent with its duties under ERISA § 404(a)(1)(A) and (B), a fiduciary responsible for engaging in the good faith determination must investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances.

### The Trustee Defendants Have a Duty to Disclose and Inform

372.    An ERISA fiduciary's duty of loyalty and its duty of prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

### The Trustee Defendants Have a Duty to Act in Accordance with the Plan Documents

373.    In order to comply with their fiduciary obligations, the Trustee Defendants were required to have complied with the Plan Documents.

374.    Pursuant to the Trust Documents, the Trustee Defendants were required to hire an independent advisor (as described in Section 401(a)(28)(c) of the Internal Revenue Code) to appraise the value of PDC stock on a semi-annual basis.  The Trustee Defendants were responsible for reviewing finalizing, and adopting the valuations.

375.    IRC § 401(a)(28)(C) requires that "all valuations of employer securities which are not readily tradeable on an established securities market with respect to activities carried on by the plan are by an independent appraiser," which means an appraiser meeting the requirements of

the regulations prescribed under section 107(a)(1). In the context of an ESOP that holds, acquires or sells securities that is not readily tradeable on an established securities market, an ESOP fiduciary needs to hire an independent appraiser, but the fiduciary remains responsible for ensuring that the valuation and the information on which it is based is complete, accurate, and up-to-date.

376. Section 1.33 of the 2001 Appleton Papers Retirement Savings and Employee Stock Ownership Plan, and various plans thereafter, define Fair Market Value as the "fair market value of Company Stock, at a certain date, as determined by the Trustee based the appraisal of an Independent Appraiser."

377. Section 1.38 of the 2001 Appleton Papers Retirement Savings and Employee Stock Ownership Plan, and various plans thereafter, define Independent Appraiser to mean "an Independent Appraiser as defined in Section 401(a)(28) of the Code, in accordance with the terms of the Trust and the provisions of Section 3(18) of ERISA."

378. The Trustee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with the Plan documents. Specifically, the Trustee Defendants cannot rely on other persons in order to make a good faith determination that the sale of Appvion stock was for fair market value and the appraisals received actually reflected the health of the company for the purpose of valuing the stock.

**The Trustee Defendants have a Duty to Monitor the Board of Directors**

379. As the representative of the sole shareholder of PDC, the Trustee Defendants also have a duty to monitor the performance of PDC and Appvion's board of directors. While the Trustee Defendants did not have authority to unilateral removal of members of any members of

the board of directors after 2005, they could request that Appvion's CEO agree to remove jointly appointed members of the board of directors.

380.    The Trustee Defendants have a duty to monitor Appvion's Board of Directors by reviewing board minutes, financial statements, and monitoring the performance of the company.

**The Trustee Defendants Breached Their Duties to (1) Act in the Best Interest of the Plan (i.e. loyalty), (2) Act Prudently, (3) Act in Accordance with the Plan Documents, and (4) Monitor the Board of Directors**

381.    The Trustee Defendants breached their fiduciary duties as described above by, among other things, the following:

(a)    Failing to properly investigate the fair market value of PDC stock.

(b)    Failing to properly investigate Willamette and SRR's methods for valuing PDC stock and adopting the valuations despite substantial flaws in the valuations that resulted in significant overvaluations of PDC stock.

(c)    Failing to properly scrutinize the financial projections provided by Appvion management, which Willamette and SRR relied on in valuing PDC stock, even though Appvion had consistently failed to meet its projections.

(d)    Failing to disclose material facts to plan participants, including but not limited to the following facts:

(i)    That the valuations significantly overstated the value of PDC stock;

(ii)    That the valuations did not include significant unfunded pension and other postretirement liabilities;

(iii)     That the valuations were based on unrealistic projections prepared by Appvion management; and

(iv)     That the valuations improperly applied a control premium that increased the valuation even though the ESOP had no practical ability to control Appvion or PDC.

(e)     Failing to monitor Appvion's Board of Directors.

(f)     Allowing Appvion management to communicate the share price to Appvion employees, even though Appvion management selectively disclosed factors that influenced the share price while omitting material information about the valuations, such as the fact that the valuations improperly applied a control premium, that the valuations did not account for some material liabilities (including significant unfunded pension and other postretirement liabilities), that Willamette, on information and belief, and SRR capped the declining income stream into perpetuity, that Willamette, on information and belief, and SRR broke Appvion into business segments and failed to include all overhead costs in the projections, that Willamette, on information and belief, and SRR failed to apply the proper discount for the lack of marketability of the shares, and that Willamette, on information and belief, and SRR improperly applied a control premium in its valuation, among other things.

(g)     Failing to participate in Appvion's management's explanation of the stock price and investment advice to employees.

(h)    Failing to follow up with Willamette and SRR on what it believed to be a low discount rate based on lack of marketability.

(i)    Failing to establish processes to adequately monitor Appvion's board of directors, especially in the operation of the ESOP Committee and the Compensation Committee.

(j)    Failing to take steps to prevent the Prior Committee Defendants and the Board of Directors from setting and benefiting from artificially high stock prices at the expense of Plan participants.

382.    These breaches constitute breaches of duties of loyalty under ERISA § 404(a)(1)(A), the duty of prudence under ERISA § 404(a)(1)(B), the duty to act in accordance with the Plan under ERISA § 404(a)(1)(D) and the duty to monitor the board of directors.

383.    The Trustee Defendants' breaches of their fiduciary duties damaged the Plan by causing it to consistently and repeatedly overpay for PDC stock.

384.    The Trustee Defendants also knew that the share price that it adopted was used by PDC/Appvion in the payment of bonuses and other incentives to directors and offices of PDC/Appvion.  The Trustee Defendants' breaches of their fiduciary duties therefore further damaged the Plan by causing Appvion to overpay directors and officers, thereby reducing cash available to pay Employee Participants for the value of their shares.

## COUNT II
## BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AND BREACH OF THE DUTY TO MONITOR AGAINST THE PRIOR COMMITTEE DEFENDANTS

385.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

386. As former members of the ESOP Committee, the Prior Committee Defendants were Named Fiduciaries under Section 8.2(a)(2) of the Plan Documents.

387. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

### Prior Committee Defendants Have a Duty to Act in the Best Interest of the Plan and a Duty to Act Prudently

388. The duty of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the Plan and its participants receive adequate consideration for the assets of the Plan and the participants' accounts in the Plan.

### The Prior Committee Defendants Have a Duty to Monitor the Trustee Defendants and the Valuations

389. ERISA § 404 requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." This requires a fiduciary to not only analyze the merits of a proposed transaction or valuation but also to thoroughly investigate a proposed transaction or valuation.

390. As members of the ESOP Committee, the Prior Committee Defendants were responsible for interpreting the Plan and establishing policies and procedures to implement the Plan.

391. In order to comply with their fiduciary obligations, the Prior Committee Defendants had a duty to monitor the actions of the Trustee Defendants and ensure they were complying with their fiduciary duties. And adequately protecting the interest of the ESOP participants.

392. The Prior Committee Defendants also had a duty to investigate the independent appraisals, including verifying that the independent appraisers were qualified, that they reviewed complete and accurate information, and that reliance on the independent appraisers' advice was reasonably justified.

393. The Prior Committee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with their duties to act in the best interest of the plan and to act prudently. Specifically, the Prior Committee Defendants cannot rely on other persons in order to make a good faith determination that the sale of Appvion stock was for fair market value and that the appraisals received actually reflected the health of the company for the purpose of valuing the stock.

394. In addition, beginning in at least 2008, the ESOP Committee began reviewing and approving the valuations prepared by the Trustee Defendants and the Valuation Defendants.

**The Prior Committee Defendants Have a Duty to Ensure Plan Participants Receive Adequate Consideration and to Ensure that the Plan Does Not Pay More Than Fair Market Value For Stock**

395. The duties of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine

that the Plan and its participants receive adequate consideration for the assets of the Plan and the participants' accounts in the Plan.

396. Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

397. In order for the trustee or other named fiduciary to make a good faith determination of fair market value relying on an independent appraiser consistent with its duties under ERISA § 404(a)(1)(A) and (B), a fiduciary responsible for engaging in the good faith determination must investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances.

**The Prior Committee Defendants Have a Duty to Disclose and Inform**

398. Additionally, an ERISA fiduciary's duties of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) include a duty to disclose and inform. Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

**The Prior Committee Defendants Had A Duty To Monitor the Repurchase Obligation**

399. Under the Plan Documents, when an employee was eligible for distributions, the Company was required to repurchase the shares of stock allocated to that employee.

400.    The Prior Committee Defendants had a duty to monitor the repurchase obligation and make sure there were sufficient funds available to meet the repurchase obligation.

**Prior Committee Defendant Breached Their Duties to (1) Act in the Best Interest of the Plan (i.e. loyalty), (2) Act Prudently, and (3) Monitor the Trustee Defendants**

401.    The Prior Committee Defendants breached their fiduciary duties in, among others, the following ways:

(a)    Buth and Karch presented Houlihan Lokey as an independent advisor who would provide an independent opinion on the value of PDC as of the time of the 2001 Transaction. However, Buth and Karch failed to disclose that Houlihan Lokey's fee was contingent on the deal closing and that their opinion was therefore not truly independent and should not be relied upon.

(b)    In convincing employees to invest in the ESOP, Buth, Karch, Fantini, and Parker also represented that their investment in the ESOP was at equal or greater risk than the average employees. They had access to inside financial information and knew when to sell their shares or leave the company in order to maximize their gains.

(c)    The Prior Committee Defendants had access to inside financial information and knew that the stock prices set by the Trustee Defendants were artificially inflated. Having access to both the financial statements and the appraisals was sufficient for them to understand that the unfunded pension/postretirement benefits were not included in any of the appraisals. They therefore knew when to sell their shares or leave the company in order to maximize their gains.

(d)     Karch represented to employees that the third party appraiser was valuing the company consistent with the methodology established by the Department of Labor.

(e)     Karch also represented to employees that the independent appraisal would protect the employees from artificially high stock prices.

(f)     The Prior Committee Defendants were involved in preparing the financial projections that the appraisers relied on in valuing PDC stock. They created overly optimistic financial projections even though they consistently failed to meet the projections, and they knew that the appraisers were incorporating those financial projections into the stock price and inflating the stock price.

(g)     When Appvion's stock reached its artificial peak, Richards falsely represented to employees that Appvion was exceeding market expectations.

(h)     Timing their exits from Appvion while the stock prices were artificially high for their own personal benefit but at the detriment of Appvion and all of the remaining employees.

(i)     Selectively disseminating information to employees in order to prevent them from discovering Appvion's true financial health.

(j)     Selectively disclosing factors that influenced the share price while omitting material information about the valuations, such as the fact that the valuations applied a control premium, that the valuations did not account for some material liabilities (including significant unfunded

pension, postretirement liabilities), that Willamette and SRR capped the declining income stream into perpetuity, that Willamette and SRR broke Appvion into business segments and failed to include all overhead costs in the projections, that Willamette and SRR failed to apply the proper discount for the lack of marketability of the shares, and that Willamette and SRR improperly applied a control premium in its valuation, among other things.

(k)     Failing to implement systemic processes to review the Trustee Defendants' processes and strategies for reviewing and adopting the appraisals.

(l)     Accepting the stock values adopted by the Trustee Defendants even though the Prior Committee Defendants knew or should have known that they were fundamentally flawed.

(m)     Failing to take steps to prevent the Prior Committee Defendants and the Board of Directors from benefiting from artificially high stock prices at the expense of Plan participants.

402.     Prior Committee Defendants' breaches damaged the Plan by causing or allowing it to consistently and repeatedly overpay for PDC stock.

## COUNT III BREACH OF FIDUCIARY DUTY BY FAILURING TO MONITOR TRUSTEE DEFENDANTS AND PRIOR COMMITTEE DEFENDANTS AGAINST BOARD OF DIRECTOR DEFENDANTS

403.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

404.    According to the Department of Labor "the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such a manner as may reasonably be expected to ensure that their performance has be in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."

405.    The Director Defendants had the authority to both appoint and remove the trustee, and they did in fact appoint State Street, Reliance, and Argent as the ESOP Trustees.

406.    The Director Defendants were also responsible for appointing members of the ESOP Committee, including the Prior Committee Defendants.

407.    The Director Defendants therefore had discretionary authority and control over the management and administration of the ESOP and its assets and were fiduciaries of the Plan.

408.    The Trustee Defendants appointed directors to Appvion's Board of Directors as described above  However, after January 1, 2005, the Trustee only had the ability to jointly nominate (with the CEO) three of seven possible individuals to the Board of Directors and it could not unilaterally remove those directors.

409.    Given the Director Defendants' ability to remove the Trustee Defendants and the relationship between the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants, the Director Defendants had a duty to monitor the Trustee Defendants and Prior Committee Defendants by implementing systematic processes to review their courses of action and strategies.

410.    The Director Defendants' knew or in the exercise of reasonable diligence should have known that the Trustee Defendants had retained Willamette and SRR to perform semi-annual valuations of PDC stock and that those valuations were fundamentally flawed as described above.

411.   The Director Defendants breached their duty to monitor by, among other things, the following:

     (a)    Allowing the Prior Committee Defendants to selectively disclose information about the valuations to employees;

     (b)    Failing to take steps to prevent the Trustee Defendants and the Prior Committee Defendants from setting and benefiting from artificially high stock prices at the expense of Plan participants.

     (c)    Allowing the Prior Committee Defendants to be paid amounts over and above the fair market value of their shares.

     (d)    Allowing Appvion management employees to receive incentive and bonus payments based on the artificially inflated value of PDC stock.

412.   Because the Director Defendants had access to both the financial statements and the semi-annual appraisals, they knew that the appraisals failed to include a deduction for the unfunded pension, postretirement liabilities, and therefore misrepresented the true value of the PDC stock.

413.   Plaintiff has been injured as a result of Director Defendants' conduct.

## COUNT IV
## ENGAGING IN PROHIBITED TRANSACTIONS AGAINST THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS AND THE TRUSTEE DEFENDANTS

414.   Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

415.   ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) provides that "a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 98 of 138   Document 1

416. ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) provides that "a fiduciary with respect to a plan shall not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

417. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect… transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

418. ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) defines a "party in interest" to include "any fiduciary… of such employee benefit plan" as well as "an employer any of whose employees are covered by such plan."

419. ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H) defines a "party in interest" to include "any employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors) of a person described in subparagraph" (C), among other subparagraphs. Subparagraph (c) refers to ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C), which defines a party in interest to include "an employer any of whose employees are covered by such plan."

420. Appvion was a party in interest to the ESOP because it was the employer whose employees were covered by the ESOP. As directors of Appvion, the Director Defendants were parties in interest pursuant to the ESOP.

421. The Prior Committee Defendants were parties in interest to the ESOP because they were employees, officers, and directors of Appvion.

422. The Prior Committee Defendants and the Director Defendants were Plan fiduciaries as members of the ESOP Committee and/or the Board of Directors.

423.    The Trustee Defendants were fiduciaries to the ESOP in their roles as trustees who were responsible for, among other things, determining the fair market value of PDC stock.

424.    The actions of the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants in adopting inflated stock valuations and additional compensation plans tied to or influenced by the stock valuations repeatedly caused the Plan to overpay for PDC stock beginning as early as December 2001.

425.    The Prior Committee Defendants sold their PDC stock at artificially high prices and thereby received consideration for their own personal accounts to the detriment of the other Plan Participants and the Company.   These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

426.    All of the Prior Committee Defendants received consideration from the incentive plans described above that were influenced by the artificially high valuations of PDC stock. These payments constitute prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

427.    The non-employee Director Defendants were awarded phantom stock units beginning in 2006, which counted as synthetic equity and were based on the value of PDC stock. Under this plan, the non-employee Director Defendants received consideration for their own personal accounts to the detriment of the other Employee Participants and when they sold their phantom stock at artificially high stock prices.   These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

428.    In addition, the Company and the ESOP Plan purchased shares from other senior management who served in fiduciary capacities at inflated prices.  These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 100 of 138   Document 1

429.     Since PDC had no assets other than Appvion, the Director Defendants arranged for Appvion to loan cash to PDC to fund the ESOP's repurchase obligations, further damaging the value of the Company.  These transactions constituted prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

430.     The Trustee Defendants knew or should have known that the Prior Committee Defendants, the Director Defendants met the definitions of parties-in-interest with respect to the Plan.

431.     The Trustee Defendants were fiduciaries who caused the Plan to purchase the Prior Committee Defendants' and the Director Defendants' stock at artificially high stock prices. As such, the Trustee Defendants caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

432.     As parties in interest, the Prior Committee Defendants and the Director Defendants violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) and ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

433.     The exemption of ERISA § 408, 29.U.S.C. § 1108 does not apply to these transactions because the Plan and the Company paid more than adequate consideration for the shares.

434.     The prohibited transactions described above caused significant losses to the Plan.

**COUNT V**
**KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY PURSUANT TO ERISA § 502(a)(3), 28 U.S.C. §1132(a)(2) AGAINST HOULIHAN LOKEY**

435.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

436.    As alleged in the paragraphs above, the State Street Defendants, Buth, Karch, Fantini, and Parker, and others breached their fiduciary duties to the Plan and the Plan Participants in connection with the 2001 Transaction.

437.    Houlihan Lokey knew that the conduct described in the above paragraphs constituted a breach of the State Street Defendants, Buth, Karch, Fantini, and Parker, and others' fiduciary duties.

438.    In addition, Buth, Karch, Fantini, and Parker received incentive payments in connection with the 2001 Transaction.  These payments were prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106.

439.    Despite this knowledge, Houlihan Lokey knowingly participated in the breaches by:

(a)    Issuing a fairness opinion that resulted in Houlihan Lokey receiving up to $8.1 million;

(b)    Representing to Appvion employees that it was preparing an independent validation of the buyout proposed in 2001, while failing to disclose that its fees were contingent on both the deal closing and were structured as a percentage of the purchase price; and

(c)    Representing to Appvion employees that the proposed buyout was a great deal for them.

440.    Houlihan Lokey's knowing participation assisted the State Street Defendants, Buth, Karch, Fantini, and Parker, and others' breaches of fiduciary duty in convincing Appvion's employees to agree to the buyout.  This allowed the Prior Committee Defendants, the State Street

Defendants, and the Director Defendants to perpetrate their breaches of fiduciary duties and frauds over the next 16 years.

441.    Houlihan Lokey received up to $8.1 million in fees in connection with the 2001 Transaction.   This fee constituted an asset of the ESOP Plan.

442.    Plaintiff was harmed as a result of Houlihan Lokey's conduct.

443.    Houlihan Lokey, Buth, and Karch presented Houlihan Lokey as an independent advisor in connection with the 2001 Transaction.   At no point did they disclose that Houlihan Lokey's fees was contingent and that Houlihan Lokey therefore had a conflict of interest.

444.    Plaintiff is entitled to equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT VI
## VIOLATION OF ERISA § 410 AND BREACH OF FIDUCIARY DUTY UNDER ERISA §§ 404(a)(1)(A) AND (B), 29 U.S.C. § 1110 AND §§ 1104 (a)(1)(A) AND (B) AGAINST THE TRUSTEE DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE HOULIHAN LOKEY DEFENDANTS

445.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

446.    ERISA § 410(a), 29 U.S.C. § 1110(a), provides in relevant part that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy."

447.    As Part IV of ERISA includes ERISA §§ 404, 405, and 406, 29 U.S.C. §§ 1104, 1105, and 1106, any provision that attempts to relieve a fiduciary of liability is void pursuant to ERISA § 410(a), unless there is an exception or exemption.   No such exception or exemption is applicable here.

448.    The DOL Regulations promulgated under ERISA § 410, 29 C.F.R. § 2509.75-4, renders "void any arrangement for indemnification of a fiduciary of an employee benefit plan by the plan" because it would have "the same results as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations."

449.    For a 100% ESOP-owned company, a provision requiring indemnity by the ESOP-owned company is treated as an indemnity provision by the Plan because it effectively requires Plan participants to pay for the costs of the breaching fiduciaries' liability.

450.    Section 8.11 of the July 31, 2002 Plan Document and subsequent plan purport to have the Company, which is defined as Appleton Papers Inc. or its subsidiaries or affiliates "indemnify and save each person who is a member of the Committee and each employee or director of the Company or a Related Company, harmless against any and all loss, liability, claim, damage, cost and expense that may arise by reason of, or be based upon, any matter connected with or related to the Plan or the administration of the Plan…"

451.    To the extent that Section 8.11 of the July, 31 2002 Plan Document and the subsequent plan documents attempt to relieve the Prior Committee Defendants from their responsibility or liability for their breaches of fiduciary duties under ERISA and have the Plan be responsible for their liability or breaches, Section 8.11 is void as against public policy.

452.    The Trustee engagement letters and trust agreements purport to have Appvion indemnify and hold Trustee Defendants harmless against and from any and all claims, damages, expenses, liabilities, and losses whatsoever.

453.    Plaintiff is entitled to declaratory judgment that any such indemnification clauses or agreements are void as against public policy and under ERISA § 410.

454. To the extent that any fiduciaries of the Plan agreed to such an indemnity provision that is against public policy under ERISA § 410 (i.e. by accepting the benefits of the indemnity provision), that fiduciary breached his or her fiduciary duties under ERISA by failing to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries (A) for the exclusive purpose of providing benefits to participants and beneficiaries and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

## COUNT VII
## CO-FIDUCIARY LIABILITY PURSUANT TO ERISA § 405, 29 U.S.C. § 1105 AGAINST THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE TRUSTEE DEFENDANTS

455. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

456. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

**The Prior Committee Defendants and the Director Defendants**

457. The Prior Committee Defendants violated ERISA §405(a)(1)-(3) when they knowingly participated in each other's violations when they acted as a Committee because (1) they each participated knowingly in the actions taken as a Committee and knew or were reckless in not knowing the actions taken were a breach, (2) failed to fulfill their duties as members of the Committee set forth in the Plan Document, and (3) had knowledge of breaches by other Prior Committee Defendants and made no efforts to remedy the breaches. As such, the Prior Committee Defendants are liable for the breaches of the other Prior Committee Defendants pursuant to ERISA §405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3).

458. The Prior Committee Defendants and Director Defendants violated ERISA §405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3) because they knew of the underlying facts, had an obligation to review the following breaches and either failed to fulfill those duties or had knowledge of the breaches and failed to make any efforts to remedy the breaches as follows:

> (a) The Prior Committee Defendants and Director Defendants knew or should have known, consistent with their responsibilities, that Trustee Defendants breached their fiduciary responsibilities as set forth in Counts 1, 6, including because each of them had access to the valuations performed by Willamette and SRR and had access to the financial information necessary to know that the stock price reflected in the valuations did not accurately reflect the fair market value of Appvion's stock.

> (b) The Prior Committee Defendants and Director Defendants knew or should have known, consistent with their responsibilities, that Trustee Defendants failed to make proper disclosures as set forth in Counts 1, 6, because each

of the Prior Committee Defendants either knew of or through a proper review would have discovered Trustee Defendants failure to make proper disclosures.

**Trustee Defendants**

459.    Trustee Defendants violated ERISA § 405(a)(1)-(3) when they participated in the prohibited transactions as set forth in Count 4 because Trustee Defendants failed to fulfill their duties as Trustee by failing to properly monitor Willamette and SRR to ensure the share prices it calculated were reasonably accurate and that Willamette and SRR's processes and information were reasonably reliable.

460.    Trustee Defendants knew of the breaches set forth in Counts 2, 3, 6 and made no effort to remedy the breaches or violations.   As such, Trustee Defendants are liable for the breaches and violations of the Prior Committee Defendants and the Director Defendants.

## COUNT VIII
### KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY PURSUANT TO ERISA § 502(a)(3), 28 U.S.C. §1132(a)(2) AGAINST THE WILLAMETTE DEFENDANTS AND THE SRR DEFENDANTS

461.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

### The Willamette Defendants and the SRR Defendants Knowingly Participated in the Trustee Defendants' Breaches of Fiduciary Duty.

462.    The Trustee Defendants were fiduciaries to the Plan.

463.    The Trustee Defendants were responsible for determining the fair market value of PDC stock and they retained the Willamette Defendants and the SRR Defendants to advise them on the fair market value of PDC stock.

464. The Trustee Defendants breached their fiduciary duties to the Plan as described above in Count I.

465. The Willamette Defendants and the SRR Defendants knew that the Trustee Defendants were relying on their opinion in setting the fair market value of PDC stock, and knew that the Trustee Defendants were failing to conduct appropriate diligence and breaching their fiduciary duties to the plan as described above in Count I.

466. The Willamette Defendants, on information and belief, and the SRR Defendants knowingly participated in the breaches by issuing valuations that were fundamentally flawed because:

> (a) They relied heavily on projections of future earnings created by Appvion's management, even though Appvion consistently missed these projections.
>
> (b) They failed to include some liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities, that would have resulted in negative valuations from at least 2009 through 2016.
>
> (c) They capped a declining income stream into perpetuity.
>
> (d) SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division.
>
> (e) SRR failed to subtract losses from the closure of Appvion's West Carrollton mill.
>
> (f) SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments.

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 108 of 138   Document 1

(g)     SRR ignored evidence of Appvion's enterprise value from the sale of its Encapsys unit and concluded that Appvion's enterprise value was $53 million in excess of what the real world data available.

(h)     They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation.

(i)     They improperly applied a control premium in its valuation, which was inappropriate since the ESOP had no practical ability to control the affairs of PDC or Appvion under the Plan Document or the Security Holder's Agreement.

467.    The Willamette Defendants and the SRR Defendants' conduct damaged Plaintiff.

468.    Plaintiff is entitled to appropriate equitable relief against the Willamette Defendants and the SRR Defendants for their knowing participation in the Trustee Defendants' breaches of fiduciary duty.

**The Willamette Defendants and the SRR Defendants Knowingly Participated in the Prior Committee Defendants' Breaches of Fiduciary Duty.**

469.    The Prior Committee Defendants were fiduciaries to the Plan. The Prior Committee Defendants breached their fiduciary duties to the Plan by the conduct described above in Count II.

470.    The Willamette Defendants and the SRR Defendants knew that the Prior Committee Defendants were breaching their fiduciary duties to the Plan by the conduct described above in Count II. Specifically, the Willamette Defendants, on information and belief, and the SRR Defendants knew, among others, the following:

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 109 of 138   Document 1

(a)　The Prior Committee Defendants were providing inflated financial projections, even though Appvion had historically failed to meet the financial projections prepared by management.

(b)　Appvion's audited financial statements showed significant unfunded pension/post-retirement and other liabilities which the Prior Committee Defendants were aware of, but which were not being included as liabilities in the valuations.

(c)　The Prior Committee Defendants were participants in the Plan, and when they terminated employment with the company they would receive distributions based on the inflated stock values.

(d)　The Prior Committee Defendants had synthetic equity from various incentive plans, which was tied to the stock valuations prepared by the Willamette Defendants and the SRR Defendants.

471.　The Willamette Defendants, on information and belief, and the SRR Defendants knowingly participated in the Prior Committee Defendants' breaches of fiduciary duty by issuing valuations that were fundamentally flawed because:

(a)　They relied heavily on projections of future earnings created by Appvion's management, even though Appvion consistently missed these projections.

(b)　They failed to include some liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities, that would have resulted in negative valuations from at least 2009 through 2016.

(c)　They capped a declining income stream into perpetuity.

(d)     SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division.

(e)     SRR failed to subtract losses from the closure of Appvion's West Carrollton Mill.

(f)     SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments.

(g)     SRR ignored evidence of Appvion's enterprise value from the sale of its Encapsys unit and concluded that Appvion's enterprise value was $53 million in excess of what the real world data available.

(h)     They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation.

(i)     They improperly applied a control premium in its valuation, which was inappropriate since the ESOP had no practical ability to control the affairs of PDC or Appvion under the Plan Document or the Security Holder's Agreement.

472.    The Willamette Defendants and the SRR Defendants' conduct damaged Plaintiff. Plaintiff is entitled to appropriate equitable relief against the Willamette Defendants and the SRR Defendants for their knowing participation in the Prior Committee Defendants' breaches of fiduciary duty.

**The Willamette Defendants and the SRR Defendants Knowingly Participated in the Director Defendants' Breaches of Fiduciary Duty**

473.    The Director Defendants were fiduciaries of the Plan.

474.   The Director Defendants breached their fiduciary duties to the Plan as described above in Count III.

475.   The Willamette and SRR Defendants knew that the Director Defendants were breaching their fiduciary duties to the plan by as described above in Count III.

476.   Willamette and SRR's conduct damaged Plaintiff.

477.   By knowingly participating in the Trustee Defendants', the Prior Committee Defendants', and Director Defendants' breaches and violations, Willamette and SRR are subject to appropriate equitable relief.

## COUNT IX
## FRAUD AGAINST WILLAMETTE

478.   Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

479.   Willamette was hired by State Street, in its capacity as trustee of the Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock.

480.   Willamette served as State Street's independent appraiser from 2001 to mid-2004.

481.   Willamette knew that its appraisal would be used by State Street to set the fair market value of PDC stock.

482.   Willamette knew that the value of the stock was material to the Plan and the Plan Participants because it would be used to set the share price to be used for Plan transactions.

483.   Willamette knew that its opinion of the stock's value would be shared with the ESOP Plan and Employee Participants. Willamette also knew that the Employee Participants would rely on Willamette's opinion of the stock's value in making decisions to, among other things, make deferrals to the plan, request statutory or additional diversification, request

distributions from the ESOP after terminating employment, and/or retire or otherwise terminate employment at Appvion.

484. Indeed, Willamette intended the Plan and the Plan Participants to rely on their valuation of the Company's stock in purchasing stock back from employees.

485. During its tenure are the Plan's independent appraiser, Willamette determined the value of PDC's stock as described above. Willamette reached these determinations even though Willamette, on information and belief, knew that its valuation analyses contained significant flaws, including that it did not account for millions of dollars in pension/postretirement benefits.

486. Because of these flaws, the stock prices as determined by Willamette, on information and belief, overstated the fair market value of PDC stock by a significant degree.

487. Willamette, on information and belief, knew that the stock prices it provided for the Plan's use were not accurate and that they overstated the fair market value of the stock.

488. The Plan and the Plan Participants believed Willamette's appraisal of fair market value.

489. The Plan and the Plan Participants had no way to know that Willamette had overstated the value of the stock because Willamette's full valuation reports were never shared with them. In addition, Willamette's wrongdoing was concealed as described above.

490. In reliance on Willamette's valuations, the Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the Plan over time.

491. The Plan justifiably relied on Willamette's opinions of the fair market value of PDC stock.

492.    As a result of Willamette's determination of the Company's stock price and the Plan and the Plan Participants' justifiable reliance there on, the Plan and the Plan Participants were damaged.

## COUNT X
## FRAUD AGAINST THE SRR DEFENDANTS

493.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

494.    SRR was hired by State Street, in its capacity as trustee of the Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock from late 2004 through the end of 2012.

495.    SRR was hired by Reliance, in its capacity as trustee of the Plan, to serve as Reliance's independent appraiser in determining the fair market value of PDC stock for the semi-annual valuations of PDC stock in 2013.

496.    SRR was hired by Argent, in its capacity as trustee of the Plan, to serve as Argent's independent appraiser in determining the fair market value of PDC stock from 2014 through mid-2017.

497.    SRR knew that its appraisal would be used by State Street, Reliance, and Argent to set the fair market value of PDC stock.

498.    SRR knew that the value of the stock was material to the Plan and the Plan Participants because it would be used to set the share price to be used for Plan transactions.

499.    SRR knew that its opinion of the stock's value would be shared with the Plan and Plan Participants.  SRR also knew that the Plan Participants would rely on SRR's opinion of the stock's value in making decisions to, among other things, make deferrals to the plan, request

114

statutory or additional diversification, request distributions from the ESOP after terminating employment, and/or retire or otherwise terminate employment at Appvion.

500.    During its tenure are the Plan's independent appraiser, SRR determined the value of PDC's stock as described above.   SRR reached these determinations even though SRR knew that its valuation analyses contained significant flaws, including the following:

(a)    They relied heavily on projections of future earnings created by Appvion's management, even though Appvion consistently missed these projections.

(b)    They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

(c)    They failed to include material liabilities, including lease liability, restructuring reserves, and pension/post-retirement liabilities, that should have resulted in negative valuations from at least 2009 through 2017.

(d)    They capped a declining income stream into perpetuity.

(e)    SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division in order to continue to justify its loft appraised values.

(f)    SRR failed to subtract losses from the closure of Appvion's West Carrollton mill and the associated severance costs.

(g)    SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments thus overstating earnings and value.

(h) They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

(i) They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the Plan Document or the Security Holder's Agreement.

501. Because of these flaws, the stock prices as determined by SRR overstated the fair market value of PDC stock by a significant degree.

502. SRR knew that the stock prices it provided for the Plan's use were not accurate and that they overstated the fair market value of the stock.

503. SRR also specifically knew that they should have included Appvion's unfunded pension liabilities and other liabilities in its valuations. Indeed, on December 31, 2013 SRR and Reliance discussed the ESOP's pension liability at an investment policy subcommittee meeting held by them. In addition, on information and belief, Ferree discussed the pension funding issue with SRR in June 2016, but SRR still did not include the pension liability in its valuation.

504. SRR also knew that the value of the stock was material to the Plan and the Plan Participants because it would be used to set the share price to be used for Plan transactions, including deferrals to the Plan and repurchases of shares.

505. Indeed, SRR intended the Plan and the Plan Participants to rely on their valuation of the Company's stock in purchasing stock back from employees.

506. The Plan and the Plan Participants believed SRR's appraisal of fair market value.

507. The Plan and the Plan Participants had no way to know that SRR had overstated the value of the stock because SRR's full valuation reports were never shared with them. In addition, SRR's wrongdoing was as described above.

508. In reliance on SRR's valuations, the Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses over time.

509. The Plan justifiably relied on SRR's opinions of the fair market value of PDC stock.

510. As a result of SRR's determination of the Company's stock price and the Plan and the Plan Participants' justifiable reliance there on, the Plan and the Plan Participants were damaged.

## COUNT XI
## NEGLIGENT MISREPRESENTATION AGAINST WILLAMETTE

511. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

512. Willamette was hired by State Street, in its capacity as trustee of the Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock.

513. Willamette served as State Street's independent appraiser from 2001 to mid-2004.

514. Willamette knew that its appraisal would be used by State Street to set the fair market value of PDC stock.

515. Willamette knew that the value of the stock was material to the Plan and the Plan Participants because it would be used to set the share price to be used for Plan transactions.

516. Willamette knew that its opinion of the stock's value would be shared with the Plan and Plan Participants. Willamette also knew that the Plan Participants would rely on Willamette's opinion of the stock's value in making decisions to, among other things, make

117

deferrals to the plan, request statutory or additional diversification, request distributions from the ESOP after terminating employment, and/or retire or otherwise terminate employment at Appvion.

517. Indeed, Willamette intended the Plan and the Plan Participants to rely on their valuation of the Company's stock in purchasing stock back from employees.

518. During its tenure are the Plan's independent appraiser, Willamette determined the value of PDC's stock as described above. Willamette reached these determinations even though Willamette, on information and belief, knew that its valuation analyses contained significant flaws, including the following:

(a) They relied heavily on projections of future earnings created by Appvion's management, even though Appvion consistently missed these projections.

(b) They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

(c) They failed to include material liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities.

(d) They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

(e) They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the Plan Document or the Security Holder's Agreement.

118

519.   Because of these flaws, the stock prices as determined by Willamette overstated the value of PDC stock by a significant degree.

520.   Because of these flaws, Willamette, on information and belief, had no reasonable grounds for believing that the stock prices it provided for the Plan's use were accurate and that they correctly stated the fair market value of the stock. Willamette was therefore negligent in determining the fair market value of the stock.

521.   The Plan and the Plan Participants believed Willamette's appraisal of fair market value.

522.   The Plan and the Plan Participants had no way to know that Willamette had overstated the value of the stock because Willamette's full valuation reports were never shared with them.  In addition, Willamette's wrongdoing was concealed as described above.

523.   In reliance on Willamette's valuations, the Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the Plan over time.

524.   The Plan justifiably relied on Willamette's opinions of the fair market value of PDC stock.

525.   As a result of Willamette's determination of the Company's stock price and the Plan and the Plan Participants' justifiable reliance there on, the Plan and the Plan Participants were damaged.

**COUNT XII**
**NEGLIGENT MISREPRESENTATION AGAINST SRR**

526.   Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

527. SRR was hired by State Street, in its capacity as trustee of the Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock from late 2004 through the end of 2012.

528. SRR was hired by Reliance, in its capacity as trustee of the Plan, to serve as Reliance's independent appraiser in determining the fair market value of PDC stock for the semi-annual valuations of PDC stock in 2013.

529. SRR was hired by Argent, in its capacity as trustee of the Plan, to serve as Argent's independent appraiser in determining the fair market value of PDC stock from 2014 through mid-2017.

530. SRR knew that its appraisal would be used by State Street, Reliance, and Argent to set the fair market value of PDC stock.

531. SRR knew that the value of the stock was material to the Plan and the Plan Participants because it would be used to set the share price to be used for Plan transactions.

532. SRR knew that its opinion of the stock's value would be shared with the Plan and Plan Participants. SRR also knew that the Plan Participants would rely on SRR's opinion of the stock's value in making decisions to, among other things, make deferrals to the plan, request statutory or additional diversification, request distributions from the ESOP after terminating employment, and/or retire or otherwise terminate employment at Appvion.

533. Indeed, SRR intended the Plan and the Plan Participants to rely on their valuation of the Company's stock in purchasing stock back from employees.

534. During its tenure are the Plan's independent appraiser, SRR determined the value of PDC's stock as described above. SRR reached these determinations even though SRR knew that its valuation analyses contained significant flaws, including the following:

(a)     They relied heavily on projections of future earnings created by Appvion's management, even though Appvion consistently missed these projections.

(b)     They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

(c)     They failed to include material liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities.

(d)     They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

(e)     They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the Plan Document or the Security Holder's Agreement.

535.    Because of these flaws, the stock prices as determined by SRR overstated the value of PDC stock by a significant degree.

536.    Because of these flaws, SRR had no reasonable grounds for believing that the stock prices it provided for the Plan's use were accurate and that they correctly stated the fair market value of the stock. SRR was therefore negligent in determining the fair market value of the stock.

537.    The Plan and the Plan Participants believed SRR's appraisal of fair market value.

538.    The Plan and the Plan Participants had no way to know that SRR had overstated the value of the stock because SRR's full valuation reports were never shared with them. In addition, SRR's wrongdoing was concealed as described above.

539.    In reliance on SRR's valuations, the Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the Plan over time.

540.    The Plan justifiably relied on SRR's opinions of the fair market value of PDC stock.

541.    As a result of SRR's determination of the Company's stock price and the Plan and the Plan Participants' justifiable reliance there on, the Plan and the Plan Participants were damaged.

## COUNT XIII
### WISCONSIN SECURITIES FRAUD AGAINST THE TRUSTEE DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND SRR

542.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

543.    The item offered/sold was a security as defined by Wisconsin law.

544.    PDC's stock is a security under Wisconsin Uniform Securities Law Section 551.102(28).

545.    The Trustee Defendants Committed Wisconsin Securities Fraud

546.    The Trustee Defendants directly or indirectly, intentionally and willfully made untrue statements of material fact and failed state material facts necessary to make their statements made not misleading as described above.

547.    The Trustee Defendants made these untrue statements and material omissions in connection with the offer, sale, or purchase of a security in this state.

548.    The Trustee Defendants acted willfully because they knew that they were making an untrue statement of material fact and were failing to state material facts necessary to make

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 122 of 138   Document 1

their statements made not misleading to the Plan and the Plan Participants in connection with the sale of securities.

**The Prior Committee Defendants Committed Wisconsin Securities Fraud**

549.    Certain of the Prior Committee Defendants (Richards, Ferree, Arent, Willetts, and Gilligan) directly or indirectly, intentionally and willfully made untrue statements of material fact and failed state material facts necessary to make their statements made not misleading as described above.

550.    These Prior Committee Defendants made these untrue statements and material omissions in connection with the offer, sale, or purchase of a security in this state.

551.    These Prior Committee Defendants acted willfully because they knew that they were making an untrue statement of material fact and were failing to state material facts necessary to make their statements made not misleading to the Plan and the Plan Participants in connection with the sale of securities.

**The Director Defendants Committed Wisconsin Securities Fraud**

552.    Certain of the Director Defendants (Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan) directly or indirectly, intentionally and willfully made untrue statements of material fact and failed state material facts necessary to make their statements made not misleading as described above.

553.    Director Defendants made these untrue statements and material omissions in connection with the offer, sale, or purchase of a security in this state.

554.    Director Defendants acted willfully because they knew that they were making an untrue statement of material fact and were failing to state material facts necessary to make their

statements made not misleading to the Plan and the Plan Participants in connection with the sale of securities.

## SRR Committed Wisconsin Securities Fraud

555.    SRR directly or indirectly, intentionally and willfully made untrue statements of material fact and failed state material facts necessary to make their statements made not misleading as described above.

556.    SRR made these untrue statements and material omissions in connection with the offer, sale, or purchase of a security in this state.

557.    SRR acted willfully because they knew that they were making an untrue statement of material fact and were failing to state material facts necessary to make their statements made not misleading to the Plan and the Plan Participants in connection with the sale of securities.

558.    Plaintiff has been damaged as the result of the above-listed Prior Committee Defendants', the above-listed Director Defendants', and SRR's conduct.

## COUNT XIV
## FEDERAL SECURITIES FRAUD AGAINST THE TRUSTEE DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND SRR

559.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

## The Trustee Defendants Committed Securities Fraud

560.    While it was acting as Trustee to the Plan in 2012 and 2013, State Street directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered State Street's statements misleading as described above.

561. While it was acting as Trustee to the Plan in 2013 and 2014, Reliance directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered Reliance's statements misleading as described above.

562. While it was acting as Trustee to the Plan in 2014 through 2017, Argent directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered Argent's statements misleading as described above.

563. The Trustee Defendants untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

564. Plaintiff has been damaged as a result of the Trustee Defendants' conduct.

**Prior Committee Defendants Committed Securities Fraud**

565. From 2012 through 2017, certain of the Prior Committee Defendants (Richards, Ferree, Arent, Willetts, and Gilligan) directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered the Prior Committee Defendants' statements misleading as described above.

566. These Prior Committee Defendants' untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

567. Plaintiff has been damaged as a result of these Prior Committee Defendants' conduct.

**Director Defendants Committed Securities Fraud**

568. From 2012 through 2017, certain of the Prior Committee Defendants (Richards, Ferree, Arent, Willetts, and Gilligan) directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered State Street's statements misleading as described above.

Case 1:18-cv-01861-WCG   Filed 11/26/18   Page 125 of 138   Document 1

569. These Director Defendants' untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

570. Plaintiff has been damaged as a result of these Director Defendants conduct in an amount to be determined at trial.

## SRR Committed Securities Fraud

571. From 2004 through 2017, SRR directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered their statements misleading as described above.

572. SRR's untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

573. Plaintiff has been damaged as a result of SRR's conduct in an amount to be determined at trial.

## COUNT XV
## BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AGAINST HOULIHAN LOKEY AND LOUIS PAONE

574. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

575. ERISA §1002(21), 29 U.S.C. §1002(21) defines a fiduciary as a person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so…

576. Houlihan Lokey and Louis Paone are ERISA plan fiduciaries because they rendered investment advice directly to the Plan Participants during the 2001 Road Show.

577. ERISA §404(A)(1), 29 U.S.C. §1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and

beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

578.    Houlihan Lokey breached its fiduciary duties by:

(a)    Allowing Buth to insinuate that Houlihan Lokey was the Plan Participants' investment advisor during the 2001 Roadshow;

(b)    By represented that it was providing an independent validation of the buyout transaction;

(c)    By representing that the highly leverage buy out was an "extraordinary" deal for the Plan Participants; and

(d)    By failing to inform the Plan and the Plan Participants that it was receiving up to $8.1 million when the buyout transaction closed.

579.    These breaches constitute breaches of duties of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B).

580.    Houlihan Lokey's and Paone's breaches damaged the ESOP Plan.

**COUNT XVI**
**BREACH OF FIDUCIARY DUTY (CORPORATE WASTE) UNDER WISCONSIN LAW AGAINST THE DIRECTOR DEFENDANTS AND THE PRIOR COMMITTEE DEFENDANTS**

581.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

127

582. Corporate officers and directors owe a fiduciary duty to act in good faith and to deal fairly in the conduct of all corporate business. This duty extends to the corporation and to its shareholders.

583. In particular, directors of a corporation may not use their position of trust to further their private interests.

584. The ESOP Plan was PDC's sole shareholder. Accordingly, the officers and directors owed a fiduciary duty to the ESOP as PDC's sole shareholder.

585. The ESOP Plan seeks recovery for damages to it in its capacity as sole shareholder of PDC. Accordingly, the ESOP Plan has standing to bring this claim directly.

**Appvion Management and Directors Received Excessive Compensation**

586. Appvion management received excessive base salaries, combined with substantial incentive payments from not only an annual bonus plan, but additional incentive plans including, but not limited to, the Long Term Incentive Plan discussed above , the Restricted Stock Unit Plan discussed above , the Executive Nonqualified "Excess" Plan discussed above.

587. Examples of the effects of these compensation plans include:

    (a)    In 2012, Appvion had a net loss of over $148 million. However, Richards received total compensation in 2012 of over $4.2 million, including his $800,000 salary, a discretionary bonus of $376,000, incentive plan compensation of $1.2 million, as well as awards under the LTIP program, Restricted Stock Units, and various other compensation.

    (b)    When Mark Richards retired in 2015, he received a $1.2 million payment under his Termination Protection Agreement, in addition to $30,000 in

outplacement services. However, the terms of the Termination Protection Agreement should not have been triggered by Richards' retirement.

(c)      On information and belief, certain officers received compensation in connection with the 2015 Encapsys sale.

(d)      As of the December 2015 valuation, the synthetic equity created by the LTIP, the RSU Plan, and the Non-Employee Director Deferred Compensation Plan (discussed above) constituted approximately 27.4% ownership of PDC, even though it was allegedly owned entirely by the ESOP.

588.     Salaries for Appvion management employees were set by the Compensation Committee of the Board of Directors. However, at all times after 2007, two out of the three members of the Compensation Committee were appointed to the Board of Directors unilaterally by the CEO. The third member of the Board of Directors was appointed jointly by the CEO and the ESOP Trustee, but the ESOP Trustee did not have authority to remove that director without agreement from the CEO. Accordingly, the Compensation Committee was not independent.

589.     The incentive plans were amended repeatedly over the years to increase benefits due to directors and officers.

590.     Compensation to directors and officers was in excess of market rates and was not warranted based on Appvion's declining revenues, excessive leverage, and negative income for most years.

591.     The Director Defendants willfully compensated Appvion management employees and themselves excessively for the services they provided to Appvion and PDC.

592.     The excessive compensation to directors and officers reduced the cash available to the ESOP and reduced the value of the ESOP's shares.

## **The Sale of Encapsys**

593.     As discussed above Appvion's Encapsys unit was Appvion's most profitable division by approximately 2014, and it was a growing segment while Appvion's other divisions were struggling.

594.     In 2015, Appvion's directors and officers agreed to sell the Encapsys unit to a third party.  The sale was completed in August 2015.

595.     While Appvion was able to use the proceeds from the sale of Encapsys to pay down some of its debt, the sale of its most profitable division crippled Appvion.

596.     Even though Appvion had net income of over $150 million in 2015, that income came largely from the sale of Encapsys and Appvion ended the year with less than $2 million in cash.

597.     Selling the Encapsys unit also significantly reduced Appvion's assets.

598.     Without the Encapsys unit, Appvion was not able to continue operating as a going concern for very long, and Appvion filed for bankruptcy 2 years later.

599.     The Director Defendants should not have agreed to the sale of Encapsys knowing that it would cripple Appvion or in the alternative, should have recognized the impact on PDC's value.

600.     The sale of Encapsys significantly reduced the value of the ESOP's shares of PDC stock.

**The Inflated Stock Valuations Caused The Company To Waste its Cash**

601.     The Director Defendants allowed the Plan to repeatedly purchase shares from the Plan and Plan Participants at a price above fair market value and repeatedly bought shares on behalf of the Plan Participants at a price above the shares fair market value.

602.     As a result, Director Defendants caused Appvion to loan cash to PDC in order to fund the Plan's repurchase obligations.

603.     Because Appvion was loaning more to PDC than it should have, based on the inflated share price, Appvion no longer had the cash available to repay its own debt and make capital improvements.

604.     This damaged the value of Plaintiff's shares.

605.     No reasonable director would have been willing to allow the Plan to pay more than the fair market value when repurchasing shares nor would it have been willing to loan funds in excess of what was necessary to cover the cost of the fair market value of the shares.

**Derivative Claims**

606.     If the Plaintiff does not have standing to bring the above claim directly, Plaintiff pleads in the alternative that it has standing to bring the above claim derivatively on behalf of the corporation.

607.     Plaintiff did not make efforts to secure from Appvion this cause of action because the Board of Directors reviewing a derivative demand for this claim would not be able to consider the demand impartially because of the years of fraudulent and deceiving conduct the Board of Directors either directly took part in, assisted in covering up , or benefited from as more fully described above.

608. Additionally, these same Director Defendants were appointed by either CEOs that are being sued for their negligent, intentional, and/or fraudulent conduct as described in Counts 3, 4, 6, 13, 14, 16 or Trustee Defendants who are being sued for their negligent, intentional, and/or fraudulent conduct as described in Counts 1, 4, 6, 7.

609. Moreover, Grant Lyon was appointed as the sole member of the ESOP Committee in August 2017. After a preliminary investigation, Lyon presented the following information to Appvion's Board of Directors on September 1, 2017:

(a) Argent had not run a process for selecting a valuation firm;

(b) Appvion consistently failed to achieve its financial projections but neither Argent nor SRR adjusted the projections;

(c) There was no deduction given for unfunded pension/post-retirement liability;

(d) Appvion was still allowing employees to invest new funds into ESOP; and

(e) There was no real forum for explaining financial condition or SRR per share valuations.

610. Lyon presented to the Board of Directors, yet none of the Director Defendants have taken any steps to seek redress for the corporate waste that occurred from 2001 through 2017.

## COUNT XVII
## FRAUD AGAINST HOULIHAN LOKEY AND PAONE

611. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

612. PDC hired Houlihan Lokey in 2001 to issue a fairness opinion in connection with the formation of the ESOP Plan, Buth, Karch and others were trying to convince Appvion employees to approve.

613. Houlihan Lokey and Paone knew that its opinion would be used by potential Employee Participants to determine whether or not to approve the proposed ESOP Plan because Paone attended a road show on 2 August 2001 where he gave a presentation to potential Employee Participants.

614. Indeed, Houlihan Lokey and Paone intended the potential Employee Participants to rely on its assessment that the proposed buy out was fair, a "good deal" and an "extraordinary opportunity."

615. At the road shows held in August 2001, Karch in the presence of Paone form Houlihan Lokey, represented that Paone was "our investment banker" leading employees to falsely believe that they could rely on Paone's statements.

616. Additionally Karch, again in Paone's presence, stated that Paone was going to provide an "independent view and validation" of the ESOP Plan.

617. Paone then went on to show Appvion employees a slide titled "fairness of purchase price" while representing to Appvion employees that he was going to "help validate the purchase price of the transaction and financial aspects as to why they are so attractive and why [the employees are] getting such a good deal."

618. As a result of Houlihan Lokey's and Paone's representations that the potential Employee Participants were getting a good deal and that the ESOP Plan was an extraordinary opportunity the ESOP Plan was formed.

619. However, the ESOP Plan was not a good deal for the ESOP Plan or its Employee Participants.

620. Instead the approval of the ESOP Plan allowed Prior Committee Defendants and Director Defendants to pad their bank accounts as described above while the Plan was losing money.

621. Additionally, Houlihan Lokey and Paone failed to inform employees that if the employees approved the ESOP Plan, Houlihan Lokey stood to gain approximately $8.1 million and if the employees did *not* approve the ESOP Plan, Houlihan Lokey would only receive $100,000.00.

622. The misrepresentation or omission was material because it concealed a material conflict of interest in advising that the purchase price was fair and that employees should invest in the ESOP.

623. The ESOP Plan and the Employee Participants had no way to know that Houlihan Lokey stood to gain $8.1 million only if they approved the ESOP Plan.

624. As a result of Houlihan Lokey and Paone's fraudulent representations and omissions, the ESOP Plan and its Employee Participants were damaged.

**COUNT XVIII**
**BREACH OF FIDUCIARY DUTY UNDER WISCONSIN LAW AGAINST HOULIHAN LOKEY AND PAONE**

625. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

626. Houlihan Lokey and Paone owed the ESOP Plan fiduciary duties because they allowed Karch to introduce them to the employees who would be voting on the existence of the plan as "our investment banker". Additionally, Houlihan Lokey and Paone provided financial

advice directly to the individuals responsible for approving or declining to approve the ESOP Plan.

627.    With their representations as discussed throughout this Complaint Houlihan Lokey and Paone directly made representations as to the advisability of investing in the ESOP Plan.

628.    Houlihan Lokey and Paone breached their fiduciary duties by, at least:

(a)    Representing to employees that it was providing an independent view and validation of the ESOP Plan proposed to the employees;

(b)    Representing to employees that the proposed ESOP Plan was a "great deal" and an extraordinary opportunity; and

(c)    Failing to disclose to the employees that if they approve the ESOP Plan, Houlihan Lokey would receive up to $8.1 million but if the employees declined to approve the ESOP Plan Houlihan Lokey would only receive $100,000.00.

629.    As a result of these breaches, Plaintiff was damaged.

## COUNT XIX
## NEGLIGENT MISREPRESENTATION AGAINST HOULIHAN LOKEY

630.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

631.    PDC hired Houlihan Lokey in 2001 to issue a fairness opinion in connection with the formation of the ESOP Plan, Buth, Karch and others were trying to convince Appvion employees to approve.

632.    Paone from Houlihan Lokey attended road shows in August 2001 in order to convince Appvion employees to approve the establishment of an ESOP Plan.

633. At the road shows, Paone showed Appvion employees a slide titled "fairness of purchase price" while representing to Appvion employees that he was going to "help validate the purchase price of the transaction and financial aspects as to why they are so attractive and why [the employees are] getting such a good deal."

634. Paone also stated that he believed that the potential Employee Participants would determine that the creation of the ESOP Plan was an "extraordinary opportunity."

635. As a result of Houlihan Lokey's and Paone's representations that the potential Employee Participants were getting a good deal and that the ESOP Plan was an extraordinary opportunity the ESOP Plan was formed.

636. However, the ESOP Plan was not a good deal for the ESOP Plan or its Employee Participants.

637. Instead the approval of the ESOP Plan allowed Prior Committee Defendants and Director Defendants to pad their bank accounts as described above while the Plan was losing money.

638. Additionally, Houlihan Lokey and Paone failed to inform employees that if the employees approved the ESOP Plan, Houlihan Lokey stood to gain approximately $8.1 million and if the employees did *not* approve the ESOP Plan, Houlihan Lokey would only receive $100,000.00.

639. The ESOP Plan and the Employee Participants had no way to know that Houlihan Lokey stood to gain $8.1 million only if they approved the ESOP Plan.

640. This misrepresentation or omission was material because it concealed a material conflict of interest in advising that the purchase price was fair and that employees should invest in the ESOP.

641.    As a result of Houlihan Lokey and Paone's fraudulent representations and omissions, the ESOP Plan and its Employee Participants were damaged.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgement to be entered against Defendants on all claims, and request that the Court order the following relief:

A.      Declare that each of the above fiduciary Defendants breached his, her or its fiduciary duties under ERISA.

B.      Require each fiduciary found to have breached his/her/its fiduciary duties to the Plans to jointly and severally restore all losses to the Plan that resulted from the breach of fiduciary duties, or by virtue of liability pursuant to ERISA § 405, to disgorge any profits.

C.      Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

D.      Award pre-judgment and post-judgment interest.

E.      Award any such other relief that the Court determines that Plaintiff is entitled pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.

## JURY DEMAND

Plaintiff demands a jury trial on all claims to which it is entitled a jury.

DATED this 26th day of November 2018.

**PREVIANT LAW FIRM, S.C.**

By:   s/Frederick Perillo
       Frederick Perillo
       Sara J. Geenen
       310 West Wisconsin Avenue, Suite 100
       NW
       Milwaukee, WI  53203

       -and-

       Leo R. Beus (Admission pending)
       L. Richard Williams  (Admission pending)
       Abigail Terhune (Admission pending)
       Ashley Williams Hale (Admission pending)

       **BEUS GILBERT PLLC**
       701 North 44th Street
       Phoenix, AZ  85008-6504
       480-429-3001
       Fax:  480-429-3100
       docket@beusgilbert.com

       Attorneys for Plaintiff