# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | | |
|---|---|---|
| Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon in his capacity as the ESOP Administrative Committee of Appvion, Inc., | ) ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) ) | Civil Action No.: 1:18-cv-01861-WCG |
| | ) | |
| Douglas P. Buth and Gayle Buth, husband and wife; Paul J. Karch and Anne Karch, husband and wife; Mark Richards and Jeanne Richards, husband and wife; Tom Ferree and Carol J. Ferree, husband and wife; Rick Fantini and Debra L. Fantini, husband and wife; Dale E. Parker and Debrah Parker, husband and wife; Angela Tyczkowski and Mark Tyczkowski, husband and wife; Kerry Arent and Timothy Arent, husband and wife; Kent Willetts and Andrea Willetts, husband and wife; Susan Scherbel and Thomas Scherbel, husband and wife; Ronald Pace and Teresa Pace, husband and wife; Stephen Carter and Lisa L. Carter, husband and wife; Kathi Seifert, an individual; Andrew Reardon and Michele Reardon, husband and wife; Terry Murphy and Mary E. Murphy, husband and wife; Mark Suwyn and Patricia Suwyn, husband and wife; Kevin Gilligan and Angela Gilligan, husband and wife; Louis A. Paone and Jane Doe Paone, husband and wife; Houlihan Lokey Capital, Inc. (f/k/a Houlihan Lokey Howard & Zukin Capital), a California corporation; Houlihan Lokey Financial Advisors, Inc. (f/k/a Houlihan Lokey Howard & Zukin Financial Advisors, Inc.), a California corporation; State Street Bank and Trust Company, N.A., a nationally chartered trust company; Kelly Driscoll and David Driscoll, husband and wife; Sydney Marzeotti and Stephen Marzeotti, husband and wife; Argent Trust Company, N.A., a Tennessee | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Demand For A Jury Trial |

corporation; Reliance Trust Company, a )
Georgia corporation; Howard Kaplan and )
Wendy Kaplan, husband and wife; Stephen )
Martin and Jane Doe Martin, husband and )
wife; David Williams and Jane Doe Williams, )
husband and wife; Willamette Management )
Associates, Inc., an Oregon corporation; )
Scott D. Levine and Debora Levine, husband )
and wife; Aziz El-Tahch and Ayelish M. )
McGarvey, husband and wife; Robert Socol )
and Lynn Socol, husband and wife; Stout )
Risius Ross, Inc., a Michigan limited liability )
company; Stout Risius Ross, LLC, an )
Michigan limited liability company, DOES 1 )
through 50, ABC Corporations 1-5, DEF )
Partnerships 1-5, GHI Limited Partnerships 1- )
5, and JKL Limited Liability Companies 1-5, )
)
Defendants. )

---

# FIRST AMENDED COMPLAINT

---

Plaintiff, the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP Plan"), by and through the ESOP Administrative Committee of Appvion, Inc. (the "ESOP Committee"), and for its First Amended Complaint ("FAC") against the Defendants alleges as follows:

## I.  **INTRODUCTION**

### A.  **The Defendants Participated in "Fraud or Concealment" Regarding the True Value of the PDC Stock.**

1.      This FAC seeks to recover damages suffered by the ESOP Plan and ultimately by its employee participants ("Employee Participants"), most of whom were union members.  When the operating paper company, Appvion, Inc. ("Appvion") filed bankruptcy in October 2017, the stock in its parent company, Paperweight Development Corp. ("PDC"), which was 100% owned by the ESOP Plan, became worthless.  As a result, the ESOP Plan and its Employee Participants

suffered hundreds of millions in damages, including those resulting from the loss of all of the retirement funds invested in the ESOP Plan.

2.    As described in this FAC, these and other damages were caused by, among others, the Defendants' breaches of fiduciary duties and fraudulent misrepresentations and omissions to the ESOP Plan. These breaches of fiduciary duty and misrepresentations included:

- Inducing Employee Participants to take money saved in their 401(k) plans and use it to provide the $106 million down payment needed to fund the ESOP Plan's purchase of 100% of PDC's stock in November 2001.  Included in these fraudulent misrepresentations was that Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") had acted independently in connection with its expansive role in the ESOP Plan; and

- Inflating the appraised value of the PDC stock in each semi-annual appraisal from 2001 through the 2017 Appvion bankruptcy by, among other issues, failing to make deductions for as much as $175.5 million in unfunded pension/post-retirement related liabilities.

3.    Because the Defendants engaged in fraud or concealment that prevented the ESOP Plan and its Employee Participants from learning of the Defendants' breaches of fiduciary duties, the ESOP Plan and its Employee Participants were unable to discover the fiduciary breaches until at least August 2017, after an independent party was appointed to the ESOP Committee and he was able to begin investigating the ESOP's finances.  For example, the ESOP appraisal reports were not provided to the Employee Participants, and Appvion management selectively disclosed factors that supposedly accounted for and supported the high stock valuations, while hiding key factors that would have lowered the stock valuations.  Without the

ability to review the appraisals, the ESOP Plan and the Employee Participants could not discover that the stock price was substantially inflated and therefore could not discover Defendants' fraud or omissions and breaches of fiduciary duties.

**B.** **Appvion Management and Professional Advisors Fraudulently Persuaded Appvion's Employees to Buy PDC Stock.**

4.　　In early 2001, Appvion management, spearheaded by then-CEO Douglas Buth and General Counsel Paul Karch, proposed an employee buyout of the company for $810 million using money from Appvion employees' individual 401(k) retirement funds.　Appvion employees had accumulated the funds over time by directing portions of their paychecks into their retirement accounts.　According to Appvion management, the buyout required employees to cumulatively agree to invest at least $100 million of their 401(k) savings into the ESOP Plan, or the deal would not go through.　However, Buth and Karch both stood to gain incentive payments that were linked to the final purchase price, but only if the purchase price was at least $700 million.

5.　　Appvion management (including Buth, Karch, and other executives) and professional advisors, including Houlihan Lokey (financial advisor), Willamette (valuation firm), State Street (the ESOP Plan's trustee) and Principal (the plan administrator) proposed the ESOP Plan to the Appvion employees.　They engaged in various road shows to sell the scheme to the employees.

6.　　A video of a road show on 2 August 2001 shows Buth, Karch and Kerry Arent (Appvion's Director of Benefits and Compensation) side-by-side with purportedly "independent" ESOP professionals, Louis Paone (Houlihan), Kelly Driscoll (State Street), and Rick Braun (Willamette) making repeated misrepresentations/omissions to Appvion's employees in order to convince them that they should seize upon this "unique one-time opportunity" to transfer money

out of their 401(k) plans to buy PDC stock. They explained that if the employees came up with at least $100 million, the company could borrow the rest (about $650 million) to buy 100% of PDC's stock.

7.    Referring to the employees' opportunity to invest in PDC's stock, Buth explained: "[I]t just does not happen more than once in a lifetime and we're very fortunate to be employees here at this time." Describing the financial return, he represented: "For every dollar that we pay down in debt, it turns into our equity. So the $100 million that we put down on this deal will grow by $500 million in less than five years if we achieve our Base Case plan . . . . The upside you guys can figure out because my management team is only focused on one thing, beating that Base Case. That's what we are paid to do." And the professional advisors agreed.

8.    Houlihan played a central role in the ESOP buyout. The retainer agreement, signed by Paone himself, documents that Houlihan would orchestrate virtually all elements of the ESOP Plan including the negotiations of the stock purchase price and the selection of the "ESOP Team," one member of which was the ESOP Trustee, State Street Global Advisors.

9.    Houlihan was also retained to provide a "fairness opinion" in support of the transaction. However, under Houlihan's retainer agreements (which were not disclosed), Houlihan stood to gain a contingent fee, calculated as a percentage of the final purchase price, but only if the deal closed.

10.    However, Buth failed to disclose this conflict of interest. Instead, he fraudulently represented that Houlihan was independent. In a 25 July 2001 letter to Appvion employees, Buth fraudulently represented that Houlihan's Paone would present an "independent validation" of the ESOP transaction. An agenda distributed to employees describing the August 2001 road show similarly said Paone would give "Independent Validation of Deal Terms."

11.     At the 2 August 2001 road show, Karch again fraudulently introduced Paone as being independent and instrumental in negotiating the price at which the ESOP Plan would buy the company from the seller: "The first person who is going to provide an independent view and validation of our deal here is Lou Paone, our investment banker from Houlihan Lokey Howard and Zukin. . . . He helped us negotiate with AWA [the seller] and arrange financing."

12.     Under the fraudulent pretext of being an independent professional, Paone then pushed the deal: "Paul had mentioned that one of the things that I'm going to do this evening is help validate the purchase price of the transaction and the financial aspects as to why they are so attractive and why you're getting such a good deal."

13.     Paone explained that while recent transactions of paper related companies had sold at an average of 9.1 times EBITDA—a measure of the company's operating cash flow, the Appvion ESOP Plan was buying Appvion for the "attractive price" of "a little over four times your company's year 2000 operating cash flow."

14.     Paone concluded: "I think in the coming slides and the discussion that you are going to hear, you're going to feel just like me that this is an extraordinary opportunity and one that could generate significant value for all of you."

15.     No one disclosed to employees that Houlihan and Paone had a conflict of interest in advising that the buyout transaction was fair. Ultimately, Houlihan stood to gain as much as $8.1 million in fees (1% of the final buyout price of $810 million) when the transaction closed. Like Buth and Karch, Houlihan stood to gain more, the higher the purchase price.

16.     Karch then introduced Kelly Driscoll from State Street which he described as "a very large and successful financial institution which manages money for lots of people in different ways, but specifically acts as trustee for many ESOP's."

6

17.     As the ESOP Trustee, Driscoll then represented that it was her team's job to "represent the ESOP from an investment perspective. . . . [W]e want to make sure we analyze this investment, we really understand the business of Appleton Papers. . . . [W]e are very comfortable with the valuation. . . . So, we are very pleased, quite frankly, on the price we were able to get with the seller. We think we got a very good price."

18.     State Street was supported in its opinion of value by the appraisal firm Willamette. Driscoll explained: "[Rick Braun from Willamette] had a whole team who was really looking at the financial aspects and the valuation aspects of this transaction … ." She then represented: "So, we had a lot of people, a lot of experts looking out for the interests of the ESOP."

19.     Similarly, Buth told employees that they were paying the right price for the transaction and that they were getting a good deal. For example, Buth stated that the deal they were offering was "lucrative" and a "wonderful opportunity." Buth also stated that Driscoll from State Street would not overpay for stock and that Driscoll would tell the employees that they underpaid for the transaction.

20.     Braun, of Willamette, then represented that Willamette would determine the value of the stock: "[W]e will come in twice a year in order to … provide a full report to the trustee and will also provide management and the board of directors with enough information so they understand what it is we did, why it makes sense, at least why we think it made sense and how we feel that is a supportable value for purposes of determining what your value is going forward."

21.     In their road show presentation, Buth, Karch and Paone downplayed the risks and appropriateness of transferring funds from an existing employment retirement plan to a new, highly-leveraged, undiversified ESOP.

22.     The ESOP Plan was analogized to a mortgage on a home even though the risks of a home mortgage are not at all comparable to a highly leveraged buyout transaction. They even compared the opportunity of owning Appvion stock to the benefits of owning shares of Microsoft.

23.     BCI's Prodoehl told employees, among other things, that the buyout opportunity was a once in a lifetime opportunity to get rich by concentrating your investment in one stock.

24.     No one disclosed to any of the employees considering the buyout that Houlihan would receive a fee contingent on the success of the deal amounting to as much as $8.1 million dollars if the employees agreed to the buyout.

25.     Employees ultimately approved the transaction, contributing approximately $107 million from their 401(k) accounts in order to complete the buyout.

26.     The Transaction closed on 9 November 2001.

27.     The Appvion employees were convinced by the fraudulent representations/omissions. They cashed out over $106 million from their individual 401(k) plans to invest in the ESOP Plan, investing their life savings, earned paycheck by paycheck, in a very risky transaction in which every dollar the employees invested was encumbered with approximately $6.60 in debt.

28.     The average size of ESOP investment made from each employee's 401(k) account was $50,000 of hard-earned dollars earned over substantial time periods. The money went from diversified, liquid, marketable 401(k) investments to an ESOP Plan from which they would be

unable to access their money prior to retirement, termination, death, or disability, except under limited circumstances. And then, only if the stock retained some value.

**C.** **PDC's Stock Valuation Rises from $10 to $33.62 And Management Sells its Stock.**

29. Following the 2001 buyout, Appvion employees continued to defer a portion of their paychecks to the ESOP to buy PDC stock, instead of investing in more reliable, diversified, marketable and liquid 401(k) accounts. Appvion also made ongoing matching contributions of PDC stock to the ESOP instead of paying cash to the employees' 401(k) accounts for some period of time. These ongoing employee contributions to the ESOP were used to meet share repurchase obligations under the ESOP, and any excess would be used to provide cash to Appvion.

30. Appvion management, including Buth, Karch and others, urged continued employee investment in the ESOP Plan. For example, Buth represented to the ESOP Plan and the Employee Participants that it was achievable for the PDC stock price to reach $100 from its initial price of $10. As an ERISA fiduciary due to his role on both the ESOP Committee and the Appvion/PDC Board of Directors, it was inappropriate for Buth to make these kinds of representations.

31. For the next six years, Appvion reported strongly increasing semi-annual stock valuations that seemed to support the road show recommendation to participate; however, these stock valuations were fraudulent and did not accurately represent the true value of PDC stock.

32. For example, from when the transaction closed on 9 November 2001 until the first valuation on 31 December 2001, the stock value rose by 28% from $10.00 to $12.83, based upon fraudulent valuations, even though the company's fundamental health did not change.

9

33.     From December 2001 through June 2004, Plaintiff believes, although Plaintiff has no access to the valuation reports, that Willamette generated fraudulent semi-annual appraisals. That is because in 2004, Willamette employees joined SRR, and SRR took over the appraisals beginning in December 2004.  Therefore, Plaintiff believes that the Willamette appraisals were conducted in the same manner.  The ESOP Trustee was at all times responsible for approving the appraisals and releasing the semi-annual stock price.

34.     The appraised stock price rose from $10 at the ESOP formation in November 2001, to $33.62 in December 2006.  At the same time, management also implemented, and Appvion Board of Directors approved, various incentive programs that awarded themselves phantom stock and deferred compensation tied to the increase in the value of PDC's stock.

35.     For example, on 8 August 2006, Appvion fraudulently reported that the Company stock had risen 9.5% for the period, for a 213% increase since the ESOP formation; however, this number was inflated and not a correct valuation:



8/8/2006

Company Stock Value Increases Over 9 Percent for First Half 2006

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2006 and determined the per share value to be $31.27. That means the share value increased 9.5% for the period January 1, 2006 through June 30, 2006. The previous value of PDC stock was $28.56 per share

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 10 of 206   Document 77

> As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $156,500, an increase of 213% since the November 2001 buyout.

36.     During this period (2005 – 2007) when Appvion's fraudulently appraised value was at or near its highest, virtually all of Appvion's top management, including Buth and Karch, armed with inside information about Appvion's true financial condition, left the company and began the process of cashing out of their personal investment in PDC stock, as well as phantom stock and deferred compensation rights.

37.     For example, Buth left on 1 July 2005, retiring at the age of 49. He was able to capture a gain of more than $852,000 for his stock. Karch left in March 2007, his gain was $304,000. These departures, timed to coincide with the fraudulently highest stock valuations, caused the ESOP Plan and Appvion to drastically overpay these executives and drained Appvion's critical cash reserves. The Defendants' inside information regarding the true value of the PDC stock was withheld from the ESOP Plan and its Employee Participants.

**D.     Appvion Ultimately Files for Bankruptcy**

38.     From December 2007 until June 2010, PDC's stock values declined from $33.41 to $12.03. The decline was blamed on the impact of the Great Recession and other factors. In December 2010, the fraudulently appraised stock values began to climb again, reaching $17.85 as of June 2013. In an effort to convince employees to continue investing in the ESOP, when management announced the PDC stock values to the ESOP Plan and the Employee Participants, they highlighted selected financial data that supposedly justified the increasing valuations. Unaware of undisclosed material deficiencies that caused every one of the stock appraisals to be fraudulently overstated, Employee Participants continued to contribute a portion of their salaries to the ESOP Plan as retirement savings.

39.     Knowing Appvion's true (but concealed) financial condition, management shifted the manner in which they were compensated.  They changed the method of how their stock was valued from one which rewarded the increase in PDC stock price to one that guaranteed their results independent of an increase in stock value.  For example, CEO Mark Richards lost money from his ESOP account when Appvion went bankrupt; however, his salary and bonus compensation was so high that he made millions per year in the years leading up to his retirement, regardless of Appvion's income or stock value:

| Year | Salary/Bonus | Synthetic Equity | Non-Equity Incentive Plan Compensation | Pension Value and Deferred Compensation | Other Compensation | Total |
|------|------|------|------|------|------|------|
| 2012 | $1,176,000 | $1,409,200 | $1,224,000 | $255,610 | $148,516 | $4,213,326 |
| 2013 | $800,000 | $1,294,020 | $102,400 | $126,139 | $497,210 | $2,819,769 |
| 2014 | $815,385 | $1,366,385 | $492,800 | $420,646 | $86,709 | $3,181,925 |
| 2015 | $800,000 | $1,388,772 | -0- | $124,408 | $2,995,387 | $5,308,567 |

40.     The Employee Participants had no similar way to protect themselves from declines in the PDC stock values.

41.     The stock price declined to $6.85 as of June 2017.  In October 2017, shortly after the fraudulent June 2017 valuation, Appvion filed for bankruptcy protection, completely wiping out the PDC stock equity value held by the ESOP Plan for the benefit of the Employee Participants.  With the filing of the Appvion bankruptcy, the game of hiding Appvion's true value was over.

42.     The primary ESOP beneficiaries were Buth, Karch and other senior management or directors who rewarded themselves by either cashing out at periods of fraudulently high stock prices or who received excessive compensation packages pre-bankruptcy, all at the ESOP Plan and the individual Employee Participant's expense.  The other beneficiaries included Houlihan, the ESOP Trustees and the ESOP appraisers.

### E. Grant Lyon Discovers that Each of PDC's Stock Valuations Are Fraudulently Overvalued.

43.     In August 2017, Grant Lyon was appointed to replace the entire Appvion ESOP Committee.  Having a forensic accounting background and training, he began an analysis of Appvion's financial statements and PDC's stock valuations.  He learned, for the first time, that each of the appraisals to which he had access (beginning with the 30 June 2005 appraisal) fraudulently overvalued PDC's stock value and concealed Appvion's true financial condition.  And as explained earlier, he had no reason to believe that the earlier appraisals were any different.

44.     Mr. Lyon has now learned that the Appvion appraisals were materially and fraudulently overstated for at least the following reasons:

- Each of the semi-annual appraisals from 2001 through 2017 failed to account for material liabilities.  For example, unfunded pension/post-retirement liabilities alone exceeded $73 million in 2001 and reached as high as $175.5 million in 2012.  Each year, these liabilities were prominently displayed in Appvion's PricewaterhouseCoopers ("PWC")-audited financial statements.  For example, the relevant portion of the 2012 balance sheet (which is just like every other year) looks as follows.  The SRR valuation reports from 31 December 2004 through 2017 do not consider the pension/post-retirement liabilities.  On information and belief, the Willamette appraisals prior to December 2004 likewise make no deduction for these pension/post-retirement liabilities:

| "LIABILITIES, REDEEMABLE COMMON STOCK, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME **(dollars in thousands)** | | |
| --- | --- | --- |
| | December 29, 2012 | December 31, 2011 |
| * * * | | |
| Long-term debt | 511,624 | 510,533 |
| Post-retirement benefits other than pension | 38,440 | 41,611 |
| Accrued pension | 137,081 | 125,245 |
| Other long-term liabilities | 32,165 | 7,379 |
| Commitments and contingencies (Note 19) | - | -" |

Had the PDC appraised values deducted just these pension/post-retirement liabilities, the PDC stock would have had a negative value as early as 2009 and every year thereafter.

- The appraisals relied heavily on projections of future earnings created by Appvion's management, even though the appraisers, the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants knew, but did not disclose, that Appvion consistently missed these projections.

- The appraisals inflated Appvion's terminal value by purporting to capitalize a declining income stream into perpetuity. Although it may be appropriate to capitalize (reduce to present value) an income stream that is assumed to continue into perpetuity, a declining income stream, by definition, cannot continue. Therefore, recognized appraisal theory does not allow its capitalization in this manner. By capitalizing a declining income stream into perpetuity, the appraisals repeatedly overstated the value of PDC stock.

- The 30 June 2015 appraisal changed valuation methods, which offset both a dramatic decline in EBITDA for Appvion's thermal paper division and the sale of Appvion's valuable Encapsys division.

- The 2012 SRR appraisal failed to subtract losses from the closure of Appvion's West Carrollton Mill and the associated severance costs.

- The appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- The appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- The appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- The appraisals improperly applied a 10% or 15% control premium in their valuations, even though the ESOP Plan as the sole shareholder had no practical ability to control the affairs of PDC or Appvion under the terms of the ESOP Plan or the Security Holder's Agreement. Further, when the PDC Stock was sold upon a triggering event, only small units of stock were sold, thus not commanding a control premium.

- The appraisals failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

- The appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- The appraisals failed to stress test Appvion's projections.

45.     In order to understand the appraisal deficiencies, it was necessary to have both the financial statements and the appraisal reports.  While all members of the ESOP Committee, the ESOP Trustees and the Appvion Board of Directors had access to the appraisal reports, the Employee Participants did not have that access.

46.     Even though union members specifically asked to see the appraisal report, they were denied access.  Thus, the ESOP Plan and the Employee Participants had no basis to conclude that the appraised stock values did not properly analyze the factors affecting Appvion's value.  The most glaring and obvious deficiency was the appraisals' failure to make a deduction for unfunded pension/post-retirement liabilities and also for the "other liabilities" recorded on each balance sheet.

47.     Lyon reported his preliminary findings to Appvion's Board of Directors on or about 1 September 2017.  As a result of the deficiencies Lyon identified, each of the fraudulent appraisals, from 2001 through 2017, masked and concealed the fundamental weaknesses in Appvion's true financial condition and prevented the ESOP Plan and its Employee Participants from being able to understand PDC stock's true value.  Therefore, the ESOP Plan (on behalf of the Employee Participants) overpaid for PDC stock from the beginning of the ESOP Plan through bankruptcy.  Based on his findings, Lyon recommended that all ESOP purchases of PDC stock be suspended.

48.     In the fall of 2018, Lyon for the first time discovered that Houlihan was not "independent" as had been fraudulently represented by Buth, Karch and Paone, but in fact stood to gain a contingent fee of as much as 1% of the $810 million purchase price (over $8 million), but only if the ESOP transaction closed.  Here is the relevant contingent fee paragraph from the engagement contract signed by Buth on behalf of PDC and Paone, as the Managing Director of Houlihan:

> 2.      In consideration of the foregoing financial advisory services, the Company agrees to pay Houlihan Lokey a non-refundable retainer fee of $100,000 upon the execution of this letter agreement. The Company also agrees to pay Houlihan Lokey a transaction fee at a Transaction closing equal to 1.0% of the "Aggregate Consideration" paid for the stock of the Company with respect to an ESOP Acquisition.  Aggregate Consideration shall mean the sum of the fair market values of any consideration

Engagement Ltr. to Douglas Buth from Louis Paone (Houlihan) 14 Feb 01, pp. 1–2.

49.     This lack of independence is particularly disturbing because Buth, who together with Paone, negotiated the ESOP stock purchase price from the seller, also had a conflict of interest.  As disclosed in the 23 July 2001 Prospectus, for example, those employees who "assisted in the acquisition" received a total "sale incentive" of $2.46 million—"40% to Mr. Buth and the balance will be distributed by Mr. Buth in his discretion among other employees who assisted with the acquisition."

50.     Therefore, Buth and Houlihan, two parties who negotiated the ESOP stock purchase price, were both conflicted because they each stood to gain millions of dollars, but only if the transaction closed.  And, the higher the purchase price they negotiated, the greater their contingent payment would be.

51.     Because the Prospectus disclosed Buth's conflict of interest, it was critical that Buth and Karch presented Houlihan (Paone) at the ESOP road show as being "independent." And even though the Prospectus reported that Houlihan rendered its preliminary opinion to

Paperweight Development's Board of Directors that the purchase price that Paperweight Development was paying for the acquisition was fair, it likewise fraudulently concealed Houlihan's conflict and that the price, by any reasonable standard, was not fair.

52.     In other words, the Prospectus fails to disclose that if Houlihan were to determine the purchase price was *not* fair, it stood to lose as much as $8.1 million.

53.     This may explain why Buth and Paone were willing to negotiate an $810 million purchase price even though the Prospectus indicates that the seller was willing to pay Buth and other Appvion management a sale incentive for anything over $700 million.

54.     Rather than being a unique, once-in-a-lifetime opportunity for Appvion's employees, the fraudulently concealed conflict of interest and the fraudulent PDC stock overvaluations allowed Buth, Karch and others, the time and resources to benefit themselves, by receiving large employment compensation packages that they used to enrich themselves before Appvion's collapse into bankruptcy.   And, in the process, they convinced the employees to transfer (and continue to transfer) their investment dollars out of a traditional, diversified, liquid, marketable, unleveraged retirement fund into this fund which lacked all of those characteristics.

55.     This FAC seeks to recover damages suffered by the ESOP Plan (and indirectly by the Employee Participants), including those resulting from the fraudulently inflated appraisals and stock price and the undisclosed conflict of interest.

56.     It also seeks to recover the amounts paid to the management insiders and ESOP Plan fiduciaries who sold their stock at inflated values and who took other inflated compensation facilitated by the overvaluation.   It seeks to recover from management and directors for the losses to Appvion and PDC from the purchase of overvalued stock; this has amounted to at least $57 million in damages from just 2009.  It also seeks to recover all fees paid to Houlihan.

18

57.    The Defendants include (1) Williamette and SRR, who performed the false appraisals, (2) the Appvion ESOP trustees who had a fiduciary duty to the ESOP Plan to, among other things, put processes in place to make sure the stock was properly valued and to conduct an independent and objective analysis of the appraisals, (3) members of the Appvion ESOP Committee and Board of Directors who owed a fiduciary duty to the ESOP Plan and who had access to the full appraisal reports, to the company projections and to Appvion audited and unaudited financial information; and (4) Houlihan for its role in fraudulently misrepresenting its independence, thus facilitating and orchestrating the entire ESOP transaction.

## II.    NATURE OF THE ACTION

58.    This action arises in part under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* and is brought by the ESOP Plan to restore losses to the ESOP Plan, obtain equitable relief to remedy violations of ERISA and/or breaches of fiduciary duty, and to obtain damages.

59.    This action seeks relief against the fiduciary Defendants for violations of ERISA's statutory and fiduciary provisions, including recovery to the ESOP Plan of any losses resulting from the breaches, disgorgement of profits of any fiduciary which have been made through the use of assets of the ESOP Plan, and other appropriate equitable and remedial relief pursuant to ERISA § 502(a)(2) (29 U.S.C. § 1143(a)(2)), ERISA § 502(a)(3) (29 U.S.C. § 1132(a)(3)), ERISA § 404 (20 U.S.C. § 1104), ERISA § 405 (20 U.S.C. § 1105), ERISA § 406 (20 U.S.C. § 1106), and ERISA § 410 (29 U.S.C. § 1110).

60.    This action also seeks relief against certain Defendants for fraud, negligent misrepresentation, Wisconsin securities fraud, federal securities fraud, and breach of fiduciary duty under Wisconsin law.

## III. PARTIES, JURISDICTION, AND VENUE

61.     Non-Party Appvion, Inc. (f/k/a Appleton Papers, Inc., and Appleton, Inc.[1]) ("Appvion") is a Delaware corporation with its principal place of business in Appleton, Wisconsin.  Appvion established and maintained the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP Plan") to provide retirement benefits for its eligible employees.  The ESOP Plan consists of an employee stock ownership component (the "ESOP Component") which holds shares of Paperweight Development Corp ("PDC"), the direct parent of Appvion, Inc., and a 401(k) component (the "Non-ESOP Component").  The ESOP Plan is an employee benefit plan within the meaning of ERISA § 3(3) (29 U.S.C. § 1002(3)) and the ESOP Component is intended to meet the requirements of ERISA § 407(d)(6) 29 U.S.C. § 1107(d)(6)).

62.     The ESOP Administrative Committee of Appvion, Inc. (the "ESOP Committee") is a fiduciary of the ESOP Plan pursuant to ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)).  The members of the ESOP Committee are appointed by the Board of Directors of Appvion.  Grant Lyon is the sole member of the ESOP Committee by appointment of Appvion's Board of Directors, effective 9 August 2017, in conjunction with an ESOP Plan amendment allowing the Committee to consist of one member.

63.     The ESOP Committee has standing to bring this action on behalf of the ESOP Plan under ERISA § 502(a) (29 U.S.C. § 1132(a)).  Additionally, the 14 August 2018 Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation (the "Liquidation Plan") states that nothing in the Liquidation Plan impairs any claim held by the ESOP Committee.  The Liquidation Plan also states that "Grant Lyon, in his

_____

[1] Appleton Papers, Inc. changed its name to Appvion in May 2013.  For simplicity, it is referred to throughout this Complaint as Appvion.

capacity as an ESOP Committee member, shall have standing to prosecute the ESOP Claims and other ESOP Preserved Claims. . ."  ESOP Preserved Claims are defined as "(i) any Claim held by the ESOP, the ESOP Committee or its members, or ESOP participants. . ., arising from or relating to the ESOP or any Interest in any Debtor, against any Person other than the Debtors."

64.     Defendant Douglas P. Buth ("Buth") and Gayle Buth are husband and wife and United States citizens who currently reside in Appleton, Wisconsin.  Buth was a CPA and formerly worked for Pricewaterhouse, Saks Fifth Avenue, and BATUS prior to working for Appvion.  During his tenure at Appvion, from 9 November 2001 through July 2005, Buth served as Chairman of the Board of Directors of Appvion and PDC, CEO, and President.  Buth was also a member of the ESOP Committee from 2001 until approximately May 2005 when he retired from Appvion.  Buth retained Houlihan and knew about the approximately $8 million Houlihan stood to gain if the ESOP buyout was approved.  Buth was instrumental in persuading employees into voting in favor of the buyout.  Buth made affirmative misrepresentations and omissions to induce the employees to approve the buyout and place their money into the ESOP Plan at the employees' expense.  As a member of the ESOP Committee, he knew the true financial health of Appvion, yet he used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan.  Buth was paid for his shares on an installment basis, and he had a gain of over $850,000 on his ESOP Investment (not including any payments under various compensation plans related to the value of the stock) upon his departure.  Buth also received excessive compensation under the various Appvion incentive plans.

65.     Defendant Paul Karch ("Karch") and Anne Karch are husband and wife and United States citizens who currently reside in Madison, Wisconsin.  Karch is a lawyer who graduated from Harvard Law School in 1982.  During his tenure at Appvion, from 2001 through

2007, Karch served as Vice President of Human Services and Law, Secretary, General Counsel and Vice President of Administration. Karch was a member of the ESOP Committee from 2001 through late 2006. Karch also served on the Board of Directors of Appvion and PDC from 2001 to 2006. Karch left Appvion in March 2007. Karch made affirmative misrepresentations and omissions to employees in order to induce them to approve the buyout and place their money into the ESOP Plan at the employees' expense. As a member of the ESOP Committee, he knew the true financial health of Appvion, yet he used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan. Karch left the company on 2 March 2007 with a gain of over $300,000. Karch also received excessive compensation under various Appvion incentive plans.

66. Defendant Mark Richards ("Richards") and Jeanne Richards are husband and wife and United States citizens who currently reside in Appleton, Wisconsin. Richards earned an MBA from Northwestern University's Kellogg Graduate School of Management. During Richards' tenure at Appvion, Richards served as Chairman of the Board of Directors of Appvion and PDC, CEO, and President. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. As a member of the ESOP Committee, he knew the true financial health of Appvion, yet he used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan. Richards also received excessive compensation under various Appvion incentive plans.

67. Defendant Tom Ferree ("Ferree") and Carol J. Ferree are husband and wife and United States citizens who, upon information and belief, currently reside in Solon, Iowa. Ferree has a master's degree in finance from the University of Iowa. During his tenure at Appvion, Ferree served as Treasurer and Vice President of Finance. Ferree was a member of the ESOP

Committee from late 2006 until April 2017. Ferree received excessive compensation under Appvion's various incentive plans. Ferree not only had access to the Appvion financial statements, but because of his position, was intimately familiar with them. He also had access to the PDC stock appraisals and participated in the generation of the financial projections used in the appraisals. As a member of the ESOP Committee, he knew the true financial health of Appvion, yet he used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan.

68. Defendant Rick Fantini ("Fantini") and Debra L. Fantini are husband and wife and United States citizens who, upon information and belief, currently reside in Denver, Colorado. Fantini has a master's degree in labor and industrial relations from Michigan State University and an MBA from Northwestern University's Kellogg Graduate School of Management. During his tenure at Appvion, Fantini served as Vice President of Operations. Fantini was the Chair of the ESOP Committee from 2001 to 2005. Fantini was present when the ESOP Committee recommended the retention of Willamette. As a member of the ESOP Committee, he knew the true financial health of Appvion, yet used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan. When Fantini left Appvion in 2005, he had a gain of over $577,000 from his ESOP investments. Fantini also received excessive compensation under Appvion's various incentive plans.

69. Defendant Dale E. Parker ("Parker") and Debrah Parker are husband and wife who currently reside in Rocky Mount, North Carolina. Parker has an MBA from Xavier University and is a CPA. Prior to joining Appvion, Parker served as the Vice President of Finance of Black Clawson Companies. During his tenure at Appvion, Parker served as Vice President of Finance and CFO from 2001 to June 2006. Parker was a member of the ESOP

Committee from 2001 to June 2006. Parker also served on Appvion and PDC's Board of Directors from 2001 to 2006. As a member of the ESOP Committee and Board of Directors, Parker knew the true financial health of Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan. Parker also received excessive compensation under Appvion's various incentive plans.

70. Defendant Angela Tyczkowski ("Tyczkowski") and Mark Tyczkowski are husband and wife who currently reside in Appleton, Wisconsin. Tyczkowski went to law school at Marquette University. During her tenure at Appvion, Tyczkowski served as Secretary, General Counsel and Chief Compliance Officer. Tyczkowski sat on the ESOP Committee from September 2006 to June 2008. As a member of the ESOP Committee, Tyczkowski knew the true financial health of Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan. Tyczkowski also received excessive compensation under Appvion's various incentive plans.

71. Kerry Arent ("Arent") and Timothy J. Arent are husband and wife who currently reside in Grand Chute, Wisconsin. Arent received her bachelor's degree from the University of Wisconsin-Oshkosh and holds a Senior Professional Human resources certification since 2005. During her tenure at Appvion, Arent served as Vice President, Executive Director and Senior VP Human Resources. Arent sat on the ESOP Committee from July 2008 through 2015. As a member of the ESOP Committee, Arent knew the true financial health of Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan. Arent also received excessive compensation under Appvion's various incentive plans.

72. Kent Willetts ("Willetts") and Andrea Willetts are husband and wife who currently reside in Appleton, Wisconsin. Willetts has an MBA from Northwestern University's

Kellogg Graduate School of Management. During his tenure at Appvion, Willetts served as Senior Vice President. Willetts sat on the ESOP Committee from July 2008 through June 2013. As a member of the ESOP Committee, Willetts knew the true financial health of Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan. Willets also received excessive compensation under Appvion's various incentive plans.

73.     Buth, Karch, Richards, Ferree, Fantini, Parker, Tyczkowski, Arent, and Willetts are collectively referred to herein as the "Prior Committee Defendants."

74.     Susan Scherbel ("Scherbel") and Thomas Scherbel are husband and wife who currently reside in Hancock, Maine. Scherbel has a bachelor's degree from Harvard and Juris Doctor and a Master of Law degrees from Georgetown University. She previously held an advisory position at the U.S. Department of Treasury relating to ESOP legislation and regulation. Scherbel was an Outside Independent Director of Appvion and PDC from 2002 through July 2011. Scherbel served on the Board of Directors' Audit Committee from 2002 through July 2011 and the Board of Directors' Compensation Committee from 2002 through 2006. Scherbel was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Scherbel, as a member of the Board of Directors, knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

75.     Ronald Pace ("Pace") and Teresa Pace are husband and wife who currently reside in Cedarburg, Wisconsin.  Pace has an MBA from the University of Connecticut and held a management position with Kohler Company from 1995 through 2015.  Pace was an Outside Independent Director of Appvion and PDC from 2003 through July 2011.  Pace served on the Board of Directors' Audit Committee from 2003 through 2008 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Pace knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition..

76.     Stephen Carter ("Carter") and Lisa L. Carter are husband and wife who currently reside in Rockford, Illinois.  Carter has a bachelor's degree from Brigham Young University and is a CPA.  Carter was an Outside Independent Director of Appvion and PDC from 2004 through 2015.  Carter served on the Board of Directors' Audit Committee from July 2004 through 2012 and again from 2014 through 2016 and served as Chairman of the Audit Committee from 2006 through 2011 and in 2016.  He was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  Carter was also considered an audit committee financial expert by the Board of Directors.  As a member of the Board of Directors, Carter knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants;

and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

77.     Kathi Seifert ("Seifert") currently resides in Appleton, Wisconsin.  Seifert was an executive with Kimberly-Clark Corporation and has served as a director of several other large companies, including Eli Lilly and Company and Revlon Consumer Products.  Seifert was an Outside Independent Director of Appvion and PDC from July 2004 through 2016.  Seifert served on the Board of Directors' Audit Committee from 2004 through 2006 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Seifert knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

78.     Andrew Reardon ("Reardon") and Michele Reardon are husband and wife who currently reside in Marco Island, Florida.  Reardon has a law degree from the University of Cincinnati and an LLM in taxation from the Washington University Law School.  Reardon was an Outside Independent Director of Appvion and PDC from June 2007 through 2014.  Reardon served on the Board of Directors' Audit Committee from 2009 through 2011 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Reardon knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2)

failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

79.     Terry Murphy ("Murphy") and Mary E. Murphy are husband and wife who currently reside in Naples, Florida.  Murphy has a master's degree in business administration from Marquette, a Juris Doctor degree from Seton Hall University School of Law, and is a CPA. Murphy was an Outside Independent Director of Appvion and PDC from June 2007 through 2017.  Murphy served on the Board of Directors' Audit Committee from 2012 through 2017 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  Murphy also served as Chairman of the Audit Committee in 2012-2015 and Audit Committee Financial Expert by Board of Directors.  As a member of the Board of Directors, Murphy knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

80.     Mark Suwyn ("Suwyn") and Patricia Suwyn are husband and wife who currently reside in Bonita Springs, Florida.  Suwyn has a doctorate degree in inorganic chemistry and has a background working in the coated paper industry.  Suwyn was an Outside Independent Director of Appvion and PDC from July 2011 through 2017.  Suwyn served on the Board of Directors' Audit Committee in 2016 and 2017 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting

and reporting practices and the quality and integrity of the PDC financial reports. As a member of the Board of Directors, Suwyn knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

81.     Kevin Gilligan ("Gilligan") and Angela Gilligan are husband and wife who currently reside in Appleton, Wisconsin. Gilligan has an MBA from Indiana University and previously worked as an executive with H.B. Fuller Company. Gilligan was a Director of Appvion and PDC from 2015 through 2017. Gilligan also served as President and CEO beginning in January 2016 and was a member of the ESOP Committee in 2016 and 2017. Gilligan attended ESOP Committee meetings where Appvion's financial performance and the ESOP Plan's ERISA compliance was discussed. As a member of the ESOP Committee, Gilligan knew the true financial health of the Appvion, but used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan. As a member of the Board of Directors, Gilligan 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

82.     Buth, Parker, Richards, Scherbel, Pace, Carter, Seifert, Reardon, Murphy, Suwyn, Karch, and Gilligan are collectively referred to herein as the Director Defendants. Of these, Buth, Parker, Richards, Karch, and Gilligan were also officers of the company and are included as Prior Committee Defendants.

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 29 of 206   Document 77

83.     Defendant Houlihan Lokey Capital, Inc., formerly known as Houlihan Lokey Howard & Zukin Capital, Inc. (together with Houlihan Lokey Howard & Zukin Financial Advisors, Inc., "Houlihan") is a California corporation with its principal place of business in Los Angeles, California.

84.     Defendant Houlihan Lokey Howard & Zukin Financial Advisors, Inc. is a California corporation with its principal place of business in Los Angeles, California.

85.     Defendant Louis A. Paone ("Paone") and Jane Doe Paone are husband and wife who currently reside in or near Charlotte, North Carolina.  Paone was Managing Director of Houlihan in 2001.  Paone attended the road shows with Appvion Management and, among other things, represented, through his acquiescence, that Houlihan was providing an "independent review and validation" of the proposed buyout transaction.  However, Houlihan was not independent.  It would receive as much as $8.1 million if the ESOP transaction closed.

86.     Defendant State Street Bank and Trust Company, N.A. ("State Street") is a nationally chartered trust company with its principal place of business in Boston, Massachusetts.  State Street Bank and Trust Company NA was the trustee of the ESOP Component of the ESOP Plan from 2001 through approximately April 1, 2013.  In its dealings with Appvion, State Street sometimes went by the name State Street Global Advisors, which is a division of State Street.

87.     Defendant Kelly Driscoll ("Driscoll") and Dave Driscoll are husband and wife who currently reside in or near Boston, Massachusetts.  Driscoll served as Senior Managing Director of State Street 1997 to 2008 and is currently a Senior Vice President for State Street.  Driscoll made affirmative representations and omissions to induce the employees to approve the buyout and place their money into the ESOP Plan at the employees' expense.  According to the 26 March 2001 Appvion Newsletter, "The Ownership Update," "[t]he Appleton Papers board of

directors has hired Kelly Q. Driscoll of State Street Global Advisors to serve as our ESOP trustee." As ESOP trustee, she had responsibilities to review the annual appraisal work for the purpose of arriving at the appropriate PDC stock price. In fact, Driscoll reported in September 2003: "I typically call Doug Buth to inform him and Appleton of the new value of PDC stock."

88.     Defendant Sydney Marzeotti ("Marzeotti") and Stephen Marzeotti are husband and wife who currently reside in Lynnfield, Massachusetts. Marzeotti served as Vice President of State Street from 2002 to present. Upon information and belief, Marzeotti, along with Driscoll, was responsible for overseeing the independent appraiser selected by State Street and arriving at the appropriate PDC stock price.

89.     State Street, Driscoll and Marzeotti are collectively referred to as the "State Street Defendants."

90.     Defendant Argent Trust Company, N.A. ("Argent") is a Tennessee corporation with its principal place of business in Ruston, Louisiana. Argent became the trustee of the ESOP Component of the Plan beginning in 2014.

91.     Defendant Reliance Trust Company ("Reliance") is a Delaware corporation with its principal place of business in Atlanta, Georgia. Reliance ESOP Group was the trustee of the ESOP Component of the Plan from approximately April 1, 2013 to June 30, 2014. Reliance was purchased by Argent in 2014.

92.     Defendant Howard Kaplan ("Kaplan") and Wendy Kaplan are husband and wife currently living in Jasper, Georgia. Kaplan served as Senior Vice President of Reliance from 2000 to 2014. Upon information and belief, Kaplan was responsible for overseeing the independent appraiser approved by Reliance. Kaplan was present when Scott Levine of Stout

Risius Ross presented on the valuations to the ESOP committee and appears to have done nothing to address the flaws Lyon later identified.

93.     Stephen Martin ("Martin") and Jane Doe Martin are husband and wife who currently reside in or near Atlanta, Georgia.  Martin served as Senior Vice President of Reliance and later for Argent. Upon information and belief, Martin was responsible for overseeing the independent appraiser approved by Reliance.  Martin was present when Scott Levine of Stout Risius Ross presented on the valuations to the ESOP committee and appears to have done nothing to address the flaws Lyon later identified.

94.     David Williams ("Williams") and Jane Doe Williams are husband and wife currently living in or near Atlanta, Georgia.  Williams served as Senior Vice President of Reliance and later for Argent.  Upon information and belief, Williams was responsible for overseeing the independent appraiser approved by Reliance and appears to have done nothing to address the flaws Lyon later identified.

95.     Reliance, Kaplan, Martin, and Williams are collectively referred to as the "Reliance Defendants," depending on the time period Martin and Williams are also collectively referred to herein as the "Argent Defendants."

96.     The Argent Defendants, the Reliance Defendants, and the State Street Defendants are collectively referred to herein as the "Trustee Defendants."

97.     Defendant Willamette Management Associates, Inc. ("Willamette") is an Oregon corporation with its principal place of business in Chicago, Illinois.  Willamette served as financial advisor to State Street as ESOP trustee and valued the share price of PDC stock from 2001 through 30 June 2004.

98.     Defendant Stout Risius Ross, Inc. is or was a Michigan corporation with offices around the United States.  SRR served as financial advisor to the ESOP trustees and valued the share price of PDC stock from 31 December 2004 through 2017.

99.     Defendant Stout Risius Ross, LLC is a Michigan limited liability company with offices around the United States.  SRR served as financial advisor to the ESOP trustees and valued the share price of PDC stock in 2017.

100.    Defendant Stout Risius Ross, Inc. and Defendant Stout Risius Ross, LLC are collectively referred to as SRR.

101.    Scott D. Levine ("Levine") and Debora Levine are husband and wife currently living in Oakton, Virginia.  Levine served as a Principal of Willamette from 2000 through 2004. Levine also served as a Managing Director of SRR from 2004 through present.  Levine was the primary individual, at both Willamette and SRR, responsible for valuing Appvion.  In 2004, when Levine moved from Willamette to SRR, Appvion's account moved as well. Under Levine's direction and supervision, Willamette, on information and belief, and SRR produced fundamentally flawed appraisals from 2001 through 2017.  Additionally, Levine attended ESOP Committee meetings to explain the valuations.   Appvion's financial performance was also discussed at those meetings.

102.    Aziz El-Tahch ("El-Tahch") and Ayelish M. McGarvey are husband and wife currently living in New York, New York.  El-Tahch served as an Associate of Willamette from at least 2002 through 2004.  El-Tahch also served as a Manager of SRR from 2004 through June 2007 and returned to SRR in 2008 as Managing Director.  In 2004, when El-Tahch moved from Willamette to SRR, Appvion's account moved as well. Under El-Tahch's direction and supervision, Willamette, on information and belief, and SRR produced fundamentally flawed

valuations from 2001 through 2007 and from 2008 through 2017. Additionally, El-Tahch attended ESOP Committee meetings to explain valuations. The financial performance of Appvion was also discussed at those meetings.

103.    Robert Socol ("Socol") and Lynn Socol are husband and wife currently living in Glencoe, Illinois. Socol was a Managing Director of Willamette from 1992 to 2004 while Willamette was conducting Appvion's early stock valuations. Socol moved to SRR in 2004 at or around the same time that Levine and El-Tahch moved to SRR. Upon information and belief, Socol was responsible for the valuation of Appvion with Levine and El-Tahch.

104.    Plaintiff is uncertain of the true names and capacities of certain individuals or entities that may be liable for the damages alleged herein and therefore sues them by fictitious names of Does 1-50, ABC Corporations 1-5, DEF Partnerships 1-5, GHI Limited Partnerships 1-5, and JKL Limited Liability Companies 1-5. Plaintiff will amend its FAC by asserting their true names, capacities, and appropriate charging allegations when they are ascertained.

105.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for jurisdiction of actions brought under Title I of ERISA.

106.    This Court has supplemental jurisdiction over the state law claims in this action subject to 28 U.S.C. § 1367.

107.    This Court also has diversity jurisdiction over the state law claims against the out-of-state Defendants because they did or are doing business in the State of Wisconsin, the acts complained of herein occurred in the State of Wisconsin, Plaintiff represents a Wisconsin-based employee stock ownership plan and the Employee Participants, and the amount in controversy herein exceeds $75,000.

## IV.    <u>NON-PARTIES IN INTEREST</u>

108.    Non-Party Appvion, Inc. is a Delaware corporation with its principal place of business in Appleton, Wisconsin.

109.    Non-Party Paperweight Development Corp. ("PDC") is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin. PDC is Appvion's parent company, and the ESOP Plan was the sole shareholder of PDC.

110.    Non-Party Benefits Consultants, Inc. ("BCI") is a Florida corporation with its principal place of business in Tampa, Florida. BCI was purchased by Principal Financial Group ("Principal") in 2003. BCI, and later Principal, acted as the administrator for the ESOP Plan.

111.    Non-Party Principal Financial Group ("Principal") is an Iowa corporation with its principle place of business in Des Moines, Iowa.

## V.    <u>DEFINED TERMS</u>

112.    "AWA" is defined as Arjo Wiggins Appleton.

113.    "ESOP Committee" is defined as employee stock ownership plan administrative committee of Appvion, Inc.

114.    "Houlihan Defendants" is defined as Houlihan Lokey and Louis Paone.

115.    "LTIP" is defined as Appvion's Long Term Incentive Plan which became effective on or about December 1, 2001.

116.    "PDC" is defined as Paperweight Development Corporation.

117.    "ESOP Plan" is defined as Appleton Papers Retirement Savings and Employee Stock Ownership Plan as amended in 2001 and from time to time thereafter.

118. "Employee Participants" is defined as employees of Appvion who chose to transfer funds from their 401(k) accounts into the ESOP Plan proposed in 2001 and those that invested in the ESOP Plan various times thereafter.

119. "RSU" is defined as the long-term restricted stock unit plan adopted by Appvion effective January 3, 2010.

120. "SERP" is defined as Supplemental Executive Retirement Plan.

121. "SRR Defendants" is defined as SRR, Levine, El-Tahch, and Socol.

122. "State Street Defendants" is defined as State Street, Driscoll and Marzeotti.

123. "Willamette Defendants" is defined as Willamette, Levine, El-Tahch. and Socol

## VI.   FACTUAL BACKGROUND

124. Appvion was formed in 1907 in Appleton, Wisconsin as The Appleton Coated Paper Company.

125. It operated as an independent company until 1970, when it merged with the NCR Corporation ("NCR").

126. In 1971, NCR merged Appleton Coated with Combined Paper Mills into Appleton Papers, Inc., with headquarters in Appleton.

127. In 1978, NCR sold Appleton Papers to B.A.T. Industries P.L.C. In 1990, B.A.T. spun off Appleton Papers and another subsidiary, Wiggins Teape into an independent company called Wiggins Teape Appleton.

128. In December 1990, Wiggins Teape Appleton merged with French paper company Arjomari-Prioux, and the new entity became AWA.

129. Appvion has historically had two primary business lines—carbonless paper and thermal paper.

130.    Carbonless paper was invented by Appleton Papers in 1954, and is a type of coated paper designed to transfer information written on the top sheet onto sheets beneath it.

131.    While Appvion had approximately 60% of the carbonless paper market in the late 1990s, the market was declining by eight to 9% per year due to the advent of computers.

132.    Appvion invented thermal paper in 1969; thermal paper is used for receipts, lottery tickets, and other similar applications.

**A.      AWA and Buth Agreed To An Employee Buyout That Created a Conflict of Interest for Appvion Management.**

133.    In 1998, Buth was named as CEO of Appleton Papers.

134.    In approximately November 2000, Buth presented the idea of an employee buyout to AWA.

135.    AWA agreed to the employee buyout.

136.    Effective 26 November 2000, AWA spun off the assets and operations of two of Appleton Papers' business lines into new entities, Appleton Coated LLC and Appleton Leasing LLC.

137.    On 12 February 2001, AWA signed a letter of intent to sell Appleton Papers to Paperweight Development Corporation ("PDC") for $843,000,000.  PDC would be owned entirely by employees as an S corporation, which meant it was tax exempt.  In July 2001, the purchase price was adjusted to $810,000,000.

138.    Also on 12 February 2001, AWA signed a letter agreeing to pay Buth and other executives of Appleton Papers bonuses if they were able to complete a sale of Appleton Papers; the bonuses would only be available if the sale was completed in 2001.  The bonuses consisted of two main components:

- A "Value Related Completion Bonus" (sales incentive) which created a bonus pool of up to $10 million depending on the sale price. Based on the $843 million sale price in the letter of intent, the pool would be $2.9062 million. If the ultimate sale price was $700 million or less, there would be no bonus pool. According to the prospectus, the sales incentive was ultimately $2.46 million, with 40% of it allocated to Buth and the rest to be distributed to other employees at Buth's discretion.

- "Loyalty Payments" totaling $4.403 million, payable only if the sale price was greater than $759.403 million. Each individual who would receive a Loyalty Payment agreed to defer 30% of the payment for between 5 and 10 years. Under the Deferred Compensation Plan, the value of the deferred portion of this payment was tied to the increase in the value of stock. According to the prospectus, the loyalty payments ultimately totaled $4.1 million, with $1.2 million of it deferred.

139. These incentive payments were to be recorded as obligations of Appleton Papers prior to closing of the Transaction.

140. Buth retained Houlihan to develop a plan for the employee buyout.

141. According to Houlihan's 14 February 2001 engagement letter, signed by Paone, Houlihan was to act as PDC's "exclusive financial advisor with respect to the possible acquisition . . . by a to-be-formed Employee Stock Ownership Plan ('ESOP') . . . ."

142. Also according to that letter, Houlihan was to receive a transaction fee at "Transaction closing equal to 1.0% of the 'Aggregate Consideration' paid for the stock of the Company with respect to an ESOP Acquisition."

143.    An addendum to that later indicates that Houlihan was to complete two phases of work which included, among other things:

- Corporate due diligence;

- Transaction value parameters;

- ESOP transaction model construction;

- Financing assessment and capital tranche sources and terms;

- Management deferred compensation and option/stock roll overs;

- Use of pension plans over-funded balances;

- Management bonus participation as ongoing investment tool;

- Assist Management in negotiations regarding a purchase of PDC;

- Advise management on the selection of the "ESOP Team" including independent trustee, ESOP Counsel, ESOP Financial Advisor and negotiate engagement terms;

- Advise on the structure of management performance warrants as part of bonus/incentive plans;

- Prepare materials to be presented to employees; and

- Assist in the documentation of transaction terms.

144.    The letters between Houlihan and Buth were not disseminated to the ESOP Plan or the Employee Participants so they did not know about Houlihan's contingent transaction fee.

145.    The plan developed by Houlihan was to use at least $100 million from the employees' 401(k) retirement plans to fund a portion of the buyout, with the rest of the sale price coming from bank debt, bonds and seller financing.

146.    After agreeing to the employee buyout in February 2001, Buth then announced the plan to the employees.

147. On July 20, 2001, James Waldo, Director of Houlihan and Buth executed another retainer agreement, which engaged Houlihan to "render an opinion as to the fairness to the Shareholder of the Company, from a financial point of view of the consideration to be paid by the Company . . . in connection with the Transaction and that such consideration is not more than the fair market value of Appleton." Houlihan charged $100,000 for this fairness opinion, which would be credited toward the 1% transaction contingent fee Houlihan was entitled to under the February 2001 retainer agreement.

148. This engagement was signed just four months after Appvion's 26 March 2001 newsletter warned that those performing fairness opinions must have no conflicts that might "impair independence":

### Who is Qualified To Issue ESOP Fairness Opinions?

* * *

1. **No conflicts of interest** and/or **fee arrangements based on contingencies**, both of which would **impair the independence of the financial advisor**.

Appleton Papers, "The Ownership Update," Issue 4, 26 Mar 01, p. 2.

**B.** **Appvion Management Pitched the Buy Out to Appvion Employees.**

149. The Appleton Papers Retirement Savings Plan was established effective 1 January 1985. This plan consisted primarily of a 401(k) component. As of July 2001, Appvion employees had approximately $155 million in their 401(k) accounts through the original Plan.

150. In order to implement the deal as structured by Houlihan, at least $100 million out of the approximately $155 million in Appvion employee 401(k) accounts would need to be contributed to carry out the buyout.

151. Without the employee's $100 million, the deal could not go forward as structured.

152. Appvion management and the ESOP professionals therefore had to pitch the transaction to employees and convince them to transfer a substantial portion of their 401(k) funds to the ESOP.

153. Appvion management circulated a prospectus dated 23 July 2001 to employees. The prospectus included the following statements:

- Paperweight Development's financial advisor, Houlihan, and the CEO team believe that the purchase price as negotiated is fair to the buyers.

- Houlihan has rendered its preliminary opinion to Paperweight Development's board of directors that the purchase price that Paperweight Development is paying for us in the acquisition is fair, from a financial point of view, to the ESOP, as the sole shareholder of Paperweight Development. Houlihan's preliminary fairness opinion was based on a number of facts and assumptions, including financial information through the end of April 1, 2001. Its preliminary opinion was rendered to the board of directors of Paperweight Development and may not be relied upon by any other person. Houlihan has been asked to render a fairness opinion to the Board of Directors of Paperweight Development effective as of the closing of the transaction to the effect described above.

154. The Prospectus did not disclose that Houlihan's fees were contingent on the deal closing or that they were structured as a percentage of the purchase price. In other words, Houlihan did not disclose it stood to gain millions but only if its fairness opinion supported the stock purchase and only if Houlihan could convince the ESOP Plan and Appvion's employees to support the ESOP purchase.

155.    In a 25 July 2001 letter to employees, Buth represented that the ESOP buyout "offers all employees not only a unique ownership opportunity, but also the potential for extraordinary rewards for initial investors and greater control of our company's future."  He also stated that "[d]uring the past few months we have made every effort to educate you about employee stock ownership.  This package of materials includes more detailed information about our KSOP plan as well as a complete prospectus."

156.    Buth stressed that Houlihan and State Street would provide "independent validation of the deal": "I also encourage you to attend a KSOP Road Show meeting where I will discuss our KSOP opportunity.  You will also receive independent validation of the deal from Lou Paone, our investment banker, and Kelly Driscoll, the ESOP trustee."

157.    In order to convince employees to contribute to the ESOP, Appvion executives Buth, Karch, and Arent, along with State Street's Driscoll, Houlihan's Paone, Principal's Pete Prodoehl, and Willamette's Braun, held a series of meetings they referred to as road shows to present the buyout to Appvion's employees.

158.    The road shows included at least two visits to each of Appvion's major facilities.

159.    As part of the pitch to convince employees to transfer their 401(k) funds to the ESOP, employees were told that the buyout was necessary or the company would be sold to an equity firm and be sold off for scrap, or that an equity firm would bleed the company dry and run it into the ground.

160.    As discussed above, Buth, Karch, and Arent presented the buyout transaction at a road show on 2 August 2001, along with purportedly "independent" ESOP professionals, Paone (Houlihan), Driscoll (State Street), and Braun (Willamette).  During this presentation, they urged employees to invest in the ESOP, emphasizing the benefits of an once-in-a-lifetime investment

opportunity. However, they failed to disclose Houlihan's conflict of interest and glossed over the risks of moving retirement funds from a 401(k) fund to a highly leveraged ESOP and the specific business risks that Appvion faced.

161. As described herein, Appvion management along with Houlihan Defendants, State Street Defendants, the Willamette Defendants, and others, used fraudulent representations and omissions to convince Appvion employees to agree to the ESOP Plan.

162. The Transaction closed on 9 November 2001.

C. **Appvion Amended the Existing Employee Retirement Savings Plan Into the Appleton Papers Retirement Savings and Employee Stock Ownership Plan.**

163. In anticipation of the buyout transaction, the Appleton Papers Retirement Savings Plan was amended and restated as of 1 January 2001 and renamed the Appleton Papers Retirement Savings and Employee Stock Ownership Plan. The amended and restated plan added the ESOP Component while retaining the traditional Non-ESOP Component.

164. Under the terms of the ESOP Plan, as amended, Employee Participants would be eligible to make a one-time irrevocable election in 2001 to transfer a portion of their non-ESOP accounts to an ESOP account. The ESOP account funds would then be invested in the stock of PDC Acquisition Corporation which would become PDC stock after the Transaction closed.

165. After the initial election in connection with the 2001 Transaction, participants in the ESOP Plan could elect to contribute a portion of their wages on an ongoing basis to either the Non-ESOP Component or the ESOP Component. Initially participants could contribute up to 15% of their salary to the ESOP Component, but in January 2002 the ESOP Committee voted to allow deferrals of up to 50% of their salary.

166. Deferrals or contributions to the ESOP Component would be invested in the stock of PDC, and the ESOP was the sole shareholder of PDC. PDC, in turn, owned all of Appvion's

stock. Shares owned by the ESOP would be allocated to the ESOP accounts of participants, who were the beneficial owners of PDC/Appvion.

167.    In theory, the share repurchase obligations would be funded from employee contributions to the ESOP Plan. Under the terms of the ESOP Plan, Appvion would also make matching contributions on behalf of employees; according to the terms of the ESOP Plan, the Board of Directors had the sole discretion to determine whether matching contributions would be in the form of company stock or cash.

168.    If net repurchases exceeded contributions to the ESOP, repurchases were funded through a loan from Appvion to PDC, which PDC loaned to the ESOP.

169.    Share repurchases would reduce the total number of shares in circulation. For example, if there were 10,000,000 shares issued and the ESOP repurchased 1,000,000, the total share count would be reduced to 9,000,000. After the initial buyout transaction, 10,684,373 shares of PDC stock were issued. By the time of the Bankruptcy in October 2017, only 5,932,120 shares remained outstanding. Stated differently, Appvion had to purchase over 4,000,000 of shares at inflated prices, drastically reducing its liquidity.

170.    Withdrawals from a participant's ESOP account were limited to statutory diversification, additional diversification, participant loans, retirement, disability, death, termination or employment and hardship distributions. As Appvion's liquidity eroded and the stock price declined, the majority of ESOP investors were unable to diversify their ESOP investment into other investments.

171.    Any sales or purchases of PDC stock were required to be for fair market value.

### 1. Fiduciaries of the ESOP

#### a. The ESOP Committee

172. The ESOP Plan authorized the creation of the ESOP Committee, which was to consist of at least three members.

173. Under the terms of the ESOP Plan, Appvion's Board of Directors had the sole authority to appoint members of the ESOP Committee.

174. Pursuant to the ESOP Plan, the ESOP Committee was "the named fiduciary with respect to the financial management of the ESOP Plan and the control or management of the assets of the Plan[.]"

175. Also pursuant to the ESOP Plan, the ESOP Committee had the following powers and responsibilities:

- to establish and carry out, or cause to be established and carried out by those persons (including without limitation, any investment manager or trustee) to whom responsibility or authority therefore has been allocated or delegated in accordance with this ESOP Plan or the Trust Agreement, funding and investment policies and methods consistent with the objectives of the ESOP Plan and the requirements of ERISA. For such purposes, such Committee shall, at a meeting duly called for the purpose, establish funding and investment policies and methods that satisfy the requirements of ERISA, and shall meet at least annually to review such policies and methods. All actions taken with respect to such policies and methods and the reasons therefore shall be recorded in the minutes of the meetings of such Committee;

- to appoint a trustee or trustees to hold the assets of the ESOP Plan, and who, upon acceptance of being appointed, shall have authority and discretion to manage and control the assets of the ESOP Plan, except to the extent that the authority to manage, acquire or dispose of assets of the ESOP Plan is delegated to one or more investment managers pursuant to paragraph (3) below; and

- to appoint an investment manager or managers, as defined in Section 3(38) of ERISA, to manage (including the power to acquire, invest and dispose of) any assets of the ESOP Plan.

176. The ESOP Committee also had the right to delegate its responsibilities under the ESOP Plan to third parties and had authority to establish nondiscriminatory rules relating to the Additional Diversification right.

177. A 2006 KSOP Guide distributed to employees titled "Take Ownership of your Future" confirmed the ESOP Committee's fiduciary status, stating "Because the committee exercises discretionary authority with respect to the management of the ESOP and provides direction to the ESOP trustee, its members also have a fiduciary obligation to act in the best interest of the ESOP."

178. In January 2008, the ESOP Committee adopted a Charter. According to the Charter, the ESOP Committee's primary responsibilities were, among other things:

- To oversee the administration and enforcement of the Appleton Employee Stock Ownership Plan;

- To direct the activities of the Trustee of the ESOP Plan;

- Appoint Trustee or Trustees to hold the assets of the ESOP Plan;

- Review stock price calculations as soon as practical after the Trustee establishes the stock price;

- Review current/forecasted company financial performance and covenant compliance;

- Review status of the ESOP Plan in relation to ERISA to ensure compliance;

- Review performance of the record keeper for the ESOP;

179. A 13 May 2015 presentation to Appvion's Board of Directors described the ESOP Committee's responsibilities, including the "**Semi-annual review and approval of stock price calculations** with Trustee and Stout Risius Ross."

<b>b.    <u>The Trustee</u></b>

180. Appvion appointed State Street as the trustee for the ESOP Component of the ESOP Plan effective as of 1 June 2001.

181. State Street was empowered to retain an Independent Appraiser to value the shares of PDC's stock.

182. In March 2013, State Street stepped down as ESOP Trustee, purportedly as part of a decision to no longer serve as trustee for private ESOPs. Appvion retained Reliance Trust to serve as the trustee effective 1 April 2013.

183. In 2014, Reliance Trust sold its ESOP business unit to Argent, and Argent took over as trustee pursuant to a trust agreement effective 1 July 2014. The ESOP Committee voted to choose Argent as the trustee in May 2015.

184. Pursuant to a May 2015 engagement letter and an Amended and Restated Trust Agreement effective 3 August 2015, Appvion designated Argent as a discretionary trustee.

185. The trust agreements and the May 2015 engagement letter are collectively referred to herein as the "Trust Documents."

186. Under the Trust Documents, the Trustee Defendants were required to retain an "Independent Appraiser," as described by Section 401(a)(28)(C) of the Internal Revenue Code, to value PDC stock. However, the Trustee Defendants were responsible for reviewing and finalizing the valuation in accordance with Section 3(18)(B) of ERISA, which requires the fair market value to be determined in good faith by the trustee.

187. In addition, the Trust Documents required the Trustee Defendants "to report to the Company as of the last day of each Plan Year . . . the then "Net Worth" of the Trust Fund, that is, the fair market value of all property held in the Trust Fund, reduced by any liabilities other than liabilities to Participants in the Plan and their Beneficiaries, as determined by the Trustee."

188. The May 2015 engagement letter with Argent also required Argent to provide the ESOP Committee and the Board of Directors with a report on the activities of the ESOP and Argent's actions as trustee within thirty days after the completion of the valuations.

189. The August 2015 trust agreement also gave Appvion the right to inspect the books and records of the trust and report on the examination to the Board of Directors.

190. On information and belief, the Trustee also met with Appvion and PDC's Board of Directors to report on the ESOP Plan.

### c. **The Board of Directors**

191. The Board of Directors for Appvion and PDC were identical, and the Director Defendants were members of both Boards of Directors.

192. Appvion and PDC's Board of Directors was also a fiduciary of the ESOP Plan under ERISA § 3(21)(A) (29 U.S.C. § 1001(21)(A)) because it exercised discretionary authority or control regarding the management of the ESOP Plan.

193. Specifically, the Board of Directors was responsible for appointing the members of the ESOP Committee under the ESOP Plan Document, as well as selecting a chairman and secretary for the ESOP Committee. Accordingly, the Board of Directors had a duty to monitor the ESOP Committee.

194. The Board of Directors also had the following responsibilities under the ESOP Plan Document:

- Discretion for determining the percentage of matching contributions to the ESOP as well as whether matching contributions to the non-ESOP Component or the ESOP Component would be in the form of cash or company stock.

- The power to amend the ESOP Plan Document. Starting in approximately 2008, the Board delegated the authority to make non-material amendments to the ESOP Plan to the ESOP Committee.

195. In addition, while the ESOP Plan Document gave the ESOP Committee the authority to appoint the trustee, in practice the Appvion/PDC Board of Directors appointed the trustee. In a 26 March 2001 newsletter, Karch stated that he, Buth, and Parker, the sole members of the Board of Directors at the time, had selected Driscoll and State Street to serve as the trustee.

196. This was confirmed in the 2006 KSOP Guide, which included the following graphic:



197.   Similarly, a November 2002 presentation explained that the Board of Directors appoints the Trustee.

198.   A 19 March 2001 employee newsletter emphasized the Board of Directors' fiduciary role in managing the company, which included reviewing the company's projections against its actual performance:

- "Shareholders have the right to elect a board of directors, a governing body that has the authority to manage the business and affairs of a corporation and has a 'fiduciary obligation,' or legal responsibility, to represent the interests of the shareholders."

- "A board of directors is charged with 'high level' oversight of the company, its officers and employees, as well as the company's financial performance. The

board of directors appoints company officers and the company officers hire the management team who are responsible for the company's day-to-day operations."

- "The board of directors and company officers make many significant decisions, such as establishing the company's financial objectives, reviewing its performance against its objectives, and determining appropriate business strategies.

- "The trustee is selected and retained by the board of directors, who evaluate the qualifications of the trustee on the basis of a number of factors."

199. In response to the question "How do we know the board of directors will make good decisions for us?" the newsletter stated:

- "The board of directors has a fiduciary obligation to the company's shareholders. That is, they have a legal responsibility to ensure that the shareholder interests are served."

- "In an ESOP company, the board has a legal obligation to the ESOP trustee as the shareholder."

- "The ESOP trustee has a fiduciary obligation to act in the best interests of plan participants."

- "The plan participants are the company's beneficial shareholders. Thus, in ESOP companies, there are two entities charged with acting in the best interests of the participant shareholders, the trustee and the board of directors."

200. A 2006 KSOP Guide distributed to employees contained nearly identical language. That document also reiterated that "The Appleton board of directors hired State Street Trust Company to serve as our ESOP trustee."

201.    According to a September 2003 newsletter, State Street representatives also attended at least one meeting of the Board of Directors per year and met with the outside directors that served on Appvion's Board of Directors.

202.    A January 2006 employee newsletter stressed that the board of directors has a legal obligation to prevent fraud relating to the ESOP: "Our company's board of directors has a legal obligation to company shareholders (in our case, the ESOP is the sole shareholder) to prevent the kind of fraud that occurred at Enron."

203.    On information and belief, the Director Defendants also participated in road shows to discuss the valuations and the ESOP Plan with employees.  For example, in November 2007, the ESOP Committee discussed holding a road show "including representatives of State Street Global Advisors, Stout Risius Ross, the ESOP Committee, and a representative from the Appleton Board of Directors and the Audit Committee."  Emails from Richards to employees on 9 November and 6 December 2007 indicated that Carter would be the director at the road shows.

204.    As a specific example, a 15 August 2008 email from Richards to Appvion employees reported on a meeting of the Appvion and PDC Board of Directors, stating that

- "The audit committee reviewed and approved our quarterly SEC filing (10Q) and earnings release and discussed the oversight and control measures we have in place for the company."

- "Tom Ferree, chief financial officer, and Syd Marzeotti from State Street joined us for the board meeting on August 7.  Tom presented an operations updated and projections for the third quarter and full-year financials.  The second half of the year will be challenging because we anticipate continued weakness in the economy.  Our estimates assume some improvements to international and

domestic sheet volume, but continued inflationary pressure on our operations. The board praised Appleton employees for our determined efforts to reduce costs and eliminate waste through Lean Sigma and spending controls."

205.    As the party responsible for appointing the ESOP Committee members and the Trustee Defendants, the Director Defendants had a duty to monitor their performance, including a duty to review the valuations. Director Defendants at all times had the authority to oversee the actions of the Trustee and the ESOP Committee.

206.    Under the 2015 trust agreement with Argent, the Director Defendants had the right to request a full report from Argent on its actions as trustee at any time, and Argent was required to provide a report on its actions and the activities of the ESOP within thirty days of each completed valuation.

### 2.    The ESOP Plan Did Not Have Control That Would Justify the Control Premium.

207.    Under ¶ 14.1(a)(1) of the ESOP Plan and the 2006 KSOP and Me document, Employee Participants were only entitled to vote on corporate matters that involved extraordinary transactions. For example, "the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets of a trade or business, or such other transactions that may be prescribed by regulation . . . ." However, the ESOP Committee had "the sole responsibility for determining when a corporate matter has arisen that involves the voting of Company Stock under this provision."

208.    However, the ESOP Plan provided that "In all other circumstances, the Trustee shall vote all shares of Company Stock as directed by the Committee."

209.    On 9 November 2001, the Appleton Papers Inc. Employee Stock Ownership Trust, through State Street as Trustee, entered into a Security Holders Agreement with PDC.

210.    Under § 1.2(a) of that agreement, State Street and PDC agreed that they were to nominate the seven members of Appvion's Board of Directors as follows:

- Prior to January 1, 2003, the Trustee and Appvion's CEO would each nominate three individuals to the Board and the Trustee and CEO would jointly nominate one individual;

- In 2003, the Trustee would nominate two individuals to the Board, the CEO would nominate three individuals to the Board, and the Trustee and CEO would jointly nominate two individuals;

- In 2004, the Trustee would nominate one individual to the Board, the CEO would nominate three individuals to the Board, and the Trustee and CEO would jointly nominate three individuals;

- After January 1, 2005, the CEO would nominate four individuals to the Board and the Trustee and CEO would jointly nominate three individuals.

211.    Under § 1.2(b) of the Security Holders Agreement, votes to remove any director were subject to § 1.2(a), and jointly nominated directors could only be removed by mutual agreement of the Trustee and the CEO.

212.    Therefore, after 1 January 2005, no director could be elected without CEO approval and no director could be removed without CEO approval.

213.    Under § 2.2 of the Security Holders Agreement, PDC and Appvion were authorized to engage in acquisitions of other companies for less than $100 million without permission of the Trustee.

214.    The terms of Security Holder's Agreement were not disclosed in the Prospectus. The terms first appeared in a Prospectus Update dated 19 November 2001. The terms of the ESOP Plan and the Security Holders Agreement severely limited the ESOP Plan's ability to control the affairs of PDC or Appvion.

**D.    The Trustee Defendants Retain an Independent Appraiser.**

215.    Under the Trust Documents, the Trustee Defendants were responsible for retaining an independent appraiser and for reviewing and approving the valuations. However, the Trustee was ultimately responsible for setting the share price which would be used for all ESOP transactions.

**1.    Willamette and SRR Valued PDC Stock At Least Two Times Per Year.**

216.    To determine the value of PDC stock, SRR and Willamette employed two appraisal methods—the Guideline Company Method and the Discounted Cash Flow Method.

217.    These methods did not value Appvion as a company, but rather broke it into segments and then added the values for those segments together. The primary segments used for the valuations were the Carbonless and Thermal segments, but at times SRR and Willamette also valued the Performance Packaging segment (included through the 31 December 2009 valuation), BemroseBooth (included through the 31 December 2007 valuation), and Encapsys (valued from mid-2009 through the end of 2014).

218.    SRR's 30 June 2005 valuation report described the Discounted Cash Flow ("DCF") Method as follows:

- "The Discounted Cash Flow ('DCF') Method estimates the value of a company based on the present value of its expected future economic benefits (i.e., distributable cash flow). Distributable cash flow is a preferred measure of a

company's earning and dividend-paying capacity because it represents the earnings available for distribution to investors after considering the reinvestment required for a company's future growth. Distributable cash flow is the amount that could be paid to the owners of a business without impairing its operations."

- "To perform a DCF Method analysis, the future available cash flow that a business can generate is projected by estimating each year's revenue, expenses, and other items such as capital expenditures and additional working capital requirements. Each year's cash flow is then discounted to the valuation date at a rate of return commensurate with the risk involved in realizing those cash flows. An investor would accept a rate of return no lower than that available from other investments with equivalent risk. Each element of this computed rate is expressed in terms of current market yields as of the Valuation Date."

- "The application of the DCF Method is meaningful with respect to the valuation of Appleton. Appleton is an operating entity that is expected to produce positive cash flows in the future. Moreover, a potential buyer of the Company would likely place a great deal of weight upon the future cash flows generated by the Company in determining its value. Our application of the Discounted Cash Flow Method—which is used to value each business unit separately—is presented in Section VII of this report."

219. SRR's 30 June 2005 valuation report described the Guideline Company Method as follows:

- "The Guideline Company Method estimates the value of a company by comparing it to publicly traded companies that are similar from an investment risk

and return perspective. Criteria for comparability in the selection of publicly traded companies include industry and operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics."

- "Once a guideline company is selected, pricing multiples are developed by dividing the enterprise value of the guideline companies by appropriate measures of operating results, such as sales, operating income, or operating cash flow. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate multiples are applied to the operating results of the subject company to estimate value."

220. SRR would perform each of these valuation methods and weighted them equally. For example, if the DCF Method valued the Thermal business at $210 million and the Guideline Company Method valued it at $200 million, SRR would add those two numbers and divide by two, reaching a valuation of $205 million.

221. SRR's goal was to determine the fair market value of PDC stock. SRR defined "fair market value" "In accordance with Title I of ERISA and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18(b)(2)(i))" as:

> "[T]he price at which an asset would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, with both parties being able, as well as willing, to trade, and with both parties being well-informed about the asset and the market for the asset."

222. In its early valuation reports, SRR further defined "asset" in its definition of fair market value as "the combined tangible and intangible assets of a company as components of a going concern business enterprise, and also gives consideration to all known liabilities."

However, as discussed below, SRR's valuation reports failed to give consideration to all known liabilities.

## 2. After the 2001 Transaction, the Share Price Increased Dramatically.

223.    State Street retained Willamette to issue a valuation opinion at the time of the 2001 Transaction.  Willamette opined that the purchase price was for not more than fair market value.  The initial share price was set at $10 per share.  This "per share purchase price and the number of shares to be sold were arbitrarily determined based on the need to raise a minimum of $100 million."

224.    This share price was used in the initial allocations and was also used to grant phantom stock to executives under the Long-Term Incentive Plan (discussed below) in December 2001.

225.    Starting 31 December 2001, the Trustee was required to begin conducting semi-annual valuations of PDC stock.

226.    At an 8 January 2002 meeting, the ESOP Committee recommended that that the Trustee retain Willamette as the valuation firm for the 31 December 2001 and 30 June 2002 valuations.

227.    Accordingly, State Street retained Willamette to conduct the valuations for the years 2001 through mid-2004.

228.    Scott Levine was the primary Willamette employee responsible for Appvion's valuations.

229.    Willamette reached the following determinations of share value:

| Valuation Date | Share Price |
|:---:|:---:|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 58 of 206   Document 77

| Valuation Date | Share Price |
|---|---|
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |

230. The 31 December 2001 valuation represented a 28% increase over the 9 November valuation, even though it was only conducted a mere seven weeks after the initial buyout transaction closed and the company's fundamental health had not changed. The 30 June 2002 valuation just six months later was a 45% increase over the 31 December 2001 valuation and an 86% increase over the 9 November 2001 valuation.

231. In 2004, Levine, the principal individual handling the Appvion account, left Willamette and went to work for SRR.

232. At the 14 January 2005 meeting of the ESOP Committee, the Committee recommended that the Trustee retain SRR for the December 2004 valuation and subsequent valuations.

233. SRR conducted the valuations from late 2004 through 2017. Levine continued to be the primary SRR employee responsible for the valuations and responsible for meeting with the ESOP Committee. Indeed, Levine presented valuations at ESOP Committee meetings, often in the presence of El-Tahch, Marzeotti, Martin and Kaplan.

234. Indeed, Marzeotti attended at least nine ESOP Committee Meetings where SRR's valuations were discussed. At several of these meetings, Marzeotti even answered questions posed by the ESOP Committee.

235. SRR reached the following determinations of share value as financial advisor to State Street:

| Valuation Date | Share Price |
|---|---|
| 12/31/2004 | $ 26.36 |
| 06/30/2005 | $ 27.77 |
| 12/31/2005 | $ 28.56 |
| 06/30/2006 | $ 31.27 |
| 12/31/2006 | $ 33.62 |
| 06/30/2007 | $ 32.89 |
| 12/31/2007 | $ 33.41 |
| 06/30/2008 | $ 26.64 |
| 12/31/2008 | $ 21.43 |
| 06/30/2009 | $ 18.87 |
| 12/31/2009 | $ 13.26 |
| 06/30/2010 | $ 12.03 |
| 12/31/2010 | $ 12.84 |
| 06/30/2011 | $ 14.10 |
| 12/31/2011 | $ 15.01 |
| 06/30/2012 | $ 16.45 |
| 12/31/2012 | $ 17.55 |

236.    In March 2013, State Street stepped down as ESOP Trustee and the ESOP Plan retained Reliance Trust to serve as the trustee. Reliance Trust agreed to retain SRR to determine the value of PDC stock.

237.    SRR reached the following determinations of share value as the financial advisor for Reliance:

| Valuation Date | Share Price |
|---|---|
| 06/30/2013 | $ 17.85 |
| 12/31/2013 | $ 16.25 |

238.    When Argent took over Reliance's ESOP business unit in 2014, Argent continued to employ SRR to conduct the valuations.

239.    SRR reached the following determinations of share value as financial advisor to Argent:

| Valuation Date | Share Price |
|---|---|
| 06/30/2014 | $ 16.30 |
| 12/31/2014 | $ 11.00 |
| 06/30/2015 | $ 12.90 |

| 12/31/2015 | $ 12.30 |
| --- | --- |
| 06/30/2016 | $ 13.70 |
| 12/31/2016 | $ 10.35 |
| 06/30/2017 | $  6.85 |

240.    In connection with the appraisals, Appvion released the resulting share price to the ESOP Plan and its participants with a brief explanation.

E.    **The Share Price As Determined By Willamette/SRR and Approved By The Trustees Was Inflated.**

241.    After becoming the sole member of the ESOP Committee in 2017, Mr. Lyon began conducting an investigation into the valuations.    Mr. Lyon determined that SRR's valuations overstated the fair market value of PDC stock because of, among others, the following deficiencies:

- They failed to account for certain known liabilities, including unfunded pension and post-retirement liabilities.

- They relied heavily on projections of future cash flow created by Appvion's management, even though the appraisers, the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants knew that Appvion consistently missed these projections.

- They changed the methodology of their valuations to compensate for periods of low earnings.

- They used the perpetuity model to capitalize a declining income stream, overstating the value of PDC stock.

- They improperly included a control premium that inflated the valuations.

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 61 of 206   Document 77

- They failed to include all overhead costs in the projections by breaking Appvion out into business segments, thus failing to account for overhead costs not allocated to individual business segments.

- They failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- They failed to appropriately consider the impact on the discounted cash flow of the need to repurchase PDC stock.

- They failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

- They failed to account for market indicia of value by, for example, failing to consider the market discount to the value of Appvion's debt.

- The appraisals failed to stress test Appvion's projections.

242.    Willamette's valuation reports have not been made available to Plaintiffs. However, on information and belief, those valuation reports had the same flaws as the SRR valuations. As discussed earlier, Levine was primarily responsible for both the Willamette and the SRR appraisals.

243.    These flaws, which are discussed in more detail below, caused each valuation of PDC stock to be materially and fraudulently overstated, which in turn caused Appvion and the ESOP Plan (largely funded from Appvion's cash) to consistently overpay for the purchase of PDC stock. Because the ESOP Plan was consistently overpaying for PDC stock, it was taking a

loss with each purchase; in addition, spending the cash on overpriced PDC stock took liquidity away from Appvion.

244.    Appvion had to increase its borrowings in order to fund the repurchase of its shares.  As debt increased, thus reducing equity, Appvion fell deeper into a hole from which it could not recover.   SRR's appraisals helped conceal the extent of Appvion's deteriorating financial condition by indicating there was still equity value in the company; however, ultimately, this only made the problem worse since Appvion and the ESOP continued to overpay for the shares.  Ultimately the deficit reached a point where it could not be concealed anymore and Appvion was forced to file for bankruptcy.

245.   For example, if only the pension/post-retirement liabilities are included, PDC stock would have had a negative value by at least 2009.  Since 2009, the ESOP has therefore overpaid for Appvion stock by at least $57 million.

### 1.    The Valuations Failed to Account for Certain Liabilities.

246.    Each of the semi-annual appraisals from 2001 through 2017 failed to account for material liabilities, even though SRR's own definition of fair market value required it to consider all known liabilities.

### a.    The Valuations Did Not Include Substantial Pension/Post-retirement Liabilities.

247.   For example, unfunded pension/post-retirement liabilities alone exceeded $73 million in 2001 and reached as high as $175.5 million in 2012.  These constituted amounts due under defined benefit plans as well as post-retirement benefits such as retiree healthcare and life insurance.   These retirement-related obligations should be viewed as loans provided by employees to Appvion, to be repaid upon retirement, and are company obligations that are senior to the shareholder's equity.

248.   Each year, these liabilities were prominently displayed in Appvion's PWC-audited financial statements.  For example, the relevant portion of the 2012 balance sheet (which is just like every other year) looks as follows:

| "LIABILITIES, REDEEMABLE COMMON STOCK, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME (dollars in thousands) | | |
| --- | --- | --- |
| | December 29, 2012 | December 31, 2011 |
| * * * | | |
| Long-term debt | 511,624 | 510,533 |
| Post-retirement benefits other than pension | 38,440 | 41,611 |
| Accrued pension | 137,081 | 125,245 |
| Other long-term liabilities | 32,165 | 7,379 |
| Commitments and contingencies (Note 19) | - | -" |

249.   From 2001 to 2017, Appvion's unfunded pension and post-retirement benefits other than pension liabilities totaled:

| Year | Pension/Post-retirement Liabilities (in thousands) |
| --- | --- |
| 2001 | $73,132 |
| 2002 | $69,221 |
| 2003 | $99,165 |
| 2004 | $108,505 |
| 2005 | $114,139 |
| 2006 | $101,638 |
| 2007 | $64,293 |
| 2008 | $154,896 |
| 2009 | $151,921 |
| 2010 | $133,716 |
| 2011 | $166,856 |
| 2012 | $175,521 |
| 2013 | $96,748 |
| 2014 | $124,656 |
| 2015 | $128,331 |
| 2016 | $132,805 |

| Year | Pension/Post-retirement Liabilities (in thousands) |
|------|---------------------------------------------------|
|      |                                                   |

250.    However, other evidence demonstrates that SRR, the Prior Committee Defendants, and the Director Defendants knew that pension liabilities, in particular, were material to a valuation.  For example, in December 2003, the Board approved Appvion's acquisition of BemroseBooth, a printing business based in the United Kingdom, for $61.7 million.  However, BemroseBooth did not perform as expected and in 2008, Appvion began making efforts to sell BemroseBooth.  Although Appvion received expressions of interest and offers, SRR noted in its 30 June 2008 valuation of Appvion that the bids Appvion received "effectively value BemroseBooth at an equity of zero after considering the assumptions of debt and [BemroseBooth's] **unfunded pension liability** which exceeds… $36 million, based on current estimates."

251.    As a further example, at a 26 May 2016 ESOP Committee meeting, the ESOP Committee discussed its unfunded pension liability and whether SRR should be including the pension funding in its valuations.  The minutes indicated that Ferree would discuss the pension funding issue with SRR on 6 June 2016.  However, SRR never adjusted the valuation to add in unfunded pension/post-retirement liabilities.

252.    On information and belief, the Willamette appraisals prior to 30 June 2005 likewise make no deduction for these unfunded pension/post-retirement liabilities.

b.    **Many of the Valuations Failed to Include All Interest-Bearing Debt.**

253.    SRR's valuations purported to calculate the enterprise value of the company, using the Guideline Company Method and the Discounted Cash Flow Method to reach a value of the full company.  SRR then subtracted certain liabilities to reach a fair market value of the

equity in the company; that fair market value was divided by the number of shares to determine the share price in that valuation.  An example from the 31 December 2008 valuation is below:

| Conclusion of Value | | | |
|---|---|---|---|
| In Thousands of U.S. Dollars | | | Indicated Value as of 12/31/2008 |
| Carbonless | | $ | 409,000 |
| Thermal | | | 233,000 |
| Performance Packaging | | | 103,000 |
| **Concluded Enterprise Value** | | $ | 745,000 |
| Add:  Cash and Cash Equivalents [a] | | | 5,500 |
| Add:  Note Receivable for Bemrose Booth | | | 3,000 |
| Add:  Chemical Division Value [b] | | | 15,000 |
| **Adjusted Enterprise Value** | | $ | 769,000 |
| Less:  Interest-Bearing Debt [c] | | | (534,300) |
| **Marketable, Controlling-Interest Value of Equity** | | $ | 235,000 |
| Less:  Discount for Limited Marketability | 5.0% | | (12,000) |
| **Fair Market Value of Equity (Rounded)** | | $ | 223,000 |
| Less:  Synthetic Equity Adjustment | | | (109) |
| **Fair Market Value of Equity (Rounded)** | | $ | 223,000 |
| Divided by:  Shares Outstanding | | | 10,406.611 |
| **Fair Market Value of Equity per Share** | | $ | 21.43 |
| Fair Market Value of Equity per Share as of 06/30/2008 | | $ | 26.64 |
| Percentage Change | | | -19.6% |

[a] Based on the Company's expected cash and debt balance as of December 31, 2008.
[b] Calculated by multiplying the Chemical Division's LTM EBITDA of $2.1 million by a multiple of 7 times.
[c] Assumes the bulk sale of receivables of $20.0 million that is expected to be completed prior to the Valuation Date.  The Company's cash balance includes the expenses related to the bulk sale of receivables.

254.    The largest liability that impacted value was the amount of interest-bearing debt that the company had.

255.    Appvion's interest-bearing debt load ranged from over $600 million in 2001 to a little over $400 million in 2015.  However, in some of its valuation reports, SRR improperly disregarded or discounted some of that debt, which directly impacted the share price calculation.

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 66 of 206   Document 77

256. In its 31 December 2008 valuation, SRR specifically acknowledged that Appvion had forecast a total interest-bearing debt balance of $602.1 million as of 31 December 2008. However, SRR discounted this value to $534.3 million and used that figure in its "conclusion of value" based on the following factors:

- Debt with a face value of over $250 million was "trading at a discount to par value as of the Valuation Date." Accordingly, SRR discounted the value of that debt by over $40 million.

- Appvion "intends to repurchase approximately $30 million of its publicly traded" debt for approximately $21 million.

- "[T]he Company expects to consummate a bulk receivables sale for $20 million, which will be used to reduce the outstanding revolver balance[.]"

257. SRR should not have reduced the debt to its trading value because: 1) Appvion was legally obligated to pay the face value of the debt; 2) Appvion did not have the cash to buy back this debt at a reduced face value; and 3) there was no indication Appvion had any present ability to refinance the full debt. In addition, as discussed below, the report acknowledged that the debt was trading at a discount at least in part due to "Company-specific performance factors" which indicates the market for the debt was reflecting a high risk of not being repaid.

258. There is no indication there was any kind of buyout in 2008, since the Company's interest-bearing debt as of December 31, 2008 (as reported in its 2008 10-K filing) was $604.1 million—almost exactly the $602.1 million amount SRR's report identified as the forecast debt. It was improper to exclude liabilities based on potential future transactions that Appvion was not legally obligated to consummate. If the debt is corrected back to $602.1 million, the stock valuation would have been materially reduced.

259.     SRR's 30 June 2009 valuation report similarly reduces the debt based on the market's trading value of Appvion's debt, again subtracting approximately $60 million from Appvion's actual outstanding debt.  However, Appvion did not actually refinance its debt until 30 September 2009.  SRR's decision to reduce the interest-bearing debt it used in its valuation analysis in the 31 December 2008 and 30 June 2009 valuations overstated the value of equity in the company.

260.     In certain of its reports, SRR failed to include all or part of the revolving line of credit as part of Appvion's "interest-bearing debt" in its valuation.  SRR claimed it was excluding the debt because it was part of Appvion's working capital, which was inconsistent with SRR's own initial standards of valuation and its own admission that "all liabilities" must be considered.  Excluding this debt was inconsistent with SRR's methodology in all other appraisals and overstated the value of Appvion's equity in the affected valuations.  This had a material impact on the share price valuation as shown below:

| Valuation Date | Revolving Line of Credit - total Debt (in thousands) | Amount of Revolver Excluded from Valuation (in thousands) | Share Price per SRR Valuation | Share Price If Revolver Included | Share Price Impact |
|---|---|---|---|---|---|
| 06/30/2012 | $32,150 | $32,150 | $16.45 | $12.84 | $3.61 |
| 06/30/2013 | $34,600 | $24,600 | $17.85 | $14.88 | $2.97 |
| 12/31/2015 | $9,600 | $9,600 | $12.30 | $11.79 | $0.51 |
| 06/30/2016 | $27,000 | $27,000 | $13.70 | $9.47 | $4.23 |
| 12/31/2016 | $31,920 | $16,898 | $10.35 | $7.65 | $2.70 |
| 06/30/2017 | $19,500 | $8,484 | $6.85 | $5.39 | $1.45 |

261.     In addition, beginning with its valuation as of 31 December 2013, SRR improperly reduced the "interest-bearing debt" it used in its report by certain "unamortized

68

discounts" that Appvion applied. For example, as of 3 January 2015 Appvion's financial statements showed the following for its publicly traded loans:

| | Amount as of 3 Jan 15 (in thousands) | Unamortized Discount (in thousands) | Discounted Value (in thousands) |
|---|---|---|---|
| First lien term loan at 5.75%, due June 2019 | $330,813 | $2,588 | $328,225 |
| Second lien senior secured notes payable at 9.0% due June 2020 | $250,000 | $3,255 | $246,745 |

262. This misstated and undercounted the interest-bearing debt and further caused SRR's valuations to be inflated.

### c. The Valuation Reports Omitted Other Significant Liabilities.

263. The SRR valuations failed to include additional long-term liabilities that were listed on Appvion's balance sheet, including compensation obligations, workers compensation obligations, accrued insurance obligations, accrued tax obligations, amounts due on accounts receivable securitization, and other obligations. These liabilities, which were reported in Appvion's audited financial statements, reached as high as $30-40 million in some years and would have had a material impact on the valuations.

### d. The Failure to Include All Liabilities Caused the Valuation Reports to Overstate Appvion's Value.

264. Had SRR's valuations included just these other liabilities and the pension/post-retirement liabilities, as discussed above, Appvion's fair market value of equity would have been negative or zero every year since 2009:

|  | 12/31/2009 Report (in thousands) | 12/31/2010 Report (in thousands) | 12/31/2011 Report (in thousands) | 12/31/2012 Report (in thousands) |
|---|---|---|---|---|
| SRR Fair Market Value of Equity | $130,000 | $124,000 | $139,000 | $153,000 |
| Pension/Post-retirement Liabilities | $151,921 | $133,716 | $166,856 | $175,521 |
| Other Liabilities | $9,294 | $5,716 | $7,389 | $32,165 |
| Total Excluded Liabilities | $161,215 | $139,432 | $174,245 | $207,686 |
| Revised Value of Equity | $(31,215) | $(15,432) | $(35,245) | $(54,686) |

|  | 12/31/2013 Report | 12/31/2014 Report | 12/31/2015 Report | 12/31/2016 Report |
|---|---|---|---|---|
| SRR Fair Market Value of Equity | $129,600 | $80,700 | $83,000 | $64,900 |
| Pension/Post-retirement Liabilities | $96,748 | $124,656 | $128,331 | $132,805 |
| Other Liabilities | $36,243 | $43,753 | $35,354 | $30,536 |
| Total Excluded Liabilities | $132,991 | $168,409 | $163,685 | $163,341 |
| Revised Value of Equity | $ (3,391) | $ (87,709) | $(80,685) | $(98,441) |

265. Because the Trustee, Appraiser and Director Defendants reviewed Appvion's PWC-audited financial statements, they were aware of these material liabilities and knew they had been excluded from the valuation analysis.

266. The Trustee, Appraiser, and Director Defendants also had access to the valuation reports and knew that SRR was not consistently including all of Appvion's interest-bearing debt.

**2.     SRR's Discounted Cash Flow Analysis Was Flawed.**

267. As part of its DCF method analysis, SRR relied on projections of future earnings over a five-year period, which were prepared by Appvion management. SRR used these projections to determine two values: 1) the Present Value of Distributable Cash Flows, which

took the projected EBITDA figures over a five years and discounted the expected cash to present value; and 2) a "Terminal Enterprise Value" which took the EBITDA for the Year 5 projection, multiplying it by a "Terminal EBITDA Multiple", and then discounting it to present value. These two values were then added together to reach the enterprise value of that segment (prior to subtracting any liabilities).

268.    For example, below is the 30 June 2012 DCF Method valuation for the Thermal segment:

## IV. DISCOUNTED CASH FLOW METHOD

### Discounted Cash Flow Method - Thermal

| In Thousands of U.S. Dollars | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Residual |
|---|---|---|---|---|---|---|---|
| | | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | |
| **Distributable Cash Flows** | | | | | | | |
| EBITDA | $ | 52,708 | $ 59,470 | $ 64,699 | $ 71,080 | $ 80,866 | |
| Depreciation and Amortization | | (15,987) | (15,636) | (15,167) | (14,381) | (14,381) | |
| Income Taxes | | (14,138) | (16,876) | (19,070) | (21,829) | (25,597) | |
| Debt-Free Net Income | | 22,583 | 26,958 | 30,462 | 34,870 | 40,888 | |
| | | | | | | | |
| Depreciation and Amortization | | 15,987 | 15,636 | 15,167 | 14,381 | 14,381 | |
| Capital Expenditures | | (11,900) | (8,400) | (13,300) | (15,400) | (15,400) | |
| Additional Working Capital | | 4,200 | 4,400 | (2,400) | (2,500) | (2,600) | |
| Distributable Cash Flows | | 30,870 | 38,594 | 29,929 | 31,351 | 37,269 | |
| | | | | | | | |
| Partial Period Adjustment [a] | | 0.46 | 1.00 | 1.00 | 1.00 | 1.00 | |
| Distributable Cash Flows Allocated to Projection Period | | 14,149 | 38,594 | 29,929 | 31,351 | 37,269 | |
| | | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | | |
| Weighted Average Cost of Capital | | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | |
| Discount Period [a] | | 0.23 | 0.96 | 1.96 | 2.96 | 3.96 | |
| Present Value Factor | | 0.9704 | 0.8820 | 0.7737 | 0.6787 | 0.5953 | |
| | | | | | | | |
| Present Value of Distributable Cash Flows | | 13,730 | 34,040 | 23,156 | 21,277 | 22,187 | |

| Enterprise Value | | | Terminal Value | | |
|---|---|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2016) | 114,000 | | 2016 EBITDA | $ | 80,866 |
| Present Value of Terminal Enterprise Value | 180,000 | | Terminal EBITDA Multiple | | 4.0x |
| | | | | | |
| | | | Terminal Enterprise Value | | 323,462 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 294,000** | | Present Value Factor | | 0.5576 |
| | | | Present Value of Terminal Enterprise Value | $ | 180,000 |

[a] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.

### a.    The DCF Analysis Was Based on Grossly Inflated Projections of Future Earnings.

269.    Because the projections prepared by Appvion management were unrealistically inflated, Appvion rarely met its targets.  SRR, the Trustee Defendants, the Prior Committee

Defendants, and the Director Defendants knew that Appvion consistently missed these projections, sometimes by very wide margins, but there is no evidence that SRR or Willamette challenged or stress tested management's projections. SRR and the Trustee Defendants should not have relied on the projections prepared by Appvion management knowing that they were consistently inaccurate.

270. For example, below are the projections used in the valuations as of 31 December 2011 and 30 June 2012, compared to the actual (adjusted) EBITDA for those years as reported in later valuations:

| Thermal Segment | | | | | |
|---|---|---|---|---|---|
| | Year Ending 12/31/2012 | Year Ending 12/31/2013 | Year Ending 12/31/2014 | Year Ending 12/31/2015 | Year Ending 12/31/2016 |
| Projected EBITDA - 12/31/2011 Report | $ 40,400 | $ 41,600 | $ 47,400 | $ 52,800 | $ 58,200 |
| Projected EBITDA - 06/30/2012 Report | $ 52,708 | $ 59,470 | $ 64,699 | $ 71,080 | $ 80,866 |
| Actual (Adjusted) EBITDA | $ 48,968 | $ 41,929 | $ 26,826 | $ 8,139 | $ 28,769 |
| Carbonless Segment | | | | | |
| Projected EBITDA - 12/31/2011 Report | $ 50,400 | $ 48,000 | $ 46,000 | $ 44,000 | $ 42,000 |
| Projected EBITDA - 06/30/2012 Report | $ 57,847 | $ 58,600 | $ 57,605 | $ 53,245 | $ 50,837 |
| Actual (Adjusted) EBITDA | $ 51,102 | $ 50,828 | 41,171 | $ 47,191 | $ 32,739[2] |

271. The projections 1) increased (by an average of 37% for Thermal and 21% for Carbonless) in the 30 June 2012 valuation from the projections used in the 31 December 2011 report; and 2) overestimated EBITDA, especially with the Thermal division missing the mark for

---

[2] Source: The actual EBITDA numbers are from Valuation Report dated 30 June 2017, Exhibits B and C.

2015 EBITDA by more than $63 million as compared to the 30 June 2012 projection. In addition, the 30 June 2012 projections were made halfway through 2012, but, the projections still materially overestimated EBITDA in 2012.

272. In particular, since the Year 5 number was the basis for the Terminal Enterprise Value, a high Year 5 value would drastically inflate the Terminal Enterprise Value and therefore the enterprise value as determined by the DCF Method valuation. The "Year 5" projections used in the DCF analysis were consistently and unrealistically inflated, causing the Terminal EBITDA Value to be consistently inflated. Below is a chart with the projected Year 5 EBITDA numbers compared to the actual EBITDA for that year, which shows how inflated the Year 5 projection was:

| Thermal | | |
|---|---|---|
| | Year 5 Projection(s) | Actual EBITDA |
| 2010 | $ 26,092 | $ 20,032 |
| | $ 29,191 | |
| 2011 | $ 61,101 | $ 33,306 |
| 2012 | $ 55,479 | $ 48,968 |
| 2013 | $ 52,000 | $ 41,929 |
| | $ 52,600 | |
| 2014 | $ 41,200 | $ 26,826 |
| | $ 50,500 | |
| 2015 | $ 52,483 | $ 7,985 |
| | $ 51,941 | |
| 2016 | $ 58,200 | $ 28,800 |
| | $ 80,866 | |

| Carbonless | | |
|---|---|---|
| | Year 5 Projection(s) | Actual EBITDA |
| 2010 | $ 52,431 | $ 59,387 |
| | $ 66,410 | |
| 2011 | $ 81,784 | $ 49,731 |
| 2012 | $ 83,964 | $ 51,102 |

| Carbonless | | |
|---|---|---|
| | Year 5 Projection(s) | Actual EBITDA |
| 2013 | $ 62,000 | $ 50,828 |
| | $ 60,500 | |
| 2014 | $ 54,800 | $ 42,171 |
| | $ 53,200 | |
| 2015 | $ 51,042 | $ 47,191 |
| 2016 | $ 42,000 | $ 32,739 |
| | $ 50,837 | |

273. The Trustee Defendants, as the parties ultimately responsible for approving the valuations, had a duty to 1) investigate and document the processes that Appvion management used to create these projections; 2) investigate any large, unexplained changes in the projections like the large increase for the 30 June 2012 projections; and 3) critically assess the reasonableness of the projections, especially in light of Appvion's consistent failure to meet its projections. On information and belief, the Trustee Defendants failed to investigate the projections.

274. Willamette, SRR, and the Trustee Defendants also should have recognized that the individuals at Appvion who were creating the projections had significant conflicts of interest. Specifically, as discussed below, they would benefit from higher stock prices under numerous incentive compensation plans that were tied to the stock price. There is no indication they appropriately considered these conflicts of interest.

> **b.    The Terminal EBITDA Value Capped A Declining Income Stream into Perpetuity.**

275. A DCF analysis is intended to represent the present value of the future cash flows from the business. SRR's calculation of the terminal EBITDA enterprise value assumed cash flow would continue growing into perpetuity, or at least continue at the Year 5 level.

276. However, for all time periods relevant to this Complaint, Appvion was recognized as a declining business; in particular, the Carbonless division was declining as consumers switched to electronic means of communication. As early as 23 April 2001, Appvion referred to itself as "a company with steady but declining earnings."

277. However, SRR's calculation of terminal values disregarded any declining EBITDA trends, instead choosing to capitalize (reduce to present value) Appvion's future income streams into perpetuity. Although it may be appropriate to capitalize an income stream that is assumed to continue into perpetuity, a declining income stream, by definition, cannot continue.

278. The effect of SRR's capitalization of a declining income stream and the use of unrealistic projections was that the terminal EBITDA value represented a disproportionately high percentage of Appvion's total enterprise value, as shown in the chart below:

|  | Terminal Value Percent of DCF Value - Carbonless | Terminal Value Percent of DCF Value - Thermal |
|---|---|---|
| 06/30/2005 Report | 66% | 81% |
| 12/31/2005 Report | 59% | 78% |
| 06/30/2006 Report | 63% | 79% |
| 12/31/2006 Report | 63% | 93% |
| 06/30/2007 Report | 66% | 94% |
| 12/31/2007 Report | 63% | 93% |
| 06/30/2008 Report | 67% | 83% |
| 12/31/2008 Report | 60% | 71% |
| 06/30/2009 Report | 65% | 70% |
| 12/31/2009 Report | 58% | 79% |
| 06/30/2010 Report | 61% | 73% |
| 12/31/2010 Report | 56% | 65% |
| 06/30/2011 Report | 60% | 68% |
| 12/31/2011 Report | 51% | 66% |
| 06/30/2012 Report | 46% | 61% |
| 12/31/2012 Report | 46% | 66% |
| 06/30/2013 Report | 53% | 68% |

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 75 of 206   Document 77

| | Terminal Value Percent of DCF Value - Carbonless | Terminal Value Percent of DCF Value - Thermal |
|---|---|---|
| 12/31/2013 Report | 53% | 70% |
| 06/30/2014 Report | 62% | 77% |
| 12/31/2014 Report | 60% | 71% |
| 06/30/2015 Report | 56% | 63% |
| 12/31/2015 Report | 60% | 65% |
| 06/30/2016 Report | 64% | 66% |
| 12/31/2016 Report | 65% | 64% |
| 06/30/2017 Report | 70% | 67% |

279. For a business with a declining income stream, it was inappropriate for the terminal values to constitute such a large portion of the overall enterprise value.

280. SRR's methods were not consistent with recognized appraisal standards. At a minimum, Willamette, SRR, and the Trustee Defendants should have documented in writing why they considered this treatment to be reasonable for Appvion, but they failed to do so.

281. SRR's willingness to rely upon highly inflated fifth year projections and failure to properly account for Appvion's declining income stream (as reflected by EBITDA), created a disproportionately large terminal value calculation that overstated the value of PDC stock.

282. This issue was compounded by the fact that Appvion needed to use its cash to meet stock repurchase obligations, which consistently exceeded the amount of cash received from stock purchases. SRR failed to adequately consider this ongoing drain on Appvion's cash flow.

### c.      SRR's DCF Method Analysis Was Not Reliable.

283. The DCF method as applied by SRR was also subject to manipulation. The DCF method required SRR to calculate the "Weighted Average Cost of Capital," which was used to generate the discount rate used to determine the present value of the projected cash flows. This calculation purported to represent "an overall rate based upon the individual rates of return for

invested capital (equity and interest-bearing debt)" which is "calculated by weighting the required returns on interest-bearing debt and common stock in proportion to their estimated percentages in an expected capital structure." Given the same projections, a lower discount rate would lead to a higher valuation, while a higher discount rate would lead to a lower valuation.

284. In practice, SRR changed the discount rate substantially from valuation to valuation without sufficient explanation. The chart below contains the weighted average cost of capital for Thermal for each of SRR's valuations:

| Valuation Date | Weighted Average Cost of Capital |
|---|---|
| 06/30/2005 | 12.5% |
| 12/31/2005 | 8.5% |
| 06/30/2006 | 9.5% |
| 12/31/2006 | 14.5% |
| 06/30/2007 | 15.5% |
| 12/31/2007 | 12.5% |
| 06/30/2008 | 12.5% |
| 12/31/2008 | 12.5% |
| 06/30/2009 | 12.5% |
| 12/31/2009 | 9.5% |
| 06/30/2010 | 9.5% |
| 12/31/2010 | 10.0% |
| 06/30/2011 | 10.0% |
| 12/31/2011 | 10.5% |
| 06/30/2012 | 14.0% |
| 12/31/2012 | 14.0% |
| 06/30/2013 | 13.5% |
| 12/31/2013 | 12.0% |
| 06/30/2014 | 12.0% |
| 12/31/2014 | 12.5% |
| 06/30/2015 | 12.5% |
| 12/31/2015 | 12.0% |
| 06/30/2016 | 12.5% |
| 12/31/2016 | 13.0% |
| 06/30/2017 | 13.0% |

285. SRR purported to illustrate how it determined the weighted average cost of capital, but it did not explain critical aspects of the calculation like its selection of a "company-specific risk premium," which varied between 0% for some years and segments and was as high as 8% for some years and segments.

286. SRR's calculation of the weighted average cost of capital, which was key to its discounted cash flow analysis discussed above, appears to rely on industry rates of return instead of Appvion's actual cost of debt. Had Appvion's actual bond risk (as shown by the fact that its bonds were trading for below par value, Appvion's Standard and Poor's rating, discussed below) and Appvion's high amount of leverage been considered, the weighted average cost of capital would have been much higher, resulting in a much lower equity valuation.

287. For example, SRR's valuation as of 30 June 2016, includes a "cost of debt" of 4.4% in the Carbonless calculation of the weighted average cost of capital, referencing that it was "[b]ased on estimated senior lending rates as of the Valuation Date."

288. However, the same document has an exhibit listing all of Appvion's interest-bearing debt, which shows an actual cost of Appvion debt of 7.55%. And because Appvion's Second Lien Notes were trading in the 55% of par value ($0.55 on the dollar) range at the time, the actual cost of Appvion debt was even higher.

289. To compound the problem, the weighted average cost of capital also miscalculates (or assumes) the percentage of debt in Appvion's capital structure was 40%. In fact, the actual debt percentage was 78.9% as calculated using the interest-bearing debt ($409.4 million) and equity ($87.6 million) figures shown in the appraisal.

290. As a result, SRR badly underestimates Appvion's actual cost of capital in its calculation of Appvion's weighted average cost of capital.

291.    The other key variable was the Terminal EBITDA Multiple, which was used to multiply the inflated Year 5 EBITDA projection and therefore accounted for a significant portion of the DCF valuation.  This multiple also varied widely with no or insufficient explanation or justification; below is the multiple used for Carbonless in each of SRR's reports:

| Valuation Date | Terminal EBITDA Multiple |
|---|---|
| 06/30/2005 | 6.0x |
| 12/31/2005 | 7.0x |
| 06/30/2006 | 7.0x |
| 12/31/2006 | 7.0x |
| 06/30/2007 | 6.0x |
| 12/31/2007 | 6.0x |
| 06/30/2008 | 6.0x |
| 12/31/2008 | 6.0x |
| 06/30/2009 | 6.0x |
| 12/31/2009 | 5.5x |
| 06/30/2010 | 5.5x |
| 12/31/2010 | 5.5x |
| 06/30/2011 | 5.5x |
| 12/31/2011 | 5.0x |
| 06/30/2012 | 4.0x |
| 12/31/2012 | 5.0x |
| 06/30/2013 | 5.5x |
| 12/31/2013 | 6.0x |
| 06/30/2014 | 5.0x |
| 12/31/2014 | 5.0x |
| 06/30/2015 | 5.5x |
| 12/31/2015 | 5.5x |
| 06/30/2016 | 5.5x |
| 12/31/2016 | 6.5x |
| 06/30/2017 | 7.0x |

292.    For example, SRR gave no justification for why the multiple increased in 2016 and 2017, even though Carbonless was in a declining industry and its EBITDA had decreased substantially.

293.    On information and belief, SRR would sometimes manipulate the discount rate and the EBITDA multiples to prevent large swings in the valuation.   For example, the projections for the Thermal and Carbonless segments discussed above included in the 30 June 2012 valuation report marked a significant increase over the projections included in the 31 December 2011 valuation report.   However, in the 30 June 2012 valuation report, SRR drastically increased the weighted average cost of capital and lowered the terminal EBITDA multiple so that the valuations of Thermal and Carbonless were nearly identical to the prior valuation report:

|  | Valuation as of 12/31/2011 | Valuation as of 6/30/2012 |
|---|---|---|
| **Carbonless** | | |
| Present Value of Distributable Cash Flows (Years 1-5) | $ 133,000 | $ 143,000 |
| WACC | **9.0%** | **12.0%** |
| Terminal EBITDA Value | $ 136,000 | $ 123,000 |
| Terminal EBITDA Multiple | **5.0x** | **4.0x** |
| **Enterprise Value** | **$ 269,000** | **$ 266,000** |
| **Thermal** | | |
| Present Value of Distributable Cash Flows (Years 1-5) | $ 98,000 | $ 114,000 |
| WACC | **10.5%** | **14.0%** |
| Terminal EBITDA Value | $ 194,000 | $ 180,000 |
| Terminal EBITDA Multiple | **5.5x** | **4.0x** |
| **Enterprise Value** | **$ 292,000** | **$ 294,000** |

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 80 of 206   Document 77

### d. SRR Changed Its DCF Methodology in Its 30 June 2015 Report.

294.    The 30 June 2015 DCF analysis also contains an additional material flaw.  SRR typically relied on five years of projected EBITDA in their DCF analysis.  However, the 30 June 2015 valuation used six years of data, which artificially increased the valuation even though the projections used for that year actually decreased.  In addition, the Year 6 projections used in the analysis substantially increased the terminal value of the analysis without explanation or justification.

295.    SRR's valuation report did not explain why it used six years of data instead of five.  While it may be permissible to use more than five years of projections for a DCF analysis (and may have even been preferable considering Appvion's declining revenues), adding an extra year of data for this one report inflated the value of Appvion's stock by approximately $2.00 a share.  It further reflected SRR's willingness to use inconsistent methods from one appraisal period to another.

296.    This valuation report coincided with 1) the sale of Encapsys, which materially lowered the overall value of the company; and 2) a terrible year for the Thermal segment, in which it's EBITDA was only $8 million.  However, using six years of data instead of five allowed SRR to increase the stock price valuation from $11.00 a share in the 31 December 2014 valuation to $12.90 a share in the 30 June 2015 valuation, even though the sale of Encapsys was devastating to Appvion's future ability to grow its cash flow.

### 3.    SRR's Guideline Company Method Analysis was Flawed.

297.    The Guideline Company Method purported to analyze the values of comparable public companies.  This was supposed to be based on SRR's independent research and determination of what companies were similar to Appvion from an investment risk and return

perspective. However, the ESOP Committee was improperly involved in selecting the guideline companies that SRR used in its analysis. In its 30 June 2016 valuation reports, SRR specifically acknowledged this guidance—"We searched several sources and held discussions with management to identify guideline public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application in our analysis."

298. In addition, while the Guideline Company Method relied heavily on analysis of other companies, the basis for the valuation was still projections prepared by management. Specifically, the method involved analysis of the guideline companies in order to determine a range of pricing multiples; SRR would then choose a pricing multiple from that range, and apply it to 1) actual revenue and EBITDA for the twelve months prior to the valuation; and 2) Appvion management's projected EBITDA and revenue for the next fiscal year. The results of this would then be averaged and a control premium of either 10% or 15% would be added to reach an enterprise value. For example, below is the valuation for Carbonless from the 31 December 2010 valuation report:

## V.  GUIDELINE COMPANY METHOD

**Indication of Value - Carbonless**

*In Thousands of U.S. Dollars*

| | Carbonless Results | Low | High | Mean | Median | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $ 64,100 | 4.1x | 7.8x | 6.1x | 6.1x | 4.5x | $ 288,000 |
| Revenue | 472,000 | 0.53x | 0.95x | 0.76x | 0.79x | 0.65x | 307,000 |
| | | | | | Indicated Enterprise Value (Rounded) | | 298,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 62,931 | 3.3x | 9.0x | 5.8x | 6.3x | 5.0x | 315,000 |
| Revenue | 472,030 | 0.55x | 0.99x | 0.81x | 0.83x | 0.65x | 307,000 |
| | | | | | Indicated Enterprise Value (Rounded) | | 311,000 |
| | | | | | Indicated Enterprise Value, Minority Interest | | 305,000 |
| | | | | | Plus: Control Premium @ 15.0% | | 46,000 |
| | | | | | **Enterprise Value, Controlling Interest Basis (Rounded)** | | **$ 351,000** |

299.  Since SRR's application of the Guideline Company method continued to rely on the inflated projections, the resulting calculation of value was likewise inflated.  In addition, SRR relied on the management projections in choosing EBITDA and revenue multiples, so higher projections caused SRR to choose higher multiples.

300.  SRR also applied the Guideline Company analysis inconsistently.  In its valuation reports between 30 June 2009 and 30 June 2012, SRR chose to disregard Thermal's "last twelve months" EBITDA value; this meant that the enterprise value was skewed toward the inflated projections.  In the 30 June 2012 valuation report, SRR took it a step farther and chose to disregard the last twelve months of revenue, so that the valuation was based only on projected data.

301.  In addition, in the 31 December 2012, 31 December 2013, and 31 December 2014 valuation reports, the enterprise value SRR identifies for Thermal through its Guideline Company Method analysis does not match the numbers in the report, overstating the value by

between two and three million dollars.  The Carbonless analysis for 30 June 2014 has a similar defect.

302.    In 2015, Appvion's Thermal segment had a disastrous year and only achieved an EBITDA of $8 million.  To compensate, SRR again changed its methodology in the 30 June 2015 valuation report:

- Ignored the last twelve months EBITDA value;

- Instead of using the projected EBITDA for fiscal year 2015, it used projected EBITDA for fiscal year 2016, which was inconsistent with all of SRR's other valuations;

- For the first time, SRR added a third component to its Guideline Company Method analysis for Thermal only, a three-year historical average of EBITDA and revenue.

303.    Starting with the 31 December 2015 valuation report, SRR disregarded both the three year historical average, last twelve months, and projected EBITDA numbers and relied solely on revenue multipliers in its valuation of the Thermal segment.

304.    As with the Discounted Cash Flow method, SRR's use of multipliers in its Guideline Company Method analyses also varied widely with little explanation.

### 4.    SRR Ignored Market Indications That Appvion Was Insolvent.

305.    In its early valuation reports, part of SRR's valuation process included looking at the Bloomberg valuation for Appvion's publicly-traded debt.  The Bloomberg valuation provides the market price of publicly-traded debt, and therefore the market's opinion of a company's risk of default on its debt.

306. In its 30 June 2005 and 31 December 2005 valuation reports, SRR noted that Appvion's debt was trading for slightly below par value, citing to the Bloomberg valuation. However, SRR used the book value of the stock for purposes of its valuation, stating that "Because the pricing of the Company's publicly-traded debt can fluctuate materially over a short period of time, we used the book value of the Company's debt to calculate the Company's equity value in our analysis."

307. SRR continued using the book value of debt until its 31 December 2008 and 30 June 2009 valuations, when it improperly disregarded the book value and used the market value in its valuations as discussed above.

308. After its 30 June 2009 valuation report, SRR stopped commenting on the Bloomberg value of Appvion's publicly-traded debt entirely. However, the Bloomberg value increasingly showed that the market considered Appvion to be troubled, when Appvion's Second Lien Notes were priced at a discount to par. In February 2016, bond prices were trading as low as 30¢ on the dollar, indicating a yield to maturity in excess of 30%. The Bloomberg value continued to trade Appvion's bonds and notes for below par through the date that Appvion filed for bankruptcy in November 2017.

309. In addition, based Appvion's had a Standard & Poor's rating of B as early as 2009; in August 2016, the rating reduced to B-. Standard & Poor's defines a B rating as follows:

> An obligor rated "BB" is less vulnerable in the near term than other lower-rated obligors. However, **it faces major ongoing uncertainties and exposure to adverse business, financial, or economic conditions** that could lead to the obligor's inadequate capacity to meet its financial commitments.

> An obligation rated "B" is **more vulnerable to nonpayment than obligations rated "BB"**, but the obligor currently has the capacity to meet its financial commitments on the obligation. **Adverse business, financial, or economic conditions will likely impair**

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 85 of 206   Document 77

**the obligor's capacity or willingness to meet its financial commitments** on the obligation.

310. SRR knew the Bloomberg value and Appvion's Standard & Poor rating was relevant to its valuations, as evidenced by its citation to the Bloomberg value in its earlier reports. However, Stout chose to ignore this market-based evidence that was inconsistent with its valuations, without explanation or justification. Likewise, the ESOP Committee, Trustee and Director Defendants failed to require that these market indicators of value be appropriately considered.

### 5. The Valuations Improperly Applied a Control Premium.

311. The appraisals improperly applied a control premium in many of their valuations. According to SRR's valuation reports, the control premium is intended to represent the difference between what a third party would pay for a marketable, minority ownership interest in a company as compared to a controlling interest where the shareholder is able to exert control over the management or operation of the company.

312. SRR applied this control premium to its appraisals of Appvion in two ways. First, for the Guideline Company Method, the enterprise value is multiplied by a control premium, which is then added to reach the enterprise value on a controlling-interest basis. For example, if the enterprise value was $300 million and the control premium was 15%, the final value would be $345 million ($300 million plus 15% of $300 million). SRR applied a control premium of 15% to its valuations from 2005 through 2011. Beginning with its 30 June 2012 through its 31 December 2014 valuation, SRR reduced the premium to 10%, without explanation for the reduction.

313. Starting with its 30 June 2015 valuation, SRR appears to have removed the control premium from its report entirely, though it continued to list the enterprise value as being

on a "controlling-interest basis." SRR did not explain why it was removing the control premium from its Guideline Company Method analysis, if in fact it did so.

314. Second, for the discounted cash flow analysis, the control premium is incorporated in the EBITDA multiples SRR applied: "the selected exit EBITDA multiple applied in the DCF method incorporates a control premium. Therefore, the indication of value from the DCF Method in our analysis represents a controlling ownership interest value." SRR does not explain how much the control premium influenced the multiplies; in addition, since the multiples varied so much as discussed above, it's unclear if SRR ever stopped applying a control premium to its DCF analysis.

315. On information and belief, Willamette also applied a control premium of at least 15% to its valuations.

316. As discussed above, application of a control premium here was not appropriate since the shareholder of the Company (the ESOP, through the Trustee Defendants) did not have any practical ability to control the resources and affairs of PDC or Appvion under the terms of the ESOP Plan or the Security Holder's Agreement. Further, since only relatively small amounts of Appvion stock were sold at a time, valuing the stock on a control basis was inappropriate.

### 6. The Valuations Were Flawed in Additional Ways.

317. In addition to the issues with the valuations discussed above, the valuations contained the following material flaws:

- In order to justify their numbers, the 2012 SRR appraisal failed to subtract losses from the closure of Appvion's West Carrollton Mill and the associated severance costs.

87

- The appraisals failed to include all overhead costs in the projections by breaking Appvion out into business segments. By not reporting on the value of Appvion as a whole, SRR was able to avoid accounting for general overhead and losses on plant closures and pick and choose which expenses to include in EBITDA, thus over-valuing the Appvion stock. For example, SRR's reports list the historical adjusted EBITDA for Thermal at $33.3 million, Carbonless at $49.3 million, and Encapsys at $11.9 million, which adds up to $94.5 million. However, SRR's reports state the EBITDA for Appvion as a whole was only $82.7 million.

- The appraisals failed to apply a large enough discount for the company's repurchase obligation and the discount for limited marketability of the shares. SRR's valuation reports combined the repurchase obligation and the discount for limited marketability as a 5% discount to equity, after subtracting interest-bearing debt. This calculation ignores the actual data about the age of ESOP participants and Appvion's actual ability to meet its repurchase obligations, especially in light of Appvion's diminishing cash flow.

- The appraisals failed to consider any kind of asset approach to valuing Appvion. This was especially problematic starting in at least 2013, when the financial statements showed that Appvion's interest-bearing debt exceeded its assets.

- SRR did not conduct any kind of stress testing to consider what would happen if the company failed to meet its projections. Stress testing allows a valuation firm to test the quality of the projections and look in depth at the assumptions behind the projections. This helps answer the question of whether the company is in

danger of default on its debts; if it is in danger of default, the premise of the projections has to change.

318.     These flaws, along with the other issues discussed above, meant the SRR valuation reports were unreliable and that they consistently overstated PDC's stock value.

**F.    The Director Defendants and the Prior Committee Defendants Reviewed the Valuations.**

**1.    The ESOP Committee Took an Active Role in The Valuations.**

319.     The ESOP Committee was always aware of and involved in the valuations.

320.     Beginning in January 2008, minutes of the ESOP Committee show that SRR and the Trustee Defendants specifically presented the valuations to the ESOP Committee after each valuation had been completed.

321.     For example, at the 10 January 2008 ESOP Committee meeting, SRR's Levine participated in the meeting telephonically and explained the valuation "as prepared by Stout Risius Ross and approved by State Street Global Advisors."

322.     The ESOP Committee requested edits to SRR's valuation presentation to State Street, including removing a reference to insurance settlement litigation and adding additional carbonless competitors to the presentation.

323.     Similarly, the 7 July 2008 minutes of the ESOP Committee show that the ESOP Committee "accepted the valuation" after discussion with SRR and State Street.

324.     In a 7 July 2009 ESOP Committee Meeting, the ESOP Committee reviewed the 30 June 2009 stock valuation prepared by SRR and approved by State Street Defendants, and requested adjustments to the share price.

325.     According to the minutes of the meeting:

The Committee reviewed the June 30, 2009 stock valuation prepared by Stout Risius Ross and approved by state Street Global Advisors. Mr. Levine described the process used to arrive at the June 30, 2009 valuation. **Following a detailed discussion, it was determined that the stock price needed to be adjusted. The ESOP Committee accepted the adjusted valuation**. A revised valuation report will be forwarded to the ESOP Committee.

326. Thereafter, representatives from SRR and the trustees participated in ESOP Committee meetings to review each of their valuations with the ESOP Committee.

### 2. The Director Defendants Either Reviewed the Valuation Reports or Should Have Been Reviewing Them As Part of its Duties to the ESOP Plan.

327. As part of its duties to oversee PDC and Appvion's operations, the Board of Directors had an Audit Committee and a Compensation Committee. According to numerous 10-K filings, the Audit Committee was tasked with "provid[ing] assistance to the Board of Directors in fulfilling its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of Paperweight Development financial reports." The Audit Committee was responsible for, among other things, reviewing the audited financial statements; as discussed below, those audited financial statements included numerous liabilities that the valuations failed to account for, or even consider, including hundreds of millions of dollars in unfunded pension/post-retirement liabilities. The director defendants that were on the Audit Committee include the following: **Carter, Pace, Scherbel, Reardon, and Murphy.**

328. PDC/Appleton's Board of Directors also reviewed both the financial projections prepared by management and the stock valuations. This included review of the financial projections that formed the basis for Willamette and SRR's valuations.

329.   Specifically, Willamette's Braun said part of the valuation process would be providing the "the board of directors with enough information so they understand what it is we did, why it makes sense, at least why we think it made sense and how we feel that is a supportable value for purposes of determining what your value is going forward."

330.   In addition, the trust agreements required the Trustee "to report to the Company as of the last day of each Plan Year of the Plan . . . the then "Net Worth" of the Trust Fund, that is, the fair market value of all property held in the Trust Fund, reduced by any liabilities other than liabilities to Participants in the Plan and their Beneficiaries, as determined by the Trustee[.]"

331.   Further, various ESOP publications including a 2001 newsletter and the 2006 KSOP guide discussed above, represented that the Directors Defendants reviewed the company's performance against its objectives.

332.   Under the 2015 discretionary trust engagement letter with Argent, Argent agreed to present a report of its actions as Trustee within thirty days of each valuation.

### G.   The Inflated Share Price Caused the ESOP Plan to Repurchase Shares for More Than Fair Market Value.

333.   SRR conducted these valuations knowing that the Trustee Defendants and the ESOP Committee would use the valuation to set the share price to be used for ESOP Plan transactions, including deferrals to the ESOP Plan and repurchases of shares.

334.   As a result of the fraudulently inflated valuations, the ESOP Plan repeatedly purchased shares from the Employee Participants at a price above the share's fair market value and repeatedly bought shares on behalf of Employee Participants at a price above the share's fair market value.

335.   Since PDC had no assets other than its ownership of Appvion, Appvion loaned cash to PDC to fund the ESOP's repurchase obligations.

336.    Because of the inflated stock valuations, Appvion was required to loan significantly more cash to PDC than it should have.  This reduced the cash Appvion had available to repay its debt and make capital improvements, which further damaged its value and ability to operate as a going concern.  The fair market value as determined by the Trustee Defendants and SRR was also used in connection with the intercompany loans from PDC to the ESOP Plan—the ESOP Plan would sell shares to PDC at fair market value in order to repay the loan.

337.    Yet, Appvion management and others (with the directors' acquiescence or approval) continued to make affirmative representations to reassure employees that the valuations were correct.  For example, in 2001, Defendant Driscoll from State Street stated that she and State Street were appointed to make sure that the employees would not be paying more than fair market value during the buyout.  In September 2003, Driscoll authored a newsletter sent to the Employee Participants that stated that "[w]ith the help of our financial advisors, our oversight of PDC stock includes frequent monitoring of Appleton's financial condition and the stock's performance. To that end, Willamette and State Street perform due diligence meetings with Appleton management during the year."  In a 2007 publication titled "Appleton: Applying Technology for Performance," Driscoll is quoted as stating that State Street was "appointed the fiduciary to make sure the transaction was fair from a financial perspective to the ESOP.  And it was.  Employees would not be paying more than the fair market value to buy Appleton Papers."

338.    In reliance upon accurate share valuations, employees continued to divert portions of their paychecks to fund the ESOP and the ESOP Plan continued to purchase PDC stock at inflated values.

339. As an added inducement, Appvion made matching contributions of PDC stock to employees' contributions.

340. Unbeknownst to the employees, to the extent the matching contributions to the ESOP Component of the Plan were in the form of PDC stock, they were effectively worthless by at least 2009.

**H.     The Executives Responsible For the 2001 Transaction Left Appvion While the Share Price Was High.**

341. As part of the 2001 Transaction, Appvion management represented that its fourteen-member executive team was putting 100% of their 401(k) plans into the ESOP.

342. However, certain Appvion management had inside financial information about the status of the Company and its true value; therefore, they knew when to pull their money out of stock or out of management incentive plans.

343. Immediately after the 2001 Transaction, the named executive officers reported holding 4.2% of the shares in the ESOP.

344. However, as the share price rapidly increased, members of the executive team at the time of the 2001 Transaction began leaving the company and receiving distributions of their ESOP accounts for a combined gain of over $7.2 million.

345. In 2004, Doug Buth, Appvion's CEO, announced that he would be retiring in early 2005 at age 49.

346. Buth was paid for his shares on an installment basis, and he had a gain of over $850,000 on his investments in the ESOP Component of the Plan (not including any payments under various compensation plans tied to the value of the stock).

347. Rick Fantini, the Vice President of Operations, left the company in 2005 and had a gain of over $577,000 from his investments in the ESOP Component of the Plan.

93

348.    By November 2006, Paul Karch was the only remaining member of the executive team from the 2001 Transaction who was still with Appvion.  However, Karch left the company on 2 March 2007 with a gain of over $300,000 from his investments in the ESOP Component of the Plan.

349.    These departures, timed while the share price was artificially high, added to the liquidity strain on the Company and therefore further reduced the true value of PDC stock.

350.    Also after the departures, senior management reported owning decreasing amounts of company stock through the ESOP.  By 31 December 2006, the top executives held only 1.59% of the ESOP shares, and by 31 December 2010, they held only 0.93% of the ESOP shares.  Instead, management became increasingly dependent on incentive plans (discussed below), which were not limited to the distribution and diversification options available under the ESOP Plan Documents and which were not calculated solely by the increase in PDC's stock value.

I.    **Management Compensation Was Excessive And Drained Cash From Appvion.**

351.    In conjunction with the 2001 Transaction, Appvion Director Defendants implemented additional incentive plans for management employees and senior executives.

352.    Following the 2001 Transaction, Appvion Director Defendants continued to add additional incentive programs as described below to reward executives and directors.  Since a number of these incentives were tied to stock value, they gave the Prior Committee Defendants and the Director Defendants a reason to inflate the price of PDC stock.  At the same time, these incentives meant the Prior Committee Defendants were not as heavily reliant on the funds they had invested in the ESOP.

### 1. Long Term Incentive Plan ("LTIP") Allowed the Board of Directors to Award Phantom Stock Units.

353. Appvion's Long Term Incentive Plan ("LTIP") was effective on or about December 1, 2001.

354. Under the LTIP, the Compensation Committee of Appvion's Board of Directors had the authority to award employees with phantom stock units.

355. Under the terms of the LTIP:

- The Compensation Committee could award up a number of units equal to 3% of total stockholders' equity in the Company each year;

- Phantom stock units were to be awarded the first day of the Plan Year (defined as the Company's fiscal year);

- Phantom stock units vested over 3 years and expired after 10 years, or upon leaving the company;

- On exercise of the phantom units granted under the LTIP, participants would receive a cash bonus equal to the increase in the value of the stock from the date of issue until the exercise date.

356. In 2016, the LTIP was renamed the Long Term Stock Appreciation Rights Plan.

357. On information and belief, when Buth left the company in July 2005, he received significant payments under the LTIP.

### 2. The Deferred Compensation Plan Allowed Employees to Defer Their Salary and Bonuses.

358. In addition to the LTIP, Appvion established a Deferred Compensation Plan (the "New Deferred Compensation Plan") effective 1 July 2000, which allowed eligible employees to defer all or a portion of their salary and/or bonus.

359.   In addition, the deferred portions of the loyalty payment made to executives as part of the 2001 Transaction were included in this plan.  However, the deferred loyalty payments were tied to increases in the value of PDC common stock.

360.   The New Deferred Compensation Plan was terminated in the first quarter of 2005 based on the recommendation of the independent directors of the Compensation Committee "because they viewed the crediting of the loyalty payment portions of the Plan based on increases in PDC common stock as an expensive form of company capital."  On termination, beneficiaries were paid $2.7 million.

### 3.   The Executive Nonqualified "Excess" Plan Allowed Executives to Defer Compensation on a Pre-Tax Basis.

361.   Effective 1 February 2006, Appvion created the Executive Nonqualified "Excess" Plan (the "Excess Plan") for executives and non-employee directors, which allows them to defer compensation on a pre-tax basis, with the value of the deferrals linked to the performance of selected mutual funds.  Like the Deferred Compensation Plan, the Excess Plan provided for matching contributions.

362.   Appvion did not actually set aside any funds to pay for this deferred compensation obligation.

363.   As of 2 January 2016, this plan included $5.4 million of deferred compensation.

### 4.   The Non-Employee Director Deferred Compensation Plan Awarded Phantom Stock to Non-Employee Directors.

364.   Also in 2006, Appvion established the Non-Employee Director Deferred Compensation Plan, which awarded non-employee members of the Board of Directors with phantom stock units.  The value of the stock awarded under this plan was to be paid in five equal

annual cash installments following a director's conclusion of service on the board of directors, based on the stock valuation as of the payment date.

365.    By 31 December 2015, there were nearly 122,000 phantom units outstanding under this plan, valued at $1.5 million.

366.    This plan gave the non-employee directors an incentive to agree to the inflated stock valuations as appraised by Willamette and SRR and approved by the Trustee Defendants.

### 5.    The Long-Term Performance Cash Plan Provided Bonuses to Management.

367.    Effective 1 January 2008, Appvion created the Long-Term Performance Cash Plan which provided for bonuses if Appvion met certain financial goals over three-year cycles. Mark Richards, Thomas Ferree, and Kent Willetts received payments under this plan for the 2009-2011 cycle.

### 6.    The Long-Term Restricted Stock Unit Replaced LTIP in Order to Ensure Management Received Additional Compensation.

368.    When the share price went down in 2009, it rendered the LTIP phantom stock units worthless until the share price went back up.  In order to continue providing incentive payments to senior executives, the Company adopted a long-term restricted stock unit ("RSU") plan effective 3 January 2010.

369.    The RSU plan awarded key management employees with future cash payments based on the full fair market value of Appvion common stock.  All units vest three years after the award date and the cash value of the stock was paid to the employee on the vesting date, based on the valuation as of the vesting date (as determined by SRR and the Trustee Defendants).

370.     After implementing the RSU Plan, the Compensation Committee of Appvion/PDC's Board of Directors decided whether to award units under the LTIP or the RSU Plan.

371.     This plan gave Appvion management an incentive to inflate the value of PDC stock.

### 7.     The Annual Incentive Plan Provided Another Method to Give Management Bonus Compensation.

372.     Appvion also had a separate Annual Incentive Plan which paid out based on company and business segment performance and other factors as determined by the CEO and the Compensation Committee of the Board of Directors.  In addition, Appvion paid discretionary bonuses under the Annual Incentive Plan.

### 8.     The Supplemental Executive Retirement Plan Also Provided Benefits to Management.

373.     In addition to these compensation plans, executives and certain other management employees also received additional benefits including pension benefits under the Supplemental SERP.  The SERP provided retirement benefits for management and other highly compensated employees whose benefits are reduced by the tax-qualified plan limitations of the pension plan for eligible salaried employees.  Effective as of 1 December 2014, the SERP was amended to provide for payment of the supplemental benefit in the form of a single life annuity.

### 9.     The Termination Protection Agreements Provided Management Additional Compensation Upon Termination.

374.     In addition, Appvion management had Termination Protection Agreements or Enhanced Severance Agreements in place which gave them substantial benefits on termination. These agreements only provided for payments if Appvion terminated the employee other than for misconduct or disability or the employee terminated employment other than for "Good Reason."

Good Reason is defined in the agreement as 1) prior to a change of control, a reduction in salary of more than 25%; or 2) after a change of control, a decrease in the executive's responsibilities, a material reduction in the executive's pay, relocation of the executive without consent, or refusal to agree to comply with requirements for assignment of the termination protection agreement.

375. The various incentive plans and termination protection agreements also included change in control provisions allowing for significant payments on a change in control.

### 10. The Various Incentive and Compensation Plans Resulted in Excessive Compensation for Management.

376. The LTIP, Non-Employee Director Deferred Compensation phantom stock units, and Restricted Stock Units all served to create synthetic equity owned by executives and directors. By the end of 2014, SRR calculated that this synthetic equity accounted for 25.3% of the equity ownership of Appvion. SRR's valuation analysis estimated a valuation for this synthetic equity and subtracted it from the equity value of the company.

377. These incentive and retirement plans were amended several times to increase benefits due to beneficiaries under these Plans, even while Appvion was losing money, while its stock price was grossly overstated and while it was unable to meet its repurchase obligations under the ESOP. On information or belief, these amendments substantially increased the amounts paid to executives under the plans. For example, in August 2015 the Company filed an Amendment to the Appvion, Inc. Long Term Incentive Plan with the SEC; the amendment provided that "Retirements on December 31 of any given Plan Year would be treated as a full year of employment for vesting purposes." When Richards retired from Appvion effective December 31, 2015, this provision allowed him to receive partial payment for LTIP units that were granted in 2015; the units were treated as 33.3% vested.

378. Under the numerous incentive and compensation plans described above, management compensation was at all times excessive, especially compared to company performance and true stock price. For example, in 2012, Appvion had a net loss of over $148 million. However, Richards received total compensation of over $4.2 million, including his $800,000 salary, a discretionary bonus of $376,000, incentive plan compensation of $1.2 million, as well as awards under the LTIP program, Restricted Stock Units, and various other compensation.

379. Excessive compensation paid to Richards and other executives (including but not limited to Thomas Ferree and Kerry Arent) caused significant harm to the corporation and was a breach of fiduciary duty toward the ESOP Plan and the Employee Participants and was not justified by the true stock price.

**J.      Appvion's Finances Became Increasingly Dire.**

**1.      Appvion Refinanced its Substantial Debt.**

380. In June 2013, Appvion refinanced its debt through a $435 million senior secured credit facility, which included a $335 million first lien term loan facility and a $100 million revolving credit facility. This was used to pay off $305 million in fixed-rate debt, an existing revolving credit facility, and pay related fees and expenses.

381. In November 2013, Appvion raised $250 million through the sale of second lien senior secured notes; Appvion used the proceeds to pay off existing debt, including related fees and expenses.

382. This refinancing increased Appvion's overall debt.

## 2. **Appvion Sold its Most Profitable Unit.**

383.    Appvion's Encapsys segment encompassed Appvion's chemical microencapsulation activities; microencapsulation is the process of putting a microscopic wall around a core substance.

384.    This process was developed in the 1950's and was part of Appvion's carbonless paper process, but Appvion had worked to develop other applications for the process over the years.

385.    In 2007, Appvion signed a multiyear supply agreement with Proctor & Gamble and expanded its microencapsulation business significantly.

386.    By 2010, Encapsys was a driving factor in SRR's valuations. According to a January 2011 employee communication, "The rapid and consistent growth of the Encapsys business was the single biggest contributor to share price growth in H2 2010. The Encapsys division continues to increase its contribution to shareholder value with each recent valuation."

387.    Similarly, an 18 July 2011 employee communication about Encapsys stated that "The continued growth of the Encapsys business was the single biggest contributor to share price growth in H1 2011, as it was for the H2 2010 valuation."

388.    By 2012, Appvion was divided into two primary operating units—the Technical Papers unit (which included the Carbonless and Thermal divisions) and Encapsys.

389.    In the years 2010 through 2013, the Encapsys unit accounted for approximately 6% of Appvion's net sales but in 2014 it accounted for approximately 8% of Appvion's net sales.

390.    Additionally, Encapsys had room for significant growth going forward and was Appvion's most profitable division.

391. In April 2015, SCH submitted a proposal to acquire the Encapsys unit and related assets for $205 million, which was later revised to $208 million. Appvion agreed to sell the Encapsys unit to SCH, and the sale was completed in August 2015.

392. On 8 May 2015, Appvion amended its Executive Nonqualified Excess Plan to allow deferral of compensation received under The Encapsys Long Term Performance Cash Plan. This Encapsys Long Term Performance Cash Plan is not described in any of the 10-K filings and it was not filed with the SEC. On information and belief, Appvion management may have received compensation from this plan as part of the sale of Encapsys.

393. In May 2015, Appvion made Argent a discretionary trustee with the authority to vote on the Encapsys sale.

394. Employees were not told about the sale of Encapsys ahead of time—the sale was approved by Argent as the Trustee and the Board of Directors of Appvion without a vote by employees.

395. In an October 2015 publication to employees, Appvion management stated that it was selling Encapsys as a way to "1) support and expand its thermal and carbonless/specialty papers business segments; 2) fund the continued growth of Encapsys; and 3) continue to reduce the company's debt. The sale of Encapsys helps the company achieve all three objectives."

396. The Board considered the impact of the sale on the ESOP and asked the ESOP trustee (at the time, Argent) to review and approve the transaction. According to a Q&A released by Appvion management:

> The sale of Encapsys required approval from the Appvion board of directors. **The board must consider the value of the transaction to the Appvion shareholders who are, ultimately, the ESOP plan participants**. The board must also consider the impacts of the transaction to the Appvion business. To assist the board in analyzing the transaction, **the board sought a fairness opinion**

**about the transaction from an independent valuation firm** as well as advice from outside legal counsel as the basis for its decision.

**The board also asked our independent ESOP trustee (Argent** Trust Company) **to review and approve the transaction,** even though approval from the ESOP trustee was not required for this transaction. To assist the ESOP trustee in analyzing the transaction, **the trustee sought a separate fairness opinion about the transaction from an independent valuation firm as well as advice from separate outside legal counsel**. Based on the analyses, fairness opinions and advice from legal counsel, **the Appvion board and Argent Trust Company concluded the transaction is fair to and in the best interest of Appvion**.

397. The sale of Encapsys closed in August 2015.

398. While the sale of Encapsys allowed Appvion to pay off some debt, the loss of its most profitable unit impaired Appvion's ability to function as a going concern. .

### 3. Richards and Other Executives Left in 2015 and Received Large Bonuses.

399. Richards retired from his role as President and CEO of Appvion and PDC on 4 August 2015. He stayed on as Chairman and Director of Appvion until on 31 December 2015, when he fully retired.

400. Even though Richards retired and did not leave Appvion for "Good Reason" as defined in his Termination Protection Agreement, he received a payment of $1.2 million as if he had left for Good Reason.

401. Richards also received a payment of $30,000 in outplacement services and over $900,000 in SERP payments, as well as payments of LTIP and Restricted Stock Units.

402. Richards received total compensation in 2015 of over $5 million.

403.    Kerry Arent, Appvion's Senior Vice President of Human Resources, also retired in 2015 and received payments under her Termination Protection Agreement as if she had left for "Good Reason" or in connection with a change in control.

404.    Arent received $427,500 in Termination Protection Payments and $5,000 in outplacement services payments.

**K.    At the Summer 2017 Road Show, Appvion Said It Would Be Able to Turn The Company Around.**

405.    At the summer 2017 road show, the company reported it was going to be able to turn around, it was doing great, that it had hired an outside consultant to find refinancing, and they would be back on their feet.  There was no indication that the company had trouble finding financing.

406.    Similarly, in a communication to employees about the 30 June 2017 valuation, Gilligan told employees that Appvion was "making good progress on several fronts that set the stage for better results in the second half of the year."

**L.    Appvion Filed for Bankruptcy Protection In 2017.**

407.    On 1 October 2017, Appvion and certain of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

408.    On 14 August 2018, the Bankruptcy Court for the District of Delaware issued a Conformation Order that included a reservation of rights stating that the order did not "operate as a waiver or release or otherwise impair in any respect (i) any claim held by the ESOP, the ESOP Committee or its members, or ESOP participants . . . ."  It also confirmed that Grant Lyon, in his capacity as an ESOP Committee Member, has standing to prosecute claims on behalf of the ESOP Plan and the Employee Participants.

104

**M.** **Fraud or Concealment Extends the Statue of Limitations for Plaintiff's Claims.**

409. Defendants committed fraud or concealed nearly two decades of wrong doing from the ESOP Plan and Employee Participants. As a result of Defendants' actions, the ESOP Plan and Employee Participants could not and did not discover the wrongdoing until after August 2017, when Grant Lyon was appointed to the ESOP Committee and began conducting an investigation into the valuations.

      **1.** **The Defendants Committed Fraud or Concealment In Connection With the 2001 Transaction.**

410. During the 2 August 2001 road show, Buth represented that the employees "know more about this opportunity about this investment than any other investment [they'll] ever make." In a March 2001 employee newsletter, Buth similarly stated that under the law, "All investors . . . . Must have access to certain basic facts about an investment prior to buying it."

411. However, the Defendants failed to disclose key facts about the 2001 transaction.

      **a.** **Buth, Karch, Arent, Driscoll, Paone, and Braun Represented to the Potential Employee Participants that the Houlihan Defendants Provided Independent Validation of the 2001 Buyout.**

412. In a 25 July 2001 letter to Appvion employees, Buth fraudulently represented that Houlihan's Paone would present an "independent validation" of the ESOP transaction. An agenda distributed to employees describing the August 2001 road show similarly said Paone would give "Independent Validation of Deal Terms."

413. During the 2 August 2001 road show Buth, Karch and Arent, side by side with purportedly "independent" ESOP professionals, went to work convincing Appvion's employees (most of whom were union members) that they should seize upon this "unique one-time opportunity" to transfer money out of their 401(k) plans to buy PDC stock.

414. During the 2 August 2001 road show, Karch stated that Houlihan's Paone was "going to provide an **independent view** and **validation**" of the buyout transaction. Karch also stated that Paone was "**our** investment banker" from Houlihan, insinuating that Paone represented the interest of the employees—the people to which he ultimately gave advice—in a fair, impartial and unbiased manner.

415. Also during the 2 August 2001 road show Paone stated, among other things:

> This is, in my opinion, an extraordinary opportunity and over the next few slides I hope to make clear why I feel so strongly about this. Paul had mentioned that one of the things that I'm going to do this evening is **help validate the purchase price of the transaction and financial aspects as to why they are so attractive and why you're getting such a good deal**.

**b.      Defendants Did Not Disclose Houlihan Lokey Defendants' Contingent Compensation Interest in Ensuring the Buyout Closed.**

416. As described above, the Houlihan Lokey Defendants committed fraud or concealment by:

- Representing to the ESOP Plan and employees that it provided an "independent review and validation" of the buyout transaction

- Failing to disclose to the ESOP Plan and employees that on 14 February 2001 it entered into an engagement with PDC which stated that Houlihan would receive "a transaction fee at a Transaction closing equal to 1.0% of the "Aggregate Consideration" paid for the stock of [Appvion] with respect to an ESOP Acquisition.

- Failing to disclose that the transaction fee that Houlihan anticipated receiving was as much as $8.1 million.

- Allowing Prior ESOP Committee Defendants and Director Defendants to represent to the ESOP Plan and the Employee Participants that Houlihan was providing independent validation of the Appvion buyout during the 2 August 2001 road show.

- Failing to provide fair, impartial and unbiased assessment of the ESOP buyout while at the same time representing to be independent.

2. **The Defendants Committed Fraud or Concealment In Connection with the Valuations.**

      a. **Willamette Defendants and SRR Defendants Produced Fraudulent Valuations that Were Fundamentally Flawed.**

417. From December 2001 through June 2004, Willamette performed semi-annual appraisals establishing stock value.

418. On 9 November 2001, Willamette Defendants validated the initial stock value on the 2001 buyout transaction at $10 per share.

419. During the 2 August 2001 road show, Braun stated:

> We were trying to keep the value as low as possible we spent a lot of time over the last few months telling everybody how little this company was worth because we were trying to help you folks buy it at the cheapest possible price, or have the ESOP buy it at the cheapest possible price.

420. On 31 December 2001, Willamette Defendants valued the stock at $12.81 per share. The share price continued to rise as described above.

421. While the share price was disclosed to the ESOP Plan and the Employee Participants, the content of the appraisals was not, thus impeding anyone's ability to ascertain the true valuation of Appvion's stock. By refusing to make the valuation reports available to the

owners of Appvion (i.e., the ESOP Plan and Employee Participants), the various defendants were able to continue to conceal the fraud until the bankruptcy filing.

422. Upon information and belief, Willamette produced seven valuations between 9 November 2001 and 30 June 2004 that failed to account for fundamental flaws. For example, they failed to account for the unfunded pension/post-retirement liabilities.

423. Each share price calculation misrepresented the value and the health of Appvion to the detriment of the ESOP Plan and Employee Participants.

424. In 2004, Willamette employees, including Levine, El-Tahch, and Socol, joined SRR, and SRR took over the appraisals beginning in December 2004.

425. Consistent with Willamette Defendants' actions, SRR conducted semi-annual valuations of PDC stock through mid-2017, producing 26 valuations as described above.

426. SRR Defendants' valuations failed to account for fundamental flaws as described above.

427. In particular, the unfunded liability was a substantial, material liability. Appvion's unfunded liabilities consisted of at least three components: 1) pension liability under several defined benefit and defined contribution pension plans; 2) the Supplemental Executive Retirement Plan, which provided retirement benefits for management and other highly compensated employees; and 3) post-retirement benefits other than pensions, which included medical, dental, and life insurance for certain retirees and eligible dependents.

428. These liabilities were included in each of Appvion's audited financial statements. However, they were inexplicably not included in any of the valuations.

429. None of the Defendants disclosed to the ESOP Plan or to Employee Participants that SRR was failing to consider material liabilities in its analysis.

430. Each stock value was disclosed to employees in communications from the Prior Committee Defendants. In addition, the values were disclosed in account statements issued to employees which showed the value of their ESOP accounts.

431. These values and the related communications constituted affirmative misrepresentations that concealed the overvaluation of PDC's stock.

**b.** **The Prior Committee Defendants' and The Director Defendants' Communications Did Not Disclose the Valuation Process.**

432. The Prior ESOP Committee Members, Director Defendants and the Trustee Defendants never released the valuation reports by Willamette and SRR to the ESOP Participants. Indeed, Union representatives for the Employee Participants specifically requested to view the valuation reports and were denied access. On 23 April 2001, Appvion told its employees they would not have access to the valuation report:

> **I understand that an ESOP appraiser values the stock at least twice a year. Will I have access to this valuation report?**
>
> No. **The trustee, as the legal shareholder, is the only one with the right to this document**.
>
> **A summary of the results of this appraisal** will be provided to plan participants when the current value is disclosed.

Appleton Papers, "The Ownership Update," 23 Apr 01, p. 4.

433. Accordingly, there was no way for the ESOP Plan or the Employee Participants to look at the processes that Willamette and SRR employed and verify that key financial information was not being omitted despite the representations that all relevant information was being considered. They were led to believe all relevant factors had been appropriately considered.

434.    For example, Appvion told the ESOP Plan and the Employee Participants that the independent appraiser would consider, among other things, the following in determining Appvion's fair market value:

> In determining a company's fair market value, the appraiser must consider all facts considered relevant.
>
> * * *
>
> The appraiser looks at a variety of factors to determine the business risk facing the company being valued compared to risks facing the guideline companies.
>
> If the company being valued is determined to be more or less risky than the public companies, that risk would generally have an impact on value.
>
> The discounted future cash flow approach utilizes the company's outlook for the future in order to determine fair market value.
>
> * * *
>
> First, the appraiser determines the amount of cash the company should generate in the future to pay its bills, invest in equipment and facilities, conduct research and development, and pay its debts as they become due.
>
> Cash that is left after the company meets its obligations, known as free cash flow, generally would be available for distribution to the owners of the company, even though the company may determine to retain this cash flow for reinvestment in the future.
>
> * * *
>
> In summary, a company's fair market value is determined by a wide variety of both internal and external factors.  Decreasing profits or revenues or increased expenses generally have a negative impact on a company's fair market value. . . .
>
> All other things being equal, factors that result in improved profitability for a company, such as increased revenues or decreased expenses, typically have a favorable impact on a company's fair market value.

"Employee Ownership at Appleton," Appleton KSOP & Me, Section 6.

435.	Similarly, a November 2002 Appvion presentation titled "Ownership Advisory Committee" described how the valuations would be conducted:

- "Value is determined by the appraiser doing several things:

    - Benchmarking the Company's financial performance against other companies of similar size in similar industries, using merger and acquisition data that is available

    - Benchmarking its financial performance against publicly traded firms in same industry

    - Evaluating value of assets if business were liquidated

    - Reviewing the Company's future financial forecast (profit and growth of revenues) & valuing future cash flows

    - Applying a weighting to respective values, blending to determine final value"

436.	However, by at least 2005, Willamette and SRR were not applying an asset approach to valuing Appvion; according to SRR this was "since the Company derives much of its value from its intangible property." In addition, they also did not typically include merger and acquisition data in their analysis.

437.	The November 2002 presentation also indicated that the independent appraiser would determine a range in value and the Trustee would select the specific share value. However, at least by mid-2005 (and perhaps earlier), SRR and Willamette were only selecting a single stock value.

438.	An October 2006 publication titled "Take Ownership of Your Future KSOP Guide" again explained the methods the valuation firm used to determine fair market value:

> When an ESOP owns stock in a private company, **an independent appraiser approved by the ESOP trustee must determine the fair market value of the company stock** at least once per year. Appleton has made the decision to value stock twice a year, June 30 and December 31.

The term fair market value means **the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company** and that neither one has an obligation to buy or sell the stock.

In determining a company's fair market value, **the appraiser must consider all facts considered relevant.** While a lot of "number crunching" goes into an appraisal, fair market value is ultimately the result of an appraiser's informed judgment. That makes it especially important to have an appraiser who is independent, knowledgeable, and experienced in such matters.

The complete list of factors that may impact a company's value is too long to be included here. However, **factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks** relating to its business. The company's customers, suppliers, management, workforce, and facilities relative to their competitors may also be considered. Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.

To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach…

439. Even the November 2015 KSOP Guide states:

When an ESOP owns stock in a private company the ESOP trustee **must determine the fair market value of the company stock** at least once per year. To do this, **the trustee hires an independent appraiser.**

\* \* \*

In determining a company's fair market value, the appraiser must consider all fact considered relevant.

\* \* \*

To determine a company's fair market value, an appraiser may consider several approaches. **Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach** . . . .

440. Numerous press releases and other communications between 13 August 2002 and 14 July 2009 to Employee Participants reassured employees that Willamette and SRR were properly valuing PDC's stock by stating they were using "an income approach and a market approach to value stock."

441. However, the ESOP Plan and its Employee Participants were never told that the Defendant appraisers were not fully considering the factors that were described in Appvion's publications. The communications describing Willamette and SRR's methods also did not disclose that the valuations improperly applied a control premium or that the valuations did not account for unfunded pension liability or post-retirement benefits other than pension liability. The failure to disclose all factors considered (or not considered) allowed the continued fraud and concealment to continue until the bankruptcy filing. Nor did they report that in arriving at fair market value, not "all liabilities" were being considered as was required by SRR's own valuation language.

    **c.** **Management, Driscoll and State Street Urged the ESOP Plan and Employee Participants to Trust the Willamette Defendants and the SRR Defendants at the Road Show and Beyond.**

442. At the 2 August 2001 road show, Kelly Driscoll of State Street stated that:

> [A]n ESOP can't pay a parent company more than the fair price of the asset and that is really critical to us and that's why we, in the end have **to make sure that we're not paying more than the fair market valu**e. And [Rick Braun from Willamette] does a lot of work helping us with that to determine what that fair market value is and **make sure he can give us an opinion that we aren't paying more than fair market** value and that the transaction, as a whole, is in the **best interest of the plan** from a financial perspective.

443.    In a 14 January 2002 email to employees, Paul Karch addressed the recent Enron collapse and stressed that the valuation of stock by an independent appraiser would protect employees:

> The value of our company stock **will be determined twice per year by an independent, third party appraiser according to the methodology established by the Department of Labor**. This valuation process **provides another level of scrutiny of the company's accounting practices**. Enron stock is publicly traded and its value, including its overvalue, was and is determined by speculators in the stock market.

444.    Similarly, in an August 2002 email about the 30 June stock valuation, Appvion's Bill Van Den Brandt stressed reliance on Willamette's professional judgment:

> Some employees have wondered how the June 30 stock value was calculated.
>
> Remember that our trustee, State Street Global Advisors, conducts the valuation.    SSGA relies upon Willamette Management Associates to perform an appraisal of Appleton Papers and PDC to assist in determining the value of PDC stock.    **Willamette considers both income and market factors to determine stock value**.    The stock value is the product of a rigorous and complicated process that ultimately requires professional judgment to complete….

445.    In a September 2003 "Ownership Update" newsletter distributed to employees, Driscoll described State Street's goal of providing "the highest quality fiduciary services" by being a "knowledgeable and proactive fiduciary acting on behalf of the ESOP."  Driscoll also described the valuation process, including meetings with members of the Board of Directors:

> We hired Willamette Management Associates, a well-known and respected firm, as our financial advisor **to assist us with our responsibilities for overseeing the plan's investment in PDC stock** and for determining the appropriate value for the stock.
>
> With the help of our financial advisors, **our oversight of PDC stock includes frequent monitoring of Appleton's financial condition and the stock's performance**. To that end, Willamette and State Street perform due diligence meetings with Appleton

management during the year. **A State Street representative attends at least one Appleton board meeting each year and conducts meetings with the outside directors that serve on Appleton's board**.

Throughout this oversight process, **State Street and Willamette build a greater understanding of Appleton's business operations, the basis for your company's financial projections, and the risks and likelihood of meeting those projections**.

Twice per year, as of June 30 and December 31, State Street determines the value of PDC stock. In its role as financial advisor, **Willamette performs an extensive analysis that calculates Appleton's value based on approaches they believe are appropriate** for Appleton's business… .

446. 31 March 2004, the KSOP Guide and Summary Plan Description stated:

In order to comply with the Department of Labor requirements that **all stock purchases be made at no more than current fair market value**, the trustee must wait until the next valuation date before investing your deferrals in company stock.

447. In a 3 May 2004 email about Doug Buth's planned departure from Appvion, Paul Karch reminded employees that "no one at Appleton determines our stock price; Willamette and our trustee State Street Global Advisors do."

448. After SRR took over for Willamette on the 31 December 2004 valuation, a 24 February 2005 internal communication from Bill Van Den Brandt assured employees that SRR could be trusted, stating:

The latest valuation of Paperweight Development Corporation was conducted by Stout Risius Ross (SSR [sic]), not Willamette Management Associates as I reported below. Many key members of the Willamette Management ESOP valuation team including Bob Socol and Scott Levine have joined SRR.

Our trustee, **State Street Global Advisors (SSGA), selects the firm to conduct the appraisal** that helps SSGA determine the value of PDC stock. **SSGA chose Stout Risius Ross because of the qualifications and experience of Socol, Levine and their colleagues as well as their knowledge of our company**. The

Willamette team had conducted all of our company's prior valuations.

**SRR is a full-service financial advisory firm with over 125 professionals** and offices in Chicago, Detroit, Cleveland and Washington DC. With the addition of Socol, Levine and others, **SRR has strong expertise in ESOP and ERISA advisory services**.

449.     With nearly every communication about stock value, Appvion management (with the acquiescence or approval of the Director Defendants) assured employees that that the appraisals were conducted by Willamette or SRR using their professional expertise and judgment to apply the market approach and an income approach. However, SRR's actual analysis was never disclosed to the Employee Participants, and nor did they disclose that SRR failed to properly take into account the standards outlined in these publications.

        **d.**     **Buth, Karch, Parker, and the Trustee Defendants Encouraged the ESOP Plan and Employee Participants to Rely on and Have Confidence in the Trustee Defendants and the Director Defendants.**

450.     In a 25 July 2001 letter to employees, Buth stressed that employees would receive "independent validation of the deal from . . . Kelly Driscoll, the ESOP trustee."

451.     At the August 2001 road show, Karch then introduced Driscoll from State Street which he described as "a very large and successful financial institution which manages money for lots of people in different ways, but specifically acts as trustee for many ESOP's."

452.     Driscoll from State Street stated that she and State Street were appointed to make sure that the employees would not be paying more than fair market value during the buyout.

453.     Driscoll then represented that it was her team's job to "represent the ESOP from an investment perspective. . . . [W]e want to make sure we analyze this investment, we really understand the business of Appleton Papers. . . . [W]e are very comfortable with the valuation. .

. . So, we are very pleased, quite frankly, on the price we were able to get with the seller. We think we got a very good price."

454. Also at the August 2001 road show, Buth stated that Driscoll from State Street would not overpay for stock and that Driscoll would tell the employees that the employees underpaid for the transaction.

455. A January 2006 newsletter also stressed that the company's board of directors and the trustee would protect employees from the kind of fraud that occurred at Enron:

> Enron executives were able to sell their stock and pay themselves large bonuses even though the company was failing and the employees were not able to sell their stock. **Can that happen to us**?
>
> * * *
>
> **Our company's board of directors has a legal obligation to company shareholders** (in our case, the ESOP is the sole shareholder) **to prevent the kind of fraud that occurred at Enron**. In the event the board of directors does not act, **our trustee, State Street Global Advisers, in its capacity as the sole shareholder, could vote to replace the entire board with directors who would act to prevent fraud**. At Enron, the ESOP was a minority shareholder and did not control the board.

456. However, since the Trustee had no ability to remove or replace members of the Board of Directors without approval of the CEO after 2005, this assurance was meaningless.

457. A May 2006 newsletter to employees reiterated that stock purchases must be at fair market value and that SRR applied a market and income approach to valuation. The newsletter further explained:

> To determine the value to be recommended to State Street, Stout Risius Ross weighs the values from all the factors they believe are appropriate and arrives at a final value. **Stout Risius Ross makes a presentation of its analysis to State Street's fiduciary committee, which is comprised of senior investment and other professionals** at State Street. **The committee reviews findings from Stout Risius Ross and then determines the current price**

**of PDC stock**. Stout Risius Ross then issues an opinion to State Street confirming the fair market value of PDC stock.

458.    On 27 March 2013, in an internal communication to Employee Participants, Ferree stated:

> [We] are pleased to welcome Reliance Trust Company as the new trustee. Reliance Trust is one of the largest independent trust companies in the country with more than $109 billion in assets under management and administration, and over 24,000 retirement plans administered. **The company is a highly-qualified, independent fiduciary** accustomed to serving ESOPs of all sizes.

459.    On 27 March 2013, Reliance Defendants sent a letter to the Employee Participants stating "[w]e are confident that you will soon recognize Reliance Trust as a highly regarded ESOP professional, a prudent fiduciary with a diligent process, and a qualified partner."

460.    On 30 June 2014, after Argent agreed to stay on as the ESOP Plan's trustee, Ferree touted Argent's experience.  Specifically he stated that Argent has "grown a successful business over its existence" and that Argent "currently has responsibility for more than $6 billion in client assets."

461.    Also on 30 June 2014, Steve Martin of Argent sent a letter to Employee Participants stating that they could be "confident that [they] will continue to be serviced by the same professional team that is familiar with your company and your ESOP, and also by Argent, a company focused on providing the highest quality fiduciary services."

462.    The letter continues:  "We understand the importance of safeguarding our clients' assets. For us, the responsibility and the approach are personal."

463.    In addition to reassuring employees that the valuations had been conducted by trusted professionals, the Prior Committee Defendants sometimes released statements that selectively discussed Willamette and SRR's valuation analysis in order to justify the share price. These discussions failed to provide a full disclosure of the valuation analysis and affirmatively concealed the fact that the valuations were inflated.

464.    For example, in the 31 December 2001 valuation, less than 2 months after the 2001 Transaction closed, Willamette valued the shares at $12.81 (a 28.1% increase over a two month period).

465.    However, Appvion management assured employees that the valuation was correct and to trust Willamette's valuation.

466.    On 14 February 2002, Karch emailed Employee Participants and stated that "The value of our company stock will be determined twice per year by an independent, third party appraiser according to the methodology established by the Department of Labor. This valuation process provides another level of scrutiny of the company's accounting practices."

467.    In a 12 March 2002 internal communication, Appvion's Bill Van Den Brandt announced the share price and stated that "Willamette's valuation considers such factors as the purchase price we paid, company performance in November and December 2001 and comparable market factors to determine our company's fair market value and, in turn, the stock value."

468.    The 12 March 2002 communication also included a quote from Buth indicating that the increase in share value was because of better than expected financing—"We got a good

119

deal, we arranged a strong financing package and we were able to keep the cash at closing so we borrowed less than we expected,' said Buth, "Those were the foundations of the appraiser's valuation."

469.   In addition, "Buth emphasized that future valuations primarily will reflect our repayment of debt, which depends on our earnings and cash flow, and any changes in valuation as we grow and transform our company."

470.   To explain the 31 December 2001 valuation to employees, Buth went on an employee road show in March 2002 with Levine and Pete Prodoehl from Principal.  The purpose of the road show was to "explain the valuation process, how it differs from the fairness opinion issued at the deal closing, and how it determines stock value."

471.   For the 30 June 2002 valuation, Willamette valued the shares at $18.58.  In an 13 August 2002 email to employees Appvion's Bill Van Den Brandt issued a communication stating that "the stock value is the product of a rigorous and complicated process that ultimately requires professional judgment to complete."  The email also attempted to explain key financial data underlying the valuation.  Buth again went on a road show in September 2002 to explain the valuation.

472.   The Company continued to hold road shows approximately twice a year to present the share price to employees and discuss company performance.

473.   Additional employee communications in support of the fraudulent stock valuations include the following:

- For the 30 June 2003 valuation, Willamette valued the shares at $22.42.  Bill Van Den Brandt informed employees that "the new stock price reflects the performance of our core businesses offset by our debt repayment in the first half

of the year and the improved valuations of comparable publicly traded companies."

- The 31 December 2003 valuation increased further to $23.36. A 19 February 2004 email from Doug Buth to employees highlighted double digit growth in the inkjet product line and the thermal, security and performance packaging businesses. The 24 February 2004 email to employees communicating the share price also again stressed SSGA's reliance upon Willamette.

- For the 30 June 2005 communication, Van Den Brandt informed employees, via email on 23 August 2005, that SRR "uses both an income approach and a market approach and to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions."

- A May 2006 newsletter to employees explained the valuation process and also identified "Value drivers for the December 31, 2005 share price," including "the better than expected financial performance of our carbonless business and continued signs that future declines might be less than expected." The newsletter also discussed repayment of debt and showed how debt repayment increased the value of the company according to SRR's methodology; however, it again did not disclose SRR's full valuation analysis or the flaws with the valuation process discussed above:

## What Causes the Price of PDC Stock to Move? (continued)

**Value drivers for the December 31, 2005, share price**

The December 31, 2005, share price of PDC stock was $28.56, a $.79 per share increase from the June 30, 2005, share price of $27.77. The most significant value driver during 2005 was the better than expected financial performance of our carbonless business and continued signs that future declines might be less than expected. International carbonless shipment volumes actually showed growth of more than 5% compared to the previous year.

**Carbonless**

Carbonless net sales for fiscal 2005 declined $12 million or 2% on volume decline of 4% compared to fiscal 2004. Overall, stronger net selling prices helped to offset a portion of the impact of decreased shipment volumes.

**Thermal**

Fiscal 2005 net sales for thermal increased 5% on a 3% shipment volume increase compared to fiscal 2004. Earnings from our thermal business decreased slightly compared to fiscal 2004 and were below forecasted levels for fiscal 2005.

**Performance packaging**

Net sales for our performance packaging segment were up nearly 112% over fiscal 2004 sales levels. The addition of the results of New England Extrusion accounted for virtually all of the increase, although sales by American Plastics and C&H Packaging increased a combined 2.8% from 2004.

**BemroseBooth**

Net sales in fiscal 2005 for our secure and specialized print services segment, represented by BemroseBooth, increased 2.0%, over fiscal 2004. Gross profit increased nearly $1 million in fiscal 2005 compared to fiscal 2004.

**Enterprise value down slightly**

Total enterprise value for all of Appleton remained essentially the same with a decline of about $2 million, less than 1% of total enterprise value.

Enterprise value is a figure that, in theory, represents the entire value of a company, including both equity and debt. The lack of change in Appleton's enterprise value reflects the fact that our businesses overall have not achieved long-term sustainable growth in sales and profits. Our mission, our four platforms and our five-year plan are all designed to create sustainable growth for Appleton. But we won't get credit for that sustainable growth in our share price until we actually achieve it in our top and bottom lines.

**Debt reduction adds value**

We reduced the book value of our net debt by $15 million during the valuation period. The $15 million reduction in debt results in a $15 million increase in equity value due to positive cash flow, which was used to repay debt.

**Equity value up $13 million**

The appraiser took our enterprise value (-$2 million) plus or minus other factors (+$15 million net debt reduction) to determine that the equity value for Appleton increased $13 million to $341 million during this valuation period. Equity value is a market-based measure of the value of a firm. It accounts for all the ownership interests in a company. The appraiser then divided the equity value of the company by the 11,938,060 shares outstanding to establish the current stock price of $28.56.

**How employees can affect share price**

The primary goal of our five-year and annual business plans and our incentive programs is to improve our business and financial performance to maximize long-term, sustainable value for our shareholders. As a result, the objectives and scorecards we set for our company, our divisions, locations, departments and teams are designed to improve company performance and increase stock value. The extent to which every employee understands and achieves the objectives for his or her location, department, function or machine will directly affect our share price. That's the power of employee ownership.

- The valuation of PDC stock peaked at $33.62 with the 31 December 2006 valuation. Richards released a communication touting the share price and stating that "by all market measures we are exceeding expectations."

- In a 2007 publication titled "Appleton: Applying Technology for Performance," Appvion Management represents that Karch said "we had our legal and financial advisors there to make sure everything we disclosed was appropriate and in compliance." According to the document, Prodoehl stated that employees "essentially had all the information they needed to make an informed decision whether or not to invest in the company." That document also represented that Driscoll stated that State Street was "appointed the fiduciary to make sure the transaction was fair from a financial perspective to the ESOP. And it was.

Employees would not be paying more than the fair market value to buy Appleton Papers."

- In a 10 July 2007 email, Appvion management reported that SRR had valued PDC stock at $32.89, which was a slight decrease since December 2006 and the first decrease in share price since the 2001 buyout transaction. The communication reassured employees that the decrease in share price was based on "a general softening in market conditions" and SRR "see[s] no major changes in the fundamentals of our company."

- For the 31 December 2007 valuation, SRR valued the shares at $33.41. An internal communication on 11 January 2008 explained the valuation, stating that the carbonless segment exceeded expectations. The communication also stated that "the year was even tougher for BemroseBooth and its results in the second half of 2007 along with increased pension liabilities for the company produced a significant decrease in share value." The communication continues: "Three factors that helped to offset those reductions in value. For the first time SRR recognized value in our developing microencapsulation business. Second, we reduced the company's debt including repurchasing some of our most expensive bonds. Third, SRR recognized value in our pending insurance claims and expected judgment for certain litigation expenses. In general, those three factors along with the performance of our paper business accounted for the $.52 increase in the PDC stock value." Additionally, Mark Richards held road shows in January 2008 along with representatives from State Street and Scott Levine of SRR to explain the valuations.

- For the 30 June 2008 valuation, an internal communication dated 7 July 2008 stated that "BemroseBooth has struggled with difficult economic conditions and tough markets for its products. [BemroseBooth] has a big pension liability with future funding requirements. Those two factors have hampered Appleton's efforts to sell BemroseBooth and have resulted in a dramatic write down of its value."

- For the 31 December 2010 valuation, SSR valued the shares at $12.84, an increase from $12.03 per share on 30 June 2010. Appvion pointed to "increased demand for its products and market share gains driven by strong sales of its carbonless sheet product and its BPA-free thermal receipt paper. Results were also positively affected by numerous price increases the company implemented during the year to offset the impact of rising pulp prices. The increase in the value of the thermal business essentially offset the value of the carbonless business. The rapid and consistent growth of the Encapsys business was the single business contributor to share price growth in H2 2010. The Encapsys division continues to increase its contribution to shareholder value with each recent valuation."

- In 2012, Appvion explored a merger with a third party which would have resulted in the ESOP being a minority shareholder. The employees voted to approve the merger; however, ultimately it fell apart and the proposed merger was terminated. Appvion management said the deal fell apart due to volatile market conditions. According to Mark Richards and Tom Ferree, Appvion had received positive feedback from potential investors about the fundamental strength of Appvion.

- For the 31 December 2012 valuation, an internal communication dated 5 February 2013 stated "Key contributors to the increase in share price were strong sales and earnings growth from our thermal papers segment, savings delivered by the strategic supply agreement with Domtar, a significant reduction in working capital, and strong improvement in adjusted operating income."

- For the 30 June 2013 valuation, SRR valued the shares at $17.85, an increase from $17.55 on 31 December 2012. Appvion management indicated that SRR was actually being conservative, noting that the market analysis would produce a significant increase in stock value but that "Historically SRR has been cautious about immediately applying those changes in value (up or down) to PDC stock. SRR chose to discount the H1 2013 performances of comparable companies until the associated stock values prove to be sustainable."

- In 2015, SRR's valuation increased from $11 a share on 31 December 2014 to $12.90 a share on 30 June 2015 and $12.30 a share on 31 December 2015. This increase was in spite of the fact that Appvion announced to employees that its 2015 earnings were not enough to cover the fixed expenses for interest, pension, ESOP distributions, maintenance, and environmental liability obligations. However, Prior Committee Defendants and Director Defendants reiterated that the same approaches were being used. In reporting the 30 June 2015 valuation, an employee communication noted that "The sale of Encapsys and our receipt of net proceeds of approximately $200 million (minus the transaction fees) had a significant positive impact on the share price of almost $5. However poor performance by our thermal business decreased per share value by approximately

$4." The communication also pointed out additional factors that influenced share price; they noted that revenues were down in the first half of 2015 but a reduction in selling, general and administrative expenses offset the decline and payment of Fox River liabilities had also improved share price. The communication did not disclose the problems with the 30 June 2015 valuation discussed above, including the facts that SRR used 6 instead of 5 years of data in its discounted cash flow analysis and that SRR had changed its guideline company methodology for that valuation. Instead, Appvion management just reiterated that Argent was relying on SRR:

> **Valuation process**
>
> Argent relies upon Stout Risius Ross (SRR), an independent valuation firm, to conduct appraisals of Appvion and PDC to assist in determining the value of PDC stock. SRR uses an income approach and a market approach to value stock.

- For the 31 December 2015 valuation, Appvion management released a communication acknowledging that the share price had decreased from $12.90 a share to $12.30 a share. However, the communication blamed the decrease on "volatile market conditions," stating: "Appvion's business performance during the second half did not significantly alter the value of the company. Most of the decline in share value was the result of volatile market conditions and the negative performances of comparable companies and general market indices."

474. Each of the Prior Committee Defendants, the Director Defendants, and the Trustee Defendants had a duty and responsibility to ensure the information provided to the ESOP Plan and its Employee Participants was accurate.

475.    The Trustee Defendants set the value of PDC stock based on Willamette and SRR's valuations.  As discussed above, these values were inflated and misrepresented the true value of PDC stock.

476.    The Prior Committee Defendants communicated the (inflated) share values as set by the Trustee and approved by the Prior Committee Defendants to the Employee Participants. In doing so, the Prior Committee Defendants knew the share values were inflated and did not represent the true value of PDC stock.

477.    The Trustee Defendants and the Director Defendants either approved these communications or knew that the Prior Committee Defendants were communicating the stock value to the Employee Participants and acquiesced in those communications.

478.    On information and belief, the employee stock communications were reviewed during meetings of the ESOP Committee and approved for release by the Prior Committee Defendants who were on the ESOP Committee at the time of the communication.

479.    Selectively disclosing factors that supposedly impacted the valuations while failing to fully disclose Willamette and SRR's valuation process constitutes fraud or concealment.

480.    These communications also did not disclose that the valuations omitted key liabilities or the other flaws in the valuations discussed above.  For example, the unfunded pension/post-retirement liabilities were reported on Appvion's balance sheet in each of the PWC audited financial statements.  This means that the liabilities were both probable and estimable. Because of the sheer magnitude of these liabilities, and, therefore, their high level of materiality to Appvion's financial condition, each ESOP fiduciary (the Director Defendants, the Prior Committee Defendants, and the Trustee Defendants) who had access to the semi-annual

Case 1:18-cv-01861-WCG   Filed 01/08/19   Page 127 of 206   Document 77

appraisals, participated in fraud or concealment by not requiring that the liabilities be explicitly addressed.

481. The communications also did not disclose that SRR was ignoring market-based evidence of Appvion's financial condition. The Bloomberg values and Standard & Poor's rating discussed above are not available without access to those services and would not have been known to the Employee Participants.

### 3. The Director Defendants Did Not Disclose That They Were Failing to Monitor the Trustee Defendants and the Prior Committee Defendants.

482. The Director Defendants received reports on the semi-annual valuations of PDC stock.

483. Braun from Willamette represented that Willamette will come to Appvion twice a year and provide a "full report" to the management and the board of directors so that they would have "enough information so they understand what it is [Willamette] did, why it makes since, at least why [Willamette] think[s] it made sense and how [Willamette] feel[s] that it is a supportable value for the purpose of determining what [the employees'] value is going forward."

484. Driscoll also reported to employees in September 2003 and May 2006 newsletters that a representative of State Street met with the Board each year.

485. The Director Defendants also had an Audit Committee that was responsible for helping the Board "fulfill its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of Paperweight Development financial reports." The Audit Committee reviewed Appvion's audited financial statements.

486.     The October 2006 KSOP Guide establishes that the Director Defendants "establish[ed] the company's financial objectives, review[ed] its performance against those objectives, and determin[ed] appropriate business strategies."

487.     The Director Defendants also had the authority to request additional information from the Trustee, especially under the 2015 trust agreements with Argent.

488.     The Director Defendants were also responsible for setting the compensation of Appvion's executives, including the excessive compensation plans tied to the value of PDC stock.  The Director Defendants therefore knew Appvion management had a conflict of interest by being financially motivated creating inflated projections that increased the valuations of PDC stock.

489.     However, the Director Defendants failed, among other things, to oversee the projections and failed to verify that key, material liabilities were included in the valuation reports.

490.     The Director Defendants did not disclose to employees that they were not monitoring the Prior Committee Defendants and the Trustee Defendants.  Instead, publications repeatedly misrepresented to employees that the Director Defendants were complying with their fiduciary duty to watch out for the Employee Participants' interests as shareholders.

491.     To the extent the Director Defendants claim that they did not know that the semi-annual PDC stock valuations were materially overstated, it is because they failed to monitor the ESOP Committee or the ESOP trustees or otherwise failed to comply with their fiduciary duty to protect the interests of the ESOP Plan and the Employee Participants.

492.    The Director Defendants also either approved or acquiesced in the release of the communications to employees that selectively justified the value of PDC stock and that misrepresented the PDC stock's value.

### 4.    **The Argent Defendants Acknowledged Critical Issues with SRR's Valuations but Admitted That They Had Rubberstamped Them Anyway.**

493.    Grant Lyon was appointed as the sole member of the ESOP Committee in August 2017.

494.    Less than a month after Lyon's appointment, he had identified specific deficiencies with the PDC stock appraisals.

495.    He then met with Argent's Steve Martin about the issues he had uncovered. Following that discussion, he prepared a report to Appvion's board dated 1 September 2017 (the "Lyon Report").

496.    Lyon gave Martin an opportunity to review the Lyon Report before Lyon gave it to the Appvion Board.

497.    Argent admitted that it had never run a review process for SRR and that it used SRR because the predecessor trustee, State Street, used them.  Argent said it had used SRR in other engagements.

498.    Argent acknowledged that Appvion had consistently missed their financial projections during Argent's time as trustee.

499.    Argent acknowledged that it had questioned SRR's low (5%) discount for lack of marketability, but SRR had not changed the discount percentage.

500.    Argent acknowledged that it has not been involved in explaining SRR's valuations or Appvion's financial condition to the Employee Participants.  Rather, Argent

Defendants allowed Appvion management and board to take the lead in communicating the stock price and financial information to Employee Participants.

501. Argent acknowledged that unfunded pension and post-retirement benefits other than pension liabilities were never included in the SRR valuation, even though those liabilities and post-retirement benefits other than pension were included in the audited financial statements.

502. Argent never disclosed these problems with the valuations to Employee Participants, but instead provided stock prices as described earlier.

5. **The Prior Committee Defendants and The Director Defendants Led the ESOP Plan and the Employee Participants to Believe that the Executive Team had the Same Level of Risk as the Potential Employee Participants.**

503. In the 2001 KSOP and the Prospectus, Appvion management represented that the money they would receive under the defined compensation plans was "subject to the same important risk and return profile as the ESOP equity investment."

504. At the 2 August 2001 road show, Buth told the employees that he and his "management team have already committed 100% of [their] funds. Of the 14 of [them] that [was] $5 million dollars…"

505. In a 14 January 2002 email to employees, Paul Karch distinguished Appvion's ESOP from Enron's, in order to reassure employees that the Appvion ESOP was safer than Enron's plan:

> Control
>
> Our ESOP holds 100 percent of the company's stock. **Our ESOP trustee, as the legal shareholder, is the sole shareholder, and thus has control of the company**. In Enron's case, their qualified plan held less than 10 percent of the company's total outstanding stock, so the trustee was a minority shareholder who could not influence or affect the governance structure and protect participants' holdings.

Diversification

**Our plan design prevents company executives or other employee group from selling their stock sooner than any other employee since all our stock is in the ESOP**. In Enron's situation, company executives owned stock that was not held in their qualified plans. That stock was not subject to the same restrictions on sales as the stock in the qualified plans.

506. Similarly, a January 2006 newsletter also stressed that the company's board of directors and the trustee would protect employees from the kind of fraud that occurred at Enron:

**Enron executives were able to sell their stock and pay themselves large bonuses** even though the company was failing and the employees were not able to sell their stock. **Can that happen to us**?

**No. Our executives are able to own company stock only through the ESOP**, so they are not able to sell it any sooner or at a different price than any other participant.

507. However, the ESOP Plan design only prevented executives or employees from selling their stock while remaining with Appvion; instead, all of the Appvion executives in place at the time of the 2001 transaction left the company by March 2007, and they all withdrew their funds either on a lump sum basis or over the five years after leaving Appvion. Further, executives received significant incentive compensation that was not part of the ESOP and therefore they were not dependent on the ESOP in the same way that other employees were.

508. When Buth left Appvion in 2004, Karch sent an internal communication dated 3 May 2004 that stated:

Since Doug's leaving the company is voluntary, he **will not receive any severance payments nor are there any special deals that apply**. Doug has the same options as any other employee who terminates his or her employment. He may choose to leave his investment in company stock or request a distribution. **My understanding is that Doug intends to leave his money invested in company stock.**

509. Buth received significant funds on his departure. Specifically, Buth received compensation under the various incentive and bonus plans discussed above.

510. However, Prior Committee Defendants and Director Defendants knew the true financial condition of Appvion and knew when to pull their money out of stock and/or management incentive plans. Indeed, at least Buth, Karch, Fantini, and Parker timed their exit to ensure they received gains from the sale of their shares. Specifically, Buth, Karch, Fantini, and Parker gained:

| Individual | Gains |
|---|---|
| Buth | $851,972 |
| Karch | $303,566 |
| Fantini | $577,365 |
| Parker | $156,493 |

### 6. Employees Were Unable To Get Additional Information About the Valuations.

511. After the 2001 Transaction, there was a committee of hourly and salaried personnel that met with the Company and the Board of Directors on behalf of the Employee Participants. However, when committee members retired or left the committee, the Company did not replace them. The committee was eventually disbanded in around 2006.

512. Also around 2006, the Company stopped meeting with Union members quarterly to discuss the ESOP by negotiating it out of the bargaining agreement.

513. During the road show presentations, employees would ask questions about the SEC filings, the Company's debt, and the valuations. When faced with these questions, CFO Tom Ferree would typically respond that he could not answer because it would be considered insider trading.

514. Employees who requested more information about the stock valuation and the company's finances were shut down.

515. Employees were prohibited from talking directly to the ESOP Trustee to get more information about the valuations.

## COUNT I
## BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AND BREACH OF THE DUTY TO MONITOR AGAINST THE TRUSTEE DEFENDANTS

516. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

517. ERISA § 404(A)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

518. The Trustee Defendants are plan fiduciaries.

### The Trustee Defendants Have a Duty to Act in the Best Interest of Plan Participants and a Duty to Act Prudently

519. The duty of loyalty under ERISA § 404(a)(1)(A) and duty of prudence under ERISA § 404(a)(1)(B) requires a fiduciary to undertake an appropriate investigation to determine that the plan and its participants receive adequate consideration for the assets of the plan and the participants' accounts in the plan.

**The Trustee Defendants Have a Duty to Thoroughly Investigate**

520.    The Trustee Defendants were responsible for hiring the independent appraisers who conducted the semi-annual valuations of PDC's stock price.

521.    ERISA § 404 requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  This requires a fiduciary to not only analyze the merits of a proposed transaction or valuation but also to thoroughly investigate a proposed transaction or valuation.

522.    In order to comply with their fiduciary obligations, the Trustee Defendants must investigate the independent appraisers' qualifications, provide the independent appraisers with complete and accurate information, and make certain that reliance on the independent appraisers' advice was reasonably justified.

523.    The Trustee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with their duties to act in the best interest of the plan and to act prudently.  Specifically, the Trustee Defendants cannot rely on other persons in order to make a good faith determination that the sale or purchase of Appvion stock was for fair market value and that the appraisals received actually reflect the health of the company for the purpose of valuing the stock.

**The Trustee Defendants Have a Duty to Ensure Plan Participants Receive Adequate Consideration and to Ensure that the ESOP Plan Does Not Pay More Than Fair Market Value For Stock**

524.    The duty of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine

that the plan and its participants receive adequate consideration for the assets of the plan and the participants' accounts in the plan.

525.    Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

526.    In order for the trustee or other named fiduciary to make a good faith determination of fair market value relying on an independent appraiser consistent with its duties under ERISA § 404(a)(1)(A) and (B), a fiduciary responsible for engaging in the good faith determination must investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances.

## The Trustee Defendants Have a Duty to Disclose and Inform

527.    An ERISA fiduciary's duty of loyalty and its duty of prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

## The Trustee Defendants Have a Duty to Act in Accordance with the ESOP Plan Documents

528.    In order to comply with their fiduciary obligations, the Trustee Defendants were required to have complied with the ESOP Plan Documents.

529.     Pursuant to the Trust Documents, the Trustee Defendants were required to hire an independent advisor (as described in Section 401(a)(28)(c) of the Internal Revenue Code) to appraise the value of PDC stock on a semi-annual basis.   The Trustee Defendants were responsible for reviewing finalizing, and adopting the valuations.

530.     IRC § 401(a)(28)(C) requires that "all valuations of employer securities which are not readily tradeable on an established securities market with respect to activities carried on by the plan are by an independent appraiser," which means an appraiser meeting the requirements of the regulations prescribed under section 107(a)(1).   In the context of an ESOP that holds, acquires or sells securities that is not readily tradeable on an established securities market, an ESOP fiduciary needs to hire an independent appraiser, but the fiduciary remains responsible for ensuring that the valuation and the information on which it is based is complete, accurate, and up-to-date.

531.     Section 1.33 of the 2001 Appleton Papers Retirement Savings and Employee Stock Ownership Plan, and various plans thereafter, define Fair Market Value as the "fair market value of Company Stock, at a certain date, as determined by the Trustee based the appraisal of an Independent Appraiser."

532.     Section 1.38 of the 2001 Appleton Papers Retirement Savings and Employee Stock Ownership Plan, and various plans thereafter, define Independent Appraiser to mean "an Independent Appraiser as defined in Section 401(a)(28) of the Code, in accordance with the terms of the Trust and the provisions of Section 3(18) of ERISA."

533.     The Trustee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with the ESOP Plan documents.   Specifically, the Trustee Defendants cannot rely on other persons in order to make a

good faith determination that the sale of Appvion stock was for fair market value and the appraisals received actually reflected the health of the company for the purpose of valuing the stock.

**The Trustee Defendants have a Duty to Monitor the Board of Directors**

534.    As the representative of the sole shareholder of PDC, the Trustee Defendants also have a duty to monitor the performance of PDC and Appvion's board of directors.  While the Trustee Defendants did not have authority to unilateral removal of members of any members of the board of directors after 2005, they could request that Appvion's CEO agree to remove jointly appointed members of the board of directors.

535.    The Trustee Defendants have a duty to monitor Appvion's Board of Directors by reviewing board minutes, financial statements, and monitoring the performance of the company.

**The Trustee Defendants Breached Their Duties to (1) Act in the Best Interest of the ESOP Plan (i.e. loyalty), (2) Act Prudently, (3) Act in Accordance with the ESOP Plan Documents, and (4) Monitor the Board of Directors**

536.    The Trustee Defendants breached their fiduciary duties as described above by, among other things, the following:

- Failing to properly investigate the fair market value of PDC stock.

- Failing to properly investigate Willamette and SRR's methods for valuing PDC stock and adopting the valuations despite substantial flaws in the valuations that resulted in significant overvaluations of PDC stock.

- Failing to properly scrutinize the financial projections provided by Appvion management, which Willamette and SRR relied on in valuating PDC stock, even though Appvion had consistently failed to meet its projections.

- Failing to take reasonable steps to determine that Willamette and SRR receive complete, accurate and current information necessary to value PDC stock, including failure to identify conflicts of interest with the individuals at Appvion who were creating the projections.

- Failing to prudently determine that its reliance on the valuation reports and appraiser's advice was reasonable.

- Failing to document, in writing, their oversight of the appraisers, the appraisal process, and their analysis and review of the final valuation reports, including, among other things, failure to ensure that either the appraiser or the trustee conducted and documented the following:

  - The identification of the individuals responsible for providing projections reflected in the valuation report and a reasonable inquiry as to whether those individuals have conflicts of interest;

  - An opinion as to the reasonableness of any projections considered and explanation why and to what extent the projections are or are not reasonable, including, at a minimum, an analysis of how the projections compare to and whether they are reasonable in light of the company's five-year historical averages.

  - The reasonableness of disregarding certain projections, including adjustments made.

  - The support of the reasonableness of projections and why those assumptions are reasonable if the company is projected to meet or exceed its historical performance.

  - The explanation why a greater weight is assigned to some valuation methods over others, including the removal of an entire valuation method.

  - The Trustee's analysis of the final valuation reports, including consideration of the topics, such as, but not limited to, the following:

    - Marketability discounts;

- Minority interests and control premiums;

- Projections of the company's future economic performance and the reasonableness or unreasonableness of such projections, including, if applicable, the bases for assuming that the company's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

- Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

- The comparability of the companies chosen as part of any analysis based on comparable companies; and

- Whether the methodologies employed were standard and accepted methodologies and the bases for any departures from standard and accepted methodologies.

- Failing to disclose material facts, including but not limited to the following facts:

  (i) That the valuations significantly overstated the value of PDC stock;

  (ii) That the valuations did not include significant liabilities, including unfunded pension and other post-retirement liabilities, certain types of interest-bearing debt, and other liabilities that were included on Appvion's audited financial statements;

  (iii) That the valuations did not comply with the standard of care for appraisals of this type;

  (iv) That the valuations were based on unrealistic projections prepared by Appvion management; and

(v)    That the valuations improperly applied a control premium that increased the valuation even though the ESOP had no practical ability to control Appvion or PDC.

(vi)    That the valuations contained other deficiencies including those described in this complaint.

- Failing to monitor Appvion's Board of Directors.

- Allowing Appvion management to communicate the share price to Appvion employees, even though Appvion management selectively disclosed factors that influenced the share price while omitting material information about the valuations, such as the fact that the valuations improperly applied a control premium, that the valuations did not account for some material liabilities (including significant unfunded pension and other post-retirement liabilities), that Willamette, on information and belief, and SRR capped the declining income stream into perpetuity, that Willamette, on information and belief, and SRR broke Appvion into business segments and failed to include all overhead costs in the projections, that Willamette, on information and belief, and SRR failed to apply the proper discount for the lack of marketability of the shares, and that Willamette, on information and belief, and SRR improperly applied a control premium in its valuation, among other things.

- Failing to participate in Appvion's management's explanation of the stock price and investment advice to employees.

- Failing to follow up with Willamette and SRR on what it believed to be a low discount rate based on lack of marketability.

- Failing to establish processes to adequately monitor Appvion's board of directors, especially in the operation of the ESOP Committee and the Compensation Committee.

- Agreeing to the sale of Encapsys.

- Failing to take steps to prevent the Prior Committee Defendants and the Board of Directors from setting and benefiting from artificially high stock prices at the expense of the ESOP Plan.

537. These breaches constitute breaches of duties of loyalty under ERISA § 404(a)(1)(A), the duty of prudence under ERISA § 404(a)(1)(B), the duty to act in accordance with the plan under ERISA § 404(a)(1)(D) and the duty to monitor the board of directors.

538. The Trustee Defendants' breaches of their fiduciary duties damaged the ESOP Plan by causing it to consistently and repeatedly overpay for PDC stock.

539. The Trustee Defendants also knew that the share price that it adopted was used by PDC/Appvion in the payment of bonuses and other incentives to directors and offices of PDC/Appvion. The Trustee Defendants' breaches of their fiduciary duties therefore further damaged the ESOP Plan by causing Appvion to overpay directors and officers, thereby reducing cash available to pay Employee Participants for the value of their shares.

## COUNT II
### BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AND BREACH OF THE DUTY TO MONITOR AGAINST THE PRIOR COMMITTEE DEFENDANTS

540. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

541. As former members of the ESOP Committee, the Prior Committee Defendants were Named Fiduciaries under Section 8.2(a)(2) of the ESOP Plan Documents.

542.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

### Prior Committee Defendants Have a Duty to Act in the Best Interest of the ESOP Plan and a Duty to Act Prudently

543.   The duty of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the ESOP Plan and its participants receive adequate consideration for the assets of the ESOP Plan and the participants' accounts in the ESOP Plan.

### The Prior Committee Defendants Have a Duty to Monitor the Trustee Defendants and the Valuations

544.   ERISA § 404 requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."   This requires a fiduciary to not only analyze the merits of a proposed transaction or valuation but also to thoroughly investigate a proposed transaction or valuation.

545.   As members of the ESOP Committee, the Prior Committee Defendants were responsible for interpreting the ESOP Plan and establishing policies and procedures to implement the ESOP Plan.

546. In order to comply with their fiduciary obligations, the Prior Committee Defendants had a duty to monitor the actions of the Trustee Defendants and ensure they were complying with their fiduciary duties adequately protecting the interest of the ESOP Plan.

547. The Prior Committee Defendants also had a duty to investigate the independent appraisals, including verifying that the independent appraisers were qualified, that they reviewed complete and accurate information, and that reliance on the independent appraisers' advice was reasonably justified.

548. The Prior Committee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with their duties to act in the best interest of the plan and to act prudently. Specifically, the Prior Committee Defendants cannot rely on other persons in order to make a good faith determination that the sale of Appvion stock was for fair market value and that the appraisals received actually reflected the health of the company for the purpose of valuing the stock.

549. In addition, beginning in at least 2008, the ESOP Committee began reviewing and approving the valuations prepared by the Trustee Defendants and SRR.

### The Prior Committee Defendants Have a Duty to Ensure that the ESOP Plan Receives Adequate Consideration and to Ensure that the ESOP Plan Does Not Pay More than Fair Market Value For Stock

550. The duties of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the ESOP Plan receives adequate consideration for the assets of the ESOP Plan and the Employee Participants' accounts in the ESOP Plan.

551. Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith

by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

552.    In order for the trustee or other named fiduciary to make a good faith determination of fair market value relying on an independent appraiser consistent with its duties under ERISA § 404(a)(1)(A) and (B), a fiduciary responsible for engaging in the good faith determination must investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances.

### The Prior Committee Defendants Have a Duty to Disclose and Inform

553.    Additionally, an ERISA fiduciary's duties of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) include a duty to disclose and inform.  Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

### The Prior Committee Defendants Had A Duty To Monitor the Repurchase Obligation

554.    Under the ESOP Plan Documents, when an employee was eligible for distributions, the Company was required to repurchase the shares of stock allocated to that employee.

555.    The Prior Committee Defendants had a duty to monitor the repurchase obligation and make sure there were sufficient funds available to meet the repurchase obligation.

**Prior Committee Defendant Breached Their Duties to (1) Act in the Best Interest of the ESOP Plan (i.e. loyalty), (2) Act Prudently, and (3) Monitor the Trustee Defendants**

556. The Prior Committee Defendants breached their fiduciary duties in, among others, the following ways:

- Buth and Karch presented Houlihan as an independent advisor who would provide an independent opinion on the value of PDC as of the time of the 2001 Transaction. However, Buth and Karch failed to disclose that Houlihan's fee was contingent on the deal closing and that their opinion was therefore not truly independent and should not be relied upon.

- In convincing employees to invest in the ESOP, Buth, Karch, Fantini, and Parker also represented that their investment in the ESOP was at equal or greater risk than the average employees. They had access to inside financial information and knew when to sell their shares or leave the company in order to maximize their gains.

- The Prior Committee Defendants had access to inside financial information and knew that the stock prices set by the Trustee Defendants were artificially inflated. For example, having access to both the financial statements and the appraisals was sufficient for them to understand that the unfunded pension/post-retirement benefits were not included in any of the appraisals. They therefore knew when to sell their shares or leave the company in order to maximize their gains.

- Karch represented to employees that the third party appraiser was valuing the company consistent with the methodology established by the Department of Labor.

- Karch also represented to employees that the independent appraisal would protect the employees from artificially high stock prices.

- The Prior Committee Defendants were involved in preparing the financial projections that the appraisers relied on in valuing PDC stock. They created overly optimistic financial projections even though they consistently failed to meet the projections, and they knew that the appraisers were incorporating those financial projections into the stock price and inflating the stock price.

- When Appvion's stock reached its artificial peak, Richards falsely represented to employees that Appvion was exceeding market expectations.

- Timing their exits from Appvion while the stock prices were artificially high for their own personal benefit but at the detriment of Appvion and all of the remaining employees.

- Selectively disseminating information to employees in order to prevent them from discovering Appvion's true financial health.

- Selectively disclosing factors that influenced the share price while omitting material information about the valuations, such as those described in this complaint, including the fact that the valuations applied a control premium, that the valuations did not account for some material liabilities (including significant unfunded pension, post-retirement liabilities), that Willamette and SRR capped the declining income stream into perpetuity, that Willamette and SRR broke Appvion into business segments and failed to include all overhead costs in the projections, that Willamette and SRR failed to apply the proper discount for the

lack of marketability of the shares, and that Willamette and SRR improperly applied a control premium in its valuation, among other things.

- Failing to implement systemic processes to review the Trustee Defendants' processes and strategies for reviewing and adopting the appraisals.

- Accepting the stock values adopted by the Trustee Defendants even though the Prior Committee Defendants knew or should have known that they were fundamentally flawed.

- Failing to take steps to prevent the Prior Committee Defendants and the Board of Directors from benefiting from artificially high stock prices at the expense of the ESOP Plan.

557.    Prior Committee Defendants' breaches damaged the ESOP Plan by causing or allowing it to consistently and repeatedly overpay for PDC stock.

## COUNT III
## BREACH OF FIDUCIARY AGAINST THE DIRECTOR DEFENDANTS

558.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

559.    According to the Department of Labor "the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such a manner as may reasonably be expected to ensure that their performance has be in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."

560.    The Director Defendants had the authority to both appoint and remove the trustee, and they did in fact appoint State Street, Reliance, and Argent as the ESOP Trustees.

561.    The Director Defendants were also responsible for appointing members of the ESOP Committee, including the Prior Committee Defendants.

148

562. The Director Defendants therefore had discretionary authority and control over the management and administration of the ESOP Plan and its assets and were fiduciaries of the ESOP Plan.

563. The Trustee Defendants appointed directors to Appvion's Board of Directors as described above, however, after January 1, 2005, the Trustee only had the ability to jointly nominate (with the CEO) three of seven possible individuals to the Board of Directors and it could not unilaterally remove those directors.

564. Given the Director Defendants' ability to remove the Trustee Defendants and the relationship between the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants, the Director Defendants had a duty to monitor the Trustee Defendants and Prior Committee Defendants by implementing systematic processes to review their courses of action and strategies.

565. The Director Defendants' knew or in the exercise of reasonable diligence should have known that the Trustee Defendants had retained Willamette and SRR to perform semi-annual valuations of PDC stock and that those valuations were fundamentally flawed as described above.

566. The Director Defendants breached their duty to monitor by, among other things, the following:

- Allowing the Prior Committee Defendants to selectively disclose information about the valuations to employees;

- Failing to take steps to prevent the Trustee Defendants and the Prior Committee Defendants from setting and benefiting from artificially high stock prices at the expense of the ESOP Plan;

- Failing scrutinize the projections prepared by Appvion management and used as the basis for the valuations, even though the projections were inconsistent with Appvion's actual performance and with Appvion's audited financial statements;

- Allowing the Prior Committee Defendants to be paid amounts over and above the fair market value of their shares; and

- Allowing Appvion management employees to receive incentive and bonus payments based on the artificially inflated value of PDC stock.

567. Because the Director Defendants had access to both the financial statements and the semi-annual appraisals, they knew that the appraisals failed to include a deduction for the unfunded pension, post-retirement liabilities and; therefore, misrepresented the true value of the PDC stock.

568. The Director Defendants held themselves out as fiduciaries and stated that they were taking care of the interests of the shareholders, which includes the ESOP Plan, as the ESOP Plan held all shares allocated to the Employee Participants.

569. For example, in a 19 March 2001 employee newsletter, the Board of Directors stated that "[s]hareholders have the right to elect a board of directors" that 'has a fiduciary obligation,' or legal responsibility, to represent the interests of the shareholders."

570. A 2006 KSOP Guide contained nearly identical language, as did a January 2006 newsletter in which the Board of Directors said: "Our company's board of directors has a legal obligation to company shareholders (in our case, the ESOP is the sole shareholder) to prevent the kind of fraud that occurred at Enron."

571. The Director Defendants failed in their fiduciary responsibility for the reasons described in this FAC, including, among other things:

- Failing to ensure the PDC stock appraised value was at fair market value for the reasons described in this FAC and failing to disclose those;

- Acquiescing or approving communications to the ESOP Plan and Employee Participants that misrepresented the fair market value of the PDC stock;

- Failing to consider and adjust for management and directors' conflict of interest as a result of being compensated with PDC stock;

- Directors Buth, Parker, and Richards disclosed that they were getting a fairness opinion from Houlihan in the prospectus, but omitted that the fairness opinion was coming from an entity that had a conflict of interest as described in this FAC.

572.    Plaintiff has been injured as a result of Director Defendants' conduct by, among other things, overpaying for PDC stock and entering into the ESOP transaction that it either would not have agreed to or would only have agreed to upon different terms.

## COUNT IV
### ENGAGING IN PROHIBITED TRANSACTIONS AGAINST THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS AND THE TRUSTEE DEFENDANTS

573.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

574.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) provides that "a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

575.   ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) provides that "a fiduciary with respect to a plan shall not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

576.   ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect… transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

577.   ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) defines a "party in interest" to include "any fiduciary… of such employee benefit plan" as well as "an employer any of whose employees are covered by such plan."

578.   ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H) defines a "party in interest" to include "any employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors) of a person described in subparagraph" (C), among other subparagraphs.  Subparagraph (c) refers to ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C), which defines a party in interest to include "an employer any of whose employees are covered by such plan."

579.   Appvion was a party in interest to the ESOP because it was the employer whose employees were covered by the ESOP.  As directors of Appvion, the Director Defendants were parties in interest pursuant to the ESOP.

580.   The Prior Committee Defendants were parties in interest to the ESOP because they were employees, officers, and directors of Appvion.

581.   The Prior Committee Defendants and the Director Defendants were Plan fiduciaries as members of the ESOP Committee and/or the Board of Directors.

582.    The Trustee Defendants were fiduciaries to the ESOP in their roles as trustees who were responsible for, among other things, determining the fair market value of PDC stock.

583.    The actions of the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants in adopting inflated stock valuations and additional compensation plans tied to or influenced by the stock valuations repeatedly caused the ESOP Plan to overpay for PDC stock beginning as early as December 2001.

584.    The Prior Committee Defendants sold their PDC stock at artificially high prices and thereby received consideration for their own personal accounts to the detriment of the ESOP Plan.  These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

585.    All of the Prior Committee Defendants received consideration from the incentive plans described above that were influenced by the artificially high valuations of PDC stock. These payments constitute prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

586.    The non-employee Director Defendants were awarded phantom stock units beginning in 2006, which counted as synthetic equity and were based on the value of PDC stock. Under this plan, the non-employee Director Defendants received consideration for their own personal accounts to the detriment of the ESOP Plan when they sold their phantom stock at artificially high stock prices.  These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

587.    In addition, the Company and the ESOP Plan purchased shares from other senior management who served in fiduciary capacities at inflated prices.  These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

588.     Since PDC had no assets other than Appvion, the Director Defendants arranged for Appvion to loan cash to PDC to fund the ESOP's repurchase obligations, further damaging the value of the Company.  These transactions constituted prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

589.     The Trustee Defendants knew or should have known that the Prior Committee Defendants, the Director Defendants met the definitions of parties-in-interest with respect to the ESOP Plan.

590.     The Trustee Defendants were fiduciaries who caused the ESOP Plan to purchase the Prior Committee Defendants' and the Director Defendants' stock at artificially high stock prices.  As such, the Trustee Defendants caused the ESOP Plan to engage in prohibited transactions in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

591.     As parties in interest, the Prior Committee Defendants and the Director Defendants violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) and ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

592.     The exemption of ERISA § 408, 29.U.S.C. § 1108 does not apply to these transactions because the ESOP Plan paid more than adequate consideration for the shares.

593.     The prohibited transactions described above caused significant losses to the ESOP Plan.

## COUNT V
## KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY PURSUANT TO ERISA § 502(a)(3), 28 U.S.C. §1132(a)(2) AGAINST HOULIHAN LOKEY

594.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

595. As alleged in the paragraphs above, the State Street Defendants, Buth, Karch, Fantini, and Parker, and others breached their fiduciary duties to the ESOP Plan in connection with the 2001 Transaction.

596. Houlihan knew that the conduct described in the above paragraphs constituted a breach of the State Street Defendants, Buth, Karch, Fantini, and Parker, and others' fiduciary duties.

597. In addition, Buth, Karch, Fantini, and Parker received incentive payments in connection with the 2001 Transaction. These payments were prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106.

598. Despite this knowledge, Houlihan knowingly participated in the breaches by:

- Issuing a fairness opinion that resulted in Houlihan receiving up to $8.1 million;

- Representing to Appvion employees that it was preparing an independent validation of the buyout proposed in 2001, while failing to disclose that its fees were contingent on both the deal closing and were structured as a percentage of the purchase price; and

- Representing to Appvion employees that the proposed buyout was a great deal for them.

599. Houlihan's knowing participation assisted the State Street Defendants, Buth, Karch, Fantini, and Parker, and others' breaches of fiduciary duty in convincing Appvion's employees to agree to the buyout. This allowed the Prior Committee Defendants, the State Street Defendants, and the Director Defendants to perpetrate their breaches of fiduciary duties and frauds over the next 16 years.

600. Houlihan received up to $8.1 million in fees in connection with the 2001 Transaction. This fee constituted an asset of the ESOP Plan.

601. Plaintiff was harmed as a result of Houlihan's conduct.

602. Houlihan, Buth, and Karch presented Houlihan as an independent advisor in connection with the 2001 Transaction. At no point did they disclose that Houlihan's fees was contingent and that Houlihan therefore had a conflict of interest.

603. Plaintiff is entitled to equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT VI
### VIOLATION OF ERISA § 410 AND BREACH OF FIDUCIARY DUTY UNDER ERISA §§ 404(a)(1)(A) AND (B), 29 U.S.C. § 1110 AND §§ 1104 (a)(1)(A) AND (B) AGAINST THE TRUSTEE DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE HOULIHAN LOKEY DEFENDANTS

604. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

605. ERISA § 410(a), 29 U.S.C. § 1110(a), provides in relevant part that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy."

606. As Part IV of ERISA includes ERISA §§ 404, 405, and 406, 29 U.S.C. §§ 1104, 1105, and 1106, any provision that attempts to relieve a fiduciary of liability is void pursuant to ERISA § 410(a), unless there is an exception or exemption. No such exception or exemption is applicable here.

607. The DOL Regulations promulgated under ERISA § 410, 29 C.F.R. § 2509.75-4, renders "void any arrangement for indemnification of a fiduciary of an employee benefit plan by

the plan" because it would have "the same results as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations."

608. For a 100% ESOP-owned company, a provision requiring indemnity by the ESOP-owned company is treated as an indemnity provision by the ESOP Plan because it effectively requires Plan participants to pay for the costs of the breaching fiduciaries' liability.

609. Section 8.11 of the 31 July 2002 Plan Document and subsequent plan purport to have the Company, which is defined as Appleton Papers Inc. or its subsidiaries or affiliates "indemnify and save each person who is a member of the Committee and each employee or director of the Company or a Related Company, harmless against any and all loss, liability, claim, damage, cost and expense that may arise by reason of, or be based upon, any matter connected with or related to the Plan or the administration of the Plan…"

610. To the extent that Section 8.11 of the 31 July 2002 Plan Document and the subsequent plan documents attempt to relieve the Prior Committee Defendants from their responsibility or liability for their breaches of fiduciary duties under ERISA and have the ESOP Plan be responsible for their liability or breaches, Section 8.11 is void as against public policy.

611. The Trustee engagement letters and trust agreements purport to have Appvion indemnify and hold Trustee Defendants harmless against and from any and all claims, damages, expenses, liabilities, and losses whatsoever.

612. Plaintiff is entitled to declaratory judgment that any such indemnification clauses or agreements are void as against public policy and under ERISA § 410.

613. To the extent that any fiduciaries of the ESOP Plan agreed to such an indemnity provision that is against public policy under ERISA § 410 (i.e. by accepting the benefits of the

indemnity provision), that fiduciary breached his or her fiduciary duties under ERISA by failing to discharge their duties with respect to the ESOP Plan solely in the interest of the participants and beneficiaries (A) for the exclusive purpose of providing benefits to participants and beneficiaries and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

## COUNT VII
## CO-FIDUCIARY LIABILITY PURSUANT TO ERISA § 405, 29 U.S.C. § 1105 AGAINST THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE TRUSTEE DEFENDANTS

614.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

615.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

### The Prior Committee Defendants and the Director Defendants

616.    The Prior Committee Defendants violated ERISA § 405(a)(1)-(3) when they knowingly participated in each other's violations when they acted as a Committee because (1) they each participated knowingly in the actions taken as a Committee and knew or were reckless

in not knowing the actions taken were a breach, (2) failed to fulfill their duties as members of the Committee set forth in the ESOP Plan Document, and (3) had knowledge of breaches by other Prior Committee Defendants and made no efforts to remedy the breaches. As such, the Prior Committee Defendants are liable for the breaches of the other Prior Committee Defendants pursuant to ERISA §405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3).

617. The Prior Committee Defendants and Director Defendants violated ERISA §405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3) because they knew of the underlying facts, had an obligation to review the following breaches and either failed to fulfill those duties or had knowledge of the breaches and failed to make any efforts to remedy the breaches as follows:

- The Prior Committee Defendants and Director Defendants knew or should have known, consistent with their responsibilities, that Trustee Defendants breached their fiduciary responsibilities as set forth in Counts 1 and 6, including because each of them had access to the valuations performed by Willamette and SRR and had access to the financial information necessary to know that the stock price reflected in the valuations did not accurately reflect the fair market value of Appvion's stock.

- The Prior Committee Defendants and Director Defendants knew or should have known, consistent with their responsibilities, that Trustee Defendants failed to make proper disclosures as set forth in Counts 1, 6, because each of the Prior Committee Defendants either knew of or through a proper review would have discovered Trustee Defendants failure to make proper disclosures.

618.     Trustee Defendants violated ERISA § 405(a)(1)-(3) when they participated in the prohibited transactions as set forth in Count 4 because Trustee Defendants failed to fulfill their duties as Trustee by failing to properly monitor Willamette and SRR to ensure the share prices it calculated were reasonably accurate and that Willamette and SRR's processes and information were reasonably reliable.

619.     Trustee Defendants knew of the breaches set forth in Counts 2, 3, 6 and made no effort to remedy the breaches or violations.   As such, Trustee Defendants are liable for the breaches and violations of the Prior Committee Defendants and the Director Defendants.

## COUNT VIII
## KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY PURSUANT TO ERISA § 502(a)(3), 28 U.S.C. §1132(a)(2) AGAINST THE WILLAMETTE DEFENDANTS AND THE SRR DEFENDANTS

620.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

### The Willamette Defendants and the SRR Defendants Knowingly Participated in the Trustee Defendants' Breaches of Fiduciary Duty.

621.     The Trustee Defendants were fiduciaries to the ESOP Plan.

622.     The Trustee Defendants were responsible for determining the fair market value of PDC stock and they retained the Willamette Defendants and the SRR Defendants to advise them on the fair market value of PDC stock.

623.     The Trustee Defendants breached their fiduciary duties to the ESOP Plan as described above in Count I.

624.     The Willamette Defendants and the SRR Defendants knew that the Trustee Defendants were relying on their opinion in setting the fair market value of PDC stock, and knew

that the Trustee Defendants were failing to conduct appropriate diligence and breaching their fiduciary duties to the ESOP Plan as described above in Count I.

625. The Willamette Defendants, on information and belief, and the SRR Defendants knowingly participated in the breaches by issuing valuations that were fundamentally flawed for the reasons described in this complaint, including:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They failed to include some liabilities, including lease liability, restructuring reserves, and pension/post-retirement liabilities, that would have resulted in negative valuations from at least 2009 through 2016.

- They capped a declining income stream into perpetuity.

- SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division.

- SRR failed to subtract losses from the closure of Appvion's West Carrollton mill.

- SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments.

- SRR ignored evidence of Appvion's enterprise value from the sale of its Encapsys unit and concluded that Appvion's enterprise value was $53 million in excess of what the real world data available.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation.

- They improperly applied a control premium in its valuation, which was inappropriate since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

626. The Willamette Defendants and the SRR Defendants' conduct damaged the ESOP Plan.

627. Plaintiff is entitled to appropriate equitable relief against the Willamette Defendants and the SRR Defendants for their knowing participation in the Trustee Defendants' breaches of fiduciary duty.

**The Willamette Defendants and the SRR Defendants Knowingly Participated in the Prior Committee Defendants' Breaches of Fiduciary Duty.**

628. The Prior Committee Defendants were fiduciaries to the ESOP Plan. The Prior Committee Defendants breached their fiduciary duties to the ESOP Plan by the conduct described above in Count II.

629. The Willamette Defendants and the SRR Defendants knew that the Prior Committee Defendants were breaching their fiduciary duties to the ESOP Plan by the conduct described above in Count II. Specifically, the Willamette Defendants, on information and belief, and the SRR Defendants knew, among others, the following:

- The Prior Committee Defendants were providing inflated financial projections, even though Appvion had historically failed to meet the financial projections prepared by management.

- Appvion's audited financial statements showed significant unfunded pension/post-retirement and other liabilities which the Prior Committee Defendants were aware of, but which were not being included as liabilities in the valuations.

- The Prior Committee Defendants were participants in the ESOP Plan, and when they terminated employment with the company they would receive distributions based on the inflated stock values.

- The Prior Committee Defendants had synthetic equity from various incentive plans, which was tied to the stock valuations prepared by the Willamette Defendants and the SRR Defendants.

630. The Willamette Defendants, on information and belief, and the SRR Defendants knowingly participated in the Prior Committee Defendants' breaches of fiduciary duty by issuing valuations that were fundamentally flawed because:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They failed to include some liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities, that would have resulted in negative valuations from at least 2009 through 2016.

- They capped a declining income stream into perpetuity.

- SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division.

- SRR failed to subtract losses from the closure of Appvion's West Carrollton Mill.

- SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments.

- SRR ignored evidence of Appvion's enterprise value from the sale of its Encapsys unit and concluded that Appvion's enterprise value was $53 million in excess of what the real world data available.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation.

- They improperly applied a control premium in its valuation, which was inappropriate since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

631. The Willamette Defendants and the SRR Defendants' conduct damaged The ESOP Plan. As such, Plaintiff is entitled to appropriate equitable relief against the Willamette Defendants and the SRR Defendants for their knowing participation in the Prior Committee Defendants' breaches of fiduciary duty.

## The Willamette Defendants and the SRR Defendants Knowingly Participated in the Director Defendants' Breaches of Fiduciary Duty

632. The Director Defendants were fiduciaries of the ESOP Plan.

633. The Director Defendants breached their fiduciary duties to the ESOP Plan as described above in Count III.

634. The Willamette and SRR Defendants knew that the Director Defendants were breaching their fiduciary duties to the ESOP Plan by as described above in Count III.

635. Willamette and SRR's conduct damaged the ESOP Plan.

636. By knowingly participating in the Trustee Defendants', the Prior Committee Defendants', and Director Defendants' breaches and violations, Willamette and SRR are subject to appropriate equitable relief.

## COUNT IX
## FRAUD AGAINST WILLAMETTE

637. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

638. Willamette was hired by State Street, in its capacity as trustee of the ESOP Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock.

639. Willamette served as State Street's independent appraiser from 2001 to mid-2004.

640. Willamette knew that its appraisal would be used by State Street to set the fair market value of PDC stock.

641. Willamette knew that the value of the stock was material to the ESOP Plan and the Employee Participants because it would be used to set the share price to be used for Plan transactions.

642. Willamette knew that its opinion of the stock's value would be shared with the ESOP Plan and Employee Participants. Willamette also knew that the Employee Participants would rely on Willamette's opinion of the stock's value in making decisions to, among other things, make deferrals to the ESOP Plan, request statutory or additional diversification, request distributions from the ESOP after terminating employment, and/or retire or otherwise terminate employment at Appvion.

643. Indeed, Willamette intended the ESOP Plan and the Employee Participants to rely on their valuation of the Company's stock in purchasing stock back from employees.

644. During its tenure are the ESOP Plan's independent appraiser, Willamette determined the value of PDC's stock as described above. Willamette reached these determinations even though Willamette, on information and belief, knew that its valuation analyses contained significant flaws, including that it did not account for millions of dollars in pension/post-retirement benefits.

645. Because of these flaws, the stock prices as determined by Willamette, on information and belief, overstated the fair market value of PDC stock by a significant degree.

646. Willamette, on information and belief, knew that the stock prices it provided for the ESOP Plan's use were not accurate and that they overstated the fair market value of the stock.

647. The ESOP Plan and the Employee Participants believed Willamette's appraisal of fair market value.

648. The ESOP Plan and the Employee Participants had no way to know that Willamette had overstated the value of the stock because Willamette's full valuation reports were never shared with them. In addition, Willamette's wrongdoing was concealed as described above.

649. In reliance on Willamette's valuations, the ESOP Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the ESOP Plan over time. The fair market value determinations also played a key role in Appvion's eventual insolvency, which caused the remaining investments in the ESOP Plan to be worthless.

650. The ESOP Plan justifiably relied on Willamette's opinions of the fair market value of PDC stock.

651. As a result of Willamette's determination of the Company's stock price and the ESOP Plan's justifiable reliance there on, the ESOP Plan has been damaged.

## COUNT X
## FRAUD AGAINST THE SRR DEFENDANTS

652. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

653. SRR was hired by State Street, in its capacity as trustee of the ESOP Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock from late 2004 through the end of 2012.

654. SRR was hired by Reliance, in its capacity as trustee of the ESOP Plan, to serve as Reliance's independent appraiser in determining the fair market value of PDC stock for the semi-annual valuations of PDC stock in 2013.

655. SRR was hired by Argent, in its capacity as trustee of the ESOP Plan, to serve as Argent's independent appraiser in determining the fair market value of PDC stock from 2014 through mid-2017.

656. SRR knew that its appraisal would be used by State Street, Reliance, and Argent to set the fair market value of PDC stock.

657. SRR knew that the value of the stock was material to the ESOP Plan and the Employee Participants because it would be used to set the share price to be used for ESOP Plan transactions.

658. SRR knew that its opinion of the stock's value would be shared with the ESOP Plan and Employee Participants. SRR also knew that the Employee Participants would rely on SRR's opinion of the stock's value in making decisions to, among other things, make deferrals to the plan, request statutory or additional diversification, request distributions from the ESOP after terminating employment, and/or retire or otherwise terminate employment at Appvion.

659. During its tenure are the ESOP Plan's independent appraiser, SRR determined the value of PDC's stock as described above. SRR reached these determinations even though SRR knew that its valuation analyses contained significant flaws, including the following:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

- Even though SRR's own valuation reports admitted that its appraisal needed to consider all known liabilities, SRR's appraisals omitted know liability, they failed to include material liabilities, including lease liability, restructuring reserves, pension/post-retirement liabilities, and some types of interest-bearing debt. Inclusion of these liabilities should have resulted in negative valuations from at least 2009 through 2017.

- They capped a declining income stream into perpetuity.

- SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division in order to continue to justify its appraised values.

- SRR failed to subtract losses from the closure of Appvion's West Carrollton mill and the associated severance costs.

- SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments thus overstating earnings and value.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

- They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

660.    Because of these flaws, the stock prices as determined by SRR overstated the fair market value of PDC stock by a significant degree.

661.    SRR knew that the stock prices it provided for the ESOP Plan's use were not accurate and that they overstated the fair market value of the stock because, for example, SRR's own valuation reports admitted that in calculating fair market value, all liabilities must be considered.

662.    SRR also specifically knew that they should have included Appvion's unfunded pension liabilities and other liabilities in its valuations. Indeed, on 31 December 2013 SRR and Reliance discussed the ESOP's pension liability at an investment policy subcommittee meeting held by them. In addition, on information and belief, Ferree discussed the pension funding issue with SRR in June 2016, but SRR still did not include the pension liability in its valuation.

663.    SRR also knew that the value of the stock was material because it would be used to set the share price to be used for ESOP Plan transactions, including deferrals to the ESOP Plan and repurchases of shares.

664.    Indeed, SRR intended the ESOP Plan to rely on their valuation of the Company's stock in purchasing stock back from employees.

665.    The ESOP Plan and the Employee Participants believed SRR's appraisal of fair market value.

666.     The ESOP Plan and the Employee Participants had no way to know that SRR had overstated the value of the stock because SRR's full valuation reports were never shared with them.  In addition, SRR's wrongdoing was as described above.

667.     In reliance on SRR's valuations, the ESOP Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses over time. The fair market value determinations also played a key role in Appvion's eventual insolvency, which caused the remaining investments in the ESOP Plan to be worthless.

668.     The ESOP Plan justifiably relied on SRR's opinions of the fair market value of PDC stock.

669.     As a result of SRR's determination of the Company's stock price and the ESOP Plan's justifiable reliance there on, the ESOP Plan was damaged.

## COUNT XI
## NEGLIGENT MISREPRESENTATION AGAINST WILLAMETTE

670.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

671.     Willamette was hired by State Street, in its capacity as trustee of the ESOP Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock.

672.     Willamette served as State Street's independent appraiser from 2001 to mid-2004.

673.     Willamette knew that its appraisal would be used by State Street to set the fair market value of PDC stock.

674.     Willamette knew that the value of the stock was material to the ESOP Plan and the Employee Participants because it would be used to set the share price to be used for Plan transactions.

170

675. Willamette knew that its opinion of the stock's value would be shared with the ESOP Plan and Employee Participants.

676. Indeed, Willamette intended the ESOP Plan to rely on their valuation of the Company's stock in purchasing stock back from employees.

677. During its tenure are the ESOP Plan's independent appraiser, Willamette determined the value of PDC's stock as described above. Willamette reached these determinations even though Willamette, on information and belief, knew that its valuation analyses contained significant flaws, including the following:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

- They failed to include material liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

- They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

678. Because of these flaws, the stock prices as determined by Willamette overstated the value of PDC stock by a significant degree.

679.     Because of these flaws, Willamette, on information and belief, had no reasonable grounds for believing that the stock prices it provided for the ESOP Plan's use were accurate and that they correctly stated the fair market value of the stock. Willamette was therefore negligent in determining the fair market value of the stock.

680.     The ESOP Plan and the Employee Participants believed Willamette's appraisal of fair market value.

681.     The ESOP Plan and the Employee Participants had no way to know that Willamette had overstated the value of the stock because Willamette's full valuation reports were never shared with them.  In addition, Willamette's wrongdoing was concealed as described above.

682.     In reliance on Willamette's valuations, the ESOP Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the ESOP Plan over time.

683.     The ESOP Plan justifiably relied on Willamette's opinions of the fair market value of PDC stock.

684.     As a result of Willamette's determination of the Company's stock price and the ESOP Plan's justifiable reliance there on, the ESOP Plan was damaged.

## COUNT XII
## NEGLIGENT MISREPRESENTATION AGAINST SRR

685.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

686.     SRR was hired by State Street, in its capacity as trustee of the ESOP Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock from late 2004 through the end of 2012.

687.     SRR was hired by Reliance, in its capacity as trustee of the ESOP Plan, to serve as Reliance's independent appraiser in determining the fair market value of PDC stock for the semi-annual valuations of PDC stock in 2013.

688.     SRR was hired by Argent, in its capacity as trustee of the ESOP Plan, to serve as Argent's independent appraiser in determining the fair market value of PDC stock from 2014 through mid-2017.

689.     SRR knew that its appraisal would be used by State Street, Reliance, and Argent to set the fair market value of PDC stock.

690.     SRR knew that the value of the stock was material to the ESOP Plan because it would be used to set the share price to be used for ESOP Plan transactions.

691.     SRR knew that its opinion of the stock's value would be shared with the ESOP Plan and Plan Participants.

692.     Indeed, SRR intended the ESOP Plan to rely on their valuation of the Company's stock in purchasing stock back from employees.

693.     During its tenure are the ESOP Plan's independent appraiser, SRR determined the value of PDC's stock as described above.  SRR reached these determinations even though SRR knew that its valuation analyses contained significant flaws, including the following:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

- They failed to include material liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

- They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

694. Because of these flaws, the stock prices as determined by SRR overstated the value of PDC stock by a significant degree.

695. Because of these flaws, SRR had no reasonable grounds for believing that the stock prices it provided for the ESOP Plan's use were accurate and that they correctly stated the fair market value of the stock. SRR was therefore negligent in determining the fair market value of the stock.

696. The ESOP Plan believed SRR's appraisal of fair market value.

697. The ESOP Plan had no way to know that SRR had overstated the value of the stock because SRR's full valuation reports were never shared with them. In addition, SRR's wrongdoing was concealed as described above.

698. In reliance on SRR's valuations, the ESOP Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the ESOP Plan over time.

699. The ESOP Plan justifiably relied on SRR's opinions of the fair market value of PDC stock.

700. As a result of SRR's determination of the Company's stock price and the ESOP Plan's justifiable reliance there on, the ESOP Plan was damaged.

# COUNT XIII

## WISCONSIN SECURITIES FRAUD AGAINST THE RELIANCE DEFENDANTS, THE ARGENT DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE SRR DEFENDANTS

701.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

702.    The item offered/sold was a security as defined by Wisconsin law.

703.    PDC's stock is a security under Wisconsin Uniform Securities Law Section 551.102(28).

704.    The Defendants misrepresented the true value of PDC stock in connection with the ESOP's purchases and sales of PDC stock.

705.    The Defendants also knew or were reckless in failing to ascertain that certain material facts were omitted from its representations relating to the value of PDC stock, that were necessary to render not misleading the remainder of their representations.

### The Trustee Defendants Committed Wisconsin Securities Fraud

706.    While it was acting as Trustee to the ESOP Plan in 2013 and 2014, the Reliance Defendants falsely represented that value of PDC's stock was properly valued at $16.25 per share in connection as of the 31 December 2013 valuation date.

707.    The Reliance Defendants communicated these stock values to the ESOP Plan and the Employee Participants directly or through the issuance of statements to employees that purported to represent the value of their stock.  Alternatively, the Reliance Defendants were aware that the Prior Committee Defendants and Appvion management were communicating these stock values to the ESOP Plan and the Employee Participants and providing limited information that purported to justify the stock values.

708.     In connection with the release of the stock valuations, the Reliance Defendants omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock, including but not limited to the following:

- That they were not taking steps to ensure that SRR reviewed accurate, reliable financial projections.

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR was improperly applying a 10% percent control premium to its valuations, even though the ESOP Plan as the sole shareholder had no practical ability to control the affairs of PDC or Appvion.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

709. While it was acting as Trustee to the ESOP Plan in 2014 through 2017, the Argent Defendants falsely represented the value of PDC stock as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 30 June 2014 | $16.30 |
| 31 December 2014 | $11.00 |
| 30 June 2015 | $12.90 |
| 31 December 2015 | $12.30 |
| 30 June 2016 | $13.70 |
| 31 December 2016 | $10.35 |
| 30 June 2017 | $6.85 |

710. The Argent Defendants communicated these stock values to the ESOP Plan and the Employee Participants directly or through the issuance of statements to employees that purported to represent the value of their stock. Alternatively, the Argent Defendants were aware that the Prior Committee Defendants and Appvion management were communicating these stock values to the ESOP Plan and the Employee Participants and providing limited information that purported to justify the stock values.

711. In connection with the release of the stock valuations, the Reliance Defendants omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock, including but not limited to the following:

- That they were not taking steps to ensure that SRR reviewed accurate, reliable financial projections.

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR was improperly applying a 10% percent control premium to its valuations, even though the ESOP Plan as the sole shareholder had no practical ability to control the affairs of PDC or Appvion. They also did not disclose that SRR may have stopped applying this control premium after its 31 December 2014 valuation.

- That SRR changed its valuation methods in connection with its 30 June 2015 appraisal, and that SRR began ignoring EBITDA in its Guideline Company Method analysis beginning with its 31 December 2015 appraisal.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

712. The Reliance and Argent Defendants made these untrue statements and material omissions in connection with the offer, sale, or purchase of a security in this state.

713. The Reliance and Argent Defendants acted willfully because they knew that they were making an untrue statement of material fact and were failing to state material facts necessary to make their statements made not misleading to the ESOP Plan and the Employee Participants in connection with the sale of securities.

714. The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

## The Prior Committee Defendants Committed Wisconsin Securities Fraud

715. Certain of the Prior Committee Defendants (Richards, Ferree, Arent, and Gilligan) directly or indirectly, intentionally and willfully made untrue statements of material fact and/or failed to state material facts necessary to make their statements made not misleading.

716.    In connection with the 31 December 2013 through the 30 June 2015 valuation dates, Richards, Arent, and Ferree falsely represented the value of PDC stock as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 31 December 2013 | $16.25 |
| 30 June 2014 | $16.30 |
| 31 December 2014 | $11.00 |
| 30 June 2015 | $12.90 |

717.    Richards, Arent, and Ferree also released or approved the release of communications that discussed and justified these stock prices, including but not limited to the following:

- A 23 January 2014 communication to employees announcing that Reliance had valued PDC stock at $16.25 per share and purporting to describe SRR's income and market analysis.

- A 16 July 2014 communication to employees announcing that Argent had valued PDC stock at $16.30 per share and purporting to describe SRR's income and market analysis as follows.

- A 13 January 2015 communication to employees announcing that Argent had valued PDC stock at $11.00 per share and purporting to describe SRR's income and market analysis.  Specifically, this email identified the following support for the share price:

  o "The income analysis was affected by our company missing its 2014 earnings targets due primarily to poor operating results from the paper business. Encapsys had the best performance of our business segments and exceeded its 2014 performance targets…. The performance of carbonless and specialty papers segment [sic] effectively offset the share value gain produced by Encapsys' performance."

  o "The performance of our thermal business reduced share value by approximately $4."

- o "The funding agreement that the company entered into for the Fox River clean-up …served to reduce the value of the company by $19 million and the share price by approximately $2.60."

- An undated communication relating to the 30 June 2015 valuation announcing that Argent had valued PDC stock at $12.90 per share and purporting to describe SRR's income and market analysis to justify the increase since the prior valuation. This email is discussed above in Section M(2)(e).

718. In connection with the release of the stock prices, Richards, Arent, and Ferree omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock, including but not limited to the following:

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR was improperly applying a 10% percent control premium to its valuations, even though the ESOP Plan as the sole shareholder had no practical ability to control the affairs of PDC or Appvion. They also did not disclose that SRR may have stopped applying this control premium after its 31 December 2014 valuation.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

719. In connection with the 31 December 2015 through 30 June 2017 valuation dates, Ferree and Gilligan falsely represented the value of PDC stock as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 31 December 2015 | $12.30 |
| 30 June 2016 | $13.70 |
| 31 December 2016 | $10.35 |
| 30 June 2017 | $6.85 |

720. Ferree and Gilligan also released or approved the release of communications that discussed and justified these stock prices, including the following:

- A 16 January 2016 communication announcing that Argent had valued PDC stock at $12.30 per share and purporting to describe SRR's income and market analysis.

The communication blamed the decrease in share value on "volatile market conditions," stating:

- o "Appvion's business performance during the second half did not significantly alter the value of the company. Most of the decline in share value was the result of volatile market conditions and the negative performances of comparable companies and general market indices."

- An undated communication relating to the 30 June 2016 valuation which announced the increase in share value to $13.70 per share and purporting to describe SRR's income and market analysis. The email attributed the share price increase to "Appvion's business performance, specifically the improved results from the thermal segment" and the reduced number of shares as a result of share repurchases."

- An undated communication from Gilligan relating to the 30 June 2017 valuation which stated that SRR's income and market analysis "did not materially change the enterprise valuation of Appvion from the last valuation." Rather, Gilligan pointed to an "increase in debt" as the reason that Appvion's stock price decreased. A 25 July 2017 communication to employees similarly identified the increased debt as the "principal impact[]" on share price.

721. In connection with the release of the stock prices, Ferree and Gilligan omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock, including but not limited to the following:

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR changed its valuation methods in connection with its 30 June 2015 appraisal, and that SRR began ignoring EBITDA in its Guideline Company Method analysis beginning with its 31 December 2015 appraisal.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

722. These Prior Committee Defendants made these untrue statements and material omissions in connection with the offer, sale, or purchase of a security in this state.

184

723. These Prior Committee Defendants acted willfully because they knew that they were making an untrue statement of material fact and were failing to state material facts necessary to make their statements made not misleading to the ESOP Plan and the Employee Participants in connection with the sale of securities.

724. The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

**The Director Defendants Committed Wisconsin Securities Fraud**

725. As discussed above in Sections C(1)(c) and M(3), the Director Defendants were monitoring Appvion's financial performance (including the audited financial statements), its projected financial performance, and the stock valuations. They therefore knew or in the exercise of reasonable care could have known of the misrepresentations and omissions discussed above.

726. The Director Defendants were also responsible for appointing both the Trustee Defendants and the Prior Committee Defendants, and accordingly had control over them.

727. In connection with the 31 December 2013 through 30 June 2017 valuation dates, certain of the Director Defendants (Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan), are jointly and severally liable to the same extent as the Trustee Defendants and the Prior Committee Defendants for the conduct described above.

**The SRR Defendants Committed Wisconsin Securities Fraud**

728. In connection with its appraisals for the 31 December 2013 through 30 June 2017 valuation dates, SRR and its employees involved in those valuations (Levine and El-Tahch) falsely represented that the fair market value of PDC stock was as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 31 December 2013 | $16.25 |
| 30 June 2014 | $16.30 |
| 31 December 2014 | $11.00 |
| 30 June 2015 | $12.90 |
| 31 December 2015 | $12.30 |
| 30 June 2016 | $13.70 |
| 31 December 2016 | $10.35 |
| 30 June 2017 | $6.85 |

729. In representing that the above prices represented the fair market value of PDC stock, SRR omitted material facts that were necessary to render not misleading its representations relating to the value of PDC stock, including but not limited to the following:

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR changed its valuation methods in connection with its 30 June 2015 appraisal, and that SRR began ignoring EBITDA in its Guideline Company Method analysis beginning with its 31 December 2015 appraisal.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

730. SRR made these untrue statements and material omissions knowing that its representations of the fair market value of PDC stock would be communicated to the ESOP Plan and the Employee Participants. SRR also knew that these stock prices would be used in connection with the offer, sale, or purchase of a security in this state.

731. SRR acted willfully because it knew or with the exercise of reasonable care could have known that its opinions of fair market value overstated the value of PDC stock. SRR also knew or with the exercise of reasonable care could have known that the omissions described above were material and that they were necessary to make their representations of stock value not misleading to the ESOP Plan and the Employee Participants.

732. The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

733.     The ESOP Plan has been damaged as the result of the above-listed Trustee Defendants', the above-listed Prior Committee Defendants', the above-listed Director Defendants', and the above-listed SRR Defendants' conduct.

## COUNT XIV
### FEDERAL SECURITIES FRAUD AGAINST THE RELIANCE DEFENDANTS, THE ARGENT DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE SRR DEFENDANTS

734.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

### The Trustee Defendants Committed Securities Fraud

735.     While it was acting as Trustee to the ESOP Plan in 2013 and 2014, the Reliance Defendants directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered Reliance's statements misleading as described above in Count XIII.

736.     While it was acting as Trustee to the ESOP Plan in 2014 through 2017, the Argent Defendants directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered Argent's statements misleading as described above in Count XIII.

737.     The Trustee Defendants untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

738.     The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

739.     The ESOP Plan has been damaged as a result of the Trustee Defendants' conduct.

## Prior Committee Defendants Committed Securities Fraud

740. From 2012 through 2017, certain of the Prior Committee Defendants (Richards, Ferree, Arent, and Gilligan) directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered the Prior Committee Defendants' statements misleading as described above in Count XIII.

741. These Prior Committee Defendants' untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

742. The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

743. The ESOP Plan has been damaged as a result of these Prior Committee Defendants' conduct.

## Director Defendants Committed Securities Fraud

744. As discussed above in Sections C(1)(c) and M(3), the Director Defendants were monitoring Appvion's financial performance (including the audited financial statements), its projected financial performance, and the stock valuations. They therefore knew or in the exercise of reasonable care could have known of the misrepresentations and omissions discussed above.

745. The Director Defendants were also responsible for appointing both the Trustee Defendants and the Prior Committee Defendants, and accordingly had control over them.

746. In connection with the 31 December 2013 through 30 June 2017 valuation dates, certain of the Director Defendants (Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan), are jointly and severally liable to the same extent as the Trustee Defendants and the Prior Committee Defendants for the conduct described above.

747. These Director Defendants did not act in good faith in connection with their supervision or monitoring of the Trustee Defendants and the Prior Committee Defendants.

748. The ESOP Plan has been damaged as a result of these Director Defendants' conduct.

## SRR Committed Securities Fraud

749. From 2013 through 2017, SRR directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered their statements misleading as described above in Count XIII.

750. SRR's untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

751. The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

752. The ESOP Plan has been damaged as a result of the SRR Defendants' conduct in an amount to be determined at trial.

753. The ESOP Plan has been damaged as the result of the above-listed Trustee Defendants', the above-listed Prior Committee Defendants', the above-listed Director Defendants', and the above-listed SRR Defendants' conduct.

## COUNT XV
## BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AGAINST HOULIHAN AND LOUIS PAONE

754. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

755.    ERISA §1002(21), 29 U.S.C. § 1002(21) defines a fiduciary as a person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so…"

756.    Houlihan and Louis Paone are ERISA plan fiduciaries because they rendered investment advice directly to the Employee Participants during the 2001 Road Show by making a presentation and answering questions raised by the Employee Participants.

757.    ERISA § 404(A)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

758.    Houlihan breached its fiduciary duties by, among other things:

- By performing all its work in connection with the ESOP transaction with a conflict of interest that caused it to be biased, partial and compromised;

- Allowing Buth to insinuate that Houlihan was the Employee Participants' investment advisor during the 2001 Roadshow;

- By representing that it was providing an independent validation of the ESOP transaction;

- By issuing a fairness opinion to the board of directors while being compensated on the basis of a contingent fee that impaired their independence and impartiality;

- By representing and advising that the highly leveraged buyout was an "extraordinary" deal for the Employee Participants;

- By failing to inform the ESOP Plan and the Employee Participants that it was would receive up to an $8.1 million contingent fee only if the ESOP transaction closed; and

- By failing to present the proposed ESOP transaction in a fair, balanced, and impartial manner, unaffected by a conflict of interest.

759.    These breaches constitute breaches of duties of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B).

760.    Houlihan's and Paone's breaches damaged the ESOP Plan, by among other things, preventing the ESOP Plan from benefitting from a truly independent financial advisor who would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, who would have negotiated the terms of the PDC stock acquisition free of conflict, and who would have provided the board of directors with an unbiased fairness opinion. As a result, Houlihan caused the ESOP Plan and the Employee Participants to enter into a transaction that they otherwise would not have, or in the alternative, on terms that were less favorable than they should have been.

## COUNT XVI
### BREACH OF FIDUCIARY DUTY UNDER WISCONSIN LAW
### AGAINST THE DIRECTOR DEFENDANTS AND THE PRIOR COMMITTEE
### DEFENDANTS

761.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

762. Corporate officers and directors owe a fiduciary duty to act in good faith and to deal fairly in the conduct of all corporate business. This duty extends to the corporation and to its shareholders.

763. In particular, directors of a corporation may not use their position of trust to further their private interests.

764. The ESOP Plan was PDC's sole shareholder. Accordingly, the officers and directors owed a fiduciary duty to the ESOP as PDC's sole shareholder.

765. The ESOP Plan seeks recovery for damages to it in its capacity as sole shareholder of PDC. Accordingly, Plaintiff, on behalf of the ESOP Plan, has standing to bring this claim directly.

**Appvion Management and Directors Received Excessive Compensation**

766. Appvion management received excessive base salaries, combined with substantial incentive payments from not only an annual bonus plan, but additional incentive plans including, but not limited to, the Long-Term Incentive Plan discussed above, the Restricted Stock Unit Plan discussed above, the Executive Nonqualified "Excess" Plan discussed above.

767. Examples of the effects of these compensation plans include:

- In 2012, Appvion had a net loss of over $148 million. However, Richards received total compensation in 2012 of over $4.2 million, including his $800,000 salary, a discretionary bonus of $376,000, incentive plan compensation of $1.2 million, as well as awards under the LTIP program, Restricted Stock Units, and various other compensation.

- When Mark Richards retired in 2015, he received a $1.2 million payment under his Termination Protection Agreement, in addition to $30,000 in outplacement

services. However, the terms of the Termination Protection Agreement should not have been triggered by Richards' retirement.

- On information and belief, certain officers received compensation in connection with the 2015 Encapsys sale.

- As of the December 2015 valuation, the synthetic equity created by the LTIP, the RSU Plan, and the Non-Employee Director Deferred Compensation Plan (discussed above) constituted approximately 27.4% ownership of PDC, even though it was allegedly owned entirely by the ESOP.

768. Salaries for Appvion management employees were set by the Compensation Committee of the Board of Directors. However, at all times after 2007, two out of the three members of the Compensation Committee were appointed to the Board of Directors unilaterally by the CEO. The third member of the Board of Directors was appointed jointly by the CEO and the ESOP Trustee, but the ESOP Trustee did not have authority to remove that director without agreement from the CEO. Accordingly, the Compensation Committee was not independent.

769. The incentive plans were amended repeatedly over the years to increase benefits due to directors and officers.

770. Compensation to directors and officers was in excess of market rates and was not warranted based on Appvion's declining revenues, excessive leverage, and negative income for most years.

771. The Director Defendants willfully compensated Appvion management employees and themselves excessively for the services they provided to Appvion and PDC.

772. The excessive compensation to directors and officers used up Appvion's available cash, which should have been used instead to 1) make capital investments in Appvion to improve

revenues; 2) meet repurchase obligations for the ESOP; and 3) pay down Appvion's debt, thereby increasing the fair market value of shareholder equity. Instead, Appvion was forced to take on additional debt in order to meet its obligations, which directly reduced shareholder value both under the valuations and because after Appvion declared bankruptcy, there was no equity left for shareholders.

773. The excessive compensation to directors and officers also directly reduced the fair market value of shareholder equity for employees, since SRR subtracted synthetic equity (phantom stock under the LTIP and Non-Employee Director Deferred Compensation Plan and RSUs) as a from Appvion's fair market value before determining shareholder equity.

774. The ESOP Plan, as Appvion's sole shareholder, was directly damaged by the Director Defendants' breaches of fiduciary duty in approving excess compensation.

## The Sale of Encapsys

775. As discussed above Appvion's Encapsys unit was Appvion's most profitable division by approximately 2014, and it was a growing segment while Appvion's other divisions were struggling.

776. In 2015, Appvion's directors and officers, including the Prior Committee Defendants at the time of the sale (Richards, Ferree, and Arent) agreed to sell the Encapsys unit to a third party. The sale was completed in August 2015.

777. While Appvion was able to use the proceeds from the sale of Encapsys to pay down some of its debt, the sale of its most profitable division crippled Appvion.

778. Even though Appvion had net income of over $150 million in 2015, that income came largely from the sale of Encapsys and Appvion ended the year with less than $2 million in cash.

779. Selling the Encapsys unit also significantly reduced Appvion's assets.

780. Without the Encapsys unit, Appvion was not able to continue operating as a going concern for very long, and Appvion filed for bankruptcy two years later.

781. The Director Defendants should not have agreed to the sale of Encapsys knowing that it would cripple Appvion or in the alternative, should have recognized the impact on PDC's value.

782. The sale of Encapsys significantly reduced the real value of the ESOP Plan's shares of PDC stock.

**The Inflated Stock Valuations Caused the Company To Waste its Cash**

783. The Director Defendants allowed the ESOP Plan to repeatedly purchase shares from the ESOP Plan and Employee Participants at a price above fair market value and repeatedly bought shares on behalf of the Employee Participants at a price above the shares fair market value.

784. As a result, Director Defendants caused Appvion to loan cash to PDC in order to fund the ESOP Plan's repurchase obligations.

785. Because Appvion was loaning more to PDC than it should have, based on the inflated share price, Appvion no longer had the cash available to repay its own debt and make capital improvements.

786. No reasonable director would have been willing to allow the ESOP Plan to pay more than the fair market value when repurchasing shares nor would it have been willing to loan funds in excess of what was necessary to cover the cost of the fair market value of the shares.

787. These repeated purchases for more than the fair market value of shares reduced the value of the ESOP Plan's shares of PDC stock.

## Derivative Claims

788.    If the Plaintiff does not have standing to bring the above claim directly, Plaintiff pleads in the alternative that it has standing to bring the above claim derivatively on behalf of the corporation.

789.    Plaintiff did not make efforts to secure from Appvion this cause of action because the Board of Directors reviewing a derivative demand for this claim would not be able to consider the demand impartially because of the years of fraudulent and deceiving conduct the Board of Directors either directly took part in, assisted in covering up, or benefited from as more fully described above.

790.    Additionally, these same Director Defendants were appointed by either CEOs that are being sued for their negligent, intentional, and/or fraudulent conduct as described in Counts 3, 4, 6, 13, 14, 16 or Trustee Defendants who are being sued for their negligent, intentional, and/or fraudulent conduct as described in Counts 1, 4, 6, 7.

791.    Moreover, Grant Lyon was appointed as the sole member of the ESOP Committee in August 2017.  After a preliminary investigation, Lyon presented the following information to Appvion's Board of Directors on September 1, 2017:

- Argent had not run a process for selecting a valuation firm;

- Appvion consistently failed to achieve its financial projections but neither Argent nor SRR adjusted the projections;

- There was no deduction given for unfunded pension/post-retirement liability;

- Appvion was still allowing employees to invest new funds into ESOP; and

- There was no real forum for explaining financial condition or SRR per share valuations.

197

792.     Lyon presented to the Board of Directors, yet none of the Director Defendants have taken any steps to seek redress for the corporate waste that occurred from 2001 through 2017.

## COUNT XVII
## FRAUD AGAINST HOULIHAN AND PAONE

793.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

794.     PDC hired Houlihan in 2001 to issue a fairness opinion in connection with the formation of the ESOP Plan, Buth, Karch and others were trying to convince Appvion employees to approve.

795.     Houlihan and Paone directly advised the ESOP Plan and the Employee Participants whether to approve the proposed ESOP transaction.  Paone attended one or more road shows, including the road show on 2 August 2001, where he gave presentations to potential Employee Participants.

796.     Indeed, Houlihan and Paone intended the potential Employee Participants to rely on its assessment that the proposed buy-out was fair, a "good deal" and an "extraordinary opportunity."

797.     At the road shows held in August 2001, Karch in the presence of Paone, represented that Paone was "our investment banker" leading employees to falsely believe that they could rely on Paone's statements.

798.     Additionally Karch, again in Paone's presence, stated that Paone was going to provide an "independent view and validation" of the ESOP Plan.

799.     Paone then went on to show Appvion employees a slide titled "fairness of purchase price" while representing to Appvion employees that he was going to "help validate the

purchase price of the transaction and financial aspects as to why they are so attractive and why [the employees are] getting such a good deal."

800.    Paone also answered questions in relation to the ESOP Plan. For example, Karch states "the question is to our advisors who have worked on lots of difference ESOPs how does this Appleton Papers plan compare to other ESOPs?"

801.    In response, Paone explains "very significant feature[s]" that make the ESOP Plan different from other ESOPs. Paone also states that "[f]or us to structure this transaction for the employees to have … 35-40% rate of return opportunity, it's pretty extraordinary to offer employees of a company."

802.    Additionally, in response to the question "Why do you have a different levels of bank debt wouldn't it have been better just to get it all on the lowest interest rate for the bank?", Paone states "[t]hat $380 million dollars is pretty much as far any bank senior lenders are willing to go today in terms of how much they are willing to lend against assets and how much they are willing to lend against the company's cash flow. If we could of put more into those, believe me when we were out in the market we tried to get as much of the capital from that source because of the low cost. At a certain point, the banks say this is beyond our appetite. We can't, our lending rule preclude us from giving you even more money. That's when you have to go to the next market for those investors who are willing to invest without security of assets and are willing to lend out for a longer term. And for that you will have to pay them a premium in terms of the interest rate."

803.    Paone and Houlihan allowed Appvion to misrepresent to the ESOP Plan and the Employee Participants that they were independent.

804. Houlihan and Paone failed to inform the ESOP Plan and the Employee Participants that if the employees approved the ESOP transaction, Houlihan stood to gain approximately $8.1 million and if the employees did not approve the ESOP transaction, Houlihan would only receive approximately $100,000.00.

805. The ESOP Plan and the Employee Participants had no way to know that Houlihan stood to gain $8.1 million only if they approved the ESOP transaction.

806. This misrepresentation or omission was material because it concealed a material conflict of interest that everything Houlihan did, including the negotiation of the purchase price of the PDC stock, the contents of its fairness opinion and its advice that the purchase price was fair and that employees should invest in the ESOP.

807. The ESOP Plan and the Employee Participants relied upon Houlihan's misrepresentation and omission in electing to participate in the ESOP transaction.

808. Houlihan's and Paone's fraudulent misrepresentations and omissions damaged the ESOP Plan, by among other things, preventing the ESOP Plan from benefitting from a truly independent financial advisor who would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, who would have negotiated the terms of the PDC stock acquisition free of conflict, and who would have provided the board of directors with an unbiased fairness opinion. As a result, Houlihan caused the ESOP Plan and the Employee Participants to enter into a transaction that they otherwise would not have, or in the alternative, on terms that were less favorable than they should have been.

## COUNT XVIII
## BREACH OF FIDUCIARY DUTY UNDER WISCONSIN LAW AGAINST HOULIHAN AND PAONE

809.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

810.     Houlihan and Paone owed the ESOP Plan fiduciary duties because they allowed Karch to introduce them to the employees who would be voting on the existence of the plan as "our investment banker".  Additionally, Houlihan and Paone provided financial advice directly to the individuals responsible for approving or declining to approve the ESOP transaction.

811.     With their representations as discussed throughout this FAC, Houlihan and Paone directly made representations as to the advisability of investing in the ESOP Plan.

812.     Houlihan breached its fiduciary duties by, among other things:

- By performing all its work in connection with the ESOP transaction with a conflict of interest that caused it to be biased, partial and compromised;

- Allowing Buth to insinuate that Houlihan was the Employee Participants' investment advisor during the 2001 Roadshow;

- By representing that it was providing an independent validation of the ESOP transaction;

- By issuing a fairness opinion to the board of directors while being compensated on the basis of a contingent fee that impaired their independence and impartiality;

- By representing and advising that the highly leveraged buyout was an "extraordinary" deal for the Employee Participants;

- By failing to inform the ESOP Plan and the Employee Participants that it was would receive up to an $8.1 million contingent fee only if the ESOP transaction closed; and

- By failing to present the proposed ESOP transaction in a fair, balanced, and impartial manner, unaffected by a conflict of interest.

813.    Houlihan's and Paone's breaches damaged the ESOP Plan, by among other things, preventing the ESOP Plan from benefitting from a truly independent financial advisor who would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, who would have negotiated the terms of the PDC stock acquisition free of conflict, and who would have provided the board of directors with an unbiased fairness opinion.  As a result, Houlihan caused the ESOP Plan and the Appvion employees to enter into a transaction that they otherwise would not have , or in the alternative, on terms that were less favorable than they should have been.

814.    As a result of these breaches, the ESOP Plan was damaged.

## COUNT XIX
## NEGLIGENT MISREPRESENTATION AGAINST HOULIHAN AND PAONE

815.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

816.    PDC hired Houlihan in 2001 to, among other things, issue a fairness opinion to Appvion and PDC's Board of Directors in connection with the formation of the ESOP Plan, Buth, Karch and others were trying to convince Appvion employees to approve.  Houlihan also helped negotiate the purchase price of the PDC stock and largely orchestrated the ESOP transaction through its completion.

817.    Paone from Houlihan attended road shows in August 2001 in order to advise and convince Appvion employees to approve the establishment of an ESOP Plan.

818.    At the road shows, Paone showed Appvion employees a slide titled "fairness of purchase price" while representing to Appvion employees that he was going to "help validate the purchase price of the transaction and financial aspects as to why they are so attractive and why [the employees are] getting such a good deal."

819.    Paone also stated that he believed that the potential Employee Participants would determine that the creation of the ESOP Plan was an "extraordinary opportunity."

820.    Paone and Houlihan allowed Appvion to misrepresent to the ESOP Plan and the Employee Participants that they were independent.

821.    Houlihan and Paone failed to inform the ESOP Plan and the Employee Participants that if the employees approved the ESOP transaction, Houlihan stood to gain approximately $8.1 million and if the employees did *not* approve the ESOP transaction, Houlihan would only receive approximately $100,000.00.

822.    The ESOP Plan and the Employee Participants had no way to know that Houlihan stood to gain $8.1 million only if they approved the ESOP transaction.

823.    This misrepresentation or omission was material because it concealed a material conflict of interest that everything Houlihan did, including the negotiation of the purchase price of the PDC stock, the contents of its fairness opinion and its advice that the purchase price was fair and that employees should invest in the ESOP.

824.    The ESOP Plan and the Employee Participants relied upon Houlihan's misrepresentation and omission in electing to participate in the ESOP transaction.

825.    Houlihan's and Paone's negligent misrepresentations and omissions damaged the ESOP Plan, by among other things, preventing the ESOP Plan from benefitting from a truly independent financial advisor who would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, who would have negotiated the terms of the PDC stock acquisition free of conflict, and who would have provided the board of directors with an unbiased fairness opinion.  As a result, Houlihan caused the ESOP Plan and the Employee Participants to enter into a transaction that they otherwise would not have, or in the alternative, on terms that were less favorable than they should have been.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgement to be entered against Defendants on all claims, and request that the Court order the following relief:

A.    With respect to Plaintiffs' ERISA claims:

1.    Declare that each of the above fiduciary Defendants breached his, her or its fiduciary duties under ERISA, and/or knowingly participated in a fiduciary's breach.

2.    Require each fiduciary found to have breached his/her/its fiduciary duties to the ESOP Plan to jointly and severally pay such amount to the ESOP Plan as is necessary to make the ESOP Plan whole for any losses which resulted from said breaches of fiduciary duties, or by virtue of liability pursuant to ERISA § 405.

3.    An order requiring the forfeiture of any interest in the ESOP Plan of any fiduciary found to have breached his or her fiduciary duty to the ESOP

Plan to the extent necessary after any recovery for the ESOP Plan to make whole the innocent participants of the ESOP Plan.

4.     Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

5.     Award pre-judgment and post-judgment interest.

6.     Declare that any indemnification agreement between the Defendants and the ESOP Plan, Appvion, or PDC violates ERISA § 410, 29 U.S.C. § 1110 and is therefore null and void.

7.     Award any such other relief that the Court determines that Plaintiff is entitled pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.

B.     With respect to the non-ERISA claims, an award of damages in an amount to be proven at trial, along with punitive damages and such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a jury trial on all claims to which it is entitled a jury.

DATED this 8th day of January 2019.

**PREVIANT LAW FIRM, S.C.**


By:s/Sara J. Geenen
    Frederick Perillo
    Sara J. Geenen
    310 West Wisconsin Avenue, Suite 100 NW
    Milwaukee, WI 53203

-and-

    Leo R. Beus (Admitted *Pro Hac Vice*)
    L. Richard Williams (Admitted *Pro Hac Vice*)
    Abigail Terhune (Admitted *Pro Hac Vice*)
    Ashley Williams Hale (Admitted *Pro Hac Vice*)

**BEUS GILBERT PLLC**
701 North 44th Street
Phoenix, AZ 85008-6504
480-429-3001
Fax: 480-429-3100
docket@beusgilbert.com
Attorneys for Plaintiff
BGD-#234144-v3-FAC