# Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| APPVION, INC. RETIREMENT SAVINGS | ) | |
| AND EMPLOYEE STOCK OWNERSHIP | ) | |
| PLAN, BY AND THROUGH GRANT LYON | ) | |
| IN HIS CAPACITY AS THE ESOP | ) | |
| ADMINISTRATIVE COMMITTEE OF | ) | |
| APPVION, INC., | ) | |
| | ) | Case No.: 1:18-cv-01861-WCG |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| DOUGLAS P. BUTH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## UNREPORTED CASES CITED IN
## <u>ARGENT TRUST COMPANY'S MOTION TO DISMISS</u>

# TABLE OF CONTENTS

*Tab*

*Cornielsen v. Infinium Capital Mgmt., LLC,*
No. 17-2583, 2019 U.S. App. LEXIS 4358 (7th Cir. Feb. 13, 2019 .....................................A

*Duhart v. United States Postal Serv., No. 17-cv-192,*
2017 U.S. Dist. LEXIS 88056 (E.D. Wis. June 8, 2017).......................................................B

*Fish v. Greatbanc Tr. Co., No. 09-cv-1668,*
2016 U.S. Dist. LEXIS 137351 (N.D. Ill. Sep. 1, 2016) ........................................................C

*Harris v. Greatbanc Tr. Co., No. 12-cv-1648,*
2013 U.S. Dist. LEXIS 43888 (C.D. Cal. Mar. 15, 2013) .....................................................D

*In re BP ERISA Litig., No. 4:10-cv-4214,*
2015 U.S. Dist. LEXIS 147819 (S.D. Tex. Oct. 30, 2015)....................................................E

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp., No. 08-cv-797,*
2010 U.S. Dist. LEXIS 30693 (E.D. Wis. Mar. 30, 2010) ...................................................F

*Pudela v. Swanson, No. 91-cv-3559,*
1995 U.S. Dist. LEXIS 2148 (N.D. Ill. Feb. 17, 1995) .........................................................G

*Qualey v. Jackson, No. 07-cv-10910-DT,*
2007 U.S. Dist. LEXIS 45620 (E.D. Mich. June 25, 2007)...................................................H

*Schaufenbuel v. InvestForClosures Fin., L.L.C., No. 09-cv-1221,*
2009 U.S. Dist. LEXIS 91269 (N.D. Ill. Sep. 30, 2009) ........................................................I

*Vandehey v. Sequium Asset Sols., LLC, No. 18-cv-1086,*
2019 U.S. Dist. LEXIS 16414 (E.D. Wis. Feb. 1, 2019).......................................................J

9031253.1

# Tab A


# *Cornielsen v. Infinium Capital Mgmt., LLC*

United States Court of Appeals for the Seventh Circuit

February 13, 2018, Argued; February 13, 2019, Decided

No. 17-2583

**Reporter**

2019 U.S. App. LEXIS 4358 *; __ F.3d __; 2019 WL 581116

KURT V. CORNIELSEN, et al., Plaintiffs-Appellants, v. INFINIUM CAPITAL MANAGEMENT, LLC, et al., Defendants-Appellees.

**Prior History:** *Cornielsen v. Infinium Capital Holdings, LLC, 168 F. Supp. 3d 1033, 2016 U.S. Dist. LEXIS 27275 (N.D. Ill., Mar. 3, 2016)*

## Core Terms

individual defendant, amended complaint, Conversion, Plaintiffs', district court, town hall, particularity, meetings, omission, allegations, scienter, documents, misrepresentation, representations, doctrine doctrine doctrine, investments, law law law, strong inference, participants, securities, loans, line of credit, requirements, misleading, redemption, pool, federal securities, oral statement, possessed

## Case Summary

### Overview

HOLDINGS: [1]-The district court did not err in dismissing the securities fraud claim brought by the employees of an asset and risk management firm against their employer for violations of *15 U.S.C.S. § 78j* and *17 C.F.R. § 240.10b-5* arising from stock investments because the stock subscription agreements included non-reliance clauses that negated reliance, which was an element of fraud; [2]-Additionally, the complaint did not meet the heightened pleading standards of *Fed. R. Civ. P. 9(b)* and *15 U.S.C.S. § 78u-4(b)* of the *PSLRA* because, inter alia, plaintiffs failed to identify the speakers of the alleged misrepresentations with adequate particularity or adequately plead scienter; [3]-The breach of fiduciary duty and common law claims failed because, like the securities fraud claims, the required elements were not pleaded with particularity required by *Rule 9(b)*.

### Outcome
Judgment affirmed.

**Counsel:** **[*1]** For KURT V. CORNIELSEN, LUCAS HULING, GARRETT FIFE, ALI GHAJARNIA, MARCUS HESS, Plaintiffs - Appellants: Daniel J. Voelker, Attorney, Olga S. Dmytriyeva, Attorney, VOELKER LITIGATION GROUP, Chicago, IL.

For INFINIUM CAPITAL MANAGEMENT, LLC, a Delaware limited liability company, INFINIUM CAPITAL HOLDINGS, LLC, a Delaware limited liability company, Defendants - Appellees: J Matthew W. Haws, Attorney, Patrick M. Smith, Attorney, KATTEN MUCHIN ROSENMAN LLP, Chicago, IL.

For CHARLES F. WHITMAN, Defendant - Appellee: Martin B. Carroll, Attorney, Erik J. Ives, Attorney, FOX, SWIBEL, LEVIN & CARROLL, LLP, Chicago, IL.

For GREGORY EICKBUSH, BRIAN JOHNSON, Defendants - Appellees: Adam L. Marchuk, Attorney, Jose A. Lopez, Jr., Attorney, PERKINS COIE LLP, Chicago, IL.

**Judges:** Before SYKES and BARRETT, Circuit Judges, and GRIESBACH, Chief District Judge.[*]

**Opinion by:** GRIESBACH

## Opinion

GRIESBACH, *District Judge*. Plaintiffs-appellants, 39 former employees of Infinium Capital Management, LLC, voluntarily converted loans they had made to their employer under the company's Employee Capital Pool program into equity in the company. A year later their redemption rights were suspended, and six months after that, they were told their investments **[*2]** were worthless. Plaintiffs filed suit against their employer, the holding company that owned their employer, and several members of the senior management, asserting claims for federal securities fraud and state law

---

[*] Of the Eastern District of Wisconsin, sitting by designation.

claims for breach of fiduciary duty and fraud. This appeal is from the district court's order dismissing with prejudice their fifth amended complaint for failure to state a claim. For the reasons that follow, we affirm.

## I. Background

Infinium is a diversified alternative asset and risk management firm with offices in Chicago, Houston, New York, and London. It trades exchange-traded and centrally cleared financial instruments offering fundamental arbitrage strategies. Infinium Capital Holdings is a holding company that owned Infinium. To simplify and for clarity, we refer to both as Infinium.

Prior to 2012, Infinium created the Employee Capital Pool, through which Plaintiffs collectively loaned the company just over $5 million. After a profitable year in 2011, Infinium invited capital pool participants to convert their loans into equity as Class B-2 shareholders in Infinium through an "Equity Conversion" program. Capital pool participants received notice of the Equity Conversion [*3] opportunity by e-mail on February 14, 2012. Members of Infinium's senior management—Charles Whitman, Gregory Eickbush, Brian Johnson, and Scott Rose (collectively, the Individual Defendants)—subsequently conducted three "town hall" meetings about the proposal. Those meetings occurred on February 16, 17, and 22, 2012, and each Plaintiff attended at least one meeting.

Plaintiffs claim that the Individual Defendants made several misrepresentations and omissions at the three town hall meetings that induced them to participate in the Equity Conversion. Plaintiffs allege the Individual Defendants stated there would be a single class of equity in Infinium and that all current and future equity holders would receive equal treatment; whereas in fact, Infinium was seeking the infusion of new funds from third-party investors and offered those investors superior rights to all other equity holders in Infinium and guaranteed the equity of those investors from certain losses. Plaintiffs also allege the Individual Defendants stated that Infinium had access to an untapped $20 million line of credit that it could use to pay down debt owed to George Hanley and Nathan Laurell, two members of Infinium's [*4] advisory board who were in the process of redeeming their equity in Infinium. Finally, the Individual Defendants allegedly also told meeting attendees that those who participated in the Equity Conversion would receive two free months of profit for January and February 2012, when in fact, Infinium had lost $4.3 million during that period and there was no profit for those months as a result. In addition, in the course of soliciting the conversion of their loans to equity,

Infinium wrote to Plaintiffs and explained that Plaintiffs would be able to redeem 50% any monies converted from debt to equity or otherwise invested by Plaintiffs in the first year (2013) and 50% in the following year (2014), with the ability to withdraw all of their equity investments in just two years.

Participants in the capital pool also received a Private Placement Memorandum (PPM) on February 14, 2012, detailing the risks of the Equity Conversion. The PPM made extensive disclosures about the risks to Plaintiffs' investments and the nature of the interests in Infinium they would obtain if they chose to participate in the Equity Conversion. It disclosed that Equity Conversion participants would "not have voting [*5] rights," meaning their interests would not permit them "to elect or remove members of the Board" and they would not "have any ability to affect the management of the company." The PPM also contradicted certain statements Plaintiffs allege the Individual Defendants made during the town hall meetings. For instance, with regard to Infinium's debts, the PPM disclosed that Plaintiffs' equity interests would be "junior in right of payment" to Infinium's "secured and unsecured debts, including commercial lines of credit" and "any other debt securities [Infinium] may issue in the future." The disclosures were particularly forthright about risks from a $53 million debt related to the redemption of equity interests in Infinium held by George Hanley and Nathan Laurell: "This will cause a significant change in the capital structure of Infinium, and could constrain or even eliminate Infinium's ability to obtain financing for its business pursuits. The servicing of this debt will constrain Infinium's available capital and could have a material adverse effect on Infinium's business."

Also disclosed in the PPM were limitations on the participants' redemption of capital, only 50% of which would be available [*6] for redemption after one year, with the remainder available after a second. The PPM explicitly stated that those redemption rights could be limited or suspended by the board under certain circumstances, such as if redemption would prevent the company from complying with regulations requiring it to hold a particular amount of capital. In addition, the company would have "broad discretion in using the proceeds" from the Equity Conversion and, indeed, might "not use them in a manner Investors would prefer."

The PPM also referred to the LLC Agreement for Infinium as well as a Subscription Agreement, both of which were attached as exhibits. The LLC Agreement provided details about the structure of Infinium, including information described in the PPM, such as capital redemption rules and the nature of participants' equity interests. The Subscription Agreement set forth several representations and warranties,

including that the Equity Conversion participant could "bear the economic risk of losing the ... entire investment." The Agreement confirmed that each Equity Conversion participant was furnished with the LLC Agreement, the Joinder, the PPM, and other documents, materials, and information [*7] as he or she deemed necessary for evaluating whether to invest in the company. The Subscription Agreement also contained a non-reliance clause which stated: "[I]n entering into this transaction the undersigned is not relying upon any information other than that contained in the LLC Agreement, the Joinder and the results of the undersigned's own independent investigation." All Equity Conversion participants were required to sign the Subscription Agreement.

Plaintiffs allege they were told that, if they did not elect to participate in the Equity Conversion by March 2, 2012, then their loans would be repaid during 2012. Thereafter, Plaintiffs allege, those who opted against taking part in the Equity Conversion would no longer be able to participate in a permanent, structured vehicle to share in the company's growth. Prior to the March 2nd deadline, Plaintiffs allege that the Individual Defendants represented to some Plaintiffs that Infinium would still have nearly $50 million in equity after Hanley and Laurell redeemed their own equity interests. Ultimately, every Plaintiff elected to participate in the Equity Conversion and, collectively, converted more than $5 million from capital pool [*8] loans into equity in Infinium. Some Plaintiffs chose to invest additional funds in excess of loans already made through the capital pool.

According to Plaintiffs, Infinium's financial position was far worse than represented to them when they agreed to participate in the Equity Conversion. During an April 2015 deposition conducted by the Securities and Exchange Commission (SEC), Plaintiff Gordon Wallace allegedly saw certain confidential documents authored or received by the Individual Defendants pertaining to Infinium's financial situation in the weeks before the Equity Conversion. According to Plaintiffs, the documents showed that Infinium was insolvent and on the verge of bankruptcy at that time and had already drawn down $6 million on the $20 million line of credit mentioned at the town hall meetings. Infinium's management team thus feared that its lender would require immediate repayment of the line of credit, an impossibility due to the company's insolvency. Moreover, Plaintiffs allege that the documents showed that Infinium had already incurred losses of $4.3 million during January and February 2012. The documents also allegedly demonstrated that, before the Equity Conversion, [*9] Infinium lacked the resources to repay the capital pool loans, to allow Hanley and Laurell to redeem their equity, or even to sustain the trading activities necessary to generate profits. As further indication of Infinium's poor

financial circumstances during early 2012, Plaintiffs allege that in late 2011 two of the Individual Defendants, Charles Whitman and Brian Johnson, privately made undisclosed redemptions of their own equity in Infinium.

Infinium's financial difficulties continued throughout 2012, culminating in losses for the year in excess of $6.5 million. On March 8, 2013, Infinium suspended Plaintiffs' rights to redeem their capital on the ground that the company was in default of its debt service obligations to Hanley and Laurell. During an "investor call" with Plaintiffs on September 1, 2013, Infinium's acting CEO revealed that the money invested by the Equity Conversion participants had become "worthless," with a value of negative $18 million. At that time, Plaintiffs also learned that, to prevent a hostile takeover by Hanley, Infinium had not only converted a portion of the debt owed to Hanley and Laurell into equity but also agreed to eliminate

Plaintiffs' right to redeem [*10] their investments. Additionally, Plaintiffs learned during the call about a class of equity consisting of money invested by third-parties that was superior to Plaintiffs' equity and protected from certain losses. Infinium sought additional outside investment during February 2013.

Plaintiffs filed this action in the Northern District of Illinois in January 2014. Their complaint alleged claims for federal securities fraud under *Section 10(b) of the Securities Exchange Act of 1934* and SEC *Rule 10b-5*. *See 15 U.S.C. § 78j*; *17 C.F.R. § 240.10b-5*. The complaint also included common law claims for fraud and breach of fiduciary duty. Essentially, Plaintiffs alleged that during the three February 2012 town hall meetings Infinium, through its management, made various misrepresentations and omissions regarding the Equity Conversion proposal and Infinium's financial condition that had a material effect on Plaintiffs' decisions to convert their loans into equity.

Although Plaintiffs amended their complaint several times (once as a matter of right and subsequently with leave of the court), the district court granted motions dismissing the second and fourth amended complaints. Both dismissals were without prejudice. After Plaintiffs filed a fifth amended complaint, the district court issued an order in [*11] July 2017 granting yet another motion to dismiss, this time with prejudice.

In dismissing the fifth amended complaint, the district court explained that Plaintiffs' most recent amendments failed to correct deficiencies that the court had previously identified. The court noted that it dismissed the second and fourth amended complaints because Plaintiffs "insufficiently pleaded scienter, failed to identify the speakers of the alleged

misrepresentations with particularity, and failed to plead a duty to speak with respect to the alleged material omissions." Yet the fifth amended complaint made no changes in the pleading of scienter, made only conclusory allegations that the defendants had a duty to speak with regard to the alleged omissions, and made only cosmetic rather than substantive changes in an attempt to identify with particularity which Individual Defendants made the alleged misrepresentations. Plaintiffs now appeal the dismissal with prejudice of the fifth amended complaint.

## II. Analysis

We review *de novo* a district court's grant of a motion to dismiss for failure to state a claim. *Calderon-Ramirez v. McCament, 877 F.3d 272, 275 (7th Cir. 2017)*. Before addressing the arguments raised by Plaintiffs, we turn first to the argument by Infinium **[*12]** and the Individual Defendants that the non-reliance clause in the Subscription Agreement requires dismissal regardless of whether the fifth amended complaint adequately stated a claim for relief.

### A. The Non-Reliance Clause

In support of their motions to dismiss the second, fourth, and fifth amended complaints, Infinium and the Individual Defendants argued that, even if Plaintiffs stated a claim, the non-reliance clause contained in the Subscription Agreement requires dismissal. The district court did not address this argument when dismissing any of the complaints. Citing *Rissman v. Rissman, 213 F.3d 381 (7th Cir. 2000)*, the defendants argue that, as a matter of law, Plaintiffs' claimed reliance on oral statements made at the town hall meetings was unreasonable in light of the Subscription Agreement's non-reliance clause, through which each Plaintiff indicated he or she was not relying upon any information other than that contained in the LLC Agreement, the Joinder, and the results of his or her own independent investigation.

In *Rissman*, this court concluded that several non-reliance clauses in a private stock sale agreement prevented a plaintiff from bringing a federal securities fraud claim alleging that he sold his shares in a family company based on his **[*13]** brother's deceitful assurances that he would never take the company public or sell it to a third party. *Id. at 382-83*. The court held that "non-reliance clauses in written stock-purchase agreements preclude any possibility of damages under the federal securities laws for prior oral statements." *Id. at 383-84* (first citing *Jackvony v. RIHT Fin. Corp., 873 F.2d 411 (1st Cir. 1989)* (Breyer, J.); then citing *One-O-One Enters. v. Caruso, 848 F.2d 1283, 270 U.S. App. D.C. 251 (D.C. Cir.*

*1988)* (Ginsburg, J.)). Emphasizing that non-reliance clauses are the product of any bargain negotiated between the parties, the court observed that they "ensure[] that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." *Id. at 384; see also Cerabio LLC v. Wright Med. Tech., Inc., 410 F.3d 981, 992 (7th Cir. 2005)* (noting that enforcement of a non-reliance clause was particularly appropriate because "the parties were sophisticated commercial entities assisted by counsel"); *Vigortone AG Prods., Inc. v. PM AG Prods., Inc., 316 F.3d 641, 644-45 (7th Cir. 2002)* ("[P]arties to contracts who do want to head off the possibility of a fraud suit will sometimes insert a 'no-reliance' clause into their contract, stating that neither party has relied on any representations made by the other. Since reliance is an element of fraud, the clause, if upheld—and why should it not be upheld, at least when the contract is between **[*14]** sophisticated commercial enterprises—precludes a fraud suit ... ." (internal citations omitted)).

Each Plaintiff in this case entered into a written agreement that contained ample cautionary language about the risks associated with the investment. In particular, the Subscription Agreement recognizes that Infinium is a highly speculative venture involving a high degree of financial risk and, as a result, each Equity Conversion participant must be able to bear the economic risk of losing his or her entire investment. Each Plaintiff signed the Subscription Agreement and represented that he or she was "not relying upon any information other than that contained in the LLC Agreement, the Joinder and the results of the undersigned's own independent investigation." Plaintiffs had every opportunity to read the agreement and investigate the company as he or she deemed appropriate to evaluate the merits and risks of the investment. Based on this court's decision in *Rissman*, the written representations in the Subscription Agreement preclude Plaintiffs from now claiming that they chose to participate in the Equity Conversion because they reasonably relied on the Individual Defendants' oral statements **[*15]** made during the town hall meetings. Although the district court's dismissal of the fifth amended complaint could be affirmed in large part on this basis alone, the court will address Plaintiffs' challenges to the merits of the district court's decision that the complaint failed to state a claim for relief.

### B. Failure to State a Claim for Federal Securities Fraud

"A motion under *Rule 12(b)(6)* tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff, 696 F.3d 635, 637 (7th Cir. 2012)*. "To survive a

*Rule 12(b)(6)* motion to dismiss, a complaint must (1) describe the claim in sufficient detail to give the defendant fair notice of the claim and grounds on which it rests, *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, and (2) contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 672, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555*.

Heightened pleading requirements apply to complaints alleging fraud. *Federal Rule of Civil Procedure 9(b)* provides that a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This generally means **[*16]** "describing the 'who, what, when, where, and how' of the fraud." *AnchorBank, FSB v. Hofer, 649 F.3d 610, 615 (7th Cir 2011)*. The purpose of this particularity requirement is "to discourage a 'sue first, ask questions later' philosophy." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 441 (7th Cir. 2011)*. "Greater precomplaint investigation is warranted in fraud cases," we have explained, "because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual), ... because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it, ... and because charges of fraud (and also mistake, the other charge that *Rule 9(b)* requires be pleaded with particularity) frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships." *Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir. 1999)* (internal citations omitted).

To state a claim for federal securities fraud, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008)* (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008))*. Even before the enactment of the Private Securities Litigation Reform Act of 1995 (PSLRA), **[*17]** this court had held that securities fraud claims must satisfy *Rule 9(b)*'s particularity standard. *See Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990)*. *Section 21D(b)(2) of the PSLRA* added the requirement that complaints alleging securities fraud "state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)(A)*. Any complaint alleging a material misstatement or omission must also "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." *Id. § 78u-4(b)(1)*.

These are the standards the district court applied in finding Plaintiffs' fifth amended complaint insufficient. Plaintiffs contend that the district court erred in three respects by dismissing their complaint with prejudice. First, they maintain that they identified with adequate particularity the alleged fraudulent statements and omissions by the Individual Defendants. Second, they assert that the complaint creates a strong inference that the Individual Defendants acted with the required state of mind. Finally, they assert that the facts alleged in the complaint show that Infinium and the Individual Defendants had a duty to disclose various pieces of information to them. We will address **[*18]** each argument in turn.

### 1. *Plaintiffs Failed to Identify the Speakers of Alleged Misrepresentations with Adequate Particularity*.

To satisfy *Rule 9(b)*'s particularity standard, a complaint must "state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Vicom, Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771, 777 (7th Cir. 1994)* (internal quotation marks omitted) (quoting *Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992))*. As a result, "[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Sears, 912 F.2d at 893* (quoting *Design Inc. v. Synthetic Diamond Tech., Inc., 674 F. Supp. 1564, 1569 (N.D. Ill. 1987))*.

The district court dismissed Plaintiffs' second amended complaint in part because it set forth only general allegations that "the Defendants" made various representations at the town hall meetings. Those allegations failed to establish the identity of the individuals who made the alleged representations and therefore clearly lacked *Rule 9(b)*'s required particularity. Likewise, the district court dismissed the fourth amended complaint because it merely replaced general allegations against "the Defendants" or "Infinium" with lists of the Individual Defendants' names—"Whitman, Eickbush, Rose, and Johnson"—and **[*19]** thus provided no greater detail regarding which individuals made which representations. It was against this backdrop that the district court determined that the fifth amended complaint involved a

change in form rather than substance by replacing three counts against "all defendants" and "all Individual Defendants" with thirteen counts that repeated the same general allegations against each defendant individually, while at the same time conceding that they did not know which Individual Defendant said what. Plaintiffs argue, however, that the "group pleading" doctrine permits them to make collective allegations here because the Individual Defendants made three group presentations to Plaintiffs as potential investors.

Prior to enactment of the PSLRA, some circuits adopted the group pleading doctrine to "allow[] plaintiffs to link certain defendants to alleged misrepresentations simply by pleading that the defendants were part of the 'group' that likely put the challenged documents together." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363 (5th Cir. 2004)*. The Ninth Circuit first formulated the doctrine in *Wool v. Tandem Computers Inc.*:

> In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, [*20] annual reports, press releases, or other "group-published information," it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of *Rule 9(b)* by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations.

*818 F.2d 1433, 1440 (9th Cir. 1987)* (citation omitted). Since the enactment of the PSLRA, however, some courts have determined that the judicially-created group pleading doctrine "cannot withstand" the PSLRA's clear statutory prerequisites "that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each fact or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'" *Southland, 365 F.3d at 364* (citing *15 U.S.C. § 78u-4(b)*). This court has embraced that reasoning and declined to permit group pleading in this context. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 603 (7th Cir. 2006)*, *rev'd on other grounds*, *551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)* (*Makor I*).

Plaintiffs argue that, although this court has expressly rejected the group pleading doctrine with regard to group-published documents, it has not gone so far as to preclude the invocation of the group pleading [*21] doctrine to oral statements. But nothing in the PSLRA indicates that its particularity requirements distinguish between oral and written statements. Indeed, extending the group pleading doctrine to encompass oral representations would be inconsistent with the reasoning that originally led some courts to create an exception to *Rule 9(b)*. As the Ninth Circuit explained in *Wool*, the court deemed it reasonable to presume that information in promulgated written documents reflected "the collective actions of the officers." *818 F.2d at 1440*. The doctrine sought to account for the opaque nature of modern business entities and "the fact that an individual's actual role in drafting and approving particular documents and statements cannot, in many cases, be reliably deduced from their title." *Southland, 365 F.3d at 363 n.5*. Oral statements, by contrast, involve no such ambiguity; they emanate from a single person against whom purportedly defrauded listeners can bring a claim directly. *See, e.g.,* *In re Interactive Network, Inc. Sec. Litig., 948 F. Supp. 917, 922-23 (N.D. Cal. 1996)* ("The purpose of the doctrine is to relieve plaintiffs the burden of proving the authorship of a writing. This problem of authorship does not arise with oral statements."); *see also* William O. Fisher, *Don't Call Me a Securities Law Groupie: The Rise and [*22] Possible Demise of the "Group Pleading" Protocol in 10b-5 Cases, 56 Bus. Law. 991, 1008 n.48 (2001)* (discussing courts' refusal to apply *Wool* to oral statements). This court's determination that the group pleading doctrine is inconsistent with the PSLRA's particularity requirements thus applies with equal weight regardless of the form of the alleged misrepresentation or omission.

Here, all Plaintiffs attended at least one town hall meeting, at which they allege that they each heard oral presentations about the Equity Conversion from the Individual Defendants. Plaintiffs' claims are premised upon their reliance on the oral statements made at the town hall meetings, despite those statements being clearly contrary to the written materials Plaintiffs received, and yet, Plaintiffs have no recollection of who said what, even though each Plaintiff personally observed which representations Whitman, Eickbush, Rose, and Johnson made on particular days. Plaintiffs concede that they cannot sufficiently plead the relationship between the particular representations made at the town hall meetings and the identity of the Individual Defendant who spoke them without taking discovery. Plaintiffs contend that they repeatedly requested [*23] that the district court allow discovery to commence in order to obtain the transcripts of the town hall meetings, but the district court denied their motions to lift the discovery stay that was put into effect pursuant to the requirements of the PSLRA.

The PSLRA imposes an automatic stay on discovery while a motion to dismiss is pending, absent exceptional circumstances. *15 U.S.C. § 78u-4(b)(3)(B)*. The purpose of the provision is to curtail abusive litigation—it allows the court to evaluate the plaintiffs' claims before imposing any unreasonable burden on the defendant and it prevents a

plaintiff from bringing an action without first possessing the information necessary to satisfy the heightened pleading requirements of the PSLRA and using discovery to obtain that information and resuscitate a complaint that would otherwise be dismissed. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007); In re Comdisco Secs. Litig., 166 F. Supp. 2d 1260, 1263 (N.D. Ill. 2001).* Plaintiffs have not argued that the district court abused its discretion in denying its motions and have not addressed the court's reasons for so ruling. Those arguments are now waived as a result. *See Hentosh v. Herman M. Finch Univ. of Health Sci./The Chi. Med. Sch., 167 F.3d 1170, 1173 (7th Cir. 1999).* In short, the district court reasonably determined that the fifth amended complaint's new gambit of alleging in separate but identical counts that all Individual Defendants **[*24]** made all misrepresentations or omissions lacked the particularity required by *Rule 9(b)* and the PSLRA.

### 2. *Plaintiffs Failed to Adequately Plead Scienter.*

As noted above, a federal securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)(A).* The "required state of mind" refers to the element of scienter, which means "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 756 (7th Cir. 2007).* Under the PSLRA's "strong inference" standard, "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, 551 U.S. at 324.* When determining whether a complaint creates a strong inference of scienter, "the court must take into account plausible opposing inferences." *Id. at 323.*

This circuit's rejection of the group pleading doctrine, discussed above, has particular relevance for the pleading of scienter in securities fraud cases. The PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference **[*25]** that *the defendant* acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)(A)* (emphasis added). Agreeing with the Fifth Circuit, this court has observed that "PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases." *Makor I, 437 F.3d at 602* (quoting *Southland, 365 F.3d at 365-66*). As a result, "plaintiffs must create a strong inference of scienter with respect to *each individual defendant*." *Pugh, 521 F.3d at 693-94* (emphasis added) (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 710 (7th Cir. 2008)* (*Makor II*)).

The fifth amended complaint's shortcomings in stating its claims with particularity as to each Individual Defendant carry over into its pleading of scienter. As the district court noted in dismissing both the fourth and fifth amended complaints, the allegation that the Individual Defendants acted with an intent to deceive hinged on a single paragraph detailing the information that Plaintiff Gordon Wallace allegedly obtained during his April 2015 deposition by the SEC. That paragraph alleges that attorneys for the SEC "showed him documents authored, and/or received, by Whitman, Eickbush, Rose, and Johnson" demonstrating that the Individual Defendants knew various pieces of information about Infinium's true financial situation in January and February 2012.

Nothing **[*26]** about that paragraph, however, associates knowledge of particular information about Infinium with any particular Individual Defendant, making it impossible to assess the statements any Individual Defendant made at the town hall meetings against the information he allegedly possessed at the time he made them. Instead, it suggests that one plaintiff saw documents indicating that one or more Individual Defendants may have possessed information that impugned the truth of the representations made at the town hall meetings. This court has determined, however, that a complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information. *See Pugh, 521 F.3d at 694* ("[T]here is a big difference between knowing about ... reports from [a subsidiary] and knowing that the reports are false." (third alteration in original) (quoting *Higginbotham, 495 F.3d at 758*)).

Analogizing to *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)*, Plaintiffs argue that they have pleaded ample facts to create a strong inference that the Individual Defendants acted with an intent to deceive when soliciting participation in the Equity Conversion. Specifically, they contend that during January and February 2012 the Individual **[*27]** Defendants all had significant equity interests in Infinium, knew that Infinium faced significant financial pressures, knew that pressure on Infinium threatened their personal investments in it, and made knowingly false statements at the three town hall meetings to secure an infusion of equity from Plaintiffs that would permit the Individual Defendants to redeem a portion of their own investments. But Infinium and the Individual Defendants counter that the complaint merely shows that, after several years of growth, Infinium presented an investment opportunity to its employees—sophisticated financial professionals—who chose to participate and then suffered the consequences of unfavorable market conditions arising shortly thereafter. Because Plaintiffs' fifth amended complaint

failed to make adequately individualized allegations against each Individual Defendant, however, we need not determine whether the inference of scienter propounded by Plaintiffs is cogent and at least as compelling as the proposed alternative.

### 3. *Plaintiffs Failed to Plead a Duty to Speak*.

As their final basis for reversal, Plaintiffs contend that the district court erred in concluding that they failed to establish [*28] that Infinium and the Individual Defendants had a duty to disclose certain information to them. Plaintiffs contend that the facts alleged support their assertion that the Individual Defendants had a "duty to speak" regarding Infinium's financial condition.

The district court's decision dismissing the fifth amended complaint summarized Plaintiffs' efforts to plead a duty to speak. Compared to the fourth amended complaint, the fifth amended complaint added two paragraphs alleging a duty to speak:

> 65. By voluntarily disclosing material facts in connection with securities transactions, Defendants Infinium, Whitman, Eickbush, Rose, and Johnson assumed a duty to speak fully and truthfully on those subjects.
> 66. A duty to disclose the true financial state of Infinium arose because secret information rendered the public statements materially misleading.

The fifth amended complaint also alleged that each of the Individual Defendants owed Plaintiffs "fiduciary duties ... first to Plaintiffs as creditors of an insolvent corporation and then as shareholders after the conversion." In dismissing the fifth amended complaint, the district court observed that these allegations did nothing to remedy the [*29] fourth amended complaint's failure to state with particularity how the alleged omissions rendered any affirmative disclosure misleading.

On appeal, Plaintiffs' duty to speak argument cites no law and is largely undeveloped. Plaintiffs discuss Infinium's line of credit as an example of an affirmative statement rendered misleading by the omission of pertinent information. They note that the fifth amended complaint alleges, on the one hand, that the Individual Defendants represented at the town hall meetings that Infinium had access to an untapped $20 million line of credit and, on the other hand, that Plaintiff Wallace saw documents during his April 2015 SEC deposition indicating that Infinium had already drawn down $6 million on that line of credit by the time of the town hall meetings. According to Plaintiffs, they adequately pleaded facts suggesting an omission by alleging this discrepancy between the representations at the town hall meetings and the information the Individual Defendants actually possessed at that time.

Plaintiffs' duty to speak argument falls short for at least two reasons. First, Plaintiffs' allegations that the Individual Defendants "assumed a duty to speak" and [*30] "owed Plaintiffs fiduciary duties" are mere legal conclusions that the court need not accept as true. *Iqbal, 556 U.S. at 678* ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). In their briefing to this court, Plaintiffs have presented no legal argument that the facts pled in the complaint gave rise to a legal duty to speak.

Second, Plaintiffs' factual allegations regarding purported omission suffer from the same absence of particularity that plagues the rest of their claims. Taking as an example the allegations surrounding the $20 million line of credit, as Plaintiffs argue in their brief, nothing in the fifth amended complaint associates particular knowledge with particular Individual Defendants. As already discussed above, the allegation pertaining to information learned during Plaintiff Wallace's April 2015 SEC deposition claims that Wallace saw "documents authored, and/or received, by Whitman, Eickbush, Rose, and Johnson" showing that they possessed several pieces of information about Infinium's financial position at the time they made the town hall presentations. Nothing in that allegation indicates which of the Individual [*31] Defendants possessed particular pieces of information that could have rendered his statements at the town hall meetings misleading. In other words, Plaintiffs failed to link any of the alleged omissions to any of the statements made by the Individual Defendants. Consequently, the district court properly concluded that the fifth amended complaint failed to allege with the requisite particularity facts indicating that the Individual Defendants possessed knowledge rendering their affirmative representations misleading at the town hall meetings.

### C. Failure to State a Claim for Breach of Fiduciary Duty and Common Law Fraud

The district court also dismissed Plaintiffs' state law claims for breach of fiduciary duty and fraud. Because Plaintiffs' briefs did not challenge the district court's dismissal of these claims, Plaintiffs have forfeited any opportunity to do so. In any event, we find that the district court did not err in dismissing Plaintiffs' breach of fiduciary duty and common law fraud claims. To state a claim for breach of fiduciary duty under Delaware law, a plaintiff must allege that a fiduciary duty existed and that the defendant breached that duty. *See Stewart v. Wilmington Trust SP Servs., Inc., 112 A.3d 271, 297 (Del. Ch. 2015)* (citation omitted). A [*32] plaintiff must plead the following elements to state a common law fraud claim: "(1) a false representation, usually one of fact, made by

the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless disregard of the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *Johnson v. Preferred Prof'l Ins. Co., 91 A.3d 994, 1017 (Del. Super. Ct. 2014)* (citation omitted). Both claims are subject to *Rule 9(b)*'s heightened pleading requirements, as they are premised on allegations that the defendants knowingly misled Plaintiffs. Plaintiffs' claims for breach of fiduciary duty and common law fraud fail for the same reasons as their security fraud claim—Plaintiffs have neither pled the required elements of scienter nor alleged the facts underlying these claims with the particularity required by *Rule 9(b)*. The district court therefore correctly concluded that Plaintiffs failed to state a claim for breach of fiduciary duty and common law fraud.

## III. Conclusion

We agree with the district court that Plaintiffs failed to state a claim upon which relief can be granted **[*33]** and find that the district court did not abuse its discretion in denying leave to further amend the complaint, since such leave was never sought. Plaintiffs have not proposed how they might be able to amend their pleading to cure the deficiencies contained in the fifth amended complaint. Under these circumstances, dismissal with prejudice is appropriate. *See Leavell v. Ill. Dep't of Nat. Res., 600 F.3d 798, 808 (7th Cir. 2010)*.

For the foregoing reasons, the district court's decision dismissing the fifth amended complaint with prejudice is AFFIRMED.

---

**End of Document**

# Tab B


# *Duhart v. United States Postal Serv.*

United States District Court for the Eastern District of Wisconsin

June 8, 2017, Decided; June 8, 2017, Filed

Case No. 17-CV-192

**Reporter**

2017 U.S. Dist. LEXIS 88056 *; 2017 WL 2483803

NEEKHOACH YISREAL DUHART, Plaintiff, v. UNITED STATES POSTAL SERVICE, Defendant.

**Subsequent History:** Related proceeding at *Duhart v. United States Postal Serv., 2018 U.S. Dist. LEXIS 112062 (N.D. Ill., July 5, 2018)*

## Core Terms

motion to dismiss, administrative remedy, exhaust, notice, motion to change venue, allegations, days

**Counsel:** **[*1]** Neekhoach Yisreal Duhart, Plaintiff, Pro se, Park Forrest, IL.

For United States Postal Service, of Oshkosh WI, Defendant: Lisa Yun, United States Department of Justice (ED-WI), Office of the US Attorney, Milwaukee, WI.

**Judges:** William C. Griesbach, Chief United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### ORDER

Plaintiff Neekhoach Duhart, proceeding *pro se*, filed this action against the United States Postal Service ("USPS"), alleging retaliatory discharge and race discrimination in violation of *Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.* ("Title VII"). Specifically, Duhart alleges that a USPS employee discriminated by calling him "black boy," his supervisors took no action in response and harassed him for taking scheduled breaks, and he was terminated in retaliation for reporting the harassment. This court has jurisdiction pursuant to *28 U.S.C. § 1331*.

The case is before the court on USPS's *Rule 12(b)(6)* motion to dismiss Duhart's complaint with prejudice. USPS argues that the complaint should be dismissed because Duhart failed to exhaust all his administrative remedies before filing suit and thus has failed to state a claim upon which relief can be granted. Duhart also filed a motion for change of venue. For the reasons stated **[*2]** herein, USPS's motion to dismiss is granted and Duhart's motion for change of venue is denied.

### ALLEGATIONS OF THE COMPLAINT

According to the allegations of the complaint, Duhart began working as a Mail Handler Assistant with USPS on November 28, 2016. Compl., ECF No. 1 at 6. On December 4, 2016, he saw a fellow Mail Handler Assistant harming USPS property and asked if she needed help. *Id.* at 8. The employee responded with an expletive and referred to Duhart as "black boy." *Id.* Duhart reported the incident to his supervisors, but they took no action. Duhart further alleges that his supervisors harassed him for taking scheduled, personal breaks during his shifts. *Id.* at 9. Duhart was terminated on December 8, 2016, which was during a 90-day probationary period. *Id.* at 6-7. He claims that USPS terminated him in retaliation to his reporting the harassment. *Id.* at 9-10.

Upon termination, on December 8, 2016, Duhart filed an EEO pre-complaint. Compl., No. 1-2 at 26. Duhart participated in mediation on January 18, 2017, but the parties failed to resolve the dispute. Compl., at 11; ECF No. 1-2 at 28-29. On January 30, 2017, Duhart received notice to file a formal administrative complaint ("EEO Complaint") within 15 days of receipt. **[*3]** Compl., at 7; ECF No. 1-2 at 30. Instead of promptly filing his EEO Complaint, Duhart filed his complaint in this action on February 10, 2017, but did not file his EEO Complaint until February 17, 2017. ECF No. 8-4 at 21; ECF No. 8-5. By letter dated April 5, 2017, the USPS EEO Investigative Services Office dismissed Duhart's EEO complaint for being untimely. ECF No. 8-6.

### LEGAL STANDARD

A motion to dismiss tests the sufficiency of the complaint to state a claim upon which relief can be granted, and does not decide the merits of the case. *Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990)*; see *Fed. R. Civ. P. 12(b)(6)*. When reviewing a motion to dismiss under *Rule 12(b)(6)*, the Court must accept all well-pleaded factual allegations as true and draw all inferences in the light most favorable to the non-moving party. *Gutierrez v. Peters, 111 F.3d 1364, 1368-69 (7th Cir. 1997)*; *Mosley v. Klincar, 947 F.2d 1338, 1339 (7th Cir. 1991)*. When extrinsic evidence outside the pleadings is submitted with a *Rule 12(b)(6)* motion to dismiss, the court must either convert the motion into one for summary judgment under *Fed. R. Civ. P. 56*, or exclude the documents attached to the motion to dismiss and continue under *Rule 12(b)(6)*. *Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998)*. However, under the incorporation-by-reference doctrine, "if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting the defendant's *12(b)(6)* motion [*4] to a motion for summary judgment." *Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687, 690 (7th Cir. 2012)*; see also *Williams v. Curran, 714 F.3d 432, 436 (7th Cir. 2013)* ("[A] court may consider . . . documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice.").

## ANALYSIS

USPS asserts that Duhart failed to exhaust his administrative remedies before filing suit in federal court. Under Title VII, employees of federal agencies must follow specific procedures before filing a legal claim. *29 C.F.R. § 1614.105*. Someone who believes they have been discriminated against must first consult a counselor within 45 days of the alleged discrimination. *29 C.F.R. § 1614.105(a)*. If the initial counseling does not resolve the dispute, the counselor must give written notice of the employee's right to file an EEO Complaint. *29 C.F.R. § 1614.105(d)*.

The complaint must be filed within 15 days of receiving the written notice. *29 C.F.R. § 1614.106(b)*; *Ester v. Principi, 250 F.3d 1068, 1071 (2001)* ("One administrative remedy federal employees must pursue is the filing of a formal complaint of discrimination within 15 days of receiving notice of the right to do so."). If these potential remedies all fail, the employee may pursue legal action in federal court once he receives a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"). [*5] *Hill v. Potter, 352 F.3d 1142, 1145 (7th Cir. 2003)*. Failure to exhaust these administrative remedies precludes the employee's right to relief. *Reynolds v. Tangherlini, 737 F.3d 1093, 1099 (7th Cir. 2013)*.

In support of its motion to dismiss, USPS filed Duhart's EEO Complaint and postmarked envelope. ECF No. 8-4 at 21; EFC No. 8-5. Because the obligation of the plaintiff to exhaust all administrative remedies before filing suit is central to Duhart's claim, the court may take notice of the EEO Complaint and postmarked envelope and converting this *Rule 12(b)(6)* motion into a motion for summary judgment. These documents conclusively establish that Duhart did not file his EEO Complaint with the agency within the 15 days allowed. The complaint was thereafter dismissed on the ground that it was untimely, and Duhart has not appealed that dismissal. Having failed to exhaust his administrative remedies, his Title VII lawsuit must be dismissed. When a plaintiff's exhaustion of administrative remedies is untimely, a court dismisses the Title VII claim without ruling on the merits. *Ester v. Principi, 250 F.3d at 1071*. While there are situations where a plaintiff can show waiver, estoppel, or equitable tolling so as to avoid dismissal, Duhart has made no such showing here or offered any explanation that could give rise to such a defense.

The plaintiff [*6] is generally granted leave to amend the complaint when a claim is dismissed if there is a problem that can potentially be cured. *Indep. Tr. Corp. V. Stewart Info. Services Corp., 665 F.3d 930, 943 (7th Cir. 2012)*; see *Fed. R. Civ. P. 15(a)(1)*. Because Duhart cannot correct this error, the motion to dismiss is granted with prejudice.

## VENUE

Duhart also filed a motion to change venue on the basis that he no longer resides within the state of Wisconsin. As his claim has been dismissed under *Rule 12(b)(6)*, the motion to change venue will be denied as moot. Even if it were not moot, the motion to change venue would be denied. It is the place where the action arose, not where the plaintiff later moves that determines the proper venue. In any event, the motion to change venue is denied.

## CONCLUSION

For the reasons given above, USPS's motion to dismiss is **GRANTED** and Duhart's motion to change venue is **DENIED**. Because the plaintiff's untimely EEO Complaint is construed as a failure to exhaust administrative remedies, he has failed to state a Title VII claim and the dismissal is with prejudice. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 8th day of June, 2017.

/s/ William C. Griesbac

William C. Griesbach, Chief Judge

United States District Court

---

**End of Document**

# Tab C

 Positive

As of: February 28, 2019 8:39 PM Z

# *Fish v. Greatbanc Trust Co.*

United States District Court for the Northern District of Illinois, Eastern Division

September 1, 2016, Decided; September 1, 2016, Filed

No. 09 C 1668

**Reporter**

2016 U.S. Dist. LEXIS 137351 *

BONNIE FISH, CHRISTOPHER MINO, MONICA LEE WOOSLEY, LYNDA D. HARDMAN, EVOLVE BANK AND TRUST, Plaintiff, v. GREATBANC TRUST COMPANY, LEE MORGAN, ASHA MORGAN MORAN, CHANDRA ATTIKEN, MORGAN FAMILY FOUNDATION, Defendants.

**Prior History:** *Fish v. GreatBanc Trust Co., 2009 U.S. Dist. LEXIS 70618 (N.D. Ill., Aug. 12, 2009)*

## Core Terms

Company's, projections, valuation, repurchase, sales, shares, fiduciary, stock, advisors, participants, due diligence, fair market value, plaintiffs', digital, shareholders, employees, per share, comparable, per-share, methodologically, risks, downside, photography, monitor, analyses, non-ESOP, sensitivity, scenario, opined, technology

**Counsel:** [*1] For Bonnie Fish, Plaintiff: James A. Bloom, LEAD ATTORNEY, PRO HAC VICE, Keller Rohrback, P.l.c., Phoenix, AZ USA; Patrick Emmet O'Shaughnessy, LEAD ATTORNEY, Toby K Henderson, PRO HAC VICE, James A Dyer, Sebaly Shillito + Dyer, Dayton, OH USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Gary A Gotto, PRO HAC VICE, Keller Rohrback, L.L.C., Phoenix, AZ USA; Gary D Greenwald, PRO HAC VICE, Keller Rohrback, L.L.P., Phoenix, AZ USA; Sebaly Shillito Dyer, Dayton, OH USA; David Ko, Michael D. Woerner, PRO HAC VICE, Keller Rohrback, LLP, Seattle, WA USA.

For Christopher Mino, Plaintiff: David Ko, LEAD ATTORNEY, Keller Rohrback LLP, Seattle, WA USA; James A. Bloom, LEAD ATTORNEY, PRO HAC VICE, Keller Rohrback, P.l.c., Phoenix, AZ USA; Patrick Emmet O'Shaughnessy, LEAD ATTORNEY, Toby K Henderson, PRO HAC VICE, James A Dyer, Sebaly Shillito + Dyer, Dayton, OH USA Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Gary D Greenwald, PRO HAC VICE, Keller Rohrback, L.L.P., Phoenix, AZ USA;

Michael D. Woerner, PRO HAC VICE, Keller Rohrback, LLP, Seattle, WA USA.

For Monica Lee Woosley, Plaintiff: David Ko, LEAD ATTORNEY, Keller Rohrback LLP, Seattle, WA USA; [*2] James A. Bloom, LEAD ATTORNEY, PRO HAC VICE, Keller Rohrback, P.l.c., Phoenix, AZ USA; Patrick Emmet O'Shaughnessy, LEAD ATTORNEY, Toby K Henderson, PRO HAC VICE, James A Dyer, Sebaly Shillito + Dyer, Dayton, OH USA Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Gary A Gotto, PRO HAC VICE, Keller Rohrback, L.L.C., Phoenix, AZ USA; Gary D Greenwald, PRO HAC VICE, Keller Rohrback, L.L.P., Phoenix, AZ USA; Michael D. Woerner, PRO HAC VICE, Keller Rohrback, LLP, Seattle, WA USA.

For Lynda D. Hardman, Plaintiff: David Ko, LEAD ATTORNEY, Keller Rohrback LLP, Seattle, WA USA; James A. Bloom, LEAD ATTORNEY, Toby K Henderson, PRO HAC VICE, James A Dyer, Sebaly Shillito + Dyer, Dayton, OH USA Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Gary A Gotto, PRO HAC VICE, Keller Rohrback, L.L.C., Phoenix, AZ USA; Gary D Greenwald, PRO HAC VICE, Keller Rohrback, L.L.P., Phoenix, AZ USA; Michael D. Woerner, PRO HAC VICE, Keller Rohrback, LLP, Seattle, WA USA.

For Evolve Bank & Trust, an Arkansas bank and trust company, Plaintiff: David Ko, LEAD ATTORNEY, Keller Rohrback LLP, Seattle, WA USA; James A. Bloom, LEAD ATTORNEY, [*3] PRO HAC VICE, Keller Rohrback, P.l.c., Phoenix, AZ USA; Patrick Emmet O'Shaughnessy, LEAD ATTORNEY, Toby K Henderson, PRO HAC VICE, James A Dyer, Sebaly Shillito + Dyer, Dayton, OH USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; John R. Wylie, DonaldaldsonGuin LLC, Chicago, IL, USA; Michael D. Woerner, PRO HAC VICE, Keller Rohrback, LLP, Seattle, WA USA.

For Lee Morgan, Asha Morgan Moran, Chandra Attiken, Defendants: Anthony M Verticchio, Jacob Deniro Rhode, LEAD ATTORNEY, PRO HAC VICE, Keating Muething &

Klekamp, Pll, Cincinnati, OH USA; Michael L Scheier, LEAD ATTORNEY, Keating, Muething & Klekamp, Cincinnati, OH USA; Benjamin Guthrie Stewart, Keating Muething & Klekamp PLL, Cincinnati, OH USA; Brian P Muething, PRO HAC VICE, Keating Muething & Klekamp, Cincinnati, OH USA; Thomas Frost Hankinson, Keating Muething and Klekamp PLL, Cincinnati, OH USA.

For Morgan Family Foundation, Defendant: Jack Frederick Fuchs, LEAD ATTORNEY, Thompson Hine LLP, Cincinnati, OH USA; Terry W. Posey, Jr., Thomas A. Knoth, LEAD ATTORNEY, Thompson Hine LLP, Miamisburg, OH USA; Gregory Robert James, Jr., Thomas Stephen Bradley, Laner Muchin, Ltd., Chicago, IL USA.

For [*4] Lee Bloom, Deponent: Stephen Victor D'Amore, LEAD ATTORNEY, Michael S. Pullos, Winston & Strawn LLP, Chicago, IL USA.

For Secretary of Labor Hilda L. Solis, Amicus: Peter Beck Dolan, LEAD ATTORNEY, U.S. Dept. of Labor, Plan Benefits Division, Office Of The Solicitor, Washington, DC USA; Ruben Richard Chapa, United States Department of Labor, Chicago, IL USA.

**Judges:** HON. JORGE ALONSO, United States District Judge.

**Opinion by:** JORGE ALONSO

# Opinion

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Bonnie Fish, Lynda Hardman, Chris Mino, and Monica Lee Woosley were employees of the Antioch Company ("Antioch" or "the Company") and vested participants in Antioch's Employee Stock Ownership Plan ("ESOP" or "the Plan"). In December 2003, Antioch purchased all outstanding shares of its stock held outside of the ESOP as part of a tender offer transaction designed to leave the Company 100% ESOP-owned ("the Transaction"). Plaintiff Evolve is the successor trustee to the Antioch ESOP.

In the years preceding the Transaction, Antioch had experienced dynamic growth in sales and virtually every other financial metric, including its share price. In the years following the Transaction, however, sales dropped precipitously, and the share [*5] price dropped along with them. In late 2008, Antioch reorganized its capital structure through a Chapter 11 bankruptcy, and the new capital structure did not include an ESOP. Contending that the ESOP's shares of Antioch stock became worthless due to the

Transaction, plaintiffs bring this action against defendants Lee Morgan, Asha Morgan Moran and Chandra Attiken, all of whom were either former members of the Board of Directors at Antioch and/or Antioch's internal ESOP Advisory Committee ("EAC"). Plaintiffs claim that, based on the actions defendants took in connection with the 2003 tender offer transaction, defendants are liable for breaching their fiduciary duties to the ESOP, enabling other fiduciaries' breaches, and causing a prohibited transaction, in violation of *sections 404*, *405* and *406* of the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. §§ 1104*, *1105* & *1106*.

The case was tried in a bench trial over 34 trial days stretching from November 2, 2015 to February 1, 2016. Following the close of evidence, the parties submitted proposed findings of fact and conclusions of law, collectively totaling over 247 pages. The Court makes the following findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52*. To the extent [*6] (if any) that the proposed findings of fact as stated may be deemed conclusions of law, they shall also be considered conclusions of law, and vice versa.

## I. PARTIES AND CLAIMS

1. Plaintiffs Bonnie Fish, Christopher Mino, Monica Lee Woosley and Lynda Hardman were participants in the ESOP and bring this lawsuit in a representative capacity on behalf of the ESOP. Plaintiff Evolve Bank and Trust was appointed trustee for the ESOP in 2008.

2. At the time of the Transaction, defendants Lee Morgan, Asha Moran, and Chandra Attiken comprised the ESOP Advisory Committee ("EAC"). Likewise at the time of the Transaction, Mr. Morgan served as CEO and Chairman of Antioch's Board of Directors, Ms. Moran was the Chief Operating Officer of Creative Memories, the Company's largest division, and Ms. Attiken was Antioch's Vice President of Human Resources. Mr. Morgan and Ms. Moran (Mr. Morgan's daughter) were also members of the Board of Directors.

3. Defendant GreatBanc & Trust Company was the ESOP's transactional trustee in 2003. The Antioch Board gave GreatBanc the independent discretion to determine whether to tender the ESOP's shares in the Transaction. Because the Transaction would not close if GreatBanc [*7] tendered the ESOP shares, GreatBanc was given explicit veto power over the Transaction. GreatBanc exercised its discretion to decline the tender offer and it thereby allowed the Transaction to close. GreatBanc and plaintiffs settled shortly before trial.

4. Plaintiffs alleged that defendants violated *ERISA sections 404*, *405* and *406* in connection with the Transaction. Plaintiffs also seek the equitable remedies of disgorgement, rescission and/or constructive trust under *ERISA section 409*.

5. *ERISA section 404* requires plan fiduciaries to discharge their duties solely in the interests of the plan participants and for the exclusive purpose of providing benefits to participants and their beneficiaries, "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *29 U.S.C. § 1104*.

6. *ERISA section 405* governs co-fiduciary breaches, and gives rise to liability if certain conditions accompany an underlying breach by a co-fiduciary. *29 U.S.C. § 1105*.

7. *ERISA section 406(a)* prohibits transactions between a plan and a party in interest where a fiduciary causes the plan to engage in any transaction that constitutes a direct or indirect sale **[*8]** or exchange of property between a plan and a party in interest, or use of plan assets by or for the benefit of a party in interest. *29 U.S.C. § 1106(a)*. *Section 406(a)* claims are subject to an affirmative defense in *ERISA section 408*. Under *section 408*, the defendants are not liable for a prohibited transaction as long as the plan receives adequate consideration for whatever plan assets it parted with in the transaction at issue. *29 U.S.C. § 1108(e)*.

8. For the reasons set forth below, the Court will enter judgment for the defendants Lee Morgan, Asha Moran, and Chandra Attiken on all of plaintiffs' claims.

## II. FINDINGS OF FACT

### A. Background of the Antioch Company

9. Antioch was founded in 1926 by Lee Morgan's father, Ernest Morgan, and incorporated in Ohio in 1946. (JX-49 at MOR001269.) Lee Morgan succeeded his father as the Company's CEO in 1970. (Tr. 1969:12-14.) Prior to 1985, Antioch manufactured and sold bookplates, bookmarks, book covers, and calendars. (JX-49 at MOR001269.) By the mid-80's, Antioch's sales amounted to just under $11 million. (PX-68:14.)

10. Antioch purchased the assets of Holes-Webway, a company that manufactured Webway brand photo albums, out of a bankruptcy sale in 1985, and Antioch continued to manufacture these albums thereafter. (Anderson **[*9]** Tr. 185:19-186:13; Hoskins Dep. Sep. 15, 2011, 65:6-9.)

11. In 1987, Rhonda Anderson, a Webway customer who had direct-selling experience with Tupperware and a number of other direct-selling organizations, taught friends and neighbors how to make scrapbooks out of Webway photo albums, and she observed that there was overwhelming interest in these scrapbooks among the young mothers in her community. (Anderson Tr. 182:14-183:5; 185:17-190:10.) She approached Cheryl Lightle, who managed Antioch's Holes-Webway unit in St. Cloud, Minnesota, about selling scrapbooks and related materials through in-home direct selling, and, in the summer of 1987, Antioch launched its Creative Memories ("CM") division, with Anderson and Lightle serving as co-founders. (Anderson Tr. 190:11-191:1.)

12. By 1995, Antioch's core business became primarily direct marketing of scrapbooks and accessories through CM. (JX-49 at MOR001269.) CM sold its products primarily through the party-plan, direct-sales method, using thousands of independent sales "consultants." (JX-49 at MOR001269.) As with other party-plan, direct-sales companies such as Tupperware or Mary Kay, consultants would host sales parties, typically in the **[*10]** consultant's home. (*Id.* at MOR001270.) CM's selling strategy was the instruction and guidance of consumers in how to preserve, present, organize and display their family photos in an appealing manner, and at the same time create a graphic family record and history. (*Id.* at MOR001269-1270; Hoskins Sep. 15, 2011 Dep. 60:16-62:9.)

13. With Lee Morgan serving as CEO, Antioch experienced substantial and prolonged growth in the late 1990s and early 2000s. Antioch's revenue increased in every year between 1998 and 2002, from $164.3 million in 1998 to $351.2 million in 2002, representing a compound annual growth rate ("CAGR") of 20.9%. (DX-668 at ¶ 38.) The Company experienced increases in gross profit and gross profit margin in each year from 1998 through 2002 as well. Specifically, gross profit increased from $87.6 million in 1998 to $209.0 million in 2002. (*Id.* at ¶ 39.) Like both revenue and gross profit, Antioch's reported earnings before interest, taxes, depreciation, and amortization ("EBITDA") increased from $31.9 million in 1998 to $85.2 million in 2002. (*Id.* at ¶ 40-41.)

14. Because Antioch was not a publicly traded stock, every year the Company engaged an independent valuation company **[*11]** to determine the fair market value of its common stock. This value would then be used to determine the amount of money owed to ESOP participants who put the stock in their ESOP account to the Company for redemption upon termination or retirement. (JX-8 at GBT06757.) The fair market value of Antioch stock grew from less than $190.00 per share at the end of 1997 to $680.00 per share at the end of

2002. (DX-35 at D&P_A009214.)

15. By the beginning of 2003, Antioch had over 1,200 full-time employees and over 70,000 consultants. The Company maintained domestic manufacturing and/or distribution facilities in Yellow Springs, Ohio, St. Cloud, Minnesota, Sparks, Nevada, Richmond, Virginia and Lenexa, Kansas, as well as four separate international facilities. (JX-8 at GBT06759; JX-63 at PR0001190-1191.)

## B. **The Antioch Company Employee Stock Ownership Plan**

16. As CEO, Lee Morgan cultivated a corporate culture of openness and transparency, and he instilled a philosophy of broad-based employee ownership to allow all to share in and profit from the Company's generation of wealth, from low wage employees to upper management. (Bevelhymer Dep. 193:13-194:6; Fish Dep. 109:8-110:5, 135:1-16; Hardman Dep. [*12] 53:22-54:21, 148:18-23, 201:13-204:5; Holthaus Dep. 164:23-166:5; Hoskins Sep. 15, 2011 Dep. 16:21-17:5; Jennett Dep. 178:12-179:6; Lipson-Wilson Dep. 38:6-39:9, 58:19-60:8, 78:9-79:2, 86:23-89:8; Luce Dep. 29:22-31:14; Ng Dep. 45:16-19.)

17. For example, Antioch's Board was comprised of 5 outside directors, 2 members of management, and 5 employee-owners elected by staff (two of whom were voting members.) (JX-64 at P-WOOSLEY-000041.) All Board meetings were open for anyone to attend, and the Company also held quarterly employee-owner meetings. (Lipson-Wilson Dec. 5, 2011 Dep. 59:5-60:8.) On its intranet site, the Company made available to every employee its annual reports, monthly narratives from the CEO Lee Morgan, and detailed financial, sales, and product margin information. (Woosley Tr. 2595:15-2597:14.) The St. Cloud, Minnesota office was also configured so that every employee in the building had a cubicle (even top-level management), with the goal of improving communication and visually portraying that no one was more important than any other person. (Woosley Tr. 2599:2-19; Hardman Dep. 201:13-204:5.)

18. Antioch's philosophy of openness and broad-based employee ownership was perhaps [*13] best exemplified by Antioch's historical use of an ESOP, which was created from newly issued stock from the Company gifted to the ESOP that diluted the Morgan family's ownership of Antioch. (Morgan Tr. 1982:1-1983:5; Hoskins Sep. 15, 2011 Dep. 77:5-78:2.)

19. Antioch's ESOP was established in 1979 as the principal employer-funded retirement benefit for Antioch's employees. By its very nature as an ESOP, it was designed to invest primarily in Antioch's stock. (DX-1; JX-49 at MOR001219.)

20. Antioch elected to become an IRS Subchapter S Corporation on January 1, 1998 after Congress authorized S corporations to have ESOPs. (May Tr. 5273:6-9; Hoskins Sept. 15, 2011 Dep. 30:1-3.) IRS Subchapter S Corporations do not incur income tax liability on earnings; rather, shareholders of S corporations incur personal income tax liability on their proportionate share of the S Corporation's earnings. (JX-49 at MOR001219.) Historically, as is typical in S corporations, the Company made distributions to its non-ESOP shareholders to pay their individual income taxes arising from corporate profit. (*Id.*; Risius Tr. 6075:18-6076:4.)

21. Because the Antioch ESOP was a shareholder, Antioch was required to make [*14] a similar income tax-related distribution to the ESOP as it did to the non-ESOP shareholders in proportion to the percentage of shares the ESOP held. (Tr. 6075:14-6076:16; Holthaus Dep. 156:18-159:3; 160:5-164:8.) Unlike the non-ESOP shareholders, however, the ESOP was a tax-exempt entity that incurred no tax liability on any of Antioch's income. (*Id.*) Because the ESOP was not subject to federal income taxation, it retained the tax distribution and allocated it to individual ESOP accounts. (Morrison Dep. 69:23-71:3.)

22. Between 1999 and 2002, the Antioch ESOP allocated any dividends or distributions paid on the common stock held in the Antioch ESOP 75% based on the annual compensation of each participant and 25% based on the account balances of each participant. (Blair Tr. 1465:13-22; Hoskins Sep. 15, 2011 Dep. 78:20-79:24.) The allocation method fit with Antioch's corporate culture because it allowed newer employees at Creative Memories, who had smaller account balances, to share more in Antioch's increasing revenue and profits. (PX-101; Tr. 1465:13-1466:3; Hoskins Sept. 15, 2011 Dep. 78:20-79:24, 116:7-117:24.) The IRS approved the amended plan and method of allocation, and the [*15] change was implemented in January 1999. (Hoskins Sept. 15, 2011 Dep. 79:4-24.)

23. At some point in late 2002, however, Antioch became aware of an IRS Technical Advice Memorandum ("TAM"), in which the IRS ruled that a similar method of allocating subchapter S distributions was improper and, instead, distributions must be allocated 100% on account balance—a method of allocation that, in the case of Antioch, would enrich long-tenured employees (among them, Lee Morgan) at the expense of the newer employees who were driving the Company's recent success. (PX-101; Blair Tr. 1465:13-1466:7; Holthaus Dep. 162:14-164:8, 164:23-165:12; Morrison Dep. 72:10-17, 320:20-321:11, 326:18-327:11; Sanan Dep. 33:5-34:8, 35:2-37:5.)

24. A TAM describes the IRS's position only with respect to a specific taxpayer, and this particular TAM did not address or bind Antioch, but Antioch's advisors agreed that it was nevertheless prudent for Antioch to reconsider its practices. Although it binds only one company, a TAM may be an "indication of the . . . position" the IRS might adopt with regard to similarly-situated companies. (Morrison Dep. 299:15-310:11, 320:9-321:11.) Helen Morrison, an ESOP specialist with Deloitte [*16] who served as one of Antioch's advisors in 2003, explained that even though Antioch's subchapter S distribution plan may have been approved by an IRS determination letter in 1999, the TAM shed light on the "larger issue" of allocating a dividend in accordance with compensation rather than strictly in accordance with the number of shares held, which, in fact, may "[n]ever [have been] appropriate."[1] (Morrison Dep. 305:1-7, 320:9-18.)

## C. Overview Of The 2003 Transaction

### 1. Genesis of the Transaction

25. In January 2003, Antioch held a meeting known as the "ESOP Summit" to explore its options related to the ESOP in light of the legal issues with its allocation method, including the IRS position on dividend allocation. (DX-39; PX-103; Blair Tr. 1465:13-22; Morrison Dep. 326:18-327:11.)

26. At the meeting, company representatives, lawyers, and professionals from Deloitte & Touche discussed different concepts that would resolve the apportionment problem caused by the IRS ruling. (PX-103; Tr. 1463:24-1464:19.) Under one of Deloitte's proposals, the ESOP would become the 100% owner of Antioch's stock. (Morgan Tr. 2281:7-11; Holthaus Dep. 170:15-171:4, 173:9-11; PX-103 at 0005-06.)

27. Shortly after the ESOP summit, Antioch retained Deloitte

---

[1] Plaintiffs have argued that this logic is faulty and defendants' explanation for abandoning the 75/25 method of allocation is not credible because the TAM did not apply to Antioch, so there was no change in the law that warranted changing Antioch's method of allocation subchapter S distributions. The Court disagrees. It would be entirely logical and prudent to reconsider an allocation method that the IRS had specifically criticized; perhaps the IRS was reconsidering its position on the matter since Antioch received its 1999 determination letter. This Court certainly does not ignore decisions of other district courts or appellate courts outside the Seventh Circuit merely because their decisions are not binding on it. The Court does not doubt that, as numerous witnesses [*17] testified, Antioch truly feared that it might run into legal or taxation issues based on its method of allocating its subchapter S distributions after becoming aware of the TAM disapproving of a similar method.

as a professional financial advisor for exploring and, ultimately, executing the 100% ESOP Transaction. (JX-7.) Deloitte's Helen Morrison was well renowned for her ESOP expertise. [*18] (Marchetti Tr. 1113:17-1114:22, Blair Tr. 1468:15-1469:5, Morgan Tr. 2288:7-16, Matthews Tr. 2484:11-2485:14; Holthaus Dep. 173:12-174:17; vonMatthiessen Dep. 39:18-40:8, 40:21-41:2.)

28. Antioch also engaged McDermott Will & Emery ("MWE") as legal counsel to provide the Board with advice regarding the Transaction. (JX-9.) MWE and its lead counsel in the engagement, Marsha Matthews, likewise possessed substantial experience and expertise in advising corporate sponsor companies considering a transaction like the one being contemplated by Antioch. (Blair Tr. 1471:19-1472:2, Matthews Tr. 2462:20-2464:8; vonMatthiessen Dep. 40:9-20.)

29. Deloitte created the outline for the general structure of the Transaction. It presented several prospective advantages to going forward with the Transaction, including: (i) eliminating corporate income tax and therefore providing increased cash flow to the Company; (ii) providing Antioch with greater flexibility to allocate ESOP contributions; (iii) providing the opportunity to avoid making distributions to the ESOP based entirely on account balance and instead make performance-based contributions to the ESOP; (iv) providing the non-ESOP shareholders with [*19] fair value for their shares; and (v) increasing ESOP value in the long term. (DX-62 at MM0039696.)

30. The Transaction also addressed several Antioch business objectives, such as: (i) helping ensure the long-term stability and security of the Company; (ii) maintaining broad-based employee ownership; (iii) providing maximum flexibility for performance-based benefit allocation; and (iv) maintaining governance control for the Morgan family, including a smooth leadership transition from Lee Morgan to Asha Moran. (Id. at MM0039695.)

31. Maintaining governance control was not merely an objective for Mr. Morgan and Ms. Moran, it was a desire that was widespread among Antioch's employees, who viewed Mr. Morgan as a "patriarch" who ran the Company in the employees' best interests. (Lipson-Wilson Dec. 5, 2011 Dep. 85:12-88:4.) (See also Bevelhymer Dep. 193:13-194:6.) Mr. Morgan and Ms. Moran had guided the Company's robust success over the past decade and the Company wanted to ensure that the Transaction did not threaten their leadership's continuity by making it susceptible to any sort of takeover. (Holthaus Dep. 175:7-176:17; Hoskins Sep. 15, 2011 Dep. 146:16-147:7; Lipson-Wilson Dec. 5, 2011 [*20] Dep. 86:9-22.)

32. As structured by Deloitte, the Company—not the ESOP—

would purchase the shares sold in the Transaction. (DX-39 at DT2404.) Helen Morrison recalled two reasons that this route was chosen. First, the Antioch ESOP had never been leveraged, and the Company had no desire for it to take on debt and become leveraged as a result of the Transaction. Second, structuring the Transaction with a leveraged ESOP would have had a significant dilutive effect on the existing shares, which was also contrary to management's aim. (*Id.*; Morrison Dep. 58:11-63:19.)

33. Defendant's expert Greg Brown opined on the structure of the Transaction based upon his experience in advising various constituencies in dozens of ESOP transactions over the course of his career. (DX-776 at 10; Tr. 4982:18-4985:11.) He testified that this type of transaction, in which a company's ESOP comes to own 100% of its sponsor company in order to enjoy tax benefits, is not uncommon or unusual. (DX-776 at 10; Tr. 5001:9-5003:13.) Mr. Brown further testified that a 100% ESOP transaction may be structured so that either the company or the ESOP purchases all of the non-ESOP shares of stock; both alternatives are common, [*21] in his experience. (DX-776 at 10; Tr. 4980:20-4982:17.)

34. Mr. Brown observed that because, in Antioch's case, the proposed transaction involved the issuance of warrants, it was necessary to have the sponsor company buy the non-ESOP shares because only the company, not the ESOP, can issue warrants. (Tr. 4986:9-4987:5.)

35. Additionally, Marsha Matthews explained during the pre-Transaction due diligence stage that another reason it might be beneficial for the sponsor company, rather than the ESOP, to purchase the non-ESOP shares is that, when the ESOP is not a purchaser, the transaction is not prohibited under *ERISA section 406(a)(1)*, and therefore the ESOP is not required by law to obtain a fairness opinion. (DX-745 at 78 (HL001147); Tr. 4580:22-4581:25.) Although this structure can save the sponsor company the expense of a financial advisor to the ESOP, the Antioch Board decided to retain advisors anyway, as described below.

36. Mr. Morgan and Ms. Moran, either individually or indirectly through estate planning trusts, held shares outside of the ESOP and would therefore participate in the transaction as selling shareholders. Mr. Brown testified that it is not improper or even unusual for non-ESOP shares in [*22] a private company to be held by officers and directors of the company. (DX-776 at 10; Tr. 5000:6-5001:7.) Defendants' ownership of non-ESOP shares was well known and was explicitly disclosed to ESOP participants. (JX-49 at MOR001217, 1279, 1295.)

37. Antioch's Board of Directors began considering the Transaction shortly after the ESOP Summit. The nine-member Board at Antioch consisted of a number of highly qualified individuals, including two employee-owners with full voting rights, two management employees (Mr. Morgan and Ms. Moran), and five outside directors—Ben Carlson, Alan Luce, Jeanine McLaughlin, Denis Sanan, and Malte von Matthiessen. Mr. Carlson brought to Antioch specialized experience and skills in human resources management. (Luce Dep. 26:6-28:3; Sanan Dep. 29:11-21.) Mr. Luce had vast direct-selling experience, having been a high-level executive at direct selling companies and a board member for the Direct Selling Association, and he was held in high regard in direct selling communities as both a practitioner and as an attorney. (Luce 13:12-17:8, 19:18-24; Sanan Dep. 31:14-20.) Ms. McLaughlin's background in manufacturing, logistics and industrial operations directly related [*23] to CM's production activities. (Luce Dep. 26:6-27:19; Sanan Dep. 29:22-30:5.) Mr. Sanan formerly worked as a senior executive in the direct-selling industry, and also served on the board of the Direct Selling Association. (Luce Dep. 26:6:21; Sanan Dep. 18:20-20:12.) And Mr. von Matthiessen had particular experience with ESOP issues, being the CEO for an ESOP company, and having served on the board of directors for the National Center for Employee Ownership. (Luce Dep. 26:6-25; Sanan Dep. 29:5-9; von Matthiessen Dep. 6:21-8:7, 25:9-26:8.)

38. At the January 30, 2003 Board meeting, Lee Morgan reported to the Board that members of management met with various advisors to discuss issues with S-corporation distributions, and that the meeting produced the idea of transitioning to a 100% ESOP-owned company. (DX-41 at ASP000160.) The Board instructed management to continue studying the proposal. (*Id.*; Sanan Dep. 42:19-25.)

39. At the July 17, 2003 Board meeting, management introduced the Board to representatives from Deloitte and MWE. (JX-13 at ASP000185.) The Deloitte presentation gave detailed information about the Sub-S distributions issue, the Transaction terms, and the effect that the Transaction [*24] would have on the Company's stock price as compared to the status quo. (JX-12.) It also highlighted the tax savings of nearly $140 million that the Transaction was expected to bring to the Company over a ten-year period. (*Id.* at TAC-CC-0239675.) The presentation also contained a sensitivity analysis, testing the Transaction's effect on the Company's various constituencies in the event that the Company's projected, continued growth failed to materialize. (*Id.* at TAC-CC-0239694-98.) GreatBanc subsequently received this presentation, which included the sensitivity testing slides. (DX-773; Moran Tr. 3150:8-3151:25.)

40. The Board engaged in considerable discussion regarding the various alternatives to the 100% ESOP Transaction that

the Company could choose to pursue, such as conversion to a sub-chapter C corporation, compliance with the IRS allocation method (which would not have allowed the Company's 75% compensation/25% account balance distributions), or going public through an IPO. (JX-12 at TAC-CC-0239666; Luce Dep. 74:2-75:24; JX-42 at MOR0015303.)

41. Also at this meeting, Marsha Matthews of MWE recommended that the Company retain an independent trustee for purposes of evaluating the [*25] proposed transaction on the ESOP's behalf. (JX-12 at TAC-CC-0239686; Sanan Dep. 86:22-87:16.) As she explained at trial, the retention of GreatBanc was specifically intended to *remove* defendants and Barry Hoskins, the directed ESOP trustee (who was also Antioch's CFO), from the transaction process so that their potential conflicts of interest as selling shareholders could not influence or interfere with an independent trustee's decision of whether or not to tender the Plan's shares. (Blair Tr. 1489:19-1490:19, 1534:24-1535:17, Matthews Tr. 2473:16-2474:13.) Board members and management agreed (Luce Dep. 47:1-24; Blair Tr. 1489:19-1490:6), and, after considering potential trustees, the Company engaged GreatBanc on August 4, 2003. (JX-14; Hoskins Feb. 15, 2010 Dep. 37:18-38:9.) Antioch's Board, not the EAC, possessed the power to appoint and remove GreatBanc. (Blair Tr. 1916:20-22; Moran Tr. 2724:1-4.)

42. GreatBanc engaged Duff & Phelps ("Duff"), as an independent financial advisor to the ESOP Trustee for the purposes of the Transaction. (JX-26; Marchetti Tr. 1097:16-24, 1111:19-1112:1.) Duff was to determine, among other things, whether the Transaction was fair to the ESOP from a financial [*26] point of view. (*Id.*) GreatBanc also engaged Jenkens & Gilchrist ("J&G") as its legal counsel. (DX-94; Tr. 1112:2-15.)

43. Antioch hired Houlihan Lokey Howard & Zukin ("Houlihan" or "Houlihan Lokey") as a financial advisor to determine whether the consideration to be paid for the non-ESOP shares was fair to the non-ESOP shareholders from a financial point of view. (DX-87.)

## 2. Antioch's Board Amended the Plan to Give GreatBanc Authority To Decide How To Vote ESOP Shares With Respect to the Transaction

44. At the time that the Transaction was under consideration, the Plan as Amended and Restated as of January 1, 2002 was the document that governed operation of Antioch's ESOP. (JX-3.) As stated above, defendants were the members of Antioch's EAC which, pursuant to the Plan, was charged with administering the ESOP. (*Id.* § 18 at MOR000225.)

Subsection (b) of Section 5 conferred upon the EAC the power to, subject to Board approval, direct the ESOP's trustee to sell shares of Company stock to any person, including the Company. (*Id.*; Tr. 3091:12-22.)

45. In connection with its engagement of GreatBanc, the Board unanimously approved Amendment No. 1 to the Plan, effective October 1, 2003, which added subsection (f) to Section 5. (JX-39; JX-40.) [*27] That subsection states as follows:

> 2003 Tender Offer — Notwithstanding the provisions of Section 5(a) and (b), the decision whether or not to tender shares of Company Stock to the Company in December 2003 shall be effected by the Trustee (without directions from the Committee) based on the Trustee's determination (in the exercise of its reasonable judgment) that such decision is in the best interests of the Plan and the Participants and is in compliance with all applicable requirements of the Code and ERISA.

(*Id.*)

46. Antioch's Employee Stock Ownership Trust Agreement similarly contained a section B governing the trustee's investment of trust assets. The Trust Agreement was amended and restated as of August 20, 2003 to include subparagraph (6) of section B. (JX-18.) This subparagraph contains language essentially identical to the language in Section 5(f) of the Plan. (*Id.*)[2]

47. The amendments [*28] to the Plan and the Trust Agreement allocated to GreatBanc the decision whether to tender the ESOP's shares to the Company as part of the Transaction, in accordance with MWE's advice to the Board.

## 3. The Company and Its Advisors Engage in Due Diligence

48. The Board's next meeting occurred on August 21, 2003. At that meeting, the additional advisors retained by the Company introduced themselves to the Board and explained their roles in the transaction. (JX-21 at ASP000188.) It is undisputed that the various advisors were widely considered to be among the best in the ESOP field. (*E.g.*, Luce 52:20-54:13; Morrison Dep. 75:10-76:15, 78:2-79:14.) Marilyn

---

[2] Both of these amendments were made retroactively, which the Plan specifically contemplated and allowed in the Plan itself. (JX-3 at section 21 ("The Company specifically reserves the right to amend the Plan and the Trust Agreement retroactively in order to satisfy any applicable requirements of the Code and ERISA."); Moran Tr. 3099:16-3101:9.)

Marchetti testified that she considered the Antioch Board to have assembled "the A team on all sides of the transaction." (Tr. 1114:18-22.)

49. Also at that meeting, it was announced that Nancy Blair had resigned her position as a Board member to become Antioch's Director of Corporate Strategy. (JX-21 at ASP000186.) In this position, she served as the Company's lead for the Transaction. (Marchetti Tr. 1173:24-1174:5; Luce 65:13-66:8.) Board member Denis Sanan testified that Ms. Blair was assigned the task of overseeing the Transaction and **[*29]** making sure that "every loose end was considered and tied." (Sanan Dep. 91:11-92:12.) Board members were confident in Ms. Blair's ability to manage the assignment efficiently and seriously. (*Id.* 93:8-94:2; von Matthiessen Dep. 122:3-123:9.)

50. Ms. Blair oversaw the due diligence process, along with Barry Hoskins, and provided the advisors with everything that they requested, which was a vast amount of material and information. (Blair Tr. 1515:2-1516:25, 1517-1535:17; Morgan Tr. 2296:16-23, 2301:6-2302:14; Moran Tr. 3176:15-21; Bloom Tr. 4269:16-4270:1; Treemarcki Tr. 4684:4-12.) Ms. Blair testified that she relied on the advisors to tell her what they needed during due diligence, and relied on their experience and expertise. (Tr. 1517:1-1518:2.) Board member Alan Luce testified that Board members were not themselves tasked with the job of providing information to advisors as that would be inconsistent with ordinary and customary corporate governance procedures. (Luce Dep. 95:25-96:24.) Instead, the task was delegated to certain members of Company management. (*Id.*)

## 4. The Company Provides Financial Projections to the Advisors

51. As part of due diligence, Antioch provided financial forecasts **[*30]** to the advisors. Antioch prepared five-year financial forecasts in the ordinary course of business. (Blair Tr. 1535:18-1536:5.) In part because the term of the Transaction was ten years (*i.e.*, that was the waiting period before all the warrants could be exercised, and if that happened, the Company would no longer be 100% ESOP-owned), the Company also developed ten-year projections to be used for analyzing the Transaction (Tr. 1536:10-1537:11.)

52. In the five years prior to the Transaction, the Company demonstrated an ability to reasonably and accurately forecast its financial performance, both one and two years ahead, coming out sometimes above and sometimes below forecast. (DX-668 at ¶¶ 98-99; Risius Tr. 5752:4-5763:18) The Company demonstrated a similar ability to reasonably and accurately forecast its EBITDA. (DX-668 at ¶ 98; Tr.

5755:21-5757:25, 5760:13-5761:5.)

53. Preparation of the ten-year projections was principally a joint effort between Nancy Blair and Antioch's finance team, including CFO Barry Hoskins and corporate manager Kim Lipson-Wilson. The starting point for these projections were the forecasts put together by Antioch's individual business units in the normal course **[*31]** of their business planning, and which took into account all the strengths, weaknesses, opportunities and threats facing those business units.[3] (Blair Tr. 1537:24-1542:24, 1731:10-21; 1959:18-1960:10; Moran Tr. 3042:23-3046:23.)

54. CM's projections were informed by an intensive strategic planning effort in the summer of 2003. (DX-61; DX-71; DX-81; PX-160; Blair Tr. 1432:7-1434:1, 1440:22-1448:7, 1456:3-1460:15; Moran Tr. 2761:23-2763:23, 3124:3-3131:2.) CM's strategy sessions included meetings held over multiple days, detailed presentations from various members of management on such topics as the scrapbook, digital photography and technology, and direct sales industries, and extended discussions focused on articulating and evaluating CM's internal and external opportunities and threats, as well as the strategic direction and key areas of focus for 2003-2008. (*Id.*)

55. In taking the individual business unit projections and developing and extending the projections over the ten-year Transaction period, Ms. Blair testified that the Antioch team, in **[*32]** an attempt to be conservative in light of the future risks the Company was facing, such as the impact of increased competition, the potential for a plateau, the uncertainty of international expansion, and emerging digital technology and photography, intentionally ratcheted down the revenue and operating margin projections. (Tr. 1537:24-1542:24, 1731:10-21, 1959:18-1960:10.) (*See* Moran Tr. 3042:23-3046:23.) Although Company management was aware of and discussed the potential for a sales plateau due to market saturation, management and the Board did not believe that the Company had reached that point yet, and would continue to experience a reasonable rate of growth and profit performance, as reflected in the Company's dynamic growth in recent years and Antioch's financial forecasting. (Blair Tr. 1441:1-1442:18; Sanan Dep. 158:1-159:15; von Matthiessen Dep. 57:17-60:9.)

56. In the ten-year projections, the Company assumed revenue growth rates of between 11% and 13% for the first 7 years following the Transaction, eventually slowing to a 6% annual

---

[3] Those individual business units included Our Own Image, ZeBlooms, Antioch Publishing, Creative Memories US, and Creative Memories International.

rate. (PX-309 at 0011-12.) These assumptions were conservative when compared to the growth rates that the Company had experienced in the years [*33] preceding the Transaction, including a 26% revenue growth rate in 2002, a 16% increase in 2001, a 20% increase in 2000, and a 22% increase in 1999. (JX-64 at P-Woosley-000067.)

57. The Board of Directors also considered the revenue projections used in analyzing the Transaction to be conservative, and intentionally wanted to use conservative projections in assessing whether the Company would be able to service its debt in the future. (Luce Dep. 121:1:122:17, 123:6-124:5.) A presentation to the Board at the October 30, 2003 Board meeting showed that in analyzing the Transaction, management used a 10.4% CAGR projection for sales over the next ten years even though the previous five years yielded a 17.4% sales CAGR. (JX-38 at D&P_A006619.) Similarly, management assumed a 6.6% EBIT CAGR over the next ten years, which paled in comparison to the 23.0% EBIT CAGR that the Company experienced from 1999-2003. (*Id.*)

58. Ms. Blair sent to all the Transaction advisors a first draft of the ten-year projections dated August 26, 2003, a slightly revised version on September 4, 2003, and another slightly revised version on October 2. (DX-141; PX-213; PX-250.) The base-case ten-year projections sent on [*34] October 2 did not change again prior to the closing of the Transaction,[4] although, as the Court will discuss further below, Duff did receive a brief telephone update concerning reduced sales expectations for the end of 2003 and 2004 from Hoskins on December 10, 2003 (PX-154:7).

59. Based on their own independent due diligence, research and expert analysis, Duff and its lead on the engagement, Lee Bloom, concluded that management's ten-year Transaction

projections were "reasonable and reliable." (Tr. 4309:3-4311:24.)

60. Kreg Jackson and Terry Treemarcki, two of the Houlihan analysts who worked on the Transaction, testified at trial that Houlihan likewise concluded based on their own independent due diligence, research, and analysis, that management's ten-year Transaction projections were reasonable. (Tr. 4545:16-21, 4709:3-14.)

61. In addition, Deloitte's team never had any concern about the reasonableness of the Company's projections, or of using those projections in the models it developed to test the feasibility of the Transaction, in part due to a comparison of the projections to the Company's recent historical results. (Abrahamson Tr. 1365:7-1369:6; Holthaus Dep. 184:1-14.)

62. The syndicate of lenders in the Transaction that together committed $170 million dollars to the Company also concluded management's ten-year Transaction projections [*36] were reasonable. (DX-181 at FTB0002859; PX-254 at -0007; Blair Tr. 1549:3-14; Hoskins Sep. 15, 2011 Dep. 158:2-11; Parker Dep. 36:18-38:15; Powe Dep. 27:19-30:16, 181:20-184:1.) Those lenders, which included Bank One, National City Bank, Fifth Third Bank, LaSalle Bank, Wachovia Bank, PNC Bank, and Keybank, each conducted their own credit analysis. (Hoskins Dep. 15, 2011 Dep. 166:10-23; Powe Dep. 164:19-165:5; Parker Dep. 18:13-23, 23:8-12; Jennett Dep. 23:10-18.) For example, as the lead bank in the syndicate, Bank One assessed the potential risks to Antioch's business—including digital photography and technology, competition, an unknown product cycle, and the repurchase obligation—noted the mitigating factors for each of these risks, and ultimately concluded that management's projections were "conservative." (DX-132 at JPMC0001-02, 04, 11, 13-14; Powe Dep. 181:20-184:1.)

## 5. The Company's Various Constituencies Enter Into Negotiations

63. The Transaction was heavily negotiated because, even though it was a closing condition that the ESOP not tender shares, GreatBanc believed that the proposed transaction as structured by Deloitte would unfairly dilute the ESOP post-Transaction. (DX-169; [*37] DX-187; DX-188; DX-190; DX-196; DX-206; DX-209; Marchetti Tr. 1147:8-18, 1159:15-1180:24, 1194:14-1195:7, 1227:19-1228:10.)

64. At the October 16, 2003 Board meeting, Ms. Blair provided the Board a detailed update on the status of negotiations. (JX-34; JX-35 at GBT00098.) Her presentation informed the Board about the negotiating positions taken by GreatBanc, and the key points of contention before a deal

---

[4] Although Plaintiffs did introduce into evidence a five-year plan that was purportedly approved at the December 4 Board meeting (PX-391; PX-391A) and that included lower projections for future sales than those that were sent to the transaction advisors, there was some uncertainty at trial as to whether that five-year plan was actually approved at the December 4 meeting or the next Board meeting in January 2004. The projections in PX-391A are dated January 18, 2004, about a month after the Transaction closed. (PX-391A at -0034), and Nancy Blair and Asha Moran testified that they did not recall seeing PX-391A at the December 4, 2003 Board meeting; rather, they recalled a PowerPoint summary of those projections. (JX-59; JX-65; Tr. 1785:11-21, 1836:11-1838:15, 2733:3-12.) In any case, the Court will assume, *arguendo*, that the five-year-plan was presented in substance to the Board on December 4, 2003, prior to the transaction, [*35] and that the Board had notice of a slight reduction in projections since the due diligence process earlier in the fall.

65. GreatBanc and Duff felt that the Package of cash, notes and warrants diluted the ESOP's share value. (DX-190; JX-34 at DT1369; Marchetti Tr. 1167:24-1168:21.) They valued the warrants, *i.e.*, the Company's future prospects, higher than the value proposed at the time, and therefore demanded that the number of warrants available to selling shareholders be fewer than contemplated in Deloitte's transaction model. Lowering the number of warrants would allow the ESOP to have a bigger stake in the Company going forward once the warrants were eventually exercised. (Marchetti Tr. 1027:12-1028:1, 1167:24-1168:21; Blair Tr. 1578:19-1581:12.) Management opposed a more restrictive cap on warrants in part because many non-ESOP shareholders **[*38]** intended to exchange shares for the Package rather than tendering for cash (a scenario where less cash would be needed to fund the Transaction). (Tr. 1580:23-1581:12; Morgan Tr. 2283:13-2286:11; Hoskins Sep. 15, 2011 Dep. 142:3-12, 148:7-13; Lipson-Wilson Dec. 5, 2011 Dep. 88:21-89:8.) The Morgan family intended to remain invested in the future of the Company and exchange as many of its shares for the Package as possible. (*Id.*)

66. Board members testified that this lack of agreement evidenced arm's length negotiation by GreatBanc on behalf of the ESOP. (Sanan Dep. 121:24-122:4; vonMatthiessen Dep. 42:14-44:5.) They further testified that, based on the presentation regarding the parties' negotiating positions, they felt that they were fully informed and understood the positions that GreatBanc was taking on behalf of the ESOP. (Luce Dep. 109:1-110:25; Sanan Dep. 124:9-15, 126:3-8, 128:20-130:9.) And Board members testified that, based on GreatBanc's negotiating, they were satisfied that GreatBanc was doing its job of appropriately representing the ESOP's best interests. (Sanan Dep. 125:17-126:2, 126:9-127:8; vonMatthiessen Dep. 42:14-45:8.)

67. After the October 16 meeting, negotiations **[*39]** turned to the addition of put price protection terms that GreatBanc and Duff deemed necessary to protect ESOP participants who might leave in the immediate aftermath of the transaction, before they had a chance to realize the economic benefits of the transaction from the tax savings. (Blair Tr. 1592:18-1593:22; JX-37 at D&P_A002728-002734.) A put price protection is a commonly used measure in ESOP transactions to help mitigate the dilution of post-transaction stock value that commonly follows this type of deal, and to assure that employees leaving shortly after a transaction realize the economic benefits of it. (Brown Tr. 4995:17-4997:10.) In the Antioch Transaction, GreatBanc and Duff insisted on the inclusion of put price protection because they independently concluded that the value of the shares in plan participant

accounts who left the Company in the first few years following the Transaction would not reflect the tax benefits that the Transaction provided. (JX-37 at D&P_A002728-002734; Marchetti Tr. 1029:10-25, 1193:4-16; Blair Tr. 1592:23-1593:22; Bloom Tr. 4380:22-4381:2.)

68. Ultimately, the put price protection included a floor price of $850 for employees who departed the Company **[*40]** before October 1, 2004, a $21.00 increase over fair market value for employees departing between October 1, 2004 and September 30, 2005, and a $12.80 increase over fair market value for employees departing between October 1, 2005 and September 30, 2006. (JX-38 at D&P_A006645.)

**6. The Parties Agree to the Transaction's Terms**

69. The parties continued to negotiate over the value of the warrants, the post-Transaction PPP terms, and other terms extrinsic to the tender offer, and after several back-and-forth proposals, they reached an agreement. (DX-222; DX-225; DX-226; DX-230; DX-241; DX-768; Marchetti Tr. 1186:10-1190:15, 1191:7-1195:15.) The Board convened on October 30, 2003 to vote on the Transaction. (JX-40.) Again, all of the Transaction advisors to each constituency, including GreatBanc, attended the meeting so that the Board could scrutinize the Transaction with advisors present to respond to any questions. (*Id.*; Tr. 1198:16-1200:25.) Representatives from GreatBanc, Houlihan, and MWE all presented on the Transaction and informed directors at the meeting of the conclusions that they reached. (*Id.*)

70. Board members questioned the advisors and debated the pros and cons of the Transaction. **[*41]** (Luce Dep. 62:19-63:9.) The assumptions and analysis that went into the projection of the Company's future tax savings of $130 million received particular scrutiny. (*Id.* at 128:14-129:5.)

71. Barry Hoskins presented on the financing that was obtained to fund the Transaction. (JX-40.) Board members gained further comfort with the prudence of sanctioning the Transaction as a result of the banks' willingness to lend the Company such substantial sums. (Hoskins Sep. 15, 2011 Dep. 161:17-162:6; Sanan Dep. 147:19-149:14.) As stated by Denis Sanan, "That said to me immediately, we have another outside bunch looking at the process and saying, this deal is good. We're going to lend our money and we're going to get it back." (*Id.* at 148:18-149:14.) Additionally, Houlihan reported to the Antioch Board that, in Houlihan's opinion, the Transaction was fair to the non-ESOP shareholders and the Transaction share price of $850 was within the range of fair market value for Antioch stock, which was between $825 and $920 per share. (JX-40 at GBT00103; Jackson Tr. 4541:16-4542:2.)

72. A few days prior to the October 30 Board meeting, Duff had provided GreatBanc with a preliminary opinion that the 2003 Transaction, [*42] as negotiated, was fair to the ESOP from a financial point of view. Duff concluded that: (i) the $850 per-share price was within the fair market per share value range of $774 to $932 for Antioch stock; (ii) the consideration to be paid by the Company for shares of the Company's common stock held by stockholders other than the ESOP in the Transaction was fair and reasonable to the ESOP from a financial point of view; and that, (iii) the terms and conditions of the Proposed Transaction were fair and reasonable to the ESOP from a financial point of view. (JX-37 at D&P_A002735.)) Based upon these findings, GreatBanc informed the Board that it had preliminarily approved the Transaction on behalf of the Antioch ESOP and that the Antioch ESOP would likely decline to participate in the tender offer. (JX-240 at GBT00103.)

73. After these presentations from advisors and discussion among the Board members, Antioch's Board preliminarily voted without dissent to go forward with the Transaction. The material terms, as described to the Board, were as follows:

    a. The Company would make a tender offer to all shareholders to redeem their shares for $850.00 per share.

    b. Selling shareholders would have [*43] the option to receive $850 in cash or a Package consisting of $280 in cash, a $280 subordinated note and a warrant valued at $290.

    c. The maximum number of warrants, and consequently the maximum number of shares that could be exchanged for the Package, was 155,000.

    d. The ESOP Trustee GreatBanc would decline to tender any shares of common stock owned by the Antioch ESOP if it ultimately determined that the transaction was fair to the Antioch ESOP from a financial point of view.

    e. Following the tender offer, the Company would go through a cash-out merger, ensuring that the Antioch ESOP owned 100% of all outstanding shares of common stock. Employee owners would direct the ESOP Trustee GreatBanc on the cash-out merger vote.

    f. Antioch would pay a one-time $8 million contribution to the ESOP prior to December 31, 2003, and an annual $2.5 million dividend to the Antioch ESOP from 2004 through 2008.

    g. During a three-year period from 2004 through 2006, any departing Antioch ESOP participants would receive the negotiated price directly tied to fair market value in exchange for the Antioch stock in their Antioch ESOP accounts. If they terminated between December 31, 2002 and September 30, 2004, [*44] they would receive the

greater of fair market value or $840.26 per share ($850 less a pro rata share of the dividend received by the ESOP). If they terminated between October 1, 2004 and September 30, 2005, they would receive fair market value plus $21.80 per share. If they terminated between October 1, 2005 and September 30, 2006, they would receive fair market value plus $12.80 per share (the "Put Price Protection" or "PPP").

    h. Antioch would also make a 21% of compensation contribution to the Antioch ESOP in 2004.

(JX-28, at D&P_A006596, 006599-601, 608.)

74. In a further exercise of caution, Board members requested at the October 30 Board meeting that management run a sensitivity analysis to help the Board determine the Company's position in the event of a downside scenario and an upside scenario. (Blair Tr. 1563:6-25; Moran Tr. 2812:7-14; Luce Dep. 136:5-138:22; Sanan Dep. 186:14-188:2; vonMatthiessen Dep. 177:10-179:7, 185:1-11.)

75. Nancy Blair also communicated to Lee Bloom around the time of the October 30 Board meeting that the Company was running sensitivity analyses. (Blair Tr. 1559:8-1561:23.) Mr. Bloom testified that it was his expectation the Company was running its own [*45] sensitivity testing in connection with the Transaction, but he did not expect to receive that sensitive testing and did not ask for it because Duff was running its own independent sensitivity testing. (Tr. 4321:12-4323:8, 4324:10-4325:25.)

76. Mr. Bloom testified that it was not common practice and would be "very unusual" for a sponsor company or its financial advisor to provide scenario analyses to the independent trustee or its fairness advisor, and that he could not recall a single transaction where he worked as the financial advisor to an independent ESOP trustee and received sensitivity analyses run by the sponsor company or its financial advisor. (Id.)

77. Kreg Jackson of Houlihan confirmed that he would not expect to see a company's sensitivity testing in a fairness opinion engagement. (Tr. 4551:8-10.)

## 7. Antioch's Board Gives Final Approval to the Transaction

78. The Board met on December 4, 2003 to give final approval to the Transaction, unanimously voting in favor of it. (JX-59.) At the meeting, CFO Barry Hoskins presented the finalized financing structure for the Transaction, which included a $170 million credit facility. The Board unanimously approved all resolutions necessary [*46] for financing. (Id.)

79. Mr. Hoskins presented a revised repurchase obligation study at this meeting. When a participant leaves an ESOP sponsored by a privately-held company, the sponsor company is obligated to repurchase the ESOP participant's shares under a fair valuation formula pursuant to *IRC § 409(h)(1)(B)*. This repurchase obligation is legally required and set forth in the plan document for each ESOP. (Hoskins Dep. Feb. 15, 2010, 19:21-20:6.) Shares repurchased from former participants can be either redeemed by the sponsor or kept in circulation by recycling the shares back into the ESOP. (Hoskins Dep. 9/15/2011, 22:25-23:19.)

80. Hoskins was responsible for forecasting and monitoring TAC's repurchase obligation. He used specialized "PERLS" software to prepare repurchase studies that projected 20 years out, based upon relevant historical data and assumptions for the future, in order to estimate the financial obligation that would be created in the future as a result of ESOP participants departing and putting their shares to the Company. (Hoskins Dep. 9/15/2011, 12:7-13:10; 13:23-14:15.)

81. The revised study that Hoskins presented at the December 4, 2003 meeting differed from an earlier estimate [*47] provided to the advisors in due diligence in that it estimated higher levels of distributions in the few years immediately following the Transaction. (*Compare* PX-197 at D&P_A010065 *with* JX-56 at PR0001074.)

82. Also at the December 4 Board meeting, Nancy Blair presented the sensitivity analysis of upside and downside scenarios for the Company's future performance that the Board had requested at the previous meeting. (JX-55; JX-59.) The sensitivity analysis showed that, even in the downside scenario, the Company was still able to meet its debt commitments and repurchase obligations, and that the stock price would be higher under the Transaction than under the status quo. (JX-55 at MOR001426, 1428-29; JX-59 at ASP000244; Blair Tr. 1622:1-4, 1622:12-1623:1.)

83. A final item of note that occurred at the December 4 meeting was the Board's Amendment No. 2 to the Plan. (JX-59 at ASP002243, 000275-77.) Before Amendment No. 2, the Plan dictated that for departing participants who had not reached the retirement age and with account balances over $50,000, payment would be distributed in a single lump sum following the allocation date of the plan year in which he or she attained age 50, or, if earlier, the allocation date of the sixth [*48] plan year following the plan year in which service was terminated. (JX-3 at § 12(a), MOR000209.) For departing participants who *had* reached the retirement age (or who suffered disability or death), the Plan allowed the EAC to either make the participant's distribution as a lump-sum payment or in substantially equal, annual installments not to

exceed five years (or a combination of those methods). (*Id.* at § 12(b), MOR000209-10; Morgan Tr. 2272:19-2273:17.)

84. Amendment No. 2 amended Section 12(a) of the Plan so that, during the time period covered by the put price protection (through October 1, 2006), distributions to departing participants under the retirement age would be made in the same manner as to retiring employees. (JX-59 at ASP000276.)

85. As a result of the Put Price Protection terms and "byzantine" S-corporation rules, Helen Morrison of Deloitte advised the Company that continuing to follow the current Plan distribution provisions posed a danger that the Company might be deemed to have two classes of stock, which would compromise the Company's S-corporation status. (DX-267; DX-271; Blair Tr. 1603:11-1605:16; Moran Tr. 2874:5-12; Morrison Dep. 81:7-82:16, 84:11-85:9, 89:2-25.) Ms. Blair testified that, [*49] after considering Ms. Morrison's advice and weighing its options, the Company decided to amend the Plan (Amendment No. 2, or "the Plan Amendment") in order to eliminate the risk of losing its S-corporation status.[5] (Tr. 1605:18-1608:25.) The Company analyzed whether doing the Transaction with the Plan Amendment was more favorable than remaining in the status quo without the Transaction and concluded that the Transaction was still "a very good deal and very fair for all the various stakeholders." (Blair Tr. 1609:2-1611:18.)

86. On or about December 9, 2003, Duff confirmed to GreatBanc that, after updated due diligence [*50] and analysis that included an interview with Antioch's CFO Barry Hoskins, it still held the opinions expressed in its October 27, 2003 preliminary fairness analysis. (JX-61.[6]) On December 16, 2003, Duff gave GreatBanc its final opinions that: (i) the consideration to be paid by the Company for shares of the Company's common stock held by stockholders other than the ESOP in the Transaction was fair and reasonable to the ESOP

---

[5] The EAC did not have the power to amend the distribution policy to departing plan participants under age 50, because prior to Amendment No. 2, the Plan did not allow any such change. Only the Board could alter the method of distributions for these non-retiree participants. (Morgan Tr. 2270:5-16.) As noted above, the EAC did, however, have the pre-existing discretion under the Plan to make payments to participants who left the Company in substantially equal, annual installments not to exceed five years, as opposed to a single lump-sum payment, which it chose to do as a cash-flow management strategy. (Morgan Tr. 2255:12-2256:10.)

[6] This memo is dated December 9, 2003, although it refers to a telephone conversation that took place on December 10, 2003. One date or the other must be incorrect, but the precise dates are immaterial, in any case.

from a financial point of view; and (ii) the terms and conditions of the Transaction were fair and reasonable to the ESOP from a financial point of view. (JX-62.)

**8. Participants Vote in Favor of the Transaction and the Transaction Closes**

87. Plan participants were entitled to vote whether to allow the merger that would serve as the final step in the Transaction. (JX-46; JX-47; JX-48; Blair Tr. 1627:22-1628:12.)

88. To allow Plan participants to make an informed voting decision, the details of the Transaction were fully described in a 200-plus page package **[*51]** of materials that included the Offer to Purchase and Proxy Statement, which was sent to all Antioch shareholders both inside and outside of the ESOP, including to all Antioch ESOP participants. (JX-45; JX-49; Blair Tr. 1631:23-1633:1.) The Company and GreatBanc also held numerous meetings and presentations to fully inform all Antioch employees about the Transaction. (*E.g.*, JX-50; JX-51; Harris Tr. 836:18-837:6.)

89. Of the ballots cast by Antioch ESOP participants directing GreatBanc on the merger portion of the Transaction, 88% of the ESOP stock owned was voted, and 90% of employees voted "for" the Transaction, including plaintiffs Bonnie Fish, Monica Lee Woosley, and Christopher Mino. (JX-64 at P-WOOSLEY-000040; DX-319; JX-52; JX-60.)

90. All outside, non-ESOP shareholders tendered their shares of common stock to the Company in response to the tender offer. (JX-64 at P-WOOSLEY-000040.)

91. GreatBanc declined to tender the shares held by the ESOP, and the Transaction closed on December 16, 2003. (Marchetti Tr. 1213:14-18; 4383:2-12.)

92. Prior to the Transaction, the Antioch ESOP beneficially owned 205,330 shares of the Company's common stock, representing approximately 42.8% of all outstanding **[*52]** shares. (JX-49 at MOR001279; JX-64 at P-WOOSLEY-000060.) The result of the Transaction, in which the Company purchased and retired all outstanding shares of stock outside the ESOP, was that the Antioch ESOP still owned the same 205,330 shares of the Company's common stock, but these shares represented 100% of all outstanding shares. (JX-64 at P-WOOSLEY-000040, 60.)

93. The Morgan family never viewed the Transaction as a means to liquidate their position in the Antioch Company—as noted above, one of the principal reasons for the Transaction was to avoid concentrating all the wealth with the largest ESOP account holders (such as Lee Morgan) instead of with the newer employees who were actually driving the Company's success, and the Morgan family took as much of the Package consideration as they could. (Morgan Tr. 2283:13-2286:11; Holthaus Dep. 164:23-166:5; Lipson-Wilson Dep. 86:23-89:8; Bevelhymer Dep. 174:5-177:4; Luce Dep. 73:6-74:1)

94. The Antioch ESOP did not borrow money, pledge assets, purchase or acquire shares, or sell any of its shares in the Transaction. (DX-776 at 9-10; Bloom Tr. 4255:10-17, 4263:4-12; Brown Tr. 4982:9-17; New Dep. 17:13-18:8.) The Antioch ESOP did not pay **[*53]** any cash to the non-ESOP shareholders or part with any assets—the Company alone paid the non-ESOP shareholders for their stock out of a combination of corporate assets and borrowed funds. (*Id.*; Tr. 4265:4-24.)

**D. The Due Diligence Process and the Information that Antioch Provided to its Advisors Prior to Approval of the Transaction**

95. As noted above, prior to the closing of the Transaction, the advisors to the interested parties engaged in extensive due diligence. Nancy Blair and Barry Hoskins were primarily responsible for compiling and distributing material responsive to the advisors' due diligence requests. (DX-88; Blair Tr. 1515:2-1516:25, 1517-1535:17; Morgan Tr. 2296:16-23, 2301:6-2302:14; Moran Tr. 3176:15-21; Bloom Tr. 4269:16-4270:1; Treemarcki Tr. 4684:4-12.) Ms. Blair responded to all the initial and supplemental due diligence requests from the advisors for both the ESOP and outside shareholders. Among other things, Ms. Blair answered emails, organized interviews, shipped out voluminous and comprehensive mailings, and provide updated financial statements. (*See, e.g.*, DX-88; DX-108; DX-111; DX-116; DX-133; DX-136; DX-138; DX-157; DX-163; DX-185; Tr. 4269:16-4270:1, 4684:4-12.) **[*54]** The Company also set up a "war room" that was accessible at any time to all the advisors and the outside lenders, which consisted of additional information and materials such as contracts, legal documents, stock records, and especially sensitive information. (DX-136; Tr. 1518:20-1519:12.)

96. GreatBanc and its advisors, along with Houlihan Lokey, received and carefully examined Company financials, projections, and strategy analyses; made on-site visits to Company facilities, which included meetings with members of financial and non-financial management; held telephonic meetings with members of management and management's legal and financial advisors; and had extensive email communications with management and management's legal

and financial advisors. (*See, e.g.*, DX-109; DX-110; DX-112; DX-117; DX-121; DX-136; DX-140; DX-141; DX-154; DX-167; DX-168; DX-169; DX-190; DX-240; DX-277 at HL000563; DX-326; JX-17; JX-37 at D&P_A002707; JX-61 at D&P_A005458-005459; PX-154; PX-171; PX-174; Tr. 1123:8-1124:17, 1515:2-1535:21, 4267:18-4285:16, 4548:24-4550:1, 4566:23-4568:1, 4593:19-4594:24, 4684:4-12, 4689:4-14.)

97. Lee Bloom testified that Duff never received any pushback from the Company or **[*55]** failed to obtain any information that it had requested, financial or otherwise, and found Company management and employees trustworthy and forthcoming. (Tr. 4270:2-4273:19.) According to Lee Bloom, Duff had "access to all the information we requested and might have reasonably requested." (Tr. 4284:25-4285:16.) Nancy Blair also confirmed that she provided all information that was requested by Duff and the other advisors, that she would have readily provided any additional information that had been requested, and that no one from Company management in any way hid any information from the advisors or influenced any employees to hide information from the advisors. (Tr. 1518:9-1520:6, 1534:6-1535:17, 1548:1-1549:19, 1551:3-7, 1560:22-1561:15.)

**1. The Risks and Threats Facing Antioch at the Time of the Transaction**

98. At the time that the Transaction reached the due diligence stage, the Company was aware of the following risks and threats to the business.

a. *The Growing Repurchase Obligation*

99. Along with CM's explosive sales growth in the years prior to the Transaction came a similar rise in share price and number of employees participating in the ESOP. (JX-49:37; PX-68:4, 20; JX-56:4.) As **[*56]** the share price and number of employees grew, the repurchase obligation grew with it.

100. As early as 1999, Morgan recognized in that year's Annual Report that Antioch's repurchase obligation had become "a huge liability not shown on our balance sheet." (DX-8:D&P A011942.)

101. In a 2000 presentation that Morgan, who considered himself an "advocate" for ESOPs (Tr. 1985:23), prepared in order to present Antioch as a "case study in corporate change" (PX-68:3), he referred to RO as one of the elements of the "dark side" of the ESOP because, even as an ESOP company prospers and its stock appreciates, the "reality" remains that the company "[has] to repurchase that stock at some point." (Morgan Tr. 1988:21-1992:22; PX-68:33.)

102. In the 2001 Annual Report, Morgan stated that: "The biggest cloud over our organization, in my opinion, is our obligation to repurchase our stock from both ESOP participants as they retire and from other stockholders . . . The potential impact on our cash position is huge." (Morgan Tr. 1992:23-1994:18; JX-2:05)

103. By 2002, 38 ESOP participants had balances over $1 million and an additional 28 had balances over $500,000. (PX-382:08.) Ten percent of the participants **[*57]** held 80 percent of the ESOP value. (Marchetti Tr. 1054:9-23; JX-37:5; Blair Tr. 1679:21-1680:2.)

104. In considering the Transaction, Morgan, Moran and others worried about "the cash flow implications of 'big' retirements . . . ." (Morgan Tr. 1996:8-1998:18, 2003:5-13; Blair Tr. 1861:4-21; PX-128:2.). They knew that some ESOP participants were members of the "working poor" who were "sitting on 7 figure retirement accounts and would like to improve their life style sooner rather than later" by abruptly terminating their employment or retiring early in order to access their ESOP retirement accounts. (PX-336:2.)

105. Blair, Morgan and others at Antioch knew there was a possibility that a substantial amount of participants might leave at once, causing a "run on the bank." (Blair Tr. 1861:4-1862:20; Treemarcki Tr. 4695:15-4698:16; PX-291:1; PX-328:1.)

b. *Indications of Consultant Dissatisfaction*

106. In order to take the "pulse of the field," Rhonda Anderson spent 18 months during 2002 through the summer of 2003 in an RV traveling across the country listening to concerns from the consultant leadership. She conducted 160 meetings, which allowed her to directly converse with approximately 80% **[*58]** of the consultant leadership. (Anderson Tr. 175:1-176:4; 225:21-226:4.)

107. During her trip, Anderson communicated by phone and in writing directly with the senior CM corporate leadership about the "climate" in the field on at least a weekly basis. (Anderson Tr. 243:4-245:19, 247:10-248:10.) She also consistently reported to Morgan, Moran, and others that the consultant leaders were alarmed about their future and the future of CM. The consultants were frustrated with shortcomings in the CM product line and new product introductions, increased competition, the impact of digital photography, and the CM compensation plan. (Anderson Tr. 176:5-177:19; 245:9-247:9; 248:11-22; Harris Tr. 743:17-744:4, 760:14-761:19.)

108. At the CM Forward Conference, a 2003 strategic planning meeting led by Asha Moran, "[c]onsultant

profitability, simplicity and productivity" was identified by senior leadership as a "must discuss" issue. (PX-149:1.)

c. *The Rise of Digital Photography*

109. The market that supported CM's robust growth in the sale of traditional scrapbooks for display of 4" x 6" prints in the 1990s began a momentous shift as the digital camera became accepted. This had a disruptive effect upon the photographic [*59] industry because, rather than developing a roll of film, people suddenly had a memory card of photos from their digital cameras that could be used in any number of ways. (Mizen Tr. 385:9-25.)

110. Since the bulk of CM's business involved the printing of 4" x 6" prints for display on blank scrapbook pages and the making of double prints for family and friends, the digital camera provided a less costly alternative that could limit the use of traditional scrapbooks and the need for multiple prints. (Mizen Tr. 385:21-386:11.) Digital technology also provided the advantage that consumers could see the images they took and send the desired images to on-line companies for printing, storing and sharing. (Mizen Tr. 427:6-429:2.)

111. Dr. Mark Mizen was the Director of Technology for CM from 1998 through the time of bankruptcy in 2008. (Mizen Tr. 352:6-9; 367:17-21; PX-57.) Through attending industry meetings and staying current with industry news reports, Mizen became aware of the advancements in digital technology that were disruptive to the photographic industry. (Mizen Tr. 360:9-361:16; 397:15-398:20.)

112. By 2000, Mizen recognized that digital technology was a threat to CM's traditional scrapbooking [*60] business and told TAC senior management, including Morgan. (Mizen Tr. 385:9-20, 397:1-399:1, 459:21-460:6, 483:15-484:15.) Over the ensuing years, he attempted to keep senior management updated on developments in the field. (Mizen Tr. 360:25-361:16, 376:11-21, 411:21-413:6; PX-25.)

113. By 2001, Luce advised Morgan that incorporating digital imaging capability into CM's program of products and services was a "strategic given" (Morgan Tr. 2132:13-2134:15; PX-54:1), and CM should include a digital product in its line "as soon as a viable product was available." (Luce Dep., 211:6-214:21; PX-51.) Luce believed CM would have three distinct advantages over its competition if it brought a digital product to the market quickly: (1) create the impression CM listens to its newer, younger consultants; (2) create a new excitement about the future of CM; and (3) expand the product line beyond the thinking of more conservative consultants. (Luce Dep., 213:15-214:15; PX-51 (Dep. ex. 582).)

114. Morgan agreed that digital imaging had become a fact of life and that CM needed to incorporate digital imaging capability into its program of products and services. (Morgan Tr. 2128:20-213:12, 2134:16-2135:4.) [*61]

115. At the CM Forward Conference, the "Impact of digital photography" was identified by senior leadership at CM as a "must discuss" issue. (PX-149:1.) Mizen gave a presentation on that issue at the CM Forward, and his "bottom line" was that digital photography was a "potential threat" that needed to be addressed, and that CM needed to "give solutions to [their] customers and Consultants." (*Id.* at 2.)

d. *Dramatic Increases in Competition Were Emerging in 2003*

116. At the time of the Transaction, CM was facing new or increased competition from (1) big-box retailers like Wal-Mart and Target who sold similar products at lower prices, (2) other direct sales companies, and (3) smaller retailers moving into CM's business space. (Harris Tr. 712:16-714:4, 724:1-13, 729:23-730:1, 737:71-12, 762:12-20, 770:11-21.)

117. Illustrating this heightened risk to CM before the Transaction, Michael's, a craft retailer, was growing rapidly and had opened a line of specialty stores called Recollections devoted strictly to memory-keeping and scrapbooking. (Harris Tr. 730:2-21; 732:4-15.) Also, two direct sales companies in the same memory preservation space—Stampin' Up and Close to My Heart—experienced substantial [*62] growth in revenue from 2002 to 2003. (Harris Tr. 737:17-739:24.)

118. CM expected in 2003 that this increased competition might increase pressure of CM's business and could lead to lower prices and lower margins that might have a material adverse effect on CM's business. (JX-49:95.)

119. At the CM Forward Strategic Meeting on July 21-22, 2003, "Competing against retail and dotnet" was identified by senior leadership at TAC as a "must discuss" issue. (PX-149:1.) "Competition" and "Other Direct Sales companies" were also identified as primary threats facing the Company. (*Id.* at 4.)

e. *Signs of Product Fatigue*

120. CM's Vice President of Marketing Suzanne Johnson Harris concluded that CM's business model was also threatened in 2003 by a lack of new products as well as higher-priced products and limited selection relative to CM's competitors. (Harris Tr. 769:14-23.)

121. CM's products were "viewed as very basic," according to Harris, and there was limited innovation relative to the competitive marketplace. (Harris Tr. 720:24-721:9.)

122. As a direct sales business, CM was highly dependent upon the motivation of its volunteer sales force and the appeal of its products to maintain and grow sales. (Wiser **[*63]** Tr. 3116:5-16; Anderson Tr. 209:5-291:25; Luce Dep., 185:3-186:3, 196:17-197:3; PX-493:1-2.)

123. CM was aware in 2003 that product innovation was a weakness of the Company. Indeed, during his work as a business consultant for TAC in 2001-2002, Luce detected signs of productivity decline and noted the lack of innovation from the product development group. He reported this problem to Morgan and Moran in 2002. (Blair Tr. 1815:13 - 1817:10; JX-16:5; Luce Dep., 280:9-282:3; PX-592.)

124. At the CM Forward Conference, the "Product Plan" was identified by senior leadership at CM as a "must discuss" issue. (PX-149:1.) The need for "wow" products was identified as a threat to CM. (*Id.* at 4.)

f. *Fear of Market Saturation and Deceleration in U.S. Sales Growth*

125. Morgan, Moran and other key CM leaders worried that CM's U.S. unit ("CM US") was near a sales plateau, or even had already entered one. (Blair Tr. 1810:23-1811:6, 1926:16-1927:9; Marchetti Tr. 990:4-991:16, 1135:1-11.) Luce testified that it is relatively common for direct-sales companies to plateau when their product lines get tired, and Lee Morgan had worried (prematurely, as it turned out) that CM was reaching a plateau as early as 1994 or **[*64]** 1995. (Luce Dep. 222:7-223:18.)

126. At the CM Forward conference, the "possible plateau" in sales was identified by senior leadership at TAC as a "must discuss" issue. (PX-149:1.) In addition, the possible plateau was identified as one of the two "[b]iggest threats" to CM in addition to digital photography. (*Id.* at 6.)

127. Marchetti recalled that, during due diligence for the Transaction, Moran and other CM managers told GBT that future growth had to come from overseas expansion "because they were saturated in the U.S." (Marchetti Tr. 1135:1-11.)

128. However, other evidence shows that CM told advisors in due diligence that it believed its U.S. market potential lay somewhere between $475 million and $500 million, more than $100 million above the projected 2003 revenue, and that its sales growth would only begin to level off after a number of years. (Williams Dep., 71:9-21; PX-154:13,45/DX-748:13,45; Treemarcki Tr. 4740:18-4642:3; PX-194:6.) As late as July 2004, Luce advised Morgan and Moran that he did not believe that "CM US has come anywhere close to topping out its sales potential in the US." (PX-495:1.)

129. Antioch's sales continued to grow in 2003, finishing

above prior year (Moran Tr. 2913:22-2914:12; **[*65]** Lipson-Wilson Dep., 259:21-260:15; Hoskins Dep. 9/16/11, 507:10-14), but the Company's sales growth was slower than anticipated, and Antioch's sales failed to meet expectations throughout 2003.

130. CM's monthly sales fell short of plan in nine of the first eleven months in 2003. (Morgan Tr. 2075:25-2078:19; PX-401:3; PX-154:7; JX-35:3; JX-22; PX-118; PX-597.) CM U.S. sales were $28.4 million below plan by the time the Transaction closed. (Morgan Tr. 2087:23-2088:20; Moran Tr. 2906:14-2907:17; PX-370.)

131. By September 9, 2003, TAC dropped its projected sales for 2004 from $443 million to $425 million. (Marchetti Tr. 1016:2-1025:4; compare JX-11:6 to PX-220:6; PX-220:214.) Then TAC again dropped its projection for 2004 to $418 million in the 2004 Business Plan presented to the Board on December 4, 2003. (PX-391:34; PX-154:7.)

g. *Soft Creative Memories International Sales and Uncertain Growth in New International Markets*

132. Regardless of precisely how much more growth there was in the domestic market, CM knew that it would reach a domestic saturation point eventually, and it was counting on international expansion for most of its future growth. Prior to the end of 2003, Canada and Australia **[*66]** were the only two foreign markets where CM had operations that had broken even or made a profit (Morgan Tr. 2090:9-2094:19, 2096:15-2097:6, 2590:19-2591:9; PX-483:71-74.). Sales in most other international markets were consistently below plan on a monthly and year-to-date basis. (PX-483:41-79.)

133. CM faced numerous barriers when attempting to penetrate into new international markets. These included unfavorable regulations, cultural and language differences, unfavorable social attitudes toward direct selling in general and questionable viability of the party plan method. By August 2003, CM's international unit's ("CMI") strategic plan called for operations to start up in many new markets in the coming years, but CM ultimately only entered new markets in a few countries, and none of those markets were profitable. (Moran Tr. 2582:12-2584:19; PX-176:9.)

134. Growth in international markets after 2004 was projected in countries where CM had fledgling operations (such as the U.K., Taiwan, Germany and Japan) or in markets that had not yet even launched (such as Austria, Mexico, Switzerland, South Africa, Spain, the Netherlands, Sweden, Denmark, South Korea, Finland, Norway, Belgium, Portugal **[*67]** and Chile). (PX-176:13-16.) As such, these growth projections were "uncertain." (Blair Tr. 1824:14-1828:22; PX-176:14.) Nevertheless, CMI adopted a 5-year plan calling for

international sales in these unproven markets to more than triple from $38 million in 2003 to $116 million in 2007. (Blair Tr. 1824:14-1828:22; PX-176:14.)

*h. New Ventures Were Not Succeeding*

135. At the time of the Transaction, TAC had two new start-up ventures: Our Own Image ("OOI") and ZeBlooms. (Blair Tr. 1530:24-1531:18.)

136. In 2003, sales and profitability for these new ventures were not strong. (*See* PX-370:5 and 7.) Management knew, prior to the Transaction, that the success of these ventures was uncertain and that they faced significant risks. (Williams Dep. at 72:18-23; PX-154:45-46; Morgan Tr. 2099:6 - 2108:6; PX-512:30; Marchetti Tr. 1086:7-21; Blair Tr. 1741:14-1745:5.)

**2. The Company Disclosed the Threats Facing Antioch**

137. At the first Board meeting attended by GreatBanc on August 21, 2003, Asha Moran gave a detailed presentation about Creative Memories and its year-to-date performance and projections. (*Id.*; JX-22.) This presentation contained a wealth of financial information about Creative Memories [*68] U.S., including that:
▪ Gross sales for Creative Memories U.S. had steadily increased from approximately $70 million in 1996 to over $306 million in 2002, and were expected to hit over $331 million in 2003. (JX-22 at D&P_A010811.)
▪ Operating income for Creative Memories U.S. had steadily increased from approximately $13 million in 1996 to over $83 million in 2002, and was expected to hit over $92 million in 2003. (JX-22 at D&P_A010819.)

▪ Each month's actual gross sales year-to-date had exceeded the previous year's sales for that month, and year-to-date sales exceeded the same time period in 2002 by 5.94%. (*Id.* at D&P_A010813, 10821.)

▪ Each month's actual sales year-to-date had failed to meet the Company's forecasts for that month, other than February and March, and year-to-date sales fell short of the forecast for that time period by 6.33%. (*Id.*)

▪ The consultant productivity metric had fallen from $727 in 2001 and $719 in 2002 to $663 in 2003 year-to-date. (*Id.* at D&P_A010817.)

138. Antioch also told GreatBanc and all advisors about the decline in consultant productivity throughout due diligence. (DX-154 at GBT06331; PX-154 at D&PA007948-7949; Marchetti Tr. 1139:9-19.)

139. The Company [*69] continued to provide updated financial information to the advisors in subsequent months. (DX-163; DX-185.) As reflected in Duff's December 9, 2003 memo to GreatBanc, Duff was aware of the state of the Company's financials as late as a few days before the Transaction closed. That memo communicated the fact that the Company's sales had missed its plan in nine of the 11 months to date in 2003. (JX-61 at D&P_A005458; *see also* PX-154 at D&P_A007937.) It likewise communicated that Antioch's earnings were nevertheless ahead of plan. (*Id.*)

140. Marilyn Marchetti testified that Duff and GreatBanc specifically took into account the Company's consultant productivity metric and other metrics and the operations of Creative Memories up against plan for the first 11 months of 2003 in conducting their analysis of the Transaction, and that the Company's performance in 2003 was very much part of the due diligence process and discussions at GreatBanc ESOP Committee meetings. (Tr. 1231:14-1232:21).

141. In addition to providing detailed financial information, the August 21 presentation also contained a SWOT analysis, management's identification and analysis of strengths, weaknesses, opportunities and threats [*70] facing CM. (JX-22 at D&P_A010837.) Digital photography and scrapbooking competitors were the first two threats described in the presentation. (*Id.*)

142. Duff's analysts asked Ms. Moran for a copy of her board presentation and she provided it to them and Houlihan the following day. (DX-121; Moran Tr. 3051:5-3052:23.)

143. The potential threats posed by more robust competition were frequently discussed with GreatBanc and Duff during due diligence, where the advisors had a "very good opportunity to speak very openly with the management teams." (Bloom Tr. 4280:9-19.) Defendants presented at trial numerous examples of company representatives, including defendants themselves, discussing the threat of competition with GreatBanc and Duff. (DX-117 at HL001190; DX-154 at GBT06329; DX-745 at HL001221-22; PX-154 at D&P_A007975; Marchetti Tr. 1132:20-1134:6; Bloom Tr. 4275:12-4276:12, 4279:6-13; Treemarcki Tr. 4701:14-4703:6.) In Duff's Preliminary Fairness Opinion, it discussed as a risk that "[c]ompetition will likely increase as several direct sales organizations could enter the market as could other album and scrapbook companies. Craft stores, such as Michaels, are experimenting with scrapbook retail outlets [*71] that offer value-added services such as workshops." (JX-37 at D&P_A002711.) Plaintiffs' expert witness, Robert Reilly, admitted that Duff and GreatBanc knew about the threats to Antioch's business. (Tr. 3931:1-3934:8.)

144. The potential threat of digital photography and

technology was also openly discussed during due diligence. The advisors' notes taken contemporaneous with the Transaction and the advisors' testimony makes clear that the potential threat (and potential opportunity) of digital photography and technology was disclosed and considered by Duff in its financial analysis. (DX-140 at GBT06912; Bloom Tr. 4277:7-4279:13, 4285:23-4287:7.)

145. Duff's preliminary fairness opinion likewise makes clear that Duff was well aware of the potential threat from digital photography and technology. (JX-37 at D&P_A002711.) And the management presentation made at the August 21 Board meeting that GreatBanc attended confirms that digital photography and technology, increased competition and consultant productivity were among the risks identified in conjunction with the Transaction. (JX-38 at D&P_A006634.)

146. In the end, the undisputed evidence showed that Duff and GreatBanc were well aware [*72] of the potential threats of competition and digital photography and technology. Duff's own Preliminary Fairness Opinion, which was shared and discussed with GreatBanc, specifically discusses these risks. (JX-37 at D&P_A002711.)

147. Lee Bloom testified that Duff considered and accounted for these risks in the financial analysis underlying Duff's fairness opinion. (Tr. 4285:23-4287:7, 4296:13-17.) Notes from Marilyn Marchetti of GreatBanc and Lee Bloom and Julie Williams of Duff reflect these threats as topics of discussion internally and with Antioch personnel during their due diligence investigations. (DX-140 at GBT06912; DX-154 at GBT06329; PX-154 at D&P_A007975; Tr. 1133:13-1134:6, 4275:12-4276:12,4277:7-13, 4285:23-4287:7, 4292:4-4293:3, 4294:17-4296:17, 4373:20-4374:15, 4891:2-4892:1, 4909:11-4910:10.) And the proxy materials themselves spelled out a host of risks that the Company faced in 2003, including detailed discussions of competition and digital photography and technology. (JX-49 at MOR001280-1285.)

### 3. Plaintiffs' Allegation That the Company Failed to Provide Certain Materials to GreatBanc

148. At the December 4, 2003 Board meeting, certain materials were discussed that plaintiffs [*73] claim were not provided to GreatBanc and/or Duff: (i) the sensitivity analysis requested by the Board at the October 30 Board meeting; (ii) the Plan Amendment regarding the method of distribution for departing employees under the age of 50; (iii) a revised repurchase obligation presentation, and (iv) the 2004 business plan. Plaintiffs called Marilyn Marchetti as a witness. Ms. Marchetti was GreatBanc's lead in the Antioch engagement. (JX-14.) She is an attorney. She is not an economist or

valuation professional. (Marchetti Tr. 942:24-25, 945:5-18.)

149. As part of GreatBanc's settlement with plaintiffs shortly before trial, Ms. Marchetti voluntarily agreed to a private interview with plaintiffs' counsel after which she provided them with a sworn affidavit that plaintiffs would not share with defense counsel. (Tr. 948:17-19; ECF No. 495.)

150. Ms. Marchetti testified that as trustee she expects to see "everything that exists" and "everything having to do with the company." (Tr. 969:3-14.) This broad expectation included the materials discussed at the December 4 meeting. Ms. Marchetti stated that receipt of the sensitivity analysis would have generated more inquiry, but she could not speculate even [*74] as to what the additional discussions would have entailed, much less if it would have an impact on Duff's analysis. (Tr. 1041:12-15, 1044:3-6, 1044:12-15, 1050:9-19, 1054:3-5.) She also stated that she would have liked to have known about the Plan Amendment and the revised repurchase obligation study, but never stated that the information would have influenced GreatBanc's analysis in any way, or to what measure. (Tr. 1066:4-7, 1067:8-13, 1070:21-23.)

151. There is some evidence suggesting that Ms. Marchetti at least had notice of the fact that some of these materials existed or probably existed, and so could have requested them if she really wanted them. But in any event, the materiality of these items to GreatBanc's and its advisors' review was disproven by testimony from several professionals who worked on the Transaction, most importantly among them GreatBanc's financial advisor, Duff & Phelps.

152. First, with respect to the sensitivity analysis, Ms. Marchetti was present at the October 30 Board meeting at which the sensitivity analysis was requested, so she could have asked to attend the December 4 Board meeting or asked for the analysis itself if she or GreatBanc's advisors deemed the sensitivity analysis [*75] material to their consideration of the Transaction.

153. In any case, the sensitivity analysis was not material. Lee Bloom knew that the Company was running sensitivity analyses and had no desire to see them, did not expect to see them, and testified that he would not have known what to do with the analyses had he received them. (Tr. 1559:9-1561:23, 4321:12-4322:9, 4325:17-25.) Duff was running its own sensitivity testing in the financial analysis underlying its fairness opinion, and therefore Mr. Bloom testified that he had no use for the Company's analyses. (Tr. 4321:12-18, 4324:10-4325:16.)

154. GreatBanc's and Duff's lack of interest in obtaining the Company's sensitivity testing is further demonstrated by its receipt of due diligence materials showing the findings of

previous sensitivity testing by the Company. (DX-773.) GreatBanc did not ask for the underlying data associated with that sensitivity testing, nor did it include any request for sensitivity testing in its written due diligence requests. (DX-111; DX-133.)

155. Defendant's expert witness, Greg Brown, testified based on his experience in advising various constituencies in ESOP transactions that he would not have expected [*76] the Company to share its sensitivity analyses with GreatBanc and Duff. (Tr. 4980:11-19, 4982:18-4983:20, 5175:21-5176:25.)

156. As to the Plan Amendment, Ms. Marchetti does not recall receiving notice of it, but some evidence suggests that she may at least have had notice that it was under consideration. Nancy Blair testified that she recalled a late-night phone call with Lee Bloom (who would presumably have passed on the info to his client GreatBanc) and Helen Morrison in which the amendment was discussed as a necessary response to the put price protection unless an alternative transaction structure was adopted. (Tr. 1609:21-1610:13.)

157. Other evidence indicates that GreatBanc and its advisors may have had notice at least of the fact of the Plan Amendment, but the evidence is, at best, inconclusive. Helen Morrison instructed Karen Ng, the ESOP's legal counsel, to send the Plan Amendment to GreatBanc and Duff (DX-272; Morrison Dep. 157:6-17, 160:20-161:11), but the evidence does not confirm whether Ng actually did so. A closing checklist sent to J&G and Marilyn Marchetti lists "Board approval of new amendment to ESOP regarding distribution provisions" at (I)(1)(e) of the checklist (DX-318; Matthews Tr. 2513:23-2516:1), and GreatBanc's October 27, 2003 ESOP Committee notes [*77] state that J&G had reviewed the Plan and "would be reviewing amendments to be adopted in connection with the tender offer" (DX-250 at GBT08388); however, the evidence does not confirm whether J&G or GreatBanc were ever actually provided any clear, specific notice of the Plan Amendment and change in distribution policy.

158. In any case, Lee Bloom testified that the Plan Amendment and change in distribution policy would not have impacted the analysis that went into Duff's fairness opinion, and, if anything, would have *increased* his confidence in issuing the opinion, because the Plan Amendment provided important flexibility for Antioch in dealing with future cash flows. (Tr. 4395:7-4397:8, 4399:9-22.) This testimony is credible, as it is corroborated by Hoskins's testimony that the banks financing the transaction had the same interpretation of the distribution policy change, as the Court will discuss in more detail below.

159. Plaintiffs presented evidence that certain members of Antioch management feared "a bit of a run on the bank" in conjunction with the Plan Amendment and change in distribution policy. (PX-328.) But the Court finds that plaintiffs failed to prove, through expert testimony or otherwise, that the Plan Amendment and change to the distribution policy actually [*78] *caused* a run on the bank. Rather, as defendants' expert Richard May explained and as the Court will discuss in more detail below, the evidence is that, although the Company did experience a massive spike in repurchase obligation in 2004, the Plan Amendment and change in distribution policy did *not* cause the Company's unusual and unpredictably high repurchase obligation in that year.

160. There is likewise no evidence that the Board did not properly consider or account for those concerns. Nor did plaintiffs introduce any expert or fact evidence that such a concern should have caused the Board or GreatBanc to abandon the Transaction.

161. Moreover, Mr. Bloom was well aware that a "run on the bank" was always a possibility at Antioch, as he warned Nancy Blair of that possibility himself. (PX-291; Blair Tr. 1854:5-15, 1857:22-1858:1.) Terry Treemarcki of Houlihan Lokey explained to the Court that concerns about a "run on the bank" are inherent in any company with an ESOP, because the only way that employees at an ESOP company can liquidate their shares is by leaving the company. (Tr. 4697:21-4698:17.) The potential for a "run on the bank" was also far from a secret given the fact that defendant Chandra Attiken [*79] disclosed concerns about that in due diligence meetings with Duff and GreatBanc as early as September 2003. (DX-109 at HL001253; Treemarcki Tr. 4696:4-4697:16.)

162. In addition, defendants' expert Greg Brown testified that based on his experience, it would not be customary or usual for the Company to share revised repurchase obligation runs with Duff or GreatBanc after determining that Antioch would be able to service even the revised estimates of that future obligation. (Tr. 5177:1-5183:14.)

163. Finally, as for the 2004 business plan, the Company continued to update Duff and GreatBanc regarding its future financial projections throughout due diligence (*compare* PX-213 at HL006477-82 *with* DX-141 at GBT06094-95 *and* PX-250), up to just a few days before the Transaction closed. Just prior to the Transaction's closing, the Company informed GreatBanc and Duff that it made a downward adjustment to its internal 2003 and 2004 sales forecasts. (DX-329; PX-154 at D&P_A007937; Bloom Tr. 4880:6-4882:4.) Julie Williams of Duff met with Barry Hoskins for a final update before the

Transaction closed. As Ms. Williams' notes reflect, she was told at that meeting that actual Antioch sales for 2003 projected [*80] to be $376 million, down from $381 million in the most recent projection. (*Compare* PX-154 at D&P_A007937 *with* PX-213 at HL006477-82.) Mr. Hoskins also informed her that the 2004 revenue projection had been lowered from $425 million to $418 million. (*Id.*) Duff considered that information in deciding whether to render its final fairness opinion to GreatBanc. (Tr. 4882:14-18.) Thus, even if Duff and GreatBanc did not receive the full 2004 business plan (which, as the Court discussed above at footnote 4, it is not clear that the Board even received prior to the Transaction), it did receive the substance of the news of the Company's downward adjustments to the 2004 forecast.[7]

### E. The Process and Analysis Undertaken By GreatBanc And Its Advisors

164. Because, as further explained below, defendants' liability to plaintiffs under both *sections 404* and *405 of ERISA* may depend upon finding an underlying breach of fiduciary duty by GreatBanc, the Court must make a detailed review of the process and analysis in which GreatBanc engaged during its tenure as trustee of the ESOP, despite the fact that GreatBanc is no longer a defendant. The process and analysis of GreatBanc and its advisors regarding the consideration provided to the non-ESOP shareholders in the Transaction is also relevant to defendants' affirmative defense to plaintiffs' *ERISA section 406* claim.

### 1. GreatBanc Hired Qualified Advisors and Engaged in Due Diligence to Gain an Appropriate Understanding of the Company

165. At the outset of GreatBanc's tenure as trustee, it sought to retain industry-leading financial and legal advisors to help it assess whether the transaction was in the best interests of the ESOP. It selected Duff to serve as its independent financial advisor; the firm and Mr. Bloom were nationally recognized leaders in the ESOP community. (JX-26; Marchetti Tr. 1097:8-24, 1111:19-1112:1; Abrahamson Tr.

---

[7] Although Plaintiffs principally focused at trial on the categories of information discussed, above, in their Complaint and Pretrial Memorandum they also identified the potential for a violation of *Internal Revenue Code section 409(p)* and the allegedly slipping sales and profits in international markets as categories of information that were purportedly "withheld" from GreatBanc. The evidence at trial established that these categories of information were in fact disclosed, and that international sales and profits were in fact rising at the time of the Transaction. [*81] (Doc. 624-2.)

1358:15-1359:10; [*82] Matthews Tr. 2479:10-2480:6; Reilly Tr. 4046:9-22.) Lee Bloom served as the lead financial analyst for Duff.

166. GreatBanc also selected Jenkins & Gilchrist as its legal counsel; the firm and lead attorney David Ackerman were nationally recognized leaders in the ESOP community. (DX-94; Marchetti Tr. 1112:2-15, 2480:8-17, 2546:2-5.)

167. Because the court has already detailed much of GreatBanc, Duff, and J&G's actions around and participation in due diligence, it need not do so again. It will suffice to say here that, after initial detailed analysis and consideration, on October 13, 2003, GreatBanc and Duff concluded that without changes, the Transaction as originally proposed would not be fair to the ESOP. (DX-204; JX-30; JX-31; Marchetti Tr. 1209:9-1219:12.)

168. After this preliminary conclusion, GreatBanc and its advisors diligently and aggressively negotiated benefits for the ESOP external to the tender offer to ensure that the Transaction would not harm ESOP participants and was fair from a financial perspective to the ESOP. These benefits included Put Price Protection, a one-time dividend, and recurring contributions to ensure that the ESOP participants shared in the tax benefits [*83] of the Transaction. (DX-206; DX-209; DX-217; DX-222; DX-225; DX-226; DX-229; DX-230; DX-241; DX-768; Tr. 1172:23-1195:9.)

169. As discussed further below, Duff took all Antioch's known strengths, weaknesses, opportunities and threats into account in performing its fairness and valuation analysis, including in its independent development of financial projections and an appropriate discount rate to be used in its discounted cash flow ("DCF") analysis. (Bloom Tr. 4285:17-4296:17, 4300:13-4304:24, 4824:6-25.)

### 2. Duff's Preliminary Fairness Opinion

170. On October 27, 2003, Duff provided GreatBanc with a preliminary opinion that the Transaction, as further negotiated, was fair to the ESOP from a financial point of view. (DX-250; DX-254; JX-37; Bloom Tr. 4349:6-4381:5.)

171. Duff ultimately concluded that the $850 per share price was within the range of Antioch's fair market value, the consideration to be paid the selling shareholders was fair and reasonable to the ESOP, and the terms and conditions of the Transaction were fair and reasonable to the ESOP from a financial point of view. (JX-37 at D&P_A002726, D&P_A002735.)

a. *Analysis of Company Fundamentals*

172. Duff & Phelps reviewed and analyzed **[\*84]** Company-specific items such as the ownership structure of Antioch, the Company's historical share price trend, the state of the Antioch ESOP (including the aggregate balances of major accounts), and the Company's status as an S Corporation. (JX-37 at D&P_A002698-002701.)

173. Duff also provided a detailed analysis of the strengths, opportunities and risks facing Antioch that it learned about through the course of due diligence. Specifically, Duff noted that the Company's brand and quality of its products and services, mission and culture, direct sales network, and international growth were potential strengths and opportunities. On the other hand, Duff considered increased competition, digital computer and scanner technology, and potential saturation to be some of the risks facing Antioch. (JX-37 at D&P_A002711.)

b. _Analysis of Historical Financial Statements_

174. Duff reviewed the Company's audited historical financial statements for the fiscal years ended December 31, 1999 through 2002 and the Company's internally prepared latest-twelve-month ("LTM") period ended September 30, 2003 (the "LTM period"). Duff considered and analyzed the Company's historical revenue CAGR and EBITDA margins, **[\*85]** among other items. Duff calculated key financial statement ratios, such as growth, profitability, activity, leverage and return on investment ratios for Antioch from 1999 through the LTM period. (JX-37 at D&P_A002712-002713, 2736-2738.) Duff also commented on Antioch's historical financial results relative to its peers, noting that, by a number of different measures, Antioch's results were consistent with or better than those of industry peers. (_Id._ at D&P_A002713.)

c. _Independent And Conservative Financial Projections_

175. Duff conducted detailed research, analysis, and due diligence of the industry and Company to develop its own set of independent financial projections. (JX-37 at D&P_A002707-18.)

176. Although Duff considered the ten-year projections provided by Antioch management not only to be "reasonable and reliable" but also to be conservative and to account further for potential industry and Company-specific risks such as competition, digital photography and technology,[8] market saturation, and international and new business expansion, Duff developed and used a set of projections that were lower

than management's projections and the Company's five-year historical experience. (_Id._ [*86] ; Bloom Tr. 4294:4-4296:17, 4309:3-4311:24, 4365:25-4367:19, 4371:3-16, 4824:6-25, 4900:3-4901:2; Williams Dep. 112:16-114:25.)

177. According to Mr. Bloom, company-specific risks should be reflected in downward adjustments to future cash flows, which is what Duff did when developing its independent financial projections. (Tr. 4286:3-4290:16, 4291:14-4292:3.)

178. Duff projected five-year revenue and EBITDA CAGRs of 10.3% and 5.5%, respectively, compared to Antioch's actual five-year historical revenue and EBITDA CAGRs of 17.4% and 21.0%, respectively. Also, Duff projected the five-year average EBITDA margin for Antioch to be 17.8%, compared to Antioch's actual five-year historical average of 19.0%. (DX-668 at ¶ 94; JX-37 D&P_A002740.) In particular, Duff reduced the growth projections for Antioch's new ventures and CM International, to account for the fact that these units were largely unproven. (Bloom Tr. 4292:4-4295:8.)

179. Based on Duff's **[\*87]** concern that projections become inherently riskier as they extend further in to the future, Duff's revenue projections increasingly diverged downward from management's projected revenues for both the Transaction and internal company purposes in the later projection years (_i.e._, from 2007-2013) Antioch management projected revenues of approximately $593 million in 2007, $667 million in 2008, $762 million in 2009, $847 million in 2010, $926 million in 2011, $993 million in 2012, and $1.053 billion in 2013. On the other hand, Duff used substantially lower projected revenues of approximately $580 million in 2007, $625 million in 2008, $670 million in 2009, $709 million in 2010, $745 million in 2011, $774 million in 2012, and $805 million in 2013. (DX-138 at HL006478-006479; JX-37 at D&P_A002740; PX-391A at 0043; Bloom Tr. 4901:7-4909:1.)

d. _DCF Analysis_

180. One of the two generally accepted valuation methodologies that Duff performed was a DCF, which is a model that provides an estimate of the fair market value of a company based on its projected cash flows, discounted to present value. (JX-37 at D&P_A002714.)

181. As described above, Duff developed a set of independent and conservative **[\*88]** projections for the Antioch Company. Duff then discounted these projections to their present value equivalent by developing and applying a discount rate, or weighted average cost of capital ("WACC"). (JX-37 at D&P_A002717-18; Tr. 4286:3-4287:20.)

---

[8] In part based on Mr. Bloom's prior position as an equity research analyst in Duff's technology research group, prior to the Transaction he had specifically gained familiarity with emerging technologies in the area of photography. (Tr. 4929:14-4930:9.)

182. Using the Capital Asset Pricing Model ("CAPM"), Duff developed a WACC range of 12% to 14%. In choosing this range, Duff assessed the industry, which required looking at the required rates of return on comparable companies (and adjusting based on the size of Antioch), as well as determining the estimated level of systematic risk to the Company, among other considerations. (*Id.*; DX-668 at ¶¶ 117-141; Tr. 4287:8-4291:12, 4377:22-4379:5.)

183. As noted above, Duff accounted for Company-specific risks by lowering the Company's projections, which according to Lee Bloom, was and is the best way to account for company-specific risks in a DCF analysis. Duff therefore did not apply a company-specific risk premium ("CSRP") to its 12%-14% WACC because that would have amounted to inappropriate double-counting. (Tr. 4291:14-4296:17.)

184. Based on negotiations between Antioch and GreatBanc as part of the Transaction, the Company agreed to make a contribution **[*89]** equal to 21% of eligible compensation to the Antioch ESOP in 2004. Duff assumed this 21% contribution could be used to repurchase shares from retiring and terminating ESOP participants, which would then be recycled to remaining participants in the ESOP. However, any future contributions beyond 2004 by the Company were discretionary. Despite this fact, Duff conservatively included this expense in every year of its DCF analysis. All else equal, the inclusion of this expense every year after 2004 had the effect of lowering Duff's value conclusion. In other words, had Duff not assumed the Company would make a contribution to the ESOP equal to 21% of eligible compensation every year from 2005-2013, it would have arrived at a higher per-share value conclusion than it did because the Company would have had more free cash in years after 2004. (JX-37 at D&P_A002716; Tr. 4326:1-4330:6.)

185. Using its conservative projections and a discount rate of 12%-14%, Duff calculated that the fair market value of Antioch ranged from $774 to $932 per share (and $845 per-share using a 13% WACC). (JX-37 at D&P_A002718.) Duff thus concluded that the $850 per-share price was within the range of fair market value **[*90]** for the Company. (*Id.* at D&P_A002726.) According to Mr. Bloom, it was the industry custom in 2003 and still remains the industry custom today to provide the ESOP trustee with a range of fair market value to determine whether or not a transaction price is consistent with fair market value. (Tr. 4919:16-4921:16.)

e. *Comparable Company Analysis*

186. As a check on the reasonableness of its DCF analysis, Duff also performed a comparable company analysis, which is a valuation methodology whereby the value of a private company like Antioch is estimated by comparing it to similar publicly traded companies. (JX-37 at D&P_A002714; Tr. 4330:7-20.)

187. According to Lee Bloom, the best practice for a valuation professional is to perform two different analyses—a DCF analysis, and a comparable company analysis. The results from those two valuations should come out close to each other, and if not, it serves as a signal that one of the analyses is unreasonable and should be re-evaluated. (Tr. 4331:12-4332:21, 4369:12-4371:2.)

188. Duff considered two comparable company groups, direct sales companies and retail craft/hobby companies, and found what Lee Bloom called a "good set" of public companies within **[*91]** these groups from which to select comparables. (JX-37 at D&P_A002719-2722, 2752-2767; DX-254 at D&P_A008637-8640, 8676-8691; Tr. 4330:7-4331:11.)

189. Duff selected three direct sales organizations and five retail craft/hobby companies as comparables. (*Id.*) In selecting these eight companies, Duff considered, among other things, the business model, size, markets served and related product lines, and risk profile of Antioch versus other potentially comparable companies in the direct sales and retail craft/hobby industries. (*Id.; see also* Tr. 4335:6-4336:5.)

190. The three comparable direct sales companies Duff selected were Avon Products ("Avon"), Blyth Inc. ("Blyth"), and Tupperware Corporation ("Tupperware"). In 2003, Avon manufactured and marketed beauty and related products; Blyth manufactured, marketed, and distributed a line of candles and home fragrance products; and Tupperware made and marketed household products. Although these products were not the same as the products Antioch sold, finding a perfect comparable company is very rare in valuation practice, and the consideration of these comparable companies was relevant and reasonable given their distinct and directly comparable **[*92]** method of selling their products. (*Id.; see also* Tr. 4892:9-4894:17.)

191. The retail craft/hobby companies Duff selected were A.C. Moore Arts and Crafts, Inc., Hancock Fabrics Inc., Jo-Ann Stores Inc., Michaels, and Rag Shops Inc. In 2003, these comparable companies all offered products that shared similarities with those offered by Antioch. In fact, Michaels had recently opened two stand-alone scrapbooking stores and was anticipating opening several more in the coming year. (*Id.*)

192. Once the comparable companies were selected, Duff compared the range of valuation multiples for the comparable publicly traded companies it selected with its DCF multiples, and concluded that the DCF multiples were generally below the range of valuation multiples for the publicly traded

companies. This indicated that the $850 per-share price was fair, and if anything, too low—in other words, if the Transaction price was unfair to anyone, it was unfair to the selling shareholders, not the ESOP. (Tr. 4332:4-21, 4335:22-4336:5, 4379:6-4380:7.)

*f. Analysis of Warrants and Put Price Protection*

193. As stated above, the optional Package consideration consisted of $280 in cash, a subordinated note payable in the [**93**] amount of $280, and one warrant valued at $290. To determine whether the Package was fair and reasonable to the Antioch ESOP, Duff analyzed whether the sum of the individual components of the Package was consistent with the value of the consideration it already determined was fair (*i.e.*, $850 per share) to the ESOP. (JX-37 at D&P_A002726-002734.)

194. Duff concluded that the cash and note components of the Package were appropriately valued, but the warrants were under-valued, and therefore dilutive to the Antioch ESOP shareholders post-Transaction. (*Id.* at D&P_A002727-28; DX-668 at ¶ 168.)

195. However, Duff calculated that the aggregate incremental economic benefit the ESOP would derive as a result of the Transaction over a ten-year period was approximately $1.6 million greater (or approximately $8.00 per share greater) than the dilution caused by the warrant component of the Package. (JX-37 at D&P_A002729-2731.)

196. To protect participants who left the Company in the three years immediately following the Transaction (2004, 2005, 2006), and who would not yet have realized sufficient economic benefits from the tax savings the Transaction would generate to compensate for the dilution [**94**] caused by the warrant component of the Package, Duff and GreatBanc negotiated for the Put Price Protection terms. Duff determined that the PPP was economically necessary to remedy the dilution caused by the Transaction (and in particular the valuation of the warrant component of the package) in the years after the Transaction. (DX-250; JX-37 at D&P_A002732-2734; Tr. 4354:6-4360:5, 4380:8-4381:4.)

*g. Consideration of the Projected Repurchase Obligation*

197. Because the Company was redeeming the shares of terminated employees (purchasing them and retiring them into treasury), the future repurchase obligation of the Company had no effect on the per-share value of Antioch. (Tr. 4326:1-4327:23, 4330:2-6, 4389:10-4391:16.)

198. However, as noted above, in its DCF analysis Duff conservatively assumed that the Company would make a contribution to the ESOP equal to 21% of eligible

compensation every year from 2005-2013, which could be used in part or in whole to fund the repurchase obligation. This assumption had the effect of lowering Duff's per-share value conclusion.

199. Duff also ran downside scenarios to test whether the Company could handle its debt obligations and repurchase obligation [**95**] going forward if operations fell below expectations. (Tr. 4317:24-4325:25.) Contrary to the projections used in Duff's DCF analysis, Mr. Bloom testified Duff did not (and he has never) performed a DCF valuation based solely upon downside revenue flows from a downside scenario, as there is "no basis" for using cash flows that are not the expected case, and "all that it could possibly do is give me a value that's too low." (Tr. 4393:24-4394:16.)[9]

200. Duff expressly recognized that the top ten account balances were currently valued in excess of $50 million, and that management estimated that 10% of active employees held over 80% of the shares in the ESOP. Duff concluded that from a cash flow feasibility perspective there was significant cushion for the Company to meet its obligations even if events in the future were not as reasonably anticipated, including a higher than projected repurchase obligation, or global operations falling below [**96**] management's expectations. (JX-37 at D&P_A002699; Tr. 4363:4-4365:23, 4367:24-4368:15.)

**3. Duff's Further Diligence And Final Fairness Opinion**

201. Before finalizing its fairness analysis, and as noted briefly above, Duff met with Antioch's CFO Barry Hoskins on or about December 9, 2003 to obtain: (i) an update on the status of the proposed Transaction, and (ii) an update on Antioch's business and financial performance through November 2003 and any changes regarding future prospects. (JX-61; PX-154 at 00007-08; Tr. 4915:12-4916:4.)

202. Mr. Bloom considered Mr. Hoskins forthcoming in response to the questions that he and his associate Julie Williams asked during the December 2003 meeting. (Tr. 4916:5-8.)

203. Duff learned that although the Company's sales were below plan for nine of the eleven months completed in 2003, the Company was still expecting to exceed its 2003 profit plan by $2.5 million due to strong margins and aggressive expense

---

[9] As discussed in more detail below, Plaintiffs' expert Robert Reilly erroneously uses downside revenue flows from two downside scenarios in two of his DCF valuations, which has the effect, in the words of Mr. Bloom, of producing "a value that's too low."

management. In addition, Duff learned that the Company's balance sheet for the year would be much stronger than anticipated with the cash balance higher than forecast by $20 million. Mr. Hoskins also informed Duff that the 2004 revenue projection had [*97] been lowered from $425 million to $418 million. (*Compare* PX-154 at 00007 *with* PX-213 at 00008-13.)

204. Duff also conducted an independent review of the interest rate environment and current public market prices and valuation statistics for public companies comparable to Antioch as of December 9, 2003, and concluded that the changes in valuation multiples were immaterial and would not change the conclusions presented in the October 27, 2003 preliminary fairness report. (JX-61 at D&P_A005458-5459; Tr. 4916:9-4925:3.)

205. Duff drew a final conclusion that the proposed Transaction price of $850 per share was within the range of fair market value of the Company as of the December 16, 2003 closing date, and that the estimated value of the warrants as of the December 16, 2003 closing date had not changed since the October 27, 2003 preliminary fairness report. (*Id.*)

206. As a result, Duff issued its final fairness opinion to GreatBanc. (JX-62.) Duff stated that nothing had come to its attention during the scope of its analysis to suggest that it was not reasonable to rely on the information furnished by Company management, including management's projections and other business-related reports, [*98] and that Duff had exercised its independent judgment in using this information. (*Id.* at D&P_A005608.)

#### 4. Jenkens & Gilchrist's Legal Due Diligence

207. Alongside GreatBanc and Duff, J&G conducted substantial legal due diligence of Antioch, including a review of the Company's finances, performance, corporate structure, employee benefits, human resources, intellectual property, vendor and supplier contracts; corporate contracts; and real estate holdings and lease arrangements, among other information. (DX-240; DX-326; PX-397.)

208. J&G's October 24, 2003 Due Diligence Memo to GreatBanc summarized their detailed analysis regarding the Company, and included bolded and bracketed notes for items of interest or follow-up. As part of their due diligence, J&G conducted an in-depth review of the corporate minutes from 2002 and 2003 and financial statements for 2001 and 2002, making notes and comments for follow-up in areas such as financial performance, international markets, and inventory issues. (DX-240.) 209. J&G's December 11, 2003 Due Diligence Memo to GreatBanc summarized their final due

diligence findings, and included responsive bold and bracketed summaries of the analysis conducted and [*99] conclusions reached regarding the issues raised in the October 24, 2003 memorandum. (DX-326; Tr. 1091:25-1093:10)

#### 5. GreatBanc's Decision to Decline the Tender Offer

210. GreatBanc did not blindly rely upon Duff or J&G. In addition to Ms. Marchetti directly participating in the due diligence meetings and investigation, GreatBanc worked closely with both Duff and J&G and stayed in contact with those advisors throughout the process. (Tr. 1123:6-1124:17.)

211. GreatBanc's ESOP Committee, a multidisciplinary body made up of professionals of diverse professional backgrounds in areas of finance, law, ESOPs, businesses, etc. to consider GreatBanc's ESOP-related decisions, met at least three times to discuss the proposed Transaction and the analyses it received from its legal and financial advisors—October 13, 2003, October 27, 2003, and December 12, 2003. Members of GreatBanc's ESOP Committee were provided with Duff's presentations and analyses and J&G's due diligence memoranda in advance of their ESOP Committee meetings to assess the information. Lee Bloom and David Ackerman attended the ESOP Committee meetings to present and explain their reports, and to respond to questions from Committee [*100] members and if necessary revise the reports according to feedback received from the ESOP Committee. (DX-204; DX-240; DX-250; DX-253; DX-326; DX-327; JX-30; JX-31; JX-37; Marchetti Tr. 1211:1-1232:21; Bloom Tr. 4340:6-4360:21, 4381:25-4383:19.)

212. GreatBanc carefully reviewed the analysis, methodology and assumptions used by Duff in assessing the Transaction at all stages, including the analysis of Company performance during the 12 months before the Transaction closed. (*Id.*; DX-185; JX-61; Tr. 1091:25-1095:17, 1231:14-1232:20.)

213. During GreatBanc's ESOP Committee meetings, the ESOP Committee reviewed the detailed analysis presented by Duff page-by-page and was engaged in discussion and questioning with Duff's representatives. (Tr. 1214:11-1215:18, 1221:12-19, 1224:1-8, 4342:16-4343:17, 4349:25-4350:15.) Far from rubber-stamping Duff's analysis, the committee challenged Duff until it was satisfied that its questions had been answered. (DX-204; DX-250; DX-327; Tr. 1218:9-1219:22, 1228:1-10, 4340:6-4343:17.) The ESOP Committee also engaged with J&G regarding their legal due diligence findings. (DX-250; DX-327.)

214. For example, during the October 13, 2003 meeting Mr. Bloom explained [*101] in detail the proposed terms of the Transaction and Duff's analysis and opinion that the

Transaction as proposed was not fair to the ESOP from a financial point of view. (DX-204.) The GreatBanc ESOP Committee then engaged in a thorough discussion of how to structure a revised proposal and the various alternatives that would make the Transaction fair to the ESOP. (*Id.*) Likewise, during the October 27, 2003 meeting, the GreatBanc ESOP Committee examined and probed each page of Duff's preliminary fairness analysis (Tr. 1221:12-19) (*see also* 1216:1-7), and also engaged with Mr. Ackerman regarding J&G's legal due diligence investigation and the issues identified for follow-up. (DX-250.) And in the December 12, 2003 meeting, the GreatBanc ESOP Committee similarly probed and considered Duff's updated due diligence and analysis since the October 27, 2003 preliminary fairness report and the Company's recent financial performance, as well as the legal due diligence findings presented by Mr. Ackerman. (DX-327)

215. Marilyn Marchetti testified that the Antioch Transaction was one of the most scrutinized, heavily discussed, heavily negotiated, and heavily analyzed transactions that was ever done **[\*102]** at GreatBanc. (Tr. 1228:1-10.)

216. GreatBanc, Duff, and J&G also all reviewed and provided comments to the tender offer proxy materials. (Tr. 1226:15-1227:14.)

217. On December 12, 2015, after final and thorough discussion of the financial and legal affairs of Antioch, and full consideration of the expert opinions and analysis from Duff and J&G, GreatBanc's ESOP Committee voted to decline to tender the shares of the Company held by ESOP in response to the Company's tender offer. (DX-327; Tr. 4381:25-4383:19.)

## F. Houlihan Lokey Also Concluded That $850 Per Share Was Fair Value

218. Duff and GreatBanc's conclusion that the $850 per share value used in the Transaction was fair is buttressed by the fact that Houlihan Lokey reached the same conclusion in its independent analysis of whether the consideration to be paid to the non-ESOP shareholders was fair from a financial point of view. (DX-87.) Plaintiffs do not dispute that Houlihan Lokey was an experienced and highly qualified valuation firm, recognized as one of the premier financial advisory firms in the ESOP industry. (DX-75; DX-87; Tr. 1111:19-1112:1, 1112:23-1113:12, 4046:23-4047:15, 4675:7-4679:10.) Houlihan went through the due diligence **[\*103]** process alongside Duff, with its analysts attending many of the same meetings and receiving the same documents. (DX-88; DX-109; DX-112; DX-116; DX-117; DX-277 at HL000563; DX-745; PX-171; PX-174; Tr. 4565:11-4587:1,

4684:4-4703:21.)

219. Then, just like Duff, Houlihan went through the process of analyzing the data to determine whether $850 was a fair transaction share price. It concluded that the range of fair market value of Antioch spanned from $825 per share to $920, thus putting the $850 per-share price well within the range. (JX-40 at GBT00103; DX-278 at HL000550.) Houlihan also analyzed the Package of cash, notes and warrants and affixed a value range for the Package of $836 to $869, also encompassing the $850 per share value. (*Id.* at GBT00103; DX-278 at HL000550.) It therefore gave the opinion that the cash consideration and the Package consideration to be received by the selling shareholders was fair to them from a financial point of view. (*Id.*) Although plaintiffs argue there were flaws in Duff's valuation and fairness conclusions through their expert Robert Reilly, they presented no evidence suggesting that Houlihan Lokey did anything wrong in reaching its valuation and fairness **[\*104]** opinions.

220. Like Duff, Houlihan constructed a written fairness analysis that provided a summary of the Transaction and its terms, a description of the due diligence performed by Houlihan, an overview of the Company's operations, history, and of the industry-specific conditions at the time. The analysis included Antioch's historical and projected financial statements, as well as other publicly available information. Also like Duff, Houlihan's analysis included both a DCF and a comparable company analysis. (DX-277.)

221. After completing a diligence process to understand Antioch's management's financial projections, Houlihan determined that it could reasonably rely upon the Company's projections for valuation purposes. (Tr. 4544:25-4545:21, 4692:15-21, 4709:3-14.)

222. Both Kreg Jackson and Terry Treemarcki, two Houlihan analysts who worked on the Transaction, testified that they have experienced situations in which the projections provided by a company in connection with a fairness opinion were not reasonable. (Tr. 4545:22-4546:22, 4709:15-4710:14.) In such cases, Houlihan's practice is to further diligence the projections in an attempt to understand them. (Tr. 4546:12-22.) If Houlihan **[\*105]** is still uncomfortable with the reasonableness of the projections, it either attempts to persuade the company to alter the projections, or will simply not use the projections and forgo a DCF analysis. (Tr. 4709:15-4710:14.) With Antioch, Houlihan Lokey accepted the projections as reasonable and incorporated them into its analysis. (Tr. 4547:9-19, 4709:3-14.)

### 1. Houlihan's DCF Analysis

223. Houlihan used these projections to perform a DCF valuation. (DX-277 at HL000591.) Houlihan developed a WACC range of 10% to 12%—slightly lower than the WACC used by Duff (meaning that the future cash flows would be discounted less than in Duff's model yielding a higher enterprise and price share value for Antioch). (*Id.* at HL000591, 605.) However, Houlihan, unlike Duff, also included a CSRP of 3%, which had the effect of increasing the discount rate to a level more similar to Duff's. Thus, Houlihan, like Duff, concluded that the $850 per-share price was well within the range of fair market value of the Company, and in fact toward the lower end of that range. (JX-40 at HL000591.)

## 2. Houlihan's Comparable Company Analysis

224. Houlihan performed a comparable company analysis in addition to a DCF analysis, **[*106]** just as Duff did. (DX-277 at HL000586, 588-89, 607-16.) Jackson and Treemarcki testified that it is Houlihan's standard practice—and it is generally prudent, when valuing a private company—to use at least two valuation methods to determine a company's value. (Tr. 4611:13-4612:1, 4706:16-4707:1.)

225. Houlihan found five companies to use as comparables, and it described them in detail, detailing their similarities to Antioch in a number of categories such as sales strategy (*i.e.*, party-plan selling), number of sales representatives, sales representative growth rates, sales per representative, sales representative turnover, and average order size. (DX-277 at HL000582, HL000607-616; Tr. 4611:1-12.) Among those five companies were Avon, Blyth and Tupperware, three of the comparable companies used in Duff's analysis. (DX-277 at HL000607-616.). (DX-277 at HL000582.)

226. Like Duff, Houlihan assessed the range of valuation multiples for the comparable publicly traded companies it selected, and assigned to Antioch a DCF multiple that was below the median multiple for the comparable companies. (*Id.* at HL000584.) This conservative valuation approach reflected a number of risks and threats to the **[*107]** Company, including increased competition in the industry. (*Id.*)

227. The comparable companies analysis yielded a per-share value of $820 to $888 per share. (DX-277 at HL000586.) Again, the $850 value used in the Transaction fell squarely within this range. The comparable company method's range was also highly similar to the range obtained through the DCF approach, particularly at the low end of the range. (*Id.*) This gave further assurance that Houlihan was valuing the Company appropriately.

## 3. Houlihan's Fairness Review Committee Approves Its Fairness Opinion

228. Before Houlihan issues any fairness opinion, the Houlihan team seeking to issue the opinion must present its analysis for scrutiny to Houlihan's Fairness Review Committee. (Tr. 4712:2-13.) The Committee is comprised of experienced, senior officers in Houlihan's fairness opinion practice group who are not part of the team that worked on the fairness opinion at issue. (Tr. 4587:14-4588:22.)

229. Houlihan's Fairness Review Committee approved the fairness conclusion reached by Houlihan's Antioch team and accordingly, Houlihan issued its fairness opinion to the Board. (DX-278; Tr. 4589:20-24.) Plaintiffs present no evidence that Houlihan **[*108]** did anything wrong in reaching its valuation opinion, and the valuation therefore serves as a contemporaneous data point indicating that the Company received adequate consideration when it paid $850 per share in the tender offer.

## G. The Testimony of Plaintiffs' Expert Robert Reilly and Defendants' Expert Jeffrey Risius Regarding Duff & Phelps's Analysis

230. Both plaintiffs and defendants offered expert testimony regarding Duff's analysis and conclusions.

## 1. Plaintiffs' Expert Robert Reilly

231. Plaintiffs' expert Robert Reilly testified that, based on his experience and expertise, he always found Lee Bloom to be a competent valuation professional. (Tr. 4046:9-22.) Reilly, however, testified that Lee Bloom and Duff's financial analysis in this case suffered from three "flaws." (PX-870; Tr. 3965:19-3966:21, 3994:13-17, 4033:17-4034:17.) Mr. Reilly did not provide any testimony or opinion regarding GreatBanc's prudence in relying upon Duff's conclusions.

a. *Industry and Company Risks*

232. Reilly described the so-called "first flaw" in Duff's analysis as a failure to properly account for three risks facing the Company at the time of the Transaction: (i) industry technological changes; (ii) **[*109]** industry consumer preference changes; and (iii) certain company-specific business trends involving its consultants. (Tr. 4066:23-4070:10, PX-870.)

233. Other than the alleged failure to sufficiently account for these three risks, Reilly testified that he agreed with the rest of Duff's DCF analysis, including their adjustment for the risk of international and new business ventures. (Tr. 3931:1-3934:8.)

Indeed, Reilly testified that ultimately the difference between his analysis and that of Duff could be characterized as "two reasonable and skilled analysts" reaching a different conclusion. (Tr. 4114:1-23.)

234. The principal bases for Reilly's conclusion that Duff overvalued the Antioch stock pre-Transaction are: (i) industry research from 2003 that he found in 2015 indicating a growing scrapbooking industry but increased competition from larger retailers; (ii) a review of selected Antioch consultant sales and productivity figures from 2003; and (iii) a few unrecorded telephone calls of unknown length with Mark Mizen, Rhonda Anderson, and Richard Wiser more than ten years after the Transaction. (PX-870 at ¶¶100-131.) Mark Mizen, Rhonda Anderson, and Richard Wiser are all former Antioch [*110] employees who testified for plaintiffs at trial, and Richard Wiser was not at the Company at the time of the Transaction and had no firsthand knowledge of what occurred prior to the Transaction. (Tr. 3578:12-3583:14.) Reilly did not have the benefit Duff did of interviewing management and other businesspeople at the Company in 2003. (Tr. 4074:12-15.)

235. Reilly developed and ran five DCF analyses, four of which used significantly lower ten-year revenue projections for Antioch than Duff and one of which used a significantly higher discount rate than Duff. Mr. Reilly's adjustments resulted in significantly lower per-share value conclusions than the median $845 per share that Duff calculated. Reilly's per-share value conclusions from his five DCFs ranged from $315 per share to $590 per share. (PX-870 at ¶¶ 35-42, Exs. 14-20.)

236. Reilly relied solely on the DCF method of valuation; he did not perform a comparable company analysis or any other analytical check on his DCF conclusions. (PX-870 at ¶155; Tr. 4127:9-13.)

237. Reilly opined that the most reasonable and reliable per-share value of Antioch stock immediately prior to the Transaction is $500. Reilly acknowledged his 2003 valuation [*111] is lower than the 2002 fair market valuation of $680 per share (which he did not take issue with) and about equivalent to an independent appraiser's fair market valuation of Antioch stock in 2001 ($496 per share), a year when the Company had substantially less revenue, gross profit, EBITDA, and total assets than it had in 2003. (PX-870 at ¶¶ 41-42; JX-8 at GBT06809; Tr. 4171:1-25)

238. Like Duff, Reilly used the Capital Asset Pricing Model to come up with an appropriate discount rate to use in his five DCF analyses. Reilly calculated a WACC of 13%, right in the middle of Duff's 12%-14% range. (Tr. 3968:11-3971:13; PX-870 at Ex. 19a.)

239. However, in the first of his five DCF models (the one that used Duff's independently calculated revenue projections), Mr. Reilly incorporated a 5% CSRP to his WACC calculation, resulting in an 18% discount rate to the ten-year cash flows he borrowed directly from Duff. (PX-870 at Ex. 19b.) Mr. Reilly's CSRP-based DCF was identical to Duff's except for the addition of this 5% CSRP, which alone had the effect of drastically lowering the per-share value conclusion (from $845 to $590). (PX-870 at Ex. 20; Tr. 3983:2-3984:12.)

240. Reilly testified that this [*112] 5% CSRP could be called the "Robert Reilly estimate"—it is not based on any specific formula or quantification of the specific risk factors he claimed Duff failed to sufficiently account for in its analysis, nor is it based on any generally accepted methodology. (Tr. 4150:15-4152:6.) He was unable to explain, on cross-examination, why he chose a 5% CSRP rather than, for instance, a 4% CSRP or a 6% CSRP, other than admitting it was "entirely a matter of [his] judgment." (Tr. 4151:5-9.)

241. In four of his other five DCF analyses, Reilly used his (and Duff's) 13% WACC calculation but applied the 13% WACC to significantly lower revenue projections than Duff used in its analysis. (PX-870 at Ex. 20.) Two of those four DCF analyses are labeled "FTI-1" and "FTI-2" because they borrow revenue projections derived from 10-year sales projections calculated by one of plaintiffs' other experts, Michael Buchanan of FTI Consulting. (Tr. 3960:15-3961:23; PX-870 at ¶132, Ex. 20.) Buchanan developed his 10-year sales projections using a hybrid that combined an autoregressive integrated moving average ("ARIMA") time-series statistical methodology for domestic sales, and a non-ARIMA based extrapolation [*113] from limited data for international sales. (Tr. 3709:19-22; PX-869.) ARIMA is a forecasting methodology that, in its classic form, is based only on past results; thus, a sales forecast based on a classic ARIMA methodology relies on past sales as the only input. Sophisticated ARIMA analyses can introduce additional variables, but the method essentially uses past performance to forecast future performance.

242. Reilly used Buchanan's ten-year projections for two of his DCFs—including FTI-1, which he determined was the most reasonable and reliable—despite testifying that he: (i) has never worked with Buchanan before and did not review or critique the data in Buchanan's report before using it in his analysis; (ii) could not recall a single engagement or transaction in his experience where ARIMA projections were used in the valuation of a company or its stock; (iii) and has never contracted for a statistician or other professional to use ARIMA to project corporate sales in any engagement or

transaction he has worked on. (Tr. 4048:9-4051:21.)

243. Moreover, every other witness who was asked—including members of Antioch management, Lee Bloom, the experts, and representatives of the Company's [*114] lenders—testified that they had never seen an ARIMA or ARIMA-type methodology used to project corporate sales for ten years in the future. (Blair Tr. 1944:19-1945:17, Moran Tr. 3154:2-3164:20, Buchanan Tr. 3700:3-3701:1, 3797:13-3801:17, 3804:10-19, Bloom Tr. 4387:3-4388:17, Risius Tr. 5867:6-5870:6, 5873:1-18, Jennett Dep. 219:19-220:14, Powe Dep. 32:22-24.) Nor had any witness seen ARIMA used to value a company in a transaction or to price a deal. (DX-668, at ¶ 203; Blair Tr. 1944:19-1945:17, Reilly Tr. 4050:1-4051:21, Bloom Tr. 4387:3-4388:17, Risius Tr. 5867:6-5870:6, 5873:1-18.)

244. The greater weight of evidence showed that ARIMA, while useful for determining whether sales are trending in one direction or another, is not a reliable methodology to project sales revenue out for a multi-year period, as Mr. Buchanan did in this case (he has never used it to project out more than 5 years in the ordinary course of his non-litigation work). (DX-423; DX-424; DX-432; DX-441; DX-448; Tr. 1944:19-1945:17; 3154:2-3164:20.)

245. Furthermore, Antioch did not have the software or capabilities for using ARIMA or econometric modeling at the time of the 2003 Transaction. (Tr. 3464:7-13, 3467:20-3468:1, [*115] 3654:16-24.)

246. With respect to Buchanan's projections of international sales through extrapolation, Buchanan admitted that his analysis was based on incomplete data and that he does not know how the analysis might be affected by using the data he did not have. (Tr. 3834:24-3836:13.)

247. With respect to Buchanan's overall approach—combining ARIMA projections for domestic sales and an extrapolation of how certain months compared to plan—Buchanan testified that this approach is not something he has ever seen before and is not a method he has personally applied in his work or used to perform services for a non-litigation client. (Tr. 3844:21-3845:19.)

248. The other two DCF analyses in which Reilly applied his 13% WACC contain projections from two downside feasibility models that Deloitte prepared for the Company. They were contemporaneously labeled "Downside" and "Big Downside." (Tr. 4188:20-24; PX-870 at Exs. 15, 16, 20.)

249. Despite his opinion that Duff's financial projections were too high and did not sufficiently account for certain industry and business-specific risks, Reilly was unable to identify any

evidence that indicated the projections management provided to Duff were unreasonable—projections [*116] which he confirmed were materially higher than the projections Duff used for purposes of its fairness analysis. (Tr. 4147:14-19; 4117:11-4121:19; JX-37; PX-213.) Reilly also testified "I don't know that anyone was able to predict 2006 and 2007 because the company's results were a lot lower than any projection, any forecast indicated." (Tr. 3991:21-23.)

b. *Reilly's Post-Transaction Valuation*

250. Reilly testified that the so-called "second flaw" in Duff's fairness analysis was its post-Transaction valuation of Antioch. According to Mr. Reilly, Duff insufficiently considered the Company's projected repurchase obligation. (Tr. 3994:13-17.) Reilly opined that an appropriate consideration of the Company's projected repurchase obligation would have resulted in a per-share valuation immediately post-Transaction that was $32 lower than his $500 value conclusion (or $468 per-share), which he opined results in an additional $7.1 million dollars in economic damages suffered by ESOP participants. (PX-870 at ¶¶ 43-49.)

251. Reilly relied upon repurchase obligation scenarios generated by plaintiffs' expert David Weinstock, a third-party administrator for Benefit Concepts Systems, Inc. (Tr. 4005:19-4006:6; [*117] PX-870 at ¶ 45.) As a first step, at the instruction of plaintiffs' counsel and without any explanation as to why, Reilly excluded from his analysis all of Weinstock's repurchase obligation scenarios based on the industry standard retirement age of 65. (PX-870 at ¶ 216; Tr. 4157:5-18.) Reilly then took Weinstock's remaining repurchase obligation scenarios chosen by plaintiffs' counsel, averaged them, discounted them to present value, concluded that Duff used a repurchase obligation projection that was $80 million dollars too low, and then deducted that full $80 million dollars directly from the Company's enterprise value immediately post-Transaction as determined by Duff. (PX-870 at Exs. 6a, 7, 21; Tr. 4157:19-4158:11.) Reilly made this $80 million dollar direct deduction, but made no concomitant reduction to the total number of outstanding shares that would have been purchased with the $80 million dollars he projected Antioch would need to redeem shares and retire them into treasury. (PX-870 at Ex. 21; Tr. 4160:22-4163:17.)

252. Specifically, Reilly deducted $80,065,000 from Duff's post-Transaction enterprise value estimate of approximately $395 million, made numerous other deductions [*118] and additions that Duff had also made, and arrived at a "Corrected Fair Market Value of Common Equity" of $104,056,000. Reilly then divided this figure by the number of fully diluted common shares outstanding immediately after the Transaction (222,547) to arrive at a per-share value of $468. Reilly thus

decreased the Company's enterprise value by $80,065,000 for the projected future repurchase of ESOP participant shares, without accounting for the fact that the Company could not incur a repurchase obligation of that amount without a corresponding reduction in the number of shares which would be purchased and retired into treasury in exchange for the $80,065,000. (*Id.*)

253. Reilly admitted that no other valuation professional in this case—Houlihan, Duff, Business Valuations, Inc. ("BVI") (which appraised the Company's stock at the end of 2002), or Prairie Capital (which appraised the Company's stock at the end of 2003)—accounted for the projected future repurchase obligation in this manner in their contemporaneous, non-litigation based, valuations of Antioch. (Tr. 4164:22-4165:19.)[10]

## H. Defendants' Expert Jeffrey Risius

254. Defendants' expert Jeffrey Risius (a managing director at Stout Risius Ross ("SRR")) offered opinions regarding the analysis and valuation work performed by Duff, as well as Reilly's criticisms of that work. (DX-667; Tr. 5688:4-5931:24, 6111:23-6138:6.) Plaintiff Evolve retained SRR in 2008 to conduct a "peer review" of Prairie Capital's year-end 2007 valuation for Antioch. (New Dep. 48:3-17.) Michael New of Evolve testified that Evolve engaged SRR because they have "one of the best reputations in the ESOP valuation world" and had a reputation within the ESOP community as "the best game in town." (*Id.* at 48:22-50:9.) Mr. New similarly lauded SRR in 2008 when recommending Antioch hire SRR, stating that "SRR has the reputation of being the best in the ESOP industry." (DX-585; New Dep., 49:13-50:13.)

### 1. Opinion Regarding Duff's Analysis and Opinions

255. Risius **[*120]** opined that based on his review of the Duff work files and reports, as well as his own independent analyses and market research, all aspects of Duff's process for reaching its fairness and valuation opinions were methodologically sound and customary, and were reasonable and appropriate, and that Duff's methodology and valuation

opinions were conservative based on what was known or knowable as of the Transaction date. (Tr. 5710:17-5711:18; DX-668 at ¶¶ 64-174.)

#### a. *Duff's Due Diligence*

256. Risius opined that Duff appropriately provided a detailed initial information request and supplemented it with numerous interviews with financial and nonfinancial management and employees, as well as in-depth independent market and industry research. Through this process, Duff familiarized itself with the Company's strengths, weaknesses, opportunities, and threats—all of which were factored into its valuation and fairness analysis. Risius also concluded that Duff was not restricted in any way with respect to the information gathering process. (DX-668 at ¶¶ 70-78; Tr. 5716:23-5721:20, 5729:19-5730:22.)

#### b. *Duff's Analysis Of Company Fundamentals*

257. Risius opined that Duff appropriately considered the **[*121]** major strengths, weaknesses, opportunities, and threats to Antioch—including risks such as competition, digital photography and technology, market saturation, and international and new business expansion. Risius further opined that based on his independent analysis of the industry and market at the time of the Transaction, Duff may have actually overstated the risk of digital photography to the Company. (DX-668 at ¶¶ 79-83; Tr. 5716:23-5721:20, 5729:19-5730:22.)

#### c. *Duff's Analysis Of Historical Financial Statements*

258. Risius opined that analyzing historical financial statements helps a valuation professional better understand and interpret the earning power of the subject company, which is usually the most important element of a business valuation. Risius concluded that Duff appropriately reviewed the Company's audited historical financial statements from 1999 through the latest-twelve-month period of 2003, and carefully considered and evaluated such metrics as historical revenue CAGR and EBITDA margins, as well as key historical financial statement ratios. (DX-668 at ¶¶ 84-88.)

#### d. *Duff's Financial Projections*

259. Risius testified that at the time of the Transaction, management had **[*122]** demonstrated a long historical track record of preparing "down the middle" reasonable projections compared to actual results, which he studied from the perspective of both one and two years out. Moreover, Risius noted that at the time of the Transaction other contemporaneous advisors and lenders concluded that management's future projections were reasonable. Risius opined that Duff nonetheless independently developed and relied on significantly lower projections than both

---

[10] Reilly opined that the "third flaw" in Duff's analysis was an insufficient consideration of *IRC Section 409(p)*. (Tr. 4033:17-4034:17.) **[*119]** However, Reilly testified that he was giving no opinion that Duff's alleged "third flaw" damaged the Company or the ESOP in any way. (Tr. 4165:20-4166:8.) Nor could he, given the fact that the Company never violated *section 409(p)*, and was able to effectively manage the issue. (Morgan Tr. 2167:12-2168:6.)

management's projections and the Company's historical results suggested would be achieved, adjusting them downward for industry and company-specific risks. Risius opined that his own independent analysis, industry research, and valuation work suggested Duff's downward adjustments contributed to a very conservative valuation of Antioch (*i.e.*, a lower per share value). In Risius's expert opinion, Duff therefore applied a methodologically sound approach to developing its own set of conservative financial projections that were reasonable and appropriate. (DX-668 at ¶¶ 89-112; Tr. 5734:3-5750:10, 5756:6-5779:11, 5783:25-5785:3.)

## 2. Duff's DCF Analysis and Comparable Company Analysis

260. Risius opined that Duff reasonably [*123] applied a methodologically sound DCF analysis in developing its fairness and valuation opinions. (DX-668 at ¶¶ 114-143.) In addition to his opinion that Duff's financial projections were reasonable and conservative, Risius testified that Duff's determination of an appropriate discount rate or WACC was likewise reasonable, conservative from a valuation perspective, and methodologically sound. (DX-668 at ¶¶ 117-143; Tr. 5785:4-5808:2.)

261. Risius reviewed Duff's work papers and analysis and concluded that Duff derived its WACC in the range of 12% to 14% by a methodologically sound application of the commonly used CAPM formula. (*Id.*)

262. Risius also conducted his own independent analysis and calculation of the WACC to use in a DCF for purposes of valuing the Antioch stock prior to the Transaction. Risius concluded that an appropriate WACC would have been 11.9%, which is below the 12% to 14% range Duff used in its DCFs, and all else equal results in a higher per-share fair market value than Duff's upper range figure of $932 per share. (*Id.*)

263. Risius further opined that based on Duff's significantly lower projections compared to management and the general optimism surrounding the scrapbooking [*124] industry at the time of the Transaction, in his expert opinion Duff's 0% CSRP was appropriate. Similar to Mr. Bloom, Risius testified that to apply a CSRP of any percentage to Duff's independently downward adjusted revenue projections would have amounted to a methodologically improper double-counting of risk, a "textbook" or "classic . . . double-count of risk," which would produce an artificially low and unsupportable value conclusion. (Tr. 5796:22-5802:9; DX-668 at ¶¶ 133-134, 212-223.)

264. Risius also testified that, if Reilly had used the quantitative formula for calculating a potential CSRP from a preeminent valuation treatise by Shannon Pratt (which plaintiffs admitted into evidence) rather than selecting a CSRP based on what was essentially his own gut feeling, he would have reached a conclusion similar to Duff's and Risius's. (PX-979; Tr. 5994:17-5998:4; 6118:6-6127:18.)[11]

265. Risius further opined that Duff's valuation was also conservative because Duff included in its DCF analysis [*125] a projected benefit expense equal to 21% of eligible compensation every year from 2005-2013, which the Company was not obligated to make, and which all else equal had the effect of lowering Duff's per-share conclusions of value. (DX-668 at ¶¶ 91, 110.)

266. Moreover, Risius testified that Duff was additionally conservative in its value conclusions because it did not account for the approximately $20 million dollars that the Company had on its balance sheet as a non-operating asset from the cash surrender value of corporate owned life insurance ("COLI"). Inclusion of this $20 million dollars would have increased Duff's value conclusion. (DX-668 at ¶ 160; Tr. 5824:12-5826:6.)

267. In addition to Duff's DCF analysis, Risius also concluded that Duff reasonably used a methodologically sound comparable company analysis to confirm that its DCF-driven valuation was reasonable and conservative. (DX-668 at ¶¶ 145-159; Tr. 5808:22-5824:11.)

268. Risius testified that it is customary and prudent for a valuation professional to use a comparable company analysis as a check on the reasonableness of a DCF valuation, like Duff did. The comparable company method serves as a "market reality check" to make [*126] sure the DCF conclusions are supportable and reasonable. (Tr. 5816:3-25.) Risius noted in relevant part that in selecting its comparable companies, there was only one company that Duff used in its analysis that was not also used by other financial analysts valuing the Company at or around the same time and outside the litigation context, which included Houlihan, BVI, and Prairie Capital. (DX-668 at ¶ 150.)

269. Although Risius determined that Duff's analysis was reasonable and methodologically sound, he also conducted his own independent comparable company analysis using the broader group of companies than Duff, Houlihan, BVI, and Prairie Capital did in their comparable company analyses. (DX-668 at ¶¶ 145-159, Ex. B; Tr. 5817:1-5824:11.) Even

---

[11] Mr. Reilly did not use or refer to the quantitative, more objective CSRP formula developed by Mr. Pratt in his treatise. Mr. Pratt is a recognized valuation expert. (Risius Tr. 5994:17-5995:6, 6126:2-7.)

though Risius used a broader set of comparable companies than Duff, he too concluded that the EBITDA multiple implied by Duff's DCF analysis was at the low end of the range of EBITDA multiples for the comparable companies, demonstrating that Duff's DCF value conclusions were reasonable and conservative. (*Id.*)

270. Based on Risius' independent research, review of the record, and DCF and comparable company analyses, he concluded that $850 per-share [*127] was at the "very low end" of the range of fair market value for Antioch stock at the time of the Transaction. (Tr. 5824:12-5829:12, 5832:7-5834:16.)

a. *Duff's Analysis of the Package Consideration and PPP*

271. Risius opined that based on his review of Duff's analysis of the individual components of the Package, he concluded that all the methodologies, inputs, and assumptions Duff used were based on commonly accepted methodologies, were reasonably selected and were appropriately applied. (DX-688 at ¶¶ 166-174; Tr. 5834:18-5837:10.)

272. Risius also concluded that Duff reasonably and appropriately negotiated for the PPP provisions as a benefit for the Antioch ESOP to protect participants who left the Company in the three years immediately following the Transaction, and who would not yet have realized the economic benefit of the Transaction to the Company (in particular the tax savings) that Duff determined counter-balanced the per-share dilution caused by the warrant component of the Package. (*Id.*)

b. *Duff's Consideration of The Projected Repurchase Obligation in Post-Transaction Valuation*

273. As noted above, Duff considered Antioch's post-Transaction obligation to repurchase shares of departing [*128] employees to test the feasibility of the Transaction in a downside scenario analysis—in other words, to test whether Antioch would be able to meet its obligations, including its repurchase obligation, if its future operations fell short of reasonable expectation.

274. From a feasibility perspective, Risius concluded that Duff appropriately ran downside scenarios to test whether the Company could handle its debt obligation and repurchase obligation going forward if Antioch's performance fell below the expected outcome. (DX-668 at ¶ 111, 252 n. 215; Tr. 5837:11-25.) (*See also* Bloom Tr. 4324:14-4325:25.) It is clear that there was a significant cash cushion available to the Company to meet its obligations if future events did not turn out as Duff reasonably anticipated post-Transaction.

275. Like all of the valuation professionals in this case, and

unlike Mr. Reilly, Duff did not account for Antioch's projected repurchase obligation in its calculation of the Company's post-Transaction value. From a valuation perspective, Risius agreed with Mr. Bloom that it is improper to account for a company's projected future repurchase obligation when that company is redeeming shares of departing ESOP [*129] participants at fair market value, as the Antioch Company did before and after the Transaction. This is because share redemption at FMV inherently has no per share valuation impact.[12]

276. By way of illustration, Risius demonstrated that if a company's aggregate equity value is $100 and that equity is divided equally among 10 shares, each share is worth $10.00. If an employee of that company with one share retires and the company repurchases that share for $10 dollars and retires it to treasury (i.e., redeems the share as Antioch did), the company would be left with an aggregate equity value of $90 divided equally among 9 shares — each share would still be worth $10 even though the company's total equity value decreased as it typically does in a redemption at fair market value. (DX-668 at ¶ 227; Tr. 5880:13-5882:22.)

277. In sum, [*130] Risius concluded that as it relates to the financial and valuation analysis prepared by Duff and presented to GreatBanc as part of its final fairness opinion: (i) the information used by Duff was adequate; (ii) the valuation methodologies employed by Duff were appropriate and properly applied; (iii) the projections used by Duff were reasonable based on what was known or knowable at the time of the Transaction; (iv) the primary inputs and assumptions used by Duff in its application of its valuation methodologies were reasonable; (v) the framework used by Duff to assess fairness from a financial point of view to the Antioch ESOP was methodologically sound; and (vi) the calculations in the Duff valuation models were accurate. (DX-668 at ¶ 174.)

**3. Risius's Rebuttal to Reilly's Critique of Duff's Analysis and Opinions**

278. Risius also testified that based on his review of Reilly's report and supporting documents, Reilly's conclusions are unreasonable and unreliable, and the Antioch ESOP suffered no damage as a result of the Transaction. (DX-668 at ¶¶ 23-26, 175-281, 283; Tr. 5711:19-5712:13.)

---

[12] In 2004, the Company also amended the Plan to allow for a short time a method of dealing with the repurchase of shares from retiring and terminating participants referred to as "ESOP recycling." Like redeeming shares, this methodology also had no impact on per-share valuation nor on the Company's aggregate equity value, as the Court will discuss further below.

a. *Risius's Rebuttal to Reilly's So-Called "First Flaw" Opinion*

279. Risius opined that Duff accounted [*131] for all the company- and industry-specific risks it identified in its valuation and fairness analysis, in addition to the Company's significant strengths which Reilly ignored in his analysis. Risius explained that Duff uncovered Company and industry-specific risk factors in its extensive due diligence process, which it then took into account through its conservative financial projections and a discount rate (WACC) based on economic, industry, and company-specific factors. (DX-668 at ¶¶ 181-190; Tr. 5716:23-5721:20, 5785:4-5788:2.) Risius opined that valuation analysts simply do not make line-item deductions from value for each and every risk facing the Company as a matter of customary practice, but that risks are customarily and properly accounted for in exactly the way the Duff accounted for them in its valuation analysis. (*Id.*)

280. Risius pointed out that Reilly's report contained virtually no citations to the factual record for his assertion that Duff's financial projections were unreasonable based on what was known or knowable at the time of the Transaction, and asserted that Reilly does not present a single source that projected the scrapbooking market to decline as of December [*132] 2003—rather, industry research from December 2003 shows just the opposite. (DX-668 at ¶¶ 83, 103-109, 189-190; Tr. 5768:12-5779:11.) The new ventures into the scrapbooking arena in 2003 from large competitors such as Michael's also belie Reilly's contention that a decline in the scrapbooking industry could have been reasonably foreseen in 2003. (*Id.*) There was increased competition in the scrapbooking industry because the prevailing wisdom was that the industry was growing.

281. Risius also opined that four of Reilly's DCF models are flawed because they are based on unsupportable cash flow projections, and Reilly's fifth DCF model is flawed because it incorporated a methodologically unsupportable 5% CSRP. (DX-668 at ¶¶ 192-223; Tr. 5862:8-5879:21, 5796:22-5802:9.) Risius asserted that the two DCFs which use revenue projections from two of Deloitte's downside models are methodologically unsound, as those projections were not reasonably expected base case results and were not prepared for purposes of valuation analysis (the evidence is that they were prepared for feasibility purposes and had the valuation of $850 as an input), which makes them inappropriate for use in a DCF analysis. [*133] (DX-668 at ¶¶ 193-196; Tr. 5862:8-5867:5.) (*See also* Tr. 1556:16-1559:7.)

282. Risius also opined that the two DCFs based on revenue projections derived from the projections prepared by plaintiffs' expert Michael Buchanan were similarly unsupportable, citing among other things (i) the deposition

testimony from Richard Wiser and Alan Luce that it is inappropriate to use ARIMA to project corporate sales ten years into the future, and (ii) the fact that no other market participants involved with the Company before or after the Transaction used ARIMA in their financial analyses and projections, including Deloitte, Duff, Houlihan, BVI, or Prairie Capital. (DX-668 at ¶¶ 197-209; Tr. 5867:6-5873:18.)

283. Risius asserted that he has never relied upon or seen other valuation financial advisors or market participants rely upon the ARIMA statistical forecasting techniques Reilly relies upon from Buchanan. (DX-668 at ¶ 203; Tr. 5869:12-5870:6, 5873:1-18.) And as noted above, Risius also concluded that Reilly's fifth and final DCF analysis was likewise methodologically unsound because the discount rate incorporated a completely subjective and unwarranted 5% CSRP applied to Duff's already risk-adjusted [*134] revenue projections. (DX-668 at ¶¶ 212-223; Tr. 5796:22-5802:9.)

284. Had Mr. Reilly undertaken a comparable company analysis, it would have indicated that the values for Antioch derived from his DCFs were unsound. (Risius Tr. 5814:6-5815:18; 5821:13-5824:11; DX-668 at Ex. B; JX-37 at D&P_A002722.)

285. Risius opined that the unreliability of Mr. Reilly's DCF value conclusions is underscored by the fact that they are materially lower than all other indications of fair market value that existed around the date of the Transaction, such as Duff's median valuation of $845 and Houlihan's low range valuation of $825 and high range valuation of $920. Risius concluded that Reilly's analysis is unduly influenced by hindsight bias. (DX-668 at ¶¶ 219-222; Tr. 5875:2-5878:20, 5887:23-5888:16, 5900:8-5901:12.)

b. *Risius's Rebuttal to Reilly's so-called "Second Flaw" Opinion*

286. Risius testified that Reilly's "second flaw" analysis is incorrect and even contrary to Reilly's own writings on the topic. As stated above, Risius explained that when a company is redeeming the shares of ESOP participants at fair market value (as Antioch did before and after the Transaction), it is well-established that there [*135] is no impact on the per-share value of the company. Risius pointed out that Reilly himself acknowledges this well-established principle in his writings. Thus, Risius opined that Reilly's deduction of the projected repurchase obligation of the Company from its post-Transaction enterprise value was inappropriate. (DX-668 at ¶¶ 224-237; Tr. 5880:13-5887:22.)

287. From a feasibility perspective, Risius also testified that even when using the future repurchase obligation projections from Weinstock—which defendants' expert Richard May

opined are methodologically unsound and also unreliable based on what was known or knowable as of the Transaction date (as the Court will discuss further below)—the tables appended to Reilly's report show that there would *still* be positive cash flow in the Company for the three years following the Transaction. (PX-870 at Ex. 6; DX-668 at ¶ 240; Tr. 5838:3-5847:20.)[13]

## I. Post-Transaction Events

### 1. The Fair Market Value of Antioch Stock From 2003-2006

288. Following the Transaction, the fair market value of Antioch stock continued to rise. (Morgan Tr. 1970:22-25; Moran Tr. 2650:16-20.) The independent valuation firm Prairie Capital determined that the fair market value of Antioch stock was $894 per share as of December 31, 2003 (two weeks after the Transaction closed at $44 less per share). A year later Prairie Capital determined that the fair market value of Antioch stock had risen even higher, to $943 per share as of December 31, 2004. (JX-74.) In other words, terminating employees in 2004 (entitled to the year end 2003 price) and 2005 (entitled to the year end 2004 price) received greater value per share than the non-ESOP shareholders in the Transaction. The year-end 2005 fair market value of Antioch stock dropped to $786 per share (DX-462), and again to $725 per share at the end of 2006. (JX-80 at P-WOOSLEY-000106.)

### 2. The Company's Management [*137] of the Repurchase Obligation

289. In the years after the Transaction, the Company experienced much larger than predicted levels of share redemptions. In 2004 alone, departing ESOP employees put approximately $109 million in ESOP shares to the Company. (JX-75 at P-WOOSLEY-000072.)

290. No evidence exists that the increased number of shares put were caused by any Transaction term, by the PPP or by

the Plan Amendment and change in distribution policy made in conjunction with the Transaction.

291. Defendants' expert Richard May testified that prior to the Transaction, the Company had followed best practices by focusing informed and detailed attention on its repurchase obligation, which included not just using state-of-the-art software and analysis of historical behavior to project what the future repurchase obligation might be, but perhaps more importantly, implementing all of the best cash management planning tools. (DX-667 at 10-15; Tr. 5308:6-5427:17, 5359:15-5373:13.)

292. As to projecting what the amount of the repurchase obligation might be in the future after the Transaction, May explained that although the total repurchase obligation of a 100% ESOP owned company is 100% of its value (since the Company [*138] has an obligation to buy back all the shares of ESOP participants when they terminate employment), the goal is to estimate what the reasonably expected amount of the repurchase obligation will be each year. In other words, what the reasonably anticipated amount of cash is that the Company will need each year to pay retiring and terminating ESOP participants for their shares of Antioch stock. (DX-667 at 5-8; Tr. 5287:3-5289:11.) May opined that the Company reasonably and adequately projected its future repurchase obligation by tasking the correct person (CFO Barry Hoskins) who was specifically qualified to prepare the studies and did so according to best practices at the time, and also by employing the best tools available.[14] (DX-667 at 10-14; Tr.

_____

[13] Risius did not offer any rebuttal opinion on Reilly's "third flaw" other than noting that opinion has no alleged damages associated with it and is based on assumptions and assertions by Reilly with no supporting facts or data. (DX-668, at ¶ 238.) Marilyn Marchetti also testified that, based on her [*136] experience seeing over 250 valuations a year, she has never seen a valuation that applied a risk factor in light of potential *IRC section 409(p)* violation risks, as Reilly suggests Duff should have done. (Tr. 1228:23-1229:25.)

[14] May also opined as to why the repurchase obligation projections presented by Plaintiffs' expert David Weinstock, as contrasted to the Company's repurchase obligation projections, were inherently unreasonable and methodologically unsound and unreliable. May explained that Weinstock's repurchase obligation projections suffered from many flaws, principally that they used unsupportable assumptions which drastically deviated from the Company's historical experience and what might reasonably be expected to happen in the future as of 2003. For example, May demonstrated that Weinstock's assumptions were disconnected from reality and, at times, unsupported by any historical experience or facts either before or even *after* the Transaction (*e.g.*, in some scenarios Weinstock predicted more than 50% of all employees would leave Antioch the very first year after the Transaction—which was unreasonable to assume in 2003, and in reality did not come close to happening in 2004.) (DX-667, at 43-48; Tr. 5395:23-5421:4.) In fact, it appears many of Weinstock's assumptions were dictated by Plaintiffs' counsel and Plaintiffs' expert Robert Reilly, none of whom are a repurchase [*140] obligation expert nor qualified to conduct repurchase obligation studies. (DX-634; DX-639; DX-641; Weinstock Tr. 3348:2-3349:11, 3360:23-3364:25; Reilly Tr. 4158:13-21.) To the extent that Weinstock's opinion is in conflict with May's, the Court finds May's opinion more credible, based both

5308:6-5327:17.) Unlike projecting corporate sales, May explained that projecting a future repurchase obligation is much more difficult given that it depends on many inherently unpredictable variables, including the unpredictable choices of individual employees about whether to retire or leave the Company—which can and does change from month-to-month and year-to-year, based on their own unique personal and professional situations.[15] (DX-667 at **[*139]** 5-8, 15; Tr. 5294:15-5297:15.)

293. May opined that although the repurchase obligation of the Company exceeded the forecasted projections in the three years after the Transaction—most drastically the $109 million obligation in 2004—that level of repurchase obligation was impossible to predict based on the historical data and the information known or knowable as of the Transaction date, as well as the numerous deterrents and disincentives to **[*141]** employees leaving the Company, such as the tax penalties for early access to the retirement account value and the desire to maintain salaried employment. (DX-667 at 15-23; Tr. 5327:20-5359:12.)[16]

294. May explained that the unusually large repurchase obligation was not caused by a "stampede" of employees leaving the Company (the employee turnover percentage was consistent with historical experience, and fewer employees left in 2004 and 2005 than in 2001), nor by any aspect of the Transaction, including the PPP terms or the Plan Amendment allowing those under the age of 50 to begin receiving 20% of their distributions right away. (*Id.*) Weinstock and plaintiff Monica Woosley both testified that the PPP terms alone would not have caused any employee to leave the Company. (Tr. 2610:21-2615:23, 3366:13-24.) Rather, May explained **[*142]** the unusual repurchase obligation was caused by an unpredictable change in behavior of a small group of high-share-balance employees. (DX-667 at 15-23; Tr. 5327:20-5359:12.)

_____

on its substance and on May's superior qualifications. (*Compare* May Tr. 5245:2-5278:6 *with* Weinstock Tr. 3316:20-3324:1.)

[15] Additionally, Karen Ng testified that she does **not** advise her clients to investigate whether particular high-balance ESOP participants are considering retiring because, in her experience, (a) the information participants provide in response to such inquiries is unreliable, and (b) participants might get nervous and wonder why they are being asked. (Ng Dep. 254:24-255:12.)

[16] Indeed, May noted that Plaintiffs Bonnie Fish, Chris Mino, and Monica Woosley, along with numerous other employees such as Mark Mizen and Rhonda Anderson, chose not to terminate their employment following the Transaction because they loved working for the Company and were not ready to end their careers and stop receiving a steady paycheck. (DX-668, at 17 n.32; Tr. 5342:21-5343:12.)

295. But even though the Company was faced with this unprecedented and unpredictable repurchase obligation, Antioch was able to handle it and thrive because it had prudently implemented a set of cash management tools. One such tool that Antioch implemented was pre-funding the future repurchase obligation by building up cash inside the ESOP through distributions made from the Company over a number of years. (Hoskins Sep. 15, 2011 Dep. 80:4-15.) As of the date of the Transaction, the Company had built up approximately $67 million dollars of cash inside the ESOP. (DX-667 at 25.) This cash could be used to fund repurchase obligation payments through a method referred to as "ESOP recycling"—where a share in the ESOP from a terminating or retiring participant (*e.g.*, an $894 dollar share) is exchanged for another asset in the ESOP of the same value (e.g., $894 in cash). (DX-667 at 25-26; Hoskins Sep. 15, 2011 Dep. 80:4-15, 82:12-85:8; Tr. 5307:24-25.).

296. As May and numerous other witnesses explained (including Weinstock **[*143]** and Reilly), this is a common method of handling the repurchase obligation that has no impact on the per-share value of the company's stock. (DX-667 at 25-26, 42-43; Blair Tr. 1638:11-1639:15; Weinstock Tr. 3367:2-3; May Tr. 5301:18-22, 5305:20-5307:3, 5367:23-5369:13; Risius Tr. 5893:19-5895:23; Reilly Tr. 6209:2-23, 6211:18-6212:22.)[17]

297. Additionally, changing the distribution policy to pay all employees who left the Company for their shares with an initial 20% lump sum and the remaining 80% with a promissory note over the following four years, **[*144]** rather than making an immediate lump-sum distribution, had the effect of improving Antioch's ability to manage the repurchase obligation (even though the distribution policy change was not implemented for that purpose). (DX-667 at 27-30; May Tr. 5361:2-5367:10.) As noted above, the Company also procured COLI which could have been surrendered for approximately $20 million in 2004 to help fund the repurchase obligation. (DX-667 at 26-27; Tr. 5369:14-5370:22.)

298. By using a portion of the cash built up in the ESOP and

_____

[17] May additionally explained, as Lee Bloom and Jeffrey Risius also testified, that redeeming shares at fair market value also has no impact on the per-share value of a company's stock. (DX-667 at 38-39; Tr. 5302:8-5305:11.) Plaintiffs have persistently argued that participants were damaged by the company's recycling in 2004 and plaintiffs should be able to recoup these funds, but after hearing all the evidence, the Court is unable to see the sense in their position—the cash in the ESOP was paid to participants, which is to say it was used to fulfill the purpose of an ESOP. It is not fairly characterized as an amount in which the ESOP was damaged.

changing the distribution policy, May explained that of the $109 million dollar repurchase obligation in 2004, the Company only had to pay approximately $13.1 million in cash above the planned 21% ESOP contribution to the terminating employees. (DX-667 at 30-31; Tr. 5370:23-5373:13.)

### 3. Bank Refinancing

299. By the end of 2004, the Company was also approximately $30 million ahead of its planned debt repayment schedule, and in compliance with all loan covenants as of December 31, 2004. (DX-668 at ¶ 247; JX-75 at P-WOOSLEY-000078, 86.) The Company had the second highest revenues and gross profits in history, and as noted above, by year-end 2004 the fair market value of Antioch **[\*145]** stock had risen to $943 dollars per-share. The Company met all of its repurchase and cash obligations, and there were no defaults on any of its loans. (*Id.*; DX-667 at 24; Hoskins Sep. 15, 2011 Dep. 185:8-186:11.) The total debt on Antioch's balance sheet fell from $180.3 million in 2003 to $154.2 million in 2004, despite the issuance of approximately $34.9 million of promissory notes to ESOP participants who left the Company. (JX-75 at P-WOOSLEY-000078; Risius Tr. 5901:20-5908:5.)

300. In 2005, despite the cash outflows associated with the Company's repurchase obligation in 2004, Antioch refinanced and paid off its loans formerly held by the 2003 lenders with a syndicate of three banks led by National City Bank (the "2005 Refinancing".) (DX-414.)[18] The 2005 Refinancing not only committed millions of dollars of new money to the Company, but also contained less restrictive financial covenant terms compared to the 2003 financing, with all other major terms remaining constant. (DX-406 at HL050973; DX-668 at ¶ 249; Blair Tr. 1640:20-1641:12; Hoskins Sep. 15, 2011 Dep. 218:14-219:25; Sanan Dep. 195:1-21; Jennett Dep. 94:12-95:6.) Further, the reduction of lenders from seven to three benefited **[\*146]** the Company, as less coordination would be required for any future negotiations with the bank. (DX-419 at MOR0011476; Tr. 1643:2-1644:5; Bevelhymer Dep. 188:9-189:7; Hoskins Sept. 15, 2011 Dep. 185:8-188:20, 218:14-219:25.)

301. Before agreeing to the 2005 Refinancing, the lenders performed independent credit analyses regarding Antioch and its financial condition. (DX-410; Jennett Dep. 30:18-91:5; Parker Dep. 18:5-23, 95:22-98:21.) For example, lead bank National City Bank conducted an in-depth and comprehensive

analysis of Antioch's current and projected future financial condition, which included (i) conducting a cash flow analysis (which included explanation of how the Company handled the approximately $109 million repurchase obligation in 2004, and stress testing how the Company would handle future repurchase obligations by independently assuming a "worst case scenario" where *all* the remaining top 50 account balance holders would retire and terminate in 2005); (ii) conducting a debt service analysis; (iii) analyzing the Company's future financial projections and performing **[\*147]** a sensitivity analysis, which included testing based on independent consultant metrics such as number of consultants ordering, average monthly consultant count, activity rate, and productivity rate; and (iv) performing industry analysis and benchmarking of the Antioch Company against the industry, which was familiar for National City Bank as it had previous credit relationships with direct selling companies such as Longaberger and Mary Kay. (DX-410 at PNC-000266-311; Jennett Dep. 30:18-91:5.)

302. Following its extensive analysis (more than a year after the Transaction), National City Bank concluded that Antioch was in a strong financial position for the future, evidenced in part by the continued strong cash flow and the way it handled the unexpectedly high repurchase obligation in 2004 and still managed to aggressively pay down the long-term debt associated with the Transaction ahead of schedule. (*Id.*) Ultimately, as the lead lender, National City Bank committed $35 million of the total $90 million revolving and term loans in the 2005 Refinancing, and approximately $17.4 million of that $35 million constituted completely new funds. (DX-414 at FT000325, Jennett Dep. 46:1-47:2, 92:22-95:6.) **[\*148]**

### 4. Sales Decline and Bankruptcy

303. In 2006, the Company experienced a double-digit sales decline for the first time, which continued in 2007. (DX-668 at 121.) No testimony or evidence links this sales decline to the Transaction, while numerous witnesses testified that the sales decline was in no way linked to the Transaction. (*E.g.*, Hoskins Sep. 15, 2011 Dep. 195:8-21, 198:2-200:22, 204:11-19; Luce Dep. 147:10-148:6, 149:8-150:10; Sanan Dep. 193:6-24; Lipson-Wilson Dec. 5, 2011 Dep. 127:17-129:8; vonMatthiessen Dep. 283:19-24.)

304. Indeed, plaintiff Monica Woosley testified she did not believe the Company's sales decline was related to the Transaction, and plaintiffs' expert Robert Reilly similarly testified that "I don't know that anyone was able to predict 2006 and 2007 because the company's results were a lot lower than any projection, any forecast indicated." (Tr. 2576:23-2578:2, 3991:21-24.) Defendants' expert Jeffrey Risius

---

[18] LaSalle Bank and Fifth Third Bank were the two other lenders that joined National City Bank in the 2005 Refinancing.

likewise testified that based on all of his independent expert research and analysis, there was nothing about the 2003 Transaction that caused the Company's unforeseeable sales decline. (Tr. 5924:13-5925:1.)

305. During the 2006 through 2008 timeframe, several [*149] unforeseeable (as of 2003) systemic market factors unrelated to the Transaction contributed to the Company's decline and ultimate bankruptcy. Defendants' expert Jeffrey Risius explained how the increase in internet speeds through the wide-spread availability of broadband and the unforeseen rise of social media companies such as Facebook (available to the public in September 2006) and technological advances like the iPhone (first released in 2007) changed the whole landscape of the traditional scrapbook industry by giving consumers a timely, cost-effective way to share their memories with their family and friends. (DX-668 at ¶¶ 253-273; Tr. 5914:24-5917:6; Sanan Dep. 171:7-15.) Indeed, through an analysis of valuation multiples from comparable companies in the industry, Risius demonstrated how the entire scrapbooking industry began to decline significantly in late 2006 and how Antioch's decline mirrored the industry decline. (DX-668 at ¶ 274; Tr. 5917:10-5922:12.)

306. This new technology disrupted Antioch's business, which was based around the party-plan method of direct selling. (Pollack Dep. 97:13-99:20.) The shift in consumer preference from paper-based products to digital-based [*150] experiences was not compatible with party-plan selling, in which consultants host groups of potential customers and spend time with them to explore product offerings and solicit orders, because digital ordering was typically done in isolation rather than in a group setting. (Id.) Therefore, the unforeseeable changes in technology directly led to a maturation of Antioch's business and declines to its revenue. (Id.; Hoskins Sep. 15, 2011 Dep. 68:13-70:25.)

307. Along with these unpredictable market changes, Risius also outlined the large-scale global financial crisis that began in late 2007 (i.e., the "Great Recession"), which was clearly not known or knowable back in December 2003, and which also had a material impact on the Company subsequent to the Transaction. (DX-668 at ¶¶ 275-281; Tr. 5922:16-5924:12.) Risius explained how during this time there was a liquidity crunch and lenders became very nervous, and that there was a large spike in bankruptcy filings as lenders called their loans, rightfully or wrongly. (Id.) Michael New of plaintiff Evolve likewise testified that the market conditions in 2008 deterred the Company's efforts to find sources of capital, despite the fact that [*151] the Company continued to pay off its bank debt and other debt as scheduled. (DX-590; New Dep. 72:2-13, 75:24-76:14.)

308. Despite the Company's decline in sales, Antioch made all scheduled periodic payments on all of its debt—including its secured bank debt and the newly issued promissory notes to former Antioch ESOP participants—in a timely manner from the date of the Transaction through June 2008. (DX-668 at ¶ 244; Luce Dep. 144:8-145:11; New Dep. 71:21-72:13; Sanan Dep. 195:22-196:5; vonMatthiessen Dep. 281:18-282:13.) Shortly thereafter, the lenders forced the Company into a pre-packaged Chapter 11 reorganization. (JX-88; New Dep. 74:8-78:10.)

## III. CONCLUSIONS OF LAW

309. "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983)*; see *29 U.S.C. § 1001(b)*.

310. One type of employee benefit plan subject to the provisions of ERISA is an employee stock ownership plan ("ESOP"), an ERISA plan that is designed to invest primarily in the employer's stock. *29 U.S.C. § 1107(d)(6)(A)*.

### A. *ERISA Section 404* Claims

311. Under *ERISA section 402(a)*, every employee benefit plan shall be established and maintained pursuant to a written instrument, which in turn shall provide for one or more "named fiduciaries" [*152] to have authority to control and manage the operation and administration of the plan. *29 U.S.C. § 1102(a)*.

312. A person is a fiduciary for purposes of ERISA, by the statute's own terms, if, inter alia, "(i) he [or she] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he [or she] has any discretionary authority or discretionary responsibility in the administration of such plan." *29 U.S.C. § 1002(21)(A)(i)*, *(iii)*.

313. ERISA requires a fiduciary acting on behalf of a plan to discharge his or her duties with respect to the plan solely in the interests of the participants and beneficiaries. In addition, the fiduciary must discharge his or her duties:

   (A) for the exclusive purpose of

   (i) providing benefits to participants and their beneficiaries, and

   (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and

(D) in accordance with the documents **[*153]** and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

*29 U.S.C. § 1104(a)(1)(A)*, *(B)* & *(D)*.[19]

314. By requiring fiduciaries to discharge their duties "solely in the interests of the participants" and "with the care, skill, prudence, and diligence . . . that a prudent man . . . would use," *ERISA section 404* imposes duties of loyalty and prudence that are "the highest known to the law," *Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982)*. Plaintiffs claim that these duties have two "applications" that are relevant to this case: they require a fiduciary who appoints another fiduciary to make reasonable efforts to monitor the appointed fiduciary, and they require all fiduciaries to provide material information to all co-fiduciaries. (Corrected Opening Post-Trial Br. ECF No. 665-1, at 13-14.)

## 1. Whether Defendants Were ERISA Fiduciaries for Purposes of the Transaction

315. First, defendants raise a threshold issue of whether they were fiduciaries at all. They do not dispute that they were members of Antioch's EAC, a named fiduciary of **[*154]** the Antioch Plan. They argue, however, that, despite the fact that they were named fiduciaries as members of the EAC, the Plan provided that the EAC did not have any fiduciary duties with respect to the Transaction.

316. ERISA "defines fiduciary status in functional terms," *Brooks v. Pactiv Corp., 729 F.3d 758, 765 (7th Cir. 2013)*, by conferring fiduciary status only on those that exercise "discretionary authority" in a particular function, *29 U.S.C. § 1002(21)(A)*. "[A] person can be a fiduciary for some purposes but not others." *King v. Nat'l Human Res. Comm., Inc., 218 F.3d 719, 723 (7th Cir. 2000)* (*citing Lockheed Corp. v. Spink, 517 U.S. 882, 116 S. Ct. 1783, 135 L. Ed. 2d 153 (1996))*. Therefore, a named ESOP fiduciary is not

responsible for all fiduciary actions that apply to a plan, but rather has fiduciary duties only with respect to actions for which he or she exercises discretionary authority. *Id.*

317. Defendants contend that they were not ERISA fiduciaries with respect to the Transaction because the Board of Directors explicitly stripped the EAC and its members of their "power to act for the plan," and therefore their fiduciary duty, with respect to the Transaction by amending the Plan and the Trust Agreement to add section 5(f), which states that, "Notwithstanding the provisions of Section 5(a) and (b), the decision whether or not to tender shares of Company Stock to the Company in December 2003 *shall be effected by [GreatBanc] **[*155]** (without directions from the [ESOP Advisory] Committee)*, based on [GreatBanc's] determination (in the exercise of its reasonable judgment) that such decision is in the best interests of the Plan and the Participants...[.]"

318. According to the plain language of this plan amendment, defendants argue, the ability "to act for the plan" in regard to the Transaction was expressly conferred by the Board of Directors upon GreatBanc, which, as independent trustee, independently elected not to tender the ESOP shares in the Transaction. (DX-37; DX-250; Marchetti Tr. 1221:23-1228:10.)

319. Because only GreatBanc, not defendants, had the "power to act for the Plan," *Klosterman v. W. Gen. Mgmt., Inc., 32 F.3d 1119, 1123 (7th Cir. 1994)*, and defendants lacked any discretionary authority with respect to the action about which plaintiffs complain, defendants conclude that they were not ERISA fiduciaries with respect to the 2003 Transaction. *Neil v. Zell, 677 F. Supp. 2d 1010, 1024 (N.D. Ill. 2010)* (dismissing benefits committee when fiduciary duties had been delegated to an independent trustee).

320. Plaintiffs respond that, regardless of the fact that the Plan was amended to strip defendants of any control over the decision whether to tender the ESOP's shares to the Company, defendants remained named fiduciaries as members of the EAC, and **[*156]** they retained plenary fiduciary responsibility to the Plan and its participants.

321. Further, plaintiffs argue that the EAC *did* exercise its fiduciary authority in a way that was critical to the Transaction by amending the distribution policy to allow employees to receive a "down payment" on their ESOP account balance upon termination rather than wait five years to receive anything. The EAC also had the authority to appoint an independent appraiser to ensure that the transaction share price was actually set at fair market value, but it did not

---

[19] *Subsection (C) of section 404(a)(1)* requires ERISA fiduciaries to diversify the plan's investments, but ESOP fiduciaries are exempt from this requirement, as an ESOP plan's very purpose is to hold employer stock. *See 29 U.S.C. § 1104(a)(2)*; *Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2465-66, 189 L. Ed. 2d 457 (2014)*.

make any such appointment.[20] Further, defendants communicated with participants to solicit their support for the transaction, so plaintiffs argue that it cannot be said that they truly had no ability to act for the Plan with regard to the transaction.

322. In their complaint, plaintiffs' claims against defendants are clearly directed at plaintiffs' actions or omissions in furtherance of or in connection with the Transaction. It [*157] is tempting to agree with defendants that, if responsibility for determining whether the Transaction was fair to the ESOP and whether the ESOP should allow the Transaction to proceed expressly lay with the independent trustee GreatBanc under the amended terms of the Plan, then it is nonsensical to conclude that defendants retained discretionary authority with respect to the same transaction.

323. It is undeniable, as plaintiffs argue, that defendants did take some actions that aided the progress of the Transaction. Defendants (especially Lee Morgan and Asha Moran, as board members) set the machinery of the Transaction in motion and supported the Transaction, in part by communicating with participants. (*See, e.g.,* Mizen Tr. 550:9-552:7.) Additionally, they amended the distribution policy to eliminate the risk of losing S corporation status due to the Transaction. But if GreatBanc's appointment as independent trustee, and the accompanying plan amendment, removed defendants' fiduciary responsibility with respect to the Transaction so that an independent party without any conflicts of interest could determine whether the Transaction was in the ESOP's best interest, then defendants' actions [*158] to aid the progress of the Transaction can be characterized as ancillary, non-fiduciary actions that are outside the scope of any fiduciary duty that the Plan allocated to defendants rather than to GreatBanc.

324. Plaintiffs have cited the Seventh Circuit's recent decision in *Chesemore v. Fenkell, 829 F.3d 803, 2016 WL 3924308 (7th Cir. 2016)*, in support of their position, but the facts of *Chesemore* are significantly different from those of this case. The conduct of the defendant Fenkell, who was not a formal trustee or named fiduciary, was far more extreme then that of defendants. True, Fenkell orchestrated the buyout transaction, just as defendants are alleged to have done here, but he plainly did so in a way that would ensure that "no one on the other side of the deal would look out for the interests of [the company] or its employees post-[transaction]" and "he effectively controlled both sides of the transaction," which

was so obviously unfair to the plaintiffs that "any involvement by a truly independent fiduciary looking after [the plaintiffs'] interests would have scuttled the deal." *829 F.3d 803, [WL] at *7*. In this case, defendants hired a truly independent fiduciary that conducted itself as such.

325. Ultimately, [*159] the Court need not decide this issue because, as the following discussion will show, it is clear based on the voluminous evidence the parties have submitted that, even if defendants had a fiduciary duty to plaintiffs or the Plan in any way that was relevant to the Transaction, they did not breach any such duty.

## 2. Whether Defendants Breached a Duty to Monitor GreatBanc

326. As stated above, one of plaintiffs' theories of liability under *section 404* is that defendants breached a duty to monitor GreatBanc. For the reasons set forth below, no such breach occurred.

### a. *Defendant Chandra Attiken Had No Duty to Monitor GreatBanc*

327. It is well settled that ERISA's duty to monitor applies only to a person or entity that has the power to appoint and remove an ERISA fiduciary. *Howell v. Motorola, Inc., 633 F.3d 552, 573 (7th Cir. 2011)*; *29 C.F.R. §2509.75-8 (D-4)*.

328. The Antioch Board of Directors, not the EAC, possessed the power to appoint and remove GreatBanc.

329. Chandra Attiken was never a member of Antioch's Board, and she therefore had no duty to monitor GreatBanc. Accordingly, any claim against her based upon a supposed duty to monitor must fail. *Howell, 633 F.3d at 573*; *Chesemore v. Alliance Holdings, Inc., 886 F. Supp. 2d 1007, 1050 (W.D. Wis. 2012)* (no duty to monitor because defendant's trustees were not "the appointing fiduciary"). The Court will enter judgment for Ms. Attiken [*160] on this claim.

330. The Court, however, will go on to determine whether the Antioch Board breached its duty to monitor GreatBanc in order to determine whether Lee Morgan and Asha Moran may be liable for the breach because they were directors during the relevant time period.

### b. *Whether Plaintiffs Must Prove an Underlying Breach of Fiduciary Duty by GreatBanc*

331. Defendants argue that a duty-to-monitor claim is a derivative claim, and plaintiffs cannot prevail on their breach of fiduciary duty claim unless they prove that the monitored

---

[20] Of course, this action would only have been logical if defendants had any reason to believe that GreatBanc was not adequately representing the ESOP's interests, which, as the Court will discuss further below, they did not.

fiduciary—Greatbanc—breached *its* fiduciary duty. *See* In re BP ERISA Litig., No. 4:10-cv-4214, 2015 U.S. Dist. LEXIS 147819, 2015 WL 6674576, at *9 (S.D. Tex. Oct. 30, 2015); Rinehart v. Akers, 722 F.3d 137, 154 (2d Cir. 2013) (duty to monitor claim dismissed as derivative of failed duty of prudence claim), vacated and remanded on other grounds, *Rinehart v. Akers, 134 S. Ct. 2900, 189 L. Ed. 2d 853 (2014).*[21]

332. Plaintiffs respond that whether the duty to monitor is breached depends on the facts and circumstances of each case, and their duty to monitor claim is not derivative of an underlying breach of fiduciary duty by the appointed fiduciary, nor does it depend directly on whether the appointed fiduciary committed an underlying breach. *See, e.g.,* Howell v. Motorola, Inc., 633 F.3d 552, 573 (7th Cir. 2011) ("The duty exists so that a plan administrator [*161] or sponsor cannot escape liability by passing the buck to another person and then turning a blind eye.")

333. Regardless of who has the better of this argument, the Court must analyze whether GreatBanc breached its fiduciary duty anyway, in order to resolve plaintiffs' co-fiduciary claim under section 405 of ERISA. For now, the Court will assume *arguendo* that defendants are correct that plaintiffs must prove an underlying breach of fiduciary duty by GreatBanc to prevail in their duty to monitor claim against defendants under section 404.

c. *Whether GreatBanc Breached its Fiduciary Duty*

334. Far from demonstrating a breach of fiduciary duty by GreatBanc, the record shows that GreatBanc conducted a thorough and vigorous review of the Transaction and worked diligently to protect the ESOP's interests by negotiating better Transaction terms.

335. First, GreatBanc engaged top financial and legal advisors in Duff and J&G. While this does not provide GreatBanc a complete defense against a section 404 prudence claim, it provides evidence that GreatBanc acted prudently. Keach v. U.S. Trust Co., 419 F.3d 626, 636-37 (7th Cir. 2005); Chesemore, 886 F. Supp. 2d at 1042. Further, the evidence at trial cited above shows that GreatBanc did more than just hire and blindly rely upon competent advisors.

336. The facts found above show that [*162] GreatBanc's ESOP Committee met at least three times with Duff to discuss Duff's interim, preliminary and final analyses. During those meetings, the ESOP Committee scrutinized the detailed analysis presented by Duff and was engaged in discussion and

questioning with Duff's representatives.

337. In addition to challenging Duff's analysis, the evidence shows that GreatBanc also challenged the Company and zealously advocated on the ESOP's behalf. GreatBanc determined that the Transaction terms as originally structured would be unfair to the ESOP. As a result of GreatBanc's advocacy and negotiation, it succeeded in persuading the Company to provide benefits to the ESOP external to the tender offer terms that allowed Duff to deliver a fairness opinion. (Marchetti Tr. 1169:9-1171:17, Blair Tr. 1580:1-6, Bloom Tr. 4516:5-19.)

338. Plaintiffs argue that GreatBanc breached its fiduciary duty by accepting Duff's fairness opinion and the underlying financial analysis, despite the evidence of GreatBanc's diligence described above. However, plaintiffs' criticisms of Duff's financial analysis, even if accepted at face value, do not establish any breach by GreatBanc. Plaintiffs failed to connect any [*163] alleged mistakes by non-fiduciary Duff with a fiduciary breach by GreatBanc, and advanced no factual or expert[22] evidence that allows the Court to connect Duff's alleged errors with a breach of prudence by the plan fiduciary, GreatBanc. Plaintiffs seem to suggest that the alleged deficiencies in Duff's analysis were so apparent on their face that GreatBanc breached its fiduciary duties in accepting them, but this argument is not supported by the trial record. Even plaintiffs' expert Robert Reilly admitted that his criticisms of Duff's analysis could be characterized as "just two reasonable and skilled analysts making a different judgment on the same set of facts." (Tr. 4114:8-24.)[23]

339. The Company intentionally prepared conservative financial projections in order to analyze the transaction, and then Duff, in turn, adjusted management's base-case projections downward even further by [*164] lowering international sales forecasts for each year, new venture forecasts for each year, and consolidated sales forecasts from year five forward. (*Compare* PX-250 (the base-case projections shared with advisors) *with* JX-37 (showing the projections used by Duff in its analysis); Bloom Tr. 4373:5-4375:2; Risius Tr. 5735:23-5736:24.) In fact, the Company's historical, five-year CAGR stood at 17.4% at the time of the Transaction, and Duff's analysis used a 10.3% CAGR for the

---

[21] *See also* ECF No. 638 at 5 n. 2 (collecting cases).

[22] The absence of expert testimony on proper fiduciary conduct is conspicuous. *Cf.* Brieger v. Tellabs, Inc., 629 F. Supp. 2d 848, 859-60 (N.D. Ill. 2009).

[23] Moreover, for the reasons discussed below under Plaintiffs' ERISA section 406 claim, the Court finds that Mr. Reilly's criticisms of Duff's analysis and his "corrected" valuation opinions are unreasonable, unreliable, and unworthy of any weight.

five-year forecast. (JX-37 at D&P_A002740; Tr. 5746:5-5747:21.)

340. Duff also lowered the projected EBITDA and profit margins for the Company, downward adjusting the EBITDA CAGR from a five-year historical rate of 21.0% to a five-year forecast of just 5.5%. (Risius Tr. 5737:1-10, 5740:4-7, 5747:22-5748:3.) Duff also incorporated the threats facing the Company, such as competition and digital photography and technology, into the projected cash flows that it used in its financial analysis.

341. The evidence of GreatBanc's process for critically analyzing Duff's work through its ESOP Committee and the factual evidence cited in the preceding paragraphs simply does not support plaintiffs' contention that the financial projections [*165] Duff used were so unreasonable that GreatBanc breached a fiduciary duty by not rejecting their use out of hand, and plaintiffs did not introduce any expert that testified to the contrary.

342. Plaintiffs' criticism of the discount rate that Duff used to value Antioch also falls flat. Mr. Bloom explained that, in his view, it is inappropriate to alter discount rates based on company-specific types of risk. Instead, company-specific risks should be reflected in downward adjustments to future cash flows, which is what Duff did when valuing Antioch. But regardless of whether the analyst chooses to account for company-specific risk by altering the discount rate or by adjusting the cash flows, Mr. Bloom testified and Mr. Risius opined that making adjustments to *both* the discount rate *and* future cash flows, in the way that plaintiffs' expert Robert Reilly did, amounts to inappropriate double counting, and the Court agrees. Thus, plaintiffs did not prove that GreatBanc breached a duty by failing to insist that Duff use a higher discount rate in its DCF, particularly in light of the uncontradicted evidence of GreatBanc's vetting of Duff's analysis, including the discount rate, through its ESOP [*166] Committee.

343. Plaintiffs also fail to show that Duff's treatment of the repurchase obligation was so flawed as to put GreatBanc on notice that it could not accept Duff's analysis. Mr. Bloom explained that the repurchase obligation had no effect on valuation of the Company and that the treatment of repurchase obligation advocated by Mr. Reilly is unsound, and Bloom's testimony was corroborated by the contemporaneous valuation of Houlihan, which did not treat the repurchase obligation projection as Mr. Reilly did and as plaintiffs suggest it should have. In other words, the weight of the evidence shows that Duff's treatment of the repurchase obligation was not something that should have put GreatBanc on notice that there was a problem with Duff's valuation and

fairness advice.

344. In the end, plaintiffs' criticisms of Duff's financial analysis are unfounded, and at best are the result only of "two reasonable and skilled analysts making a different judgment." Nothing about Duff's analysis of the Transaction should have put GreatBanc on notice that it would be imprudent to rely upon its financial expert's fairness opinion.

345. Plaintiffs have failed to prove that GreatBanc breached any [*167] ERISA-based fiduciary duty of prudence to the ESOP.

d. *Regardless of Whether GreatBanc Breached Its Fiduciary Duty, Defendants Satisfied ERISA's Duty to Monitor*

346. As described above, defendants contend that plaintiffs' failure to prove that GreatBanc breached its fiduciary duty is fatal to their duty to monitor claim. Even assuming that plaintiffs did establish an underlying breach by GreatBanc, or that, as plaintiffs have argued, the law does not require them to do so to prevail on their *section 404* claim, they have still failed to prove that defendants breached their duty to monitor GreatBanc.

347. The duty to monitor requires only monitoring "at reasonable intervals" to ensure that "performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan." *Id.* (*citing 29 C.F.R. § 2509.75-8* at FR-17 (Department of Labor questions and answers)). *Howell v. Motorola, Inc., 633 F.3d 552, 573 (7th Cir. 2011)*. In *Howell*, the court affirmed the district court's decision in *Lingis v. Motorola, Inc., 649 F. Supp. 2d 861, 881-82 (N.D. Ill. 2009)*, which found that an annual review of the appointed fiduciary satisfied the duty to monitor. *Id. at 882-83*.

348. Plaintiffs failed to prove that the Antioch Board (and therefore Lee Morgan and Asha Moran as directors) breached its duty to monitor the activities that GreatBanc [*168] performed in connection with the Transaction. There were only four months between GreatBanc's retention and the closing of the 2003 Transaction. In that time, the evidence shows that GreatBanc representatives met with the Board of Directors on two separate occasions. In addition, at the Board meeting on October 16, 2003, the management team presented the Board with a written and verbal report about GreatBanc's negotiating positions and GreatBanc's financial and analytical rationales supporting its position (which at the time was that the Transaction was not fair to the ESOP). Moreover, Antioch's Board supplemented this monitoring by utilizing members of Antioch's management team as contact points with GreatBanc. Nancy Blair was in frequent communication with GreatBanc and its advisors during the

negotiation of terms extrinsic to the tender offer that would allow for a fairness opinion, and reported to Board members about those communications.

349. Defendants' expert Greg Brown testified that the Board's monitoring activity was completely consistent with usual and customary practice that he has observed in advising the various constituencies involved in ESOP transactions. That is to [*169] say, the Board gained a foundational understanding of the nature of GreatBanc's responsibilities, a basic understanding of the work performed by GreatBanc, and an awareness that GreatBanc was acting in the best interests of the ESOP participants. (DX-776; Tr. 5203:3-5215:16.) Plaintiffs presented no fact or expert evidence that convinces the Court otherwise.

350. Mr. Brown also gave the opinion that a monitoring fiduciary must balance its need to observe the trustee with the need to preserve the trustee's independence by not meddling with the trustee's fulfillment of its duties. (DX-776 at 13; Tr. 5218:17-5219:5.) This was particularly persuasive to the Court because requiring defendants to inject themselves into GreatBanc's decision-making process to satisfy ERISA's duty to monitor is contrary to the very reason an ESOP sponsor should hire an independent fiduciary.

351. Defendants recognized that there was a conflict of interest inherent in the proposed Transaction, which required them to hire GreatBanc as an independent trustee. It would have made no sense to go to the great expense of hiring an independent trustee, only to interfere with the trustee's work—indeed, as Antioch's former [*170] legal counsel Marsha Matthews testified, the retention of GreatBanc was specifically intended to *remove* defendants from the transaction process so that their potential conflicts of interest as sellers could not influence or interfere with an independent trustee's decision about whether or not to tender the plan's shares.

352. Setting aside the lack of any underlying breach of fiduciary duty by GreatBanc, defendants have satisfied ERISA's duty to monitor, and judgment for defendants is therefore appropriate.

### 3. Duty to Inform

a. *Threshold Issue: Whether Any Duty to Inform Exists*

353. Plaintiffs claim that defendants' fiduciary duties of loyalty and prudence required them to inform all co-fiduciaries of any information material to the actions they took on behalf of the ESOP or its participants.

354. Defendants contend that nowhere in the statutory text or the accompanying regulations does ERISA impose such a "duty to inform" on its fiduciaries, nor does the Plan impose any such duty. Courts have recently rejecting the argument that anything "in ERISA itself or in traditional principles of trust law creates such a duty [to inform]." *In re Lehman Bros. Sec. and ERISA Litig., 113 F. Supp. 3d 745, 765 (S.D.N.Y. 2015)*, aff'd *Rinehart v. Lehman Bros. Holdings Inc., 817 F.3d 56, 63 (2d Cir. 2016)* ("the District Court correctly concluded that ERISA [*171] does not impose a duty on appointing fiduciaries to keep their appointees apprised of nonpublic information" (internal quotation marks and citation omitted)). Imposing a duty to inform into ERISA "would transform [the appointing fiduciary's] limited obligations under ERISA into all-encompassing ones. Whenever [the fiduciary] received information in any business capacity, he would have been obliged to consider whether ERISA required disclosure of that information to the Plan Committee." *In re Lehman Bros., 113 F. Supp. 3d at 765*. By "effectively turning *all* of [the fiduciary's] business duties into ERISA duties," the so-called duty to inform "would stretch the concept of fiduciary duty far beyond what ERISA contemplates." *Id. at 766*. *See also In re BP ERISA Litigation*, No. 4:10-cv-4214, *2015 U.S. Dist. LEXIS 147819, at *36 (S.D. Tex. Oct. 30, 2015)* ("ERISA does not impose a duty on monitoring fiduciaries to keep their appointees apprised of material, non-public information"); *Lingis v. Motorola, 649 F. Supp. 2d 861 (N.D. Ill. 2009)* (expressing "skepticism" that fiduciaries based "on their power to appoint and remove [a fiduciary] could owe Plan beneficiaries a duty to inform the [appointed fiduciary] of facts...") aff'd *Howell, 633 F.3d at 572-73*.[24]

355. In light of the above-cited authority, defendants' position is strong. But the Court need not decide today whether ERISA imposes a duty to inform because, even if there is such any

---

[24] Plaintiffs have argued that a number of the above-cited cases finding that there is no duty to provide nonpublic information to co-fiduciaries [*172] are distinguishable because they are based on the rationale that providing nonpublic information to co-fiduciaries might be insider trading, in violation of securities law, and this rationale applies only to public companies. However, in a slightly different context, a district court has recently rejected a rigid distinction between the standards of prudence applicable to public companies and closely-held ones, reasoning that the discussions of securities laws and insider trading in cases such as *Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2465-66, 189 L. Ed. 2d 457 (2014)*, were context-specific applications of the legal standard, rather than essential elements of the legal standard the courts were applying. *See Hill v. Hill Bros. Constr. Co., Inc., No. 3:14CV213-SA-SAA, 2016 U.S. Dist. LEXIS 40225, 2016 WL 1252983, at *5 (N.D. Miss. Mar. 28, 2016)*. This Court finds the analysis in *Hill* persuasive.

such duty, plaintiffs have not proved that defendants breached it.

b. *Even If a Duty to Inform Exists as Part of the Duty to Monitor, Lee Morgan and Asha Moran Did Not Breach the Duty*

356. As members of Antioch's Board of Directors, Mr. Morgan and Ms. Moran (along with [*173] their co-directors) put in place important procedural safeguards to ensure GreatBanc received what it requested.

357. First, one of the directors, Nancy Blair, in whom the Board had the "utmost confidence" (Morgan Tr. 2146:15; Sanan Dep. 91:11-92:12, 93:8-94:2; von Matthiessen Dep. 122:3-123:9), left the Board to take on the full-time role as the liaison between the Company and GreatBanc. Appointing fiduciaries like the Antioch Board and its members may satisfy their fiduciary obligations by instructing management and other employees of the company to provide access to anything requested by the appointed fiduciary. *Keach v. U.S. Trust Co., 313 F. Supp. 2d 818, 864-65 (C.D. Ill. 2004)*, aff'd, *419 F.3d 626 (7th Cir. 2005)*. That is precisely what the evidence showed happened here. The Antioch Board instructed Ms. Blair to provide GreatBanc and its advisors with anything that they requested, and Ms. Blair did so to the best of her ability.

358. Second, the Board of Directors approved the retention of talented, independent advisors for itself, the ESOP and the selling shareholders that all had significant experience with ESOP transactions. Neither MWE nor Deloitte ever advised the Board that any of the supposedly missing information should be provided to GreatBanc,[25] nor was the Board [*174] ever told of information to lead them to believe that data material to GreatBanc was withheld. (Blair Tr. 1561:16-23; Morgan Tr. 2294:22-2296:23; Moran Tr. 3097:10-3098:4.) Plaintiffs do not point to a single document containing a due diligence request from GreatBanc, Duff, or any other advisor that went unfulfilled by the Company.

359. Third and most importantly, the record lacks any evidence, from either a fact witness or an expert witness, that the purportedly missing information would have caused GreatBanc to either tender shares and thereby kill the Transaction or renegotiate any of its terms. Ms. Marchetti

testified that she did not know what the effect of considering the purportedly missing information would have been. Indeed she was unable to testify that even one particular piece of information would have [*175] made a difference in GreatBanc's analysis. At most, she testified that the information would have generated discussions, but she testified that she could not speculate on what the result of those possible discussions might have been.

360. Consider in further detail the principal pieces of information plaintiffs argue should have been provided to GreatBanc: (i) a number of downside feasibility scenarios run by Deloitte and a sensitivity analysis presented at the December 4, 2003 board meeting; (ii) a pre-Transaction Plan Amendment and change to the distribution policy; (iii) a revised repurchase obligation study presented at the December 4, 2003 Board meeting, and (iv) the 2004 business plan presented at the December 4, 2003 Board meeting.

361. With regard to the four downside scenarios and the sensitivity analysis, as the Court explained above, Lee Bloom's testimony makes clear that they would not have been material to Duff's independent financial analysis and its ultimate fairness conclusion. Mr. Bloom unequivocally stated that he expected the Company would be running its own downside scenarios in connection with the Transaction, but he never asked the Company for its downside analyses, he would generally have no [*176] expectation of seeing those analyses, and he is not even sure what he would have done with the analyses had he received them. Duff's lack of desire to see the Company's downside scenarios makes perfect sense in light of the fact that Duff was running its own downside scenarios, based on the financial information that Antioch did provide.

362. Plaintiffs have placed great importance on the fact that Ms. Marchetti said that it was an "absolute must" for the Company to produce to GreatBanc the downside scenario projections that the Company had received from Deloitte and that she would have expected to receive them. But in relying on this testimony, plaintiffs ignore the fact that Ms. Marchetti could not even speculate as to how those materials might have changed GreatBanc's conclusions, and while she testified that, as an independent trustee, she expects to receive such materials in order to get an "indication of management's thinking," she suggested that these materials certainly would not have *per se* raised a red flag because "[w]e can understand sensitivity runs and there's no reason not to share [them]." (Tr., 1042:17, 1043:13-15.) The net effect of Bloom and Marchetti's testimony on the [*177] subject is to suggest that, at best, these downside projections may have been of some interest to GreatBanc, but they would not have been of critical importance in the final analysis.

---

[25] True, Helen Morrison did advise Karen Ng at one point to send the Plan Amendment to GreatBanc and Duff, but if in fact Ng failed to do so, there is no evidence that it was anything other than an oversight by Ng, in which the Board and Company were completely uninvolved. In any case, as discussed further below, any failure to disclose the Plan Amendment was harmless because it was not material to GreatBanc and Duff's review.

363. Further, Kreg Jackson, one of the analysts for Houlihan Lokey, testified that Houlihan does not normally request or expect to receive downside scenarios prepared by the sponsor company in the context of a fairness opinion.

364. Defendant's expert witness Greg Brown testified that, based on his experience in advising various constituencies in hundreds of ESOP transactions over the course of his career, he would not have expected the Company to share its sensitivity analyses with GreatBanc and Duff. Plaintiffs presented no expert witness who contradicted this opinion.

365. With regard to the Plan Amendment that the Board adopted on December 4, 2003, Mr. Bloom testified that receiving notice of the Plan Amendment and change in distribution policy would not have impacted the analysis that went into Duff's fairness opinion. In fact, he explained that knowing of the amendment would have made him feel even more comfortable issuing the opinion, because allowing the Company to pay out distributions over time rather than in an immediate lump [*178] sum provided important financial flexibility for Antioch. This is consistent with the testimony of Barry Hoskins, who explained that the Plan Amendment eased concerns of the banks that were financing the transaction because the banks wanted the Company to be able to spread out its repurchase obligation liability over several years to minimize the strain on the Company's free cash if there were an unanticipated spike in terminations or retirements. Plaintiffs presented no contrary fact or expert evidence to persuade the Court otherwise.

366. Finally, Mr. Bloom explained that the Company's future repurchase obligation would not impact Duff's valuation supporting its fairness opinion. Greg Brown likewise testified that he would not have expected, based on his extensive experience, that the Company would have shared any revised repurchase obligation estimate after determining that it would be able to service even the revised estimates of that future obligation in light of the revised future base-case projections.

367. The fact that the December 4, 2003 study, combined with Ms. Attiken's comments at the meeting, tended to show that the repurchase obligation in the coming years might be higher than originally [*179] forecast was of little significance. As Mr. Bloom pointed out, sophisticated analysts familiar with ESOPs knew that the repurchase obligation "could always be higher" in any given year (Tr., 4492:9-22), and he took that into consideration.

368. Moreover, Duff closely examined and considered the Company's future repurchase obligation in its fairness and valuation analysis, as the Court will discuss in further detail below, and Lee Bloom also testified that he recalled receiving extensive runs of the repurchase obligation study in a document that was approximately "three inches thick." (Tr. 4439:11-18.) Ms. Marchetti knew that Barry Hoskins frequently ran repurchase obligation studies throughout the year because during due diligence he showed her two gray steel drawers filled with repurchase obligation study runs, and told her "he liked to run the numbers and he did it frequently." (Tr. 1101:18-1103:7.) Thus, if Duff and GreatBanc wanted to see additional runs of repurchase obligation projections before the transaction closed, they knew that Hoskins was likely to have run the numbers again, and they could have requested any additional runs before giving the Transaction final approval [*180] in December. The Court fails to see why defendants were required to anticipate this request that was never made and provide the study, unprompted.

369. Compounding the Court's difficulty in this regard is the fact that this revised repurchase study did not have the earth-shattering significance plaintiffs would ascribe to it. Hoskins's revised study showed that the repurchase obligation in the years after the transaction would rise from over $9 million in 2003 to $11 million in 2004, $22 million in 2005, and $36 million in 2006. Attiken presented additional information (the precise details of which are lost) that suggested that the repurchase obligation from 2004 to 2006 might be as much as $25 million or even $30 million higher over that three-year period. But plaintiffs never explain what was so compelling about these studies that GreatBanc and its advisors needed to know about them, when sophisticated analysts and experienced trustees such as Duff and GreatBanc know that a spike in repurchase obligation liability is always a possibility.

370. When viewed in the full context of the other documents presented at the December 4, 2003 Board meeting, it is still clearer that the revised [*181] repurchase study would not have been any sort of dire warning to Duff or GreatBanc, if produced. Even the downside scenario that the Company considered at the December 4, 2003 board meeting showed significant positive cash flow over the 2004-2006 period, and, as defendants' expert Risius testified, in any downside scenario in which revenues dropped precipitously, the repurchase obligation would also drop because the share price would drop. (Tr. 5839:6-5846:5 (discussing PX-870:75 (internal page 74))). Thus, as Risius testified, there remained a significant cash-flow cushion to absorb an unanticipated rise in repurchase obligation. (See DX-668 at ¶¶ 111, 252 n. 215; Tr. 5838:3-5849:19.) Hoskins's revised repurchase study, even combined with Attiken's comments, about which we know few specifics, was hardly a canary in a coal mine, when viewed in its full context, in light of all relevant facts and circumstances.

371. As for the revised 2004 business plan, which showed reduced sales expectations for the coming year, again the

Court fails to see the significance. Nothing in the fact that the Company reduced its future projections in the 2004 business plan presented on December 4, 2003, **[*182]** would have so shocked GreatBanc or its advisors that they would have had second thoughts about the Transaction. The best evidence of this is that, as noted numerous times in the above findings of fact, Hoskins *did* tell Duff in his discussion with Julie Williams and Lee Bloom on or about December 9, 2003, that the Company had reduced its expectations for 2004.

372. Further, even leaving aside that discussion, the Company's weaker-than-expected sales in 2003 were still above the prior year's sales, and the Company was coming off years and years of explosive growth. The evidence shows that, *as it told GreatBanc and its advisors during due diligence*, the Company feared hitting a domestic sales plateau (although it had plans to keep revenue growing in spite of it); it did not fear, as a realistic possibility, a catastrophic sales decline. Reduced expectations in the 2004 business plan would not have been the canary in the coal mine either.

373. At the December 4, 2003 board meeting, the Company used a downside projection showing flat or slightly negative growth to assess whether it had sufficient cash flow to service its debt and pay other operating expenses such as repurchase obligation **[*183]** even if the Company had already hit the dreaded sales plateau, and it determined that it could. Granted, it recognized that the ESOP might end up "worse off," in a sense, if the Company proceeded with the Transaction under such a scenario because the stock growth would not make up for the reduction in annual distributions, but there was still more "future upside" because a cashless exercise of warrants would see the ESOP remain the majority owner of the company with 83% of the outstanding stock, instead of 50% under the expected or "base case" scenario. Taking this information into account and recognizing that the downside scenario it considered was *not* the expected case, the Board decided that it made sense to proceed with the Transaction. (JX-55 at MOR001426, 1428-29.) The Court fails to see why the Board should not have expected GreatBanc and its advisors—who, thanks to the Company's conscientious efforts to respond fully to all due diligence requests, had all the data they asked for to aid their review—to undertake the same analysis and reach a similar conclusion, without the Company's meddling.

374. In sum, even assuming that a duty to inform exists under ERISA, plaintiffs **[*184]** failed to carry their burden of proving that defendants violated that duty. The facts developed at trial establish that the Antioch Board, and its members including Mr. Morgan and Ms. Moran, instituted procedural safeguards by entrusting senior management with

overseeing the Transaction and its associated due diligence, and by engaging reputable advisors to represent the Company and the various constituencies who, based on their experience and expertise in ESOP transactions, could inform the Company of what they needed to do their job. The Company did in fact provide voluminous due diligence material to Duff and GreatBanc, and Duff's lead analyst, Lee Bloom, testified that Duff received everything it asked for and needed to conduct its analysis.

375. Perhaps most important, plaintiffs not only failed to produce evidence that the allegedly withheld information was material, Mr. Bloom's and Ms. Marchetti's testimony proved just the opposite. *Keach v. U.S. Trust Co., 419 F. 3d 626, 637-38 (7th Cir. 2005)* (materiality of missing information a prerequisite to liability, and allegedly missing information must be placed "within the context of the totality of the circumstances of the [fiduciary's] valuation process").

376. In light of the foregoing evidence, **[*185]** plaintiffs have failed to carry their burden to prove that defendants violated the so-called duty to inform.

### B. *ERISA Section 405* Co-Fiduciary Claim

377. *ERISA section 405* allows courts to impose liability on a defendant in any of the following circumstances: "(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with *section 1104(a)(1)* of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

378. Co-fiduciary liability claims under *ERISA section 405* are derivative of an underlying breach of fiduciary duty, meaning that plaintiffs must prove a breach of fiduciary duty by GreatBanc in order to impose liability on defendants. *Gabriel v. Alaska Elec. Pension Fund, 773 F.3d 945, 952 n.2 (9th Cir. 2014)* (co-fiduciary claims derivative of underlying breach of fiduciary duty); *Monper v. Boeing Co., 104 F. Supp. 3d 1170, 1180 (W.D. Wash. 2015)* ("Co-fiduciary and failure to monitor are derivative claims that necessarily fail where there is no underlying violation.").

379. Because, as explained above, plaintiffs **[*186]** failed to prove that GreatBanc breached any duty to the ESOP, no co-fiduciary claim against defendants exists, and the Court will therefore enter judgment for defendants on plaintiffs' *section*

*405* claim.

380. Even if defendants did establish that GreatBanc breached a duty, they have failed to satisfy any prong of *section 405* with respect to actions by defendants. It is clear from the above discussion that defendants did not have knowledge of any breach by GreatBanc, as the *subsections (a)* and *(c) of section 405* require, nor did defendants do anything to enable any breach by GreatBanc, as *subsection (b)* requires. On the contrary, defendants hired GreatBanc in good faith to assess the fairness of the Transaction, they gave GreatBanc and its advisors all the information it requested in order to assess the fairness of the Transaction, and GreatBanc gave them every indication that it was taking all reasonable and prudent actions necessary to competently assess the fairness of the Transaction.

381. Because plaintiffs have failed to prove an underlying breach of fiduciary duty by GreatBanc, and because they have failed to prove that defendants enabled a breach or had any knowledge of a GreatBanc breach, plaintiffs' co-fiduciary claim under *ERISA section 405* fails.

**C. *ERISA Section 406* Prohibited [*187] Transaction Claim**

40. Plaintiffs brought a claim against defendants pursuant to *29 U.S.C § 1106(a)(1)*, which states that "A fiduciary with respect to a plan is not permitted to cause the plan to engage in a transaction, if he or she knows or should know that such transaction constitutes a direct or indirect:

(A) *sale or exchange, or leasing, of any property between the plan and a party in interest*;
(B) lending of money or other extension of credit between the plan and a party in interest
(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) *transfer to, or use by or for the benefit of, a party in interest of any assets of the plan*; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of *ERISA § 407(a)*."

*ERISA §§ 406(a)(1)(A)-(E), 29 U.S.C. §§ 1106(a)(1)(A)-(E)* (emphasis added).

**1. Which Subsection Applies?**

382. In some of the earlier briefing in this case, the core of the parties' dispute appeared to be whether the Transaction was an indirect "sale or exchange . . . between the plan and a party in interest" under *406(a)(1)(A)*. Defendants have argued that the Transaction does not fit this description because no plan assets were involved and the ESOP was not a party to the transaction: [*188] *Antioch*, not the ESOP, purchased the outside shareholders' shares of stock, which were then retired into treasury, so the number of shares and amount of assets in the ESOP was the same after the Transaction as it was before it. The ESOP did not come into possession of the selling shareholders' stock in the Company, even indirectly through a third-party intermediary, nor did the selling shareholders receive ESOP assets directly or indirectly.

383. Plaintiffs have argued that the transaction was an "indirect" transaction between the Plan and a party in interest because, although no plan assets were exchanged, the ESOP participated in the Transaction by agreeing not to tender its shares, and the goal of the transaction was to make the ESOP the owner of 100% of the outstanding shares of Antioch stock, so it was as if the ESOP were indirectly purchasing the outside shareholders' shares of stock. The Court is skeptical of plaintiffs' argument, which finds little support in the plain language of the statute.[26]

384. Perhaps stronger is plaintiffs' argument, fleshed out for the first time in its closing brief, that, regardless of whether the Transaction was a sale or exchange [*190] between the Plan and a party in interest under *406(a)(1)(A)*, it was a "use" of plan assets "by or for the benefit of . . . a party in interest" under *406(a)(1)(D)*. Defendants, as selling shareholders, certainly benefited by "using" the ESOP's assets, at least indirectly, as both (i) the reason to initiate the Transaction and

---

[26] Plaintiffs' citation to the Seventh Circuit's 2014 opinion in this case addressing a statute of limitations issue, in which the Seventh Circuit described "the economic substance of the [*189] Transaction" as an indirect purchase of stock from the Morgan family and other shareholders by the ESOP, does not diminish the Court's skepticism. See *Fish v. GreatBanc Trust Co., 749 F.3d 671, 675 (7th Cir. 2014)*. The Seventh Circuit was reviewing the timeliness of plaintiffs' claims, not their merits, and it was required to "consider the factual record in the light most favorable to the plaintiffs and give them the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence," which requires viewing the facts in a "harsh light" towards defendants. *Id. at 674*. The factual record has changed dramatically since the Seventh Circuit last weighed in on this matter two years ago, with a mountain of new evidence having been introduced, and, more importantly, at this stage the Court owes no deference to plaintiffs' account of the facts and is not bound to make any inferences in plaintiffs' favor. This Court's review of the merits of plaintiffs' claims is little affected, if at all, by the Seventh Circuit's review of a decision that did not reach the merits.

sell their shares to Antioch in exchange for cash payments, in the sense that the goal of becoming 100% ESOP-owned and therefore exempt from income tax provided part of the rationale for the Transaction, and (ii) a key component in effectuating the Transaction, in the sense that the Transaction would not have been able to proceed unless the ESOP's independent trustee agreed not to tender any ESOP shares to the Company.

385. The Court will assume that the Transaction was, if not an indirect sale or exchange between the Plan and a party in interest within the meaning of *section 406(a)(1)(A)*, at least an indirect use of plan assets for the benefit of a party in interest within the meaning of *406(a)(1)(D)*.

## 2. Defendants Did Not Cause the Plan to Engage in a Transaction

386. Defendants also argue that, regardless of which subsection of *406(a)(1)* applies, they did not "cause" the ESOP to engage [*191] in the transaction, as *406(a)(1)* requires. A person cannot "cause" a prohibited transaction unless he or she "exercise[s] discretionary authority or control" over whether the plan enters into the transaction. *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan, 883 F.2d 345, 352 (5th Cir. 1989)* ("The jury's finding that the defendants did not exercise discretionary authority or control over the trustees' decision to sell the trust stock is also a finding that they did not 'cause' the plan to enter into such a transaction.").

387. According to defendants, they had no discretion in regard to the ESOP as it related to the Transaction, and they took no actions to "cause"—as a matter of fact or law—the Plan to engage in the Transaction. The Antioch Board stripped the EAC (and therefore defendants) of all discretionary authority with respect to the Transaction and gave that authority to GreatBanc. *See Chesemore, 886 F. Supp. 2d at 1050-51* (party without discretionary control with respect to transaction "did not cause" the transaction and was thus not liable under *section 406*).

388. Again, the Court is tempted to agree with defendants. The whole purpose of engaging GreatBanc as an independent trustee was to **remove** defendants from the ESOP's decision as to whether or not to tender its shares in the Transaction because defendants had [*192] conflicts of interest. It would be a bizarre logic that would hold them accountable for "causing" the ESOP to engage in a transaction when they hired an independent trustee for the specific purpose of deciding whether to cause the ESOP to engage in the Transaction (by declining to tender its shares) or not, in

accord with the independent trustee's independent determination of which alternative was in the ESOP's best interests.[27]

389. Nevertheless, the statute does not say what it means by "cause." How near a cause of the ESOP's participation in the Transaction need defendants have been? Defendants' actions were not the sole or even nearest cause of the transaction, but they were undeniably a "but for" cause of [*193] the transaction. Indeed, they were a "driving force" behind it, as plaintiffs argue. (Corrected Opening Post-Trial Br., ECF No. 665-1, at 23.)

390. The parties cite little law to help the Court decide this question. In the end, it need not do so because defendants have clearly established that the Company purchased the outside shareholders' shares for "adequate consideration" within the meaning of the statutory exemption of *section 408(e)*, so the defendants cannot be liable for causing a prohibited transaction under *section 406(a)*.

## 3. Defendants Met the "Adequate Consideration" Defense in *ERISA Section 408(e)*

391. Even if the Court found that the Transaction was prohibited under *ERISA section 406*, defendants would still prevail because they have proven that the Transaction satisfied *ERISA section 408(e)*'s affirmative defense. ERISA provides that an otherwise prohibited transaction does not give rise to liability where the sale or purchase of employer securities is for "adequate consideration." *29 U.S.C. § 1108(e)(1)*. "For securities with no recognized market, as in this case, ERISA defines 'adequate consideration' to be 'the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated [*194] by the Secretary [of Labor].'" *Keach v. U.S. Trust Co., 419 F.3d 626, 636 (7th Cir. 2005)* (quoting *29 U.S.C. § 1002(18)(B)*).

392. "In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the

---

[27] Plaintiffs argue that a fiduciary cannot simply avoid responsibility as a fiduciary by merely delegating it, but this argument misses the point. Defendants did not delegate responsibility merely to be free of the burden of it; they delegated their authority to decide whether to determine whether it was fair to the ESOP to allow the 2003 Transaction to proceed because they knew that they could not trust their own judgment on the matter. Plaintiffs ignore this critical distinction.

asset, and that the fair market value was determined in good faith by the fiduciary." *Id. at 636, 636 n.5* (citations omitted); *Proposed Regulation Relating To The Definition Of Adequate Consideration, 53 Fed. Reg. 17,632, 17,634 (May 17, 1988).*[28]

393. "'Fair market value' is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Keach v. United States Trust Co., 313 F. Supp. 2d 818, 867 (C.D. Ill. 2004), aff'd, 419 F.3d 626 (7th Cir. 2005)* (citing *Eyler v. Commissioner, 88 F.3d 445, 451 (7th Cir. 1996)). See also Proposed Regulation, 53 Fed. Reg. 17,632, 17,634 (May 17, 1988).*

394. The Proposed Regulation further provides that the "Department is aware that the fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure, and that it "is not the Department's intention that only one valuation figure will be acceptable as the fair market value [*195] of a specified asset." *Id.* "Rather . . . the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for that asset." *Id. See also, e.g., Keach, 313 F. Supp. 2d at 867-68* (concluding *ERISA section 408(e)* exemption was satisfied where per-share transaction purchase price fell within a range of fair market value determined by two contemporaneous valuation experts); *Unaka Co. v. Newman, Dist. No. 2:99-CV-267, 2005 U.S. Dist. LEXIS 43660, 2005 WL 1118065, at *28 (E.D. Tenn. Apr. 26, 2005)* ("Fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure; therefore, the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for that asset.").

395. "The 'good faith' requirement establishes an objective rather than a subjective standard of conduct, which is assessed in light of all relevant facts and circumstances." *Keach, 313 F. Supp. 2d at 867* (citing *Montgomery v. Aetna Plywood, Inc., 39 F. Supp. 2d 915, 937 (N.D. Ill. 1998)).*

396. "'ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing.'"

---

[28] The Seventh Circuit noted in *Keach* that although this proposed regulation ("Proposed Regulation") has yet to be approved for publication in the Code of Federal Regulations, the Seventh Circuit and other courts of appeal look to it for guidance and have adopted its two-part test. *Keach, 419 F.3d at 636 n.5.*

*Keach, 313 F. Supp. 2d at 867* (quoting *Chao v. Hall Holding Co., 285 F.3d 415, 437-38 (6th Cir. 2002)); Eyler, 88 F.3d at 455.*

397. "The ultimate outcome of an investment is not proof that a fiduciary acted imprudently." *Keach, 313 F. Supp. 2d at 867* (citation omitted). [*196] "[T]he fiduciary's duty of care requires prudence, not prescience and the appropriateness of an investment is to be determined from the perspective of the time the investment was made, not from hindsight." *Id.* (internal quotations and citation omitted); *Keach, 419 F.3d at 638* ("ERISA's fiduciary duty of care requires prudence, not prescience." (internal quotations and citation omitted)).

398. "A trustee has a duty to seek independent advice where he lacks the requisite education, experience and skill, but must ultimately make its own decision based on that advice. Yet before relying an advisor's opinion, the fiduciary must conduct a prudent and sufficient investigation and make certain that reliance on the advisor's advice is reasonably justified under the circumstances." *Keach, 313 F. Supp. 2d at 867* (citing *Chao, 285 F.3d at 430; Cunningham, 716 F.2d at 1473-74; In re Unisys Savings Plan Litig., 74 F.3d 420, 435 (3d Cir. 1996)* ("ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary.")).

399. "Assigning qualified individuals with appropriate experience to work in concert with financial and legal advisors who are also highly experienced is evidence that a trustee conducted a prudent investigation." *Id.* (citing *Howard v. Shay, 100 F.3d 1484, 1489 (9th Cir. 1996); Martin v. Feilen, 965 F.2d 660, 671 (8th Cir. 1992)). See also Keach, 419 F.3d at 636-37.*

400. In light of these principles [*197] of law and the facts found above, even if plaintiffs had established a violation of *ERISA section 406*, defendants have met their burden under *ERISA section 408(e)* to establish that the Company paid fair market value for the non-ESOP shareholders' stock, and that the fair market value was determined in good faith by GreatBanc in reliance upon the advice and opinions from its financial expert Duff & Phelps and legal expert Jenkens & Gilchrist only after GreatBanc scrutinized its advisors' credentials, analysis and conclusions.

401. The facts found above establish that GreatBanc engaged Duff, a qualified valuation firm with extensive experience in ESOP transactions, to analyze the Transaction from the perspective of the ESOP. Plaintiffs have not suggested Duff was not an experienced and highly qualified valuation firm. Indeed, plaintiffs' own expert Robert Reilly testified that based on his experience and expertise, he found Lee Bloom—

the Duff lead—to be a competent analyst and advisor. GreatBanc also engaged J&G, a leading law firm with extensive experience in ESOP transactions, to perform legal due diligence regarding the Transaction. Plaintiffs do not argue J&G was not an experienced and highly qualified firm.

402. Following [*198] an extensive and independent process of due diligence, analysis, and valuation work—as established in the facts found above—Duff issued an opinion indicating that the $850 per-share price was within the range of fair market value of Antioch, which it determined through its DCF analyses to be between $774 and $932 per share. Duff's comparable company analysis confirmed the reasonableness of its DCF value conclusion. This comparable company analysis showed that, if anything, the $850 per share Transaction price was too low. Duff also analyzed the package of cash, notes, and warrants before ultimately advising GreatBanc that it was prepared to offer a fairness opinion.

403. GreatBanc's ESOP Committee scrutinized the detailed analysis presented by Duff and engaged in substantial discussion and questioning with Duff's representatives to challenge Duff's analysis until it was satisfied that its questions had been answered and it could agree with and accept Duff's conclusions.

404. Both GreatBanc and Duff went to considerable lengths to understand Antioch's business and independently assess the financial fairness of the Transaction from the ESOP's perspective, including interviewing members [*199] of management, visiting Antioch's facilities, reviewing strategic business plans, and examining and analyzing financial documents and projections. *See Keach, 313 F. Supp. 2d at 868*.

405. The record is clear that GreatBanc and Duff understood the potential weaknesses and threats facing the Company going forward—including digital photography and technology, industry competition, and internal company trends, as described more fully above in Part II.D.1 of this Order—but also the strengths and opportunities, and properly evaluated, considered and accounted for all of the Company's strengths, weaknesses, risks and opportunities in their analysis of the financial fairness of the Transaction, including the $850 per share price.

406. While, in light of later events and with the benefit of hindsight, it may seem that GreatBanc, Duff and Antioch should have been more concerned about the risks and threats facing the Company, the Court recognizes that, in 2003, Antioch's numbers were still relatively strong, and the Company was only seeing the first signs of distress, which were so subtle as to be difficult to recognize as such. In

particular, it may seem obvious in hindsight that the emerging technological changes in digital [*200] photography would undo CM's business. But Lee Bloom's testimony concerning why Duff concluded that the opportunities digital photography presented actually outweighed the risks was particularly persuasive to the Court. When asked whether he had discussed the issue of digital photography with Antioch or CM managers during due diligence, he testified as follows:

> Yeah. We very specifically discussed it. We thought we had them on that one. You know, digital photography is coming; isn't that going to wreck your business. And, I mean, the general answer is, well, digital photography is just another way of taking a picture. What do you do with that picture when you take it. Keep in mind iPhones weren't—they—I don't think Steve Jobs had even thought of the iPhone in 2003. So people didn't have easy ways to present these photos that they were taking. You still had to produce an image somehow and preserve that image. So at the time, the best way to print your digital pictures was people had laser—inkjet printers. Well, inkjet printers, the quality degrades very quickly. *So now we're back to the archival issues. What can you do to print and preserve photo quality images*, to the extent that you're [*201] even using photos on a scrapbook page.
>
> The other issue with digital photography—I kind of chuckle. I've been working with computers since high school in the 1970s. And I wrote some pretty slick programs in high school, as the high school kids do now. . . . And I wanted to preserve these programs that I was writing. So I preserved them on the best system available at the time, which was yellow tape that feeds into a teletype machine. I'm not sure how many people here have even seen a teletype machine. And I have in my basement a bag of these spools of yellow tape that have my programs encoded on them. I have no way to read these spools, but I actually have them preserved someplace. I can never access these—as far as I know, I can't access these programs. . . . *And this was an issue and still is an issue with digital photography; simply taking the image and storing the digits doesn't really make the image available to you*. . . .
>
> I guess the last thing I'd say is the more pictures that are being taken, the more likely somebody is going to want to take a picture and put it into their scrapbook. So, you know, there were—yeah, there were risks and there were opportunities that came up from [*202] digital photography.

(Tr. 4277:13-4279:5 (emphasis added).)

407. As Rhonda Anderson testified, from the beginning CM's business was always directed toward memory preservation and keeping an archive of family photos to preserve family history. Digital photography was not the best way to achieve that goal in 2003, nor is it today. No evidence proves that it was obvious or even knowable at the time of the Transaction in 2003 that CM's customers would simply stop caring about CM's tried-and-true methods of memory preservation and family archiving in favor of the convenience of digital picture sharing methods that were unanticipated in 2003. The evidence of increased competition in the industry rather suggested the opposite. And the evidence of the company's internal problems with its products and consultants was, as a whole, inconclusive in 2003: much of it was anecdotal, and, to the extent it was not anecdotal but supported by data, it was not clear from the limited data available in 2003 that the problems were serious, lasting or insoluble. The Court does not agree with plaintiffs that, in determining whether $850 was a fair transaction price, GreatBanc and Duff failed to account for the [*203] risks facing the company.

408. It is undisputed that GreatBanc and Duff consistently probed and challenged the assumptions and proposals presented by the Company. Through their own independent (and more conservative) financial analysis, GreatBanc and Duff concluded that (a) the $850 per-share price was within the range of fair market value, (b) the consideration paid for the non-ESOP shareholders' stock was fair and reasonable to the ESOP from a financial point of view, and (c) the terms and conditions of the Transaction were fair and reasonable to the ESOP from a financial point of view. The evidence shows that the rigor with which GreatBanc and Duff reviewed and analyzed the Transaction terms and the consideration to be paid by the Company for the non-ESOP shareholders' stock was sufficient to satisfy and exceed the standard of prudence and good faith prescribed by ERISA. See _Keach, 313 F. Supp. 2d at 868_.

409. In addition to the conduct of GreatBanc and Duff, additional findings of fact establish other persuasive evidence that no more than fair market value was paid for the non-ESOP shareholders' stock in the Transaction, and that this determination was made in good faith.

410. Separate and apart from GreatBanc's [*204] retention of Duff on behalf of the ESOP, the Company hired its own valuation firm with extensive experience in ESOP transactions—Houlihan Lokey—to analyze whether the consideration to be paid to the non-ESOP shareholders was fair from a financial point of view. Plaintiffs do not dispute that Houlihan Lokey was an experienced and highly qualified valuation firm. Houlihan's analysis was as extensive as Duff's, as fully described above. Plaintiffs present no evidence that

Houlihan did anything wrong in concluding that $850 per share was fair value.

411. The Court also finds that the opinions of defendants' expert witness Jeffrey Risius provide further credible and persuasive support for its conclusion that no more than fair market value was paid for the non-ESOP shareholders' stock, and that this determination was reached in good faith. Risius' opinion that all aspects of Duff's process for reaching its fairness and valuation opinions were reasonable and appropriate, that Duff's methodology and valuation opinions were conservative based on what was known or knowable as of the date of the Transaction, and that the $850 per-share value was at the "very low end" of the range of fair market [*205] value for Antioch stock, are supported by the facts found above and Risius' experience, expertise, and independent research and valuation analysis.

412. As discussed in the findings of fact, plaintiffs' expert Robert Reilly testified Duff's analysis suffered from two principal "flaws" that inflated the per-share fair market value of Antioch stock immediately before and immediately after the Transaction.[29] The Court finds that Mr. Reilly's opinions are not credible because they are not based on sound or commonly applied valuation methodologies, and are improperly determined "from the perspective of . . . hindsight" based in part on telephone conversations with former Antioch employees sympathetic to plaintiffs more than ten years after the Transaction, rather than from "the time the investment was made" in 2003. _Keach, 313 F. Supp. 2d at 867_.

413. As described above, there are methodological and reliability problems with Mr. Reilly's analysis in regard to the four [*206] DCFs that were based on ARIMA (FTI 1 and FTI 2) and Deloitte's downside feasibility models (Downside and Big Downside), and for those reasons, the Court does not find his opinions to be sufficiently credible to outweigh the fact and expert evidence contrary to it that the Transaction price of $850 per share was indeed adequate consideration.

414. With regard to the ARIMA-based DCFs, the testimony at trial showed that ARIMA is useful for analyzing data to identify trends therein, but because an ARIMA analysis is principally based on past sales, it essentially assumes that the current trend will continue. There is no dispute that Antioch's sales growth slowed in 2003, so Mr. Buchanan's ARIMA analysis showing that, if the trend in the 2003 numbers

---

[29] Neither Mr. Reilly nor Plaintiffs present any evidence (or even argue) that the package portion of consideration paid to non-ESOP shareholders constituted less than adequate consideration—it did not. They only challenge the $850 per-share cash consideration.

continued, the Company's sales would fall (as, in fact, they did), is of little usefulness in determining what was a reasonable projection of the Company's future performance in 2003. The ARIMA-based DCFs are insufficiently attentive to the possibility of reversing the trend by making transformative efforts to boost sales in the future, whether through promotional activities or expansion into new geographic or product markets or any other means. [*207] They do not sufficiently account for the possibility that the current trend in 2003 was just a blip on the radar of no lasting significance, a momentary valley in a trend line consisting of numerous peaks and valleys. In order to know whether it was reasonable to assume that the current trend would continue, it is necessary to look at the full, holistic Antioch picture at the time of the Transaction, and the evidence at trial did not show that defendants knew or should have known at the time of the Transaction that the risks facing the Company were so dire that the Company should have heard its death knell in a few months of slower-than-expected sales in 2003, despite the fact that it was coming off years and years of explosive growth.

415. Reilly's uncritical reliance on Michael Buchanan's projections in his DCF models—in light of the weight of evidence (including testimony from Reilly himself) that the modeling techniques Buchanan implemented are not reliable for projecting out 10 years of corporate sales and not used in practice by financial experts for valuing company stock or to price a transaction—was improper under *Federal Rule of Evidence 703* and further undermines the credibility of his pre-Transaction [*208] per-share value opinions. *See, e.g.*, *TK-7 Corp. v. The Estate of Ishan Barbouti, 993 F.2d 722, 732-33 (10th Cir. 1993)* (opinion improper under *Fed. R. Evid. 703* in part because "there is no indication in the record that Dr. Boswell[, who based his expert lost-profits opinion on Mr. Werber's sales figures,] had any familiarity with the methods or reasoning used by Mr. Werber in arriving at his projections" and "there was no evidence that other experts in his field would rely on such a study and would adopt it").

416. With respect to the DCFs based on Deloitte's downside feasibility models, they were never meant to be used as the basis for a DCF analysis; it would be inappropriate to do so, as Risius explained, because the discount rate would be "mismatch[ed]" to the cash flow projections (Tr. 5866:6-5857:5); and the only possible result that could come from using them in that way, as Lee Bloom explained, is to render "a value that's too low" (Tr. 4393:24-4394:16). These DCFs, too, are unreliable.

417. The Court also rejects as unreliable Mr. Reilly's valuation derived from his fifth DCF that is driven by his subjective 5% CSRP. The findings of fact show his 5% CSRP is not supported by any reliable formula or quantitative analysis. Indeed, Risius testified that application of an objective quantitative [*209] analysis of the Company's profit margins prior to the Transaction demonstrate that a 0% CSRP is appropriate. This Court can hardly hold that Reilly is right and Risius is wrong based on what is essentially Mr. Reilly's gut feeling. (*Compare* Reilly Tr., 4114:4-23; 4150:23-4151:25 *with* Risius Tr., 5797:3-5799:22; 6120:9-6126:7.)

418. As to Reilly's "second flaw" opinions regarding the post-Transaction per-share value, the Court is persuaded by the testimony of Jeffrey Risius, Lee Bloom, and Richard May that when a company is redeeming and retiring shares put by terminating ESOP participants (like Antioch did), or implementing ESOP recycling (like Antioch did in 2004), the future repurchase obligation has no impact on per-share value. The Court also finds persuasive the testimony from Risius and Lee Bloom as to the methodological errors with Reilly's "second flaw" calculations. The Court does not find Mr. Reilly's "second flaw" opinion to be credible.

419. Reilly's post-Transaction per-share value opinions are also improper and not credible because he uncritically relies upon repurchase obligation projections from David Weinstock that are methodologically flawed, and therefore unreliable. [*210] *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 748 (3d Cir. 1994)* ("If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.") (quoting *In re "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1223, 1245) (E.D.N.Y. 1985)).* Moreover, at the unexplained instruction from plaintiffs' counsel, Reilly did not incorporate into his averaging analysis an entire study cohort that Weinstock prepared based on a retirement age of 65, presumably to increase the damages conclusion of his post-Transaction valuation.

420. Because the consideration paid for the non-ESOP shareholders' stock was supported by the financial analysis and valuations performed by Duff and Houlihan Lokey and the retrospective valuation analysis performed by Risius, and the record also demonstrates that GreatBanc arrived at its valuation in good faith, the Court finds that no more than adequate consideration was paid for the non-ESOP shareholders' stock. *See Keach, 313 F. Supp. 2d at 870.*

421. Therefore, even if plaintiffs had established a violation of *ERISA section 406*, the exemption found in *ERISA section 408(e)* is satisfied. For this reason, plaintiffs' prohibited transaction claim fails and judgment will be entered for defendants.

## D. Damages and Causation

422. Because the Court has concluded [*211] that defendants' actions and omissions did not violate the standards set in *ERISA sections 404*, *405* or *406*, there is no need to address causation of damages. Nevertheless, the Court notes briefly that, even if plantiffs would otherwise have prevailed on their claims, the evidence shows that defendants did not cause any of plaintiffs' alleged damages.

423. Even assuming that plaintiffs succeeded in proving breaches by defendants under *ERISA sections 404* and *405*, the evidence shows that any such breaches did not cause[30] any damages because (a) as explained in detail above, the Company did not overpay for the non-ESOP shares, and (b) it was not the Transaction that caused the Company to fail and the ESOP participants' shares to become worthless; rather, the Company failed due to a sales decline caused by market forces and conditions outside the defendants' control and that defendants could not have predicted in 2003.

424. The Company continued to do well enough following the Transaction that the per share value of the stock held by plan participants as of December 31, 2003, two weeks after the Transaction closed, was $44 greater than the $850 per share Transaction price, and nearly $100 more per share a year later as of December 31, 2004. The weight of evidence showed that events unrelated to the Transaction caused the Company's decline and ultimate reorganization of its capital structure through a bankruptcy proceeding five years after the Transaction closed.

425. By the spring of 2005, the Company had weathered a storm in which it had incurred an unpredictable and unprecedented $109 million dollars in repurchase obligations. Meanwhile, Antioch was able to pay down more than $30 million dollars of its Transaction debt ahead of schedule, and to secure a re-financing of that debt under more favorable terms. It was not until 2006 that the Company's sales decline became a serious threat, and the evidence at trial did not connect the sales decline to the Transaction.

426. *Chesemore v. Alliance Holdings, Inc., 948 F. Supp. 2d 928 (W.D. Wis. 2012)* is instructive on the issue of causation. In *Chesemore*, the court held that the evidence did not show that "the acquisition debt or [*213] overpayment [*i.e.*, the financial aspects of the transaction] *caused* Trachte's collapse," because even if they "placed additional pressure on Trachte," plaintiffs "ignore[d] the tsunami that was the 2008 financial crisis." *Id. at 942* (emphasis in original). Regardless of whether the company stock owned by the ESOP was initially overvalued, the company held its position for two years and only collapsed after the financial crisis began. Accordingly, the court concluded that the plaintiffs were not entitled to a rescission of the transaction because "the 2008 recession [was] the principal cause of [the company's] precipitous loss in value," not the transaction. *Id.*[31]

427. This case is similar. The true cause of Antioch's bankruptcy was not the Transaction but sweeping technological change in the industry, which brought with it equally sweeping changes in consumer preferences that caused a precipitous sales decline.[32] Like in *Chesemore*, Antioch stock appreciated twice after the Transaction according to two independent valuations. Even three and four years after the Transaction the stock value was independently valued only moderately lower at $786 (as of year end 2005 and applicable to terminees in 2006) and $725 per share (as of year end 2006 and applicable to terminees in 2007). By this time, no reasonable connection to the Transaction existed, and there was certainly none that plaintiffs have been able to quantify. Only when the emergence of broadband and social media combined to substantially alter customer behavior [*215] did the Company's financial decline become serious. Therefore, even if plaintiffs had proved liability under either *section 404* or *405*, defendants are entitled to judgment.

428. As for plaintiffs' *section 406* claim, plaintiffs depend on their expert Robert Reilly for evidence of damages. As the

---

[30] The parties dispute which side has the burden of proving causation, but it makes no difference because, after a bench trial spanning 34 trial days in which both parties introduced massive amounts of evidence, the evidentiary record is so well-developed that there are no evidentiary holes to be held against either party. [*212]

[31] Although the court in *Chesemore* held that (as in this case) the plaintiffs were not entitled to a rescission of the transaction because the transaction did not cause the company to fail, the court went on to award the plaintiffs the amount that the ESOP overpaid in the transaction. This distinction is perhaps lost on plaintiffs, who have rushed to apprise the Court of the Seventh Circuit's recent decision affirming the district court in this respect, see *Chesemore v. Fenkell, 829 F.3d 803, 2016 WL 3924308 (7th Cir. 2016)*, but this decision is of no help to [*214] plaintiffs. In this case, there was no overpayment for the shares exchanged in the Transaction; rather, the Transaction price was within the range of fair market value, determined in good faith. Thus, neither a rescission remedy ***nor*** an overpayment remedy is available to plaintiffs, and if *Chesemore* helps either side, it helps defendants.

[32] The 2008 financial crisis may also have been a factor in Antioch's bankruptcy, to the extent it contributed to Antioch's difficulty finding sources of capital around the time it was forced into bankruptcy, although it was not the major factor it was in *Chesemore*.

Court has already explained at length, the Court finds that Mr. Reilly's opinions are methodologically flawed and unreliable. For this alternative reason, the Court must enter judgment for defendants on the *section 406* claim.

## CONCLUSION

429. For the foregoing reasons, the Court enters judgment in favor of defendants on all claims.

430. Plaintiffs have also sued the Morgan Family Foundation as a gratuitous transferee of funds that Asha Moran and Lee Morgan received as payment for their shares in the Transaction. (*See* Second Am. Compl., ¶¶ 139-151, ECF No. 380.) The Foundation has moved for summary judgment. (ECF No. 668.) At the presentment hearing, all parties agreed that **[*216]** plaintiffs cannot prevail on their claims against the Morgan Family Foundation if the individual defendants are not liable, so the court enters judgment in favor of the Morgan Family Foundation, and the Foundation's pending motion for summary judgment is moot.

431. At a pretrial status conference on October 21, 2015, plaintiffs represented that, at the close of proceedings, they would present for the Court's approval a plan of allocation of the proceeds of the settlement with GreatBanc. A status conference is set for October 11, 2016 at 9:30 a.m. to discuss the matter.

**SO ORDERED.**

**ENTERED: September 1, 2016**

/s/ Jorge Alonso

**HON. JORGE ALONSO**

**United States District Judge**

End of Document

# Tab D

# *Harris v. Greatbanc Trust Co.*

United States District Court for the Central District of California

March 15, 2013, Decided; March 15, 2013, Filed

Case No. EDCV12-1648-R (DTBx)

**Reporter**

2013 U.S. Dist. LEXIS 43888 *; 55 Employee Benefits Cas. (BNA) 1312; 2013 WL 1136558

SETH D. HARRIS, Acting Secretary of the United States Department of Labor, Plaintiff, v. GREATBANC TRUST COMPANY, et al., Defendants.

## Core Terms

Aluminum, indemnity agreement, Indemnitees, indemnification, fiduciary duty, alleges, motion to dismiss, motion to strike, Defenses, breached, defense costs, settlement

**Counsel: [*1]** For Hilda L Solis, Secretary of the United States Department of Labor, Plaintiff: Daniel J Chasek, US Dept of Labor - Office of the Solicitor, Los Angeles, CA; David M Ellis, PRO HAC VICE, US Department of Labor, Office of the Solicitor - Plan Benefits Security Division, Washington, DC; Jeffrey M Hahn, PRO HAC VICE, Syma Ahmad, US Department of Labor - Office of the Solicitor, Plan Benefits Security Division, Washington, DC.

For GreatBanc Trust Company, Defendant: Nicole A Diller, LEAD ATTORNEY, Morgan Lewis and Bockius LLP, San Francisco, CA; Jason S Mills, Morgan Lewis and Bockius LLP, Los Angeles, CA; Julie A Govreau, Theodore M Becker, PRO HAC VICE, Morgan Lewis and Bockius LLP, Chicago, IL.

For Sierra Aluminum Company, Sierra Aluminum Company Employee Stock Ownership Plan, The, Defendants: Charles M Dyke, LEAD ATTORNEY, Trucker Huss, APC, San Francisco, CA; Sean T Strauss, Trucker Huss, San Francisco, CA.

**Judges:** Hon. Manuel L. Real, United States District Judge.

**Opinion by:** Manuel L. Real

## Opinion

### ORDER GRANTING DEFENDANTS' MOTIONS TO

DISMISS COUNT II OF COMPLAINT WITHOUT LEAVE TO AMEND AND DENYING PLAINTIFF'S MOTION TO STRIKE DEFENDANT GREATBANC TRUST COMPANY'S AFFIRMATIVE DEFENSES

### I.INTRODUCTION

On September **[*2]** 28, 2012, plaintiff Seth D. Harris, Acting Secretary of the United States Department of Labor ("Secretary"), filed a Complaint against GreatBanc Trust Company ("GreatBanc"), Sierra Aluminum Company ("Sierra Aluminum"), and, nominally, the Sierra Aluminum Company Employee Stock Ownership Plan (the "ESOP") (Sierra Aluminum and the ESOP collectively are referred to as the "Sierra Defendants"). The Secretary alleges claims for violations of the Employee Retirement Income Security Act of 1974, as amended (*29 U.S.C. § 1001, et seq.*) ("ERISA") and seeks relief under *ERISA §§ 409* and *502(a)(2) & (a)(5)* (*29 U.S.C. §§ 1109* and *1132(a)(2) & (5)*).

Presently before the Court are the following motions: 1) GreatBanc's Motion to Dismiss Count II of the Complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*; 2) Sierra Defendants' Motion to Dismiss Count II of the Complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*; and 3) the Secretary's Motion to Strike GreatBanc's Affirmative Defenses.

The Motions came on regularly for hearing on March 4, 2013 at 10:00 a.m. After full consideration of the pleadings, the papers, and arguments of counsel, and good cause appearing, **[*3]** the Court hereby GRANTS GreatBanc's and the Sierra Defendants' Motions to Dismiss without leave to amend and DENIES the Secretary's Motion to Strike.

### II.RELEVANT ALLEGATIONS

Sierra Aluminum is a California corporation located in Riverside, California, that produces extruded aluminum products. (Compl. ¶ 6.) Sierra Aluminum sponsors the ESOP,

which it established on March 31, 2001. (Compl. ¶¶ 7, 10.) The ESOP is funded exclusively through employer contributions, as determined by Sierra Aluminum's Board of Directors, in the form of cash or shares of Sierra Aluminum stock. (Compl. ¶ 11.) The ESOP is governed by ERISA. (Compl. ¶ 7.)

On April 1, 2005, Sierra Aluminum entered into an engagement agreement with LaSalle Bank, pursuant to which LaSalle became Trustee of the ESOP. (Compl. ¶ 12.) LaSalle served as Trustee for seven months until October 31, 2005, when GreatBanc replaced it and assumed all of LaSalle's rights and responsibilities. (Compl. ¶ 13.)

GreatBanc's engagement agreement with Sierra Aluminum contains the following indemnification provision ("Indemnification Agreement"):

14. Indemnification.

For purposes of this Section 14, the term "Indemnitees," shall mean [GreatBanc] and its officers, **[*4]** directors, employees, and agents. Subject to the applicable provisions of ERISA, [Sierra Aluminum] shall indemnify the Indemnitees for any loss, cost, expense or other damage, including attorney's fees, suffered by any of the Indemnitees resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by any one or more of the indemnitees pursuant to this Agreement, the Plan or the Trust. The indemnification provided for in this Section 14 shall include, but not be limited to: (a) any action taken or not taken by any of the Indemnitees at the direction or request of [Sierra Aluminum], any agent of [Sierra Aluminum], or any committee or fiduciary under the Plan or Trust; and (b) all costs and expenses incurred by the Indemnitees in enforcing the indemnification provisions of this Section 14, including attorney's fees and costs. However, these indemnification provisions shall not apply to the extent that any loss, cost, expense, or damage with respect to which any of the Indemnitees shall seek indemnification is held by a court of competent jurisdiction, in a final judgment from which no appeal can be taken, to have resulted either from **[*5]** the gross negligence or willful misconduct of one or more of the Indemnitees or from the violation or breach of any fiduciary duty imposed under ERISA on any one or more of the Indemnitees. An Indemnitee who receives an advancement of fees or expenses from [Sierra Aluminum] pursuant to this paragraph shall make arrangements reasonably satisfactory to [Sierra Aluminum] to ensure that such Indemnitee will

reimburse [Sierra Aluminum] for such advancements in the event it is determined the Indemnitee is not entitled to retain such amounts hereunder.

(Compl. ¶ 61.)

Count II of the Secretary's complaint alleges that *Section 410(a) of ERISA* (*29 U.S.C. § 1110(a)*) invalidates the Indemnification Agreement. (Compl. ¶¶ 61-62.) The Secretary alleges that because the ESOP owns 100% of Sierra Aluminum, enforcement of the Indemnification Agreement would harm the ESOP because payments of defense costs or indemnification would decrease Sierra Aluminum's assets and, therefore, the value of its stock. (*Id.* ¶ 64.) In addition, the Secretary alleges that the Indemnification Agreement improperly permits Sierra Aluminum to indemnify GreatBanc even if it breached its fiduciary duties under ERISA in the event **[*6]** the parties settle the case rather than obtain a final, non-appealable judgment. (*Id.* ¶¶ 72, 75.)

### III. LEGAL STANDARD

To withstand a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and must state "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. In resolving a *Rule 12(b)(6)* motion, the Court must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded allegations as true. *See Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996)*. "Assertions that are mere 'legal conclusions,' however, are not entitled to the assumption of truth." *Adams v. I-Flow Corp., No. CV 09-09550 R (SSx), 2010 U.S. Dist. LEXIS 33066, 2010 WL 1339948, at *2 (C.D. Cal. Mar. 30, 2010)* (citing *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009))*.

As to the Secretary's motion to strike, *Federal Rule of Civil Procedure 12(f)* provides that "the court may strike from a pleading [on its own or upon motion made by a party] an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Redundant" means allegations **[*7]** "that are needlessly repetitive or wholly foreign to the issues involved in the action." *State of California Dep't. of Toxic Substances Control v. Alco Pacific, Inc., 217 F. Supp.2d 1028, 1033 (C.D. Cal. 2002)* (citation omitted). "'Immaterial' means "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993)*, rev'd on other grounds, *510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994)* (citation omitted). "Impertinent" matters consist of statements that do not

pertain, and are not necessary to the issues in question. *Id.*

# IV. DISCUSSION

## A. The Secretary's Second Claim For Relief To Void The Indemnification Agreement Under *ERISA § 410(a)*.

Defendants seek dismissal of the Secretary's Second Claim for Relief on the grounds that the Secretary has failed to allege plausible facts supporting its claim that *ERISA § 410(a)* voids the Indemnification Agreement. The Court agrees.

Under *ERISA § 410(a)*, "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty under this part shall be void as against public policy."

The Indemnification **[*8]** Agreement at issue in this case expressly prohibits indemnification if a court enters a final judgment from which no appeal can be taken finding GreatBanc liable for breach of its fiduciary duties under ERISA, and therefore the Indemnification Agreement does not run afoul of *ERISA 410(a)*. The indemnification agreement that was at issue in *Johnson v. Couturier, 572 F.3d 1067 (9th Cir. 2009)* is different than the Indemnification Agreement in this case, in that the Couturier indemnification agreement did not exclude indemnification for breaches of fiduciary duty under ERISA. In *Couturier*, the plaintiffs sought to preliminarily enjoin a company's advancement of defense costs to ESOP trustees under an indemnification agreement, where the ESOP owned 100% of the company. *Id. at 1075*. The *Couturier* court's decision to invalidate the indemnification agreement turned on three factors not alleged here: (1) the agreement did not exclude indemnification for breaches of fiduciary duties under ERISA; (2) plaintiffs had met their burden of proving all of the requisite elements for a preliminary injunction, including that they would likely succeed in proving that the defendants breached their ERISA **[*9]** fiduciary duties; and (3) the plan sponsor no longer was an operating company, had sold substantially all its assets to another company, and had adopted a plan of liquidation pursuant to which the ESOP participants would receive the net cash proceeds. Were it not for the rather unique circumstances present in the *Couturier* case, under which payments to indemnitees would reduce dollar-for-dollar the funds to be distributed to the ESOP participants pursuant to the plan of liquidation, the plan asset regulations, *29 C.F.R. Section 2510-3.101(a)(2)* and *3.101(h)(3)*, would have applied and the assets of the plan sponsor company would not have been treated as assets of the ESOP and no basis under ERISA would have existed for concluding that the indemnification

agreement would harm the ESOP. *Id. at 1078-81*. *Couturier* is inapplicable to this case, as the Complaint here does not allege facts consistent with any of the above-mentioned factors present in *Couturier*.

Notwithstanding that the Indemnification Agreement in this case precludes indemnification if a court enters a final non-appealable judgment concluding that GreatBanc breached its fiduciary duties under ERISA, the Secretary argues that **[*10]** the Indemnification Agreement is void under *ERISA § 410(a)* for two reasons: (1) in the event of a settlement, GreatBanc could obtain the benefit of defense and indemnification from Sierra Aluminum even if GreatBanc admits it breached its fiduciary duties under ERISA; and (2) the Indemnification Agreement does not specify how GreatBanc will reimburse Sierra Aluminum for advanced defense costs if a court ultimately determines that GreatBanc breached its duties under ERISA.

### 1. Settlement Agreements.

The Secretary argues for an extension of the anti-exculpatory language of Section 410(a) to settlement agreements. The Secretary cites no legal authority that supports extending the reach of Section 410(a) to preclude advancement of defense costs incurred by a fiduciary in defending an action alleging fiduciary breach because of the mere possibility that the parties may settle the case rather than obtain an adjudication on the merits. Indeed, the only case cited by the parties addressing this contention rejected it. *See Martinez v. Barasch, 01 Civ. 2289 (MBM)(JCF), 2006 U.S. Dist. LEXIS 6914, 2006 WL 435727, at *4-5 (S.D.N.Y. Feb. 22, 2006)* (holding that "settling defendants may generally enforce contractual indemnity **[*11]** rights without running afoul of ERISA," so long as the "specific contract provisions do not violate Section 410(a)'s prohibition against exculpatory indemnity clauses"). Furthermore, notwithstanding that defendants rarely admit liability in a settlement agreement, this is the Secretary's lawsuit and as the plaintiff, the Secretary is free to condition its consent to any settlement of this case on any terms it believes are appropriate.

### 2. Reimbursement of Advanced Attorneys' Fees and Costs.

If the Secretary is concerned about GreatBanc's ability to reimburse advanced defense costs in the event that a court ultimately determines that GreatBanc breached its duties under ERISA, the Secretary may seek a bond. Setting aside the indemnification agreement is not necessary or appropriate.

## B. The Secretary's Motion To Strike GreatBanc's Affirmative Defenses.

In light of the Court granting GreatBanc's and the Sierra Defendants' Motions to Dismiss, the Court denies the Secretary's Motion to Strike GreatBanc's Affirmative Defenses.

**V.CONCLUSION**

In light of the foregoing, the Court GRANTS GreatBanc's and Sierra Defendants' Motions to Dismiss without leave to amend, and DENIES the Secretary's Motion to **[*12]** Strike GreatBanc's Affirmative Defenses.

**IT IS SO ORDERED.**

Dated: March 15, 2013

/s/ Manuel L. Real

Hon. Manuel L. Real

United States District Judge

---

**End of Document**

# Tab E

 Neutral

As of: February 28, 2019 8:40 PM Z

# In re BP P.L.C. Sec. Litig.

United States District Court for the Southern District of Texas, Houston Division

October 30, 2015, Decided; October 30, 2015, Filed, Entered

MDL No. 4:10-MD-2185; Civil Action No. 4:10-cv-4214

**Reporter**

2015 U.S. Dist. LEXIS 147819 *; 2015 WL 6674576

IN RE: BP P.L.C. SECURITIES LITIGATION. This document relates to: IN RE: BP ERISA LITIGATION

**Subsequent History:** Motion granted by, Dismissed without prejudice by *PEAK6 Capital Mgmt., LLC v. BP P.L.C. (In re BP P.L.C. Sec. Litig.), 2016 U.S. Dist. LEXIS 417 (S.D. Tex., Jan. 4, 2016)*

Stay denied by *In re BP P.L.C. Secs. Litig., 2016 U.S. Dist. LEXIS 5675 (S.D. Tex., Jan. 14, 2016)*

**Prior History:** *In re BP p.l.c. Sec. Litig., 2015 U.S. Dist. LEXIS 27138 (S.D. Tex., Mar. 4, 2015)*

## Core Terms

fiduciary, Appointing, Plaintiffs', monitor, Stock, fiduciary duty, breached, jury trial, derivative, Plans, allegations, amend, duty to inform, appointees, insider, participants, documents, requires, respondeat superior, motion to dismiss, governing plan, prudently, duties, manage, notice, terms, responsibilities, duty-to-monitor, investing, courts

**Counsel: [*1]** For Ralph Whitley, Individually and on behalf of all others similarly situated, Plaintiff: Arvind B. Khurana, Lori G Feldman, Sanford P. Dumain, LEAD ATTORNEYS, PRO HAC VICE, Milberg LLP, New York, NY USA; Gregory M. Egleston, LEAD ATTORNEY, Egleston Law Firm, Brooklyn, NY USA; Stephen J Fearon, Jr, LEAD ATTORNEY, Olga Anna Posmyk, Squitieri & Fearon LLP, New York, NY USA; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Amber M. Nesbitt, Kenneth A. Wexler, Wexler Wallace LLP, Chicago, IL USA; Joseph Goljan, Squitieri & Fearon, New York, NY USA.

Frankie Ramirez, Plaintiff, Pro se.

For David M. Humphries, Consol Plaintiff: James E. Miller, LEAD ATTORNEY, Shepherd Finkelman Miller & Shah LLP, Chester, CT USA; Thomas Robert Ajamie, LEAD ATTORNEY, Dona Szak, Ajamie LLP, Houston, TX USA; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm,

Houston, TX USA; Kim Zeldin, Liner LLP, Los Angeles, CA USA; Laura Elizabeth Towbin, Novack and Macey, LLP, Chicago, IL USA; Mitchell L. Marinello, Novack & Macey, Chicago, IL USA; Ronald S Kravitz, Shepherd Finkelman Miller & Shah LLP, San Francisco, CA USA.

For Charis Moule, Consol Plaintiff: W Mark Lanier, LEAD ATTORNEY, The Lanier Law **[*2]** Firm, Houston, TX USA; Arvind B. Khurana, Lori G Feldman, Jennifer J. Sosa, Sanford P. Dumain, PRO HAC VICE, Scott Foglietta, Milberg LLP, New York, NY USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY USA; Marvin Alan Miller, Matthew E Van Tine, Miller Law LLC, Chicago, IL USA; Robert I Harwood, Tanya Korkhov, Harwood Feffer LLP, New York, NY USA; Todd L Kammerman, Milberg Weiss Bershad, New York, NY USA.

For Edward F. Mineman, Consol Plaintiff: W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Bruce C Howard, Wheaton, IL USA; Edwin J Mills, Michael J. Klein, Stull Stull, New York, NY USA; Patrice Lyn Bishop, PRO HAC VICE, Stull, Stull & Brody, Beverly Hills, CA USA; Robert D. Allison, Steven Paul Schneck, Robert D. Allison & Associates, Chicago, IL USA.

For Syed Arshadullah, Ron Pierce, Consol Plaintiffs: W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Robert A Izard, Jr, Izard Nobel LLP, West Hartford, CT USA; William W Thomas, Behn Wyetzner Chtd., Evanston, IL USA.

For Jerry T. Mcguire, **[*3]** Consol Plaintiff: Jennifer J. Sosa, LEAD ATTORNEY, PRO HAC VICE, Milberg Llp, New York, NY USA; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY USA; Jeffrey M Norton, Newman Ferrara LLP, New York, NY USA; Marvin Alan Miller, Matthew E Van Tine, Miller Law LLC, Chicago, IL USA; Robert I Harwood, Tanya Korkhov, Harwood Feffer LLP, New York, NY USA; Scott Foglietta, Milberg LLP, New York, NY USA; Todd L

Kammerman, Milberg Weiss Bershad, New York, NY USA.

For Maureen S. Riely, Consol Plaintiff: Jennifer J. Sosa, LEAD ATTORNEY, PRO HAC VICE, Scott Foglietta, Milberg LLP, New York, NY USA; W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Todd L Kammerman, Milberg Weiss Bershad, New York, NY USA.

For Thomas P Soesman, Consol Plaintiff: W Mark Lanier, LEAD ATTORNEY, The Lanier Law Firm, Houston, TX USA; Charles Robert Watkins, Guin, Stokes & Evans, LLC, Chicago, IL USA; Thomas J McKenna, Gainey and McKenna, New York, NY USA; William W Thomas, Behn Wyetzner Chtd., Evanston, IL USA.

For Bp P.L.C., Defendant: Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Thomas [*4] W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX USA; Eric G. Serron, Morgan D Hodgson, Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Richard C Pepperman, II, Sullivan & Cromwell LLP, New York, NY USA.

For Anthony Hayward, The Savings Plan Investment Oversight Committee, Defendants: Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Eric G. Serron, Morgan D Hodgson, Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Iain C. Conn, Andy G. Inglis, Carl-Henric Svanberg, Paul M Anderson, Antony Burgmans, Cynthia B. Carroll, Sir William M. Castell, George David, Ian Davis, Douglas J. Flint, Deanne S. Julius, Defendants: Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA.

For Robert W. Dudley, [*5] Defendant: Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA.

For Bryon E. Grote, Defendant: Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Richard J. Dorazil, Defendant: Daryl A Libow, LEAD ATTORNEY, Sullivan & Cromwell LLP, Washington, DC USA; Eric G. Serron, Morgan D Hodgson, Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

John Does 1-20, Defendant, Pro se.

For Corey Correnti, Marvin Damsma, James Dupree, Patrick Gower, Jeanne M. Johns, Patricia H. Miller, Stephen J. Riney, Brian D. Smith, Lord John Browne, Stephanie C Moore, Defendants: Eric G. Serron, Morgan D Hodgson, Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Thomas W Taylor, Andrews and Kurth, [*6] Houston, TX USA.

For Bp Corporation North America, Inc., Bp America, Inc., Lamar Mckay, Gregory T. Williamson, Neil Shaw, Thomas L Taylor, Consol Defendants: Eric G. Serron, Morgan D Hodgson, Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Stephanie C. Atkins, Consol Defendant: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, DC USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For State Street Bank And Trust, Consol Defendant: Aron J Frakes, McDermott Will Emery LLP, Chicago, IL USA; Wilber H Boies, McDermott Will & Emery, Chicago, IL USA.

John Does 1-10, Consol Defendant, Pro se.

For The Investment Committee, Consol Defendant: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

For Bp Corporation North America, Inc.'S Board of Directors, Consol Defendant: Eric G. Serron, Morgan D Hodgson, Paul J Ondrasik, Jr, Steptoe & Johnson LLP, Washington, [*7] DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA; William W Thomas, Behn Wyetzner Chtd., Evanston, IL USA.

For Robert A Malone, Consol Cross Defendant: Eric G. Serron, Morgan D Hodgson, Paul J Ondrasik, Jr, Steptoe &

Johnson LLP, Washington, DC USA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL USA; Marc De Leeuw, Sullivan & Cromwell, New York, NY USA; Thomas W Taylor, Andrews and Kurth, Houston, TX USA.

**Judges:** Hon. Keith P. Ellison, United States District Judge.

**Opinion by:** Keith P. Ellison

# Opinion

## MEMORANDUM AND ORDER

Before the Court is Defendants' Partial Motion to Dismiss the First Amended Consolidated ERISA Complaint and to Strike Plaintiffs' Jury Demand (the "Motion").

## I. Background[1]

Each of the nine plaintiffs is an individual participant and beneficiary of either the BP Employee Savings Plan ("ESP") or the BP Capital Accumulation Plan ("CAP").[2] Plaintiffs seek to bring this action [*8] derivatively on behalf of the ESP, the CAP, the BP Partnership Savings Plan ("PSP") and the BP DirectSave Plan ("DSP") (collectively, the "Plan"), each of which featured the option of investing in the "BP Stock Fund," a fund comprised entirely of BP American Depositary Shares ("ADSs").[3]

Plaintiffs bring their claims under ERISA, alleging that Defendants breached their fiduciary duties to the Plan from January 16, 2007 to June 24, 2010 (the "Relevant Period").[4] Specifically, Plaintiffs assert two general theories of liability ("Count I" and "Count II," respectively):

(1) The "Insider Defendants"[5] and "Corporate [*9] Defendants"[6] breached their duties of prudence and loyalty by permitting Plan participants to invest in the BP Stock Fund, and

(2) The "Designated Officer Defendants,"[7] the "Appointing Officer Defendants,"[8] the Savings Plan Investment Oversight Committee Defendants (the "SPIOC),[9] the "Board Defendants,"[10] and the Corporate Defendants breached their duties to adequately monitor other fiduciaries and provide them with accurate information.[11]

According to Plaintiffs, Defendants' actions and/or inaction cost Plan participants hundreds of millions of dollars in losses following the Deepwater Horizon explosion.[12]

This is not the first motion to dismiss that the Court has considered in this action. In March of 2012, it dismissed Plaintiffs' First Consolidated ERISA Complaint, holding that Plaintiffs had failed to adequately rebut the so-called "*Moench* presumption of prudence."[13] The Court also dismissed Plaintiffs' duty-to-monitor claims on the grounds that such claims are a form of secondary liability only,

---

[1] The Court has previously provided a detailed background of Plaintiffs' ERISA action and will refrain from repeating itself here. *See, e.g.,* Doc. No. 116 ("2012 Mem. and Order").

[2] First Am. Consolidated ERISA Compl. ("Compl.") ¶ 1, Doc. No. 173. The individual plaintiffs are: (i) David M. Humphries, Jerry McGuire, Edward Mineman, Charis Moule, Maureen S. Riley, Thomas P. Soesman, Arshadullah Syed, and Ralph Whitley, each of whom is a participant in the ESP; and (ii) Frankie Ramirez, who is a participant in the CAP. Compl. ¶ 1.

[3] *See* Compl. ¶¶ 4, 18. In the alternative, and "only to the extent deemed necessary by the Court," Plaintiffs seek to bring their claims on behalf of a putative class of similarly situated participants and beneficiaries of the Plans. Compl. ¶ 1.

[4] Compl. ¶ 3.

---

[5] The term "Insider Defendants" refers to the Defendants who are alleged to have had insider information regarding the artificially inflated value of BP's stock. These Defendants include BPNAI, Anthony Hayward, Lamar McKay, Neil Shaw, and James Dupree. Compl. ¶ 306.

[6] The "Corporate Defendants" include BP p.l.c. ("BP"), BP America Inc. ("BP America") and BPNAI. Compl. ¶ 39.

[7] The "Designated Officer Defendants" include Lord John Browne, Richard Dorazil, Anthony Hayward, McKay, and Robert Malone. Compl. ¶ 66.

[8] The "Appointing Officer Defendants" include McKay and Malone. Compl. ¶ 67.

[9] The "SPIOC [*10] Defendants" include the SPIOC, Malone, McKay, Stephen Riney, Brian Smith, Thomas Taylor, Corey Correnti, Marvin Damsma, Dorazil, Dupree, Patrick Gower, Jeanne Johns, Patricia Miller, Stephanie Moore, Shaw, and Gregory Williamson. Compl. ¶ 88.

[10] The "Board Defendants" include Malone, McKay, Riney, Smith, and Taylor. Compl. ¶¶ 44-54.

[11] Compl. ¶¶ 305-35.

requiring a primary violation to be viable.[14] Later that year, the Plaintiffs filed a motion for leave to amend, but the Court denied Plaintiffs' motion because the proposed amendments would have been futile in light of the *Moench* presumption. Plaintiffs timely appealed to the Fifth Circuit.

It would turn out, however, that these motion-to-dismiss proceedings were largely for naught. In June of 2014, the Supreme Court scuttled the *Moench* presumption and created a new framework for evaluating claims against certain ERISA fiduciaries.[15] Accordingly, the Fifth Circuit vacated this Court's denial of leave to amend and remanded the matter for reconsideration in light of *Dudenhoeffer*. On remand, this Court granted Plaintiffs leave to amend their complaint,[16] and Plaintiffs filed the First Amended Consolidated ERISA Complaint (the "Complaint") earlier this year. Defendants have now moved to dismiss.

## II. <u>Legal Standard</u>

In deciding whether to dismiss a case for failure to state a claim under *Rule 12(b)(6)*, "the **[*12]** district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff."[17] "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]' to relief requires more than labels and conclusions."[18] Mere "formulaic recitation of the elements of

a cause of action will not do."[19] Even taking into account the liberal pleading standard set forth by *Rule 12(b)(6)*, the Court may not assume that a plaintiff can prove facts he has not alleged.[20] Moreover, dismissal is appropriate when the complaint "lacks an allegation regarding a required element necessary to obtain relief."[21]

ERISA does not impose heightened pleading requirements.[22] Thus proceeding under *Rule 8*, a plaintiff is required to provide only "a short and plain statement of the claim" to put the defendant on notice of the subject and basis of the claim.[23] "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."[24]

In evaluating a 12(b)(6) motion, the court "must **[*13]** limit [its consideration] to the contents of the pleadings, including attachments thereto."[25] Documents not attached to the pleadings, but to the motion to dismiss, may be considered "part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim ... [because i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."[26]

## III. <u>Fiduciary Status of Defendants</u>

The first question pertinent to any breach-of-fiduciary-duty

---

[12] Compl. ¶ 331.

[13] *See* 2012 Mem. and Order, 36. The *Moench* presumption provided that company stock is a presumptively prudent investment for employee benefit plans. *Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 254 (5th Cir. 2008)*. To **[*11]** overcome the presumption, a plaintiff had to allege "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest." *Id. at 256*.

[14] 2012 Mem. and Order, 42.

[15] *Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 189 L. Ed. 2d 457 (2014)*. Because the Plans authorized investment in employer stock, they are Eligible Individual Account Plans ("EIAPs"), as defined in *ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3)*.

[16] *See* Dkt. 170 ("2015 Mem. and Order"). Defendants sought permission to seek interlocutory review, and the Court granted it. The appeal is still pending.

[17] *Fernandez—Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir.1993)*.

[18] *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

[19] *Id.*

[20] *Campbell v. Wells Fargo Bank, N.A., 781 F.2d 440, 443 (5th Cir.1986)*.

[21] *Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir.1995)* (citation omitted).

[22] *In re Dynegy, Inc. ERISA Litig., 309 F.Supp.2d 861, 867 (S.D.Tex.2004)*.

[23] *Fed. R. Civ. P. 8(a)*.

[24] *Twombly, 550 U.S. at 546*.

[25] *Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir.2000)* (citing *Fed. R. Civ. P. 12(b)(6)*).

[26] *Id. at 498-99*.

claim under ERISA is whether the defendant was in fact a fiduciary.[27] Defendants have focused the brunt of their motion to dismiss on this threshold consideration, arguing that Plaintiffs have failed to allege specific facts showing that BP, BP America, BPNAI, the Board Defendants, or the Designated Officers were fiduciaries with respect to either (i) prudently managing Plan assets (*e.g.*, the BP Stock Fund), or (ii) monitoring and informing other fiduciaries.[28] In other words, Defendants argue that these entities and individuals were not Plan fiduciaries in any way that would be pertinent to this litigation. **[\*14]**

## A. Legal Overview

ERISA recognizes two types of fiduciaries: "named fiduciaries" and "functional fiduciaries."[29] Named fiduciaries are persons or entities who are either "named in the plan instrument or, pursuant to a procedure specified in the plan, [are] identified as a fiduciary [by an employer]."[30] They are expressly afforded the "authority to control and manage the operation . . . of the plan."[31] Functional fiduciaries, on the other hand, need not be named as fiduciaries in the governing plan document. Instead, courts look to whether, as a practical matter, an entity or individual "exercises discretionary authority and control that amounts to actual decision-making power . . . with respect to the plan."[32] Thus, "[f]iduciary duties may . . . arise either from the terms of the governing plan or from acts and practices in carrying it out."[33]

---

[27] *Pegram v. Herdrich, 530 U.S. 211, 226, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000)*.

[28] Defs' Mem. Supp. at 13 (hereinafter "Resp."), Doc. No. 155. Defendants concede, however, the fiduciary status of the members of the SPIOC and the Appointing Officers. Resp. at 12.

[29] *See Mertens v. Hewitt Assocs., 508 U.S. 248, 251, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993)* (citing *29 U.S.C. § 1002(21)(A)* and *§ 1102(a)*).

[30] *29 U.S.C. § 1102(a)*.

[31] *See 29 U.S.C. § 1102(a)*. Benefit plans are required to provide for a named fiduciary. *29 U.S.C. 1102(a)(1)*.

[32] *Dynegy, 309 F. Supp. 2d at 872*; *29 U.S.C. § 1002(21)(A)(i)* and *(iii)*; *see also Landry v. Air Line Pilots Ass'n Inter. AFL—CIO, 901 F.2d 404, 418 (5th Cir.1990)* ("[F]iduciary status is to be determined by looking **[\*15]** at the actual authority or power demonstrated, as well as the formal title and duties of the parties at issue [emphasis in original].").

[33] *Kirschbaum, 526 F.3d at 251*.

But, critically, fiduciary status under ERISA is not an all-or-nothing concept.[34] Instead, the scope of an ERISA fiduciary's responsibility is "correlative with the scope of [his] duties."[35] "An ERISA fiduciary for one purpose is not necessarily a fiduciary for other purposes. Rather, a person is a fiduciary only *to the extent* he has or exercises specified authority and control over a plan or its assets."[36] For example, the fact that a person has the authority to appoint plan fiduciaries means that he has a fiduciary duty to monitor those appointees,[37] but it does not mean that he has a fiduciary obligation to prudently manage and invest the plan's assets.[38]

This principle is the driving force behind the structure of ERISA plans. Plan documents are usually crafted to ensure that the plan sponsor—which, typically, is the **[\*16]** employer who establishes the plan—is not named as a fiduciary or otherwise granted meaningful authority or control over plan management.[39] Instead, plans typically allocate discreet parcels of authority to certain committees and individuals, creating silos of fiduciary duties intended to cordon off the scope of potential ERISA liability. Here, Defendants argue that all applicable authority and control—and, therefore, all applicable fiduciary obligations—resided exclusively with the SPIOC and the Appointing Officers, while Plaintiffs contend that such authority was vested more

---

[34] *Id.* (citing *Cotton v. Mass. Mut. Life Company, 402 F.3d 1267, 1277 (11th Cir.2005)*.

[35] *Id.*

[36] *Id.*

[37] *In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511, 553-54 (S.D. Tex. 2003)*.

[38] *See Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc., 793 F.2d 1456, 1459-60 (5th Cir.1986)* ("For example, if an employer and its board of directors have no power with respect to a plan other than to appoint the plan administrator and the trustees, then their fiduciary duty extends only to those functions.")

[39] Plan sponsors, as such, have no inherent fiduciary duties regarding the management or administration of the plan. While true that plan sponsors are often vested with the authority to unilaterally amend the terms of a plan, the Supreme Court has held that, "without exception," the "decisions of a plan sponsor to modify, amend or terminate the plan" do not give rise to fiduciary status. *Kirschbaum, 526 F.3d at 251* (citing *Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999))*. These decisions relate to plan design (as opposed to plan "management" or "administration"), and are the decisions of a trust settlor, not a fiduciary. *Id.*

broadly.

## B. The Corporate Defendants: Fiduciary Status and Scope

Plaintiffs [*17] allege that the Corporate Defendants were both named and functional fiduciaries. Moreover, even if the Corporate Defendants were not directly fiduciaries under the terms of the Plans, they should be held liable under the doctrine of *respondeat superior*. The Court disagrees.

### (1) BP and BP America

In the Complaint, Plaintiffs allege that BP and BP America are direct fiduciaries under the Plan, but they seem to have dropped this argument in the briefing—and for good reason. The Complaint contains little more than conclusory allegations that BP and BP America "exercised discretionary authority and control with respect to [the Plan],"[40] and an examination of the Plan reveals that it does not endow either company with any relevant authority and control. In fact, the Plan does not even mention BP America. Consequently, Plaintiffs instead attempt to tie BP and BP America into the litigation solely through a theory of respondeat superior, which is discussed below.

### (2) BPNAI

Whether Plaintiffs adequately alleged that BPNAI is a fiduciary is a more difficult question that requires close scrutiny of a complicated web of interrelated documents. Plaintiffs direct the Court's attention [*18] to three documents in particular: (1) the Plan; (2) the Investment Manager Agreement; and (3) the Investment Options Guide.[41] But before delving into the terms of these documents, a proper understanding of the role that each document plays within the constructs of ERISA is necessary.

As discussed in Section III.A above, the Fifth Circuit has recognized that fiduciary duties can arise from sources of two different types. First, courts look to "the terms of the governing plan."[42] ERISA requires that every employee benefit plan be established and maintained pursuant to a written instrument (typically referred to as the "governing plan" or "plan document").[43] The plan document is responsible for expressly allocating fiduciary responsibilities amongst plan managers. Here, that "plan document" is the Plan.

Second, if entities are not vested with fiduciary authority in the plan document, "their status as fiduciaries is controlled by ERISA's definition of fiduciary, which is functional in nature."[44] Courts consequently look to a person's alleged [*19] "acts and practices in carrying . . . out [the governing plan]" to determine whether he is a functional fiduciary.[45] The ancillary documents cited by Plaintiffs are relevant to this end. Although express grants of fiduciary authority are the sole province of the governing plan, non-plan documents can serve as evidence that an entity, in practice—and despite the terms of the governing plan—exercised functional authority and control over a particular aspect of the plan, giving rise to functional-fiduciary status.

***The Plan*** — Plaintiffs' lone basis for concluding that the Plan vests BPNAI with fiduciary responsibilities is Section 1.72, which provides that BPNAI is the "Plan Sponsor."[46] But this provision is of no consequence to fiduciary status: a "company cannot be subject to fiduciary liability simply by virtue of its role as a plan sponsor."[47] Moreover, the Plan names the SPIOC—not BPNAI—as the "Investment Named Fiduciary,"[48] and accordingly vests the SPIOC with authority and control regarding the "management or disposition of any assets of the Trust" as well as "the discretion to designate an Investment Manager."[49] Put differently, the Plan endows the SPIOC with the very authority that Plaintiffs allege [*20] belongs to BPNAI. The Plan provides no basis for concluding that BPNAI is a fiduciary.

Because plaintiffs are unable to show that BPNAI had any "fiduciary duties . . . aris[ing] . . . from the terms of the governing plan," they must show that a fiduciary duty arose

---

[40] *See, e.g.*, Compl., ¶ 93.

[41] Plaintiffs also cite to a provision that they attribute to the Trust Agreement, but the cited language is actually found in the Investment Manager Agreement.

[42] *Kirschbaum, 526 F.3d at 251*.

[43] *29 U.S.C. § 1102(a)(1)*.

[44] *Dynegy, 309 F. Supp. 2d at 899*.

[45] *Kirschbaum, 526 F.3d at 251*.

[46] *See* Resp. at 9 (citing only ESP § 1.72 in discussing the alleged fiduciary status of BPNAI).

[47] *Dynegy, 309 F. Supp. 2d at 899*.

[48] ESP § 1.12. More to the point, the Plan largely *forbids* administrators from allocating or delegating discretionary authority and control to BPNAI. ESP § 14.1(e)(2); 14.1(g)(4).

[49] ESP § 1.62.

"from [BPNAI's] acts and practices in carrying it out."[50] To that end, Plaintiffs cite to the Investment Manager Agreement and the Investment Options Guide.

***Investment Manager Agreement ("IMA")*** — Plaintiffs cite to numerous provisions in the IMA that purportedly grant BPNAI authority and control over managing the Plan assets and appointing an investment manager.[51] Defendants, however, claim that all of these provisions—which lie outside the terms of the governing plan—are inapplicable because the version of the IMA on which Plaintiffs rely long predated the creation of the SPIOC and the relevant version of the Plan.[52] Once the SPIOC was created, the operative Plan documents delegated investment oversight authority [*21] to the SPIOC and limited BPNAI's responsibility to Plan amendments made in a settlor capacity.[53] Thus, say Defendants, at all times during the Relevant Period, the IMA provisions cited by Plaintiff apply to the SPIOC, not to BPNAI.[54]

Defendants are correct. As an initial matter, the IMA is not part of the "governing plan" and cannot give rise to named-fiduciary status. At most, allegations based on the IMA can be used to show that BPNAI was a functional fiduciary. But, even assuming that Plaintiffs' IMA-based allegations plausibly suggest that BPNAI was acting as a functional fiduciary around the time of its signing,[55] BPNAI's fiduciary status in April of 2000—which is when the IMA was executed—is not relevant to Plaintiffs' claims. Here, the Relevant Period runs from 2007-2010, and Plaintiffs have pled no facts showing that BPNAI acted as a functional fiduciary during that period of time. To the contrary, as Defendants note, every amendment made to the IMA during the Relevant Period was executed by the SPIOC, further suggesting that [*22] the SPIOC was the lone investment-related functional fiduciary for the purposes of this litigation.

***Investment Options Guide*** — Plaintiffs further allege that the Investment Options Guide ("IOG") expressly recognizes BP's authority and control to liquidate the BP Stock Fund: "Under limited circumstances and in accordance with ERISA, the investment manager may attempt to liquidate all the BP ADS in the BP Stock Fund should the investment manager or BP determine such an investment is no longer prudent."[56] But this argument is flawed for two reasons. First, Plaintiffs have taken the quoted language out of context. The language appears in a section [*23] of the IOG entitled "Tracking," which outlines State Street's obligation to manage the BP Stock Fund such that it tracks the market price of BP stock.[57] Thus, BP's ability to liquidate the Fund arises only to the extent that the Fund is not properly tracking the price of BP ADS. Second, even if the quoted IOG language is meant to grant BPNAI liquidation authority outside of the "tracking" context, the Court has already held that, under *Dudenhoeffer*, Plaintiffs cannot plead a divestment/liquidation claim—ERISA's duty of prudence cannot require a fiduciary to divest stock on the basis of insider information.[58]

**(3) Respondeat Superior**

Plaintiffs additionally assert that the Corporate Defendants are vicariously liable for their employees' breaches of fiduciary duty under ERISA. Under the common-law formulation of respondeat superior, this issue would be easily resolved in favor of the Plaintiffs; Plaintiffs have alleged facts sufficient to show that employees of each Corporate Defendant, acting within their scopes of employment, participated in a breach of fiduciary duty. But the Fifth Circuit's [*24] formulation of respondeat superior in the ERISA context departs from the common-law construction. To state a claim against an employer for respondeat superior liability under ERISA, a plaintiff must satisfy two elements.[59] First, as at common law, the plaintiff must adequately allege that an employee breached his duty to a third party while acting in the course

---

[50] *See* [Kirschbaum, 526 F.3d at 251](#).

[51] Plaintiffs also cite to the Investment Strategy Guidelines, which are appended to the IMA as Exhibit C-1.

[52] Reply Mem. in Supp. ("Reply") at 3, Doc. No. 195.

[53] *Id.*

[54] *Id.*

[55] The Court questions the extent to which the IMA actually grants BPNAI discretionary authority or control that would be applicable to Plaintiff's claims. For example, despite Plaintiffs' claims to the contrary, there is no basis to conclude that BPNAI had a duty to monitor State Street—the IMA expressly notes in its first recital that the "Investment Committee" was charged with appointing the investment manager. (The "Investment Committee" referenced in the April 2000 version of the IMA was the predecessor to the SPIOC, which was created in 2004.)

[56] Compl. ¶ 111 (quoting the 2007 and 2008 Investment Options Guides).

[57] Investment Options Guide at 35.

[58] *See* 2015 Mem. and Order, at 24 n.13.

[59] *See* [Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S., 841 F.2d 658, 665 (5th Cir.1988)](#); *see also* [Bannister v. Ullman, 287 F.3d 394, 411-412 (5th Cir. 2002)](#) (Garza, J., concurring).

and scope of his employment.[60] Second, unlike at common law, the Fifth Circuit requires that plaintiffs satisfy an additional, federal requirement to vicarious liability under ERISA: the principal must "actively and knowingly participate[] in the agent's breach" or exercise "*de facto* control over the agent."[61]

This additional requirement substantially limits the utility of respondeat superior—if an employer was an "active . . . participant" or exercised "*de facto* control," then the employer likely had sufficient "authority or control" over the breach to be directly liable under ERISA as a fiduciary. Judge Garza recognized as much in his concurring opinion in *Bannister v. Ullman*:

> The "active and knowing" requirement means that respondeat superior will rarely do any [*25] heavy lifting in the ERISA context. Remember that ERISA makes anyone who "exercises any authority or control" over plan assets directly responsible as a fiduciary. Whenever a principal "actively" participates in an agent's decision about how to use plan assets, he will, by virtue of his control over the agent's actions, also be exercising a degree of control over the assets themselves. The "active and knowing" requirement therefore makes respondeat superior basically a non-issue. The issue is only whether the principal, by virtue of its de facto control over the agent, also had control over the disposition of plan assets.[62]

The majority implicitly recognized this point as well, noting that "the ultimate issue in any non-fiduciary respondeat superior theory of liability is virtually identical to a case . . . in which liability is directly predicated upon breach of the fiduciary duty to exercise proper control over plan assets."[63] Thus, while Plaintiffs are technically correct that "[t]he Fifth Circuit recognizes that respondeat superior may be a source of liability [in ERISA cases]," as a practical matter, the doctrine has largely been rendered moot.

Nevertheless, Plaintiffs [*26] have pressed forward with their respondeat superior claim, arguing that the Corporate Defendants "effectively controlled the individual defendants" because the Corporate Defendants employed the individual defendants and appointed them to Plan-related positions. But more than an employer-employee relationship is required to meet the "active and knowing participation" or "*de facto* control" element under *American Federation* and *Bannister*. An employer-employee relationship is only half of the equation in the ERISA context. The Fifth Circuit added the "active and knowing/control" element to the common-law scope-of-employment test specifically because it demands something more than mere employment to establish vicarious liability. To hold that an employer's control over an employee satisfies the second element would effectively render it superfluous.

Moreover, the vicarious liability test requires that the principal have "participated *in the agent's breach*."[64] Although Plaintiffs allege that the Corporate Defendants appointed the individual defendants to Plan-related positions, they have not alleged that the Corporate Defendants' control or participation extended to the individual Defendants' [*27] alleged *breach*. To the contrary, Plaintiffs fail to tie the Corporate Defendants in any way to the individual defendants' alleged breach.[65]

## (C) BPNAI Board of Directors: Fiduciary Status and Scope

Defendants argue that claims against the Board should be dismissed for the same reasons that claims against BPNAI should be dismissed: the Board's power to amend the Plan on behalf of BPNAI can be taken only in a non-ERISA settlor capacity. Plaintiffs respond by citing to allegations in the Complaint that the Board, acting on behalf of BPNAI, had the authority to freeze or liquidate the BP Stock Fund if it determined that the Fund was no longer a prudent investment.

Defendants are correct. Plaintiffs' claims against the Board go hand-in-hand with their claims against BPNAI—the Board's authority and control under the Plans is entirely derivative of BPNAI's authority and control. The Plan grants no substantive authority to the Board other than to act on BPNAI's behalf "whenever [BPNAI] has the authority to take [*28] action under [the] Plan."[66] Indeed, when arguing that the Board is a fiduciary, Plaintiffs cited to the same set of allegations that they asserted against BPNAI.[67] Just as those allegations were

---

[60] *Id.*

[61] *Bannister, 287 F.3d at 408.*

[62] *Id. at 412* (Garza, J., concurring).

[63] *Id. at 408.*

[64] *Id. See also* Am. Fed., 841 F.2d at 665.

[65] This is unlike in *Bannister* where the Board member of a parent company called an executive at a subsidiary and, essentially, instructed the executive to breach his ERISA duties.

[66] *See* ESP § 14.5.

[67] Compl. ¶ 122 (citing Plan provision providing that, whenever

insufficient to show that BPNAI was a fiduciary during the Relevant Period, so too are they insufficient to support Plaintiffs' claims against the Board.

**(D) Designated Officers**

Plaintiffs cite to three Plan provisions as evidence that the Designated Officers had a duty to prudently manage Plan assets. None of these provisions, however, provides a compelling basis to conclude that the Designated Officers had any fiduciary duty to the [*29] Plan that would be relevant to this litigation.

Plaintiffs first claim that, "under the express terms of the Plan, the Designated Officers were Investment Named Fiduciaries within the meaning of ERISA," citing to Section 6.3 of the Plan.[68] The provision states that "a Designated Officer may, from time to time, as directed by the Investment Committee, . . . limit or freeze investments . . . ."[69] According to Plaintiffs, the use of the term "may" indicates that the Designated Officer had a choice as to whether to follow the direction of the SPIOC.[70] Thus, the Designated Officers had "discretion and responsibility over the management . . . of the Plan."[71]

This argument is unpersuasive for the reasons that Defendants cite in their Reply. Under Section 6.3, the Designated Officers could take action only "as *directed* by the Investment Committee."[72] The Designated Officers have no authority to limit or freeze investments in the BP Stock Fund unless they are [*30] so "directed" by the SPIOC. In other words, even assuming that the word "may" confers some level of discretion over the BP Stock Fund,[73] such authority arises

only if the SPIOC has issued a directive to the Designated Officers pursuant to Section 6.3. But here, there is no allegation that this triggering event occurred. Accordingly, the Complaint fails to allege facts showing that the Designated Officers had authority under Section 6.3 to manage Plan assets.

Plaintiffs next claim that the Designated Officers had authority and [*31] control over the management of State Street. In support, they cite only to Section 13.1 of the Plan, which provides that a "Designated Officer may enter into . . . Trust Agreements to provide for the holding, investment, and payment of Plan assets."[74]

Defendants assert several arguments in response. Their second argument—that the act of establishing a trust is taken in a settlor (*i.e.*, non-fiduciary) capacity—is the most compelling. Here, Plaintiffs have alleged that the Designated Officers merely had the authority to enter into a trust agreement on behalf of BPNAI. As Defendants correctly note, setting up a trust is the quintessential act of a settlor.[75] And even if some fiduciary duty did somehow arise from executing the trust agreement, it would have nothing to do with prudently managing the BP Stock Fund or appointing a fiduciary.

Finally, Plaintiffs claim that Section 14.1(b) of the Plan, which lists a number of powers afforded to Designated Officers, authorizes them to act as fiduciaries. But, as was the case with Plaintiffs' allegations against the Board, the authority provided in this section of the Plan [*32] is entirely derivative of BPNAI's authority. Plaintiffs admitted as much at the Hearing.[76] Accordingly, the authority granted to Designated Officers under Section 14.1(b) is insufficient to show that the Designated Officers were fiduciaries during the

---

BPNAI has authority to take action, the Board has authority to act on its behalf) ¶ 122 ("[BPNAI], through authority vested in its Board . . ."); 147 (references only BPNAI, not the Board); ¶ 92; ¶ 106 (deriving the Board's authority from BPNAI's authority under Investment Options Guide); ¶ 111 (deriving the Board's authority on BPNAI's authority under Investment Options Guide); ¶ 147 (deriving the Board's authority from BPNAI's supposed authority under IMA's Investment Strategy Guidelines); ¶ 295 (same).

[68] Resp. at 14. Plaintiffs also cite to Paragraphs 55-65 of the Complaint, but these paragraphs contain no citations to any documents, much less a citation to the "express terms" of the Plan that name the Designated Officers as "Investment Named Fiduciaries."

[69] ESP § 6.3.

[70] Resp. at 14.

[71] *Id.*

[72] ESP § 6.3 (emphasis added).

[73] Even this proposition is debatable. On the one hand, Plaintiffs are correct that use of the word "may" (as opposed to, for example, "shall") suggests that the Designated Officers had the authority to disregard a directive from the SPIOC. On the other hand, however, the phrase "as *directed* by the Investment Committee" (as opposed to, for example, "as *recommended* by the Investment Committee") casts some limited degree of doubt on that conclusion. "Directing" someone to take an action suggests that he is under some obligation to follow the order, while recommending that someone take an action implies that the person has discretion over whether to heed the recommendation.

[74] ESP § 13.1.

[75] *See* Hunter v. Caliber Sys., Inc., 220 F.3d 702, 718 (6th Cir. 2000) ("establishing . . . [a] trust" is an action taken "as [an] employer performing settlor functions").

[76] Mot. to Dismiss Hr'g, 15:17-21.

Relevant Period in any way applicable to this litigation.

***

In summary, the Court holds that Plaintiffs have failed to allege facts showing that any of the Corporate Defendants, the Board Defendants, or the Designated Officer Defendants were fiduciaries with respect to the Plans. As a result, all claims against the Defendants—but only to the extent that they served in one or more of the foregoing capacities—should be dismissed. This results in the dismissal of all claims against the Corporate Defendants. It likewise results in the dismissal of all claims against Defendants Browne and Hayward, who are alleged only to have served as Designated Officers.

## IV. Alleged Breach of the Duty to Monitor

In Count II of the Complaint, Plaintiffs allege that the Corporate Defendants, Board Defendants, Designated Officer Defendants, Appointing Officer Defendants, and the SPIOC Defendants (the "Monitoring Defendants") breached their fiduciary [*33] duty to monitor the fiduciaries that they allegedly appointed to manage the Plans' assets. But, as the Court already held in Section III, the Corporate Defendants, the Board Defendants, and the Designated Officer Defendants (in their capacities as such) did not owe the Plans *any* applicable fiduciary duties. Plaintiffs' claims against those Defendants—including their duty-to-monitor claims—will be dismissed accordingly.[77] Plaintiffs' duty-to-monitor claims against the SPIOC and Appointing Officers, however, are undisturbed by this holding. Indeed, Defendants have expressly conceded that the SPIOC and the Appointing Officers had a duty to monitor the fiduciaries that they appointed.[78] Instead, Defendants have opted to attack Plaintiffs' Count II claims against the SPIOC and Appointing Officers on a different front: even if these Defendants had a duty to monitor, the Complaint lacks well-pled factual allegations showing that they breached that duty. Thus, contend Defendants, Count II should be dismissed in its entirety. The Court agrees.[79]

---

[77] *See* Section III.B, *supra*.

[78] Under the terms of the Plan, the Appointing Officer is responsible for appointing the SPIOC. ESP §§ 1.60, 14.1. The SPIOC is responsible for appointing the investment manager, [*34] State Street. *See* ESP § 1.62; *see also* ESP § 14.1(p) (incorporating by reference the SPIOC Bylaws, which provide that the SPIOC's authority includes "selecting, directing, monitoring and terminating external investment managers").

[79] Plaintiffs also included a claim for co-fiduciary liability within

## A. Requisite Underlying Breach of Fiduciary Duty

Duty-to-monitor claims are derivative in nature. "To prevail on these derivative claims, Plaintiffs must adequately state a claim for an underlying breach of fiduciary duty" by the appointed fiduciary.[80] Plaintiffs' duty to monitor claims against the SPIOC fail for this reason. Although the SPIOC appointed State Street (giving rise to a duty to monitor), Plaintiffs have not alleged that State Street committed any underlying breach of fiduciary duty. As a result, Plaintiffs' duty-to-monitor claims against the SPIOC should be dismissed.

The duty-to-monitor claims against the Appointing Officers, however, meet this threshold requirement. Plaintiffs adequately allege that the insider SPIOC Defendants—who were appointed by the Appointing [*35] Officers—breached their fiduciary duties to the Plan.[81]

## B. Scope of the Duty to Monitor

Before addressing any potential breaches of the duty to monitor, the Court must first define the contours of the duty itself. Indeed, the scope of the duty to monitor was the parties' primary source of disagreement in the briefing. According to Plaintiffs, the duty to monitor is composed of two fiduciary obligations: (1) a duty to inform appointees of material, non-public information that is within the possession of the monitoring fiduciary and could affect the appointees' evaluation of the prudence of investing in the plan sponsor's securities; and (2) a duty to ensure that the monitored fiduciaries are performing their fiduciary obligations.[82] Defendants take a narrower view of the duty to monitor. While they acknowledge that a monitoring fiduciary must take certain measures to ensure that the appointees are adequately performing their fiduciary obligations, [*36] they reject the notion that any so-called "duty to inform" exists under ERISA.

For at least two reasons, the Court concludes that ERISA does not impose a duty on monitoring fiduciaries to keep their

---

Count II. The Court discusses that issue in Section V, *infra*, and concludes that Plaintiffs have failed to state a claim.

[80] 2012 Mem. and Order, at 42.

[81] Because Plaintiffs have failed to allege an underlying breach by the non-insider SPIOC Defendants, as a matter of law, the Appointing Officers could not have breached their duty to monitor them, and Plaintiffs' claims should be dismissed accordingly.

[82] *See* Compl. ¶ 329.

appointees apprised of material, non-public information. First, as Judge Kaplan recently discussed in detail in *In re Lehman Brothers*, "nothing in ERISA itself or in traditional principles of trust law" imposes such a duty."[83] ERISA merely provides that "a person is a fiduciary *only to the extent* he has or exercises specified authority and control over a plan or its assets."[84] Here, under the terms of the Plan, the Appointing Officers' fiduciary authority and control was limited to appointing and removing members of the SPIOC.[85] Their fiduciary duties can be expanded no further. The Department of Labor has specifically laid out the "ongoing responsibilities of a fiduciary who has appointed trustees or other fiduciaries" in the Code of Federal Regulations, and a "duty to inform" appointed fiduciaries is nowhere to be found.[86] Nor is it present in any other ERISA provision or federal regulation.[87]

ERISA is a complex statutory and regulatory apparatus, and "adding additional requirements [to it] is not to be undertaken lightly."[88] Plaintiffs have not provided a weighty reason to impose a duty-to-inform requirement here. The Court therefore declines to impose a fiduciary duty that Congress and federal regulators did not see fit to include when crafting this elaborate statute and its related regulations.[89]

Second, Plaintiffs have not provided any precedent that conclusively establishes a duty to inform, nor is the Court

aware of any.[90] Although Plaintiffs correctly assert that a court in this district recognized a duty to inform in *In re Enron*, the precedential weight of that case is limited. The *Enron* fiduciaries' duty to inform appears to have arisen from the express terms of the governing plan, not ERISA. Section XIII.8 of the plan required Enron to "provide the Administrative Committee with 'any information that the Committee determines is necessary for the proper administration of the Plan.'"[91] The Plan at issue here contains no such provision.

Moreover, despite the dozens of pages that the *Enron* court spent outlining the applicable legal standards governing the plaintiffs' ERISA claims, the court made no mention of any inherent duty under ERISA to inform appointed fiduciaries of material, non-public information. It seems a stretch to conclude that the *Enron* court intended to recognize a duty to inform—especially one that had not been conclusively established within the Fifth Circuit—by merely discussing it in passing.

On the other hand, at least one case from this district cuts directly against the duty to inform. In *In re Reliant Energy*, Reliant's authority under the plan was limited to appointing and removing members of the benefits committees. As here, the plaintiffs claimed that this power gave rise to a duty to disclose to the benefits committee "all pertinent facts required for the Committees to perform their function as fiduciaries."[92] But the court rejected the plaintiffs' argument, holding that the "limited fiduciary duties [of appointing and removing fiduciaries] do not give rise to the expansive duty to disclose all allegedly pertinent [*40] information to the Plan

---

[83] *In re Lehman Brothers Sec. and ERISA Litig., 113 F. Supp. 3d 745, 2015 U.S. Dist. LEXIS 90109, 2015 WL 4139978, at *14 (S.D.N.Y. 2015).*

[84] *Kirschbaum, 526 F.3d at 248.*

[85] *See* ESP §§ 1.60 and 14.1(c)(3).

[86] *See* 29 C.F.R. § 2509.75-8 (FR—17 Q & A) ("Q: What are the ongoing responsibilities of [*37] a fiduciary who has appointed trustees or other fiduciaries with respect to these appointments? A: At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."). Courts have also been careful to restrict the duty of a fiduciary to disclose plan-related information to participants. *See also* 2015 Mem. and Order, at 8-10 (discussing the ways in which "efforts to imbue [ERISA] with [a duty of disclosure to plan participants] have generally been unsuccessful at the Fifth Circuit").

[87] *Lehman, 2015 U.S. Dist. LEXIS 90109, 2015 WL 4139978, at *14.*

[88] *2015 U.S. Dist. LEXIS 90109, [WL] at *15.*

[89] *See* 2015 U.S. Dist. LEXIS 90109, [WL] at *14. This is especially

true where, as here, Plaintiffs' [*38] conception of the proposed duty to inform "would transform [the Appointing Officers'] limited obligations into all-encompassing ones," creating "endless conflicts of interests between duties of corporate employees to act in the best interests of their employers . . . and newly imposed duties to disclose confidential employer information to plan fiduciaries." *Id.*

[90] *Kopp v. Klein, 722 F.3d 327 (5th Cir. 2013)* references the duty to inform in passing, but its reference is far too oblique to reasonably conclude that the duty to inform is the law of the land. The same is true for a handful of [*39] district court cases within the Fifth Circuit's jurisdiction. *See, e.g., In re Dell, Inc. ERISA Litig., 563 F. Supp. 2d 681 (W.D. Tex. 2008)* (same).

[91] *See* **In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511, 653 (S.D. Tex. 2003)**.

[92] *In re Reliant Energy ERISA Litig., 336 F. Supp. 2d 646, 658 (S.D. Tex. 2004).*

fiduciaries."[93] "Liability based on a failure to monitor does not arise unless the appointing fiduciary failed to periodically monitor the performance of each of the appointed members of the REI Benefits Committee."[94]

## C. Alleged Breach of the Duty to Monitor

Although the duty to monitor does not include a duty to inform, it does include an obligation to take reasonable measures to ensure that appointees are adequately performing their duties. The Court now turns to the question of whether Plaintiffs have sufficiently alleged that the Appointing Officers failed to adequately monitor the members of the SPIOC.

The Department of Labor has promulgated an ERISA Interpretive Bulletin that lays out "the ongoing responsibilities of a fiduciary who has appointed . . . other fiduciaries" as follows:

> At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs [*41] of the plan.[95]

Courts have acknowledged that this obligation to review the performance of fiduciaries is also triggered if the appointing fiduciary has notice of appointee misconduct.[96]

Here, Plaintiffs claim that the Appointing Officers ignored "numerous 'red flags' that BP stock was not a prudent investment for the retirement plan."[97] But Plaintiffs' argument misconstrues the relevant law. The question is not whether Defendants had notice that the BP Stock Fund was an imprudent investment, but rather whether the Appointing Officers had "notice of possible *breaches* by [the members of the SPIOC] that they failed to investigate."[98] For the SPIOC members to have breached their duty of prudence, they must

have *known* (or should have known) that the market price of BP ADSs was artificially inflated.[99] Thus, to plead a "red flag" (*i.e.*, "notice of possible breaches"), Plaintiffs must allege that the Appointing Officers had notice that the SPIOC members might be *knowingly* investing in stock that was artificially inflated—not just that the SPIOC members were investing in artificially inflated stock.[100] Plaintiffs have not pointed to any such allegation in the Complaint, and their duty-to-monitor claim [*42] against the Appointing Officers fails as a result.[101]

## V. Co-Fiduciary Liability

Plaintiffs claim that certain Defendants are liable as co-fiduciaries under *ERISA § 405(a)*. *Section 405* provides that a fiduciary may be held liable for another fiduciary's breach of duty if:

> (A) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (B) by his failure to comply with *section 404(a)(1)*, *29 U.S.C. § 1104(a)(1)*, in the administration of his specific

---

[93] *Id. at 659*. Also of note, the court distinguished *In re WorldCom, Inc. ERISA Litig., 263 F.Supp.2d 745 (S.D.N.Y.2003)*, which is a case that Plaintiffs rely on here.

[94] *Id. at 657 n. 13*.

[95] *Id.*

[96] *Dynegy, 309 F.Supp.2d at 902*.

[97] Resp. 18.

[98] *Dynegy, 309 F.Supp.2d at 902, 904* (emphasis added).

[99] 2015 Mem. and Order, at 17-18, 19.

[100] *See Dynegy, 309 F. Supp. 2d at 902, 904* (dismissing a duty-to-monitor claim for failing to allege that the defendants "had notice of possible *breaches* by their appointees that they failed to investigate" or "the corporate defendants had notice that any specific appointees were incompetent or otherwise subject to replacement for cause"). To hold otherwise would effectively impose a duty to inform on monitoring fiduciaries. Plaintiffs are essentially proposing that, if a monitoring fiduciary—based on his insider knowledge—has notice that his appointees are *unknowingly* making imprudent investment decisions, he has a duty to take action. But, assuming that the appointees are exercising proper diligence in their decision-making, the only conceivable action that the monitoring fiduciary could take to remedy the situation would be to inform the appointees of the insider information. As the Court held above, a monitoring fiduciary has no such duty to inform.

[101] The Court acknowledges that, in addition to serving as an Appointing Officer, McKay served on the SPIOC and is adequately alleged to have breached his duty of prudence [*43] as an SPIOC member. Thus, in the most technical sense, it can be said that McKay, in his capacity as an Appointing Officer, was aware that he, in his capacity as an SPIOC member, was acting imprudently. But the Court declines to venture far enough into the realm of metaphysics to address whether a person can monitor *himself*. Plaintiffs' prudence-based claims against McKay provide them with a sufficient tool to hold McKay accountable for any wrongdoing attributable to his failure to prudently exercise his own investment-related responsibilities.

responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(C) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances **[\*44]** to remedy the breach.

_29 U.S.C. § 1105(a)_. To survive a motion to dismiss, a plaintiff must plead _facts_ showing that the requirements of one of these provisions are satisfied.[102] As Defendants correctly point out, however, the Complaint contains nothing more than a conclusory assertion invoking the language of _Section 405_.[103] And Plaintiffs do little to dispute this point in their briefing. Instead of directing the Court to allegations of facts in support of their theory, they merely recite Paragraph 333 of the Complaint—which is inescapably conclusory—and claim that "nothing more is needed to plead co-fiduciary liability."[104] This is plainly incorrect: "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."[105] Plaintiffs' allegations of co-fiduciary liability are paradigmatic examples of that which _Iqbal_ expressly proscribes. Their claim should be dismissed accordingly.

## VI. <u>Prudence Claim against James Dupree</u>

In January of this year, the Court considered whether to grant Plaintiffs' motion for leave to amend their complaint.[106] As part of that consideration, the Court analyzed whether Plaintiffs' proposed amended complaint ("Proposed Amended Complaint") sufficiently alleged that Defendant James Dupree knew, based on insider information, that the market price of BP ADS was artificially inflated. This allegation is an essential element to Plaintiffs' insider-information prudence claim against Dupree.[107]

---

[102] _See Ashcroft v. Iqbal, 556 U.S. 662, 682, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)._

[103] _See_ Compl. ¶ 333 ("Monitoring Defendants are liable as co-fiduciaries because they were the Plans' fiduciaries and they knowingly participated in each other's fiduciary breaches as well as those by monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make **[\*45]** any effort to remedy these breaches, despite having knowledge of them.").

[104] Resp. 19.

[105] _Iqbal, 556 U.S. at 678_. Plaintiffs' citations to out-of-circuit, pre-_Iqbal_ cases are unavailing.

[106] _See_ 2015 Mem. and Order.

The Court held that Plaintiffs failed to allege sufficient facts in the Proposed Amended Complaint showing that Dupree knew or should have known the relevant insider information. Although Plaintiffs had alleged a number of facts indicating that Dupree was in a position to have had access to the insider information, the specific allegation that "Dupree [knew or] should have known that OMS was not implemented . . . [was] not clearly stated in the [Proposed Amended Complaint]."[108] The **[\*46]** Court did, however, allow Plaintiffs to amend their claim against Dupree.[109]

Plaintiffs failed to address this defect when they filed the Complaint now before the Court. Accordingly, the Court cannot hold that the Complaint states a claim against Dupree. But, in light of Plaintiffs' oral argument at a hearing on the Motion (the "Hearing"), the Court finds that Plaintiffs may be able to state a claim if given the chance to amend their complaint one final time. At the Hearing, Plaintiffs explained why they had failed to do address the Court's concern:

> We have very limited information. There's only so much we can say. I think you wanted us to . . . allege that Dupree knew that OMS wasn't being implemented in the Gulf. We don't have that information as a fact. We just don't based on the fact that we haven't had discovery in this case.

Mot. to Dismiss Hr'g, 53:8-14. But the "_Twombly_ **[\*47]** plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant."[110] Here, Dupree's knowledge qualifies as such a fact, and at the hearing, Plaintiffs indicated that they would be willing to plead that, on information and belief, Dupree had knowledge of the inside information.[111] The Court therefore grants Plaintiffs leave to amend the Complaint for that limited purpose.

## VII. <u>Limiting Time Periods of Plaintiffs' Claims</u>

---

[107] _Id._ at 21-22.

[108] _Id._ at 22; _see also, e.g., id._ ("[A]lthough Mr. Dupree is alleged to have been the highest ranking officer responsible for the implementation of MS in the Gulf, he is not alleged to have known that OMS was not in place on contract-owned rigs. Thus, it is unclear whether Plaintiffs believe him to have had insider information . . . .")

[109] _Id._

[110] _Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)._

[111] Mot. to Dismiss Hr'g 53:19-21.

Defendants seek to narrow Plaintiffs' claims to the extent that they assert fiduciary liability outside the period that a given Defendant is alleged to have served as a Plan fiduciary. Under *ERISA § 409(b)*, "No fiduciary shall be liable with respect to a breach of fiduciary duty . . . if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary."[112] Thus, to state a claim in conformity with *Section 409*, *Iqbal* requires that a plaintiff allege facts showing that the defendant was a fiduciary *at the time of each alleged breach*.[113]

But here, Plaintiffs have alleged facts showing that certain individual defendants were fiduciaries at the time of some—but not all—of the alleged breaches during the Relevant Period. For example, Plaintiffs allege that Defendant Lamar McKay started serving in a fiduciary capacity on December 18, 2007, yet seek to hold him liable for all fiduciary breaches that occurred after January 16, 2007—well before McKay is alleged to have begun serving as an ERISA fiduciary. Thus, the Complaint lacks well-pled facts that support the full breadth of Plaintiffs' claims.

Plaintiffs' argue that "[a] *Rule 12(b)(6)* motion cannot be used to narrow the period of time for which a Defendant was a fiduciary, particularly given that Plaintiffs have not received ERISA discovery and the allegations [in the Complaint] are based on unverified representations of Defendants in connection with the parties' early exchange of documents and information."[114] But as Defendants correctly note, Plaintiffs fail to cite to [*49] any authority in support of their proposition. To the contrary, the Southern District has

recognized that courts may narrow ERISA claims based on dates alleged in a complaint.[115]

Moreover, Plaintiffs' position is inconsistent with well-established pleading standards. To state a claim for breach of fiduciary duty under ERISA in conformity with *Section 409*, *Iqbal* requires that a plaintiff allege facts showing that the [*50] defendant was a fiduciary at the time of each alleged breach.[116] Plaintiffs do not dispute that their Complaint is deficient in this regard—at least, with respect to certain defendants for certain periods of time—so it would make little sense to allow Plaintiffs' admittedly deficient claims to proceed uninhibited.

## VIII. Standing to Bring Claims on Behalf of PSP and DSP

Plaintiffs sought to bring this action derivatively on behalf of each of the four Plans.[117] Defendants moved to dismiss the derivative actions brought on behalf of the PSP and DSP, correctly arguing that, because no Plaintiff is alleged to be (or have ever been) a participant in either Plan, Plaintiffs lack statutory standing to bring derivative claims on behalf of such Plans. At the Hearing, Plaintiffs stated that they would be willing to drop their PSP and DSP derivative claims, and instead proceed on a class-action basis with respect to those two Plans.[118]

## IX. Motion to Strike Plaintiffs' Jury Trial Demand

Defendants have moved to strike Plaintiffs' demand for a jury trial. ERISA does not provide a statutory right to a jury trial, so "any entitlement to a jury trial must arise from the *Seventh Amendment*."[119] The *Seventh Amendment* applies to "suits in which legal rights [are] to be ascertained and determined, in

---

[112] *29 U.S.C. § 1109(b)*

[113] *See Pegram v. Herdrich, 530 U.S. 211, 120 S.Ct. 2143, 2152-53, 147 L. Ed. 2d 164 (2000)* ("[T]he threshold question is not whether the actions of some person employed to provide [*48] services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.").

[114] Plaintiff's Mem. Supp. at 1-2. Plaintiffs' arguments regarding the need for discovery are unpersuasive. While discovery has not yet begun in the ERISA class action *per se*, as a practical matter, Plaintiffs already have access to information regarding each individual defendant's corporate role through the discovery that has taken place in the federal securities class action. Moreover, even if the Court narrows Plaintiffs' claims as Defendants have requested, Plaintiffs are still free to seek documents during ERISA discovery regarding the dates of the applicable Defendants' corporate roles. If information is unearthed showing that a Defendant served in a fiduciary role for longer than originally alleged, then the Court will grant Plaintiffs leave to amend their pleadings accordingly.

[115] *See Shannahan v. Dynegy, Inc., 2006 U.S. Dist. LEXIS 80943, 2006 WL 3227319, at *8 (S.D. Tex. Nov. 6, 2006)*.

[116] See *Pegram, 120 S.Ct. at 2152-53*.

[117] Plaintiffs noted in their briefing, however, that "in the event that class action procedures are deemed necessary by the Court," they wish to assert their claims as a class action on behalf of participants in the Plans. Compl. ¶ 4.

[118] Mot. to Dismiss Hr'g at 55:19-24. Defendants [*51] have not challenged Plaintiffs' ability to bring a class action in this Motion to Dismiss, but noted that they reserved the right to do so at a later time.

[119] *Salameh v. Provident Life & Acc. Ins. Co., 23 F. Supp. 2d 704, 719 (S.D. Tex. 1998)*.

contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered."[120] In most cases, "To determine whether a particular action will resolve legal rights, [courts] examine both the nature of the issues involved and the remedy sought."[121]

Case law within the Fifth Circuit weighs decisively in favor of striking Plaintiffs jury demand. Following the Fifth Circuit's holding [*52] in *Borst v. Chevron*, nearly every Texas federal court to address the issue has held that "ERISA claims do not entitle a plaintiff to a jury trial."[122] In fact, in two cases, the plaintiffs themselves readily conceded that they had no right to a jury trial for an ERISA claim and struck their own jury demand.[123] As Defendants correctly note, Plaintiffs fail to

identify any contrary authority, citing only to out-of-Circuit and pre-ERISA decisions from the 1950s, 1960s, and early 1970s; nor is the Court aware of any such authority.

## X. Conclusion

After considering the parties' filings, all responses and replies thereto, the oral arguments of the parties, and the applicable law, the Court holds that Defendants' motion to dismiss should be **GRANTED** in its entirety. As a result:

(A) All claims against the Corporate Defendants, Anthony Hayward, and Lord John Browne are dismissed;
(B) Count I of the Complaint is dismissed to the extent that it is based on a Defendant's role as a Designated Officer or member of the Board of Directors;
(C) Count II of the Complaint is dismissed in its entirety; and
(D) Plaintiffs' demand for a jury trial is stricken.

The Court grants Plaintiffs 15 [*54] days leave to replead

---

[120] *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564, 110 S. Ct. 1339, 108 L. Ed. 2d 519 (U.S. 1990)*.

[121] *Borst v. Chevron Corp., 36 F.3d 1308, 1323 (5th Cir. 1994)* (citing *Chauffeurs, 494 U.S. at 565*). This analysis consists of two inquiries: "(1) a comparison of the present statutory action to 18th-century actions in the courts of England before the merger of the courts of law and equity; and (2) an examination of the relief sought to determine whether it is legal or equitable in nature."

[122] *See, e.g., Morales v. Prudential Fin., Inc., 2009 U.S. Dist. LEXIS 8819, 2009 WL 311109, at *4 (S.D. Tex. Feb. 5, 2009)* (noting that "[d]efendants are correct that ERISA claims do not entitle a plaintiff

to a jury trial" and perfunctorily striking jury demand); *Lain v. UNUM Life Ins. Co. of Am., 27 F.Supp.2d 926, 935 (S.D. Tex. 1998)* (same); *Francis v. S. Cent. Houston Action Council, Inc., 2015 U.S. Dist. LEXIS 85447, 2015 WL 4207142, at *2 (S.D. Tex. July 1, 2015)* (same); *Salameh, 23 F. Supp. 2d. at 719* (same); *Clyde A. Wilson Int'l Investigations, Inc. v. Travelers Ins. Co., 959 F. Supp. 756, 758 (S.D. Tex. 1997)* (noting in dicta that plaintiffs, who were asserting a claim under *502(a)(2)*, "have no right to a jury trial under *section 502 of ERISA*"); *MB Valuation Servs., Inc. v. Ins. Co. of N. Am., 1997 U.S. Dist. LEXIS 24417, 1997 WL 642987, at *5 (N.D. Tex. Oct. 6, 1997)* ("As noted above, the Fifth Circuit held that ERISA claims are equitable rather than legal in nature. Therefore, the Fifth Circuit determined that the *Seventh Amendment* does not provide a plaintiff in an ERISA action a constitutional right to a jury trial."); *Kersh v. UnitedHealthcare Ins. Co., 946 F. Supp. 2d 621, 645 (W.D. Tex. 2013)* (noting in dicta that "it is correct that ERISA claims do not entitle a plaintiff to a jury trial"); *Harwood v. Unicare Life & Health Ins. Co., 2010 U.S. Dist. LEXIS 43035, 2010 WL 1790477, at *1 (W.D. Tex. May 3, 2010)* ("Unicare objects to the amendment because [*53] the proposed amended complaint includes a jury demand. A plaintiff asserting an ERISA claim is not entitled to a jury trial. That portion of the proposed amended complaint that includes a jury demand is futile."); *Paragon Office Servs., LLC v. UnitedHealthcare Ins. Co., 2012 U.S. Dist. LEXIS 138217, 2012 WL 4442368, at *2 (N.D. Tex. Sept. 26, 2012)* ("There is no right to jury trial for the ERISA claims.").

[123] *N. Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare, 782 F. Supp. 2d 294, 316 (S.D. Tex. 2011)* (Ellison, J.) (party agreed to strike its own jury demand "in recognition that the Fifth Circuit does not provide for a jury trial in ERISA matters"); *Lain, 27 F. Supp. 2d at 935* ("[Plaintiff] concedes that if ERISA preempts her state-law claims, her ERISA claim must be tried to the court without a jury.")

their duty-of-prudence claim against Defendant James Dupree.

**IT IS SO ORDERED**.

Signed this 30th day of October 2015.

/s/ Keith P. Ellison

Hon. Keith P. Ellison

United States District Judge

---

# Tab F

⚠ Caution

As of: February 28, 2019 8:43 PM Z

## *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*

United States District Court for the Eastern District of Wisconsin

March 30, 2010, Decided; March 30, 2010, Filed

Case No. 08-C-797

**Reporter**

2010 U.S. Dist. LEXIS 30693 *; Fed. Sec. L. Rep. (CCH) P95,660

IRON WORKERS LOCAL NO. 25 PENSION FUND, et al., Plaintiffs, v. OSHKOSH CORP., et al., Defendants.

## Core Terms

company's, impairment, goodwill, fiscal, amended complaint, stock, earnings, allegations, estimated, acquisition, fraudulent, sales, class period, costs, conference call, manufacturing, integrating, executives, scienter, losses, predictions, investors, weak, announced, prospects, reduction, workforce, optimism, particularity, restructuring

**Counsel:** **[\*1]** For Massachusetts Public Pension Funds, Lead Plaintiff: Alan I Ellman, Carol C Villegas, Christopher J Keller, Jonathan Gardner, Stefanie J Sundel, LEAD ATTORNEYS, Brian D Penny, Mark S Goldman, Sidney S Liebesman, Labaton Sucharow LLP, New York, NY; Robert H Friebert, LEAD ATTORNEY, Friebert Finerty & St John SC, Milwaukee, WI; George Burnett, Liebmann Conway Olejniczak & Jerry SC, Green Bay, WI.

For Iron Workers Local No 25 Pension Fund, Plaintiff: Corey Mather, Guri Ademi, Shpetim Ademi, LEAD ATTORNEYS, Ademi & O'Reilly LLP, Cudahy, WI; David A Rosenfeld, Samuel H Rudman, LEAD ATTORNEYS, Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY; George Burnett, Liebmann Conway Olejniczak & Jerry SC, Green Bay, WI.

For Richard Saxon, Wesley Childs, Consolidated Plaintiffs: Corey Mather, Guri Ademi, Shpetim Ademi, LEAD ATTORNEYS, Ademi & O'Reilly LLP, Cudahy, WI; D Seamus Kaskela, David M Promisloff, LEAD ATTORNEYS, Barroway Topaz Kessler Meltzer & Check LLP, Radnor, PA.

For Oshkosh Corporation, Robert G Bohn, Defendants: Edward P Welch, Robert S Saunders, LEAD ATTORNEYS, Skadden Arps Slate Meagher & Flom LLP, Wilmington, DE; Daniel T Flaherty, Godfrey & Kahn SC, Appleton, WI.

For Charles **[\*2]** L Szews, David M Sagehorn, Defendants: Daniel T Flaherty, Godfrey & Kahn SC, Appleton, WI.

For Deloitte & Touche LLP, Defendant: John F Hartmann, Joshua Z Rabinovitz, Kirkland & Ellis LLP, Chicago, IL; Paul F Linn, Timothy M Hansen, Michael Best & Friedrich LLP, Milwaukee, WI.

For Oshkosh Corporation, Robert G Bohn, Consolidated Defendants: Daniel T Flaherty, LEAD ATTORNEY, Godfrey & Kahn SC, Appleton, WI; Edward P Welch, Robert S Saunders, LEAD ATTORNEYS, Skadden Arps Slate Meagher & Flom LLP, Wilmington, DE.

For Gary Buckley, Buckley Group Member, Melvin McCartney, Buckley Group Member, Frank G Warther, Buckley Group Member, Touraj Dayan, Buckley Group Member, Thomas W Prough, Buckley Group Member, Movants: Jason R Oldenburg, Previant Goldberg Uelmen Gratz Miller & Brueggeman SC, Milwaukee, WI.

For Massachusetts Public Pension Funds, Movant: Alan I Ellman, Carol C Villegas, Christopher J Keller, Jonathan Gardner, Stefanie J Sundel, LEAD ATTORNEYS, Labaton Sucharow LLP, New York, NY; Robert H Friebert, Friebert Finerty & St John SC, Milwaukee, WI.

For Lichtenberg Revocable Trust U/A DTD 07/14/2005, Movant: Patrick G McBride, O'Neil Cannon Hollman DeJong SC, Milwaukee, WI.

For Iron Workers **[\*3]** Local No 25 Pension Fund, Movant: Shpetim Ademi, LEAD ATTORNEY, Ademi & O'Reilly LLP, Cudahy, WI.

**Judges:** William C. Griesbach, United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### DECISION AND ORDER

On May 18, 2009, Plaintiffs filed a 192-page amended complaint in which they allege that Defendant Oshkosh Corp.,

as well as its officers and its auditor, Deloitte & Touche, committed securities fraud, in violation of *section 10(b)* of the Securities Exchange Act of 1934 and *Rule 10b-5*. The Defendants have moved to dismiss, arguing that the amended complaint fails to set forth with particularity the fraud allegations against them. They further assert that the complaint fails to allege plausible fraudulent statements or scienter (*i.e.,* intent to defraud), and it also fails to connect the dots between the allegedly fraudulent statements and any loss suffered by the Plaintiffs. For the reasons given herein, the motions to dismiss will be granted.

### I. Background

The Oshkosh Corporation is a manufacturer of heavy trucks used by industry and the military. Although the company has been around nearly a hundred years, it was a growth spurt of recent vintage that propelled it into the Fortune 500 and a listing on **[*4]** the New York Stock Exchange. In Plaintiffs' view, the company was able to achieve this growth not through the sustainable organic expansion of Oshkosh's core businesses but through a "myopic acquisition spree" fueled by the top executives' egos. (Pltf. Br. at 5.) Specifically, from 1996 to 2006, the company acquired some fifteen companies, including businesses in the firefighting, ambulance, towing and concrete mixing industries.

### A. Geesink Norba

The principal focus of this action is the company's accounting treatment for its purchase, in July 2001, of a Dutch company called Geesink Norba Group ("Geesink"), a leading manufacturer of garbage trucks. According to the complaint, the purchase gave Oshkosh a sought-after international presence and served to boost the dynastic egos of Oshkosh CEO Robert Bohn and CFO Charles Szews. (Am. Compl., P 82.) Oshkosh paid $ 137.6 million for the company and, according to the complaint, everyone soon realized that Oshkosh had paid too dearly for Geesink. Of the $ 137.6 million purchase price, $ 95.6 million was considered "goodwill," i.e., an amount exceeding the book value of the company. For present purposes, goodwill is simply a placeholder figure **[*5]** that represents the fact that companies are worth more as a going concern -- and sometimes a lot more -- than the book value of their land, buildings, machines, computers and the like. Plaintiffs assert that soon after the purchase of Geesink, it became clear that Geesink would not meet Oshkosh's financial projections. According to confidential sources, the purchase was a failure from the beginning. Geesink management had to be replaced, and managers soon observed that the company was not

meeting its sales forecasts. (Am. Compl. PP 83-84.) Confidential sources also stated that executives Bohn and Szews were aware of Geesink's problems throughout this period and pressured Geesink's management to increase sales in Europe so that the acquisition could live up to its billing. (Am. Compl. PP 86-88.)

Although many of Geesink's troubles resulted from poor market conditions, the amended complaint also asserts that there were management issues as well. A confidential source stated that the companies had difficulty integrating their computer systems, and management at Geesink became a "revolving door" that made accomplishing goals difficult. (Am. Compl. PP 89-90.) The failure to immediately meet **[*6]** projections led to short-sightedness and a narrow focus on trying to meet short-term goals and cut costs in an attempt to convince shareholders that the deal wasn't a total waste. In addition, a culture clash between the new Oshkosh management and Geesink management hindered growth.

According to the amended complaint, it should have been obvious that the acquisition was a failure by 2003 at the latest, as the company's "losses alone were evidence that the various restructuring efforts at Geesink were not working and that Geesink's goodwill was impaired." (Am. Compl. PP 92.) Given this string of losses, the Plaintiffs argue, Oshkosh should have recognized an impairment to Geesink's goodwill. A given goodwill valuation only makes sense if the company's prospects for profit-making render the company worth more than its book value; because Geesink's continuing losses undermined that premise, it no longer made sense (in Plaintiffs' view) to pretend that Geesink was worth some $ 96 million more than its book value. Under Generally Accepted Accounting Principles ("GAAP"), goodwill must be assessed annually, and it must be assessed more frequently where circumstances warrant. *See, e.g., In re Remec Inc. Securities Litigation, 415 F. Supp. 2d 1106, 1113-14 (S.D. Cal. 2006).* **[*7]** According to the amended complaint, the circumstances of Geesink's continuing losses and its general weakness should have caused Oshkosh to reevaluate its goodwill and recognize an impairment. By failing to do so, Plaintiffs allege, Oshkosh kept its assets and stock price artificially inflated during the class period.

Beginning in 2004 Oshkosh reported Geesink's quarterly earnings and losses as follows:

Q1 2004 $ 2 million
Q2 2004 ($ 2.6 million)
Q3 2004 ($ 3.4 million)
Q4 2004 $ 2.2 million
Q1 2005 ($ 2.6 million)
Q2 2005 ($ 1.5 million)
Q3 2005 ($ 5.1 million)

Q4 2005 $ .6 million
Q1 2006 $ .9 million
Q2 2006 $ 1.6 million
Q3 2006 $ 1.3 million
Q4 2006 ($ .9 million)
Q1 2007 ($ 4.2 million)
Q2 2007 ($ 6.2 million)
Q3 2007 ($ .5 million)
Q4 2007 ($ 8.4 million)
Q1 2008 ($ 5.4 million)
Q2 2008 ($ 8.6 million)

The total losses during the period amounted to $ 40.8 million. The class period begins on November 26, 2003, when the pattern of actionable fraud allegedly began. [1] On that date, the company filed its annual report (its fiscal year ends September 30 rather than December 31). All annual reports filed during the class period were audited by Defendant Deloitte & Touche. In the 2003 10-K, the company [*8] stated that it expected to be able to reduce costs at Geesink; that competition in Europe was limited; that sales would grow 2.8% in the next fiscal year; and that there were no significant modifications to goodwill. (Am. Compl. PP 115-118.) The next quarterly earnings release showed increased profits for Oshkosh Corporation overall, due largely to its defense business, but a slight decline in its commercial business. (Am. Compl. PP 127-128.) During an analyst conference call, Bohn and Szews appeared satisfied with Geesink's earnings. Even so, Szews noted that Geesink's order backlog had dropped and estimated Geesink refuse sales would "be flat in fiscal 2004, due to no projected recovery in European markets." (Am. Compl. P 132.) The 10-Q reflected the company's concerns about demand, noting that "European refuse backlog remained down due to a soft European economy." [2]

The next quarter was also favorable for the company as a whole. Bohn reported that "[i]t's our strongest quarter ever, and our defense business, including its robust parts sales, was the driving force behind it." (Am. Compl. P 139.) Even so, the commercial sector was still lagging. Bohn recognized that Geesink's second quarter results were "lower than expectations; primarily due to the low production volumes as European refuse markets remained extremely weak." But, "[o]n a more positive note, the production line for our new

---

[1] Plaintiffs suggest the fraud began earlier, but the statute of limitations barred any claims based on earlier activity.

[2] Typically a company announces earnings and holds a conference call the same day. The company's SEC filing -- a 10-K or 10-Q -- follows soon after. The complaint cites statements the company made through [*9] all three of these forms.

model is fully operational and the first GPM III was delivered. We've also introduced a new rear-loader in Europe targeted at the price-conscious customer." (Am. Compl. PP 143.) The theme continued into the next quarter: business was good for Oshkosh Corporation, but weakness lingered at its Geesink unit. On July 27, 2004, CEO Bohn noted the strength of Oshkosh Corporation's overall earnings growth but singled out weakness in Europe as a drag on earnings:

Market dynamics for all segments are robust and improving, except for the European refuse market, which remains weak. . . . We are not counting on improvement in European market conditions [*10] in the short-term and have initiated significant measures to improve Geesink Norba Group's performance, including a work force reduction and introduction of a new line of value-priced refuse bodies.

(Am. Compl. P 152.)

During the conference call, Bohn expanded on the information provided in the earnings release:

A major factor remains the weakened European refuse market, which is down about 20% from its peak. That has had a cascading earnings impact in the form of lower volume, tighter price competition and underabsorption of overhead. Coupled with the factory conversion to a new production line for the GPM III and the start-up of ValuPak production, you have valid underlying reasons for the lack of performance, but that doesn't alleviate our need to take action. And we have.

We took a $ 1.8 million redundancy charge to right size the work force and align it with overall market conditions. We focused on bringing the GPM III on line quickly and have exceeded productivity targets. The first few ValuPak units produced in Romania have met quality requirements and orders for this new value-priced line are beginning to flow. These launches cost $ 1.2 million during the third quarter. We believe [*11] these developments, along with a stabilizing industry order rate for new bodies, have us poised for a recovery in 2005, 2006.

(Am. Compl. P 154.)

Although the European refuse market was weak, CFO Szews projected that Geesink would return "to modest profitability on flat sales in fiscal 2005 due to manufacturing efficiencies anticipated following the re-layout of manufacturing processes in [fiscal 2004]." (Am. Compl. P 156.)

Sluggishness continued in the European refuse business, however. In the company's July 28, 2004 10-Q, it noted that while the commercial segment was picking up, refuse sales were falling behind. "[L]osses in the Company's European

refuse business [are] due to weak industry conditions in Europe and related workforce downsizing, increased steel and component costs, manufacturing inefficiencies, competitive pricing conditions as a result of new market entrants in rear- and front-discharge concrete mixers and higher start-up costs on new product launches." (Am. Compl. P 159.) The company estimated "that industry volume in European refuse products are down approximately 20.0% from 2003 levels and that pricing is adversely impacted in most European countries." (Am. Compl. **[*12]** P 160.)

At the end of fiscal year 2004, Bohn repeated the motif that had been developing for the last several years. Business was good -- it was Oshkosh Corp.'s best year ever -- but the Geesink business was still underperforming:

> We estimate European municipal markets experienced a downturn of 15% in 2004, following a 5% downturn in 2003. We also believe that selling prices declined in several countries across Europe. This, compounded by significant investments to convert our Emmeloord operations for production of our new-style, smooth-sided refuse bodies, led [Geesink's] to report a loss. However, [Geesink's] plants are more efficient following installation of new moving lines in The Netherlands. And, we've only begun to realize sales opportunities for the new smooth-sided bodies and the new ValuePak line of value-priced rear loaders. At this point we don't see recovery in the refuse market across Europe as a whole. We will aggressively promote our ValuePak line built in Romania to help drive revenues.

(Am. Compl. P 169.)

During the end-of-year conference call, an analyst asked a pointed question: "Why shouldn't we just look at [Geesink] as having been just a bad acquisition that's getting **[*13]** worse? And at what point do you say … we made a mistake and maybe we do something different?" (Am. Compl. P 173.) Either Bohn or Szews (the complaint does not specify) answered the question by blaming the weak European economy, which led to limited demand for its garbage removal line. It was noted that competitors had gone, or were going, bankrupt, and in the meantime Geesink had been improving efficiency and trimming its workforce to stay competitive. This left the company on "a very good footing." "Now, we don't see a lot of improvement in the market in '05. We do think that by '06, that we're going to start getting some benefits in volume in this marketplace and pricing, because there are too strong a rumors about our competitors going bankrupt, about people for sale. There will be a crack in that market." (Am. Compl. P 173.)

In its annual 10-K filing, the company explained the process for evaluating its goodwill, and noted that it had evaluated

Geesink for an impairment in its goodwill.

> In evaluating the recoverability of goodwill, it is necessary to estimate the fair value of the reporting units. In making this assessment, management estimates discounted anticipated cash flows of **[*14]** a reporting unit based on a number of factors including historical operating results, business plans and market conditions. Rates used to discount cash flows are dependent upon interest rates and the cost of capital at a point in time. There are inherent uncertainties related to these factors and management's judgment in applying them to the analysis of goodwill impairment. It is possible that assumptions underlying the impairment analysis will change in such a manner that impairment in value may occur in the future.

(Am. Compl. P 178.)

Although Geesink's losses prompted the company to consider writing down Geesink's goodwill, it believed that the European economy was primarily to blame for the losses. It had taken a loss in 2004 due to workforce reductions, and if the European market picked up at all the company believed its leaner position would allow it to achieve profitability. "Based on the Company's estimated benefits of these investments in fiscal 2004 and additional investments planned for fiscal 2005, and based on the Company's estimates of improving European refuse market conditions beginning in fiscal 2006, the Company developed long-term projections of estimated cash flows **[*15]** from [Geesink] to assess the fair value of the business." (Am. Compl. P 180.) Its conclusion was that Geesink's fair value was some $ 20 million more than the company was carrying it on the books for, and thus there was no impairment to Geesink's goodwill value.

The trend continued into fiscal 2005. The company overall continued its profitability, but there were still problems at Geesink. CEO Bohn suggested that Geesink "went through too many changes at once -- engineering and fielding a completely new design and installing a new production system simultaneously. Combined with the weak European market, that has taken its toll on profitability at Geesink." (Am. Compl. P 193.) Bohn stated that the company had sent a team of executives to evaluate problems at Geesink and noted that there was a risk the company would have to take a goodwill impairment charge. Even so, he noted the possibility that Geesink could return to profitability over the coming year or year-and-a-half. During the first-quarter conference call on January 25, 2005, an analyst echoed the question that had been asked at an earlier call: "is there a point when you and the board say, you know what, we're not going to keep **[*16]** doing this, or is it just things always take longer than expected?" (Am. Compl. P 198.) Szews stated that with new

management in place and a little patience, "I think we have got some opportunities there, I believe we can turn this thing around." In the company's 10-Q, it noted that it had performed another goodwill evaluation for Geesink but concluded that goodwill was not impaired given realistic hopes of turning the company around. (Am. Compl. P 200.)

The trajectory continued into Q2 of 2005: the company had record earnings, but Geesink continued to lag behind. Even so, management's tone became somewhat more optimistic:

> Our European refuse operation still needs significant improvement, but we've made substantial progress overall. The incoming order rate was up about 58 percent in the second quarter compared to the prior year, giving every indication that the European market is starting to strengthen. We earned a five-year service contract with Sita UK, a major customer, and resolved many of the issues associated with our Geesink-branded GPM III product. The "lean" team will remain in the Netherlands for a few more months to oversee implementation of the cost reduction opportunities **[\*17]** they identified. Today, we are even more confident that our European refuse operation can turn a profit in fiscal 2006.

(Am. Compl. P 209.)

As before, the company stated that it had considered Geesink's goodwill valuation but opted not to find any impairment in light of its prospects for a turnaround and expectations of profitability within the near year or so. (Am. Compl. P 216.)

The next quarter was a bad one for Geesink's books. The company took a $ 4.3 million charge for workforce reductions resulting from its "leaner" operations, but Bohn noted on the analyst conference call that "[w]e believe this workforce reduction will restore [Geesink] to profitability beginning in … the fourth quarter of fiscal 2005." (Am. Compl. P 226.) During the call one analyst again pressed for an analysis of the impairment issue: "[T]he impairment on Geesink. Could you talk about what you said you don't expect any to happen? But on the other hand, Geesink has certainly been a disappointment quarter after quarter after quarter. When does that decision get made? And what would the implications be?" (Am. Compl. P 231.) Defendants responded: "Well, the decision, I guess we look at it every quarter right now, **[\*18]** but we believe that we are going to be profitable in fiscal '06. And if we are profitable, more likely than not then we do not have an impairment decision next year based upon the current action plans that we have in place. If on the other hand, we consistently lose money quarter after quarter in '06, we probably are facing an impairment charge and the amount I couldn't predict." (*Id.*)

Bohn's predictions for profitability were finally borne out in the final quarter of 2005. He believed that the company's cost-savings measures and product improvements had resulted in a small turnaround (a modest profit of $ 600,000), and expected that Geesink could be "modestly profitable throughout fiscal 2006 due to product design changes, outsourcing and other cost reduction activities in process." (Am. Compl. P 240.) The company's 2005 10-K explained the goodwill evaluation process and again noted that Geesink's fair value exceeded its carrying value; as such, no impairment to goodwill was found. But the filing observed that if Geesink was "not able to achieve expected sales and operating income performance in fiscal 2006 and fiscal 2007, the Company could be required to record a goodwill impairment **[\*19]** charge." (Am. Compl. P 255.)

Geesink remained profitable into fiscal 2006, earning some $ 900,000 in the first quarter. "[P]rofitability of the Company's European refuse operations in the first quarter of fiscal 2006 compared to an operating loss of $ 2.6 million in the first quarter of fiscal 2005. Such improvement resulted from favorable market conditions and the restructuring of that business in fiscal 2004 and 2005." (Am. Compl. P 267.) During the Q1 conference call, Bohn explained his growing optimism:

> [W]e have an improved outlook for the Geesink Norba Group. They continue to move along the turnaround path: they are slightly ahead of schedule on outsourcing key components to reduce product costs; their full time cost reduction team is driving further cost reduction initiatives; and they have worked through their workforce reduction very smoothly. We expect them to complete the last of the workforce reductions by early in the third quarter, and we believe the workforce will then be sized appropriately for the Geesink Norba Group to be successful in their markets.

(Am. Compl. P 271.)

The turnaround trend continued into the next quarter, which was Geesink's best quarter since Oshkosh **[\*20]** had bought the company. Geesink earned some $ 1.6 million in the second quarter of 2006, and CFO Szews explained that the results were due to "higher sales volume and lower manufacturing costs . . . . We continue to expect Geesink Norba Group operating income to improve sequentially each quarter in fiscal 2006 as we execute on our cost reduction plan." (Am. Compl. P 287.) In the third quarter, Geesink showed another large profit of $ 1.3 million. During the conference call Bohn praised the management team for its efforts to make Geesink more "lean." (Am. Compl. P 300.) Szews, however, noted that the company expected more modest results in the near future: We expect this business to have break-even results in the fourth quarter of fiscal 2006

due to seasonal factors, softness in demand in the United Kingdom and chassis availability issues in France." (Am. Compl. PP 303, 310.)

That prediction came true in the last quarter of fiscal 2006. Although the 2006 fiscal year was Oshkosh Corporation's "most successful financial performance ever," Geesink lost $ 900,000. (Am. Compl. P 314.) Still, Szews reflected continued optimism during the company's conference call. He believed that orders were **[*21]** strong and that the company's cost reduction efforts would continue to pay dividends. (Am. Compl. P 325.) The company's 10-K, however, indicated its belief that Geesink refuse product sales would be down slightly in fiscal 2007 "due to slow demand in the United Kingdom and the lack of available chassis in France." (Am. Compl. P 328.) The 10-K also contained a detailed discussion of the issue of Geesink's goodwill:

> While the Company's Geesink Norba Group reported operating income of $ 2.9 million in fiscal 2006, its fourth quarter performance resulted in a loss. In addition, its backlog was down 25.0% as of September 30, 2006 due to a decrease in orders in the United Kingdom and France. As a result of this loss and decrease in backlog, the Company continued to monitor whether an impairment of the Geesink Norba Group goodwill had occurred. Goodwill associated with the Geesink Norba Group, which was recorded in connection with the acquisition of this business in July 2001, totaled [euro] 107.6 million as of September 30, 2006 ($ 136.5 million based on the exchange rate as of September 30, 2006). Most of the European refuse markets served by the Geesink Norba Group have been in a recession **[*22]** since 2001. While experiencing a slight improvement in fiscal 2005 and 2006, the Company believes that refuse collection vehicle market sales volumes in Europe declined by more than 20% from fiscal 2001 levels to fiscal 2004 levels and that pricing in several of its markets declined by 5% to 10% over this period. During fiscal 2004, the Company launched a new Geesink-branded, smooth-sided, rear loader refuse collection vehicle and the ValuPak, value-priced refuse collection vehicle into the European refuse market to spur demand for the Company's products. Following the launch of the new Geesink-branded rear loader, its product cost substantially exceeded the Company's estimated product cost and initial production units involved substantial warranty claims until certain design changes were made in fiscal 2005 and 2006. These issues caused the Geesink Norba Group to begin reporting operating losses in the business in the quarter ended June 30, 2004. The Company made a management change and assigned its lean team to the business in early fiscal 2005

to resolve the product design issues and to substantially reduce the manufacturing costs of the Geesink-branded rear loader. As a result **[*23]** of these initiatives, the Company recorded a $ 3.7 million workforce reduction charge in fiscal 2005 to rightsize its workforce in The Netherlands and to commence a strategy to outsource certain activities to lower cost manufacturing sites. In the fourth quarter of fiscal 2005 and the first three quarters of fiscal 2006, the Geesink Norba Group returned to profitability. During the fourth quarter, the United Kingdom market began to decline as a result of a decrease in government funding and the consolidation of two of Geesink's primary customers in that country. In addition, limited chassis availability in France reduced orders in that country. The Company expects that the business will incur operating losses through the first two quarters of fiscal 2007, but that the business will be modestly profitable in fiscal 2007. The Company believes that profitability will continue to improve in fiscal 2008 following the improvement of the markets in the United Kingdom and France, additional cost reduction activities and other planned actions. Based largely on the Company's estimated benefits of its cost reduction initiatives in fiscal 2005 and 2006 and the improvement in the end markets, the **[*24]** Company developed long-term projections of estimated cash flows from the Geesink Norba Group to assess the fair value of the business. As a result, the Company determined that the fair value of the Geesink Norba Group exceeded its carrying value at September 30, 2006, and therefore determined that the goodwill recorded in connection with the acquisition of the Geesink Norba Group was not impaired.

(Am. Compl. P 332.)

As had been foreshadowed somewhat, Geesink's turnaround stalled and it lost $ 4.2 million in the first quarter of 2007 and then lost $ 6.2 million in the second quarter. This latter figure included a substantial $ 4.9 million charge for more labor reductions, part of the company's continued cost savings and restructuring efforts. Oshkosh Corporation had also purchased JLG, a large manufacturer of "access equipment" such as aerial work platforms, lifts and stock pickers, and the company believed that Geesink's factory in Romania could be integrated into the new JLG business:

> we expect to leverage our Geesink Norba Group Romanian factory to serve as a supplier for JLG and its aerial products. The eastern European operation will serve as a cost effective supplier of large weldments **[*25]** and fabrications, and we will expand the operation to manufacture parts for both the Geesink Norba Group and JLG. We believe that these actions will result in

annual savings for the Geesink Norba Group of over EUR 7 million beginning in fiscal 2008, and then expect the savings to grow as we move more work into Romania.

(Am. Compl. P 368.)

CFO Szews elaborated: "We expect that our Romanian factory will be able to support certain JLG fabrication requirements, creating a win-win situation for the two businesses, as [Geesink] will benefit from increased absorption with a more fully utilized facility and JLG will gain a low-cost supplier of parts. We expect all of these efforts to form a sustained turnaround at this business." (Am. Compl. P 372.) In response to an analyst's question, Szews acknowledged that Geesink had dealt the company's earnings a "body blow," however, he didn't predict much of a turnaround in the near future, due largely to the fact that European holidays comprise much of the company's fiscal fourth quarter (thus weakening demand). (Am. Compl. P 375.) In the 10-Q for the company's second quarter of fiscal 2007, Oshkosh again provided a detailed explanation of its decision [*26] not to take an impairment charge:

> In the third quarter of fiscal 2006, Geesink, seeking a low-cost country to produce products, established a production facility in Eastern Europe. As Geesink started up this operation, existing facilities became underutilized. As a result, Geesink's excess capacity and overhead has in part led to operating losses. In addition, during fiscal 2006, Geesink increased salaried headcount to rectify product design issues associated with the fiscal 2005 launch of its GPM III model. Geesink believes the problems have been corrected and the additional headcount is no longer necessary. During the second quarter of fiscal 2007, Geesink began an initiative to reduce operating costs, eliminate excess headcount and close an underutilized facility. In connection with these and other initiatives, the Company recorded charges totaling $ 4.9 million for workforce reductions and other adjustments in the second quarter of fiscal 2007. At the same time, the Company developed a plan to further leverage Geesink's lowcost country manufacturing capabilities in Eastern Europe by insourcing certain work including production related to the Company's recently acquired access equipment [*27] segment.
>
> The Company presently believes that its strategy of reducing its workforce and other expenses, idling a facility and developing low-cost country manufacturing capabilities will result in the business returning to acceptable profitability over an eighteen to twenty-four month period. Based largely on the estimated benefits of Geesink's cost reduction initiatives and estimated low-cost country expansion, the Company developed long-term projections of estimated cash flows for Geesink to assess the fair value of the business. Based on these projections, the Company determined that the fair value of Geesink exceeded its carrying value at March 31, 2007, and therefore determined that the goodwill recorded in connection with the acquisition of Geesink was not impaired. The Company will continue to monitor its turnaround activities at Geesink and their impact on the Company's valuation of this investment.

(Am. Compl. P 381.)

The next quarter brought a small operating loss of $ 500,000 for Geesink. Bohn conceded that: "Our struggles [with Geesink] have been disappointing, but the more we dig into the issues, the more we believe the business can be successful with some facility rationalization [*28] and proper leadership." (Am. Compl. P 390.) The 10-Q echoed the impairment analysis quoted above, and concluded that "[t]he Company does not believe that this new estimated operating loss significantly altered the long-range value of Geesink and hence no detailed impairment calculation was performed at June 30, 2007." (Am. Compl. P 401.)

The next quarter brought more losses for Geesink. During the conference call, CEO Bohn conceded that things were not working out:

> We also made several major decisions this quarter regarding the Geesink Norba Group, our European refuse business and this is a business that has underperformed way too long and caused a decline in this segment's operating income in a year when the rest of the segment showed solid improvement. We are working through some very aggressive actions that we expect to put into business that will give it a much stronger foundation than what we have today, to grow and to be profitable.

(Am. Compl. P 418.)

Bohn explained that plans were in the works to shuffle production around to different plants in Europe and to achieve efficiencies that way. Oshkosh's new CFO, David Sagehorn, explained that "[w]e do not expect to see the results of [*29] the turnaround at the Geesink Norba Group until fiscal 2009, as we work through fiscal 2008 to complete the actions that we expect to allow the business to return to profitability." (Am. Compl. P 420.) The company's fiscal year-end 10-K provided another assessment of the goodwill impairment issue, echoing previous conclusions while incorporating continued losses into the calculation. Ultimately, the company concluded no goodwill write-down was required, but it suggested one could be imminent if expectations did not materialize:

> To the [*30] extent that Geesink is not able to achieve

expected progress on its turnaround initiatives in fiscal 2008, the Company could be required to record a goodwill impairment charge. The range of potential charge would be based on a number of factors, including the results of the Company's cost reduction activities, the timing and results of the insourcing of fabrications to Geesink's Eastern European facility, Geesink's operating performance, competition, required future capital expenditures, interest rates and long-term growth assumptions. The Company cannot provide any assurance that future goodwill impairment tests will not result in a charge to future earnings.

(Am. Compl. P 433.)

The first quarter of fiscal 2008 continued the pattern of losses at Geesink, with that unit losing some $ 5.4 million. Szews (now president and chief operating officer) stated that the restructuring was in "full swing" and noted that construction of a facility in Romania was underway in an effort to produce parts for Oshkosh's JLG company and transition away from facilities in Sweden and the Netherlands. (Am. Compl. P 447.) This news came against the background of a declining Oshkosh stock price. Although the **[*31]** company was still very profitable, its growth had slowed. Bohn addressed investors and analysts on the conference call: "We know that many of you listening today are frustrated by our recent share price decline. We are too. We do not think that the current price accurately reflects the strength of this management team, our ability to mitigate weaker economic conditions or the long-term prospects for the Oshkosh family of companies." (Am. Compl. P 451.) Roughly two weeks later, the complaint notes, Bohn sold some $ 5.7 million of company stock. (Am. Compl. P 455.)

The 10-Q noted that Geesink's sales were actually up 54.5% over the same quarter the previous year. This was due to a rebound in U.K. demand and favorable exchange rates. Even so, the company lost money due to "start-up costs at the Company's Romanian operations and facility rationalization costs to move production from Sweden to The Netherlands." (Am. Compl. P 460.)

Oshkosh Corporation released its second quarter earnings on May 1, 2008. During the conference call, Szews acknowledged that Geesink had lost some $ 8.6 million and noted that "[o]verall, results in this segment were quite disappointing due to difficulties in restructuring **[*32]** our European refuse collection vehicle business . . ." (Am. Compl. P 473.) Szews also acknowledged "experiencing larger inefficiencies during the ramp-up than we anticipated as we integrate the production of the Geesink and Norba product lines," and expressed hope that "these inefficiencies will be overcome as our employees move up the learning curve.

Geesink also began fabricating parts in its Romanian facility in the second quarter to be used in the manufacture of JLG aerial products in Belgium." (Am. Compl. P 473.) During the call, an analyst asked Szews pointedly about Geesink: "what do we need to see before we throw in the towel on this one?" Szews responded by noting the continued problems resulting from integration and multiple shifts in facilities: "Well, it's coming to a head pretty quickly here. We essentially moved all of the production of Norba into the Emmeloord, Netherlands facility. We're a little bit constipated. That's what caused the downturn in the forecast for at least the Geesink business and that we really need to exit by the end of the third quarter because we're a little bit behind in production." (Am. Compl. P 476.)

The company's May 1, 2008 10-Q reflected that **[*33]** although Geesink had increased its sales significantly over the same period the previous year, several factors resulted in continued operating losses. "The increase in the operating loss related primarily to charges associated with a previously announced facility rationalization plan and inefficiencies associated with the relocation of production of Norba-branded products to The Netherlands, along with an unfavorable foreign exchange rate that resulted in a larger loss in U.S. dollars." (Am. Compl. P 482.) And once again, the 10-Q noted that the company was continuing to evaluate the goodwill of Geesink for possible impairment. Because the losses were due to restructuring and facilities problems (rather than, say, weakened demand or increased competition), the company did not view Geesink's goodwill as impaired but stated that it would continue to monitor the situation. (Am. Compl. P 483.)

Eight weeks later, on June 26, 2008 (the end of the class period) Oshkosh issued a press release announcing that it was lowering its earnings estimates for the third quarter and 2008 and taking a goodwill impairment charge:

Oshkosh Corporation (NYSE: OSK), a leading manufacturer of specialty vehicles **[*34]** and vehicle bodies, today announced that it expects a loss of approximately $ 1.22 to $ 1.32 per share for its third quarter of fiscal 2008 compared to the Company's prior earnings per share (EPS) estimate range of $ 1.40 to $ 1.50 of income for the quarter. The expected loss relates to a non-cash charge for the impairment of goodwill to be recorded in connection with the Company's European refuse collection vehicle manufacturer, the Geesink Norba Group (Geesink). The impact of the impairment charge on third fiscal quarter earnings is estimated to be approximately $ 175 million, or $ 2.32 per share. Projected third fiscal quarter results also reflect weaker performance expectations compared with previous

estimates for, most notably, the Company's access equipment segment and, to a lesser extent, its fire & emergency and commercial segments.

Lower than expected sales in both North America and Europe driven by softness in non-residential construction and general economic weakness, and rising raw material and fuel costs, have caused us to reduce our outlook for the third quarter and full fiscal year 2008, said Robert G. Bohn, Oshkosh Corporation chairman and chief executive officer. During **[*35]** the quarter, we also lowered our outlook for Geesink due to a slower and more difficult than expected return to profitability, coupled with expectations of a weaker European economy and higher raw materials costs. This revised outlook has caused us to believe that the value of Geesink no longer supports the goodwill recorded for this business, resulting in the impairment charge we are announcing today.

(Am. Compl. P 492.)

The company held a conference call the same day, during which management conceded that Geesink's facilities rationalization program was simply not working -- its benefits were lower than expected while its costs were higher. In addition, business coming from Oshkosh's recently acquired JLG division was drying up due to a "slowdown in the European access equipment market." (Am. Compl. P 493.) The company believed that Geesink would break even in 2009 but acknowledged that it could no longer carry it on the books at the current value. It estimated an impairment charge of $ 175 million.

On the news, Oshkosh Corporation's stock dropped some 33% in heavy trading on what was a sharply down day for the entire market. The drop came amidst the overall decline in the economy and **[*36]** the stock market; I may take judicial notice that the Dow Jones Industrial Average had already dropped from over 14,000 in October 2007 to 11,811 on June 25, 2008 -- a drop of more than sixteen percent in roughly nine months -- and these drops foreshadowed further plummets into the six-thousands and the recession that occurred in late 2008 and 2009. The Defendants note that during the conference call after the announcement, no analyst asked about Geesink -- their focus instead was on the decline in JLG's business. In fact, the amended complaint cites a June 26, 2008 article from the *Milwaukee Journal-Sentinel,* which quoted an analyst who stated that "[t]he magnitude of (Thursday's) downward revision in access equipment's outlook is a surprise and highlights the speed at which JLG's business outlook has deteriorated." (Am. Compl. P 495.) This suggests, according to the Defendants, that the precipitous stock drop had much more to do with JLG than with any

write-down of Geesink's goodwill.

In the company's year-end 10-K, filed in November 2008, Oshkosh explained the goodwill impairment charge at some length:

The Company has taken steps over the last 18 months to turn around the Geesink **[*37]** business, including selling an unprofitable facility in The Netherlands during the first quarter of fiscal 2008, reaching an agreement with the Works Council in Sweden regarding rationalizing a facility in that country in order to consolidate Norba-branded production in The Netherlands, reducing its work force, installing new executive leadership, integrating operations with JLG, implementing lean manufacturing practices, introducing new products and outsourcing components to lower cost manufacturing sites. In June 2008, it became evident that synergies related to Geesink's facility rationalization program would be lower than expected and costs to execute the rationalization would be higher than anticipated. The resulting slower than expected and more difficult return to profitability of Geesink's business, further escalation of raw material costs, a softening of economies in Western Europe and a reduction in fabrication volume for the Company's access equipment segment at Geesink's Romania facility due to a slowdown in the European access equipment market led to the Company's conclusion that a charge for impairment was required. During the third quarter of fiscal 2008, the Company **[*38]** took these factors into account in developing its fiscal 2009 and long-term forecast for this business. With the assistance of a third-party valuation firm, the Company determined that Geesink goodwill and nonamortizable intangible assets were impaired and the Company recorded non-cash impairment charges of $ 167.4 million and $ 7.8 million, respectively, in the third quarter of fiscal 2008, representing the entire amount recorded for these assets. The evaluation was based upon a discounted cash flow analysis of the historical and forecasted operating results of this business.

(Am. Compl. P 496.)

## II. Analysis

The amended complaint brings claims for violations of *Section 20* of the Exchange Act, as well as *Rules 10b-5* and *10b-5(a)* and *(c)*. As suggested above, the principal focus of the amended complaint is the company's failure to take a goodwill impairment charge and acknowledge that it was carrying the Geesink company on its books at an inflated

value. This fraudulent and unrealistic valuation allegedly caused harm to those in the proposed class who bought shares of Oshkosh during the class period. The Defendants' motions to dismiss assert that the amended complaint fails to specify its **[*39]** allegations of fraud with particularity because the complaint is excessively lengthy and vague. They further argue that the complaint fails to plausibly allege that any of the Defendants acted with the requisite mental state or that their actions caused the Plaintiffs' loss.

## A. Pleading under the Private Securities Litigation Reform Act ("PSLRA")

*Section 10(b)* of the Exchange Act and *Rule 10b-5*, adopted thereunder, create a private right of action for securities fraud. *Rule 10b-5* makes it unlawful "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *17 CFR § 240.10b-5*.

The Supreme Court has recognized, however, that "[p]rivate securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms **[*40]** to the law. As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)* (citation omitted). Under the PSLRA, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*. These requirements echo the mandate found in *Fed. R. Civ. P. 9(b)* that allegations of fraud must be pleaded with particularity. *In re Stone & Webster, Inc., Securities Litigation, 414 F.3d 187, 194 (1st Cir. 2005)*.

"In a typical *§ 10(b)* private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008)*.

## B. **[*41]** Claims Relating to Geesink's Goodwill

### 1. The Complaint Fails to Allege Fraud with Particularity

Despite the Tolstoy-esque length of the amended complaint, the Defendants argue that the complaint's allegations are not stated with sufficient particularity under *Rule 9* and the PSLRA. The Plaintiffs' response brief argues that it has pled more than enough detail: in fact, they assert, no fewer than 386 paragraphs in the amended complaint contain allegations about how the Defendants' statements were material and misleading. (Pltf. Br. at 19.) As such, they argue that the Defendants have been more than adequately apprised of the nature of the claims being leveled against them.

It is true that the "gist" of the complaint is clear enough: the Plaintiffs believe the Geesink acquisition was a failure from the get-go (the company overpaid for it), and the company should have admitted this "at least five years" before it did by recognizing a goodwill impairment. (Am. Compl. P 86.) But from this general premise the amended complaint asserts that essentially every statement the company made (as set forth in Section I above) was fraudulent. That is, every earnings announcement since November 26, 2003 **[*42]** was fraudulent because it failed to tell the truth about Geesink's goodwill impairment.

Recognition of an impairment involves an accounting judgment about the future: to take an impairment is an admission that future prospects do not justify carrying the asset on the books at its present value, whereas maintaining one's goodwill evaluation is a prediction that the company's prospects for earnings are sound. But even though such an analysis is based largely on forecasts about the future, that does not give companies *carte blanche* to issue reckless or completely unfounded statements about their goodwill. Failure to take an impairment charge may constitute securities fraud when "the need to write-down [the asset] . . . was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud.' " *Caiafa v. Sea Containers Ltd., 525 F. Supp.2d 398, 410 (S.D.N.Y.2007)* (alterations and ellipsis in original) (quoting *In re K-tel International, Inc. Securities Litigation, 107 F. Supp.2d 994, 1001 (D. Minn. 2000)*, aff'd, *300 F.3d 881 (8th Cir.2002))*.

I conclude, however, that the kind of generalized allegations found in the amended complaint do **[*43]** not suffice under *Rule 9(b)* or the PSLRA. Most importantly, the allegations of fraud make no attempt to differentiate between the vastly different circumstances surrounding each reporting period and

each statement made during those periods. Under the PSLRA an allegation of fraud cannot be "one size fits all" -- each allegation must be tied to an explanation for *why* the statement was untrue and why the speaker had reason to know it was untrue. Despite the hundreds of paragraphs set forth in the complaint, nowhere do we find these kind of particularized allegations about each of the company's statements pertaining to Geesink's goodwill. The complaint is filled with citations to the company's SEC filings, and these filings detail the various problems and opportunities the company faced as it attempted to integrate its acquisition. But what may have been true in 2004 or 2008 was surely different in 2006 when Geesink was actually making money. Wasn't the company entitled to have some optimism that its restructuring efforts were working after four quarters of positive earnings? Surely the goodwill impairment analysis would have been different every quarter -- as set forth above, some quarters **[*44]** gave reason for optimism, whereas others looked bleaker. Each new quarter involved some new factor: an acquisition, the reshuffling of management, the closing of plants, changes in the market, etc., and each of these considerations presented a new scenario in which profitability may have been achieved (or not). The complaint does not specify, however, why the company's statements were unrealistic in each quarter. Instead, it asserts a general premise (Oshkosh paid too much for Geesink) and then simply claims that every statement during the class period was fraudulent because the company refused to recognize that fact. Each quarter's statements are bundled together as a pattern of fraud lasting four and one-half years, and we are to asked simply to believe that *everything* the company said about Geesink was a lie, when in fact the situation each quarter was highly volatile.

In *City of Sterling Heights Police & Fire Retirement System v. Vodafone Group Public Ltd. Co., 655 F. Supp. 2d 262 (S.D.N.Y. 2009)*, the district court summarized cases involving allegations that the company committed securities fraud by not writing down its assets sooner. In that case, Defendant Vodafone announced **[*45]** that it would incur a $ 40-49 *billion* impairment charge associated with its German, Italian and Japanese operations. *Id. at 266*. Plaintiffs' allegations there mirrored the allegations in this case. They argued that the defendant knew its European operations were failing but held off taking a goodwill write-down despite that knowledge. The district court found such allegations too conclusory to survive a motion to dismiss:

> The plaintiff alleges that because the Company's operations in Germany, Japan and Italy had not expanded as rapidly as expected at the time of acquisition, the defendants were "increasingly aware that the impairment indicators existed." (Compl. P 139.) The

Complaint speculates that Mannesmann's "extremely high price" left Vodafone with "no margin of error." (Compl. P 140.) "Thus, once the German results were even the slightest bit disappointing, impairment would exist." (Compl. P 141.) Such assertions are too broad to be objectively assessed and fail to identify any awareness by the defendants that an impairment charge was necessary.

*Id. at 270-71*.

Similarly, the Seventh Circuit has frowned upon generic *ex post facto* complaints that allege fraud based largely on subsequent **[*46]** data:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*DiLeo v. Ernst & Young, 901 F.2d 624, 627-28 (7th Cir. 1990)*.

Similarly, in *In re Wet Seal, Inc.*, the district court dismissed the complaint because its premise was wholly unsupported by any factual allegations that suggested fraud rather than, say, bad luck. There, the complaint alleged that management knew future prospects were bleak but nevertheless maintained a rosy outlook:

> The problem with the FACC [First Amended Class Action Complaint] . . . is that it is premised largely on the idea that management and members of the board knew the new line would fail, **[*47]** which in turn meant that they knew that Wet Seal would fail to recapture its customer base and to generate sufficient cash flows to support its balance sheet. But Plaintiffs fail to plead the concrete facts that support their premise-they do not explain the precise information, known to Defendants but not the investing public, that indicated the 2004 line would fail. The omission of such facts from the FACC is fatal, because Defendants repeatedly warned that, if the 2004 back-to-school line were not successful, they might face charges to earnings or insolvency. These disclosures mean Defendants' conduct was more consistent with their understanding of the difficult financial condition of

the company and their honest hope that their turn-around efforts would succeed and thereby return Wet Seal to profitability.

*In re Wet Seal, Inc. Securities Litigation, 518 F. Supp.2d 1148, 1151 -1152 (C.D. Cal. 2007)* (emphasis added).

The same holds true here. The complaint fails to identify what information management possessed, each quarter, that would have given them the foreknowledge that Geesink was doomed. And it further fails to account for the fact that the company's disclosures repeatedly warned **[*48]** that if management's hopes were not realized, the company might have to take a goodwill impairment. Instead, the complaint's assertions are so broad that they cannot even be meaningfully assessed. The complaint baldly asserts that the company should have taken a write-down "at least" five years before it did, but provides no explanation for how the Plaintiffs reached that result. It further fails to explain how much the goodwill should have been written down, and when, and what specifically about the company's goodwill evaluation was fraudulent. The complaint's sweeping allegations fail especially when one considers that a goodwill evaluation is a "custom" process based on several factors present at the time the assessment is made. As Oshkosh Corporation's filings state:

> In making this [goodwill] assessment, management estimates discounted anticipated cash flows of a reporting unit based on a number of factors including historical operating results, business plans and market conditions. Rates used to discount cash flows are dependent upon interest rates and the cost of capital at a point in time. There are inherent uncertainties related to these factors and management's judgment in **[*49]** applying them to the analysis of goodwill impairment. It is possible that assumptions underlying the impairment analysis will change in such a manner that impairment in value may occur in the future.

(Am. Compl. P 178.)

Although the amended complaint recognizes that there are a "number of factors" that figure into the goodwill assessment, it ignores these by its reliance on the blanket assertion that Geesink was essentially worthless during the entire class period. Instead of explaining why each statement was fraudulent -- *i.e.,* why management knew the company's prospects were weak -- the complaint makes the following generic conclusion about Oshkosh's reporting of goodwill:

> Oshkosh's valuation model for testing goodwill impairment was flawed and unrealistic because it failed to factor in historic and repeated operating losses at Geesink, the recession pressures within its industry,

declining demand for Geesink products, unrealistic restructuring charges, unachievable sales targets, unrealistic cost reduction plans, and repeated failed efforts to restructure the business.

This conclusory paragraph is repeated six times, verbatim, throughout the amended complaint. (Am. Compl. P 121(g), **[*50]** 184(g), 259(g), 435(g), 488(g), 335(g)). It is inconceivable, first of all, that each of these charges (unachievable sales goals, declining demand, recession pressures, etc.) would have applied in blanket fashion to each and every one of the company's statements over the course of more than four years. As the company's filings and other statements made clear, there were countless factors that affected Geesink's profitability. The complaint's reliance on boilerplate pleading about the company's goodwill evaluation does not come close to the particularized allegations that are required by the PSLRA.

Putting the accounting jargon about impaired goodwill to one side, what the amended complaint is really alleging is that Oshkosh was simply too bullish in its quarterly predictions about future prospects at Geesink. But instead of explaining why optimism was unwarranted at each step of the way (*i.e.,* why management knew otherwise), the amended complaint simply cites disappointing figures from the future as though these are evidence of fraud in the past. If that were true, of course, we would have to conclude that almost every company in the fall of 2008 was run by fraudsters because their **[*51]** predictions would have been knocked down by the dramatic recession that ensued. It should go without saying that one could be mistaken in a prediction about the future without committing fraud -- the fact that losses ultimately occurred does not mean the Defendants had reason to know that there was little basis for predicting or hoping otherwise. "For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence." *DiLeo, 901 F.2d at 626*.

That the executives committed fraud is especially unlikely given the fact that Geesink was a recently-acquired company in a new territory. As Plaintiffs note, this was Oshkosh Corporation's first significant entree into the European market. Its SEC filings are riddled with qualifiers about supply and demand problems in various countries, as well as the vicissitudes of foreign currency markets. Some of its predictions were rosy, **[*52]** while others were less sanguine. And in Oshkosh's case, the company explained each quarter

that its Geesink operation was a work in progress. Factories were shutting down and production was being moved, new management teams were brought in, and it was introducing new products to meet shifting demand, until it eventually tried to integrate its larger JLG acquisition into the mix and leverage that company to create a market for Geesink's operations. In short, the landscape was ten times more complex than the market for teen clothing, as in *Wet Seal*, and yet the complaint merely relies on a one-size-fits-all allegation of fraud, as though everything the company said about Geesink during more than four years was a lie simply because Geesink ultimately lost money.

The difficulty of making such predictions is demonstrated by the first quarter of fiscal 2008. In that quarter, Geesink actually managed to boost its sales significantly over the previous year's first quarter, but even then, the company lost money: "[t]he increase in the operating loss related primarily to charges associated with a previously announced facility rationalization plan and inefficiencies associated with the relocation [*53] of production of Norba-branded products to The Netherlands, along with an unfavorable foreign exchange rate that resulted in a larger loss in U.S. dollars." (Am. Compl. P 482.) This is not the case of a horse-and-buggy company bullheadedly insisting that good times are around the corner despite the mass appeal of the automobile; instead, Geesink was a company in flux, in a foreign market that was in flux, and it was run by an ever-changing management regime (as one confidential informant complained) that was itself part of a growing conglomerate and integration effort. It is reasonable to question the decisions that management made, but given the complexities of the business, an assertion that they committed *fraud* requires more than the cut-and-paste job found in the amended complaint.

In sum, given all of the parameters underlying the goodwill calculation, which changed quarter-to-quarter, it is not enough to broadly plead that all of the company's statements over a four and one-half year period were false because they failed to take an unspecified write-down of goodwill. "That Vodafone ultimately would take an impairment charge in 2006 does not in itself provide an actionable basis [*54] to claim that the failure to do so earlier was fraudulent." *Vodafone, 655 F.Supp.2d at 272*.

To plead with particularity under such circumstances, a Plaintiff would need to identify, at a minimum, which of the company's assumptions were unfounded. For example, in this case the state of the market for refuse trucks in Europe was a key factor in Geesink's sales prospects. At some times, the company's filings recognized that the market was weak, while in others the company expressed some hope. A plaintiff arguing for a quicker write-down of goodwill would have to

explain how, in a given quarter, the company's optimism about that market was not just wrong (as demonstrated by later data) but so wholly unfounded that it was fraudulent. Another key factor was the company's prospects for employing "lean" measures to cut costs. A plaintiff would have to show not just that the measures did not work, but that the company had no reasonable expectation that they *could* work. Ultimately, as the Plaintiffs recognize, a company's valuation of its goodwill is an assessment about the future, and in order to show fraud a complaint will have to set forth not merely the fact that the company was wrong, but [*55] that the company had little chance of ever being right. *Acito v. IMCERA Group. Inc., 47 F.3d 47, 53 (2d Cir. 1995)* ("lack of clairvoyance simply does not constitute securities fraud"). These are just a few examples. Because the amended complaint fails to explain with any particularity why each of the company's statements were fraudulent *within the context they were made,* the complaint must be dismissed.

## 2. The Amended Complaint Fails Adequately to Allege Scienter

Under *15 U.S.C. § 78u-4(b)(2)*, a plaintiff must allege facts that give rise to a "strong inference" that the defendants acted with "a mental state embracing intent to deceive, manipulate or defraud." In reviewing a complaint, a court must determine whether the inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, 551 U.S. at 314*. In *Tellabs,* the Supreme Court made clear that a court's inquiry is more searching than is typical in ruling on a motion to dismiss. It is not merely a question of whether the facts *as alleged* give rise to an inference of scienter; the question is whether the inference of scienter is a strong one when compared to other inferences [*56] one might draw based on common sense and experience. "The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id. at 323-24*.

As noted above, the amended complaint fails to identify specific information known to the Defendants that would suggest they knew their forecasts about Geesink's prospects were unreasonable. Instead, the amended complaint alleges the Defendants knew generally that the European economy was weak, or that restructuring efforts would fail, or that the company's historical profits did not justify its goodwill valuation. These general allegations are not substitutes for

actual knowledge that the company's forecasts were unreasonable, however. There are no allegations of secret internal forecasts predicting gloom, doctored books hiding the truth or accounting gimmicks painting a rosier [*57] picture. None of the confidential witnesses stated that any of the Defendants knew X was true while they said Y, or that internal projections showed something different from what was publicly disclosed. "There are no allegations that there were any internal reports that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud." *In re Loral Space & Communications Ltd. Securities Litigation, 2004 U.S. Dist. LEXIS 3059, 2004 WL 376442, *17 (S.D.N.Y. 2004)*. Geesink -- a new venture in a new territory -- was dependent on a multitude of parameters that changed every quarter, and management had little ability to predict with certainty that its hope for profitability was a lost cause. The fact that they remained optimistic does not mean they committed fraud. And the fact that one of the Big Four accounting firms evidently agreed with their approach weakens the inference that the need to recognize an impairment was so manifest that the failure to do so was fraudulent.

It is important, too, to recognize that the company's disclosures were not [*58] universally bullish, and its reasons for optimism were concrete and particularized rather than reflections of knee-jerk egotism or quixotic sunniness. During slower periods, the company repeatedly explained why new approaches -- restructuring, new leadership, improved demand, etc. -- might lead to better results, but at the same time it cautioned that these expectations could falter and could lead to a goodwill reevaluation. These were statements of qualified, cautious optimism rather than efforts to deceive. This, in itself, undermines any inference that the Defendants acted with an intent to deceive.

But because "[t]he strength of an inference cannot be decided in a vacuum," it is worth exploring the full context of the Defendants' alleged intent and motive to deceive. Plaintiffs place the most weight on financial considerations. Between 2003 and 2008, Bohn received over $ 31 million in compensation and stock options, while Szews earned $ 9 million. These lofty compensation packages would not have been feasible, Plaintiffs argue, had the company recognized an impairment sooner. In addition, during the class period Bohn and Szews sold some $ 52 million worth of stock at prices their [*59] alleged fraud had helped to inflate. In particular, the amended complaint sets forth in bold print and capital letters the fact that Bohn sold some $ 5.7 million worth of stock in February 2008: "ALTHOUGH BOHN HAD JUST TOLD THE MARKET AND, IN PARTICULAR, ITS SHAREHOLDERS HE THOUGHT OSHKOSH STOCK WAS UNDERVALUED, APPROXIMATELY TWO WEEKS AFTER THE CONFERENCE CALL AND ANNUAL SHAREHOLDERS MEETING, HE SOLD $ 5.7 MILLION WORTH OF OSHKOSH STOCK." (Am. Compl., P 458.)

"[B]ecause executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Tribune Co., 521 F.3d 686, 695 (7th Cir. 2008)*. The timing and magnitude of Bohn's stock sale was suspicious, in Plaintiffs' view, because it occurred just after Bohn had assured stockholders that he believed the company's stock was undervalued. Additionally, it occurred only four months before Oshkosh Corporation announced the impairment to Geesink's goodwill. [3] Bohn netted some $ 5.7 million from the sale, and Plaintiffs note that he would have received only half of that amount ($ 2.87 million) if he had waited until the day after the company's impairment disclosure.

A number of reasons undermine the possibility of drawing any "strong" inference of scienter. First, it is impossible to divine an intent to deceive from the facts alleged because the Plaintiffs' story is internally inconsistent, and almost fantastical. They allege a class period dating back to November 2003 (and that date derives from the statute of limitations -- they allege the fraud began even earlier). If this pattern of fraud was really carried on until June 2008 -- a period of over four and one-half years -- one would think that Bohn and Szews would have made out much better than they did. There would be scores of suspicious stock sales, and the Defendants would have cashed in all along the way until the music stopped. Instead, we are asked to believe that Bohn and Szews masterminded a scheme of more than four years only to allow Bohn to save roughly $ 2.8 million by selling in February 2008 rather than June 2008 and to earn unspecified extra salary and benefits due to the company's inflated stock price.

> [P]laintiffs' allegations about trading relate to an exceedingly long putative class period. The allegedly fraudulent [*61] scheme lasted some 46 months (from August 12, 1999, to June 12, 2003). By way of comparison, the Ninth Circuit has considered a class period of just 15 months "unusually long." *See In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092-93 (9th Cir. 2002)*. Alleging such a lengthy class period weakens any inference of scienter that could be drawn from the

---

[3] Defendants [*60] note that Bohn did not "sell" stock but merely exercised options.

timing of defendants' trades. Indeed, the lengthy period strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim.

*Teachers' Retirement System Of LA v. Hunter, 477 F.3d 162, 185 (4th Cir. 2007).*

Just as the lengthy class period requires a stretch of the imagination, so does the relatively modest nature of the Defendants' stock activity. Although Plaintiffs use italics to emphasize that Bohn netted $ 5.7 *million* from his February 2008 sale, modified typeface is no substitute for factual context. The key context is that Bohn's option exercise in February 2008 amounted to only 13% of his total holdings in Oshkosh Corporation. Had Bohn intended to cash out before the bad news hit, presumably he would have been able to do a lot better. *In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1094 (9th Cir. 2002)* **[*62]** ("Chief Executive Officer John Luongo sold only 13% of his total number of shares and vested options over the course of a fifteen-month period. Under our precedent, this figure is not suspicious, and does not support a strong inference of fraud.") Given the fact that he retained the vast majority of his stock during the reckoning in 2008, it would be more reasonable to infer that his stock sales during the class period were simply in the normal, responsible course undertaken by any executive who receives stock as part of their compensation packages. [4]

Finally, I conclude that any inference of an intent to deceive is further undermined by the disclosures the company actually made. **[*63]** As noted earlier, the company's disclosures do not suggest cocky insouciance but rather a measured, cautious optimism. Had the executives intended to defraud, they would likely have used stronger language intended to convey more than mere cautious optimism. They would not, for example, have repeatedly warned about the possibility of an impairment charge, and they would not have performed *quarterly* impairment analyses on Geesink's goodwill. Rather than hiding anything, Oshkosh executives teed up the issue and flagged the question of an impairment so that investors could make their own judgments.

Along the same lines, it is important to recall that all of

Geesink's earnings numbers were disclosed, and there is no allegation that the Defendants fudged its numbers. That is, the principal allegation is simply that the Defendants failed to draw the requisite accounting *inference* from Geesink's numbers. As such, because the company actually provided all the underlying data required to make the accounting judgment in question, it is difficult to believe that the failure to take an impairment was part of some scheme to deceive. By disclosing that Geesink had lost more than $ 40 million during **[*64]** the class period, the Defendants can hardly be said to have been unjustifiably pumping the company up.

> As the public filings discussed above indicate, the evolving poor performance of Globalstar during 2000 was publicly disclosed. When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment. *See Thor Power Tool Co. v. Comm'r Internal Revenue, 439 U.S. 522, 544, 99 S. Ct. 773, 58 L. Ed. 2d 785 (1979)* (" 'Generally accepted accounting principles' . . . tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.") The failure to comply with standard accounting practices, without more, does not constitute circumstantial evidence of misconduct or recklessness. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999)* (quotations omitted). The plaintiffs have failed to allege sufficient facts to show that the failure to take an earlier impairment charge was so clearly required by accounting **[*65]** principles that the failure to take such a charge was fraudulent, particularly in view of the disclosures of the ongoing poor performance of Globalstar.

*In re Loral Space & Communications Ltd. Securities Litigation, 2004 U.S. Dist. LEXIS 3059, 2004 WL 376442, * 17* (some citations omitted).

Recall in fact that some analysts had begun peppering the executives with questions about an impairment throughout the class period (one asked when they should "throw in the towel"), and this demonstrates that the issue was clearly in the minds of investors and the media rather than being hidden away. The information required to make the accounting judgment was disclosed to investors, and in fact the company's disclosures highlighted the possibility of an impairment in the future. This undermines any notion that the Defendants were attempting to deceive investors by delaying recognizing an impairment to Geesink's goodwill. Had the executives wanted to deceive investors, the course they chose

---

[4] In addition, the amended complaint provides almost no context about the company's stock price during this period. Publicly available records show that Oshkosh was trading in the low 40's during February 2008, but it had been as high as 50 only six weeks earlier and higher than 60 in October 2007. (*See also* Dkt. 91, Ex. B.) It is unclear why Bohn would have selected February 2008 -- more than four months before the impairment was announced -- to exercise his options as part of an attempt to defraud investors.

-- full disclosure about Geesink's losses and repeated warnings that an impairment charge could ensue -- was certainly an odd one.

In sum, the competing inferences far outweigh any inference that the Defendants intended to commit fraud. Rather [*66] than attributing the course of events to fraud, it is far more reasonable to conclude that although the Geesink acquisition simply didn't work out, the Defendants maintained reasonable (if unrealized) hopes that success could eventually be achieved. These hopes, bolstered by occasional profits, justified a continued belief that Geesink's goodwill was sound. Along the way they couched these hopes in cautionary language and disclosed all of the information investors would have needed to judge the viability of Geesink's business.

## C. Other Allegations of Fraud

Although the failure to write down Geesink's goodwill is the centerpiece of the amended complaint, Plaintiffs also allege generally that the Defendants committed securities fraud by boasting about the company's prowess in integrating its acquisitions, such as Geesink and JLG. For example, during an October 16, 2006 conference call, Bohn stated that: "with our outstanding history of buying and integrating market-leading companies and creating significant shareholder value, we are extremely, extremely confident that our offer to purchase JLG in an all-cash deal will be another positive milestone in our company's history." (Am. Compl., [*67] P 312.) The company further stated in one of its 10-K filings that it had "successfully negotiated and integrated fourteen acquisitions since 1996." (Am. Compl., P 333.) Plaintiffs assert these statements are false because the company had not, in fact, successfully integrated its acquisitions, and its history of buying companies was not "outstanding." Confidential sources back up Plaintiffs' claims by suggesting that Oshkosh had overpaid for the acquisitions and had not adequately planned for their integrations.

As Defendants note, however, the company's statements suggesting that it was "successful" in integrating acquisitions are hardly actionable. First, as noted at length above, the fact that things did not work out in the long run does not mean that the company's claim of success in the short term was fraudulent. Second, the company's statements are simply expressions of confidence that reflect judgments about management's general ability to manage. Such statements cannot be fraudulent because they are matters of opinion incapable of being disproved. *Searls v. Glasser, 64 F.3d 1061, 1066-67 (7th Cir. 1995)*. For example, who is to say that, in 2006, when Geesink was earning a profit, [*68] the company had *not* successfully integrated its acquisitions? And because

such vague statements are unverifiable, they are also immaterial. It is difficult to imagine a putative investor making a decision based on a few stray expressions of competence from the company's CEO. "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Grossman v. Novell, Inc., 120 F.3d 1112, 1119-20 (10th Cir. 1997).* [5]

## D. Claims Against Deloitte & Touche

The amended complaint alleges that the fraud did not end with the company's executives. According [*69] to the Plaintiffs, Oshkosh's auditor, Deloitte & Touche, issued audit opinions regarding the company's financial statements but consistently disregarded the need to take an impairment charge for Geesink's goodwill. But as with their claims against the Oshkosh executives, the amended complaint fails to allege a plausible scenario of fraud and fails to allege *any* suggestion of scienter. Most notably, the argument that Geesink's goodwill needed to be written down earlier is simply based on the Plaintiffs' opinion about the reasonableness of that judgment. As Deloitte & Touche explains, however, the impairment analysis is highly subjective and is based on a number of factors, including the company's future prospects. Such factors were, of course, disclosed in the company's filings. The entire complaint is premised on the notion that Deloitte "knew" that an impairment to goodwill existed, but such a premise is simply untenable without some specific evidence that the impairment analysis was no longer a matter of judgment but was so obvious that fraud was involved.

In addition, there is no credible suggestion of scienter. As with the lengthy class period Plaintiffs propose, the number of defendants [*70] involved in the alleged fraud stretches credibility. Whenever a complaint's fraud allegation is based on a violation of GAAP, the Plaintiffs will be forced to assert (regardless of the evidence) that the third-party auditor was part of the scheme to deceive as well. That is not a happy place to be under the PSLRA. We know that the company's

---

[5] Defendants also raise the defense that their forward-looking statements were protected by the statutory safe harbor, *15 U.S.C. § 78u-5(c)(1)*, because they were accompanied by meaningful cautionary language. The briefs do not make clear which statements are at issue, however. In any event, because I conclude the statements are not fraudulent, I need not consider the issue of the statutory safe harbor.

executives had at least some financial incentive to prop up the share price for five years -- but what was in it for the auditor? All we are told is that Deloitte earned significant fees during the class period. But of course that would be true for any major accounting firm performing audit services. There has to be something extra, some additional whiff of purposeful deceit, to separate the GAAP claim against this auditor from the boilerplate, obligatory, allegations that would have to be made against *any* auditor in a case like this. Here, we are simply told that Deloitte participated in the fraud but not given any plausible reason why it would have done so. Auditors are people, and people generally do not engage in activities -- particularly fraudulent ones -- without some reason. Would Deloitte have been replaced as auditor if it failed to go [*71] along with the program? Were threats made? Were auditors' bonuses tied to maintaining good relations with Oshkosh management? Did Bohn imply that he needed cover from Deloitte for five years so he could sell thirteen percent of his stock at inflated prices? Without any plausible motive alleged, it is difficult to draw any inference of intent to deceive.

In addition, as noted above, the data underlying Deloitte's impairment analysis were also disclosed, allowing investors to see clearly when the company was making money and when it wasn't. As Deloitte & Touche notes, had the Defendants intended to deceive shareholders, it would have been "nonsensical" to conduct an impairment test fraudulently while at the same time disclosing accurate financial data and alerting shareholders about the very danger that ultimately ensued, namely, the impairment charge. If a real estate agent is trying to bamboozle a prospective buyer, he would not tell him the house is in great shape and then lead him on a detailed inspection to show off the faulty foundation, leaky roof and termite damage. That is simply not how one goes about committing fraud. The complaint must be dismissed against Deloitte & Touche [*72] for the same reasons it must be dismissed against the other Defendants. [6]

### E. Count Two

The amended complaint also alleges a count based on market manipulation, in violation of *Rules 10b-5(a)* and *(c)*. "Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i)

deceive the investing public, including Lead Plaintiffs; (ii) artificially inflate the market price of Oshkosh's common stock; and (iii) cause Lead Plaintiffs to purchase Oshkosh's common stock at artificially inflated prices." (Am. Compl., P 570.) The substance of the scheme, according to the complaint, was

> the knowing and/or deliberately reckless suppression and concealment of information regarding the impairment of goodwill with respect to the Company's acquisition of Geesink and JLG, as well as material anticipated writedowns and other charges that rendered Defendants' [*73] statements regarding earnings guidance throughout the Class Period, each materially false and misleading when made. Defendants knowingly suppressed and concealed such information to distort the balance of facts available to Oshkosh's investors during the Class Period.

(Am. Compl., P 572.)

Defendants argue that this claim is inextricably intertwined with count one, and as such both must be dismissed for the reasons set forth above. Plaintiffs argue, however, that count two does not require the pleading of any affirmative fraudulent statements. Instead, all that is required is an allegation suggesting the "manipulation of financial results" to the detriment of the Plaintiff class. (Pltf. Br. at 73.)

"To state a claim under *Rule 10b-5(a)* and *(c)*, Plaintiffs must allege that each defendant (1) committed a deceptive or manipulative act (2) with scienter (3) that affected the market for securities, and further that Defendants' acts caused Plaintiffs' injuries." *Desai v. General Growth Properties, Inc., 654 F. Supp.2d 836, 862 (N.D. Ill. 2009)*. As discussed above, the story told in the amended complaint is not one of market manipulation or fraud. There can be no plausible inference of scienter [*74] (intent to deceive or manipulate) when the Defendants disclose accurate financial information and repeatedly highlight the possibility of an impairment charge. Plaintiffs' barebones argument to the contrary does not overcome the story told in the amended complaint and the reasonable inferences to be drawn therefrom. Accordingly, Defendants are correct that the count two must be dismissed for the same reasons as count one.

### F. Amendment

Finally, Plaintiffs argue that if this Court accepts the Defendants' arguments, it should at least allow Plaintiffs to amend the complaint to cure any defects. The Seventh Circuit recently observed that a variety of factors are relevant when a district court decides whether to allow an amendment in a PSLRA case:

---

[6] Because there is no underlying fraud pled, the § 20 claim fails as well. *In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004)* ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.") (internal quotation marks omitted.)

It is true that there are some cases in which courts of appeals have found that it is best to use a dismissal without prejudice for a PSLRA complaint, given the demanding nature of PSLRA pleading standards. *See, e.g., Belizan v. Hershon, 434 F.3d 579, 583, 369 U.S. App. D.C. 160 (D.C. Cir. 2006)* (a PSLRA "complaint that omits certain essential facts and thus fails to state a claim warrants dismissal pursuant to *Rule 12(b)(6)* but not dismissal with prejudice"); *Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003)* [*75] (dismissal with prejudice in PSLRA suit is appropriate only where "it is clear on de novo review that the complaint could not be saved by amendment"). But by the same token, there are other cases in which courts of appeals have upheld dismissals with prejudice of securities complaints at a relatively early stage. *See, e.g., Pugh v. Tribune Co., 521 F.3d 686, 698 (7th Cir. 2008)* (dismissal of second amended complaint); *In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 390-91, 125 Fed. Appx. 490 (4th Cir. 2005)*; *In re Alpharma, Inc. Sec. Litig., 372 F.3d 137, 153-54 (3d Cir. 2004)* (initial individual complaints folded into one consolidated complaint, which was then dismissed with prejudice without an opportunity to amend).

*Fannon v. Guidant Corp., 583 F.3d 995, 1002 (7th Cir. 2009).*

Defendants have cited case law holding that the PSLRA supercedes *Rule 15*'s otherwise generous provisions for amendments. The statute mandates that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements are not met." *15 U.S.C. § 78u-4(b)(3)(A)*. Some courts have interpreted this as requiring, or at least strongly urging, dismissal [*76] *with* prejudice even if the liberal standards of *Rule 15* might otherwise counsel in favor of allowing an amendment. *Miller v. Champion Enterprises Inc., 346 F.3d 660, 692 (6th Cir. 2003)* ("[W]e think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of *Rule 15(a) of the Federal Rules of Civil Procedure*.") This conclusion is based at least in part on the tremendous expense borne by Defendants in defending such lawsuits, as well as the fact that Plaintiffs usually have ample opportunity for investigation before they file their complaints. (Here, for example, they had multiple confidential witnesses, as well as countless statements from company officials. The docket also reflects the presence of roughly *fifteen* lawyers representing the Plaintiffs.) Given the fact that there is so much opportunity for investigation (and the fact that many Plaintiffs' law firms are experts in the ins and outs of the PSLRA), courts might be inclined to be less forgiving if the first complaint is not up to par.

Other courts, however, have disagreed: "[i]nterpreting the PSLRA as constricting the operation of *Rule 15(a)* would [*77] be contrary to the purposes of the Act." *ACA Financial Guaranty Corp. v. Advest, Inc., 512 F.3d 46, 56 (1st Cir. 2008)*. Given the fact that the Seventh Circuit's recent guidance on amendments in PSLRA cases failed to mention any additional disfavor of amendments in PSLRA cases, I am reluctant to conclude that the PSLRA trumps the typical considerations involved in a Rule 15 analysis. Even so, however, I am satisfied that an amendment should not be allowed in this case because an amendment would be futile. As noted at length above, this was not a case where the Plaintiffs left something significant out of their pleadings whose inclusion could be expected to cure the defects identified. If facts or allegations were left out, it was not due to oversight or an inability to investigate but because the documents or statements simply did not exist. More importantly, this was a complaint whose own allegations undercut the very conclusions Plaintiffs ask us to draw. It is simply not plausible to infer that any of the Defendants intended to defraud anyone given the true and extensive financial data they did disclose and the consistent red flags they issued about a potential impairment to goodwill. [*78] As such, it is difficult to imagine Plaintiffs adding anything to the 192-page complaint to nullify the implausibility of that inference. Accordingly, there is little reason to allow another round of pleadings and extensive briefing. The amended complaint will therefore be dismissed *with* prejudice.

### III. Conclusion

For the reasons given above, the motions to dismiss are **GRANTED** and the amended complaint is **DISMISSED** with prejudice.

**SO ORDERED** this 30th day of March, 2010.

/s/ William C. Griesbach

William C. Griesbach

United States District Judge

**End of Document**

# Tab G

 Caution

As of: February 28, 2019 8:42 PM Z

# *Pudela v. Swanson*

United States District Court for the Northern District of Illinois, Eastern Division

February 17, 1995, Decided ; February 21, 1995, DOCKETED

No. 91 C 3559

## Reporter

1995 U.S. Dist. LEXIS 2148 *; 1995 WL 77137

PETER J. PUDELA, JR., MICHAEL D. CASEY, CYNTHIA DEIBER, RICHARD FAZIO and ROY H. COLE, individually, and as former Trustee of the Champion Business Forms, Inc. Employee Stock Ownership Plan and Trust, Plaintiffs, v. ROGER W. SWANSON, individually, and as former Trustee of the Champion Business Forms, Inc. Employee Stock Ownership Plan and Trust, AUBREY T. RICHEY, as Successor Trustee of the Champion Business Forms, Inc. Employee Stock Ownership Plan and Trust, ROGER W. SWANSON, individually, CHAMPION BUSINESS FORMS, INC., DANIEL KAFCAS, WILLIAM RYAN and MARTIN SMITH, Defendants.

## Core Terms

stock, shares, fiduciary, plaintiffs', valuation, participants, indemnification, defendants', independent appraisal, contributions, Formula, securities, terminating, bylaw, voting, independent appraiser, funds, prohibited transaction, fair market value, requirements, questions, expenses, annual, parties, valuing, motion in limine, benefit plan, damages, loans, partial summary judgment

## Case Summary

### Procedural Posture

Plaintiff employees brought an action against defendant employer alleging violations of the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.* The employees sought summary judgment on their claims, and the employer brought several motions in limine.

### Overview

Former employees of an employer brought an action under ERISA alleging that, when they ceased their employment and exercised their right to sell back the shares allocated to them through their participation in an employee stock option plan (ESOP), they received less than they would have if the shares been appropriately valued. The employees blamed the low

share price on the actions of the principal shareholder who was also the ESOP trustee. The court held that summary judgment for the employees was inappropriate where (1) a question existed regarding whether an indemnification bylaw challenged by the employees was complied with; (2) the directors' liability for approving the challenged indemnification bylaw was not established as a matter of law or by undisputed fact; and (3) questions of fact existed bearing on the issue of the appropriateness of the employer's valuation of stock. The court barred as untimely the employees' claims based on breach of fiduciary duty regarding the purported valuation of ESOP stock, but denied the employer's motion to bar evidence regarding the alleged excessiveness of the principal's compensation because such evidence was clearly relevant.

### Outcome

The court denied the employees' motion for partial summary judgment, granted the employer's motions in limine regarding statutes of limitations and extra-contractual damages, and denied the employer's motions in limine regarding evidence of stock valuation and the principal stockholder's compensation.

## Counsel: [*1] For PETER J PUDELA, JR, MICHAEL D CASEY, CYNTHIA DEIBER, RICHARD FAZIO, ROY H COLE, individually, and as former Trustee of the Champion Business Forms, Inc., Employee Stock Ownership Plan and Trust, plaintiffs: G. Gale Roberson, Jr., McBride, Baker & Coles, Northwestern Atrium Center, Chicago, IL.

For ROGER W SWANSON, individually, and as former Trustee of the Champion Business Forms, Inc., Employee Stock Owner Plan and Trust, CHAMPION BUSINESS FORMS, INC., DANIEL KAFCUS, WILLIAM RYAN, MARTIN V SMITH, defendants: Marvin Green, Anne Jentry-Green, Law Offices of Jentry-Green, P.C., Chicago, IL. For AUBREY T RICHEY, as Successor Trustee of the Champion Business Forms, Inc. Employee Stock Ownership Plan and Trust, defendant: Eugene Hardiman, Hardiman & Hardiman, Chicago, IL. Paul G. Hardiman, Hardiman and Hardiman, P.C., Chicago, IL.

For ROGER W SWANSON, CHAMPION BUSINESS FORMS, INC, DANIEL KAFCUS, WILLIAM RYAN, MARTIN V SMITH, counter-claimants: Marvin Green, Anne Jentry-Green, Law Offices of Jentry-Green, P.C., Chicago, IL. For AUBREY T RICHEY, counter-claimant: Eugene Hardiman, Hardiman & Hardiman, Chicago, IL. Paul G. Hardiman, Hardiman and Hardiman, P.C., Chicago, IL.

For ROY H COLE, counter-defendant: G. Gale Roberson, Jr., McBride, Baker & Coles, Northwestern Atrium Center, Chicago, IL. Charles Drake Boutwell, McCullough, Campbell & Lane, Chicago, IL.

**Judges:** JOAN B. GOTTSCHALL, United States Magistrate Judge

**Opinion by:** JOAN B. GOTTSCHALL

# Opinion

*MEMORANDUM OPINION AND ORDER*

Eight motions are presently pending in this case. This memorandum will address each motion in turn, commencing with plaintiffs' motion for partial summary judgment.

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

In this motion, plaintiffs seek a ruling in their favor on a number of issues raised in this suit. Since plaintiffs are the movants and the parties bearing the burden of proof on the matters presented, they must demonstrate the absence of a genuine issue of material fact and entitlement to a judgment in their favor as a matter of law. *Cuddington v. Northern Indiana Public Serv. Co., 33 F.3d 813, 815 (7th Cir. 1994)*. Correspondingly, in their cross-motion for summary judgment on two issues, defendants face the same burden of proof. As background for the discussion that follows, there follows a brief summary of the claims asserted in this suit.

The individuals bringing this suit under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), *29 U.S.C. § 1001 et seq.,* are all former employees **[*2]** of defendant Champion Business Forms, Inc. ("Champion"). By reason of their employment with Champion, plaintiffs were also participants in Champion's Employee Stock Ownership Plan ("the ESOP"). While ESOP participation would have given plaintiffs an indirect

ownership interest in Champion, [1] **[*3]** Roy H. Cole ("Cole") is the only plaintiff who personally owned shares of Champion stock. Champion's principal shareholder was Roger W. Swanson ("Swanson"), who owned 390 of Champion's 1,000 outstanding shares before the commencement of the events giving rise to this dispute. Since Swanson's wife and other members of his family owned over 200 shares of Champion stock at all times relevant to this dispute, Swanson would have been able to direct the voting of over one-half of Champion's shares if family members voted according to his directions. D.Stmt., P30. [2]

At all times relevant to this dispute, Swanson was Champion's president and a member of its board of directors. Besides this role in company management, Swanson also held the positions of trustee of the ESOP and of Champion's Profit Sharing Plan ("the PSP"). Swanson's status as trustee of the two benefit plans gives rise to certain fiduciary duties and it potentially creates a conflict of interest that is germane to plaintiffs' allegations of transactions prohibited under ERISA.

---

[1] As discussed in the following excerpt from a handbook on qualified employee benefit plans, ESOP participants are given certain rights with respect to the voting of corporate shares. Like stockholders, they can also sell shares obtained from an ESOP. Where an employer's stock is not publicly traded, special rules apply to the voting and sale of shares by the participant.

An employee stock ownership plan, or ESOP, is defined in ERISA § 407(d)(6), *29 U.S.C.A. § 1107(d)(6),* as a stock bonus plan or a combination stock bonus plan and money purchase plan meeting the requirements of *IRC § 401* and which is designed to invest primarily in qualifying employer securities. The plan must also meet the requirements of applicable Treasury regulations. The Internal Revenue Code in *§ 4975(e)(7)* adds to this definition the requirement that the plan must meet the requirements of *IRC § 409(h)*, which generally gives a participant the right to demand that benefits be distributed in the form of employer securities and, if the employer securities are not readily tradeable on an established market, the right to require that the employer repurchase the employer securities under a fair valuation formula.

See *29 U.S.C. §§ 1104(a)* and *1106(a)-(b)*. [3]

---

\* \* \* \* \*

*Internal Revenue Code § 4975(e)(7)* also requires that, if the employer has a registration type class of securities, as defined in *IRC § 409(e)(4)*, it must meet the requirements of *IRC § 409(e)*. Under *IRC § 409(e)(2)* each participant must be permitted to direct the manner in which the registration type class of securities allocated to the participant's account are to be voted. Voting rights must also be provided under that section if the stock of the employer is not publicly traded after an ESOP acquires the securities of the employer such that over 10% of the total assets of the ESOP are employer securities. If the employer stock is not a registration type class of securities (and it would not normally be where the stock is not publicly traded), *IRC § 409(e)(3)* requires that each participant or beneficiary be permitted to direct the manner in which shares allocated to his or her account will be voted in any corporate matter which involves the voting of such shares with respect to the approval or disapproval of any corporate merger, consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets, or similar transaction as prescribed in the regulations. The voting right requirements of *§ 409(e)(3)* will be met if the plan permits one vote to each participant with respect to each issue, and the trustee votes the shares held by the plan in the proportion determined after each such participant votes. *IRC § 409(e)(5)*.

Michael J. Canan, *Qualified Retirement and Other Employee Benefit Plans* § 3.39 at 112-114 (1994 ed.).

[2] References to "D.Stmt." are to defendants' statement of material undisputed facts submitted pursuant to Local Rule 12(n) and to the evidentiary materials supporting the cited paragraph of defendants' fact statement. Correspondingly, references to "P.Stmt." are to plaintiffs' fact statement under Local Rule 12(m) and supporting evidentiary materials. References may also be made to one of plaintiffs' exhibits ("PX  ") or to one of defendants' exhibits ("DX  ").

[3] ERISA § 404 sets forth in the following terms a fiduciary's duty to participants in an employee benefit plan:

(a)(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

    (A) for the exclusive purpose of:

    (i) providing benefits to participants and their beneficiaries; and

    (ii) defraying reasonable expenses of administering the plan;

    (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would

[**4] At the heart of plaintiffs' complaint is their contention that when they ceased their employment with Champion and

---

use in the conduct of an enterprise of a like character and with like aims;

    (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

    (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

*29 U.S.C. § 1104(a)(1).*

ERISA § 406 prohibits the following actions by benefit plan fiduciaries:

(a) Except as provided in *section 1108* of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--

    (A) sale or exchange, or leasing, of any property between the plan and a party in interest;

    (B) lending of money or other extension of credit between the plan and a party in interest;

    (C) furnishing of goods, services, or facilities between the plan and a party in interest;

    (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or

    (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of *section 1107(a)* of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates *section 1107(a)* of this title.

(b) A fiduciary with respect to a plan shall not--

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

*29 U.S.C. § 1106(a)-(b).*

exercised their right to sell back the shares allocated to them by the ESOP, they received less than they would have if Champion's shares are appropriately valued. Among factors allegedly resulting in a lower valuation of the ESOP shares, plaintiffs contend that excessive compensation paid Swanson reduced Champion's earnings. Also, Champion allegedly made illegal loans to the ESOP, charging interest on the loans that reduced the accounts of ESOP participants. The loans are allegedly prohibited transactions between a plan and a party in interest or fiduciary under ERISA § 406.

Plaintiffs further allege breaches of fiduciary duty and prohibited transactions occurring when Champion's directors voted to approve Swanson's excessive compensation. Among other claims made, plaintiffs allege that the ESOP was set up to further Swanson's personal interest, that errors were made in the calculation of amounts due participants, and that Champion's board of directors engaged in a prohibited transaction when it passed a corporate resolution that permits indemnification of defendants' [*5] expenses in this lawsuit. Plaintiffs seek money damages, as well as a number of forms of equitable relief. While defendants challenge plaintiffs' standing to assert claims to all the relief sought, questions of standing have not been presented in a properly supported dispositive motion. Consequently, this memorandum does not address questions of standing. Nor does the court consider questions bearing on the ESOP's qualification for favorable income tax treatment or the plan's compliance with the reporting and disclosure requirements of ERISA.

The discussion that follows is limited to the arguments made in plaintiffs' motion for partial summary judgment, originally filed October 13, 1993. The court will consider plaintiffs' arguments in the sequence followed in the motion.

### (1)-(2) Provision for Indemnification of Champion's directors

On April 25, 1988, those present at Champion's board of directors meeting discussed counsel's proposal that the corporation adopt a bylaw providing for indemnification of officers and directors in certain circumstances. At that time, the board was apparently comprised of Swanson and Cole, as well as Daniel Kafcas ("Kafcas"), William Ryan ("Ryan") and [*6] Martin Smith ("Smith"). The latter three individuals were outside directors. With the exception of Cole, who is now one of the plaintiffs in this suit, all the other directors are defendants in this action.

Minutes of the April 1988 meeting state as follows:

Mr. Swanson stated that in view of the fact that outside Directors had come onto the Board for the first time, counsel had recommended that there be appropriate legal protection and defense for officers and Directors of the

Corporation. Mr. Green explained that what was being proposed was a ByLaw providing indemnification for the officers and Directors in the event they were sued for acts performed on behalf of the Corporation or in proper pursuance of their duties. Mr. Green noted that such indemnification would not apply if an officer or Director were found to have acted in bad faith, but that if an officer or Director had acted in good faith, the indemnification would require the Corporation to pay any judgment and expenses, such as attorneys fees, incurred by the officer or Director. Mr. Cole asked whether the payment of expenses would apply if a Director initiated an action against the Corporation. Mr. Freeman stated that [*7] the purpose of such indemnification was to protect Directors against a suit by a minority shareholder suing derivatively. Following further discussion, on motion duly made by Mr. Swanson and seconded by Mr. Ryan, a majority of the Directors, Mr. Cole voting against the motion, adopted the following Resolution:

RESOLVED, that the Corporation's attorneys be, and they hereby are, authorized and directed to prepare a proposal regarding indemnification by the Corporation of its officers and Directors and to present said proposal to the next Board Meeting.

PX 33 at 2.

It appears that the proposal was not immediately prepared, however. Instead, over three years later, Champion's directors voted on July 24, 1991, to adopt Article XII of the company's bylaws, entitled "Indemnification of Officers, Directors, Employees and Agents." *See* PX 34. Although § 2 of the bylaw provides for indemnification in derivative actions, as had been mentioned by counsel at the April 1988 meeting, § 1 provides as follows for a more expansive right of indemnification:

The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or [*8] completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he or she is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best

interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in **[*9]** or not opposed to the best interests of the Corporation and, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that his or her conduct was unlawful.

PX 34 at 2.

Under §§ 3 and 4 of Article XII, indemnification would be made upon termination of a successful defense, with the final decision as to indemnification generally made by board of directors members who had not been involved in the litigation against the director or officer.

Also included in the new bylaw was the following provision for advancement of expenses while a lawsuit is still pending:

> Expenses incurred in defending a civil or criminal action, suit or proceeding may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding, as authorized by the board of directors in the specific case, upon receipt of an undertaking by or on behalf of the director, officer, employee or agent to repay such amount, unless it shall ultimately be determined that he or she is entitled to be indemnified by the Corporation as authorized in this Article.

*See* § 5, PX 34 at 2. The amendment adopting Article XII was made retroactive, effective **[*10]** as of April 25, 1988, the date it was first proposed. PX 34 at 1. Although the amendment came after the filing of this lawsuit, plaintiffs do not dispute that such an indemnification provision is lawful under Illinois law. *See 805 ILCS 105/108.75*.

Champion has apparently paid the expenses of defending this lawsuit. The amount paid has not been established, however. Although plaintiffs would set the amount paid in fiscal year 1991 at about $ 60,000 or more, they have no breakdown of the specific fees making up Champion's legal expenses for 1991 or for any other year. P.Stmt., PP 46-47. Despite plaintiffs' failure of proof on the question of the amount of fees actually paid, Swanson has elsewhere represented to this court that through January 31, 1994, Champion has paid expenses in excess of $ 314,000 in connection with this litigation. First Amended Complaint ("Cmplt."), Ex. D, P 3.

In their motion for summary judgment, plaintiffs request a finding that Champion's indemnification bylaw is invalid on one or both of two alternative grounds: (1) that adoption of the indemnification provision was a prohibited transaction under ERISA § 406(b)(2), *29 U.S.C. § 1106* **[*11]** *(b)(2)*; or *(2)* that the provision is an invalid exculpatory provision under ERISA § 410, *29 U.S.C. § 1110*. As relief, plaintiffs would have the court order that the individual defendants repay to Champion the amount of legal expenses previously paid on their behalf, and that the value of Champion stock be adjusted retroactively to reflect that cash flow adjustment. Such adjustment would increase the amount to which plaintiffs were entitled when they sold their shares to the ESOP. Defendants for their part cross-move for summary judgment, seeking a declaration that Champion's indemnification bylaw is valid.

Looking first to the question of whether the indemnification bylaw is invalid as an exculpatory provision within the meaning of ERISA § 410, the court begins its inquiry with the language of the statute itself. The section provides as follows:

> (a) Except as provided in sections 1105(b)(1) and 1105(d) of this title, any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy.

> (b) Nothing in **[*12]** this subpart shall preclude--
> > (1) a plan from purchasing insurance for its fiduciaries or for itself to cover liability or losses occurring by reason of the act or omission of a fiduciary, if such insurance permits recourse by the insurer against the fiduciary in the case of a breach of a fiduciary obligation by such fiduciary;
> > (2) a fiduciary from purchasing insurance to cover liability under this part from and for his own account; or
> > (3) an employer or an employee organization from purchasing insurance to cover potential liability of one or more persons who serve in a fiduciary capacity with regard to an employee benefit plan.

*29 U.S.C. § 1110*. While the Department of Labor ("DOL") has interpreted the section as voiding a provision for indemnification of a plan's fiduciary by the benefit plan itself, the DOL has determined that it would not preclude another party from satisfying a liability incurred by a fiduciary in the same manner as insurance under § 410(b)(3). *See Donovan v. Cunningham, 541 F. Supp. 276, 289 (S.D. Tex. 1982)*, rev'd in part on other grounds, *716 F.2d 1455 (5th Cir. 1983)*, **[*13]** cert. denied, 467 U.S. 1251 (1984) (discussing DOL interpretative bulletin at *29 C.F.R. 2509.75-4*). As an example of a permissible indemnification, the DOL mentions

indemnification of the fiduciary by "an employer, any of whose employees are covered by the plan." *29 C.F.R. 2509.75-4 (1975)*. As this court reads it, the DOL interpretation suggests that as a bottom line, an indemnification agreement should "leave the fiduciary fully responsible and liable" for any breach of fiduciary duty.

Plaintiffs argue that, in the context of an ESOP plan, an indemnification provision like the one here allows corporate assets to be used for indemnification, thereby reducing the value of stock owned by the ESOP. Positing that an indemnification agreement that materially reduces the value of stock would violate § 410, they would therefore have the court find that Champion's bylaw is invalid. Arguably, plaintiffs read into § 410 an additional requirement for ESOPs that is not found in the language of the statute itself. [4] Because Champion's bylaw could be interpreted as leaving plan fiduciaries filly responsible and liable for any breach of fiduciary duties, this court [*14] cannot conclude that it is invalid as an exculpatory clause.

[*15] In their corresponding request for summary judgment, defendants argue that Champion's indemnification clause is *per se* valid, pointing to the following comment by the Seventh Circuit: "How could anyone take seriously the proposition that ERISA forbids the indemnification of fiduciaries *wrongly* accused of misconduct, when ERISA itself allows a court to award fees to the prevailing side?" *Packer Engineering, Inc. v. Kratville, 965 F.2d 174, 176 (7th Cir. 1992)*. While this court would agree that under *Packer Engineering* and other Seventh Circuit precedent, employee benefit plans may, in appropriate circumstances, be required to bear the financial burden of litigation against plan trustees, defendants have not established that any of Champion's directors have provided the corporation with an undertaking to repay legal expenses if their defense is unsuccessful, as

required under § 5 of the bylaw. If they have not done so, they potentially would not bear the financial burden of a finding that they breached their fiduciary duties. Because it is uncertain that the bylaw was complied with in any event, the court will defer ruling on the validity [*16] of the indemnification clause.

Having thus rejected both sides' requests for judgment on the question of the validity of Champion's indemnification provision under ERISA § 410, the court must consider plaintiffs' alternative argument that, in adding Article XII to Champion's bylaws, defendants engaged in a prohibited transaction within the meaning of ERISA § 406. Again, in making this argument, plaintiffs complain that payment of defendants' legal expenses has adversely affected the value of Champion's stock, the ESOP's sole asset. As plaintiffs see it, the retroactive adoption of the bylaw was an action adverse to the interests of plan participants, in that it imposed on them the costs of defendants' wrongdoing, in violation of ERISA § 406(b)(2). *29 U.S.C. § 1106(b)(2)*. Defendants respond that even assuming that substantial fees have been paid, the payments fall under one of the exceptions to prohibited transactions in ERISA § 408(c). Under that section, a fiduciary is not prohibited from "receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties [*17] with the plan . . . . *29 U.S.C. § 1108(c)(2)*.

Without deciding whether the above exception would apply in this case, for the reasons discussed below, the court denies summary judgment on the question of whether Champion's directors engaged in a prohibited transaction when they adopted the bylaw permitting indemnification. Since different factors are pertinent in considering the allegations against the various individual defendants, the discussion turns to the outside directors first, and then to Swanson.

ERISA § 406(b) prohibits a "fiduciary" from engaging in prohibited transactions involving a benefit plan. Liability, then, turns on status as a fiduciary. Importantly, under ERISA § 3(21), fiduciary status may be based on either the exercise of discretionary authority or control respecting plan management or administration, or (2) the exercise of any authority or control--without the qualification that this exercise be discretionary--over management or disposition of plan assets. *29 U.S.C. § 1002(21)(A)*. There being no allegation that outside members of Champion's board of directors had the authority to vote [*18] or otherwise control the ESOP's shares of Champion stock, [5] defendants Kafcas,

---

[4] Carried to its logical extreme, plaintiffs' argument could prevent corporations with ESOPs from adopting an indemnification provision, since payment of corporate legal expenses necessarily reduces corporate earnings, and hence, the value of corporate stock. (Since all corporate expenses reduce earnings, query whether plaintiffs would impose on corporate officers or directors a heightened duty to monitor corporate expenditures wherever a corporation sponsors an ESOP.) In contrast, if the corporation had adopted a different form of benefit plan, such as a defined contribution or defined benefit plan, the additional concern over the cost of indemnification seemingly would not come into play. While the court does not rule out the possibility that plaintiffs may establish that directors violated other sections of ERISA in authorizing certain corporate expenditures, it does not know of other cases where a similar argument has been made. This being so, the court declines to read into ERISA § 410 additional requirements that are not present in cases where the employee benefit plan at issue is not an ESOP.

[5] Champion's directors no doubt had certain authority to direct the disposition of Champion's assets, but stock ownership does not

Ryan and Smith would only be fiduciaries of the ESOP to the extent they exercised discretionary authority or control respecting plan management or administration. *See Leigh v. Engle, 727 F.2d 113, 133-134 (7th Cir. 1984)* (ERISA ties fiduciary responsibilities to person's actual authority; fiduciary duty exists to extent of discretion created). *See also McGath v. Auto-Body North Shore, Inc., 7 F.3d 665, 670 (7th Cir. 1993)* (fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions).

[*19] In this case, the outside directors' involvement in plan management and administration was quite limited. There is evidence of only two decisions made involving the plan--the appointment of members of the ESOP's administrative committee and the appointment of a successor trustee to Swanson. P.Stmt., P12. Unless there is an ongoing duty to monitor the appointees' actions, *Leigh v. Engle, 727 F.2d at 134-135*, the directors would be liable only for a breach of duty in deciding whom to appoint. *See Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co., 941 F.2d 561, 569 (7th Cir. 1991)*, cert. denied, 117 L. Ed. 2d 426, 112 S. Ct. 1182 (1992). Because there is no evidence of dereliction in the two decisions on whom to appoint, the outside directors would be fiduciaries only to the extent of their oversight over those appointed to manage or administer the ESOP.

Even assuming plaintiffs can establish that the outside directors were "fiduciaries" because of an ongoing duty to supervise Swanson, summary judgment in plaintiffs' favor on this question is nonetheless inappropriate. [*20] As this court sees it, even though a stronger claim of dealings in his own self-interest can be made against Swanson, [6] Champion's

expenditure of funds to indemnify him (and other directors if they had a duty to supervise him) would only give rise to liability if Swanson is found to have committed the wrongs complained of. Because the evidence of record does not establish those matters as a matter of law and undisputed fact, plaintiffs are not entitled to a judgment in their favor on the question whether the passage of Champion's indemnification bylaw was a prohibited transaction.

[*21] *(3) Question Whether Annual Independent Appraisal of Champion Stock Is Required*

Champion states that since its fiscal year ended September 30, 1990, it has retained an independent appraiser to value the shares of its stock held by the ESOP. D.Stmt., P23. [7] Before that time, however, annual valuations of the ESOP's stock were made using a formula that incorporated four separate computations ("the Formula"). P. Stmt., P24. According to Champion, it used the Formula on the advice of its outside accountants. As Champion sees it, the Formula was a reasonable method of valuation, consistently followed and uniformly applied, in conformity with the following provision of the 1984 ESOP plan document:

> Within 120 days following the close of each Fiscal Year, the Trustee shall determine the fair market value as of the last day of each Fiscal Year of each asset held by the Trustee on such date. Such fair market value shall be determined in accordance with a reasonable method selected by the Trustee, consistently followed and uniformly applied . . . .

PX 8 at § 4.6.

[*22] A review of Champion's ESOP plan documents [8]

---

[6] As trustee of the ESOP, Swanson was on most corporate matters able to vote the ESOP's stock without consulting plan participants. Defendants point out that Swanson may have had voting control over Champion's stock through the holdings of his family members, but the ESOP was a minority shareholder, possessing a right to bring a shareholder derivative suit to redress matters such as directors' approval of excessive compensation paid Swanson. Because Swanson might have had a duty as ESOP trustee to try to prevent such alleged abuse, plaintiffs have a colorable argument that, in voting to indemnify himself for past breaches of duty, Swanson has

confer a direct ownership interest in a corporation's assets. Because the ESOP owned only shares of Champion stock, Champion's bank accounts and other assets were not "plan assets." In assessing whether directors had authority or control over the management or disposition of plan assets, the court therefore considers only whether they controlled or could direct the disposition of the ESOP's stock. There being no evidence that Kafcas, Ryan and Smith could do so, they are not fiduciaries by reason of their ability to control or direct the use of plan assets.

---

engaged in a prohibited transaction involving the plan.

[7] The first appraisal of the value of the ESOP's stock was made by the Merrill Lynch Business Brokerage and Valuation division of Merrill Lynch, Fenner & Smith Incorporated ("Merrill Lynch"). P.Stmt., P42. The parties dispute whether the valuation then performed was an objective one, as Merrill Lynch was retained in or around June 1991, shortly after plaintiffs gave notice that this suit would be brought. There is also circumstantial evidence to the effect that defendants might have expressed to Merrill Lynch a preference that the estimated value of the stock be set at as low a figure as possible. *See* P.Stmt. and D.Stmt., PP42-45. While plaintiffs have also retained an expert to perform a valuation for the years in question, P. Stmt., P77, details concerning the reports of each side's experts have not been presented in the parties' fact statements. This being so, all questions concerning the value of Champion's stock remain in dispute.

[8] The parties have provided the court with the following documents governing Champion's ESOP plan: (1) The Summary Plan Description provided participants after adoption of the plan in 1983

indicates that at numerous points, those administering the plan might be called upon to determine the value of the stock held by the ESOP. For instance, if the ESOP were to purchase additional Champion shares, those purchases were to be at prices not exceeding the value of the shares. PX 2 at § 3; DX 2 at § 5; PX 8 at § 11.7. Annual determinations of the stock's value would also facilitate tasks such as the allocation of forfeitures. DX 2 at § 6(b). In the event of termination or other withdrawal from the plan, a participant might be paid the fair market value of shares allocated him or her, or he or she might exercise a put option that allowed sale of the participant's shares to Champion or the ESOP at the then fair market value of the stock. PX 2 at § 9; DX 2 at §§ 15-16; PX 8 at §§ 8.1, 15.2, 15.3.

 [*23] All the plaintiffs in this case, then, were entitled to sell their shares for its fair market value. Although it is not clear how such value was determined in the case of each plaintiff, it is agreed that plaintiff Peter J. Pudela, Jr. ("Pudela") sold his shares to the ESOP for an amount computed using the Formula. P.Stmt., P72. Defendants also suggest that the ESOP used the Formula in determining the payment to plaintiff Cole, who terminated his employment during the time that the Formula was in use. D.Stmt., PP32-35.D. However, the parties have not stated whether plaintiffs Cynthia Deiber ("Deiber"), Michael D. Casey ("Casey") and Richard Fazio ("Fazio") received payments from the ESOP that were computed using the Formula. P.Stmt., PP73-74; D.Stmt., PP32-35. Given the timing of the payments, the amounts paid to Deiber, Casey and Fazio may have been based on the Merrill Lynch valuation.

One of the main issues in this suit is whether the stock of Champion has been fairly valued, be it through use of the Formula or on the basis of Merrill Lynch's appraisal. Plaintiffs take the position that the stock has at all times been undervalued, and they argue that the Merrill Lynch report is [*24] not that of a disinterested appraiser. *See supra* note 7. They would have the court order that a new valuation by an independent appraiser be had, with accounts retroactively

---

(PX 2), (2) a copy of the plan document executed September 30, 1983 (DX 2), and (3) a copy of the plan document, as amended and restated effective October 1, 1984 (PX 8). PX 8 also includes later amendments to the 1984 plan. Some of those amendments reflect changes to income tax laws.

Although the 1984 plan document as amended would seem to govern most of the questions raised in this suit concerning plan administration, the matters of which plaintiffs complain took place over a number of years. Since provisions of both the 1983 and 1984 plan documents conceivably may impact on the decisions to be made in this case, the discussion at this point makes reference to both the 1983 and 1984 plans.

adjusted to reflect a new appraised value. Cmplt., P79(A)-(D). 9

 [*25] Before addressing plaintiffs' arguments, it is necessary to first review certain provisions of ERISA and related tax code sections governing the circumstances in which employee benefit plans qualify for favorable tax treatment.

The previously described valuations of Champion's ESOP stock would presumably have been made with an eye to compliance with applicable laws, including ERISA's requirement of annual reports. Such reports must contain a statement of plan assets at their current values. *29 U.S.C. § 1023*. At all times relevant to this dispute, Treasury regulations have also required that in determining the price at which a right of first refusal or put option is exercised, the value of an ESOP's assets should be determined as follows:

> For purposes of § 54.4975-(7)(b)(9) and (12) and this section, valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities. In the case of a transaction between a plan and a disqualified person, value must be determined as of the date of the transaction. For all other purposes under this subparagraph (5), value must be determined as of the most  [*26] recent valuation date under the plan. An independent appraisal will not in itself be a good faith determination of value in the case of a transaction between a plan and a disqualified person. However, in other cases, a determination of fair market value based on at least an annual appraisal independently arrived at by a person who customarily makes such appraisals and who is independent of any party to a transaction under *§ 54.4975-7(b)(9)* and *(12)* will be determined to be a good faith determination of value.

*Treas. Reg. § 54.4975-11(d)(5)* (as amended in 1979). A

---

9 On their motion for partial summary judgment, plaintiffs' request for relief is somewhat more limited than that set forth in their complaint, as plaintiffs seek only a "declaratory judgment that the ESOP obtain an independent appraisal to ascertain an annual valuation of Champion stock owned by the ESOP for all years required by law." Notably, plaintiffs do not request a finding that the appropriate appraised value is that set by the expert they have retained in this lawsuit.

Plaintiffs not having attempted to establish the actual value of stock held by the ESOP, and the evidence being insufficient to establish that the value set by Merrill Lynch is inappropriate, the decision on this aspect of plaintiffs' motion is a very limited one. Thus, the court considers only the legal question of whether independent appraisal was required. It does not reach the question of whether Merrill Lynch provided an independent appraisal of the stock.

requirement that independent appraisal be had is not, however, found in § 409(h)(1)(B) of the Internal Revenue Code ("the Code" or "IRC"). Instead, IRC § 409(h) provides that, in the case of employer securities not readily tradeable on an established market, an ESOP participant entitled to a distribution from a plan "has a right to require that the employer repurchase employer shares under *a fair valuation formula.*" 26 U.S.C. § 409(h)(1)(B) (emphasis added).

Were IRC § 409(h) the only provision of applicable tax law dealing with valuations of employer stock held by an ESOP, one might [*27] conclude that in the years at issue here, Champion's ESOP was not required to obtain the independent appraisal referred to in the Treasury's interpretative regulations. While such appraisal might have been advisable, so that a plan fiduciary might better meet participants' challenges to the sufficiency of the amounts paid them for their shares of ESOP stock, the Code apparently required only a fair valuation formula. Indeed, the parties seemingly agree that prior to the enactment of the Tax Reform Act of 1986 ("TRA 1986"), there was no requirement of independent appraisal in the provisions dealing with tax qualification of ESOPs. Consequently, before the passage of TRA 1986, use of the Formula would not necessarily have been improper, provided that the Formula was a fair means of valuing Champion's stock.

TRA 1986 added two more qualification requirements for ESOP's, however. Together, they have been incorporated into the Code at § 401(a)(28)(B)-(C). Section 401(a)(28)(C) is the provision on which plaintiffs rely in arguing that the ESOP was required to use the services of an independent appraiser in valuing the ESOP's shares. Although the provision for diversification of investments [*28] at § 401(a)(28)(B) is not at issue in this suit, defendants ask that §§ 401(a)(28)(B) and 401(a)(28)(C) be interpreted in a parallel manner. Importantly, § 401(a)(28)(B) has been interpreted as applicable only to stock contributed to an ESOP after December 31, 1986. See I.R.S. Notice 88-56, 1988-1 C.B. 540. Since Champion made no contributions of additional shares to the ESOP after December 31, 1986, under the Internal Revenue Service ("IRS") notice, the ESOP would arguably not have been required to give participants the option of diversifying the investments in their individual accounts. [10] As set forth below, the parties disagree as to

whether the independent appraisal requirement of § 401(a28)(C) similarly need only be applied in cases where a corporation contributes shares to its ESOP after December 31, 1986.

[*29] IRC § 401(a)(28)(C) is entitled "Use of independent appraiser." As already noted, though, Champion did not retain an independent appraiser to value its shares until its fiscal year ended September 30, 1990. Instead, in the intervening years between passage of TRA 1986 and the retention of an independent appraiser, annual valuations of Champion shares were made using the Formula. Plaintiffs complain that use of the Formula yielded a smaller per share valuation and payout to them than that which might have been determined by an independent appraiser, since current earnings were a factor in the Formula. As plaintiffs see it, defendants were able to reduce current earnings and the value per share of Champion's stock by awarding excessive compensation to Swanson. Plaintiffs further posit that defendants would have endeavored to undervalue ESOP stock so that terminating participants would receive a lower price for their shares than the true market value of Champion's shares. Due to the undervaluations and resulting smaller payouts, the company would have preserved its assets and its ability to pay excessive compensation to Swanson. To remedy the alleged wrong, plaintiffs ask that the court [*30] declare that Champion was required to use an independent appraiser, rather than the Formula, in valuing Champion stock for the years at issue in this suit.

A first step in the assessment of plaintiffs' arguments is to look to the language of IRC § 401(a) 28 (C). The full text of the subsection is as follows:

A plan meets the requirements of this subparagraph if all valuations of employer securities which are not readily tradable [sic] on an established securities market *with respect to activities carried on by the plan* are by an

---

used for the acquisition of additional investments in the employer's stock. The notice does not address the precise circumstances of this case, where funds were contributed after December 31, 1986, but then used to cash out terminating participants. Thus, the contributions in this case served to prevent the reduction of the ESOP's holdings that would have occurred if shares had been transferred to terminating participants.

Even though Champion's post-1986 contributions tended to preserve the number of shares in the plan, rather than increase them, the transfers are arguably post-1986 contributions within the meaning of I.R.S. Notice 88-56. After all, the shares repurchased by the ESOP were then reallocated to remaining plan participants, increasing their individual accounts in the same way that a contribution of money or new stock would have done.

---

[10] This court uses the term "arguably" when discussing the premise in the main text because the proposition noted therein is not the only conceivable interpretation of the IRS statement.I.R.S. Notice 88-56 addresses situations in which new shares of an employer's stock are contributed to an ESOP after December 31, 1986, as well as where funds are contributed after that date, with the funds subsequently

independent appraiser). . . .

*26 U.S.C. § 401(a)(28)(C)* (emphasis added). Although the statute does not define "activities carried on by the plan" to which the independent appraisal requirement applies, the House Report for TRA 1986 states that "under the bill, the valuation of employer securities contributed to or purchased by an ESOP must be determined by an independent appraiser. . . ." H.R. No. 426, 99th Cong., 1st Sess. at 794 (1985), *reprinted in* 1986-3 C.B. Vol. 2 at 794. Were the House Report the only available Congressional statement concerning the independent appraisal requirement in *§ 401(a)(28)(C)*, **[*31]** one might conclude that the only plan activity calling for independent appraisal was the initial purchase or acquisition of employer securities by an ESOP. On the other hand, the Committee Report states that "under the House bill, all valuations of employer securities contributed to or purchased by an ESOP *with respect to activities carried on by the plan* must be made by an independent appraiser. . . ." H.R. Conf. Rep. No. 841, 99th Cong., 2d Sess. at II-553 (1986), *reprinted in* 1986-3 C.B. Vol. 4 at 553 (emphasis added). The logical thrust of the additional reference to "activities carried on by the plan" is that even after an initial acquisition of shares by an ESOP, independent appraisal would be required at other points in an ESOP's existence, including the purchase by it of shares allocated to a terminating participant.

Obviously, the Champion ESOP has engaged in the latter form of transaction since the end of 1986, as the plaintiffs in this case received cash for their Champion shares in 1989 and subsequent years. However, § 1175 of TRA 1986 states that "the amendment [to *IRC § 401*] made by this subsection shall apply to stock acquired after December 31, 1986." Tax Reform **[*32]** Act of 1986, Pub.L. 99-514, § 1175(a)(2), 100 Stat. 2085, 2519 (1986), *reprinted in* 1986-3 C.B. Vol. 1 at 436. Relying on the language of TRA 1986, and interpreting the independent appraisal requirement of *IRC § 401(a)(28)(C)* in a manner parallel to the IRS' interpretation of the diversification requirement of *IRC § 401(a)(28)(B)*, one might reasonably argue that the Champion ESOP is exempt from the independent appraisal requirement because no shares were contributed to the ESOP after December 31, 1986. This is the interpretation defendants urge to counter plaintiffs' argument that independent appraisal is needed in all post-1986 transactions where the value of an ESOP's stock is a consideration. [11]

**[*33]** The parties have not addressed all relevant questions of statutory construction and law as extensively as they might have. In particular, they have not argued the question of whether Champion's post-1986 contributions to the ESOP for use in buying participants' shares should or should not be treated the same as post-1986 contributions of new shares of stock or money. *See supra* note 10. Looking at the facts from plaintiffs' point of view, the procedure Champion has chosen is arguably characterized as a new employer contribution to the ESOP, as the Code seems to contemplate that employer securities be sold back to the employer, rather than the ESOP. *See 26 U.S.C. § 409(h)(1)-(2)*. [12] Instead of purchasing shares itself and then giving them to the ESOP, Champion has chosen to make contributions to its ESOP so the latter could acquire terminating participants' shares. Since Champion would have subjected itself to TRA 1986 if it first bought the shares back and then gave them to the ESOP, it arguably should not be allowed to avoid application of TRA 1986 through the method it has chosen.

**[*34]** Without speculating as to whether additional research into the case law would yield a ready answer to this question of statutory interpretation, the court observes that in the case of an employer that makes continuing contributions to an ESOP, [13] the question being argued here would be of little or no consequence. Because TRA 1986 states that the changes in *§ 401(a)(28)* "apply to stock acquired after December 31, 1986," an ESOP receiving continuing contributions from an employer would be required to have an independent appraisal with respect to those employer shares acquired after 1986. Independent appraisal thus having been had for new shares acquired, the fiduciaries of an ESOP would seem hard-put to argue that shares acquired earlier, before the end of 1986, had differing values. Since the value of a share of stock turns on present value, rather than on the date it was first acquired, one might expect that many ESOPs as a matter of course would obtain independent appraisals of all the employer shares they hold. Thus, Congress simply might not have foreseen the problem presented in this case.

**[*35]** Overall, this court believes there is possible merit in plaintiffs' argument that the ESOP was required to obtain independent appraisals of its stock after 1986. However,

---

[11] Defendants' argument on this motion concerning the scope of ERISA *§ 401(a)(28)* is consistent with amendments made to Champion's ESOP after TRA 1986. While requiring independent appraisal "with respect to activities carried on by the Plan," the appraisal requirement was limited to "Employer Securities acquired by the Plan after December 31, 1986." PX 8, Amendment Number

Two at § 5.6(b).

[12] On the other hand, the IRS would apparently contemplate purchase by either the employer or the ESOP. *See Treas. Reg. § 54.4975-7(b)(9)*-(10) (1977).

[13] The IRS has taken the position that, for a plan to qualify for tax-favored treatment, it must be "permanent." Continuity of employer contributions is among factors considered in, the assessment as to whether a plan is permanent. *26 C.F.R. § 1.401-1(b)(2)*.

qualification for tax-favored treatment is not an issue in this suit. As this court sees it, the action here is primarily one to recover benefits due plaintiffs under the ESOP plan or to enforce rights under the terms of the plan. *29 U.S.C. § 1132(a)(1)*. Consequently, the fundamental question is not whether the ESOP has complied with the additional requirements for tax qualification imposed by TRA 1986, but whether defendants have violated the terms of the plan itself. To answer that question, one must look to the terms of the plan.

As observed at the outset of the discussion in this section, Champion's plan called for valuations to be made at numerous points throughout the ESOP's existence. Champion's ESOP delegated responsibility for those valuations to the plan trustee or Champion's plan administrative committee. For instance, the 1983 Plan document provided that "in determining the fair market value of Company Stock for purpose [sic] of the Plan, the Committee shall utilize [*36] generally accepted methods of valuing stock of closely-held corporations for purposes of arm's-length transactions and may rely upon a determination of valuation of Company Stock made by an independent party experienced in preparing valuations of closely-held corporations." DX 2 at § 18. Under the 1984 plan, each year the trustee was to determine the fair market value of plan assets "in accordance with a reasonable method selected by the Trustee, consistently followed and uniformly applied . . . ." PX 8 at § 4.6. In the case of purchases of company stock, fair market value was to be "determined in good faith by the Administrative Committee." PX 8 at § 11.7.

Having reviewed the evidence of record, this court cannot conclude as a matter of law and undisputed fact that defendants failed to comply with the plan's provisions concerning valuation of employer stock. While retention of an independent appraiser would appear to have been an acceptable method of valuation under the terms of the plan, the only explicit requirement was that a fair market value be determined. Since the Formula may have provided a fair valuation, this court denies plaintiffs' request for a declaratory judgment that [*37] the ESOP was required to obtain an annual independent appraisal of its stock during the years since the effective date of TRA 1986.

At the same time, the court denies defendants' request for a judgment to the contrary effect—that an independent appraisal was *not* required. As noted in the preceding discussion, plaintiffs' argument has merit, even though the question bears on qualification for tax-favored treatment, an issue that is not before the court. [14] Further, given the evidence of Swanson's

ability and incentive to control the amount of corporate earnings, there are questions of fact bearing on the issue of whether application of the Formula yielded a fair valuation of Champion's stock. Since these factual questions cannot be determined on the present record, a declaration in defendants' favor would not result in dismissal of plaintiffs' claim in any event. The net result, then, is that the issue of whether independent appraisal was required remains unresolved, as does the question of whether there has been a fair valuation of Champion's shares.

**[*38]** *(4)-(6) Alleged loans to the ESOP*

In this part of their argument, plaintiffs focus on transfers of money or stock to the ESOP. First, they contend that in using PSP assets to purchase the 104 shares of Champion stock initially owned by the ESOP, Swanson sought to benefit himself, disregarding the interests of other benefit plan participants. In all, the ESOP came to own 231 shares sold by former Champion shareholder Vladimir Sakun. Although plaintiffs now concede that the 127 other shares of Champion stock owned by the ESOP were acquired as a result of company contributions to the ESOP in 1983 and 1984, they originally characterized the series of acquisitions as made possible by prohibited "loans" from a party in interest. *See* P.Stmt., PP28-29.

Besides seeking a determination that the ESOP should have no obligation to repay loans made in 1983 and 1984, plaintiffs complain of certain transfers of funds from Champion to the ESOP in 1989 and 1990. P.Stmt., PP48-60. The ESOP used the advances in question to pay terminating participants. Since the ESOP had no funds of its own, it could not have bought the shares of terminating participants without a contribution from Champion [*39] or a loan from Champion or some other entity.

Defendants admit that the transfers of funds to be used in payouts to participants were characterized as "loans" on the financial records of both Champion and the ESOP, and that the accounts of plan participants were charged with interest on those advances. However, sometime after successor trustee Aubrey T. Richie ("Richie") asserted in another lawsuit that the characterization of the transfers as "loans" may have been mistaken, Champion apparently forgave the loans, and eliminated the interest charges to individual accounts. D.Stmt., PP48-60. According to defendants, when recomputations made in 1992 indicated that a terminating ESOP participant had been underpaid, the participant was paid the amount of any shortfall in the earlier payment to him or her. D.Stmt., PP32-35.

---

[14] The parties have not addressed the question whether plan | documents required that the ESOP be administered so as to conform with applicable tax laws.

Having reviewed the record, this court concludes that plaintiffs are not entitled to judgment on the questions of prohibited loan transactions raised in paragraphs 4 through 6 of their motion. Looking first to the transactions in 1983 and 1984, because there is no evidence that Champion expected some kind of payment in return, plaintiffs have not established that loans [*40] were in fact made. [15] Also, with respect to the 127 shares contributed to the ESOP by the company, it defies logic that an unconditional contribution of an employer's shares is a loan. Finally, plaintiffs having failed to present authority to the effect that retroactive adjustment cannot rectify errors in accounting for an advance of funds from a party in interest, the court concludes that plaintiffs are not entitled to summary judgment on the proposition that 1989 and 1990 advances to the ESOP were prohibited loan transactions. This decision is without prejudice to plaintiffs' ability to recover amounts due them on account of past errors, but not paid them as yet.

**[*41]** *(7) Request for Order Requiring Recomputation of Allocations of Contributions and Forfeitures*

Defendants concede that in a number of the years between the ESOP's initiation and the termination of plaintiffs' participation in the plan, errors were made in the allocation of contributions and forfeitures between the accounts of ESOP participants. P.Stmt., P32. As a consequence, Swanson's account allegedly has been allocated a greater number of shares than it would have received absent the errors. P.Stmt., PP33-34. According to defendants, however, Champion corrected the errors upon being advised of them by its accountants in 1992, and all accounts are now correctly stated. Defendants also maintain that, in cases when a past participant had been underpaid, he or she was sent the amount of the earlier underpayment. Nonetheless, plaintiffs have not received any such payment, as the recomputations allegedly reveal that they have all been overpaid. D.Stmt., PP32-35.

Plaintiffs argue that the recomputations are unfavorable to them, but they present no evidence to the effect that the recomputations were not in conformity with applicable plan provisions. Nor do they present authority to [*42] the effect that, without more, errors of this nature provide an independent basis for relief under ERISA. Where, as here, any injury is easily redressed through the payment of money, it would seem that good faith corrections of errors might be given effect. While the amount that should have been paid plaintiffs remains in dispute, this aspect of their motion for partial summary judgment is denied.

*(8)-(10) Individual Requests for Payment of Value of ESOP Stock Allocated to Plaintiffs' Accounts*

In these three paragraphs of their motion, plaintiffs ask that they be paid the value of the Champion stock in their respective accounts as established for a particular valuation date, plus earnings to the actual date of distribution to the extent such amount exceeds the amounts they have previously received. At the same time, though, they present no evidence as to the specific amount that was due them under the terms of the plan. Because of plaintiffs' failure to establish undisputed facts essential to the proposition urged, this aspect of their motion is denied.

*(11) Alleged Late Payment to Cole and Related Question of Entitlement to Consequential Damages*

It is undisputed that Cole's [*43] employment was terminated by Champion at the direction of Swanson in December 1987. Plaintiffs do not contend that Cole left Champion on account of retirement, disability or death.

Defendants maintain that the time for distribution of Cole's vested benefit was governed by § 9.2(b) of the 1984 plan, which provides as follows:

> In the event of termination of service for any reason other than retirement, permanent and total disability or death, the distribution of the amount of the Participant's Vested Accounts normally will be deferred until after he incurs a One Year Break in Service. The following alternative modes of distribution may be selected by the Administrative Committee (after considering the available liquid assets of the Company and the Trust Estate):
> (1) Distribution of a Participant's Vested Accounts in a single distribution; or
> (2) Distribution of a Participant's Vested Accounts in substantially equal, annual installments over a period not exceeding ten years (provided that such period does not exceed the life expectancy of the Participant); or
> (3) Distribution in any combination of the foregoing manners.

PX 8 at § 9.2(b)(2).

---

[15] This is not to say that in using PSP assets to purchase the initial 104 shares held by the ESOP, PSP fiduciaries could not have violated fiduciary duties owed PSP participants. It is well-established that a benefit plan fiduciary may breach duties owed plan participants where he or she makes investment decisions out of personal motivations, without making adequate provision that participants' best interests will be served. *See, e.g., Leigh v. Engle, 858 F.2d 361, 364 (7th Cir. 1988), cert. denied sub nom. Estate of Johnson v. Engle, 489 U.S. 1078, 103 L. Ed. 2d 833, 109 S. Ct. 1528 (1989).* However, as noted in connection with the discussion of defendants' motions in limine, this question of breach of fiduciary duty is barred by the statute of limitations under ERISA § 413.

Consistent with a belief that it could **[*44]** elect payment to Cole over an extended period of years, Champion's ESOP administrative committee sent Cole a letter of January 11, 1989. The letter states in relevant part as follows:

> In regard to your employee stock ownership equity due: As there are currently no cash assets in the fund we will begin paying you annually.
>
> Your balance as of 9-30-87 was 24.9269 shares at $ 2,718.54 per share or $ 67,764.77 (see attached statement). Enclosed is a check for one-tenth of that amount or $ 6,776.48.
>
> Each year you will receive a check for the balance i.e. for 1989 (on or about September) you will receive a check for one-ninth of your remaining equity based on the September 30, 1988 valuation (see attached statement) . . . .

PX 35. While stating that Cole did in fact receive $ 6,776.48 from the ESOP in 1989, plaintiffs have not addressed the factual accuracy or credibility of other statements made in the administrative committee's letter. Among factors not addressed, plaintiffs present no evidence concerning the amount of Champion's liquid assets at the time of the decision to pay Cole's vested account balance in installments.

It is undisputed that at some point in 1988, Cole **[*45]** verbally requested that he receive his distribution from the ESOP in one lump sum, and that said request was denied. D.Stmt., PP66-67. Contrary to the intention expressed in the administrative committee's letter, however, Cole did not receive the balance due him over a period of ten years. Instead, Cole received the 1989 payment and a payment of $ 66,101 in 1990. The parties dispute whether Cole requested that the first payment to him be made in 1989, instead of 1988. Having considered the evidence on the present record, this court cannot conclude that defendants wrongfully delayed payment to Cole.

Champion's refusal to pay Cole in a single lump sum during 1988 (the year he apparently received a distribution from Champion's profit sharing plan) has had adverse income tax consequences for Cole, as the timing of the payments allegedly precluded him from claiming the favorable treatment of lump sum distributions available under *I.R.C. § 402*. As an element of damages in this suit, Cole accordingly seeks the amount of additional taxes that he paid on his distribution from the ESOP. On this motion for summary judgment, plaintiffs ask that Cole be awarded the extra taxes paid, in addition **[*46]** to any underpayment of the amount due him from his ESOP account.

This aspect of plaintiffs' motion is denied. As defendants note in one of their motions in limine, Cole's claim raises the question of whether the amount of extra taxes paid constitutes extra-contractual damages. Even assuming Cole could ultimately establish that he was entitled to a lump sum distribution in 1988, the Seventh Circuit has found that lost tax benefits are extra-contractual damages. *See Harsch v. Eisenberg, 956 F.2d 651, 654* (7th Cir.), *cert. denied sub nom. Bihler v. Eisenberg, 121 L. Ed. 2d 29, 113 S. Ct. 61 (1992)*. Such damages may not be awarded under either ERISA § 502(a)(1)(B) or § 502(a)(3). *Id. at 656-660*. Based on *Harsch*, this aspect of plaintiffs' motion is denied.

*Request for Attorneys' Fees*

Having considered all plaintiffs' arguments and declined to enter judgment in their favor on any of the propositions urged in their motion, the court need not address plaintiffs' request for attorneys' fees. The motion for partial summary judgment is therefore denied in all respects.

### DEFENDANTS' **[*47]** MOTIONS IN LIMINE

This memorandum addresses defendants' seven motions in limine using the same sequence as have plaintiffs in their objections to those motions.

*(1) Motion in limine to bar evidence, arguments and prayers for relief pertaining to any purported Ward valuation of ESOP stock [16]*

Plaintiffs have retained Ward, Lane & Associates, P.C. ("Ward") to provide expert testimony on the questions of valuation at issue in this suit. Ward's written reports do not refer to a valuation of Champion stock, however. Instead, the reports state that a valuation of the company as a whole has been made. Noting this fact, as well as Dennis Ward's admission at deposition that he had not valued "the ESOP stock" or "the ESOP shares," defendants suggest that Ward is not **[*48]** competent to provide testimony concerning the value of the ESOP's shares.

As Ward himself indicated in the deposition excerpt attached to defendants' motion, through the use of simple mathematics, Ward's estimate of the value of the company as a whole can be translated into an estimate of the value of its shares. Ward's valuation being clearly relevant, and because no further challenge to Ward's competency is made in this motion, the motion is denied.

*(2) Motion to bar evidence, arguments and prayers for relief*

---

[16] Hereafter, references to defendants' motions will omit the terms "in limine" and "arguments and prayers for relief," where the omission would not mischaracterize the substance of a motion or make the heading in this memorandum grammatically incorrect.

by Cole as a former fiduciary of the ESOP

Because plaintiff Cole was a co-fiduciary of the ESOP until Champion terminated his employment in 1987, defendants seek to bar inquiry at trial into any claims by Cole "in his capacity as a former trustee or other fiduciary" of the ESOP. Although this court is not aware that there are any such claims in the complaint--Cole seeks benefits allegedly due him as a *participant* in the plan--defendants accuse Cole of having acquiesced to some of the alleged violations of ERISA at issue in this suit. In particular, they state that Cole voted against the compensation awarded Swanson in 1988, but took no further action with respect to [*49] the matter. Answer to Cmplt., P156. While defendants assert a laches defense against Cole's claim, they provide no details of any other alleged breach of duty in their motion or their answer.

Questions of whether Cole's recovery should be reduced on account of prior inaction, and whether Cole has any obligation to indemnify Champion on account of a breach of duty as a co-fiduciary, cannot be decided on the present record. Defendants may raise questions concerning Cole's actions as an ESOP co-trustee at trial, but the pendency of defendants' defenses and counterclaims does not preclude Cole from seeking amounts due him as a participant in the plan. Defendants' motion is therefore denied.

*(3) Motion to bar evidence under relevant statutes of limitation*

In this motion, defendants argue that all causes of action arising out of alleged breaches of fiduciary duty by Swanson and Champion in or connected with the 1983 and 1984 creation and funding of the ESOP are barred by applicable statutes of limitations. As authority, they cite both ERISA and Illinois law. Although ERISA § 413, *29 U.S.C. § 1113*, would clearly govern the time for bringing plaintiffs' [*50] claims of breach of fiduciary duty, the reason for defendants' reference to statutes of limitation under Illinois law is not explained. This being so, the court considers only whether the statute of limitations under ERISA bars plaintiffs' claims of breach of fiduciary duty arising out of the 1983 and 1984 creation and funding of the ESOP.

ERISA § 413 provides as follows:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation,

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

*29 U.S.C. § 1113*.

Since it is not contended that defendants took steps [*51] to cover up or conceal any breach of fiduciary duty occurring in 1983 or 1984, [17] the exception under ERISA § 413 for cases of fraud or concealment is inapplicable. *Radiology Center, S.C. v. Stifel, Nicolaus & Co., 919 F.2d 1216, 1220 (7th Cir. 1990)*. This being so, in the absence of plaintiffs' actual knowledge of a breach of duty, a six-year statute of limitations will apply. *Starr v. JCI Data Processing, Inc., 767 F. Supp. 633, 637 (D.N.J. 1991)*. *See also Martin v. Consultants & Administrators, Inc., 966 F.2d 1078, 1090 (7th Cir. 1992)*.

[*52] This lawsuit was filed on June 7, 1991, more than six years after the creation and initial funding of the ESOP in 1983 and 1984. Regardless of when plaintiffs learned of the breaches of duty alleged to have occurred in 1983 and 1984, their claim is clearly untimely. Defendants' motion in limine is therefore granted, although this ruling is limited to plaintiffs' claim for recovery for breaches of duty in 1983 and 1984. As trial progresses, the court will rule on the admissibility of evidence concerning events occurring in those years.

*(4) Motion to bar evidence, arguments and prayers for relief by Cole for extra-contractual damages*

As explained in the discussion of plaintiffs' motion for partial summary judgment, Cole is not entitled to recover these damages in this suit. The motion is therefore granted.

*(5) Motion to bar evidence to the effect that Swanson's compensation is excessive*

Evidence as to the reasonableness of Swanson's compensation is clearly relevant in this suit. Because defendants have provided no support for their argument that plaintiff must

_____

[17] Plaintiffs contend that in filing Form 5500-C for fiscal years ended September 30, 1983 and September 30, 1984, the ESOP did not characterize the initial funding and subsequent contributions of shares as prohibited transactions, P.Stmt., PP75-76, but they do not deny that they knew of the foundation of the ESOP. Also, the 1983 and 1984 contributions were reported on the annual returns. In this court's view, the evidence does not establish concealment on defendants' part such that the statute of limitations would be tolled.

retain an expert to testify that Swanson's compensation was excessive, their motion is denied.

*(6) Motion to bar* **[*53]** *evidence pertaining to Arthur Andersen's alleged valuation*

The subject of this motion is a report by Champion's accountants in which they provide estimates as to the value of Champion as a business enterprise and the value of Champion's equity. Because plaintiffs may be able to establish a foundation for this relevant evidence, defendants' motion is denied.

*(7) Motion to bar evidence pertaining to the note of Robert Gross as to Marvin Green's statement*

Among the materials discovered by plaintiffs in this suit, there is a document on which Robert Gross ("Gross"), one of the Merrill Lynch employees involved in Champion's valuation, wrote "Strategy will make it unprofitable to sue." At his deposition Gross testified to his belief that Marvin Green, one of defendants' attorneys, made that statement. Plaintiffs state that they would seek to use the statement to prove a pattern of oppression and insensitivity to the rights of ESOP participants on defendants' part.

Defendants object to admission of the statement on a number of bases, but plaintiffs may be able to establish the necessary foundation and overcome defendants' hearsay objection to the statement. However, ruling on the objections **[*54]** must await trial, at which point the court will consider relevancy and the other objections against the backdrop of the other trial evidence. Without prejudice to defendants' ability to renew it, the motion in limine is therefore denied.

**CONCLUSION**

For the reasons set forth above, plaintiffs' motion for partial summary judgment [#79] is denied. Defendants' motions in limine regarding statutes of limitations [#108] and Cole's extra-contractual damages [#112] are granted. Defendants' motions in limine regarding the following matters are denied: (1) Arthur Andersen's alleged valuation [#109], (2) the note of Robert Gross [#110], (3) Ward valuation of ESOP stock [#111], (4) claims by Cole as a former fiduciary [#113], and (5) Swanson's excessive compensation [#114].

ENTER:

JOAN B. GOTTSCHALL

United States Magistrate Judge

DATED: February 17, 1995

End of Document

# Tab H

 Cited

As of: February 28, 2019 8:40 PM Z

# *Qualey v. Jackson*

United States District Court for the Eastern District of Michigan, Southern Division

June 25, 2007, Decided; June 25, 2007, Filed

No. 07-CV-10910-DT

**Reporter**

2007 U.S. Dist. LEXIS 45620 *; 41 Employee Benefits Cas. (BNA) 2292

JOHN QUALEY, JR., Plaintiff, vs. ROGER A. JACKSON, et al., Defendants.

## Core Terms

Merger, fiduciary, stock, preliminary injunction, Affiliates, Plans, parties, shareholders, plan participant, shares, approve, merits, strong likelihood, entities, issuance, factors, voted, owns, business decision, common stock, discretionary, irreparable, outstanding, Benefits, Holdings

**Counsel:** **[*1]** For John Qualey, Jr., Plaintiff: Barry D. Adler, LEAD ATTORNEY, Adler and Assoc. (Farmington Hills), Farmington, MI; Ellen M. Doyle, Malakoff, Doyle, Pittsburgh, PA; Ronen Sarraf, Sarraf Gentile, New York, NY.

For Roger A. Jackson, Robert E. Rossiter, James H. Vandenberghe, David E. Fry, Conrad L. Mallet, Jr., Larry W. McCurdy, Roy E. Parrott, David P. Spalding, James A. Stern, Henry D.G. Wallace, Richard F. Wallman, Lear Corporation, Lear Corporation Employee Benefits Committee, Defendants: Jeffrey G. Raphelson, Maya S. Hamie, Bodman, Detroit, MI.

For Vincent J. Intrieri, American Real Estate Partners, L.P., Carl C. Icahn, Defendants: Bruce L. Segal, Joseph Aviv, Honigman, Miller, Bloomfield Hills, MI.

**Judges:** PRESENT: Honorable Gerald E. Rosen, United States District Judge.

**Opinion by:** Gerald E. Rosen

## Opinion

OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

At a session of said Court, held in the U.S. Courthouse, Detroit, Michigan on June 25, 2007

PRESENT: Honorable Gerald E. Rosen

United States District Judge

I. INTRODUCTION

Plaintiff John Qualey, Jr., filed this purported class action against Lear Corporation ("Lear"), its Board of Directors, its Employee Benefits Committee, American Real Estate **[*2]** Partners, L.P. ("AREP"), and Carl Icahn, Chairman of the Board of AREP's general partner, American Property Investors, Inc. ("API"). Qualey is an employee of Lear Corporation and a participant of one of Lear's three employee benefit plans (the "Plans"). Qualey's lawsuit was precipitated by a February 9, 2007 Merger Agreement entered into between Lear and two wholly-owned subsidiaries of AREP, AREP Car Holdings Corp. and AREP Car Acquisition Corp. (the "AREP Affiliates"). Plaintiff claims that the Lear Defendants violated ERISA by approving the Merger Agreement and the sale of the Plan's holdings of Lear Stock to Defendant AREP. No sale, however, has yet occurred and none will occur until the Lear Shareholders vote on, and approve, the merger. [1]

This matter is presently before the Court on Plaintiff's Motion for a Preliminary Injunction. [2] Defendants have responded

_____

[1] The annual shareholders' meeting is scheduled for June 27, 2007. It was anticipated that the merger would be presented for approval by the shareholders at that meeting. However, on June 15, 2007, the Delaware Court of Chancery entered a preliminary injunction preventing the merger vote until Lear makes certain additional disclosures concerning its CEO Robert Rossiter, who conducted the merger negotiations. Lear was to provide the Delaware court **[*3]** with the supplemental disclosures and its proposal as to the timing of its provisions to stockholders on June 18 and if the court is satisfied, the merger vote may be able to proceed as scheduled. This Court, however, is unaware of the current status of the Delaware court's consideration of the matter.

[2] Although the Court also has pending before it Defendants' Motions to Dismiss, in light of the possibility that the shareholders' vote on

and Plaintiff has replied. Having reviewed and considered the parties' briefs and the entire record of this matter, the Court has concluded that oral argument on this Motion is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

### A. THE MERGER AGREEMENT

Lear Corporation is a leading global supplier of automobile parts. On February **[*4]** 9, 2007, Lear entered into an Agreement and Plan of Merger (the "Merger Agreement") with AREP Car Holdings Corp. and AREP Car Acquisition Corp. for the sale of all issued and outstanding shares of Lear at $ 36 per share. Lear publicly announced the Merger Agreement that same day. The Merger, however, has not yet been consummated. Lear's shareholders must vote to adopt the Merger Agreement as a condition to closing. As noted above, the stockholder meeting to vote on the Merger Agreement was scheduled for June 27, 2007, but whether the vote will take place as scheduled must await the final decision of the Delaware Court of Chancery, which in turn is awaiting disclosure of certain court-ordered supplemental information. Once the vote takes place, if the requisite number of votes approving the Merger is not obtained, the Merger will not take place and no shares of Lear stock will be sold or transferred to AREP.

### B. LEAR'S RETIREMENT PLANS

As indicated, Lear sponsors three separate employee benefit plans: the Salaried Employees Retirement Savings Plan, the Hourly Employees Retirement Savings Plan and the Hourly Employees 401(k) Savings Plan. These Plans are all eligible individual account **[*5]** plans ("EIAPs") under ERISA. Plan participants are given the option of investing their contributions and Lear's matching contributions in one of several investment options. The Lear Corporation Stock Fund, which is comprised of Lear stock and cash, is one of the investment options available to participants in each of the Plans. Collectively, the Plans hold approximately 1.5 million shares of Lear common stock. [3] In any vote by Lear stockholders on the Merger Agreement, Plan participants will be able to vote the Lear stock held in the Plans on their behalf due to the pass-through voting provisions contained in the

Plans. *See* Lear Defendants' Ex. 2 § 7.4; Ex. 3 § 7.4; Ex. 4 § 7.02(a)(iii).

7.02(a)(iii).

### C. PLAN ADMINISTRATION

The Employee Benefits Committee (the "Committee") is the "Plan Administrator" of each of the Plans for purposes of *§ 3(16) of ERISA. 29 U.S.C. § 1002(16).* The Committee, which is appointed by the Lear Board of Directors, is responsible for the "administration, operation and interpretation" of the Plan. *See* Lear **[*6]** Defendants' Exs. 2 and 3, §§ 10.1-10.3; Ex. 4 § 9.01 The Company, the Committee and the Plan Trustee are each expressly designated as a Plan "Fiduciary" with respect to the Hourly and Salaried Retirement Savings Plans, but only with respect to the specific responsibilities of each of Plan and Trust Fund administration. *See* Exs. 2 and 3, § 10.6. [4] The "Company," as defined in the Plan documents does not include the Board of Directors. *See id.,* §§ 1.9 and 1.11. The only role of the Board of Directors with respect to Plan administration and day-to-day operation is the selection of the members of the Committee. *Id.* § 10.1. In addition, the Company approves the powers of the Trustee to control and disburse funds, *id.* § 11.2, and appoints an accountant to prepare the Plans' financial statements. *Id.* §§ 10.5, 11.2. Plaintiffs do not dispute that neither the Committee nor the Trustee played any role in determining the terms of the Merger Agreement and nor will they play any role in effecting the merger.

Each of the Plans expressly state that the Plan Participants themselves direct the voting of shares held in their accounts. Thus, ". . . all voting shares held by the Trustee for Participants shall be 'Employee Voting Shares' and shall be voted by the Trustee as directed by the Participants." *Id.* § 7.4. *See also* Ex. 4 § 7.02(iii) (shares invested by the 401(k) Plan participants in the Lear Common Stock Fund are voted by the Trustee "as instructed by the Participant.")

### D. THE AREP DEFENDANTS

AREP Car Holdings and AREP Car Acquisition, the two "AREP Affiliates" that are parties to the Merger Agreement with Lear, own no Lear stock. The AREP Affiliates are subsidiaries of American Real Estate Partners, L.P. ("AREP"), a Delaware limited partnership. American Property Investors, Inc. ("API"), a Delaware corporation, is the general partner of AREP. Carl Icahn is the owner and

---

the merger will go forward on June 27, it has determined that resolution of the motion for preliminary injunction is of paramount importance at this time.

[3] Lear has 76,642,783 shares of common stock outstanding. Prelim. Proxy Statement, pp. 1 and 108. The Plans' holdings amount to approximately 2 of those shares.

---

[4] The Committee and "any Plan Participant or beneficiary who makes an investment election or otherwise exercises control permitted under the Plan over assets in the account" are designated as **[*7]** fiduciaries with respect to the 401(k) Plan. Ex. 4, §§ 8.07, 9.01.

Chairman of the Board of API. Icahn also owns approximately 90% of the depository and 86.5% of the preferred units of AREP. He also is the owner of approximately 16% of Lear's outstanding stock. Vincent Intrieri is a member of Lear's Board of Directors. **[*8]** He is also a director of AREP and an employee, officer or director of other entities not affiliated with AREP that are also owned and controlled by Carl Icahn. Intrieri did not participate in the Lear Board of Directors vote on the Merger. Rather, he recused himself from Board discussion and all Board action concerning the Merger. [5]

## III. DISCUSSION

In his Complaint, Plaintiff John Qualey, Jr. alleges two claims: In Count I, Qualey asserts a claim against all of the Defendants seeking to prevent the Plans' sale of Lear stock on the grounds that it constitutes a transaction prohibited under *Section 406 of ERISA*, *29 U.S.C. § 1106*, which prohibits certain transactions between an ERISA plan and a "party-in-interest." In Count II, Qualey alleges a claim against the Lear Defendants, only, for breach of fiduciary duties under *ERISA Sections 404* and *405*, *29 U.S.C. §§ 1104*, *1105*.

## A. STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

A preliminary injunction is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 573 (6th Cir. 2002)*; **[*9]** *Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000)*. Further, "[t]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Id.* [6]

In deciding whether a plaintiff is entitled to a preliminary injunction, the court is to consider four factors:

(1) whether the plaintiff has a strong likelihood of success on the merits;

(2) whether he would suffer irreparable harm if

preliminary relief is not issued;

(3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and

(4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Michigan High School Athletic Association, Inc., 64 F.3d 1026, 1030 (6th Cir. 1995)*; **[*10]** *USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94, 98 (6th Cir. 1982)*. The four considerations applicable to preliminary injunctions are factors to be balanced and are not prerequisites that must be satisfied. *Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003)*; *In re Eagle-Picher Indus., Inc., 963 F.2d 855, 859 (6th Cir. 1992)*. "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id.* Moreover, the court is not required to make specific findings concerning each of the four factors if fewer factors are dispositive. *Jones, supra.*

## 1. PLAINTIFF HAS NOT DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

For the first factor to favor the granting of an injunction, "a plaintiff must demonstrate a strong or substantial likelihood or probability of success." *United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 35 (6th Cir.1992)*. A mere likelihood of success is not sufficient to meet this standard; the plaintiff must demonstrate that the likelihood is "strong or substantial." *Raymond James & Associates, Inc. v. Leonard & Co., 411 F. Supp. 2d 689, 693 (E.D. Mich. 2006)* (citing *United of Omaha Life, supra*). The Court **[*11]** finds that Plaintiff here has not met this standard.

Plaintiff's Count I claim is predicated upon his contention that the Defendants violated *ERISA § 406*, *29 U.S.C. § 1106*. This section provides in pertinent part,

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect --

(A) sale or exchange. . . of any property between the plan and a party in interest. . . .

*29 U.S.C. § 1106(a)(1)(A).*

First, Plaintiff has not demonstrated that the Lear Director Defendants were acting as ERISA fiduciaries when they approved the Merger with the AREP Affiliates. Directors are not fiduciaries with respect to ERISA merely because of the positions they hold. *Riley v. Murdock, 890 F. Supp. 444 (E.D.N.C. 1995)*. A person is a fiduciary under ERISA to the extent

---

[5] Intrieri is not a member of the Employee Benefits Committee, nor is he alleged to be one.

[6] Whereas on a motion for summary judgment a plaintiff need only create a jury issue, "[t]o obtain a preliminary injunction he not only ha[s] to demonstrate specific harm, but also carry the *burden of persuasion*, showing a likelihood of success on the merits." *Leary v. Daeschner, supra*, (quoting *National Wildlife Fed'n v. Burford, 278 U.S. App. D.C. 320, 878 F.2d 422, 432 (D.C. Cir. 1989)*, *rev'd on other grounds sub nom. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)).*

(I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, **[*12]** or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The Supreme Court has recognized that ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan. . . ." *Mertens v. Hewitt Assocs., 508 U.S. 248, 262, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993)*. The Sixth Circuit also has emphasized the need to examine the conduct at issue when determining whether an individual is an ERISA fiduciary:

> The fiduciary obligations imposed by ERISA are implicated only where an employer acts in its fiduciary capacity. Thus, we must examine the conduct at issue to determine whether it constitutes "management" or "administration" of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards.

*Hamilton v. Carell, 243 F.3d 992, 998 (6th Cir. 2001)* (quoting *Hunter v. Caliber Sys., Inc., 220 F.3d 702, 718 (6th Cir. 2000)*. Thus, courts recognize that a person is deemed to be a fiduciary only to the extent that he performs one of the described "plan **[*13]** management" or "plan administration" functions. *See Klosterman v. W. Gen. Mgmt., Inc., 32 F.3d 1119, 1122 (7th Cir.1994)*. A clear distinction is drawn under ERISA between actions that constitute "managing" or "administering" a plan and actions that constitute "business decisions" that merely have an effect on an ERISA plan. *Sengpiel v. B.F. Goodrich Co., 156 F.3d 660, 665 (6th Cir. 1998)*. The former are deemed fiduciary acts subject to ERISA, while the latter are not, regardless of whether those business decisions have an effect on the benefits at issue. *Id*. *See also Akers v. Palmer, 71 F.3d 226, 231 (6th Cir.1995)* ("ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants. . . . [O]nly discretionary acts of plan management or administration, or those acts designed to carry out the very purposes of the plan, are subject to ERISA's fiduciary duties.").

In this case, the claims against the Lear Defendants are predicated on the Lear Directors' approval of the Merger Agreement. Approval of the Merger Agreement had nothing to do with administering **[*14]** the Plans or investing Plan assets. This was a business decision that is not subject to ERISA. *See United Steel Workers of America v. Cyclops Corp., 860 F.2d 189, 203 n. 15 (6th Cir. 1988)* ("in general, an employer's fiduciary duties do not extend to negotiations of the sale of a going concern.") *See also Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir.1988)* (" 'ERISA . . . envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer. ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets.' ") (quoting *Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir.1986))*; *Trenton v. Scott Paper Co., 832 F.2d 806, 809 (3d Cir.1987)*, *cert. denied*, 485 U.S. 1022, 108 S. Ct. 1576, 99 L. Ed. 2d 891 (1988); *Amato v. Western Union Int'l, 773 F.2d 1402, 1416-17 (2nd Cir.1985)* (ERISA employers may wear two hats and assume fiduciary status only when functioning in their capacity as plan administrators, not when conducting business), *cert. dismissed*, 474 U.S. 1113, 106 S. Ct. 1167, 89 L. Ed. 2d 288 (1986); *Sutton v. Weirton Steel Div. of Nat'l Steel Corp., 567 F. Supp. 1184 (N.D.W.Va.)*, *aff'd*, *724 F.2d 406 (4th Cir.1983)*, *cert. denied*, **[*15]** 467 U.S. 1205, 104 S. Ct. 2387, 81 L. Ed. 2d 345 (1984) (same).

Since the Lear Defendants were not acting in any ERISA fiduciary capacity in approving the Merger Agreement, *Section 406* simply does not apply to them. *See Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1101 (9th Cir. 2004)* (dismissing *§ 406* claim where defendant was not a fiduciary with respect to the challenged transaction). Therefore, Plaintiff cannot demonstrate a strong likelihood of success on the merits of his claim in Count I of his Complaint. [7]

But, even if the Lear Defendants were deemed to be ERISA fiduciaries for purposes of the sale of Plan assets to the AREP Affiliates, *Section 406* still would not apply to them because they have not *caused* the Plans to engage in a prohibited transaction. *ERISA § 406* is expressly limited to cases in which a fiduciary "causes" the plan "to engage in a [prohibited] transaction." If the defendant-fiduciary does not "cause" the plan "to engage in" a prohibited transaction, there is no claim under *ERISA § 406*. *See Lockheed Corp. v. Spink, 517 U.S. 882, 888-89, 116 S. Ct. 1783, 135 L. Ed. 2d 153 (1996)* **[*16]** ("a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction").

---

[7] These same reasons also establish that Plaintiff cannot demonstrate a strong likelihood of success on the merits on his breach of fiduciary duty claim in Count II.

Here, the Lear Defendants have not "caused" the Plans to engage in a prohibited transaction. The only action that has been taken is the approval of the Merger Agreement by the Director Defendants. No "sale or exchange" of stock held by the Plans will occur unless and until a majority of Lear shareholders -- including the Plan participants -- cause it to happen by voting in favor of the merger. If the shareholders do not approve the merger, it will not occur. If they do approve the merger, it will be the shareholders, not the Defendants, who will "cause" the conversion of all shares to $ 36 per share.

Furthermore, Plaintiff has not demonstrated a strong likelihood of success in establishing that the AREP Affiliates that will be purchasing the Lear stock if the shareholders do approve the merger are "parties in interest" under *ERISA § 406*.

As indicated, the AREP Affiliates are subsidiaries of American Real Estate Partners, L.P. ("AREP"), a Delaware limited partnership. American Property Investors, Inc. ("API"), a Delaware corporation, is the general partner of AREP. Carl Icahn is **[*17]** the owner and Chairman of the Board of API. Icahn also owns approximately 90% of the depository and 86.5% of the preferred units of AREP. He also is the owner of approximately 16% of Lear's outstanding stock. Plaintiff claims that the AREP Affiliates are "parties in interest" because they are affiliates of a limited partnership (AREP) whose general partner (API) is controlled by an individual who owns more than 10% of Lear's common stock.

*ERISA § 3(14), 29 U.S.C. § 1002(14)*, states that a partnership may be considered a party in interest if 50% or more of its capital interest or profits interest is "owned directly or indirectly, or held by a person" who is a direct or indirect owner of 50 % or more of the ERISA employer's stock. *29 U.S.C. § 1002(14)(G), (E)*. The AREP Affiliates do not qualify as parties in interest under this definition. Although it is not disputed that Carl Icahn owns more than 50% of AREP, he does *not* own 50% or more of Lear's common stock.

*ERISA § 3(14)* also states that an entity may be considered a party in interest if it is a "10 percent or more shareholder directly or indirectly" of the ERISA employer. *29 U.S.C. § 1002(14)(H), (C)*. The AREP Affiliates are not parties **[*18]** in interest under this definition, either. Plaintiff does not allege that the AREP Affiliates own any Lear stock. Nor does Plaintiff allege that entities controlled by the AREP Affiliates, e.g., subsidiaries, own any Lear stock. Therefore, the AREP Affiliates are not parties in interest under this definition.

Plaintiff, however, claims that the AREP Affiliates are parties in interest under this definition because Carl Icahn owns more than 10% of Lear stock and Icahn controls API and AREP. However, this "alter ego" theory -- that an entity is a party in interest if it is controlled by someone who would be a party in interest under the statute -- has been squarely rejected. In *Reich v. Compton, 57 F.3d 270 (3rd Cir. 1995)*, the court (in an opinion authored by now Justice Alito) held that a "corporation wholly controlled" by a party in interest was not itself a party in interest for purposes of *ERISA § 406*. The court determined that the definition of party in interest under *Section 406* should be strictly construed, noting that had it wanted to, Congress could easily have provided that an alter ego/shell corporation of a party in interest is also a party in interest, but did not do so. *Id. at 277*. **[*19]** Permitting a plaintiff to use an alter ego theory to expand the entities considered as parties in interest would "upset the carefully crafted and detailed legislative scheme Congress created." *Id. at 274*. *See also Jordan v. Michigan Conference of Teamsters Welfare Fund, 207 F.3d 854, 860 (6th Cir. 2000)* (finding that "ERISA must be strictly construed" and that "the transactions prohibited by *ERISA § 406* cannot be interpreted broadly").

Plaintiff also argues that the AREP Affiliates are parties in interest because AREP is "controlled" by Defendant Vincent Intrieri, who is also on Lear's Board of Directors. Putting aside for the moment the fact that Plaintiff's claim that Intrieri controls AREP is contradicted by his claim that Carl Icahn owns and controls AREP, *ERISA § 3(14)* identifies parties in interest in terms of who owns the entity in question, what percentage that person owns, and what that person's relationship with the employer is. Plaintiff has made no allegations regarding Intrieri's ownership of Lear stock or interest in the AREP Affiliates. The Court simply cannot consider the AREP Affiliates to be parties in interest based on Plaintiff's conclusory assertion that AREP is **[*20]** controlled by Intrieri.

For all of the foregoing reasons, the Court finds that Plaintiff has failed to demonstrate a strong likelihood of success on the merits of his claims. A finding that there is no likelihood of success on the merits "is usually fatal" to a movant's preliminary injunction motion. *Raymond James & Associates, Inc. v. Leonard & Company, 411 F. Supp. 2d 689, 693 (E.D. Mich. 2006)*, (citing *Gonzales v. Nat'l Bd. of Medical Examiners, 225 F.3d 620, 625 (6th Cir. 2000))*. Nonetheless, the Court will proceed to examine the other preliminary injunction factors.

## 2. PLAINTIFF HAS FAILED TO DEMONSTRATE IRREPARABLE HARM

It is well-settled that a plaintiff's harm is not irreparable if it is fully compensable by money damages. *Taubman v. Webfeats,*

*319 F.3d 770, 777 (6th Cir. 2003)*; *see also Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992)*. Such "harm" includes alleged losses in value of stock. *See e.g., Beztak Co. v. Bank One Columbus, N.A., 811 F. Supp. 274, 285 (E.D. Mich. 1992)* (holding that "losses due to depressed stock prices . . . are compensable . . . monetary losses [that] do not constitute irreparable harm.").

In this case, Plaintiff himself seems to acknowledge **[\*21]** that his losses are compensable by money damages as the remedy he seeks in his "Prayer for Relief" in his Complaint is "[a]n Order enjoining the sale of any stock held by the Plans, ***or in the alternative, an increase in the amount being offered for Company stock***." [Complaint, Prayer for Relief, P B.]

Because Plaintiff can be fully compensated by money damages, he has failed to demonstrate such irreparable harm that would entitle him to a preliminary injunction.

3. <u>HARM TO THIRD PARTIES</u>

The third factor, whether issuance of the requested preliminary injunction would cause harm to others, also weighs against its issuance. Harm to others includes harm to the defendant. *Chrysler Corp. v. Franklin Mint Corp., 1994 U.S. App. LEXIS 18389, 1994 WL 378144, \*2 (6th cir. 1994)*. Here Plaintiff, one individual Plan participant, wants the Court to take action that could harm all Lear stockholders and Plan participants -- by denying them the right to vote on whether they want the merger to occur and the right to receive $ 36 per share of stock they hold. [8] Although Plaintiff suggests that the Lear Defendants would suffer no harm because they "could still proceed with the Buy Out and acquire Lear's outstanding stock except for **[\*22]** the Plans' 1.5 million shares," this ignores the fact that the Merger Agreement requires that " *each* share" and "*all* shares" of Lear stock be cancelled prior to the merger and that those stocks "shall cease to exist." Plaintiff's assertion that 1.5 million shares could be held back from the merger, thus, is a fiction.

4. <u>A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST</u>

Finally, the Court finds that the public interest would not be served by the issuance of a preliminary injunction in this case. An injunction here could impede future mergers and the efficient functioning of capital markets. Moreover, the public interest favors corporations' abilities to make business decisions that have nothing to do with the management or

administration of plan assets unhindered by ERISA's restrictions. The cases Plaintiff relies upon are inapposite. None of those cases involve a situation in which the plaintiffs sought to use ERISA to preliminarily enjoin a merger.

IV. CONCLUSION

For all of the foregoing reasons, the Court finds that Plaintiff **[\*23]** has failed to establish the circumstances here warrant the issuance of a preliminary injunction. Therefore,

IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction is DENIED.

s/ Gerald E. Rosen

United States District Judge

Dated: June 25, 2007

---

[8] Although Plaintiff personally deems the amount to be inadequate, the Court notes that the Delaware Court of Chancery found $ 36 per share to be reasonable.

# Tab I

 Cited

As of: February 28, 2019 8:43 PM Z

# *Schaufenbuel v. InvestForClosures Fin., L.L.C.*

United States District Court for the Northern District of Illinois, Eastern Division

September 30, 2009, Decided; September 30, 2009, Filed

Case No. 09 C 1221

**Reporter**

2009 U.S. Dist. LEXIS 91269 *; Fed. Sec. L. Rep. (CCH) P95,363

BRADLEY J. SCHAUFENBUEL, et al., Plaintiffs, v. InvestForClosures FINANCIAL, L.L.C., et al., Defendants.

## Core Terms

Entities, securities, motion to dismiss, investors, principals, investments, fraudulent, alleges, dismissal without prejudice, Indenture, grounds, breach of contract claim, fraudulent scheme, motion to strike, breach of contract, fraud allegations, plaintiff's claim

**Counsel: [*1]** For Bradley J Schaufenbuel, Robert N Schaufenbuel, John Reed, IV, Sarah Reed, John Reed, III, Jan Reed, American Mass Media Corporation, Roberta K Clark, Plaintiffs: Robert Craig Thurston, LEAD ATTORNEY, Thurston Law Offices, P.C., Huntley, IL; Joel Martin Weiner, Law Offices of Joel M. Weiner, Palatine, IL.

For Maria A Valentin, Liam A Angelini, Keith A. Raines, Bonnie C. Raines, Ravikumar Jammalamadaka, Sumathi Jammalamadaka, Paul J Herink, G Matthew Knowlton, Wilhelm Hall, Kathleen F Markus, Jonathan Patton, Kathleen Tajak, Ruth Halverson, as Trustee of the Halverson Family Trust, Dave Hale, Joseph Cavaluzzi, Joseph S Pearse, Andrew Kaufman, Frank M Cupp, Thomas Snyder, Mary O'Sullivan-Snyder, as Administrator of the Estate of Sarah Pearse, Patrick O'Sullivan, Daniel Sullivan, Kailash Gupta, Kanta Gupta, Nishant Gupta, Natasha Gupta, William R Richoz, on behalf of Themselves and All Others Similarly Situated, Plaintiffs: Robert Craig Thurston, LEAD ATTORNEY, Thurston Law Offices, P.C., Huntley, IL.

For InvestForClosures Financial, L.L.C., ROI Developers, InvestForClosures, InvestForClosures.com, LLC, InvestForClosures Ventures, LLC, Sands of Gold Escrow, Sands of Gold, ROI Financial, **[*2]** Realty Opportunities International Escrow 23, ROI Escrow, Defendants: Elaine Cindy Davenport, LEAD ATTORNEY, Sanchez & Daniels, Chicago, IL; Hugh C. O'Donnell, Nora Catherine Elias, Sanchez Daniels & Hoffman, LLP, Chicago, IL.

For Sands of Gold Estates, Defendant: Hugh C. O'Donnell,

Sanchez Daniels & Hoffman, LLP, Chicago, IL.

For Francis X Sanchez, also known as Frank Sanchez, James D Bourassa, also known as Jim Bourassa, Richard Sanchez, Salomon Sanchez Jr., Defendants: Elaine Cindy Davenport, Sanchez & Daniels, Chicago, IL; Hugh C. O'Donnell, Nora Catherine Elias, Sanchez Daniels & Hoffman, LLP, Chicago, IL.

James D Bourassa, also known as Jim Bourassa, Defendant, Pro se, Gilberts, IL.

For Deana M Guidi, Darcey L Martin, Tom Rodriguez, Defendants: Charles A. Dunlop, LEAD ATTORNEY, Genevieve M Lynott, Russell Wade Baker, Campion, Curran, Dunlop & Lamb, P.C., Crystal Lake, IL.

**Judges:** Hon. Harry D. Leinenweber, United States District Judge.

**Opinion by:** Harry D. Leinenweber

## Opinion

### MEMORANDUM OPINION AND ORDER

Before the Court are three Motions to Dismiss: A Motion to Dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(2)* for lack of personal jurisdiction filed by Defendant Darcey L. Martin, a Joint Motion to Dismiss **[*3]** pursuant to *Federal Rule of Civil Procedure 12(b)(6)* filed by Defendants Martin, Deana M. Guidi, and Tom Rodriguez, and a Joint Motion to Dismiss pursuant to *Rule 12(b)(6)* filed by Defendants InvestForClosures Financial, L.L.C., InvestForClosures.com LLC, InvestForClosures Ventures, LLC (collectively, the "IFC Entities"), and Francis Sanchez. Also pending is a Motion to Strike filed by Plaintiffs. For the following reasons, Defendant Martin's *Rule 12(b)(2)* Motion to Dismiss is denied; Defendants Martin, Guidi, and Rodriguez's *Rule 12(b)(6)* Motion to Dismiss is granted; and the *Rule 12(b)(6)* Motion to Dismiss of Defendant Sanchez and the IFC Entities'

is granted in part and denied in part; and Plaintiffs' Motion to Strike is granted.

# I. BACKGROUND

This action stems from Plaintiffs' investments in various "InvestForClosures" entities which, they claim, Defendants procured by fraudulent means and then refused to repay. Defendants include four entities whose names all include the term "InvestForClosures," including the IFC Entities, and several individuals who, Plaintiffs claim, control or are affiliated with the IFC Entities. Plaintiffs bring seventeen claims, on behalf of themselves and **[*4]** all others similarly situated, for violations of the Securities Act of 1933 (Count 1) and the Securities Exchange Act of 1934 (Count 2), fraud (Count 3), breach of fiduciary duty (Count 4), civil conspiracy (Count 5), violation of the Illinois Uniform Fraudulent Transfer Act (Count 6), unjust enrichment (Count 7), constructive trust (Count 8), violation of the Illinois Consumer Fraud Act (Count 9), piercing the organizational veil (Count 10), conversion (Count 11), violation of the Illinois Securities Law (Count 12), breach of contract (Count 13), violation of the Investment Advisers Act of 1940 (Count 14), violation of the Trust Indenture Act (Count 15), civil RICO violation (Count 16), and violation of the Money Laundering Act (Count 17).

All of Plaintiffs' claims relate to the same alleged fraudulent scheme whereby Defendants induced Plaintiffs to purchase unregistered high-interest debt securities from IFC Entities. According to Plaintiffs, Defendants fraudulently told them that their investment money would be used to refurbish and sell distressed properties, which never happened, and to develop a resort in Mexico, which never existed. Further, Plaintiffs claim, Defendants would **[*5]** use the funds obtained from later investors to pay off earlier investors and, as a result, most investors, including Plaintiffs, never received any payment at all. Plaintiffs claim that Defendants have retained over $ 8 million of their investment money.

The Complaint originally named thirty-two separate defendants and thirty "John Does" but Plaintiffs have dismissed some defendants voluntarily as of April 27, 2009, the date they filed the most recent Complaint. Seven defendants, including Martin, Guidi, Rodriguez, Sanchez, and the IFC Entities, have moved to dismiss the Complaint in its entirety. The IFC Entities are separate entities which, Plaintiffs claim, received or solicited investment money. Allegedly, Defendant Martin acted as a liaison between the IFC Entities and the investors and Defendant Guidi was General Counsel of the IFC Entities and interacted with investors. The Complaint also alleges that Defendant Rodriguez was the accountant for the IFC Entities and transferred IFC funds to Defendant Sanchez, who was the Chief Executive Officer of the IFC Entities and the mastermind of the fraud.

# II. DISCUSSION

## A. Defendant Darcey L. Martin's *Rule 12(b)(2)* Motion

Defendant Martin moves **[*6]** to dismiss the Complaint on the grounds that the Court's exercise of personal jurisdiction over her violates the *Fifth Amendment's due process clause* because she is a Florida resident and has insufficient contacts with Illinois. However, Plaintiffs bring Count 2 of the Complaint pursuant to the Securities Exchange Act of 1934 which provides:

> Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter . . . may be brought in any such district . . . and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

*15 U.S.C. § 78aa.*

Because the Securities Exchange Act expressly authorizes nationwide service of process, the Court's jurisdictional due process inquiry turns on defendant's contacts with the United States as a whole, rather than with the state in which the court sits. *See Lisak v. Mercantile Bancorp, Inc., 834 F.2d 668, 671-72 (7th Cir., 1987).* That is because where a statute authorizes nationwide service of process and a defendant resides within the territorial boundaries **[*7]** of the United States the government's exercise of power over them in any of its courts is justified. *Fitzsimmons v. Barton, 589 F.2d 330, 333-34 (7th Cir. 1979)* (holding that in action brought under Securities Exchange Act sufficient contacts between defendant and the United States must exist, but contacts with the specific forum are unnecessary); *see also Board of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc., 212 F.3d 1031, 1035-36 (7th Cir., 2000); Diamond Mortg. Corp. of Illinois v. Sugar, 913 F.2d 1233, 1244 (7th Cir., 1990).* The Seventh Circuit has held that the nationwide service of process provision in the Securities Exchange Act comports with due process, *Fitzsimmons, 589 F.2d at 333-34*, and the Court is bound by the Seventh Circuit's ruling. Thus, because Martin resides in the United States, the Court's exercise of personal jurisdiction over her in this case is proper and her Motion to Dismiss pursuant to *Rule 12(b)(2)* is denied.

## B. Defendants' *Rule 12(b)(6)* Motions

### 1. Standard of Review

It is undisputed that Rule 9(b)'s heightened pleading standard applies to at least some of Plaintiffs' claims but the parties dispute which ones. Under *Rule 9(b)*, [*8] "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The parties disagree on the meaning of the term "alleging fraud" with respect to each of Plaintiffs' claims. Plaintiffs concede that *Rule 9(b)* applies to Count 1 (violation of the Securities Act of 1933), Count 2 (violation of the Securities Exchange Act of 1934), Count 3 (common law fraud), Count 6 (violation of Illinois UFTA), and Count 16 (civil RICO). Defendants argue that Count 4 (breach of fiduciary duty), Count 5 (civil conspiracy), Count 7 (unjust enrichment), Count 8 (constructive trust), Count 9 (violation of Illinois Consumer Fraud Act), Count 10 (piercing the legal entity), Count 11 (conversion), Count 12 (violation of Illinois Securities Law), Count 14 (violation of the Investment Advisers Act of 1940), Count 15 (violation of the Trust Indenture Act of 1939), and Count 17 (violation of the Money Laundering Act of 1939) are also subject to Rule 9(b)'s heightened pleading standard because these claims are based upon underlying fraud. Thus, it is Defendants' position that only Count 13 (breach of contract) is not subject to Rule 9(b)'s heightened pleading [*9] standard.

The law in this Circuit is well-settled that the applicability of Rule 9(b)'s heightened pleading standard turns not on the title of the claim but on the underlying facts alleged in the complaint. *Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502 (7th Cir., 2007).* Where a claim, whatever its title, "sounds in fraud," meaning it is premised upon a course of fraudulent conduct, *Rule 9(b)* may be implicated. *Id.* Here, the Complaint and Plaintiffs' briefs in response to the pending motions to dismiss are riddled with references to the fraudulent scheme in which they allege Defendants participated. It is this alleged fraudulent scheme that underlies the entire Complaint. Counts 1-12, 14, 16, and 17 all rest solely upon the alleged fraud and therefore are subject to *Rule 9(b).*

*Rule 9(b)* requires a party to "state with particularity the circumstances constituting fraud or mistake." Courts interpret the "circumstances" reference in *Rule 9(b)* to require plaintiff to plead the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. *See*

*Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing Services, Inc., 536 F.3d 663, 669 (7th Cir., 2008)*; [*10] *Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir., 1999)* (*Rule 9(b)* requires the complaint to set forth "the who, what, where, and when of the alleged fraud"); *Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 777 (7th Cir., 1994).* The purpose of this rule is "to force the plaintiff to do more than the usual investigation before filing his complaint" because "public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)." *Ackerman, 172 F.3d at 469.*

The remaining Counts 13, for breach of contract, and 15, for a violation of the Trust Indenture Act, exist independent of the alleged fraudulent scheme and, therefore, are subject to *Rule 8(a)*'s more lenient notice pleading standard. However, even under *Rule 8(a)*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant [*11] is liable for the misconduct alleged." *Iqbal, 129 S.Ct. at 1949.* A complaint need not set forth all of the relevant facts but it must describe the claim with sufficient detail so as to provide the defendants with fair notice of what the claim is and the grounds upon which it rests. *See FED. R. CIV. P. 8(a)*; *E.E.O.C. v. Concentra Health Services, Inc., 496 F.3d 773, 776 (7th Cir., 2007).* The Court accepts as true all well-pleaded facts alleged in the complaint and draws all reasonable inferences in a light favorable to the plaintiff. *See Twombly, 550 U.S. at 555-56.* However, the Court need not accept as true legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Iqbal, 129 S.Ct. at 1949.*

### 2. The Sufficiency of the Complaint's Fraud-Based Claims

The Court will first examine the fraud claim found in Count 3 of the Complaint because the viability of most of Plaintiffs' claims turns on the sufficiency of their fraud claim. In other words, if Plaintiffs have failed to plead fraud adequately, Counts 1-12, 14, 16, and 17 also fail because all of these claims are based upon the same underlying fraud alleged in [*12] Count 3. *See Borsellino, 477 F.3d at 507-08*; *National Council on Compensation Ins., Inc. v. American Intern. Group, Inc., No. 07-2898, 2009 U.S. Dist. LEXIS 14524, 2009 WL 466802 (N.D.Ill., Feb. 23, 2009)*; *McKee v. Pope Ballard*

*Shepard & Fowle, Ltd., 604 F.Supp. 927 (N.D.Ill., 1985).*

For example, Plaintiffs' securities claims (Counts 1 and 2) rest upon the allegation that "[t]he IFC entities took the accumulated investments and concealed the money in Mexico while falsely representing to investors that the IFC entities were actively engaged in developing the Sands of Gold Estates in Playa Ventura, Mexico." (Compl. P 154.) Plaintiffs' breach of fiduciary duty claim (Count 4) relies on the allegation that "the IFC principals breached their fiduciary duties to Plaintiffs by failing to invest Plaintiffs' money as represented but instead transferring it to and concealing it in Mexico with no intent on returning Plaintiffs' investments or paying the interest or return on such investments." (Compl. P 197.) Plaintiffs' civil conspiracy claim (Count 5) relies upon the allegation that "[t]he IFC principals sought investments from Plaintiffs by falsifying the purpose of the investments so that they could unlawfully conceal [*13] the money in Mexico shielded from the claims of Plaintiffs for the return on their investments." (Compl. P 201.) These allegations, which appear consistently throughout Counts 1-12, 14, 16 and 17, refer to the same alleged fraudulent scheme that forms the basis of Count 3. Accordingly, Plaintiffs must plead fraud sufficiently in order for Counts 1-12, 14, 16 and 17 to survive.

Under applicable Illinois law, a plaintiff must allege the following elements to state a claim for fraud:

> (1) a representation of a material fact by defendant,
> (2) the representation was false,
> (3) defendant knew the statement was false at the time he or she made it,
> (4) plaintiff justifiably relied upon the statement,
> (5) defendant made the statement to induce plaintiff to take some act, and
> (6) plaintiff was injured as a result of his or her reliance.

*Davis v. G.N. Mortg. Corp., 396 F.3d 869, 881-82 (7th Cir., 2005)* (citing *Capiccioni v. Brennan Naperville, Inc., 339 Ill. App. 3d 927, 791 N.E.2d 553, 558, 274 Ill. Dec. 461 (Ill.App.Ct., 2003)*.

Here, Plaintiffs have not alleged fraud adequately with respect to any defendant and, therefore, Counts 1-12, 14, 16 and 17 fail. Throughout, the Complaint refers to Defendants collectively: "IFC systematically misrepresented [*14] returns and interest that would be earned" (Compl. P 6), "IFC continued to promise investors that their return would be forthcoming" (Compl. P 8), "Investors were told by Defendants" (Compl. P 124), "[t]he IFC entities failed to disclose" (Compl. P 130), "the IFC principals would move investors [sic] money around from banking institution to banking institution" (Compl. P 133), "the IFC entities did little or no actual property flipping business" (Compl. P 134), "[t]he IFC principals told prior investors" (Compl. P 137), "the IFC principals used false incentives" (Compl. P 137), "the IFC principals [falsely] represented that such certificates were being issued" (Compl. P 139), "the IFC principals continued to make false and fraudulent representations" (Compl. P 140), "Defendants were selling property in Mexico that they didn't own or have the right to sell" (Compl. P 142), and the list goes on. The Complaint defines the terms "IFC," "IFC entities," "IFC principals," and "Defendants" to include multiple individuals and entities. Thus, it is impossible to discern from the Complaint which Defendant made which fraudulent representation.

The only instances where the Complaint identifies the [*15] speaker of a fraudulent statement are found in paragraphs 85-87 where Plaintiffs allege that Defendants Sanchez and Bourassa made fraudulent statements to certain individuals, none of whom is a plaintiff in this case. As a result, the statements identified in paragraphs 85-87 cannot form the basis of Plaintiffs' fraud claim because Plaintiffs cannot show that they relied upon statements made to others. *See Regnery v. Wallerich, 626 F.Supp.2d 872, 875 (N.D.Ill., 2009)*.

As the Seventh Circuit explained in *Ackerman* and *Vicom*, the group pleading employed by Plaintiffs in the Complaint is insufficient under *Rule 9(b)*. Accordingly, Count 3 (common law fraud), and Counts 1, 2, 4-12, 14, 16, and 17 which all rest upon the same alleged fraudulent scheme, are dismissed without prejudice.

### 3. The Sufficiency of the Complaint's Remaining Claims

#### a. Breach of Contract (Count 13)

The Complaint brings a breach of contract claim against all Defendants on the grounds that the IFC entities and IFC principals have refused and failed to pay Plaintiffs according to their investment agreements despite Plaintiffs' demands for payment. Under applicable Illinois law, a plaintiff must allege the following elements [*16] to state a claim for breach of contract:

> (1) the existence of a valid contract between plaintiff and defendant,
> (2) performance by plaintiff,
> (3) breach by defendant, and
> (4) damages to plaintiff as a result of defendant's breach.

*Priebe v. Autobarn, Ltd., 240 F.3d 584, 587 (7th Cir., 2001)* (citing *Hickox v. Bell, 195 Ill. App. 3d 976, 552 N.E.2d 1133,*

*1143, 142 Ill. Dec. 392 (Ill.App.Ct., 1990).*

Defendants Martin, Guidi and Rodriguez moved to dismiss the breach of contract claim on the grounds that the Complaint fails to allege the existence of any contract between them and Plaintiffs. Their argument is well-founded; the Complaint does not allege that any of them are party to a contract with Plaintiffs and, accordingly, Count 13 is dismissed without prejudice with respect to Defendants Martin, Guidi and Rodriguez.

Defendants Sanchez and the IFC Entities also moved to dismiss this claim on the grounds that the Complaint fails to identify which Defendants had contracts with Plaintiffs, and which Defendants breached those contracts. However, the Complaint and the documents attached to it support Plaintiffs' claim that Defendants InvestForClosures Ventures, LLC, and InvestForClosures Financial, L.L.C., entered into investment agreements [*17] with Plaintiffs and, because the Complaint adequately alleges the remaining elements of breach of contract with respect to these two Defendants, Plaintiffs' breach of contract claim against them survives. Plaintiffs' breach of contract claim is dismissed without prejudice with respect to Defendant InvestForClosures.com LLC because neither the allegations of the Complaint nor the documents attached to it indicate that InvestForClosures.com entered into any contract with any Plaintiff.

Plaintiffs also bring a breach of contract claim against Defendant Sanchez who signed the investment agreements. However, Sanchez signed these agreements in his capacity as Chief Executive Officer of InvestForClosures Ventures, LLC, and InvestForClosures Financial, L.L.C., not in his personal capacity and thus he is not personally liable for any breach by those Defendants. *See Radioactive Energy of Illinois, LLC v. GZ Gourmet Foods & Beverage, Inc., No. 08-311, 2009 U.S. Dist. LEXIS 14029, 2009 WL 458616, at *7 (N.D.Ill., Feb. 24, 2009)* (citing *White & Brewer Trucking, Inc. v. Donley, 952 F.Supp. 1306, 1315-16 (C.D.Ill., 1997)*; *Wottowa Ins. Agency, Inc. v. Bock, 104 Ill. 2d 311, 472 N.E.2d 411, 413, 84 Ill. Dec. 451 (Ill., 1984)).* Accordingly, Plaintiffs' breach of [*18] contract claim is dismissed without prejudice with respect to Defendant Sanchez.

*b. Violation of the Trust Indenture Act (Count 15)*

Plaintiffs bring a claim against all Defendants for violating the Trust Indenture Act, *15 U.S.C. § 77aaa et seq.* (the "Act"), by selling unregistered securities to Plaintiffs and by failing to provide Plaintiffs with certain information required by the Act. The Act specifically prohibits any person from selling unregistered securities or selling registered securities without a prospectus containing the requisite information. *15 U.S.C. § 77fff.*

Defendants Martin, Guidi and Rodriguez moved to dismiss this claim on the grounds that the Complaint does not allege they sold any securities. The Court agrees. Although the Complaint contains the conclusory allegation that "Defendants offered to sell, sold, and issued securities and/or indentures" it offers nothing else to support this conclusion with respect to Defendants Martin, Guidi, or Rodriguez. The Complaint merely alleges that Defendant Martin acted as a liaison between investors and the IFC entities after the investors had purchased their securities and not that she actually sold any securities. The Complaint [*19] alleges that Defendant Guidi acted as General Counsel for the IFC entities and that she interacted with investors, but it does not allege that she sold any securities. With respect to Defendant Rodriguez, the Complaint alleges only that he was the staff accountant for the IFC entities and not that he sold any securities. Thus, the Trust Indenture Act does not apply to Martin, Guidi, or Rodriguez and Count 15 is dismissed without prejudice with respect to them.

Defendant Sanchez and the IFC Entities fare differently with respect to this claim. The Complaint alleges that Sanchez communicated directly with, and sold securities to, potential investors and that the IFC Entities were the issuing entities. Thus, the Act applies to Sanchez and the IFC Entities and their motion to dismiss is denied with respect to Count 15.

### C. Plaintiffs' Motion to Strike

After briefing on Defendants' Motions to Dismiss concluded, Plaintiffs filed a motion to strike a portion of the reply brief submitted by Defendants Martin, Guidi, and Rodriguez which quoted and characterized an excerpt of a letter from Plaintiffs' counsel to the Attorney Review and Disciplinary Commission. In that excerpt, Plaintiffs' counsel [*20] stated that Defendant Martin, who is also an investor in the IFC Entities, "should have come to [him] to discuss letting her out of the case." Defendants Martin, Guidi, and Rodriguez characterize this statement as evidence that Plaintiffs are unaware of any wrongdoing by Defendant Martin, but named her as a defendant anyway in order to conduct unwarranted discovery and pressure her to settle. Plaintiffs seek to strike this portion of the reply brief on the grounds that it is unfairly prejudicial and concerns inadmissible settlement discussions.

Under *Federal Rule of Civil Procedure 12(f)*, the Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Without taking any position on the meaning of the quoted statement by Plaintiffs' counsel, the Court finds that the statement is immaterial to the sufficiency of the Complaint. Accordingly, Plaintiff' motion to strike is granted and that portion of Defendants' reply brief

addressing the statement is stricken.

### III. <u>CONCLUSION</u>

For the reasons stated herein, the Court rules as follows:

1. Defendant Martin's *Rule 12(b)(2)* Motion to Dismiss for lack of personal jurisdiction is denied.

2. Defendants Martin, **[*21]** Guidi, and Rodriguez's *Rule 12(b)(6)* Motion to Dismiss the Complaint is granted and the Complaint is dismissed in its entirety, without prejudice, with respect to Defendants Martin, Guidi, and Rodriguez.

3. Defendants Sanchez and the IFC Entities' *Rule 12(b)(6)* Motion to Dismiss is granted in part and denied in part; with respect to Defendants Sanchez and InvestForClosures.com LLC, Count 15 survives but Counts 1-14, 16, and 17 are dismissed without prejudice; with respect to Defendants InvestForClosures Financial, L.L.C., and InvestForClosures Ventures LLC, Counts 13 and 15 survive but Counts 1-12, 14, 16, and 17 are dismissed without prejudice.

4. Plaintiffs' Motion to Strike is granted.

**IT IS SO ORDERED.**

/s/ Harry D. Leinenweber

Harry D. Leinenweber, Judge

United States District Court

**DATE:** 9/30/2009

**End of Document**

# Tab J

No *Shepard's* Signal™
As of: February 28, 2019 8:39 PM Z

## *Vandehey v. Sequium Asset Sols., LLC*

United States District Court for the Eastern District of Wisconsin

February 1, 2019, Decided; February 1, 2019, Filed

Case No. 18-C-1086

**Reporter**

2019 U.S. Dist. LEXIS 16414 *

JACQUELYN A. VANDEHEY, individually and on behalf of all others similarly situated, Plaintiff, v. SEQUIUM ASSET SOLUTIONS, LLC and JOHN DOES, Defendants.

## Core Terms

credit card, consumer, unsophisticated, amount of debt, collection, confused, alleges, motion to dismiss, survive, lists, mail, debt collector, misleading, argues, notice, inferences, transacted, practices, abusive, labeled, website, places, days, intelligence, verification, conclusions, accurately, deductions, deceptive, possesses

**Counsel:** **[\*1]** For Jacqueline A Vandehey, individually and on behalf of all others similarly situated, Plaintiff: Francis R Greene, Philip D Stern, Andrew T Thomasson, Stern Thomasson LLP, Springfield, NJ.

For Sequium Asset Solutions LLC, a Georgia Limited Liability Company, Defendant: John P Loringer, Kevin F Geary, Sarah A Gallas, Wilson Elser Moskowitz Edelman & Dicker LLP, Milwaukee, WI.

**Judges:** William C. Griesbach, Chief United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### DECISION AND ORDER

Plaintiff Jacquelyn A. Vandehey, on behalf of herself and all others similarly situated, filed this action against Sequium Asset Solutions, LLC and several John Does (collectively, Sequium), alleging that Sequium violated the *Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692, et seq.* Specifically, Vandehey alleges that a letter she received from Sequium that sought to collect a debt she owed failed to state the amount of the debt and the name of the creditor, in

violation of *§ 1692g*, and was false, deceptive, and misleading, in violation of *§ 1692e*. Presently before the court is Sequium's motion to dismiss the complaint for failure to state a claim. For the reasons below, Sequium's motion will be granted in part and denied in part.

### LEGAL STANDARD

**[\*2]** "A motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 736 (7th Cir. 2014)*; *Fed. R. Civ. P. 12(b)(6)*. To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. "While a plaintiff need not plead 'detailed factual allegations' to survive a motion to dismiss, she still must provide more than mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action' for her complaint to be considered adequate under *Federal Rule of Civil Procedure 8*." *Bell v. City of Chicago, 835 F.3d 736, 738 (7th Cir. 2016)* (quoting *Iqbal, 556 U.S. at 678*). When reviewing a motion to dismiss under *Rule 12(b)(6)*, a court must "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak v. City of Chicago, 810 F.3d 476, 480-81 (7th Cir. 2016)*. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal, 556 U.S. at 678*. In the FDCPA context, "a plaintiff fails to state a claim and dismissal is appropriate as a matter of law when it is 'apparent from a reading of the letter that not even a significant fraction of the population would be misled by it.'" *Zemeckis v. Global Credit & Collection Corp., 679 F.3d 632, 636 (7th Cir. 2012)* (quoting *Taylor v. Cavalry Inv., L.L.C., 365 F.3d 572, 574*

*(7th Cir. 2004))*.

## ALLEGATIONS OF THE COMPLAINT

Vandehey alleges that she received a letter dated August 4, 2017 from Sequium, a debt collector, who sought to collect a debt she owed to a creditor. The August 4, 2017 letter, which is attached as an exhibit to the complaint, was the initial written communication Sequium sent to Vandehey to collect the Debt. Vandehey's debt is a financial credit card obligation that arose out of one or more transactions entered into primarily for personal, family, and household purposes. The Debt was assigned to Sequium for the purpose of collection after Vandehey defaulted.

At the top of the letter is Sequium's name, address, phone number, and hours of operation. Below this information is a table labeled "Account Information," which lists the date, reference number, creditor name, account number, and the total due. The entry for "Creditor Name" is "BLAZE CREDIT CARD." ECF No. 1, Ex. A. Vandehey alleges that Blaze Credit Card is a financial product, not the name of a creditor, and therefore Sequium failed to name the creditor to whom the debt is owed. The "Total Due" is listed as $521.25. *Id.* A similar table with the same information appears **[*3]** in the bottom-right corner of the letter.

The body of the letter informs Vandehey of different payment options. Specifically, the letter states:

> If you would like to make a payment on your account we have three convenient ways to pay:
>
> • **Pay by phone**: Please call the number listed above and speak with a representative.
>
> • **Pay by Mail**: Please enclose the bottom portion of this letter with your payment.
>
> • **Pay Client Directly**: Pay from an old statement or contact the creditor directly.

*Id.* Vandehey alleges that the Pay Client Directly option is confusing and misleading to an unsophisticated consumer because the letter does not identify the "Client" or "the creditor" and because reference to an "old statement" when the letter already states a "Total Due" makes the amount due on the date of the letter unclear.

After the payment options and below Sequium's signature, the letter states:

> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt, or any portion **[*4]** thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different for [sic] the current creditor.

*Id.*

On the letter's left side, a table labeled "PAY ONLINE" informs Vandehey that she can pay on Sequium's website, which is a fourth, unenumerated payment option. Below Sequium's website URL is the statement: "We accept Visa & Mastercard." *Id.* Should Vandehey choose to mail a payment, the letter includes at the bottom of the first page a mailing slip that she is instructed to detach and return with payment. Above the mailing slip, the letter states in all caps that it is from a debt collector and is an attempt to collect a debt.

Vandehey filed this action alleging that Sequium's letter violates *§§ 1692e* and *1692g*.[1] Vandehey seeks to represent a class and to obtain relief in the form of actual and statutory damages, as well as costs and reasonable attorneys' fees should she prevail.

## ANALYSIS

### A. Unsophisticated Consumer Standard

Congress' express purpose in **[*5]** enacting the FDCPA was "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *15 U.S.C. § 1692(e)*; *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 602, 130 S. Ct. 1605, 176 L. Ed. 2d 519 (2010)*. In this circuit, a debt collection letter's compliance with the FDCPA is evaluated under an "unsophisticated consumer" standard, meaning the letter must "be clear and comprehensible to an individual who is 'uninformed, naive, [and] trusting' but not without a rudimentary knowledge about the financial world or incapable

---

[1] Vandehey has withdrawn any potential claims related to Sequium's website or the disclosures under *§ 1692g(a)(5)*. ECF No. 16 at 16 n.2.

of making basic deductions and inferences." *Zemeckis, 679 F.3d at 635* (quoting *Veach v. Sheeks, 316 F.3d 690, 693 (7th. Cir. 2003))*. An unsophisticated consumer "is wise enough to read collection notices with added care" and possesses "reasonable intelligence." *Boucher v. Fin. Sys. of Green Bay, Inc., 880 F.3d 362, 366 (7th Cir. 2018)* (citing *Williams v. OSI Educ. Servs., Inc., 505 F.3d 675, 678 (7th Cir. 2007))*. Moreover, "while our unwary debtor may tend to read collection letters literally, he does not interpret them in a bizarre or idiosyncratic fashion." *Pettit v. Retrieval Masters Creditors Bureau, Inc., 211 F.3d 1057, 1060 (7th Cir. 2000)*. Although the unsophisticated consumer "is not a dimwit," he does not parse collection letters like a patent lawyer construes a patent. *Lox v. CDA, Ltd., 689 F.3d 818, 822 (7th Cir. 2012)*; *cf. Russell v. Equifax A.R.S., 74 F.3d 30, 34 (2d Cir. 1996)*.

## B. FDCPA Claims

Sequium moves **[*6]** to dismiss Vandehey's complaint on the grounds that she pleads no facts that support her claims that Sequium's letter failed to include the required validation information under *§ 1692g* or was false, deceptive, or misleading under *§ 1692e*. Vandehey first alleges that the letter failed to state the amount of the debt under *§ 1692g(a)(1)*. Although the letter lists $521.25 as the "Total Due" in two different places, Vandehey argues that the letter's statement that Vandehey can "pay from an old statement" adds "confusing other information (or misinformation)" that leaves an unsophisticated debtor confused as to what the amount of the debt is because, due to the addition of interest and late fees, the amount of debt on any "old statement" could be different than $521.25. *See Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C., 214 F.3d 872, 876 (7th Cir. 2000)*. Sequium counters that the mere fact that a payment can be made from an old statement does not make the amount of the debt unclear because the total due as of the letter's date is readily available in two places in the letter. To be confused about the amount of debt would require, Sequium argues, a willful choice to remain ignorant of the stated amount of the debt.

Sequium's letter clearly and accurately states the amount of the debt. The letter **[*7]** plainly lists the "Total Due" as $521.25 in two places, which is "clear[] enough that the recipient is likely to understand it." *See Chuway v. Nat'l Action Fin. Servs., Inc., 362 F.3d 944, 948 (7th Cir. 2004)*. Vandehey's argument that offering her the option to make a payment "from an old statement" adds confusing information about the amount of the debt is unconvincing. The letter's statement that Vandehey can "pay from an old statement" merely specifies a method of payment; it does not add confusing information such that an unsophisticated consumer

would be confused as to the amount of the debt owed as of the date of the letter. Even if an unsophisticated consumer recognized that an old statement listed a different amount due, the consumer would not suddenly become confused about whether the amount on the old statement or the amount on the more recent letter reflected the balance as of the letter's date. Rather, the consumer would, as Sequium's letter states, "pay *from* an old statement," ECF No. 1, Ex. A (emphasis added). That is, the consumer would make a payment toward the August 4, 2017 amount due using any of the methods provided in a past statement. Moreover, the letter lists paying from an old statement as one of several methods for "making a payment." **[*8]** *Id*. That Vandehey can make a full or partial payment on her debt using the Pay Client Directly method does not somehow imply that the amount she owes is different than the amount listed on Sequium's letter. Because Sequium's letter accurately lists the amount of the debt, Vandehey states no claim under *§ 1692g(a)(1)*. Also, because less than a significant fraction of the population would be misled by the letter's statement of the amount of debt, Vandehey also fails to state a claim under *§ 1692e* related to the debt. *See Taylor, 365 F.3d at 574*.

Vandehey next alleges that Sequium failed to state the "name of the creditor to whom the debt is owed" in violation of *§ 1692g(a)(2)*. Vandehey alleges that Blaze Credit Card is a financial product and not the current creditor. According to Vandehey, then, Blaze Credit Card is not a "creditor" under *§ 1692a(4)*, which defines a "creditor" as "any *person* who offers or extends credit creating a debt or to whom a debt is owed." (emphasis added). Because a financial product is not a "person," Vandehey argues, Blaze Credit Card cannot be a "creditor" such that *§ 1692g(a)(2)* is satisfied. Sequium argues that Vandehey's allegation that Blaze Credit Card is not the name of the creditor is a legal conclusion that cannot be accepted **[*9]** as true on a motion to dismiss. Sequium argues that courts have recognized that "any legitimate name under which the creditor operates could meet the requirements of *§ 1692g(a)(2)*," *Blarek v. Encore Receivable Mgmt., No. 06-C-0420, 2007 U.S. Dist. LEXIS 22549, 2007 WL 984096, at *7 (E.D. Wis. Mar. 27, 2007)*, meaning that listing Blaze Credit Card rather than the full incorporated business name of the creditor is sufficient to state the name of the creditor.

Vandehey's *§ 1692g(a)(2)* claim survives because, at this stage in the litigation, "the full and complete name of the creditor is unknown, that is, at least to the court." *Schneider v. TSYS Total Debt Mgmt., No. 06-C-345, 2006 U.S. Dist. LEXIS 48177, 2006 WL 1982499, at *3 (E.D. Wis. July 13, 2006)*. This court has recognized on several occasions that "[t]here may be multiple names for a creditor which an unsophisticated consumer could still perceive as being the correct name of the creditor." *Luzinski v. Arrow Fin. Servs.,*

*LLC, No. 05-CV-1322, 2007 U.S. Dist. LEXIS 71788, 2007 WL 2819556, at *2 (E.D. Wis. Sept. 26, 2007)* (quoting *Blarek, 2007 U.S. Dist. LEXIS 22549, 2007 WL 984096, at *16); see also Bode v. Encore Receivable Mgmt., No. 05-CV-1013, 2007 U.S. Dist. LEXIS 64477, 2007 WL 2493898, at *7 (E.D. Wis. Aug. 30, 2007)* ("Indeed, an unsophisticated consumer could perceive multiple names for a creditor as being the correct name of the creditor."). Even if Sequium's claim that Vandehey is more familiar with Blaze Credit Card than any other name associated with the creditor is true, no evidence in the record shows that the actual creditor, not the name of the credit card Vandehey used to incur the debt, operated under the name Blaze Credit Card or used that name from the inception of its relationship with Vandehey. **[*10]** Based on the undeveloped record now before the court, Blaze Credit Card is a financial product and not the name of the creditor. ECF No. 1 at ¶¶ 29-30. As the case progresses, Sequium is free to present evidence demonstrating that the actual creditor operated under, transacted as, or commonly used the name Blaze Credit Card and that Vandehey was, therefore, likely to understand that Blaze Credit Card was the de facto creditor as opposed to a credit card or some other entity. *See, e.g., Luzinski, 2007 U.S. Dist. LEXIS 71788, 2007 WL 2819556, at *2* (granting summary judgment for debt collector on a *§ 1692g(a)(2)* claim where the debtor previously made checks payable and mailed payments to the name listed as the creditor in the collection letter, when the actual creditor's name was different). Given the absence of such evidence in the present record, Vandehey states a claim under *§ 1692g(a)(2)*.

For the same reason that Vandehey's *§ 1692g(a)(2)* claim survives, her related claim that Sequium's statement that Vandehey can "Pay Client Directly: Pay from an old statement or contact the creditor directly" is potentially misleading under *§ 1692e* also survives. ECF No. 1, Ex. A. Because, at this stage, the court is unaware of who the creditor is and whether the creditor operated or transacted under **[*11]** the name Blaze Credit Card, "it would not be appropriate for the court to determine whether the unsophisticated debtor would be confused by" the letter's references to the "Client" and "the creditor." *See Schneider, 2006 U.S. Dist. LEXIS 48177, 2006 WL 1982499, at *3*. Because an unsophisticated consumer possesses "reasonable intelligence" and can make "basic deductions and inferences," *see Williams, 505 F.3d at 678; Veach, 316 F.3d at 693*, it is clear that the unsophisticated consumer would equate the "Client" with "the creditor" when reading the phrase "Pay Client Directly: Pay from an old statement or contact the creditor directly" as a whole. Sequium's use of a colon clarifies what "Pay Client Directly" entails. Following the colon is a statement that Vandehey can pay from an old statement or contact the creditor directly. The basic inference

that follows is that the "Client" is the creditor listed on Sequium's letter and on an old statement. The mere reference to a "Client," therefore, would not be confusing or misleading to an unsophisticated consumer. Only because the record is unclear as to the identity of the creditor and whether Blaze Credit Card was, as Sequium claims, the de facto creditor name does Vandehey's *§ 1692e* claim that relates to her *§ 1692g(a)(2)* claim survive.

## CONCLUSION

For the foregoing **[*12]** reasons, Sequium's motion to dismiss (ECF No. 9) is **GRANTED** as to Vandehey's *§§ 1692g(a)(1)* and *§ 1692e* claims related to the amount of the debt and **DENIED** as to all other claims. The Clerk is directed to set the matter on for a telephone scheduling conference.

Dated this 1st day of February, 2019.

/s/ William C. Griesbach

William C. Griesbach, Chief Judge

United States District Court

**End of Document**