# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

APPVION, INC. RETIREMENT SAVINGS )
AND EMPLOYEE STOCK OWNERSHIP )
PLAN, BY AND THROUGH GRANT LYON )
IN HIS CAPACITY AS THE ESOP )
ADMINISTRATIVE COMMITTEE OF )
APPVION, INC., )
                                        )   Case No.: 1:18-cv-01861-WCG
              Plaintiff, )
         v. )
                                        )
DOUGLAS P. BUTH, *et al.,* )
                                        )
            Defendants. )

## UNREPORTED CASES CITED IN ARGENT TRUST COMPANY'S
## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

**<u>Table of Contents</u>**

*Armstrong v. Amsted Indus.,*
 No. 01-cv-2963, MDL 1417, 2004 U.S. Dist. LEXIS 14776 (N.D. Ill. July 30, 2004) .......... A

*Herrington v. Household Int'l, Inc.,*
 No. 02-cv-8257, 2004 U.S. Dist. LEXIS 5461 (N.D. Ill. Mar. 30, 2004) ............................ B

*Hill v. Tribune Co.,*
 Nos. 05-cv2602, 05-cv2927V, 06-cv0741, 2006 U.S. Dist. LEXIS 71244 (N.D. Ill. Sep. 29, 2006) ............................................................................................................................................... C

*Hurtado v. Rainbow Disposal Co.,*
 No. 17-cv-01605, 2018 U.S. Dist. LEXIS 118128 (C.D. Cal. July 9, 2018) ........................ D

*In re RCN Litig.,*
 No. 04-cv-5068, 2006 U.S. Dist. LEXIS 12929 (D.N.J. Mar. 21, 2006) ............................... E

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.,*
 No. 08-cv-797, 2010 U.S. Dist. LEXIS 30693 (E.D. Wis. Mar. 30, 2010) ........................... F

*Neil v. Zell,*
 No. 08-cv-6833, 2009 U.S. Dist. LEXIS 117735 (N.D. Ill. Dec. 17, 2009) ......................... G

*Perez v. First Bankers Tr. Servs.,*
 No. 12-cv-4450, 2017 U.S. Dist. LEXIS 52117 (D.N.J. Mar. 31, 2017) ............................... H

*Van Den Heuvel v. AI Credit Corp.,*
 No. 12-cv-0327, 2014 U.S. Dist. LEXIS 199881 (E.D. Wis. Apr. 11, 2014) ........................ I

*White v. Chevron Corp.,*
 No. 16-cv-0793, 2016 U.S. Dist. LEXIS 115875 (N.D. Cal. Aug. 29, 2016) ........................ J

# Tab A


# *Armstrong v. Amsted Indus.*

United States District Court for the Northern District of Illinois, Eastern Division

July 29, 2004, Decided ; July 30, 2004, Docketed

No. 01 C 2963, MDL 1417

**Reporter**
2004 U.S. Dist. LEXIS 14776 *; 33 Employee Benefits Cas. (BNA) 1385

JUAN ARMSTRONG, et al., Plaintiffs, vs. AMSTED INDUSTRIES, INC., et al., Defendants.

**Subsequent History:** Motion denied by *Bradley v. Amsted Indus., 2004 U.S. Dist. LEXIS 14780 (N.D. Ill., July 29, 2004)*

Reversed by, Remanded by *Armstrong v. LaSalle Bank Nat'l Ass'n, 2006 U.S. App. LEXIS 11077 (7th Cir. Ill., May 4, 2006)*

**Prior History:** *Armstrong v. Amstead Indus., 2004 U.S. Dist. LEXIS 12427 (N.D. Ill., July 1, 2004)*

**Disposition:** **[*1]** Amsted defendants' and LaSalle's motions for summary judgment granted. Plaintiffs' motion for summary judgment denied. Defendants Berg, Sopranos and Chiappetta's motion for summary judgment denied.

## Core Terms

fiduciary, valuation, stock, repurchase, shares, participants, plaintiffs', fiduciary duty, defendants', amendments, forecast, imprudent, turnover, summary judgment motion, benefits, percent, redemptions, acquisition, transactions, decisions, assumptions, breach of fiduciary duty, prohibited transaction, employees, retiring, breached, parties, prudent, sponsor, annual

## Case Summary

### Procedural Posture

Plaintiff participants brought suit against defendants, an employer, its employee stock ownership plan (ESOP), ESOP committee members, plan administrators, two vice-presidents, and a bank, asserting violations of the Employee Retirement Income Security Act of 1974, *29 U.S.C.S. § 1001 et seq.* Plaintiffs were certified as a class. The parties filed cross-motions for summary judgment.

### Overview

Plaintiffs asserted various theories of defendants' breach of fiduciary duties, which resulted in significant losses to the ESOP assets. The court found that the ESOP committee members and plan administrators were ESOP fiduciaries and had a duty to prudently manage their repurchase obligation provided for in the ESOP but that, despite defendants' repurchase obligations estimates having been wrong, their treatment of the issue did not constitute imprudence. The court noted that there was no indication from the parties' experts that the most prudent of fiduciaries would have determined that a cash cushion created was not sufficient to have met the employer's repurchase obligation. Further, plaintiffs failed to produce any evidence of a causal connection between the plan's losses and the alleged breaches. Plaintiffs did not allege a failure to investigate the ESOP investments nor self-dealing; rather, they asserted defendants failed to properly investigate and forecast their repurchase obligation to plaintiffs without sufficient evidence proving that a proper forecast would have caused a reasonable fiduciary to have questioned the employer's cash cushion's adequacy.

### Outcome

The court granted defendants' motions for summary judgment and denied plaintiffs' motion.

**Counsel:** For JEFFERY BRADLEY, plaintiff: Mark D. DeBofsky, Nathan Q Rugg, Daley, DeBofsky & Bryant, Chicago, IL.

For RADFORD S SMITH, III, THOMAS P FRIEBURG, GARLYN B MAJOR, NATHAN R HILL, JACKIE P. CARLEE, NATHANIEL HAMPTON, RENNIE L BLANKENSHIP, individually and in their capacity as plan participants and beneficiaries on behalf of the AMSTED Industries, Inc., Employee Stock Ownership Plan as a whole, JOHN M.R. SCHILLING, JUDY L SPARKS, individually and in their capacity as plan participant and beneficiaries on behalf of the AMSTED Industries, Inc., Employee Stock Ownership Plan as a whole, plaintiffs: Mark D Debofsky,

Debofsky & Debofsky, Chicago, IL. Nathan Q Rugg, Daley, DeBofsky & Bryant, Chicago, IL.

For JUAN ARMSTRONG, JAMES E DUCKETT, RODERICK GILLESPIE, LARRY HOLDER, JACK D LECROY, DARWYN LIGHTSEY, MICHAEL G MARCHANT, JOE L MASON, JR, CHARLES MCQUEEN, NOEL G SANDERS, III, DWIGHT SMITH, JOHN E SMITH, GERARD WALKER, DANIEL L WHEELER, plaintiffs: Clinton C Carter, W Daniel Miles, [*2] III, Beasley, Allen Crow, Et Al, Montgomery, AL. Gary D. McCallister, Thomas Aquinas Kelliher, Gary D. McCallister & Associates, Ltd., Chicago, IL. Pamela Beard Slate, Nicola A Thompson, Joel L DiLorenzo, Slate Kennedy LLC, Birmingham, AL. Susan E Kennedy, R Jason Thomas, Slate Kennedy LLC, Montgomery, AL.

For MIGUEL ZEPEDA, JR, individually, in their capacity as plan participants and beneficiaries on behalf of AMSTED Industries, Inc. Employee Stock Ownership Plan as a whole, and on behalf of all others similarly situated, plaintiff: Clinton C Carter, W Daniel Miles, III, Beasley, Allen Crow, Et Al, Montgomery, AL. Gary D. McCallister, Thomas Aquinas Kelliher, Gary D. McCallister & Associates, Ltd., Chicago, IL. Robert M. Foote, Peter John Flowers, Foote, Meyers, Mielke, Flowers & Solano, Geneva, IL. Pamela Beard Slate, Nicola A Thompson, Joel L DiLorenzo, Slate Kennedy LLC, Birmingham, AL. Susan E Kennedy, R Jason Thomas, Slate Kennedy LLC, Montgomery, AL.

For AMSTED INDUSTRIES INCORPORATED EMPLOYEES' STOCK OWNERSHIP PLAN, ("ESOP"), AMSTED INDUSTRIES, defendants: Thomas G. Abram, Michael G. Cleveland, Richard H. Schnadig, Charles Benno Wolf, Alison J Maki, Vedder, Price, [*3] Kaufman & Kammholz, P.C., Chicago, IL. Charis A. Runnels, Morgan Lewis Bockius, Chicago, IL.

For M.J. HOWER, defendant: Michael G. Cleveland, Richard H. Schnadig, Charles Benno Wolf, Alison J Maki, Vedder, Price, Kaufman & Kammholz, P.C., Chicago, IL. Charis A. Runnels, Morgan Lewis Bockius, Chicago, IL.

For AMSTED INDUSTRIES, INC., AMSTED INDUSTRIES INCORPORATED EMPLOYEES' STOCK OWNERSHIP PLAN, defendants: Thomas G. Abram, Vedder, Price, Kaufman & Kammholz, P.C., Chicago, IL.

**Judges:** JAMES B. MORAN, Senior Judge, U. S. District Judge.

**Opinion by:** JAMES B. MORAN

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiff class brought this action against Amsted Industries, Inc. (Amsted), the Amsted Employee Stock Ownership Plan (ESOP), Amsted ESOP committee members, Amsted plan administrators, two Amsted vice-presidents, and LaSalle Bank (LaSalle), for violations of the Employee Retirement Income Security Act of 1974, _29 U.S.C. § 1001 et seq._, (ERISA). Plaintiffs; the Amsted defendants (all defendants except LaSalle); LaSalle; and defendants, Thomas Berg, O.J. Sopranos, and Robert Chiapetta, have all filed motions for summary judgment. The Amsted defendants' and LaSalle's [*4] motions for summary judgment are granted. Plaintiffs' motion is denied, and Berg, Sopranos and Chiapetta's motion is moot.

## BACKGROUND

This action arises from defendants' management of Amsted's Employee Stock Ownership Plan (ESOP). Complaints were filed separately, but then consolidated and transferred to this court by the multi-district litigation panel. We ordered plaintiffs to file two amended complaints: one for Amsted retirees and one for non-retirees. These motions for summary judgment relate to the claims of the non-retirees, whom we certified as a class (Armstrong class) on December 16, 2002. _In re Amsted Industries, Inc. "ERISA" Litigation, 2002 U.S. Dist. LEXIS 24144, 2002 WL 31818964 (N.D.Ill. 2002)_.

Amsted, a manufacturer of industrial products, was a publicly-traded company until 1986, when it became wholly employee-owned through an ESOP. The ESOP distributes shares of the corporation into Amsted employees' individual retirement accounts at the end of each fiscal year. The addition of new shares and changes in Amsted's stock price causes the value of the accounts to fluctuate. The ESOP's named fiduciary is Amsted's ESOP Committee, though the Committee may delegate authority [*5] to other individuals, plan administrators, who then also assume fiduciary responsibility. Plaintiffs' claims stem from three central concerns: Amsted's purchase of Varlen Corporation (Varlen), Amsted's obligation to repurchase ESOP stock from its retiring employees, and LaSalle's valuation of the ESOP stock.

In early 1999, Amsted's president, Arthur Goetchel, seriously began to consider acquiring the publicly-traded company, Varlen. After receiving advice from the investment banking firm, Salomon Smith Barney (Salomon), and meeting with its board of directors, Amsted attempted a friendly acquisition of Varlen. Amsted's initial offer of $ 33 per share was rejected,

after which the company participated in an auction, purchasing the Varlen shares for $ 42 per share -- 50 cents more than the next highest bidder. During this process, Amsted, its lenders, and Salomon, analyzed the effects of purchasing Varlen at various costs. Plaintiffs maintain that Amsted did not, however, sufficiently consider the effect on the ESOP. Specifically, plaintiffs allege that Amsted created a significant risk that it would not be able to meet its obligation to repurchase ESOP shares after taking on the debt [*6] of the Varlen purchase. Before Amsted's purchase of Varlen was finalized on August 16, 1999, Salomon issued a fairness opinion on the transaction which found that the price to be paid for the stock was fair. Amsted financed the purchase with a $ 1 billion unsecured loan from Citibank. Following the purchase, Amsted had approximately $ 200 million in available credit.

About a month after Amsted purchased Varlen, the annual value of Amsted stock was determined. Under the then current terms of Amsted's ESOP plan document, the ESOP trustee was responsible for setting the fair market value of Amsted's stock annually on the last day of the fiscal year. LaSalle, the ESOP trustee, hired an independent investment banking firm to perform the valuation. For many years William Blair & Company valued the shares, but in 1998 LaSalle hired Duff & Phelps to perform the valuations. From the inception of the ESOP through 1998, the percentage change in annual stock value ranged from -11.7 per cent from 1989 to 1990, to 32.1 per cent from 1987 to 1988. To determine the value of Amsted's stock, Duff & Phelps performed due diligence review of the company by evaluating financial forecasts and cash flow [*7] projections, and meeting with executives in key operating divisions to discuss financial reporting and business plans. While defendants maintain that Duff & Phelps' workpapers reflect that their valuation took into account a forecast of Amsted's repurchase obligation, plaintiffs contend that Amsted never supplied Duff & Phelps with information on this obligation and the financial analysts never considered it in performing their valuation. Duff & Phelps did not conduct an independent analysis into the price paid for Varlen -- its valuation assumes that fair market value was paid. Nor did the firm discount the valuation for lack of marketability -- the inability to sell the stocks on the open market.

On October 25, 1999, Duff & Phelps presented its valuation of Amsted stock at $ 184.41 per share to LaSalle's ESOP fiduciary committee for review and approval. Duff & Phelps provided summaries that indicated the share price was the same regardless of whether or not the Varlen acquisition was considered. LaSalle approved the valuation, after which neither Amsted nor the ESOP committee could reject it. The stock value was set at $ 184.41 as of September 30, 1999,

reflecting a 32 per cent [*8] increase from its 1998 value. During the same time period, the Dow Jones average was up 31.8 per cent and the Standard & Poor 500 was up 26.1 per cent. Under the then current terms of the ESOP plan document, a participant terminating work at Amsted was entitled to a lump sum cash payment for his vested shares. The annual stock price established by LaSalle determined the value of a departing employee's redemption payout.

Following the announcement of the 1999 valuation, ESOP distribution requests began to surpass expectations. The parties dispute how much Amsted estimated it would pay in redemptions and how those estimates evolved as the redemption requests increased, but it is clear that by late January 2000, Amsted believed it would have to pay $ 68 million more than it forecast in its business plan for fiscal year 2000. At Amsted's directors meeting on January 27, 2000, the company began to consider ways in which to protect its cash reserves. Following the meeting Amsted explored different avenues for addressing its mounting repurchase liability, including decreasing expenditures for the expansion of a manufacturing plant, employing Salomon to investigate the possibility of an initial [*9] public offering, and retaining an ESOP consulting firm and Amsted's legal counsel to determine ways to decrease the amount of repurchases and its impact on the company's cash flow. On March 14, 2000, Amsted's legal counsel suggested that the plan administrators amend the ESOP plan document to allow for quarterly share valuations instead of annual valuations, limitations on participants' rights to lump sum cash payouts, and deferred payments for ESOP shares. By April 2000, Amsted was obligated to pay $ 180 million to repurchase ESOP shares for the first three quarters of the fiscal year. Its forecast for the whole year was adjusted to $ 240 million. At a special directors' meeting on April 25, 2000, Amsted's board unanimously voted to adopt two amendments to the ESOP, eliminating the right to a lump sum cash payout and eliminating the joint and survivor annuity option. Amsted now bought terminating employees' company shares with promissory notes, which paid out in annual installments over four years. As the redemption rate continued to increase, Amsted's board of directors voted unanimously to further amend the ESOP plan document at its regularly scheduled meeting on July 18, 2000. Share [*10] valuations were now made quarterly, not annually. To become immediately eligible for an ESOP distribution, participants had to retire at age 65, be 55 with 30 years of service, or be permanently disabled. Those not immediately eligible had to wait five years after terminating employment, or until the ESOP loan was repaid, whichever occurred last. Also, Amsted's contributions to participants' accounts were reduced.

## DISCUSSION

The function of the court in ruling on a motion for summary judgment is to determine if there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. If the evidence on file shows that no such issue exists and that the moving party is entitled to judgment as a matter of law, we will grant the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Bennett v. Roberts, 295 F.3d 687, 694 (7th Cir. 2002)*. A "metaphysical doubt as to the material facts" is not enough to create a genuine issue of fact for trial, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*; [*11] the evidence must allow for a reasonable trier of fact to find for the non-movant. *Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994)*. When reviewing a motion for summary judgment we draw all inferences in the light most favorable to the non-movant. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987)*. The court considers plaintiffs' and defendants' cross-motions independently -- the failure of one party's motion for summary judgment does not mandate the success of the other party's motion.

In over 200 pages of briefs the parties present their arguments for summary judgment on plaintiffs' claims for breach of fiduciary duty, which they allege resulted in a $ 167 million to $ 202 million loss for Amsted's ESOP. Plaintiffs' first amended complaint alleges five counts against defendants. Count I alleges defendants are liable for numerous breaches of fiduciary duty under *29 U.S.C. § 1109*. In Count II, plaintiffs allege that defendants wrongfully denied their claims and benefits in violation of *29 U.S.C. § 1132*. Plaintiffs argue that defendants made unlawful amendments [*12] to the ESOP in Count III. Counts IV and V, brought on behalf of a subclass for breach of contract and conversion, were dismissed as to all defendants. Count II was also dismissed against LaSalle. Both Counts II and III were dismissed for certain plaintiffs who filed their suits after the prescribed ESOP time limit for challenging the plan administrator's final decision.

Since plaintiffs filed their complaint their theories have undergone some transformation, causing them to drop their claim that defendants unlawfully amended the ESOP. Plaintiffs now maintain that the amendments were necessary (and in fact should have been enacted sooner), but only due to defendants' earlier breaches of duty resulting in significant losses to the ESOP assets. As plaintiffs' view of the amendments have changed, Count II, alleging wrongful denial of benefits, has apparently also been disregarded.

Plaintiffs do not contend that any defendant acted dishonestly or engaged in self-dealing or was guilty of disloyalty. [1] This is not a case about insiders acting for their own benefit or corrupt intent or greed. Plaintiffs also recognize that the financial or business advisors upon whom various defendants [*13] relied were independent, reputable, experienced and expert in the areas in which they were here involved. Even so, they contend that the defendants are liable for what was, indisputably, a precipitous decline in the value of the employees' ESOP shares. Plaintiffs focus on their theories of defendants' breach of fiduciary duties. They argue that defendants breached *29 U.S.C. § 1104*, which establishes a fiduciary's general duties; *§ 1105*, which establishes liability for the breach of a co-fiduciary; and *§ 1106*, which prohibits certain transactions likely to injure a pension plan. We will address each parties' summary judgment motion in turn.

## [*14] Amsted Defendants' Motion for Summary Judgment

An ESOP is an ERISA plan allowed to invest primarily in "qualifying employer securities," typically shares of the employer's stock. *29 U.S.C. § 1107(d)(6)(A)*. Since the ESOP acts as both an employee retirement benefit plan and a method of corporate finance through employee ownership, it is not designed to guarantee retirement benefits. *See Moench v. Robertson, 62 F.3d 553, 568 (3d Cir. 1995)*. By its nature, the ESOP puts its assets at greater risk than a typical diversified ERISA plan. *Kuper v. Iovenko, 66 F.3d 1447, 1457 (6th Cir. 1995)*. While ERISA provisions cannot eliminate the risk inherent in an ESOP, they seek to ensure that ESOP fiduciaries properly manage a plan's assets for the benefit of its participants. Plaintiffs maintain that Amsted defendants violated ERISA provisions in the breach of their fiduciary duty, thus placing the ESOP's assets at risk.

Other than Berg, Chiappetta and Sopranos, who filed a separate motion of summary judgment which will be discussed later, the Amsted defendants agree that as the plan sponsor, the ESOP committee members [*15] and the plan

---

[1] Plaintiffs do suggest that any analysis of the Varlen acquisition by Amsted is somehow tainted because it was not expressly for the ESOP participants. Who did what for whom may well affect the standard of judicial review, but undertakings for Amsted are undertakings for Amsted's stockholders and the Amsted stockholders are the ESOP participants. Further, plaintiffs seek to question the independence of the trustee and consultants because they were paid for their efforts. But so long as what they were paid is reasonable and customary, that cannot provide a basis for challenge -- otherwise every trustee and expert has a conflict.

administrators, they were fiduciaries of the ESOP. [2] Section 404 of ERISA, *29 U.S.C. § 1104*, imposes duties upon fiduciaries managing plan assets. It states, in part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and --

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

[*16] Due to the nature and purpose of the ESOP, a fiduciary does not violate the diversification requirement or the prudence requirement (to the extent it requires diversification) when an ESOP acquires or holds shares of the plan sponsor's stock. See *29 U.S.C. § 1104(2)*. Plaintiffs do not allege that the Amsted defendants failed to diversify; rather, they allege defendants did not act for the exclusive benefit of the ESOP participants and that they acted imprudently. Plaintiffs bring their claims pursuant to § 409 of ERISA, which imposes liability on a plan's fiduciary for any losses to the plan resulting from the fiduciary's breach of duties or obligations. *29 U.S.C. § 1109(a)*.

Under ERISA, a person may be a fiduciary for some purposes, but not for others. See *Plumb v. Fluid Pump Service, Inc., 124 F.3d 849, 854 (7th Cir. 1997)*. *Section 1002(21)(A)* states that "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets [*17] . . . ." *29 U.S.C. § 1002(21)(A)*. ERISA allows an individual to serve both as a fiduciary and an officer or representative of a plan sponsor, thus creating dual roles with different duties and responsibilities. See *29 U.S.C. § 1108(c)(3)*. The Supreme

Court has found that a plan administrator is not acting as a fiduciary when adopting, amending, or terminating a benefit plan. *Lockheed Corp. v. Spink, 517 U.S. 882, 890-91, 135 L. Ed. 2d 153, 116 S. Ct. 1783 (1996)*. Moreover, plan administrators who are also officers of the plan's sponsoring employer, assume fiduciary status only when and to the extent they act as plan administrators, not when they conduct business unregulated by ERISA. *Canale v. Yegen, 782 F. Supp. 963, 967 (D.N.J. 1992)*(quoting *Payonk v. HMW Industries, Inc., 883 F.2d 221, 227 (3d Cir. 1989)*); see also *Martin v. Feilen, 965 F.2d 660, 666 (8th Cir. 1992)*(Rejecting the Secretary of Labor's argument for a broad application of ERISA's fiduciary duty, the court stated that even though "virtually all of an employer's significant business decisions affect the *value* [*18] of its stock, and therefore the benefits that ESOP plan participants will ultimately receive," ERISA fiduciary duties only attach when an individual invests the ESOP's assets or administers the plan). Even when a fiduciary/corporate representative undertakes day-to-day business operations that may have a collateral effect on employee benefits, ERISA does not require that he operate solely in the interest of plan participants. *Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir. 1988)*(quoting *Phillips v. Amoco Oil Co., 614 F. Supp. 694, 718 (N.D. Ala. 1985)*, aff'd, *799 F.2d 1464 (11th Cir. 1986)*). Thus, to find Amsted defendants liable for breach of fiduciary duty, we must first find that they were fiduciaries as to the activities at issue.

Varlen Acquisition

The Amsted defendants argue that their decision to purchase the Varlen Corporation and their forecasting of their repurchase obligation are business decisions and activities that do not trigger a fiduciary duty under ERISA. Plaintiffs recognize that the Varlen acquisition was not a fiduciary act ("Amsted Defendants argue they cannot be liable for participating in the decision [*19] to acquire Varlen. Plaintiffs do not claim that they are" (Class Plaintiffs' Brief 14)), but claim that the Amsted defendants still breached their duty in regards to this matter by "never putting on their fiduciary hat."

Plaintiffs rely on *Reich v. Hall Holding Co., 990 F. Supp. 955 (N.D. Ohio 1998)*, aff'd *285 F.3d 415 (6th Cir. 2002)*, to support their contention that the Amsted defendants' purchase of Varlen, and analysis of its repurchase obligation, triggered fiduciary obligations that the defendants chose to ignore. In Reich, ESOP fiduciaries were sued for breach of duty after the ESOP purchased stock in the plan sponsor for $ 3.5 million, allegedly more than adequate consideration. The court rejected defendants' argument that the decision to purchase this stock was not a fiduciary decision because it

---

[2] In their response to the motion by Berg, Chiappetta and Sopranos, plaintiffs agree to dismiss their complaint against Sopranos.

was part of the establishment of the ESOP. The court distinguished the acquisition of these assets from the establishment of the ESOP and stated that ERISA fiduciary provisions apply in this case because "a person is a fiduciary to the extent . . . he exercises any authority or control respecting management or disposition of [a plan's] assets. [*20] " *Id. at 960* (quoting *29 U.S.C. § 1002(21)(A)*). The court further noted that an ESOP's purchase of employer stocks requires the plan fiduciaries to investigate the fair market value of the stock to ensure that adequate compensation is paid. The circumstances in *Reich* are too distinct from those in this case to provide support for plaintiffs' argument. In *Reich*, fiduciaries used ESOP assets to purchase employer stock -- clearly exercising control over the plan's assets. Amsted did not use ESOP assets to purchase Varlen.

*Reich* reaffirms that an individual must be dealing with a plan's assets to be subject to ERISA's fiduciary duty. Though plaintiffs argue that there was a general failure on the part of defendants to assume their role as fiduciaries, they appear to recognize that the Amsted defendants only need to don their "fiduciary hat" when they are exercising authority or control over ESOP assets or administering the plan. Though the Amsted ESOP's assets are the shares of Amsted, properties acquired and owned by Amsted are not plan assets. Department of Labor Regulations, *29 C.F.R. § 2510.3-101(a)(2)* [*21] . Therefore, Amsted's acquisition of Varlen did not involve authority or control over plan assets.

Repurchase Obligation

Plaintiffs also allege that the Amsted defendants violated their fiduciary duties with regard to forecasting their obligation to repurchase stock from retiring ESOP participants. [3] Amsted defendants respond that, as with the Varlen purchase, no fiduciary duty applies to the analysis of their repurchase obligation. However, these forecasts are not as easily classified as business decisions or transactions. If an employer sponsors an ESOP that distributes shares not traded on the open market, the Internal Revenue Code requires that the ESOP participants have the right to sell their shares to the employer for a fair price. *26 U.S.C. § 409(h)(1)(B)*. The ESOP participant's right to redemption is called a "put option"

and the burden created for the employer/plan sponsor is its "repurchase obligation." Up until the Amsted ESOP was amended in 2000, participants had the right to a lump sum cash payment when they exercised their "put option." As fiduciaries to the plan, the Amsted defendants could not ignore this obligation -- imposed by law [*22] and the terms of plan -- to the ESOP participants. Thus, they had a duty to prudently manage their repurchase obligation.

Under the prudent person standard, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *29 U.S.C. § 1104(a)(1)(B)*. The prudence of a fiduciary's actions must be evaluated from the perspective of the time of his actions, not with the benefit [*23] of hindsight. *Katsaros v. Cody, 744 F.2d 270, 279 (2d. Cir. 1984)*; *Metzler v. Graham, 112 F.3d 207, 209 (5th Cir. 1997)*. As the Seventh Circuit has noted, "Fiduciary duty of care requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Society, 920 F.2d 457, 465 (7th Cir. 1990)*.

Plaintiffs argue the Amsted defendants were not making proper assumptions in their analysis of the repurchase obligation, nor monitoring important factors for the analysis, such as the age of ESOP participants, but rather were relying only on historical data. Plaintiffs' expert Kace Clawson testified that a repurchase obligation analysis focuses primarily on stock value, the company's turnover rate and the ESOP terms for repurchase of the stock, but it also involves "a complete survey of the company, its employees, their ages, estimates of turnover rates" (Clawson Dep. 18). Clawson affirmed that estimates of future turnover are subjective, based on historical turnover and the company's assessment of the attitude of its current employees (Clawson Dep. 19-20). Wilson Ellis, another plaintiffs' expert, testified that Amsted should have taken more [*24] information into account in forecasting its repurchase obligation, such as the increase in redemptions in the years immediately prior to 1999, the value of participants' ESOP accounts, and the increase in the average age of the workforce (Ellis Dep. 244-45).

Plaintiffs also argue that Amsted's assumption of a 9 per cent turnover rate in forecasting its obligation was imprudent. Until 1995, the average annual turnover rate for shares of the ESOP [4] was 7.8 per cent. In 1996 it rose to 10.9 per cent

---

[3] This allegation is entwined with the Varlen allegation, for plaintiffs are arguing in part that defendants' breach stems from their failure to recognize that the Varlen purchase created a significant risk that Amsted would not be able to meet its obligation to the ESOP participants. While recognizing the interplay between the allegations, they can be separated into distinct claims and should be for the sake of clarity.

[4] The share turnover rate is distinct from the employee turnover rate. Of course, the two rates are interrelated because shares are turned over by departing employees. The share turnover rate is the number of vested shares redeemed by departing employees divided by the total number of outstanding shares.

(apparently impacted by the closing of a facility), and in 1997 and 1998 respectively, it was 9.0 per cent and 9.4 per cent. Ellis testified that the increased turnovers after 1995 should have alerted Amsted to reexamine its assumptions regarding share turnover (Ellis Dep. 244). Newman continued to use the 9 per cent turnover rate -- a standard assumption that had been used for years -- in his formulas for projecting the repurchase obligation.

 [*25] Plaintiffs attack assumptions made in the use of PERLS software, as well. Amsted began using PERLS software in 1997 and reported some problems with its forecasts. Plaintiffs argue that Amsted's perception that the PERLS software was subject to big variations in its assumptions resulted from Amsted's failure to use realistic assumptions in its own forecasts. They further maintain defendants relied on unrealistic assumptions when using the PERLS software.

Defendants contend no reasonable factfinder could conclude that its repurchase obligation analysis was imprudent. They argue Amsted was well aware of the significance of the repurchase obligation and continually monitored the situation. They also maintain plaintiffs lack evidence that a hypothetical, objective, prudent fiduciary would have come to a different conclusion regarding Amsted's repurchase obligation, much less to the conclusion that share redemptions would increase to over 30 per cent between 1999 and 2000.

Despite the fact Amsted's repurchase obligation estimates were wrong, its treatment of this issue did not constitute imprudence. Indeed, plaintiffs' expert, Clawson, admits that the forecast of a prudent analysis may [*26] be followed by a higher turnover rate than predicted. The two primary factors Clawson identified, the historical share turnover rate and the assessment of employee attitudes toward the ESOP, would not have indicated that the Amsted defendants should have predicted a redemption rate of over 30 per cent in 2000. Ellis, another plaintiffs' expert, admits that "it was not knowable in advance what the percentage increase would be or even with certainty that there would be an increase …" (Ellis Dep. 244). Defendants' expert, Larry Levine, supports his assertion with his statistical survey, finding there was less than a one percent probability that the 2000 turnover rate would have occurred (Levine Report 14-15). After the Varlen purchase, Amsted had $ 200 million in unused credit from its unsecured Citibank loan. There is no indication from plaintiffs' or defendants' experts that the most prudent of fiduciaries would have determined that this cash cushion would not suffice to meet Amsted's repurchase obligation.

In support of their argument that Amsted abdicated its duty with regards to forecasts of its repurchase obligation,

plaintiffs highlight a comment by Joseph Newman, former Amsted [*27] controller. During his deposition, Newman stated that an evaluation of the repurchase obligation is an "exercise in futility" (Newman Dep. 177-78). Despite plaintiffs' claim, this is not evidence of defendants' disregard of Amsted's obligation. Newman's deposition clearly illustrates that he was using "repurchase obligation" to mean not just Amsted's obligation to satisfy quarterly or annual redemptions, but the obligation it would have if all the outstanding shares were redeemed -- an obligation that "is not going to come into being unless the entire company -- every employee inputs his shares" [5] (Newman Dep. 178). The "exercise in futility" is not forecasting what Amsted will have to pay in any given year for share redemptions, but determining what it would have to pay if every plan participant redeemed his shares.

 [*28] Even if plaintiffs have evidenced that Amsted's assumptions and analysis regarding its repurchase obligation were too conservative, they have not evidenced that defendants' misjudgment caused harm to the ESOP. A causal connection between plan losses and the breach of fiduciary duty is necessary. *Kuper v. Iovenko, 66 F.3d 1447, 1459-60 (6th Cir. 1995)*. In Kuper, participants in an ESOP brought an ERISA action for breach of fiduciary duty against the plan fiduciaries for failure to investigate and evaluate the appropriateness of the ESOP's assets after a substantial decline in the value of its primary holding. *Id. at 1459*. The court affirmed summary judgment for the defendant, explaining, "To show that an investment decision breached a fiduciary's duty to act reasonably in an effort to hold the fiduciary liable for a loss attributable to this investment decision, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan." *Id.* (citing *Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 279 (2d Cir. 1992))*. The court determined that plaintiffs had failed to demonstrate this [*29] causal connection -- there was no showing that "an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Id. at 1460*. Though plaintiffs do not allege a failure to investigate ESOP investments, their allegations are similar. They maintain that the defendants failed to properly investigate and forecast their repurchase obligation to ESOP participants. But, plaintiffs have not shown that an investigation, which conforms to their experts' standards and uses their assumptions, would have led Amsted to predict the redemption crisis and take proper precautions.

---

[5] Earlier in his deposition Newman states, "A repurchase obligation is the total valuation of all shares that have not been tendered for distribution. The shares held by the -- the value of the shares held by the participants who are still active in the plan" (Newman Dep. 55).

The Amsted plan participants fail to provide sufficient evidence that a proper forecast, even with an increased turnover rate, would have caused a reasonable fiduciary to question whether Amsted's cash cushion was adequate.

Plan Amendments

Though plaintiffs originally argued that Amsted's amendments to the ESOP plan document were breaches of fiduciary duty, they now argue that defendants' failure to take such action sooner was the breach. For plaintiffs to support this claim, they must evidence more than just defendants' failure to predict this cash flow crisis [*30] (which, as discussed above, is not a failure that constitutes a violation of the prudent person standard). Plaintiffs must show that the Amsted defendants sat by, ignoring ESOP participants' interests, as the higher than expected redemption rate caused a financial crisis. The evidence cannot support such a finding.

Defendants argue that plaintiffs cannot bring a breach of fiduciary duty claim for failure to amend the plan document because amending a plan is an administrator's settlor function, not a fiduciary function, and therefore not subject to claims of breach of duty. Amending a plan is a settlor function. *See Lockheed Corp. v. Spink, 517 U.S. 882, 890-91, 135 L. Ed. 2d 153, 116 S. Ct. 1783 (1996).* Nonetheless, plaintiff's contend that the ESOP plan and trust documents, relevant at the time of the ESOP's escalating redemption rates, imposed a fiduciary duty on defendants even when making amendments to the plan. Assuming that defendants had a fiduciary duty, stemming not from ERISA law but from the Amsted ESOP's plan document, there is no evidence that defendants breached this duty by ignoring remedial actions.

Plaintiffs maintain that once the liquidity crisis became clear [*31] to Amsted in late December 1999 or early January 2000, they "did not take action until April 2000 -- five months later …." (Plfs' Reply 65). Besides adding at least a month to this alleged delay, plaintiffs ignore the undisputed fact that the Amsted defendants did take action. They began to research possible responses to the situation. While it is true that defendants did not amend the ESOP until three months after their January board meeting, when they first proposed responses to the increase in redemptions, this does not evidence the Amsted defendants' imprudence. To the contrary, hiring legal experts, ESOP consultants and financial advisors to investigate measured responses (as opposed to making rash decisions), evidences prudence on the part of Amsted. Nor does Amsted's decision not to make more drastic changes in April 2000, constitute evidence of imprudence. With the benefit of hindsight it is apparent that the April amendments did not slow the number of redemptions, thus

necessitating more amendments in July 2000. Yet, our knowledge of what transpired after Amsted's decisions does not render its course of action at the time imprudent. Plaintiffs have not produced any evidence [*32] to show that the board of directors' decision to make only two amendments in April 2000 amounted to a breach of fiduciary duty.

Prohibited Transactions-*29 U.S.C. § 1106(a)(1)(A)* and *(D)*

Plaintiffs argue that both Amsted and LaSalle caused the ESOP to engage in prohibited transactions in violation of § 404(a)(1)(A) and (D) of ERISA, *29 U.S.C. § 1106(a)(1)(A)* and *(D)*. *Section 1106(a)* states, in part:

> Except as provided in *section 1108* of this title:
> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect --
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . .
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; . . . .

*Section 1108* provides that these transactions are permitted as long as they are made for adequate consideration. *29 U.S.C. § 1108(e)(1)*. Defendants argue that this section does not apply to the benefits payments that were made to retired employees who opted for a cash payout on their [*33] ESOP holdings. We agree.

We need not address whether the retired employees were parties in interest because even if they are, *§ 1106* does not implicate these payouts. The Supreme Court has stated that the common thread among *§ 1106*'s prohibited transactions is that they "generally involve uses of plan assets that are potentially harmful to the plan." *Lockheed Corp. v. Spink, 517 U.S. 882, 893, 135 L. Ed. 2d 153, 116 S. Ct. 1783 (1996)*. This assessment explains why the burden of proof shifts to the fiduciary to show that adequate compensation was provided, once it is established that a transaction falls under *§ 1106*.

Not all payments by an ERISA plan are transactions under *§ 1106(a)(1)*. In Lockheed Corp., the Court held that the payment of benefits to a plan participant in accordance with the terms of a pension benefit plan did not violate *§ 406(a)(1)(D)*, prohibiting the transfer of plan assets to a party in interest. The Supreme Court explained, "The payment of benefits in exchange for the performance of some condition by the employee is not a 'transaction' within the meaning of *§ 406(a)(1)*." *Lockheed Corp., 517 U.S. at 895*. As in *Lockheed Corp.*, Amsted [*34] employees received benefits under the Amsted ESOP in exchange for their service to the company.

In an attempt to distinguish their prohibited transaction claim from the one in Lockheed Corp., plaintiffs present two different views of the elements of a § 1106 claim. First, plaintiffs maintain that to establish a § 1106 claim they need only show that a fiduciary used plan assets to purchase employer stock from a party in interest. Citing *Keach v. U.S. Trust Co. N.A., 235 F. Supp. 2d 886, 898-99 (C.D. Ill. 2002)*, plaintiffs argue the adequate consideration exemption allowed under § 1108(e) is an affirmative defense, for which defendants bear the burden. Yet, in emphasizing the harm of defendants' alleged prohibited transactions, plaintiffs focus not on the transaction -- the payment of benefits to plan participants -- but, rather, on the alleged overpayment resulting from LaSalle's faulty valuation. They argue that this overpayment was potentially harmful to the plan, like other prohibited transactions; was not pursuant to the terms of the plan; and was not sanctioned by ERISA, but rather, was in violation of 29 U.S.C. § 1104. While it [*35] is true that a fiduciary's imprudent valuation of company stock would be potentially harmful to an ESOP, would not be condoned by a benefits plan, and would be in violation of § 1104, that does not change the scope of prohibited transactions under § 1106.

In Lockheed Corp., the Supreme Court established that the payment of benefits to plan participants is outside the boundaries of § 1106(a)(1)(D), stating: "Whatever the precise boundaries of the prohibition in § 406(a)(1)(D), there is one use of plan assets that it cannot logically encompass: a *quid pro quo* between the employer and plan participants in which the plan pays out benefits to the participants pursuant to its terms." *517 U.S. 882, 895, 135 L. Ed. 2d 153, 116 S. Ct. 1783 (1996)*. Though plaintiffs assert that retired employees were paid too much as a result of an imprudent valuation, the payment to the ESOP participants was in accordance with the terms of the ESOP.

We also apply the Court's exclusion to transactions under § 1106(a)(1)(A). As highlighted above, the Court found payments to participants in accordance with plan terms not to be transactions within the meaning of § 1106(a)(1). *Lockheed Corp., 517 U.S. at 895.* [*36] Excluding these types of transactions from the scope of this prohibition comports with the section's general purpose, which is to "prevent plan fiduciaries from engaging in certain transactions that benefit third parties at the expense of plan participants and beneficiaries." Laborers' Pension Fund v. Arnold, 2001 WL 197634 at *8 (2001) (citing *Marks v. Independence Blue Cross, 71 F. Supp.2d 432, 437 (E.D. Pa. 1999)).* Amsted's purchase of plan participants' shares in accordance with the terms of the plan was not benefitting third parties at the expense of the participants.

## LaSalle's Motion for Summary Judgment

Plaintiffs allege that LaSalle, like the Amsted defendants, violated both 29 U.S.C. § 1104 and 29 U.S.C. § 1106. LaSalle's alleged breach stems from its failure to investigate Amsted's purchase of Varlen and analysis of its repurchase obligation; its imprudent valuation of Amsted's stock; and its inaction as the value of the ESOP's assets plummeted. LaSalle moves for summary judgment on all counts.

The parties begin by debating the proper standard that the court should apply in reviewing [*37] LaSalle's actions for breach of fiduciary duty. LaSalle argues that as an independent and experienced trustee its decisions are entitled to deference and the court should not substitute its judgment for that of the trustee. It relies on several cases in which courts reviewed a fiduciary's investment decisions under the arbitrary and capricious standard. *Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995)*; *Moench v. Robertson,* 62 F.3d 553, 571 (3d Cir. 1995); *Ershick v. United Missouri Bank of Kansas City, N.A., 948 F.2d 660, 666-67 (10th Cir. 1991)*. Plaintiffs counter that the Seventh Circuit demonstrated in *Eyler v. Commissioner of Internal Revenue, 88 F.3d 445, 454-55 (7th Cir. 1996)*, that the prudent person standard is the proper standard to apply in this case. Though Eyler did not involve a claim for breach of fiduciary duty, the Seventh Circuit stated that courts employ the prudent person standard in reviewing a fiduciary's determination of a fair market price for a prohibited transaction, such as the sale of the fiduciary's own stock to the ESOP. *Id.*

Plaintiffs also rely on *Horn v. McQueen, 215 F. Supp.2d 867 (W.D. Ky. 2002),* [*38] to explain why a deferential standard was used in Kuper and Moench, but should not be used in LaSalle's case. In Horn, the court acknowledged the application of the arbitrary and capricious standard in the circuit court cases, but applied the prudent man standard because the allegations against the fiduciary did not involve investment decisions but, rather, involved overpayment for employer securities. *Id. at 874-75*.

Like in *Horn,* plaintiffs have attempted to fashion a § 1106 claim for prohibited transactions against LaSalle. However, LaSalle's alleged breaches are more akin to those in *Kuper* and *Moench* than those in *Eyler* and *Horn*. LaSalle is an independent trustee accused of failing to rigorously and prudently review the valuation of Amsted's stock. It is not a fiduciary/employer representative accused of inflating the value of its own stock and then selling it to the ESOP, or buying stock from the ESOP at a discounted rate. Nor is there sufficient evidence for a reasonable factfinder to determine that LaSalle was engaged in self-dealing. According to plaintiffs, LaSalle's alleged failure to question Amsted's

purchase of Varlen was **[*39]** motivated by a desire to preserve its annual trustee fee and ensure good corporate relations. Thus, plaintiffs argue, LaSalle's inaction amounts to "dealing with the assets of the plan in [its] own interest or for [its] own account . . . ." *See 29 U.S.C. § 1106(b)*. As we explained above, and will discuss further below, the Varlen purchase did not implicate fiduciary duties. Furthermore, even if there was a question of LaSalle's fulfillment of its duties as the ESOP trustee, plaintiffs provide no facts that create a question of self-dealing by LaSalle. The mere fact that LaSalle was compensated for its services as trustee does not raise a triable issue regarding self-dealing.

Besides the fact that the claims against LaSalle are more akin to those in <u>Kuper</u> and <u>Moench</u> than <u>Horn</u>, there is another reason to apply a deferential standard to LaSalle's decisions in this case. We agree with LaSalle that the explanation for the standard applied in <u>Kuper</u> and <u>Moench</u>, on the one hand, and the standard applied in <u>Eyler</u> and <u>Horn,</u> on the other, relates to the independence of the fiduciary. The decisions of independent and experienced fiduciaries **[*40]** garner deferential review, while the decisions of fiduciaries with a conflict of interest or engaged in suspect transactions do not receive such deference. Before determining whether a defendant breached a fiduciary duty in *Steinman v. Hicks, 252 F. Supp.2d 746, 760 (C.D.Ill. 2003)*, the court noted that its determination of whether the defendant acted as a "hypothetical prudent fiduciary" would have in the given circumstances, involves a "highly deferential" review of the fiduciary's acts. As in *Steinman*, our review of whether LaSalle met the prudent person standard will be deferential to the decisions it made as an independent trustee.

## Varlen Purchase and Repurchase Obligation

Plaintiffs maintain LaSalle breached its fiduciary duty with regards to Amsted's purchase of Varlen. They argue that LaSalle had an obligation to conduct an independent investigation of the purchase or to contract a firm to conduct an investigation. Plaintiffs further contend the steps LaSalle did take to review the purchase were inadequate to meet its fiduciary obligation. As discussed above, Amsted's purchase of Varlen was not a fiduciary act to which ERISA applies. The **[*41]** Varlen purchase was a business decision and LaSalle cannot be held liable for breach of fiduciary duty to plaintiffs for failure to override an employer's business decision. *Kuper v. Iovenko, 66 F.3d 1447, 1460 (6th Cir. 1995)*(holding that fiduciaries did not breach duty by failing to block plan sponsor's decision to transfer ESOP assets from one trust to another); *Martin v. Feilen, 965 F.2d 660, 666 (8th Cir. 1992)*(holding that though an employer's business decisions affect stock value and, therefore, pension benefits,

an ESOP fiduciary does not become liable for these decisions).

As LaSalle points out, a requirement that ESOP trustees conduct independent investigations into employers' business transactions that do not involve ESOP assets would be unduly burdensome. *See Keach v. U.S. Trust Co., N.A., 313 F. Supp.2d 818, 870 (C.D. Ill. 2004)*(finding no legal requirement that a trustee hire a CPA firm to review an ESOP transaction and noting that such expert assistance would be cost-prohibitive in many ESOP transactions). An independent investigation was especially unnecessary in this case, where the sole owners of Amsted were **[*42]** ESOP participants, and Amsted hired an independent firm, Salomon, Smith, Barney, to assess its purchase of Varlen.

The parties' factual disputes over LaSalle's review of the Varlen transaction are inconsequential, given that it had no fiduciary duty to review or approve this business decision. Nonetheless, the undisputed facts establish that LaSalle did monitor Amsted's purchase. Vaughn Gordy, the LaSalle trust officer principally in charge of the Amsted ESOP, attended an April 1999 Amsted board meeting during which Salomon presented its report on the Varlen purchase (Defs' Facts 60). Following this presentation, LaSalle consulted with Duff & Phelps, its financial advisor, and legal advisors, regarding the purchase (Defs' Facts 61). Gordy was updated on the Amsted transaction from the beginning of negotiations until the close of the deal. He discussed the transaction with Amsted's general counsel, Thomas Berg; reviewed Salomon's fairness report; and had Duff & Phelps review it. Thus, even though LaSalle did not have a fiduciary obligation with regard to Amsted's business decision, it took measures to monitor the transaction.

Plaintiffs allege that LaSalle also breached its fiduciary **[*43]** duty with regard to Amsted's repurchase obligation by both failing to properly monitor and evaluate Amsted's projections, and failing to take the obligation into account in its valuation of Amsted's stock. Plaintiffs' maintain that LaSalle's alleged failure to monitor Amsted's repurchase obligation forecasts constitutes a breach of fiduciary duty. This claim fails for the same reason plaintiffs' repurchase obligation claim failed against the Amsted defendants -- there is no evidence that, even if Amsted had used less conservative assumptions in its forecasts, it would have predicted an increase in redemptions that would threaten its cash flow.

## Amsted Stock Valuation

Plaintiffs' central complaint against LaSalle is its alleged breach of fiduciary duty in valuing Amsted's stock. Under the terms of the plan document, LaSalle, as trustee of the Amsted

ESOP, was responsible for determining the fair market value of the company's stock. Plaintiffs argue that LaSalle breached this duty as trustee of the ESOP by (1) failing to ensure that Duff & Phelps (D&P), the valuation company it hired, had complete and correct information, and made proper assumptions for its valuation, especially [*44] regarding the Varlen acquisition and Amsted's repurchase obligation; and (2) failing to apply a marketability discount.

### Reliance on D&P Valuation

LaSalle maintains it is both appropriate and customary for a trustee to hire an independent expert, such as D&P, to value a plan sponsor's stock, and that LaSalle's reliance on D&P's finding was not imprudent. Plaintiffs recognize that securing an independent assessment of a stock valuation from a financial advisor or legal counsel is evidence of a thorough investigation, but argue that it is not a complete defense to a claim of imprudence against a fiduciary responsible for the valuation. Citing *Howard v. Shay, 100 F.3d 1484, 1489 (9th Cir. 1996)*, they argue the fiduciary must also (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances. Shay involved a fiduciary accused of self-dealing who had the burden of proving that he fulfilled his fiduciary duties and that the ESOP received adequate consideration for its assets. *Id. at 1488*. As we have [*45] explained above, this is not a case of self-dealing -- plaintiffs have not offered any evidence of self-dealing by Amsted or LaSalle, [6] nor does the ESOP's purchase of retiring participants' shares amount to prohibited transactions. LaSalle does not bear the burden of showing that adequate consideration was paid for the shares. Rather, plaintiffs must show that LaSalle's valuation was in some way imprudent, and thus a breach of fiduciary duty. Even if the standard developed in Howard applies to LaSalle, who was not involved in self-dealing or a prohibited transaction, a reasonable trier of fact could not find that this trustee violated it.

[*46] D&P's credentials as an expert in valuation are not at

---

[6] This distinction between Shay and the Amsted case can be made with the other cases on which plaintiffs primarily rely, *Donovan v. Cunningham, 716 F.2d 1455 (5th Cir. 1983)*, and *Eyler v. Commissioner of Internal Revenue, 88 F.3d 445 (7th Cir. 1996)*. It is a significant distinction because the scrutiny of a fiduciary's decisions are justifiably stricter when it is involved in a transaction that provides personal benefit. The suspect nature of such transactions also explains why the burden of proof transfers to the fiduciary in such cases.

issue -- plaintiffs did not dispute that D&P was "one of the premier ESOP valuation firms in the United States" (Defs' 19). Plaintiffs do dispute that LaSalle ensured that D&P had accurate information and made proper assumptions when performing its valuation. Plaintiffs argue that D&P did not have full access to documentation on Varlen or Amsted's acquisition of the company, nor did it conduct an independent investigation into the acquisition. Therefore, plaintiffs argue that D&P's assumption that fair market value was paid for Varlen, and its conclusion that the purchase had a neutral effect on Amsted's stock price, was imprudent. While Elyse Bluth, the D&P manager in charge of the Amsted valuation, admits that D&P did not conduct an independent investigation of the Varlen acquisition, this does not establish that their conclusion regarding its effect on the stock price was unreliable. In an arm's-length transaction, such as Amsted's purchase of Varlen at auction, the value of the asset is best determined by the purchase price. *See In re: The Two S Corporation, 875 F.2d 240, 244 (9th Cir. 1989)*. Thus, D&P's assumption [*47] that fair market value was paid was not unsound. Upon review of the valuation, it was not imprudent for LaSalle to accept D&P's assessment that the acquisition of Varlen, offset by the debt Amsted incurred for the purchase, did not affect Amsted's stock price.

Plaintiffs also assert that D&P ignored Amsted's repurchase obligation in its valuation. They point to Bluth's testimony that she did not recall receiving any PERLS sheets (Bluth Dep. 55-56), and also highlight the testimony of Jeff Schiedemeyer, a D&P employee who worked on the Amsted valuation -- that he did not recall receiving any "specific repurchase obligation forecast" from Amsted (Schiedemeyer Dep. 67). Though D&P may not have received separate reports dealing only with Amsted's repurchase obligation, the undisputed facts reveal that D&P was informed of the obligation through financial and cash flow statements that included information on the cost of shares repurchased from the ESOP (Bluth Dep. 39, 77-78). While the 1999 valuation report did not specifically address the repurchase obligation, it did take it into account as part of Amsted's projected future cash flows -- flows that would be affected by the number of stock [*48] shares redeemed by terminating employees.

In their arguments that LaSalle was not vigilant enough in its review of D&P's valuation, plaintiffs rely heavily on *Donovan v. Cunningham, 716 F.2d 1455 (5th Cir. 1983)*. As in Eyler, the defendant fiduciary in Cunningham sold shares of the sponsor company's stock to the ESOP. *Id. at 1474*. The sale price was found not to be adequate consideration but, rather, in excess of fair market value. *Id.* The fiduciaries in Cunningham argued that the sale price was taken from an investment firm's independent valuation of the stock. However, the transactions at issue took place over a year after

the valuation. *Id. at 1468-69*. Not only was the valuation out of date, it was based on expectations of revenues that had clearly not materialized by the time of the stock sales. *Id.* LaSalle's reliance on D&P's valuation does not equate with the *Cunningham* fiduciaries' reliance on an out-of-date valuation that contained information which time had conclusively proven false. D&P's valuation contained assumptions that experts may have differed on, but that does not render LaSalle's reliance [*49] on the valuation a breach of fiduciary duty.

Marketability Discount

Plaintiffs rely on Eyler for the proposition that LaSalle's failure to apply a marketability discount was imprudent. In Eyler, the defendant appealed a tax court's holding that a marketability discount should have been applied to the price of his company's stock, shares of which were sold to the company ESOP. *Eyler v. Commissioner of Internal Revenue, 88 F.3d 445, 453 (7th Cir. 1996)*. The Seventh Circuit rejected defendant's argument that no marketability discount should apply because ESOP participants had a "put option," allowing them to sell the shares to the company. *Id.* The court rejected this argument "for the fundamental reason that as of the date of the ESOP transaction, [the company] had no history of paying ESOP distributions in cash." *Id.* The court's fundamental reason for requiring a marketability discount does not apply in LaSalle's case. Amsted did have a history of paying cash for ESOP participants' redeemed shares.

In his deposition, plaintiffs' expert, Kace Clawson, stated the application of a marketability discount is a "subjective determination by the valuation [*50] appraiser" (Clawson Dep. 12). D&P applied a zero per cent marketability discount to its October 1999 valuation of Amsted stock. Given Amsted's history of paying terminated participants their benefits quickly, and in full, its bylaws calling for the stock to be treated as if sold on the open market, and its precedent of not applying a marketability discount, no reasonable trier of fact could find that LaSalle breached its duty in accepting D&P's expert opinion.

Plan Amendments

Plaintiffs also seek to impose co-fiduciary liability on LaSalle for failure to amend the ESOP plan document sooner. This fails both because amending the plan is a settlor function [7],

---

[7] Even if the plan documents imposed fiduciary liability on the administrators when making plan amendments (as discussed in our analysis of the Amsted defendants' motion), that does not mean

for which the ESOP plan committee was responsible, and because, as explained above, the Amsted defendants did not violate the prudent person standard in reaching their decisions to amend the plan.

[*51] The Varlen acquisition resulted in a very sizable debt, but that was not the source of Amsted's cash flow problems. We are told that the business plan contemplated the servicing of that debt from the Varlen operations, and we are not directed to any evidence that they did not -- or, more importantly, that it was imprudent to believe that those operations could service that debt. That acquisition still left about $ 200 million credit available for the repurchase of ESOP shares from its retiring employees, far more than historically had been necessary. We are told that the stock evaluation was too high, primarily because it did not take into account a presumed likelihood that a higher value would impact the repurchase obligation, although that "too high" is not quantified. But prior increased valuations, some of similar dimensions, had not triggered any significant change in stock or employee turnover. The cash crunch resulted from a turnover increase from 9 or 10 per cent to over 32 per cent, an extraordinary and wholly unexpected surge. When the dimensions of that cash crisis began to emerge, the measures taken to stem the hemorrhaging were not imprudent. We recognize that the changes [*52] in Amsted's fortunes had a far-reaching adverse impact on at least many in the class and bitterly disappointed their expectations, but that adverse impact is not, by itself, the predicate of legal liability.

Other Issues and Motions

Given that we have granted summary judgment on all claims discussed above for both the Amsted defendants and LaSalle, it follows that defendants are also granted summary judgment for plaintiffs' *§ 1105* claims seeking liability against defendants for their co-fiduciaries' violations. Plaintiffs' motion for summary judgment is denied and defendants Berg, Sopranos and Chiappetta's motion for summary judgment is moot.

**CONCLUSION**

For the foregoing reasons, the Amsted defendants' and LaSalle's motions for summary judgment are granted. Plaintiffs' motion for summary judgment is denied. Defendants Berg, Sopranos and Chiappetta's motion for summary judgment is moot, and is therefore denied.

---

amendments are no longer a settlor function, only that the settlor is now subject to fiduciary responsibilities.

JAMES B. MORAN

Senior Judge, U.S. District Court

July 29, 2004.

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT **[*53]** IS HEREBY ORDERED AND ADJUDGED that the Amsted defendants' and LaSalle's motions for summary judgment are granted. Plaintiffs' motion for summary judgment is denied. Defendants Berg, Sopranos and Chiappetta's motion for summary judgment is moot, and is therefore denied.

Date: 7/29/2004

**End of Document**

# Tab B


# *Herrington v. Household Int'l, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

March 30, 2004, Decided ; March 31, 2004, Docketed

No. 02 C 8257

**Reporter**
2004 U.S. Dist. LEXIS 5461 *; 2004 WL 719355

HERRINGTON, et al., Plaintiffs, v. HOUSEHOLD INT'L, INC., et al., Defendants.

**Disposition:** [*1] Motion to dismiss granted in part and denied in part.

## Core Terms

fiduciary, Stock, allegations, contributions, disclose, employees, matching, motion to dismiss, misrepresentation, participating, investments, non-public, omission, monitor, manage, disclosure, breached, fiduciary duty, practices, requirements, retirement, imprudent, premature, notice pleading, co-fiduciary, conclusions, provisions, prudently, juncture, pleading requirements

## Case Summary

### Procedural Posture

Plaintiffs, employees, filed a class action suit against defendants, company, its chief executive officer (CEO), investment plan committee, and its members, and alleged failure to prudently manage investment plan assets, to provide complete information to plan participants, to properly monitor the committee and its members, and breach of the duty to manage plan assets. The company, the CEO, the committee, and its members moved to dismiss.

### Overview

The company's investment plan also constituted an employee stock ownership plan. The plan was an employee pension benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, *29 U.S.C.S. § 1001 et seq.* While the company was engaged in improper accounting practices, the fiduciaries of the plan continued to offer the company's stock fund as a 401(k) retirement investment to participating employees, and did not provide the truth concerning the artificially inflated value of the company's stock. As a result of those acts or omissions, the plan

experienced a loss in the hundreds of millions of dollars. The court denied the committee and its members' motion to dismiss the employees' claim that they failed to prudently manage the plan assets where the employees' allegation that because the committee and its members knew of the company's predatory lending practices, the investments made were imprudent, was sufficient to state a claim. The motion to dismiss was granted to the extent that the employees alleged intentional misrepresentation because the employees failed to meet the heightened pleading requirements under *Fed. R. Civ. P. 9(b)*.

### Outcome

The motion to dismiss was denied as to the claims of failure to prudently manage plan assets, breach of loyalty, breach of duty to monitor, and breach of duty to manage the plan regarding matching contributions. The motion to dismiss was granted as to the claims of misrepresentation, omission to disclose non-public information, failure to disclose non-public information on the part of the company and the CEO, and co-fiduciary liability.

**Counsel:** For ARTHUR RAY HERRINGTON, JR, on Behalf of Himself and a Class of Persons Similarly Situated, and on Behalf of the Household International Tax Reduction Investment Plan, plaintiff: Edwin J Mills, Stull, Stull & Brody, New York, NY. Robert D. Allison, Robert D. Allison & Associates, Chicago, IL.

For HOUSEHOLD INTERNATIONAL INC., DAVID A SCHOENHOLZ, W F ALDINGER, defendants: Robert Y. Sperling, Ronald Steven Betman, Catherine W. Joyce, Michael P. Roche, Winston & Strawn LLP, Chicago, IL. Nathan P. Eimer, Adam B. Deutsch, Eimer Stahl Klevorn & Solberg, LLP, Chicago, IL.

For ROBERT J DARNALL, GARY G DILLON, ANTHEA DISNEY, JOHN A EDWARDSON, J DUDLEY FISHBURN, CYRUS F FREIDHEIM, JR, JAMES H GILLIAM, JR, LOUIS E LEVY, GEORGE A LORCH, JOHN D NICHOLS, JAMES B PITBLADO, LARREE M RENDA, S JAY STEWART, STEVEN L MCDONALD, MARY E BILBREY, MICHAEL A DELUCA, defendants:

Robert Y. Sperling, Ronald Steven Betman, Catherine W. Joyce, Michael P. Roche, Winston & Strawn LLP, Chicago, IL.

**Judges:** Samuel Der-Yeghiayan, United States District Judge.

**Opinion by:** Samuel Der-Yeghiayan

# Opinion

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This **[*2]** matter is before the court on Defendants' Motion to Dismiss the complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. The motion was filed by Defendants Household International ("Household"), the Administrative and Investment Committee of the Plan and its members Edgar A. Ancona, Mary E. Bilbrey, Michael Carlson, Colin P. Kelly and David A. Schoenholz and William F. Aldinger ("Aldinger"), the Chief Executive Officer and Chairman of Household. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs Michael Cokenour ("Cokenour") and Arthur Ray Herrington, Jr. ("Herrington") were employees of Defendant Household and participants in the Household Tax Reduction Investment Plan ("Plan"), a tax-qualified 401(k) plan. This action is brought by Plaintiffs on behalf of "all participants in the Plan and their beneficiaries, excluding the Defendants, for whose accounts the fiduciaries of the Plan made or maintained investments in Household stock through the Household Stock Fund between July 23, 2001 and the present."

Defendant Household is a holding company with three heads: (1) consumer, which **[*3]** includes consumer lending, mortgage services, retail services and auto finance businesses; (2) credit card, which includes domestic Visa and MasterCard businesses; and (3) international, which includes operations in the United Kingdom and Canada. Household is the sponsor of the Plan at issue. Next, the complaint names as defendants, the Administrative and Investment Committee of the Plan ("Committee") and its members Edgar A. Ancona, Mary E. Bilbrey, Michael Carlson, Colin P. Kelly and David A. Schoenholz (collectively, the "Committee Defendants") and Aldinger, the Chief Executive Officer and Chairman of Household.

The Plan is an "employee pension benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") § 3(2)(A), *29 U.S.C. § 1002(2)(A)*, an "eligible individual account plan," within the meaning of ERISA § 407(d)(3), *29 U.S.C. 1107(d)(3)*, and a "qualified cash or deferred arrangement" within the meaning of the Internal Revenue Code ("I.R.C.") *§ 401(k), 26 U.S.C. § 401(k)*. The Plan is maintained to "enable eligible employees of the Company to acquire **[*4]** Company Stock and to accumulate funds for their future security by electing to make income deferral contributions and by sharing in Company contributions to the Plan." Plan art. 1.2. "The Plan also constitutes an employee stock ownership plan that is designed to invest primarily in Company Stock and that is intended to meet the applicable requirements of *Sections 401(a), 409, and 4975(e)(7)* of the [Internal Revenue] Code and *Section 407(d)(6) of ERISA*." *Id.*

With the Plan in place, eligible Household employees are allowed to contribute to the Plan through deductions from their paychecks. The participating employees may direct the investment of their contributions to one or more of several available Plan funds. These investment options are mostly diversified mutual funds, but participating employees who desire to invest in Company Stock may do so through an investment option designed for that purpose, the Household International, Inc. Common Stock Fund (the "Household Stock Fund"). The Plan requires Household to match the participating employee's contributions at specified percentages by making contributions to the participating employees' accounts in the **[*5]** Household Stock Fund. These matching contributions can be made either in Household common stock or cash. Plan art. 11.1. The matching contributions are primarily invested in Household Stock, "except for the short term investment of cash." Trust Agreement, art. 9.

In October 2002, Household paid $ 484 million to settle widespread charges of suspect lending practices. This settlement, described as "the largest consumer settlement in history," resulted in a $ 525 million charge to Household's earnings. As a result, Household allegedly engaged in improper accounting practices and restated its earnings for at least an eight year period, spanning 1994-2002. The complaint further alleges that this caused an overstatement of pre-tax income by approximately $ 610 million in defendant Household's favor. On March 18, 2003, things worsened for Household as they consented to an S.E.C. issued Order Instituting Cease and Desist Proceedings, Making Findings and Imposing Cease-and-Desist Order pursuant to *Section 21C of the Securities Exchange Act of 1934*, relating to

Household's account re-aging practices and disclosures. This Order found, in relevant part, that Household restructured a far higher [*6] volume of delinquent loans than its peer lenders, and implemented a policy of automatically restructuring delinquent loans, often without contacting the borrower. The Order thus held that Household failed to accurately disclose its restructuring policies, and the disclosures made were nevertheless materially misleading.

While defendant Household was engaged in this questionable behavior, the fiduciaries of the Plan continued to offer the Household Stock Fund as a 401(k) retirement investment to participating employees. These Plan fiduciaries never withdrew the Household Stock Fund as an option, nor did they choose to make the Household matching contributions in cash rather than Stock, nor did they provide the participating employees with the truth concerning the artificially inflated value of defendant Household Stock and the risks associated with continuing to have more than 60% of the Plan's assets invested in said Stock. As a result of these acts or omissions by the Plan fiduciaries, the Plan, with thousands of participating employees, experienced a loss in the hundreds of millions of dollars once defendant's Household's questionable practices were exposed.

The Plaintiffs filed [*7] a four count class action complaint against the above-named defendants. Count I alleges the Committee Defendants failed to prudently manage the Plan assets by continuing to offer Household Stock as a retirement investment when they knew it was imprudent. Count II alleges the Committee Defendants failed to provide complete and accurate information to Plan participants concerning their retirement investment in Household Stock. Count III alleges that Household and defendant C.E.O. Aldinger failed to properly monitor the Committee Defendants, including by failing to provide them with crucial information regarding the value of Household Stock. Count IV alleges that Household breached its duty to manage Plan assets by continuing to provide the Household matching contributions in Household Stock rather than cash. Defendants responded to each of the four counts by filing a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*.

**LEGAL STANDARD**

In ruling on a motion to dismiss, the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, [*8] and accept as true all well-pleaded facts and allegations in the complaint. *Thompson v. Illinois Dep't of Prof'l Regulation, 300 F.3d 750, 753 (7th Cir. 2002)*; *Perkins v. Silverstein, 939 F.2d 463, 466 (7th Cir. 1991)*. The

allegations of a complaint should not be dismissed for a failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High School, 144 F.3d 448, 454-55 (7th Cir. 1998)*; *Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992)*. The plaintiff need not allege all of the facts involved in the claim and can plead conclusions. *Higgs v. Carver, 286 F.3d 437, 439 (7th Cir. 2002)*; *Kyle, 144 F.3d at 455*. However, any conclusions pled must "provide the defendant with at least minimal notice of the claim," *Id.,* and the plaintiff cannot satisfy federal [*9] pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the bases of [his] claim." *Perkins, 939 F.2d at 466-67*

**DISCUSSION**

I. Fiduciary Duty

Defendants first argue that none of the Defendants are fiduciaries and thus they cannot have breached a fiduciary duty. Plaintiffs correctly point out that every ERISA plan requires a named fiduciary and that even persons not named as fiduciaries can be considered functional fiduciaries. *29 U.S.C. § 1102(a)(1)* &*(2)*; *29 U.S.C. § 1002(21)(A)*. Also, the definition of fiduciary under ERISA shows that this issue is not as clear cut an issue as Defendants would have this court believe. *Section 3(21) of ERISA* states the following:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, [*10] with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

*29 U.S.C. § 1002*. Plaintiffs allege that the Committee Defendants were named fiduciaries and were responsible for monitoring the investments of the Plan and Plaintiffs have

made other allegations of involvement with the Plan in a position of trust. We agree with Plaintiffs that the allegations do not conclusively show that the Defendants were not fiduciaries with respect to the monitoring of the investments and providing a company match. Defendants' arguments in this regard are premature at this juncture. *See Pappas v. Buck Consultants, Inc., 923 F.2d 531, 538 (7th Cir. 1991)*(indicating that the determination of whether an individual is a fiduciary involves "factual determinations.").

## II. Imprudent Investment of Plan Assets (Count I)

In Count I of the complaint Plaintiffs allege that the Committee Defendants failed to prudently **[*11]** manage the Plan assets by their continuous offer of Household Stock as a retirement investment and continuing to invest matching contributions in Household Stock, notwithstanding that they knew or should have known such investment was imprudent.

## A. Whether Plaintiffs State a Claim

Defendants take issue with the conclusory nature of Plaintiffs' allegations in Count I. Pursuant to *Federal Rule of Civil Procedure 8(a)* a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The notice pleading standard is admittedly liberal, requiring only that notice of the claim be given rather than detailed facts underlying the claim. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)*.

Plaintiffs allege that the Committee Defendants "knew or should have known" that investing in Household Stock was imprudent. (Comp. 53). Plaintiffs also allege that the Committee defendants were "key" Household employees or officers, appointed by Household's CEO, who exercised their Plan-related behavior in the course and scope of their **[*12]** employment with Household. (Comp. 38, 41, 42, 47). Defendants contend that the allegations are too vague and do not provide them with notice of the claim against them. Defendants indicate that Plaintiffs were required to explain how the alleged key employees knew that the investments were imprudent and when they acquired the knowledge. Defendants also argue that Plaintiffs were required to explain in more detail the alleged improper conduct of the key employees. We disagree. While a more detailed complaint would have been beneficial for Defendants' understanding of the charges against them and for the court to understand the charges alleged by Plaintiffs, Plaintiffs have met the liberal pleading requirements under the notice pleading standard. Plaintiffs are not required to allege all of the facts for their claim or allege facts to support each element of their claim. *Higgs, 286 F.3d at 439*; *Kyle, 144 F.3d at 455*; *see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc, 40 F.3d 247, 251 (7th Cir. 1994)*(indicating that under current notice pleading standard in federal courts a plaintiff "need to plead facts that, if true, **[*13]** establish each element of a 'cause of action,'" that "at this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint," and that "matching facts against legal elements comes later").

Plaintiffs have indicated that the managing employees in question were key employees and that they managed to acquire the knowledge that Household was guilty of predatory lending practices and misstatements. Plaintiffs contend that because the Committee members knew of the practices that the investments made were imprudent. This is sufficient to state a claim. Defendants' assertions that Plaintiffs have not explained exactly what each Defendant did wrong, how they acquired the information, and how they improperly used the information are premature at this juncture. Defendants improperly seek to require the same type of detail in regards to Count I required under *Federal Rule of Civil Procedure 9(b)* for fraud claims. *See Uni* Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992)*(explaining that the *Rule 9(b)* particularity requirement requires a plaintiff to plead the "'who, **[*14]** what, when and where' of the alleged fraud."). Plaintiffs' allegations are sufficient to withstand a motion to dismiss under the notice pleading standard.

## B. Discretion of Committee to Alter Investments

Defendants also claim that Count I cannot state a claim because even if the alleged key employees were aware of the Household practices, the Committee members had no discretion under the Plan to choose not to invest in Household stock. Defendants' argument in this regard is unconvincing. No section in ERISA would be read to require fiduciaries to make investments for a plan if the fiduciary has information that shows that the investment is a poor one. Plaintiffs correctly point out that ERISA states explicitly that fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter." *29 U.S.C.A. § 1104(a)(1)(D)*.

A fiduciary is required to discharge his or her duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity **[*15]** and familiar with such matters would use in

the conduct of an enterprise of a like character and with like aims. . . ." *29 U.S.C.A. § 1104(a)(1)(B)*. Thus the Committee Defendants cannot hide behind the provisions of the Plan. *See Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 568, 86 L. Ed. 2d 447, 105 S. Ct. 2833 (1985)*(stating that "trust documents cannot excuse trustees from their duties under ERISA, and that trust documents must generally be construed in light of ERISA's policies").

## C. Failure to Take Illegal Actions

Defendants also assert that Count I fails to state a claim because even if the Committee Defendants knew of the alleged unlawful practices by Household, Defendant Committee Defendants were prohibited under federal securities law from trading based upon non-public information. Plaintiffs argue that at a minimum the Committee Defendants could have notified the appropriate regulatory agencies of the misstatements by Household, refrained from further investment in Household stocks, or made a public announcement regarding Household's conduct. We are not convinced that such actions could **[*16]** be required of the Committee Defendants. Had the Committee Defendants done either of the first two alternatives it is possible that the ultimate result would be that the public would learn of or suspect the improper conduct by Household which would generally be the same result as the third alternative. It is possible that had the Committee Defendants followed the suggested conduct they would simply have accelerated the demise of the Household stock held by the fund. Their duty as fiduciaries was to prevent such losses. However, it is not conclusive from the facts before us whether or not the Committee Defendants had viable alternatives that they could have taken. At this stage of the proceedings it is not the burden of Plaintiffs to address all of the potential counter-arguments by Defendants in the complaint. We find that Defendants' arguments on this issue are premature and deny the motion to dismiss Count I to the extent that it contains a claim of imprudent management of the Plan assets. *Conley, 355 U.S. at 45-46* (stating that the allegations of a complaint should not be dismissed for a failure to state a claim "unless it appears beyond doubt that the plaintiff **[*17]** can prove no set of facts in support of his claim which would entitle him to relief.").

## III. Breach of Duty of Loyalty (Count I)

Defendants also argue that we should dismiss the breach of loyalty claim in Count I. Plaintiffs contend that the Committee Defendants had a conflict of interest because they

were both on the Committee and were employees of Household. *Section 408(c)(3) of ERISA* states that "nothing in section 1106 of this title shall be construed to prohibit any fiduciary from . . . serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest." *29 U.S.C.A. § 1108(c)(3)*. Defendants cite *Cuddington v. Northern Indiana Public Service Co.* for the proposition that "just because the Pension Committee is dominated by [the employer's] employees does not automatically mean that a conflict exists." *33 F.3d 813, 816 (7th Cir. 1994)*. However, such an argument only encourages this court to proceed to the next steps of litigation to assess the evidence and decide if there is sufficient evidence that a conflict exists. Plaintiffs do allege that the compensation of the Committee **[*18]** Defendants was tied into the Household stock price and the Plan investment in the stock and thus we think that it would be premature to dismiss the breach of loyalty claim based upon a conflict of interest at this juncture.

## IV. Misrepresentation Claim (Count II)

In count II, Plaintiffs allege that the Committee Defendants failed to provide complete and accurate information to Plan participants concerning their retirement investment in Household Stock.

## A. Applicability of *Rule 9(b)*

Defendants first argue that *Federal Rule of Civil Procedure 9(b)* is applicable to Count II because Count II is essentially a fraud claim, or should be treated as one for purposes of this motion and that Plaintiffs have not met the pleading requirements under *Rule 9(b)*. While the notice pleading standard is generally applied in the federal courts, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," *Fed. R. Civ. P. 9(b)*, which is accomplished if the plaintiff identifies "the identity of the person making the misrepresentation, the time, place, **[*19]** and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992)*(quoting *Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990))*. *Rule 9(b)* has been termed an exception to the otherwise liberal pleading requirements set forth in *Rule 8. Payton v. Rush-Presbyterian-St. Luke's Medical Ctr., 184 F.3d 623, 627 (7th Cir. 1999)*. The justification for a stricter standard of pleading stems from the reality that fraud claims can cause harm to business reputations. *Id.*

At first blush, Count II contains no allegations of fraud, however a closer examination of the complaint leads us to

conclude that *Rule 9(b)* is applicable to Count II. The core of the parties' arguments on this point stem from how they characterize the alleged misrepresentations in Count II. Defendants argue that the alleged misrepresentations at issue are allegations concerning intentional wrongdoing and in response Plaintiffs argue that at most they allege negligent conduct and therefore *Rule 9(b)* does not operate. Both sides cite *Adamczyk v.* **[*20]** *Lever Bros. Co.* in which that court held that *Rule 9(b)* does not apply to negligent misrepresentation claims, but does apply to claims of knowing misrepresentation. *991 F. Supp. 931, 939 (N.D. Ill. 1997).*

Plaintiffs allege that the Committee Defendants made misrepresentations because their compensation was connected to Household's stock price, and the Plan's investment supported the stock. (Comp. 111, 112). We agree with Defendants that the allegations in the complaint clearly allege intentional misrepresentations and that *Rule 9(b)* is applicable. Plaintiffs have not met the heightened pleading requirements under *Rule 9(b)* and therefore we grant the motion to dismiss Count II to the extent that it alleges intentional misrepresentation.

## V. Omission to Disclose Non-Public Information (Count II)

Defendants argue in support of dismissal of Count II that, apart from the misrepresentations alleged in the complaint, the plaintiffs fail to state a claim with respect to the alleged omission to disclose nonpublic information. Plaintiffs argue in response that defendants are improperly characterizing Count II and that defendants had a duty to provide information to the **[*21]** Plan Participants, and the defendants breached that duty.

Count II states: "Employees never received any information from the Company or any other plan fiduciary that indicated that the Company's stock was not a prudent investment." (Compl. 107, 131). Defendants argue that this allegation, which forms the basis for Plaintiffs' omissions claim, is an attempt to broaden the disclosure requirements far beyond what is required by *ERISA § 404*, into "a continuous gathering and disclosure of all material nonpublic information about a plan sponsors financial condition…" (Def. Reply Brf. at 26). Plaintiffs, for their part, defend this allegedly sweeping disclosure duty by correctly noting a series of cases which held that fiduciaries have a duty to speak when silence would hurt a beneficiary. *See, e.g., Franklin v. First Union Corp., 84 F. Supp. 2d 720, 735 (E.D. Va. 2000)* (fiduciary had "a duty to notify the plaintiffs of the changes in the investment funds in such a manner as to prevent any misinformation to and misleading of the plaintiffs…").

The issue, in its simplest form, thus becomes to what extent plaintiffs can push *ERISA § 404*'s duty of disclosure provisions **[*22]** beyond its explicit terms, given the facts alleged in this case, to state a claim with respect to the alleged omission to disclose non-public information. The United States Supreme Court has yet to address this question. *Varity Corp. v. Howe, 516 U.S. 489, 506, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996)* ("we need not reach the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries"). To resolve the issue, both parties have debated the applicability of a recent Fifth Circuit case dealing with the general issue at hand. *Ehlmann v. Kaiser Foundation Health Plan of Texas, 198 F.3d 552 (5th Cir. 2000).*

The Seventh Circuit has not allowed claims for fiduciary breach based on passive behavior, "unless a fiduciary fails to give a beneficiary material information regarding a plan and the fiduciary's silence is misleading." *Chojnacki v. Georgia-Pacific Corp., 108 F.3d 810, 817 (7th Cir. 1997).* It is apparent from the face of the complaint that the allegations regarding the omission to disclose nonpublic information encompasses such "passive behavior."

All of the **[*23]** cases cited by Plaintiffs involved a specific alleged failure to disclose a concrete piece of information, and how that specific failure as to that specific piece of information states a cause of action in light of *Varity Corp. See, e.g., McDonald v. Provident Indemnity Life Ins. Co., 60 F.3d 234 (5th Cir. 1995)* (failure to disclose a new rate schedule); *Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec. Inc., 93 F.3d 1171 (3d Cir. 1996)* (failure to disclose details regarding the investment advisor); *Bins v. Exxon Co. U.S.A., 189 F.3d 929* (failure to disclose change in lump sum retirement incentive). These cases are distinguishable because even they do not go as far as plaintiffs are hoping to extend defendants duty to disclose information. More importantly, the *Chojnacki* decision from our Court of Appeals, would seem to restrain this extension of this breach of fiduciary duty based upon "passive behavior." *See Chojnacki, 108 F.3d at 817.*

The disclosure standard urged by Plaintiffs in this case is too broad as it would require defendants to continuously gather and disclose nonpublic information bearing **[*24]** some relation to the plan sponsor's financial condition. Such a burdensome and unprecedented level of disclosure has not been approved by the Seventh Circuit and for this court to permit such would be to extending the statutory language beyond their plain meaning. Our authority to interpret ERISA's fiduciary provisions is not absolute, but is limited by the text of the statute. In this instance, plaintiff's proposed duty is not found in the text of the statutes or the cases. We

also note that as indicated above, that a public disclosure of the wrongdoing or a notification of others that might leak the information to the public would have caused the stock price to fall and the losses would result to the Plan regardless. Therefore, we grant the motion to dismiss Count II to the extent it is based on the alleged omission to disclose nonpublic information.

## VI. Failure to Monitor and Provide Accurate Information (Count III)

In count III of the complaint, Plaintiffs allege that Household and Mr. Aldinger breached fiduciary duties under ERISA by failing to monitor the Committee Defendants and to provide them with information. Defendants first assert that Household had no fiduciary [*25] responsibility with respect to the alleged acts or omissions of the Committee Defendants. Secondly, defendants argue that the claim should also be dismissed as Plaintiffs fail to allege any facts showing that Mr. Aldinger or Household breached any duty they might have had to monitor the Committee Defendants. Defendants final argument in support of dismissal states that plaintiffs fail to state a claim against Household or Mr. Aldinger based on their alleged failure to divulge nonpublic information to the Committee Defendants.

At this stage in the opinion, we have held that at this juncture the claims remain against the Committee Defendants except for the claim based on the alleged failure to disclose non-public information and the intentional misrepresentation claim. Defendants acknowledge that Aldinger had the authority under the plan to appoint and remove Committee members. Defendants argue that Aldinger and Household properly monitored the Committee Defendants and argue that the facts alleged do not show that Aldinger and Household failed to act in a reasonable manner. Such an argument includes a factual determination and is premature at this juncture.

Defendants also argue that [*26] Aldinger and Household were not fiduciaries. However, the fact that individuals authorized to monitor administrators of a retirement plan and had "only limited fiduciary responsibilities does not mean that they had no responsibilities whatever." *Leigh v. Engle, 727 F.2d 113, 135 (7th Cir. 1984)*. The individuals charged with such monitoring are "fiduciaries responsible for selecting and retaining their close business associates as plan administrators . . . [and cannot] abdicate their duties under ERISA merely through the device of giving their lieutenants primary responsibility for the day to day management of the trust." At the very least a finding that neither Aldinger or Household were fiduciaries is premature at this stage. Therefore, we deny

the motion to dismiss Count III to the extent that it alleges a claim based upon Aldinger's and Household's fiduciary duty to monitor the Committee Defendants.

Plaintiffs also allege in Count III that Aldinger and Household failed to disclose non-public information to the Committee Defendants. For the reasons stated above in regards to the similar issue in Count II we grant the motion to dismiss. We also note that Plaintiffs [*27] have not shown that ERISA or the plan placed any such duty on the shoulders of Aldinger or Household.

## VII. Breach of Duty to Manage Plan Assets- Matching Contributions (Count IV)

Count IV alleges that Household breached its duty to manage Plan assets by continuing to provide the Household matching contributions in Household Stock rather than cash. Defendants argue that this claim should be dismissed because Household had no discretion to depart from making the match in Company Stock, and that in the absence of such discretion no fiduciary duty could be breached.

As indicated above, a plan fiduciary is not required to follow the plan requirements if the result would be detrimental to the plan. *29 U.S.C.A. § 1104(a)(1)(D)*; *29 U.S.C.A. § 1104(a)(1)(B)*. Thus, neither Household nor the Committee Defendants can hide behind the provisions of the Plan.

Plaintiffs assert that Household breached its duty of prudence to Plan participants by continuing to make matching contributions in Household stock. In accordance with our conclusions above, we are not certain that this would be a viable alternative for Household to avoid loss to the [*28] Plan. Such actions could have created suspicion and caused the stock price to fall. However, such a determination is premature at this juncture. Defendants argue that even if Household gave matching cash contributions from Household, the Plan required the Committee Defendants to use the cash contributions to purchase Household stock. However, as indicated above once the Committee Defendants had the cash contributions from Household, they were not necessarily obligated to follow the Plan guidelines if such actions would be detrimental to the Plan. Therefore we deny the motion to dismiss Count IV to the extent that it alleges a breach of a duty of prudence against Household in regards to matching contributions with Household stock.

## VIII. Co-Fiduciary Liability (Count I)

Defendants argue that we should dismiss Count I to the extent

that it alleges a claim of co-fiduciary liability. *Section 1105 of ERISA* provides:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: **[*29] (1)** if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; **(2)** if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or **(3)** if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

*29 U.S.C.A. § 1105(a)*. Plaintiffs allege that the Committee Defendants breached their fiduciary duty by "knowingly undertaking to conceal Household's failure to prudently and loyally manage Plan assets . . . ." (Comp. 122). We find that this conclusory allegation does not even meet the liberal requirements under the notice pleading standard. There are not sufficient facts to provide Defendants with notice of the operative facts which would pertain to a co-fiduciary liability claim. The allegations that all of the Defendants knew of the improper conduct of Household and the Defendants individually acted improperly **[*30]** does not show that co-fiduciary liability is appropriate. Therefore, we grant Defendants' motion to dismiss the claim based upon co-fiduciary liability.

**CONCLUSION**

Based on the foregoing analysis, we deny the Defendants' motion to dismiss the claim for failure to prudently manage Plan assets in Count I. We deny the Defendants' motion to dismiss the breach of loyalty claim in Count I. We grant the Defendants' motion to dismiss the misrepresentation claim in Count II. We grant the Defendants' motion to dismiss the claim for the alleged omission to disclose non-public information in Count II. We deny the Defendants' motion to dismiss the breach of duty to monitor claim in Count III. We grant the Defendants' motion to dismiss the claim in Count III based upon Aldinger's and Household's failure to disclose non-public information. We deny the Defendants' motion to dismiss the breach of duty to manage the Plan claim regarding matching contributions in Count IV. We also grant the Defendants' motion to dismiss the co-fiduciary liability claim in Count I.

Samuel Der-Yeghiayan

United States District Court Judge

Dated: March 30, 2004

**End of Document**

# Tab C


# *Hill v. Tribune Co.*

United States District Court for the Northern District of Illinois, Eastern Division

September 29, 2006, Decided ; September 29, 2006, Filed

No. 05 C 2602, No. 05 C 2927V, No. 06 C 0741

**Reporter**

2006 U.S. Dist. LEXIS 71244 *; 39 Employee Benefits Cas. (BNA) 1845

MARGARET K. HILL, Trustee of Kelk Irrevocable Trust, on behalf of herself and all others similarly situated, Plaintiff, v. THE TRIBUNE COMPANY, DENNIS J. FITZSIMONS, DONALD C. GRENESKO, and JACK FULLER, Defendants. THOMAS F. MURRAY, individually and on behalf of a class of similarly situated Plan participants, Plaintiff, v. THE TRIBUNE COMPANY, DENNIS J. FITZSIMONS, JOHN W. MADIGAN, DONALD C. GRENESKO, CHANDLER BIGELOW, DAVID J. GRANAT, TRIBUNE COMPANY EMPLOYEES BENEFITS COMMITTEE, GERALD W. AGEMA, JEFFREY CHANDLER, JOHN DOES 1-30, FIDELITY MANAGEMENT TRUST COMPANY, ROGER GOODAN, MARK M. HARRIS, ENRIQUE HERNANDEZ, BETSY HOLDEN, BRIGID E. KENNEY, THOMAS D. LEACH, LUIS E. LEWIN, ROBERT MORRISON, RUTHELLYN MUSLIN, WILLIAM OSBORN, J. CHRISTOPHER REYES, IRENE M.F. SEWELL, WILLIAM STINEHART, DUDLEY TAFT, KATHRYN TURNER, VANGUARD FIDUCIARY TRUST COMPANY and MILES D. WHITE, Defendants. CITY OF PHILADELPHIA BOARD OF PENSIONS AND RETIREMENT, individually and on behalf of all others similarly situation, Plaintiffs, v. THE TRIBUNE COMPANY, LOUIS SITO, and RAYMOND JANSEN, Defendants.

**Subsequent History:** Affirmed by *Pugh v. Tribune Co., 2008 U.S. App. LEXIS 6912 (7th Cir. Ill., Apr. 2, 2008)*

**Prior History:** *Hill v. Tribune Co., 2005 U.S. Dist. LEXIS 23931 (N.D. Ill., Oct. 13, 2005)*

## Core Terms

circulation, allegations, stock, press release, scienter, individual defendant, fiduciary, lead plaintiff, inflated, numbers, advertising, cases, filings, motion to dismiss, figures, Plans, Securities, newspaper, participants, overstated, investing, lawsuit, audits, misleading, inferring, company stock, deficient, overstatements, appointed, issuing

## Case Summary

**Procedural Posture**

Plaintiff stockholder sued defendants, a corporation and executives, alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, *15 U.S.C.S. §§ 78j(b)* and 78t(a), and *17 C.F.R. § 240.10b-5*. In a separate case, plaintiff participants sued defendants, the corporation and alleged fiduciaries, alleging violations of the Employee Retirement Income Security Act of 1974 (ERISA). Defendants in both actions moved to dismiss.

**Overview**

Both actions involved allegations that paid circulation numbers for newspapers owned by the corporation had been overstated, resulting in artificial inflation of the corporation's stock price. The court found that the securities fraud claims failed because scienter was not alleged as required under *15 U.S.C.S. § 78u-4(b)* of the Private Securities Litigation Reform Act of 1995. Some of the executives were allegedly involved in inflating the circulation numbers but were not alleged to have taken steps to mislead the investing public. Allegations against other executives did not support an inference that they knew that circulation was overstated. The ERISA breach of fiduciary duty claims, which were brought under *29 U.S.C.S. §§ 1104*, *1105*, *1109*, and *1132*, also failed. The complaint failed to sufficiently allege a breach of fiduciary duty arising from a failure to diversify away from the corporation's stock; the exception from mandatory diversification under *29 U.S.C.S. § 1104(a)(2)* applied. Nor did the complaint sufficiently allege a negligent failure to disclose information regarding the overvaluation of the stock or a failure to adequately monitor appointed fiduciaries.

**Outcome**

Defendants' motions to dismiss were granted.

**Counsel: [*1]** For Thomas F Murray, individually and on behalf of a class of similarly situated Plan participants, Plaintiff: Charles Robert Watkins, John R. Wylie, Futterman

Howard Watkins Wylie & Ashley, Chtd., Chicago, IL; David C. Harrison, Richard Bemporad, Lowey, Dannenberg, Bemporad and Selinger PC White Plains, NY; Denise V. Zamore, Scott & Scott, LLC, Colchester, CT.

For Chad Boylan, Plaintiff: Mark V. Jackowski, Scott & Scott, LLC, Colchester, CT.

For The Tribune Company, Defendant: David F. Graham, Rachel B. Niewoehner, Erin Elaine Kelly, Mark Bruce Blocker, Tara Kocheran Charnes, Sidley Austin LLP, Chicago, IL.

For Dennis J Fitzsimons, John W. Madigan, Donald C Grenesko, Chandler Bigelow, David J. Granat, Gerald W Agema, Jeffrey Chandler, Roger Goodan, Mark M Harris, Enrique Hernandez, Betsy Holden, Brigid E Kenney, Thomas D Leach, Luis E Lewin, Robert Morrison, Ruthellyn Muslin, William Osborn, J Christopher Reyes, Irene M.F. Sewell, William Stinehart, Dudley Taft, Kathryn Turner, Miles D White, Defendants: Craig Christopher Martin, Amanda S Amert, Douglas Allen Sondgeroth, Jenner & Block LLP, Chicago, IL;

For Tribune Company Employee Benefits Committee, Defendant: [*2] Rachel B. Niewoehner, Erin Elaine Kelly, Sidley Austin LLP, Chicago, IL.

For Margaret K Hill, Trustee of Kelk Irrevocable Trust, on behalf of herself and all others similarly situated, Plaintiff: Norman Rifkind, Amelia Susan Newton, Leigh R. Lasky, Lasky & Rifkind, Ltd., Chicago, IL; Benny C. Goodman, III, Henry Rosen, Lerach Coughlin Stoia Geller, Rudman & Robbins, San Diego, CA; Lawrence D. McCabe, Marvin L Frank, Murray, Frank & Sailer LLP, New York, NY.

For Tribune Company, Dennis J Fitzsimons, Donald C Grenesko, Jack Fuller, Defendants: David F. Graham, Tara Kocheran Charnes, Sidley Austin LLP, Chicago, IL; Kyle David Rettberg, Neal, Gerber & Eisenberg, Chicago, IL.

For John W. Madigan, Defendant: Tara Kocheran Charnes, Sidley Austin LLP, Chicago, IL.

For City of Philadelphia Board of Pensions and Retirement, proposed: Leigh Robbin Handelman, Patrick Vincent Dahlstrom, Douglas M Risen, Pomerantz Haudek Block Grossman & Gross LLP, Chicago, IL; Sherrie R. Savett, Berger & Montaque, P.C., Philadelphia, PA.

For Deka Investment GmbH, Movant: Brian Murray, Christopher S. Hinton, Murray, Frank & Sailer LLP, New York, NY; Adam J. Levitt, Wolf, Haldenstein, Adler, [*3] Freeman & Herz LLC, Chicago, IL.

For City of Philadelphia Board of Pensions and Retirement individually and on Behalf of All Others Similarly Situated, Plaintiff: Sherrie R. Savett, Douglas M Risen, Berger &

Montaque, P.C., Philadelphia, PA; Leigh Robbin Handelman, Patrick Vincent Dahlstrom, Pomerantz Haudek Block Grossman & Gross LLP, Chicago, IL.

For Tribune Company, Dennis J Fitzsimons, Jack Fuller, Donald C Grenesko, John W. Madigan, Defendants: David F. Graham, Tara Kocheran Charnes, Sidley Austin LLP, Chicago, IL.

For Louis Sito, Defendant: Alexander M. Levym, Judd Burstein, Judd Burstein, P.C., New York, NY; Steven Alan Miller, Sachnoff & Weaver, Ltd., Chicago, IL.

For Raymond Jansen, Defendant: Brendan J. Healey, Mandell Menkes LLC, Chicago, IL.

**Judges:** William T. Hart, UNITED STATES DISTRICT JUDGE.

**Opinion by:** William T. Hart

# Opinion

## MEMORANDUM OPINION AND ORDER

Before the court are three cases involving investments in the stock of defendant The Tribune Company ("Tribune"). Two of the cases are brought by a Tribune stock holder. These "Securities Cases" allege federal securities fraud claims governed by the Private Securities Litigation Reform Act of 1995 [*4] ("PSLRA"). The other case is brought by participants in Tribune pension plans holding Tribune shares in their accounts during the pertinent time period. This "ERISA Case" alleges violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). In each case, overstatements regarding the circulation of two newspapers (Newsday and Hoy) operated by Tribune subsidiaries, and a drop in Tribune share prices following disclosure of the overstatements of circulation are alleged. Most of the named defendants are management officials at Tribune who were not directly involved in the overstatements of circulation. The two types of cases are here originally for purposes of coordinated discovery. Motions to dismiss are pending in each case.

Pursuant to the PSLRA, the court appointed the City of Philadelphia Board of Pension and Retirement ("CPBPR") as lead plaintiff in the Securities Cases and also appointed lead counsel. See *Hill v. The Tribune Co., 2005 U.S. Dist. LEXIS 23931, 2005 WL 3299144 (N.D. Ill. Oct. 13, 2005)*. As required by court order, a Consolidated Amended Class Action Complaint was filed in the Securities Cases (the

"CAC"). [1] Subsequently, lead plaintiff filed a separate [*5] action against two defendants who had not been named in the CAC, *CPBPR v. Tribune Co., 2005 U.S. Dist. LEXIS 23931, No. 06 C 741* (the "741 case"). Lead plaintiff, in an abundance of caution, filed the 741 case instead of first seeking to amend the CAC because the statute of limitations for adding the two new defendants potentially was about to expire. Shortly after filing the 741 case, lead plaintiff moved to consolidate the 741 case into the Hill case and to amend the CAC. The proposed Second Amended Consolidated Class Action Complaint ("SAC") adds the two new defendants, including allegations about their backgrounds and connection to the case. It also adds some additional allegations regarding the overstatement of circulation and deletes an erroneous allegation about when certain arrests occurred. While defendants contend both the CAC and SAC should be dismissed for failing to adequately allege security law claims, there is no objection to consolidating the cases, which is what the PSLRA requires. Therefore, the 741 case will be dismissed without prejudice and lead plaintiff will be granted leave to file the SAC in the Hill case. The pending motions to dismiss in the Securities Cases will be treated [*6] as applying to the SAC. The motion to dismiss filed in the 741 case will be considered as if it had been filed in the Hill case. In accordance with the PSLRA, no discovery has been permitted while the motions to dismiss have been pending.

The PSLRA does not apply to the ERISA case. Although the plaintiffs in the five ERISA cases that had been pending had requested appointment of a lead plaintiff, no such appointment was made because, unlike the PSLRA, *Fed. R. Civ. P. 23*, has no provision for appointment of a lead plaintiff. *Hill, 2005 U.S. Dist. LEXIS 23931, 2005 WL 3299144 at *3*. In accordance with *Fed. R. Civ. P. 23(g)*, [*7] interim counsel was appointed for the ERISA Cases. *2005 U.S. Dist. LEXIS 23931, [WL] at *3-5*. A Consolidated Amended ERISA Complaint ("CAEC") was filed in the lowest numbered ERISA Case, *Murray v. The Tribune Co., 2005 U.S. Dist. LEXIS 23931, No. 05 C 2927*, and the other four ERISA cases were dismissed without prejudice. The CAEC has two named plaintiffs, Kenneth Pugh and Chad Boylan. All defendants in the ERISA Case have moved to dismiss the CAEC in that case.

Different pleading standards apply to the two types of cases.

The motions to dismiss the Securities Case will be considered first. Although some of the Securities Case defendants have not expressly joined in the motions to dismiss, to the extent any argument is applicable to another defendant, it will be considered as to all applicable defendants.

# I. SECURITIES CASE

## A. Defendants and Claims

Named as defendants in the SAC are the Tribune, Dennis FitzSimons, Donald Grenesko, Jack Fuller, John Madigan, Robert Brennan, Richard Czark, Robert Garcia, Louis Sito, and Raymond Jansen. The SAC describes each defendant as follows. Tribune is a media and entertainment company engaged in newspaper publishing, television, radio, and entertainment. The publishing [*8] segment includes at least 11 daily newspapers and represents approximately "70% of Tribune's total business." SAC P 17. FitzSimons has been Tribune's Chairman, President, and Chief Executive Officer since January 2003. From July 2001 through December 2002, he was its President and Chief Operating Officer. Grenesko is Senior Vice President, Finance and Administration, which makes him Tribune's Chief Financial Officer. Fuller was President of Tribune Publishing Company. Madigan was Chairman and Chief Executive Officer of Tribune from July 2001 through December 2002. [2]

Brennan was Newsday's Vice President for Circulation until placed on administrative leave in June 2004. Czark was Hoy's National Circulation Manager. Garcia was a sales and distribution manager for Hoy. Sito was Newsday's Vice President for Circulation until replaced by Brennan. Also, Sito was President, Publisher, and [*9] Chief Executive of Hoy; President and Chief Executive Officer of DSA Community Publishing; and Vice President for Hispanic Media at Tribune until his retirement in July 2004. Sito signed false circulation audits for Hoy that were reported to the Audit Bureau of Circulations ("ABC"). Jansen was the Publisher of Newsday from 1994 until he retired in July 2004. On behalf of Newsday, Jansen signed circulation audits containing false numbers which were reported to ABC. [3] The putative plaintiff class consists of persons who purchased Tribune common stock between January 24, 2002 and September 10, 2004.

The SAC contains two claims. The First Claim is against all defendants for violation of § 10(b) of the Securities Exchange

---

[1] Because it was the lowest numbered case of the original three Securities Cases that had been filed, the CAC was filed in the Hill case, which retained its original caption even though Margaret Hill is no longer the named plaintiff. The other two cases were dismissed without prejudice. See *Hill, 2005 U.S. Dist. LEXIS 23931, 2005 WL 3299144 at *3, 5*.

---

[2] FitzSimons, Grenesko, Fuller, and Madigan will be collectively referred to as the "Tribune Individual Defendants."

[3] Brennan, Czark, Garcia, Sito, and Jansen will be collectively referred to as the Newsday-Hoy Individual Defendants.

Act of 1934 (*15 U.S.C. § 78j(b)*) and Rule 10b-5 (*17 C.F.R. § 240.10b-5*). In the Second Claim all the individual **[*10]** defendants (that is, all defendants except Tribune) are alleged to be liable as controlling persons of the Tribune under § 20(a) of the Securities Exchange Act of 1934, *15 U.S.C. § 78t(a)*. Also in the Second Claim, FitzSimons, Grenesko, Fuller, and Madigan are claimed to be controlling persons of Brennan, Czark, Garcia, Sito, and Jansen. [4]

**[*11] B. Pleading Standards**

Because fraud is alleged, *Fed. R. Civ. P. 9(b)*'s requirement of particularized pleading applies to the SAC. Ordinarily, under *Rule 9(b)*, state of mind may be pleaded generally. The PSLRA, however, imposes more stringent pleading requirements than *Rule 9(b)*. In addition to the requirements of *Rule 9(b)*, the PSLRA requires that a complaint of securities fraud (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(1)*, *(2)*; *Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 594 (7th Cir. 2006)*. It is the latter requirement that is at issue: whether lead plaintiff has adequately pleaded that defendants acted with the necessary scienter or state of mind. The SAC must contain sufficient **[*12]** factual allegations "to convince a court at the outset that the defendants likely intended 'to deceive, manipulate, or defraud'" the investing public. *Id. at 594-95* (quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)*). Even under the

---

[4] Brennan, Czark, and Garcia were named in the CAC, but have not appeared. Defendants have requested that default judgments be entered against them. Sito and Jansen were the two new defendants named in the 741 case. Tribune was also named in the 741 case. At the time that the 741 case was reassigned, the motion to dismiss in Hill was already fully briefed. An agreed motion was filed in the 741 case requesting that defendants not be required to answer or otherwise plead in the 741 case since there was a pending motion to consolidate and a pending motion to dismiss the Hill case. The agreed motion was granted. At a subsequent hearing, however, defendant Sito indicated he might have contentions different from those raised in the Hill motion to dismiss. Sito was then ordered to indicate whether he joined in the previously briefed motion and to raise any additional contentions in a separate motion. Additional briefs were taken on the issues raised by Sito. Jansen has never indicated he has any distinct issues to raise and his attorney did not file an appearance until after Sito's motion was fully briefed.

PSLRA, at the pleading stage the plaintiff need only provide sufficient factual allegations; it is not necessary to establish or prove any facts, nor submit evidence in any form. See *Simpson v. Nickel, 450 F.3d 303, 306 (7th Cir. 2006)*.

The PSLRA did not change the scienter requirement for a *§ 10(b)* violation. *Tellabs, 437 F.3d at 600*. The standard is still a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst, 425 U.S. at 193 n.12*. Accord *Tellabs, 437 F.3d at 595*. That standard includes "reckless disregard of the truth," *SEC v. Jakubowski, 150 F.3d 675, 681 (7th Cir. 1998)*, cert. denied, *525 U.S. 1103, 119 S. Ct. 868, 142 L. Ed. 2d 770 (1999)*, which "may be defined as a highly unreasonable omission, involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, and which **[*13]** presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.)*, cert. denied, *434 U.S. 875, 98 S. Ct. 224, 98 S. Ct. 225, 54 L. Ed. 2d 155 (1977)*. Accord *Tellabs, 437 F.3d at 600*.

Although not changing the scienter standard itself, the PSLRA now requires that it be pleaded with sufficient facts to create a "strong inference" of scienter. The circuit courts have offered differing constructions of the strong inference requirement. While the pending motions were being briefed, Tellabs was issued, in which, for the first time, the Seventh Circuit addressed PSLRA pleading requirements. [5] The Seventh Circuit adopted the "middle ground" approach that had been adopted by six other circuits.

**[*14]**

    The text of the statute states only that the complaint must support "a strong inference" of scienter. Without more detailed instruction, we conclude that the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference. Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient.

---

[5] Tellabs was issued two days before lead plaintiff filed its answer to the Hill motion to dismiss. Lead plaintiff did not cite Tellabs in its brief, but did rely on many cases that are consistent with Tellabs. It also relied on some cases that are inconsistent with Tellabs. Defendants relied on Tellabs in their reply filed in Hill. Lead plaintiff's answer brief to Sito's motion to dismiss was filed well after Tellabs was decided. In that brief, lead plaintiff does not mention Tellabs.

*Tellabs, 437 F.3d at 601*.

Regarding inferences to be drawn from the facts that are alleged, the Seventh Circuit stated:

> Instead of accepting only the most plausible of competing inferences as sufficient at the pleading stage, we will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent. "Faced with two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant, it is inappropriate for us to make a determination as to which inference will ultimately prevail, lest we invade the traditional role of the factfinder." *Pirraglia v. Novell, Inc., 339 F.3d 1182, 1188 (10th Cir. 2003).* **[*15]** "Scienter is normally a factual question to be decided by a jury, but the complaint must at least provide a factual basis for its scienter allegations." [In re] Cerner Corp. [Securities Litigation], 425 F.3d [1079,] 1084-85 [(8th Cir. 2005)]. If a reasonable person could not draw such an inference from the alleged facts, the defendants are entitled to dismissal; the complaint would fail as a matter of law to meet the requirements of *§ 78u-4(b)(2)*. See *Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1105 (10th Cir. 2003)* ("We [] understand a 'strong inference' of scienter to be a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading.").

*Id. at 602*.

The Seventh Circuit rejected the group pleading presumption. There must be a strong inference of scienter regarding each defendant.

> The so-called "group pleading presumption" is "premised on the assumption that in cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published **[*16]** information,' it is reasonable to presume that these are the collective actions of the officers." [City of Monroe Employees Retirement System v.] Bridgestone Corp., 399 F.3d [651,] 689 [(6th Cir. 2005)]. . . . The answer, in our view, lies in the language of the statute. *Section 78u-4(b)(2)* requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." As the Fifth Circuit recently held, "PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is

inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate actions." Southland [Sec. Corp. v. Inspire Ins. Solutions, Inc.], 365 F.3d [353,] 365-66 [(5th Cir.2004)]. See also *Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1018 (11th Cir. 2004)* ("[W]e believe that the most plausible reading in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently **[*17]** demonstrating each defendant's state of mind regarding his or her alleged violations."). We find this reasoning persuasive. While we will aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases.

*Id. at 602-03*.

## C. Facts Alleged

With these standards in mind, the allegations supporting scienter must be considered. At least as early as 2001, Newsday and Hoy overstated their paid circulation. Under standards set by ABC, an independent non-profit monitoring service, distribution of a newspaper does not count as paid circulation unless the newspaper is sold for at least 25% of its basic single copy price. Schemes that were employed to overstate paid circulation included phony hawking programs, false affidavits that understated returns and overstated net sales, and directions to subordinates to pay distributors for bogus deliveries of newspapers. Many copies of the two papers were dumped or delivered to persons who had no paid subscriptions. The SAC contains allegations as to Brennan's, Czark's, Garcia's, **[*18]** Sito's, and Jansen's direct involvement in and actual knowledge of these schemes.

The limited allegations regarding Jansen are conclusory. They are insufficient to strongly infer his actual knowledge or reckless disregard regarding the circulation numbers. Sito disputes whether his scienter regarding the circulation numbers is adequately alleged. In light of the report that Sito recently pleaded guilty to mail fraud related to the circulation numbers, an amended complaint may be able to easily allege facts supporting Sito's knowledge or reckless disregard. For present purposes, it will be assumed that lead plaintiff has adequately alleged Sito's direct involvement in and actual knowledge of the inflation of circulation numbers for Hoy.

The overstated paid circulation numbers resulted in Newsday and Hoy charging higher advertising rates than would have been charged without the inflated circulation numbers. After

the overstated circulation numbers were revealed, Tribune recorded a $ 90,000,000 charge against earnings representing amounts expected to be refunded to advertisers. The inflated advertising rates being charged prior to the disclosure allegedly resulted in a higher [*19] price for Tribune stock. Tribune's stock price allegedly dropped as a result of the disclosure of overstated circulation numbers and the charge against earnings.

As summarized in the SAC, the facts allegedly concealed from the investing public during the class period were:

(a) since at least FY 2001, defendants were fraudulently inflating the circulation of Tribune's <u>Newsday</u> and <u>Hoy</u> publications, thus generating ill-gotter. revenue from their advertisers;

(b) as a result of the inflated circulation figures, the Company's publicly reported financial results during the Class Period were artificially inflated (including revenue, earnings, and growth figures) and the Company's liabilities were understated;

(c) defendants had intentionally or recklessly established extremely weak circulation controls which allowed for the circulation overstatements to go on unchecked for the better part of three years;

(d) the true circulation of <u>Newsday</u> was only 480,000-490,000 copies of the weekday paper and 540,000-550,000 of Sunday's editions, or roughly 80% of what had been previously reported;

(e) the true circulation of <u>Hoy</u> was only 40,000 to 50,000 copies, or roughly half [*20] of what had been previously reported; and '

(f) as a result of (a)-(e) above, defendants' ability to continue to achieve future earnings per share and revenue growth would be severely threatened, and would and did result in a $ 90 million charge against earnings.

SAC P 12.

The false statements were contained in press releases and SEC filings. The press releases alleged in the SAC were issued from October 25, 2001 through April 15, 2004. The press releases contained false statements of the type summarized above in that they contained statements about <u>Newsday</u> or <u>Hoy</u> circulation for particular time periods, Tribune income and earnings for particular time periods, and/or statements about Tribune advertising revenues. No individual defendant is alleged to be directly responsible for issuing any of the press releases, but FitzSimons is quoted in a number of the press releases and Madigan is quoted in one. In February 2004, and thereafter, advertisers filed lawsuits alleging <u>Newsday</u> and <u>Hoy</u> had overstated circulation. Tribune initially denied the allegations. The forceful denial

allegedly prevented the stock price of Tribune from falling at that time. On February 11, 2004, Tribune [*21] issued a press release stating:

Newsday publisher Raymond Jansen issued the following statement today regarding [sic] lawsuit filed yesterday against the newspaper and the Spanish-language newspaper Hoy:

"The lawsuit filed yesterday against Newsday and Hoy is completely without merit.

The allegations contained in the lawsuit are false. The source of the allegations is a disgruntled former employee who was a principal of a bankrupt distribution company that was an affiliate of Newsday, bought in 1998.

The allegations involve less than 1% of Newsday's total circulation, and less than 15% of Hoy's total circulation.

The Audit Bureau of Circulations conducts annual audits of Newsday and Hoy. The last one was done in 2003, and we are scheduled for another in 2004.

As the lawsuit is without merit and the allegations it contains false, we will not comment further at this time."

SAC P 100.

The SEC filings that allegedly contained false statements are annual Forms 10-K for the years 2001 through 2003 and quarterly Forms 10-Q for the first quarter of 2002 through the first quarter of 2004. The SEC filings contained false statements of the type summarized above reporting Tribune's [*22] income and earnings, reports of <u>Newsday's</u> circulation, representations about internal controls, and statements about Tribune advertising revenue.

The 2003 Form 10-K included an announcement of a Code of Ethics for CEO and Senior Financial Officers that had been adopted effective May 6, 2003.

Madigan, FitzSimons, Fuller, and Grenesko signed the annual Form 10-K's, except that Madigan did not sign the one for 2003. Except for the Form 10-K for 2001, the SEC filings contained certifications required by the Sarbanes-Oxley Act of 2002, *15 U.S.C. § 7241*. Each of the Sarbanes-Oxley certifications is signed by Grenesko and either Madigan or FitzSimons.

The SEC began an informal investigation in February 2004. In March 2004, the United States Attorney for the Eastern District of New York began a criminal investigation. Prior to June 2004, the United States Attorney for Connecticut and the Connecticut Attorney General began investigations. The allegations regarding these inquiries are not specific, but it is implied that Tribune was aware of all of the investigations prior to June 2004. See SAC PP 6-7.

In early June 2004, there were reports of a decrease in [*23]

advertising sales for Tribune holdings. At that point, the price of Tribune shares began to fall. In June 2004, Tribune backed off its position that the advertisers' lawsuits were completely without merit, placed Brennan on administrative leave, and partially disclosed the circulation fraud. In a June 17, 2004 press release issued by Newsday, it was stated that September 2003 circulation for Newsday was overstated by approximately 40,000 daily and 60,000 on Sundays. It was stated that Hoy circulation was overstated by approximately 15,000 daily and 3,000 on Sundays. It was also stated that both publications "expect to make significantly smaller adjustments to their March 2004 circulation figures." SAC P 115.

In a July 14, 2004 press release announcing second quarter results, Tribune stated that an investigation had revealed further adjustments would be made to the September 2003 and March 2004 circulation figures for Newsday and Hoy, and that there were also misstatements for 2001 and 2002. It was also noted that the second quarter results included a $ 35,000,000 charge related to an anticipated settlement of the advertisers' lawsuits. FitzSimons is quoted as stating [*24] that "we moved aggressively to address circulation misstatements at Newsday and Hoy." SAC P 119.

In a July 28, 2004 article in the financial press, it was reported that Newsday had lowered its guaranteed circulation numbers by 55,000 daily and 100,000 for Sundays and that advertising rates would be cut.

On July 30, 2004, Tribune filed its second quarter 2004 Form 10-Q. In the Form 10-Q, Tribune reiterated the results stated in the July 14, 2004 press release, including the $ 35,000,000 charge related to the advertisers' lawsuits. It was also stated that Tribune would continue to vigorously defend the lawsuits and continue to evaluate the adequacy of the $ 35,000,000 reserve. As had been reported in the press, it was noted that Newsday and Hoy had been censured by ABC. It was also noted that the SEC, the United States Attorney, and the Nassau County District Attorney were investigating and that Tribune was cooperating with those investigations.

In a September 10, 2004 press release, which coincides with the ending date of the putative class period, Tribune disclosed the true circulation numbers. It was also stated that the cost to settle the advertisers' lawsuits would [*25] increase by $ 45-60,000,000 and that the additional charge would be included in third quarter results.

## D. Newsday-Hoy Individual Defendants

Sito is the only one of the Newsday-Hoy Individual Defendants who has expressly moved for dismissal.

Arguments he raises, however, also apply to Jansen, Brennan, Czark, and Garcia. One of Sito's contentions is that he cannot be liable for securities fraud because he was not responsible for issuing any of the press releases or SEC filings containing the alleged false representations. Lead plaintiff responds that Sito knowingly signed false circulation audits for Hoy that were submitted to ABC. The same is alleged regarding Jansen and Newsday circulation audits. The allegations are insufficient to support Jansen's knowledge or reckless disregard of the inflated circulation numbers. Lead plaintiff contends the submissions to ABC were public statements upon which liability may be based.

It need not be considered whether submissions to ABC constitute public statements upon which a securities fraud claim may be based. The PSLRA requires that each statement alleged to be misleading be specified in the complaint. *15 U.S.C. § 78u-4(b)(1)*; [*26] *Tellabs, 437 F.3d at 594*. The misleading statements upon which lead plaintiff's claims are based are alleged in the section of the SAC entitled "False and Misleading Statements," SAC PP 60-112, with some additional misleading statements also included in the section entitled "The Truth Begins to Emerge," see id. PP 115-16, 119-20, 124-25. The misleading statements that are identified are all press releases [6] [*27] or SEC filings. The Newsday-Hoy Individual Defendants did not sign any of the SEC filings nor are they alleged to have been directly involved in preparing any of those filings or issuing or preparing any of the press releases. [7] Since the circulation audits submitted to ABC are not themselves specifically identified as misleading statements upon which the securities fraud claims are based, Sito's and Jansen's liability cannot be directly based on submitting the audits to ABC.

Lead plaintiff contends that, even if the circulation audits are not considered to be public statements, Sito can still be liable because he participated in the scheme to defraud and there is no requirement that a participant in a securities fraud scheme himself make any public statements. Lead plaintiff cites *In re*

---

[6] All the press releases are Tribune press releases except for the June 17, 2004 press release which is identified as a Newsday press release. Jansen was still the publisher of Newsday at that time and is quoted in the press release, but it is not specifically alleged that he was responsible for issuing the press release. Instead, it is indicated that Tribune was actually responsible for issuing the press release. The revised circulation figures contained in the press release are not attributed to Jansen. See SAC P 115.

[7] The one limited exception is that the February 11, 2004 press release from Tribune contains a lengthy quote of a statement given by Jansen. Even taking this as a statement by Jansen upon which *§ 10(b)* liability could be based, as previously stated, there is no adequate basis for strongly inferring Jansen's scienter.

*Lernout & Hauspie Securities Litigation, 236 F. Supp. 2d 161, 173 (D. Mass. 2003)*, for the proposition that "the better reading of *§ 10(b)* and *Rule 10b-5* is that they impose primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement [*28] by another person creates the nexus between the scheme and the securities market." In the present case, it is unnecessary to determine the full parameters of indirect conduct. A key problem with lead plaintiff's contention is that the allegations as to Sito and the other Newsday-Hoy Individual Defendants only support, at most, that they were inflating circulation numbers in order to charge higher advertising rates that would increase revenues for their publication. There are no allegations to support that these defendants had any intentions regarding deceiving the investing public. Without any allegations connecting these defendants to the allegedly misleading press releases and SEC filings, cf. *Higginbotham v. Baxter International, Inc., 2005 U.S. Dist. LEXIS 12006, 2005 WL 1272271 *6 (N.D. Ill. May 25, 2005)*, nor any specific allegations from which it may be strongly inferred that these defendants were working with Tribune executives to prop up the value of Tribune stock, lead plaintiff does not satisfy the scienter pleading requirement for these defendants. Notably, the section of the SAC entitled "Scienter" makes no express allegation regarding any of the Newsday-Hoy Individual Defendants. [*29] See SAC PP 133-51. Allegations about knowledge that the Newsday-Hoy Individual Defendants had is limited to allegations that they directly and knowingly participated in the inflation of circulation numbers.

In its answer to Sito's motion, lead plaintiff bases additional allegations on a May 30, 2006 United States Attorney press release reporting guilty pleas by nine former <u>Newsday</u> and <u>Hoy</u> employees, including Sito, Brennan, Czark, and Garcia, but not Jansen. "Ordinarily, as long as they are consistent with the allegations of the complaint, a plaintiff may asset additional allegations in its response to a motion to dismiss. However, *Rule 9(b)* requires the necessary allegations be in the complaint itself. Additional allegations contained in the responsive brief, however, may indicate that plaintiff should be given the opportunity to amend the Complaint to comply with *Rule 9(b)*." *Guaranty Residential Lending, Inc. v. International Mortgage Center, Inc., 305 F. Supp. 2d 846, 852 (N.D. Ill. 2004)* (citations omitted). However, taking into consideration the additional allegations would not change today's ruling.

The First Claim against defendants Brennan, Czark, [*30] Garcia, Sito, and Jansen will be dismissed.

## E. Tribune Individual Defendants

As to the Tribune Individual Defendants, lead plaintiff alleges that the allegations sufficiently support at least reckless disregard of the truth. It contends that discrepancies between actual revenues and the reported paid circulation would have put the Tribune Individual Defendants on notice of problems with reported circulation. It also contends that the circulation controls in place were so obviously weak that the Tribune Individual Defendants would have known they were deficient. Additionally, lead plaintiff points to bonuses for FitzSimons and Madigan [8] which were based in part on increases in cash flow and stock options all four Tribune Individual Defendants exercised during the putative class period.

[*31] Regarding the discrepancies between reported circulation and revenue, lead plaintiff alleges:

> Verifying the accuracy of the sales claims would have been a relatively easy task since Tribune was entitled to revenue for every issue sold. Revenues received from third-party newspaper vendors should have matched precisely with the number of issues each vendor claimed to have sold. However, when the papers were discarded, rather than sold, there was no revenue. Thus, defendants knew or were reckless in not knowing that the sales revenues received from vendors did not support the circulation figures being reported to the Audit Bureau of Circulations.

SAC P 134. There are no further allegations detailing this conclusory allegation.

As defendants point out, it is also alleged that ABC includes in paid circulation any paper sold for at least 25% of the single copy price. SAC PP 43-44. While that would mean there is not a direct correlation between paid circulation and newspaper sales revenue, perhaps having general information about available discount programs would reveal a discrepancy between reported paid circulation and actual revenues. The problem is that the PSLRA does not [*32] permit that type of speculation when determining whether a strong inference of scienter has been alleged. Also, there are no allegations regarding what structures are in place at Tribune itself for reviewing revenue reports from the various newspapers it owns nor the line of authority. The allegations regarding discrepancies between reported paid circulation and revenue from selling newspapers are not a basis for inferring that the Tribune Individual Defendants should have known paid

---

[8] Allegations refer to bonuses for "executives and other key employees." SAC P 139 (quoting April 7, 2003 Proxy Statement). However, only FitzSimons and Madigan are specifically alleged to have received such bonuses. SAC PP 139-42.

circulation was overstated.

The allegations as to deficient internal controls are also conclusory. There are no allegations as to the controls that were in place nor what could have been done differently. Instead, lead plaintiff simply alleges methods that were used to inflate circulation and contends internal controls must have been deficient because the fraudulent overstatements were not discovered. Just as overstatements of income or revenue are not by themselves enough to infer scienter, see *Higginbotham, 2005 U.S. Dist. LEXIS 12006, 2005 WL 1272271 at \*7* (collecting cases), failure to discover overstated newspaper circulation is not enough, by itself, to infer scienter. There should also be allegations as to [*33] what controls were actually in place and what controls should have been in place.

It is alleged that: "The inability of Tribune's internal auditors to confirm circulation from these fictitious hawkers, as described in the Briggs affidavit, should have raised red flags about both circulation and revenue." SAC P 135. Allegations based on the Briggs affidavit are contained in paragraphs 34-59 of the SAC (see SAC P 33). The only reference to Tribune auditors is contained in P 57 which alleges:

> In 2003 [a Chicago distributor of Hoy] met with Czark and [consultant Ed] Smith to discuss what he/she should say to Tribune auditors who were reviewing the paid circulation that the distributor had reported relating to his work in Chicago. The distributor suggested that he overstate the volume of sales of <u>Hoy</u> at each hawker location. Smith replied that the distributor should instead fabricate bills from other hawking companies and tell the auditors that those non-existent companies had helped to distribute <u>Hoy</u> in Chicago. Smith explained that the distributor could blame the fictitious hawker companies for any hawkers and hawker locations that Tribune auditors could not confirm. [*34] The distributor did as Smith had instructed, setting up phony accounts in the names of other hawking firms, which he/she cited to <u>Hoy</u> as if they substantiated paid circulation numbers.

Because this one alleged incident apparently did not result in a large adjustment to circulation numbers or result in discovery of the circulation scheme does not show that the auditing program that was in place was so obviously deficient that Tribune executives should have been aware of the deficiencies. Without adequate allegations as to existing or missing controls, the scheme to inflate circulation that is described does not make it obvious that it only went undiscovered because there were insufficient controls. The fraudulent scheme that is alleged is not a basis for strongly inferring that high level Tribune executives should have known insufficient controls were in place to reveal fraud. Cf.

*Svezzese v. Duratek, Inc., 2002 U.S. Dist. LEXIS 20967, 2002 WL 1012967 \*5-6 (D. Md. April 30, 2002)*, aff'd by unpublished order, *67 F. App'x 169 (4th Cir. 2003)*.

While the allegations that FitzSimons and Madigan received additional bonuses based on increased cash flow shows these two defendants [*35] had a possible motive for overstating Tribune revenues, motivation is not by itself sufficient to infer scienter. *Tellabs, 437 F.3d at 601*. Additionally, it is not at all clear how much their bonuses were affected by the increased advertising income resulting from inflated circulation figures for two of Tribune's subsidiary newspaper holdings. The bonus evidence is not even very strong evidence of motive. Cf. *Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068-69 (5th Cir. 1994)*; *Chu v. Sabratek Corp., 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000)*. Also, the exercising of stock options that is alleged is not a basis for inferring motive. There are no allegations regarding options activity outside the putative class period. Therefore, the allegations do not support that defendants' options activity during the putative class period was unusual or otherwise suspicious. *Higginbotham, 2005 U.S. Dist. LEXIS 12006, 2005 WL 1272271 at \*8*.

Even if the allegations are insufficient to support scienter prior to February 2004, lead plaintiff contends it is adequately alleged that scienter existed thereafter because the Tribune Individual Defendants were aware [*36] that the first advertisers' lawsuit had been filed. Awareness of the lawsuit does not establish that the Tribune Individual Defendants were turning a blind eye if they did not immediately accept the allegations of the lawsuit as true. The present allegations include that an investigation was begun, intermediate disclosures were made in June 2004, and full disclosures were made by September 2004. There are no allegations regarding any interim internal reports that were made that would have provided the Tribune Individual Defendants with information that was inconsistent with any of the press releases or SEC filings made between February and September 2004. Lead plaintiff points to the February 11, 2004 press release containing an absolute denial of the merits of the advertisers' lawsuit. But even if that press release should be attributed to one or more of the Tribune Individual Defendants, *as* previously discussed, there is no sufficient basis for concluding that, as of that date, any of these defendants should have known that there was at least some truth to the allegations regarding inflated circulation numbers. Similarly, the fact that government agencies were instituting investigations [*37] is no basis for strongly inferring scienter on the part of the individual defendants. There are no specific facts alleged about the government investigations to support that, prior to September 2004, any particular Tribune Individual Defendant had knowledge to support scienter.

As to the further press releases and Form 10-Q from June and July 2004, no specific facts are alleged to support that, as of the dates of the particular statements, any Individual Tribune Defendant had or should have had knowledge that was inconsistent with facts contained in those statements.

Since plaintiffs have not alleged facts from which scienter on the part of the Tribune Individual Defendants can be strongly inferred, the First Claim as against those defendants will be dismissed.

## F. Tribune's Scienter

Still to be considered is whether scienter is adequately alleged regarding Tribune itself. As previously discussed, none of the Individual Tribune Defendants are adequately alleged to have had scienter. Therefore, scienter on the part of Tribune cannot be based on any high level Tribune officer having the necessary knowledge or intent. Lead plaintiff argues that knowledge of any Tribune employee [*38] can be attributed to Tribune. It argues that Tribune's scienter can be based on the Newsday-Hoy Individual Defendants' knowledge that the circulation numbers were being falsified. As previously discussed, there is no sufficient basis for strongly inferring that Jansen knew the Newsday circulation numbers were false or recklessly disregarded the falsity of the circulation numbers. Therefore, any attribution of knowledge or scienter must be based on one of the other four Newsday-Hoy Individual Defendants.

Contrary to lead plaintiff's contention, for purposes of *§ 10(b)* liability, a corporation is not assumed to have the knowledge of every single one of its employees no matter what the employee's position may be. See *Higginbotham, 2005 U.S. Dist. LEXIS 12006, 2005 WL 1272271 at *8-9* (discussing cases). Instead, the corporation's scienter is generally limited to being based on knowledge or scienter of a senior officer or director of the corporation, or an employee involved in issuing the alleged misrepresentation. Id. None of the Newsday-Hoy Individual Defendants are senior officers or directors of Tribune and, as previously discussed regarding their individual liability, none (other than [*39] Jansen regarding one press release) were involved in issuing any of the SEC filings or press releases containing the alleged misrepresentations.

Lead plaintiff contends that these defendants can be considered to be spokespersons for Tribune in that they were authorized to provide circulation numbers to ABC. That, however, does not make them spokespersons as to the false statements that constitute the alleged violations of *§ 10(b)*. While senior Tribune officers and other unspecified Tribune employees relied on the Newsday-Hoy Individual Defendants

for the circulation figures they reported in SEC filings and press releases, it was incumbent on lead plaintiff to adequately allege that those responsible for the SEC filings and press releases recklessly relied on the circulation figures that were provided. There are no allegations specifying who at Tribune issued the press releases. Lead plaintiff cannot simply attribute to Tribune the knowledge of lower level employees who were not also responsible for the SEC filings and press releases. Since Tribune's scienter is not adequately alleged, the First Claim against Tribune will be dismissed.

## G. Conclusion

The First Claim will [*40] be dismissed in its entirety. Since lead plaintiff has not adequately alleged the direct liability of any defendant, the Second Claim as to controlling person liability must also be dismissed. *Higginbotham, 2005 U.S. Dist. LEXIS 12006, 2005 WL 1272271. at *10*. The Securities Case will be dismissed with prejudice. Class certification will be denied without prejudice.

## II. ERISA CASE

Two motions to dismiss have been filed in the ERISA Case. One is brought by all defendants and addresses issues generally applicable to all defendants. The other motion is brought by particular defendants.

## A. Pleading Standard

In the CAEC (Consolidated Amended Erisa Complaint), [9] it is expressly stated that: "Plaintiffs do not allege fraud in this action, but only breaches of fiduciary duty and ERISA violations." CAEC P 162. Assuming the actual allegations and contentions are consistent with this statement, *Fed. R. Civ. P. 9(b)* does not apply to the claims contained in the CAEC. On defendants' motion to dismiss, plaintiffs' well-pleaded allegations of fact are taken as true and all reasonable inferences are drawn in plaintiffs' favor. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517, [*41] (1993)*; *Dixon v. Page, 291 F.3d 485, 486 (7th Cir. 2002)*. The CAEC need not set forth all relevant facts or recite the law; all that is required is a short and plain statement showing

---

[9] Counsel for the ERISA plaintiffs have failed to comply with the requirement that, in addition to electronically filing pleadings, paper copies of complaints, motions, briefs, and other pleadings must be provided to the judge assigned to the case. See *N.D. Ill. Loc. R. 5.2(e)*. Counsel shall make sure to comply with this requirement in the future.

that plaintiffs are entitled to relief. *Fed. R. Civ. P. 8(a)(2)*; *Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1008 (7th Cir. 2002)*; *Anderson v. Simon, 217 F.3d 472, 474 (7th Cir. 2000)*, cert. denied, *531 U.S. 1073, 121 S. Ct. 765, 148 L. Ed. 2d 666 (2001)*. Plaintiffs need not plead facts; conclusions may be pleaded as long as defendants have at least minimal notice of the claim. *Fed. R. Civ. P. 8(a)(2)*; *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*. Even if not required to plead specific facts, plaintiffs can plead themselves out of court by alleging facts showing there is no viable claim. See *Slaney v. Int'l Amateur Ath. Fed'n, 244 F.3d 580, 597 (7th Cir.)*, cert. denied, *534 U.S. 828, 122 S. Ct. 69, 151 L. Ed. 2d 35 (2001)*; *Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 670 & n.14 (7th Cir. 1998)*, cert. denied, *525 U.S. 1114, 119 S. Ct. 890, 142 L. Ed. 2d 788 (1999)*. **[*42]** As long as they are consistent with the allegations of the CAEC, plaintiffs may assert additional facts in their response to the motion to dismiss. *Brokaw v. Mercer County, 235 F.3d 1000, 1006 (7th Cir. 2000)*; *Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir. 2000)*. Plaintiffs are not bound by legal characterizations of their claims contained in the CAEC. *Forseth, 199 F.3d at 368*; *Kirksey v. R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1041 (7th Cir. 1999)*. However, in response to a motion to dismiss that raises the issue, plaintiffs must identify a legal basis for a claim and make adequate legal arguments in support of it. *Kirksey, 163 F.3d at 1041-42*; *Stransky v. Cummins Engine Co., 51 F.3d 1329, 1335 (7th Cir. 1995)*.

### [*43] B. Claims and Defendants

The ERISA Case concerns investments in Tribune stock by two ERISA benefit plans [10] that are offered to particular Tribune employees, the Tribune Company 401(k) Savings Plan ("TS Plan") [11] and the Times Mirror Savings Plus Plan

---

[10] Portions of the Plans are quoted in the CAEC, but the Plans themselves are not attached as exhibits. Defendants have provided copies of the Plans and plaintiffs do not dispute that they are accurate copies. Since central to plaintiffs' claims, the Plans may be considered on the motion to dismiss. *Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 661 (7th Cir. 2002)*; **Duferco Steel Inc. v. M/V Kalisti, 121 F.3d 321, 324 n.3 (7th Cir. 1997)**; *Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431 (7th Cir. 1993)*. If inconsistent with allegations of the CAEC, the actual documents will control. See *Rosenblum, 299 F.3d at 661* (quoting 5 Wright & Miller, Federal Practice & Procedure Civil 2d § 1327 at 766 (1990)); *In re Wade, 969 F.2d 241, 249 (7th Cir. 1992)*; *Beam v. IPCO Corp., 838 F.2d 242, 244-45 (7th Cir. 1988)*.

[11] Prior to 2004, the TS Plan's name was the Tribune Company Savings Investment Plan.

---

("TM Plan"). The TM Plan is limited to employees of Times Mirror and its subsidiaries, which merged into Tribune in 2000. Both Plans are defined contribution plans that provide individual accounts for participants. See *29 U.S.C. § 1002(34)*. Participants have a choice of investing their money in one or more of ten different funds. Nine of the funds are third-party, publicly-traded mutual funds. The other fund for each Plan is a fund that is required to invest almost entirely in Tribune common stock, the Company Stock Fund. The Company Stock Fund for each Plan had been an Employee Stock Ownership Plan ("ESOP") before being merged into the TS and TM Plans. Plaintiffs contend that defendants breached their fiduciary duties by continuing to have the Company Stock Fund for each Plan invest in Tribune stock despite the value of that stock being inflated by overcharging for advertising based on the inflated **[*44]** circulation numbers.

**[*45]** Allegedly, defendants should have known that the value of Tribune stock was artificially inflated and acted negligently by failing to reasonably investigate information regarding Tribune stock, failing to ensure there were adequate internal controls, and failing to keep participants adequately informed.

A jurisdictional issue raised by defendants -- surprisingly, in the last footnote of their brief-is whether plaintiffs' claims are cognizable under *29 U.S.C. § 1132(a)(2)*. Because this goes to plaintiffs' standing to bring their claims, it is a jurisdictional issue. *Mutual Life Insurance Co. of New York v. Yampol, 840 F.2d 421, 423 (7th Cir. 1988)*; *Bona v. Barasch, 2003 U.S. Dist. LEXIS 4186, 2003 WL 1395932 *9 (S.D.N.Y. March 20, 2003)*.

Courts are split regarding whether this section can be a basis for relief when the relief will not benefit all participants of the fund or the plan itself. Here, relief will be limited to participants who had monies invested in the Company Stock Fund during a specific time period. Presumably, at least some participants did not. The Seventh Circuit has not yet ruled on this issue. This court adopts the view that plaintiffs **[*46]** may bring *§ 1132(a)(2)* claims under the circumstances of this case. See *Rogers v. Baxter International, Inc., 417 F. Supp. 2d 974, 980-82 (N.D. Ill. 2006)*. Plaintiffs may also be entitled to relief under *§ 1132(a)(3)*. See *id. at 982-83*. No claim will be dismissed for lack of jurisdiction.

There are three categories of defendants in the ERISA case. The Tribune Company Employee Benefits Committee (the "EBC") is named as a defendant as well as eleven current or former members of the EBC (the "Committee Defendants"). Each Plan names the EBC as a fiduciary and empowers the EBC to administer the Plans and establish and administer an investment policy. Thirteen defendants are members of the

Tribune Board of Directors (the "Board Defendants"). The Board is responsible for appointing members of the EBC. The Board is specifically named as a fiduciary of the TS Plan. Also named as a defendant is Tribune itself. Tribune is alleged to be a de facto fiduciary of the Plans in that it employs and directs the people who make investment decisions for the Plans.

The CAEC contains three claims. The First Claim is against all defendants for breaches of fiduciary [*47] duty, including cofiduciary duties, citing 29 U.S.C. §§ 1104, 1109, 1132. [12] The breach is described as an imprudent investment claim. The Second Claim is against all defendants for breach of fiduciary duty, including cofiduciary duties, citing 29 U.S.C. §§ 1104, 1105, 1109, 1132. The breach is negligent misrepresentations and omissions arising out of a duty to investigate and discover the circulation fraud. The alleged communications containing inaccurate information included summary plan descriptions that incorporated SEC filings. These are generally the same SEC filings that are alleged in the Securities Case. See § I(C) supra. Other alleged communications concerned options for participants' investment of the funds in their Plan accounts, in which the strong performance of Tribune stock was highlighted. Particularly, one such communication included a cover letter from FitzSimons addressed to "Fellow Employee" and boasting that 2003 "was one of great progress for Tribune Company, including achieving record earnings. [*48] " CAEC P 120. The Third Claim is against the Tribune and Board Defendants for breach of fiduciary duty, citing 29 U.S.C. §§ 1104, 1109, 1132. The breach is captioned as "Failure to Properly Appoint, Monitor and Inform the Committee Defendants."

## C. First Claim

Defendants' principal argument is that, as fiduciaries of the Plans, they had no duty to question the valuation of Tribune stock by conducting an independent inquiry into the circulation figures provided by Newsday and Hoy. Defendants contend this is especially true since, in accordance with 29 U.S.C. § 1104(a)(2), the Company Stock Funds were exempt from ERISA's diversity requirement and a presumption arises that it was prudent to continue to hold the funds' investments to Tribune [*49] stock. See Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1097-98 (9th Cir. 2004). See also Summers v. State Street Bank & Trust

Co., 453 F.3d 404 (7th Cir. 2006). Defendants also point out that the circulation figures were already being independently audited by ABC and that the Tribune itself responded to reports by investigating the circulation fraud and took corrective action.

The express terms of both Plans require that an available investment option be a fund primarily consisting of Tribune stock. Therefore, the § 1104(a)(2) exception applies and defendants ordinarily would not be required to diversify the Company Stock Funds. See Wright, 360 F.3d at 1093-94. However, § 1104(a)(2) and language of a plan-cannot "be interpreted to include a per se prohibition against diversifying an ESOP." Summers, 453. F.3d at 407 (quoting Kuper v. Iovenko, 66 F.3d 1447, 1457 (6th Cir. 1995)). [13] A fiduciary responsible for investing plan funds still has a duty of prudent investment that can override plan restrictions and § 1104(a)(2) in special circumstances. Summers, 453 F.3d at 407. On this subject, [*50] the Seventh Circuit has favorably cited standards set forth by the Sixth Circuit in Kuper and the Third Circuit in Moench v. Robertson, 62 F.3d 553, 571-72 (3d Cir. 1995), cert. denied, 516 U.S. 1115, 116 S. Ct. 917, 133 L. Ed. 2d 847 (1996). See Summers, 453 F.3d at 410. Moench holds that a fiduciary's decision not to diversify assets of a plan covered by § 1104(a)(2) is presumed to be proper and that presumption can only be overcome by showing an abuse of discretion. 62 F.3d at 571. "In attempting to rebut the presumption, the plaintiff may introduce evidence that 'owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust.'" Id. (quoting Restatement (Second) of Trusts § 227 cmt. g (1957)). Similarly, Kuper holds "the plaintiff must show that the ERISA fiduciary could not have reasonably believed the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities." Kuper, 66 F.3d at 1459 [*51] (quoted in Summers, 453 F.3d at 410). The Seventh Circuit's discussion of the issue has also made clear that investment risk, not stock price decline, is the key consideration, see Summers, 453 F.3d at 408-11, including whether the participants' retirement funds are almost entirely invested in the company's stock or there are other assets besides the company stock, see id. at 410-11.

---

[12] Although 29 U.S.C. § 1105 is not expressly cited in the First Claim, plaintiffs expressly refer to cofiduciary liability. See CAEC P 169.

[13] Defendants cite the dictum in Wright, 360 F.3d at 1097-98, suggesting that it is inconsistent with the language of § 1104(a)(2) to ever require that a fiduciary diversify a plan that is governed by that subsection. The Seventh Circuit's recent decision in Summers makes clear that the Seventh Circuit has not taken that position.

It is expressly alleged in the CAEC that investment in the Company Stock Fund is one option a participant may choose, not the only option. There are also express allegations regarding the percentage of Plan assets that participants [*52] had invested in the Company Stock Fund. As of December 31, 2003, 61% of the TS Plan's assets and 23% of the TM Plan's assets were in the Company Stock Fund. [14] The distribution of total assets of the Plans, however, does not establish exactly how individual participants allocated their accounts.

Citing *In re Westar Energy Inc., ERISA Litigation, 2005 U.S. Dist. LEXIS 28585, 2005 WL 2403832 (D. Kan. Sept. 29, 2005)*; *Schied v. Dynegy, Inc. (In re Dynegy, Inc. ERISA Litig.), 309 F. Supp. 2d 861 (S.D. Tex. 2004)*, and *Barker v. American Mobil Power Corp., 64 F.3d 1397 (9th Cir. 1995)*, defendants contend ERISA imposed no duty upon them to independently inquire about, investigate, or audit company affairs or reports potentially affecting its stock value. Defendants [*53] concede, however, that so-called "red flags" will create such a duty. Essentially, that is the theory relied upon by plaintiffs. They contend that internal controls for circulation were so obviously deficient that defendants would have known the circulation figures could not be relied upon. Thus, it is alleged that defendants should have known circulation was overstated and, correspondingly, advertising revenues were inflated. Although not expressly alleged, it is implied that, had they recognized the internal control deficiencies, defendants would have also realized the inflated numbers would eventually become public, resulting in a need both to refund past advertising charges and decrease future advertising rates, and ultimately resulting in a charge to past income and decrease in future income. For present purposes, it will be assumed that obviously deficient internal controls and the corresponding implications as to an effect on company income would be a "red flag" putting defendants on notice. Plaintiffs do not detail the alleged control deficiencies. It must be considered whether the conclusory allegation as to obvious control deficiencies and their implications is sufficient [*54] to support plaintiffs' claims.

Unlike the Securities Case in which the PSLRA and *Rule 9(b)* apply, *Rule 8(a)* applies to the ERISA case. *Rule 8(a)* still requires that the claim be adequately described so as to fairly notify defendants as to the claims against each of them. *Wilson v. Advocate Health and Hospitals Corp., 2006 U.S. Dist. LEXIS 45283, 2006 WL 1749662 *3 (N.D. Ill. June 21, 2006)*; *Ward v. Independent Order of Foresters, 2006 U.S. Dist. LEXIS 11290, 2006 WL 571874 *2 (S.D. Ind. March 7, 2006)*. In the present type of case, case law supports that conclusory allegations that all defendants should have known pertinent facts about the corporation generally have not been found to be sufficient unless it is, at a minimum, alleged that each particular defendant was in a position to know or to learn the information. Thus, allegations a defendant was a director or officer of the corporation, or an employee in a particular position, will generally suffice to support that the defendant should have known certain related information transacted at Board level; but alleging that a defendant was a member of a plan's investment committee, without more, is generally insufficient to take as true that the defendant [*55] should have known specific information about the operations of the corporation that sponsors the plan. See *Howell v. Motorola, Inc., 337 F. Supp. 2d 1079, 1089-91 (N.D. Ill. 2004)* (collecting cases); *In re Ferro Corp. ERISA Litigation, 422 F. Supp. 2d 850, 861 (N.D. Ohio 2006)*; *Rogers, 417 F. Supp. 2d at 984*; *In re Sears, Roebuck & Co. ERISA Litigation, 2004 U.S. Dist. LEXIS 3241, 2004 WL 407007 *5 (N.D. Ill. March 3, 2004)*. But compare *Herrington v. Household International, Inc., 2004 U.S. Dist. LEXIS 5461, 2004 WL 719355 *4-5 (N.D. Ill. March 31, 2004)*. Also, plaintiffs may plead themselves out of court by providing specific allegations that are inconsistent with conclusory allegations. *Slaney, 244 F.3d at 597*; *Wright, 360 F.3d at 1098*.

As to the Committee Defendants, it is generally alleged that they "were all senior Tribune management personnel who should have been intimately aware of Tribune's financial condition and business practices and internal controls and should have known about the Tribune circulation scandal and other facts alleged" in the CAEC. CAEC P 32. That general allegation, however, is inconsistent [*56] with allegations that two Committee defendants were the Director of Benefits and Senior Vice President of Human Resources. Also, a number of Committee Defendants are simply alleged to be Vice Presidents of Tribune, without identifying those positions as being related to circulation or finance. The allegations are insufficient to take as true that these defendants should have known internal controls for circulation in a subsidiary were deficient.

As to those defendants who are alleged to be Directors, high-level Tribune Officers, or Tribune officials in the Finance or Treasurer's offices, the allegations are also insufficient. Tribune is alleged to be one of the country's largest media and entertainment companies. The publishing segment allegedly represents more than 70% of Tribune's total revenues, which exceeded $ 5 billion annually in recent years. Operating profits during the three years preceding the filing of the CAEC ranged from $ 800 million to $ 1.3 billion, with 65% coming from the publishing segment. CAEC P 92. Newsday

---

[14] In the CAEC, plaintiffs cite to the plans' 2003 Forms 11-K, but do not attach them to the CAEC. Defendants provide the Forms 11-K for 2004 which show that, as of December 31, 2004, the respective percentages were 59% for the TS Plan and 32% for the TM Plan.

and Hoy are owned by subsidiaries and are just two of a number of newspapers owned by Tribune. Allegations in the CAEC indicate the Tribune owns at [*57] least 14 newspapers. See CAEC P 130 (quoting a June 21, 2004 Bloomberg article). Even with income inflated by overstated circulation figures, Newsday revenues for 2002 were about $ 602 million, which represented 15.6% of Tribune's publishing revenues and approximately 12% of total revenues. CAEC P 103. Newsday was not Tribune's largest newspaper, the Chicago Tribune, the Los Angeles Times, and the Baltimore Sun also being owned by Tribune subsidiaries. And Hoy was substantially smaller, having circulation one-seventh or less that of Newsday.

While it is alleged that circulation controls at the two newspapers were weak, the only specific allegation is that circulation managers were not required to certify the amount of claimed circulation. CAEC P 93. Unlike the SAC in the Securities Case, the CAEC does not detail the fraudulent conduct of the Newsday and Hoy employees who were directly perpetrating the overstatement of circulation. However, it is still alleged that employees had distributors pad sales figures, that retailers were paid to dump papers, and a computer program was created to falsify sales. Id. P 129 (quoting a June 2004 article [*58] from the Chicago Sun-Times). In light of the allegedly fraudulent attempt to inflate circulation and cover up the inflation, it would not have been obvious for an outsider to discover figures were inflated, and even more difficult to determine the true numbers. None of the defendants in the ERISA Case are alleged to have been directly involved in the fraudulent reporting of circulation. After accusations, ABC conducted an audit, found a lack of sufficient records, and took more time than expected to be able to complete the audit. Previously, though, ABC had audited Newsday's and Hoy's circulation reports without finding any problems. It was only, after accusations, that ABC investigated intensively enough to discover a problem. According to the CAEC, in response to the first advertiser's lawsuit, Tribune also conducted its own investigation, which, within a few months, uncovered circulation overstatements.

None of the individual defendants in the ERISA Case are alleged to have been employed by Newsday or Hoy. Instead, all the individual defendants are employees and/or Directors of the parent company, Tribune. While significant assets, Newsday and Hoy represent [*59] only about 12% of company revenues. Also, Tribune is alleged to have a number of larger newspaper and other media holdings. Those allegations are inconsistent with any. of the individual defendants having intimate knowledge of operations at Newsday and Hoy. The facts alleged are inconsistent with any of the individual defendants having knowledge that would have made it obvious that Newsday and Hoy had insufficient

internal controls for circulation. Lacking such knowledge, there would be no basis for any individual defendant's conduct being negligent. Since none of the individual defendants would have known of the deficient controls, there is no sufficient basis for attributing such putative knowledge to the EBC itself or the Tribune. [15]

[*60] Even if the conclusory allegations that defendants should have known circulation was overstated at Newsday and Hoy were to be taken as true, defendants contend the First Claim should be dismissed because plaintiffs have not alleged a sufficient decline in stock price or a sufficiently serious deterioration of Tribune's financial situation accompanied by a genuine risk of insider trading. See *Wright, 360 F.3d at 1098-99* (citing *Moench*, 62 F.3d at 572; *LaLonde v. Textron, Inc., 270 F. Supp. 2d 272, 280 (D.R.I. 2003)*, aff'd in part, vacated in part, *369 F.3d 1 (1st Cir. 2004)*). While *Wright* stands for the proposition that those are two principal factual grounds for overcoming the presumption, Wright does not hold that these are the only possible factual grounds for overcoming the presumption. Moreover, in *Summers, 453 F.3d at 407-11*, the Seventh Circuit discussed other possible scenarios that would support finding that the ERISA fiduciaries had violated the duty of prudence. But even viewing the possible scenarios for imprudent investment more broadly than defendants do, plaintiffs' First [*61] Claim does not withstand scrutiny.

Even assuming that non-negligent conduct would have resulted in defendants having full knowledge of the overstatements of circulation and the potential for a $ 95 million charge to income, [16] prudence did not require selling off the Plans' Tribune stock and closing the Company Stock Fund. As is alleged in the CAEC, the Tribune's annual revenues exceed $ 5 billion. The charge to income, which represents refunds or credits to advertisers from at least three different years, represents less than 2% of Tribune's revenues for a single year. While such a loss of revenue could be expected to affect dividends and/or the value of the company's stock, it would not be expected to put the company at risk of

_____

[15] Tribune also contends all claims against it should be dismissed because the Plans do not formally make it a fiduciary. Case law, however, supports that persons or entities can act as "de facto" or "functional" fiduciaries. See *In re Luna, 406 F.3d 1192, 1202 (10th Cir. 2005)*; *Rogers, 417 F. Supp. 2d at 986*. Plaintiffs have adequately alleged that Tribune is a de facto fiduciary. See CAEC PP 71-74; *Rogers, 417 F. Supp. 2d at 986*.

[16] A September 10, 2004 article in Bloomberg reported that Tribune officials indicated there would be a total charge of up to. $ 95 million. CAEC P 143. In October 2004, it was disclosed that the actual charges had been determined to total $ 90 million. Id. P 146.

going out of business, which was the pertinent scenario in *Summers.*

[*62] In the present case, the pertinent scenario is whether it would be imprudent to permit continued investment in a stock because of an expected revelation that could be expected, at least in the short term, to drop the value of the stock. See, e.g., *Sears, 2004 U.S. Dist. LEXIS 3241, 2004 WL 407007 at *4* (allegation that continued investment in company stock fund was imprudent was sufficient where the plan's investment committee knew or should have known information that, when disclosed, resulted in a 30% drop in the value of the company's stock). Plaintiffs have alleged a 25% drop in the value of Tribune's stock, which they conclusorily attribute to the revelation of the overstatement of circulation. CAEC P 154. Such an allegation, however, is incredible in light of the allegation that correcting the circulation figures only resulted in a corresponding adjustment to revenues representing less than 2% of one year's revenues. Moreover, the conclusory allegation is inconsistent with other allegations in the CAEC. According to the CAEC, Tribune stock was selling for approximately $ 52.00 as of February 2004 when the first advertisers' lawsuit was filed. There is, however, no allegation that the advertisers' [*63] lawsuit drew much public attention nor affected the stock's value. Instead, it is alleged that the truth began to emerge on June 17, 2004. By June 16, the stock's value had already dropped to $ 46.78. [17] Despite the June 17 revelation, the stock closed higher at the end of the day ($ 47.27). On June 18, the price dropped back to $ 46.81, nearly the same level as June 16. Plaintiffs focus on July 15, 2004 as the date the Tribune began to more fully disclose the overstatements. On that date, an expected charge of $ 35 million dollars was announced and the stock price dropped from $ 43.12 to $ 42.00, a 2.6% drop. CAEC P 138. On September 10, 2004, an announcement was made indicating there would be a total charge of $ 95 million. Id. P 143. On September 13, 2004, Tribune stock closed at $ 39.72. Id. P 145. Although, it is alleged that the stock dropped to $ 35.00 by the end of 2004, there is no allegation that additional charges to income were anticipated. As defendants point out, as of November 30, 2004, the stock had risen to $ 43.37, above the July 15 price, even though there had been additional disclosures regarding circulation adjustments, but no additional reports of charges [*64] to income. The drop in price from July 15 to September 13 was $ 3.40, representing

7.9% of the July 15 price. Plaintiffs do not allege any disclosures in December 2004 that would have tied the $ 8.37 decline during that month to the circulation overstatements.

On a motion to dismiss, the actual causes of changes in the price of Tribune stock cannot be determined. However, plaintiffs' allegation that the disclosure of circulation figures caused a 25% drop in 2004 *is* completely inconsistent with a one-time 2% effect on income and the price fluctuations that occurred at the times particular announcements [*65] were made. If the actual fluctuations in stock prices were the only pertinent facts to consider, the allegation that continued investment was imprudent would have to be rejected. Looking only at revelations and stock prices, the November 30, 2004 price shows that the stock fully recovered from the key revelations. No further negative effect on Tribune's reported income occurred thereafter. Therefore, it would have been imprudent to completely divest prior to the key disclosures beginning July 15, 2004.

The analysis based on fluctuations in price of Tribune stock is based on hindsight. It assumes that the stock price changes that actually occurred reflect what defendants should have foreseen beforehand. Had defendants looked beyond the reported circulation figures, though, at best-which still involves some clairvoyance-they would have known ahead of time that Tribune's reported revenues would be expected to take a $ 90-95 million hit. As noted, that represents less than 2% of a single year's revenue for the Tribune. While a short-term impact of a limited degree could be expected from such a revelation, it is not one that would threaten the viability of the company. This is not a sufficient [*66] impact on the company to overcome the presumption in favor of following the Plans' express requirements to include a Company Stock Fund as an option for participants.

As the Court of Appeals states in Summers:

[D]etermining the "right" point, or even range of "right" points, for an ESOP fiduciary to break the plan and start diversifying may be beyond the practical capacity of the courts to determine. The Department of Labor pamphlet that we cited earlier states that a directed trustee may have a duty to sell "where there are clear and compelling public indicators, as evidenced by an 8-K filing with the Securities and Exchange Commission (SEC), a bankruptcy filing or similar public indicator, that call into serious question a company's viability as a going concern." U.S. Dept. of Labor, supra, at 5-6. That is not an administrable standard; note the hedge in "may" and the fact that selling when bankruptcy is declared will almost certainly be too late.

*453 F.3d at 411*.

---

[17] The CAEC does not contain allegations as to the stock's price in June 2004 or November 2004. For the dates in June and November 2004, judicial notice is taken of the sales price of the stock. Facts taken by judicial notice, including the selling price of publicly traded stocks, may be considered on a motion to dismiss. *Takara Trust v. Molex Inc., 429 F. Supp. 2d 960, 963 (N.D. Ill. 2006).*

The First Claim will be dismissed in its entirety for two sufficient reasons. One, the allegations do not support that any defendant should have known about the circulation problems. [*67] Two, the facts alleged do not support that defendants acted imprudently by not discontinuing the Company Stock Fund.

## D. Second Claim

As to the Second Claim, defendants contend that *(1)* it cannot be based on SEC filings and other statements that defendants made in their corporate capacities, not their ERISA fiduciary capacities; (2) they had no duty to disclose; and (3) it is not alleged that defendants had the necessary information or that they could have discovered it.

Defendants argue that the SEC filings and some of the other communications allegedly containing the misrepresentations and omissions cannot be a basis for the Second Claim because they were communications made in defendants' corporate capacities, not their fiduciary capacities. This is an argument that goes to only a portion of the Second Claim. Plaintiffs also base the Second Claim on communications particularly pertaining to the plans. In any event, cases consistently hold that incorporating SEC filings into summary plan descriptions of ERISA plans makes the statements in the SEC filings statements made in the fiduciaries' ERISA capacity. See, e.g., *Gee v. UnumProvident Corp., 2005 U.S. Dist. LEXIS 3183, 2005 WL 534873 [*68] *16 (E.D. Tenn. Jan. 13, 2005)*; *In re AEP ERISA Litigation, 327 F. Supp. 2d 812, 825 (S.D. Ohio 2004)*; *In re WorldCom, Inc., 263 F. Supp. 2d 745, 766-67 (S.D.N.Y. 2003)*; *Rankin v. Rots, 278 F. Supp. 2d 853, 876 (E.D. Mich. 2003)* (quoting *Worldcom, supra*). Defendants cite no case to the contrary. [18] The facts alleged in the CAEC are not sufficient to conclusively determine any particular alleged communication was made solely in a defendant's capacity as a corporate officer.

 [*69] The second contention also goes to only part of the Second Claim. Plaintiffs allege both the nondisclosure of information and negligent misrepresentations. This contention does not apply to the latter. Moreover, plaintiffs do not appear to be claiming that defendants should have made independent disclosures regarding the overvaluation of Tribune stock. To the extent plaintiffs allege omissions, they are alleging that facts were omitted from documents that otherwise addressed the issue of investing in the Company Stock Funds. The law is clear that, when a fiduciary makes statements to participants, those statements must be full and accurate and cannot be misleading. *Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 590 (7th Cir. 2000)*; *In re Enron Corp. Securities, Derivative & "ERISA" Litigation, 284 F. Supp. 2d 511, 557 (S.D. Tex. 2003)*. Also, the distinction between a misleading affirmative representation and a misleading omission is not always clear. There is case law supporting that ERISA fiduciary breaches can be based on negligent failures to disclose information that the fiduciary should have known. See *James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 449 (6th Cir. 2002),* [*70] cert. denied, *538 U.S. 1033, 123 S. Ct. 2077, 155 L. Ed. 2d 1062 (2003)*; *Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 381 (4th Cir. 2001)*; *Enron, 284 F. Supp. 2d at 559*. Some courts have emphasized that special circumstances are required for an affirmative duty to disclose. See *In re Syncor ERISA Litigation, 351 F. Supp. 2d 970, 987 (C.D. Cal. 2004)*; *Hill v. BellSouth Corp., 313 F. Supp. 2d 1361, 1369 (N.D. Ga. 2004)*. For plans involving investment in the employer's stock, there is no general duty to continuously disclose information about the financial condition of the employer. See *Herrington, 2004 U.S. Dist. LEXIS 5461, 2004 WL 719355 at *7-8*. More importantly, the Second Claim is subject to dismissal on another ground. Therefore, this particular issue will not be resolved at this time. Cf. *AEP, 327 F. Supp. 2d at 832*; *In re Xcel Energy, Inc., 312 F. Supp. 2d 1165, 1182 (D. Minn. 2004)*.

As is discussed above in § II(C), the alleged facts do not support that defendants should have known that the reported circulation figures were overstated. Therefore, the [*71] allegedly inaccurate representations made by defendants were not negligent. The Second Claim will be dismissed in its entirety.

## E. Third Claim

The Third Claim is against the Tribune and Board Defendants for failing to adequately monitor the EBC, the members of which had been appointed by the Tribune/Board Defendants. Allegedly,

> Tribune and the Board Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about Tribune's true circulation figures, and (b) failing to ensure the monitored fiduciaries appreciated and accurately communicated the huge risk of significant investment by rank and file employees in the Fund. Tribune and the Board

---

[18] Defendants cite *WorldCom, 263 F. Supp. 2d at 760*. This particular holding in WorldCom is that, when SEC filings are incorporated in plan documents, simply signing SEC filings does not make a corporate officer a fiduciary of the plan. However, if a corporate officer is otherwise a fiduciary of the ERISA plan, he or she will be responsible, in his or her capacity as a plan fiduciary, for SEC filings incorporated in the plan's summary plan description. *Id. at 766*.

Defendants should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plans to continue offering the Fund, and continuing to invest the Plans' assets in the Fund when it was not prudent to do so, yet failed to take action to disclose to Participants or otherwise protect them from the consequences of these fiduciaries' failures.

CAEC P 188.

Defendants do not dispute that fiduciaries [*72] who appoint fiduciaries of an ERISA plan have a duty to periodically monitor the appointees "to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfied the needs of the plan." *In re Cardinal Health, Inc. ERISA Litigation, 424 F. Supp. 2d 1002, 1047 (S.D. Ohio 2006)* (quoting *29 C.F.R. § 2509.75-8*). However, the focus of plaintiffs' allegations (as well as their arguments in response to the motion to dismiss) are that the Tribune/Board Defendants breached their duty to monitor by failing to disclose information regarding the inflated circulation numbers and the related inflation of Tribune stock prices. Defendants contend the duty to monitor does not include a duty to disclose. Alternatively, to the extent there is a duty to disclose, defendants contend it is limited facts for which the appointing fiduciary has actual knowledge, but they are not alleged to have had actual knowledge of the inflated circulation figures and stock prices.

*Herrington, 2004 U.S. Dist. LEXIS 5461, 2004 WL 719355 at *9*, held that the duty to monitor does not include the duty to disclose nonpublic information [*73] to the appointee. In Herrington, this holding was based on the conclusion that *29 U.S.C. § 1104*'s duty of disclosure does not extend to plan fiduciaries being required to disclose such information to participants. See *2004 U.S. Dist. LEXIS 5461, [WL] at *8-9*. Courts that have actually considered the issue, however, hold that the duty to monitor also includes the duty to disclose information. See *Woods, 396 F. Supp. 2d 1351, 1373-74* & n.13 (collecting cases). This duty to disclose has not been extended beyond information for which the appointing authority has actual knowledge. See *Ferro, 422 F. Supp. 2d at 863* ("knew that the Company Fund was no longer a prudent investment option"); *Woods, 396 F. Supp. 2d at 1374* ("material information within the appointing fiduciary's knowledge"); *In re Polaroid ERISA, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005)* ("all Defendants . . . had knowledge of facts which should have caused them to question the prudence of continued investment in Polaroid common stock"); *Sears, 2004 U.S. Dist. LEXIS 3241, 2004 WL 407007 at *8* ("had knowledge of the accounting irregularities"); *Worldcom, 263 F. Supp. 2d at 765* [*74] ("material information he had regarding the prudence of investing in WorldCom stock"). The majority rule will be followed.

Although plaintiffs have not alleged defendants had actual knowledge of the inflated circulation numbers and stock price, it is claimed that they were aware of obvious deficiencies in internal controls at Newsday and Hoy. As discussed above in § II(C), the facts alleged do not support that the Tribune and Board Defendants were aware of obvious deficiencies in internal controls. Therefore, the Third Claim will be dismissed.

## F. Conclusion

Since all the claims are otherwise subject to dismissal, it is unnecessary to consider additional issues that defendants raise regarding particular defendants. The ERISA Case will be dismissed in its entirety. Class certification will be denied without prejudice.

IT IS THEREFORE ORDERED that:

(1) In Case No. 06 C 741: Plaintiff's cause of action is dismissed without prejudice.

(2) In case No. 05 C 2602: Lead plaintiff's motion to consolidate, amend, and join two new defendants [93] is granted. Lead plaintiff is granted leave to file the Second Amended Consolidated Class Action Complaint. Lead plaintiff's [*75] requests for default [87, 88, 89] are denied. Defendants' motions to dismiss [63] are granted. Class certification is denied without prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants and against lead plaintiff dismissing lead plaintiff's cause of action with prejudice.

(3) In Case No. 05 C 2927: Defendants' motions to dismiss [49, 54] are granted. Class certification is denied without prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiffs dismissing plaintiffs' cause of action with prejudice.

William T. Hart

UNITED STATES DISTRICT JUDGE

DATED: SEPTEMBER 29, 2006

**End of Document**

# Tab D

 Neutral

As of: June 20, 2019 5:50 PM Z

# *Hurtado v. Rainbow Disposal Co.*

United States District Court for the Central District of California

July 9, 2018, Decided; July 9, 2018, Filed

Case No. 8:17-cv-01605-JLS-DFM

**Reporter**

2018 U.S. Dist. LEXIS 118128 *; 2018 WL 3372752

Antonio Hurtado et al. v. Rainbow Disposal Co., Inc. v. Employee Stock Ownership Plan Committee et al.

**Prior History:** *Hurtado v. Rainbow Disposal Co., 2018 U.S. Dist. LEXIS 118090 (C.D. Cal., July 9, 2018)*

## Core Terms

stock, plan participant, fiduciary, valuation, invested, plan administrator, pleaded, indemnification, benefits, participants, documents, shares, breach of fiduciary duty, fiduciary duty, Engagement, Recycling, allegations, obligations, rescission, prudent, argues, fair market value, motion to dismiss, defense costs, termination, Ownership, Disposal, requires, prohibited transaction, equitable relief

**Counsel:** **[*1]** ATTORNEYS FOR PLAINTIFF: Not Present.

ATTORNEYS FOR DEFENDANT: Not Present.

**Judges:** Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE.

## Opinion

**CIVIL MINUTES - GENERAL**

**PROCEEDINGS: (IN CHAMBERS) ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS (Docs. 73, 75, 77, 78, 83)**

Before the Court are five Motions to Dismiss filed by Defendants.[1] Plaintiffs[2] opposed in a single omnibus brief,

(Opp., Doc. 95), and Defendants filed separate replies. (Docs. 101-105.) Having reviewed the parties' papers and taken the Motions under submission, the Court DENIES Defendants' Motions.

## I. BACKGROUND

Plaintiffs bring this purported class action pursuant to the *Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq.* Plaintiffs are participants and beneficiaries of the Rainbow Disposal Co., Inc. Employee Stock Ownership Plan who seek to "restore losses to the Plan and to remedy Defendants' breaches of fiduciary duty...." (FAC ¶ 4, Doc. 57.)

### A. The Rainbow ESOP

Rainbow Disposal Co. ("Rainbow"), formed in 1970, was primarily engaged in the transport and disposal of "trash and rubbish materials" from residential and commercial properties. (*Id.* ¶ 52.) Rainbow's articles of incorporation, as amended in 2004, provided that all **[*2]** outstanding shares of Rainbow's capital stock were to be owned by: "(a) employees of the Corporation (or a subsidiary of the Corporation); (b) any trust, partnership or limited liability company with respect to which an employee of the Corporation (or a subsidiary of the Corporation) is treated as the owner of such shares for federal income tax purposes; (c) the Corporation's Employee Stock Ownership Plan and Trust; and/or (d) individuals or entities receiving such shares as a benefit distribution ...." (*Id.* ¶ 59.)

---

[1] Moving Defendants are Gerald Moffatt (Doc. 73); Gregory Range (Doc. 77); GreatBanc Trust Company (Doc. 75); Rainbow Disposal Co. (Doc. 83); and Jon Black, Bill Eggleston, Catharine Ellingsen,

Rainbow Disposal Co. Employee Stock Ownership Plan Committee, and Republic Services, Inc. (collectively, the "Republic Defendants") (Doc. 78). The Moving Defendants also joined in each other's Motions, and Defendant Jeff Snow joined in Moffatt's Motion (*see* Doc. 74.)

[2] Plaintiffs are Antonio Hurtado, Christopher Ortega, Jose Quintero, Maritza Quintero, Jorge Urquiza, and Maria Valadez.

On July 1, 1995, Rainbow established the Rainbow Employee Stock Ownership Plan (the "Plan"). (*Id.* ¶ 53.) The Plan held 100% of Rainbow's stock. (*Id.* ¶ 5.) The Plan was governed by the "Plan Document," which was restated most recently in 2004. (*Id.* ¶ 53; *see* Plan Document, Doc. 75-2.) The Plan Document included the following relevant provisions.

Section 5(a) required that the Trust Assets were to be invested by the Trustee "primarily (or exclusively) in Company Stock ... ." (Plan Doc. § 5(a).) Indeed, 97% of the Plan's assets constituted Rainbow stock. (FAC ¶ 84.) Section 5(d) required that any sale of stock held by the Plan "must be made at a price not less than the Fair Market Value as of the date of [*3] the sale." (Plan Doc. § 5(d).) Fair Market Value was in turn defined as "[t]he fair market value of Company Stock, as determined by the Trustee ... based upon a valuation by an independent appraiser (within the meaning of *Section 401(a)(28)(C)* of the [Internal Revenue] Code)." (*Id.* § 2 at 5.)

Section 8 provided that Plan Participants were entitled to direct the Trustee to vote their shares of stock on "any corporate matter which involves the voting of such shares at a shareholder meeting and which constitutes a merger, consolidation, recapitalization, reclassification, dissolution, sale of substantially all assets of a trade or business or a similar transaction as specified in regulations under *Section 409(e)(3)* of the [Internal Revenue] Code." (*Id.* § 8.) In March 2009, Plan Participants received a Summary Plan Description (the "2009 SPD"), which summarized Section 8 as follows: "In certain important corporate matters, ... such as a merger or liquidation of the Company, [Plan Participants] may have the right to decide how shares of Company Stock allocated to your Company Stock Account will be voted." (FAC ¶ 110.)

Section 17 governed administration of the Plan and designated Rainbow as the Plan Administrator. (*See* Plan Doc. § 17(h).) Subsection (a) provided that a Committee appointed [*4] by Rainbow's Board of Directors (the "ESOP Committee") would serve as a fiduciary of the Plan with authority to control and manage its operation and administration. (*Id.* § 17(a).) Subsection (c) provided that the ESOP Committee was responsible for directing the Trustee as to the investment of the Trust Assets. (*Id.* § 17(c).) Finally, subsection (g) provided that Rainbow would "indemnify each member of the Committee (to the extent permitted by law) against any personal liability or expense ... resulting from his service on the Committee, except such liability or expense as may result from his own willful misconduct." (*Id.* § 17(g).)

The Plan Document also established a Trust, which was administered pursuant to the Trust Agreement. (Trust Agreement, Doc. 75-10.) Paragraph A required that the trust assets be held in trust by the Trustee and that the Trustee

invest those assets as directed by the ESOP Committee. (*Id.* ¶ A.) Further, Rainbow's Board of Directors was permitted to directly engage the Trustee to act, so long as the Trustee independently determined that the Board's instructions were "fair and reasonable and in the best interests of the Participants." (*Id.* ¶ B(6).)

In 2002, GreatBanc was hired as the Trustee of the Plan pursuant [*5] to the "Trustee Engagement Agreement," and has since acted as the sole Trustee. (FAC ¶¶ 114-115; *see* Trustee Engagement Agreement, Doc. 75-8.) The Trustee Engagement Agreement was amended in 2014 to include an indemnification provision, which provided that Rainbow was to indemnify the Trustee "for any loss, cost, expense, or other damage, ... [except] to the extent that any loss, cost, expense, or damage ...is held by a court of competent jurisdiction, in a final judgment from which no appeal can be taken, to have resulted either from the gross negligence or from the willful misconduct of one or more of the Indemnitees or from the violation or breach of any fiduciary duty imposed under ERISA ...." (2014 Trustee Engagement Amendment § 6, Doc. 75-9.) Further, the indemnification provision permitted Rainbow to advance defense costs to the Trustee, so long as the Trustee "ma[de] arrangements reasonably satisfactory" to ensure reimbursement to Rainbow if the it was ultimately determined ineligible for indemnification. (*Id.*)

## B. Factual Allegations

The First Amended Complaint makes the following factual allegations:

By no later than 2009, Rainbow was under the management of Defendant Gerald Moffatt, the Executive Chairman; [*6] Defendant Jeff Snow, the President; and non-party Bruce Shuman, the Chief Executive Officer. (FAC ¶¶ 17-18, 35, 65.)

In early 2010, Shuman and Moffatt formed an entity called Southeast Renewables, LLC ("Southeast Renewables"), which engaged in the same business activities as Rainbow. (*Id.* ¶ 66.) Shuman, Moffatt, and Rainbow each held ownership interests in Southeast Renewables, but Rainbow was the sole member to provide capital for the venture. (*Id.* ¶¶ 67-70.) In May 2010, Moffatt and Shuman "caused Rainbow Disposal to form West Florida Recycling," which worked jointly with Southeastern Renewables on many projects but failed to ever turn a profit. (*Id.* ¶¶ 72-75.) Southeastern Renewables then purchased West Florida Recycling, and West Florida Recycling thereafter filed for bankruptcy. (*Id.* ¶ 77.) Rainbow lost the $6 to $8 million investment it had contributed to West Florida Recycling, which "resulted in decreases to the value of the Rainbow stock" held by Plan. (*Id.* ¶ 78.) Moreover, because of these investments, Rainbow

was unable to satisfy its outstanding debt obligations, which caused the value of its stock to further decrease. (*Id.* ¶¶ 79-80.)

On July 10, 2014, Moffatt, on behalf **[*7]** of Rainbow and the Plan, amended the Trustee Engagement Agreement and expanded GreatBanc's authority to allow it to "review a proposed transaction involving a sale of all of the issued and outstanding stock of the Company to Republic Services." (*Id.* ¶¶ 132-33.) Then, on August 25, 2014, Moffatt executed Amendment 4 to the Plan Document, which provided that "the Trustee shall have the discretionary authority (without directions from the ESOP Committee, the Board of Directors or any other party) to: (i) sell all or substantially all of the outstanding shares of the Company to a third party in a change of control transaction, and (ii) execute and deliver instruments to effect such a sale." (*Id.* ¶ 135; *see* Amendment 4 to Plan Doc., Doc. 75-6.) There is no indication that Amendment 4 was adopted in conformance with Section 20's requirement that the Board of Directors approve any amendment to the Plan. (FAC ¶ 136.)

The following day, Republic Services, Inc. ("Republic"), the Plan, and Rainbow entered into a Stock Purchase Agreement, setting forth that Republic Services would purchase all of the outstanding Rainbow stock from the Plan contingent upon a closing of the sale, effective October 1, 2014 (the "October 2014 transaction"). **[*8]** (*Id.* ¶ 137.) Attached to the Stock Purchase Agreement was a document entitled "Unanimous Written Consent of the Board of Directors" signed by Defendants Moffat, Snow, and Range. (*Id.*)

The sale closed on October 1, 2014, and Republic acquired all of the shares of Rainbow "either 'for the net proceeds of $50,829,073' according to the 2014 Form 5500 filed with the [Department of Labor] on April 18, 2016' or '$48,815,131.29'" according to a later letter written by the ESOP Committee to Plan Participants. (*Id.* ¶ 138.) The 2014 Form 550 also stated that an additional $16,800,000 was placed in an escrow account pursuant to a "holdback arrangement" whereby the proceeds were to be distributed to Plan Participants over the 36-month period ending October 1, 2017. (*Id.*)

Also on October 1, 2014, Moffatt executed Amendment 5 to the Plan Document and Amendment 3 to the Trust Agreement. (*Id.* ¶¶ 139-40.) Amendment 5 to the Plan Document stated that the Fair Market Value definition of Section 2 and the voting requirements set forth in Section 8 were no longer effective. (*Id.* ¶ 140; *see* Amendment 5 to Plan Doc. § 1, Doc. 75-7.) Moreover, Amendment 5 provided that after the closing of the October 2014 transaction, Trust assets were to be invested primarily in investments designed **[*9]** to preserve principal consistent with the requirements of

ERISA." (FAC ¶ 143; Amendment 5 to Plan Doc. § 8.) Amendment 3 to the Trust Agreement provided that the Trustee may act "without direction from the ESOP Committee with respect to matters related to ... the Stock Purchase Agreement." (FAC ¶ 145; *see* Amendment 3 to Trust Agreement § 2, Doc. 75-13.)

On October 3, 2014, Plaintiffs and other Plan Participants received a letter signed by GreatBanc, which stated that "all of the stock in the ESOP had been sold to Republic" pursuant to a "lengthy sale process in which the Company sought and received substantial offers from multiple bidders ... ." (FAC ¶ 147.) The letter also advised Plan Participants that they would receive "75% of their closing cash allocation" and that the remaining 25% would be distributed to Plan Participants upon the IRS's approval of termination of the Plan. (*Id.* ¶ 148.) The letter did not set forth "(a) the sale price of the ESOP's stock, (b) any assessment of the fair market value of the stock, as assessed by an independent appraiser, (c) any further details of the sale, (d) whether any consideration was provided other than purchase of the Rainbow ESOP stock, (e) [] information that the prior ESOP **[*10]** fiduciaries had resigned on October 1, 2014 or (e) the names or contact information ... of the new fiduciaries or any contact information of anyone from whom they could ask questions about the status of their ESOP accounts." (*Id.* ¶ 149.)

The same day, the ESOP Committee, now comprised of Defendants Black, Ellingson, and Eggleston (the "New ESOP Committee") held a meeting in which it determined that the Plan assets, roughly $14.9 million, should remain invested in Goldman Sachs Treasury obligations for a period of six to nine months. (*Id.* ¶¶ 25, 179, 182.) However, the Plan assets ultimately remained invested in the Treasury bonds for nearly three years until they were distributed to Plan Participants. (*Id.* ¶ 258(m)-(n).)

The next communication to Plan Participants about the sale was dated October 17, 2014, and informed Plan Participants that the Plan's stock had been sold at a price of $17.66 per share and that Plan Participants would receive the "cash equivalents for stock allocated to them" in three separate payments. (*Id.* ¶¶ 150-151.) The $17.66 share price assumed that the ESOP would receive "nearly all of the $16,800,000 placed in escrow" and the October 17, 2014 letter did not **[*11]** disclose that the Plan Participants were "highly unlikely" to receive that maximum amount. (*Id.* ¶ 153.)

On October 21, 2014, Rainbow filed the "Amended and Restated Articles of Incorporation," (the "Restated Articles"), eliminating the requirement that Rainbow be employee owned. (*Id.* ¶ 146.) The Restated Articles recited that they had been approved by shareholder vote, but no vote was actually

held. (*Id.*)

Then, on October 31, 2014, Republic filed a Form 10-Q with the Securities & Exchange Commission, in which it disclosed the October 2014 transaction as being "for $112 million in cash" in addition to the following consideration: "agreements not to compete, along with other restrictive covenants with key executives. We also assumed capital lease agreements for operational facilities in Southern California. Rainbow's operations in Southern California include hauling routes, a recycling facility, a transfer station, a compressed natural gas (CNG) refueling station, and a CNG-powered vehicle fleet." (*Id.* ¶ 156.) Republic's later 2014 10-K Report stated that the purchase price was allocated between property and equipment, intangible assets, goodwill "expected to arise from other assets acquired ..." and approximately $18.9 million in liabilities. (*Id.* ¶¶ 167-168.)

Around [*12] the same time, Republic issued a press release regarding the sale and stated that Republic acquired Rainbow's "business and facilities," including its "hauling routes in Huntington Beach, Fountain Valley, Midway City, Westminster, Orange County, Newport Beach, and Irvine as well as a recycling facility, a transfer station, 'a compressed natural gas (CNG) refueling station, and a vehicle fleet." (*Id.* ¶ 155(a).) Moreover, "[a]s part of the transaction, the primary principals at Rainbow, Jerry Moffatt and Jeff Snow, have joined Republic Services, and will now lead a newly created business unit ... ." (*Id.* ¶ 155(b).)

In November 2014, Plan Participants received "Notice to Interested Parties," advising that Republic would apply to the IRS for a determination on whether the Plan met the qualifications for termination as set forth in the Internal Revenue Code (the "IRC"). (*Id.* ¶ 158.) Around the same time, Plaintiff Chris Ortega sent a letter to the Plan Administrator requesting certain documents pertaining to the Plan pursuant to ERISA. (*Id.* ¶ 183.) Defendant Jon Black responded without identifying his position or relationship to the Plan and refused to provide any documents, including the [*13] Plan Document or the most recent summary plan description. (*Id.* ¶ 184.) Ortega sent another letter repeating his requests, and Black responded on law firm letter head (though he has no association with the firm and is not a lawyer), claiming that some of the requested documents were "confidential." (*Id.* ¶ 186.) He also produced some documents without substantively identifying them. (*Id.*)

On January 20, 2015, Ortega's counsel sent yet another letter to Black, which specifically requested the valuation report that GreatBanc relied upon in determining the fair market valuation of Rainbow's stock for the October 2014 transaction. (*Id.* ¶ 187.) Counsel for Black responded and provided a "valuation of [Rainbow] as of June 30, 2014," which reflected a $16.67 price per share (the "June 2014 valuation"). (*Id.* ¶¶ 188, 203.)

One year later, in November 2015, the ESOP Committee circulated to Plan Participants an undated letter from GreatBanc, which disclosed that Republic had actually paid a total purchase price of $112,000,000 in the October 2014 Transaction. (*Id.* ¶ 171.) Then, in April 2016, the ESOP Committee announced to Plan Participants that the IRS had issued a favorable determination regarding [*14] termination of the Plan. (*Id.* ¶ 173.) A few months later, Great Banc sent Plan Participants a letter stating that "issues related to the $16.8 million in escrow had been resolved" and that the Plan would receive $4,475,000 as its final payment. (*Id.* ¶ 174.) Plaintiffs Quintero and Ortega later requested a copy of the "Escrow Settlement Agreement" from the ESOP Committee, which refused to provide it. (*Id.* ¶¶ 190-195.)

Finally, in August 2017, Plan Participants received a letter, which stated that they could complete forms to take a distribution. (*Id.* ¶ 175.) The August 2017 letter enclosed a Summary Plan Description that was dated October 2014 (the "2014 SPD"), which had not been previously furnished to Plan Participants. (*Id.* ¶ 176.) The 2014 SPD identified the ESOP Committee as the Plan Administrator. (*Id.* ¶ 97.)

Ultimately, after all distributions had been made following the October 2014 transaction, Plaintiffs received approximately $15 per share, which is less than the $16.67 per share valuation as set forth in the June 2014 valuation and less than the $17.66 per share valuation as set forth in the October 17, 2014 letter to Plan Participants. (*Id.* ¶ 203.)

On September 15, 2017, Plaintiffs [*15] filed the instant action. On February 28, 2018, Plaintiffs filed the First Amended Complaint, alleging fourteen counts of violations of ERISA. (*Id.* ¶¶ 209-384.) Defendants, in various combinations, move to dismiss all fourteen.

## II. LEGAL STANDARD

When evaluating a *Rule 12(b)(6)* motion, the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party. *Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).* If a complaint fails to state a claim as a matter of law, that is, if "it appears certain that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief," the complaint is dismissed. *Id.*

In ruling on a *12(b)(6)* motion, a court may "consider certain

materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Gerritsen v. Warner Bros. Entm't, Inc., 112 F. Supp. 3d 1011 (C.D. Cal. 2015)* (quoting *United States v. Ritchie, 342 F.3d 903, 907-08 (9th Cir. 2003)* (internal quotation marks omitted)).

## III. DISCUSSION

### A. Count I

Count I is brought against Moffatt as the Prior ESOP Committee Defendant[3] and GreatBanc under *ERISA § 404, 29 U.S.C. § 1104(a)(1)*, for relying on the June 2014 valuation to determine the fair market value of Rainbow's [*16] shares for the October 2014 transaction. (FAC ¶¶ 209-226.)

Defendants argue that Plaintiffs fail to state a claim because (1) the June 2014 valuation was not "stale" by the time of the October 2014 transaction, (GreatBanc Mem. at 9-11, Doc. 75); and (2) no facts "plausibly support the inference" that the June 2014 valuation was an inaccurate appraisal or for less than market value at the time the sale closed. (*Id.* at 12; Moffatt Mem. at 6, Doc. 73-1.)

Under *§ 404*, a fiduciary act must act solely in the best interests of plan participants by acting (1) "with the care, skill, prudence, and diligence ...[of a] prudent man acting in a like capacity and familiar with such matters" and (2) "in accordance with the documents and instruments governing the plan ... ." *29 U.S.C. § 1104(a)(1)(A), (B), (D)*. Thus, *§ 404* "focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Butler v. Dickerson Employee Benefits Inc.*, No. CV 09-4279-JLS (PJWx), 2011 WL 13177000, at *4 (C.D. Cal. May 2, 2011). To satisfy *§ 404* when facilitating a transaction involving the sale of plan assets, the fiduciary must conduct an "adequate inquiry into the proper valuation of shares." *Allen v. GreatBanc Tr. Co., 835 F.3d 670, 678-79 (7th Cir. 2016)*.

---

[3] Plaintiffs' Opposition provides a chart that delineates which Defendants are included in the particular groups identified in each Count. (*See* Opp. at xxi-xxii.) The "Prior Committee Defendant" is Moffatt and the "New Committee Defendants" are Black, Ellingsen, and Eggleston. (*Id.*) Therefore, contrary to the Republic Defendants' reading, the Court does not read the FAC to allege Counts I, II, IV, VIII, X-XII and XIV against the ESOP Committee as a separate entity. (*See* Republic Mem. at 8.) Count IX, however, is properly brought against the ESOP Committee, as explained *infra*.

The Court finds that Plaintiffs have adequately pleaded [*17] Count I by alleging that reliance on the June 2014 valuation did not constitute a thorough investigation of the merits of the sale price for the October 2014 transaction. Defendants' arguments ultimately concern whether reliance on a three-month-old valuation would be "prudent" in the circumstances and whether the valuation was accurate as of the date of the sale. (*See* GreatBanc Mem. at 10; Moffatt Mem. at 6.) *See 29 U.S.C. § 1104(a)(1)(B)*. These arguments are not amenable for resolution on a motion to dismiss. Defendants "remain[] free to move for summary judgment after discovery on the grounds that [their] process for conducting a valuation of the stock was adequate." *Allen, 835 F.3d at 679*.

Because the Court finds that Plaintiffs have adequately pleaded Count I as to the adequacy of the inquiry, the Court need not reach the parties' other arguments concerning the interpretation of Section 5(d) and the IRC. (*See* GreatBanc Mem. at 9-10.)

Therefore, the Motions are DENIED as to Count I.

### B. Count II

Count II is also brought against Moffatt as the Prior ESOP Committee Defendant and GreatBanc under *ERISA § 404, 29 U.S.C. § 1104*, for their failure to require a Plan Participant vote prior to the October 2014 transaction. (FAC ¶¶ 227-243.)

Defendants argue that (1) Plan Participants were [*18] not entitled to a vote under the Plan Document, (Moffatt Mem. at 7-8; GreatBanc Mem. at 12-13), and (2) Plaintiffs lack standing to pursue this claim because they cannot show that the value of their shares would have increased if the October 2014 transaction had not been approved, (GreatBanc Mem. at 14-15).

As discussed above, *§ 404(a)(1)* requires a plan's fiduciaries to act both prudently and in accordance with the plan's governing documents. *29 U.S.C. § 1104(a)(1)(A)-(B), (D)*. Section 8 of the Plan Document, which tracks *§ 409(e)(3) of the IRC*, requires a shareholder vote for "a merger, consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business or a similar transaction specified in regulations under *Section 409(e)(3)* of the [Internal Revenue] Code." (FAC ¶ 229; Plan Doc. § 8.)

The Court finds that Plaintiffs' allegations raise the plausible inference that the October 2014 transaction came within the purview of Section 8. (*See* FAC ¶ 235.) Plaintiffs allege that they received conflicting information regarding the terms of the sale. Although the October 2014 transaction was

represented to Plaintiffs as simply a stock sale (*see id.* ¶ 147), Republic's press release, as alleged by Plaintiffs, indicated that the deal **[*19]** encompassed far more than just stock: Republic claimed also to have acquired Rainbow's "business and facilities," including its hauling routes, transfer and refueling stations, vehicle fleet, and even its key executives. (*Id.* ¶ 155.) If Republic indeed acquired all of the assets as set forth in the FAC, the deal may well have come within the definition of a "sale of substantially all assets."[4] (*See* Plan Doc. § 8.)

At this stage of the case, Plaintiffs do not have access to the details of the October 2014 transaction, but they have told a sufficiently "plausible story" to support their claim. *Allen, 835 F.3d at 678*.

Moreover, GreatBanc has not shown that Plaintiffs lack standing at this juncture. Relying on *DeFazio v. Hollister, 636 F. Supp. 2d 1045 (E.D. Cal. 2009)*, GreatBanc contends that Plaintiffs cannot allege that it is "likely, and not merely speculative" that the value of their shares would have increased if the October 2014 transaction had not gone forward. (GreatBanc Mem. at 15.) However, as noted in *DeFazio*, measuring losses to an ERISA plan requires reference to "expert testimony or other evidence regarding investment returns during the relevant period." *DeFazio, 636 F. Supp. 2d at 1073*. Clearly, such a question should not be resolved at the pleadings stage.

Accordingly, the Motions are **[*20]** DENIED as to Count II.

## C. Count III

Count III is brought under *ERISA § 102(a)* against the Pre-October 1, 2014 Plan Administrator, which is Rainbow. (FAC ¶¶ 95, 244-252.) Plaintiffs allege that the 2009 SPD did not adequately and accurately apprise Plaintiffs of whether they had the right to vote on the October 2014 transaction. (*Id.* ¶ 250.)

Rainbow argues that Count III should be dismissed because (1) the 2009 SPD did reasonably apprise Plaintiffs of their voting rights, and (2) Plaintiffs do not state a plausible claim for appropriate equitable relief. (Rainbow Mem. at 7, Doc. 83-1.)

*ERISA § 102(a)* requires that SPDs "be written in a manner calculated to be understood by the average plan participant" and "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *29 U.S.C. § 1022(a)*. The regulations implementing *§ 102* require that the plan administrator must "tak[e] into account such factors as the level of comprehension and education of typical participants in the plan and the complexity of the terms of the plan." *29 C.F.R. § 2520.102-2(a)*. To enforce *§ 102*, the plaintiff must prove both "(1) that there is a remediable wrong, *i.e.*, that the plaintiff seeks relief to redress **[*21]** a violation of ERISA or the terms of a plan, and (2) that the relief sought is appropriate equitable relief." *Gabriel v. Alaska Elec. Pension Fund, 773 F.3d 945, 954 (9th Cir. 2014)* (internal citations omitted).

The 2009 SPD provided that Plan Participants "may have the right" to vote in "certain important corporate matters." (FAC ¶ 248.) Plaintiffs allege that Plan Participants, "would have and did understand that they had the right to vote" on the October 2014 transaction from this single sentence. (*Id.* ¶ 249.) Whether the 2009 SPD offered sufficient "clarity and completeness" to apprise Plan Participants of their voting rights turns on factual considerations such as who is the "typical participant" in Rainbow's Plan. *See 29 C.F.R. § 2520.102-2(a)*. Moreover, resolution of Count III may also depend on whether Plan Participants did, in fact, have a right to vote on the sale to Republic. To the extent that the 2009 SPD apprised Plan Participants that they did not have such a right, as Rainbow implies, (*see* Rainbow Mem. at 6), then it may be an inaccurate summation of Plan Participants' rights. *See Layaou v. Xerox Corp., 238 F.3d 205, 211 (2d Cir. 2001)* (reversing summary judgment where the SPD failed to describe the "full import" of the plan's provisions). Therefore, Plaintiffs have plausibly alleged a remediable wrong.

Moreover, Plaintiffs **[*22]** have identified appropriate equitable relief. As the Ninth Circuit recognized in *Skinner*, a plan administrator has a statutory duty "to provide participants with an SPD that [is] sufficiently accurate and comprehensive to reasonably apprise [them] of their rights and obligations under the plan." *Skinner v. Northrop Grumman Ret. Plan B, 673 F.3d 1162, 1167 (9th Cir. 2012)*. Therefore, under a theory of breach regarding the accuracy of the 2009 SPD, "the remedy of surcharge could hold [Rainbow] liable for benefits it gained through unjust

---

[4] In focusing on the allegations related to the possible asset sale, the Court does not mean to foreclose the possibility that Section 8 required a shareholder vote even if the October 2014 transaction was merely a stock sale. *See Jewel Companies, Inc. v. Pay Less Drug Stores Nw., Inc., 741 F.2d 1555, 1561 n.7 (9th Cir. 1984)* (noting that California law "attempt[s] to treat all methods of corporate fusion identically" in order to prevent the "circumvention of shareholders' voting and appraisal rights"). However, the Court need not make this determination before Plaintiffs have had the opportunity to discover fully the terms of the October 2014 transaction.

enrichment or for harm caused as the result of its breach." *Id.* Whether Plaintiffs can ultimately prove unjust enrichment or actual harm is a matter for summary judgment. *See Gabriel, 773 F.3d at 958.*

Accordingly, the Motions are DENIED as to Count III.

## D. Count IV

Count IV is brought under *ERISA § 404*, *29 U.S.C. § 1104*, against Moffatt as the Prior ESOP Committee Defendant; Black, Ellingsen, and Eggleston as the New ESOP Committee Defendants; and GreatBanc for their failure to make required disclosures about the October 2014 transaction. (FAC ¶¶ 253-261.)

Defendants argue that their disclosures satisfied the disclosure requirements under ERISA (*see* GreatBanc Mem. at 17; Moffatt Mem. at 8-9; Republic Mem. at 11-12, Doc. 78-1) and that Plaintiffs have not shown that they were harmed [*23] by the inadequate disclosures, (Republic Mem. at 13.)

Although *§ 104* imposes disclosure obligations solely on plan administrators, *see* *29 U.S.C. § 1024(b)(4)*, *§ 404* extends to all fiduciaries "an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information." *King v. Blue Cross & Blue Shield of Illinois, 871 F.3d 730, 744 (9th Cir. 2017)*. This obligation is coextensive with the disclosure requirements under *§ 104*. *See Faircloth v. Lundy Packing Co., 91 F.3d 648, 657 (4th Cir. 1996).*

"A fiduciary breaches his duty by providing plan participants with materially misleading information, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally." *Mathews v. Chevron Corp., 362 F.3d 1172, 1183 (9th Cir. 2004)* (citing *James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 449 (6th Cir. 2002))*. However, *§ 404* does not require that plaintiffs "prove any injury in order to prosecute violations" of fiduciary duty. *Ziegler v. Connecticut Gen. Life Ins. Co., 916 F.2d 548, 551 (9th Cir. 1990).*

Plaintiffs allege that the Prior ESOP Committee, the New ESOP Committee, and GreatBanc failed to disclose the material terms of the October 2014 transaction - terms which impacted the calculation of Plan Participants' benefits - and made material misrepresentations about the valuation of the benefits, including the total sale price. (FAC ¶¶ 154, 171, 258.) Defendants contend that they "timely responded to participant inquiries ... providing 'complete [*24] and accurate' information regarding Plaintiffs' benefits" consistent

with ERISA disclosure requirements. (Republic Mem. at 11; GreatBanc Mem. at 17.)

Resolution of this argument will require factual determinations regarding what disclosures were actually made. For example, Plaintiffs allege that the New ESOP Committee failed to disclose their takeover as fiduciaries a*t the time of the October 2014 transaction. (FAC ¶ 149.) The Ninth Circuit has recognized that "the persons to whom the management and investment of his plan funds have been entrusted" constitutes material information about the plan. *Hughes Salaried Retirees Action Comm. v. Adm'r of Hughes Non-Bargaining Ret. Plan, 72 F.3d 686, 690 (9th Cir. 1995)*. Moreover, GreatBanc states that it did not disclose the valuation report on which it relied in determining the sale price in the October 2014 transaction, (*see* GreatBanc Mem. at 9 n.9), which may be a required disclosure given that Plaintiffs' benefits were measured by the value of the stock that was sold. *Hughes, 72 F.3d at 690*. In short, whether Defendants' disclosures were, in fact, complete, accurate, and consistent with ERISA is a question of fact not amenable for resolution at this stage.

Moreover, Defendants' arguments regarding harm are inapt, as Plaintiffs need not show an injury flowing from a violation [*25] of fiduciary duty under *§ 404*, *see Ziegler, 916 F.2d at 551*.

The Motions are DENIED as to Count IV.

## E. Count V

Count V is brought against Defendants Moffatt and Snow under *ERISA § 406(b)(1)* and *(3)* for engaging in a prohibited transaction. (FAC ¶¶ 262-270.) Specifically, Plaintiffs argue that Moffatt and Snow negotiated employment agreements with Republic as consideration for the sale of the Plan's stock. (*Id.* ¶¶ 268-270.)

Defendants argue that this claim should be dismissed because Plaintiffs do not allege that Moffatt and Snow were paid "at the expense of" Plan Participants and there was no transaction involving "plan assets." (Moffatt Mem. at 9.)

Under *§ 406*, a fiduciary is prohibited from "deal[ing] with the assets of the plan in his own interest or for his own account," and from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." *29 U.S.C. § 1106(b)(1)*, *(3)*. However, plaintiffs need not show that the plan suffered any losses from the transaction. *Butler*, 2011 WL 13177000, at *7. Rather, they need show only that the plan's assets were used "for a purpose

which did not benefit the plan." *Kayes v. Pac. Lumber Co., 51 F.3d 1449, 1467 (9th Cir. 1995)*. Moreover, *§ 406(b)* should be broadly construed and liability should be imposed even where there is [*26] no taint of scandal, no hint of self-dealing, no trace of bad faith." *Butler*, 2011 WL 13177000, at *7. "[T]he burden is on the fiduciary to show consideration received from a party dealing with the plan was not received in connection with a transaction involving the assets of the plan." *Id.*

Plaintiffs allege that Moffatt and Snow "negotiated and entered into agreements" as part of the October 2014 transaction, whereby they "ensured their continued employment or payments" following the sale. (FAC ¶ 268.) Therefore, Defendants' arguments that they were not paid "at the expense of" Plan Participants is unavailing (*see* Moffatt Mem. at 10) because use of the Plan's stock to secure employment contracts is arguably a "purpose which did not benefit" the Plan. *Kayes, 51 F.3d at 1467*.

Defendants' second argument, that Rainbow's stock did not constitute "plan assets" (*id.* at 10), also lacks merit. While *29 C.F.R. § 2510.3-101(h)(3)* establishes that "corporate assets are not plan assets where the plan is an ESOP," *Johnson v. Couturier, 572 F.3d 1067, 1080 (9th Cir. 2009)*, clearly "the assets of the plan would include the employer securities." *See 51 FR 41262*-01, at 41277 (Nov. 13, 1986). Here, Plaintiffs allege that 97% of the Plan's assets were Rainbow's securities. (FAC ¶ 84.) Therefore, Plaintiffs have sufficiently alleged that Moffatt and Snow's [*27] negotiation of employment agreements in connection with the sale of Rainbow's stock violated their fiduciary duties under *§ 406*.

Accordingly, Plaintiffs have adequately pleaded Count V.

## F. Count VI

Count VI is brought against Defendants GreatBanc, Moffatt, and Snow under *ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D)*, for engaging in a prohibited transaction. (FAC ¶¶ 271-281.) Like Count V, Count VI concerns the employment agreements that were negotiated for Moffatt and Snow in connection with the October 2014 transaction. Plaintiffs allege that if the promise of continued employment for Moffatt and Snow had not been included as part of the deal, Republic would have paid more for the shares of Rainbow and Plan Participants therefore would have received more per share. (*Id.* ¶ 278.)

Defendants argue that the allegation concerning the effect of the agreements on Rainbow's stock price is "highly improbable." (Moffatt Mem. at 12; GreatBanc Mem. at 18.)

GreatBanc separately argues that Plaintiffs failed to allege that it played a causal role in the October 2014 transaction. (GreatBanc Mem. at 18.)

To state a claim under *§ 406(a)(1)(D)*, the plaintiff must allege that the defendant "cause[d] the plan to engage in a transaction, [which he knows or should know] [*28] constitutes a direct or indirect ...transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." *29 U.S.C. §1106(a)(1)(D)*. However, "lack of harm to the plan ... [is] not relevant, and certainly not controlling, under *[§] 406*." *M & R Inv. Co. v. Fitzsimmons, 484 F. Supp. 1041, 1055 (D. Nev. 1980)*, *aff'd*, *685 F.2d 283 (9th Cir. 1982)*. To determine whether a directed trustee "causes" a plan to engage in a prohibited transaction, "the question is whether the directed trustee played a discretionary role in bringing [it] about." *Chesemore v. All. Holdings, Inc., 770 F. Supp. 2d 950, 970 (W.D. Wis. 2011)*.

As described above, the October 2014 transaction involved the use of Plan assets to negotiate a benefit for Moffatt and Snow in the form of employment agreements with Republic. Even if Plaintiffs' allegation regarding harm to the Plan Participants is "improbable" as Defendants contend, harm is not a relevant consideration to self-dealing transactions. *M & R Inv. Co., 484 F. Supp. at 1055*.

GreatBanc's causation argument fares no better. *Amendment 4* to the Plan Document gave GreatBanc discretionary authority sell all of the outstanding shares of Rainbow's stock without direction from the ESOP Committee or the Board of Directors. (*Amendment 4* to Plan Doc.) Moreover a trustee always has discretion to reject a transaction that would be contrary to ERISA. *See Chesemore, 770 F. Supp. 2d at 970*. Plaintiffs allege that pursuant to the authority vested by [*29] *Amendment 4* and its fiduciary obligations under ERISA, GreatBanc caused the Plan to enter into the October 2014 transaction. (FAC ¶ 279.) Therefore, Plaintiffs have sufficiently alleged GreatBanc's causal role.

Thus, the Motions are DENIED as to Count VI.

## G. Count VII

Count VII is brought against Defendant Range under *ERISA § 406(b)(1)* and *(3)*, *29 U.S.C. § 1106(b)(1),(3)*, for engaging in a prohibited transaction. (FAC ¶¶ 282-288.) Plaintiffs allege that Range, who was a member of Rainbow's Board of Directors at the time of the October 2014 transaction, was also the founder and head of a financial advisory firm called Stout. (*Id.* ¶ 286.) Plaintiffs allege that Stout served as Rainbow's financial advisor in the October 2014 transaction,

and thus Range received consideration for his services in connection with a transaction involving Plan assets. (*Id.* ¶ 288.)

Range argues that this claim should be dismissed because Plaintiffs do not allege that he was paid with Plan assets or that he caused the payment to Stout. (Range Mem. at 5-7, Doc. 77.)

As discussed with respect to Counts V and VI, *§ 406* imposes a "per se prohibition" on transactions involving assets of the plan, *M & R Inv. Co., 484 F. Supp. at 1055*, in which fiduciaries receive personal benefits "from any party dealing with such [*30] plan." *29 U.S.C. § 1106(b)(3)*. Moreover, *§ 406(b)* does not have a causal element; it requires only that the fiduciary received consideration from a transaction involving assets of the plan. *See id.* Here, Plaintiffs have alleged that Range received compensation from Rainbow, a "party dealing with [the Plan]," in connection with his role in facilitating the October 2014 transaction. (FAC ¶ 288.)

Accordingly, Plaintiffs have adequately pleaded Count VII.

## H. Count VIII

Count VIII is brought against Moffatt as the Prior ESOP Committee Defendant and Great Banc under *ERISA § 404(a)(1)(A)* and *(B)*, *29 U.S.C. § 1104*, for failure to manage a chose in action. (FAC ¶¶ 289-304.) Plaintiffs allege that GreatBanc and the Prior ESOP Committee, including Moffatt, had a fiduciary duty to bring a shareholder action against Moffatt and Shuman for investing Rainbow's assets into Southeastern Renewables and West Florida Recycling, entities in which they personally held ownership interests. (*Id.* ¶ 296.) Moreover, Plaintiffs allege that if Defendants had pursued or raised these claims prior to the October 2014 transaction, the fair value of Rainbow's stock would have increased. (*Id.* ¶ 303.)

Moffatt argues that this claim should be dismissed because Plaintiffs fail to allege that [*31] the investments into Southeastern Renewables and West Florida Recycling involved Plan assets. (Moffatt Mem. at 12-13.) GreatBanc argues that (1) it cannot be liable because it did not have the power to bring a derivative suit absent direction from the ESOP Committee; (2) Plaintiffs have not shown that these ventures affected the ultimate price of the October 2014 transaction; and (3) bringing a derivative claim "would have made no sense whatsoever" because it would have caused Rainbow's stock price to decline. (GreatBanc Mem. at 19-20.)

When an ESOP fiduciary also serves as a corporate director or officer, his ERISA duties extend to all business decisions

from which he could directly profit. *Johnson, 572 F.3d at 1077*. Moreover, the duties of prudence and loyalty under *§ 404* "include the duty to take reasonable steps to realize on claims held in trust." *Harris v. Koenig, 602 F. Supp. 2d 39, 54 (D.D.C. 2009)*. "When, as in this case, a plan has potential claims against a third party, the 'trustees have a duty to investigate the relevant facts, to explore alternative courses of action and, if in the best interests of the plan participants, to bring suit.'" *Id.* (*citing McMahon v. McDowell, 794 F.2d 100, 112 (3d Cir. 1986))*.

Here, Plaintiffs allege that Moffatt and Shuman invested Rainbow's assets into Southeastern Renewables [*32] and West Florida Recycling, enterprises in which Moffatt and Shuman held ownership interests and from which they stood to personally benefit. (FAC ¶ 296.) Therefore, this is a self-dealing transaction, which, at minimum would require that the Plan's fiduciaries "investigate the relevant facts" and make a determination as to whether suit should be brought. *See Harris, 602 F. Supp. 2d at 54*. That this might potentially require Moffatt "to bring suit against himself does not relieve him of this duty under ERISA." *Delta Star, Inc. v. Patton, 76 F. Supp. 2d 617, 637 (W.D. Pa. 1999)*.

Nor is GreatBanc excused from liability as a directed trustee. First, even if GreatBanc could not act without direction from the ESOP Committee, a "directed trustee" is still subject to a duty of prudence. *Dolins v. Cont'l Cas. Co., No. 16 C 8898, 2017 U.S. Dist. LEXIS 132803, 2017 WL 3581143, at *3 (N.D. Ill. Aug. 18, 2017)*. "Under the duty of prudence, a directed trustee can disobey the named fiduciary's directions when it is plain that they are imprudent." *Id.* Thus, Plaintiffs have plausibly alleged that GreatBanc violated its fiduciary duty by failing to act in the face of a self-dealing transaction by Moffatt and Shuman and by failing to alert the appraiser for the October 2014 transaction to the existence of these claims. *See Beam v. HSBC Bank USA, No. 02-CV-0682E(F), 2003 U.S. Dist. LEXIS 15744, 2003 WL 22087589, at *3 (W.D.N.Y. Aug. 19, 2003)*. Even if a derivative suit would not ultimately have [*33] been the appropriate remedy, GreatBanc nevertheless had a duty "to investigate the relevant facts [and] to explore alternative courses of action ... ." *Harris, 602 F. Supp. 2d at 54*. Whether GreatBanc actually acted properly in the circumstances cannot be resolved on the pleadings.

Moreover, Plaintiffs have adequately pleaded that the fair market value of Rainbow's stock would have been higher at the time of the transaction if Rainbow had not suffered losses in connection with the investments in Southeastern Renewables and West Florida Recycling. (FAC ¶ 82.) Whether this causal connection can be proven is a factual matter for trial. *Harris, 602 F. Supp. 2d at 56*.

In conclusion, Plaintiffs have adequately pleaded Count VIII and the Motions are DENIED as to Count VIII.

## I. Count IX

Count IX is brought under *ERISA § 104(b)(4)*, *29 U.S.C. § 1024(b)(4)*, against the "Post-Transaction Plan Administrator" and under *§ 404*, *29 U.S.C. § 1104*, against Black, Ellingsen, and Eggleston as the New ESOP Committee Defendants for failing to provide documents upon request. (FAC ¶¶ 305-319.)

Rainbow and the Republic Defendants move to dismiss Count IX. Rainbow argues that, as the Plan Administrator, it "produced all requested documents described with particularity ... and none of the remaining allegedly withheld documents 'restrict [*34] or Committee et al. govern the plan's operation.'" (Rainbow Mem. at 10.) The Republic Defendants argue that the ESOP Committee is not a proper defendant because it is not a "person" under ERISA and was not the Plan Administrator pursuant to Section 17(h) of the Plan Document. (Republic Mem. at 8-9; 10-11.)

Under *§ 104(b)(4)*, "the administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, other instruments under which the plan is established or operated." *29 U.S.C. § 1024(b)(4)*. "The relevant documents are those documents that provide individual participants with information about the plan and benefits," *i.e.*, "those that allow the individual participant to know exactly where he stands with respect to the plan—what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted." *Hughes, 72 F.3d at 690*.

Whether the disclosures to Plaintiffs were complete and accurate is a question that the Court [*35] will not decide at this stage. As noted above, GreatBanc denies that it relied on the June 2014 valuation report in entering into the October 2014 transaction, (*see* GreatBanc Mem. at 9 n.9), and Plaintiffs allege that the June 2014 valuation report is the sole valuation report that they received. (FAC ¶ 188.) Therefore, the Plan Administrator's failure to disclose the correct valuation report alone may impose liability under *§ 104(b)(4)*. *See Hughes, 72 F.3d at 690* (noting that a stock valuation report "is an instrument under which a plan is established or operated when the plan measures benefits by the value of stock"). Moreover, the Escrow Settlement Agreement is

alleged to have set forth the calculation of the total benefits to which Plan Participants were ultimately entitled. (FAC ¶ 174.) Thus, the terms of the Escrow Settlement Agreement, which were denied to Plaintiffs, seem to bear directly on "what benefits [participants] may be entitled to." *Hughes, 72 F.3d at 690*.

Turning to the Republic Defendants' arguments, as an initial matter, the Court finds that the ESOP Committee is a "person" that may be held liable for breaching its fiduciary duties under ERISA. *See Harris v. Amgen, Inc., 573 F.3d 728, 737 (9th Cir. 2009)* (finding that plaintiffs were entitled to amend their complaint to add [*36] the plan's "Fiduciary Committee" as a proper defendant); *Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 371 (4th Cir. 2014)*. Moreover, the Court finds premature the argument that the ESOP Committee was not the Plan Administrator for purposes of *§ 104*. Although Section 17(h) of the Plan Document identifies Rainbow as the Plan Administrator, Plaintiffs allege that the 2014 SPD named the ESOP Committee as the Plan Administrator and that the Form 5500 filed with the SEC also identifies the ESOP Committee as the Plan Administrator following the October 2014 transaction. (*See* FAC ¶ 97.) The Republic Defendants acknowledge these communications but state that there is "no conflict" with Section 17(h) because the Committee is permitted "to assist" in administration of the Plan. (*See* Republic Mem. at 10 n.6.) Therefore, "because factual issues remain with regard to the identity of the Plan Administrator during the relevant period, and with regard to the Plan Administrator's alleged delegation of duties to the Plan Committee and its members," dismissal of the claim at this stage is not appropriate, *Gough v. Tennyson, No. 17-CV-2215-PJH, 2017 U.S. Dist. LEXIS 160188, 2017 WL 4310761, at *4 (N.D. Cal. Sept. 28, 2017)*, and the Court need not reach Republic's argument regarding penalties against non-administrators.

Accordingly, Plaintiffs have adequately pleaded Count IX. The [*37] Motions are DENIED as to Count IX.

## J. Count X

Count X is brought under *ERISA § 404(a)(1)*, *29 U.S.C. § 1104(a)(1)*, against GreatBanc and Black, Ellingsen, and Eggleston as the New ESOP Committee for failing to properly invest Plan assets after the October 2014 transaction. (FAC ¶¶ 320-336.) Specifically, Plaintiffs allege that 100% of the Plan's assets were invested in short-term treasury obligations from the time of the October 2014 transaction until September 2017 and that a prudent investor would have diversified over this period. (*Id.* ¶¶ 323-327, 334.)

Defendants argue that they acted both prudently and in accordance with the Plan Document by investing in treasury obligations. (GreatBanc Mem. at 20-21; Republic Mem. at 14-16.)

In general, ERISA imposes a duty to diversify, and, if the plaintiff proves a failure to diversify, the burden shifts to the defendant to demonstrate that nondiversification was nonetheless prudent. *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 438 (3d Cir. 1996). Here, Defendants do not contest that the Plan's assets were invested solely in treasuries. Whether this decision was prudent under the circumstances is not amenable for resolution on a motion to dismiss, as evident by the cases cited by Defendants themselves. (*See* Republic Mem. at 16, *citing Flanigan v. GE, 242 F.3d 78 (2d Cir. 2001)* (summary [*38] judgment); *Donovan v. Mazzola, 716 F.2d 1226, 1229 (9th Cir. 1983)* (post trial).) *See also Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 596 (8th Cir. 2009)* (reversing dismissal where allegations "can be understood to assert that the Plan includes a relatively limited menu of funds ... despite the ready availability of better options").

Accordingly, Plaintiffs have properly pleaded Count X.

## K. Count XI

Count XI is brought under *ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)*, against Moffatt as the Prior ESOP Committee Defendant; Moffatt, Range, and Snow as the Prior Director Defendants; and Black, Ellingson and Eggleston as the New ESOP Committee Defendants for failing to monitor GreatBanc in its exercise of duties as Trustee. (FAC ¶¶ 337-345.) Count XI incorporates by reference the alleged breaches of fiduciary duties raised by prior counts.

Defendants argue that Count XI should be dismissed because Plaintiffs have not plausibly alleged the underlying breaches of fiduciary duty. (*See* Republic Mem. at 17-19; Moffatt Mem. at 13; Range Mem. at 8.) They also argue that Plaintiffs have failed to allege facts to demonstrate a deficient monitoring process. (Republic Mem. at 19-20; Range Mem. at 8-9.)

Defendants cannot succeed on their first argument because, pursuant to the above, Plaintiffs have adequately pleaded the breaches upon which Count XI [*39] is based. As to the second argument, "[a] plaintiff is not required to plead specific facts about the fiduciary's internal processes because such information is typically in the exclusive possession of a defendant." *Fernandez v. Franklin Res., Inc., No. 17-CV-06409-CW, 2018 U.S. Dist. LEXIS 59336, 2018 WL 1697089, at *7 (N.D. Cal. Apr. 6, 2018)*. Rather, the plaintiff need

allege facts to show only "that the fiduciary knew or should have known about the trustee's misconduct and failed to take steps to remedy the situation." *Solis v. Couturier, No. 2:08-CV-02732-RRB (GGH), 2009 U.S. Dist. LEXIS 51888, 2009 WL 1748724, at *7 (E.D. Cal. June 19, 2009)*.

Consistent with this standard, Count XI alleges that the Prior Committee and the Prior Directors knew that GreatBanc was aware of the breaches of fiduciary duty that took place prior to the October 2014 transaction and yet failed to take corrective action. (FAC ¶¶ 343-345.) Similarly, Count XI alleges that the New ESOP Committee Defendants, after becoming fiduciaries, knew that GreatBanc was aware that the trust assets were improperly invested and that the Prior ESOP Committee Defendants had engaged in prohibited transactions, yet failed to take corrective action. (*Id.* ¶ 346-348.)

Accordingly, Plaintiffs have adequately pleaded a failure to monitor and the Motions are DENIED as to Count XI.

## L. Count XII

Count [*40] XII is brought against all Defendants under *ERISA § 405, 29 U.S.C. § 1105*, for co-fiduciary liability.

Defendants argue that Count XII should be dismissed because it is a derivative claim and Plaintiffs have not plausibly alleged breaches of fiduciary duty against any Defendants. (Moffatt Mem. at 14; Range Mem. at 9-10; GreatBanc Mem. at 21-22; Republic Mem. at 19-20.)

Under *§ 405*, the fiduciary of a plan is liable for the breach of fiduciary duty of another fiduciary if he knowingly participates, conceals, enables, or fails to remedy his co-fiduciary's breach. *29 U.S.C. § 1105(a)*.

As with Count XI, Count XII rises and falls with Plaintiffs' other claims. Because the Court finds that Plaintiffs have stated claims for breach of fiduciary duty as to all Defendants, Plaintiffs have adequately pleaded Count XII. The Republic Defendants' arguments regarding whether Plaintiffs have adequately shown sufficient knowledge to sustain this Count are not appropriate for resolution at the pleading stage, as evidenced by the cases they cite. (*See* Republic Mem. at 20, *citing Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983)* (post trial).)

Accordingly, Plaintiffs have adequately pleaded Count XII.

## M. Count XIII

Count XIII is brought against Republic under *ERISA § 502(a)(3)*, *29 U.S.C. § 1132(a)(3)*, for knowing participation in breaches of fiduciary [*41] duty and prohibited transactions. (FAC ¶¶ 365-375.) Specifically, Plaintiffs allege that Republic knew that Moffatt, Snow, and Range were fiduciaries of the Plan and knew that the October 2014 transaction constituted a breach of their fiduciary duties, yet went forward with the sale anyway. (*Id.* ¶¶ 367, 371-373.) Plaintiffs demand "disgorgement of any profits, having a constructive trust placed on any proceeds received (or which are traceable thereto), having the sale rescinded, requiring all of part of stock to be restored to the Rainbow ESOP accounts, or ... other appropriate equitable relief." (*Id.* ¶ 375.)

The Republic Defendants argue that Republic cannot be liable for knowing participation because it was not a party in interest to the Plan. (Republic Mem. at 20-21.) Second, they argue that mere knowledge is insufficient to establish liability. (*Id.* at 21-22.) Third, they argue that Plaintiffs have not sought a proper equitable remedy. (*Id.* at 23.)

Civil actions brought against non-fiduciaries must be brought under *ERISA § 502(a)(3)*, *29 U.S.C. § 1132(a)(3)*, which authorizes participants to sue only for "appropriate equitable relief." *Chesemore v. All. Holdings, Inc., 948 F. Supp. 2d 928, 940 (W.D. Wis. 2013)*, aff'd sub nom. *Chesemore v. Fenkell, 829 F.3d 803 (7th Cir. 2016)*. "[T]o adequately allege a claim against nonfiduciaries under *§ 1132(a)(3)*, plaintiffs must plead the [*42] defendants 'had actual or constructive knowledge of the circumstances that rendered the transaction unlawful.'" *Urakhchin v. Allianz Asset Mgmt. of Am., L.P., No. SACV-15-1614-JLS (JCGx), 2016 U.S. Dist. LEXIS 104244, 2016 WL 4507117, at *8 (C.D. Cal. Aug. 5, 2016)* (citing *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 251, 120 S. Ct. 2180, 147 L. Ed. 2d 187 (2000)*). Moreover, the relief available is confined to "those categories of relief that, traditionally speaking ... were typically available in equity." *CIGNA Corp. v. Amara, 563 U.S. 421, 439, 131 S. Ct. 1866, 179 L. Ed. 2d 843 (2011)*. "This relief includes injunction, rescission, reformation, equitable estoppel and surcharge, which is monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Chesemore, 948 F. Supp. 2d at 940*.

Here, Plaintiffs allege that Republic conducted a "due diligence investigation" prior to the October 2014 transaction that made them aware of the existence of the Plan and the fiduciary responsibilities of Moffatt and Snow. (FAC ¶¶ 370-371.) Moreover, Plaintiffs adequately allege that Republic actually participated in and facilitated breaches of fiduciary duty by Moffatt and Snow by offering them continued employment contracts in connection with the sale of Plan assets. (*Id.* ¶ 372(d).) Therefore, these allegations are sufficient to show "some orchestration" of the conflicted transaction that subjects Republic to liability. (*See* Republic [*43] Reply at 4-5, Doc. 102.)

Republic also argues that Plaintiffs' demands are not appropriate equitable relief because "what they actually seek is money damages from Republic's general assets." (Republic Mem. at 22-23.) As to rescission specifically, Republic argues that this remedy is a "non-starter" because Plan Participants cannot return the consideration paid for the stock. (*Id.* at 23.) Plaintiffs respond that rescission is available even if restoration is not possible. (Opp. at 56.)

Rescission is an appropriate equitable remedy in the context of ESOP transactions. *See Eaves v. Penn, 587 F.2d 453, 463 (10th Cir. 1978)*. "Under true rescission, the plaintiff returns to the defendant the subject of the transaction, plus any other benefit received under the contract, and the defendant returns to the plaintiff the consideration furnished, plus interest." *Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d 1017, 1031 (9th Cir. 1999)*. "If true rescission is no longer possible (perhaps because the plaintiff no longer owns the subject of the sale), the court may order its monetary equivalent. This remedy entitles the plaintiff to the return of the consideration paid less any value received on the investment." *Id.*

Here, Plaintiffs have adequately alleged that rescission is an appropriate equitable remedy. Even if true rescission is no longer [*44] possible because Plaintiffs have disposed of the consideration they received after termination of the Plan, the "monetary equivalent" is the actual value of the Plan's stock absent the alleged conflict, *i.e.* the price that Republic would have paid in the absence of the employment agreements secured by Moffatt and Snow. *See Ambassador, 189 F.3d at 1031*. Thus, the "recissionary measure of damages" would restore losses to the Plan caused by the conflict without entitling Plaintiffs to a windfall. (*See* Republic Reply at 8-9.) *See Strategic Diversity, Inc. v. Alchemix Corp., 666 F.3d 1197, 1208 (9th Cir. 2012)*.

Because Plaintiffs have adequately pleaded the elements of Count XIII and seek an appropriate equitable remedy, the Motions are DENIED as to Count XIII.

## N. Count XIV

Count XIV is brought against all Defendants under *ERISA § 410*, *29 U.S.C. § 1110*, and seeks to void as unlawful the indemnity provisions in the Plan Document and the Trustee Engagement Agreement to the extent that they purport to allow indemnification for breaches of fiduciary duty. (FAC ¶¶

376-384.)

Defendants argue that these provisions do not violate ERISA as a matter of law because they prohibit indemnification for breaches of fiduciary duties. (GreatBanc Mem. at 23; Moffatt Mem. at 14-15; Range Mem. at 10-11; Republic Mem. at 23-24.) Moreover, Defendants [*45] argue that indemnification will not be at the expense of Plan Participants because the Plan has been terminated and Republic now owns Rainbow. (Republic Mem. at 24; GreatBanc Mem. at 24.)

Under *§ 410*, "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." *29 U.S.C. § 1110(a)*. The Department of Labor has interpreted this statute to "render[ ] void any arrangement for indemnification of a fiduciary of an employee benefit plan by the plan" because "such an arrangement would have the same result as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations." *Johnson, 572 F.3d at 1080*. "Under the majority view, indemnification by an ESOP sponsor functionally equates to an impermissible indemnification by the ESOP itself." *Pfeifer v. Wawa, Inc., 214 F. Supp. 3d 366, 373 (E.D. Pa. 2016)* (*citing*, inter alia, *Johnson, 572 F.3d at 1079*).

In *Johnson*, the Ninth Circuit held that indemnification agreements that purport to provide indemnity "so long as the challenged acts or omissions do not involve deliberate wrongful [*46] acts or gross general negligence" are void because they allow defendants to be indemnified "even if they violated the ERISA 'prudent man' standard of care." *Johnson, 572 F.3d at 1078-1080*. Moreover, the Court considered and rejected the argument that *§ 410* does not apply where the indemnification "would be made from corporate, not plan assets." *Id. at 1080*. The Court found that such a provision was "tantamount to asking ESOP participants to pay for Defendants' defense costs." *Id.* Finally, the Court found that limitations such as "to the extent not preempted by federal law" or "subject to the relevant provisions of [ERISA]" did not, per se, render the subject indemnification agreements enforceable. *Id. at 1074-75, 1081*.

Beginning with the Plan Document, Section 17(g) provides that Rainbow will "indemnify each member of the Committee (to the extent permitted by law) against any personal liability or expense ... resulting from his service on the Committee, except such liability or expense as may result from his own willful misconduct." (Plan Document § 17(g).) Section 17(g) is nearly indistinguishable from the indemnification

agreement that the Ninth Circuit found unenforceable in *Johnson, 572 F.3d at 1074-75*. *See also Fernandez v. K-M Indus. Holding Co., 646 F. Supp. 2d 1150, 1155 (N.D. Cal. 2009)* (finding unenforceable an indemnification provision that was "[s]ubject to the applicable provisions [*47] of ERISA").

As to the Trustee Engagement Agreement, the indemnification provision contained in the 2014 Amendment specifically prohibits indemnification for breaches of ERISA, though it does allow Rainbow to front defense costs for GreatBanc. In *Johnson*, the Ninth Circuit found that because the plaintiffs were likely to succeed in proving breaches of fiduciary duty, the right to advancement of defense costs was void. *Johnson, 572 F.3d at 1081*. At this stage in the case, the Court has not made any determination regarding Plaintiffs' likelihood of success on the merits, and it is not clear whether Rainbow is currently fronting defense costs for GreatBanc. Thus, the Court will not dismiss the claim at this juncture.[5] *Pudela v. Swanson, No. 91 C 3559, 1995 U.S. Dist. LEXIS 2148, 1995 WL 77137, at *5 (N.D. Ill. Feb. 21, 1995)*.

Nevertheless, Defendants contend that *Johnson* does not apply because the Plan has been terminated and so any defense costs will be borne by Republic, as the owner of Rainbow, rather than the Plan. (GreatBanc Mem. at 24; Republic Mem. at 24.) However, because the Court has found that Plaintiffs have stated claims against Rainbow and the Republic Defendants, any recovery that Plaintiffs obtain could, at least in part, also be paid by Republic. Therefore, because the [*48] use of Republic assets to pay defense costs could jeopardize the ultimate recovery of Plan Participants, the same concerns apply here as in *Johnson*. *See Fernandez, 646 F. Supp. 2d at 1155* ("The rationale underlying [*Johnson*'s] holding supports the conclusion that indemnification agreements are invalid any time an ESOP would bear the financial burden of indemnification, whether directly or indirectly").

Thus, the Motions are DENIED as to Count XIV.

## IV. CONCLUSION

_____

[5] Defendants cite to *Harris v. GreatBanc Tr. Co., No. EDCV12-1648-R DTBX, 2013 U.S. Dist. LEXIS 43888, 2013 WL 1136558, at *3 (C.D. Cal. Mar. 15, 2013)* and repeatedly point to it as a decision by this Court in which a similar provision was held enforceable. (*See* GreatBanc Mem. at 23; Moffatt Mem. at 14; Republic Mem. at 23-24.) In fact, it is a decision by another judge in the Central District. While this Court has great respect for the decisions of other judicial officers in the Central District, their rulings are *not* rulings by this Court and should not be referenced as such.

For the foregoing reasons, the Court DENIES Defendants' Motions in their entirety.

---

**End of Document**

# Tab E


Positive
As of: June 20, 2019 5:58 PM Z

# *In re RCN Litig.*

United States District Court for the District of New Jersey

March 21, 2006, Decided

MASTER FILE NO. 04-5068 (SRC)

**Reporter**
2006 U.S. Dist. LEXIS 12929 *; 37 Employee Benefits Cas. (BNA) 1824; 2006 WL 1273834

IN RE RCN LITIGATION

**Notice:** **[*1]** NOT FOR PUBLICATION

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Claim dismissed by *In re RCN Litig., 2006 U.S. Dist. LEXIS 12930 (D.N.J., Mar. 21, 2006)*

## Core Terms

fiduciary, stock, invest, participants, fiduciary duty, Bulletin, DOL, breached, stock fund, funds, contributions, duties, securities, trust agreement, allegations, non-public, imprudent, motion to dismiss, communications, discretionary, co-fiduciary, Company's, documents, vested, conflicting interest, possessed, prudent, investment decision, stock price, circumstances

**Counsel:** For STEPHANIE THOMAS, on behalf of herself and all others similarly situated, SCOTT GRASSI, ARNOLD PRASHAD, Plaintiffs: LISA J. RODRIGUEZ, TRUJILLO RODRIGUEZ & RICHARDS, LLP, HADDONFIELD, NJ.

For HAROLD HILL, (Civil 04-5368), Plaintiff: GARY S. GRAIFMAN, KANTROWITZ, GOLDHAMER & GRAIFMAN, ESQS., MONTVALE, NJ; LISA J. RODRIGUEZ, TRUJILLO RODRIGUEZ & RICHARDS, LLP, HADDONFIELD, NJ.

For DEBRA K. CRAIG, (Civil 04-5940), ROBERT M. MAGUIRE, (Civil 04-5941), Plaintiffs: LISA J. RODRIGUEZ, TRUJILLO RODRIGUEZ & RICHARDS, LLP, HADDONFIELD, NJ; RONEN SARRAF, SARRAF GENTILE, LLP, NEW YORK, NY.

For DAVID C. MCCOURT, MICHAEL J. MAHONEY, COMPENSATION COMMITTEE, EUGENE ROTH, ALFRED FASOLA, MICHAEL B. YANNEY, JOHN D. FILIPOWICZ, JR. TERRELL WINFIELD, DEBORAH M. ROYSTER, WILLIAM TERRELL WINFIELD, JR., (Civil 04-5940 & Civil 04-5941), MICHAEL A ADAMS, GRETCHEN BARRON, CHARLIE BLUE, BRUCE C GODFREY, PATRICK HOGAN, ELLYN ITO, JOHN JONES, NORMAN KUSHIN, LOU MONARI, JONATHAN R. PARKES, RCN CORPORATION, JAMES SAILE, TIMOTHY J. STOKLOSA, EDWIN TALIAFERRO, KEITH TERRERI, RICARDO VENEGAS, BLAIR WORRALL, JOYCE YACCARINO, Defendants: EDWARD CERASIA, II, PETER MICHAEL AVERY, **[*2]** PROSKAUER ROSE LLP, NEWARK, NJ.

For MERRILL LYNCH TRUST COMPANY, FSB, Defendant: LEE G. DUNST, GIBSON DUNN & CRUTCHER LLP, NEW YORK, NY.

**Judges:** Stanley R. Chesler, U.S.D.J.

**Opinion by:** Stanley R. Chesler

# Opinion

**CHESLER, District Judge**

**THIS MATTER** comes before the Court on Defendant Merrill Lynch Trust Company FSB's ("MLTC") Motion to Dismiss Plaintiff's Consolidated Complaint (docket entry # 41). The Court, having considered the papers submitted by the parties, for the reasons set forth below, and for good cause shown, **GRANTS** Defendant's Motion.

## I. BACKGROUND OF THE CASE

The Plaintiffs in these consolidated cases are current or former participants in RCN Corporation's ("the Company") Savings and Stock Ownership Plan (the "Plan"), and a class of all others similarly situated, during the period between January 12, 1999 through December 21, 2004 (the "Class Period"). The Plan was a defined contribution "employee pension benefit plan," within the meaning of ERISA. *29 U.S.C. § 1002(2)(A)*. The Plan was managed by an Administrative Committee (the "Committee") that was comprised of RCN employees appointed by the Company to

administer the [*3] Plan on their behalf. MLTC was appointed by the Committee to act as the trustee for the Plan. The Plaintiffs brought suit against various defendants, including RCN Corporation, various RCN directors, officers, and employees, members of the RCN Compensation Committee and Administrative Committee, as well as MLTC (collectively "Defendants").

The Plaintiffs' investment portfolios in the Plan all included RCN stock. The Plaintiffs are claiming that the Defendants breached their fiduciary duties owed to the Plaintiffs by continuing to offer RCN common stock as a Plan investment option for participant contributions, using RCN securities for employer contributions to the Plan, and maintaining heavy investment in RCN securities when the stock was "no longer a prudent investment for the Plan." (Compl. at 2, P5.) The Plaintiffs also claim that certain Defendants, including MLTC, breached their fiduciary duties by failing to provide material information regarding the imprudence of investing Plan assets in RCN securities to other fiduciaries, failing to communicate "complete and accurate information to the Plan participants" regarding the risks of investing in RCN stock, and breaching their duty [*4] of loyalty to the Plan and its participants by failing to avoid "inherent conflicts of interest." (Compl. At 2-3, PP6 - 8.)

The Plan had both a 401(k) component and an Employee Stock Ownership Plan ("ESOP") component. Participants could direct the investment of their individual contributions into various investment options offered by the Plan, as selected by the Committee. In 2003, the Plan offered twenty-four mutual funds, one common collective trust, three "Global Manager" predetermined portfolios, and the RCN Common Stock Fund as investment options which participants could select. Subject to statutory limitations, employees could contribute between 1% and 50% of their eligible compensation to the Plan on a pre-tax basis. Plan participants could direct how their contributions would be allocated among the various investment options offered as part of the Plan. The Plan also offered matching Employer ESOP contributions. The Company matched employee contributions at a rate of 100% for the first 3.5% of participants' pre-tax contributions. [1] The Company would also make profit sharing contributions to the accounts of participants, at the Company's discretion, which were placed into [*5] the ESOP portion of the plan.

By year 2000, RCN stock began to decline. By December 21, 2000, RCN stock had fallen 90% from its Class Period high of $ 72/share to $ 6.06. On September 26, 2003, the Committee modified the Plan's structure so that participants were no longer permitted to allocate any contributions to the RCN Stock Fund and also prohibited Plan participants from moving assets from other investments into the RCN Stock Fund (although previous contributions could remain in RCN stock). After January 16, 2004, Company matching contributions were also no longer made in RCN stock, but were made in cash. In May 2004, RCN stock was delisted from the NASDAQ. On May 27, 2004, RCN filed for [*6] reorganization under Chapter 11. When RCN announced its formal emergence from Chapter 11 on December 21, 2004, all outstanding shares of RCN stock, including those invested in the RCN Stock Fund, were cancelled.

## II. DISCUSSION

Defendant MLTC has moved to dismiss the claims against it under both *FED. R. CIV. P. 12(b)(1)* and *12(b)(6)*. MLTC's *Rule 12(b)(1)* motion challenges the standing of five of the six named Plaintiffs to sue under both Article III and ERISA. The *Rule 12(b)(6)* motion challenges the sufficiency of the Plaintiffs' Complaint to set forth a legally cognizable claim against MLTC for breach of any fiduciary duty under ERISA. Because the Court finds sufficient cause to dismiss the Plaintiffs' complaint under *Rule 12(b)(6)*, the Court need not address MLTC's *Rule 12(b)(1)* arguments regarding the standing of individual Plaintiffs in this case. [2]

 [*7] In deciding a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, the Court must presume that all allegations in the Complaint must be taken as true and viewed in the light most favorable to the complainant. See *Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*; *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. Resolution of these motions in no way indicates a predisposition by the Court of an issue of contested facts. *FED R. CIV PROC. 12(b)(6)*. Where, as here, the Complaint at issue attaches or references various documents, the Court is not limited to

---

[1] These Company matching contributions vested on a sliding scale based on years of continuous service with the Company. Employees with less than 2 years of service were 0% vested, from 2-3 years of service, they were 25% vested, etc…. Employees were 100% vested after five years of continuous service with the Company.

---

[2] Because standing is a threshold jurisdictional issue, the Court would normally address this issue before any arguments on the merits of the Plaintiffs' claims. See *Miller v. Rite Aid Corp., 334 F.3d 335, 340- 41 n.2 (3d Cir. 2003)* . In the present case, however, MLTC concedes that at least one of the named Plaintiffs has standing, so a favorable ruling on these grounds would not result in dismissal of the case, and the Court would still need to address the merits regardless of the Court's finding on the standing issue.

reviewing the allegations set forth in the body of the Complaint in deciding a motion to dismiss. The Court may properly consider these materials without the need to convert the motion into one for summary judgment. See *Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 17 (1st Cir. 1998)* (holding court may look to materials outside the complaint in deciding a *12(b)(6)* motion where the claims in the complaint "are expressly linked to-and admittedly **[\*8]** dependent upon-a document"); *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3rd Cir. 1993)* ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

## A. The Plan's Governing Documents Demonstrate That MLTC Acted as a Directed Trustee

Plaintiffs argue that MLTC had discretionary authority over the Plan's investments in the RCN Stock Fund, citing to Plan literature that notes, while the RCN Stock Fund is invested primarily in RCN common stock, it is "subject to the right of the trustee to invest this fund or any part thereof in other instruments." [3] (Compl. at 25, P99 (citing to Plan Prospectus

attached as Exhibit E).) The Plan's operative document (the "Plan Document"), however, defines a rather limited scope for this discretionary authority. (See RCN 1087-88.) The Plan Document, while cited to by both parties in their papers regarding the current motion, is not specifically mentioned or attached to the Plaintiffs' Complaint. (See Pl. Br. at 26 (referring to the duties delineated for MLTC in Section **[\*9]** 4.4); Def. Br. at 6 (same).) The contents of the Plan Document, however, are necessarily at issue in the Plaintiffs' allegations and may properly be considered by the Court in evaluating the present motion. See *Weinter v. Klais and Co., 108 F.3d 86, 89 (6th Cir. 1997)* (holding that documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the complaint and central to the claims); *Hogan v. Eastern Enters./ Boston Gas, 165 F. Supp. 2d 55, 58 (D.Mass. 2001)* (considering ERISA plan documents in ruling on motion to dismiss).

**[\*10]** The Plan Document defines the discretionary investment power held by MLTC over investments in the RCN Stock Fund in Section 4.4. (See RCN 1087-88.) This section grants MLTC, as the Plan's trustee, authorization to "invest a portion of the contributions received [(for the RCN Stock Fund)] in other securities as a reserve for the payment of administrative expenses and cash distributions." (Id.) These

---

[3] The Plaintiffs' Complaint attaches a document entitled "Trust Agreement" (the "Trust Agreement") which they allege defines the terms under which MLTC served as the Plan's trustee. (See Compl., Ex. B.) It is worth noting that the attached Trust Agreement appears to be an agreement between Commonwealth Telephone Co. and Boston Safe Deposit and Trust Company, and neither RCN nor MLTC is a party to the agreement. (Id. at 18.) At oral argument, MLTC admitted that there is no Trust Agreement specifically governing the relationship between MLTC and RCN which spells out the terms under which MLTC served as the Plan's trustee. Even if, however, the Trust Agreement submitted with the Plaintiffs' Complaint accurately defined the responsibilities MLTC had under the Plan's terms, it would not support the Plaintiffs' assertion that MLTC had a fiduciary responsibility for Plan investments because, as the Plan's trustee, MLTC had "exclusive authority and discretion to manage and control" the funds in the Plan. (Compl. at 25, P99 (quoting Trust Agreement, Article II, § 2.1.1)). While the Plaintiffs acknowledge that ultimate responsibility for the Plan's assets lies with the Company and its delegates, they claim that MLTC was "vested with the duty and ability to take protective action regarding imprudent investment of the Plan's assets." (Id.) The terms of the Trust Agreement offered by the Plaintiffs, however, demonstrate that MLTC was a directed trustee with *no* discretion over the investment of Plan assets. This agreement shows that MLTC operated under a clear obligation to invest the Plan's assets in accordance with the directions provided by the Committee or individual Plan participants. On the first page of the Trust Agreement, it expressly states that "the Employer desires to appoint the Trustee as a 'nondiscretionary trustee' (within the meaning of Section VI(g) of Prohibited

Transaction Class Exemption 77-9 under *Section 408(a)* of the Employee Retirement Income Security Act of 1974, as amended ('ERISA')) for the limited purposes hereinafter set forth" and that "the Trustee desires to act as such a nondiscretionary trustee." (Compl., Ex. B. at 1.) While the Trust Agreement states that "the Trustee shall have exclusive authority and discretion to manage and control the Trust Fund" this authority and discretion is "at all times subject to the proper, written directions of the Committee." (Id., Ex. B., at 2, Article II, § 2.1.1.) Section 2.2 defines the authority to make investment decisions, vesting this authority and discretion with the Committee, leaving MLTC, as the trustee, to "invest, reinvest and dispose of the assets comprising the Trust Fund in accordance with the Committee's Directions." (Id., Ex. B at 3, Article II, § 2.2.) MLTC similarly was required to defer to the directions of the individual participants in determining how a participant's money is invested among the various investment options offered under the Plan. (Id. at 2, Article II, § 2.1.1.) Section 2.2 of the Trust Agreement expressly leaves MLTC, as the trustee, with "no duty hereunder to review the investments held in the Trust Fund" and specifically prohibits them from "making suggestions or otherwise rendering investment advice to the Committee or any Participant with respect to investment, reinvestment, or disposition of assets held in the Trust Fund." (Id.) While each party, under the terms of the Trust Agreement, agrees to discharge their duties and responsibilities with appropriate "care, prudence, and diligence" (id. at 11, Article III, § 3.1.1(b)), MLTC, as the trustee, is specifically absolved of any duty "to question, or otherwise inquire into, the performance of another fiduciary with respect to duties allocated to such other fiduciary under the Plan." (Id. at 11, Article III, § 3.1.4.)

securities "shall include short term obligations of the U.S. government, commercial paper, money market funds, savings instruments, certificates of deposit, repurchase agreements or other short term investments deemed prudent by the trustee." (Id.)

The Plaintiffs' argument that this language grants MLTC "control over Plan assets" and a requirement "to monitor at least a subset of these investments" is not convincing. (Pl. Br. at 26.) The Plaintiffs' are attempting to "infer a broad grant of discretionary investment authority from an explicitly narrow grant of authority for a limited purpose." *Difelice v. US Airways, Inc., 397 F. Supp. 2d 735, 745 (E.D. Va. 2005)* (rejecting similar argument to impose discretionary authority upon a plan trustee). The Plan's governing **[*11]** documents do not grant MLTC discretionary authority over the investment of funds placed into the Plan. This authority is expressly vested in the Committee and the Plan's participants. Section 4.4 outlines a very limited and narrow exception to this general rule.

This exception, furthermore, is designed to serve only a very narrow purpose. The cash component of the RCN Stock Fund is designed to permit MLTC to maintain "a reserve for the payment of administrative expenses and cash distributions," rather than provide an alternative investment option to act as a hedge against the performance of RCN stock. [4] (RCN 1087.) MLTC did not have authority under the Plan to divert investments away from the RCN Stock Fund at its discretion, but merely had the necessary authority needed to execute her duties as the Plan's trustee. (Id.) Such limited discretion is not beyond that given to a directed trustee. See, *In re WorldCom, Inc. ERISA Litig., 354 F. Supp. 2d 423, 442 (S.D.N.Y. 2005)* (noting that where trust agreement gives trustee additional powers as necessary to perform their nondiscretionary duties, this does not raise a question of fact as to whether trustee is a directed **[*12]** trustee). The language of the documents governing the administration of the Plan and establishing the role of MLTC as the Plan's trustee affirm that MLTC was a directed trustee, pursuant to Section 403(a) of ERISA, *29 U.S.C. § 1103(a)*, who was subject to the directions of the Committee and individual Plan participants regarding the selection of investment options for Plan funds.

---

[4] The Plaintiffs' Complaint does not allege that MLTC breached any duty to the Plan participants related to its administration of the Plan, or that it failed to maintain sufficient reserves in the RCN Stock Fund to pay administrative expenses or cash distributions. The basis of the Plaintiffs' Complaint is that MLTC allowed the Plan participants to lose the value of their investments in RCN Stock by allowing such investments even though these investments were "clearly imprudent." (Compl. at 24, P98.)

**B. MLTC's Duties as a Directed Trustee**

As a directed trustee, MLTC had a limited fiduciary duty with **[*13]** respect to Plan investments. See *Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1102 (9th Cir. 2004)* (holding directed trustee have limited fiduciary duties under ERISA); *Srein v. Frankfort Trust Co., 323 F.3d 214, 223 (3d Cir. 2003)* ("When, as here, a trustee bank is entrusted with and performs duties to 'control, manage, hold, safeguard and account for [a] fund's assets and income,' it functions as a fiduciary under ERISA.") (quoting *Board of Trustees v. Wettlin Associates, Inc., 237 F.3d 270, (3d Cir. 2001)*). In *Re WorldCom, Inc. ERISA Litig., 354 F. Supp. 2d at 444* (same); U.S. Dept. of Labor, Field Assistance Bulletin 2004-03 (Dec. 17, 2004) (a "trustee, therefore, will, by definition, always be a 'fiduciary' under ERISA as a result of its authority or control over plan assets") available at *http://www.dol.gov/ebsa/regs/fab_2004-3.html* (hereinafter "DOL Bulletin"). A directed trustee, under ERISA, can be relieved of "fiduciary obligations regarding the management and control of a plan's assets when the trustee is 'directed' by **[*14]** the plan's designated fiduciaries," leaving them "subject only to the 'proper directions' of the named fiduciary." *Wright, 360 F.3d at 1102* (citing *29 U.S.C. § 1103(a)(1)*). See also *Lalonde v. Textron, Inc., 369 F.3d 1, 7 (1st Cir. 2004)* (noting limited fiduciary duty under ERISA for directed trustees). Directed trustees can have fiduciary duties to the extent that they exercise control over a plan's assets, but this duty is extremely limited. *Srein, 323 F.3d at 222* (citing *Smith v. Provident Bank, 170 F.3d 609 (6th Cir. 1999)*). Regarding the direction of investment of Plan assets in specific securities, as long as the directed trustee is required, by the Plan's terms, to follow the directions of a named fiduciary, their investment decisions are essentially "immune from judicial inquiry." *Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995)*.

While existing Third Circuit precedent under Moench and Srien leaves a directed trustee, like MLTC, with a very narrow fiduciary duty, other courts have recently begun to apply a slightly broader view of the fiduciary duties of **[*15]** a directed trustee. Many of these courts have relied on recent guidance from the Department of Labor, where the Department defined the fiduciary role for a trustee. See DOL Bulletin. While a bulletin on this subject from the Department of Labor is not controlling, it is "entitled to respect" to the extent that it has the "power to persuade," *Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944)*, and other courts have found this DOL Bulletin to be persuasive in similar cases. See, e.g., *Difelice, 397 F. Supp. 2d at 751-52* ("The DOL's interpretation of ERISA, while not binding here, is nonetheless entitled to

deference depending upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'") (quoting *Skidmore, 323 U.S. at 140*); *In re WorldCom, Inc. ERISA Litigation, 354 F. Supp. 2d at 444-46* (finding the DOL Bulletin entitled to "substantial weight"). [5] Under the DOL standards, directed trustees like MLTC can be liable for a breach of fiduciary duty where [*16] they follow directions from a named fiduciary that are not properly given or otherwise contrary to ERISA or the Plan's provisions. *Difelice, 397 F.Supp.2d at 746-47*. For the reasons below, however, the Plaintiffs' claims cannot survive even under this broader view of a directed trustee's fiduciary duties.

[*17] *1. The Complaint Fails to Allege Facts Which, if Proven, Would Establish a Fiduciary Duty for MLTC to Question or Disregard the Investment Directions Provided by the Plan's Named Fiduciaries.*

The Plaintiffs do not allege that MLTC failed to follow any proper directions from the Committee or Plan participants regarding the investment of Plan funds in the RCN Stock Fund, nor do they claim that MLTC acted in a manner contrary to the terms of the Plan. The basis of the Plaintiffs' claim against MLTC is that they claim that MLTC had a duty to ignore the Plan documents and the investment directions given to them to invest Plan funds in the RCN Stock Fund on the grounds that making such "imprudent" investments were contrary to ERISA. (Compl. at 24-25, PP97-99.) The question before the Court is, therefore, whether MLTC, as a directed trustee, owed a fiduciary duty to the Plaintiffs under ERISA to avoid placing Plan funds in the RCN Stock Fund at any time during the Class Period.

---

[5] As the <u>WorldCom</u> court noted:

Although the Bulletin breaks new ground by giving concrete guidance to directed trustees about their duty to inquire into the prudence of investment decisions, the opinions expressed in the Bulletin are well-reasoned and flow from a careful analysis of complex issues. The Bulletin anticipates many of the central issues facing directed trustees in deciding how to fulfill their fiduciary duties, and provides specific and helpful example-based guidance that effectively balances important policy concerns embodied in the ERISA statute. The Bulletin, therefore, reflects persuasive authority to which this Court should give at least substantial weight in articulating the standard that should be applied to a directed trustee's responsibilities when receiving a direction to invest plan assets in particular securities, and especially directions to invest in the securities of the employer.

*In re WorldCom ERISA Litigation, 354 F. Supp. 2d at 446*.

Even under the DOL bulletin's standards, the fiduciary duty of a directed trustee is "significantly narrower than the duties generally ascribed to a discretionary trustee under common trust principles." [*18] *In re WorldCom ERISA Litigation, 354 F. Supp. 2d at 446* (quoting DOL Bulletin). The basis of the Plaintiffs' allegations against MLTC is that they breached the "duties and mandates of ERISA" by following the directions of the Plan's named fiduciaries and "continuing to allow investment of Plan assets in the RCN stock fund when it was clearly imprudent to do so." (Compl. at 24, P98.) The DOL Bulletin has defined a narrow set of circumstances where a directed trustee may have a duty to make an inquiry of a named fiduciary before investing plan assets as directed. See DOL Bulletin. According to the DOL Bulletin, there are two situations where MLTC, as a directed trustee, could have breached their duty of prudence by continuing to invest Plan funds in RCN stock as directed. See *In re WorldCom ERISA Litigation, 354 F. Supp. 2d at 446* (referring to DOL Bulletin).

If MLTC had possession of material, non-public information, necessary to evaluating the prudence of investing in RCN stock, they would be held to a duty to inquire about the named fiduciary's knowledge and consideration of the information with respect to the investment directions to place Plan [*19] funds into RCN stock holdings. DOL Bulletin ("If a directed trustee has material non-public information that is necessary for a prudent decision, the directed trustee, prior to following a direction that would be affected by such information, has a duty to inquire about the named fiduciary's knowledge and consideration of the information with respect to the direction."). The Plaintiffs' Complaint, however, does not allege that MLTC was in possession of any non-public information regarding RCN's financial performance. [6] The

---

[6] The Complaint alleges that "Merrill Lynch's corporate affiliates also served as advisors to RCN" and were "intimately knowledgeable about the affairs of RCN," but makes no allegations that these affiliates possessed non-public information about RCN's financial state. (Compl. at 39, P153.) Although it is not alleged in the Complaint that these affiliated companies possessed non-public information regarding the financial health of RCN, "the possession of non-public information by one part of an organization will not [generally] be imputed to the organization as a whole (including personnel providing directed trustee services) where the organization maintains procedures designed to prevent the illegal disclosure of such information under securities, banking or other laws." DOL Bulletin. What is required to create a duty for a directed trustee is "*actual knowledge* of material non-public information" possessed by *"individuals responsible for the directed trustee services."* Id. (emphasis added). While the Plaintiffs' brief alleges that MLTC possessed "non-public information concerning RCN's financial health" (Pl. Br. at 36), there is no such allegation contained in their

Complaint asserts merely that MLTC should have noted the "precipitous decline" of RCN stock's value, the under-performance of RCN stock against traditional benchmarks such as the NASDAQ Stock Market Index and the NASDAQ Telecommunications Index, and the negative analyst reports of RCN issued by Merrill Lynch and others. (Compl. at 38 - 41, PP147 - 160.) Through this information, it is alleged, MLTC "knew or should have known that continued investment in RCN stock was not prudent." (Id.)

 [*20]  All of the information cited by the Plaintiffs to form the basis of MLTC's fiduciary duty not to invest in RCN stock was publicly available. A directed trustee who possesses the kinds of public information as alleged in the Plaintiffs' Complaint will "rarely have an obligation under ERISA to question the prudence of a direction to purchase publicly traded securities at the market price." DOL Bulletin. The "extraordinary circumstances" where such an obligation exists are limited to situations where there is public information which creates "clear and compelling indicators . . . that call into serious question a company's viability as a going concern." Id. (emphasis added). There are, however, no such "clear and compelling indicators" alleged in the Plaintiffs' Complaint. "Because stock prices fluctuate as a matter of course, even a steep drop in a stock's price would not, in and of itself, indicate that a named fiduciary's direction to purchase or hold stock is imprudent and, therefore, not a proper direction." Id. Similarly, "media or other public reports or analyses that merely speculate on the continued viability of a company" are insufficient to trigger an obligation [*21] by a directed trustee to question a named fiduciary's investment decisions. Id. Accordingly, none of the "extraordinary circumstances" are alleged to have existed which would have imposed a duty on MLTC not to follow the directions of the Plan's named fiduciaries to invest in and hold RCN stock as a Plan investment.

*2. As a Directed Trustee, MLTC Did Not Have a Duty to Communicate Negative Public Information Regarding RCN's Financial Status to Plan Participants.*

---

Complaint. Plaintiffs cannot defeat MLTC's motion to dismiss by introducing key allegations in their motion when those allegations are missing from their original Complaint. See *Associated General Contractors of California v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)* (holding a court may not "assume that the [Plaintiffs] can prove facts that [they] have not alleged in [their] amended complaint" in determining the merits of a *12(b)(6)* motion). See also *Reichhold, Inc. v. United States Metals Ref. Co., 2004 U.S. Dist. LEXIS 27634, *9 (D.N.J. Oct 27, 2004)* (court is limited to facts alleged in complaint and "may not consider facts raised for the first time by parties in legal briefs") (citing *Hauptmann v. Wilentz, 570 F. Supp. 351, 364 (D.N.J. 1983)*, aff'd without opinion, *770 F.2d 1070 (3d Cir. 1985)*).

The Plaintiffs also allege that MLTC breached their fiduciary duty by failing to communicate to Plan participants the "imprudence of investment in [RCN] stock" despite their regular communications with the Plan participants. (Compl. at 41-42, P165.) The Plaintiffs' brief also alleges that MLTC breached its fiduciary duty by failing to take the "base step of informing Plan participants that one of its fellow Merrill Lynch subsidiaries was advising institutional investors not to invest in RCN stock because it was too speculative." (Pl. Br. at 38.)

As a directed fiduciary, however, MLTC was under no such obligation. As noted above, the only material information alleged to have been possessed by MLTC was public [*22] information regarding RCN's financial status, including analyst reports and the current trend of RCN's stock price. Stock prices, public filings, and analyst reports, even those prepared by a 'fellow Merrill Lynch subsidiary,' are all publicly available information. While an obligation exists for directed trustees to disclose non-public information that they possess to named fiduciaries prior to following investment decisions that may be affected by that information, no such duty exists to disclose publicly available information. See DOL Bulletin ("The directed trustee [does] not have an obligation to disclose reports and analyses that are available to the public."). MLTC, therefore, was under no duty to disclose publicly available information to Plan participants regarding RCN's financial state or the prudence of investing in RCN stock.

*3. The Plaintiffs' Complaint Fails to State a Claim Against MLTC for Co-Fiduciary Liability*

*Section 405(a) of ERISA* recognizes that a fiduciary may be liable for breaches of duty committed by other fiduciaries:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, [*23] knowing such act or omission is a breach;

> (2) if, by his failure to comply with *section 1104(a)(1)* of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

*29 U.S.C. § 1105(a)*. The Plaintiffs' Complaint tracks the language of the statute by generally alleging that all the Defendants in this case were liable as co-fiduciaries by violating all three scenarios of co-fiduciary liability under *§*

1105(a). (Compl. at 60, P229.) To sustain a claim under § 1105(a)(2), however, the Plaintiffs' must first allege facts sufficient to find that MLTC breached their fiduciary duty as a directed trustee of the Plan. Since, for the reasons noted above, MLTC has not breached their fiduciary duties as a directed trustee, this claim is unsustainable. See Difelice, 397 F. Supp. 2d at 757 ("Where, as here, a directed trustee is not alleged to have violated his exclusive duties, but to have failed to [*24] object to the named fiduciary directions, a directed trustee's primary liability as a fiduciary, and its secondary liability as a co-fiduciary are essentially coextensive.").

The Plaintiffs' § 1105(a)(1) claim is similarly unsustainable. Plaintiffs make no effort to allege any scenario where MLTC participated or knowingly concealed any known breach of fiduciary duties of any other Plan fiduciary. The substance of the Plaintiffs' allegation under § 1105(a)(1) is that all Defendants "knowingly participated in, or knowingly undertook to conceal the failure to prudently and loyally manage the Plan's assets with respect to offering Company stock as an investment option in the Plan, . . . despite knowing that such failure was a breach." (Compl. at 53, P205.) This is, in essence, a restatement of the Plaintiffs' claim that MLTC breached its fiduciary duty by continuing to follow investment directions given to them by the Committee to invest Plan funds in RCN stock when they knew or should have known that the continued investment in RCN stock was imprudent. For the reasons noted above, however, the MLTC's mere compliance with the investment directions to invest Plan funds in RCN stock was [*25] not a breach of fiduciary duty and the Plaintiffs have failed to allege sufficient extraordinary circumstances whereby MLTC's continued compliance with these directions would constitute such a breach. As the Enron court held:

> If the directed trustee follows 'proper' directions of the named fiduciary with respect to that part of the plan management or control granted to the named fiduciary, and if those directions are 'in accordance with the terms of the plan' and 'not contrary to' ERISA under § 403(a)(1), the directed trustee is not liable for a co-fiduciary's (the named fiduciary's) breaches.

Tittle v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.), 284 F. Supp. 2d 511, 584-85 (S.D.Tex. 2003). The declining stock price and negative analyst reports alleged by the Plaintiffs are insufficient to create a duty for MLTC to question the prudence of the directions to invest Plan funds in RCN stock - or to impart sufficient knowledge to MLTC that such an investment direction constituted a breach of any co-

fiduciary's duty either. [7] As the WorldCom court noted, "unless the Plaintiffs can show that [MLTC] knew or should have known that an investment [*26] in [RCN] securities was imprudent . . . then its understanding of [the named fiduciary's] performance of its fiduciary functions is beside the point." [8] Id.

[*27] The Plaintiffs also present a specific allegation of co-fiduciary under § 1105(a)(3), claiming that MLTC (and the other named Defendants) "knew or should have known that incomplete information had been provided by the Plan's other fiduciaries, yet failed to undertake any action to remedy this breach." (Id. at 60, P230.) The Complaint, however, does not allege any factual underpinning to support their legal conclusion that MLTC breached its duties under § 1105(a)(3). The Complaint asserts that, during the Class Period, RCN made various public statements, forecasts, and filings to the Plan participants and others that "fostered a positive attitude toward the Company's stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities in their employer." (Compl. at 40-43, PP161-168.) These statements, it is presumed, are in contrast to the continued decline in RCN's stock price during the Class Period, and the Company's eventual bankruptcy. Even if, as the Plaintiffs allege, these communications were "inaccurate, incomplete and materially misleading" (Compl. at P42, 164), there are no facts alleged that MLTC had any knowledge that these communications [*28] were inaccurate or misleading or that the Company, through these communications, was breaching any fiduciary duty to Plan participants.

---

[7] While the alleged facts in the Plaintiffs' Complaint do not give MLTC sufficient knowledge that the investment directions from the Committee to put Plan funds into RCN stock were unwise or a breach of the Committee's fiduciary duty, MLTC also had no affirmative duty as a directed trustee "to investigate the manner in which [the named fiduciaries] administered the Plan, and had no duty to inquire whether the [named fiduciaries] were undertaking prudent reviews of the Plan's holdings." In re WorldCom ERISA Litigation, 354 F. Supp. 2d at 450.

[8] The ERISA requirement that a directed trustee like MLTC have knowledge of a named fiduciary's breach in order to impose liability for the named fiduciary's breach is similar to the common law's requirements. As the RESTATEMENT (SECOND) OF TRUSTS notes:

> Even though the person holding the power holds it as a fiduciary and in fact violates his duty as a fiduciary in the exercise of the power, the trustee is not liable for acting in accordance with the exercise of the power if he has no notice that the holder of the power is violating his duty as fiduciary.

RESTATEMENT (SECOND) OF TRUSTS § 185 cmt. e. (1959).

Accordingly, MLTC was under no duty to take corrective action under § 1105(a)(3).

*4. The Facts Alleged in the Plaintiffs' Complaint Fail to State That MLTC Operated Under an Actionable Conflict of Interest.*

Count IV of the Plaintiffs' Complaint claims that MLTC "was guided by its own financial interests, and by the draw of continued business, rather than by the fiduciary tenet of protecting the Plan and the Trust" (Compl. at 47 - 48, P187), and that MLTC "breached its duty to avoid conflicts of interest and promptly to resolve them." (Compl. at 62, P238.) The Court, however, cannot agree with the Plaintiffs implication that MLTC's position, as a compensated trustee for RCN's ESOP plan, created a *per se* conflict of interest that MLTC had an affirmative duty to avoid. MLTC was indeed retained by the Committee (whose members were appointed by RCN) and appropriately compensated for its services as a trustee of the Plan. The only way for a professional trustee such as MLTC, who is selected and retained by a company to administer a savings [*29] and retirement plan that invests in that company's stock, to affirmatively avoid the conflict of interest that the Plaintiffs' are implying, however, would be to provide their services for free.

ERISA clearly did not intend for such a consequence. ERISA expressly allows ESOP plans that invest primarily in the stock of the sponsoring company. See *Moench*, 62 F.3d at 571 (finding ERISA provides "statutory acknowledgment of the terms of ESOP trusts"); *Martin v. Feilen, 965 F.2d 660, 670 (8th Cir. 1992)* (finding that ERISA's fiduciary requirements must be interpreted with the acknowledgment "Congress intended an ESOP to be a 'technique of corporate finance'"). ERISA also explicitly allows professional trustees, like MLTC, to receive reasonable compensation for their services in administering ESOP plans. See *29 U.S.C. § 1108(b)*. The Court, therefore, cannot find that MLTC, or any similarly situated professional trustee, operates under an actionable *per se* conflict of interest simply by acting as a compensated trustee for a company's ESOP Plan.

The Plaintiffs' Complaint also fails to sufficiently allege that MLTC, through any [*30] of their actions during the Class Period, placed whatever interests they may have had in maintaining their position with the Committee and RCN before those of the Plan's participants. As a trustee, MLTC had a duty to "exclude all selfish interest and all considerations of the interests of third persons in carrying out his duties," and ERISA does not "sanction any derogation from these strict fiduciary requirements." *Delta Star, Inc. v. Patton, 76 F. Supp. 2d 617, 636* (citing *McMahon v. McDowell, 794 F.2d 100, 110 (3d Cir. 1986))*. As noted

above, however, the Plaintiffs' Complaint fails to state a claim that MLTC's actions violated its fiduciary duty to the Plan participants. Accordingly, this claim is dismissed as well.

## III. CONCLUSION

For the reasons stated above, and for good cause shown, the Court **GRANTS** Defendants' Motion to Dismiss pursuant to *Rule 12(b)(6)* for failure to state a claim upon which relief can be granted. An appropriate form of order will be filed herewith.

Date: March 21, 2006

Stanley R. Chesler, U.S.D.J.

## ORDER

## CHESLER, District Judge

**THIS MATTER** comes before the Court on Defendant Merrill [*31] Lynch Trust Company FSB's ("MLTC") Motion to Dismiss Plaintiff's Consolidated Complaint (docket entry # 41). The Court having considered the papers submitted by the parties, having heard oral argument, and for the reasons set forth in the opinion filed herewith; and for good cause shown

**IT IS THIS** 21st day of March 2006

**ORDERED** that Defendant's motion (docket entry # 41) is hereby **GRANTED;** and it is further

**ORDERED** that Defendant MLTC is hereby dismissed from the case.

Stanley R. Chesler, U.S.D.J.

# Tab F


# *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*

United States District Court for the Eastern District of Wisconsin

March 30, 2010, Decided; March 30, 2010, Filed

Case No. 08-C-797

**Reporter**

2010 U.S. Dist. LEXIS 30693 *; Fed. Sec. L. Rep. (CCH) P95,660

IRON WORKERS LOCAL NO. 25 PENSION FUND, et al., Plaintiffs, v. OSHKOSH CORP., et al., Defendants.

## Core Terms

company's, impairment, goodwill, fiscal, amended complaint, stock, earnings, allegations, estimated, acquisition, fraudulent, sales, class period, costs, conference call, manufacturing, integrating, executives, scienter, losses, predictions, investors, weak, announced, prospects, reduction, workforce, optimism, particularity, restructuring

**Counsel:** [*1] For Massachusetts Public Pension Funds, Lead Plaintiff: Alan I Ellman, Carol C Villegas, Christopher J Keller, Jonathan Gardner, Stefanie J Sundel, LEAD ATTORNEYS, Brian D Penny, Mark S Goldman, Sidney S Liebesman, Labaton Sucharow LLP, New York, NY; Robert H Friebert, LEAD ATTORNEY, Friebert Finerty & St John SC, Milwaukee, WI; George Burnett, Liebmann Conway Olejniczak & Jerry SC, Green Bay, WI.

For Iron Workers Local No 25 Pension Fund, Plaintiff: Corey Mather, Guri Ademi, Shpetim Ademi, LEAD ATTORNEYS, Ademi & O'Reilly LLP, Cudahy, WI; David A Rosenfeld, Samuel H Rudman, LEAD ATTORNEYS, Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY; George Burnett, Liebmann Conway Olejniczak & Jerry SC, Green Bay, WI.

For Richard Saxon, Wesley Childs, Consolidated Plaintiffs: Corey Mather, Guri Ademi, Shpetim Ademi, LEAD ATTORNEYS, Ademi & O'Reilly LLP, Cudahy, WI; D Seamus Kaskela, David M Promisloff, LEAD ATTORNEYS, Barroway Topaz Kessler Meltzer & Check LLP, Radnor, PA.

For Oshkosh Corporation, Robert G Bohn, Defendants: Edward P Welch, Robert S Saunders, LEAD ATTORNEYS, Skadden Arps Slate Meagher & Flom LLP, Wilmington, DE; Daniel T Flaherty, Godfrey & Kahn SC, Appleton, WI.

For Charles [*2] L Szews, David M Sagehorn, Defendants: Daniel T Flaherty, Godfrey & Kahn SC, Appleton, WI.

For Deloitte & Touche LLP, Defendant: John F Hartmann, Joshua Z Rabinovitz, Kirkland & Ellis LLP, Chicago, IL; Paul F Linn, Timothy M Hansen, Michael Best & Friedrich LLP, Milwaukee, WI.

For Oshkosh Corporation, Robert G Bohn, Consolidated Defendants: Daniel T Flaherty, LEAD ATTORNEY, Godfrey & Kahn SC, Appleton, WI; Edward P Welch, Robert S Saunders, LEAD ATTORNEYS, Skadden Arps Slate Meagher & Flom LLP, Wilmington, DE.

For Gary Buckley, Buckley Group Member, Melvin McCartney, Buckley Group Member, Frank G Warther, Buckley Group Member, Touraj Dayan, Buckley Group Member, Thomas W Prough, Buckley Group Member, Movants: Jason R Oldenburg, Previant Goldberg Uelmen Gratz Miller & Brueggeman SC, Milwaukee, WI.

For Massachusetts Public Pension Funds, Movant: Alan I Ellman, Carol C Villegas, Christopher J Keller, Jonathan Gardner, Stefanie J Sundel, LEAD ATTORNEYS, Labaton Sucharow LLP, New York, NY; Robert H Friebert, Friebert Finerty & St John SC, Milwaukee, WI.

For Lichtenberg Revocable Trust U/A DTD 07/14/2005, Movant: Patrick G McBride, O'Neil Cannon Hollman DeJong SC, Milwaukee, WI.

For Iron Workers [*3] Local No 25 Pension Fund, Movant: Shpetim Ademi, LEAD ATTORNEY, Ademi & O'Reilly LLP, Cudahy, WI.

**Judges:** William C. Griesbach, United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### DECISION AND ORDER

On May 18, 2009, Plaintiffs filed a 192-page amended complaint in which they allege that Defendant Oshkosh Corp.,

as well as its officers and its auditor, Deloitte & Touche, committed securities fraud, in violation of *section 10(b)* of the Securities Exchange Act of 1934 and *Rule 10b-5*. The Defendants have moved to dismiss, arguing that the amended complaint fails to set forth with particularity the fraud allegations against them. They further assert that the complaint fails to allege plausible fraudulent statements or scienter (*i.e.,* intent to defraud), and it also fails to connect the dots between the allegedly fraudulent statements and any loss suffered by the Plaintiffs. For the reasons given herein, the motions to dismiss will be granted.

## I. Background

The Oshkosh Corporation is a manufacturer of heavy trucks used by industry and the military. Although the company has been around nearly a hundred years, it was a growth spurt of recent vintage that propelled it into the Fortune 500 and a listing on **[*4]** the New York Stock Exchange. In Plaintiffs' view, the company was able to achieve this growth not through the sustainable organic expansion of Oshkosh's core businesses but through a "myopic acquisition spree" fueled by the top executives' egos. (Pltf. Br. at 5.) Specifically, from 1996 to 2006, the company acquired some fifteen companies, including businesses in the firefighting, ambulance, towing and concrete mixing industries.

## A. Geesink Norba

The principal focus of this action is the company's accounting treatment for its purchase, in July 2001, of a Dutch company called Geesink Norba Group ("Geesink"), a leading manufacturer of garbage trucks. According to the complaint, the purchase gave Oshkosh a sought-after international presence and served to boost the dynastic egos of Oshkosh CEO Robert Bohn and CFO Charles Szews. (Am. Compl., P 82.) Oshkosh paid $ 137.6 million for the company and, according to the complaint, everyone soon realized that Oshkosh had paid too dearly for Geesink. Of the $ 137.6 million purchase price, $ 95.6 million was considered "goodwill," i.e., an amount exceeding the book value of the company. For present purposes, goodwill is simply a placeholder figure **[*5]** that represents the fact that companies are worth more as a going concern -- and sometimes a lot more -- than the book value of their land, buildings, machines, computers and the like. Plaintiffs assert that soon after the purchase of Geesink, it became clear that Geesink would not meet Oshkosh's financial projections. According to confidential sources, the purchase was a failure from the beginning. Geesink management had to be replaced, and managers soon observed that the company was not meeting its sales forecasts. (Am. Compl. PP 83-84.) Confidential sources also stated that executives Bohn and Szews were aware of Geesink's problems throughout this period and pressured Geesink's management to increase sales in Europe so that the acquisition could live up to its billing. (Am. Compl. PP 86-88.)

Although many of Geesink's troubles resulted from poor market conditions, the amended complaint also asserts that there were management issues as well. A confidential source stated that the companies had difficulty integrating their computer systems, and management at Geesink became a "revolving door" that made accomplishing goals difficult. (Am. Compl. PP 89-90.) The failure to immediately meet **[*6]** projections led to short-sightedness and a narrow focus on trying to meet short-term goals and cut costs in an attempt to convince shareholders that the deal wasn't a total waste. In addition, a culture clash between the new Oshkosh management and Geesink management hindered growth.

According to the amended complaint, it should have been obvious that the acquisition was a failure by 2003 at the latest, as the company's "losses alone were evidence that the various restructuring efforts at Geesink were not working and that Geesink's goodwill was impaired." (Am. Compl. PP 92.) Given this string of losses, the Plaintiffs argue, Oshkosh should have recognized an impairment to Geesink's goodwill. A given goodwill valuation only makes sense if the company's prospects for profit-making render the company worth more than its book value; because Geesink's continuing losses undermined that premise, it no longer made sense (in Plaintiffs' view) to pretend that Geesink was worth some $ 96 million more than its book value. Under Generally Accepted Accounting Principles ("GAAP"), goodwill must be assessed annually, and it must be assessed more frequently where circumstances warrant. *See, e.g., In re Remec Inc. Securities Litigation, 415 F. Supp. 2d 1106, 1113-14 (S.D. Cal. 2006)*. **[*7]** According to the amended complaint, the circumstances of Geesink's continuing losses and its general weakness should have caused Oshkosh to reevaluate its goodwill and recognize an impairment. By failing to do so, Plaintiffs allege, Oshkosh kept its assets and stock price artificially inflated during the class period.

Beginning in 2004 Oshkosh reported Geesink's quarterly earnings and losses as follows:

    Q1 2004 $ 2 million
    Q2 2004 ($ 2.6 million)
    Q3 2004 ($ 3.4 million)
    Q4 2004 $ 2.2 million
    Q1 2005 ($ 2.6 million)
    Q2 2005 ($ 1.5 million)
    Q3 2005 ($ 5.1 million)

Q4 2005 $ .6 million
Q1 2006 $ .9 million
Q2 2006 $ 1.6 million
Q3 2006 $ 1.3 million
Q4 2006 ($ .9 million)
Q1 2007 ($ 4.2 million)
Q2 2007 ($ 6.2 million)
Q3 2007 ($ .5 million)
Q4 2007 ($ 8.4 million)
Q1 2008 ($ 5.4 million)
Q2 2008 ($ 8.6 million)

The total losses during the period amounted to $ 40.8 million. The class period begins on November 26, 2003, when the pattern of actionable fraud allegedly began. [1] On that date, the company filed its annual report (its fiscal year ends September 30 rather than December 31). All annual reports filed during the class period were audited by Defendant Deloitte & Touche. In the 2003 10-K, the company [*8] stated that it expected to be able to reduce costs at Geesink; that competition in Europe was limited; that sales would grow 2.8% in the next fiscal year; and that there were no significant modifications to goodwill. (Am. Compl. PP 115-118.) The next quarterly earnings release showed increased profits for Oshkosh Corporation overall, due largely to its defense business, but a slight decline in its commercial business. (Am. Compl. PP 127-128.) During an analyst conference call, Bohn and Szews appeared satisfied with Geesink's earnings. Even so, Szews noted that Geesink's order backlog had dropped and estimated Geesink refuse sales would "be flat in fiscal 2004, due to no projected recovery in European markets." (Am. Compl. P 132.) The 10-Q reflected the company's concerns about demand, noting that "European refuse backlog remained down due to a soft European economy." [2]

The next quarter was also favorable for the company as a whole. Bohn reported that "[i]t's our strongest quarter ever, and our defense business, including its robust parts sales, was the driving force behind it." (Am. Compl. P 139.) Even so, the commercial sector was still lagging. Bohn recognized that Geesink's second quarter results were "lower than expectations; primarily due to the low production volumes as European refuse markets remained extremely weak." But, "[o]n a more positive note, the production line for our new

model is fully operational and the first GPM III was delivered. We've also introduced a new rear-loader in Europe targeted at the price-conscious customer." (Am. Compl. PP 143.) The theme continued into the next quarter: business was good for Oshkosh Corporation, but weakness lingered at its Geesink unit. On July 27, 2004, CEO Bohn noted the strength of Oshkosh Corporation's overall earnings growth but singled out weakness in Europe as a drag on earnings:

> Market dynamics for all segments are robust and improving, except for the European refuse market, which remains weak. . . . We are not counting on improvement in European market conditions [*10] in the short-term and have initiated significant measures to improve Geesink Norba Group's performance, including a work force reduction and introduction of a new line of value-priced refuse bodies.

(Am. Compl. P 152.)

During the conference call, Bohn expanded on the information provided in the earnings release:

> A major factor remains the weakened European refuse market, which is down about 20% from its peak. That has had a cascading earnings impact in the form of lower volume, tighter price competition and underabsorption of overhead. Coupled with the factory conversion to a new production line for the GPM III and the start-up of ValuPak production, you have valid underlying reasons for the lack of performance, but that doesn't alleviate our need to take action. And we have.
>
> We took a $ 1.8 million redundancy charge to right size the work force and align it with overall market conditions. We focused on bringing the GPM III on line quickly and have exceeded productivity targets. The first few ValuPak units produced in Romania have met quality requirements and orders for this new value-priced line are beginning to flow. These launches cost $ 1.2 million during the third quarter. We believe [*11] these developments, along with a stabilizing industry order rate for new bodies, have us poised for a recovery in 2005, 2006.

(Am. Compl. P 154.)

Although the European refuse market was weak, CFO Szews projected that Geesink would return "to modest profitability on flat sales in fiscal 2005 due to manufacturing efficiencies anticipated following the re-layout of manufacturing processes in [fiscal 2004]." (Am. Compl. P 156.)

Sluggishness continued in the European refuse business, however. In the company's July 28, 2004 10-Q, it noted that while the commercial segment was picking up, refuse sales were falling behind. "[L]osses in the Company's European

---

[1] Plaintiffs suggest the fraud began earlier, but the statute of limitations barred any claims based on earlier activity.

[2] Typically a company announces earnings and holds a conference call the same day. The company's SEC filing -- a 10-K or 10-Q -- follows soon after. The complaint cites statements the company made through [*9] all three of these forms.

refuse business [are] due to weak industry conditions in Europe and related workforce downsizing, increased steel and component costs, manufacturing inefficiencies, competitive pricing conditions as a result of new market entrants in rear- and front-discharge concrete mixers and higher start-up costs on new product launches." (Am. Compl. P 159.) The company estimated "that industry volume in European refuse products are down approximately 20.0% from 2003 levels and that pricing is adversely impacted in most European countries." (Am. Compl. [*12] P 160.)

At the end of fiscal year 2004, Bohn repeated the motif that had been developing for the last several years. Business was good -- it was Oshkosh Corp.'s best year ever -- but the Geesink business was still underperforming:

> We estimate European municipal markets experienced a downturn of 15% in 2004, following a 5% downturn in 2003. We also believe that selling prices declined in several countries across Europe. This, compounded by significant investments to convert our Emmeloord operations for production of our new-style, smooth-sided refuse bodies, led [Geesink] to report a loss. However, [Geesink's] plants are more efficient following installation of new moving lines in The Netherlands. And, we've only begun to realize sales opportunities for the new smooth-sided bodies and the new ValuePak line of value-priced rear loaders. At this point we don't see recovery in the refuse market across Europe as a whole. We will aggressively promote our ValuePak line built in Romania to help drive revenues.

(Am. Compl. P 169.)

During the end-of-year conference call, an analyst asked a pointed question: "Why shouldn't we just look at [Geesink] as having been just a bad acquisition that's getting [*13] worse? And at what point do you say … we made a mistake and maybe we do something different?" (Am. Compl. P 173.) Either Bohn or Szews (the complaint does not specify) answered the question by blaming the weak European economy, which led to limited demand for its garbage removal line. It was noted that competitors had gone, or were going, bankrupt, and in the meantime Geesink had been improving efficiency and trimming its workforce to stay competitive. This left the company on "a very good footing." "Now, we don't see a lot of improvement in the market in '05. We do think that by '06, that we're going to start getting some benefits in volume in this marketplace and pricing, because there are too strong a rumors about our competitors going bankrupt, about people for sale. There will be a crack in that market." (Am. Compl. P 173.)

In its annual 10-K filing, the company explained the process for evaluating its goodwill, and noted that it had evaluated Geesink for an impairment in its goodwill.

> In evaluating the recoverability of goodwill, it is necessary to estimate the fair value of the reporting units. In making this assessment, management estimates discounted anticipated cash flows of [*14] a reporting unit based on a number of factors including historical operating results, business plans and market conditions. Rates used to discount cash flows are dependent upon interest rates and the cost of capital at a point in time. There are inherent uncertainties related to these factors and management's judgment in applying them to the analysis of goodwill impairment. It is possible that assumptions underlying the impairment analysis will change in such a manner that impairment in value may occur in the future.

(Am. Compl. P 178.)

Although Geesink's losses prompted the company to consider writing down Geesink's goodwill, it believed that the European economy was primarily to blame for the losses. It had taken a loss in 2004 due to workforce reductions, and if the European market picked up at all the company believed its leaner position would allow it to achieve profitability. "Based on the Company's estimated benefits of these investments in fiscal 2004 and additional investments planned for fiscal 2005, and based on the Company's estimates of improving European refuse market conditions beginning in fiscal 2006, the Company developed long-term projections of estimated cash flows [*15] from [Geesink] to assess the fair value of the business." (Am. Compl. P 180.) Its conclusion was that Geesink's fair value was some $ 20 million more than the company was carrying it on the books for, and thus there was no impairment to Geesink's goodwill value.

The trend continued into fiscal 2005. The company overall continued its profitability, but there were still problems at Geesink. CEO Bohn suggested that Geesink "went through too many changes at once -- engineering and fielding a completely new design and installing a new production system simultaneously. Combined with the weak European market, that has taken its toll on profitability at Geesink." (Am. Compl. P 193.) Bohn stated that the company had sent a team of executives to evaluate problems at Geesink and noted that there was a risk the company would have to take a goodwill impairment charge. Even so, he noted the possibility that Geesink could return to profitability over the coming year or year-and-a-half. During the first-quarter conference call on January 25, 2005, an analyst echoed the question that had been asked at an earlier call: "is there a point when you and the board say, you know what, we're not going to keep [*16] doing this, or is it just things always take longer than expected?" (Am. Compl. P 198.) Szews stated that with new

management in place and a little patience, "I think we have got some opportunities there, I believe we can turn this thing around." In the company's 10-Q, it noted that it had performed another goodwill evaluation for Geesink but concluded that goodwill was not impaired given realistic hopes of turning the company around. (Am. Compl. P 200.)

The trajectory continued into Q2 of 2005: the company had record earnings, but Geesink continued to lag behind. Even so, management's tone became somewhat more optimistic:

> Our European refuse operation still needs significant improvement, but we've made substantial progress overall. The incoming order rate was up about 58 percent in the second quarter compared to the prior year, giving every indication that the European market is starting to strengthen. We earned a five-year service contract with Sita UK, a major customer, and resolved many of the issues associated with our Geesink-branded GPM III product. The "lean" team will remain in the Netherlands for a few more months to oversee implementation of the cost reduction opportunities [*17] they identified. Today, we are even more confident that our European refuse operation can turn a profit in fiscal 2006.

(Am. Compl. P 209.)

As before, the company stated that it had considered Geesink's goodwill valuation but opted not to find any impairment in light of its prospects for a turnaround and expectations of profitability within the near year or so. (Am. Compl. P 216.)

The next quarter was a bad one for Geesink's books. The company took a $ 4.3 million charge for workforce reductions resulting from its "leaner" operations, but Bohn noted on the analyst conference call that "[w]e believe this workforce reduction will restore [Geesink] to profitability beginning in … the fourth quarter of fiscal 2005." (Am. Compl. P 226.) During the call one analyst again pressed for an analysis of the impairment issue: "[T]he impairment on Geesink. Could you talk about what you said you don't expect any to happen? But on the other hand, Geesink has certainly been a disappointment quarter after quarter after quarter. When does that decision get made? And what would the implications be?" (Am. Compl. P 231.) Defendants responded: "Well, the decision, I guess we look at it every quarter right now, [*18] but we believe that we are going to be profitable in fiscal '06. And if we are profitable, more likely than not then we do not have an impairment decision next year based upon the current action plans that we have in place. If on the other hand, we consistently lose money quarter after quarter in '06, we probably are facing an impairment charge and the amount I couldn't predict." (*Id.*)

Bohn's predictions for profitability were finally borne out in the final quarter of 2005. He believed that the company's cost-savings measures and product improvements had resulted in a small turnaround (a modest profit of $ 600,000), and expected that Geesink could be "modestly profitable throughout fiscal 2006 due to product design changes, outsourcing and other cost reduction activities in process." (Am. Compl. P 240.) The company's 2005 10-K explained the goodwill evaluation process and again noted that Geesink's fair value exceeded its carrying value; as such, no impairment to goodwill was found. But the filing observed that if Geesink was "not able to achieve expected sales and operating income performance in fiscal 2006 and fiscal 2007, the Company could be required to record a goodwill impairment [*19] charge." (Am. Compl. P 255.)

Geesink remained profitable into fiscal 2006, earning some $ 900,000 in the first quarter. "[P]rofitability of the Company's European refuse operations in the first quarter of fiscal 2006 compared to an operating loss of $ 2.6 million in the first quarter of fiscal 2005. Such improvement resulted from favorable market conditions and the restructuring of that business in fiscal 2004 and 2005." (Am. Compl. P 267.) During the Q1 conference call, Bohn explained his growing optimism:

> [W]e have an improved outlook for the Geesink Norba Group. They continue to move along the turnaround path: they are slightly ahead of schedule on outsourcing key components to reduce product costs; their full time cost reduction team is driving further cost reduction initiatives; and they have worked through their workforce reduction very smoothly. We expect them to complete the last of the workforce reductions by early in the third quarter, and we believe the workforce will then be sized appropriately for the Geesink Norba Group to be successful in their markets.

(Am. Compl. P 271.)

The turnaround trend continued into the next quarter, which was Geesink's best quarter since Oshkosh [*20] had bought the company. Geesink earned some $ 1.6 million in the second quarter of 2006, and CFO Szews explained that the results were due to "higher sales volume and lower manufacturing costs . . . . We continue to expect Geesink Norba Group operating income to improve sequentially each quarter in fiscal 2006 as we execute on our cost reduction plan." (Am. Compl. P 287.) In the third quarter, Geesink showed another large profit of $ 1.3 million. During the conference call Bohn praised the management team for its efforts to make Geesink more "lean." (Am. Compl. P 300.) Szews, however, noted that the company expected more modest results in the near future: We expect this business to have break-even results in the fourth quarter of fiscal 2006

due to seasonal factors, softness in demand in the United Kingdom and chassis availability issues in France." (Am. Compl. PP 303, 310.)

That prediction came true in the last quarter of fiscal 2006. Although the 2006 fiscal year was Oshkosh Corporation's "most successful financial performance ever," Geesink lost $ 900,000. (Am. Compl. P 314.) Still, Szews reflected continued optimism during the company's conference call. He believed that orders were **[*21]** strong and that the company's cost reduction efforts would continue to pay dividends. (Am. Compl. P 325.) The company's 10-K, however, indicated its belief that Geesink refuse product sales would be down slightly in fiscal 2007 "due to slow demand in the United Kingdom and the lack of available chassis in France." (Am. Compl. P 328.) The 10-K also contained a detailed discussion of the issue of Geesink's goodwill:

> While the Company's Geesink Norba Group reported operating income of $ 2.9 million in fiscal 2006, its fourth quarter performance resulted in a loss. In addition, its backlog was down 25.0% as of September 30, 2006 due to a decrease in orders in the United Kingdom and France. As a result of this loss and decrease in backlog, the Company continued to monitor whether an impairment of the Geesink Norba Group goodwill had occurred. Goodwill associated with the Geesink Norba Group, which was recorded in connection with the acquisition of this business in July 2001, totaled [euro] 107.6 million as of September 30, 2006 ($ 136.5 million based on the exchange rate as of September 30, 2006). Most of the European refuse markets served by the Geesink Norba Group have been in a recession **[*22]** since 2001. While experiencing a slight improvement in fiscal 2005 and 2006, the Company believes that refuse collection vehicle market sales volumes in Europe declined by more than 20% from fiscal 2001 levels to fiscal 2004 levels and that pricing in several of its markets declined by 5% to 10% over this period. During fiscal 2004, the Company launched a new Geesink-branded, smooth-sided, rear loader refuse collection vehicle and the ValuPak, value-priced refuse collection vehicle into the European refuse market to spur demand for the Company's products. Following the launch of the new Geesink-branded rear loader, its product cost substantially exceeded the Company's estimated product cost and initial production units involved substantial warranty claims until certain design changes were made in fiscal 2005 and 2006. These issues caused the Geesink Norba Group to begin reporting operating losses in the business in the quarter ended June 30, 2004. The Company made a management change and assigned its lean team to the business in early fiscal 2005

to resolve the product design issues and to substantially reduce the manufacturing costs of the Geesink-branded rear loader. As a result **[*23]** of these initiatives, the Company recorded a $ 3.7 million workforce reduction charge in fiscal 2005 to rightsize its workforce in The Netherlands and to commence a strategy to outsource certain activities to lower cost manufacturing sites. In the fourth quarter of fiscal 2005 and the first three quarters of fiscal 2006, the Geesink Norba Group returned to profitability. During the fourth quarter, the United Kingdom market began to decline as a result of a decrease in government funding and the consolidation of two of Geesink's primary customers in that country. In addition, limited chassis availability in France reduced orders in that country. The Company expects that the business will incur operating losses through the first two quarters of fiscal 2007, but that the business will be modestly profitable in fiscal 2007. The Company believes that profitability will continue to improve in fiscal 2008 following the improvement of the markets in the United Kingdom and France, additional cost reduction activities and other planned actions. Based largely on the Company's estimated benefits of its cost reduction initiatives in fiscal 2005 and 2006 and the improvement in the end markets, the **[*24]** Company developed long-term projections of estimated cash flows from the Geesink Norba Group to assess the fair value of the business. As a result, the Company determined that the fair value of the Geesink Norba Group exceeded its carrying value at September 30, 2006, and therefore determined that the goodwill recorded in connection with the acquisition of the Geesink Norba Group was not impaired.

(Am. Compl. P 332.)

As had been foreshadowed somewhat, Geesink's turnaround stalled and it lost $ 4.2 million in the first quarter of 2007 and then lost $ 6.2 million in the second quarter. This latter figure included a substantial $ 4.9 million charge for more labor reductions, part of the company's continued cost savings and restructuring efforts. Oshkosh Corporation had also purchased JLG, a large manufacturer of "access equipment" such as aerial work platforms, lifts and stock pickers, and the company believed that Geesink's factory in Romania could be integrated into the new JLG business:

> we expect to leverage our Geesink Norba Group Romanian factory to serve as a supplier for JLG and its aerial products. The eastern European operation will serve as a cost effective supplier of large weldments **[*25]** and fabrications, and we will expand the operation to manufacture parts for both the Geesink Norba Group and JLG. We believe that these actions will result in

annual savings for the Geesink Norba Group of over EUR 7 million beginning in fiscal 2008, and then expect the savings to grow as we move more work into Romania.

(Am. Compl. P 368.)

CFO Szews elaborated: "We expect that our Romanian factory will be able to support certain JLG fabrication requirements, creating a win-win situation for the two businesses, as [Geesink] will benefit from increased absorption with a more fully utilized facility and JLG will gain a low-cost supplier of parts. We expect all of these efforts to form a sustained turnaround at this business." (Am. Compl. P 372.) In response to an analyst's question, Szews acknowledged that Geesink had dealt the company's earnings a "body blow," however, and he didn't predict much of a turnaround in the near future, due largely to the fact that European holidays comprise much of the company's fiscal fourth quarter (thus weakening demand). (Am. Compl. P 375.) In the 10-Q for the company's second quarter of fiscal 2007, Oshkosh again provided a detailed explanation of its decision [*26] not to take an impairment charge:

> In the third quarter of fiscal 2006, Geesink, seeking a low-cost country to produce products, established a production facility in Eastern Europe. As Geesink started up this operation, existing facilities became underutilized. As a result, Geesink's excess capacity and overhead has in part led to operating losses. In addition, during fiscal 2006, Geesink increased salaried headcount to rectify product design issues associated with the fiscal 2005 launch of its GPM III model. Geesink believes the problems have been corrected and the additional headcount is no longer necessary. During the second quarter of fiscal 2007, Geesink began an initiative to reduce operating costs, eliminate excess headcount and close an underutilized facility. In connection with these and other initiatives, the Company recorded charges totaling $ 4.9 million for workforce reductions and other adjustments in the second quarter of fiscal 2007. At the same time, the Company developed a plan to further leverage Geesink's low-cost country manufacturing capabilities in Eastern Europe by insourcing certain work including production related to the Company's recently acquired access equipment [*27] segment.

> The Company presently believes that its strategy of reducing its workforce and other expenses, idling a facility and developing low-cost country manufacturing capabilities will result in the business returning to acceptable profitability over an eighteen to twenty-four month period. Based largely on the estimated benefits of Geesink's cost reduction initiatives and estimated low-cost country expansion, the Company developed long-term projections of estimated cash flows for Geesink to assess the fair value of the business. Based on these projections, the Company determined that the fair value of Geesink exceeded its carrying value at March 31, 2007, and therefore determined that the goodwill recorded in connection with the acquisition of Geesink was not impaired. The Company will continue to monitor its turnaround activities at Geesink and their impact on the Company's valuation of this investment.

(Am. Compl. P 381.)

The next quarter brought a small operating loss of $ 500,000 for Geesink. Bohn conceded that: "Our struggles [with Geesink] have been disappointing, but the more we dig into the issues, the more we believe the business can be successful with some facility rationalization [*28] and proper leadership." (Am. Compl. P 390.) The 10-Q echoed the impairment analysis quoted above, and concluded that "[t]he Company does not believe that this new estimated operating loss significantly altered the long-range value of Geesink and hence no detailed impairment calculation was performed at June 30, 2007." (Am. Compl. P 401.)

The next quarter brought more losses for Geesink. During the conference call, CEO Bohn conceded that things were not working out:

> We also made several major decisions this quarter regarding the Geesink Norba Group, our European refuse business and this is a business that has underperformed way too long and caused a decline in this segment's operating income in a year when the rest of the segment showed solid improvement. We are working through some very aggressive actions that we expect to put into business that will give it a much stronger foundation than what we have today, to grow and to be profitable.

(Am. Compl. P 418.)

Bohn explained that plans were in the works to shuffle production around to different plants in Europe and to achieve efficiencies that way. Oshkosh's new CFO, David Sagehorn, explained that "[w]e do not expect to see the results of [*29] the turnaround at the Geesink Norba Group until fiscal 2009, as we work through fiscal 2008 to complete the actions that we expect to allow the business to return to profitability." (Am. Compl. P 420.) The company's fiscal year-end 10-K provided another assessment of the goodwill impairment issue, echoing previous conclusions while incorporating continued losses into the calculation. Ultimately, the company concluded no goodwill write-down was required, but it suggested one could be imminent if expectations did not materialize:

> To the [*30] extent that Geesink is not able to achieve

expected progress on its turnaround initiatives in fiscal 2008, the Company could be required to record a goodwill impairment charge. The range of potential charge would be based on a number of factors, including the results of the Company's cost reduction activities, the timing and results of the insourcing of fabrications to Geesink's Eastern European facility, Geesink's operating performance, competition, required future capital expenditures, interest rates and long-term growth assumptions. The Company cannot provide any assurance that future goodwill impairment tests will not result in a charge to future earnings.

(Am. Compl. P 433.)

The first quarter of fiscal 2008 continued the pattern of losses at Geesink, with that unit losing some $ 5.4 million. Szews (now president and chief operating officer) stated that the restructuring was in "full swing" and noted that construction of a facility in Romania was underway in an effort to produce parts for Oshkosh's JLG company and transition away from facilities in Sweden and the Netherlands. (Am. Compl. P 447.) This news came against the background of a declining Oshkosh stock price. Although the [*31] company was still very profitable, its growth had slowed. Bohn addressed investors and analysts on the conference call: "We know that many of you listening today are frustrated by our recent share price decline. We are too. We do not think that the current price accurately reflects the strength of this management team, our ability to mitigate weaker economic conditions or the long-term prospects for the Oshkosh family of companies." (Am. Compl. P 451.) Roughly two weeks later, the complaint notes, Bohn sold some $ 5.7 million of company stock. (Am. Compl. P 455.)

The 10-Q noted that Geesink's sales were actually up 54.5% over the same quarter the previous year. This was due to a rebound in U.K. demand and favorable exchange rates. Even so, the company lost money due to "start-up costs at the Company's Romanian operations and facility rationalization costs to move production from Sweden to The Netherlands." (Am. Compl. P 460.)

Oshkosh Corporation released its second quarter earnings on May 1, 2008. During the conference call, Szews acknowledged that Geesink had lost some $ 8.6 million and noted that "[o]verall, results in this segment were quite disappointing due to difficulties in restructuring [*32] our European refuse collection vehicle business . . ." (Am. Compl. P 473.) Szews also acknowledged "experiencing larger inefficiencies during the ramp-up than we anticipated as we integrate the production of the Geesink and Norba product lines," and expressed hope that "these inefficiencies will be overcome as our employees move up the learning curve.

Geesink also began fabricating parts in its Romanian facility in the second quarter to be used in the manufacture of JLG aerial products in Belgium." (Am. Compl. P 473.) During the call, an analyst asked Szews pointedly about Geesink: "what do we need to see before we throw in the towel on this one?" Szews responded by noting the continued problems resulting from integration and multiple shifts in facilities: "Well, it's coming to a head pretty quickly here. We essentially moved all of the production of Norba into the Emmeloord, Netherlands facility. We're a little bit constipated. That's what caused the downturn in the forecast for at least the Geesink business and that we really need to exit by the end of the third quarter because we're a little bit behind in production." (Am. Compl. P 476.)

The company's May 1, 2008 10-Q reflected that [*33] although Geesink had increased its sales significantly over the same period the previous year, several factors resulted in continued operating losses. "The increase in the operating loss related primarily to charges associated with a previously announced facility rationalization plan and inefficiencies associated with the relocation of production of Norba-branded products to The Netherlands, along with an unfavorable foreign exchange rate that resulted in a larger loss in U.S. dollars." (Am. Compl. P 482.) And once again, the 10-Q noted that the company was continuing to evaluate the goodwill of Geesink for possible impairment. Because the losses were due to restructuring and facilities problems (rather than, say, weakened demand or increased competition), the company did not view Geesink's goodwill as impaired but stated that it would continue to monitor the situation. (Am. Compl. P 483.)

Eight weeks later, on June 26, 2008 (the end of the class period) Oshkosh issued a press release announcing that it was lowering its earnings estimates for the third quarter and 2008 and taking a goodwill impairment charge:

> Oshkosh Corporation (NYSE: OSK), a leading manufacturer of specialty vehicles [*34] and vehicle bodies, today announced that it expects a loss of approximately $ 1.22 to $ 1.32 per share for its third quarter of fiscal 2008 compared to the Company's prior earnings per share (EPS) estimate range of $ 1.40 to $ 1.50 of income for the quarter. The expected loss relates to a non-cash charge for the impairment of goodwill to be recorded in connection with the Company's European refuse collection vehicle manufacturer, the Geesink Norba Group (Geesink). The impact of the impairment charge on third fiscal quarter earnings is estimated to be approximately $ 175 million, or $ 2.32 per share. Projected third fiscal quarter results also reflect weaker performance expectations compared with previous

estimates for, most notably, the Company's access equipment segment and, to a lesser extent, its fire & emergency and commercial segments.

Lower than expected sales in both North America and Europe driven by softness in non-residential construction and general economic weakness, and rising raw material and fuel costs, have caused us to reduce our outlook for the third quarter and full fiscal year 2008, said Robert G. Bohn, Oshkosh Corporation chairman and chief executive officer. During **[*35]** the quarter, we also lowered our outlook for Geesink due to a slower and more difficult than expected return to profitability, coupled with expectations of a weaker European economy and higher raw materials costs. This revised outlook has caused us to believe that the value of Geesink no longer supports the goodwill recorded for this business, resulting in the impairment charge we are announcing today.

(Am. Compl. P 492.)

The company held a conference call the same day, during which management conceded that Geesink's facilities rationalization program was simply not working -- its benefits were lower than expected while its costs were higher. In addition, business coming from Oshkosh's recently acquired JLG division was drying up due to a "slowdown in the European access equipment market." (Am. Compl. P 493.) The company believed that Geesink would break even in 2009 but acknowledged that it could no longer carry it on the books at the current value. It estimated an impairment charge of $ 175 million.

On the news, Oshkosh Corporation's stock dropped some 33% in heavy trading on what was a sharply down day for the entire market. The drop came amidst the overall decline in the economy and **[*36]** the stock market; I may take judicial notice that the Dow Jones Industrial Average had already dropped from over 14,000 in October 2007 to 11,811 on June 25, 2008 -- a drop of more than sixteen percent in roughly nine months -- and these drops foreshadowed further plummets into the six-thousands and the recession that occurred in late 2008 and 2009. The Defendants note that during the conference call after the announcement, no analyst asked about Geesink -- their focus instead was on the decline in JLG's business. In fact, the amended complaint cites a June 26, 2008 article from the *Milwaukee Journal-Sentinel,* which quoted an analyst who stated that "[t]he magnitude of (Thursday's) downward revision in access equipment's outlook is a surprise and highlights the speed at which JLG's business outlook has deteriorated." (Am. Compl. P 495.) This suggests, according to the Defendants, that the precipitous stock drop had much more to do with JLG than with any

write-down of Geesink's goodwill.

In the company's year-end 10-K, filed in November 2008, Oshkosh explained the goodwill impairment charge at some length:

The Company has taken steps over the last 18 months to turn around the Geesink **[*37]** business, including selling an unprofitable facility in The Netherlands during the first quarter of fiscal 2008, reaching an agreement with the Works Council in Sweden regarding rationalizing a facility in that country in order to consolidate Norba-branded production in The Netherlands, reducing its work force, installing new executive leadership, integrating operations with JLG, implementing lean manufacturing practices, introducing new products and outsourcing components to lower cost manufacturing sites. In June 2008, it became evident that synergies related to Geesink's facility rationalization program would be lower than expected and costs to execute the rationalization would be higher than anticipated. The resulting slower than expected and more difficult return to profitability of Geesink's business, further escalation of raw material costs, a softening of economies in Western Europe and a reduction in fabrication volume for the Company's access equipment segment at Geesink's Romania facility due to a slowdown in the European access equipment market led to the Company's conclusion that a charge for impairment was required. During the third quarter of fiscal 2008, the Company **[*38]** took these factors into account in developing its fiscal 2009 and long-term forecast for this business. With the assistance of a third-party valuation firm, the Company determined that Geesink goodwill and nonamortizable intangible assets were impaired and the Company recorded non-cash impairment charges of $ 167.4 million and $ 7.8 million, respectively, in the third quarter of fiscal 2008, representing the entire amount recorded for these assets. The evaluation was based upon a discounted cash flow analysis of the historical and forecasted operating results of this business.

(Am. Compl. P 496.)

## II. Analysis

The amended complaint brings claims for violations of *Section 20* of the Exchange Act, as well as *Rules 10b-5* and *10b-5(a)* and *(c)*. As suggested above, the principal focus of the amended complaint is the company's failure to take a goodwill impairment charge and acknowledge that it was carrying the Geesink company on its books at an inflated

value. This fraudulent and unrealistic valuation allegedly caused harm to those in the proposed class who bought shares of Oshkosh during the class period. The Defendants' motions to dismiss assert that the amended complaint fails to specify its **[\*39]** allegations of fraud with particularity because the complaint is excessively lengthy and vague. They further argue that the complaint fails to plausibly allege that any of the Defendants acted with the requisite mental state or that their actions caused the Plaintiffs' loss.

## A. Pleading under the Private Securities Litigation Reform Act ("PSLRA")

*Section 10(b)* of the Exchange Act and *Rule 10b-5*, adopted thereunder, create a private right of action for securities fraud. *Rule 10b-5* makes it unlawful "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *17 CFR § 240.10b-5*.

The Supreme Court has recognized, however, that "[p]rivate securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms **[\*40]** to the law. As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)* (citation omitted). Under the PSLRA, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*. These requirements echo the mandate found in *Fed. R. Civ. P. 9(b)* that allegations of fraud must be pleaded with particularity. *In re Stone & Webster, Inc., Securities Litigation, 414 F.3d 187, 194 (1st Cir. 2005)*.

"In a typical *§ 10(b)* private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008)*.

## B. **[\*41]** Claims Relating to Geesink's Goodwill

### 1. The Complaint Fails to Allege Fraud with Particularity

Despite the Tolstoy-esque length of the amended complaint, the Defendants argue that the complaint's allegations are not stated with sufficient particularity under *Rule 9* and the PSLRA. The Plaintiffs' response brief argues that it has pled more than enough detail: in fact, they assert, no fewer than 386 paragraphs in the amended complaint contain allegations about how the Defendants' statements were material and misleading. (Pltf. Br. at 19.) As such, they argue that the Defendants have been more than adequately apprised of the nature of the claims being leveled against them.

It is true that the "gist" of the complaint is clear enough: the Plaintiffs believe the Geesink acquisition was a failure from the get-go (the company overpaid for it), and the company should have admitted this "at least five years" before it did by recognizing a goodwill impairment. (Am. Compl. P 86.) But from this general premise the amended complaint asserts that essentially every statement the company made (as set forth in Section I above) was fraudulent. That is, every earnings announcement since November 26, 2003 **[\*42]** was fraudulent because it failed to tell the truth about Geesink's goodwill impairment.

Recognition of an impairment involves an accounting judgment about the future: to take an impairment is an admission that future prospects do not justify carrying the asset on the books at its present value, whereas maintaining one's goodwill evaluation is a prediction that the company's prospects for earnings are sound. But even though such an analysis is based largely on forecasts about the future, that does not give companies *carte blanche* to issue reckless or completely unfounded statements about their goodwill. Failure to take an impairment charge may constitute securities fraud when "the need to write-down [the asset] . . . was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud.' " *Caiafa v. Sea Containers Ltd., 525 F. Supp.2d 398, 410 (S.D.N.Y.2007)* (alterations and ellipsis in original) (quoting *In re K-tel International, Inc. Securities Litigation, 107 F. Supp.2d 994, 1001 (D. Minn. 2000)*, aff'd, *300 F.3d 881 (8th Cir.2002))*.

I conclude, however, that the kind of generalized allegations found in the amended complaint do **[\*43]** not suffice under *Rule 9(b)* or the PSLRA. Most importantly, the allegations of fraud make no attempt to differentiate between the vastly different circumstances surrounding each reporting period and

each statement made during those periods. Under the PSLRA an allegation of fraud cannot be "one size fits all" -- each allegation must be tied to an explanation for *why* the statement was untrue and why the speaker had reason to know it was untrue. Despite the hundreds of paragraphs set forth in the complaint, nowhere do we find these kind of particularized allegations about each of the company's statements pertaining to Geesink's goodwill. The complaint is filled with citations to the company's SEC filings, and these filings detail the various problems and opportunities the company faced as it attempted to integrate its acquisition. But what may have been true in 2004 or 2008 was surely different in 2006 when Geesink was actually making money. Wasn't the company entitled to have some optimism that its restructuring efforts were working after four quarters of positive earnings? Surely the goodwill impairment analysis would have been different every quarter -- as set forth above, some quarters **[*44]** gave reason for optimism, whereas others looked bleaker. Each new quarter involved some new factor: an acquisition, the reshuffling of management, the closing of plants, changes in the market, etc., and each of these considerations presented a new scenario in which profitability may have been achieved (or not). The complaint does not specify, however, why the company's statements were unrealistic in each quarter. Instead, it asserts a general premise (Oshkosh paid too much for Geesink) and then simply claims that every statement during the class period was fraudulent because the company refused to recognize that fact. Each quarter's statements are bundled together as a pattern of fraud lasting four and one-half years, and we are to asked simply to believe that *everything* the company said about Geesink was a lie, when in fact the situation each quarter was highly volatile.

In *City of Sterling Heights Police & Fire Retirement System v. Vodafone Group Public Ltd. Co., 655 F. Supp. 2d 262 (S.D.N.Y. 2009)*, the district court summarized cases involving allegations that the company committed securities fraud by not writing down its assets sooner. In that case, Defendant Vodafone announced **[*45]** that it would incur a $ 40-49 *billion* impairment charge associated with its German, Italian and Japanese operations. *Id. at 266*. Plaintiffs' allegations there mirrored the allegations in this case. They argued that the defendant knew its European operations were failing but held off taking a goodwill write-down despite that knowledge. The district court found such allegations too conclusory to survive a motion to dismiss:

> The plaintiff alleges that because the Company's operations in Germany, Japan and Italy had not expanded as rapidly as expected at the time of acquisition, the defendants were "increasingly aware that the impairment indicators existed." (Compl. P 139.) The

Complaint speculates that Mannesmann's "extremely high price" left Vodafone with "no margin of error." (Compl. P 140.) "Thus, once the German results were even the slightest bit disappointing, impairment would exist." (Compl. P 141.) Such assertions are too broad to be objectively assessed and fail to identify any awareness by the defendants that an impairment charge was necessary.

*Id. at 270-71*.

Similarly, the Seventh Circuit has frowned upon generic *ex post facto* complaints that allege fraud based largely on subsequent **[*46]** data:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*DiLeo v. Ernst & Young, 901 F.2d 624, 627-28 (7th Cir. 1990)*.

Similarly, in *In re Wet Seal, Inc.,* the district court dismissed the complaint because its premise was wholly unsupported by any factual allegations that suggested fraud rather than, say, bad luck. There, the complaint alleged that management knew future prospects were bleak but nevertheless maintained a rosy outlook:

> The problem with the FACC [First Amended Class Action Complaint] . . . is that it is premised largely on the idea that management and members of the board knew the new line would fail, **[*47]** which in turn meant that they knew that Wet Seal would fail to recapture its customer base and to generate sufficient cash flows to support its balance sheet. But Plaintiffs fail to plead the concrete facts that support their premise-they do not explain the precise information, known to Defendants but not the investing public, that indicated the 2004 line would fail. The omission of such facts from the FACC is fatal, because Defendants repeatedly warned that, if the 2004 back-to-school line were not successful, they might face charges to earnings or insolvency. These disclosures mean Defendants' conduct was more consistent with their understanding of the difficult financial condition of

the company and their honest hope that their turn-around efforts would succeed and thereby return Wet Seal to profitability.

*In re Wet Seal, Inc. Securities Litigation, 518 F. Supp.2d 1148, 1151 -1152 (C.D. Cal. 2007)* (emphasis added).

The same holds true here. The complaint fails to identify what information management possessed, each quarter, that would have given them the foreknowledge that Geesink was doomed. And it further fails to account for the fact that the company's disclosures repeatedly warned **[*48]** that if management's hopes were not realized, the company might have to take a goodwill impairment. Instead, the complaint's assertions are so broad that they cannot even be meaningfully assessed. The complaint baldly asserts that the company should have taken a write-down "at least" five years before it did, but provides no explanation for how the Plaintiffs reached that result. It further fails to explain how much the goodwill should have been written down, and when, and what specifically about the company's goodwill evaluation was fraudulent. The complaint's sweeping allegations fail especially when one considers that a goodwill evaluation is a "custom" process based on several factors present at the time the assessment is made. As Oshkosh Corporation's filings state:

> In making this [goodwill] assessment, management estimates discounted anticipated cash flows of a reporting unit based on a number of factors including historical operating results, business plans and market conditions. Rates used to discount cash flows are dependent upon interest rates and the cost of capital at a point in time. There are inherent uncertainties related to these factors and management's judgment in **[*49]** applying them to the analysis of goodwill impairment. It is possible that assumptions underlying the impairment analysis will change in such a manner that impairment in value may occur in the future.

(Am. Compl. P 178.)

Although the amended complaint recognizes that there are a "number of factors" that figure into the goodwill assessment, it ignores these by its reliance on the blanket assertion that Geesink was essentially worthless during the entire class period. Instead of explaining why each statement was fraudulent -- *i.e.*, why management knew the company's prospects were weak -- the complaint makes the following generic conclusion about Oshkosh's reporting of goodwill:

> Oshkosh's valuation model for testing goodwill impairment was flawed and unrealistic because it failed to factor in historic and repeated operating losses at Geesink, the recession pressures within its industry,

declining demand for Geesink products, unrealistic restructuring charges, unachievable sales targets, unrealistic cost reduction plans, and repeated failed efforts to restructure the business.

This conclusory paragraph is repeated six times, verbatim, throughout the amended complaint. (Am. Compl. P 121(g), **[*50]** 184(g), 259(g), 435(g), 488(g), 335(g)). It is inconceivable, first of all, that each of these charges (unachievable sales goals, declining demand, recession pressures, etc.) would have applied in blanket fashion to each and every one of the company's statements over the course of more than four years. As the company's filings and other statements made clear, there were countless factors that affected Geesink's profitability. The complaint's reliance on boilerplate pleading about the company's goodwill evaluation does not come close to the particularized allegations that are required by the PSLRA.

Putting the accounting jargon about impaired goodwill to one side, what the amended complaint is really alleging is that Oshkosh was simply too bullish in its quarterly predictions about future prospects at Geesink. But instead of explaining why optimism was unwarranted at each step of the way (*i.e.*, why management knew otherwise), the amended complaint simply cites disappointing figures from the future as though these are evidence of fraud in the past. If that were true, of course, we would have to conclude that almost every company in the fall of 2008 was run by fraudsters because their **[*51]** predictions would have been knocked down by the dramatic recession that ensued. It should go without saying that one could be mistaken in a prediction about the future without committing fraud -- the fact that losses ultimately occurred does not mean the Defendants had reason to know that there was little basis for predicting or hoping otherwise. "For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence." *DiLeo, 901 F.2d at 626*.

That the executives committed fraud is especially unlikely given the fact that Geesink was a recently-acquired company in a new territory. As Plaintiffs note, this was Oshkosh Corporation's first significant entree into the European market. Its SEC filings are riddled with qualifiers about supply and demand problems in various countries, as well as the vicissitudes of foreign currency markets. Some of its predictions were rosy, **[*52]** while others were less sanguine. And in Oshkosh's case, the company explained each quarter

that its Geesink operation was a work in progress. Factories were shutting down and production was being moved, new management teams were brought in, and it was introducing new products to meet shifting demand, until it eventually tried to integrate its larger JLG acquisition into the mix and leverage that company to create a market for Geesink's operations. In short, the landscape was ten times more complex than the market for teen clothing, as in *Wet Seal,* and yet the complaint merely relies on a one-size-fits-all allegation of fraud, as though everything the company said about Geesink during more than four years was a lie simply because Geesink ultimately lost money.

The difficulty of making such predictions is demonstrated by the first quarter of fiscal 2008. In that quarter, Geesink actually managed to boost its sales significantly over the previous year's first quarter, but even then, the company lost money: "[t]he increase in the operating loss related primarily to charges associated with a previously announced facility rationalization plan and inefficiencies associated with the relocation [*53] of production of Norba-branded products to The Netherlands, along with an unfavorable foreign exchange rate that resulted in a larger loss in U.S. dollars." (Am. Compl. P 482.) This is not the case of a horse-and-buggy company bullheadedly insisting that good times are around the corner despite the mass appeal of the automobile; instead, Geesink was a company in flux, in a frantic market that was in flux, and it was run by an ever-changing management regime (as one confidential informant complained) that was itself part of a growing conglomerate and integration effort. It is reasonable to question the decisions that management made, but given the complexities of the business, an assertion that they committed *fraud* requires more than the cut-and-paste job found in the amended complaint.

In sum, given all of the parameters underlying the goodwill calculation, which changed quarter-to-quarter, it is not enough to broadly plead that all of the company's statements over a four and one-half year period were false because they failed to take an unspecified write-down of goodwill. "That Vodafone ultimately would take an impairment charge in 2006 does not in itself provide an actionable basis [*54] to claim that the failure to do so earlier was fraudulent." *Vodafone, 655 F.Supp.2d at 272*.

To plead with particularity under such circumstances, a Plaintiff would need to identify, at a minimum, which of the company's assumptions were unfounded. For example, in this case the state of the market for refuse trucks in Europe was a key factor in Geesink's sales prospects. At some times, the company's filings recognized that the market was weak, while in others the company expressed some hope. A plaintiff arguing for a quicker write-down of goodwill would have to

explain how, in a given quarter, the company's optimism about that market was not just wrong (as demonstrated by later data) but so wholly unfounded that it was fraudulent. Another key factor was the company's prospects for employing "lean" measures to cut costs. A plaintiff would have to show not just that the measures did not work, but that the company had no reasonable expectation that they *could* work. Ultimately, as the Plaintiffs recognize, a company's valuation of its goodwill is an assessment about the future, and in order to show fraud a complaint will have to set forth not merely the fact that the company was wrong, but [*55] that the company had little chance of ever being right. *Acito v. IMCERA Group. Inc., 47 F.3d 47, 53 (2d Cir. 1995)* ("lack of clairvoyance simply does not constitute securities fraud"). These are just a few examples. Because the amended complaint fails to explain with any particularity why each of the company's statements were fraudulent *within the context they were made,* the complaint must be dismissed.

## 2. The Amended Complaint Fails Adequately to Allege Scienter

Under *15 U.S.C. § 78u-4(b)(2)*, a plaintiff must allege facts that give rise to a "strong inference" that the defendants acted with "a mental state embracing intent to deceive, manipulate or defraud." In reviewing a complaint, a court must determine whether the inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, 551 U.S. at 314*. In *Tellabs,* the Supreme Court made clear that a court's inquiry is more searching than is typical in ruling on a motion to dismiss. It is not merely a question of whether the facts *as alleged* give rise to an inference of scienter; the question is whether the inference of scienter is a strong one when compared to other inferences [*56] one might draw based on common sense and experience. "The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id. at 323-24*.

As noted above, the amended complaint fails to identify specific information known to the Defendants that would suggest they knew their forecasts about Geesink's prospects were unreasonable. Instead, the amended complaint alleges the Defendants knew generally that the European economy was weak, or that restructuring efforts would fail, or that the company's historical profits did not justify its goodwill valuation. These general allegations are not substitutes for

actual knowledge that the company's forecasts were unreasonable, however. There are no allegations of secret internal forecasts predicting gloom, doctored books hiding the truth or accounting gimmicks painting a rosier [*57] picture. None of the confidential witnesses stated that any of the Defendants knew X was true while they said Y, or that internal projections showed something different from what was publicly disclosed. "There are no allegations that there were any internal reports that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud." *In re Loral Space & Communications Ltd. Securities Litigation, 2004 U.S. Dist. LEXIS 3059, 2004 WL 376442, *17 (S.D.N.Y. 2004).* Geesink -- a new venture in a new territory -- was dependent on a multitude of parameters that changed every quarter, and management had little ability to predict with certainty that its hope for profitability was a lost cause. The fact that they remained optimistic does not mean they committed fraud. And the fact that one of the Big Four accounting firms evidently agreed with their approach weakens the inference that the need to recognize an impairment was so manifest that the failure to do so was fraudulent.

It is important, too, to recognize that the company's disclosures were not [*58] universally bullish, and its reasons for optimism were concrete and particularized rather than reflections of knee-jerk egotism or quixotic sunniness. During slower periods, the company repeatedly explained why new approaches -- restructuring, new leadership, improved demand, etc. -- might lead to better results, but at the same time it cautioned that these expectations could falter and could lead to a goodwill reevaluation. These were statements of qualified, cautious optimism rather than efforts to deceive. This, in itself, undermines any inference that the Defendants acted with an intent to deceive.

But because "[t]he strength of an inference cannot be decided in a vacuum," it is worth exploring the full context of the Defendants' alleged intent and motive to deceive. Plaintiffs place the most weight on financial considerations. Between 2003 and 2008, Bohn received over $ 31 million in compensation and stock options, while Szews earned $ 9 million. These lofty compensation packages would not have been feasible, Plaintiffs argue, had the company recognized an impairment sooner. In addition, during the class period Bohn and Szews sold some $ 52 million worth of stock at prices they [*59] alleged fraud had helped to inflate. In particular, the amended complaint sets forth in bold print and capital letters the fact that Bohn sold some $ 5.7 million worth of stock in February 2008: "ALTHOUGH BOHN HAD JUST TOLD THE MARKET AND, IN PARTICULAR, ITS SHAREHOLDERS HE THOUGHT OSHKOSH STOCK WAS UNDERVALUED, APPROXIMATELY TWO WEEKS AFTER THE CONFERENCE CALL AND ANNUAL SHAREHOLDERS MEETING, HE SOLD $ 5.7 MILLION WORTH OF OSHKOSH STOCK." (Am. Compl., P 458.)

"[B]ecause executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Tribune Co., 521 F.3d 686, 695 (7th Cir. 2008).* The timing and magnitude of Bohn's stock sale was suspicious, in Plaintiffs' view, because it occurred just after Bohn had assured stockholders that he believed the company's stock was undervalued. Additionally, it occurred only four months before Oshkosh Corporation announced the impairment to Geesink's goodwill. [3] Bohn netted some $ 5.7 million from the sale, and Plaintiffs note that he would have received only half of that amount ($ 2.87 million) if he had waited until the day after the company's impairment disclosure.

A number of reasons undermine the possibility of drawing any "strong" inference of scienter. First, it is impossible to divine an intent to deceive from the facts alleged because the Plaintiffs' story is internally inconsistent, and almost fantastical. They allege a class period dating back to November 2003 (and that date derives from the statute of limitations -- they allege the fraud began even earlier). If this pattern of fraud was really carried on until June 2008 -- a period of over four and one-half years -- one would think that Bohn and Szews would have made out much better than they did. There would be scores of suspicious stock sales, and the Defendants would have cashed in all along the way until the music stopped. Instead, we are asked to believe that Bohn and Szews masterminded a scheme of more than four years only to allow Bohn to save roughly $ 2.8 million by selling in February 2008 rather than June 2008 and to earn unspecified extra salary and benefits due to the company's inflated stock price.

> [P]laintiffs' allegations about trading relate to an exceedingly long putative class period. The allegedly fraudulent [*61] scheme lasted some 46 months (from August 12, 1999, to June 12, 2003). By way of comparison, the Ninth Circuit has considered a class period of just 15 months "unusually long." See *In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092-93 (9th Cir. 2002).* Alleging such a lengthy class period weakens any inference of scienter that could be drawn from the

---

[3] Defendants [*60] note that Bohn did not "sell" stock but merely exercised options.

timing of defendants' trades. Indeed, the lengthy period strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim.

*Teachers' Retirement System Of LA v. Hunter, 477 F.3d 162, 185 (4th Cir. 2007).*

Just as the lengthy class period requires a stretch of the imagination, so does the relatively modest nature of the Defendants' stock activity. Although Plaintiffs use italics to emphasize that Bohn netted $ 5.7 *million* from his February 2008 sale, modified typeface is no substitute for factual context. The key context is that Bohn's option exercise in February 2008 amounted to only 13% of his total holdings in Oshkosh Corporation. Had Bohn intended to cash out before the bad news hit, presumably he would have been able to do a lot better. *In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1094 (9th Cir. 2002)* **[*62]** ("Chief Executive Officer John Luongo sold only 13% of his total number of shares and vested options over the course of a fifteen-month period. Under our precedent, this figure is not suspicious, and does not support a strong inference of fraud.") Given the fact that he retained the vast majority of his stock during the reckoning in 2008, it would be more reasonable to infer that his stock sales during the class period were simply in the normal, responsible course undertaken by any executive who receives stock as part of their compensation packages. [4]

Finally, I conclude that any inference of an intent to deceive is further undermined by the disclosures the company actually made. **[*63]** As noted earlier, the company's disclosures do not suggest cocky insouciance but rather a measured, cautious optimism. Had the executives intended to defraud, they would likely have used stronger language intended to convey more than mere cautious optimism. They would not, for example, have repeatedly warned about the possibility of an impairment charge, and they would not have performed *quarterly* impairment analyses on Geesink's goodwill. Rather than hiding anything, Oshkosh executives teed up the issue and flagged the question of an impairment so that investors could make their own judgments.

Along the same lines, it is important to recall that all of

---

[4] In addition, the amended complaint provides almost no context about the company's stock price during this period. Publicly available records show that Oshkosh was trading in the low 40's during February 2008, but it had been as high as 50 only six weeks earlier and higher than 60 in October 2007. (*See also* Dkt. 91, Ex. B.) It is unclear why Bohn would have selected February 2008 -- more than four months before the impairment was announced -- to exercise his options as part of an attempt to defraud investors.

Geesink's earnings numbers were disclosed, and there is no allegation that the Defendants fudged its numbers. That is, the principal allegation is simply that the Defendants failed to draw the requisite accounting *inference* from Geesink's numbers. As such, because the company actually provided all the underlying data required to make the accounting judgment in question, it is difficult to believe that the failure to take an impairment was part of some scheme to deceive. By disclosing that Geesink had lost more than $ 40 million during **[*64]** the class period, the Defendants can hardly be said to have been unjustifiably pumping the company up.

> As the public filings discussed above indicate, the evolving poor performance of Globalstar during 2000 was publicly disclosed. When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment. *See Thor Power Tool Co. v. Comm'r Internal Revenue, 439 U.S. 522, 544, 99 S. Ct. 773, 58 L. Ed. 2d 785 (1979)* (" 'Generally accepted accounting principles' . . . tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.") The failure to comply with standard accounting practices, without more, does not constitute circumstantial evidence of misconduct or recklessness. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999)* (quotations omitted). The plaintiffs have failed to allege sufficient facts to show that the failure to take an earlier impairment charge was so clearly required by accounting **[*65]** principles that the failure to take such a charge was fraudulent, particularly in view of the disclosures of the ongoing poor performance of Globalstar.

*In re Loral Space & Communications Ltd. Securities Litigation, 2004 U.S. Dist. LEXIS 3059, 2004 WL 376442, * 17* (some citations omitted).

Recall in fact that some analysts had begun peppering the executives with questions about an impairment throughout the class period (one asked when they should "throw in the towel"), and this demonstrates that the issue was clearly in the minds of investors and the media rather than being hidden away. The information required to make the accounting judgment was disclosed to investors, and in fact the company's disclosures highlighted the possibility of an impairment in the future. This undermines any notion that the Defendants were attempting to deceive investors by delaying recognizing an impairment to Geesink's goodwill. Had the executives wanted to deceive investors, the course they chose

-- full disclosure about Geesink's losses and repeated warnings that an impairment charge could ensue -- was certainly an odd one.

In sum, the competing inferences far outweigh any inference that the Defendants intended to commit fraud. Rather [*66] than attributing the course of events to fraud, it is far more reasonable to conclude that although the Geesink acquisition simply didn't work out, the Defendants maintained reasonable (if unrealized) hopes that success could eventually be achieved. These hopes, bolstered by occasional profits, justified a continued belief that Geesink's goodwill was sound. Along the way they couched these hopes in cautionary language and disclosed all of the information investors would have needed to judge the viability of Geesink's business.

## C. Other Allegations of Fraud

Although the failure to write down Geesink's goodwill is the centerpiece of the amended complaint, Plaintiffs also allege generally that the Defendants committed securities fraud by boasting about the company's prowess in integrating its acquisitions, such as Geesink and JLG. For example, during an October 16, 2006 conference call, Bohn stated that: "with our outstanding history of buying and integrating market-leading companies and creating significant shareholder value, we are extremely, extremely confident that our offer to purchase JLG in an all-cash deal will be another positive milestone in our company's history." (Am. Compl., [*67] P 312.) The company further stated in one of its 10-K filings that it had "successfully negotiated and integrated fourteen acquisitions since 1996." (Am. Compl., P 333.) Plaintiffs assert these statements are false because the company had not, in fact, successfully integrated its acquisitions, and its history of buying companies was not "outstanding." Confidential sources back up Plaintiffs' claims by suggesting that Oshkosh had overpaid for the acquisitions and had not adequately planned for their integrations.

As Defendants note, however, the company's statements suggesting that it was "successful" in integrating acquisitions are hardly actionable. First, as noted at length above, the fact that things did not work out in the long run does not mean that the company's claim of success in the short term was fraudulent. Second, the company's statements are simply expressions of confidence that reflect judgments about management's general ability to manage. Such statements cannot be fraudulent because they are matters of opinion incapable of being disproved. *Searls v. Glasser, 64 F.3d 1061, 1066-67 (7th Cir. 1995)*. For example, who is to say that, in 2006, when Geesink was earning a profit, [*68] the company had *not* successfully integrated its acquisitions? And because

such vague statements are unverifiable, they are also immaterial. It is difficult to imagine a putative investor making a decision based on a few stray expressions of competence from the company's CEO. "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Grossman v. Novell, Inc., 120 F.3d 1112, 1119-20 (10th Cir. 1997).* [5]

## D. Claims Against Deloitte & Touche

The amended complaint alleges that the fraud did not end with the company's executives. According [*69] to the Plaintiffs, Oshkosh's auditor, Deloitte & Touche, issued audit opinions regarding the company's financial statements but consistently disregarded the need to take an impairment charge for Geesink's goodwill. But as with their claims against the Oshkosh executives, the amended complaint fails to allege a plausible scenario of fraud and fails to allege *any* suggestion of scienter. Most notably, the argument that Geesink's goodwill needed to be written down earlier is simply based on the Plaintiffs' opinion about the reasonableness of that judgment. As Deloitte & Touche explains, however, the impairment analysis is highly subjective and is based on a number of factors, including the company's future prospects. Such factors were, of course, disclosed in the company's filings. The entire complaint is premised on the notion that Deloitte "knew" that an impairment to goodwill existed, but such a premise is simply untenable without some specific evidence that the impairment analysis was no longer a matter of judgment but was so obvious that fraud was involved.

In addition, there is no credible suggestion of scienter. As with the lengthy class period Plaintiffs propose, the number of defendants [*70] involved in the alleged fraud stretches credibility. Whenever a complaint's fraud allegation is based on a violation of GAAP, the Plaintiffs will be forced to assert (regardless of the evidence) that the third-party auditor was part of the scheme to deceive as well. That is not a happy place to be under the PSLRA. We know that the company's

---

[5] Defendants also raise the defense that their forward-looking statements were protected by the statutory safe harbor, *15 U.S.C. § 78u-5(c)(1)*, because they were accompanied by meaningful cautionary language. The briefs do not make clear which statements are at issue, however. In any event, because I conclude the statements are not fraudulent, I need not consider the issue of the statutory safe harbor.

executives had at least some financial incentive to prop up the share price for five years -- but what was in it for the auditor? All we are told is that Deloitte earned significant fees during the class period. But of course that would be true for any major accounting firm performing audit services. There has to be something extra, some additional whiff of purposeful deceit, to separate the GAAP claim against this auditor from the boilerplate, obligatory, allegations that would have to be made against *any* auditor in a case like this. Here, we are simply told that Deloitte participated in the fraud but not given any plausible reason why it would have done so. Auditors are people, and people generally do not engage in activities -- particularly fraudulent ones -- without some reason. Would Deloitte have been replaced as auditor if it failed to go [*71] along with the program? Were threats made? Were auditors' bonuses tied to maintaining good relations with Oshkosh management? Did Bohn imply that he needed cover from Deloitte for five years so he could sell thirteen percent of his stock at inflated prices? Without any plausible motive alleged, it is difficult to draw any inference of intent to deceive.

In addition, as noted above, the data underlying Deloitte's impairment analysis were also disclosed, allowing investors to see clearly when the company was making money and when it wasn't. As Deloitte & Touche notes, had the Defendants intended to deceive shareholders, it would have been "nonsensical" to conduct an impairment test fraudulently while at the same time disclosing accurate financial data and alerting shareholders about the very danger that ultimately ensued, namely, the impairment charge. If a real estate agent is trying to bamboozle a prospective buyer, he would not tell him the house is in great shape and then lead him on a detailed inspection to show off the faulty foundation, leaky roof and termite damage. That is simply not how one goes about committing fraud. The complaint must be dismissed against Deloitte & Touche [*72] for the same reasons it must be dismissed against the other Defendants. [6]

**E. Count Two**

The amended complaint also alleges a count based on market manipulation, in violation of *Rules 10b-5(a)* and *(c)*. "Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i)

deceive the investing public, including Lead Plaintiffs; (ii) artificially inflate the market price of Oshkosh's common stock; and (iii) cause Lead Plaintiffs to purchase Oshkosh's common stock at artificially inflated prices." (Am. Compl., P 570.) The substance of the scheme, according to the complaint, was

> the knowing and/or deliberately reckless suppression and concealment of information regarding the impairment of goodwill with respect to the Company's acquisition of Geesink and JLG, as well as material anticipated writedowns and other charges that rendered Defendants' [*73] statements regarding earnings guidance throughout the Class Period, each materially false and misleading when made. Defendants knowingly suppressed and concealed such information to distort the balance of facts available to Oshkosh's investors during the Class Period.

(Am. Compl., P 572.)

Defendants argue that this claim is inextricably intertwined with count one, and as such both must be dismissed for the reasons set forth above. Plaintiffs argue, however, that count two does not require the pleading of any affirmative fraudulent statements. Instead, all that is required is an allegation suggesting the "manipulation of financial results" to the detriment of the Plaintiff class. (Pltf. Br. at 73.)

"To state a claim under *Rule 10b-5(a)* and *(c)*, Plaintiffs must allege that each defendant (1) committed a deceptive or manipulative act (2) with scienter (3) that affected the market for securities, and further that Defendants' acts caused Plaintiffs' injuries." *Desai v. General Growth Properties, Inc., 654 F. Supp.2d 836, 862 (N.D. Ill. 2009)*. As discussed above, the story told in the amended complaint is not one of market manipulation or fraud. There can be no plausible inference of scienter [*74] (intent to deceive or manipulate) when the Defendants disclose accurate financial information and repeatedly highlight the possibility of an impairment charge. Plaintiffs' barebones argument to the contrary does not overcome the story told in the amended complaint and the reasonable inferences to be drawn therefrom. Accordingly, Defendants are correct that the count two must be dismissed for the same reasons as count one.

**F. Amendment**

Finally, Plaintiffs argue that if this Court accepts the Defendants' arguments, it should at least allow Plaintiffs to amend the complaint to cure any defects. The Seventh Circuit recently observed that a variety of factors are relevant when a district court decides whether to allow an amendment in a PSLRA case:

---

[6] Because there is no underlying fraud pled, the § 20 claim fails as well. *In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004)* ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.") (internal quotation marks omitted.)

It is true that there are some cases in which courts of appeals have found that it is best to use a dismissal without prejudice for a PSLRA complaint, given the demanding nature of PSLRA pleading standards. *See, e.g., Belizan v. Hershon, 434 F.3d 579, 583, 369 U.S. App. D.C. 160 (D.C. Cir. 2006)* (a PSLRA "complaint that omits certain essential facts and thus fails to state a claim warrants dismissal pursuant to *Rule 12(b)(6)* but not dismissal with prejudice"); *Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003)* [*75] (dismissal with prejudice in PSLRA suit is appropriate only where "it is clear on de novo review that the complaint could not be saved by amendment"). But by the same token, there are other cases in which courts of appeals have upheld dismissals with prejudice of securities complaints at a relatively early stage. *See, e.g., Pugh v. Tribune Co., 521 F.3d 686, 698 (7th Cir. 2008)* (dismissal of second amended complaint); *In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 390-91, 125 Fed. Appx. 490 (4th Cir. 2005); In re Alpharma, Inc. Sec. Litig., 372 F.3d 137, 153-54 (3d Cir. 2004)* (initial individual complaints folded into one consolidated complaint, which was then dismissed with prejudice without an opportunity to amend).

*Fannon v. Guidant Corp., 583 F.3d 995, 1002 (7th Cir. 2009).*

Defendants have cited case law holding that the PSLRA supercedes *Rule 15*'s otherwise generous provisions for amendments. The statute mandates that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements are not met." *15 U.S.C. § 78u-4(b)(3)(A)*. Some courts have interpreted this as requiring, or at least strongly urging, dismissal [*76] *with* prejudice even if the liberal standards of *Rule 15* might otherwise counsel in favor of allowing an amendment. *Miller v. Champion Enterprises Inc., 346 F.3d 660, 692 (6th Cir. 2003)* ("[W]e think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of *Rule 15(a) of the Federal Rules of Civil Procedure*.") This conclusion is based at least in part on the tremendous expense borne by Defendants in defending such lawsuits, as well as the fact that Plaintiffs usually have ample opportunity for investigation before they file their complaints. (Here, for example, they had multiple confidential witnesses, as well as countless statements from company officials. The docket also reflects the presence of roughly *fifteen* lawyers representing the Plaintiffs.) Given the fact that there is so much opportunity for investigation (and the fact that many Plaintiffs' law firms are experts in the ins and outs of the PSLRA), courts might be inclined to be less forgiving if the

first complaint is not up to par.

Other courts, however, have disagreed: "[i]nterpreting the PSLRA as constricting the operation of *Rule 15(a)* would [*77] be contrary to the purposes of the Act." *ACA Financial Guaranty Corp. v. Advest, Inc., 512 F.3d 46, 56 (1st Cir. 2008)*. Given the fact that the Seventh Circuit's recent guidance on amendments in PSLRA cases failed to mention any additional disfavor of amendments in PSLRA cases, I am reluctant to conclude that the PSLRA trumps the typical considerations involved in a Rule 15 analysis. Even so, however, I am satisfied that an amendment should not be allowed in this case because an amendment would be futile. As noted at length above, this was not a case where the Plaintiffs left something significant out of their pleadings whose inclusion could be expected to cure the defects identified. If facts or allegations were left out, it was not due to oversight or an inability to investigate but because the documents or statements simply did not exist. More importantly, this was a complaint whose own allegations undercut the very conclusions Plaintiffs ask us to draw. It is simply not plausible to infer that any of the Defendants intended to defraud anyone given the true and extensive financial data they did disclose and the consistent red flags they issued about a potential impairment to goodwill. [*78] As such, it is difficult to imagine Plaintiffs adding anything to the 192-page complaint to nullify the implausibility of that inference. Accordingly, there is little reason to allow another round of pleadings and extensive briefing. The amended complaint will therefore be dismissed *with* prejudice.

### III. Conclusion

For the reasons given above, the motions to dismiss are **GRANTED** and the amended complaint is **DISMISSED** with prejudice.

**SO ORDERED** this 30th day of March, 2010.

/s/ William C. Griesbach

William C. Griesbach

United States District Judge

End of Document

# Tab G



# *Neil v. Zell*

United States District Court for the Northern District of Illinois, Eastern Division

December 17, 2009, Decided; December 17, 2009, Filed

No. 08 C 6833

**Reporter**

2009 U.S. Dist. LEXIS 117735 *; 48 Employee Benefits Cas. (BNA) 1462

DAN NEIL, CORIE BROWN, HENRY WEINSTEIN, WALTER ROCHE, JR., MYRON LEVIN and JULIE MAKINEN, individuals, on behalf of themselves and on behalf of all others similarly situated, Plaintiffs, v. SAMUEL ZELL; GREATBANC TRUST COMPANY, a Delaware corporation; EGI-TRB, L.L.C., a Delaware corporation; TRIBUNE COMPANY EMPLOYEE BENEFITS COMMITTEE, GERALD AGEMA, HARRY AMSDEN, CHANDLER BIGELOW, MICHAEL BOURGON, DONALD GRENESKO, JAMES KING, LUIS E. LEWIN, RUTHELLYN MUSIL, SUSAN O'CONNOR, JOHN POELKING, NAOMI SACHS, IRENE SEWELL, GARY WEITMAN, JEFFREY S. BERG, BRIAN L. GREENSPUN, BETSY D. HOLDEN, WILLIAM A. OSBORN, WILLIAM PATE, MARY AGNES WILDEROTTER, MARK SHAPIRO, FRANK WOOD, DENNIS J. FITZSIMONS, Defendants.

**Subsequent History:** Motion granted by, in part, Complaint dismissed at, in part *Neil v. Zell, 677 F. Supp. 2d 1010, 2010 U.S. Dist. LEXIS 22673 (N.D. Ill., 2010)*

Reconsideration denied by *Neil v. Zell, 2011 U.S. Dist. LEXIS 23235 (N.D. Ill., Mar. 8, 2011)*

## Core Terms

Tribune, fiduciary, shares, stock, Plaintiffs', merger, Company's, fiduciary duty, voting, fiduciary breach, prohibited transaction, stock purchase, breached, indirect, adequate consideration, member of the board, per share, allegations, securities, Trusts, participated, Rights, motion to dismiss, regulation, themselves, decisions, purchases, agreeing, company stock, qualifying

## Case Summary

### Procedural Posture

Plaintiffs, employees who participated in an employee stock

option plan (ESOP), sued defendants, the ESOP trustee, committee members that oversaw the ESOP, and the company's board of directors and its CEO, alleging breach of fiduciary duty and engaging in prohibited transactions under the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.* Defendants moved to dismiss the complaint. The employees contested the motion.

### Overview

The claim arose out of a transaction, whereby a company was converted from a publicly traded entity to a private company owned by the ESOP. The company was unable to pay the new debt acquired to finance the deal, and went bankrupt. The transaction, which was a leveraged ESOP, was developed by the person who became the company's CEO. In dismissing most of the employees' breach of fiduciary claims, the court found that the ESOP trustee was an ERISA fiduciary, and that the employees adequately stated a breach of the fiduciary duty of prudence based on the trustee's engaging in the overall restructuring transaction. The court further found that the CEO was not an ERISA fiduciary based on his activity of proposing the restructuring transaction as an ESOP, but that the employees stated a claim against the CEO and a related entity for their knowing participation in a breach of fiduciary under ERISA. However, the members of the company's board of directors and the members of an employee benefits committee were not fiduciaries. The court also found that the employees sufficiently stated prohibited transactions claims, except as to a claim based on a voting agreement with certain trusts.

### Outcome

The court dismissed the breach of fiduciary claim, except for the claims against the ESOP trustee and the claim of knowing participation in a fiduciary breach against the CEO and a related entity. The court dismissed the prohibited transactions claims except for the claims as to direct and indirect purchases of company stock and an investor rights agreement, and the claim that the CEO and the related entity participated in an ERISA violation.

**Counsel: [*1]** For Dan Neil, individuals, on behalf of

themselves and on behalf of all others similarly situated, Myron Levin, individuals, on behalf of themselves and on behalf of all others similarly situated, Walter Roche, Jr., individuals, on behalf of themselves and on behalf of all others similarly situated, Henry Weinstein, individuals, on behalf of themselves and on behalf of all others similarly situated, Corie Brown, individuals, on behalf of themselves and on behalf of all others similarly situated, Plaintiffs: Daniel M. Feinberg, LEAD ATTORNEY, PRO HAC VICE, Lewis, Feinberg, Renaker & Jackson, PC, Oakland, CA; Gerald S Ohn, LEAD ATTORNEY, Cotchett Pitre and McCarthy, Burlingame, CA; Joseph W Cotchett, LEAD ATTORNEY, Cotchett, Illston & Pitre, Burlingame, CA; Laura Schlichtmann, LEAD ATTORNEY, Cotchett, Pitre & McCarthy, Burlingame, CA; Philip L Gregory, LEAD ATTORNEY, PRO HAC VICE, Cotchett Pitre Simon and McCarthy, Burlingame, CA; Todd F Jackson, LEAD ATTORNEY, PRO HAC VICE, Lewis Feinberg Lee Renaker and Jackson PC, Oakland, CA; Angelica Jongco, PRO HAC VICE, Lewis, Feinberg, Lee, Renaker & Jackson, Oakland, CA; Hina E Sodha, Michael M. Mulder, Thomas R. Meites, Meites, Mulder, Mollica [*2] & Glink, Chicago, IL; Nina Wasow, PRO HAC VICE, Lewis, Feinberg, Lee, Renaker & Jackson, P.C., Oakland, CA; Paul William Mollica, Meites, Mulder, Burger & Mollica, Chicago, IL.

For Jack Nelson, individuals, on behalf of themselves and on behalf of all others similarly situated, Plaintiff: Daniel M. Feinberg, LEAD ATTORNEY, PRO HAC VICE, Lewis, Feinberg, Renaker & Jackson, PC, Oakland, CA; Gerald S Ohn, LEAD ATTORNEY, Cotchett Pitre and McCarthy, Burlingame, CA; Joseph W Cotchett, LEAD ATTORNEY, Cotchett, Illston & Pitre, Burlingame, CA; Laura Schlichtmann, LEAD ATTORNEY, Cotchett, Pitre & McCarthy, Burlingame, CA; Philip L Gregory, LEAD ATTORNEY, PRO HAC VICE, Cotchett Pitre Simon and McCarthy, Burlingame, CA; Todd F Jackson, LEAD ATTORNEY, PRO HAC VICE, Lewis Feinberg Lee Renaker and Jackson PC, Oakland, CA; Hina E Sodha, Michael M. Mulder, Thomas R. Meites, Meites, Mulder, Mollica & Glink, Chicago, IL; Nina Wasow, PRO HAC VICE, Lewis, Feinberg, Lee, Renaker & Jackson, P.C., Oakland, CA; Paul William Mollica, Meites, Mulder, Burger & Mollica, Chicago, IL.

For Shareholder Daniel M. Feinberg, Nina R Wasow, Plaintiffs: Hina E Sodha, Meites, Mulder, Mollica & Glink, Chicago, IL.

Todd F Jackson, [*3] Plaintiff, Pro se, Oakland, CA.

Angelica Jongco, Plaintiff, Pro se, Oakland, CA.

For Julie Makinen, individuals, on behalf of themselves and on behalf of all others similarly situated, Plaintiff: Daniel M.

Feinberg, Lewis, Feinberg, Renaker & Jackson, PC, Oakland, CA; Paul William Mollica, Meites, Mulder, Burger & Mollica, Chicago, IL.

For Samuel Zell, Dennis J. Fitzsimons, Frank Woods, Mary Agnes Wilderotter, William Pate, Brian L. Greenspun, Jeffrey S. Berg, William A. Osborn, Betsy D. Holden, Tribune Company Employee Benefits Committee, Greatbanc Trust Company, a Delaware corporation, Defendants: David J. Bradford, LEAD ATTORNEY, PRO HAC VICE, Craig Christopher Martin, LEAD ATTORNEY, Amy Danielle Wills, Barry Levenstam, Douglas Allen Sondgeroth, Jenner & Block LLP, Chicago, IL.

For Tribune Company, a Delaware corporation, Tribune Employee Stock Ownership Plan, Defendants: David J. Bradford, LEAD ATTORNEY, PRO HAC VICE, Craig Christopher Martin, LEAD ATTORNEY, Jenner & Block LLP, Chicago, IL.

For EGI-TRB, LLC, a Delaware corporation, Defendant: David J. Bradford, LEAD ATTORNEY, PRO HAC VICE, Amy Danielle Wills, Barry Levenstam, Douglas Allen Sondgeroth, Jenner & [*4] Block LLP, Chicago, IL.

For Gerald W Agema, Defendant: Craig Christopher Martin, Jenner & Block LLP, Chicago, IL.

For Harry Amsden, Mark Shapiro, Gary Weitman, Irene Sewell, Naomi Sachs, John Poelking, Susan O'Connor, Ruthellyn Musil, Luis Lewin, James King, Gerald Agema, Donald Grenesko, Michael Bourgon, Chandler Bigelow, Defendants: David J. Bradford, LEAD ATTORNEY, Amy Danielle Wills, Barry Levenstam, Craig Christopher Martin, Douglas Allen Sondgeroth, Jenner & Block LLP, Chicago, IL.

**Judges:** REBECCA R. PALLMEYER, United States District Judge.

**Opinion by:** REBECCA R. PALLMEYER

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiffs are six current and former employees of Tribune Company who participated in the company's Employee Stock Option Plan ("ESOP"), which was created in 2007 as part of a deal that converted Tribune Company from a publicly traded company to a private company wholly owned by the ESOP. They seek to represent a class of participants in the ESOP. Defendants include GreatBanc, the trustee of the ESOP; members of the committee that oversaw the ESOP; members of Tribune Company's Board of Directors; and Samuel Zell.

Zell was instrumental in structuring the going-private deal, which made him the CEO of Tribune **[*5]** Company after the deal was completed in December 2007. Tribune took on $ 8.3 billion in new debt to finance the deal but was unable to repay that debt when profits declined, and the company is now in bankruptcy.

In Claim One, Plaintiffs allege that, by carrying out the transaction, Defendants violated their fiduciary duties under the Employee Retirement and Income Security Act ("ERISA"), *29 U.S.C. § 1001 et seq.* Among other allegations, Plaintiffs allege that the deal was imprudent because of the great amount of debt Tribune took on. In Claim Two, Plaintiffs allege that several parts of the deal were prohibited transactions under ERISA. They allege that the ESOP paid too much for its shares of Tribune Company, that the purchase was improper because those shares were not immediately marketable, that Tribune Company paid too much for the shares it bought to take the company private, that it was improper for the ESOP to bargain away its voting rights to Zell, and that a voting agreement with the Company's biggest shareholder was impermissible. Defendants have moved to dismiss both counts. For the reasons that follow, Defendants' motion is granted in part and denied in part. Claim One is **[*6]** dismissed, except for the claim of fiduciary breach against Defendant GreatBanc and the claim of knowing participation in a fiduciary breach against Defendants Zell and EGI-TRB. Claim Two is dismissed as well, except for the claims that GreatBanc breached its fiduciary duty by agreeing to the direct and indirect purchases of Tribune stock and by agreeing to the Investor Rights Agreement and the claim that Zell and EGI-TRB knowingly participated in an ERISA violation.

## FACTUAL BACKGROUND

On June 10, 1847, the Chicago Tribune printed its first edition on a hand press in a run of 400 copies. TRIBUNE COMPANY:: HISTORY, *http://www.tribune.com/about/history.html* (last visited Dec. 7, 2009). By 2006, Tribune Company was a publicly traded company worth billions that owned, among other assets, 10 daily newspapers, 25 television stations, more than 50 websites, significant real estate holdings, and, most importantly to some readers, the Chicago Cubs. (Compl. P 59.) As the media industry reacted to the rise of the internet, profits at Tribune and its competitors declined and shareholders began to agitate for change. Katharine Q. Seelye, *Tribune to Consider Selling Some Media Assets,* N.Y. TIMES, **[*7]** Sept. 22, 2006, at C1. In response, in September 2006, Tribune created a special committee of its Board of Directors to consider structural changes to the company,

including a sale of some or all of its assets. *Id.;* (Compl. P 60.) Over the next six months, the Board and the Committee considered several options, including various plans to sell the company; a plan to spin-off the Broadcasting and Entertainment Group; and an ESOP transaction, proposed by Samuel Zell, that would take the company private and make the employees the owners. (Compl. PP 62, 65, 75.)

An ESOP is "a type of pension plan intended to encourage employers to make their employees stockholders." *Steinman v. Hicks, 352 F.3d 1101, 1103 (7th Cir. 2003).* Congress has encouraged the creation of ESOPs by "giving tax breaks and by waiving the duty ordinarily imposed on trustees by modern trust law . . . to diversify the assets of a pension plan." *Id.* Significantly, Congress intended ESOPs to serve dual purposes, as both "an employee retirement benefit plan and a technique of corporate finance that would encourage employee ownership." *Martin v. Feilen, 965 F.2d 660, 664 (8th Cir. 1992)* (internal quotation omitted). Employees **[*8]** may be involved in the decision to create an ESOP, but, because the ESOP is a technique of corporate finance and because of the generally voluntary nature of the system governed by ERISA, no such employee input is required. *See* Michael W. Melton, *Demythologizing ESOPs, 45 TAX L. REV. 363, 381 n.86 (1991).* Employee ownership does not require direct employee control; instead, control can be given to the plan's fiduciary, who must manage the plan prudently under *ERISA § 404, 29 U.S.C. § 1104.* In February 2007, because it was considering Zell's ESOP plan, Tribune Company hired GreatBanc to serve as trustee of the possible ESOP. (Compl. PP 43, 69.) Presumably, Tribune intended to avoid a conflict between its own interests and that of its employees, who would become owners of the company if the deal went through.

After considering the options, Tribune decided on Zell's ESOP deal. (*Id.* P 75.) The deal involved several parts, all of which were formally agreed to on April 1, 2007. First, the ESOP Trust was established effective February 7, 2007, and the ESOP Plan was established with an effective date of January 1, 2007. (Defs' Ex. 15, at 1, Ex. 20, at 1.) The document establishing the Plan **[*9]** states that the Company's Board of Directors is responsible for appointing the Plan's trustee as well as the members of the committee responsible for administering the Plan. (Defs' Ex. 20, at 1-2.) That committee, the Employee Benefits Committee ("EBC"), was given discretion to authorize the trustee to act without the committee's direction with regard to "any matter concerning the purchase, sale, or voting of Company Stock, including the financing and other matters incidental to such purchase or sale." (*Id.* at 53.)

Second, the ESOP bought 8,928,571 newly issued shares of

Tribune Company's common stock from Tribune Company at $ 28 per share. (Compl. P 89.) The ESOP paid for the purchase with a promissory note in the principal amount of $ 250 million to be paid to Tribune Company over 30 years. (*Id.*) Thus, the transaction created a leveraged ESOP in which "[t]he loan, including interest, is repaid by the trustee from the cash contributions of the employer." Dan M. McGill & Donald S. Grubbs, Jr., FUNDAMENTALS OF PRIVATE PENSIONS at 678 (6th ed.1989). Those cash contributions were made possible by Tribune's elimination of matching contributions to the Company's 401(k) Plan. (Compl. P 109, **[*10]** 114.) As a condition of the stock purchase, the ESOP was prohibited from reselling its shares. (*Id.* P 90.) As required by the purchase agreement, GreatBanc obtained an analysis of the deal from an outside consulting firm. That analysis, set forth in a letter by the consultant, Duff & Phelps, LLC, concluded that "the terms and conditions of the Proposed Transaction are fair and reasonable to the ESOP from a financial point of view." (Defs' Ex. 25, at 7.)

Third, EGI-TRB, an entity controlled by Zell, invested $ 250 million in Tribune Company in exchange for 1,470,588 shares of Tribune Company's common stock and a promissory note from the Company in the principal amount of $ 200 million, which the Company repaid after the merger. (Compl. PP 44, 91.) The difference between EGI-TRB's investment and the principal of the promissory note, $ 50 million, represents a share price of $ 34 per share. Also in exchange for EGI-TRB's investment, the parties agreed to the Investor Rights Agreement, which gave Zell and EGI-TRB rights of corporate governance following the merger. (*Id.* P 78, 93.) That is, although the ESOP would have complete ownership of the Company, Zell would have the power to manage **[*11]** it under the Investor Rights Agreement, which requires the ESOP to vote its shares in favor of Zell and two directors of his choosing. (*Id.* P 169.) As part of the Agreement, Zell was appointed to the Tribune Board on May 9, 2007. (*Id.* P 95.) In another agreement, the Chandler Trusts, Tribune Company's then-largest shareholders, agreed to vote their shares in favor of the deal. (*Id.* P 92.) Tribune Company filed a shelf-registration statement as part of the agreement with the Chandler Trusts. [1] Presumably, the statement allowed the Trusts' later sale of their shares, but Plaintiffs have not explained in detail how the Trusts benefitted from the agreement. (*Id.*)

On April 25, 2007, after the ESOP and EGI-TRB acquired their shares, the Tribune Company began a tender offer to repurchase 126 million shares of publicly **[*12]** traded stock at $ 34 per share. (Compl. P 94.) That price represented a premium over the trading value of Tribune Company; the stock closed at $ 32.78 on April 25. The offer expired on May 24, 2007, and on June 4, 2007, those 126 million shares were retired. (*Id.*) In all, the tender offer cost Tribune Company $ 4.284 billion, financed by new debt. (*Id.* PP 104-105.) As a result of the tender offer Tribune Company, the ESOP, and EGI-TRB together controlled more than 50% of the Tribune's shares. (*Id.* P 97.)

The final aspect of the transaction challenged in this lawsuit was the Merger Agreement, also entered into on April 1, 2007. Pursuant to that Agreement, the ESOP merged with Tribune Company on December 20, 2007. (Compl. P 97.) As part of the merger, Tribune borrowed yet another $ 4 billion to retire, at $ 34 per share, the 118 million shares of common stock remaining after the tender offer that were not owned by the Company or by the ESOP. (*Id.* P 97; Def's Ex. 18, at 47.) After the merger, the Company became wholly owned by the ESOP, and was able to convert from a C-corporation to an S-corporation, thereby avoiding most corporate taxes. [2] (Compl. PP 80, 97, 99.) In addition to paying **[*13]** EGI-TRB for the shares EGI-TRB had acquired on April 1, Tribune repaid the $ 200 million promissory note it had given EGI-TRB, with interest. (*Id.* P 98.) Also as part of the merger, Zell loaned the company another $ 225 million and paid $ 90 million for a warrant allowing him, after ten years, to purchase 40% of the company for $ 500 million. (Compl. P 102.) After the merger, Tribune's total outstanding debt--before borrowing to complete the merger, the company already owed billions--was $ 12.8 billion.

Conditions did not improve at Tribune following the merger: sales and revenues declined, thousands of jobs were cut, and Tribune had difficulty meeting its debt obligations. (Compl. PP 115-126.) Plaintiffs filed this lawsuit in September 2008, just three months before Tribune filed for **[*14]** Chapter Eleven bankruptcy. (*Id.* P 127.) In Claim One, Plaintiffs allege that all Defendants, except EGI-TRB, acted as fiduciaries of the ESOP, and violated their fiduciary duties. In Claim Two, Plaintiffs allege that several pieces of the deal were prohibited transactions under ERISA. Defendants have moved to dismiss both claims.

---

[1] A shelf-registration statement allows securities to "be registered for an offering to be made on a continuous or delayed basis in the future." *17 C.F.R. § 230.415.* The securities are, in other words, figuratively placed on a shelf and can be taken down and sold at a later time. *See generally* 1 Thomas Lee Hazen, TREATISE ON THE LAW OF SECURITIES REGULATION § 3.11 (6th ed. 2009).

[2] For a C-corporation, "profits are taxed at the corporate level and then shareholders recognize income subject to taxation when they receive distributions of the net corporate profits as dividends." *Colo. Gas Compression, Inc. v. CIR, 366 F.3d 863, 865 (10th Cir. 2004).* For an S-corporation, though, profits and losses are "passed through to the shareholders without taxation at the corporate level." *Id.*

## ANALYSIS

Under *Federal Rule of Civil Procedure 8(a)(2)*, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Detailed factual allegations are not required, but the plaintiff must provide enough facts "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. The plaintiff must present "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.; see also Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*; *Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009)*. As explained below, Defendants urge that Plaintiffs' 53-page complaint fails this test.

### A. Breach of Fiduciary Duty

Plaintiffs' first claim is that all Defendants, except EGI-TRB, were fiduciaries of the ESOP at some time, and that all of them **[*15]** breached their fiduciary duties either by agreeing to the deal, by failing to stop it, or by failing to remedy the damage caused by the deal. (Compl. PP 146-59.) Defendants move to dismiss this claim, arguing that the only Defendant who had a fiduciary duty to Plaintiffs was GreatBanc, and that Plaintiffs have not alleged facts that, if proven, would show that GreatBanc breached that duty.

To be an ERISA fiduciary, a party must be named as a fiduciary in the plan or meet ERISA'S functional definition:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*ERISA § 3(21)*, *29 U.S.C. § 1002(21)*. The court considers below whether each group of Defendants qualifies under this definition, and, **[*16]** if so, whether Plaintiffs have stated a claim for breach of fiduciary duty under *ERISA §§ 409*, *502(a)(2)*, *29 U.S.C. §§ 1109*, *1132(a)(2)*.

### i. GreatBanc

GreatBanc is named as the ESOP's fiduciary in the plan

documents, so there is no dispute that it had a fiduciary duty to the ESOP. Defendants argue, however, that Plaintiffs' allegations and certain documents that the court may consider demonstrate that GreatBanc did not violate its fiduciary duty. (Defs' Br. at 25.) The statute describes the scope of the duty owed by an ERISA fiduciary in broad terms: the fiduciary is expected to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), *29 U.S.C. § 1104(a)(1)(B)*. Case law imposes on an ESOP fiduciary a still more demanding duty of prudence than a typical ERISA fiduciary because an ESOP holds employer stock only, making diversification impossible. *Armstrong v. LaSalle Bank Nat'l Ass'n, 446 F.3d 728, 732 (7th Cir. 2006)*.

Defendants assert that GreatBanc acted prudently, as a matter of **[*17]** law, because the ESOP paid $ 28 per share, which Plaintiffs do not dispute was lower than the market price. (Defs' Br. at 25-26.) In support of this assertion, Defendants cite case law holding that, under *ERISA § 408(e)*, *29 U.S.C. § 1108(e)*, an ESOP is not presumptively prohibited from buying company stock so long as it pays less than the market price. *See In re Radioshack Corp. ERISA Litig., 547 F. Supp. 2d 606, 617 (N.D. Tex. 2008)*; *In re Coca-Cola Enterprises Inc. ERISA Litig., No. 1:06-CV-0953, 2007 U.S. Dist. LEXIS 44991, 2007 WL 1810211, at *17 (N.D. Ga. 2007)*. That proposition--that purchases of company stock at a below-market price is not *per se* improper--is all that the cases Defendants cite stand for, however. Defendants cite no cases holding, as a matter of law, that a purchase of employer stock at below market rate is always a prudent decision. In fact, two circuit courts have held to the contrary, observing that an ESOP transaction that satisfies the exceptions of § 408(e) is not automatically a prudent transaction under § 404. *Chao v. Hall Holding Co., Inc., 285 F.3d 415, 425 (6th Cir. 2002)*; *Martin v. Feilen, 965 F.2d 660, 665 (8th Cir. 1992)*. [3] This

---

[3] Both courts relied on rules proposed by the Department of Labor, which explain that the "applicability of section 408(e) to a transaction does not relieve a fiduciary with respect to the plan from the general fiduciary responsibility provisions of section 404 of the Act, [*29 U.S.C. § 1104*]." *Rules and Regulations for Fiduciary Responsibility, Proposed Regulation Relating to the Statutory Exemption for Certain Acquisitions, Sales, or Leases of Property, 44 Fed. Reg. 50367, 50369* (proposed Aug. 28, 1979). "Thus, while a plan may be able to acquire qualifying employer securities under the provisions of section 408(e) and this regulation, if the acquisition were not prudent (because, for example, of the poor financial condition of the employer), the appropriate plan fiduciaries would remain liable for any loss resulting from a breach of fiduciary responsibility." *Id. at 50369 n.13*.

court concludes that the fact that GreatBanc [**18**] purchased shares at $ 28 per share does not automatically insulate it from liability for fiduciary breach.

Defendants next argue that Plaintiffs' allegations, together with documents attached to the motion to dismiss, show that GreatBanc did meet its fiduciary obligations. (Defs' Br. at 28.) Those documents are [**19**] opinion letters from a firm employed by GreatBanc, which supposedly show that the deal was a prudent one. (Defs' Exs. 23-25.) Even assuming that the court can properly consider those letters at this stage of the case, *see generally Hecker v. Deere & Co., 556 F.3d 575, 582-83 (7th Cir. 2009)*, the letters are not enough to support a motion to dismiss. As the Fifth Circuit has explained in a widely quoted formulation, "An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Donovan v. Cunningham, 716 F.2d 1455, 1474 (5th Cir. 1983)*. Moreover, the court is reluctant to rely on opinion letters absent discovery regarding the analysis that supports the conclusions stated in them.

Defendants next argue that even if Plaintiffs' claim against GreatBanc does not fail as a matter of law, it must be dismissed because Plaintiffs' complaint fails to allege sufficient facts to raise a right to relief above the speculative level. Plaintiffs' allegations include, among others, that the deal saddled Tribune with so much debt that the company was very unlikely to succeed, that GreatBanc failed to ensure [**20**] the expert advice it sought was reasonable, and that GreatBanc failed to conduct its own thorough review of the deal. (Compl. P 110-11, 151.) Defendants impugn these allegations as "wild shots at GreatBanc's work." (Defs' Reply Br. at 19.) The court finds that they are not so wild that the claim must be dismissed. In particular, Plaintiffs' allegations raise serious questions regarding whether GreatBanc adequately considered the risk created by the great amount of debt Tribune would take on in the deal. *Armstrong, 446 F.3d at 733 (7th Cir. 2006)* (ESOP fiduciary must consider obvious risk of liquidity problem caused by taking on great amount of debt); *Steinman v. Hicks, 352 F.3d 1101, 1106 (7th Cir. 2003)* (discussing hypothetical case where ESOP fiduciary would be imprudent by failing to adequately respond to a very high debt-equity ratio). Thus, on the issue of GreatBanc's prudence in agreeing to the deal, the court is satisfied that Plaintiffs have pleaded sufficient facts to nudge their claim "across the line from conceivable to plausible." *Twombly, 550 U.S. at 570*. Accordingly, Defendants' motion is denied on the issue of GreatBanc's prudence in agreeing to the deal.

Plaintiffs also [**21**] argue that their claim against GreatBanc includes a claim for fiduciary breach committed during the time between Step One, the agreement to the deal in April 2007, and Step Two, the consummation of the merger in December 2007. (Pls' Br. at 7-8.) In addition to the allegations of imprudence they attach to the original agreement to the deal, Plaintiffs also point to Tribune Company's declining fiscal health between Steps One and Two, and allege that GreatBanc's failure to blow the whistle at that time was a fiduciary breach. (Compl. PP 84-85.) Defendants argue that Plaintiffs have pleaded themselves out of court on this issue by alleging the following: "Although the Step Two Purchase Transaction closed in December 2007, the ESOP's fiduciaries committed to Step Two at the time of the Step One Purchase Transaction in April 2007." (Compl. P 88.) Plaintiffs' language can be read to mean that all relevant decisions were made by April 2007, but the court believes that Defendants read too much into the word "committed." In their brief in opposition to the motion, Plaintiffs suggest that even though GreatBanc committed to the deal in April 2007, it might have withdrawn its commitment by exercising [**22**] the Merger Agreement's Company Material Adverse Effect clause. (Pls' Br. at 21-22.) This suggestion is arguably vague: Plaintiffs do not explain what the grounds would be for such an exercise. Plaintiffs also point out, however, that GreatBanc could have stopped the merger by orchestrating a shareholder vote against the deal. (*Id.* at 21.) Thus, Plaintiffs' claim that GreatBanc acted imprudently extends to the time between the agreement in April 2007 and the merger itself in December 2007.

## ii. Sam Zell and EGI-TRB

Defendants assert that Zell cannot be liable for any breach of fiduciary duty because he could not have been a fiduciary before April 1, 2007, when the deal was made. (Defs' Br. at 20-21.) Before that time, argue Defendants, Zell could not have had responsibility for the ESOP because he was negotiating adversely to it; that is, Zell was on the other side of the table. Plaintiffs respond that Zell functioned as a fiduciary even before the deal was made in that he dictated the terms of the deal. (Pls' Br. at 23.) Plaintiffs note that a person may become a plan fiduciary by exercising control over a fiduciary function. *E.g. Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc., 793 F.2d 1456, 1460 (5th Cir. 1986)* [**23**] (parties that lacked authority under plan's terms could still be found to be fiduciaries if they exercised such control over the plan's trustees so as to cause the trustees to "relinquish their independent discretion").

Whether a person is a fiduciary is indeed determined by a functional test, but proposing a deal that a plan fiduciary adopts is a far cry from exercising control over the fiduciary's decision. Plaintiffs rely on a case from the Eighth Circuit holding that accountants hired by an ESOP had fiduciary

responsibilities to the plan because "they recommended transactions, structured deals, and provided investment advice to such an extent that they exercised effective control over the ESOP's assets." *Martin v. Feilen, 965 F.2d 660, 669 (8th Cir. 1992)*. That case is distinguishable, though, because Zell was not *working* for the ESOP, he was *negotiating* with it. *See also Keach v. U.S. Trust Co., N.A., 234 F. Supp. 2d 872, 882-83 (C.D. Ill. 2002)* (members of company's board and executive committee who "exercised control over the structure and orchestration of the ESOP transaction" were fiduciaries of the ESOP), *aff'd, 419 F.3d 626 (7th Cir. 2005)*. The accountants in *Martin* were **[*24]** insiders who captured control of the ESOP. So were the board members in *Keach.* Plaintiffs here do not allege that Zell, an outsider, exercised any kind of control over the ESOP before it agreed to his proposal.

If merely proposing a deal to an ESOP were sufficient to create a fiduciary duty, then *anyone* proposing a deal to an ESOP would have the same conflict of interest that Plaintiffs attempt to pin on Zell. (Pls' Br. at 24.) In short, adopting Plaintiffs' argument would make it impossible for anyone to negotiate a transaction with an ESOP for fear that it might be deemed unfavorable to the plan beneficiaries. The court concludes that Zell was not a fiduciary before April 1, 2007. Plaintiffs' argument that Zell became a fiduciary after he became a Tribune Board member on May 9, 2007, is considered in the next section.

Although Plaintiffs do not allege that EGI-TRB was a fiduciary of the ESOP, (Compl. P 44), they allege that it and Zell are liable for knowing participation in fiduciary breaches. (*Id.* P 173). That non-fiduciaries can be liable as knowing participants in fiduciary breaches under *ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3)*, follows from the Supreme Court's opinion in *Harris Trust & Savings Bank v. Salomon Smith Barney, 530 U.S. 238, 120 S. Ct. 2180, 147 L. Ed. 2d 187 (2000)* **[*25]** (where plan allegedly engaged in prohibited transaction with nonfiduciary party in interest, § 502(a)(3) allowed a suit against the party in interest for knowing participation in a prohibited transaction). Defendants argue that the rule of *Harris Trust* applies only to parties in interest, but their argument is belied by the language of § 502(a)(3), which allows an action "by a participant . . . to enjoin any act or practice which violates any provision" of ERISA. As the Court explained in *Harris Trust,* § 502(a)(3) "admits of no limit . . . on the universe of possible defendants." *Harris Trust, 530 U.S. at 246; see also Daniels v. Bursey, 313 F. Supp. 2d 790, 808 (N.D. Ill. 2004)* (to state a claim under § 502(a)(3), "the plaintiff must allege only that a fiduciary violated a substantive provision of ERISA and the nonfiduciary knowingly participated in the conduct that constituted the violation").

Although § 502(a)(3) does not limit the class of defendants, it does limit the type of available relief to "appropriate equitable relief." *Sereboff v. Mid Atlantic Med. Servs., Inc., 547 U.S. 356, 126 S. Ct. 1869, 164 L. Ed. 2d 612 (2006); Harris Trust, 530 U.S. at 249-51*. Typical equitable relief against a party that knowingly **[*26]** participates in a fiduciary breach would be an order requiring the party to return whatever plan assets it obtained in the transaction. *E.g. Landwehr v. DuPree, 72 F.3d 726 (9th Cir. 1995)*. Here, though, the only entity that directly obtained any plan assets is Tribune Company, which is not a party. Thus, whatever equitable relief may be available against Zell and EGI-TRB is more complicated. The court need not resolve the difficulty of determining appropriate relief at this stage, however. Plaintiffs have stated a claim against Zell and EGI-TRB for knowingly participating in a fiduciary breach.

### iii. Members of the Board of Directors

Three Defendants--Betsy Holden, William Osborn, and Dennis FitzSimons--were members of the Board of Directors on April 1, 2007, when the deal was made; Zell joined the board after the deal was made but before the merger; and six--Jeffrey Berg, Brian Greenspun, Mary Wilderotter, William Pate and Frank Wood--joined the board after the merger. Defendants argue that members of the Board had no fiduciary responsibility to the Plan because they had no control over GreatBanc's decision, as the ESOP's fiduciary, to enter into the deal. (Defs' Br., at 21-22.) The **[*27]** Board decided to create the ESOP and decided, on behalf of Tribune Company, to do the deal, but Defendants argue that those decisions were outside of ERISA's scope. (*Id.* at 15-16.) Generally speaking, the act of creating a plan and decisions leading up to that act are not fiduciary acts. *Pegram v. Herdrich, 530 U.S. 211, 226-27, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000); Akers v. Palmer, 71 F.3d 226 (6th Cir. 1995)* ("the decision to create an ESOP and fund it with newly-issued stock is a settlor function"). Neither are business decisions, even when they affect a plan's financial health. *Ames v. Am. Nat'l Can Co., 170 F.3d 751, 757 (7th Cir. 1999); Sengpiel v. B.F. Goodrich Co., 156 F.3d 660, 665 (6th Cir. 1998)*.

Plaintiffs do not argue that the Directors exercised a fiduciary function by establishing the ESOP; they argue instead that the Directors exercised a fiduciary function when they agreed to the complicated transaction by which the ESOP became the sole owner of Tribune because entering into that transaction implemented the Directors' decision to establish the ESOP. (Pls' Br., at 13-14.) Courts have held that ERISA's restrictions apply to the implementation of certain decisions that are themselves beyond ERISA's **[*28]** scope. *Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 295-96 (5th Cir. 2000)* (decision to terminate plan not covered by ERISA, but fiduciary's acts

in implementing the termination are covered); *Waller v. Blue Cross of Cal., 32 F.3d 1337, 1342 (9th Cir. 1994)* (same). These cases are distinguishable, though, because the implementation of Tribune's decision to create the ESOP was complete when the Directors, on behalf of Tribune, and GreatBanc, on behalf of the ESOP, agreed to the deal.

By appointing GreatBanc as fiduciary, the Board of Directors removed itself from direct responsibility for the ESOPs actions. (The court considers a separate claim regarding the Directors' exercise of their fiduciary responsibilities in appointing and monitoring GreatBanc below.) Unlike the companies in *Bussian* and *Waller*, the Board did not make a business decision and then implement it. The board made a non-fiduciary decision as settlor to create the ESOP, then made a non-fiduciary business decision on Tribune Company's behalf to enter into the deal, and, finally, GreatBanc, acting on behalf of the ESOP, made an independent decision to also enter into the deal. Plaintiffs themselves acknowledge that the documents **[*29]** creating the ESOP did not require the ESOP to agree to the deal, (Pls' Br. at 15), and Plaintiffs' complaint does not allege that the Directors influenced GreatBanc's decision in any way. Accordingly, Defendants Holden, Osborn, and FitzSimons, who were members of the Board on April 1, 2007, did not exercise a fiduciary function when they agreed to the deal.

Defendants next argue that the five Defendants who did not join the Board of Directors until December 2007 had no fiduciary responsibility for the deal, which was made and finalized before their association with Tribune. (Defs' Br. at 21.) In response, Plaintiffs argue that these Defendants are liable as successor fiduciaries who failed to investigate and remedy breaches by their predecessors. (Pls' Br. at 28-29.) The obvious stumbling block for this theory is *ERISA § 409(b)*, *29 U.S.C. § 1109(b)*: "No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." *ERISA § 409(b)*, *29 U.S.C. § 1109(b)*. Plaintiffs nevertheless insist that the breach they are alleging with respect to these defendants-- failing to **[*30]** investigate and remedy the earlier breach--is an independent one defined by *ERISA § 405(a)(3)*, *29 U.S.C. § 1105(a)(3)*, which holds fiduciaries liable when they have "knowledge of a breach by such other fiduciary" but fail to make "reasonable efforts under the circumstances to remedy the breach." Putting aside the dearth of facts pleaded on these claims, they must ultimately be dismissed because co-fiduciary liability applies only to fiduciaries. Plaintiffs cannot hold these Defendants liable as co-fiduciaries without first showing that they are fiduciaries. Thus, the Defendants who joined the board of directors in December 2007--Berg, Greenspun, Wilderotter, Pate and Wood--had no fiduciary

duty to remedy the alleged fiduciary breach committed before their tenure on the board. This reasoning also relieves the Defendants who served on the board before December 2007-- Holden, Osborn, FitzSimons, and Zell--of any liability under a "failure to remedy" theory.

Finally, the court turns to Plaintiffs' argument that, even though the members of the Board of Directors had no fiduciary responsibility for the decisions that GreatBanc or the EBC made, they had a duty to monitor GreatBanc and the EBC **[*31]** based on their powers of appointment and removal. *Baker v. Kingsley, 387 F.3d 649, 663-64 (7th Cir. 2004)*. Defendants acknowledge this duty, but argue that Plaintiffs have failed to allege sufficient facts to support their claim for breach of the duty to monitor. (Defs' Br. at 23-24.) Indeed, Plaintiffs allege only in the most general terms that the Members of the Board of Directors breached their duty to monitor GreatBanc. (Compl. PP 152, 155.) They expand on that allegation modestly in their brief, arguing that, based on the short amount of time between GreatBanc's appointment and the deal, the members of the Board should have known that GreatBanc could not adequately exercise its responsibilities. (Pls' Br. at 25.) But this is nothing more than speculation, and Plaintiffs' allegations with respect to the EBC go no further. (Compl. P 155.) Without more, Plaintiffs' allegations that the Board breached its duty to monitor is no more than conceivable; it fails *Twombly's* plausibility requirement. *Twombly, 550 U.S. at 570*.

Plaintiffs seek to rely on this court's ruling in *Howell v. Motorola, Inc., 337 F. Supp. 2d 1079, 1099 (N.D. Ill. 2004)*, that whether director defendants breached their **[*32]** duty to monitor was "a question that will require extensive discovery and factual development." *Howell* is distinguishable, though, because the plaintiffs' complaint in that case contained more than a bare assertion that the defendants breached their duty to monitor; it contained factual allegations about *how* the defendants breached that duty. *Id. at 1083-84*. Accordingly, Claim One is dismissed with respect to all conduct by Defendants serving on the Tribune's Board of Directors, aside from Zell, against whom, as explained above, Plaintiffs have stated a claim for knowing participation in a fiduciary breach.

### iv. The Employee Benefits Committee and its Members

The EBC is designated in plan documents as the plan's administrator and given the power, which it exercised, to "authorize the Trustee to act without the direction of the [EBC] with regard to any matter concerning the purchase, sale, or voting of Company Stock." (Defs' Ex. 20, at 53.) The plan documents also state that if the EBC so authorizes the Trustee, the EBC "shall have no authority or responsibility whatsoever with regard to the matters so delegated to the

Trustee." (*Id.*) In light of these limitations on the EBC's liability, [*33] Plaintiffs' claim against the EBC and its members focuses on the powers that the EBC was not permitted to delegate, that is, matters not concerning the purchase, sale, or voting of Company Stock. (Pls' Br. at 27-28.) In Plaintiffs' estimation, two side agreements that were part of the deal fall under those powers retained by the EBC. The first is the Voting Agreement made between the Chandler Trusts and Tribune Company, but that Agreement--a copy is attached to Defendants' motion--did not involve the ESOP, so the EBC had no say in the parties' decisions to enter into it. (Def's Ex. 14.) The other "side agreement" identified by Plaintiffs is the ESOP's agreement to vote its shares in favor of Zell, but decisions on the voting of Company Stock was one of the duties that the EBC in fact delegated to GreatBanc. (Defs' Ex. 20, at 53.) Accordingly, Plaintiffs have failed to allege a fiduciary breach by the EBC or its members.

The analysis that the court applied above to claims against members of the Board of Directors for breaching the duty to monitor and the duty to remedy past breaches also applies to members of the EBC. Accordingly, Claim One is dismissed with respect to the EBC and all [*34] Defendants who served on the EBC.

## B. Prohibited Transaction

Plaintiffs' second claim is that, understood correctly, the deal challenged in this case involved five transactions that are prohibited by *ERISA § 406(a)*, *29 U.S.C. § 1106(a)*. Under § 406(a), an ERISA plan is barred, with some important exceptions, from buying company stock or engaging in most transactions with the employer or any party in interest. A fiduciary that engages in a prohibited transaction is liable for a fiduciary breach under *ERISA §§ 502(a)(2)*, *409*, *29 U.S.C. §§ 1132(a)(2)*, *1109*. And under *ERISA § 502(a)(3)*, *29 U.S.C. § 1132(a)(2)*, a non-fiduciary who participates in a prohibited transaction is liable for equitable relief. *Harris Trust & Savings Bank v. Salomon Smith Barney, 530 U.S. 238, 120 S. Ct. 2180, 147 L. Ed. 2d 187 (2000)*. The five transactions that Plaintiffs allege were prohibited are (1) the ESOP's direct stock purchase from Tribune Company, (2) Tribune Company's stock purchase from Zell and from some Director Defendants at the time of the merger, (3) Tribune Company's stock purchases through the Tender Offer and stock cancellation, (4) the Investor Rights Agreement, and (5) the Voting Agreement with the Chandler Trusts. (Compl. PP 167-73.) [*35] The court examines these transactions in turn.

### i. The ESOP's Direct Stock Purchase from Tribune

*ERISA § 406(a)*'s bar on purchasing company stock, *29 U.S.C.*

*§ 1106(a)(1)(E)*, has an exemption to allow for the establishment of ESOPs: a plan may purchase "qualifying employer securities" for "adequate consideration." *ERISA §§ 407(d)(4)*, *408(e)(1)*, *29 U.S.C. §§ 1107(d)(4)*, *1108(e)(1)*. One "qualifying employer security" is stock, *id.* § 407(d)(4), *§ 1107(d)(4)*, and adequate consideration

> means (A) in the case of a security for which there is a generally recognized market, either (i) the price of the security prevailing on a national securities exchange . . . or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest; and (B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations [*36] promulgated by the Secretary.

*Id.* § 402(18)(A)(I), *§ 1002(18)(A)(I)*.

Plaintiffs' principal argument is that the price paid by the ESOP for the shares of Tribune stock on April 1, 2007, was not adequate consideration. (Compl. P 167.) Defendants respond that the $ 28 per share that the ESOP paid was adequate consideration because it was less than "the price of the security prevailing on a national securities exchange," that is, the $ 32.81 per share closing price on the New York Stock Exchange that day. (Defs' Br. at 33-34.) To overcome this hurdle, Plaintiffs assert that the market price was not a fair measure of the value of the shares sold to the ESOP because they were not shares "for which there is a generally recognized market." (Pls' Br. at 32-33.) The shares at issue were indeed not bought on the market; they were issued to the ESOP from Tribune. They were not registered, so they could not be sold on an exchange. Moreover, the ESOP was prohibited from reselling them at all. Cf. *Pietrangelo v. NUI Corp., No. Civ. 04-3223, 2005 U.S. Dist. LEXIS 40832, 2005 WL 1703200, at *13 (D.N.J. 2005)* (dismissing prohibited-transaction claim because it was "undisputed that the Plans purchased the NUI securities at market [*37] price from a qualifying national securities exchange"). Defendants may be correct that the restrictions themselves are unremarkable when it comes to creating a leveraged ESOP, (Defs' Br. at 26-27), but that does not affect the application of ERISA's "adequate consideration" requirement.

In determining whether the "adequate consideration" requirement is met, Defendants argue that the market price is the right metric because, despite the resale restriction, the

ESOP's shares represented an ownership stake in the Tribune equivalent to that of the publicly traded shares. (Defs' Reply Br., at 13.) The court is uncertain what an ownership stake has to do with whether there was a legitimate market for the shares. Defendants cannot seriously argue that a trading restriction has no affect on the value of those shares. Indeed, one of the valuation letters that Defendants attached to their motion to dismiss suggests using a 5% discount for securities that are not marketable. (Defs' Ex. 24, at 5.) Defendants also point out that the ESOP paid less for its shares than Zell paid and urge that the ESOP's shares actually represented a greater ownership stake than other shares because the ESOP's shares entitled **[*38]** it to an eventual 100% ownership of the company. (*Id.;* Defs' Br. at 34.) Ultimately, though, the ESOP's purchase price should not be directly compared to the price paid by other parties because no other party could bring to the table what the ESOP brought: an end to millions of dollars worth of corporate taxes based on the conversion from a C-corporation to an S-corporation. Thus, the shares bought by the ESOP were not "a security for which there is a generally recognized market."

In the case of an asset that is not publicly traded, adequate consideration is defined as the asset's fair market value as determined in good faith. ERISA § 402(18)(A)(I); *29 U.S.C. § 1002(18)(A)(I)*. Defendants argue that even under this definition, Claim Two must be dismissed for the same reasons that they argued, under Claim One, that GreatBanc, as the ESOPs fiduciary, acted prudently. (Defs' Reply Br. at 14-15.) The court has already ruled that those arguments are not sufficient to grant the motion to dismiss Claim One. Thus, the motion to dismiss is denied as to Plaintiffs' claim that the stock purchase was a prohibited transaction under *29 U.S.C. § 1106(a)(1)(E)*. Whether the ESOP paid adequate consideration **[*39]** for the stock it bought from Tribune Company is a question of fact, not one for which Defendants are entitled to judgment as a matter of law.

Plaintiffs also argue that the ESOP's stock purchase was a prohibited transaction for another (and far more complicated) reason. (Pls' Br., at 34-35.) Under *ERISA § 408(e)*, *29 U.S.C. § 1108(e)*, to qualify for the exception, the plan must pay adequate compensation, and it must be an eligible individual account plan as defined in *ERISA § 407(d)(3)*, *29 U.S.C. § 1107*. One such eligible individual account plan is an ESOP, which is defined in the same section as an "individual account plan--(A) which is a stock bonus plan which is qualified, or a stock bonus plan and money purchase plan both of which are qualified, under *section 401* of Title 26, and which is designed to invest primarily in qualifying employer securities, and (B) *which meets such other requirements as the Secretary of the Treasury may prescribe by regulation.*" *ERISA § 407(d)(6)*, *29 U.S.C. § 1107(d)(6)* (emphasis added). Those other

requirements are found at *29 C.F.R. § 2550.407d-6*, but *subsection (c)* of that regulation requires an ESOP to meet yet more requirements that the Treasury Secretary **[*40]** can prescribe under certain Internal Revenue Code provisions. *See IRC § 4975(e)(7)(B)*, *26 U.S.C. § 4975(e)(7)(B)*. *Those* other requirements are listed at *26 C.F.R. § 54.4975-11*, which lists conditions for an ESOP including satisfying *IRC § 4975(e)(7)(A)*, *26 U.S.C. § 4975(e)(7)(A)*. That subsection requires the plan to qualify under *IRC § 409(l)*, *26 U.S.C. § 409(l)*, which mandates that the securities purchased by an ESOP be "common stock issued by the employer . . . which is readily tradable on an established securities market." *Id. § 409(l)(1)*.

The most obvious reading of *§ 409(l)(1)* is that an ESOP holds readily tradable shares only if it can sell the shares on the market immediately. Under that reading, the sale here was prohibited. In a letter sent one day before oral argument, Defendants suggested that the court adopt the IRS's reading of "readily tradeable" as meaning "publicly traded," as defined in *26 C.F.R. § 54.4975-7(b)(1)(iv)*. *See* I.R.S. *Priv. Ltr. Rul. 200237026*. Under that regulation, "'publicly traded' refers to a security that is listed on a national securities exchange registered under section 6 of the Securities Exchange Act of 1934 (*15 U.S.C. 78f*) or that is quoted on **[*41]** a system sponsored by a national securities association registered under section 15A(b) of the Securities Exchange Act (*15 U.S.C. 78o*)." That *some* Tribune shares were publicly traded, however, does not mean that the shares the ESOP acquired were also publicly traded. Nor is the court moved by Defendants' reference to *26 C.F.R. § 54.4975-7(b)(10)*. That provision is addressed to the distribution of an employer security with a "trading limitation," but the status of the security at the time it is distributed to a plan participant is a separate question from the status of that security at the time it is purchased by the ESOP. The court concludes that Plaintiffs have adequately alleged that GreatBanc violated its fiduciary duties by agreeing to a stock purchase that was a prohibited transaction.

### ii. Tribune Company's stock purchase from Zell and Directors at the time of the merger

Plaintiffs also contend that Tribune Company's purchase of stock from Zell, EGI-TRB, and the Tribune Directors before December 2007 were prohibited transactions because those sellers were parties in interest under *ERISA 3(14)(H)*, *29 U.S.C. § 1002(14)(H)*, and the $ 34 paid per share was greater than "adequate **[*42]** consideration." (Pls' Br. at 37.) At the time of the purchases, the stock was indeed trading below $ 34 per share, but it was Tribune, not the ESOP, that was the buyer. *ERISA § 406*, *29 U.S.C. § 1106*, refers to "direct or indirect" transactions, however; Tribune Company's purchase

of stock that would eventually be transferred to the ESOP was, Plaintiffs contend, a transaction that involved the ESOP indirectly. (Pls' Br. at 37.) Section 406 specifically includes indirect transactions in order to prevent parties from avoiding its restrictions through "the interjection of a third party into an otherwise prohibited transaction." *Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)*. For example, just as a plan could not purchase an aircraft from a party in interest, neither could it buy the aircraft from a third party that had purchased it from the party in interest in an attempt to avoid ERISA's restrictions. *McDougall v. Donovan, 552 F. Supp. 1206, 1216 (N.D. Ill. 1982)*.

Plaintiffs' challenge to this aspect of the transaction survives if the ESOP was an indirect purchaser of the shares purchased from Zell, EGI-TRB, and the Tribune Directors before December 2007, and if the **[*43]** $ 34 paid per share was more than adequate consideration under *ERISA 408(e)(1), 29 U.S.C. § 1108(e)(1)*. Construing the stock purchase at issue here as an indirect purchase arguably furthers the Congressional purpose of preventing parties in interest from enriching themselves in a going-private transaction. Defendants insist that the ESOP was not in fact an indirect purchaser because the ESOP did not pay anything in the purchase. (Defs' Reply Br. at 24.) That argument ignores the $ 250 million payment the ESOP made at the time it agreed to the merger. [4] The motion is denied with respect to this portion of Claim Two.

### iii. Tribune Company's stock purchases through the Tender Offer and stock cancellation

Plaintiffs contend that Tribune Company's stock purchases from the **[*44]** public at large through the Tender Offer and the stock cancellation immediately before the merger were also prohibited transactions because they too represented an indirect purchase by the ESOP of the employer's stock for more than adequate consideration. (Pls' Br., at 37.) Again, Defendants' only argument against this claim is that the ESOP paid nothing in the purchases. (Defs' Reply Br. at 24.) The court has already rejected that argument; Defendants motion is denied with respect to this portion of Claim Two as well.

### iv. The Investor Rights Agreement

Plaintiffs also attack the Investor Rights Agreement, under which the ESOP agreed to vote its shares in favor of Zell and his chosen directors, as an impermissible transaction because it constitutes the use of a plan asset for a party in interest. *ERISA § 406(a)(1)(D)*, *29 U.S.C. § 1106(a)(1)(D)*. Defendants first argue that Zell was not a party in interest when the agreement was made, (Defs' Reply Br. at 15), but the language of § 406(a)(1)(D) does not refer to the agreement; it refers to the "transaction." At the time of the "transaction," that is, when the ESOP voted its shares in favor of Zell as required by the agreement, Zell was a **[*45]** member of the board and, therefore, a party in interest. *ERISA § 3(14)(H)*; *29 U.S.C. § 1002(14)(H)*.

Defendants next argue that, even though the shares themselves were a plan asset, the Plan's agreement to vote them for Zell was not barred by § 406(a)(1)(D) as a direct or indirect "use" of a plan asset for the benefit of a party in interest because, as a matter of law, the right to vote ESOP stock is not a plan asset at all. (Defs' Br., at 36; Defs' Reply Br. at 24.) The Sixth Circuit so held, over a dissent, in *Grindstaff v. Green, 133 F.3d 416 (6th Cir. 1998)*, although two other courts have ruled to the contrary, *Newton v. Van Otterloo, 756 F.Supp. 1121, 1127-28 (N.D. Ind. 1991)* (Miller, J.); *O'Neill v. Davis, 721 F.Supp. 1013, 1014-16 (N.D. Ill. 1989)* (Nordberg, J.).

The *Grindstaff* court relied on the outcome of the vote at issue, reasoning that because Congress anticipated that company managers would also run ESOPs, when those managers, acting as members of the ESOP committee, voted for themselves as managers in an uncontested election, they did not breach their fiduciary duty to the ESOP. *Id. at 424-25*. From this narrow holding, the court extrapolated that "the right to vote, or **[*46]** direct the voting of an ESOP's shares, even when used to perpetrate [5] one's own incumbency, does not, by itself, constitute a plan asset." *Id. at 425*. As the dissenting judge pointed out, though, the majority ignored *ERISA § 3(21)(A)(i)*, *29 U.S.C. § 1002(21)(A)(i)*, which defines fiduciary conduct under ERISA to include "any authority or control respecting management or disposition of" a plan's assets. *Grindstaff, 133 F.3d at 432*. Even if the right to vote a share is not a plan asset, the share itself is an asset, so voting that share must be "management" of the asset. *Newton, 756 F. Supp. at 1128*; *O'Neill, 721 F. Supp at 1015*. Moreover, the common law of trusts applies a duty of proper care to voting decisions by trustees, *Grindstaff, 133 F.3d at*

---

[4] It may be that the ESOP is not an indirect purchaser of the shares for a different reason: even though the ESOP eventually gained the ownership stake that had been represented by the shares, it never actually acquired the shares because Tribune Company retired them before the merger. Defendants themselves have not presented such an argument, however, and the court is reluctant to develop it without the benefit of briefing.

---

[5] Presumably the court's intended word was "perpetuate." *See* Brett McDonnell, *ESOPs' Failures: Fiduciary Duties When Managers of Employee-Owned Companies Vote to Entrench Themselves, 2000 COLUM. BUS. L. REV. 199, 212 n.59*.

*432* (citing *RESTATEMENT (SECOND) OF TRUSTS § 193, cmt. a* (1959)), and courts routinely look to the common law to interpret ERISA. *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109-11, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989))*. Finally, in regulations interpreting ERISA, the Department of Labor has concluded that "[t]he **[*47]** fiduciary act of managing plan assets that are shares of corporate stock includes the voting of proxies appurtenant to those shares of stock." *29 C.F.R. § 2509.08-2 (2009)*; *29 C.F.R. § 2509.94-2 (1995)*. For all these reasons, the court respectfully declines to adhere to the broad language of the majority opinion in *Grindstaff*. The reasoning of the dissenting judge as well as that of the courts in *Newton* and *O'Neill* is more convincing. Voting of shares held by the ESOP constitutes the "management" or "use" of plan assets. Thus, Plaintiffs have stated a claim that by agreeing to the Investor Rights Agreement, GreatBanc breached its fiduciary duty and Zell and EGI-TRB knowingly participated in an ERISA violation.

### v. The Voting Agreement with the Chandler Trusts

The final part of the deal that Plaintiffs allege was a prohibited transaction was the Voting Agreement made between the Chandler Trusts and Tribune Company. (Compl. P 92, 171.) Among other promises, the Trusts agreed **[*48]** to vote their shares in favor of the ESOP deal. Plaintiffs argue that, because the ESOP was an indirect party to the agreement, and because the agreement was made for Zell's benefit, it was a prohibited transaction under ERISA. (Pls' Br., at 38.) The agreement may have indirectly affected the ESOP, but Plaintiffs have not explained how the ESOP indirectly "engaged" in the transaction between the Chandler Trusts and Tribune Company. *ERISA 406(a)(1)*, *29 U.S.C. § 1106(a)(1)*. The ESOP could not even have become a party to the Voting Agreement through the merger because the agreement, by its terms, terminated at the time of the merger. (Defs' Ex. 14, at 2, 6). Accordingly, Claim Two is dismissed as to the Voting Agreement.

### <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint [110] is granted as to Claim One except for the claim of fiduciary breach against Defendant GreatBanc and the claim of knowing participation in a fiduciary breach against Defendants Zell and EGI-TRB. As to Claim Two, the motion is denied with respect to the claims that GreatBanc breached its fiduciary duty by agreeing to the direct and indirect purchases of Tribune stock **[*49]** and by agreeing to the Investor Rights Agreement and the claim that Zell and EGI-TRB knowingly participated in an

ERISA violation. The motion to dismiss Claim Two is otherwise granted.

ENTER:

Dated: December 17, 2009

/s/ Rebecca R. Pallmeyer

REBECCA R. PALLMEYER

United States District Judge

**End of Document**

# Tab H

 Neutral

As of: June 20, 2019 5:26 PM Z

# *Perez v. First Bankers Trust Servs.*

United States District Court for the District of New Jersey

March 31, 2017, Decided; March 31, 2017, Filed

Civil Action No. 12-4450 (MAS) (DEA)

**Reporter**

2017 U.S. Dist. LEXIS 52117 *

THOMAS E. PEREZ, Secretary of Labor, Plaintiff, v. FIRST BANKERS TRUST SERVICES, INC., et al., Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Appeal dismissed by *Sec'y v. First Bankers Trust Servs., 2017 U.S. App. LEXIS 22523 (3d Cir. N.J., Sept. 21, 2017)*

**Prior History:** *Perez v. First Bankers Trust Servs., Inc., 2015 U.S. Dist. LEXIS 111029 (D.N.J., Aug. 17, 2015)*

## Core Terms

valuation report, Memo, projections, Offering, valuation, fiduciary, customer, companies, first quarter, backlog, bids, margins, argues, stock, Annual, fair market value, seller's, Post-Transaction, Engagement, negotiate, verify, homebuilding, peer group, discount rate, asserts, financing, conference call, purported, services, weather

**Counsel:** [*1] For THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor, Plaintiff: ANDREW KARONIS, LEAD ATTORNEY, UNITED STATES DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, NEW YORK, NY; ANDREW MICHAEL KATZ, LEAD ATTORNEY, U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, NEW YORK, NY; JENNIFER D. WEEKLEY, LEAD ATTORNEY, OFFICE OF THE SOLICITOR, U.S. DEPARTMENT OF LABOR, NEW YORK, NY; PATRICIA M. RODENHAUSEN, LEAD ATTORNEY, U.S. DEPARTMENT OF LABOR, REGIONAL SOLICITOR, NEW YORK, NY.

For FIRST BANKERS TRUST SERVICES, INC., Defendant: BRIAN D. SULLIVAN, LEAD ATTORNEY, FOX ROTHSCHILD LLP, ROSELAND, NJ; KEITH R. MCMURDY, LEAD ATTORNEY, FOX ROTHSCHILD, LLP, NEW YORK, NY.

**Judges:** MICHAEL A. SHIPP, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MICHAEL A. SHIPP

# Opinion

## SHIPP, District Judge

This matter arises from the SJP Group, Inc. Employee Stock Ownership Plan's (the "SJP ESOP" or the "Plan") purchase of thirty-eight percent of the outstanding stock of SJP Group, Inc. ("SJP"), a total of 380,000 shares, through trustee Defendant First Bankers Trust Services, Inc. ("FBTS" or "Defendant"), from Vincent DiPano[1] ("DiPano") for $16 million. Plaintiff Thomas E. Perez,[2] the Secretary of Labor, United States Department of Labor [*2] ("Plaintiff" or the "Secretary") asserts that FBTS breached its duties of loyalty and prudence, and engaged in a prohibited transaction with respect to the Plan's purchase of DiPano's 380,000 shares. The Court conducted a seventeen-day bench trial, beginning on May 23, 2016, and culminating on September 23, 2016. (ECF Nos. 179-83, 186, 189-92, 199-201, 210, 213-14, 216.) The parties submitted proposed findings of fact and conclusions of law on October 28, 2016 (ECF Nos. 224, 225), and responses on November 15, 2016 (ECF Nos. 226, 227).

Pursuant to *Rule 52(a) of the Federal Rules of Civil Procedure*, and after careful consideration of the entire record in this case and the applicable law, the Court concludes that FBTS breached its duties of prudence and loyalty, and

---

[1] The Secretary of Labor and DiPano reached a settlement of the Secretary's claims against DiPano pursuant to a partial Consent Judgment and Order, which the Court approved on April 20, 2016. (ECF No. 149.)

[2] This action was originally commenced by the former Secretary of Labor, Hilda L. Solis. (ECF No. 1.) The caption was subsequently revised to reflect the succeeding, and now former, Secretary of Labor, Thomas E. Perez. Although Thomas E. Perez is no longer the current Secretary of Labor, the Court maintains Thomas E. Perez as Plaintiff in the caption above for the purpose of consistency.

engaged in a prohibited transaction under the *Employee Retirement Income Security Act of 1974*.

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to *§ 1132(e)(1)* of the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. §§ 1001-1461*. Venue of this action appropriately lies in the District of New Jersey pursuant to *§ 1132(e)(2) of ERISA*.

## II. Findings of Fact[3]

### A. Overview of the Litigation

1. At all relevant times herein, the SJP ESOP was an employee stock ownership plan sponsored by SJP. (Stipulation **[*3]** of Facts ¶ 1, ECF No. 177; May 23, 2016 Tr. (DiPano) 31:13-15.)

2. On or about November 16, 2006, FBTS was retained as trustee of the SJP ESOP. (Joint Ex. 6 (FBTS Engagement Agreement); May 24, 2016 Tr. (D'Esposito) 26:12-15.)

3. The SJP ESOP was created so that SJP could sponsor a pension plan for SJP's employees. (May 23, 2016 Tr. (Dugan) 109:10-14.)

4. On April 16, 2007, Defendant DiPano sold 380,000 shares of stock in SJP to the SJP ESOP—representing 38% of SJP's outstanding shares—for $16 million (the "Transaction" or the "SJP ESOP Transaction"). (Stipulation of Facts ¶¶ 2-3.)

5. In 2009, the Department of Labor ("DOL") initiated an investigation into the Transaction to determine compliance with ERISA. (May 24, 2016 Tr. (M. Munoz) 98:11-99:1.)

6. On July 17, 2012, the DOL filed its Complaint in this action. (ECF No. 1.) In its Complaint, the DOL alleged, among other things, that FBTS, as trustee, did not adequately perform its duties and, as a result, caused the SJP ESOP to overpay for SJP common stock. (*See id.*)

7. A bench trial for this action concluded on September 23, 2016.

### B. Background of SJP and Its Management

8. At all relevant times, SJP was a closely-held site preparation construction **[*4]** company concentrating in the homebuilder market in New Jersey. (Stipulation of Facts ¶ 4; May 23, 2016 Tr. (Dugan) 112:7-9, 163:22-164:1; June 29, 2016 Tr. (Aliferis) 14:17-23.)

9. SJP consists of three separately incorporated companies: Dyna-Tec Drilling and Blasting, LLC ("Dyna-Tec"), National Crushing and Recycling, LLC ("National"), and South Jersey East Coast Paving, LLC ("South Jersey") (collectively, "SJP" or the "Company"). (Joint Ex. 1 (Offering Memo), at 6; May 23, 2016 Tr. (Dugan) 112:10-14.)

10. Each of the constituent companies of SJP specialized in a distinct area of site preparation. For example, Dyna-Tec specialized in rock drilling and blasting, National specialized in crushing and processing rocks generated from blasting operations, and South Jersey specialized in excavating and paving the site. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 11; May 23, 2016 Tr. (DiPano) 18:8-20, 19:4-13, 19:24-21:8.)

11. In addition, SJP provided land development and construction services for residential homebuilders and commercial real estate developers in New Jersey, New York, and Pennsylvania. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 8; May 23, 2016 Tr. (DiPano) 19:1-13.)

12. From 2002 to 2007, **[*5]** SJP's primary business was providing site development services for homebuilders. At all relevant times, the vast majority of SJP's work was for residential sites. (May 23, 2016 Tr. (Dugan) 117:13-118:20, 120:24-121:2, 122:9-128:10 (stating that from 2002 to 2007, SJP did not work on any projects involving oil or gas refineries, oil pipelines, theaters, railroads, airports, casinos, harbors, ports, public highways, public bridges, dams, canals, waterlocks, correctional facilities, and schools and was unsure if SJP worked on projects involving hospitals or power plants); June 29, 2016 Tr. (Aliferis) 14:21-23; Stipulation of Facts ¶ 5.)

13. Between 2002 and 2006, South Jersey accounted for the majority of SJP's revenues. (May 23, 2016 Tr. (Dugan) 113:5-20; Joint Ex. 1 (Offering Memo), at 126-28 (revenues broken out by customer and division).)

14. The majority of SJP's top customers were residential homebuilder companies. (May 23, 2016 Tr. (Dugan) 118:9-121:2; June 29, 2016 Tr. (Aliferis) 14:17-23.)

---

[3] In evaluating the testimony of the witnesses appearing at trial, and after the Court had the opportunity to hear their testimony and observe their demeanor, the Court undertook an individualized credibility assessment of each witness and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility. Such determinations are reflected in the factual findings.

15. The majority of SJP's revenues came from work on residential homebuilding projects in New Jersey. (May 23, 2016 Tr. (Dugan) 120:24-121:2, 133:11-15; May 24, 2016 Tr. (D'Esposito) 95:10-12.)

16. Site preparation companies, [*6] such as SJP, are highly dependent on the construction of new housing. (Joint Ex. 1 (Offering Memo), at 47.)

17. SJP operates within the homebuilding industry because its customers were homebuilders and its business was dependent on homebuilding construction. (May 23, 2016 Tr. (Dugan) 118:9-121:2; July 14, 2016 Tr. (Messina) 64:2-13.)

18. Carmen Yacuzzio ("Yacuzzio") founded SJP in 1959 and was its owner until his death in 2004. (Joint Ex. 1 (Offering Memo), at 6, 22.)

19. DiPano joined SJP in 1984. (Joint Ex. 1 (Offering Memo), at 22.) DiPano initially served as SJP's Vice President and subsequently became SJP's President in 2002 or 2003. (Stipulation of Facts ¶ 11.)

20. DiPano became Chief Executive Officer ("CEO") of SJP in 2004 or 2005, following the death of Yacuzzio. (May 23, 2016 Tr. (DiPano) 23:10-17, 48:19-20; May 23, 2016 Tr. (Dugan) 107:15-20; Stipulation of Facts ¶¶ 7, 10; Joint Ex. 1 (Offering Memo), at 29 "Organizational Chart".)

21. DiPano became the majority owner of SJP in March of 2005 when he purchased SJP's outstanding shares from Yacuzzio for $4.5 million. (Pl.'s Ex. 1 (Yacuzzio Stock Transfer Agreement), at 63; May 23, 2016 Tr. (DiPano) 23:18-21, 26:11-20.) Specifically, DiPano purchased 90% of the outstanding shares of South Jersey, 44% of the outstanding [*7] shares of National, and 43.48% of the outstanding shares of Dyna-Tec. (Pl.'s Ex. 1 (Yacuzzio Stock Transfer Agreement), at 63; May 23, 2016 Tr. (DiPano) 26:11-27:4.)

22. Upon DiPano's purchase of Yacuzzio's stock, DiPano became the majority owner of each of SJP's constituent companies in March of 2005. (Pl.'s Ex. 1 (Yacuzzio Stock Transfer Agreement), at 63; May 23, 2016 Tr. (DiPano) 23:18-21.)

23. Frank Dugan ("Dugan") has worked for SJP since 1985. (Joint Ex. 1 (Offering Memo), at 22; May 23, 2016 Tr. (Dugan) 107:2-4.)

24. Dugan served as SJP's Vice President from at least January 1, 2006 through the date of the Transaction. (Stipulation of Facts ¶¶ 8, 12.)

25. Michael D'Esposito ("D'Esposito") has worked for SJP since at least the mid-1990s. (Stipulation of Facts ¶ 9; May 24, 2016 Tr. (D'Esposito) 6:16-18.)

26. D'Esposito served as SJP's Assistant Controller and then Controller, and became SJP's Chief Financial Officer ("CFO") in 2006. (Stipulation of Facts ¶¶ 9, 13.)

27. At the time of the Transaction, D'Esposito held the position of Secretary/Treasurer and CFO. (Stipulation of Facts ¶ 9; May 24, 2016 Tr. (D'Esposito) 7:1-12; Joint Ex. 1 (Offering Memo), at 29 "Organizational Chart.")

28. In contemplation [*8] of the Transaction, DiPano and Dugan exchanged their shares of the three constituent companies of SJP for a pro-rata share of the newly unified SJP. (Joint Ex. 1 (Offering Memo), at 14 "Reorganization.")

29. At the time of the Transaction, DiPano owned 70% of SJP's outstanding stock and Dugan owned 30% of SJP's outstanding stock. (Stipulation of Facts ¶¶ 7-8.)

30. The SJP constituent companies largely had the same management, board members, and officers at the time of the Transaction. (May 23, 2016 Tr. (Dugan) 108:7-9; Joint Ex. 1 (Offering Memo), at 29 "Organizational Chart.")

31. Since approximately January 2006 through the date of the Transaction, SJP's Board of Directors consisted of Dugan and DiPano. (Stipulation of Facts ¶ 14.)

## C. SJP Hires Advisors in Anticipation of the SJP ESOP Transaction

32. In 2006, SJP retained Steven Etkind ("Etkind") of Sadis & Goldberg as legal counsel to guide SJP through the process of establishing an ESOP and to provide an opinion on whether the ESOP had been duly established. (Stipulation of Facts ¶ 18.)

33. Sadis & Goldberg was not retained to provide an opinion regarding the fair market value of SJP. (Stipulation of Facts ¶ 19.)

34. In October 2006, SJP retained Duff & Phelps, LLC ("Duff & Phelps") [*9] to advise SJP on the logistics of establishing an ESOP and again in January 2007 to act as SJP's financial advisor in connection with the SJP ESOP Transaction. (Stipulation of Facts ¶¶ 24-25.)

35. Pursuant to the Duff & Phelps Engagement Agreement, SJP agreed to pay Duff & Phelps professional fees, including a transaction fee "equal to 1.00% of the amount of the total anticipated committed financing ($20,000,000) or $200,000." (Joint Ex. 8 (Duff & Phelps Engagement Agreement), at 3 ¶¶

5.a, 5.b.)

36. The Duff & Phelps Engagement Agreement (Joint Ex. 8, at 2-3) further provided, in pertinent part, that:

> The Company [(i.e. SJP)] agrees to furnish, or use its best efforts to cause to be furnished, to Duff & Phelps all reasonably requested data and information concerning the Company and all such other data, material and information as Duff & Phelps shall reasonably request. . . . Duff & Phelps assumes no responsibility for the accuracy or completeness of any information provided by or on behalf of the Company.

37. Duff & Phelps's role in the contemplated Transaction was to represent the seller—i.e., DiPano and SJP—while FBTS's role was to represent the buyer—i.e., the SJP ESOP. (May 25, 2016 Tr. (Miscione) 8:3-10:14; June 29, 2016 **[*10]** Tr. (Aliferis) 77:13-18, 121:19-25; June 30, 2016 Tr. (Gross) 20:14-18; July 6, 2016 Tr. (Ash) 57:3-12; May 26, 2016 Tr. (Ippensen) 4:19-23.)

## D. Background of FBTS and FBTS Employees

38. FBTS has been in the business of administering ESOP plans since 1989. (May 26, 2016 Tr. (Ippensen) 132:11-13.)

39. In 2006 and 2007, FBTS had an Employee Benefits Committee ("EB Committee") responsible for reviewing proposed ESOP transactions. (May 25, 2016 Tr. (Cory) 88:9-13; Stipulation of Facts ¶ 36.)

40. The EB Committee could only approve transactions with unanimous consent of its members. (May 26, 2016 Tr. (Ippensen) 139:14-140:-3; May 27, 2016 Tr. (Serbin) 159:5-8.)

41. As of April 16, 2007, FBTS's EB Committee was comprised of eight or nine members. (May 26, 2016 Tr. (Ippensen) 132:17-19, 138:21-25; May 27, 2016 Tr. (Serbin) 145:5-10.)

42. At or around the time of the Transaction, Brian Ippensen ("Ippensen"), Kjersti Cory ("Cory"), Kimberly Serbin ("Serbin"), and Meni Ash ("Ash") served on the EB Committee. (May 26, 2016 Tr. (Ippensen) 132:24-133:6; May 27, 2016 Tr. (Serbin) 103:12-14; July 6, 2016 Tr. (Ash) 27:21-25.)

43. Ash is currently employed by FBTS. (July 6, 2016 Tr. (Ash) 4:13-14.)

44. At **[*11]** or around the time of the Transaction, Ash served as FBTS's Vice President of New Business Development. (July 6, 2016 Tr. (Ash) 5:1-6.)

45. As Vice President of New Business Development, Ash's job was in sales, and she was responsible for bringing in new business. (July 6, 2016 Tr. (Ash) 5:7-12; May 26, 2016 Tr. (Ippensen) 134:23-135:1.)

46. Ash earned a commission for all new business that she generated for FBTS. (July 6, 2016 Tr. (Ash) 100:23-101:1.)

47. Ash received a 20% commission on fees generated by FBTS when it was retained to serve as a trustee in anticipation of an ESOP transaction and an additional 20% commission on fees generated in the first year in which FBTS was retained to serve as an ongoing trustee. (July 6, 2016 Tr. (Ash) 101:3-21.)

48. Cory served as a trust officer at FBTS in 2006 and 2007. (May 25, 2016 Tr. (Cory) 86:25-87:5, 88:15-16.)

49. Cory left employment at FBTS in 2012 and, as of the date of her testimony, worked for an FBTS competitor. (May 25, 2016 Tr. (Cory) 87:6-8; 117:14-19.)

50. Serbin is currently employed by FBTS and was an employee of FBTS at the time of the Transaction. (May 27, 2016 Tr. (Serbin) 102:25-103:15.)

51. Serbin has an educational background **[*12]** in business administration with an emphasis in accounting and finance. (May 27, 2016 Tr. (Serbin) 103:16-25.)

52. Ippensen was the President of FBTS in 2006 and 2007. (May 26, 2016 Tr. (Ippensen) 4:8-12; 92:2-6.)

53. Ippensen has been a Certified Public Accountant since 1991. (May 26, 2016 Tr. (Ippensen) 133:13-16.)

54. As of April 13, 2007, Ippensen estimated that he had reviewed 250 to 300 valuation reports during the course of his career. (May 26, 2016 Tr. (Ippensen) 133:17-20.)

55. Although FBTS did not have a formal policy requiring every conversation to be memorialized, meeting minutes were typically taken at each EB Committee meeting. (May 27, 2016 Tr. (Serbin) 137:10-16; May 26, 2016 Tr. (Ippensen) 147:14-148:5.)

## E. FBTS Considers Trustee Role for SJP ESOP Transaction (October-November 2006)

56. FBTS first considered a trustee role with respect to the SJP ESOP Transaction in the fourth quarter of 2006, sometime toward the end of October. (May 27, 2016 Tr. (Serbin) 104:1-9; July 6, 2016 Tr. (Ash) 102:18-23.)

57. A professional trustee, like FBTS, possesses various

capabilities in the areas of accounting, finance, legal, and ESOP administration. (June 29, 2016 Tr. (Aliferis) 111:5-18; [*13] 148:25-149:16.)

58. Prior to being retained, FBTS performed a two-step approval process with the EB Committee. (July 6, 2016 Tr. (Ash) 103:6-104:17.)

59. For the first step of the EB Committee's two-step approval process, Ash introduced SJP's interest in performing an ESOP transaction to the EB Committee and recommended a financial and legal advisor for the Transaction. (July 6, 2016 Tr. (Ash) 5:1-6, 103:6-18.) Specifically, Ash informed the EB Committee that SJP was a paving company that was a fully-integrated site developer with very little competition. (July 6, 2016 Tr. (Ash) 129:7-12.) Ash further informed the EB Committee that SJP was projected to have its most successful year in 2006. (July 6, 2016 Tr. (Ash) 129:7-18.)

60. Ash recommended that FBTS should retain Prairie Capital ("Prairie") as the financial advisor and Steiker, Fischer, Edwards and Greenapple ("SFE&G") as the legal advisor. (July 6, 2016 Tr. (Ash) 103:15-18.)

61. FBTS adopted Ash's recommendations for the financial and legal advisors. (May 26, 2016 Tr. (Ippensen) 143:14-144:2.)

62. The EB Committee granted approval to proceed to the second step of the EB Committee's two-step approval process. (July 6, 2016 Tr. (Ash) [*14] 128:12-16.) The second step involved Ash providing "[m]ore information about the company." (July 6, 2016 Tr. (Ash) 129:25-130:8.)

63. After FBTS has been appointed as trustee, it typically assigns a team to work directly on a transaction and to work and consult with the EB Committee in ultimately approving or rejecting the transaction. (May 27, 2016 Tr. (Serbin) 104:12-25.)

64. For the SJP ESOP Transaction, FBTS assigned Ash and Cory. (May 27, 2016 Tr. (Cory) 105:1-14.)

65. Ash was the "point person" and "team leader" for the SJP ESOP Transaction and she attended the November 15, 2006 due diligence meeting on behalf of FBTS and participated in follow-up meetings on the Transaction. (May 25, 2016 Tr. (Cory) 116:10-117:8; Sept. 23, 2016 Tr. (Cory) 4:24-5:11; May 26, 2016 Tr. (Ippensen) 140:15-141:5; (July 6, 2016 Tr. (Ash) 14:22-24; May 27, 2016 Tr. (Serbin) 150:4-6.)

66. None of FBTS's employees, other than Ash, spoke to SJP's management prior to the Transaction. (Sept. 23, 2016 Tr. (Cory) 64:11-14; May 27, 2016 Tr. (Serbin) 128:11-13.)

67. With respect to the SJP ESOP Transaction, Cory did not visit SJP or meet with any of SJP's management, did not speak with Duff & Phelps, did not participate [*15] in meetings in which Ash may have participated, and "wasn't necessarily there every step of the way" until after the Transaction. (May 25, 2016 Tr. (Cory) 94:24-95:16, 98:25-99:2, 116:15-21.)

68. Ash and Ippensen expected that Cory would be principally responsible for reviewing SJP's financial documents. (July 6, 2016 Tr. (Ash) 8:8-9:24, 12:1-19; May 26, 2016 Tr. (Ippensen) 37:8-12.)

69. Cory was not a valuation expert, however, and did not consider herself to be principally responsible for reviewing and understanding valuation reports concerning SJP. (May 25, 2016 Tr. (Cory) 92:11-93:9.)

70. Cory believed that all EB Committee members were equally responsible for reviewing valuation reports concerning SJP. (May 25, 2016 Tr. (Cory) 92:20-93:2.)

71. Ippensen assumed that if he did not hear from Ash or Cory during the six-month period leading up to the SJP Transaction, then there were no major issues concerning the Transaction. (May 26, 2016 Tr. (Ippensen) 141:18-23.)

## F. November 15, 2006 Meeting

72. On November 15, 2006, FBTS retained SFE&G as independent legal counsel in connection with the proposed SJP ESOP Transaction. (Joint Ex. 6 (FBTS Engagement Agreement), at 4; FBTS Ex. 7.)

73. SFE&G was retained to conduct legal [*16] due diligence as opposed to financial or valuation due diligence. (FBTS Ex. 7, D00036; May 26, 2016 Tr. (Ippensen) 76:6-8; 168:2-13.)

74. Further, SFE&G did not opine on the fair market value of DiPano's shares but expressly relied on the opinion of Prairie, FBTS's valuation firm, concerning the value of those shares. (FBTS Ex. 13, D00085-86, ¶ (j).)

75. Steven Fischer ("Fischer"), who served as one of FBTS's expert witnesses at trial, was a member of SFE&G at the time of the Transaction. (Stipulation of Facts ¶ 39.)

76. On November 15, 2006, a meeting was held at SJP's offices in New Jersey, which included SJP's management team (i.e., DiPano, Dugan, and D'Esposito), Duff & Phelps, Prairie, and FBTS. (Stipulation of Facts ¶¶ 44-45.) Specifically, the following individuals were in attendance: Ash of FBTS; DiPano, D'Esposito and Dugan of SJP; Peter Aliferis ("Aliferis") of Prairie; Steve Greenapple

("Greenapple") of SFE&G; John Miscione[4] ("Miscione") of Duff & Phelps; Etkind of Sadis & Goldberg, and Alvin Cheslow ("Cheslow") of Drescher & Cheslow (SJP's corporate attorney). (May 23, 2016 Tr. (DiPano) 53:5-12; Stipulation of Facts ¶ 45.)

77. Ash, who was the only person that attended the November [*17] 15, 2006 meeting on behalf of FBTS, did not possess any expertise in finance or valuation. (May 26, 2016 Tr. (Ippensen) 8:6-11, 37:2-7; July 6, 2016 Tr. (Ash) 8:1-7, 8:8-9:24, 12:1-19.)

78. Ash did not take any notes of what was discussed at the November 15, 2006 meeting. (July 6, 2016 Tr. (Ash) 100:6-8.)

79. Neither SFE&G nor Prairie provided Ash with a copy of any notes that they may have taken during the November 15, 2006 meeting. (July 6, 2016 Tr. (Ash) 100:13-22.)

80. Although Ash was not a financial expert, her role at the November 15, 2006 meeting was to evaluate SJP's management team based on her ability to assess people. (July 6, 2016 Tr. (Ash) 8:8-9:24, 12:1-19, 107:6-14; May 26, 2016 Tr. (Ippensen) 37:2-7.)

81. The meeting was held so that FBTS could learn about SJP and determine whether it would be interested in serving as a trustee for the proposed Transaction. (May 26, 2016 Tr. (Ippensen) 8:12-18.)

82. The meeting began with introductions of the attendees and with Dugan introducing the Company, its history, and financial outlook. (July 6, 2016 Tr. (Ash) 105:2-10.)

83. The meeting lasted between two and three hours, (May 23, 2016 Tr. (Dugan) 176:22-177:11), during which FBTS [*18] explained the process of ESOP sponsorship and the services that FBTS could provide to SJP's management and advisors. (May 23, 2016 Tr. (Dugan) 139:2-12, 177:13-20.)

84. The November 15, 2006 meeting included a tour of SJP's facility, where the attendees observed SJP's equipment and facilities firsthand. (May 23, 2016 Tr. (Dugan) 139:8-12; July 6, 2016 Tr. (Ash) 105:11-15.)

85. The November 15, 2006 meeting was the only time that FBTS met with SJP or Duff & Phelps prior to the Transaction. (July 6, 2016 Tr. (Ash) 10:6-20; May 26, 2016 Tr. (Ippensen) 11:7-19.)

86. At the meeting, SJP discussed its own reputation, purported competitive advantage, relationship with customers, plans to reduce customer concentration with major customers like K. Hovnanian Homes ("Hovnanian"), and plans to expand into different regions. (June 29, 2016 Tr. (Aliferis) 47:7-22; July 6, 2016 Tr. (Ash) 105:17-106:7.)

87. With regard to customer concentration, SJP made everyone aware that it "had a client concentration." (July 6, 2016 Tr. (Ash) 105:21-106:3.)

88. With regard to expansion, John Miscione stated that SJP was "interested in diversifying, not only in diversifying in terms of what kind of work [it] did, but [*19] also in geographics, moving into the state of New York." (July 6, 2016 Tr. (Ash) 106:8-14.)

89. FBTS had the opportunity at the meeting to interview and ask questions of SJP's management. (May 25, 2016 Tr. (Miscione) 45:19-21; June 29, 2016 Tr. (Aliferis) 114:9-11.)

90. Between FBTS and Prairie, only Aliferis of Prairie had received SJP's consolidated financial statements prior to the meeting, providing him with "the ability to ask some questions about those financials." (July 6, 2016 Tr. (Ash) 105:7-10; FBTS Ex. 2.)

91. FBTS did not receive historical financial information at this meeting beyond what SJP verbally discussed.[5]

92. During the November 15, 2006 meeting, Duff & Phelps conveyed an offer to FBTS of $16 million to sell a minority of SJP's outstanding shares. (July 6, 2016 Tr. (Ash) 10:2-5.)

93. Based on what she observed at the November 15, 2006 meeting, Ash determined that SJP had a "good management team" because the team members had worked together for a long time with their previous employer, and because they "looked to be a cohesive management team." (July 6, 2016 Tr. (Ash) 106:25-107:5.)

94. Ash did not communicate the information obtained from the November 15, 2006 meeting [*20] to FBTS before signing the FBTS Engagement Agreement.[6] (May 26, 2016

---

[4] At the time of the Transaction, Miscione was a managing director at Duff & Phelps. (May 25, 2016 Tr. (Miscione) 4:18-21.)

---

[5] FBTS was unable to cite any testimony where a witness recalled receiving historical financial information at the November 15, 2006 meeting. FBTS, rather, cites instances of custom and practice and speculates the likelihood of receiving additional information, which the Court finds unpersuasive absent other corroborating evidence. (May 24, 2016 Tr. (D'Esposito) 39:11-22; June 29, 2016 Tr. (Aliferis) 47:7-22.)

[6] Defendant cites only the purported typical practice—which does not prove what occurred with regard to the SJP ESOP Transaction

Tr. (Ippensen) 9:22-10:19.)

95. On November 16, 2006, the day after the November 15, 2006 meeting, Ash signed the FBTS Engagement Agreement. (Joint Ex. 6 (FBTS Engagement Agreement), at 7; Stipulation of Facts ¶ 34.)

**G. FBTS Engagement Agreement**

96. FBTS was retained to represent the Plan in its purchase of a minority stake of SJP from DiPano. (Joint Ex. 6 (FBTS Engagement Agreement); Joint Ex. 7 (Prairie Engagement Agreement), at 1; Joint Ex. 1 (Offering Memo), at 8 "General Transaction Overview"; May 23, 2016 Tr. (DiPano) 30:7-18.)

97. FBTS understood that its duty as a Plan trustee included determining the fair market value of DiPano's shares. (Joint Ex. 6 (FBTS Engagement Agreement), at 2 ¶ 5 (setting forth FBTS's appointment as Trustee of the Trust); May 26, 2016 Tr. (Ippensen) 4:24-5:2, 6:25-7:4.)

98. FBTS understood that, at all times, it was acting in a fiduciary capacity to the SJP Plan beneficiaries. (May 26, 2016 Tr. (Ippensen) 131:22-25.)

99. Paragraph 5 of the FBTS Engagement Agreement (Joint Ex. 6, at 2) provides:

First Bankers agrees as of the date set forth above to accept its appointment as Trustee of the Trust. First Bankers will exercise all duties, responsibilities, and powers of a fiduciary under ERISA in its capacity [*21] as a discretionary Trustee of the Trust and shall control the management and disposition of the Company Stock held by the Trust to the extent such duties, responsibilities, and authority are consistent with the terms of the Plan and Trust Agreement and are not delegated to: (i) an investment manager as defined under ERISA, (ii) the Plan Administrator (as defined in the Plan) or (iii) a named fiduciary. First Bankers acknowledges its status as a discretionary Trustee under ERISA, including the responsibilities and duties of a

───────────────────────────

specifically—and a single cursory answer from Ippensen for the proposition that Ash presented the findings from the November 15, 2006 meeting to FBTS. (May 26, 2016 Tr. (Ippensen) 9:22-25; 137:10-22.) Defendant failed to provide evidence with regard to the contents of the presentation, any record of the presentation, or any testimony pertaining to any other details corroborating the occurrence of this purported meeting between FBTS and Ash. In light of the presented evidence and the Court's assessment of the witnesses' credibility, the Court finds that Ash did not communicate the information obtained from the November 15, 2006 meeting to FBTS prior to signing the engagement agreement.

fiduciary involving the financing, acquisition and holding of Company Stock of a privately held Corporation.

100. Under the FBTS Engagement Agreement, SJP agreed to pay FBTS $30,000 in consideration for FBTS's services. (Joint Ex. 6 (FBTS Engagement Agreement), at 3 ¶ 7; May 26, 2016 Tr. (Ippensen) 140:4-9.)

101. The FBTS Engagement Agreement did not provide for a success fee or bonus for FBTS with respect to its work as a transactional trustee for the SJP ESOP. (May 26, 2016 Tr. (Ippensen) 140:10-14.) If FBTS approved the SJP ESOP Transaction, however, it could be retained as an ongoing trustee. (Joint Ex. 6 (FBTS Engagement Agreement) 12; May 26, 2016 Tr. (Ippensen) 6:16-24.)

102. FBTS understood [*22] that even though it was paid by SJP (i.e., the seller's company), its role was to represent the interests of the Plan (i.e., the buyer). (Joint Ex. 6 (FBTS Engagement Agreement), at 5 ¶ 2; May 26, 2016 Tr. (Ippensen) 4:19-23.)

103. The FBTS Engagement Agreement also set forth the following fee schedule for any work FBTS performed for the Plan as an ongoing trustee: an annual fee calculated as a percentage of the Plan's assets, and in no event less than $15,000. (Joint Ex. 6 (FBTS Engagement Agreement), at 12; May 26, 2016 Tr. (Ippensen) 6:16-24.)

104. FBTS was permitted to engage an independent financial advisor and approve a valuation report and/or fairness opinion furnished by such independent financial advisor. (Joint Ex. 6 (FBTS Engagement Agreement), at 10, 12.)

105. The valuation firm would prepare a report determining the fair market value of the shares to be purchased by the ESOP. (May 25, 2016 Tr. (Cory) 90:18-24.)

106. The SJP ESOP trust agreement provided that all contributions from SJP would be held in trust by the named trustee (i.e., FBTS), and that the trustee would hold and invest trust assets for the exclusive benefit of the Plan participants and beneficiaries. (Joint Ex. 3 (Trust Agreement), at 3, Article I, §§ 1.01-1.04.)

107. The SJP ESOP trust agreement authorized the [*23] trustee (i.e., FBTS) to use trust assets to buy company stock, and required that all purchases of company stock be made at fair market value as determined in good faith and in accordance with applicable requirements of ERISA. (Joint Ex. 3 (Trust Agreement), at 4, Article II, § 2.01(a)-(b).)

108. As the trustee, FBTS was a "named fiduciary" within the

meaning of both the SJP ESOP plan document (the "Plan Document") and *ERISA § 402(a)*. (Joint Ex. 4 (Plan Document), at 70 "Article Fifteen — Fiduciary Responsibility" ¶ 15.01.)

109. The Plan Document required FBTS to discharge its duties solely in the interest of the Plan participants and beneficiaries for the exclusive purpose of providing benefits and defraying reasonable expenses. (Joint Ex. 4 (Plan Document), at 70 "Article Fifteen — Fiduciary Responsibility" ¶ 15.03.)

110. The Plan Document further required FBTS to discharge its "duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." (Joint Ex. 4 (Plan Document), at 70 "Article Fifteen — Fiduciary Responsibility" ¶ 15.03.)

### H. FBTS's Pre-Transactional Investigation Procedure[7]

111. FBTS does not have any written **[\*24]** materials describing its review procedures for an initial ESOP acquisition transaction. (May 25, 2016 Tr. (Cory) 89:3-7; May 26, 2016 Tr. (Ippensen) 115:6-17.)

112. Between 2006 and 2012, FBTS's pre-transactional review process was "always evolving." (May 25, 2016 Tr. (Cory) 89:8-23.)

113. There is no uniform approach in the ESOP industry as to how a fiduciary needs to conduct due diligence for an ESOP Transaction, and due diligence will vary depending on the facts and circumstances of the case. (June 21, 2016 Tr. (Fischer) 95:1-14.)

114. In the ESOP industry, whether a fiduciary's reliance on a valuation report is reasonable depends not only on the four corners of the valuation report, but on the entirety of everything else the fiduciary knows, everything else the valuation firm knows, and everything discussed between the fiduciary and its attorneys, its valuation firm, and the seller's

company. (June 21, 2016 Tr. (Fischer) 76:5-77:25.)

115. The very same issue may be addressed in different ways from one experienced and reasonable trustee to the next. (June 21, 2016 Tr. (Fischer) 77:21-25.)

### I. FBTS Retains Prairie (November 20, 2006)

116. At the time of the Transaction, Prairie, among other **[\*25]** things, was in the business of performing valuations of closely-held companies. (June 29, 2016 Tr. (Aliferis) 4:14-19; Joint Ex. 9 (Apr. 11, 2007 Draft), at 55; June 30, 2016 Tr. (Gross) 6:8-13.)

117. Prairie provided ongoing valuation services for approximately 80% of the plans for which it performed the initial valuation. (June 30, 2016 Tr. (Gross) 19:13-20:3.)

118. Prairie is a highly respected valuation firm in the ESOP industry. (June 21, 2016 Tr. (Fischer) 40:6-7.)

119. One of the "heads" of Prairie, Robert Gross ("Gross"), has been involved in "hundreds" of ESOP transactions over the course of his career. (June 30, 2016 Tr. (Gross) 26:15-19; June 21, 2016 Tr. (Fischer) 40:10-18.)

120. At the time of the Transaction, Gross was the Managing Director at Prairie. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 55.)

121. Gross had no personal involvement in the Transaction, including preparing the valuation or the fairness opinion. (June 30, 2016 Tr. (Gross) 20:22-22:13.)

122. At the time of the Transaction, Aliferis was employed at Prairie as the Vice President of Corporate Finance. (June 29, 2016 Tr. (Aliferis) 4:9-13; Joint Ex. 9 (Apr. 11, 2007 Draft), at 58.)

123. Aliferis led the Prairie team working on the SJP valuation. (June **[\*26]** 29, 2016 Tr. (Aliferis) 5:7-13; June 30, 2016 Tr. (Gross) 20:19-21.)

124. Aliferis had previously performed one to two valuations for FBTS prior to the SJP ESOP Transaction. (June 29, 2016 Tr. (Aliferis) 6:1-3.)

125. On November 20, 2006, FBTS entered into an engagement agreement with Prairie pursuant to which Prairie would "undertake a series of ESOP-related services" including "a Preliminary Valuation/Feasibility study." (Joint Ex. 7 (Prairie Engagement Agreement), at 1.) FBTS retained Prairie to provide, among other things, the following services: estimate the fair market value of SJP's stock; provide a valuation report; and provide a fairness opinion. (Joint Ex. 7

---

[7] FBTS also contends that once it was engaged, it participated in "numerous conversations" about the SJP ESOP Transaction. (May 27, 2016 Tr. (Serbin) 152:15-24.) Upon reviewing Defendant's citation to the record and the relevant testimony, the Court finds that these conversations did not occur. The Court makes this finding based on the lack of detail offered by Defendant in support, the Court's assessment of the witnesses' credibility, and the fact that the testimony mentioned the SJP ESOP Transaction as just one of many topics discussed in these purported discussions.

(Prairie Engagement Agreement), at 1-2.)

126. FBTS selected Prairie based on its previous work experience with the valuation firm and believed that Prairie had a great reputation in the valuation industry. (May 26, 2016 Tr. (Ippensen) 143:14-144:2; May 27, 2016 Tr. (Serbin) 157:24-158:5.)

127. Pursuant to the FBTS Engagement Agreement, SJP agreed to pay for the valuation services that Prairie provided. (Joint Ex. 6 (FBTS Engagement Agreement), at 8 ¶ 2.)

128. Specifically, SJP agreed to pay Prairie the following fees: $16,000 to $19,000 for a "Preliminary Valuation/Feasibility" and $16,000 to $19,000 for a "[d]etailed valuation and required [*27] opinions." (Joint Ex. 7 (Prairie Engagement Agreement), at 3 "Item 3.")

129. FBTS understood that Prairie would not be ensuring the accuracy of the information provided by SJP or its agents. (Joint Ex. 7 (Prairie Engagement Agreement), at 4; May 26, 2016 Tr. (Ippensen) 30:8-31:10.)

130. Prairie's Engagement Agreement with FBTS contained the following disclaimer:

> In completing this engagement, we will rely on information provided by [FBTS] and [SJP] including, but not limited to, financial statements, projections, product information, facilities descriptions, employee data, and other information as may be requested. We will accept this information as being accurate without independent verification.

(Joint Ex. 7, at 4.)

131. Similarly, in the "Statement of Limiting Conditions" contained in Prairie's April 11, 2007 Draft Valuation Report and April 27, 2007 Post-Transaction Valuation Report, Prairie again advised FBTS that:

> Information supplied by others that was considered in this valuation is from sources believed to be reliable, and no further responsibility is assumed for its accuracy. We have assumed that the information furnished by the Company has been reasonably prepared and reflects the best currently available estimates [*28] and judgment of the Company's management as the historical and expected future performance of the Company and have not undertaken any independent analysis to verify the reasonableness of such information.[8]

---

[8] Prairie states that the disclaimer does not mean that Prairie does not try to verify the information. Rather, Aliferis testified that Prairie "does make efforts to verify the financial information presented to it." (June 29, 2016 Tr. (Aliferis) 115:22-116:4.) Aliferis, however,

(Joint Ex. 9 (Apr. 11, 2007 Draft), at 54; Joint Ex. 10 (Apr. 27, 2007 Report), at 68.)

132. Nonetheless, FBTS expected Prairie to review the financial information provided to it by SJP and Duff & Phelps. (May 26, 2016 Tr. (Ippensen) 34:9-17.)

133. During its due diligence process, Prairie did not discuss the basis of the valuation and the Transaction as a whole with FBTS and SJP except for the instances specifically set forth in the Court's findings of fact.[9]

134. FBTS felt assured that Prairie received accurate information from SJP because the information primarily came in the form of audited financial statements. (May 26, 2016 Tr. (Ippensen) 35:14-24.)

135. Audits of financial statements for the period of 2002 to 2005 were complete at the time of the Transaction. Audited financial statements for the year 2006 were in draft form as of the date of the Transaction, given that the Churchin Group needed the ESOP valuation to adjust SJP's 2006 financial statements for the ESOP contribution. (July 1, 2016 Tr. (Fouratt) 22:8-12.) [*29]

136. FBTS, however, did not obtain or review the 2006 draft audited financial statements prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 36:18-23 (FBTS did not receive any audited financials for SJP prior to the Transaction other than those contained in the Offering Memo) 37:15-38:8 (other than the financial information in the Offering Memo, FBTS, through Ash, may have verbally received "limited information" prior to the Transaction).)

## J. Duff & Phelps Offering Memorandum (January 2007)

137. SJP retained Duff & Phelps again in January 2007 to act as SJP's financial advisor in connection with SJP's decision to implement the ESOP and in connection with the Transaction.

---

did not elaborate. Accordingly, the Court finds that the "efforts" made by Prairie consist only of the actions that the Court sets forth in its findings of fact.

[9] FBTS alleges that Prairie asked some questions of Duff & Phelps, SJP's financial advisor, as well as SJP's management, (June 29, 2016 Tr. (Aliferis) 115:2-8), and that Prairie also had some discussions with FBTS and its counsel regarding the basis of the valuation and the Transaction as a whole. (June 29, 2016 Tr. (Aliferis) 115:8-11.) FBTS, however, failed to produce any documentary evidence supporting these purported discussions. Based on the lack of corroborating evidence and the Court's assessment of the witnesses' credibility, the Court finds that Prairie did not engage in discussions beyond those specifically outlined in the Court's findings of fact.

(Court's Finding of Fact ("CFF") ¶ 34.)[10]

138. SJP and Duff & Phelps entered into an engagement agreement dated January 18, 2007, pursuant to which Duff & Phelps agreed to perform, *inter alia*, the following services: determine the value of SJP's equity for the ESOP Transaction; prepare a transaction memorandum and financial models for presentation to the ESOP trustee; participate in due diligence visits, meetings, and consultations between SJP and the ESOP trustee; coordinate distribution of all financial information [*30] related to the ESOP Transaction to the ESOP trustee and its advisors; assist SJP in negotiating with the ESOP trustee; assist SJP in negotiating ESOP Transaction documents; and act as agent for SJP in identifying and developing sources of financing. (FBTS Ex. 25, D00485-86.)

139. Duff & Phelps prepared a Confidential Information Memorandum dated January 2007 (the "Offering Memo") to be sent to potential third-party lenders to obtain financing and to FBTS representing DiPano's opening bid for the sale of his shares to the SJP ESOP. (Stipulation of Facts ¶ 32; May 25, 2016 Tr. (Miscione) 7:3-16, 21:10-18; *see also* Joint Ex. 1 (Offering Memo).)

140. The Offering Memo was marketing material, which, in the context of similar transactions, tends to focus on the positive aspects of the company and downplay risk factors that would typically be identified during the buyer's due diligence investigation. (July 15, 2016 Tr. (Messina) 73:11-24; *see also* Sept. 19, 2016 Tr. (Puntillo) 110:3-22 (buyer is expected to adjust seller's projections based on risk assessment).)

141. The Offering Memo contained a general overview discussion of the site preparation industry, including financial, regulatory, and [*31] regional issues. (Joint Ex. 1 (Offering Memo); Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 46-54; May 26, 2016 Tr. (Ippensen), at 153:20-154:21.)

142. The Offering Memo contained four bullet points on the issue of "seasonal demand," briefly discussing how changing demand for services between seasons affected cash flow, labor, and equipment management. (Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 49; May 26, 2016 Tr. (Ippensen) 155:5-156:5.)

143. Although the Offering Memo's discussion of stock prices appeared to be current through the fourth quarter of 2006, its discussion of North American housing jobs, machinery costs, gas prices, construction spending, employment rates in the site prep industry, and asphalt prices were only current through June and July of 2006. (Joint Ex. 1 (Offering Memo), at 47-48.)

144. The Offering Memo further contained a discussion about one of SJP's major customers, Hovnanian, including an analysis of Hovnanian's financial performance in 2005 and 2006. (Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 53; May 26, 2016 Tr. (Ippensen) 156:22-158:17.)

145. The Offering [*32] Memo stated that "New Jersey will continue to be a primary focus for [Hovnanian]" and that 23.7% of Hovnanian's proposed communities were located in New Jersey. (Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 53.)

146. The Offering Memo stated that SJP had been "steadily diversifying away from Hovnanian."[11] (Joint Ex. 1 (Offering Memo), at 12.) By "diversifying" the Offering Memo meant that SJP was attempting to add additional customers. (May 24, 2016 Tr. (D'Esposito) 22:4-23:2; 35:24-36:21.)

147. SJP was never asked to identify its purported additional customers, explain why it believed it could get more customers, or what additional costs, if any, would be needed to cultivate those additional customers. (June 29, 2016 Tr. (Aliferis) 85:6-86:8, 86:23-87:8 (did not recall SJP specifically explaining how SJP determined that municipalities and commercial developers had available projects); Sept. 23, 2016 Tr. (Cory) 43:12-19 (did not recall discussions about whether SJP was diversifying away from Hovnanian, or how it could replace Hovnanian if it lost Hovnanian as a customer); July 6, 2016 Tr. (Ash) 56:4-24 (did not recall SJP explaining specifics of its customer diversification strategy).) [*33]

148. The Offering Memo suggested that one of the reasons that SJP was projected to outperform its historical earnings was because of its plans for customer diversification. (Joint Ex. 1 (Offering Memo), at 40.)

149. Contrary to the seller's representation that SJP had been steadily diversifying away from Hovnanian, the Offering Memo showed that SJP's dependence on Hovnanian had actually increased from 44% in 2002 to nearly 60% in 2006. (Joint Ex. 1 (Offering Memo), at 12 ("Customer Concentration"), 126-28 ("Top Ten Customers");

---

[10] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[11] As proof of this diversification strategy, the Offering Memo noted that as of December 2006, only 20% of SJP's outstanding bids were on Hovnanian jobs. (Joint Ex. 1 (Offering Memo), at 12, 27; July 6, 2016 Tr. (Ash) 66:22-67:6; May 26, 2016 Tr. (Ippensen) 93:5-14.)

Demonstrative 22.)

150. The Offering Memo offered 380,000 shares of DiPano's stock, or 38% of all outstanding shares in SJP for $16 million. (Joint Ex. 1 (Offering Memo), at 8, General Transaction Overview.)

151. FBTS and its advisors did not receive a copy of the Yacuzzio Stock Transfer Agreement prior to the Transaction and were not aware that DiPano had purchased 60% of the outstanding shares of SJP just two years earlier in March of 2005 for $4.5 million—more than five times less than the price DiPano proposed to sell the shares to the SJP ESOP. (Pl.'s Ex. 4; Pl.'s Ex. 4(a); Pl.'s Ex. 4(b); Pl.'s Ex. 4(c); May 26, 2016 Tr. (Ippensen) 118:20-22.)

152. FBTS did not obtain any of SJP's financial information with the exception [*34] of what was contained in the Offering Memo. (*See generally* Pl.'s Ex. 4; Pl.'s Ex. 4(a); Pl.'s Ex. 4(b); Pl.'s Ex. 4(c) (Index of FBTS's Rule 34 Responses); May 26, 2016 Tr. (Ippensen) 36:18-23 (FBTS did not receive any audited financials for SJP prior to the Transaction other than those contained in the Offering Memo) 37:15-38:8 (other than the financial information in the Offering Memo, FBTS, through Ash, may have verbally received "limited information" prior to the Transaction).)

153. Cory—the individual that FBTS identified as principally responsible for reviewing the financial materials—did not receive the Offering Memo, or even know of Duff & Phelps's role, before the SJP ESOP Transaction. (May 25, 2016 Tr. (Cory) 98:25-100:25 (no recollection if she either knew about Duff & Phelps prior to the Transaction or when she saw the Offering Memo).)

154. Duff & Phelps relied on historical financial information provided by SJP to draft the Offering Memo. (May 25, 2016 Tr. (Miscione) 34:17-20.)

155. The Offering Memo contained a financial overview of SJP, including historical financial statements for the period 2002 through Estimated Fiscal Year End December 2006, five-year financial projections [*35] from 2007 through 2011, a description of SJP, and a description of the proposed ESOP Transaction—the sale by DiPano of 380,000 shares of SJP to the ESOP, representing 38% of all outstanding shares of the Company, for $16 million. (*See generally* Joint Ex. 1 (Offering Memo), at 3, Table of Contents.)

156. After SJP's 34.4% growth in 2006, Duff & Phelps projected the Company to make 0% growth in 2007. (Joint Ex. 1 (Offering Memo), at 9.) Duff & Phelps also projected 4% growth in 2008, 6% growth in 2009, 8% growth in 2010, and 6% growth in 2011. (Joint Ex. 1 (Offering Memo), at 9.)

157. The Offering Memo attached the 2005 Audited Financial Statements (which incorporated audited financial information from 2004); Audited Prepared Combined Statements for 2002 to 2005; and a "Draft" combined forecasted financial statement for 2006. (*See* Joint Ex. 1 (Offering Memo), at 56-120.)

158. The Offering Memo included a disclaimer that expressly advised FBTS of the following:

    1. that the Offering Memo does not purport to be all inclusive or contain all of the information that a prospective investor might find to be material;

    2. that any prospective investor should conduct its own due diligence on SJP's business, financial information and future prospects;

    3. that Duff & Phelps did not independently [*36] verify any of the information contained in the Offering Memo;

    4. that Duff & Phelps disclaimed any responsibility for the accuracy of the information contained in the Offering Memo;

    5. that Duff & Phelps disclaimed any responsibility for any material information that may have been omitted from the Offering Memo;

    6. that the information contained in the Offering Memo was only current through the date of the Offering Memo, if not earlier;

    7. that Duff & Phelps disclaimed any responsibility to supplement or update any of the information contained in the Offering Memo;

    8. that the Offering Memo did not purport to be an indication of the current state of affairs of SJP or constitute a representation that there has been no change to the business or affairs of SJP.[12]

(Joint Ex. 1 (Offering Memo), at 2.)

159. As the information contained in the Offering Memo was prepared no later than January 2007, the Offering Memo did not incorporate SJP's actual financial performance for the first quarter of 2007. (May 25, 2016 Tr. (Miscione) 11:15-19, 13:5-14; *see generally* Joint Ex. 1 (Offering Memo).)

## K. Duff & Phelps Sends Prairie and FBTS the Offering Memo

160. On or about March 2, 2007, Duff & Phelps sent Prairie a copy of the [*37] Offering Memo. (Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo).)

---

[12] The Court notes that this list constitutes a summary of, as opposed to a direct excerpt from, Joint Exhibit 1, at 2.

161. Prairie then forwarded a copy of the Offering Memo to FBTS at some point prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 37:13-20; May 25, 2016 Tr. (Miscione) 7:12-20.)

162. FBTS understood that the seller's projections in the Offering Memo were based on financial information that was current no later than December 2006. (May 27, 2016 Tr. (Ippensen) 49:21-50:11.)

163. Ippensen interpreted the Offering Memo as containing an industry analysis, reviewed it, and felt comfortable with the industry analysis. (May 26, 2016 Tr. (Ippensen) 153:20-155:4; May 27, 2016 Tr. (Ippensen) 48:10-49:1.)

164. FBTS and Prairie failed to identify the inconsistency between the Offering Memo's representation that SJP was increasingly diversifying away from Hovnanian and the fact that SJP had grown increasingly reliant on Hovnanian during the past five years. (July 6, 2016 Tr. (Ash) 68:18-70:15 (not specifically aware of how SJP was diversifying away from Hovnanian, or how long it had been diversifying away); June 29, 2016 Tr. (Aliferis) 68:3-17 (did not recall SJP saying that it was steadily diversifying [*38] away from Hovnanian, and did not specifically recall looking to see if customer concentration was increasing or decreasing).)

**L. March 12, 2007 Visit**

165. Aliferis of Prairie visited several work sites near SJP's offices on March 12, 2007.[13] (June 29, 2016 Tr. (Aliferis) 43:21-44:6; *see also* Joint Ex. 9 (Apr. 11, 2007 Draft), at 6.)

166. Aliferis only recalls being driven around by Dugan to three or four work sites and spending approximately five minutes at each work site. (June 29, 2016 Tr. (Aliferis) 43:24-44:6, 45:5-14.)

167. Dugan explained to Aliferis the services that SJP was providing at each work site. (June 29, 2016 Tr. (Aliferis) 45:5-14.)

168. Aliferis observed firsthand that it was raining "pretty bad" during the March 12, 2007 visit.[14] (June 29, 2016 Tr.

169. No representatives from FBTS participated in or attended the March 12, 2007 visit. (June 29, 2016 Tr. (Aliferis) 42:20-43:1; May 26, 2016 Tr. (Ippensen) 11:13-19; July 6, 2016 Tr. (Ash) 112:2-10.)

170. Prairie did not inform FBTS of anything discussed at the March 12, 2007 visit. (May 26, 2016 Tr. (Ippensen) 11:20-12:6; July 6, 2016 Tr. (Ash) 91:11-17.)

**M. March 13, 2007 Financing for Transaction [*39]**

171. By correspondence dated March 13, 2007, First American Bank approved a financing package for SJP in the amount of $22.5 million in connection with the SJP ESOP Transaction—in the amount of various notes totaling $18.5 million, and a $4 million line of credit, which was collateralized by all of SJP's assets, including its equipment, bank accounts, and contracts. (FBTS Ex. 31, at D00526-27.)

172. Dugan and D'Esposito provided information to First American Bank regarding SJP in connection with First American Bank's loan to SJP. (May 23, 2016 Tr. (DiPano) 97:2-6.)

173. The information SJP provided to First American Bank in connection with financing the SJP ESOP Transaction included SJP's customers, how SJP obtained work, how SJP bid on jobs, and how SJP tracked jobs. (May 23, 2016 Tr. (Dugan) 150:8-15.)

174. First American Bank representatives visited the SJP offices and job sites on more than one occasion. (May 23, 2016 Tr. (DiPano) 98:17-24, 99:3-7; May 23, 2016 Tr. (Dugan) 153:6-7.)

175. In addition to First American Bank, two other lending institutions, LaSalle Business Credit, LLC and Citibank, issued financing proposals to SJP in connection with the ESOP Transaction. The financing **[*40]** proposals were expressly subject to those institutions performing due diligence and they expressly advised SJP that they did not constitute offers of loan commitments. (FBTS Ex. 29, at 1 ("It should be emphasized that the following is not intended to be nor should it be construed as a commitment . . . to provide the requested financing, but serves merely as a preliminary description of the possible terms of the proposed financing . . . subject to further review, analysis, consideration and credit approval . . . ."), FBTS Ex. 30, at 1 ("This letter, however, is neither a contract nor an offer to enter into a contract nor a

---

[13] Although Prairie describes the March 12, 2007 visit as a "due diligence meeting," the Court finds no evidence concerning what specific due diligence Prairie conducted on March 12, 2007, besides visiting several of SJP's work sites.

[14] On September 21, 2016, Plaintiff filed a Motion for Judicial Notice as to the weather conditions near SJP's offices on March 12, 2007. (ECF No. 215.) Defendant responded on September 27, 2016. (ECF No. 217.) Upon reviewing the parties' submissions, the Court denies

Plaintiff's Motion.

commitment to obligate [LaSalle Business Credit] in any way."), at 5 ("[T]his letter is an expression of interest and is not a binding commitment of [LaSalle Business Credit] to provide financing . . . [and] [t]he closing of the loan would be conditioned upon [*inter alia*] . . . a satisfactory due diligence review of the business and financial affairs of [SJP].").)

176. The SJP ESOP executed a loan from SJP to fund the Transaction (the "Internal ESOP Loan"). (May 27, 2016 Tr. (Ippensen) 24:1-5.)

177. SJP later wrote down the Internal ESOP Loan by an undetermined amount.[15] (May 27, [*41] 2016 Tr. (Ippensen) 24:6-10.)

## N. March 2007 — Prairie Due Diligence

178. On March 16, 2007, Aliferis requested additional information from D'Esposito, including, but not limited to, information regarding SJP's top ten customers in terms of overall revenue for December 31, 2006; updated backlog[16] and revenue recognition, names and estimated revenues associated with the current top five to seven job bids; an updated staffing matrix for the fiscal year ended 2006; and the "composition of revenues for SJP Contractors, National[,] and Dyna-Tec." (FBTS Ex. 32.)

179. Aliferis also spoke with SJP management about backlog to confirm that the statements concerning backlog in the Offering Memo were correct. (June 29, 2016 Tr. (Aliferis) 64:6-12.)

180. In addition, Aliferis spoke with SJP management about SJP's profit margins on "average" jobs. (June 29, 2016 Tr. (Aliferis) 70:9-14.)

---

[15] FBTS alleges inconsistent facts regarding the amount of the Internal ESOP Loan write-down. In its Proposed Findings of Fact, FBTS states that the write-down was $5.5 million, and in its Proposed Conclusions of Law, FBTS states that the write-down was $9.6 million. (*Compare* Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 552 (citing May 27, 2016 Tr. (Ippensen) 24:6-10), *with* Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 705 (citing July 6, 2016 Tr. (Ash) 127:3-8).) FBTS fails to cite to, and the Court is unaware of, any documents presented at trial that contain the actual amount of the write-down. Because the specific amount of the write-down is immaterial to the Court's decision for reasons set forth in the Discussion section below, the Court need not determine whether the write-down was $5.5 million or $9.6 million.

[16] Backlog is work on hand (i.e., new work or a previous year's unfinished contract work) that has yet to be performed. (May 23, 2016 Tr. (DiPano) 41:3-14.)

181. By e-mail message dated March 24, 2007, Aliferis sent D'Esposito and Miscione, a representative of First American Bank, the preliminary projections that were utilized by Prairie for the valuation of SJP's common stock. (FBTS Ex. 9.)

182. The March 24, 2007 e-mail message requested that D'Esposito "review the [*42] enclosed analysis and verify the comments" so that Prairie could move forward with its valuation report. (FBTS Ex. 9.)

183. To verify the projections, Prairie reviewed SJP's updated financial information, which was provided by SJP. (June 29, 2016 Tr. (Aliferis) 79:20-25.)

184. Prairie relied on the information provided by SJP and did not undertake an independent analysis to verify the underlying rationale. (June 29, 2016 Tr. (Aliferis) 79:15-25.)

185. On March 28, 2007, D'Esposito sent an e-mail message to Aliferis, copying Miscione and Daniel Christoffel of Duff & Phelps, attaching the draft audited combined financial statements for the period ending December 31, 2006 prepared by the Curchin Group. (FBTS Ex. 34; May 24, 2016 Tr. (D'Esposito) 30:2-5.)

186. In the March 28, 2007 e-mail message, D'Esposito informed Prairie that SJP exceeded its projected earnings before interest, tax, depreciation, and amortization ("EBITDA") for 2006 of $9.5 million with an adjusted EBITDA for 2006 of $11 million. (FBTS Ex. 34; May 24, 2016 Tr. (D'Esposito) 51:12-25.)

187. Prairie asked for information regarding the operational overview of SJP and the different services offered by SJP in the market. (June [*43] 29, 2016 Tr. (Aliferis) 119:7-15.)

188. Prairie also wanted to see historical audited financial statements, as well as information relating to backlog, customers, suppliers, and year-to-date financial information. (June 29, 2016 Tr. (Aliferis) 119:7-20.)

189. SJP provided all of the information that Prairie requested. (June 29, 2016 Tr. (Aliferis) 119:25-120:1.) Most of this information was already contained in the Offering Memo. (May 29, 2016 Tr. (Aliferis) 119:11-13 (describing information requested as "[p]retty much consistent with— more or less consistent with what was [previously] provided by the [C]ompany's financial advisor").)

## O. March 29, 2007 Teleconference

190. On March 29, 2007, Ash and Cory of FBTS held a conference call with two of FBTS's attorneys from SFE&G to discuss the Stock Appreciation Rights ("SARs") schedule and

the terms of the indemnification agreement in the Stock Purchase Agreement (the "SPA"). (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

191. The conference call attendees were EB Committee members Cory and Ash, as well as FBTS's legal counsel, Greenapple and Margaret Steere. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

192. No one from Prairie participated in the March 29, 2007 conference call. (FBTS Ex. 11 (Mar. 29, [*44] 2007 Conference Call Memo), at 1.)

193. Cory took notes ("March 29, 2007 Conference Call Memorandum") during the March 29, 2007 conference call. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1-2; May 25, 2016 Tr. (Cory) 126:15-127:6.)

194. According to the March 29, 2007 Conference Call Memorandum, the only issues discussed were the SARs and the proposed indemnification clause. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

195. SARs are a form of incentive compensation designed to benefit company management whereby management receives a bonus when the stock price of the company rises. (May 25, 2016 Tr. (Miscione) 54:23-55:5; May 25, 2016 Tr. (Cory) 107:21-25.)

196. The participants of the March 29, 2007 conference call did not discuss what consequence SARs had on the fair market value of SJP and did not ask Prairie to quantify the effect of SARs on the final purchase price. (May 25, 2016 Tr. (Cory) 108:22-109:5.)

197. Cory asked a single question about the SPA, specifically, how Section 8.5 would work. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 2; May 25, 2016 Tr. (Cory) 129:7-13.)

198. The attendees discussed the indemnification clause in the SPA and noted that the indemnification should come from the seller, the party receiving the money, not the Company. (FBTS [*45] Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1; May 25, 2016 Tr. (Cory) 130:6-16.) The meeting notes indicate that Greenapple requested a revision to the indemnification clause. (FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo), at 1.)

199. The terms of indemnification were not negotiated by FBTS, as FBTS merely sought to change the indemnification provision to comply with *ERISA § 410*.[17] (FBTS Ex. 11 (Mar.

29, 2007 Conference Call Memo), at 1; May 25, 2016 Tr. (Cory) 130:6-21.)

**P. Prairie's April 11, 2007 Draft Valuation Report & Fairness Opinion**

200. On April 11, 2007, Prairie sent a draft valuation report ("April 11, 2007 Draft Valuation Report") to Cory at FBTS. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 1.)

201. It is typical to have a draft valuation report dated as of the transaction closing and a final report generated after the date of closing to allow for the final report to accurately reflect the valuation on the closing date. (June 21, 2016 Tr. (Fischer) 62:4-63:12.)

202. Prairie typically spends two to two-and-a-half months on a valuation report, during which Prairie works on multiple simultaneous engagements. (June 29, 2016 Tr. (Aliferis) 136:11-16, 169:23-170:24.)

203. The general time period spent on valuation periods [*46] depends on the circumstances of each particular transaction. (June 29, 2016 Tr. (Aliferis) 169:23-170:24.)

204. In the April 11, 2007 Draft Valuation Report, the Industry Analysis section was missing. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 30.)

205. It is a best practice for a valuation professional to include an industry analysis section in a valuation report. (June 30, 2016 Tr. (Van Horn) 130:3-6; July 14, 2016 Tr. (Messina) 72:1-3; June 30, 2016 Tr. (Gross) 23:1-4.)

206. The industry analysis section: (1) tells the reader that the valuation professional reviewed relevant industry and economic factors that could potentially impact the subject company; and (2) educates the reader about important trends and important factors that could influence the value of the subject company. (June 30, 2016 Tr. (Van Horn) 131:10-19.)

207. A prudent investor would not have gone forward with

---

agreement were "negotiated," as opposed to being revised to comply with *ERISA § 410*. See *Johnson v. Couturier, No. 05-2046, 2008 U.S. Dist. LEXIS 82902, 2008 WL 4443085, at *5 (E.D. Cal. Sept. 26, 2008)*, aff'd and remanded, *572 F.3d 1067 (9th Cir. 2009)* ("A number of federal courts have held that under *ERISA § 410*, where an ESOP owns a substantial portion of the sponsoring company's stock, it would be inconsistent with the intentions of ERISA to allow a trustee who has breached his fiduciary duties to the ESOP to be indemnified by the sponsoring company where the ESOP would indirectly bear the financial burden.") (citations omitted).

---

[17] There is no evidence that the terms of the indemnification

the Transaction given that the April 11, 2007 Draft Valuation Report was missing information about SJP's industry and region. (Sept. 19, 2016 Tr. (Puntillo) 87:10-24.)

208. After the Transaction, the April 27, 2007 Post-Transaction Valuation Report contained an Industry Analysis section, which a prudent investor would have considered [*47] to be material prior to the Transaction for determining whether the tenor of the industry analysis for SJP reasonably reflected SJP's projected performance. (Sept. 19, 2016 Tr. (Puntillo) 85:15-86:14.)

209. The April 27, 2007 Post-Transaction Valuation Report contained no discussion explaining or justifying the financial projections for SJP in light of the unfavorable economic trends in the housing industry. (June 30, 2016 Tr. (Van Horn) 130:20-131:19; 174:2-17.)

210. Prairie used SJP's record 2006 financial performance as the baseline for its projections even though it resulted in projections that deviated from SJP's five-year historical average performance, due to, *inter alia*, the recent growth of the Company. (Stipulation of Facts ¶¶ 51-52; *see also* July 5, 2016 Tr. (Stoesser) 24:5-7 ("The valuation reports by Prairie . . . by Duff & Phelps, use[] a baseline [of] 2006, which was a really strong year for SJP"); July 14, 2016 Tr. (Messina) 96:16-22.)

211. With the exception of the Industry Analysis section, Prairie's April 11, 2007 Draft Valuation Report contained many of the key components that are typical within the ESOP industry: a review of the transaction, a discussion of Prairie's [*48] background and experience, a discussion of the materials it reviewed, a discussion of SJP's historic financial data, a discussion of SJP's projections of future performance, and a discussion of how Prairie came up with its valuation, including the methodologies used, as well as a narrative about the Company and the economy. (June 21, 2016 Tr. (Fischer) 41:23-42:17.)

212. Both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report contained numerous errors and were missing some valuation components. (*See, e.g.*, July 14, 2016 Tr. (Messina) 105:6-106:14 (Plaintiff's expert witness, Dana Messina ("Messina"), concluded that Prairie committed a host of valuation errors); *see generally* June 30, 2016 Tr. (Van Horn) 153:5-188-20 (Defendant's expert witness, Bradley Van Horn ("Van Horn") identified errors among valuation components).)

213. In preparation of the April 11, 2007 Draft Valuation Report, Prairie's review included a variety of data points, such as SJP's revenue, profitability, working capital, and discount rates. (June 29, 2016 Tr. (Aliferis) 122:19-123:7.)

214. In preparation of the April 11, 2007 Draft Valuation Report, Prairie and FBTS did [*49] not ask Duff & Phelps follow-up questions concerning: (a) the projected growth rate; (b) the projected margins; and (c) the assumptions and justifications supporting Duff & Phelps's projections.[18] (May 25, 2016 Tr. (Miscione) 14:21-16:8 (no recollection of being asked by FBTS or Prairie how Duff & Phelps arrived at the compound annual growth rate ("CAGR")), 16:21-17:5 (no recollection of being asked how Duff & Phelps arrived at EBITDA or gross profit margins), 83:9-12 (no recollection of being asked what assumptions were used in seller's financial model); May 24, 2016 Tr. (D'Esposito) 13:3-6 (no recollection of being asked if 2006 earnings were sustainable); June 29, 2016 Tr. (Aliferis) 114:12-15 (no recollection of what specific financial information was provided); 14:3-13 (no specific recollection of how SJP's management described SJP); 23:5-16 (no specific recollection of discussing the peer group with SJP), 58:18-20 (did not recall if SJP identified its competitors by name), 59:2-12 (no specific recollection of discussing modifications to SJP's equipment); 68:12-17 (no recollection of analyzing customer concentration trend), 77:15-78:9 (no specific recollection of discussing projections [*50] with Duff & Phelps or SJP's management), 89:11-24 (did not recall comparing size of SJP's bids after the change of ownership).)

215. Prairie by and large accepted, without verification, representations made by SJP's management and financial advisor concerning SJP's business (e.g., its reputation, contracts, backlog, bidding, and bid rate), as well as its historical and projected financial performance. (June 29, 2016 Tr. (Aliferis) 50:1-52:16; June 30, 2016 Tr. (Gross) 24:6-25:2, 25:14-26:6.)

216. Prairie copied verbatim information from the Offering Memo, including information about SJP and projections provided SJP, and pasted that information into the April 11, 2007 Draft Valuation Report. (*Compare* Joint Ex. 1 (Offering Memo), at 22-32, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 8-17; May 26, 2016 Tr. (Stipulation by D. Schnapp) 66:15-20 (establishing Prairie's copying and pasting).)

217. Prairie received financial and company information directly from SJP or its advisors, which Prairie used in preparing the April 11, 2007 Draft Valuation Report. (Stipulation of Facts ¶ 43.)

---

[18] Further, there is no evidence that Aliferis spoke with or obtained information directly from SJP's accountant. (June 29, 2016 Tr. (Aliferis) 78:21-79:11 (did not know of the Curchin Group or Robert Fouratt); July 1, 2016 Tr. (Fouratt) 23:22-25 (could not recall speaking with Aliferis prior to the Transaction).)

218. It is typical in ESOP transactions that valuation companies get information relating to the company from the company (June 21, 2016 Tr. (Fischer) [*51] 42:18-23.)

219. Dugan and D'Esposito provided information about SJP to Duff & Phelps and Prairie.[19] (May 23, 2016 Tr. (DiPano) 33:17-35:4, 42:7-19-43:2.)

220. Dugan provided information to Prairie[20] regarding contracts, backlog, customer information, and field operations. (May 23, 2016 Tr. (DiPano) 78:13-79:3; May 23, 2016 Tr. (Dugan) 149:17-150:2.)

221. FBTS did not review any of the financial information that Prairie received to ensure that it was accurate or complete. (May 26, 2016 Tr. (Ippensen) 34:14-35:13.)

222. The EB Committee typically receives a draft valuation report a few days before the transaction is tentatively set to close. (May 27, 2016 Tr. (Serbin) 133:12-16.)

223. The April 11, 2007 Draft Valuation Report was provided to FBTS less than three business days before the Transaction, and less than two business days before Prairie's presentation at the April 13, 2007 conference call. (Stipulation of Facts ¶ 48 (describing conference call on April 13, 2007); Joint Ex. 5 (Stock Purchase Agreement).)

224. Prairie did not provide FBTS with any draft valuations prior to April 11, 2007. (Pl.'s Ex. 4, Pl.'s Ex. 4(a), Pl.'s Ex. 4(b), Pl.'s Ex. 4(c) (Index of FBTS Rule 34 Responses); May 25, [*52] 2016 Tr. (Cory) 102:2-5 (testifying that she did not recall receiving a draft valuation report prior to April 11, 2007); May 26, 2016 Tr. (Ippensen) 12:7-13:1 (testifying that he was not aware of receiving any draft valuation reports prior to April 11, 2007 and that if FBTS had received a draft valuation report prior to April 11, 2007, it would have been kept in FBTS's files); May 27, 2016 Tr. (Serbin) 129:7-9

_____

[19] FBTS further alleges that Dugan and D'Esposito later began to communicate directly with FBTS. (May 23, 2016 Tr. (DiPano) 42:7-19-43:2.) Upon reviewing the evidence presented and assessing the credibility of the witnesses, however, the Court finds that Dugan and D'Esposito had direct communications with Prairie, but not with FBTS. (*See* May, 26 2016 Tr. (Ippensen) 75:19-20; May 27, 2016 Tr. (Ippensen) 31:2-7; July 6, 2016 Tr. (Ash) 61:9-12; Sept. 23, 2016 Tr. (Cory) 51:24-52:4.)

[20] In his testimony, DiPano refers generally to FBTS and Prairie as "they" when describing who requested information from SJP in connection with the SJP ESOP Transaction. (May 23, 2016 Tr. (DiPano) 78:13-79:3.) In light of the lack of evidence that FBTS received financial documents directly from SJP, and after assessing the credibility of the witnesses, the Court finds that the information was provided directly to Prairie but not directly to FBTS.

(testifying that the April 11, 2007 Draft Valuation Report is the only valuation report that she could recall); July 6, 2016 Tr. (Ash) 21:17-20, 89:20-23 (testifying that she did not recall receiving a draft valuation prior to April 11, 2007); June 29, 2016 Tr. (Aliferis) 8:5-8, 94:22-25.)

225. FBTS had an obligation to review and to understand the April 11, 2007 Draft Valuation Report. (May 26, 2016 Tr. (Ippensen) 145:21-23.)

226. Ippensen reviewed the April 11, 2007 Draft Valuation Report prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 133:17-134:5.)

227. When reviewing the April 11, 2007 Draft Valuation Report, Ippensen performed his own "capitalized cash flow" calculation of market valuation using historical information as a "gut check." (May 27, 2016 Tr. (Ippensen) 13:18-14:19.) [*53]

228. The capitalized cash flow method is derived from the historical cash flow divided by the discount rate adjusted for growth. (May 27, 2016 Tr. (Ippensen) 13:15-14:1.)

229. To perform the calculation, Ippensen added together the historical EBITDA figures for 2004, 2005, and 2006 and divided that number by three. That number was then divided by the 19.25 discount factor minus four percent, i.e., the expected growth rate in the April 11, 2007 Draft Valuation Report. (May 27, 2016 Tr. (Ippensen) 81:5-82:25; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

230. In making his "gut-check" calculation, Ippensen did not use SJP's historical cash flows, but rather, its historical EBITDA. Additionally, Ippensen did not look at the full historical period set forth in the April 11, 2007 Draft Valuation Report, but rather only the three most recent years (two of which were SJP's highest performing years). (May 27, 2016 Tr. (Ippensen) 81:9-82:10; *see also* Joint Ex. 1 (Offering Memo), at 34, 37.)

231. Ippensen's results from the capitalized cash flow method for valuation comported with Prairie's valuation of SJP. (May 27, 2016 Tr. (Ippensen) 14:2-10.)

232. When Ippensen reviewed the April 11, 2007 Draft Valuation Report, he did so to ensure that [*54] Prairie's due diligence procedures, as set forth on page six, comported with IRS Ruling 59-60. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 6; May 26, 2016 Tr. (Ippensen) 184:6-20.)

233. Serbin also read and reviewed the April 11, 2007 Draft Valuation Report prior to the meeting on April 13, 2007, at which she voted to approve the Transaction. (May 27, 2016 Tr. (Serbin) 106:12-107:21.)

234. Prairie's fairness opinion addressed "whether the consideration to be paid for the shares by the ESOP is equal to or less than their fair market value as of the date of closing, and whether the Transaction is fair to the ESOP Trust from a financial point of view." (Joint Ex. 7 (Prairie Engagement Agreement), at 2.)

235. The purpose of Prairie's fairness opinion was to opine as to whether the Transaction was fair from a financial point of view to the ESOP and whether the terms of financing were reasonable, and set forth the terms under which it conducted its analysis. (June 30, 2016 Tr. (Gross) 48:14-49:5.)

236. Although FBTS retained Prairie to provide a valuation report, FBTS understood that FBTS was ultimately responsible for making the determination of the fair market value of DiPano's shares. (May 26, 2016 Tr. (Ippensen) 7:5-11.)

237. In [*55] its fairness opinion, Prairie opined that the consideration the SJP ESOP was paying as part of the Transaction did not exceed fair market value, and that the terms and conditions of the Transaction were fair to the SJP ESOP. (June 30, 2016 Tr. (Gross) 58:18-59:12.)

238. Prairie's fairness opinion stated:
> In completing this engagement, we have relied on information provided by the ESOP Trustee and the Company including, but not limited to, financial statements, projections, product information, facilities descriptions, employee data, and other information as may have been requested. This information has been accepted as being accurate without independent verification by us.

(Joint Ex. 11 (Apr. 16, 2007 Fairness Opinion), at 3.)

239. Typically, one of the components of a valuation report is "[a] statement that the data received has been relied on with/without independent verification." (June 30, 2016 Tr. (Van Horn) 150:12-24.) This statement puts the reader (i.e., FBTS) "on alert" that the valuation advisor (i.e., Prairie) did not independently verify the information that it received from its sources and that the burden for conducting any necessary due diligence was shifted to the reader (i.e., FBTS). (June 30, 2016 [*56] Tr. (Van Horn) 151:12-21.)

240. In the normal course of performing a valuation, Prairie often received financial statements; however, Prairie does not undertake an independent audit of that information as Prairie is not an accounting firm. (June 30, 2016 Tr. (Gross) 23:21-24:12; June 29, 2016 Tr. (Aliferis) 4:20-5:6.)

241. Unless information provided by the seller is implausible on its face, Prairie will typically accept such information as

true. (June 29, 2016 Tr. (Aliferis) 80:21-81:12, 83:6-84:16; June 30, 2016 Tr. (Gross) 25:14-19.)

242. Prairie relied on projections of SJP's future performance to reach its conclusions regarding the value of DiPano's stock. (Stipulation of Facts ¶ 47.)

243. In the April 11, 2007 Draft Valuation Report, Prairie used the discounted cash flow ("DCF") method and the market multiple method in preparing its valuation. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 46; June 29, 2016 Tr. (Aliferis) 18:11-23; May 26, 2016 Tr. (Ippensen) 103:16-20; Stipulation of Facts ¶ 49.)

244. Prairie weighed the market multiple method and the DCF method, fifty percent each in the April 11, 2007 Draft Valuation Report. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 46; May 26, 2016 Tr. (Ippensen) [*57] 103:16-109.)

245. Prairie's conclusion of SJP's value under the DCF method was $36,105,000. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 46.)

246. Prairie's conclusion regarding SJP's value under the market multiple method was $53,607,000. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 46.)

247. The market multiple method and the DCF method were both standard valuation methods used in the ESOP industry and were appropriately used by Prairie. (June 30, 2016 Tr. (Van Horn) 82:13-83:8.) It was appropriate to give each valuation method fifty percent weight. (July 14, 2016 Tr. (Messina) 159:1-23.)

248. Under the DCF method, the value of a company is derived by adding all of the company's projected future cash flows and discounting them to their present value. (July 14, 2016 Tr. (Messina) 70:13-21; June 30, 2016 Tr. (Gross) 18:1-9; May 26, 2016 Tr. (Ippensen) 186:5-17. June 29, 2016 Tr. (Aliferis) 23:20-24; 148:4-14.)

249. Under the market multiple method, the value of a closely held company is derived by identifying similar publicly traded companies (the "peer group"), expressing the known market value of the peer group (based on publicly traded share price) as a function of a financial metric, and then applying that formula to derive the privately [*58] held company's value. (June 30, 2016 Tr. (Gross) 15:5-16:2; July 14, 2016 Tr. (Messina) 111:23-112:8.)

### i. FBTS's Review of Prairie's Reliance on 2006 Performance

250. FBTS understood that the financial projections used by

Prairie were a leading driver of Prairie's value conclusion under the DCF method. (May 26, 2016 Tr. (Ippensen) 39:1-40:1; July 14, 2016 Tr. (Messina) 70:22-71:4 (explaining that the driving factors of the DCF method are the cash flow projections and discount rate).)

251. SJP experienced significant, positive revenue growth in the years 2005 and 2006 and reported record revenues, gross profits, and EBITDA for 2006.[21] (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79; May 24, 2016 Tr. (D'Esposito) 11:6-12:11.)

252. SJP's growth in the years 2005 and 2006 coincided with DiPano's assumption of the CEO position at SJP. (May 24, 2016 Tr. (D'Esposito) 31:4-8.)

253. FBTS attributed SJP's growth in 2005 and 2006 to the change in management structure. (May 27, 2016 Tr. (Ippensen) 64:21-65:9; May 27, 2016 Tr. (Serbin) 118:6-11.)

254. Although FBTS may have attributed SJP's growth to change in management, FBTS's belief was unsubstantiated given that FBTS failed to conduct any analysis or diligence to determine [*59] the actual effect of management.[22]

255. FBTS noted SJP's growth in 2005 and 2006 by customer, utilizing the Top Ten Customer Lists in the Offering Memo. (Joint Ex. 1 (Offering Memo), at 126-28; May 26, 2016 Tr. (Ippensen) 87:22-88:4.)

256. FBTS did not conduct a detailed analysis of SJP's growth in 2005 and 2006 by customer, however, and failed to identify, for example, the inconsistency between SJP's representation that it was diversifying away from Hovnanian and the fact that SJP had grown increasingly reliant on

---

[21] SJP's estimated growth between 2005 and 2006 in terms of net revenues and growth was 34.4% or $60,831,000. (Joint Ex. 1 (Offering Memo), at 122.)

[22] Defendant contends that DiPano "modernized SJP by, among other things, making upgrades to SJP's equipment fleet and computer systems, as well as changing the management of SJP's maintenance facility and the heavy equipment tracking system." (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 23 (citing May 23, 2016 Tr. (DiPano) 48:21-49:3).) There is no evidence, however, that Prairie or FBTS knew or considered the effect of the change in management structure prior to the SJP ESOP Transaction. (See June 29, 2016 Tr. (Aliferis) 60:5-20, 62:7-63:4 (Aliferis was unaware that SJP had any proprietary software, and had no recollection of discussing SJP's computer system either with SJP or FBTS) (citing June 29, 2016 Tr. (Aliferis) 60:5-20, 62:7-63:4); see also June 29, 2016 Tr. (Aliferis) 59:18-60:17 (did not recall any discussions with SJP regarding upgrading its fleet beyond the ordinary periodic maintenance, nor did he recall discussing upgrades to its computer system).)

Hovnanian during the past five years. (CFF ¶ 164.)[23]

257. FBTS also attributed the 2006 growth to SJP's bidding on larger projects and moving into areas outside of New Jersey, such as New York. (May 27, 2016 Tr. (Ippensen) 65:10-15.) FBTS, however, did not independently verify whether this was true. (May 26, 2016 Tr. (Ippensen) 59:10-61:17; 80:8-15 (unable to identify any evidence except SJP's top customers for 2006 as reflected in the Offering Memo); July 6, 2016 Tr. (Ash) 43:7-16.)

258. The Offering Memo revealed that while some customer revenues were growing (e.g., Hovnanian), other customer revenues were decreasing or wholly disappeared (e.g., Sharp, Millennium, Sunrise, Kara Homes, Inc. [*60] ("Kara Homes"),[24] Artisan Group, Continental, Signature, Halpern, American Properties, Nordic, Bukiet, SGS Communities). (Joint Ex. 1 (Offering Memo) at 126.)

259. Ippensen reviewed the projections in the April 11, 2007 Draft Valuation Report and felt "extremely comfortable" with the projected 0% growth for 2007. (May 26, 2016 Tr. (Ippensen) 186:24-187:5.)

260. Ippensen "remember[ed] distinctly" when reviewing the projections seeing few other reports in his sixteen years of experience that projected 0% growth the year following 34% growth. (May 26, 2016 Tr. (Ippensen) 186:24-187:8.)

261. Ippensen believed that the projections, which projected 0% growth for 2007 and increased growth in the following years, were "extremely conservative." (May 26, 2016 Tr. (Ippensen) 186:24-187:11.)

262. Ippensen did not think that the financial projections contained in the April 11, 2007 Draft Valuation Report were unrealistic for various reasons, including growth in SJP's revenue over the prior five years; projected zero percent growth for 2007; $58 million backlog going into 2007; $8.5 million of awarded bids for 2007; and outstanding bids for 2007, which SJP could also have been awarded. (May 27, 2016 Tr. (Ippensen) 16:2-19.)

263. The financial [*61] projections in the April 11, 2007 Draft Valuation Report increased SJP's total operating

---

[23] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[24] Additionally, FBTS and Prairie did not discuss the effect of Kara Homes's bankruptcy on either SJP's ability to match its 2006 revenues, or on SJP's stated strategy of diversifying away from Hovnanian. (May 26, 2016 Tr. (Ippensen) 102:21-103:1; May 23, 2016 Tr. (Dugan) 176:9-15, 189:17-23.)

expenses between 2006 and 2007 and continued to increase the operating expenses from 2007 to 2011. (May 27, 2016 Tr. (Ippensen) 17:12-22; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

264. SJP was projected to achieve revenue growth of $16 million during the five years 2007 through 2011, which is $1 million more than the revenue growth that SJP achieved in 2006 as compared to 2005. (May 27, 2016 Tr. (Ippensen) 21:6-20; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

265. Prairie projected that SJP would generate average revenues, gross profits, gross profit margins, EBITDA, EBITDA margins, and cost of sales margins that deviated from SJP's historical five-year average. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

266. Prairie projected that SJP would match its 2006 record gross profits in 2007 and achieve record gross profits in each subsequent year. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

267. Prairie's projected cost of sales, cost of sales margins, and income from operations margins were more favorable than either SJP's five-year average, three-year average, or two-year average historical margins. (June 29, 2016 Tr. (Aliferis) 28:4-30:3, 31:1-16; Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79.) [*62]

268. The financial projections in the April 11, 2007 Draft Valuation Report decreased EBITDA for 2007 by five percent as compared to 2006. (May 27, 2016 Tr. (Ippensen) 17:23-18:17; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79. June 29, 2016 Tr. (Aliferis) 33:2-10; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.) SJP's 2007 projected EBITDA, however, was still approximately twice as large as SJP's year historical average. (*See* Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

269. When calculating the projected revenues and sales for SJP, Prairie took into account whether SJP had sufficient equipment, personnel, and finances to realize the projections, based on the information supplied by SJP. (June 29, 2016 Tr. (Aliferis) 3 5:7-15; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

270. Although Prairie projected SJP's costs to increase because SJP was in a capital intensive business, (June 29, 2016 Tr. (Aliferis) 35:7-22; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79), Prairie projected that SJP's costs as a percentage of sales would be 5.5% less than SJP's historical cost as a percentage of sales (Joint Ex. 9 (Apr. 11, 2007 Draft), at 79; *see also* Demonstrative 3.)

271. SJP's 2006 unadjusted income from operations was 16.25%. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72.) SJP's five-year, three-year, and two-year average [*63] unadjusted income from operations were: 9.92%, 9.89%, and 12.99%,

respectively. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72.)

272. Further, from 2002 to 2003, SJP's unadjusted income from operations decreased from 13.05% to 6.90%; and from 2003 to 2004, SJP's unadjusted income from operations decreased from 6.90% to 3.86%. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72.)

273. Prairie believed that the 16.25% unadjusted income from operations in 2006 demonstrated that SJP's profitability had been increasing, specifically since 2004. (June 29, 2016 Tr. (Aliferis) 151:11-20.)

274. Prairie also determined that the gross profit projections for 2007 to 2011, which mirrored the 25.4% achieved by SJP in 2006, were reasonable based on discussions with management, historical trend analysis, growth in revenue and profitability, strong backlog numbers, and continued solicitation of bids on new projects. (June 29, 2016 Tr. (Aliferis) 152:16-153:10; Joint Ex. 9 (Apr. 11, 2007 Draft) at 72.)

275. Aliferis concluded that the drivers for SJP's profitability were an increase in revenues, due to SJP's change in management, and an increase in profit margins, due to SJP's ability to provide a variety of services for each job (meaning that SJP was vertically integrated [*64] and could offer a more comprehensive array of services per job, permitting it to bid for larger projects). (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51; June 29, 2016 Tr. (Aliferis) 87:17-89:24, 151:14-25; May 23, 2016 Tr. (DiPano) 46:2-20.) For example, SJP had the ability to clear a work site, to process refuse from the site, and then to perform work on the site, such as paving, the creation of roads, and other necessary infrastructure for home building activity. (May 25, 2016 Tr. (Miscione) 24:3-10.)

276. As a function of SJP's ability to crush and recycle rock on site, the Offering Memo stated that SJP was the "only vertically integrated site developer in the region." (Joint Ex. 1 (Offering Memo) at 11.)

277. Notwithstanding the Offering Memo's description of SJP as "vertically integrated," SJP was only partially vertically integrated because it did not supply its own commodity products, such as asphalt, through its value chain. (July 14, 2016 Tr. (Messina) 49:21-50:6.)

278. Prairie believed that SJP's vertical integration allowed SJP to achieve its record revenues in 2006 and to bid on larger more profitable projects. (June 29, 2016 Tr. (Aliferis) 89:7-10, 99:15-20.)

279. SJP had been partially vertically [*65] integrated, however, since at least 1996 when Dyna-Tec's formation

completed the SJP trifecta of South Jersey, National, and Dyna-Tec. (Joint Ex. 1 (Offering Memo) at 25; May 23, 2016 Tr. (DiPano) 27:20-25 (testifying that SJP had been using rock crushing equipment since 1996); May 25, 2016 Tr. (Miscione) 24:11-25:13.)

280. SJP's partial vertical integration did not provide it with any long-term sustainable competitive advantages because smaller companies had the ability to subcontract different parts of the value chain, thereby vertically integrating themselves. (July 14, 2016 Tr. (Messina) 53:10-18; Joint Ex. 1 (Offering Memo), at 46 (stating that "[s]mall companies can compete effectively by subcontracting their services to larger firms, specializing by type of work, or becoming a preferred contractor for local builders and developers").)

281. Although cost advantages owing to a company's vertical integration are typically quantified in a valuation report (July 14, 2016 Tr. (Messina) 53:22-54:3), SJP's purported cost advantages due to its vertical integration were not quantified in the April 11, 2007 Draft Valuation Report (*see generally* Joint Ex. 9 (Apr. 11, 2007 Draft)).

282. The EBITDA gross profits and EBITDA [*66] margins in the April 11, 2007 Draft Valuation Report were more favorable to a higher valuation of SJP than the same computations in the Offering Memo. (May 26, 2016 Tr. (Ippensen) 54:9-21.)

283. FBTS was never told by Prairie why the difference in the EBITDA gross profits and EBITDA margins between the Offering Memo and the April 11, 2007 Draft Valuation Report arose. (May 26, 2016 Tr. (Ippensen) 54:22-55:6.)

### ii. FBTS's Review of Prairie's Consideration of Backlog

284. Backlog is work on hand (i.e., new work or a previous year's unfinished contract work) that has yet to be performed. (May 23, 2016 Tr. (DiPano) 41:3-14.)

285. SJP's backlog at the end of 2006 was approximately $58 million.[25] (Joint Ex. 1 (Offering Memo), at 27; Joint Ex. 9 (Apr. 11, 2007 Draft), at 13; June 29, 2016 Tr. (Aliferis) 153:23-154:1.)

286. As stated in the Offering Memo, SJP's backlog grew from 2005 to 2006 as a result of SJP's bidding on larger multi-

phase projects and an increased work rate. (May 23, 2016 Tr. (DiPano) 70:7-25; Joint Ex. 1 (Offering Memo), at 27.)

287. In contrast to SJP's backlog at the end of 2006 of $58 million, SJP's backlog at the end of 2005 was $38 million and 2006 was SJP's most profitable year. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 13, 32.)

288. SJP [*67] expected to work on 75% of the $58 million backlog in 2007. (May 26, 2016 Tr. (Ippensen) 74:15-21; Joint Ex. 1 (Offering Memo), at 27; Joint Ex. 9 (Apr. 11, 2007 Draft), at 13.)

289. It would have been unusual for Prairie to make any sort of independent verification of SJP's backlog. (June 30, 2016 Tr. (Van Horn) 97:11-98:8.)

290. Prairie did not obtain or review any of SJP's contracts supporting the backlog. (June 29, 2016 Tr. (Aliferis) 64:13-65:16, 84:13-16.)

291. FBTS did not independently verify SJP's representations concerning backlog prior to the Transaction.[26]

292. The significant amount of backlog SJP had going into 2007 was one of the reasons FBTS and Prairie felt confident that SJP would be able to realize its 2007 projections as set forth in the April 11, 2007 Draft Valuation Report. (May 26, 2016 Tr. (Ippensen) 75:6-9; May 25, 2016 Tr. (Cory) 143:19-23, 164:23-165:9; May 27, 2016 Tr. (Serbin) 121:7-9; June 29, 2016 Tr. (Aliferis) 63:12-17.)

293. Prairie believed that SJP's revenue and revenue growth projections were supported by backlog and bids. (June 29, 2016 Tr. (Aliferis) 106:18.) Prairie, however, did not determine whether SJP's profit and expense margins (e.g., gross margins, EBITDA margin, [*68] cost of goods sold margins) were also supported by backlog and bids. (July 29, 2016 Tr. (Aliferis) 131:16-136:10.)

294. While backlog can be a good indicator of a company's revenues for the following year, particularly for a company in the construction industry, (June 29, 2016 Tr. (Aliferis) 153:11-22; July 14, 2016 Tr. (Messina) 181:10-12), backlog

---

[25] SJP's 2006 year-end backlog was comprised of contracts that SJP had been awarded in 2002, 2003, 2004, 2005, and 2006. (Joint Ex. 1 (Offering Memo), at 26; May 23, 2016 Tr. (Dugan) 130:2-19 (explaining that the prefix on the Job Number referred to the year in which the contract had been awarded).)

[26] FBTS did not obtain or review any of SJP's contracts supporting SJP's backlog figure. (May 26, 2016 Tr. (Ippensen) 75:19-20; May 27, 2016 Tr. (Ippensen) 31:2-7; July 6, 2016 Tr. (Ash) 61:9-12; Sept. 23, 2016 (Cory) 51:24-52:4; *see also* June 29, 2016 Tr. (Aliferis) 64:13-65:16, 84:13-16 (Prairie did not obtain or review any of SJP's contracts supporting SJP's backlog figure.) Rather, this representation was copied verbatim by Prairie from the Offering Memo. (*Compare* Joint Ex. 1 (Offering Memo), at 27, *with* Joint Ex. 9 (Apr. 11, 2007 Draft) at 13.)

alone would have been insufficient to assure a prudent investor that SJP was going to meet its projections for 2007. (Sept. 19, 2016 Tr. (Puntillo) 81:22-84:4.)

295. A prudent investor must determine what the backlog consists of, with whom the company has contracts, whether the backlog is represented by signed contracts, and how long it will take a company to generate revenue from the backlog. (Sept. 19, 2016 Tr. (Puntillo) 81 :22-84:4.) Further, backlog is not necessarily correlated with sales because it can be cancelled. (July 14, 2016 Tr. (Messina) 88:5-13.)

296. Three of the largest jobs in SJP's backlog had been awarded in 2006 (i.e., Grove at New Windsor for $14,101,078, Reserve at New Windsor for $5,062,415, and Montvale for $2,829,289). (May 23, 2016 Tr. (Dugan) 157:22-25; Joint Ex. 1 (Offering Memo), at 26.)

297. In addition, SJP generally bid approximately [*69] $140 million in work per year and had an average historical hit rate of approximately 45%. (Joint Ex. 1 (Offering Memo), at 27.) The 45% hit rate represented the quantity of jobs SJP successfully bid. (May 23, 2016 Tr. (DiPano) 59:3-17.)

298. FBTS considered SJP's historical hit rate of 45% one of the reasons SJP could meet its 2007 projections as set forth in the April 11, 2007 Draft Valuation Report. (Joint Ex. 1 (Offering Memo), at 26; May 26, 2016 Tr. (Ippensen) 79:10-22; July 6, 2016 Tr. (Ash) 125:13-19 (Ash believed that SJP had a good chance of making its projections given its $58 million backlog and 45% hit rate on its bids).)

299. Going into 2007, SJP was starting to expand into New York by bidding on increasingly large-scale site development projects in that state, including work related to the Stewart Air Force Base and for Hovnanian. (May 23, 2016 Tr. (Dugan) 145:24-146:23.)

300. SJP's growing backlog was a positive indicator that SJP was growing as a company and winning increased bid work. (May 23, 2016 Tr. (DiPano) 70:20-25.)

301. In the process of carrying out its audit, the Curchin Group reviewed SJP's contracts and billings to date, confirmed the total amounts, the amount of work to date, [*70] the amounts billed, and any amounts owed to SJP. (July 1, 2016 Tr. (Fouratt) 8:15-24.)

302. The Curchin Group also independently verified SJP's backlog numbers by making inquiries to management and analyzing the information provided about the remaining work to be done, as well as contracts awarded but not yet started. (July 1, 2016 Tr. (Fouratt) 9:14-22.)

303. The Curchin Group did not complete its audit of SJP's

finances for 2006 prior to the Transaction because it needed the completed SJP valuation to adjust the finances for SJP's contribution to the ESOP and did not review any of SJP's contracts prior to the Transaction. (CFF ¶ 135.)[27]

304. Prairie and FBTS did not determine when SJP had been awarded the contracts that constituted its backlog. (June 29, 2016 Tr. (Aliferis) 107:8-108:10; May 27, 2016 Tr. (Ippensen) 70:20-22.)

305. On February 7, 2007, SFE&G requested from SJP a description of SJP's contracts in excess of $50,000. (Joint Ex. 13 (February 7, 2011 E-mail from Steere to Dugan), at 4.)

306. On March 29, 2007, SFE&G renewed its request to SJP for a description of contracts valued in excess of $50,000. (FBTS Ex. 64 (Mar. 29, 2007 E-mail from Steere to D'Esposito), at D00854.)

307. In response to SFE&G's [*71] requests for contracts in excess of $50,000, SJP indicated that it would only provide SFE&G with a single basic form contract. (FBTS Ex. 64 (Mar. 30, 2007 E-mail from Cheslow to Steere), at D00853-54.)

308. SJP did not enter into contracts with three out of its top ten customers. (May 23, 2016 Tr. (Dugan) 135:2-24.)

309. FBTS was not aware that SJP conducted business with some of its customers without entering into a contract.[28]

### iii. FBTS's Review of Prairie's Consideration of Historical Volatility

310. FBTS reviewed the historical EBITDA and EBITDA margins for SJP for the years 2002 to 2006, and did not consider SJP's financial performance to be volatile. (May 26, 2016 Tr. (Ippensen) 56:6-58:7.)

311. The Offering Memo and April 11, 2007 Draft Valuation Report reflected the volatility of SJP's historical margins and growth. (Joint Ex. 1 (Offering Memo), at 34, 38; Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79; July 14, 2016 Tr. (Messina) 89:16-24, 95:25-96:6; 97:25-98:4 (describing SJP's historical

---

[27] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[28] Given that FBTS never independently verified SJP's representations concerning backlog prior to the Transaction (CFF ¶ 291), and in the absence of evidence to the contrary, the Court finds that FBTS did not know that SJP conducted business with some of its customers without a contract.

EBITDA, EBITDA margins, and cost of goods sold margins as volatile.).)

312. As reported in the April 11, 2007 Draft Valuation Report, SJP's historical margins for EBITDA, income from operations, and income before taxes and gross profit, varied **[*72]** substantially from one year to the next. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79 "Percentage Income Statements," "Year to Year Growth," and "EBITDA Margin"; *see also* Demonstrative 10 (showing SJP's EBITDA margin standard deviation).)

313. FBTS never expressed any concern to either Prairie or Duff & Phelps that the historical financial performance of SJP appeared to be volatile. (May 26, 2016 Tr. (Ippensen) 56:6-8, 58:8-12; May 25, 2016 Tr. (Miscione) 16:15-17:9.)

314. FBTS believed that SJP's historical financial performance was not volatile because SJP's revenues grew from 2002 to 2006. (May 27, 2016 Tr. (Ippensen) 20:16-21:5.)

315. Revenue and revenue growth rates do not necessarily translate into profit and are not necessarily good indicators of a company's financial health, particularly in a cyclical business or a business with low margins. (July 14, 2016 Tr. (Messina) 81:21-82:9.)

316. In cyclical or low margin businesses, it is possible for a company to grow revenue while simultaneously failing to grow its profit. (July 14, 2016 Tr. (Messina) 81:21-82:9.)

317. It is important to analyze both the top line in terms of revenue and the bottom line in terms of net income and margins. (May 27, 2016 Tr. **[*73]** (Serbin) 115:23-116:6 (stating that "[r]evenue is great, but you got to make money with that revenue. So it has to be smart business versus the other. Because you can work all day long and make—and lose lots of money"); May 25, 2016 Tr. (Cory) 166:20-167:2.)

318. SJP's revenues in 2004 grew by $7.7 million (or 21.31%) and its net income increased 154.35%, yet its EBITDA margin decreased by 1.3% and its gross profit margin decreased by 5.9%. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 72, 79.)

*iv. FBTS's Review of Prairie's Reliance on Seller's Projections*

319. Prairie utilized the Offering Memo's projections, though it made some upwards adjustments. (Stipulation of Facts ¶ 47; June 29, 2016 Tr. (Aliferis) 80:1-9, 91:24-92:11; May 26, 2016 Tr. (Ippensen) 41:14-23; *compare* Joint Ex. 1 (Offering

Memo), at 36, 40, 122, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

320. FBTS did not recast the seller's projections; rather, it utilized the seller's projections and/or made upward adjustments to various earnings line items (i.e., EBITDA, EBITDA margin, gross profit, gross profit margin, pretax income) or a downward adjustment to the expense line items (i.e., cost of goods sold). (Stipulation of Facts ¶ 47; June 29, 2016 Tr. (Aliferis) 80:1-9, 91:24-92:11; May 26, 2016 Tr. (Ippensen) **[*74]** 41:14-23; *compare* Joint Ex. 1 (, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

321. A prudent investor typically recasts the projections contained in the seller's financial model based on at least some of the investor's independent due diligence. (Sept. 19, 2016 Tr. (Puntillo) 59:23-61:1; 109:2-6.) Recast projections tend to be more conservative than the seller's projections. (Sept. 19, 2016 Tr. (Puntillo) 109:2-110:22.)

322. Approximately three weeks prior to the Transaction, Prairie sought SJP's comment and approval for the projections Prairie sought to utilize in its valuation. (FBTS Ex. 9 (Mar. 24, 2016 E-mail from Aliferis to D'Esposito and Miscione).)

323. Neither Prairie nor FBTS spoke with SJP's accountant about SJP's historical or projected financial information. (July 1, 2016 Tr. (Fouratt) 23:22-24:3.)

324. Prairie assumed that the projections provided by SJP reflected SJP's best estimates. Prairie did not undertake any independent analysis to verify whether the stated reasons supporting the projections were correct apart from reviewing updated financials and speaking with the Company. (June 29, 2016 Tr. (Aliferis) 79:15-25.)

325. FBTS never asked Prairie how it arrived at the projection figures **[*75]** it used in its April 11, 2007 Draft Valuation Report. (May 26, 2016 Tr. (Ippensen) 55:7-10.)

326. FBTS never compared the projections used in the April 11, 2007 Draft Valuation Report with the projections contained in the Offering Memo. (May 26, 2016 Tr. (Ippensen) 55:2-10.)

327. FBTS never expressed any concerns that the projected revenues, EBITDA margins, or cost-of-sales margins were more favorable than SJP's historical performance. (May 26, 2016 Tr. (Ippensen) 42:7-13 (no recollection of expressing concern that projected revenues were too high in light of historical levels), 44:17-21 (no recollection of expressing concerns to Prairie that EBITDA margin was higher than historical levels), 46:18-22 (no recollection of expressing concern regarding projected cost of sales margins lower than

historical levels); Sept. 23, 2016 Tr. (Cory) 38:18-39:2.)

328. Cory, whom FBTS identified as the employee principally responsible for the financial review, did not speak to anyone about Prairie's projections, did not know if anyone else at FBTS spoke with either SJP or Prairie about these projections, and did not recall what, if anything, FBTS did to verify that the projections were attainable. (May [*76] 25, 2016 Tr. (Cory) 113:11-114:11.)

329. Ash, who does not have a financial background, felt comfortable with Prairie's projections because Prairie felt comfortable with the projections. (July 6, 2016 Tr. (Ash) 60:8-14 (stating that if Prairie is comfortable with the projections, then she is also comfortable with the projections).)

330. FBTS did not independently review the accuracy of the financial information that SJP provided to Prairie. (May 26, 2016 Tr. (Ippensen) 35:10-13.)

331. FBTS did not review SJP's final 2006 audited financials as they had not been completed until after the Transaction, (July 1, 2016 Tr. (Fouratt) 22:8-10), and did not review the draft audited financials for 2006 prior to the Transaction. (CFF ¶ 136.)[29]

332. Unlike FBTS, at least one prospective lender solicited by SJP to finance the Transaction noted the inconsistency between the projected gross profit margins and the historical margins, and asked Duff & Phelps to explain why SJP believed it would achieve its projections. Pl.'s Ex. 5 (Jan. 25, 2007 E-mail from Buendia to Miscione) at 3.)

333. Prairie copied verbatim large portions of SJP's business description contained in the Offering Memo and pasted those descriptions directly into [*77] its valuation report, including information pertaining to SJP's reputation, customer concentration, site job bids, bid hit rate, backlog, competition, and purported competitive advantages. (*Compare* Joint Ex. 1 (Offering Memo), at 22-32, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 8-17; May 26, 2016 Tr. (Stipulation by Defendant's counsel) 66:15-20.)

334. Prairie assumed the information it copied and pasted from the Offering Memo to be accurate based on discussions with SJP's management and the information that it received from SJP's advisors. (June 29, 2016 Tr. (Aliferis) 52:11-18; June 30, 2016 Tr. (Gross) 24:6-25:2, 25:14-26:6.)

335. Although Ippensen believed that the written materials that Prairie consulted independently corroborated SJP's representations regarding its standing in the industry, (May 26, 2016 Tr. (Ippensen) 70:24-71:6), none of these materials specifically mentioned SJP or discussed SJP's industry standing. (June 29, 2016 Tr. (Aliferis) 52:19-53:6.)

336. FBTS did not raise the issue of Prairie's copying-and-pasting with Prairie. (May 26, 2016 Tr. (Ippensen) 64:12-13.)

337. FBTS knew that Prairie had accepted the Offering Memo's representations as true. (May 26, 2016 Tr. (Ippensen) 65:15-21.)

338. Neither FBTS [*78] nor Prairie spoke with SJP's customers, or any trade associations, or otherwise independently verified the seller's favorable descriptions of SJP. (May 26, 2016 Tr. (Ippensen) 69:8-18, 73:23-74:9; July 6, 2016 Tr. (Ash) 67:12-20, 80:3-20; Sept. 23, 2016 Tr. (Cory) 45:1-4.)

### v. FBTS's Review of Prairie's Consideration of Industry Cyclicality

339. Cyclical industries tend to operate with more volatility due to fluctuations within the economy. (July 14, 2016 Tr. (Messina) 61:21-62:1.)

340. When valuing a company's historical financial performance within a cyclical industry, a valuation professional should look back at least five years. (July 14, 2016 Tr. (Messina) 77:19-23.)

341. The homebuilding industry is cyclical. (July 14, 2016 Tr. (Messina) 61:21-66:16; May 26, 2016 Tr. (Ippensen) 158:25; July 5, 2016 Tr. (Stoesser) 89:1-14; Joint Ex. 1 (Offering Memo), at 12, 47.)

342. The homebuilding industry cycle is approximately seven to ten years. (July 14, 2016 Tr. (Messina) 66:3-8; July 5, 2016 Tr. (Stoesser) 89:3-14.)

343. Prairie's use of 2006 as the baseline for its projections ignored the fact that SJP was in a cyclical business and led to an inflated value conclusion by projecting SJP's "peak" indefinitely into the [*79] future. (July 14, 2016 Tr. (Messina) 62:2-10, 77:24-78:23.)

344. When creating projections for future growth, it is not typical to simply rely on the growth of the most recent financial year. (May 25, 2016 Tr. (Miscione) 72:9-18.)

345. At some point in 2006, the housing market in New Jersey began to decline off of its record high in 2005. (Joint

---

[29] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

Ex. 10 (Apr. 27, 2007 Report), at 32 (Residential Building Permits), at 33 (Non-Residential contracts); Joint Ex. 2 (Mar. 2, 2007 E-mail from Christoffel to Aliferis, attaching Offering Memo), at 54; May 26, 2016 Tr. (Ippensen) 158:18-25.) According to information available prior to the SJP ESOP Transaction, residential building permits in New Jersey had declined in 2006, and were expected to further decline in 2007. (Joint Ex. 10 (Apr. 27, 2007 Report), at 32 (residential building permits in 2006 were down from 38,632 in 2005 to 33,328 in 2006, and expected to decline further to 29,996 in 2007).)

346. FBTS interpreted the April 11, 2007 Draft Valuation Report as stating that, for the years 2007 to 2009, there would be a cooling of the national housing market. (May 26, 2016 Tr. (Ippensen) 161:25-162:13.)

347. The April 11, 2007 Draft Valuation Report stated:

Although recent indicators have been mixed, the economy seems likely to expand at a moderate [*80] pace on balance over coming quarters. The [Federal Open Market Committee ("FOMC")] currently acknowledges mixed signals applicable to the economy. The *Beige Book* prepared several weeks prior to a meeting of the FOMC suggested, "Despite continuing softness in automobile and housing-related sales, most Districts reported that consumer spending increased during October and early November."

(Joint Ex. 9 (Apr. 11, 2007 Draft), at 20.)

348. The April 27, 2007 Post-Transaction Valuation Report explicitly stated that New Jersey's housing market was not expected to improve in 2007. (Joint Ex. 10 (Apr. 27, 2007 Report), at 32-33 ("New Jersey's housing market will not pull out of its slump in 2007").)

349. FBTS understood that during this period, SJP would be working not only on residential site preparation, but also on commercial and public construction. (May 26, 2016 Tr. (Ippensen) 162:19-163:9.)

350. FBTS was unaware, however, of how many commercial or public construction projects SJP was involved in, and, prior to the Transaction, FBTS was unaware of the percentage of SJP's revenues that came from residential as opposed to non-residential projects. (May 27, 2016 Tr. (Ippensen) 36:6-37:12.)

351. FBTS understood that the Federal Treasury [*81] Department had predicted that the housing market was going to rebound after 2007. (May 26, 2016 Tr. (Ippensen) 163:12-16.)

352. Based on Ippensen's review of the April 11, 2007 Draft Valuation Report, he believed that the slowdown in the economy would have less of an effect in the Northeast than in other parts of the country. (May 27, 2016 Tr. (Ippensen) 90:18-91:2; Joint Ex. 9 (Apr. 11, 2007 Draft), at 26.)

353. The April 11, 2007 Draft Valuation Report, however, noted that the United States economy and other dominant world economies showed satisfactory prospects for the forthcoming quarters of 2006, not 2007. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 29 (referencing projected U.S. GDP growth for 2006, and projected growth of world economy for 2006, though noting that consumer spending in the United States was likely to slow in 2007).)

354. Return on assets is an indicator of how profitable a company is relative to its investments in capital equipment and other assets. (July 14, 2016 Tr. (Messina) 102:7-10.)

355. Return on assets provides a "sanity check" on projections because companies in industries tend to have consistent return on assets. (July 14, 2016 Tr. (Messina) 102:10-16.)

356. Return on assets is typically computed [*82] in a valuation report. (July 14, 2016 Tr. (Messina) 102:-25-103:4; July 15, 2016 Tr. (Messina) 39:14-21; *see, e.g.,* Pl.'s Ex. 8 (Dec. 31, 2007 Report), at 89 "Rate of Return Ratios"; Sept. 23, 2016 Tr. (Cory) 40:18-22.)

357. Companies with dominant market positions, enormous brand values, and economies of scale, such as Microsoft, Disney, IBM, and Procter & Gamble, do not achieve return on assets above 25%. (July 14, 2016 Tr. (Messina) 104:1-13.)

358. A company without any competitive advantages and earning returns on assets in the 25% to 30% range would expect to see competition enter its marketplace, thereby driving down margins to the company's historical average. (July 14, 2016 Tr. (Messina) 104:20-105:5.)

359. Prairie did not compute SJP's historical or projected return on assets in its valuation for the Transaction. (Joint Ex. 9 (Apr. 11, 2007 Draft).)

360. Prairie, however, did compute SJP's return on assets in subsequent valuation reports. (*See, e.g.,* Pl.'s Ex. 8 (Dec. 31, 2007 Report), at 89; Pl.'s Ex. 9 (Dec. 31, 2008 Report), at 88.)

361. SJP's historical return on assets were:


*Go to table1*

(Pl.'s Ex. 8 (Dec. 31, 2007 Report), at 89; Demonstrative 7.)

362. SJP's five-year historical average return [*83] on assets

was approximately 11%. (Demonstrative 7; Demonstrative 17.)

363. Prairie projected that SJP would achieve return on assets in excess of 25%. (July 14, 2016 Tr. (Messina) 103:13-19; *see also* Demonstrative 7.)

364. FBTS never discussed either SJP's historical or projected return on assets prior to the Transaction. (Sept. 23, 2016 Tr. (Cory) 41:15-18.)

365. Aliferis testified that he accounted for the decline in the homebuilding industry by assuming flat revenue growth. (June 29, 2016 Tr. (Aliferis) 102:14-17.)

366. The flat revenue growth that Prairie projected SJP to experience in 2007 was based on SJP's highest year at the peak of the homebuilding industry's cycle. (July 14, 2016 Tr. (Messina) 77:24-78:8 (Prairie projected SJP's peak cycle indefinitely into the future), 82:10-21 (error to assume a zero percent growth rate from a record year when industry is facing headwinds and largest customer is stating that it was going to operate as if in a prolonged decline).)

367. Prairie's projections assumed that SJP would outperform its entire industry because Prairie believed that SJP was "run well." (June 29, 2016 Tr. (Aliferis) 106:1-4.)

368. Prairie's valuation failed to account for [*84] the likelihood that SJP's 2006 record performance was attributable to a contemporaneous or near contemporaneous peak in the homebuilding cycle during which it obtained several large projects from Hovnanian. (July 14, 2016 Tr. (Messina) 62:4-63:16 (explaining dangers of using peak or trough of cycle), 66:9-16 (noting general consensus that housing cycle was coming to an end around April of 2007), 78:3-23 (indicating that Prairie used peak of cycle to formulate projections); May 23, 2016 Tr. (Dugan) 130:24-132:21 (SJP was awarded several large Hovnanian contracts).)

369. FBTS did not consider the possibility that SJP's record 2006 performance was attributable in whole or in part to a near contemporaneous peak in the homebuilding cycle. (May 26, 2016 Tr. (Ippensen) 81:23-82:11; June 29, 2016 Tr. (Aliferis) 107:17-19, 172:7-17.)

370. FBTS did not question Prairie as to what Prairie did to account for the cyclicality of SJP's industry. (Sept. 23, 2016 Tr. (Cory) 59:1-7.)

*vi. FBTS's Review of Prairie's Consideration of SJP's Competitive Advantages*

371. In determining the fair market value of a particular company, it is important to understand the company's competition and the competitive landscape. [*85] (June 29, 2016 Tr. (Aliferis) 10:5-6, 16:13-15; June 30, 2016 Tr. (Gross) 22:21-23:13; July 14, 2016 Tr. (Messina) 33:23-37:7 (discussing concepts of competitive risk and competitive advantage as they pertain to valuation); Sept. 23, 2016 Tr. (Cory) 44:11-22.)

372. SJP operates in a highly competitive industry. (July 14, 2016 Tr. (Messina) 42:2-12; Joint Ex. 1 (Offering Memo), at 27-28 (discussing SJP's competition, including the trend for material suppliers to "expand their lay down operations into SJP's marketplace"), at 46 (discussing competitive landscape), at 49 (discussing competition from general contractors).)

373. A valuation report should include the following components:

 1. Size and Competition: Discuss how the absolute and relative size of the entity affects its value, how the company determines pricing, who the competitors are and how they compete.
 2. Product/service Differentiation: Discuss how the company's products and/or services differ from its competitors.
 3. Market Share: Discuss the company's positioning relative to the industry and competition.

 4. Ease of Market Entry: Discuss the ease, barriers and obstacles of entering the market. Provide a summary of the barriers to entry and how they affect [*86] the company.[30]

(June 30, 2016 Tr. (Van Horn) 171:1-9, 172:4-11, 178:5-16.)

374. Prairie failed to include these components in its April 11, 2007 Draft Valuation Report, in whole or in part, by failing to identify SJP's competitors by name, failing to discuss SJP's positioning relative to the industry and its competition, and failing to discuss the ease of entry or barriers to entry into SJP's market and the effect on the Company. (June 30, 2016 Tr. (Van Horn) 171:16-22, 178:5-16.)

375. FBTS never ascertained the identities of SJP's competitors or determined what equipment those competitors possessed. (May 26, 2016 Tr. (Ippensen) 65:9-21, 69:8-70:2; May 25, 2016 Tr. (Miscione) 25:16-18; May 25, 2016 Tr. (Cory) 152:24-153:4; July 6, 2016 Tr. (Ash) 47:22-23; June 29, 2016 Tr. (Aliferis) 58:18-20; Sept. 20, 2016 Tr. (Puntillo) 11:21-12:13.)

376. FBTS could not have analyzed SJP's competitive

_____

[30] The Court notes that this list constitutes a summary, as opposed to a direct excerpt, of the June 30, 2016 trial transcript.

landscape without knowing who its competitors were or determining what equipment they used. (Sept. 20, 2016 Tr. (Puntillo) 13:9-25.)

377. Prior to the Transaction, FBTS believed that SJP had a competitive edge or a competitive advantage, (*see* May 26, 2016 Tr. (Ippensen) 67:21-25), even though the Offering **[*87]** Memo reported that smaller companies, which provided one or more of SJP's primary services—paving, excavation and underground utilities, rock crushing and recycling, and drilling and blasting—made up SJP's competition, and that material suppliers had entered SJP's marketplace resulting in a 30% reduction of paving revenues. (Joint Ex. 1 (Offering Memo), at 27-28.)

378. FBTS did not verify the seller's representations regarding SJP's purported advantages over its competitors. (Sept. 23, 2016 Tr. (Cory) 46:22-25 (stating that she did not know what FBTS did to verify that SJP had competitive advantages); July 6, 2016 Tr. (Ash) 80:10-20.)

379. It is generally accepted in finance that sustainable competitive advantages are typically limited to proprietary technology, brand name, and cost advantage. (July 14, 2016 Tr. (Messina) 39:18-40:23.)

380. Absent a sustainable competitive advantage, a company cannot continuously outperform its industry. (July 14, 2016 Tr. (Messina) 40:24-41:17.)

381. A valuation professional should not project that a company will outperform its industry unless such company possesses a sustainable competitive advantage. (July 14, 2016 Tr. (Messina) 40:24-41:17.)

382. SJP operated in an industry **[*88]** with low barriers to entry. (July 14, 2016 Tr. (Messina) 42:22-43:7; Joint Ex. 1 (Offering Memo), at 28.)

383. SJP did not possess any pricing power as it bid for a vast majority of its business. (July 14, 2016 Tr. (Messina) 42:8-12.)

384. SJP did not differentiate its product through non-price strategies as it was dependent on bidding to obtain business. (July 14, 2016 Tr. (Messina) 43:13-23.)

385. SJP did not possess any proprietary technology such as patents, trademarks, or licenses. (FBTS Ex. 64, at D00854 (item 5); June 29, 2016 Tr. (Aliferis) 62:4-9; May 23, 2016 Tr. (Dugan) 191:7-22.)

386. SJP informed Aliferis that it was in possession of equipment it had imported from Europe and of which no competitor in the local marketplace was in possession. (June

29, 2016 Tr. (Aliferis) 59:2-10.)

387. At or around the time of the Transaction, National accounted for only 12.9% of SJP's revenues. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 12.)

388. In or around 1996, National began using mobile rock crushing equipment. (May 23, 2016 Tr. (DiPano) 27:20-23, 38:7-9; May 23, 2016 Tr. (Dugan) 87:16-25; May 24, 2016 Tr. (D'Esposito) 19:3-11 (late 1990's).)

389. SJP's mobile rock crushers were the first of their kind in the United States and were **[*89]** featured in a CBS television evening news story. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 10; May 23, 2016 Tr. (DiPano) 48:10-14.)

390. In 2006 and the first quarter of 2007, SJP's use of mobile rock crushing equipment allowed it to work in rocky areas that were difficult to develop and, therefore, to provide services in areas that none of its competitors were able to provide services. (May 23, 2016 Tr. (DiPano) 46:21-47:16.) Because the crushed rock could then be used for other purposes on the job site, this also eliminated the cost of purchasing and delivering the material that would otherwise be used for those purposes. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 9-10; May 23, 2016 Tr. (DiPano) 18:8-20.)

391. Unlike a stationary rock crusher, a mobile rock crusher was track mounted and able to move around a job site. (May 23, 2016 Tr. (DiPano) 27:8-17.)

392. A mobile rock crusher could move to a blasting location on a site, rather than trucking the blasting refuse to the crusher. This eliminated an additional cost. (May 23, 2016 Tr. (DiPano) 29:20-25; May 24, 2016 Tr. (D'Esposito) 19:12-23.)

393. SJP made modifications to the mobile rock crushing equipment on a yearly basis and employed new technology for **[*90]** the crushers every two to three years. (May 23, 2016 Tr. (DiPano) 40:21-41:2.) One of the upgrades implemented on its mobile rock crushers was a vibrating screen, which was able to more capably sort smaller rock fragments from dirt. (May 23, 2016 Tr. (DiPano) 39:4-40:2.)

394. One of the benefits of the mobile rock crusher was that it took less than one day to set up, as opposed to a stationary rock crusher, which took five days to set up. (May 23, 2016 Tr. (DiPano) 28:1-9; 29:3-11.)

395. SJP's use of the mobile rock crushing equipment allowed it to capture certain customers who wanted to develop sites that were previously prohibitive or more costly to develop. (May 23, 2016 Tr. (DiPano) 48:6-18.)

396. SJP's rock crusher was not proprietary technology

because anyone could purchase one. (June 29, 2016 Tr. (Aliferis) 62:4-6; July 14, 2016 Tr. (Messina) 44:6-14, 45:6-17.)

397. As of April 16, 2007, and to the best of DiPano's knowledge, SJP was still the only company in the United States that had a mobile primary and secondary rock crusher. (May 23, 2016 Tr. (DiPano) 45:6-17.) But, "other companies [had] started buying crushers that were of the portable type . . . , and also cheaper—a configuration **[\*91]** of portable and mobile. It could be a mobile primary, but not of the quality that [SJP] would buy." (May 23 Tr. (DiPano) 45:12-16.)

398. The Offering Memo described SJP's use of its rock crushing equipment as a "major innovation in the industry" because it allowed SJP to reduce haul off costs by reusing the crushed rock at the worksite, and further stated that SJP's mobile rock crushing equipment allowed National to become a "dominant market leader." (Joint Ex. 1 (Offering Memo), at 11, 23-24.)

399. Prairie copied these representations about SJP's rock crushing equipment verbatim into its April 11, 2007 Draft Valuation Report. (*Compare* Joint Ex. 1 (Offering Memo), at 23-24, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 10.)

400. Prairie obtained its information about SJP's innovative position in the market only from "discussions with [SJP's] management regarding the [C]ompany's product services, customers[,] and market" and SJP's financial advisor. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 7; June 29, 2016 Tr. (Aliferis) 50:11-52:6, 52:11-18; June 30, 2016 Tr. (Gross) 24:6-25:2, 25:14-26:6.)

401. Cory—the individual whom FBTS identified as the person chiefly responsible for reviewing SJP's financial materials—believed that SJP's use of the mobile rock crusher justified **[\*92]** Prairie's projections of higher profit margins than SJP's historical profit margins. (May 25, 2016 Tr. (Cory) 145:15-19, 150:24-151:11.)

402. FBTS determined that SJP's use of the mobile rock crushing equipment gave it a competitive advantage, which would enable SJP to reach the projections contained in the April 11, 2007 Draft Valuation Report. (May 26, 2016 Tr. (Ippensen) 67:21-25.)

403. FBTS believed that SJP's use of the rock crushing equipment allowed SJP to realize higher profit margins than its competitors. (May 26, 2016 Tr. (Ippensen) 67:16-25.)

404. FBTS never spoke with any of SJP's competitors, customers, or trade associations to verify the representations concerning SJP's rock crushing equipment. (May 26, 2016 Tr.

(Ippensen) 65:9-21, 66:23-70:2, 70:19-23.)

405. FBTS was unaware of whether Prairie had spoken with any of SJP's customers. (May 26, 2016 Tr. (Ippensen) 70:16-18.)

406. Neither FBTS nor Prairie determined whether any of SJP's competitors possessed similar rock crushing equipment or how easily they could acquire such equipment. (May 25, 2016 Tr. (Cory) 152:24-153:7; May 26, 2016 Tr. (Ippensen) 69:24-70:2; June 29, 2016 Tr. (Aliferis) 57:22-58:17.)

407. Prairie and FBTS **[\*93]** did not determine what quantitative effect, if any, the rock crushing equipment had on SJP's expenses or profitability. (July 6, 2016 Tr. (Ash) 47:8-12; May 25, 2016 Tr. (Cory) 152:1-4; June 29, 2016 Tr. (Aliferis) 58:21-59:1; May 26, 2016 Tr. (Ippensen) 68:1-69:7.)

408. The April 11, 2007 Draft Valuation Report represents that SJP possessed proprietary technology. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51 (stating "implementation of proprietary technology and improved processes and controls helped the Company realize higher margins as well as positioning it well for ongoing growth").)

409. The April 11, 2007 Draft Valuation Report did not identify the purported "proprietary technology" it mentioned. (*See generally* Joint Ex. 9 (Apr. 11, 2007 Draft).)

410. SJP's attorney, Cheslow, specifically advised FBTS's attorneys that SJP did not possess proprietary technology (i.e., patents, trademarks, or licenses) prior to the Transaction. (FBTS Ex. 64 (Mar. 30, 2007 E-mail Chain), at D00854, item 5.)

411. SJP did not possess any other type of proprietary technology prior to the Transaction. (June 29, 2016 Tr. (Aliferis) 62:7-9.)

412. Cory incorrectly believed that SJP's rock crushing equipment constituted SJP's proprietary **[\*94]** technology. (Sept. 23, 2016 Tr. (Cory) 45:11-16.)

413. SJP had made "modifications" to its rock crushing equipment, which Dugan believed rendered the equipment proprietary. (May 23, 2016 Tr. (Dugan) 191:7-17.)

414. SJP did not have a patent on this modification to its equipment and any other company could have made this modification. (May 23, 2016 Tr. (Dugan) 191:18-22.)

415. There is no mention in the April 11, 2007 Draft Valuation Report of the modifications that Dugan identified. (*See generally* Joint Ex. 9 (Apr. 11, 2007 Draft).)

416. FBTS was not aware of these modifications prior to the Transaction. (June 29, 2016 Tr. (Aliferis) 59:2-12.)

417. FBTS never noticed or resolved the inconsistent representations in the April 11, 2007 Draft Valuation Report (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51) and the e-mail message from Cheslow (FBTS Ex. 64, at D00854) regarding SJP's alleged proprietary technology.

418. If a company possesses a patent or proprietary technology, such technology and the cost advantages associated with having such technology should be discussed in a valuation report. (July 14, 2016 Tr. (Messina) 44:15-23.)

419. SJP did not possess a brand name that provided it with a competitive advantage [*95] over its competitors. (July 14, 2016 Tr. (Messina) 47:9-22.)

420. SJP did not possess any cost advantages as it was a relatively small, regional site preparation company. (July 14, 2016 Tr. (Messina) 47:23-48:16.)

421. SJP's competition included large companies that had the advantage of servicing multiple types of projects simultaneously. (Joint Ex. 1 (Offering Memo), at 46.)

422. SJP's competition included smaller companies that were able to effectively compete by subcontracting their services to larger firms. (Joint Ex. 1 (Offering Memo), at 46.)

423. Historically, SJP's paving division accounted for 20% of SJP's total revenue. (Joint Ex. 1 (Offering Memo), at 28; Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

424. Prior to the Transaction, SJP's paving revenues had been reduced by 30% as a result of material suppliers expanding their lay down operations into SJP's marketplace. (Joint Ex. 1 (Offering Memo), at 28; Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

425. Prior to the Transaction, SJP's suppliers became SJP's major competition. (Joint Ex. 1 (Offering Memo), at 28; Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

426. Bargaining power describes the business leverage that one party may have over another to secure contractual advantages. (July 14, 2016 Tr. (Messina) 61:11-17.)

427. SJP's relationship with Hovnanian did not constitute a contractual advantage [*96] because SJP did not have any exclusive rights to perform business with Hovnanian; rather, SJP had to bid for Hovnanian's business. (July 14, 2016 Tr. (Messina) 58:4-13; June 29, 2016 Tr. (Aliferis) 70:5-8; July 6, 2016 Tr. (Ash) 65:21-24, 66:14-18, 67:7-17; May 24, 2016 Tr. (D'Esposito) 76:4-6.)

428. The Offering Memo downplayed the increase in major competition with SJP's business by representing that "[i]n 2005 and 2006[,] this trend has slowed and SJP feels it once again has a competitive advantage." (Joint Ex. 1 (Offering Memo), at 28.)

429. Prairie copied the Offering Memo's representations regarding SJP's competition verbatim and pasted them into the April 11, 2007 Draft Valuation Report. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

430. Specifically, the April 11, 2007 Draft Valuation Report stated:

> **Paving** — while the paving division accounts for approximately 20% of SJP Group revenues, in recent years, paving revenues have been reduced by nearly 30%. The major factor contributing to the reduction of revenues was the trend for some material suppliers to expand their lay down operations into SJP's marketplace. Suppliers, who once gave SJP a competitive edge due to the Company's purchasing volume, professionalism, and prompt [*97] payment, became the major competition. In 2005 and 2006 this trend has slowed and SJP feels it once again has a competitive advantage.

(Joint Ex. 9 (Apr. 11, 2007 Draft), at 14.)

431. Neither the Offering Memo nor the April 11, 2007 Draft Valuation Report explained why SJP believed that this trend (i.e., material suppliers becoming SJP's major competition) had slowed. (*See* Joint Ex. 1 (Offering Memo); Joint Ex. 9 (Apr. 11, 2007 Draft); May 26, 2016 Tr. (Ippensen) 81:12-16.)

432. FBTS did not resolve the inconsistency between Prairie's statement that SJP believed it "once again has a competitive advantage" with the seller's representation that SJP had recently lost 30% of its paving revenues to competition.[31]

### vii. FBTS's Review of Prairie's Use of Discount Rate

433. The discount rate in the April 11, 2007 Draft Valuation Report represented the present value of future earnings and did not represent the risk that SJP would not make its projections. (July 14, 2016 Tr. (Messina) 70:8-21.)

434. Typically, no more than two or three percent of any present value discount rate pertains to company-specific risk

---

[31] In light of the lack of evidence concerning FBTS's knowledge of the inconstancy and FBTS's failure to produce evidence as to how FBTS reconciled the inconsistency, the Court finds that FBTS did not resolve the inconsistency between Prairie and SJP's statements.

factors. (July 14, 2016 Tr. (Messina) 107:1-108:6; *see also* June 30, 2016 Tr. (Van Horn) 86:22-88:23 (computing **[*98]** the subject company risk premium as 3.3% of the total discount rate and testifying that the remainder is objective data found from publicly available hard sources); June 29, 2016 Tr. (Aliferis) 148:15-24 (stating that company-specific premium added "2 or 2 and a half percentage point risk").)

435. To determine a cost of equity discount rate, Prairie reviewed the capital asset pricing model, the risk-free bond rate, the market risk premium, the size of the Company, and the Company-specific premium. (June 29, 2016 Tr. (Aliferis) 131:16-133:7.)

436. The discount rate utilized in the DCF method is primarily based on fixed numbers, with the exception of the company-specific premium, which typically adds only two to three percentage points to the total discount rate. (July 14, 2016 Tr. (Messina) 107:1-108:6; *see also* June 30, 2016 Tr. (Van Horn) 86:22-88:23 (computing the subject company risk premium as 3.3% of the total discount rate and testifying that the remainder is objective data found from publicly available hard sources); June 29, 2016 Tr. (Aliferis) 148:15-24 (stating that company-specific premium added "[two] or [two-]and[-]a[-]half percentage point risk").

437. Prairie considered **[*99]** the issue of customer concentration in formulating the discount rate, by taking into account Company-specific risk.[32] (June 29, 2016 Tr. (Aliferis) 148:15-24.)

438. Prairie applied a discount rate of 19.25% in its DCF analysis. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 42.)

439. Prairie's free cash flow projections were free cash flows that could be obtained by all equity holders and took into account interest expense and outstanding long-term debt. (June 29, 2016 Tr. (Aliferis) 131:16-132:23.)

440. Prairie's projected net cash flow for 2007 was $4,782,800 and Prairie's projected revenues for 2007 was $60,715,660. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 81; May 27, 2016 Tr. (Serbin) 186:24-187:8.)

441. The 2007 projected net cash flow was then reduced by 25%, for a total of $3,587,100 in adjusted net cash flow, to account for the fact that three months of the year 2007 had passed by the time of the Transaction.[33] (Joint Ex. 9 (Apr. 11,

2007 Draft), at 81; May 27, 2016 Tr. (Ippensen), at 5:18-6:7.)

442. In the April 11, 2007 Draft Valuation Report, Prairie also included a range of discount rates and valuation ranges for the SJP stock:

*Go to table2*

(Joint Ex. 9 (Apr. 11, 2007 Draft), at 51.)

443. Prairie provided three, rather than one, valuation numbers, in an effort to represent a range of fairness as to price. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51; June 29, 2016 Tr. (Aliferis) 149:17-150:15.)

444. The April 11, 2007 Draft Valuation Report did not identify or discuss specific factors or assumptions that were used to arrive at the three different discount rates. (Joint Ex. 9 (Apr. 11, 2007 Draft).)

445. Prairie concluded that fair market value for 38% of the SJP stock ranged from $16,398,434 to $16,839,489. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 51; June 29, 2016 Tr. (Aliferis) 150:12-15.)

446. The 19.25% discount rate amounted to a valuation of $16,398,434. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 48.)

447. The $16 million purchase price was lower than the low end of Prairie's range of fairness as to price. (June 29, 2016 Tr. (Aliferis) 150:16-18.)

448. Ippensen concluded that a lower, less conservative discount rate (i.e., 18.25%) would have been appropriate. (Joint Ex. 9; May 27, 2016 Tr. (Ippensen) 10:4-13.)

449. Based on Prairie's April 11, 2007 Draft Valuation Report, Serbin concluded that the $16 million purchase price for the SJP stock was fair market value **[*101]** because it was below the value resulting from the highest discount rate, i.e.,

---

[32] While Aliferis believed that he factored in SJP's customer concentration into the company-specific discount rate, he could not recall how much he specifically contributed to the discount rate. (June 29, 2016 Tr. (Aliferis) 148:15-24.)

[33] The 25% reduction was a necessary adjustment to reflect the fact that the buyer would not be purchasing the cash flows for January through March of 2007 (i.e., the first quarter of the year), which is entirely driven by the mathematical ratio of annual cash flows that remain available to the buyer. (May 27, 2016 Tr. (Ippensen) 79:12-18, 80:1-5.) Further, the 25% discount was "rounded down" (i.e., in favor of the seller), because sixteen of the fifty-two weeks in 2007 (or 30%) had elapsed prior to the Transaction, and, therefore, the ESOP would not obtain 30% of the projected cash flows for 2007 as of the Transaction date. (May 27, 2016 Tr. (Ippensen) 79:12-25 (discount should have been larger than 25%, because 25% only accounted for passage of time through March, and not April); Joint Ex. 9 (Apr. 11, 2007 Draft), at 81; May 27, 2016 Tr. (Ippensen) 6:1-22.)

$16,398,434 from a 19.25% discount rate. (May 27, 2016 Tr. (Serbin) 123:17-124:7; Joint Ex. 9 (Apr. 11, 2007 Draft), at 51.)

450. In addition, Prairie included a 5% discount for lack of marketability, which amounted to an additional reduction in the value of the SJP stock based on the fact that the stock was not in the publicly traded marketplace. (May 27, 2016 Tr. (Ippensen) 12:15-13:2; June 29, 2016 Tr. (Aliferis) 134:18-23; Joint Ex. 9 (Apr. 11, 2007 Draft), at 51.)

451. The 5% discount for lack of marketability is required under the DCF method if the company is not publicly traded, and the 5% discount was in the middle range of what Ippensen would normally expect. (May 27, 2016 Tr. (Ippensen) 80:6-81:4 (5% lack of marketability is neither too high nor too low, and failure to apply a marketability discount to a privately held company would be a "clear error").)

452. Because the SJP ESOP was purchasing the stock for less than the fair market value estimated by FBTS and Prairie, FBTS did not negotiate the price with DiPano. (May 27, 2016 Tr. (Ippensen) 12:8-14; 124:8-15; July 6, 2016 Tr. (Ash) 110:2-7.)

453. Purchase prices in ESOP transactions [*102] are not always negotiated. A trustee may choose to accept the purchase price offered by the seller if it is reasonable or below a valuation firm's assessment of fair market value, and instead focus on negotiating other aspects of the transaction. (June 21, 2016 Tr. (Fischer) 47:7-48:7.)

### viii. FBTS's Review of Prairie's Consideration of SJP's 2007 First Quarter Performance

454. SJP's revenues for January 2007 were 37% below SJP's revenues for January 2006. (Pl.'s Ex. 23 (1006 Chart-Ql Revenues).)

455. SJP's revenues progressively declined for each month in the first quarter of 2007. (Pl.'s Ex. 23 (1006 Chart-Q1 Revenues).)

456. SJP's revenues for January 1, 2007 through March 31, 2007, were 56.4% below SJP's revenues for those months in 2006. (Pl.'s Ex. 23 (1006 Chart-Q1 Revenues).)

457. According to SJP's interim financial statements, SJP's gross profits for January 1, 2007 through March 31, 2007 were 97.4% below SJP's gross profit for those months in 2006. (Pl.'s Ex. 24 (1006 Chart-Q1 Gross Profit).)

458. According to SJP's interim financial statements, SJP's net income for January 1, 2007 through March 31, 2007 was

128.3% below SJP's net income for those months in 2006. (Pl.'s Ex. 25 (1006 [*103] Chart-Net Income).)

459. FBTS did not review any of SJP's interim financial statements for the first quarter of 2007 prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 90:12-14.)

460. During the April 13, 2007 telephone conference, Aliferis claimed to have only reviewed the interim financial statements for January 2007 and February 2007, and represented that he would review the March 2007 interim financial statements before finalizing his report. (Joint Ex. 12 (Apr. 13, 2007 Memo), at 1.)

461. The April 27, 2007 Post-Transaction Valuation Report, however, indicated that Prairie only reviewed SJP's interim financial statements for the period ending February 28, 2007 prior to the Transaction. (Joint Ex. 10 (Apr. 27, 2007 Report), at 3 "Analysis of Information Provided.")

462. Ippensen speculated that the reason Prairie did not review the interim financial statements for March 2007 is because those statements may not have been available prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 27:12-17.)

463. Ippensen was never specifically told that the interim financial statements for March were unavailable. (May 26, 2016 Tr. (Ippensen) 29:4-12.)

464. Ippensen assumed that the interim financials for March 2007 were unavailable [*104] because the April 27, 2007 Post-Transaction Valuation Report (Joint Ex. 10, at 3) did not reference them. (May 26, 2016 Tr. (Ippensen) 29:1-7, 90:1-4.)

465. Even assuming that the March 2007 interim financial statements were not prepared in their final format, all of the information used to compile the interim financial statements for March 2007 was known or knowable prior to the Transaction. (June 29, 2016 Tr. (Aliferis) 183:23-184:21 (absent accounting changes, revenue and expenses should be documented).)

466. Prairie was able to use interim financial information current through April 30, 2007 in its post-Transaction valuation of SJP as of April 30, 2007, because, even assuming that the actual interim statement for April 30, 2007 was not available, all of the information necessary to create the April 30, 2007 interim statement was known or reasonably knowable as of that date. (June 29, 2016 Tr. (Aliferis) 185:25-186:4; Pl.'s Ex. 7 (Apr. 30, 2007 Report), at 3.)

467. FBTS never discussed SJP's poor 2007 first quarter performance prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 91:24-92:17; May 25, 2016 Tr. (Cory) 112:19-25; Sept. 23, 2016 Tr. (Cory) 19:20-20:3, 20:4-17.)

468. At the time he voted **[*105]** for the Transaction, Ippensen had concluded that SJP had the capacity (throughout its personnel, equipment, management and backlog) to make up any seasonal fluctuations in its revenues throughout the remainder of 2007. (May 27, 2016 Tr. (Ippensen) 95:25-96:6.)

469. Ippensen assumed that Aliferis confirmed with SJP that there were no operational or financial changes based on a representation to that effect in the April 11, 2007 Draft Valuation Report, but Ippensen was unaware of what specifically Aliferis did to make that determination. (May 27, 2016 Tr. (Ippensen) 61:24-62:12, 62:20-63:23; May 26, 2016 Tr. (Ippensen) 92:4-13 (did not recall discussing 2007 first quarter with anyone, but assumed Prairie discussed it because "the report included commentary about representations from SJP about no operational or financial changes").)

470. Ippensen concluded that despite SJP's 2007 first quarter performance, the numbers set forth in the April 11, 2007 Draft Valuation Report were achievable and conservative, based on Prairie's use of a 19.25% discount rate, 0% prediction in revenue growth, 5% discount for lack of marketability, 25% discount of net cash flow, and 40% discount on the market **[*106]** multiple method. (May 27, 2016 Tr. (Ippensen) 27:5-14.)

471. At the time she voted for the Transaction, Ash had concluded that SJP could still meet its projections despite a bad first quarter. (July 6, 2016 Tr. (Ash) 125:20-126:1.) Ash lacked the necessary ability to determine if, in fact, SJP could realistically meet its projections. (July 6, 2016 Tr. (Ash) 8:8-9:24, 12:1-19; May 26, 2016 Tr. (Ippensen) 37:2-7.) Rather, Ash's conclusion was based on the general principle that "you can have a bad quarter and still continue to meet the projections [because] we had nine months to go." (July 6, 2016 Tr. (Ash) 125:20-126:1.)

472. Revenue performance could be affected by "temporary explainable event[s]," such as adverse weather or maintenance on machinery. (Sept. 20, 2016 Tr. (Puntillo) 42:2-43:2.)

473. Although weather can be a "temporary explainable event" that may affect performance, it is incumbent on a prudent investor to (1) verify that weather does in fact account for the extent of the observable effect (Sept. 19, 2016 Tr. (Puntillo) 79:21-80:13); (2) verify if weather resulted in a delay or cancellation of the projects, and if delayed, for how long (Sept. 19, 2016 Tr. (Puntillo) 80:14-19); **[*107]** and (3) if the projects were delayed, what additional expenses would be incurred as a result of those delays and thus, the effect of those delays on profitability margins, such as EBITDA. (Sept. 19, 2016 Tr. (Puntillo) 80:19-81:5.)

474. FBTS assumed that projects do not just "disappear[] into thin air," (May 27, 2016 Tr. (Ippensen) 88:11-18), without ever examining what additional costs SJP would expectedly incur due to those delays (e.g., payroll and equipment leasing) (May 24, 2016 Tr. (D'Esposito) 72:4-73:12), or the mathematical effect that delays would have as a result of the progressive discounts under the DCF method.

475. In 2006, SJP's most profitable year, 87% of SJP's total year income was earned in the first quarter of 2006, showing that SJP was capable of having an extremely successful quarter that would make its year. (Demonstrative 24.)

476. SJP's total 2006 first quarter revenues were $15,453,027, representing approximately 25% of its total annual revenues of $60.7 million. (Pl.'s Ex. 23.)

477. FBTS and Prairie did not look at SJP's historical quarterly performance to assess the impact of SJP's 2007 first quarter performance on the valuation. (May 27, 2016 Tr. (Ippensen) **[*108]** 96:21-24; *see also* June 29, 2016 Tr. (Aliferis) 100:5-24 (other than January 2007 and February 2007, Aliferis did not recall looking at SJP's historical quarterly or monthly performance, and did not recall being asked to do so by FBTS).)

478. A decline of 56% in revenues was significant enough to merit additional discussion with Prairie. (Sept. 23, 2016 Tr. (Cory) 22:21-24:13.)

479. Neither the April 11, 2007 Draft Valuation Report, the April 27, 2007 Post-Transaction Valuation Report, the April 13, 2007 Memo, nor the April 16, 2007 Financial Report Review[34] mentions SJP's 2007 first quarter financial performance or explains how SJP will be able to make up for this shortfall during the remainder of the year. (Joint Ex. 9 (Apr. 11, 2007 Draft); Joint Ex. 10; Joint Ex. 12 (Apr. 13, 2007 Memo); Joint Ex. 15 (Financial Report Review), at 3.).

480. Generally, a valuation report should identify material information affecting its value conclusions. (July 15, 2016 Tr. (Messina) 68:9-13.)

481. Conversely, if a valuation report does not contain a

---

[34] After a transaction closes, FBTS's financial analyst prepares a document called a "Financial Report Review." (Sept. 23, 2016 Tr. (Cory) 26:12-24, 69:22-25; May 26, 2016 Tr. (Ippensen) 120:11-16.) The Financial Report Review includes, *inter alia*, the names of the FBTS officers who performed a post-transaction review of the valuation, the performance of market indices for the period under review, a summary of changes to a company's financial metrics over the preceding year, and the qualifications of the valuation analyst. (*See, e.g.*, Joint Ex. 15 (Financial Report Review).)

discussion of a particular issue, that issue, in all likelihood, was not considered material to the valuation. (July 15, 2016 Tr. (Messina) [**109**] 68:14-17.)

482. In light of the significant decline in revenues during the first quarter of 2007, a reliable valuation report of SJP, as of April 16, 2007, would have had some discussion of the possible causes of those results. (July 15, 2016 Tr. (Messina) 78:9-15, 78:20-79:12.)

483. A valuation firm typically discusses its most recent financial results and their effect, if any, on projections. (July 14, 2016 Tr. (Messina) 86:22-87:2.)

484. The only record of any discussion concerning SJP's 2007 first quarter performance prior to the Transaction is Cory's handwritten notation that Aliferis "briefly reviewed internally prepared 2/28/07 #s." (Joint Ex. 12 (Apr. 13, 2007 Memo), at 3.)

485. SJP's poor 2007 first quarter performance is first mentioned in connection with Prairie's preparation of a post-Transaction report for April 30, 2007. (Pl.'s Ex. 7 (Apr. 30, 2007 Report), at 45-46.)

486. FBTS's EB Committee notes for the post-Transaction April 30, 2007 Post-Transaction Valuation Report similarly alluded to SJP's poor 2007 first quarter performance and explained it, in part, as a result of the weather. (Pl.'s Ex. 15 (EB Committee Notes), at 3 "Post-Transaction Review April 30, 2007.")

487. In light of SJP's actual 2007 first quarter revenues, SJP would [**110**] need to realize a compound quarterly rate of approximately 58%—more than fourteen times its average historical rate of approximately 4%—to realize the revenues projected in Prairie's valuation reports. (Sept. 19, 2016 Tr. (Puntillo) 76:4-77:25; Demonstrative 19.)

488. A prudent investor would have performed some sort of due diligence in light of the discrepancy between the projected annualized revenues and net income and the projected revenues and net income used in Prairie's valuation reports to determine the reasonableness of Prairie's projections. (Sept. 19, 2016 Tr. (Puntillo) 73:18-22; 78:16-77:12.)

489. Even assuming that SJP achieved a 0% revenue growth rate in the second, third, and fourth quarters of 2007, SJP's overall 2007 revenue growth rate would be approximately negative 15% in light of SJP's poor performance in the first quarter of 2007. (July 14, 2016 Tr. (Messina) 85:13-25.)

490. All else being equal, had Prairie utilized a negative 15% revenue growth rate for 2007, SJP's value under the DCF

method would have decreased by $7.2 million. (July 14, 2016 Tr. (Messina) 88:14-21.)

491. Historically, SJP earned between 15% and 20% of its annual revenues during the first quarter [**111**] of a given year. (May 24, 2016 Tr. (D'Esposito) 16:13-21.)

492. Historically, if the weather during the first quarter of a year is particularly mild, the first quarter revenues might account for closer to 20% of annual revenues, but if the first quarter experiences more severe weather, the first quarter revenues might be closer to 15% of annual revenues. (May 24, 2016 Tr. (D'Esposito) 16:22-17:1.)

493. Based on D'Esposito's testimony regarding the historical relationship between first quarter revenues and total annual revenues, SJP's 2007 first quarter revenues of $6.73 million (Pl.'s Ex. 23) represented between $33.67 million (15%) to $44.89 million (20%) of annual projected revenues.

494. SJP's 2007 first quarter revenues of $6.73 million (Pl.'s Ex. 23) represented approximately 17% of SJP's actual annual 2007 revenues of $40.129 million. (Pl.'s Ex. 8 (Dec. 31, 2007 Report), at 46.)

495. Weighing each quarter evenly, SJP's actual 2007 first quarter revenues of $6.73 million yield projected annualized revenues of less than $27 million—approximately $34 million below SJP's projected revenues used in Prairie's valuation reports. (Demonstrative 24; Sept. 19, 2016 Tr. (Puntillo) 71:6-16.)

496. Based on SJP's [**112**] actual financial performance during the first quarter of 2007, SJP's annualized net income was negative $4.7 million—approximately $13.3 million below SJP's projected net income used in Prairie's valuation reports. (Demonstrative 24; Sept. 19, 2016 Tr. (Puntillo) 73:2-23.)

497. At the end of 2006, SJP's CFO was expecting SJP to realize approximately $5 million in revenues per month for the first quarter of 2007. (May 24, 2016 Tr. (D'Esposito) 17:2-4, 17:19-23.)

498. FBTS never asked Prairie to determine SJP's historical quarterly growth, or determine any relationship between SJP's first quarter historical performance and its annual performance. (June 29, 2016 Tr. (Aliferis) 27:18-24, 100:5-11.)

499. At trial, FBTS suggested that SJP's 2007 first quarter performance was due to abnormally severe weather. (May 24, 2016 Tr. (D'Esposito) 63:15-64:2; June 29, 2016 Tr. (Aliferis) 80:17-20; May 23, 2016 Tr. (DiPano) 66:1-67:5; May 27, 2016 Tr. (Ippensen) 61:4-15.)

500. Since the 1990s, SJP has typically experienced lower revenues during the first three months of the year than in the remaining months of the year because the weather is usually worse during the first three months of the year. (May [*113] 24, 2016 Tr. (D'Esposito) 16:3-12, 36:35-37:5.)

501. Although Prairie believed that the projects affected by weather-related delays in the first quarter of 2007 could still be completed in the 2007 fiscal year, (June 29, 2016 Tr. (Aliferis) 159:25-160:6), FBTS never determined whether any of the first quarter projects were cancelled, as opposed to delayed, (May 25, 2016 Tr. (Cory) 113:4-7), or whether SJP would incur additional expenses to make up its lost first quarter revenues. (May 24, 2016 Tr. (D'Esposito) 72:24-73:12 (did not recall being asked if SJP would incur additional expenses for wages or equipment leasing to make up the lost first quarter revenues; *see also* June 29, 2016 Tr. (Aliferis) 99:12-100:4 (Prairie never looked at SJP's financial performance on a quarter-by-quarter basis).)

502. FBTS did not ask Prairie what the effect on the valuation would be if some of the revenues projected for 2007 were delayed until 2008. (June 29, 2016 Tr. (Aliferis) 27:11-15.)

503. SJP's 2007 first quarter performance was not measured in comparison to the summer of 2006, but rather the identical winter months of 2006. Accordingly, seasonal winter weather does not explain the 2007 first quarter [*114] decline in relation to the first quarter of 2006.

504. During particularly severe winters, SJP had earned a minimum 15% of its annual revenue during first quarters in years prior to 2007. (May 24, 2016 Tr. (D'Esposito) 16:13-17:1.) Here, the $6.73 million first quarter revenues were less than 11% of the annual projected revenues of $61 million.

505. There was nothing that led FBTS to believe that the weather during the first quarter of 2007 was out of the ordinary from prior years. (May 27, 2016 Tr. (Ippensen) 60:18-20, 60:23-61:3.)

506. Dr. David Robinson, New Jersey State climatologist for the Center for Environmental Protection, Cook College/NJAES, Rutgers University, authored a February 2007 Climate Summary showing that February 2007 was the sixteenth coldest February since 1895 and the second coldest February since 1979. (FBTS Ex. 28, at D00508.)

507. Prior to the Transaction, FBTS did not determine the effect of weather on SJP's 2007 first quarter performance. (May 27, 2016 Tr. (Ippensen) 61:4-15, 67:14-20 (FBTS did not verify weather conditions in SJP's region).)

508. Neither FBTS nor Prairie independently verified the weather conditions in SJP's region for the first quarter of 2007. [*115] (May 27, 2016 Tr. (Ippensen) 67:17-20; June 29, 2016 Tr. (Aliferis) 80:21-25; Sept. 23, 2016 Tr. (Cory) 37:5-16.)

509. The data from the New Jersey Office of the Climatologist shows that January 2007 was abnormally mild, and that the period of November 2006 through January 2007 was the second warmest on record, and that precipitation was 0.26 inches below normal. (Pl.'s Ex. 16 (Jan. 2007 Weather Summary), at 1.)

510. The monthly average temperature for January 2007 was 37.1°F, which was 5.9°F higher than the normal temperature of 31.2°F. (Pl.'s Ex. 17 (Monthly Mean Temperatures), at 2.)

511. The average temperature in January 2006 was 38.9°F, which was approximately 8°F higher than normal, and the warmest since 1998. (Pl.'s Ex. 17 (Monthly Temperature Records), at 2.)

512. The average temperature in February 2006 was 34.3°F, which was approximately 1°F higher than average. (Pl.'s Ex. 17 (Monthly Temperature Records), at 2.)

513. The average temperature in March 2006 was 41.8°F, which was slightly higher than average. (Pl.'s Ex. 17 (Monthly Temperature Records), at 2.)

514. The average precipitation in February 2006 was 1.9 inches, which was approximately 0.5 to 1.0 inches below average. (Pl.'s Ex. 18 (Monthly Precipitation Records), at 2.)

515. The average precipitation in March 2006 was 0.8 inches, which was over three inches below average, and the driest March on record. (Pl.'s Ex. [*116] 17 (Monthly Temperature Records), at 2.)

516. FBTS and Prairie understood that SJP's ability to generate revenue was dependent, in part, on the weather, and that SJP could generate additional revenues if the weather was unseasonably mild. (June 29, 2016 Tr. (Aliferis) 99:6-11; May 27, 2016 Tr. (Ippensen) 65:23-25; Sept. 23, 2016 Tr. (Cory) 37:17-23; July 5, 2016 Tr. (Stoesser) 109:10-13, 114:2-115:4.)

517. Although SJP achieved record high revenues in 2006, neither Prairie nor FBTS considered the possibility that SJP's revenues in 2006 might have been the result of abnormally mild weather. (June 29, 2016 Tr. (Aliferis) 99:21-100:4; May 27, 2016 Tr. (Ippensen) 67:14-16; 6:113:1-3.)

518. Under the DCF method, revenues realized later in time are discounted more steeply than revenues realized closer in time—for example, projected revenues for 2008 are worth

13% less than projected revenues for 2007. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 81 "Present Value Factors at 19.25%"; June 29, 2016 Tr. (Aliferis) 25:11-27:10.)

519. Under the DCF method, a company that is expected to realize revenues in 2007 has a higher value than one where those revenues are delayed until 2008 or subsequent years as they are discounted more heavily. (July 14, 2016 Tr. (Messina) 86:22-87:2; July [*117] 15, 2016 Tr. (Messina) 84:20-86:12; June 29, 2016 Tr. (Aliferis) 26:25-27:7.)

520. A prudent investor would not have accepted the seller's stated explanation that the Company's poor first quarter performance was caused by adverse weather without first independently verifying the purported connection between performance and weather. (Sept. 19, 2016 Tr. (Puntillo) 79:21-80:5.)

521. A prudent investor would have first verified the purported weather conditions to determine if in fact they were outside of the historical norms. (Sept. 19, 2016 Tr. (Puntillo) 80:6-13.)

522. If the weather was outside the historical norms, a prudent investor would have additionally investigated whether the target company's projects were postponed rather than cancelled as a result of the adverse weather. (Sept. 19, 2016 Tr. (Puntillo) 80:14-19.)

523. If the projects were postponed rather than cancelled, a prudent investor would have additionally determined the effect of the postponement on SJP's cash flows and profit margins. (Sept. 19, 2016 Tr. (Puntillo) 80:19-24.)

524. At trial, FBTS suggested that SJP's 2007 first quarter performance was due to equipment maintenance. (Sept. 20, 2016 Tr. (Puntillo) 38:13-16 (question [*118] posed by counsel for FBTS regarding maintenance); May 23, 2016 Tr. (DiPano) 65:1-9.)

525. SJP shut down National's operations in the beginning of January 2007 to conduct "heavy maintenance." (May 23, 2016 Tr. (DiPano) 65:1-20.) The shutdown resulted in a lack of revenue for National and increased maintenance, equipment, and personnel costs, all of which were absorbed in January 2007. (May 23, 2016 Tr. (DiPano) 65:1-20.)

526. There is nothing in the April 11, 2007 Draft Valuation Report, April 27, 2007 Post-Transaction Valuation Report, the April 13, 2007 Memo, or the April 16, 2007 Financial Report Review that discussed SJP's first performance or attributed it to equipment maintenance. (Joint Ex. 9 (Apr. 11, 2007 Draft); Joint Ex. 10; Joint Ex. 12; Joint Ex. 15.)

527. FBTS did not have any conversations regarding the weather and its potential effect on SJP's valuation or regarding SJP performing maintenance on its equipment during the first quarter of 2007.[35]

528. Neither the April 30, 2007 Post-Transaction Valuation Report nor the corresponding EB Committee notes discussed any equipment maintenance. (Pl.'s Ex. 7 (Apr. 30, 2007 Report), at 45-46 "Revenues" (referring to weather) and "Gross Profit" (referring [*119] to housing market); Pl.'s Ex. 15 (EB Committee Notes), at 3 "Post-Transaction Review April 30, 2007" (referring to "horrible weather").)

529. Companies typically perform equipment maintenance over a scheduled period of time because a business can operate more profitably to the extent that it can operate at a steady pace without disruption. (July 15, 2016 Tr. (Messina) 79:2-12.)

530. It would be very unusual for a company to take all of its equipment offline for maintenance in the first quarter and absorb a 56% revenue decline without explanation. (July 15, 2016 Tr. (Messina) 79:2-12.)

### ix. FBTS's Review of Prairie's Consideration of Customer Concentration

531. SJP's top customer, as a percentage of revenue in 2006, was the homebuilder, Hovnanian. (Stipulation of Facts ¶ 53; May 23, 2016 Tr. (Dugan) 118:21-24 (testifying that, although Hovnanian was not exclusively a residential builder, it was predominantly a residential builder).)

532. SJP was able to grow its business with Hovnanian over the years because of SJP's capability to develop sites with rocky land. (May 23, 2016 Tr. (DiPano) 56:19-57:16.)

533. As of December 31, 2006, Hovnanian accounted for nearly 60% of SJP's revenues for 2006. (Joint Ex. 1 (Offering Memo), at 26 (Exhibit 21); Stipulation [*120] of Facts ¶ 54.)

534. As of December 31, 2006, more than 78% of SJP's reported backlog for 2006 was on Hovnanian projects (i.e.,

---

[35] Although Cory testified that she recalls some conversation regarding the weather and its potential connection with SJP's 2007 first quarter performance (but cannot say if it occurred before or after the Transaction), (Sept. 23, 2016 Tr. (Cory) 30:12-17), the Court finds that no conversation took place before the SJP ESOP Transaction based on the lack of corroborating evidence and after evaluating the credibility of the witnesses. Additionally, Cory has absolutely no recollection of any discussion regarding SJP performing maintenance on its fleet during 2007 first quarter. (Sept. 23, 2016 Tr. (Cory) 30:18-24.)

$45,167,302 out of a total $57,743,170). (Joint Ex. 1 (Offering Memo), at 26 (Exhibit 22).)

535. Between 2002 and 2006, SJP's revenue growth was almost entirely attributable to Hovnanian. (Demonstrative 22; Sept. 19, 2016 Tr. (Puntillo) 97:20-99:15; Joint Ex. 1 (Offering Memo), at 34 (historical revenues), 126-28 (historical revenues by customers).)

536. Between 2002 and 2006, SJP's concentration in Hovnanian had increased from 44% to 59%. (Demonstrative 22; Joint Ex. 1 (Offering Memo), at 126-28.)

537. Between 2002 and 2006, Hovnanian revenues grew at a compound annual growth rate of 25%. (Demonstrative 22; Joint Ex. 1 (Offering Memo), at 34, 36, 126-28.)

538. Between 2002 and 2006, non-Hovnanian revenues grew at a compound annual growth rate of 7%. (Demonstrative 22; Joint Ex. 1 (Offering Memo), at 34, 36, 126-28.)

539. In 2006, Hovnanian was the sixth or seventh largest homebuilder in the United States, a Forbes Platinum 400 company for five consecutive years and on Fortune Magazine's list of "100 Fastest Growing Companies" for four consecutive years, and #403 on the 2006 Fortune 500, ranked second based on a five-year total return to investors of 60%. (Pl.'s Ex. 12, at 3.)

540. After the close of 2006, [*121] Hovnanian released its 2006 Annual Report (the "Hovnanian 2006 Annual Report" or "Hovnanian's 2006 Annual Report"). (Pl.'s Ex. 11 (HOV Annual Report).)

541. Prairie did not review Hovnanian's 2006 Annual Report prior to the SJP ESOP Transaction.[36]

542. Although the Hovnanian 2006 Annual Report contained optimistic statements of Hovnanian's future activity, (July 14, 2016 Tr. (Messina) 199:20-200:13 (correspondence from CEO in Annual Report has lower reliability than 10K, tends to be more optimistic)), it also indicated that, in 2006, Hovnanian had paid $159 million in penalties for walking away from projects. (Pl.'s Ex. 11 (HOV Annual Report), at 8.)

543. The Hovnanian 2006 Annual Report also revealed that 2006 "was a challenging year" due to the "sudden downturn in many of [Hovnanian's] housing markets." (Pl.'s Ex. 11 (HOV Annual Report), at 5.) Hovnanian sustained reduced profits and stated that "it is difficult to predict when the overall housing market will turn around." (Pl.'s Ex. 11 (HOV Annual Report), at 7.)

544. Hovnanian's 2006 Annual Report noted the sudden downturn of the homebuilding industry in that year and stated that it was managing its business as if the industry was in a prolonged downturn. (Pl.'s Ex. 11 (HOV Annual Report), at 7.)

545. The Hovnanian 2006 Annual Report [*122] indicated that Hovnanian's total revenues had increased on a year-by-year basis from 2002 to 2006. (Pl.'s Ex. 11 (HOV Annual Report), at 3.)

546. The Hovnanian 2006 Annual Report also showed that Hovnanian had 36 communities actively being built in New Jersey, which included some of SJP's backlog. (Pl.'s Ex. 11 (HOV Annual Report), at 4; May 24, 2016 Tr. (D'Esposito) 55:1-22.)

547. Hovnanian's 2006 Annual Report announced that Hovnanian would reduce costs by renegotiate pricing with its subcontractors, over whom it claimed to have "a great deal of leverage." (Pl.'s Ex. 11 (HOV Annual Report), at 7.)

548. Hovnanian had also disclosed this strategy on September 11, 2006, in a symposium on the homebuilding industry sponsored by Credit Suisse (the "Credit Suisse Report"), in which Hovnanian represented that it would aggressively renegotiate subcontractor costs. (Pl.'s Ex. 12 (Credit Suisse Report), at 17.)

549. FBTS acknowledged that Hovnanian's representations concerning its intent to renegotiate subcontractor contracts to reduce costs as set forth in Hovnanian's 2006 Annual Report (Pl.'s Ex. 11 (HOV Annual Report)) and the Credit Suisse Report (Pl.'s Ex. 12) could adversely affect SJP's projected margins. (May 26, 2016 Tr. (Ippensen) 95:4-25, 96:14-25.)

550. FBTS [*123] did not review either the Credit Suisse Report (Pl.'s Ex. 12) or the Hovnanian 2006 Annual Report (Pl.'s Ex. 11 (HOV Annual Report)) prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 94:8-23, 97:1-5; July 6, 2016 Tr. (Ash) 54:25-55:6.)

551. Although Prairie acknowledged that it would have been important to determine Hovnanian's stock price prior to the Transaction, (June 29, 2016 Tr. (Aliferis) 72:19-25, 73:13-17), neither FBTS nor Prairie looked at the share price of

---

[36] Although Aliferis testified that Hovnanian's 2006 Annual Report is something Prairie "would have reviewed," (June 29, 2016 Tr. (Aliferis) 74:19-23), Aliferis did not specifically recall reviewing the document, the document was never listed as a document reviewed by Prairie, and neither the April 11, 2007 Draft Valuation Report nor the April 27, 2007 Post-Transaction Valuation Report mentioned the Hovnanian 2006 Annual Report. (July 14, 2016 Tr. (Messina) 59:15-60:9 (if Prairie relied on Plaintiff's Exhibit 11, it should have been listed in the valuation report).)

Hovnanian prior to the Transaction. (May 26, 2016 Tr. (Ippensen) 93:21-25; Sept. 23, 2016 Tr. (Cory) 43:23-44:4; July 6, 2016 Tr. (Ash) 54:17-25; June 29, 2016 Tr. (Aliferis) 72:19-25.)

552. Neither FBTS nor Prairie contacted Hovnanian to discuss its relationship with SJP. (July 6, 2016 Tr. (Ash) 51:4-11; May 26, 2016 Tr. (Ippensen) 85:9-13; Sept. 23, 2016 Tr. (Cory) 42:22-24; June 29, 2016 Tr. (Aliferis) 50:18-22.)

553. FBTS did not speak with Hovnanian or any other SJP customer because it would have violated FBTS's best practices. (May 26, 2016 Tr. (Ippensen) 97:10-19.) As proposed ESOP transactions are not public, FBTS does not speak to customers because spreading information about a change in ownership of a given [*124] company could affect that company's relationship with its customers. (May 26, 2016 Tr. (Ippensen) 161:10-20; June 29, 2016 Tr. (Aliferis) 50:11-51:4.)

554. In a minority ESOP purchase, a trustee would not speak with a company's customers prior to approving a transaction because the ESOP is not a synergistic buyer looking to run the company or replace management, but is rather the classic financial buyer, and contacting customers could place the ESOP in the middle of a very important and delicate relationship. (June 21, 2016 Tr. (Fischer) 45:24-47:6; 61:7-17.)

555. A valuation report should list the materials reviewed by the valuation advisor. (July 14, 2016 Tr. (Messina) 60:3-4; June 30, 2016 Tr. (Van Horn) 153:5-19.)

556. Neither the Hovnanian 2006 Annual Report nor the Credit Suisse Report was identified as one of the documents that Prairie reviewed in either the April 11, 2007 Draft Valuation Report or the April 27, 2007 Post-Transaction Valuation Report. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 4, 6-7; Joint Ex. 10 (Apr. 27, 2007 Report), at 3, 5-6.)

557. A prudent investor would have considered a customer's representations of a dramatic slowdown in the housing market and its intention to renegotiate agreements with subcontractors [*125] to be material information in determining whether the company's projections were reliable. (Sept. 19, 2016 Tr. (Puntillo) 89:20-91:1.)

558. A prudent investor would have considered a 59% customer concentration to be material as the target company's loss of that customer would have large adverse effects on the target company. (Sept. 19, 2016 Tr. (Puntillo) 91:12-24.)

559. Based on SJP's representations regarding (1) its year end 2006 backlog; (2) its intent to work off 75% of that backlog in

2007; and (3) the percentage of Hovnanian and non-Hovnanian bids outstanding, Hovnanian represented 62% of SJP's projected revenue for 2007. (Demonstrative 23; Sept. 19, 2016 Tr. (Puntillo) 101:2-103:7; Joint Ex. 1 (Offering Memo), at 12, 26-27; Joint Ex. 9 (Apr. 11, 2007 Draft), at 13.)

560. Based on SJP's representations regarding (1) its year end 2006 backlog; (2) its intent to work off 75% of that backlog in 2007; and (3) the percentage of Hovnanian and non-Hovnanian bids outstanding, non-Hovnanian revenues would need to grow by 117% from 2007 to 2008 to simultaneously meet SJP's projected revenues while limiting Hovnanian revenues to 20% of total revenues.[37] (Demonstrative 20; Sept. 19, 2016 Tr. (Puntillo) 105:4-19.)

561. A prudent investor [*126] would have been concerned with such a drastic and unprecedented reduction in the projected Hovnanian revenues given the growth of non-Hovnanian revenues required to meet SJP's projections. (Sept. 19, 2016 Tr. (Puntillo) 105:20-106:1.)

562. A prudent investor would have required a breakdown between projected Hovnanian and non-Hovnanian revenues in light of SJP's historical dependence on Hovnanian as well as SJP's representation that it was diversifying away from Hovnanian. (Sept. 19, 2016 Tr. (Puntillo) 106:9-23.)

563. FBTS believed that Prairie applied a risk discount of 19.25%, which, in part, accounted for Hovnanian's large percentage of sales with SJP. (Joint Ex. 9 (Apr. 11, 2007 Draft) 42; May 26, 2016 Tr. (Ippensen) 82:17-83:18.)

564. The April 11, 2007 Draft Valuation Report did not identify how much, if any, of the discount rate was due to customer concentration, and FBTS never discussed the amount of the discount rate attributable to customer concentration. (May 26, 2016 Tr. (Ippensen) 83:19-84:6; June 29, 2016 Tr. (Aliferis) 148:4-24.)

565. The Offering Memo's representation that Hovnanian projects constituted only 20% of SJP's outstanding bids was copied into the April 11, 2007 [*127] Draft Valuation Report. (Joint Ex. 1 (Offering Memo), at 12; Joint Ex. 9 (Apr. 11, 2007 Draft), at 13, 32.)

566. In explaining its "diversification plan" to Prairie, SJP made general representations that it would add additional, unspecified customers, and would solicit unspecified commercial and municipal developers. (June 29, 2016 Tr. (Aliferis) 85:6-86:8.)

---

[37] The Offering Memo stated that, at the end of 2006, Hovnanian only represented 20% of the outstanding bids. (Joint Ex. 1 (Offering Memo), at 12.)

567. SJP never explained in any detail why it believed it would successfully diversify away from Hovnanian, other than telling prospective customers that SJP can offer services "for [a] reasonable pric[e] and [do] quality work." (June 29, 2016 Tr. (Aliferis) 85:24-86:8.)

568. FBTS and Prairie never determined which specific customers SJP planned to cultivate as part of its diversification plan, beyond SJP's general statement that "there was always demand for [SJP's] services from other customers in the marketplace." (June 29, 2016 Tr. (Aliferis) 86:23-87:8 (did not recall SJP specifically explaining how SJP determined that municipalities and commercial developers had available projects); Sept. 23, 2016 Tr. (Cory) 43:12-19 (did not recall discussions about whether SJP was diversifying away from Hovnanian, or how it could replace Hovnanian if it lost Hovnanian as a customer); July [*128] 6, 2016 Tr. (Ash) 56:4-24 (did not recall SJP explaining specifics of its customer diversification strategy).)

569. Prairie never considered what effect SJP's customer or regional "diversification plan" would have on its profit margins. (June 29, 2016 Tr. (Aliferis) 71:23-72:15 (no recollection as to differences in margins depending on customer or region).)

570. FBTS never asked, and was unaware of whether Prairie asked, SJP how it was specifically planning to reduce its customer concentration in Hovnanian. (May 24, 2016 Tr. (D'Esposito) 24:20-24; May 26, 2016 Tr. (Ippensen) 86:2-6.)

571. The seller's representation that only 20% of SJP's outstanding bids were for Hovnanian at the end of 2006, despite SJP's historical dependence on Hovnanian for more than half of its revenues, implied that SJP might not in fact meet its projected revenues absent an explanation as to how it would make up for this shortfall. (Sept. 19, 2016 Tr. (Puntillo) 105:20-106:8.)

572. One of the prospective lenders whom Duff & Phelps solicited to finance the Transaction asked Duff & Phelps to explain the dramatic decrease in Hovnanian bids in light of the importance of Hovnanian to SJP's 2006 revenues and its end [*129] of year 2006 reported backlog. (Pl.'s Ex. 5 (Sovereign Bank E-mail), at 2; May 25, 2016 Tr. (Miscione) 26:8-16, 27:7-11, 28:16-19.)

573. FBTS and Prairie did not consider the possibility that SJP's stated decline in Hovnanian bids might signal a problem in SJP's relationship with its major customer (e.g., lack of available Hovnanian projects, or Hovnanian's rejection of SJP's bids). (May 26, 2016 Tr. (Ippensen) 86:15-87:4, 93:10-18.)

574. FBTS and Prairie did not ask SJP to explain how SJP was planning to make up the shortfall in revenues that had traditionally been provided by Hovnanian. (Sept. 23, 2016 Tr. (Cory) 43:12-19.)

575. On April 13, 2007—at the close of market prior to the Transaction—Hovnanian was trading at $23.69 per share. (Stipulation of Facts ¶ 55.)

576. During the week of April 9, 2007, Hovnanian was trading at its lowest adjusted closing price since the week of May 19, 2003. (ECF No. 136-1 (Motion for Judicial Notice), at 1, facts nos. 2, 3; ECF No. 156 (Order Granting Motion for Judicial Notice as Unopposed).)

577. Hovnanian's adjusted share price of $23.69 per share at the close of market on Friday, April 13, 2007, was its third lowest price since May 21, 2003, with [*130] the second and third lowest prices falling on April 10, 2007 and April 11, 2007. (ECF No. 136-1 (Motion for Judicial Notice), at 6 (Chart).)

578. The share price for Hovnanian steadily decreased from July 22, 2005 to April 13, 2007. (ECF 136-1 (Motion for Judicial Notice), at 1, fact no. 4; ECF 136-5 (Hovnanian Stock Chart); ECF No. 155 (Order Granting Motion for Judicial Notice as Unopposed).)

*x. FBTS's Review of Prairie's Consideration of Kara Homes's Bankruptcy*

579. Kara Homes had consistently been one of SJP's top ten customers from 2004 to 2006. (Joint Ex. 1 (Offering Memo), at 126; Stipulation of Facts ¶ 56.)

580. Kara Homes accounted for 1.9% of SJP's total annual revenues as of October 2006 (Joint Ex. 1 (Offering Memo), at 26), 9% of SJP's total adjusted revenues for 2005 (Joint Ex. 1 (Offering Memo), at 34, 126), and 3.5% of SJP's total adjusted revenues for 2004 (Joint Ex. 1 (Offering Memo), at 34, 126). Prairie never discussed the number of projects that Kara Homes historically provided to SJP or the effects of Kara Homes's bankruptcy on SJP's ability to either diversify its customer base or meet its projections. (May 23, 2016 Tr. (Dugan) 175:6-12 (no recollection of telling Prairie how many projects Kara provided), 189:17-23 (no recollection of what questions Prairie asked [*131] regarding Kara Homes).)

581. Kara Homes declared bankruptcy in October of 2006—approximately 6 months prior to the Transaction. (PACER, U.S. Bankruptcy Court, District of New Jersey, Chapter 11, Case No.: 06-19626(MBK)); ECF No. 136-1 (Motion for Judicial Notice), at 1, fact no. 1; ECF No. 156 (Granting

582. At the time Kara Homes declared bankruptcy, it owed SJP approximately $700,000 that SJP was unable to collect. (May 23, 2016 Tr. (Dugan) 121:7-12.)

583. In 2006, SJP wrote off $768,810 as an operating expense, which represented the amount owed to it by Kara Homes plus approximately $70,000 in legal fees. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 31.)

584. The trustee in the Kara Homes bankruptcy action sued SJP to recover payments that Kara Homes made to SJP shortly before declaring bankruptcy. (May 23, 2016 Tr. (Dugan) 121:20-122:2; FBTS Ex. 34, at D00545.)

585. Despite the bankruptcy filing, SJP listed Kara Homes as one of its top-ten customers in the Offering Memo sent to FBTS. (Joint Ex. 1 (Offering Memo), at 26 "Exhibit 21-SJP Top Customers YTD.")

586. SJP informed Prairie that Kara Homes had declared bankruptcy. (May 23, 2016 Tr. (Dugan) 175:6-176:1.)

587. Kara Homes was not accounted for in the backlog [*132] or projected revenues for 2007 in the April 11, 2007 Draft Valuation Report.[38] (May 26, 2016 Tr.

---

[38] Aliferis gave no testimony regarding whether the Kara Homes revenues that were owed—but not paid and/or returned to the bankruptcy estate—were written off from SJP's 2006 revenues. As the valuation reports prepared by Aliferis (Joint Ex. 9 (Apr. 11, 2007 Draft); Joint Ex. 10) do not break down historic or projected revenues by customer, it is impossible to specifically determine how Kara Homes's revenues were accounted for by Prairie in either the backlog or in the projected revenues. Further, although historical expenses were reduced to reflect the costs SJP incurred as a result of the Kara Homes bankruptcy, it does not appear that either Duff & Phelps or Prairie adjusted SJP's historical revenues to account for the fact that SJP could not collect on the revenues earned. Although Dugan speculated that the Kara Homes revenues might have been written off SJP's total revenues in the audited 2006 financials, he testified that he did not know whether Prairie actually made a revenue (as opposed to an expense) adjustment for Kara Homes (May 23, 2016 Tr. (Dugan) 171:6-8) and was unsure as to the year in which the Curchin Group made the appropriate write off (May 23, 2016 Tr. (Dugan) 171:9-16). Neither SJP's draft 2006 financial report attached to the Offering Memo (Joint Ex. 1 (Offering Memo), at 116-120), nor SJP's draft 2006 financial report prepared in March (Pl.'s Ex. 22 (Combined 2006 Draft)) contained any adjustments to uncollected revenue based on the Kara Homes bankruptcy. As the financial reports were prepared based on the accrual method, rather than cash received (Pl.'s Ex. 22 (Combined 2006 Draft), at 8 "Basis of Accounting"), SJP's reported revenues included the amounts owed by Kara Homes, regardless of whether they were collected.

(Ippensen) 101:16-21.)

588. The April 11, 2007 Draft Valuation Report referenced SJP's expenses from litigation involving Kara Homes for purposes of deducting those costs from SJP's future projected expenses. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 31 ("Kara Homes w[ri]te-off and legal fees"); May 26, 2016 Tr. (Ippensen) 100:20-101:11.)

589. The April 11, 2007 Draft Valuation Report failed to discuss the effect of the Kara Homes bankruptcy on SJP's projected revenues or its stated customer diversification plan. (*See generally* Joint Ex. 9 (Apr. 11, 2007 Draft).)

590. FBTS and Prairie never discussed the effect of the Kara Homes bankruptcy on either SJP's ability to match its 2006 revenues, or on SJP's stated strategy of diversifying away from Hovnanian. (May 26, 2016 Tr. (Ippensen) 102:21-103:1; May 23, 2016 Tr. (Dugan) 176:9-15, 189:17-23.)

### xi. FBTS's Review of Prairie's Consideration of SJP's Bidding

591. The Offering Memo represented that at the end of 2006, SJP had $60 million in bids outstanding, and that SJP bids for approximately $140 million in projects per year with a historical hit rate of approximately 45% on [*133] average. (Joint Ex. 1 (Offering Memo), at 27.)

592. Prairie copied these representations verbatim and pasted them into its April 11, 2007 Draft Valuation Report. (*See* Joint Ex. 9 (Apr. 11, 2007 Draft), at 13, 32; *see also* May 26, 2016 Tr. (Ippensen) 79:10-18.)

593. FBTS believed that SJP's projections were reasonable due, in part, to SJP's outstanding hit rate. (May 26, 2016 Tr. (Ippensen) 79:19-22; *see also* Joint Ex. 12 (Apr. 13, 2007 Memo), at 1 (noting that "SJP wins about 45% of the bids they bid on").)

594. An average historical hit rate of 45% on an average bidding volume of $140 million means that SJP was awarded on average $63 million in new projects every year. (May 26, 2016 Tr. (Ippensen) 79:23-80:4; *see also* July 5, 2016 Tr. (Stoesser) 101:13-24.)

595. Historically, SJP had never attained $63 million in annual revenues; SJP's highest revenues were approximately $61 million and its five-year average revenues were approximately $43 million. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

596. FBTS and Prairie also believed that SJP began bidding on larger, more profitable projects after Yacuzzio passed

away. (May 26, 2016 Tr. (Ippensen) 59-10:19; May 27, 2016 Tr. (Ippensen) 22:1-2; June 29, 2016 Tr. (Aliferis) 89:7-10. *But see* July 6, 2016 Tr. (Ash) 43:7-11 [*134] (could not remember if she was told that SJP began bidding on more profitable jobs after DiPano and Dugan took over control of SJP).)

597. FBTS never verified SJP's outstanding bids. (May 26, 2016 Tr. (Ippensen) 80:8-15.)

598. FBTS does not know what evidence, if any, there was to support the statement that "SJP was bidding on larger, more profitable projects." (May 26, 2016 Tr. (Ippensen) 59:10-61:17 (unable to identify any evidence except SJP's top customers for 2006 as reflected in the Offering Memo); July 6, 2016 Tr. (Ash) 43:7-16.)

599. Prairie did not review any of the bid proposals and did not compare SJP's bidding under DiPano with SJP's bidding under Yacuzzio. (June 29, 2016 Tr. (Aliferis) 89:11-24.)

600. Prairie's representations concerning SJP's bidding were based solely on discussions with SJP and its advisors. (June 29, 2016 Tr. (Aliferis) 89:25-90:16 (acknowledging that SJP's new business strategy was only based on discussions with management or its financial advisor).)

### xii. FBTS's Review of Prairie's Application of the Market Multiple Method

601. One of the methodologies used by Prairie in its valuation was the market multiple method, whereby the value of a closely held company [*135] is derived by identifying similar publicly traded companies (the "peer group"), expressing the known market value of the peer group (based on publicly traded share price) as a function of a financial metric, and then applying that formula to derive the closely held company's value. (June 30, 2016 Tr. (Gross) 13:9-15, 15:5-16:2; July 14, 2016 Tr. (Messina) 111:23-112:8.)

602. Prairie selected peer group companies that were much larger, had a significantly more diversified geographical and customer base, and performed far more sophisticated work than SJP. (July 14, 2016 Tr. (Messina) 112:18-113:8.)

603. For the market multiple method, Prairie used three metrics, EBITDA, EBIT,[39] and pretax income, from seven guideline companies and reduced those multiples by 40% to develop a more conservative comparison with SJP. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 43-45)

---

[39] Earnings before interest and taxes ("EBIT").

604. Prairie applied the 40% discount to the multiples of the public companies used in the market multiple method for the purpose of taking into account the differences between the public companies and SJP in terms of size, access to capital, geographic diversity and economies of scale. (June 29, 2016 Tr. (Aliferis), at 134:1-11.)

605. Aliferis concluded that [*136] the 40% discount was conservative. (June 29, 2016 Tr. (Aliferis) 135:23-136:10.)

606. Prairie also attempted to quantify the dilutive aspect of the stock appreciation rights plan. (June 29, 2016 Tr. (Aliferis) 134:23-25.)

607. In addition, Prairie looked at dividends in the marketplace to assess what comparable dividends were trading at as compared to an SJP security. (June 29, 2016 Tr. (Aliferis) 135:11-16.)

608. Prairie determined that an SJP security would trade comparably to dividends in the marketplace or below. (June 29, 2016 Tr. (Aliferis) 135:11-16.)

609. As the April 11, 2007 Draft Valuation Report sets forth, "when using multiples from publicly traded companies, a discount is used to account for differences in size, risk, diversification, customer concentration and other factors." (Joint Ex. 9, at 45.)

610. Ippensen determined that the 40% discount utilized by Prairie was even more conservative than he expected and resulted in his having even greater comfort in relying on the April 11, 2007 Draft Valuation Report. (May 26, 2016 Tr. (Ippensen) 191:7-17.)

611. Financial information from SJP's closest competitors, which were private companies, was not readily available. (May 23, 2016 [*137] Tr. (Dugan) 164:2-19; Joint Ex. 9 (Apr. 11, 2007 Draft), at 44.)

612. It is difficult to find companies that are "exactly" like the subject company because the guideline companies may have larger operations, access to capital that the subject company does not, or provide different services; nonetheless, it is prudent to use guideline companies in a valuation analysis. (June 29, 2016 Tr. (Aliferis) 21:13-25.)

613. FBTS did not find it unusual that SJP outperformed its peer companies, as set forth in the market multiple method analysis of the April 11, 2007 Draft Valuation Report, in the categories of EBITDA, EBIT and pretax income percentage, because SJP had less overhead than these larger publicly traded companies. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 43; May 26, 2016 Tr. (Ippensen) 111:16-112:6.) Publicly traded companies typically perform better, however, than privately

traded companies. (July 14, 2016 Tr. (Messina) 137:1-10.) This is the reason why a valuation professional must apply a discount when performing the market multiple method. (June 29, 2016 Tr. (Aliferis) 136:3-10; June 30, 2016 Tr. (Gross) 35:1-10.)

614. Although Aliferis typically consults with company management to ask if peer group [*138] candidates performed similar work to that of the target company, Prairie did not consult SJP on this subject matter. (June 29, 2016 Tr. (Aliferis) 23:1-16; May 23, 2016 Tr. (Dugan) 128:14-22, 163:18-21; Sept. 23, 2016 Tr. (Cory) 64:15-19.)

615. Prairie selected the following peer group companies in conducting its market multiple analysis of SJP: Fluor, which engages in engineering for upstream oil and gas production; Perini, which constructs highways, bridges, light rail transit systems, subways, airports and wastewater treatment facilities; Jacobs Engineering, which designs and engineers processing plants, including projects for clients in chemicals and polymers, pharmaceuticals and biotechnology, oil and gas, refining, and food and consumer products; Granite Construction, Inc., which constructs dams, mass transit facilities, pipelines, canals, tunnels, waterway locks and dams, and airport infrastructure; Meadow Valley Corp., which constructs highway bridges and airport runways; and URS Corp., which provides systems engineering and technical assistance for the design and development of new weapons systems and the modernization of aging weapons systems. (July 14, 2016 Tr. (Messina) [*139] 113:13-114:12; Joint Ex. 9 (Apr. 11, 2007 Draft), at 64-69.)

616. Although Prairie used Sterling Construction Co., Inc. ("Sterling") as one of the publicly traded companies in its peer group (Joint Ex. 9 (Apr. 11, 2007 Draft), at 43; Joint Ex. 10 (Apr. 27, 2007 Report), at 57), Prairie omitted the company description of Sterling from both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report. (May 26, 2016 Tr. (Ippensen) 110:14-22.)

617. FBTS did not identify the omission of Sterling prior to the Transaction. (Sept. 23, 2016 Tr. (Cory) 65:15-20; May 26, 2016 Tr. (Ippensen) 110:14-111:1.)

618. FBTS was unable to assess the comparability of Sterling with SJP without having been provided a description of Sterling.

619. FBTS did nothing to determine if the peer group selected by Prairie was appropriate. (Sept. 23, 2016 Tr. (Cory) 63:24-65:10; May 26, 2016 Tr. (Ippensen) 114:7-24.)

620. The peer group companies that Prairie selected were incomparable to SJP. (July 14, 2016 Tr. (Messina) 112:18-23; May 23, 2016 Tr. (Dugan) 122:9-128:10 (stating that for the period from 2002 to 2007, SJP did not work on any projects involving oil or gas refineries, oil pipelines, theaters, railroads, airports, casinos, harbors, [*140] ports, public highways, public bridges, dams, canals, waterlocks, correctional facilities, and schools and was unsure if SJP worked on projects involving hospitals or power plants).)

621. SJP's financial metrics, market cycle, and operations did not closely resemble the financial metrics, market cycle, and operations of the peer group companies Prairie selected. (July 14, 2016 Tr. (Messina) 113:1-8; *see also* Joint Ex. 9 (Apr. 11, 2007 Draft), at 64-69; Demonstratives 9, 10, 13, 15, 17, 18.)

622. The peer group companies Prairie selected only had minimal exposure to the housing market and their performance was not strongly correlated with the cyclicality of the homebuilding industry. (July 14, 2016 Tr. (Messina) 119:13-120:17; Demonstrative 9, 10, 13; July 14, 2016 Tr. (Messina) 113:9-12.)

623. From 2002 to 2006, the peer group companies Prairie selected achieved a consistent return on assets ranging from 4.9% to 5.6%. (Demonstrative 17.)

624. From 2002 to 2006, SJP achieved a return on assets which fluctuated wildly between 2.4% and 29.1%. (Demonstrative 17.)

625. The fluctuations in SJP's historical return on assets were largely due to the fact that SJP operated in a competitive cyclical industry. (July 14, [*141] 2016 Tr. (Messina) 135:13-21.)

626. SJP's historical returns and margins exhibited dramatically more volatility than the historical returns and margins of the peer group companies Prairie selected. (Demonstrative 10; July 14, 2016 Tr. (Messina) 120:4-9.)

627. SJP's EBITDA margin had a significantly higher standard deviation than the standard deviation of the EBITDA margin of the peer group companies Prairie selected. (July 14, 2016 Tr. (Messina) 120:4-17; Demonstrative 10.)

628. It is generally accepted in finance that high volatility in margins is evidence that the company's industry is cyclical. (July 14, 2016 Tr. (Messina) 61:18-62:1, 135:13-21.)

629. The profit margins of the peer group companies Prairie selected were, on average, approximately 2.3%. (Demonstrative 15.)

630. SJP's five-year historical average profit margin was 3.9%. (Demonstrative 15.)

631. Prairie projected that SJP's profit margins would average 8.4%. (Demonstrative 16.)

632. SJP's projected profit margins were over three times higher than the profit margins of the peer group companies Prairie selected. (July 14, 2016 Tr. (Messina) 133:13-17; Demonstrative 15, Demonstrative 16.)

633. According to the April 27, 2007 Post-Transaction [*142] Valuation Report, SJP's projected return on assets was approximately five times higher than the historical returns of the peer group companies selected by Prairie. (July 14, 2016 Tr. (Messina) 138:6-139:4; Demonstrative 18.)

634. According to the April 27, 2007 Post-Transaction Valuation Report, SJP's projected profit margins of 8.4% (Demonstrative 16) were between two to eight times higher than the profit margins of each of the peer group companies used by Prairie. (Demonstrative 15; July 14, 2016 Tr. (Messina) 133:10-17.)

635. Although it is generally accepted in finance that a company may temporarily realize returns in excess of its industry, that company cannot indefinitely realize above-industry returns absent a sustainable competitive advantage. (CFF ¶ 3811)[40]

636. Prairie's execution of the market multiple method overemphasizes SJP's abnormally strong performance in 2006 and minimizes SJP's weaker performance during other times within the homebuilding industry cycle. (July 14, 2016 Tr. (Messina) 123:16-124:1.)

637. Under Prairie's approach, approximately 80-90% of SJP's fair market value was driven by SJP's 2006 performance. (July 14, 2016 Tr. (Messina) 123:11-124:1.)

638. SJP's net [*143] income in 2006 was approximately $5 million, whereas its three-year historical average net income and five-year average net income were approximately $2.5 million and $2 million, respectively. (Demonstrative 11.)

639. Despite the fact that the majority of SJP's projects were in site preparation for homebuilders, Prairie did not include the Homebuilders Index in the peer group, even though homebuilders had similar financial metrics to SJP. (July 14, 2016 Tr. (Messina) 64:2-13, 114:18-24, 117:16-119:6; Demonstrative 9.)

640. Homebuilder companies were more comparable peer group companies than the peer group companies selected by Prairie because SJP's financial results and end-market demands more closely resembled those of homebuilder companies. (July 14, 2016 Tr. (Messina) 114:19-24, 117:11-119:6; Demonstrative 9.)

641. The homebuilder companies used by Messina in his market multiple method analysis included: Brookfield Homes, Beazer Homes, DR Horton, Dominion Homes, Hovnanian, KB Homes, Lennar Corp., Orleans Homebuilder, MDC Holdings, Inc., M/I Homes, Meritage Homes Corp., NVR Inc., Pulte Group, The Ryland Group, Standard Pacific Corp., Toll Brothers, Tousa Inc., and WCI Communities (collectively, [*144] the "Homebuilder Peer Group"). (July 14, 2016 Tr. (Messina) 115:8-116:24.)

642. Prairie should have utilized SJP's five-year historical performance in its market multiple method to normalize for SJP's historical performance. (July 14, 2016 Tr. (Messina) 124:2-6.)

643. Prairie's application of a 40% discount to the multiples of the peer group companies selected by Prairie did not adequately account for the differences between SJP and those peer group companies. (July 14, 2016 Tr. (Messina) 128:2-129:2.)

644. Even after applying a 40% discount to the multiples of the peer group companies selected by Prairie, the multiples of the Homebuilder Peer Group companies were more similar to SJP. (July 14, 2016 Tr. (Messina) 129:10-130:2; Demonstrative 13.)

## Q. Miscellaneous Errors in Prairie's Valuation Reports

645 Prairie incorrectly identified the target company as "The Care of Trees Earnings" instead of "SJP" in a chart in both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report. (Joint Ex. 9 (Apr. 11, 2007 Draft), at 86; Joint Ex. 10 (Apr. 27, 2007 Report), at 100.)

646. There is no evidence that FBTS noted this error prior to the Transaction or considered this error to be critical. (Sept. [*145] 23, 2016 Tr. (Cory) 78:2-16.)

647. The Offering Memo and all of the transactional documents, including the SPA, the ESOP Promissory Note, and the ESOP Pledge Agreement described the stock to be sold to the SJP ESOP as "Class B Shares" or "Series B Convertible Common Stock." (Joint Ex. 1 (Offering Memo), at 1; Joint Ex. 5 (Stock Purchase Agreement), at 2; Pl.'s Ex.

---

[40] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

40 (Promissory Note), at 1; Pl.'s Ex. 41 (ESOP Pledge Agreement), at 1.)

648. Both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report identify the securities as "Super Common Stock." (Joint Ex. 9 (Apr. 11, 2007 Draft), at 49; Joint Ex. 10 (Apr. 27, 2007 Report), at 63.)

649. FBTS did not consider Prairie's misidentification of the shares to be a critical error prior to the Transaction. (Sept. 23, 2016 Tr. (Cory) 81:16-22.)

650. Both the April 11, 2007 Draft Valuation Report and the April 27, 2007 Post-Transaction Valuation Report contained numerous mathematical errors. (June 30, 2016 Tr. (Van Horn) 163:7-164:8.)

**R. April 13, 2007 Teleconference**

651. FBTS conducted a conference call on April 13, 2007, where presentations were given by its advisors, Aliferis and Greenapple, about the April 11, 2007 Draft Valuation Report and legal due diligence, respectively. (May 25, 2016 Tr. (Cory) 105:4-8; May 27, 2016 Tr. (Serbin) [*146] 108:2-7; July 6, 2016 Tr. (Ash) 25:7-12; 115:7-21; Stipulation of Facts ¶ 48.)

652. The April 13, 2007 conference call consisted, in part, of a presentation by Prairie of its April 11, 2007 Draft Valuation Report, and a presentation by SFE&G of legal issues relating to the anticipated Transaction. (Stipulation of Facts ¶ 48; May 27, 2016 Tr. (Serbin) 108:2-7; July 6, 2016 Tr. (Ash) 25:7-12, 122:18-123:2.)

653. The April 13, 2007 conference call attendees included EB Committee members Ash, Serbin, and Cory, as well as Greenapple and Aliferis. (Joint Ex. 12 (Apr. 13, 2007 Memo).) Cory, Serbin and Ash were the only EB Committee members to attend this meeting. (May 25, 2016 (Cory) 103:15-21; *see also* Joint Ex. 12 (Apr. 13, 2007 Memo).) In other words, only three of the eight to nine members of the EB Committee attended this final EB committee meeting on April 13, 2007. (May 26, 2016 Tr. (Ippensen) 132:17-19, 138:21-25; May 27, 2016 Tr. (Serbin) 145:5-10; May 25, 2016 (Cory) 103:15-21; *see also* Joint Ex. 12 (Apr. 13, 2007 Memo).) Ippensen, who typically attended the final EB Committee meeting, did not attend the April 13, 2007 teleconference. (May 25, 2016 Tr. (Cory) 92:10, 103:15-21; *see also [*147]* Joint Ex. 12 (Apr. 13, 2007 Memo).)

654. Cory took notes during the teleconference on April 13, 2007. (Joint Ex. 12; May 25, 2016 Tr. (Cory) 102:17-103:11.) Cory's two pages of handwritten notes, which were

subsequently typed, were the only notes that memorialized the April 13, 2007 conference call. (*See* Joint Ex. 12 (Apr. 13, 2007 Memo); May 26, 2016 Tr. (Ippensen) 17:13-21.)

655. The April 13, 2007 conference call began at 2:00 p.m. and lasted two to three hours. (FBTS Ex. 10 (E-mail from M. Steere to P. Aliferis dated April 13, 2007) (noting a 2:00 p.m. start time); July 6, 2016 Tr. (Ash) 25:22-26:7 (testifying that meetings typically last two to three hours); June 29, 2016 Tr. (Aliferis) 163:6-9.)

656. According to the notes of the meeting, the only[41] issues discussed pertaining to valuation were:

1. SJP has a competitive edge by bringing large equipment to the site and making gravel with the old pavement instead of hauling the old pavement away and bringing in the new gravel.
2. Post-transaction director positions.
3. The transaction is for 38%.
4. A collective bargaining agreement to which SJP was a party.
5. An OSHA exam.

6. Company management's focus and enthusiasm about SJP and the proposed [*148] transaction.
7. SJP is vertically integrated in its paving operations.
8. SJP wins 45% of the jobs it bids on.
9. SJP's succession planning. If something happened to Frank Dugan, "this would not be devastating."
10. Aliferis stated that he "briefly reviewed" the interim financials through February 28, 2007 and would review the interim financials through March 31, 2007 to finalize the valuation report.[42]

(Joint Ex. 12 (Apr. 13, 2007 Memo).)

_____

[41] Defendant alleges that not all topics discussed during the meeting were included in the meeting notes. (May 27, 2016 Tr. (Serbin) 109:3-18; 110:21-111:8; June 29, 2016 Tr. (Aliferis) 163:12-15.) The Court acknowledges that the notes are not transcripts and most likely do not memorialize absolutely everything said during the conference call. The Court, however, finds that only the topics encompassed within the notes were discussed in significant detail, absent specific testimony concerning other discussions that the Court expressly sets forth in its findings of fact. The Court finds that other discussions may have occurred but only in an informal and cursory fashion. The Court's finding is supported by the fact that the testimony cited by Defendant does not specifically identify any issues discussed but excluded from the memo. For example, even with regard to Defendant's purported discussion about "some" industry talk, Defendant fails to identify what information was discussed. (*See* May 27, 2016 Tr. (Serbin) 132:8-16).)

[42] The Court notes that this list constitutes a summary, as opposed to a direct excerpt, of Joint Exhibit 12.

657. The participants of the April 13, 2007 teleconference did not discuss industry trends prior to the Transaction.[43] (June 29, 2016 Tr. (Aliferis) 37:15-38:19; Sept. 23, 2016 Tr. (Cory) 59:10-21.)

658. Aliferis walked the EB Committee through the April 11, 2007 Draft Valuation Report, helping it understand how Prairie arrived at its valuation and conclusion that the SJP ESOP was paying less than fair market value for SJP's shares, and taking the time to go through the pertinent pages of the report, with the EB Committee having the opportunity to ask questions throughout the process. (July 6, 2016 Tr. (Ash) 118:10-119:1; May 27, 2016 Tr. (Serbin) 110:4-20.)

659. Aliferis informed the EB Committee that, based on his review of interim financial statements [*149] for the period ending on February 28, 2007 and what he had been advised verbally by SJP, there were no "substantial changes" and stated that SJP remained in position to realize its revenue projections for 2007 and beyond. (Joint Ex. 12; May 25, 2016 Tr. (Cory) 123:10-16; June 29, 2016 Tr. (Aliferis) 162:11-163:2.)

660. Although Prairie represented in the April 11, 2007 Draft Valuation Report that "discussions with management have yielded that the [sic] conclusion there has been no material change in the operations and financial statements of the Company from December 31, 2006 to April 16, 2007," the financial data for the first quarter of 2007 revealed that SJP's revenues for January 1, 2007 through March 31, 2007, was 56.4% below SJP's revenues for those months in 2006, that SJP's gross profit for January 1, 2007 through March 31, 2007 was 97.4% below SJP's gross profit for those months in 2006, and that SJP's net income for January 1, 2007 through March 31, 2007 was 128.3% below SJP's net income for those months in 2006. (CFF ¶¶ 454-58)[44]

661. During the April 13, 2007 conference call, FBTS did not discuss SJP's poor 2007 first quarter performance prior to the Transaction.[45] (May 26, 2016 [*150] Tr. (Ippensen) 91:24-

92:17; May 25, 2016 Tr. (Cory) 112:19-25; Sept. 23, 2016 Tr. (Cory) 19:20-20:3, 20:4-17; May 24, 2016 Tr. (D'Esposito) Tr. 18:17-24; June 29, 2016 Tr. (Aliferis) 37:15-20, 38:16-19.)

662. Prior to voting, Serbin reviewed the projected financial statements in the April 11, 2007 Draft Valuation Report, including the historical sales numbers, net income, EBITDA, company profits, projected revenue, projected net income, and projected EBITDA margins. (May 27, 2016 Tr. (Serbin) 115:13-116:22; Joint Ex. 9 (Apr. 11, 2007 Draft), at 79.)

663. Based on Serbin's review of the April 11, 2007 Draft Valuation Report, Serbin felt that she was able to evaluate the risk for the buyer. (May 27, 2016 Tr. (Serbin) 116:11-22.)

664. Serbin felt comfortable voting to approve the Transaction based, in part, on the April 11, 2007 Draft Valuation Report's projection of zero percent revenue growth in 2007. (May 27, 2016 Tr. (Serbin) 119:18-25.)

665. In addition, Serbin voted to approve the Transaction as a result of the strength of the management team and the $58 million backlog, approximately 75% of which SJP was expected to complete in 2007. (May 27, 2016 Tr. (Serbin) 120:1-6, 120:16-121:6.)

666. Serbin also [*151] reviewed the April 11, 2007 Draft Valuation Report to determine whether Prairie was using appropriate methodologies to calculate the enterprise value of SJP and weighing the approaches correctly. (May 27, 2016 Tr. (Serbin) 122:2-16.)

667. In addition to considering the April 11, 2007 Draft Valuation Report, Ippensen considered his independent knowledge and experience, as well as information he gained from reading and watching the news, when voting to approve the Transaction. (May 27, 2016 Tr. (Ippensen) 89:4-90:14.)

668. Based on media reports and his general knowledge, Ippensen believed that the economy would slow down during 2007, but subsequently trend upward. (May 27, 2016 Tr. (Ippensen) 90:11-14.)

669. Ippensen voted affirmatively to approve the Transaction. (May 27, 2016 Tr. (Ippensen) 22:23-23:1.)

670. FBTS had no further discussions regarding Prairie's valuation of SJP prior to April 13, 2007 (see Pl.'s Ex. 4(b);

---

[43] The notes memorializing the April 13, 2007 teleconference—either those created contemporaneously or those created subsequently—did not discuss the industry trends. (Joint Ex. 12 (Apr. 13, 2007 Memo); FBTS Ex. 12 (Draft Valuation with Notes; Joint Ex. 15 (Financial Report Review), at 3-4; Pl.'s Ex. 15 (EB Committee Notes), at 3 (SJP Group Annual Review Apr. 16, 2007).)

[44] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[45] Defendants allege that "Aliferis relayed all information he learned from [SJP] management about the [C]ompany's financial performance for the first quarter of 2007, as well as the causes of that

performance, to FBTS during the April 13, 2007 meeting." (June 29, 2016 Tr. (Aliferis) 201:13-20.) Based on the testimony, Cory's notes, and the Court's evaluation of the witnesses' credibility, the Court finds that FBTS did not discuss SJP's poor 2007 first quarter performance prior to the Transaction.

Pl.'s Ex. 4(c) (Index of FBTS's Rule 34 Responses)), and did not have any prior meetings in which valuation issues were discussed. (May 26, 2016 Tr. (Ippensen) 19:3-20:24, 21:9-25, 25:22-26:7 (apart from a possible meeting on April 6, 2007 based solely on the handwritten portion [*152] of FBTS Exhibit 12, at 1, is not aware of any other meetings); May 25, 2016 Tr. (Cory) 105:19-106:1 (believes there were meetings prior to April 13, 2007, but concedes she may not have participated in those meetings and is unaware of any documents memorializing those meetings); Sept. 23, 2016 Tr. (Cory) 75:17-23 (cannot recall any other discussions apart from March 29, 2007, where valuation was not discussed, April 13, 2007, and April 16, 2007).)

671. Each member of the EB Committee casts a vote to approve or reject a transaction. (May 26, 2016 Tr. (Ippensen) 139:14-21.)

672. Unanimity was required to approve the Transaction. (CFF ¶ 40.)[46]

673. Members of the EB Committee were permitted to cast a vote even if they had not participated in the presentation by the valuation advisor. (July 6, 2016 Tr. (Ash) 26:25-27:2; May 27, 2016 Tr. (Serbin) 147:16-24, 159:18-22.)

674. It was the EB Committee's job to thoroughly review the April 11, 2007 Draft Valuation Report, be prepared to ask questions and, if necessary, challenge the information that had been provided to the EB Committee. (May 27, 2016 Tr. (Serbin) 107:8-18.)

675. If the EB Committee determines that a valuation report needs to be revised, [*153] it can either: a) request that the information be provided and wait for it prior to voting; or b) ask its professional advisors to provide additional detail as to the requested information and ask that it be included in the valuation report when available. (May 27, 2016 Tr. (Serbin) 130:15-131:23.) The EB Committee did not take either of these courses of action with regard to the SJP ESOP Transaction.

676. FBTS has not produced any records or documents showing who voted to approve the Transaction. (*See* Pl.'s Ex. 4; Pl.'s Ex. 4(a); Pl.'s Ex. 4(b); Pl.'s Ex. 4(c) (Index of FBTS's Rule 34 Responses).)

**S. FBTS's Lack of Negotiation as to Price and Other Terms**

677. In private equity transactions, a prudent investor will typically negotiate the price of the securities. (Sept. 19, 2016 Tr. (Puntillo) Tr. 61:19-22.)

678. Serbin testified that FBTS typically negotiates the purchase price in ESOP Transactions. (May 27, 2016 Tr. (Serbin) 127:23-128:7.)

679. In this case, Duff & Phelps had been retained to negotiate with FBTS. (Joint Ex. 8 (Duff & Phelps Engagement Agreement), at 2 ¶ b(iii), (iv); May 25, 2016 Tr. (Miscione) 18:1-11.)

680. FBTS had been retained to negotiate with SJP and DiPano. (Joint Ex. 6 (FBTS Engagement Agreement), at 2 ¶ 3.a.)

681. FBTS did not make any counteroffers [*154] or engage in any negotiations with DiPano or his agents over the $16 million asking price. (May 27, 2016 Tr. (Serbin) 127:17-25; July 6, 2016 Tr. (Ash) 64:2-15, 108:24-109:1; May 25, 2016 Tr. (Miscione) 22:7-9.)

682. FBTS did not propose a counteroffer to the proposed $16 million purchase price for the stock in the Offering Memo because FBTS concluded that the fair market value of 38% of SJP's shares was in excess of $16 million. (Joint Ex. 1 (Offering Memo), at 8; May 26, 2016 Tr. (Ippensen) 116:20-117:20.)

683. SARs are an item that can be negotiated between the buyer and seller of stock. (May 25, 2016 Tr. (Miscione) 55:6-9.)

684. Here, the SARs were not "negotiated" as opposed to being a subject of discussion.[47] (*See* FBTS Ex. 11 (Mar. 29, 2007 Conference Call Memo) (indicating that "clarification" was needed for the second tranche for the stock appreciation rights).)

685. Contrary to FBTS's claim otherwise, the evidence shows

---

[46] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[47] FBTS alleges that it negotiated the SARs. (May 26, 2016 Tr. (Ippensen) 171:15-172:1; May 27, 2016 Tr. (Serbin) 126:3-5.) FBTS, however, has offered no testimony or documentary evidence concerning how the SARs were negotiated, the terms of such negotiation, and/or who negotiated the SARs. Further, Cory testified that she believed SARs only conferred an intangible value to a company and could not recall discussing what effect SARs had on the fair market value of SJP, or asking Prairie to quantify the effect of SARs on the final purchase price. (May 25, 2016 Tr. (Miscione) 54:23-55:5; May 25, 2016 Tr. (Cory) 107:21-23, 110:4-6.) Based on the evidence presented and upon the Court's evaluation of the credibility of the witnesses, the Court finds that the parties did not "negotiate" the SARs terms.

that FBTS also did not negotiate the indemnification provision and representations and warranties in the SPA. (CFF ¶ 199.)[48]

686. FBTS negotiated the ESOP interest rate on the ESOP loan, which the SJP Plan would be taking out from the Company to make the stock purchase. **[*155]** (May 26, 2016 Tr. (Ippensen) 171:15-172:1.)

687. FBTS did not negotiate aspects of the employment agreements with Dugan and DiPano, including compensation and non-compete and non-solicitation provisions.[49]

## T. April 16, 2007 Closing

688. Before the Transaction closed, on the morning of April 16, 2007, FBTS had a "very short" telephone conversation with SJP's management to inquire whether there had been any substantial changes to SJP's performance in the first quarter of 2007. (Sept. 23, 2016 Tr. (Cory) 32:7-20.)

689. On April 16, 2007, FBTS authorized the Plan to purchase 380,000 shares of SJP from DiPano, representing 38% of SJP's outstanding shares, for $16 million. (Stipulation of Facts ¶ 59; Joint Ex. 5 (Stock Purchase Agreement).)

690. The Transaction closed with the same material terms as those that the seller initially proposed during the November 15, 2006 Meeting and in the Offering Memo. (Joint Ex. 1 (Offering Memo), at 8; July 6, 2016 Tr. (Ash) 10:2-5.)

## U. Post-Transaction

691. On April 27, 2007, FBTS received the April 27, 2007 Post-Transaction Valuation Report from Prairie. (Joint Ex. 10 (Apr. 27, 2007 Report), at 1, "04-27-07" date stamp; *see also* May 25, 2016 Tr. (Cory) 110:7-24; May 26, 2016 Tr. (Ippensen) 15:14-21.) **[*156]**

---

[48] In light of the extensive findings by the Court, the Court repeats its earlier finding of fact to provide the necessary context, due to its relevance to this section of the Court's findings.

[49] Although Serbin testified that there were "discussions" about employment agreements with key employees of SJP, (May 27, 2016 Tr. (Serbin) 124:23-125:16), there is no corroborating evidence that FBTS engaged in any negotiations with respect to the employment agreements. In fact, FBTS has not produced any record evidence of employment agreements, or even as to discussions or negotiations about such employment agreements. Based on the evidence presented and upon the Court's evaluation of the credibility of the witnesses, the Court finds that the parties did not "negotiate" aspects of the employment agreements with Dugan and DiPano.

692. The April 27, 2007 Post-Transaction Valuation Report largely reached the same value conclusions as the April 11, 2007 Draft Valuation Report—approximately $36 million under the DCF method and approximately $53 million under the market multiple approach—but it contained an additional fifteen pages discussing economic trends relevant to SJP's industry.[50] (*Compare* Joint Ex. 10 (Apr. 27, 2007 Report), at 29-43, 56, 60, *with* Joint Ex. 9 (Apr. 11, 2007 Draft), at 30, 42, 46.)

693. The industry analysis contained in the April 27, 2007 Post-Transaction Valuation Report described a softening in the housing industry, particularly in New Jersey, and forecasted that New Jersey's housing market would not pull out of its slump in 2007. (Joint Ex. 10 (Apr. 27, 2007 Report), at 32-33.)

694. The industry analysis noted that, in 2006, new housing permits in New Jersey fell by 13.7% and that construction contracts fell by 11%. (Joint Ex. 10 (Apr. 27, 2007 Report), at 32-33.)

695. The information regarding industry trends contained in the April 27, 2007 Post-Transaction Valuation Report, which set forth Prairie's opinion of SJP's value as of April 16, 2007, was known or reasonably knowable as of the date of the Transaction. (June 29, 2016 Tr. (Aliferis) 9:2-17 (information used in a valuation report **[*157]** must be reasonably knowable as of the date the company is being valued).)

696. The fact that the economic trends are referenced in the post-Transaction April 30, 2007 valuation EB Committee notes, but not in the April 16, 2006 EB Committee notes, suggests that FBTS did not discuss the economic trends prior to the Transaction. (Pl.'s Ex. 15 (EB Committee Notes), at 3 (cf. entry for "SJP Group Annual Review April 16, 2007" and "SJP Group Post-Transaction Review April 30, 2007").)

697. As the seller, DiPano executed the SPA, along with Ash of FBTS, and Dugan of SJP dated April 16, 2007. (Joint Ex. 5.)

698. The SPA set forth various terms and conditions relating to the sale of 38% of SJP's stock to the SJP ESOP by DiPano. (Joint Ex. 5.)

699. Paragraph 3.11 of the SPA between DiPano and FBTS provides, in relevant part:

---

[50] The April 11, 2007 Draft valued SJP at $36,105,000 under the DCF method and $53,607,000 under the market approach, whereas the April 27, 2007 Post-Transaction Valuation Report valued SJP at $35,470,000 under the DCF method and $52,743,000 under the market approach.

All information, reports, financial statements, exhibits and schedules furnished or to be furnished by or on behalf of the Seller or the Company pursuant to the terms of this Agreement (the "Documents") are, to the knowledge of the Seller and the Company, accurate and complete in all material respects and do not and will not omit to state any material fact necessary in order to make the information furnished, **[\*158]** in the light of the circumstances under which such information is furnished, not misleading, and are sufficient to provide a prospective [Employee Stock Ownership Trust ("ESOT")] of Company stock with appropriate information about the Company and its affairs. To the knowledge of the Seller and the Company, no information, report, financial statement, exhibit or schedule prepared or furnished by or on behalf of the Seller or the Company in connection with any of the transactions contemplated under this Agreement, the Documents, or included herein or therein, contained or contains as of the date prepared or furnished any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(Joint Ex. 5, at 6.)

700. Paragraph 8.1 of the SPA between DiPano and FBTS provides, in relevant part:

Subject to the provisions of Section 8.2 below, the Seller shall indemnify the ESOT for any loss, cost, expense or other damage, including attorney's fees suffered by the ESOT ("Damages"), resulting from, arising out of or incurred with respect to any misrepresentation or breach of any **[\*159]** representation, warranty or covenant made by the Seller or the Company herein.

(Joint Ex. 5, at 20.)

701. Following the Transaction, FBTS was retained to serve as the Plan's ongoing trustee, and Prairie was retained to prepare the Plan's annual valuation reports. (Stipulation of Facts ¶ 62; May 26, 2016 Tr. (Ippensen) 5:18-6:12.)

702. FBTS served as the ongoing trustee for the Plan until 2014. (May 27, 2016 Tr. (Ippensen) 5:18-6:1, 68:18-24; Stipulation of Facts ¶ 62.)

703. In situations where FBTS serves as an ongoing trustee, FBTS follows a four-step process for reviewing post-transactional annual valuation reports: (1) it reviews a draft valuation report; (2) it conducts a conference call with the valuation professional; (3) FBTS's internal financial analyst completes a number of forms documenting certain aspects of the draft valuation report, and forwards the report with his

analysis to FBTS's president; and (4) FBTS's president reviews the draft report and the internal financial analyst's report, and presents his recommendations to FBTS's committee for its review. (Pl.'s Ex. 14 (Oct. 4, 2009 E-mail from Cory to Munoz); May 26, 2016 Tr. (Ippensen) 119:7-22.)

704. FBTS does not follow **[\*160]** the four-step review process described above in reviewing initial acquisition transactions. (Sept. 23, 2016 Tr. (Cory) 68:10-23; May 26, 2016 Tr. (Ippensen) 118:23-119:22.)

705. After a transaction closes, FBTS's financial analyst prepares a document called a "Financial Report Review." (Sept. 23, 2016 Tr. (Cory) 26:12-24, 69:22-25; May 26, 2016 Tr. (Ippensen) 120:11-16.)

706. The Financial Report Review includes, *inter alia*, the names of the FBTS officers who performed a post-transaction review of the valuation, the performance of market indices for the period under review, a summary of changes to a company's financial metrics over the preceding year, and the qualifications of the valuation analyst. (*See, e.g.*, Joint Ex. 15 (Financial Report Review).)

707. As part of the Financial Report Review, FBTS inputs data into a program called the "Baker Hill" system to run a risk analysis on the company. (May 26, 2016 Tr. (Ippensen) 120:19-122:3; *see also* Joint Ex. 15 (Financial Report Review), at 5-8 (containing the footer "Baker Hill").)

708. FBTS does not prepare a Financial Report Review or generate a Baker Hill Report, or prepare any comparable reports, prior to a transaction. (Sept. 23, 2016 **[\*161]** Tr. (Cory) 70:5-72:11; *see also* May 26, 2016 Tr. (Ippensen) 120:11-16.)

709. The purpose of the Financial Review Report is to provide a starting point for subsequent reviews, and to allow EB Committee members who were not involved prior to the transaction to "come up to speed." (Sept. 23, 2016 Tr. (Cory) 70:1-4, 71:16-21.)

710. The Financial Report Review for the SJP Transaction was prepared months after the Transaction. (May 26, 2016 Tr. (Ippensen) 120:14-16; Sept. 23, 2016 Tr. (Cory) 27:24-28:14; Joint Ex. 15 (Financial Report Review), at 1 "Date of Report".)

711. Handwritten notes taken by Aliferis after the Transaction closed reflected information received from SJP's management, including information on the impact of the weather and SJP having $45 million of work remaining to complete in 2007, which was communicated to FBTS after

the Transaction closed.[51] (Plaintiff Ex. 36; June 29, 2016 Tr. (Aliferis) 158:13-159:23.) These notes also showed that Aliferis was also given information about SJP's efforts to keep more work in-house, rather than subcontracting it out, which would result in higher profit margins. (June 29, 2016 Tr. (Aliferis) 160:13-19.)

712. Sometime after the [*162] Transaction, Cory took notes entitled "SJP Transaction Questions."[52] (FBTS Ex. 12, at D00082.)

713. The notes show that Cory reviewed the April 27, 2007 Post-Transaction Valuation Report through the feasibility analysis which comes at the end of the report. (FBTS Ex. 12, at D00082; May 25, 2016 Tr. (Cory) 142: 8-17.)

714. The notes show that Cory had discussions about backlog, employee relations, employee participation in benefits, top-line growth of the Company, competitive advantage of the mobile rock crusher, SJP's liquidity ratio, and the capital asset pricing model with Aliferis after the SJP ESOP Transaction had closed. (FBTS Ex. 12, D00082; May 25, 2016 Tr. (Cory) 142:21-147:25.)

**V. Fair Market Value**

715. SJP's fair market value as of April 16, 2007 was $17,144,737.[53] (July 14, 2016 Tr. (Messina) 33:13-16.)

716. SJP's fair market value as of April 16, 2007, using the DCF method, was $13,859,289.[54] (July 14, 2016 Tr. (Messina) 33:19-22, 110:8-10.)

717. SJP's fair market value as of April 16, 2007, using the market multiple method, was $20,430,185 million.[55] (July 14, 2016 Tr. (Messina) 33:19-22.)

718. The fair market value of 38% of SJP as of April 16, 2007 was $6,515,000.[56] (July 14, 2016 Tr. [*163] (Messina) 33:13-16.)

719. Unlike Prairie's valuation, Messina adjusted SJP's projected growth to account for SJP's abnormally profitable year of 2006 and the peaks and troughs of a typical cycle. (July 14, 2016 Tr. (Messina) 78:15-79:8.)

720. In performing the DCF analysis, Messina utilized a negative 15% revenue growth rate for 2007, which was based on the assumption that SJP was down 56% in revenue in the first quarter of 2007 and would generate 0% revenue growth in the remainder of 2007. (July 14, 2016 Tr. (Messina) 85:13-25; *see also* Demonstrative 8.)

721. According to Messina, Prairie's use of a 0% growth rate in 2007 when its business was down 56% in the first quarter of 2007 and in light of the industry headwinds was not

---

[51] The language in Plaintiff's Exhibit 36 concerning the weather and SJP's 2007 first quarter performance is virtually identical to the language that appears in Aliferis's post-Transaction valuation (Pl.'s Ex. 7, at 45-46), but is wholly lacking in either of the pre-Transaction valuations (Joint Ex. 9 (Apr. 11, 2007 Draft) and Joint Ex. 10; June 29, 2016 Tr. (Aliferis) 179:12-181:7.) Accordingly, the Court finds that the handwritten notes at Plaintiff's Exhibit 36—which reference the "first four months of the year" and the precipitation for the month of April—were taken after the Transaction. (*See* Pl.'s Ex. 36; *see also* June 29, 2016 Tr. (Aliferis) 176:20-178:13.) Aliferis testified that he did not know, either way, when the notes at Plaintiff's Exhibit 36 were prepared, and that "one could infer that they might have been prepared after the [T]ransaction." (June 29, 2016 Tr. (Aliferis) 182:8-18.)

[52] FBTS's Exhibit 12, which references content by page numbers in the valuation report, primarily corresponds with the content and pages numbers in the April 27, 2007 Post-Transaction Valuation Report, rather than the content in the April 11, 2007 Draft Valuation Report. For instance, Cow's notes refer to CAPM on Page 53. Only page 53 of the April 27, 2007 Post-Transaction Valuation Report, however, contains a discussion of CAPM. Page 53 of the April 11, 2007 Draft did not contain a discussion of CAPM, rather, that page is the Reconciliation and Conclusion of Value.

[53] Messina rounded the value in his trial testimony to $17.1 million. The precise figure is contained in Messina's expert report (Pl.'s Ex. 19, at 6), which was not admitted into evidence. Because Messina was describing the figures in his expert report when rounding the values in his testimony, the Court finds that Messina was referring to the precise value contained in his expert report.

[54] Messina rounded the value in his trial testimony to $13.9 million. The precise figure is contained in Messina's expert report (Pl.'s Ex. 19, at 6), which was not admitted into evidence. Because Messina was describing the figures in his expert report when rounding the values in his testimony, the Court finds that Messina was referring to the precise value contained in his expert report.

[55] Messina rounded the value in his trial testimony to $20.4 million. The precise figure is contained in Messina's expert report (Pl.'s Ex. 19, at 6), which was not admitted into evidence. Because Messina was describing the figures in his expert report when rounding the values in his testimony, the Court finds that Messina was referring to the precise value contained in his expert report.

[56] Messina rounded the value in his trial testimony to $6.5 million. The precise figure can be derived from Messina's expert report (Pl.'s Ex. 19, at 6), which was not admitted into evidence. Messina's expert report finds the total value of SJP to be $17,144,737, of which 38% is $6,515,000. Because Messina was describing the figures in his expert report when rounding the values in his testimony, the Court finds that Messina was referring to the precise value as derived from his expert report.

supported by the data and facts. (July 14, 2016 Tr. (Messina) 82:10-21.)

722. Had Prairie utilized SJP's five-year[57] average historical gross profit margin of 21.06%, SJP's fair market value under the DCF method would have been $12.1 million lower. (July 14, 2016 Tr. (Messina) 93:12-94:23.)

723. Messina computed SJP's fair market value under the DCF method by assuming negative 15% sales in 2007, growing thereafter at a rate of 5%, using historic operating margins for [*164] gross margin and EBITDA to achieve a return on assets ranging between 10.2% and 13.8%. (July 14, 2016 Tr. (Messina) 109:12-110:12; Demonstrative 8.)

724. Unlike Prairie's valuation, Messina's projected growth accounts for the unfavorable industry "headwinds," which Prairie identified in its April 27, 2007 Post-Transaction Valuation Report but failed to account for in its valuation of SJP. (July 14, 2016 Tr. (Messina) 85:12-25.)

725. Unlike Prairie's valuation, Messina's projected growth accounts for the 56% decline in SJP's 2007 first quarter revenues and its likely effect on SJP's margins. (July 14, 2016 Tr. (Messina) 79:24-80:11, 82:12-21, 85:12-25, 86:15-87:2, 168:2-16.)

726. Unlike Prairie's valuation, Messina's projected growth is grounded in SJP's historical gross margins and EBITDA margins, and is slightly higher than SJP's historical return on assets. (July 14, 2016 Tr. (Messina) 109:8-21.)

727. Messina also based his growth rate projections on the 3% growth of the economy at the time of the Transaction. (July 14, 2016 Tr. (Messina) 87:18-22.)

728. Messina used a 20% discount rate in contrast to Prairie's 19.25% discount rate to account for the various risks associated with SJP [*165] such as customer concentration. (July 14, 2016 Tr. (Messina) 108:7-14.)

729. The fair market value of 38% of SJP as of the date of the Transaction was $6,515,000, or $9,485,000 less than the $16 million price that FBTS caused the SJP ESOP to pay for DiPano's shares. (July 14, 2016 Tr. (Messina) 140:23-141:4; Demonstrative 8; Demonstrative 14.)

### III. Parties' Positions[58]

---

[57] *Fish v. Greatbanc Tr. Co., No. 09-1668, 2016 U.S. Dist. LEXIS 137351, 2016 WL 5923448, at *51 (N.D. Ill. Sept. 1, 2016)* (finding a five-year historical average to be an appropriate benchmark for valuation projections).

Plaintiff, the Secretary of Labor, asserts that FBTS failed to meet its fiduciary duties of loyalty and prudence under *ERISA § 404(a)(1)(A)* and *(B)*. (Pl.'s Post Trial Br. 7, ECF No. 224.) Plaintiff further asserts that Defendant committed a prohibited transaction under *ERISA § 406* by causing the SJP ESOP to pay more than the fair market value for the stock. (Pl.'s Post Trial Br. 7-8.)

### A. Duty of Loyalty

Plaintiff asserts that Defendant "violated its duty of loyalty mandated by ERISA" by failing to protect the interest of the Plan "over and above any other party's interest." (*Id.* at 25-26.) Specifically, Plaintiff argues that Defendant caused the SJP ESOP to execute an imprudent transaction because Defendant sought retention as the SJP ESOP's ongoing trustee upon completion of the Transaction. (*Id.* at 27.)

Plaintiff argues that "[w]hen a fiduciary is presented with unsubstantiated evidence [*166] supporting the seller's valuation, the duty of loyalty compels the fiduciary to diligently question and probe such evidence." (*Id.* at 26.) Plaintiff further argues that Defendant "consistently accepted, without substantiation, information in favor of DiPano and . . . accepted his explanations . . . without independently verifying those explanations" to remain the Plan's trustee. (*Id.* at 27.) Plaintiff additionally argues that although Defendant had a duty to negotiate the best possible price for SJP's shares, Defendant never even attempted to negotiate the price. (*Id.* at 26.) Plaintiff asserts that Isluch deference to the [s]eller is wholly inconsistent with a true arm's length transaction." (*Id.* at 27.) As such, Plaintiff argues that Defendant breached its duty of loyalty by acting in its own interest to the detriment of the Plan. (*Id.* at 25-27.)

Defendant argues that it did not breach its duty of loyalty. (Def.'s Resp. Br. 28, ECF No. 227.) Defendant argues that it verified all information, ensured the information provided to it was "complete," and asserts that there "is no evidence of any information that [Defendant] should have considered, but did not." (*Id.* at 28.) Furthermore, Defendant argues that it was not required to negotiate the price [*167] of the stock, as the offer price was already at fair market value. (*Id.* at 28-29.) Defendant finally asserts that Plaintiffs claim that it acted in

---

[58] The Court primarily utilizes the parties' post-trial submissions to briefly summarize their positions. (Pl.'s Post Trial Br., ECF No. 224; Def.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 225; Pl.'s Resp. Br., ECF No. 226; Def.'s Resp. Br., ECF No. 227.) Although the Court utilizes the parties' post-trial submissions in compiling this summary, the Court considers the totality of the evidence and arguments presented at trial in reaching its decision.

its own interest is "patently absurd." (*Id.* at 29.)

## B. Duty of Prudence

Plaintiff argues that Defendant violated a trustee's duty of prudence as required under *ERISA § 404(a)(1)(B)* by failing to conduct a prudent investigation as to the fair market value of the shares. (Pl.'s Post Trial Br. 7-9.) Plaintiff asserts that when Defendant's conduct is weighed against that of a prudent investor making a comparable purchase, Defendant's conduct fails to reach the required standard of care because Defendant failed to: (1) follow up and resolve red flags in the April 11, 2007 Draft Valuation Report; (2) independently verify material information; (3) ensure that the April 11, 2007 Draft Valuation Report was reliable; and (4) employ an adequate review process. (Pl.'s Post Trial Br. 10-21.)

Defendant, on the other hand, argues that the "prudence standard is not concerned with results, but rather looks at the conduct and procedures utilized." (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 561, ECF No. 225 (citing *Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 918 (8th Cir. 1994))*.) Defendant argues that a trustee may obtain the advice of an expert **[*168]** to demonstrate good faith, but make his own decisions based upon that advice. (*Id.* ¶¶ 562-68.) Defendant states that it satisfied its legal obligations to investigate under ERISA. (*Id.* ¶¶ 569-99.)

### 1. Red Flags

To prove a breach of the duty of prudence, Plaintiff relies upon testimony by its expert, Professor Richard Puntillo ("Professor Puntillo"), that Defendant failed to identify, follow up, or resolve red flags with regard to the transaction. (Pl.'s Post Trial Br. 10.) The red flags Plaintiff identified were: (1) SJP's poor financial performance in the three months prior to the Transaction; and (2) the reduction of bids from Hovnanian projects, which had previously accounted for 50% of SJP's revenue, to a mere 20% of SJP's outstanding bids at the end of 2006. (*Id.* at 10-12.) Plaintiff argues that Defendant's failure to identify these red flags constituted "a profound departure from the custom and practice of prudent investors." (*Id.* at 13.)

Defendant, however, argues that Professor Puntillo's 'red flags' are fabrications" and that the "investor due diligence" standard Professor Puntillo relied upon in reaching his conclusions is inapplicable to the ESOP industry. (Def.'s Resp. Br. 9-11; Def.'s Proposed **[*169]** Findings of Fact and Conclusions of Law ¶¶ 634-35.) Defendant asserts that because Professor Puntillo is "unfamiliar with the ESOP industry," he was unable to determine the standard of care and whether a breach of that standard had occurred. (Def.'s Resp.

Br. 9; Def 's Proposed Findings of Fact and Conclusions of Law ¶¶ 649-52.) Defendant argues that its expert witness, Fischer, was the only expert to opine as to the customs in ESOP transactions. (Def.'s Proposed Findings of Fact and Conclusions of Law VII 576-81.) Defendant asserts that Fischer is familiar with ESOPs based on his education and experience. (*Id.*) Defendant argues that Fischer testified that there is "no bright line rule with regard to what a fiduciary must do to comply with ERISA." (Def. Resp.'s Br. 10; Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 575.)

Defendant responds that Defendant considered the poor performance of SJP in the first quarter of 2007 before the Transaction but believed that SJP would recover and meet its revenue projections. (Def.'s Resp. Br. 12-13; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 653-55.) Defendant believed that the 2007 downturn was due to weather conditions **[*170]** and that SJP had historically recovered from downturns. (Def.'s Resp. Br. 12-13; Def 's Proposed Findings of Fact and Conclusions of Law ¶¶ 658-72.) Defendant argues that Plaintiff's red flag argument regarding Hovnanian was also "fabricated." (Def.'s Resp. Br. 13.) Defendant asserts that SJP was attempting to diversify away from Hovnanian and obtain new clients. (*Id.* at 14.) Defendant further argues that SJP's diversification strategy "did not mean dropping Hovnanian as a client" and "was not a radical departure" from SJP's business strategy. (*Id.*) Additionally, Defendant states that Hovnanian continued to be a "terrific" customer for SJP and that SJP was working on a "$100 million job" for Hovnanian in 2006. (*Id.*)

### 2. Independent Verification of Material Information

Plaintiff argues that "[a] prudent investor cannot blindly accept self-serving representations by a conflicted party, but must exercise a healthy degree of skepticism to ensure there is sufficient basis to rely on those representations." (Pl.'s Post Trial Br. 13.) Plaintiff asserts that Defendant failed to independently verify material information, including: "(1) SJP's reported backlog; (2) SJP's purported 'dominance' in its industry; **[*171]** (3) SJP's supposed 'competitive advantages'; (4) SJP's stated 'diversification away' from Hovnanian; and (5) SJP's status as the preferred site developer for Hovnanian in New Jersey." (*Id.*)

Plaintiff argues that this is particularly troubling as SJP's representations were contradicted by other disclosed information such as: (1) rock crushing equipment that was projected to increase profits over previous years that had already been in use for the past ten years; (2) claims that the growth was based on "proprietary technology" when SJP had no proprietary technology; and (3) statements that SJP had been diversifying away from Hovnanian when SJP's concentration in Hovnanian had increased in the previous four

years. (*Id.* at 13-14.) Furthermore, Plaintiff asserts that Defendant failed to sufficiently investigate the relationship between Hovnanian and SJP, in light of SJP's historical reliance on Hovnanian. (*Id.* at 14-15.)

Defendant argues that it conducted appropriate verification as the professionals it retained were qualified, it took steps to ensure the accuracy of the financial information provided, and it reviewed and questioned the valuation report before relying upon it. (Def.'s Resp. Br. 14-18; Def.'s Proposed **[*172]** Findings of Fact and Conclusions of Law ¶¶ 569-72.) Defendant claims that SJP's backlog was not disputed and that "no further verification was needed." (Def.'s Resp. Br. 16.) Furthermore, Defendant claims that it verified that backlog by speaking with SJP management. (*Id.* at 17.) Defendant states that Plaintiff's expert, Messina, agreed that the backlog was work that would be finished in 2007 or 2008 and there was no indication that SJP would not be able to replenish its backlog. (*Id.*) Defendant also argues that "SJP's pattern of industry success and competitive advantage was thoroughly reviewed and considered by [Defendant] at the time of the transaction and there is no evidence that further diligence would have uncovered anything to the contrary at the time." (*Id.* at 17-18.)

Furthermore, Defendant argues that "the record evidence shows that [Defendant] and its advisors obtained appropriate information regarding Hovnanian and took this information into account." (*Id.* at 18.) Defendant points to the Offering Memo, which analyzed Hovnanian's "financial performance in 2005 and 2006" and stated that "25.7% of Hovnanian's proposed communities are in New Jersey." (*Id.*) Defendant also states that Hovnanian's impact on **[*173]** SJP was discussed in the November 15, 2006 meeting. (*Id.*) Defendant asserts that it reviewed publicly available information about Hovnanian and that it is not industry custom or practice to contact customers and doing so "would have had an adverse effect on [SJP's] business." (*Id.* at 15.)

### 3. Prairie Valuation

Plaintiff asserts that the April 11, 2007 Draft Valuation Report prepared by Prairie was unreliable and that Defendant breached its fiduciary duty by not ensuring that its reliance on the draft report was reasonably justified. (Pl.'s Post Trial Br. 15.) Plaintiff argues that "Prairie expressly advised [Defendant] that it was not verifying any of the inputs used to create its valuation." (*Id.*) Plaintiff asserts that Prairie copied the seller's descriptions verbatim into its reports and did not investigate the seller's claims. (*Id.*) Furthermore, Plaintiff asserts that, according to the April 11, 2007 Draft Valuation Report, SJP's "projected performance was far more favorable than its historical performance" and the draft report used SJP's financial performance in 2006 as a baseline for comparison, even though 2006 was an outlier year. (*Id.*) Plaintiff further

asserts that the April 11, 2007 **[*174]** Draft Valuation Report used higher profit margins than SJP had previously ever attained and incorrectly chose engineering firms instead of homebuilders as peer group companies for the market multiple method of valuation. (*Id.* at 16.)

Defendant argues that its expert, Fischer, testified that the April 11, 2007 Draft Valuation Report was "detailed, thorough, professional, well-organized, and of high quality" and could be relied upon. (Def.'s Resp. Br. 10; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 587-89.) Defendant states that because Prairie was a "major player" in the ESOP world, it was "reasonable . . . to be more comfortable with Prairie['s] . . . work product" than that of another unfamiliar company. (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 590.) Furthermore, Defendant asserts that its expert, Van Horn, opined that Prairie's valuation reports were "comprehensive and in line with the normal and customary valuation procedures that were expected at the time to produce a reliable opinion." (Def.'s Resp. Br. 10; Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 591-99.) Defendant argues that Plaintiff's own expert, Messina, used very similar projected **[*175]** sales growth rates as Prairie and was "unaware of any information provided by SJP . . . that was misleading, inaccurate or erroneous." (Def.'s Resp. Br. 17, 23.) Additionally, Defendant argues that the information Prairie received from SJP was primarily in the form of audited financial statements, which could reasonably be relied upon. (*Id.* at 19-20.) Defendant, therefore, argues that it reasonably relied on the April 11, 2007 Draft Valuation Report. (*Id.* at 22.)

Defendant further argues that it gave the April 11, 2007 Draft Valuation Report a "meaningful review" and "understood its obligations with respect to evaluating the report and fulfilled those obligations" by ensuring Prairie had accurate information and raising questions on numerous topics. (*Id.* at 22-23.) Defendant argues that SJP experienced growth in the past two years and it was reasonable for Prairie to predict continued growth. (*Id.* at 23-25.) In fact, Defendant argues that the final projections in the April 11, 2007 Draft Valuation Report were conservative. (*Id.* at 24-25.) Defendant additionally argues that the peer group companies Prairie selected for the market multiple method were appropriate because SJP was not a homebuilder. (*Id.* at 25.) Instead, the group that SJP was **[*176]** compared to included "construction and engineering firms with similar characteristics to SJP." (*Id.*) Furthermore, Defendant states that it applied "an extremely conservative discount rate" to make the comparison even more conservative. (*Id.*)

### 4. Review Process

Finally, Plaintiff asserts that Defendant breached its duty of prudence by engaging in a hasty and inadequate review process. (Pl.'s Post Trial Br. 17.) Plaintiff claims that Defendant received the April 11, 2007 Draft Valuation Report only three days before the Transaction and that Cory, who FBTS claims was in charge of reviewing the underlying documents, never saw the financial statements underlying the Offering Memo prior to the Transaction. (*Id.*)

Plaintiff further argues that, despite Defendant's assertion that there were "numerous" discussions about the Transaction, there was no evidence presented that anyone at FBTS reviewed the April 11, 2007 Draft Valuation Report prior to the April 13, 2007 teleconference. (*Id.* at 18; Pl.'s Resp. Br. 4.) Plaintiff urges the Court to reject Defendant's assertion that the April 11, 2007 Draft Valuation Report must have been reviewed because it is routine practice to review draft valuation reports. [*177] (Pl.'s Post Trial Br. 18.) Plaintiff argues that Defendant cannot demonstrate that it satisfied the duty of prudence simply by pointing to its usual process for reviewing valuation reports. (Pl.'s Resp. Br. 2.)

Furthermore, Plaintiff argues that even if the purported "numerous discussions" had occurred, the lack of records of a review process is troubling, stating "it does not matter how many people staffed a transaction if they cannot account for what they did or why they did it." (*Id.* at 19-20.) Plaintiff additionally argues that Defendant's own witness, Ash, stated that there might not have been meetings if "a report makes sense to her and the asking price is within the [valuation] reports' concluded range," thus contradicting Defendant's claim that FBTS followed the typical process on this Transaction. (*Id.*)

Finally, Plaintiff argues that based upon , Defendant's "generally vague and unsupported testimony" does not support a finding of good faith in determining fair market value. (Pl.'s Post Trial Br. 21.) Plaintiff asserts that Defendant's statements of due diligence are "vague and unsupported" as there is no record of the numerous meetings and investigations that Defendant claims occurred [*178] and Defendant's witnesses fail to recall with specificity what was discussed at the purported meetings. (Pl.'s Resp. Br. 4-9.)

Defendant argues that it acted in good faith in determining the value of the shares. (Def.'s Resp. Br. 18-19.) Defendant states that it "engaged highly competent, experienced advisors that sufficiently vetted the Transaction, and . . . [Defendant] not only reasonably relied on its advisors, but took measures to confirm their work as well." (*Id.* at 19.) Defendant alleges that it had multiple meetings about the April 11, 2007 Draft Valuation Report and gave the draft report a "meaningful review." (*Id.*) Defendant states that Prairie is a "highly

respected valuation firm" and the information provided to Prairie was "accurate." (*Id.* at 19-20.) Defendant further argues that its reliance on the April 11, 2007 Draft Valuation Report was "reasonably justified under the circumstances" because Defendant's employees discussed the draft report with Prairie, reviewed liquidity reports, and reviewed the pricing model. (*Id.* at 20.)

## C. Prohibited Transactions

Plaintiff argues that under *(D)*, Defendant was prohibited from causing the SJP ESOP to purchase employer stock. (Pl.'s Post Trial Br. 7.) Plaintiff [*179] further asserts that the "adequate consideration" exemption does not apply because Defendant caused the SJP ESOP to pay more than its "fair market value" of the shares. (*Id.* at 7-8, 22-23.) Plaintiff's expert witness, Messina, testified that the "fair market value of DiPano's shares at the time of the Transaction was only $6,515,000 only a fraction of the price that [Defendant] caused the Plan to pay." (*Id.* at 22.)

Plaintiff argues that Defendant's criticism of Messina is "without merit." (Pl.'s Resp. Br. 26.) Plaintiff asserts that Messina was qualified as an expert since he had previously performed valuations of homebuilder construction companies. (*Id.*) Plaintiff further argues that the fact that SJP was able to obtain a loan in the amount of $22.5 million is not a corroboration of its value. Furthermore, Plaintiff states that while Messina predicted record revenues, he adjusted them in light of SJP's poor performance in 2007. (*Id.* at 26-27.) Plaintiff additionally argues that Messina disregarded the high end market multiples in his valuation of SJP as they reflected companies that were larger and more profitable than SJP. (*Id.*)

On the other hand, Plaintiff asserts that Defendant's expert witness, Fischer, gave testimony [*180] that was "self-serving," "vague," and inconsistent. (*Id.* at 23.) Plaintiff also argues that Defendant's expert witness, Van Horn, gave testimony that was based on "circular reasoning" and "unsupported assumptions" and that he relied upon a checklist that was "facially unhelpful, [and] arbitrar[y]. (*Id.* at 23-24.) Finally, Plaintiff argues that Defendant's expert witness, Joel Stoesser ("Stoesser"), was "unpersuasive" because he "did not know the value the banks assigned to SJP . . . or what process they may have used to reach a value" and could not explain his conclusions. (*Id.* at 24.)

Defendant argues that the Transaction was not prohibited, as the SJP ESOP paid the fair market value of the stock, and because the April 11, 2007 Draft Valuation Report was reliable. (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 608-33; Def.'s Resp. Br. 26-28.) In fact, Defendant's expert witness, Stoesser, opined that the price projected by

Prairie was too conservative. (Def.'s Resp. Br. 26-28.) On the other hand, Defendant argues that Plaintiff's expert witness, Messina, gave testimony as to the value of the stock that "improperly considered SJP's performance in hindsight" and was "not credible" as Messina has "no experience [*181] in the construction industry" and did not investigate the industry. (*Id.* at 26-27.) Furthermore, Defendant argues that, while calculating SJP's value, Messina disregarded high multiples that would have "increased [the value] by approximately $10 million" with no explanation, rendering his valuation "biased and flawed." (*Id.*)

### D. Indemnification

Defendant asserts that the SPA between DiPano and Defendant states that DiPano has provided full and accurate information to Defendant and that DiPano will indemnify the Plan for any failure to do so. (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 317-26.)

Plaintiff asserts that Defendant "cannot escape liability based on the Indemnification Provision contained in the [SPA]." (Pl.'s Resp. Br. 18.) Plaintiff argues that these provisions "do not provide a safe harbor" for Defendant because Defendant still had a fiduciary duty to verify material representations and the indemnification clause only takes effect if DiPano "knowingly" provided false information. (*Id.* at 19-20.)

### E. Loan Forgiveness

Defendant states that SJP forgave $9.6 million of the $22.5 million loan that was used to finance the transaction, bringing the amount of the loan below the amount of Plaintiff's [*182] assessment of SJP's fair market value.[59] (Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 705.)

On the other hand, Plaintiff argues that, although SJP's loan was forgiven several years later by SJP, the loan forgiveness does not retroactively reduce the purchase price that the SJP ESOP paid to DiPano. (Pl.'s Resp. Br. 28-29.) Furthermore, Plaintiff argues that because neither the loan documents nor the forgiveness documents were entered into evidence, the Court should not consider them. (*Id.*) Plaintiff also asserts that

---

[59] Defendant alleges inconsistent amounts with regard to the loan forgiveness. (*See* CFF ¶ 177 n.15.) For the purpose of summarizing Defendant's legal position, however, the Court characterizes Defendant as contending that the write-down was for $9.6 million because Defendant makes this argument using the $9.6 million figure in its post-trial submission. (*See* Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 704-10.)

there is no legal exception for loan forgiveness under *ERISA § 406(a) (1) (A),, (D).* (*Id.*)

### IV. Conclusions of Law

Congress enacted ERISA to "protect . . . the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans and to "provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts." *29 U.S.C. § 1001(b).* ERISA's "comprehensive legislative scheme" includes "an integrated system of procedures for enforcement." *Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985)* (citation omitted). ERISA subjects employee benefit plans to participation, funding, and vesting requirements, and to uniform standards on matters like reporting, disclosure, and [*183] fiduciary responsibility. *See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90-91, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983).*

"Under ERISA, a plan that primarily invests in the shares of stock of the employer that creates the plan is referred to as an ESOP." *Chao v. Hall Holding Co., 285 F.3d 415, 425 (6th Cir. 2002).* "Even though ESOPs can be much riskier than a typical ERISA plan, the fiduciaries of [ESOP] plans are still held to their fiduciary responsibilities." *Id.*

ERISA defines a "fiduciary" as:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*29 U.S.C. § 1002(21)(A).* ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties." *Mertens v. Hewitt Assocs., 508 U.S. 248, 262, 113 S. Ct. 2063, 124 L. Ed. 2d 161 (1993)* (internal citation omitted). "ERISA requires every plan to have one or more named fiduciaries." [*184] *Renfro v. Unisys Corp., 671 F.3d 314, 323 (3d Cir. 2011)* (citing *29 U.S.C. § 1102(a)(1)*). Additionally, "[u]nder ERISA, even if a person is not named as a fiduciary in plan documents, he may still be 'a fiduciary with respect to a plan to the extent . . . he .

. . exercises any authority or control respecting management or disposition of its assets." *Sec'y of Labor v. Doyle, 675 F.3d 187, 200 (3d Cir. 2012)* (quoting *29 U.S.C. § 1002(21)(A)(i)*).

*Section 404 of ERISA* provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . [and] with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *29 U.S.C. § 1104(a)(1)(A)*, *(B)*. *Section 406* supplements an ERISA fiduciary's general duties of loyalty and prudence to the plan's beneficiaries, as set forth in *Section 404*, "by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 241-42, 120 S. Ct. 2180, 147 L. Ed. 2d 187 (2000)* (quoting *Comm'r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 160, 113 S. Ct. 2006, 124 L. Ed. 2d 71 (1993))*. Specifically, *Section 406 of ERISA* categorically bars transactions for the purchase of employer stock on behalf of an employee benefit plan by a plan fiduciary. *29 U.S.C. § 1106(a)(1)(A)*, *(D)*. *Section 408*, however, exempts certain transactions prohibited under *Section 406*. *29 U.S.C. § 1108*.

Here, the Secretary[60] asserts that FBTS, acting as the Plan's fiduciary, breached its duty of [*185] loyalty under *Section 404(a)(1)*, breached its duty of prudence under *Section 404(a)(1)(B)*, and engaged in a prohibited transaction under *Section 406(a)(1)(A)* and *(D)* that was not exempt pursuant to *Section 408(e)*.

## A. Duty of Prudence

ESOP fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets. *Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2463, 189 L. Ed. 2d 457 (2014)*. *Section 404(a)(1)(B) of ERISA* provides that a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *29 U.S.C. § 1104(a)(1)(B)*. "These duties are the 'highest known to the law.'" *Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996)* (quoting *Donovan*

*v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982))*.

"[T]he courts measure *[S]ection 1104(a)(1)(B)*'s 'prudence' requirement according to an objective standard, focusing on a fiduciary's conduct[61] in arriving at an investment decision, not on its results, and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *In re Unisys Sav. Plan Litig., 74 F.3d 420, 434-35 (3d Cir. 1996)* (citations omitted). "A trustee's lack of familiarity with investments[, however,] is no excuse: under an objective standard[,] trustees are to be judged 'according to the standards of others acting in a like capacity [*186] and familiar with such matters.'" *Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir.)*, cert. denied, 469 U.S. 1072, 105 S. Ct. 565, 83 L. Ed. 2d 506 (1984) (citation omitted). "[T]he definition of 'prudent behavior' is an evolving concept that is given meaning by the facts and circumstances of each case." *Brock v. Teamsters Local Union No. 863, 113 F.R.D. 32, 34 (D.N.J. 1986)* (quoting *Donovan v. Walton, 609 F. Supp. 1221, 1240 (S.D. Fla. 1985))*.

Additionally, although "[e]mploying a financial advisor is evidence of adequate investigation, . . . reliance on experts is not a shield—it is 'but a single factor to be weighed in determining whether a fiduciary has breached [its] duty.'" *Chesemore v. All. Holdings, Inc., 886 F. Supp. 2d 1007, 1041-42 (W.D. Wis. 2012)*, aff'd sub nom., *Chesemore v. Fenkell, 829 F.3d 803 (7th Cir. 2016)* (quoting *Eyler v. Commissioner, 88 F.3d 445, 456 (7th Cir. 1996))*. In other words, "[a]n independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Donovan v. Cunningham, 716 F.2d 1455, 1474 (5th Cir. 1983)*. While fiduciaries may "rely on the expertise" of a valuation expert such as Prairie, fiduciaries remain "responsible for ensuring that [the] information is complete and up-to-date." *Id.*

Upon reviewing the totality of the evidence presented at trial, the Court finds that FBTS breached its duty of prudence. Despite FBTS's purported expertise and capacity for

---

[60] *Section 502(a)(2) of ERISA* provides that the Secretary may bring a civil action for appropriate relief, including losses suffered by a plan as a result of a fiduciary's breach and to enjoin a fiduciary from any further act or practice that violates ERISA. *29 U.S.C. § 1132(a)(2)*.

[61] Because the analysis is focused on conduct, the Court finds unpersuasive FBTS's argument that First American Bank's willingness to finance the SJP ESOP Transaction indicates that the Transaction was prudent, especially in light of the evidence of FBTS's failure to act as a prudent investor. (CFF ¶ 171; Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 702.) Additionally, Defendant asserts that Plaintiff's arguments are based on hindsight, (Def.'s Proposed Findings of Fact and Conclusions of Law 11683), but that argument is untenable where the analysis is focused on a fiduciary's conduct at the time of the Transaction. *Perez v. Bruister, 823 F.3d 250, 264 (5th Cir. 2016)*.

conducting the requisite diligence in an ESOP transaction,[62] FBTS did little more than delegate all of its responsibilities to third parties. In sum, FBTS relied entirely on information provided by its valuation [*187] advisor, Prairie, who in turn relied entirely on information provided by the seller and his financial advisor, Duff & Phelps.[63] (*See* CFF in 129-36.) By merely retaining Prairie and SFE&G, holding *pro forma* meetings that lacked substantive review of the Transaction, and engaging in cursory informal discussions,[64] FBTS failed to fulfill its duty of prudence to the SJP ESOP.

Principally, FBTS failed to fulfill its duty to "make an honest, objective effort to read [Prairie's] valuation [report], understand it, and question the methods and assumptions that [did] not make sense." *Howard, 100 F.3d at 1490*. Regardless of whether a fiduciary retains a third-party valuation expert, ERISA requires a fiduciary to "evaluate the advice given and 'exercise [its] own judgment' about the transaction." *All Holdings, Inc., 886 F. Supp. 2d at 1041-42* (quoting *Jenkins v. Yager, 444 F.3d 916, 927-28 (7th Cir. 2006)).* Accordingly, "[t]he degree to which a fiduciary makes an *independent* inquiry is critical" when determining whether the fiduciary breached its duty of prudence. *Eyler, 88 F.3d at 456* (emphasis added).

_____

[62] (CFF ¶¶ 38, 57.)

[63] Although Duff & Phelps was retained by SJP, it was understood that Duff & Phelps's role in the Transaction was to represent the seller. (*See* CFF ¶ 37.)

[64] Various witnesses proffered by Defendant alleged that they engaged in numerous informal discussions, but failed to specify the substance of the discussions with any meaningful detail and failed to produce sufficient corroborating testimony or documentary evidence. *See supra*, note 6. The Court, accordingly, finds that the lack of notes or any other corroborating evidence in conjunction with the lack of detailed testimony failed to establish that any of these informal discussions occurred. *See supra*, note 6. In making this finding, the Court acknowledges that "[t]he focal point of [the Court's] inquiry under ERISA is not whether a fiduciary took adequate notes of its investigation, but whether it acted with the prudence required of a fiduciary under the prevailing circumstances at the time of the transaction." *Henry v. Champlain Enters., Inc., 445 F.3d 610, 620 (2d Cir. 2006).* Even in the absence of sufficient notes, for example, other evidence, such as evidence of a meeting generally to raise concerns, and evidence that "the report changed in ways that reflected those concerns" can demonstrate that a fiduciary satisfied its duty. *Id. at 620-21.* Here, however, no such evidence was presented. The purported informal conversations were uncorroborated by specific testimony or documentary evidence, and the April 11, 2007 Draft Valuation Report was never altered in a manner that would indicate that the alleged conversations had occurred.

Here, FBTS's independent inquiry into Prairie and Duff & Phelps's valuations of SJP was effectively nonexistent. For example, when reviewing the April 11, 2007 Draft Valuation Report, FBTS attributed SJP's success to change in [*188] management, (CFF ¶ 253), the purported diversification effort in customers, (CFF ¶¶ 148, 164), and SJP's expansion of bidding on larger projects and on projects in New York (CFF ¶ 257). FBTS never verified or attempted to quantify the effects of these purported rationales for SJP's purported continued success, and instead felt satisfied after a superficial review of the draft report. (CFF ¶¶ 254, 256, 257.) The mere fact that the April 11, 2007 Draft Valuation Report called for zero percent growth after a record year in 2006, and the use of a 19.25% discount rate, were FBTS's primary bases for concluding that the projections were conservative. (CFF ¶¶ 227-29, 259-60, 449, 470, 563.)

When FBTS retained Prairie, Prairie expressly stated that it would be relying on information provided by FBTS and SJP without conducting independent verification. (CFF ¶¶ 129-31.) Accordingly, a prudent investor would have recast projections from the April 11, 2007 Draft Valuation Report after having completed at least some independent due diligence. (CFF ¶ 321.) FBTS, however, never asked Prairie how it arrived at the projection figures it used in the April 11, 2007 Draft Valuation Report and never compared [*189] the projections from Prairie with the Offering Memo. (CFF ¶¶ 147, 214, 325-26, 498, 502, 570, 574); *see also Chao, 285 F.3d at 432* (stating that one indicator of the lack of prudence was that the trustee did not know which documents the valuation advisor reviewed in preparing the valuation report).

Additionally, FBTS never independently reviewed the accuracy of the financial information SJP provided to Prairie. (CFF ¶ 330.) Although FBTS argues that it reasonably relied on audited financial statements, FBTS had never obtained or reviewed SJP's audited financials for 2006, which Prairie used as a baseline for its projections. (CFF ¶¶ 134-35.) FBTS has consistently argued that it did not conduct an independent inquiry because it never had any reason to doubt the accuracy of the information provided by SJP and Duff & Phelps. (Def.'s Resp. Br. 19-23.) Yet, that argument is self-serving given that FBTS would have discovered reasons to doubt the accuracy of the seller's representations had FBTS conducted the required level of due diligence.

Similarly, FBTS suggests that it took reasonable care to ensure that Prairie received complete and accurate information from SJP because the SARs between DiPano and FBTS provided [*190] that DiPano would indemnify the SJP ESOP for damages arising out of DiPano or SJP's misrepresentation or breach of any representation, warranty, or covenant. (*See* Def's Proposed Findings of Fact and

Conclusions of Law ¶¶ 317-20 (citing Joint Ex. 5 (SARs between DiPano and FBTS), at 20).) In conjunction with an agreement between Duff & Phelps and SJP, ensuring that SJP would provide accurate and complete information to Duff & Phelps, FBTS believed that the indemnification provision precluded the need to conduct its own independent inquiry. (*See id.* ¶¶ 317-26.)

ERISA makes clear, however, that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." *29 U.S.C. § 1110(a)*; *see also Pfahler v. Nat'l Latex Prods. Co., 517 F.3d 816, 837 (6th Cir. 2007)* ("Indemnification agreements do not prevent a fiduciary from being held liable, but instead only provide that if the fiduciary is held liable, then someone else will compensate the fiduciary for that liability."). The mere fact that SJP and DiPano agreed to provide complete and accurate information, therefore, did not relieve FBTS of its fiduciary obligation to conduct an independent inquiry. **[*191]**

The Court next considers the most glaring issues that any meaningful review of the April 11, 2007 Draft Valuation Report would have revealed. Although the April 11, 2007 Draft Valuation Report superficially contained many of the critical components of a valuation report, (CFF ¶ 211), it contained a blank page where it indicated that information about the state of SJP's industry and region was missing. (CFF ¶ 204.) A prudent investor would not have moved forward with the Transaction where a valuation report was missing an entire industry analysis section. (CFF ¶¶ 204-07.) Similarly, the EBITDA gross profits and margins in the April 11, 2007 Draft Valuation Report differed from the Offering Memo without any explanation. (CFF ¶¶ 282-83.) With regard to the rest of the April 11, 2007 Draft Valuation Report, Prairie copied and pasted entire sections from the Offering Memo into its draft report. (CFF ¶¶ 216, 333-34, 336, 399, 429, 565, 592.) The Court finds it odd that FBTS never raised the verbatim copying-pasting by Prairie, and that FBTS never questioned Prairie's blanket adoption of Duff & Phelps's position. Moreover, the April 11, 2007 Draft Valuation Report contained numerous other **[*192]** obvious errors. (CFF ¶¶ 212, 645-50.) The fact that FBTS failed to follow up and question Prairie about any of these glaring issues is troublesome.

Beyond these glaring errors, FBTS's failure to inquire about the critical assumptions within the April 11, 2007 Draft Valuation Report is even more troubling. *See Cunningham, 716 F.2d at 1469-70* ("The insufficiency of [the fiduciary's] investigation lies in [its] failure to identify the facts and assumptions underlying the [valuation report] and to consider

whether they remained valid at the time of the ESOP transactions."); *see also id. at 1470* (finding that the fiduciary breached its duty of prudence where "[c]ursory study of [the valuation report] would have shown that [the author of the report] did not [identify the facts and assumptions underlying the valuation report and did not consider whether they remained valid] in several material respects"). First, while FBTS attributed SJP's 2006 growth to SJP's bidding on larger projects and moving into areas outside of New Jersey, such as New York, FBTS never verified whether this was true. (CFF ¶ 257.) Next, FBTS relied on Prairie's rationale that the optimistic projections beyond 2006 were attributable to SJP's vertical integration. (CFF **[*193]** ¶¶ 277-78.) FBTS, however, never raised the fact that SJP was vertically integrated since 1996, making it questionable that vertical integration was the cause of the 2006 record revenues. (CFF ¶¶ 279-81.)

Another example where FBTS failed to independently verify critical facts is with regard to SJP's backlog. (CFF ¶¶ 221, 291.) FBTS relied entirely on Prairie's copied-and-pasted section from the seller's Offering Memo. (CFF ¶¶ 215-16, 290-91.) Although it may be unusual for an ESOP fiduciary to verify every contract related to backlog, a prudent investor would have conducted some minimal level of due diligence given how significant backlog is for predicting future revenues. (CFF ¶¶ 294-95.) In addition, FBTS did not review the audits for SJP's 2006 financials prior to the Transaction. (CFF ¶ 136.)

Similarly, FBTS failed to raise any issues with Prairie regarding Prairie's failure to account for industry cyclicality in the April 11, 2007 Draft Valuation Report, despite the fact that the market had begun to trend downward at the end of 2006.[65] (CFF ¶¶ 339-70.) Moreover, SJP's largest customer, Hovnanian, had similarly begun to trend downward in performance, but FBTS had never reviewed Hovnanian's **[*194]** 2006 Annual Report or stock prices, which would have revealed the trend. (CFF ¶¶ 531-78.) Instead, FBTS failed to consider that the homebuilding industry had potentially peaked when adopting Prairie and SJP's overly optimistic projections. (CFF ¶¶ 343, 366-70.) Additionally, FBTS did nothing to determine whether Prairie's selection of peer group companies was appropriate when applying the market multiple method. (CFF ¶ 619.) Although SJP closely resembled homebuilders, Prairie selected peer companies that had minimal exposure to the housing market. (CFF ¶¶ 610-44.)

FBTS also failed to question Prairie's overstatement of SJP's

---

[65] FBTS also failed to raise any issues with respect to Prairie's failure to account for SJP's historical volatility. (CFF 7 310-18.)

mobile rock crusher as a sustainable competitive advantage, where it did not fall into any of the established categories of sustainable competitive advantages: (1) proprietary technology; (2) brand name; or (3) cost advantage. (CFF ¶¶ 371-415.) Although the mobile rock crusher provided a competitive advantage, FBTS failed to establish or verify that it would be sustainable to support the long term projections of SJP's performance. (CFF ¶¶ 371-415.) Moreover, although the April 11, 2007 Draft Valuation Report represented that SJP possessed proprietary technology, [*195] the draft report did not identify the purported proprietary technology. (CFF ¶¶ 408-09.) As further indication of FBTS's failure to properly review the April 11, 2007 Draft Valuation Report, FBTS failed to question SJP's unsubstantiated claim of possessing proprietary technology. (CFF ¶ 417.) Moreover, FBTS never recognized or resolved the inconsistency between the April 11, 2007 Draft Valuation Report's claim that SJP "fe[lt] it once again ha[d] a competitive advantage," and the draft report's representation that SJP's revenues were falling due to increased competition. (CFF ¶¶ 428-32.)

Finally, the two most significant indicators of FBTS's breach of its duty of prudence are: (1) FBTS's failure to consider SJP's poor performance in the first quarter of 2007; and (2) FBTS's failure to consider SJP's customer concentration. "A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent." *Armstrong v. LaSalle Bank Nat'l Ass'n, 446 F.3d 728, 734 (7th Cir. 2006)*. When reviewing the April 11, 2007 Draft Valuation Report, FBTS ignored the increased risk associated with SJP's poor performance in the first quarter of 2007 and SJP's increased reliance on Hovnanian.

SJP struggled during January 2007, bringing [*196] in 37% below SJP's January 2006 revenues, and SJP's revenues progressively declined in each of the three months of the first quarter. (CFF ¶¶ 454-55.) Combined, SJP's first quarter revenues were 56.4% lower than the first quarter revenues in 2006, and SJP's first quarter gross profits were 97.4% below the first quarter gross profits in 2006. (CFF ¶¶ 456-67.) Oddly, however, neither the April 11, 2007 Draft Valuation Report nor the April 27, 2007 Post-Transaction Valuation Report mentioned SJP's first quarter performance in 2007. (CFF ¶ 479.) Consistent with FBTS's pattern of blind adoption of Prairie's draft report, FBTS never reviewed the interim financials for SJP in 2007. (CFF ¶¶ 459, 467); *see Cunningham, 716 F.2d at 1469* (finding that a company's underperformance in the time since the valuation report, but before the ESOP transaction, should be taken into consideration when determining the final purchase price of the company's stock).

Although FBTS claims to have attributed the first quarter performance to weather and maintenance, FBTS did not behave like a prudent investor because it never verified whether its reasoning was accurate and what the consequences would be on SJP's valuation. (CFF ¶¶ 473-530.) [*197] In addition, FBTS never discussed these purported conclusions with Prairie or among its own employees to indicate any diligence with respect to these considerations. (CFF ¶¶ 477, 484-86, 498, 502-02, 507-08, 527-28.) FBTS's conclusion that SJP could still make up the revenues reflected nothing more than an unsubstantiated belief without a diligent review of the facts. (CFF ¶¶ 468, 471); *see Cunningham, 716 F.2d at 1469* (finding that relying upon "knowledge they had gained as managers [of the company] to conclude that the company was just as strong, and hence just as valuable" despite recent underperformance was an insufficient basis for relying on a valuation report generated prior to the underperformance period); *id. at 1474* (stating that "[i]n these circumstances, it was not enough for fiduciaries to simply rely on their generalized notions that the company's prospects were good").

The other significant indicator of FBTS's breach of its duty of prudence was its failure to consider SJP's increasing reliance on Hovnanian and FBTS's simultaneous failure to investigate Hovnanian's projections. *Katsaros, 744 F.2d at 276, 279* (finding that the fiduciary breached its duty of prudence where "red flags would have been uncovered if a reasonably careful inquiry had [*198] been made"). Here, SJP and Duff & Phelps represented that SJP was actively diversifying away from Hovnanian, which Prairie, and later FBTS, adopted without question. (CFF ¶¶ 6-49.) SJP, however, never explained how it would accomplish diversifying and what effect that would have going forward. (CFF ¶¶ 146-49.)

In addition to the inherent risk of SJP's dependence on a single customer, Hovnanian's 2006 Annual Report contained numerous red flags that Prairie and FBTS never considered. Hovnanian, as a whole, was experiencing slowdowns, and had to pay $159 million in penalties for walking away from projects. (CFF ¶ 542.) In fact, Hovnanian's 2006 Annual Report acknowledged a sudden downturn in the homebuilding industry and stated that Hovnanian was managing its business as if the industry was in a prolonged downturn. (CFF ¶¶ 543-44.) Additionally, Hovnanian announced that it would reduce costs by renegotiating pricing with its subcontractors, such as SJP, because Hovnanian possessed substantial leverage. (CFF ¶¶ 547-48.) FBTS never reviewed the Hovnanian 2006 Annual Report and even a brief review of the report would have revealed these material concerns regarding SJP's future. (CFF ¶ 550.) [*199] Moreover, FBTS and Prairie failed to even look at Hovnanian's stock price or conduct any other form of minimal due diligence to check the health of Hovnanian and its relationship with SJP. (CFF ¶ 551.)

Further, while a prudent investor would have required a breakdown between Hovnanian and non-Hovnanian projected revenues, FBTS and Prairie failed to do so as part of their overall failure to consider customer concentration in their valuation of SJP. (CFF ¶¶ 562-68.)

In addition to the two key red flags that FBTS and Prairie failed to identify or consider, the April 11, 2007 Draft Valuation Report, and FBTS's adoption of the draft report, ignored another issue. By the time the Offering Memo listed Kara Homes as a top ten customer, Kara Homes had already declared bankruptcy. (CFF ¶¶ 579-82.) Although SJP informed Prairie that Kara Homes was bankrupt (CFF ¶ 586), Prairie and FBTS never accounted for Kara Homes in the backlog, SJP's diversification plan, or projected revenues for 2007, other than deducting litigation costs from SJP's future projected expenses. (CFF ¶¶ 587-90); *see Cunningham, 716 F.2d at 1471* (finding that a prudent ESOP investor must consider something that will drain cash from the company).

Beyond **[*200]** FBTS's failure to conduct a meaningful substantive review and independent inquiry, FBTS's review process for the Transaction also suffered from procedural deficiencies. First, the April 11, 2007 Draft Valuation Report was given to FBTS less than three business days before the Transaction, and less than two business days before Prairie's April 13, 2007 presentation. (CFF ¶ 223.) Ippensen reviewed the April 11, 2007 Draft Valuation Report and merely conducted a "gut check" calculation to determine that he was comfortable with the valuation. (CFF ¶¶ 227-31.) He did not review or independently verify any of the underlying information. (*See, e.g.*, CFF ¶¶ 91, 136, 152, 221, 256, 291); *Brundle v. Wilmington Tr., NA., No. 15-1494, 2016 U.S. Dist. LEXIS 152908, 2016 WL 6542718, at *12 (E.D. Va. Nov. 3, 2016)* (stating that concerns may also arise when the fiduciary or its independent advisers are pressed for time (citing *Perez v. First Bankers Tr. Servs., Inc., No. 12-8648, 210 F. Supp. 3d 518, 2016 U.S. Dist. LEXIS 134063, 2016 WL 5475997 (S.D.N.Y. Sept. 28, 2016)))*.

Additionally, while Ash was the only person from FBTS to attend the November 15, 2006 meeting and was assigned as the team lead on the Transaction, she did not possess any expertise in finance or valuation, and did not take notes during the meeting, which would have permitted her to effectively report back to someone with the appropriate credentials. (CFF ¶¶ 77-78.) While this November meeting **[*201]** was introductory in nature, where Ash introduced the ESOP Transaction process to SJP, Ash's lack of financial expertise was significant because the November meeting was the only time that FBTS would ever meet with SJP or Duff & Phelps prior to the Transaction. (CFF ¶ 85); *see Katsaros, 744 F.2d at 275* (finding that the fiduciary

breached its duty of prudence where the fiduciary's employees that received the presentation for the proposed transaction did not have "sufficient training to express an opinion as to the soundness of the [transaction]" nor the proper expertise or background in the important matters of the evaluating the transaction). Moreover, Ash never reported what was discussed at the meeting to FBTS before signing the engagement letter. (CFF ¶ 94.)

Further, there was miscommunication among FBTS's employees. Ash was the FBTS team lead on the SJP ESOP Transaction, but expected Cory to be principally responsible for reviewing SJP's financial documents. (CFF ¶ 68.) In contrast, Cory believed that all EB Committee members were equally responsible for reviewing the financial documents. (CFF ¶ 70.) Even if Cory had known she was principally in charge of reviewing SJP's financial documents, however, she **[*202]** was not a valuation expert and, therefore, did not possess the requisite competency to properly evaluate the Transaction. (CFF ¶ 69.) Nevertheless, Ippensen believed that Cory and Ash, neither of whom were qualified to evaluate the April 11, 2007 Draft Valuation Report, would be able to identify any issues in the Transaction and report them to him. (CFF ¶ 71.)

The numerous problems with FBTS's conduct as a fiduciary ultimately culminated in FBTS's failure to negotiate the price that the SJP ESOP would pay for DiPano's shares.[66] *Howard, 100 F.3d at 1489* (identifying the failure to negotiate price as one indication of the lack of prudence). FBTS blindly adopted Duff & Phelps's original offer of $16 million in the Offering Memo via Prairie's adoption of Duff & Phelps's analysis. (CFF ¶¶ 92, 681-82.) Although the failure to negotiate price alone is insufficient to demonstrate that FBTS breached its fiduciary duty, it weighs heavily against FBTS in light of the substantial evidence indicative of FBTS's imprudent conduct. *Perez, 210 F. Supp. 3d 518, 2016 U.S. Dist. LEXIS 134063, 2016 WL 5475997, at *12.*

In sum, the Court need not determine whether any single action or inaction by FBTS may have constituted a breach of its fiduciary duty because the totality of FBTS's missteps conclusively prevented **[*203]** FBTS from exercising its own judgment regarding the Transaction. *See All. Holdings, Inc., 886 F. Supp. 2d at 1041-42* ("The fiduciary must still evaluate the advice given and "exercise [its] own judgment" about the transaction." (quoting *Jenkins, 444 F.3d at 927-28*.)). Here, FBTS's failure to conduct an independent inquiry into the myriad of red flags, glaring errors, and other significant issues affecting the valuation of SJP led to a passive and blind

---

[66] The only thing FBTS negotiated was the ESOP loan interest rate. (CFF ¶¶ 199, 452, 684-87.)

adoption of the seller's optimistic valuation.[67] These failures, in conjunction with FBTS's decision to accept the seller's initial offer without negotiating the price, demonstrate that FBTS failed to fulfill its duty of prudence under ERISA.

**B. Duty of Loyalty**

Section 404(a)(1)(A) of ERISA provides that "a fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). A "trustee[] violate[s its] duty of loyalty when [it] act[s] in the interests of the plan sponsor rather than with an eye single to the interests of the participants and beneficiaries of the plan." Reich v. Compton, 57 F.3d 270, 291 (3d Cir. 1995) (citation omitted). "A fiduciary breaches [its] duty of loyalty whenever [it] acts to benefit [its] own personal interest" or "when [it] acts in favor of the interests of a third party, even if [its] own personal interest **[*204]** is not directly implicated." Bevel v. Higginbottom, No. 98-474, 2001 U.S. Dist. LEXIS 17977, 2001 WL 1352896, at *14 (E.D. Okla. Oct. 4, 2001) (citing Marshall v. Kelly, 465 F. Supp. 341, 350 (W.D. Okla. 1978) (loans and payment to plan fiduciary and his wholly-owned company; fiduciary extended loans to personal friend on terms more favorable than those available to plan participants).

"The duty of loyalty is grounded in the motivation driving a fiduciary's conduct, and liability will not lie where a fiduciary's decisions were motivated by what is best for the ESOP, even if those decisions also incidentally benefit the fiduciary." Perez, 210 F. Supp. 3d 518, 2016 U.S. Dist. LEXIS 134063, 2016 WL 5475997, at *13 (citing Bierwirth, 680 F.2d at 271). "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." Perez v. Bruister, 54 F. Supp. 3d 629, 654 (S.D. Miss. 2014) (quoting Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 299 (5th Cir. 2000)). "The level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should depend on the circumstances of the case and the magnitude of the potential conflict." *Id.* (quoting Bussian, 223 F.3d at 299).

One instance where a fiduciary may have dual loyalties is where a plan is acquiring the stock of the sponsoring corporation. *See* Donovan v. Bierwirth, 538 F. Supp. 463, 468 (E.D.N.Y. 1981), *modified*, 680 F.2d 263 (2d Cir. 1982). "[T]o ensure that actions are in the best interests of plan participants and beneficiaries, fiduciaries under certain circumstances may have to 'at a minimum' undertake an 'intensive and scrupulous independent investigation **[*205]** of [the fiduciary's] options." Bussian, 223 F.3d at 299 (quoting Leigh v. Engle, 727 F.2d 113, 125-26 (7th Cir. 1984) (second alteration in original)). Accordingly, in an ESOP transaction where a fiduciary has dual loyalties, the fiduciary's "independent investigation into the basis for an investment must be both intensive and scrupulous and must be discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan." Bierwirth, 538 F. Supp. at 470; *see* Bussian, 223 F.3d at 299 (finding that the duty of loyalty overlaps with the duty of care). Here, FBTS was subject to dual loyalties because it was in its interest to complete the ESOP Transaction so that it could earn $15,000 in annual fees as the SJP ESOP's ongoing trustee.[68] (CFF ¶¶ 101-03, 701-02.)

Upon reviewing the totality of the evidence presented at trial, the Court finds that FBTS breached its duty of loyalty. FBTS failed to conduct the requisite due diligence and failed to negotiate the price of the stock. While lack of negotiation by itself is not dispositive, courts have found a breach of the duty of loyalty in ESOP transactions where the purchase price was reached without negotiation and the fiduciary also failed to conduct a thorough investigation. *See, e.g.*, Chao, 285 F.3d at 437 (holding **[*206]** that the trustee breached his duties when: (1) the trustee relied on incorrect information; (2) the trustee was generally unaware of what was going on; (3) the trustee was not consulted on major decisions; (4) there was no negotiation as to the stock price; (5) there was more concern for the return on investment for the Master Trust; and (6) the ESOP was charged several thousand dollars more so that defendants could deal in round numbers).[69]

---

[67] Katsaros, 744 F.2d at 275 (finding that the fiduciary breached its duty of prudence where it "passively received a rosy superficial picture of [a] bank and its holding company from persons with an interest in obtaining their approval" before the fiduciary approved a loan from the pension fund to the bank).

[68] Moreover, Ash, FBTS's team lead on the Transaction, would receive an additional 20% commission on fees generated in the first year in which FBTS was retained to serve as an ongoing trustee. (CFF ¶ 47.) Similarly, Prairie provided ongoing valuation services for approximately 80% of the plans for which it performed the initial valuation. (CFF ¶ 117.)

[69] *See also* Howard, 100 F.3d at 1489 (finding a breach where the trustee accepted a valuation without further investigation and did not attempt to negotiate the purchase price); Dimond v. Ret. Plan for Emps. of Michael Baker Corp. & Affiliates, 582 F. Supp. 892, 898 (W.D. Pa. 1983) (finding a breach when the trustee conducted no investigation and relied solely upon the words of the seller without seeking independent advice); Horn, 215 F. Supp. 2d at 882 (finding a breach when the trustee failed to complete negotiations for the

Here, it is undisputed that Defendant did not negotiate the purchase price. (*See* May 27, 2016 Tr. (Serbin) 127:17-25; July 6, 2016 Tr. (Ash) 64:2-15, 108:24-109:1; May 25, 2016 Tr. (Miscione) 22:7-9.) Additionally, for the reasons set forth in the above discussion regarding the duty of prudence, FBTS failed to conduct the SJP ESOP Transaction at arm's length, as evidenced by its repeated deference to the seller's representations, and failed to conduct an intensive and scrupulous investigation. *See Howard, 100 F.3d at 1488-89.* Accordingly, the Court finds that FBTS breached its duty of loyalty.

## C. Prohibited Transaction

*Section 406 of ERISA* categorically bars transactions for the purchase of employer stock on behalf of an employee benefit plan by a plan fiduciary. *29 U.S.C. § 1106(a)(1)(A),* *(D).* *Section 408,* however, exempts [*207] certain transactions prohibited under *Section 406.* *29 U.S.C. § 1108.* Specifically, *Section 408(e)* exempts certain transactions if the purchase of the employer stock was for "adequate consideration." *29 U.S.C. § 1108(e)(1).*

"In transactions involving securities with no known market value, as is the case here, ERISA defines 'adequate consideration' as 'the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary.'" *Henry v. Champlain Enters., Inc., 445 F.3d 610, 618 (2d Cir. 2006)* (quoting *29 U.S.C. § 1002(18)(B)*). "In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the asset, and that the fair market value was determined in good faith by the fiduciary."[70] *Keach v. U.S. Tr. Co., 419 F.3d 626, 636 (7th Cir. 2005).* "Although fair market value and good faith are often stated as distinct requirements, they are closely intertwined." *Perez, 210 F. Supp. 3d 518, 2016 U.S. Dist. LEXIS 134063, 2016 WL*

---

purchase price and could not articulate where the purchase price came from.

[70] The majority of courts addressing this issue have adopted a two-part standard for evaluating the adequacy of consideration under *Section 408(e)*: (1) fair market value; and (2) good faith. *See Henry, 445 F.3d at 619*; *Chao, 285 F.3d at 436-37*; *Eyler, 88 F.3d at 454-55*; *Howard, 100 F.3d at 1488*; *Cunningham, 716 F.2d at 1467.* They have done so based on a 1988 Department of Labor proposed regulation that has yet to be approved for publication in the Code of Federal Regulations. *See Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17, 632 (May 17, 1988)* (to be codified at 29 C.F.R. § 2510-3(18)(b)).

*5475997, at *8* (quoting *Henry, 445 F.3d at 619*).

"Whether a fiduciary has made a proper determination of 'fair market value' depends on whether the parties 'are well-informed about the asset and the market for that asset.' Thus, in practice, the 'fair market value' inquiry overlaps considerably with the 'good faith' inquiry; both are 'expressly focused upon [*208] the *conduct* of the fiduciaries.'" *Henry, 445 F.3d at 619* (quoting *Cunningham, 716 F.2d at 1467*). It is the fiduciary's burden to prove that the ESOP received "adequate consideration" for its purchase of company stock by a preponderance of the evidence. *Id.* Accordingly, "the ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Cunningham, 716 F.2d at 1468*; *see also In re Unisys Sav. Plan Litig., 74 F.3d at 446* (quoting *Cunningham's* incorporation of the duty of prudence to demonstrate adequate consideration); *Perez v. Bruister, 823 F.3d 250, 262 (5th Cir. 2016)* (stating that the adequate consideration "requirement must be interpreted, 'so as to give effect to the *Section 404* duties,' which includes the duty of prudence (quoting *Cunningham, 716 F.2d at 1467*)).

Additionally, "[a]lthough securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, it is not a complete defense to a charge of imprudence." *Howard, 100 F.3d at 1489* (citation omitted). A fiduciary must "investigate the expert's qualifications," "provide the expert with complete and accurate information," and "make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Id.* (citing *Donovan v. Mazzola, 716 F.2d 1226, 1234 (9th Cir. 1983)*, and *Cunningham, 716 F.2d at 1474*).

Here, the [*209] parties do not dispute that the SJP ESOP Transaction was a prohibited transaction within the meaning of *Section 406 of ERISA.* The issue, therefore, is whether the adequate consideration exemption to *Section 406* applies. Specifically, the Court must determine whether the SJP ESOP received adequate consideration for $16 million in the SJP ESOP Transaction. As set forth in the Court's discussion regarding the duty of prudence, FBTS was not well-informed about the asset and blindly adopted a valuation report that failed to consider material facts concerning SJP's market. Accordingly, the Court finds that FBTS failed to overcome its burden to demonstrate an exemption to its engagement in a prohibited transaction.

## D. Remedies

As a preliminary matter, FBTS argues that because SJP forgave $9.6 million in loans that the SJP ESOP had used to fund the Transaction, the SJP ESOP really paid only $6.3 million, which is less than the fair market value alleged by Plaintiff.[71] (Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 704-10.) The case law FBTS relies upon, however, does not support FBTS's position. In fact, in *Henry v. U.S. Trust Co. of California, NA.*, the Second Circuit flatly disagreed with the position espoused [*210] by FBTS, finding that the cancellation of debt in an ESOP context cannot "be construed as having reduced, *post facto*, the purchase price" in an earlier ESOP transaction. *569 F.3d 96, 99-100 (2d Cir. 2009).*

FBTS also relies on *Harris v. Bruister*, which is distinguishable because the seller in *Harris* was paid less than the market value estimated by the Secretary of Labor's valuation expert. *No. 10-77, 2013 U.S. Dist. LEXIS 178816, 2013 WL 6805155, at *17 (S.D. Miss. Dec. 20, 2013).* Here, the seller received $16 million, which far exceeded Messina's estimate of the fair market value for the purchased shares. Similarly, FBTS's reliance on *Henry v. Champlain Enterprises, Inc.*, is unavailing because the plaintiff in *Henry* "did not specifically allege any loss" from the alleged breach of duty. *288 F. Supp. 2d 202, 230 (N.D.N.Y. 2003).* Here, as set forth in *Henry*, the purported cancellation of debt does not affect Plaintiff's request for damages. Accordingly, the Court does not consider SJP's cancellation of the SJP ESOP's debt in assessing damages.

1. Restitution of Plan Losses

*Section 409(a) of ERISA* provides that a fiduciary who breaches its duty to a plan "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." *29 U.S.C. § 1109(a).* Here, "the correct measure of damages is the amount [the SJP ESOP] overpaid." *Bruister, 823 F.3d at 266* (quoting *Bruister, 54 F. Supp. 3d at 676*). As set forth [*211] in the Court's findings of fact above, the fair market value of DiPano's shares at the time of the SJP ESOP Transaction was $6,515,000, for which the SJP ESOP paid $16 million. Accordingly, the Court awards $9,485,000, plus interest, representing the lost opportunity cost suffered by the SJP ESOP,[72] subject to the appropriate reduction outlined in

the Court's April 20, 2016 Final Judgment and Bar Order as to DiPano. (ECF No. 150.)

2. Injunctive Relief

Plaintiff also seeks injunctive relief permanently enjoining FBTS "from serving as a fiduciary to an ERISA-covered Plan in the future." (Pl.'s Post-Trial Br. 29.) *Section 409(a) of ERISA* permits the Court to issue "equitable or remedial relief as the court may deem appropriate, including removal of [a] fiduciary." *29 U.S.C. § 1109(a).* Upon reviewing the totality of the evidence presented, the Court does not find that FBTS's conduct warrants the requested injunctive relief.

## V. Conclusion

For the reasons set forth above, the Court finds that FBTS breached its duties of prudence and loyalty, and engaged in a prohibited transaction under ERISA. Accordingly, the Court awards $9,485,000, plus interest, subject to the appropriate reduction outlined in the Court's April 20, 2016 [*212] Final Judgment and Bar Order as to DiPano. (ECF No. 150.) An order consistent with this Opinion will be entered.

/s/ Michael A. Shipp

MICHAEL A. SHIPP

UNITED STATES DISTRICT JUDGE

**Dated:**    March    31,    2017

---

[71] Defendant alleges inconsistent amounts with regard to the loan forgiveness. (*See* CFF ¶ 177 n.15.) For the purpose of summarizing Defendant's legal position, however, the Court characterizes Defendant as contending that the write-down was for $9.6 million because Defendant makes this argument using the $9.6 million figure in its post-trial submission. (*See* Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 704-10.)

[72] "Prejudgment interest exists to make plaintiffs whole and to preclude defendants from garnering unjust enrichment." *Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d 65, 102 (3d Cir. 2012).* Prejudgment interest on restitution for violations of ERISA is determined by *26 U.S.C. §§ 6621, 6622. See, e.g., Whitfield v. Tomasso, 682 F. Supp. 1287, 1306 (E.D.N.Y. 1988)* (applying *26 U.S.C. §§ 6621, 6622*).

**Table1** (*Return to related document text*)

**Historical Return on Assets**

| | |
|---|---|
| 2002 | 12.6% |
| 2003 | 0.2% |
| 2004 | 2.4% |
| 2005 | 11.9% |
| 2006 | 25.4% |

**Table1** (*Return to related document text*)

---

**Table2** (*Return to related document text*)

| Discount Rate | SJP Stock Valuation Range |
|---|---|
| 18.25% | $16,839,489 |
| 18.75% | $16,615,881 |
| 19.25% | $16,398,434 **[*100]** |

**Table2** (*Return to related document text*)

---

**End of Document**

# Tab I


# *Van Den Heuvel v. AI Credit Corp.*

United States District Court for the Eastern District of Wisconsin

April 11, 2014, Decided; April 11, 2014, Filed

Case No. 12-C-0327

**Reporter**

2014 U.S. Dist. LEXIS 199881 *

RONALD H. VAN DEN HEUVEL, individually, and as Trustee of The Ronald H Van Den Heuvel Irrevocable Trust dated July 22, 2003, KELLY YESSMAN VAN DEN HEUVEL, Trustee of the YK Irrevocable Trust dated November 1, 2010, PARTNERS CONCEPTS DEVELOPMENT, INC., and VHC, INC., Plaintiffs, v. AI CREDIT CORPORATION, FIRST INSURANCE FINANCING CORP., ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, and PHOENIX LIFE INSURANCE COMPANY, Defendants.

**Prior History:** *Van Den Heuvel v. A1 Credit Corp., 2012 U.S. Dist. LEXIS 196447 (E.D. Wis., July 31, 2012)*

## Core Terms

illustrations, allegations, premium, policies, misrepresentation, promissory note, insurers, projections, financing, misleading, insurance policy, Borrower, collateral, motion to dismiss, disclosures, fail to disclose, documents, Lender, surrender value, Plaintiffs', predict, circumstances, parties, reasons, replace, values, loans, surrender, disclose, fails

**Counsel: [*1]** For Ronald H Van Den Heuvel, Individually, and as Trustee of The Ronald H Van Den Heuvel Irrevocable Trust Dated July 22, 2003,, Plaintiff: William T Eveland, LEAD ATTORNEY, Mary Cannon Veed, Sharilee K Smentek, Arnstein & Lehr LLP, Chicago, IL.

For Kelly Yessman Van Den Heuvel, Trustee of the YK Irrevocable Trust Dated November 1, 2010, Partners Concepts Development Inc, VHC Inc, Plaintiffs: Sharilee K Smentek, William T Eveland, Arnstein & Lehr LLP, Chicago, IL; Mary Cannon Veed, Arnstein & Lehr LLP, Chicago, IL.

For AI Credit Corporation, Defendant: Chelsea Ashbrook McCarthy, Holland & Knight LLP, Chicago, IL; Cynthia G Burnside, Holland & Knight LLP, Atlanta, GA.

For First Insurance Financing Corporation, Defendant, Counter Claimant: Claire E Hartley, Susan G Schellinger,

LEAD ATTORNEYS, Davis & Kuelthau SC, Milwaukee, WI.

For Allianz Life Insurance Company of North America, Defendant: Eric L Maassen, James F Cirincione, Foley & Lardner LLP, Milwaukee, WI.

For Phoenix Insurance Company, Defendant: Alana K Pulaski, Delaney D Dichoso, Thomas Hetherington, Edison McDowell & Hetherington LLP, Houston, TX; George Burnett, Law Firm of Conway Olejniczak & Jerry SC, Green Bay, WI.

For Ronald **[*2]** H Van Den Heuvel, Counter Defendant: Mary Cannon Veed, William T Eveland, LEAD ATTORNEYS, Sharilee K Smentek, Arnstein & Lehr LLP, Chicago, IL.

**Judges:** William C. Griesbach, Chief United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### DECISION AND ORDER GRANTING MOTIONS TO DISMISS

Plaintiff Ronald H. Van Den Heuvel originally filed this action *pro se* in state court against Defendants A.I. Credit Corporation (AICC) and First Insurance Financing Corporation (FIFC) for damages he sustained under a life insurance premium financing agreement (the Agreement) he entered into in 2005 with AICC. In his original complaint, Van Den Heuvel alleged that AICC and FIFC, which later purchased AICC's assets and succeeded to AICC's interests under the Agreement, coerced him into accepting various modifications of the agreement and breached the agreement in various ways resulting in losses totaling millions of dollars. Van Den Heuvel retained counsel after the case was removed to federal court based on diverse citizenship of the parties, *28*

*U.S.C. § 1332*, and filed an amended complaint.

The amended complaint added both plaintiffs and defendants. As plaintiffs, Van Den Heuvel added two corporations he owns and/or operates, and the trustees **[*3]** for the Ronald H. Van Den Heuvel Irrevocable Trust and the YK Irrevocable Trust, all of whom the amended complaint referred to as "Plaintiff Beneficiaries." (Am. Compl. ¶ 6, ECF No. 41.) In addition to AICC and FIFC, the amended complaint also asserted claims against Life and Legacy Group, LLC (LLG), an Illinois insurance agency, and Libby Grant, its owner and a licensed insurance producer through whom Van Den Heuvel purchased the insurance, as well as the various life insurance companies that had issued policies to Van Den Heuvel, including Allianz Life Insurance Company of North America, John Hancock Life Insurance Company, Pacific Life Insurance Company, Phoenix Life Insurance Company, and Sun Life Assurance Company of Canada. The amended complaint asserted claims for misrepresentation and fraud against AICC, Grant and LLG, and each of the insurers, and a claim for declaratory relief and disgorgement against FIFC.

On June 17, 2013, the Court granted motions to dismiss for failure to state a claim against AICC, FIFC, and several of the insurers. The dismissals were without prejudice, except for FIFC which was dismissed with prejudice. Plaintiffs subsequently requested and were granted **[*4]** leave to file a second amended complaint (SAC), which they did on August 15, 2013. The SAC names only AICC, FIFC, Phoenix and Allianz as defendants and again asserts claims for misrepresentation and fraud against AICC and the insurers and a claim for declaratory relief and disgorgement against FIFC. The defendants have again filed motions to dismiss for failure to state a claim. For the reasons that follow, the motions will be granted, this time all with prejudice.

## I. BACKGROUND

In 2005, Van Den Heuvel sought investors to finance development of a prospective business in the recycling of food service waste. (SAC ¶ 19, ECF No. 111.) The development of the business, which involved an unidentified complex process apparently developed by Van Den Heuvel, "depend[ed] significantly" on his skill and knowledge. (*Id.*) As a result, individually and through two trusts and two business entities, Van Den Heuvel sought insurance on his own life for the benefit of investors and his family members. (*Id.* at ¶ 20.)

In June 2005, Van Den Heuvel's personal insurance agent conferred with James MacFarlane, an "employee of Phoenix responsible for supporting the marketing of 'large accounts.'" (*Id.* at ¶ 21.) **[*5]** The unidentified insurance agent and MacFarlane constructed a proposal for insurance to be issued by Phoenix and financed by AICC. (*Id.*) Later, on an unknown date, "Nancy Smith, Account Manager representing AICC submitted a proposal" to Van Den Heuvel consisting of four insurance policies from Phoenix, which would provide $70 million of combined death benefits. (*Id.*) The proposal also included a financing scheme, referred to as "Capital Maximization Strategy" (CMS). (*Id.* at ¶¶ 14, 21.)

Under the CMS program, Van Den Heuvel would finance the first five years of premiums by borrowing from AICC. (*Id.* at ¶¶ 14, 21, 30.) After this point, the "insurance policies would 'pay for themselves' because the earnings on the then-accumulated policy cash values would be sufficient to pay future premiums, and eventually sufficient to repay the premium loan." (*Id.* at ¶ 14.) Plaintiffs allege that because of the scheme's "proprietary formulae," as well as the complex calculations for life insurance policy cash values and surrender values, AICC and Phoenix knew that Van Den Heuvel "would be compelled to rely on the accuracy and representative character of the policy illustrations provided to him." (*Id.* **[*6]** at ¶¶ 14, 23.) As a result, Plaintiffs contend that Van Den Heuvel was "unable to evaluate or predict the effect of changes in the economic assumptions that would underlay the illustrations." (*Id.* at ¶ 23.)

Plaintiffs allege that this complicated financing scheme presented by Nancy Smith of AICC was "based upon policy illustrations supplied by Phoenix, as well as CMS Supplemental Illustrations prepared by or at the direction of AICC." (*Id.* at ¶ 21.) According to the projections and illustrations, "it could be confidently expected that the policies would become self-sustaining after five years and no additional premiums would need to be borrowed." (*Id.*) Beyond this five year window, "the supplemental illustrations purported to predict that the policy cash values would become sufficient to pay off the amount borrowed after ten years." (*Id.*) In addition to the payments on the premium financing loan, Plaintiffs were required to supply collateral in the amount of the difference between the surrender value of the policies and the amount borrowed. (*Id.* at ¶ 29.) The second goal of the CMS program was to gradually decrease the collateral requirement as the surrender value increased. In support **[*7]** of these allegations, Plaintiffs attached sixteen pages of documents entitled "Capital Maximization Strategy" to the complaint. (Ex. A, ECF No. 111-1.) Plaintiffs did not attach the illustrations supplied by Phoenix for the insurance policies to the SAC, though the complaint alleges that these illustrations were also misleading. (SAC ¶¶ 21, 23-25, 27-28, 73, ECF No. 111.)

After receiving these materials, Van Den Heuvel "discussed the proposed loan program and projections" with MacFarlane

of Phoenix and "representatives of AICC, including its senior officers Mark Geary and Jim McGeary" at an unidentified time and place. (*Id.* at ¶ 22.) The complaint does not describe the content of this discussion or allege that any of these individuals made misleading or fraudulent statements during any discussions. Undeterred by the risks, the undisclosed "proprietary formulae," or his inability to understand the complexities of the financing scheme or insurance calculations, Van Den Heuvel agreed to the proposal in the summer of 2005 and obtained four life insurance policies from Phoenix. (*Id.* at ¶ 29.) Plaintiff and AICC executed a Master Promissory Note on July 20, 2005.

Plaintiffs allege the CMS [*8] program was a "vanishing premium" program, whereby the obligation to pay annual premiums "vanishes" over time as the surrender value of the policies increases. (*Id.* at ¶ 25.) They contend that AICC and Phoenix knew that the scheme was extremely risky, unlikely to meet the projected results, and based on unrealistic assumptions about the market. (*Id.*) The CMS program was designed to induce the insured "to pour large sums of money and credit into a 'vanishing premium' program" and then present the insured with the "choice of walking away from its investment or 'pouring good money after bad.'" (*Id.*)

Specifically, Plaintiffs allege that the illustrations and projections provided by AICC and Phoenix did not comply with applicable insurance law and were materially false and misleading in several respects. (*Id.* at ¶¶ 26-28.) Plaintiffs allege the following against AICC: it concealed the unlikelihood that the "policies or loans would perform consistently with the illustrations"; it failed to disclose that variations from the projections would undermine the program's ability to be self-sustaining; it provided a one-dimensional description of interest crediting rates; it "had no reasonable basis [*9] to believe that the outcomes projected by its illustrations were likely to actually occur"; it "never informed Plaintiffs that its illustrations had been deliberately distorted and made misleading"; it failed to disclose that the premiums would be inadequate to create a self-sustaining financing scheme; it failed to inform Plaintiffs that it would "refuse to lend the premiums for the second and subsequent years of the program if credit ratings of the insurers . . . dropped"; and it failed to inform Plaintiffs that "straightforward 20-year term life and universal life insurance . . . could have been purchased at fixed prices for a fraction of the cost." (*Id.* at ¶¶ 24, 47-57.) Plaintiffs make similar allegations against Phoenix, but ultimately ground their claim for fraud and misrepresentation in Phoenix's failure to comply with applicable insurance regulations in various ways: (1) Phoenix accepted Van Den Heuvel's insurance applications even though it failed to ensure that "the proposed insurance is not unsuitable for the insured"; (2) Phoenix failed to ensure

that the policy summaries, illustrations, and solicitation materials were compliant with insurance regulations and not misleading; [*10] (3) Phoenix failed to disclose the additional commission and other benefits it received; (4) Phoenix failed to disclose that the CMS presentation understated the need for insurance premium payments and collateral; (5) Phoenix failed to disclose that the "suitability analysis, program summaries, and illustrations employed by AICC, LLG, and Grant did not meet the requirements of applicable Wisconsin insurance regulations and were materially false and misleading"; and (6) Phoenix "omitted disclosures" that were necessary to prevent "their representations from being misleading." (*Id.* at ¶¶ 24, 28, 70-75.)

In 2008, American International Group (AIG), the parent of AICC, and Phoenix experienced significant "financial reverses." (*Id.* at ¶ 31.) At some point following these reverses, AICC informed Plaintiffs that it would not finance the 2008 premiums for the Phoenix insurance policies because Phoenix's credit ratings had been downgraded and AICC wanted to improve its own financial situation. (*Id.*) AICC offered, however, to finance the premiums if three of the four Phoenix policies were replaced with policies issued by Allianz. (*Id.*) Plaintiffs agreed and replaced the policies with three policies [*11] issued by Allianz. (*Id.* at ¶ 32.) As part of this transaction, Phoenix generated illustrations of the insurance policy performance and AICC or Phoenix generated an illustration of the self-sustaining finance scheme. (*Id.*) According to the complaint, these new illustrations prepared by Phoenix or AICC repeated the same flaws in the original illustrations created by Phoenix and/or AICC and were thus misleading. (*Id.* at ¶ 32.) In addition, Plaintiffs allege that AICC and Phoenix failed to disclose that the "surrender and reissue of the Phoenix policies would cause significant decreases in the surrender value" of the policies, which "significantly increase[d] the likelihood that the insurance program would fail to perform as illustrated." (*Id.*) However, the complaint does not allege that Allianz played any role in generating or presenting any illustrations or projections for the replacement insurance polices. Rather, the complaint alleges that Allianz violated "applicable insurance laws" when it accepted the insurance applications even though it did not have the information necessary for it to conclude that "the surrender and reissue were suitable transactions for the insured," failed [*12] to "make the disclosures necessary to make the sales presentation and disclosures not misleading," and failed to ensure that the policy was not unsuitable for the insured. (*Id.* at ¶¶ 33-34, 73-75.) Finally, AICC failed to disclose that it received commissions or compensation from Allianz for the transaction. (*Id.* at ¶¶ 36, 74.)

In July 2009, AIG sold AICC's portfolio of premium

financing business to FIFC. (*Id.* at ¶ 37.) Plaintiffs contend FIFC purchased the portfolio at a substantial discount, and consequently, it had a "substantial incentive to manufacture a default on Plaintiff's loans and earn a quick profit by forcing the surrender of Plaintiff's policies." (*Id.*) Plaintiffs contend that FIFC only obtained the rights in the loans and collateral that AICC had and "took title to each of the assigned loans subject to any defenses of borrowers which would have been available to such borrowers as against AICC." (*Id.* at ¶ 60.) Shortly after its purchase, FIFC refused to advance the funds necessary to pay the premiums due in 2009 without substantial additional collateral. (*Id.* at ¶ 38.) On October 28, 2009, FIFC declared that Plaintiffs were in default on their loan obligations because **[*13]** the insurance policy premiums were not paid. (*Id.*) At the same time, Plaintiffs allege that FIFC agreed to allow Plaintiffs to assign up to $20 million of the death benefits to support the loans to "induce Plaintiffs to continue to pay premiums." (*Id.* at ¶¶ 39, 65.) Despite this alleged commitment, FIFC later refused Plaintiffs' efforts to assign death benefits. (*Id.* at ¶¶ 41, 64.)

Additionally, at FIFC's demand at some point in time, Plaintiffs began making monthly payments for interest, though the amounts were allegedly unrelated to the actual amounts of interest accruing. (*Id.* at ¶¶ 40, 63.) Plaintiffs continued to make additional payments and posted additional collateral to "protect their investment in the insurance program" through 2010. (*Id.* at ¶ 41.) Finally in 2010, when Plaintiffs did not meet a demand for premium and collateral, FIFC declared that Van Den Heuvel was in default under the Master Note and exercised its rights to the surrender of the policies, the letter of credit, and other liquid collateral. (*Id.* at ¶¶ 42, 65.) As a result of these alleged actions by FIFC and the fact that FIFC took title subject to the defenses Plaintiffs had against AICC, Plaintiffs claim **[*14]** to be "entitled to recover . . . the entire proceeds" because First Insurance wrongfully foreclosed on the collateral." (*Id.* at ¶ 68.) More than seven years after the program commenced, the surrender value of the policies had not increased sufficiently to make the policies self-sustaining or to fully collateralize the premium loan. (*Id.* at ¶ 43.) As a result, Plaintiffs allege they have spent more than $8.8 million on premium payments, more than $2 million on interest and other borrowing costs, and forfeited collateral valued in excess of $3.5 million. (*Id.* at ¶ 44.) Based on these allegations, Plaintiffs have asserted three causes of action against the four defendants: misrepresentation and fraud against AICC, Phoenix, and Allianz and disgorgement and declaratory relief against FIFC.

The SAC alleges that Plaintiffs are all residents of Wisconsin for diversity purposes. (SAC ¶¶ 1-6, ECF No. 111). The SAC also alleged that FIFC is a corporation organized under the laws of Illinois, with its principal place of business in Illinois,

(SAC ¶ 8, ECF No. 111), and that AICC is a corporation organized under the laws of New Hampshire, with its principal place of business in New Jersey. (SAC **[*15]** ¶ 7, ECF No. 111). However, Plaintiffs failed to adequately allege the citizenship of Phoenix and Allianz, so the Court ordered a statement on jurisdiction for these defendants on January 13, 2014. (ECF No. 140.) In response, Allianz asserted that it is a corporation organized under the laws of Minnesota, with its principal place of business in Minnesota. (Decl. of Theodore C. Caldwell, Jr., ECF No. 141.) Phoenix filed an affidavit asserting it was a corporation organized under the laws of New York, with its principal place of business in Connecticut. (Aff. of Susan Zophy, ECF No. 142-1.) AICC also filed a declaration, even though its citizenship was adequately alleged in the SAC, that it is a corporation organized under the laws of New Hampshire, with its principal place of business in New York. (Decl. of Marc Milano, ECF No. 143.) Accordingly, this Court has diversity jurisdiction over the case pursuant to *§ 1332*.

## II. LEGAL STANDARD AND MOTIONS TO STRIKE

Dismissal for failure to state a claim under *Rule 12(b)(6)* is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. To state a claim, a complaint must contain sufficient factual matter "that is **[*16]** plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*). In addition, under the heightened federal pleading standard of *Rule 9(b)*, a plaintiff alleging fraud must state with particularity the circumstances constituting fraud. *Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 569 (7th Cir. 2012)* (citing *Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir. 2007)* ("This heightened pleading requirement is a response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do.") (internal quotation marks omitted)). To state the circumstances with the requisite particularity, the plaintiff must allege "the who, what, when, where, and how" of the alleged fraud. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc., 536 F.3d 663, 668 (7th Cir. 2008)*. The purpose of the heightened pleading standard is "to force the plaintiff to do more than the usual investigation before filing his complaint" in order to minimize the damage to reputation a baseless claim of fraud can have on a party. *Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir. 1999)*.

In deciding a motion to dismiss, the court construes the allegations in the complaint in the light most favorable to the

plaintiff, accepts all well-pleaded facts as true, and draws all inferences in favor of the non-moving party. *Estate of Davis v. Wells Fargo Bank, 633 F.3d 529, 533 (7th Cir. 2011)*. In addition, district courts have discretion to consider certain documents outside the pleadings without converting the motion under *Rule 12(b)(6)* to a motion for summary judgment under *Rule 56*. *Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998)*. In particular, **[\*17]** documents submitted with a motion to dismiss may be considered part of the pleadings if they are "referred to in the plaintiff's complaint and are central to his claim." *188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 735 (7th Cir. 2002)* (internal quotation marks omitted); *see also Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687, 690 (7th Cir. 2012)* ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting the defendant's *12(b)(6)* motion to a motion for summary judgment."). "The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material." *Burke v. 401 N. Wabash Venture, LLC, 714 F.3d 501, 505 (7th Cir. 2013)* (internal quotation marks omitted).

Here, both Plaintiffs and Phoenix have submitted documents related to the transactions described in the SAC. First, Phoenix submitted copies of the policy illustrations corresponding to the four policies it issued on Van Den Heuvel that are referenced in the SAC. Plaintiffs responded with 38 pages of documents that were provided to Van Den Heuvel by "Thomas Wedige on or about September 25, 2003 in connection with insurance transactions entered into at approximately **[\*18]** that date." (Decl. of Ronald H. Van Den Heuvel, ECF No. 123.) Wedige is identified in the letterhead of the documents as a partner in Voyageur Financial Group LLC, which was apparently advising Van Den Heuvel on his life insurance purchases. Both Phoenix and Plaintiffs have moved to strike the other party's submissions.

Plaintiffs' motion to strike Phoenix's illustrations is denied. The policy illustrations were provided to Van Den Heuvel during the application process and should be considered under the incorporation-by-reference doctrine, as they are referenced in the SAC and central to Plaintiffs' claim that Phoenix is liable for fraud and misrepresentation. The policy illustrations are directly relevant to Plaintiffs' allegation that Phoenix misrepresented the facts to Van Den Heuvel concerning the insurance he purchased. Plaintiffs cannot avoid dismissal of unsupported claims by omitting documents that fatally undermine their allegations. *See 188 LLC, 300 F.3d at 735* ("The purpose of the exception is to prevent

parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents."). The policy illustrations are proper matters for the Court's consideration **[\*19]** of Phoenix's motion to dismiss.

The same is not true of Plaintiffs' submission of the Thomas Wedige material. The Wedige material is not referenced in the SAC and appears to bear a date two years before the SAC alleges Van Den Heuvel purchased the policies from Phoenix. Moreover, Plaintiffs offer no explanation why the additional documents are needed. They do not specify what language they contain that could possibly bear on their claims. Instead they offer only a vague argument that the submission has two purposes: (1) "[t]o suggest the sort of authentication and 'disambiguation' issues" that preclude the Court from considering Phoenix's submission without converting the motion to dismiss to summary judgment under *Rule 56*, and (2) to provide a complete picture of the presentation to Van Den Heuvel to create "an issue of fact concerning what the parties represented to each other." (Pl.'s Opp'n to Mot. to Dismiss 6-8, ECF No. 122..) Yet in their brief in opposition to Phoenix's motion to dismiss Plaintiffs fail to cite one page of the submission. Instead, the additional filing seems only to clutter the record. For these reasons, Phoenix's motion to strike Plaintiffs' documents is granted.

## III. [\*20] ANALYSIS

At the outset, AICC argues that the allegations of the SAC provides no support for any claims on the part of the two corporations or the two trusts Van Den Heuvel has added as plaintiffs. There are no allegations that these entities had any involvement with any of the defendants, AICC argues, and no suggestion that any of the Plaintiffs, other than Van Den Heuvel, were the recipients of or relied on any statements or representations of the defendants. It thus follows, AICC contends that all claims by parties other than Van Den Heuvel should be dismissed.

AICC is correct that the SAC is strangely silent on the standing of the Plaintiffs other than Van Den Heuvel to assert claims of misrepresentation or fraud against the other defendants. The SAC does suggest that the other Plaintiffs were beneficiaries under the policies Van Den Heuvel purchased and indeed may have been involved in the purchase of the policies themselves. (SAC ¶¶ 6, 20.) But by itself, this would not appear sufficient to confer standing on them. A beneficiary under a life insurance policy may have standing to sue, but generally only after the insured dies. *See Meleski v. Schbohm LLC, 2012 WI App 63, ¶ 7, 341 Wis.2d 716, 817 N.W.2d 887* ("Other Wisconsin decisions also recognize, either **[\*21]** expressly or implicitly, the applicability of the

third-party-beneficiary doctrine to permit a non-insured to sue an insurance company in order to seek fulfillment of the insurance company's promise to pay that non-insured once that promise becomes fixed by a triggering event."). Van Den Heuvel is still alive and the policies are no longer in effect. Plaintiffs offer no argument in response to AICC's standing argument, which under the circumstances would appear an implicit concession on their part. In any event, it is a waiver. *See Bonte v. U.S. Bank, N.A., 624 F.3d 461, 466 (7th Cir.2010)* ("Failure to respond to an argument . . . results in waiver."). The Court therefore concludes that only Van Den Heuvel has standing to bring this action and all claims by the other Plaintiffs are dismissed.

Turning next to Van Den Heuvel's claim against AICC, the Court concludes in the discussion that follows that the SAC suffers from essentially the same defects as the first: The SAC fails to allege the circumstances constituting the fraud with the particularity required by *Fed. R. Civ. P. 9(b)*. Indeed, the SAC fails to allege fraud at all. Van Den Heuvel's claim against FIFC is even weaker and suffers from the additional burden of having already been dismissed by the Court [*22] with prejudice. Finally, the claims against the two insurers assume the insurers owed Van Den Heuvel additional duties to make sure the policies he purchased were appropriate for his circumstances under unspecified insurance statutes and regulations. They also assume that the insurers had a duty to determine whether Van Den Heuvel's separate premium financing agreement with AICC, and later FIFC, was appropriate for him, despite the fact he had his own attorney and insurance agent advising him. Neither assumption has support in the law. For all of these reasons, the defendants' motions to dismiss will be granted.

## A. AICC Claim: Fraud and Misrepresentation

As the Court noted in its previous decision, the purpose of the heightened pleading requirement in fraud cases is to require plaintiffs "to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir. 1999)*. Thus, plaintiffs must describe the "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)*. "[T]he reference to 'circumstances' in [*Rule 9(b)*] is to matters such as the time, place, and contents of the false representations or omissions, [*23] as well as the identity of the person making the misrepresentation or failing to make a complete disclosure and what that defendant obtained thereby." 5A Wright & Miller, FEDERAL PRACTICE & PROCEDURE Civ. § 1297 (3d ed. 2005);

*accord Windy City, 536 F.3d at 668.*

Like the previous complaints, the SAC fails to describe the who, what, when, where, and how of the alleged fraud. The SAC offers general allegations as to how the AICC's CMS was intended to work, but it fails to identify who at AICC made any statements to Van Den Heuvel or any of the other plaintiffs that could constitute actionable fraud. To be sure, the SAC now names several individuals who were allegedly involved in the transaction, but it fails to identify the fraudulent statements they allegedly made and when and to whom they were made. The closest they come to providing the required particularity as to the content of the allegedly fraudulent statements is to attach what they describe as the CMS Illustrations to the SAC as Exhibit A. But the illustrations, like most of the allegedly fraudulent omissions Van Den Heuvel alleges, concern future events, not facts in existence at the time of the transaction. To be actionable, "statements of fact ordinarily must relate to present or preexisting facts, not future [*24] ones." *Badger Pharmacal, Inc. v. Colgate-Palmolive Co., 1 F.3d 621, 627 (7th Cir. 1993)*. As the Seventh Circuit recently explained in affirming the dismissal of a complaint alleging securities fraud:

> The law does not require public disclosure of mere risks of failure. No prediction—even a prediction that the sun will rise tomorrow—has a 100 percent probability of being correct. The future is shrouded in uncertainty. If a mistaken prediction is deemed a fraud, there will be few predictions, including ones that are well grounded, as no one wants to be held hostage to an unknown future.

*City of Livonia Emple. Ret. Sys., 711 F.3d 754, 758 (7th Cir. 2013)*.

Not only did the alleged misrepresentations concern future events, as opposed to preexisting facts, it is also clear from the attachments to the SAC that the alleged misrepresentations were not offered as actual predictions of future events. The illustrations on which Van Den Heuvel relies contained express disclosures placing the reader on notice that they were merely intended to explain the underlying theory of the financing vehicle and that the figures used in the illustrations were not guaranteed. The CMS Illustrations, attached to the SAC, contain the following disclosure at the bottom of every page: "Life insurance values based on current expenses and crediting rate. Results [*25] are not guaranteed. Financing assumptions are for illustrative purposes only. A.I. Credit will determine the actual loan terms." (CMS Illustrations, Ex. A, ECF No. 111-1.) This disclosure is directly below the signature of Ronald Van Den Heuvel on eight different pages. (*Id.* at 1, 3, 5, 7, 9, 11, 13, 15.) The promissory notes contain additional disclosures:

"Borrower acknowledges and agrees that lender has not and will not provide any advice or recommendations in connection with the loans, including but not limited to advice or recommendations relating to estate or financial planning, taxes or accounting or legal matters." (Master Promissory Note 7, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 11, Ex. 3, ECF No. 115-3.) The notes also state that "Borrower agrees to, at its sole cost and expense, maintain the Insurance Policy that secures this Note." (Master Promissory Note 4, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 11, Ex. 3, ECF No. 115-3.) The terms of the note further "indemnify and hold harmless Lender for any losses Borrower incurs, either directly or indirectly, . . . including without limitation, any losses relating to the inability of the customer to replace [*26] life insurance due to age, health, or any other reason." (Master Promissory Note 6, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 11, Ex. 3, ECF No. 115-3.) The notes warn, among other things, that "neither the insurance agent/broker nor the insurance company is Lender's agent and neither can legally bind Lender in any way or make any commitment on Lender's behalf." (Master Promissory Note 6, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 11, Ex. 3, ECF No. 115-3.) The notes also considered the possibility of extending additional amounts to the borrower and additional collateral requirements:

> Lender shall not be required to extend any amounts due hereunder (other than the original principal amount hereof) to borrower or any other person or entity, including but not limited to any additional amounts necessary to fund premiums due in respect of the insurance policy. As a condition to making additional loans hereunder, lender may require a pledge of additional collateral in a type and amount determined at the sole discretion of lender.

(Master Promissory Note 7, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 11, Ex. 3, ECF No. 115-3.) [*27] In signing the notes, Van Den Heuvel acknowledged that he had been represented by his "own competent counsel in connection with this loan" and had "read this note in its entirety." (Master Promissory Note 6, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 13, Ex. 3, ECF No. 115-3.) The notes even encouraged the parties to be familiar with the disclaimers: "*Important: Read Disclaimers above on this page." (Master Promissory Note 8, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 11, Ex. 3, ECF No. 115-3.) Finally, the SAC alleges that Van Den Heuvel had a personal insurance agent advising him on these transactions, though the SAC fails to identify this insurance agent or provide any information on his or her role in creating the program, advising Van Den Heuvel, or communicating with any of the various defendants.

(SAC ¶ 21, ECF No. 111.)

Van Den Heuvel has attempted to overcome these disclosures by ignoring them, even though they render many of his claims meritless. For example, Van Den Heuvel alleges that AICC failed to disclose that "straightforward 20-year term life and universal life insurance . . . could have been purchased at fixed prices for [*28] a fraction of the cost" and that Van Den Heuvel "has been unable to replace the insurance coverage originally planned" due to current medical conditions. (Id. at ¶¶ 57-58.) But the notes "indemnify and hold harmless Lender for any losses Borrower incurs, either directly or indirectly, . . . including without limitation, any losses relating to the inability of the customer to replace life insurance due to age, health, or any other reason." (Master Promissory Note 6, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 11, Ex. 3, ECF No. 115-3.) As another example, Van Den Heuvel alleges that AICC "knew, but did not disclose to the Van Den Heuvel, that it would refuse to lend the premiums for the second and subsequent years of the program." (SAC ¶ 55, ECF No. 111.) However, the notes expressly state "Lender shall not be required to extend any amounts due hereunder (other than the original principal amount hereof) to borrower or any other person or entity, including but not limited to any additional amounts necessary to fund premiums due in respect of the insurance policy." (Master Promissory Note 7, Ex. 2, ECF No. 115-2; Amended and Restated Master Promissory Note 11, Ex. [*29] 3, ECF No. 115-3.) Van Den Heuvel obviously believes he made a poor decision, but he cannot rewrite the Agreement they made in order to lay risks he accepted at the feet of AICC. See *Gries v. First Wisconsin Nat. Bank of Milwaukee, 82 Wis. 2d 774, 780, 264 N.W.2d 254, 257 (Wis. 1978)* ("Although the failure of the business is unfortunate for both the plaintiffs and the bank, it was a risk which the plaintiffs assumed, and which can not be shifted to the bank.") Van Den Heuvel chose to enter the Agreement in the face of disclaimers acknowledging that they were entering into the premium financing agreement at his own risk.

Relying on *Kaloti Enterprises, Inc. v. Kellogg Sales Co., 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205*, Van Den Heuvel also argues that AICC had a duty to disclose that its illustrations were based on assumptions such as "the amount of cash surrender value or the innumerable other charges made in arriving at 'policy value'" that were not likely to hold true over the long term. (Pl.'s Mem. in Opp'n 3, ECF No 122.) Van Den Heuvel contends that unlike even knowledgeable consumers, AICC and the insurers "possess computer and actuarial resources" that permit them to calculate the relevant variables needed to determine the level of risk involved in premium financing agreements. Based on *Kaloti Enterprises*, Van Den Heuvel contends this imbalance of knowledge

gave [*30] rise to a duty on the part of AICC to more clearly disclose the risks involved in entering into a premium financing agreement. ( *Id.* at 3-4.)

*Kaloti Enterprises* does not support Van Den Heuvel's argument. In that case the plaintiff distributor sued its supplier for fraud in the inducement for failing to disclose that it had adopted a new marketing strategy before entering an agreement for the purchase of product by its distributor. Under the new strategy, the supplier intended to sell directly to the distributor's customers at a lower cost than the plaintiff distributer could offer based on the price it agreed to pay the supplier for the same product. In reversing the lower court's dismissal of the complaint, the Wisconsin Supreme Court held that a party to an agreement has a duty to disclose facts when one party exclusively holds knowledge of facts material to the transaction that the other party has no means of acquiring.

That principle does not apply here. In *Kaloti Enterprises*, the undisclosed fact was of a change in the supplier's marketing strategy that fatally undermined the distributer's ability to compete. The decision to change the strategy had already been made before the supplier entered [*31] the new contract with its distributor. In this case, in contrast, the information Van Den Heuvel alleges AICC failed to disclose is not even factual. As already explained, the information consisted of illustrations intended to demonstrate how the CMS premium financing mechanism would work under a given but uncertain set of assumptions. In other words, the information consisted of future predictions, assuming certain conditions are met. No one has knowledge, however, let alone exclusive knowledge, of what will happen in the future. Thus, *Kaloti Enterprises* does not apply.

Ultimately, Van Den Heuvel's claims revolve around AICC's inability to accurately predict the future, which is obviously not an actionable misrepresentation. The SAC, now in its third version, remains confusing and vague without particularized allegations. In the absence of any plausible allegations that would give rise to a duty to disclose the information Van Den Heuvel alleges was withheld or some affirmative statement of present or pre-existing fact, AICC cannot be liable under any misrepresentation theory. Moreover, the illustrations and notes are replete with disclaimers that advised Van Den Heuvel that performance [*32] was not guaranteed and that the projections were illustrative only. AICC did not guarantee the success of this program at the time the parties entered into it, and Van Den Heuvel cannot read such a guarantee into it after the fact. Because dismissal on all of these bases is appropriate, AICC's arguments regarding the economic loss doctrine and the statute of limitations will not be discussed.

For these reasons, AICC's motion to dismiss will be granted.

**B. FIFC Claim: Disgorgement and Declaratory Relief**

The claim against FIFC, Van Den Heuvel contends, is derivative of the claim against AICC. In other words, Van Den Heuvel concedes that FIFC did not engage in fraud. His confusing claim against FIFC seems to be that if AICC engaged in fraud, then FIFC's rights under the Agreement are subject to whatever defenses Van Den Heuvel would have had against AICC. This claim clearly fails since, as already explained, Van Den Heuvel's claim for fraud against AICC fails. Thus, by his own logic, his claim against FIFC fails as well.

Even aside from the failure of Van Den Heuvel's claim against AICC, however, it is difficult to see how FIFC could be liable to Van Den Heuvel for his losses under the Agreement. [*33] There are no allegations that would support a claim of successor liability for any torts AICC may have committed, *see Chicago Truck Drivers, Helpers and Warehouse Workers Union, 59 F.3d 48, 49 (7th Cir. 1995)* ("The successorship doctrine provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities."), and Van Den Heuvel does not even assert a claim of fraud against FIFC. According to the SAC, FIFC purchased AICC's assets, not the corporation itself or its liabilities. (SAC ¶ 37, ECF No. 111.) While FIFC's rights under the Agreement may have been subject to whatever defenses Van Den Heuvel had against AICC, FIFC has never attempted to enforce the Agreement in any judicial proceeding, and Van Den Heuvel never sought its rescission. If, on the other hand, Van Den Heuvel had a claim against AICC for fraud as a separate tort, he has offered no argument or authority explaining why this would render FIFC liable to him or how AICC's fraud could be legally required to disgorge anything it received under the Agreement.

Van Den Heuvel also alleges that FIFC took actions under the Agreement, inconsistent with its earlier promises, that resulted in Van Den Heuvel's inability to pay the 2010 premiums for the insurance policies. FIFC then [*34] exercised its rights under the Agreement to surrender the policies and apply the funds received to the amounts Van Den Heuvel owed. As noted in the previous decision, however, there is no allegation that FIFC took any action that it was not authorized to take under the Agreement. There is no claim that it breached the Agreement. Nor is there any allegation supporting Van Den Heuvel's claim for declaratory relief against FIFC. The Court cannot even tell from the SAC what declaratory relief he is seeking. It is for these reasons that Van Den Heuvel's claim against FIFC was dismissed with

prejudice, and neither the SAC, nor Van Den Heuvel's belated motion for relief from the earlier order provides any reason to reconsider that ruling. For all of these reasons, Van Den Heuvel's motion for relief from the previous order is denied and FIFC's motion to dismiss is granted.

## C. Phoenix: Fraud and Misrepresentation

The claims against the insurers also fail. Again, Van Den Heuvel's theory of liability is difficult to follow. The SAC's confusing attempt to allege fraud against Phoenix is riddled with inconsistencies and errors. As an initial matter, it alleges that Phoenix was involved in developing [*35] the scheme, but it is unclear what role Phoenix played in the process of developing it. (SAC ¶¶ 21-22, 25, ECF No. 111) The Phoenix policies were apparently solicited in 2003, before the proposed CMS "program of insurance and premium finance" was even contemplated. (*Id.* at ¶¶ 20-22; Pl.'s Opp'n to Mot. to Dismiss 6 n.3, ECF No. 122; .) James MacFarlane, an employee of Phoenix, "conferred with Van Den Heuvel's personal insurance agent," but there are no facts as to who was present, what was discussed, where it occurred, or when it occurred. (SAC ¶ 21, ECF No. 111.) On some other occasion or occasions, James MacFarlane "reviewed and discussed the proposed loan program and projections with Van Den Heuvel." (*Id.* at ¶ 22.) The number, time, location, content, and participants of these discussions are unalleged. Finally, Van Den Heuvel alleges that Phoenix knew that the "suitability analysis, program summaries, and illustrations employed by AICC, LLG, and Grant did not meet the requirements of applicable Wisconsin insurance regulations and were materially false and misleading," even though no other allegations mention suitability analysis, program summaries, LLG, or Grant. (*Id.* at ¶ 74.) [*36]

Not surprisingly, it is difficult to discern what part of the alleged scheme Phoenix participated in because the SAC lacks clarity and consistency. Instead of providing a sound factual basis "with particularity," the complaint reverts to vague assertions that Phoenix should have provided information to cure the allegedly "false and misleading" nature of the illustrations and projections. (*Id.* at ¶¶ 24-26, 28-29, 32, 74-75.) The complaint alleges that Phoenix "either created or had a right to receive each and every item of marketing material provided to the insureds in the course of their solicitation of insurance" and "had actual knowledge of the so-called Capital Maximization Strategy and had agreed to allow AICC to solicit premium finance loans for the purchase of their insurance using the projections created by the Capital Maximization Strategy model." (*Id.* at ¶¶ 71-72.) Van Den Heuvel does not indicate where, when, or how the insurers had access to "each and every" item of marketing material or

even what is included in "each and every item of marketing material." At one point, the complaint even alleges that Phoenix generated illustrations of the insurance policy performance on [*37] behalf of Allianz when the Phoenix policies were replaced by Allianz policies. (*Id.* at ¶ 32.)

It is also difficult to determine when many of the alleged events occurred. Van Den Heuvel refers generally to insurer defendants that were involved in the alleged scheme at different times. (*Id.* at ¶¶ 71-75.) For instance, the SAC alleges in various places that the "illustrations" were misleading or otherwise failed to comply with applicable insurance regulations, yet Van Den Heuvel provides no indication of when these supposed delivery of illustrations by Phoenix took place—the only specific allegation refers to Nancy Smith, an AICC account manager, delivering CMS Illustrations at an unidentified time. (*Id.* at ¶ 21.) From the face of the complaint, there were one or more discussions in 2005 in which Phoenix and/or AICC conferred or discussed the scheme with Van Den Heuvel or his personal insurance agent, but the first communication with Phoenix apparently occurred as early as 2003. (Phoenix Mot. to Dismiss 4-5, ECF No. 118; Zophy Aff., Exs. A-D, ECF No. 118-2-118-5.) According to Van Den Heuvel, Allianz and Phoenix, which are lumped together though Allianz was not involved until 2008 or 2009, [*38] are somehow both liable for misleading illustrations and projections offered by AICC and perhaps other illustrations and projections from LLG and Grant, who are involved in some unspecified manner in this complicated morass. (SAC ¶ 74, ECF No. 111.) Finally, Van Den Heuvel never even indicates when the surrender of the Phoenix policies and issuance of the Allianz policies occurred, just that it occurred sometime after the "financial reverses in 2008." (*Id.* at ¶ 32.)

Van Den Heuvel's labyrinthine and confusing allegations are inadequate to comply with the requirements of *Rule 9(b)*. *See Stephenson v. Hartford Life & Annuity Ins. Co., 2003 U.S. Dist. LEXIS 17036, 2003 WL 22232968, at *7 (N.D. Ill. Sept. 26, 2003)* ("Although there is no mystery as to the nature of the allegations, plaintiffs' failure to specifically plead the date, place, method, speaker or recipient of the alleged misrepresentations leave defendants with far too much guess-work."). Van Den Heuvel must "reasonably notify the defendants of their purported role in the scheme." *Vicom, Inc., v. Harbridge Merch. Servs., 20 F.3d 771, 778 (7th Cir. 1994)* (internal quotations omitted). When the case involves multiple defendants, the complaint must inform each defendant of the nature the particular actions constituting their alleged participation in the fraud. *Ackerman, 172 F.3d at 471* (finding inadequate a complaint that failed to associate a particular defendant [*39] with the particular set of misleading statements, nor did it specify the contents of the statements).

"The grounds for the plaintiff's suspicions must make the allegations plausible, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 441-43 (7th Cir.2011)* (explaining that *Rule 9(b)* is "designed to discourage a 'sue first, ask questions later' philosophy"). Van Den Heuvel has failed to meet the dictates of *Rule 9(b)* here.

Van Den Heuvel's claims against Phoenix are also substantively lacking. He claims that Phoenix is responsible for the fraudulent and misleading projections created by AICC and provided to Van Den Heuvel. To the extent this claim relies on the viabilty of his claim against AICC, it must fail because, as already explained, he has no cause of action against AICC for fraud or misrepresentation. Though it is difficult to separate the allegations against AICC from those against Phoenix because of the confusing organization of the SAC, at least some part of their claims against Phoenix do not rely on misrepresentations by AICC. (SAC ¶ 32, ECF No. 111.) These allegations harbor other flaws.

The SAC specifically alleges that Phoenix violated *Wis. Stat. §§ 628.34(1)(a)* and *628.347*. ( [**40]** *Id.* at ¶¶ 26-28, 70-75.) Van Den Heuvel also makes general allegations that Phoenix has violated "applicable Wisconsin insurance regulation." (*Id.* at ¶ 73.) In his brief, Van Den Heuvel clarifies that Phoenix violated Wis. Adm. Code § 2.16(29). (Pl.'s Opp'n to Mot. to Dismiss 4, ECF No. 122.) He argues that these alleged violations constitute a violation of a duty to disclose sufficient to support a claim of misrepresentation by omission. (*Id.* at 2-5.) However, the statutes and regulations of Wisconsin's insurance industry do not create a private right of action. *Kranzush v. Badger State Mut. Cas. Co., 103 Wis. 2d 56, 76-82, 307 N.W.2d 256 (1981)*; *see also N.A.A.C.P. v. American Family Mut. Ins. Co., 978 F.2d 287, 301 (7th Cir. 1992)* ("No court of Wisconsin has permitted anyone to enforce provisions of this kind in the insurance laws through private litigation."). Instead, enforcement resides with the Commissioner of Insurance. *Wis. Stat. § 601.41(1)* ("The commissioner shall administer and enforce chs. 600 to 655 and ss. *59.52(11)(c)*, *66.0137(4)* and *(4m)*, *100.203*, *120.13(1)(b) to (g)*, and 149.13 and shall act as promptly as possible under the circumstances on all matters placed before the commissioner."). It would be inconsistent with the administrative system created by the state to allow Van Den Heuvel to enforce these statutes and regulations in private litigation through an end-run around the **[*41]** administrative procedures by permitting the violation of the regulations to be grounds for fraud.

This case clearly demonstrates the policy justification for such restraint. As Van Den Heuvel acknowledges, the insurance system is "a web of regulations and principles." (Pl.'s Opp'n to Mot. to Dismiss 4, ECF No. 122.) The parties' briefs barely scratch the surface of the interconnected web of rules that govern the activities of insurers, brokers, intermediaries, and agents. (Phoenix Mot. to Dismiss 20-23, ECF No. 118; Phoenix Reply 5-6, ECF No. 126; Pl.'s Opp'n to Mot. to Dismiss 3-6, ECF No. 122; Allianz Br. in Supp. of Mot. to Dismiss 20-21, ECF No. 120; Pl.'s Opp'n to Allianz Mot. to Dismiss 2-7, ECF No. 128; Allianz Reply 7-10, ECF No. 136.) For example, the SAC alleges that Phoenix (and Allianz) violated *Wis. Stat. § 628.347* by recommending an insurance plan when it did not have reasonable grounds to believe the policy was not unsuitable. (SAC ¶¶ 26-27, ECF No. 111.) Yet, *§ 628.347* appears to be applicable only to recommendations regarding annuities, which are not involved in this case. *Wis. Stat. § 628.347* ("In recommending to a consumer the purchase of an annuity . . . an insurance intermediary . . . shall have reasonable grounds **[*42]** to believe that the recommendation is suitable for the consumer on the basis of facts disclosed by the consumer as to his or her investments, other insurance products, and financial situation and needs."). Further, the statute creates no private right of action, but it does describe remedial measures the commissioner may impose for violations and make persons who violate the section subject to penalties under *§§ 601.64* and *601.41*. *Wis. Stat. § 628.347(5)-(6)*. The importance of administrative expertise is obvious in such a system.

The Phoenix policy illustrations, which Phoenix attached to its motion to dismiss, further support the conclusion that Van Den Heuvel's claim must be dismissed. Among other things, the Phoenix policy illustrations projected surrender values and death benefit values based on a scheduled premium outlay plan. In order to calculate these values, Phoenix assumed certain non-guaranteed elements, including credited interest rates, cost of insurance charges, and expense charges. Van Den Heuvel acknowledged—when signing the illustration—that he understood that "any non-guaranteed elements illustrated are subject to change and that actual results could be more or less favorable than those shown. The Sales Representative **[*43]** has told me that they are not guaranteed." (*E.g.*, Zophy Aff., Ex. A at 5, ECF No. 118-2.) The illustrations were projections and explained that the projections assumed a continuation of an existing state of affairs which "is not likely to occur and actual results may be more or less favorable than those illustrated." (*Id.* at 1.) The disclaimers are not buried in fine print—they are the first item on the first page. The illustrations also warned that the "[v]alues shown in this illustration may not reflect your actual tax or accounting consequences. Consult professional advisors for interpretation." (*Id.*) As a result, Van Den Heuvel's claim that Phoenix should have disclosed the impact of investment yield shortfalls or included different interest

crediting rates are barred by the language of the illustrations.

Based on the foregoing, Van Den Heuvel's allegations against Phoenix are insufficient to state a claim for fraud and misrepresentation that entitles him to relief. It is therefore unnecessary to consider Phoenix's arguments regarding the application of the statute of limitations or the economic loss doctrine.

### D. Allianz: Fraud and Misrepresentation

Van Den Heuvel's claim against Allianz **[*44]** is fatally flawed for largely the same reasons his claim against Phoenix fails. As to Allianz, the allegations are even less particular. As noted above, the SAC refers generally to insurer defendants that were involved in the alleged scheme at different times. (SAC ¶¶ 70-75, ECF No. 111.) Allianz was not involved in any sales presentations or other communications with Plaintiffs before 2008. (*Id.* at ¶ 32.) Yet, the SAC groups Allianz with Phoenix, which was involved as early as 2003. There is no theory under which Allianz could be liable for actions taken by other companies years earlier in 2003, 2005, or 2007.

Given the disorganization of the SAC, it is unsurprising that it never alleges any of the circumstances required by *Rule 9(b)*. At one point, the SAC alleges that it was Phoenix, not Allianz, that "generated illustrations of the insurance policy performance" when AICC demanded the replacement of the Phoenix insurance policies. (SAC ¶ 32, ECF No. 111.) Van Den Heuvel attempts to rescue the complaint by arguing that it alleges the misleading illustrations "were delivered by an insurance broker and representatives of AICC." (Pl.'s Opp'n to Allianz Mot. to Dismiss 2, ECF No. 128.) But there **[*45]** are no allegations of this delivery aside from a general statement that "[t]he illustrations and other information provided by AICC and Phoenix did not disclose that surrender and reissue of the Phoenix policies would cause significant decreases in the surrender value of the package of policies and significantly increase the likelihood that the insurance program would fail to perform as illustrated." (SAC ¶ 32, ECF No. 111.) The complaint then describes the flaws as "repeated" from the earlier illustrations. (*Id.*) Other allegations that relate to Allianz are fatally vague: "Plaintiffs relied upon sales presentations of AICC and Allianz in determining to proceed further with the insurance program." (*Id.* at ¶ 35.) The complaint never alleges what misrepresentations Allianz made or any of the other basic questions of "who, what, where, when, and how." *Windy City, 536 F.3d at 668.*

Likewise, the substance of the claim against Allianz is flawed for many of the reasons already discussed. The Allianz policy illustrations contained numerous disclosures that alerted Van Den Heuvel that the projections were not guaranteed: "This is an illustration only, not an offer, contract, or promise of future policy performance." (Decl. **[*46]** of LaRita A. Fenske, Ex. A at 1, ECF No. 121-1.) Each illustration also states the following:

> Keep in mind that different time periods and different indices will produce higher or lower averages, and that even if the average credited rate for a policy is as illustrated, actual policy values could be different because of year to year difference in actual credited rates. It is also very important to remember that past results are not indicative of, and do not guarantee future results.

(*Id.* at 3.) These are unambiguous disclosures that are accessible even to the lay person, let alone a sophisticated businessman with legal counsel and a personal insurance agent. The illustrations also provide returns under multiple scenarios. (*Id.* at 11-16.) As a result, Van Den Heuvel's vague claim that the Allianz illustrations contained affirmative misrepresentations, or were otherwise misleading, is meritless. Accordingly, Allianz's motion to dismiss will be granted.

### IV. CONCLUSION

If Van Den Heuvel has a claim against some person or entity for the large amount of money he lost in the series of transactions described in the SAC, it is not alleged in this complaint. After two efforts to amend his complaint and nine motions **[*47]** to dismiss pursuant to *Rule 12(b)(6)*, it is clear that any further amendments to his claims for fraud or misrepresentation against AICC, Phoenix, and Allianz or a contract action against FIFC would be futile. Consequently, all claims against all the defendants are dismissed with prejudice.

Based on the foregoing, Plaintiffs' motion to file a sur-reply is **GRANTED**. Defendants' requests to file sur-replies are **DENIED**. Phoenix's motion to strike is also **GRANTED**. Plaintiffs' motion to modify the Court's decision under *Rule 60(b)* is **DENIED**. The motions to dismiss filed by Defendants AICC, FIFC, Phoenix, and Allianz are **GRANTED** and all claims against these defendants are dismissed with prejudice.

**SO ORDERED** this 11th day of April, 2014.

/s/ William C. Griesbach

William C. Griesbach, Chief Judge

2014 U.S. Dist. LEXIS 199881, *47

United States District Court

**End of Document**

# Tab J


# *White v. Chevron Corp.*

United States District Court for the Northern District of California

August 29, 2016, Decided; August 29, 2016, Filed

Case No. 16-cv-0793-PJH

**Reporter**

2016 U.S. Dist. LEXIS 115875 *; 62 Employee Benefits Cas. (BNA) 1602

CHARLES E WHITE, et al., Plaintiffs, v. CHEVRON CORPORATION, et al., Defendants.

**Subsequent History:** Dismissed by *White v. Chevron Corp., 2017 U.S. Dist. LEXIS 83474 (N.D. Cal., May 31, 2017)*

## Core Terms

fiduciaries, funds, options, stable, recordkeeping, imprudent, monitor, money market fund, participants, investments, cause of action, allegations, mutual fund, breach of duty, no facts, prudent, expenses, plaintiffs', underperformance, defendants', requires, services, lineup, sufficient to state, plan participant, duty of loyalty, preservation, loyalty, removal, trusts

**Counsel:** **[*1]** For Charles E White, Jr., John P. Jacobs, Verlan D. Hoopes, Nora L. Pennington, James A. Ray, Jeannette A. Finley, individually and as representative of a class of similarly situated persons of the Chevron Employee Savings Investment Plan, Plaintiffs: Jerome J Schlichter, LEAD ATTORNEY, Heather Lea, James Redd, Michael Armin Wolff, Troy Andrew Doles, Schlichter Bogard and Denton, LLP, St. Louis, MO; Jaime G. Touchstone, Jamie L. Dupree, Futterman Dupree Dodd Croley Maier LLP, San Francisco, CA.

For Chevron Corporation, ESIP Investment Committee, Defendants: Brian David Boyle, LEAD ATTORNEY, O'Melveny Myers LLP, Washington, DC; Catalina Joos Vergara, LEAD ATTORNEY, O'Melveny and Myers LLP, Los Angeles, CA; Mark Randall Oppenheimer, LEAD ATTORNEY, OMelveny Myers, Los Angeles, CA.

**Judges:** PHYLLIS J. HAMILTON, United States District Judge.

**Opinion by:** PHYLLIS J. HAMILTON

## Opinion

## ORDER GRANTING MOTION TO DISMISS

Defendants' motion to dismiss the complaint in the above-entitled action pursuant to *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim came on for hearing before this court on June 22, 2016. Plaintiffs appeared by their counsel Heather Lea, Jamie Dupree, Michael Wolff, and James Redd, and defendants appeared by their counsel Catalina **[*2]** Vergara and Sharon Bunzel. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion as follows.

## BACKGROUND

Plaintiffs commenced this proposed class action under the *Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.*, on February 17, 2016. The underlying purpose of ERISA is to "protect the interests of participants in employee benefit plans and their beneficiaries." *Schikore v. Bankamerica Supplemental Retirement Plan, 269 F.3d 956, 963 (9th Cir. 2001)* (citing *29 U.S.C. § 1001(b)*. Plaintiffs allege claims of breach of fiduciary duty under *ERISA § 502(a)*, 29 U.S.C. § 1132(a).

*ERISA § 404(a)(1)* imposes several duties on plan fiduciaries. See *29 U.S.C. § 1104(a)(1)*. "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of administering the plan[,]" and must discharge their duties "solely in the interests of the participants and beneficiaries." See *29 U.S.C. § 1104(a)(1)(A)*. In addition, fiduciaries must use "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise **[*3]** of a like character and with like aims." Id. *§ 1104(a)(1)(B)*.

"These responsibilities imposed by ERISA have the familiar ring of their source in the common law of trusts[,]" *Pegram v. Herdrich, 530 U.S. 211, 224, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000)*, and courts accordingly look to the law of trusts "[i]n determining the contours of an ERISA fiduciary's duty," *Tibble v. Edison Int'l, 135 S.Ct. 1823, 1828, 191 L. Ed. 2d 795 (2015)* ("Tibble II").

Plaintiffs are six participants in the Chevron Employee Savings Investment Plan ("the Plan" or "ESIP Plan"). The purposes of the Plan are to provide eligible employees the opportunity to share in the profits and ownership of Chevron Corporation. ESIP Plan, Exh. D. to Declaration of Catalina J. Vergara ("Vergara Decl."), at 2. Portions of the Plan are intended to qualify as a profitsharing plan under *§ 401(a) of the Internal Revenue Code*, as a qualified cash or deferred arrangement under *§ 401(k)* of the Code, and as a stock bonus and employee stock ownership plan ("ESOP") under *§§ 401(a)* and *4975(e)(7)* of the Code. Id.; see also Complaint ("Cplt") ¶¶ 1-3, 7, 12-17.

As of December 31, 2014, the Plan had more than $19 billion in total assets and over 40,000 participants with account balances. Cplt ¶ 11. Plaintiffs "bring this action . . . on behalf of the Plan against [d]efendants." Cplt ¶ 1; see also Cplt ¶ 3 (plaintiffs seek to "enforce [d]efendants' personal liability under *29 U.S.C. § 1109(a)* to make good to the [*4] Plan all losses resulting from each breach of fiduciary duty and restore to the Plan any profits made through [d]efendants' use of the Plan's assets").

Defendants are Chevron Corporation, the Chevron Investment Committee ("Investment Committee"), and 20 DOEs (collectively, "Chevron" or "defendants"). Cplt ¶¶ 18-23. Chevron Corporation is the Plan Sponsor and Plan Administrator, and is the sole named fiduciary of the Plan, with the authority to control and manage the operation of the Plan. Cplt ¶ 18. The Plan provides that Chevron Corporation may designate one or more actuaries, accountants, or consultants as fiduciaries to carry out its responsibilities under the Plan. Cplt ¶ 19. Any of those duties and responsibilities that have not been delegated are carried out by Chevron Corporation's officers, directors, and employees, including the Investment Committee. See Cplt ¶ 5.

The Investment Committee is comprised of representatives from Chevron Corporation's Treasury Department. See November 2015 Investment Policy Statement ("IPS"), Exh. J to Vergara Decl., at 3. The Investment Committee is responsible for establishing and maintaining the Plan's IPS, which defines the Plan's investment objectives, [*5] and provides criteria for selecting, monitoring, and removing the Plan's investment options. Cplt ¶ 20; see Exh. J to Vergara

Decl., at 1. The members of the Investment Committee are the General Manager of Benefit Plan Investments, the Manager of Reporting and Control, and the Investment Strategist from Chevron Corporation's Treasury Department. Cplt ¶ 20; Exh. J to Vergara Decl. at 3. Plaintiffs allege that while the Investment Committee is not named a fiduciary in the Plan document, it is a fiduciary to the Plan under *29 U.S.C. § 1002(21)(A)* because it has and exercises discretionary authority and control over the administration of Plan investments and investment-related expenses. Cplt ¶ 21.

As alleged in the complaint, Chevron Corporation through the Investment Committee determined the Plan participants' investment options. Cplt ¶ 25. During the proposed class period, which began on February 17, 2010, the Plan offered a variety of options in which participants could invest their retirement assets. As of December 31, 2014, participants had a choice of 12 Vanguard mutual funds, 12 Vanguard collective trust target date funds, a Vanguard money market fund, 3 non-Vanguard mutual funds, a Dodge & Cox fixed income [*6] separate account, a State Street collective trust, and a Chevron common stock fund. See Cplt ¶ 26. Participants could also allocate funds in their accounts among investments made through a brokerage option. See Exhs. E-I to Vergara Decl.

Plaintiffs assert that defendants breached their duties of loyalty and prudence in choosing some of these investment options. Specifically, they allege that defendants breached their duties of loyalty and prudence by providing participants with a money market fund as a capital preservation option, instead of offering them a stable value fund; by providing "retail" investment options that charged higher management fees than lower-cost "institutional" versions of the same investments; by providing mutual funds that charged higher management fees than other lower-cost investment options such as collective trusts and separate accounts; by failing to put Plan administrative services out for competitive bidding on a regular basis, and instead paying excessive administrative fees to Vanguard as recordkeeper through revenue sharing from Plan investment options; and by retaining the Artisan Small Cap Value Fund (ARTVX) as an investment option despite its underperformance [*7] compared to its benchmark, peer group, and lower-cost investment alternatives. Plaintiffs also allege that Chevron Corporation breached its fiduciary duty by failing to monitor its appointees' performance and fiduciary process, failing to ensure that the appointees had a fiduciary process in place, and failing to remove appointees whose performance was inadequate.

The gist of the complaint is that the value of the proposed class members' retirement accounts would have been greater

had defendants chosen alternative funds or investment options with either higher returns or lower administrative and management fees (or both), and that based on the alleged breaches of fiduciary duty, defendants are personally liable to make good to the Plan any losses resulting from their failure to choose investment options with higher returns and/or lower fees.

The complaint asserts five causes of action. These are (1) a claim of breach of the duties of loyalty and prudence, and violation of the IPS, in connection with defendants' selection of a money market fund instead of a "stable value fund;" (2) a claim of breach of the duties of loyalty and prudence, based on unreasonable investment management fees; [*8] (3) a claim of breach of the duties of loyalty and prudence, based on excessive administrative fees charged by the Vanguard Group, Inc., designated the Plan's recordkeeper; (4) a claim of breach of the duties of loyalty and prudence, and violation of IPS, based on alleged delay in removing the ARTVX Fund from the investment menu; and (5) a claim of breach of fiduciary duty based on Chevron Corporation's alleged failure to monitor fiduciaries. See Cplt ¶¶ 113-135.

Defendants now seek an order dismissing the complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim.

**DISCUSSION**

A. Legal Standard

A motion to dismiss under *Rule 12(b)(6)* tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003)*. Under the minimal notice pleading requirements of *Federal Rule of Civil Procedure 8*, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," *Fed. R. Civ. P. 8(a)(2)*, a complaint may be dismissed under *Rule 12(b)(6)* if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. *Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013)*.

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual allegations, [*9] need not be accepted. *Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; see also *In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008)*. The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (citations and quotations omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678* (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Id. at 679*. Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. *Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005)*.

Review is generally limited to the contents of the complaint, although the court can also consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the document. See *Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007)*. Thus, the court may consider matters that are properly the subject of judicial notice, *Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005)*; *Lee v. City of L.A., 250 F.3d 668, 688-89 (9th Cir. 2001)*, and may also consider exhibits attached to the complaint, see *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989)*, and documents referenced extensively in the complaint and documents [*10] that form the basis of a the plaintiff's claims. See *No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003)*.

B. Defendants' Motion

Defendants argue that the duty of loyalty claims must be dismissed because plaintiffs allege no facts from which disloyalty can be inferred; that there is no requirement that an ERISA plan offer a stable value fund, and that plaintiffs plead no facts showing that inclusion of the money market fund was imprudent; that plaintiffs plead no facts showing that the Plan fiduciaries were imprudent in their selection of the remaining investment options; that plaintiffs do not plausibly allege any imprudence in the Plan's revenue-sharing arrangement with Vanguard; that there was no imprudence in the timing of the removal of the ARTVX Fund; and that the monitoring claim fails.

1. Claims of breach of duty of loyalty

In the first through fourth causes of action, plaintiffs allege that defendants breached their fiduciary duties of "loyalty and prudence." See Cplt ¶¶ 114, 118, 122, 126. Defendants argue that the claims of breach of loyalty must be dismissed because plaintiffs allege no facts from which disloyalty can be inferred.

As noted above, ERISA imposes on plan fiduciaries an

obligation to act "solely in the interest of [*11] the participants and beneficiaries" and "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." *29 U.S.C. § 1104(a)(1)(A)*. This requires that plan fiduciaries make decisions "with an eye single to the interests of the participants and fiduciaries." See *Donovan v. Bierwirth, 680 F.2d 263, 271 (2nd Cir. 1982)*, quoted in *Pegram, 530 U.S. at 235*. Here, defendants assert, the complaint fails to allege facts sufficient to create a plausible inference that the Plan fiduciaries discharged their duties with anything other than complete loyalty as required by *§ 1104(a)(1)(A)*.

Defendants contend that the allegations regarding defendants' selection of a money market fund instead of a stable value fund (first cause of action), regarding the Plan's administrative and investment-management expenses (second and third causes of action), and regarding the replacement of the ARTVX Fund (fourth cause of action) are "prudence" challenges, with no facts pled showing that defendants acted in the interest of anyone other than the Plan participants and beneficiaries, much less that they acted in the interest of Chevron or other Plan fiduciaries. In short, defendants assert, plaintiffs cannot proceed with a claim of disloyalty simply by virtue of having attached a "disloyalty" label [*12] to the complaint.

In opposition, plaintiffs assert that the duty of loyalty is not limited to a prohibition against self-dealing, but rather that it also includes a duty to cause the Plan to incur only reasonable expenses. They contend that the complaint alleges facts showing that defendants caused the Plan to incur unreasonable expenses for management and administrative services, thereby asserting breach of the duty of loyalty.

The court finds that the claims alleging breach of the duty of loyalty must be dismissed. Plaintiffs cite no authority in support of the proposition that causing an ERISA Plan to incur unreasonable expenses is a breach of the duty of loyalty, distinct from a breach of the duty of prudence. Nor does the complaint include such an assertion. The complaint simply alleges that defendants violated the "duties of loyalty and prudence" by offering a money market fund instead of a stable value fund, by offering higher-cost funds rather than less expensive funds, and by retaining the ARTVX Fund notwithstanding its underperformance. See Cplt ¶¶ 114, 118, 122, 126.

Although *ERISA § 404(a)(1)* does not use the terms "duty of prudence" and "duty of loyalty," the statute does differentiate between [*13] the two, as set forth in *29 U.S.C. § 1104(a)(1), subparts (A)* and *(B)*. Because the law of trusts is relevant to "determining the contours of an ERISA fiduciary's duty,"

*Tibble II, 135 S.Ct. at 1828*, the definition in the Restatement, Third, of Trusts is instructive, with regard to the duty of loyalty:

> (1) Except as otherwise provided in the terms of the trust, a trustee has a duty to administer the trust solely in the interest of the beneficiaries, or solely in furtherance of its charitable purpose.
> (2) Except in discrete circumstances, the trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests.
> (3) Whether acting in a fiduciary or personal capacity, a trustee has a duty in dealing with a beneficiary to deal fairly and to communicate to the beneficiary all material facts the trustee knows or should know in connection with the matter.

*Restatement (Third) of Trusts § 78* (2007).

Here, the complaint pleads no facts sufficient to raise a plausible inference that defendants took any of the actions alleged for the purpose of benefitting themselves or a third-party entity with connections to Chevron Corporation, at the expense of the Plan [*14] participants, or that they acted under any actual or perceived conflict of interest in administering the Plan. Instead, plaintiffs simply allege in the first through fourth causes of action that "Chevron breached its duties of loyalty and prudence" under *§ 1104(a)(1)(A)* & *(B)*. See Cplt ¶¶ 114, 118, 122, 126.

Nor do plaintiffs in their opposition point to any facts suggesting that the Plan fiduciaries engaged in self-dealing or failed to act "solely in the interest" of the Plan's participants, or identify any facts plaintiffs could add to state a claim for breach of the duty of loyalty. Because the complaint does not differentiate between breach of the duty of prudence and breach of the duty of loyalty, and includes no separate allegations to support the duty of loyalty claim, the court finds the allegations in the complaint insufficient to sustain the disloyalty claim. See *Romero v. Nokia, 2013 U.S. Dist. LEXIS 149166, 2013 WL 5692324 at *5 (N.D. Cal. Oct. 15, 2013)*.

2. Claims of breach of duty of prudence

ERISA imposes on fiduciaries a duty to act prudently "under the circumstances then prevailing." *29 U.S.C. § 1104(a)(1)(B)*; see also *Tibble II, 135 .S.Ct at 1828* (citing *Fifth Third Bancorp v. Dudenhoeffer, 134 S.Ct. 2459, 189 L. Ed. 2d 457 (2014))*. This standard "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and [*15] determine the merits of a particular investment." *Pension Benefit Guar.*

*Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt., 712 F.3d 705, 716 (2nd Cir. 2012)* (citation and quotation omitted).

Plaintiffs allege that defendants breached the duty of prudence in four ways — by failing to offer Plan participants the option of investing in a stable value fund in place of (or in addition to) a money market fund; by providing funds with unreasonably high management fees; by entering into a revenue-sharing agreement with Vanguard, designated as the Plan's recordkeeper, which caused the Plan to incur unreasonably high administrative fees; and by unduly delaying in removing the ARTVX Fund as an investment option. See Cplt ¶¶ 27-99.

a. Claim alleging failure to offer stable value fund

In the first cause of action, plaintiffs challenge defendants' choice of a money market fund to serve as the Plan's capital conservation option, asserting that this choice was imprudent and also violated the Plan's IPS, and that defendants should have provided a stable value fund as an investment option. See Cplt ¶¶ 27-38, 114.[1] Both money market funds and stable value funds are considered conservative investments, in that they emphasize capital preservation rather than maximization of returns. See *Tibble v. Edison Int'l*, 729 F.3d 1110, 1136 (9th Cir. 2013) ("Tibble I") (noting conservative [*16] objectives of short-term investment funds — similar to traditional money market funds — and stable value funds), vacated on other grounds, *135 S.Ct. 1823, 191 L. Ed. 2d 795 (2015)*.

Among the duties ascribed to the Investment Committee by the IPS is the duty of "understanding the risk and return characteristics of each investment option" presented in the Plan. IPS, Exh. J to Vergara Decl. at 3. The "investment objectives" stated in the IPS include "offer[ing] a variety of funds (investment options) that allow Members and Beneficiaries to construct an efficient investment portfolio across a broad risk/return spectrum to achieve their own investment goals, time horizons and risk tolerances" including the provision that "[a]t least one fund will provide for a high [*17] degree of safety and capital appreciation." Cplt ¶

---

[1] According to the complaint, a stable value fund consists of a pool of fixed-income securities (primarily bonds) that is managed by a group of insurance companies and/or banks that provide a guaranty of principal and accrued interest and a steady, relatively high income stream. See Cplt ¶¶ 27-28 (citing *Abbott v. Lockheed Martin Corp., 725 F.3d 803, 806 (7th Cir. 2013)*; Paul J. Donahue, Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market, *39 Akron L. Rev. 9, 20-22, 24 (2006)*).

31; Exh. J to Vergara Decl. at 5. The IPS also describes nine "investment categories and options" selected by the Committee, which includes "short-term investment(s)" that "provide [m]embers and [b]eneficiaries with investment options that seek maximum current income that are consistent with preservation of capital and liquidity." Exh. J to Vergara Decl. at 5-6.

Although neither ERISA nor the IPS mandates inclusion of a stable value fund, plaintiffs strongly suggest that defined contribution plans are required to offer stable value funds as capital preservation options. See Cplt ¶ 31 (stable value funds meet the fiduciary standards set forth in *29 U.S.C. § 1104(a)(1)* and the IPS, and "[m]oney market funds do not, because they provide a minimal return and no guaranteed interest rate"); Cplt ¶ 32 (despite requirements of IPS, "Chevron failed to offer a stable value fund that would have provided participants the 'maximum current income' while preserving capital and liquidity without any greater increase in risk compared to money market investments"); id. (standards set forth in IPS "are the standards applicable to a loyal and prudent fiduciary under ERISA's fiduciary standards" and "[s]table value [*18] funds meet these requirements . . . and the IPS's standards of a loyal and prudent fiduciary").

Defendants contend that the first cause of action must be dismissed for failure to state a claim because ERISA does not require employee benefit plans to offer a stable value fund. Defendants contend that notwithstanding that the chosen money market fund succeeded in preserving invested principal and providing returns on the principal consistent with short-term interest rates, plaintiffs are now alleging, in hindsight, that a stable value fund would have delivered higher returns during the alleged class period, and that the relatively modest returns they received from the money market fund option did not justify its use in a 401(k) plan.

Defendants assert, however, that the Ninth Circuit in Tibble I rejected the contention that "it was imprudent for [a plan fiduciary] to include a short-term investment fund" - akin to a money market fund - "rather than a stable value fund" in a 401(k) plan lineup. See id., *729 F.3d at 1136*. Defendants also point to the Seventh Circuit's decision in *Hecker v. Deere & Co., 556 F.3d 575 (7th Cir. 2009)*, where the court found that "nothing in [ERISA] requires plan fiduciaries to include any particular mix of investment vehicles [*19] in their plan." *Id. at 586*.

Defendants argue that in Tibble I, as here, the plaintiffs attempted to establish the imprudence of the fiduciaries' investment choice based on hindsight outcomes. The Ninth Circuit's response was that in evaluating the prudence of an

investment decision, "the primary question is whether the fiduciaries, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Id.*, 729 F.3d at 1136 (citing Cal. *Ironworkers Field Pension Tr. v. Loomis Sayles & Co., 259 F.3d 1036, 1043 (9th Cir. 2001))*. Because evidence in that case showed that the investment team discussed "the pros and cons of a stable-value alternative" before opting for a short-term investment fund alternative, the plaintiffs' fiduciary breach claim failed. Id.

Here, defendants assert, plaintiffs make the conclusory assertions that in monitoring the Plan investments, "Chevron failed to weigh the benefits of a stable value fund compared to the Vanguard Prime Money Market Fund or come to a reasoned decision as to why providing the Vanguard Prime Money Market Fund was in compliance with the IPS, . . . and . . . failed to remove the imprudent Vanguard Prime Money Market Fund as a Plan investment option." Cplt ¶ 37. However, [*20] defendants argue, plaintiffs plead no facts sufficient to show that the fiduciaries did not use reasoned decision-making to select a money market option instead of a stable value option. They contend that plaintiffs are in essence asking this court to infer an imprudent process from the decision itself.

In opposition, plaintiffs assert that the complaint alleges facts sufficient to state a claim of breach of the duty of prudence in connection with defendants' choice of a money market fund over a stable value fund. They argue that while stable value funds and money market funds both have the objective of preserving capital, stable value funds provide a relatively stable rate of return that generally exceeds the returns provided by money market funds. Plaintiffs also contend that stable value funds are not available to common retail investors, but are instead designed for large retirement plans to provide liquidity and preservation of capital similar to money market funds but with greater income. Consequently, they contend, a majority of large 401(k) plans offer a stable value fund as an investment option.

Plaintiffs point to allegations that instead of providing participants a stable [*21] value fund as the Plan's low-risk, liquid investment, defendants provided the Vanguard Prime Money Market Fund, initially in the higher-cost Investor class and then, as of April 2012, in the lower-cost Institutional class. See Cplt ¶ 33. They assert that in the past six years this money market fund provided low annual return (0.04% - 0.07%), which did not even beat the rate of inflation, even though a stable value fund could potentially have returned considerably more (1.32%-3.12%). See Cplt ¶¶ 34-35. Plaintiffs agree that the IPS does not mandate a stable value

fund, but they argue that because it does mandate "maximum current income . . . consistent with preservation of capital and liquidity," a prudent fiduciary would necessarily have either provided a stable value fund or come to a reasoned decision as to why a lower-yielding but no safer money market fund is and remains a prudent option for the Plan.

Plaintiffs contend that they are not alleging in the first cause of action that the act of providing a money market fund was in itself a breach of fiduciary duty, but rather that the returns on stable value funds are higher, and that money market funds are not necessarily "risk-free." [*22] For example, plaintiffs assert, stable value funds weathered the 2008 financial crisis better than money market funds did. Plaintiffs argue that in view of the Plan's large asset level (over $19 billion) and access to a stable value fund designed specifically for the Plan and the apparent superiority of stable value funds to money market funds in terms of risk of loss, liquidity, and income, it is "beyond plausible" that defendants did not balance those factors or come to a reasoned decision for their actions in the past six years.

The court finds that the complaint does not allege sufficient facts to show a breach of the duty of prudence in connection with defendants' selection of the money market fund as the "capital preservation option." Offering a money market fund as one of an array of mainstream investment options along the risk/reward spectrum more than satisfied the Plan fiduciaries' duty of prudence. See *Loomis v. Exelon, 658 F.3d 667, 673-74 (7th Cir. 2011)* (dismissing investment lineup challenge, noting that a fiduciary that "offer[s] participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense index funds that track the market, and low-expense, low-risk, modest-return bond [*23] funds . . . has left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this").

The IPS provides that "[a]t least one fund will provide for a high degree of safety and capital preservation," directs that all Plan options must be liquid and daily-valued, and promotes participant flexibility in allocating their accounts. See Vergara Decl., Ex. J (IPS) at 1, 5. The inclusion of a money market option is consistent with the IPS guidance, and plaintiffs' attempt to infer an imprudent process from its offering is therefore implausible.

Plaintiffs concede that neither ERISA nor the IPS required that the Plan include a stable value fund, do not dispute that some defined contribution plans include money market funds, that some include stable value funds, and that some include both money market funds and stable value funds. Nevertheless, they take the position that it was imprudent for

the Plan fiduciaries fail to consider including a stable value fund. However, plaintiffs plead no facts showing that the Plan fiduciaries failed to evaluate whether a stable value fund or some other investment option would provide a higher return and/or failed to evaluate [*24] the relative risks and benefits of money market funds vs. other capital preservation options.

A complaint that lacks allegations relating directly to the methods employed by the ERISA fiduciary may survive a motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed." See *St. Vincent, 712 F.3d at 718* (quotation omitted). No such inference can be made in this case. Under *Iqbal, 556 U.S. at 678*, the plausibility standard asks for more than a sheer "possibility" that a defendant has acted unlawfully. Without some facts that raise an inference of imprudence in the selection of the money market fund — apart from the fact that stable value funds may provide a somewhat higher return than money market funds — plaintiffs have failed to state a claim.

Finally, plaintiffs' focus on the relative performance of stable value and money market funds over the last six years is an improper hindsight-based challenge to the Plan fiduciaries' investment decision-making. A fiduciary's actions are judged "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." *St. Vincent, 712 F.3d at 716*; see also *DeBruyne v. Equitable Life Assurance Soc'y of U.S., 920 F.2d 457, 465 (7th Cir. 1990)* (ERISA "requires [*25] prudence, not prescience") (quotation omitted).

b. Claim asserting that defendants provided funds with excessive management fees

In the second cause of action, plaintiffs assert that defendants imprudently provided Plan participants with investment options in the form of funds that charged unreasonable management fees. Cplt ¶¶ 39-77, 117-120. This cause of action challenges the defendants' decisions with regard to the selection and maintenance of the Plan's mix and range of investment options.

Plaintiffs allege (1) that the fiduciaries imprudently chose to offer certain retail-class shares of mutual funds (both Vanguard and non-Vanguard) when cheaper institutional-class shares were available, see Cplt ¶¶ 44-55; (2) that the fiduciaries imprudently included a few non-Vanguard funds in the mix when they could have offered a cheaper, all-Vanguard lineup, see Cplt ¶¶ 56-59; and (3) that the fiduciaries chose to offer mutual funds (with excessive fees) when they could have reduced investment management expenses by using alternative investments structured as separate accounts or collective trusts, see Cplt ¶¶ 60-77.

Defendants argue that the second cause of action must be dismissed because plaintiffs [*26] have pled no facts sufficient to state a claim that the Plan fiduciaries were imprudent in their selection of the Plan's investment options. First, defendants contend that the fiduciaries' choice of retail-class mutual funds — instead of institutional funds — was not improper, as a fiduciary is not required to offer only wholesale or institutional funds, and indeed, retail-class funds can have advantages over their institutional-class counterparts.

Moreover, defendants assert, plaintiffs have alleged that several institutional class funds were included in the Plan lineup in 2010, see, e.g., Cplt ¶ 47 (showing several institutional-class Vanguard funds in the Plan); Cplt ¶ 53 ("Chevron provided the lowest-cost share class of the American Funds EuroPacific Growth Fund since February 2010"); and that the fiduciaries continuously re-evaluated whether to switch to cheaper institutional share classes, see, e.g., Cplt ¶ 48 ("Chevron moved to lower-cost share classes for the Vanguard mutual funds in 2012"), or to eliminate higher-fee funds altogether, see, e.g., Cplt ¶¶ 49-51.

Second, defendants assert that the facts pled in the complaint do not show that the fiduciaries acted imprudently in [*27] offering non-Vanguard funds to complement the lineup's array of Vanguard options, even though the fees for the Vanguard funds might have been higher. Defendants contend that fiduciaries have latitude to value investment features other than price (and indeed, are required to do so).

Third, defendants contend that it was not imprudent for the Plan fiduciaries to include mutual funds on the Plan lineup, rather than structuring the investments as separate accounts and collective trusts. Defendants argue that plaintiffs' theory has been rejected by the Ninth Circuit, see *Tibble I, 729 F.3d at 1134-35*, and the Seventh Circuit, see *Hecker, 556 F.3d at 586*, and *Loomis, 658 F.3d at 671-72*.

In opposition, plaintiffs argue that the facts alleged show that because the Plan had over $19 billion in assets, it had substantial bargaining power to demand low fees for investment management services, but that rather than using the Plan's bargaining power, defendants provided Plan investment options with far higher expenses than institutional investment vehicles that plaintiffs claim were readily available based on the Plan's size.

Second, plaintiffs contend that the complaint alleges facts sufficient to state a claim that defendants breached the duty of prudence by providing Plan [*28] participants with fund options (both Vanguard and non-Vanguard) with excessive management fees.

Third, plaintiffs argue that the facts alleged show that defendants could have offered separately managed accounts that would have provided numerous benefits to Plan participants over retail mutual funds, and could have negotiated with the investment advisers of the Plan's five actively managed mutual funds for separate account management at an even lower cost than those advisers' lowest mutual fund fees. However, plaintiffs assert, "[t]hey apparently did not even try."

Plaintiffs assert further that defendants provided participants with an S&P 500® index investment in a Vanguard mutual fund even though they could have opted for the same investment in a lower-cost Vanguard collective trust; and that the target retirement date asset allocation investments that were offered in a collective trust could have been offered in a lower-cost version. Again, plaintiffs assert, "[d]efendants apparently never inquired about these lower cost options, and have provided no reasonable basis for rejecting them."

Based on the above, plaintiffs argue that the second cause of action states a valid claim of breach of the duty [*29] of prudence. Plaintiffs contend that merely by offering an "array" of investment options, with a range of fees, fiduciaries do not become immune from claims of breach as to particular instruments, and argue that Hecker, Loomis, and Renfro do not stand for that proposition. Instead, plaintiffs assert, those courts carefully limited their decisions to the facts presented. For example, plaintiffs argue, Hecker held that the plaintiffs in that case never alleged that any of the 26 investment alternatives offered through the 401(k) plan at issue was unsound or reckless.

Plaintiffs argue that unlike Hecker, where the court noted that "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)," id., 556 F.3d at 586, the complaint in the present case does not assert that all retail mutual funds are imprudent per se and does not vaguely allege that some other alternative might have been cheaper but plagued by other problems. Instead, plaintiffs contend, their position is that defendants could have provided the exact same investment at a lower cost — either through cheaper share classes, collective trusts, or separate [*30] accounts, or by hiring the same mutual fund advisers. Plaintiffs assert that these preferred alternatives are "readily available to attentive, loyal, and prudent fiduciaries knowledgeable in this area and the exact same investment option could not be plagued by other problems."

Plaintiffs contend that as for defendants' assertion that they satisfied their duties by investing in Vanguard mutual funds — given that Vanguard is recognized as a leader in providing

low-cost mutual funds — defendants have ignored the fact that Vanguard provided different versions of the exact same investment, and that the versions differed based on cost and who could invest in them. Plaintiffs' contention is that defendants provided the more expensive version, even though this $19 billion Plan was "qualified" for the least expensive version.

As with other arguments regarding the claims of breach of the duty of prudence, plaintiffs cite Tussey v. ABB, Inc., 746 F.3d 327 (8th Cir. 2014) and Braden v. Wal-Mart Stores, Inc., 588 F.3d 585 (8th Cir. 2009), for the proposition that factual disputes cannot be resolved on a 12(b)(6) motion to dismiss. See Tussey, 746 F.3d at 336 (the question whether an ERISA fiduciary breached its duties is "inevitably fact intensive"); Braden, 588 F.3d at 596-98 (court cannot expect plaintiffs to plead specific facts about defendants' fiduciary [*31] processes because those facts are not disclosed and tend to be in the sole possession of defendants). Accordingly, plaintiffs assert, dismissal of claims of breach of fiduciary duty is rarely appropriate in the absence of a factual record.

The court finds that the second cause of action fails to state a claim. In order to withstand a motion to dismiss, the complaint must allege facts sufficient to give rise to a "reasonable inference" that the Plan fiduciaries engaged in conduct constituting a breach of fiduciary duty. See St. Vincent, 712 F.3d at 718-19. While the court is required, for purposes of this motion, to take the factual allegations in the complaint as true, the court is not "bound to accept as true a legal conclusion couched as a factual allegation." See Iqbal, 556 U.S. at 678. That is, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79. Only a complaint that pleads sufficient facts to state a plausible claim for relief will survive a motion to dismiss. See id.

Fiduciaries have latitude to value investment features other than price (and indeed, are required to do so), as recognized by the courts. See Hecker, 556 F.3d at 586; Loomis, 658 F.3d at 670; Renfro v. Unisys Corp., 671 F.3d 314, 326-27 (3rd Cir. 2011). In particular, where, as here, a plan offers a diversified array of investment [*32] options, the fact that some other funds might offer lower expense ratios is not relevant, as ERISA does not require fiduciaries to "scour the market to find and offer the cheapest possible funds (which might, of course, be plagued by other problems)." Hecker, 556 F.3d at 586, quoted in Loomis, 658 F.3d at 670; see also Tibble I, 729 F.3d at 1135.

Courts have dismissed claims that fiduciaries are required to offer institutional-class over retail-class funds, and claims that fiduciaries were imprudent in failing to offer cheaper funds.

For example, in Tibble I, the Ninth Circuit noted while it is true that retail-class mutual funds generally have higher expense ratios than their institutional-class counterparts, largely because the amount of assets invested in institutional-class funds is far greater than that associated with the typical individual investor, that does not mean that a fiduciary should offer only institutional-class funds. "There are simply too many relevant considerations for a fiduciary, for that type of bright-line approach to prudence be tenable." Id., 729 F.3d at 1135 (noting that a fiduciary might choose funds with higher fees for a number of reasons, including potential for higher return, lower financial risk, more services offered, or greater management [*33] flexibility).

In Hecker, the Seventh Circuit found "nothing in the statute that requires plan fiduciaries to include any particular mix of investment vehicles in their plan," and rejected the argument that a plan administrator is required to offer only institutional-class funds, noting that retail-class funds, being open to the public, give participants the benefits of competition. Id., 556 F.3d at 586. In Loomis, the Seventh Circuit repeated this point, explaining that because retail funds are offered to investors in the general public, their expense ratios are necessarily set against the backdrop of market competition, which benefits participants; in addition, they are highly liquid, unlike institutional vehicles. Id., 658 F.3d at 670-72, cited in Tibble I, 729 F.3d at 1134. The court added that "[a] pension plan that directs participants into privately held trusts or commingled pools . . . lacks the market-to-market benchmark provided by a retail mutual fund." Id., 658 F.3d at 670-72. Thus, the retail-versus-institutional-share-class claim must be dismissed. See Iqbal, 556 U.S. at 678; see also Renfro, 671 F.3d at 326-28 (affirming dismissal of a claim "directed exclusively to the fee structure" of a Plan).

Plaintiffs' contention that the Plan fiduciaries should have offered cheaper share classes of the funds actually [*34] included in the Plan's investment lineup is based on the assumption that the mere inclusion of a fund with an expense ratio that is higher than that of the lowest share class violates the duty of prudence. This claim, standing alone, is insufficient to state a claim that fiduciaries imprudently failed to consider lower cost options. Moreover, the allegations in the complaint show that the Plan fiduciaries changed the investment options from year to year. See, e.g., Cplt ¶¶ 49-51, 64-66, 68-69 (identifying funds removed in 2012, 2014, and 2015). This supports the inference that the fiduciaries were monitoring the investment options.

Further, the facts as pled reflect that the Plan fiduciaries provided a diverse mix of investment options and expense ratios for participants. The breadth of investments and range of fees the Plan offered participants fits well within the

spectrum that other courts have held to be reasonable as a matter of law. For example, plaintiffs allege that the Plan's investment options charged fees ranging from .05% to 1.24%. See Cplt ¶¶ 47-55. In Tibble I, 729 F.3d at 1135, the Ninth Circuit affirmed the reasonableness of fees that "varied from .03[%] to 2%." In Loomis, 658 F.3d at 669-72, the Seventh Circuit affirmed [*35] dismissal of an excessive-fee claim where "expense ratios rang[ed] from 0.03% to 0.96%." In Renfro, 671 F.3d at 319, 326-28, the Third Circuit affirmed dismissal of an excessive fee claim where fees "ranged from 0.1% to 1.21%." In Hecker, 556 F.3d at 586, the Seventh Circuit affirmed dismissal of an excessive-fee claim where "[a]t the low end, the expense ratio was .07%; at the high end, it was just over 1%."

As for plaintiffs' citation of Tussey and Braden in support of their assertion that dismissal would be inappropriate, and that they should be permitted to explore whether there was some imprudence in how the fiduciaries selected share classes for the Plan, the court finds that those cases are distinguishable. In both Tussey and Braden - unlike the situation here — the complaint alleged facts supporting the inference that the fiduciaries' process for selecting the fund options was flawed.

For example, in Tussey, the court found "allegations of wrongdoing with respect to fees [sufficient to] state a claim for fiduciary breach" where an outside consulting firm advised the administrator it was overpaying for Plan recordkeeping services and cautioned that the revenue sharing the recordkeeper received under the Plan might have been subsidizing other [*36] corporate services the recordkeeper provided to the administrator. Id., 746 F.3d at 331, 335-36. In Braden, the court found that allegations that the mutual funds paid "kickbacks . . . [to the fund's trustee] in exchange for inclusion of their funds in the Plan," together with allegations that the fund offered only ten retail-class mutual funds despite its large size, were sufficient to state a claim of fiduciary breach. Id., 588 F.3d at 590, 594-95.

By contrast, the conclusory claim asserted by plaintiffs in the present case is more akin to the claims that failed in Loomis, Renfro, and Hecker. Courts can and do consider the total menu of available investment options in assessing whether excessive-fee allegations are plausible. In St. Vincent, the Second Circuit noted that "the prudence of each investment is not assessed in isolation, but, rather, as the investment relates to the portfolio as a whole." Id., 712 F.3d at 717. Similarly, in Renfro, the court held that "the range of investment options and the characteristics of those included options — including the risk profiles, investment strategies, and associated fees — are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's [*37] mix and range of investment

options should be measured." *Id., 671 F.3d at 327*); *see also Loomis, 658 F.3d at 673-74* (same); *Hecker, 556 F.3d at 586* (same).

In short, the complaint alleges no facts that are suggestive of imprudent action. While plaintiffs appear to be challenging the entire lineup of funds, the challenge is primarily based on speculation that the Plan fiduciaries "could have" provided lower-cost versions of the funds, or "could have" had the same advisors manage the same funds in a separate account, or "could have" structured the investments differently. It is inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly. In particular, mutual funds have unique regulatory and transparency features, which make any attempt to compare them to investment vehicles such as collective trusts and separate accounts an "apples-to-oranges comparison." See *Tibble I, 729 F.3d at 1134*.

c. Claim alleging imprudent revenue-sharing arrangement with Vanguard

In the third cause of action, plaintiffs allege that defendants imprudently caused the Plan to pay excessive administrative fees to Vanguard (the Plan's recordkeeper), and failed to put Plan administrative services out for competitive bidding on a regular basis. Cplt [*38] ¶¶ 121-124. Plaintiffs assert that because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in participants' accounts, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount per plan participant, rather than as a percentage of plan assets. Cplt ¶¶ 79-80. Plaintiffs contend that a recordkeeper involved in an arrangement providing asset-based fees will thus receive unreasonable compensation, unless the recordkeeper rebates to the plan all revenue-sharing payments that exceed a reasonable per-participant fee. Cplt ¶¶ 81-83.

Plaintiffs also assert that defendants acted imprudently in "fail[ing] to monitor and control" the amount of the fees Vanguard received. Cplt ¶¶ 85, 89. They allege that from February 2010 through March 31, 2012, defendants caused the Plan to compensate Vanguard for recordkeeping services with asset-based revenue sharing of the annual expenses of the Plan's investment options, and that those fees increased through that period as the Plan assets grew from $13 billion to $16 billion (a 22% increase) even though the cost to Vanguard of recordkeeping services did not [*39] significantly change during that time. Cplt ¶ 86. They contend "upon information and belief" that defendants have not conducted a competitive bidding process for the Plan's recordkeeping services within the past six years, thereby imprudently causing the Plan to pay excessive recordkeeping fees, and causing Plan participants to lose "millions of dollars in their retirement savings." Cplt ¶¶ 88-90.

Defendants argue that the third cause of action should be dismissed because the complaint does not plausibly allege that defendants breached the duty of prudence in implementing the Plan's revenue-sharing arrangement with Vanguard. In particular, defendants contend that plaintiffs plead no facts showing the specific amount of fees the Plan paid during this period, and offer no benchmark to establish an amount of fees that would have been reasonable, and that plaintiffs plead no facts showing that defendants' process was flawed.

Instead, defendants assert, plaintiff's claim depends on three primary allegations - (1) that from February 2010 to March 31, 2012, the Investment Committee compensated Vanguard for administrative services exclusively through a share of the asset-based expenses charged [*40] for the Plan's investment options, rather than on a fixed per-participant basis; (2) that the assets in the Plan increased by 22% during this two-year period, leading to an "unreasonable" increase in Vanguard's recordkeeping compensation; and (3) that the Plan fiduciaries failed to solicit bids from alternative service-providers. Defendants argue that each of these theories fails as a matter of law, because ERISA does not condemn a fiduciary's use of a revenue-sharing arrangement to cover recordkeeping costs; because the increase in Plan assets over this two-year period does not support the inference that Vanguard's revenue-sharing payments grew to unreasonable levels; and because ERISA does not require plan fiduciaries to obtain competitive bids from recordkeeping service providers.

In opposition, plaintiffs argue that the complaint pleads sufficient facts to state a claim of breach of the duty of prudence with regard to the recordkeeping fees. As for defendants' suggestion that plaintiffs must specify the exact amount Vanguard received as compensation for its recordkeeping services from all sources, plaintiffs contend that defendants themselves do not state how much Vanguard received [*41] in total compensation, or explain how that compensation was reasonable, and that they also fail to explain how any participant could determine the amount of compensation that was paid, in view of the fact that defendants do not disclose the amount Vanguard receives in revenues sharing from Plan investments. They assert that defendants are seeking the kind "heightened fact pleading of specifics" that is not required even under Twombly.

As for defendants' argument that the revenue-sharing arrangement existed for only the first two years of the proposed class period, plaintiffs concede that the complaint and judicially-noticeable documents show that defendants in fact did switch to lower-cost share classes and did end

revenue sharing by April 2012. Nevertheless, they question why defendants fail to explain why they did not end the arrangement earlier, when (according to plaintiffs) the facts alleged in the complaint suggest that they should have done so. Plaintiffs assert that "these facts plausibly suggest" that defendants simply did not get around to fixing the Plan in this respect until April 2012, which plaintiffs claim is not the conduct of a prudent fiduciary.

Plaintiffs argue that **[*42]** the facts alleged in the complaint plausibly show that defendants allowed Vanguard to take fees it collected from the Plan's investment options and did not monitor that total compensation, much less negotiate a fee based on a fixed, per participant rate, to ensure Vanguard's compensation was and remained reasonable from year to year. Plaintiffs assert that a prudent fiduciary would have put the Plan's recordkeeping services out for competitive bidding on a regular basis and, in doing so, would have significantly lowered Plan expenses and increased participant retirement account balances.

Plaintiffs also argue that defendants' contention that nothing in ERISA requires fiduciaries to solicit bids is "erroneous[ ]." They cite the Seventh Circuit's decision in George in support of the proposition that "prudent fiduciaries engage in a competitive bidding process on a regular basis" to ensure that a plan's recordkeeping fees are reasonable. While they concede that George does not hold that ERISA compels competitive bidding on a regular basis, they argue that George does "recognize" that prudent fiduciaries ordinarily solicit bids for the management of large plans such as this one. Plaintiffs **[*43]** assert further that under Tussey, a failure to monitor plan recordkeeping expenses paid through revenue sharing is a "recognized breach of fiduciary duty." At a minimum, they contend, the third cause of action raises disputed factual issues which cannot be resolved on a *Rule 12(b)(6)* motion.

The court finds that the complaint does not plead facts sufficient to state a plausible claim for breach of the duty of prudence in connection with the recordkeeping fees charged by Vanguard. Essentially, plaintiffs allege that for two years at the beginning of the six-plus-year proposed class period, defendants paid recordkeeping fees using an asset-based revenue-sharing arrangement, and that those fees necessarily exceeded a prudent amount purely because they were asset-based and not based on the number of participants, and because plaintiffs believe that the fiduciaries did not seek competitive bids for the recordkeeping services. See Cplt ¶¶ 79-82, 85-87.

It is plaintiffs' obligation to plead facts that create more than a "sheer possibility that [the Plan fiduciaries] ha[ve] acted unlawfully" to make a plausible claim for relief and to survive a motion to dismiss. See *Iqbal, 556 U.S. at 678*. While the question whether it was imprudent **[*44]** to pay a particular amount of recordkeeping fees does involve questions of fact that cannot be resolved on a *Rule 12(b)(6)* motion, plaintiffs have not alleged facts from which the court can "infer more than the mere possibility of misconduct," and thus have alleged — but have not shown — that they are entitled to relief. See *id. at 679*.

In the absence of any such facts, all that remains is plaintiffs' conclusory assertion that fees under a revenue-sharing arrangement are necessarily excessive and unreasonable. Such a per-se rule is without support. Revenue sharing is a "common" and "acceptable" investment industry practice that "frequently inure[s] to the benefit of ERISA plans." See *Tussey, 746 F.3d at 336*; see also *Hecker, 556 F.3d at 585* (an arrangement whereby 401(k) plan trustee and recordkeeper "recovered its [administrative] costs from the [plan] participants" by "assess[ing] asset-based fees against the various mutual funds," and transferring to itself some of the money collected, "violate[d] no statute or regulation").

Further, the allegation that the Plan's assets grew over the two-year period in which the Plan's administrative services costs were defrayed out of asset-based fees does not, without more, show that this arrangement resulted in unreasonable fees. To the contrary, **[*45]** the fact that the Plan fiduciaries renegotiated the arrangement to specify a per-participant fee after just two years of receiving asset-based revenue-sharing payments for its services, and the fact that during those two years, defendants switched to cheaper share classes for at least four funds, see Cplt ¶ 86; Vergara Decl., Ex. F (2011 IRS Form 5500) at 34; Vergara Decl. Exh. G (2012 Form 5500) at 31, plausibly suggest that defendants were monitoring recordkeeping fees to ensure that they did not become unreasonable.

Finally, the allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation. Indeed, plaintiffs admit that nothing in ERISA compels periodic competitive bidding. As for plaintiffs' contention that the George decision supports such a requirement, the court in George held that the failure to solicit competitive bids might be imprudent where (1) plaintiffs presented concrete evidence about the objective level of fees and why they were unreasonable; and (2) the plan fiduciaries had not renegotiated their recordkeeping arrangement for more than fifteen years. See *George, 641 F.3d at 798-99* (based on evidence adduced in the case, a triable issue **[*46]** of fact existed regarding the prudence of the plan fiduciaries' decision not to solicit competitive bids).

2016 U.S. Dist. LEXIS 115875, *46

Page 12 of 15

George's analysis has no application here, where plaintiffs do not even allege that a competitive bid would have benefitted the Plan or the Plan participants, because they do not allege any facts from which one could infer that the same services were available for less on the market. See, e.g., *Young v. GM Inv. Mgmt. Corp., 325 F. App'x 31, 33 (2nd Cir. 2009)* (plaintiffs did not plausibly allege that the fiduciaries agreed to pay excessive fees where they "fail[ed] to allege that the fees were excessive relative to the services rendered").

In Tussey, which was an appeal following a bench trial in which the district court entered judgment in the plaintiffs' favor, the plaintiffs faulted the plan's fiduciaries for allegedly failing to "adequately leverage the Plan's size to reduce fees" or to assess whether its recordkeeper's "pricing was competitive." The Eighth Circuit affirmed the district court on the recordkeeping claim, finding that the case involved "serious allegations of wrongdoing" - i.e., that the outsized recordkeeping fees were subsidizing costs that would otherwise have been the sponsor's own responsibility — which stated a claim of breach [*47] of the duty of loyalty. *Id., 746 F.3d at 336.*

Here, however, these indicia of imprudence are not present. Plaintiffs have alleged no facts suggesting that the Plan fiduciaries could have obtained less-expensive recordkeeping services. Moreover, in contrast to the facts at issue in George, the Plan fiduciaries did renegotiate their recordkeeping arrangement with Vanguard to limit compensation to annual, per-participant fees. In addition, plaintiffs do not allege any facts showing that those renegotiated fees were unreasonable.

Tussey is even less relevant, because in that case, the evidence presented at trial revealed significant wrongdoing, including that the defendant used revenue sharing to benefit itself and Fidelity (the recordkeeper) at the plan's expense. *Id., 746 F.3d at 335-36.* Here, there are no allegations of wrongdoing or engaging in prohibited transactions.

While plaintiffs allege that the recordkeeping fees paid during the period February 2010 to March 31, 2012, were excessive, there are no facts alleged showing what recordkeeping fees Vanguard charged (so it is not clear on what basis plaintiffs are asserting that the fees were excessive). Plaintiffs do not claim that the Plan fiduciaries were required to disclose [*48] the amount of the recordkeeping fees but failed to do so. More importantly, there are no facts alleged showing that the Plan fiduciaries failed to consider putting the fee structure out for competitive bidding, or failed to negotiate a reasonable fee structure with Vanguard.

d. Claim alleging failure to timely remove low-performing ARTVX Fund

In the fourth cause of action, plaintiffs allege that defendants acted imprudently and violated the IPS by failing to remove the ARTVX Fund as a Plan investment option earlier than they did. Cplt ¶¶ 125-129. Defendants contend that the fourth cause of action should be dismissed because plaintiffs have not pled facts sufficient to state a claim of breach of the duty of prudence in connection with the timing of the removal of the ARTVX Fund.

The ARTVX Fund was provided as a Plan investment option, from February 2010 to April 1, 2014. Cplt ¶ 91. Plaintiffs allege that in addition to imposing an excessive fee structure, the ARTVX Fund significantly underperformed its benchmark and alternatives available to the Plan, such that a prudent fiduciary would have removed it well before defendants did. Cplt ¶¶ 91-99. They assert that ERISA's prudent fiduciary [*49] standards require regular monitoring of the performance of plan investment options, and removal of any fund that persistently underperforms, and that defendants violated those standards. Cplt ¶¶ 92, 98.

Plaintiffs also assert that defendants violated the fund monitoring requirements of the IPS. Cplt ¶ 92. The IPS identifies a number of qualitative and quantitative factors that the Investment Committee considers when selecting and monitoring any investment option. The qualitative factors include "fundamental changes in a fund manager's investment philosophy, organizational structure (e.g., manager tenure), and financial condition (including any significant changes in total assets under management)." The quantitative factors include "adherence to fund objectives, performance, and expenses." See Exh. J to Vergara Decl., at 7

Plaintiffs allege that the ARTVX Fund persistently lagged its benchmark, and ranked in the bottom 2-6%, in four of the previous five years, performing poorly in the Morningstar category rankings in three of the previous four years. See Cplt ¶¶ 93-94. They assert that notwithstanding that underperformance, and the fund's failure to meet the Plan's investment strategy [*50] objectives, defendants failed to remove the fund until March 31, 2014, causing the Plan to suffer over $70 million in losses relative to more prudent alternatives defendants could have provided. Cplt ¶¶ 92, 94, 97-98. Plaintiff's theory is that the ARTVX Fund could and should have been removed prior to April 2014, and that defendants acted imprudently in failing to do so. See Cplt ¶¶ 98-99.

Defendants argue that this cause of action is nothing more than an attempt to second-guess the Plan fiduciaries' balancing of competing interests under conditions of uncertainty, and argue that the mere fact that an investment has performed poorly is insufficient to support a plausible

inference that the fiduciaries failed to monitor the investment. They also contend that the complaint pleads no facts directly addressing faults in the Plan fiduciaries' process, and that to state a claim plaintiffs must allege facts sufficient to permit the court to reasonably infer that there was a breach, which requires more than the mere "possibility" of misconduct. They argue that plaintiffs cannot meet that standard by relying on allegations concerning the magnitude of a decrease in the investment's price or [*51] by alleging — in hindsight — that better opportunities were available.

Defendants note that plaintiffs do not allege that the fiduciaries ignored a fund manager change, or a change in investment philosophy, or some other signal of a problem requiring closer attention, and that they have not referenced any specific monitoring steps that were not followed by the Committee. Instead, defendants assert, plaintiffs' challenge is directed solely at the ARTVX Fund's performance leading up to its eventual removal from the Plan lineup.

Defendants argue, however, that such allegations do not show a process failure — and indeed, the fact that the Plan fiduciaries did ultimately remove the ARTVX Fund supports the opposite inference that they were monitoring the Fund and removed it when they determined it was not, at that time, a suitable option for the Plan. Defendants claim that it is "pure speculation" to say that a meeting or other review by the Investment Committee would or should have resulted in a particular change of course or would otherwise have prevented the consequences of failure to remove the Fund from the Plan lineup.

As for the allegation that Plan participants would have done better [*52] in alternative investments offered by Vanguard that outperformed the ARTVX Fund during the relevant period, see Cplt ¶¶ 94-95, defendants reiterate that ERISA judges fiduciary decision-making as of the time the decisions were made. They argue that plaintiffs have not alleged any facts sufficient to suggest that the Plan fiduciaries could predict that the ARTVX Fund would underperform plaintiffs' preferred alternatives during the period from February 2010 until April 1, 2014, when the fund was removed from the lineup.

Finally, defendants contend that the allegations regarding the ARTVX Fund's performance before 2014, in comparison to the fund's alleged benchmark in one-, three-, and five-year periods leading up to September 30, 2014, see Cplt ¶ 97, say nothing about the information the Plan fiduciaries had at hand when deciding whether to remove the fund in the period before April 1, 2014, when it was dropped from the lineup. They also argue that judicially noticeable performance data shows that the ARTVX Fund did not consistently

underperform its benchmark before it was removed, but rather outperformed it on a long-term trailing basis (citing Vergara Decl., Ex. S (Fund Morningstar Performance [*53] Charts)). Accordingly, defendants contend, the fiduciaries' choice not to remove the fund based on short-term underperformance was consistent with a focus on long-term performance, which defendants contend was a rational philosophy for retirement plans, with their "longer investment horizons."

In opposition, plaintiffs contend that the complaint pleads sufficient facts to state a viable claim of breach of the duty of prudence with regard to the timing of the removal of the ARTVX Fund. They assert that an examination of the "terrible performance" of the ARTVX Fund would have led a prudent fiduciary to remove it earlier than defendants did. Plaintiffs argue that defendants have identified no facts that justify their waiting until April 2014 to remove the ARTVX Fund from the Plan options, despite its drastically poor performance in 4 of the 5 preceding years.

Plaintiffs also criticize defendants for citing in their moving papers only to the "qualitative factors" listed in the IPS, asserting that the IPS also lists "quantitative factors," including the 1-, 3-, and 5-year performance relative to benchmark, which the fiduciaries were also required to consider, but which (according to plaintiffs) [*54] "[d]efendants evidently did not do here." And, plaintiffs argue, even if defendants had identified any "facts" justifying the delay in removing the Fund, that would only raise a factual issue which cannot be decided in a *Rule 12(b)(6)* motion.

Plaintiffs contend that they are not asserting that the ARTVX Fund was an imprudent choice merely because it lost value, but rather, that it should have been removed well before 2014, based on consistent underperformance. They argue that defendants have provided no explanation for taking 2 years to decide to remove the ARTVX Fund, or even describe when they noticed the fund's underperformance or what actions they took in light of that underperformance. Plaintiffs assert that all defendants have done is to show the possibility that they engaged in some process at some time that ultimately led to the removal of this fund in April 2014. They claim that such a showing does not establish the propriety of their inaction before that time. At best, they assert, it raises only a factual dispute.

The court finds that complaint does not plead facts sufficient to state a claim with regard to the timing of the removal of the ARTVX Fund. Rather, the allegations create a plausible inference [*55] that the Plan fiduciaries were attentively monitoring the fund, as they removed the fund in April 2014, and did so while it was still outperforming its benchmark on a

long-term trailing basis. Further, plaintiffs' characterization of the fund's performance includes a substantial period after defendants had removed the fund, and plaintiffs themselves now appear to recognize that the period of "consistent" underperformance did not begin until "around 2012."

Poor performance, standing alone, is not sufficient to create a reasonable inference that plan administrators failed to conduct an adequate investigation — either when the investment was selected or as its underperformance emerged — as ERISA requires a plaintiff to plead some other objective indicia of imprudence. See *St. Vincent, 712 F.3d at 718-19*; *DeBruyne, 920 F.2d at 465*. Indeed, a fiduciary may — and often does — retain investments through a period of underperformance as part of a long-range investment strategy. See *Jenkins v. Yager, 444 F.3d 916, 926 (7th Cir. 2006)* (defendant did not breach fiduciary duties by retaining the same mutual funds in 401(k) plan lineup even though those funds lost money over a three-year period, as it can be reasonable "to stay with . . . mutual funds even during years of lower performance"). The Plan **[*56]** fiduciaries plainly engaged in a process for removal of the ARTVX Fund. It is not part of defendants' burden to confirm what the process involved. The mere fact that the fund's price dropped is not sufficient to state a claim for breach of fiduciary duty.

As for plaintiffs' assertion that Plan participants would have done better in alternative investments offered by Vanguard that outperformed the ARTVX Fund during the relevant period, ERISA judges fiduciary decision-making as of the time the decisions were made. See *29 U.S.C. § 1104(a)(1)(B)* (fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing"); *St. Vincent, 712 F.3d at 716* ("we judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight"); *DeBruyne, 920 F.2d at 465* (allegation that a fund lost money when it did not "follow[] the crowd" does not show a breach of the duty, which requires only "prudence, not prescience"). Plaintiffs have not alleged any facts sufficient to suggest that the Plan fiduciaries could predict that the ARTVX Fund would underperform plaintiffs' preferred alternatives during the period from February 2010 until April 1, 2014, when the **[*57]** Fund was removed from the lineup.

3. Claim alleging breach of the duty to monitor

In the fifth cause of action, plaintiffs allege that Chevron Corporation breached its fiduciary duty to monitor appointees to whom it delegated fiduciary responsibility - "to the extent that any of Chevron Corporation's fiduciary responsibilities were delegated to another fiduciary." See Cplt ¶¶ 130-135. Defendants contend that the fifth cause of action fails because it is derivative of the first through fourth causes of action, none of which pleads facts sufficient to state a plausible claim.

Defendants also argue that the fifth cause of action would fail even if any of the other claims survived, because a monitoring claim requires a threshold showing that the monitoring fiduciary failed to "review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards." See *In re Calpine Corp., 2005 U.S. Dist. LEXIS 9719, 2005 WL 1431506 at *6 (N.D. Cal. Mar. 31, 2005)*. Defendants assert that there are no such allegations here, and that plaintiffs have indeed pled no facts at all about the monitoring process, or how it was supposedly deficient.

In opposition, plaintiffs argue that because the claims **[*58]** under the first through fourth causes of action are sufficient to state a claim, the claim of failure to properly monitor the fiduciaries alleged to have committed those breaches also survives dismissal. Plaintiffs add that as with their other claims, they "lack the inside information necessary for them to plead specifically how [d]efendants monitored fiduciaries they appointed or were responsible for," and thus, plaintiffs argue, they "cannot be expected to plead those facts as a condition to surviving dismissal."

The court finds that plaintiffs have not alleged facts sufficient to state a claim of "failure to monitor." A fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments at the outset." *Tibble II, 135 S.Ct. at 1828*; see also *Rest. (Third) of Trusts § 90, Comment b*, p. 295 (2007). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble II, 135 S.Ct. at 1828-29*.

The allegation that Chevron Corporation had a duty to monitor its appointees "[t]o the extent that any of [Chevron's] fiduciary responsibilities were delegated to another fiduciary," suggests **[*59]** that plaintiffs do not know whether Chevron Corporation in fact delegated its fiduciary duties or to whom. Moreover, the fifth cause of action does not specify which "appointees" or "other fiduciaries" Chevron Corporation failed to monitor.

The complaint asserts that Chevron Corporation is the sole named fiduciary of the Plan, and also alleges that under § 14.5 of the Plan, Chevron Corporation "may designate one or more actuaries, accountants, or consultants as fiduciaries to carry out its responsibilities under the Plan." Cplt ¶¶ 18, 19. However, the complaint also alleges that "[t]he duties and responsibilities of Chevron Corporation under the Plan that

have not been delegated are carried out by its directors, officers and employees, including the Chevron Investment Committee, acting on behalf of and in the name of Chevron Corporation and not as individual fiduciaries." Cplt ¶ 19. In view of this lack of clarity, the court finds that the fifth cause of action (and related factual allegations) does not provide "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Fed. R. Civ. P. 8(a)*.

In addition, plaintiffs allege no facts showing how the monitoring process was deficient. They **[*60]** assert that Chevron Corporation breached its duty to monitor (a) by "failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so," and by "standing idly by as the Plan suffered enormous losses" as a result of the imprudent actions and omissions of the appointees; (b) by "failing to monitor its appointees' fiduciary process[;]" (c) by failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive[;]" (d) by "failing to ensure that the monitored fiduciaries considered the ready availability of comparable investment options to such a jumbo plan," including lower-cost options; and (e) by "failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive-cost investments, and an option that did not even keep up with inflation[.]" See Cplt ¶ 133.

Defendants are correct in referring to this claim as "derivative," as the claim as pled is wholly dependent on the breaches of duty alleged in the first through fourth causes of action. Thus, if plaintiffs cannot state a claim as to the first **[*61]** through fourth causes of action, they cannot maintain a claim that Chevron Corporation failed to monitor the fiduciaries.

Plaintiffs concede that they have alleged insufficient facts, but argue that they should be permitted to conduct discovery in order to acquire such facts. This is insufficient to state a plausible claim. While an ERISA plaintiff may lack direct evidence of the fiduciaries' process, the plaintiff must at a minimum plead facts that give rise to a "reasonable inference" that the defendant committed the alleged violation. See *St. Vincent, 712 F.3d at 718*. Plaintiffs have failed to do so.

**CONCLUSION**

In accordance with the foregoing, the motion is GRANTED. The facts as pled do not raise a plausible inference that defendants breached their fiduciary duties and/or duties of loyalty and prudence. The dismissal is WITH LEAVE TO AMEND. Any amended complaint is due no later than September 30, 2016.

**IT IS SO ORDERED**.

Dated: August 29, 2016

/s/ Phyllis J. Hamilton

PHYLLIS J. HAMILTON

United States District Judge

---