# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**APPVION, INC. RETIREMENT SAVINGS
AND EMPLOYEE STOCK OWNERSHIP
PLAN, by and through Grant Lyon,**

     **Plaintiff,**

     **v.**                                  **Case No. 18-CV-1861-WCG**

**DOUGLAS P. BUTH, et al.,**

     **Defendants.**

---

## REPORT AND RECOMMENDATION

---

In this ERISA action, the court dismissed the plaintiff's first amended complaint ("FAC") in its entirety. The plaintiff, Grant Lyon, then filed a second amended complaint ("SAC"), which stretches to 395 pages. After the six groups of defendants filed motions to dismiss, the court referred the case to me for a report and recommendation as to those motions. The narrow issue presented to me is whether the plaintiff's second amended complaint successfully cured the defects the district judge identified in his first amended complaint. *See* ECF No. 233. I conclude that the second amended complaint has *not* cured those defects and recommend that the court dismiss most of the claims. However, I conclude that two claims asserted against defendant Argent should survive.

## BACKGROUND

This case arises from the sale of a paper company to its employees, structed as an employee stock ownership plan (ESOP).[1] At the beginning of 2001, Appleton Papers, Inc. (Appvion), a Wisconsin-based paper company, was owned by a French conglomerate called Arjo Wiggins Appleton (AWA). SAC ¶ 1. AWA, in an apparent effort to divest itself from the paper industry, directed the CEO of Appvion, Douglas Buth, to sell Appvion on the open market, offering him a contingent bonus of up to $10 million that he could divide among himself and other senior management. *Id.* In fact, AWA had been trying to sell Appvion since 1998. *Id.* ¶ 70. Buth's predecessor, Richard Curwen, stepped down as CEO of Appvion because he was unsuccessful at finding a third-party purchaser. *Id.* By 2000, with AWA threatening to sell Appvion to a venture capital firm, Buth proposed the idea of an employee buyout. *Id.* ¶ 71.

Eventually, AWA sold Appvion to its employees as part of an ESOP. *Id.* The transaction required the creation of a new holding company for Appvion, called Paperweight Development Corp. ("PDC"), and the deal was structured as a sale of 100% of PDC's stock to the ESOP. *Id* ¶ 2. The sale price was $810 million. *Id.* ¶ 71. The second amended complaint alleges that Buth and others undertook a massive and complex fraud in order to make the company saleable at that price.

Buth had no experience with ESOPs, so he retained Houlihan, an investment banking firm, to "quarterback" the entire process for a contingent fee of 1% of the total sale price. *Id.* ¶ 3. Houlihan selected State Street, a financial firm, to be the ESOP fiduciary and trustee and

---

[1] As the parties and district judge are already well-versed in the underlying factual allegations, I will not repeat many of them here.

hired Willamette, a separate financial company, to serve as a neutral valuator of the PDC stock. *Id.* ¶ 4. Allegedly incentivized by AWA's contingent bonus, Buth and others decided to fraudulently inflate the value of Appvion and essentially dupe its employees into paying more than fair market value. Through a series of misleading "road shows" and other allegedly fraudulent activities, Buth, Karch (Appvion's general counsel), Houlihan, and State Street concealed the fair market value of Appvion and convinced its employees to invest their 401(k) plans (valued at over $100m) into buying Appvion from AWA. *Id.* ¶¶ 6, 7, 20–23. The remaining $700 million was financed through a series of loans. *See* SAC ¶ 138.

According to the SAC, the fraud continued even after the sale was completed. As the owners of a substantial amount of PDC's newly minted stock, Buth and others continued to conspire to fraudulently inflate the stock price. The stock price, which opened at $10 per share in 2001, surged to prices of $28.56 (in 2005, when Buth left the company) and $33.41 (in 2007, when Karch left the company). *See id.* ¶ 652. The SAC claims that PDC was always overvalued, and that this overvaluation was either intentionally perpetuated or fraudulently overlooked by Appvion's corporate officers and board of directors. *Id.* ¶ 27. Once State Street and Willamette left the picture, they were replaced by defendants Reliance, Argent, and Stout Risius Ross ("SRR"), who stepped in and kept the fraud going. *Id.* ¶¶ 587, 610–13. When the stock price was up, those in the know sold high. *See, e.g.,* SAC ¶ 728. Meanwhile, the employees who had invested their sizeable pension fund into owning their own company were left holding the bag. Appvion ultimately went bankrupt in 2017. *See id.* ¶ 335. As part of those proceedings, plaintiff Grant Lyon was appointed to represent the ESOP. *Id.* ¶ 567. After Lyon filed this lawsuit, the court dismissed the first amended complaint because the claims were either time-barred or failed to meet the appropriate pleading standard. *See generally* ECF No.

186. Now, in the SAC, Lyon maintains numerous allegations that the defendants violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ *et seq.*, and federal securities laws.

## LEGAL STANDARDS

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'" *Zemeckis v. Global Credit & Collect. Corp.*, 679 F.3d 632, 634–35 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim satisfies this pleading standard when its factual allegations 'raise a right to relief above the speculative level.'" *Zemeckis*, 679 F.3d at 635 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). When analyzing a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Johnson v. Enhanced Recovery Co.*, 961 F.3d 975, 980 (7th Cir. 2020) (citing *Heredia v. Capital Mgmt. Servs., L.P.*, 942 F.3d 811, 814 (7th Cir. 2019)). But 12(b)(6) requires more than "mere labels and conclusions." *Twombly*, 550 U.S. at 555.

"Working hand in glove with Rule 12(b)(6)" is Fed. R. Civ. P. 8(a). which requires a plaintiff's complaint to contain a short and plain statement of his claims. *Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005). The complaint need only provide fair notice of what the plaintiff's claim is and grounds upon which it rests. *Id.* Complaints are given liberal construction; "District judges must heed the message of Rule 8: the pleading stage is not the occasion for technicalities." *Id.* (quoting *Luckett v. Rent-A-Center, Inc.*, 53 F.3d 871, 873 (7th Cir.

1995)). Rule 8(a) is standard, but when a plaintiff grounds his claim for relief in allegation of fraud, then his pleading must meet the heightened standard of Fed. R. Civ. P. 9(b). *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Rule 9(b) requires a plausible theory of fraud, for which the plaintiff provides "the who, what, when, where, and how" of the alleged fraud. *Id.* (citations omitted).

In addition, with respect to the securities law claims, "[e]xacting pleading requirements are among the control measures Congress included in the PSLRA [Private Securities Litigation Reform Act of 1995]." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007). The express purpose of the PSLRA was to stem the filing of frivolous federal securities lawsuits. *See id.* "The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 184, 194 & n.12 (1976)).

## DISCUSSION

The six motions to dismiss are filed by: (1) the directors & officers, ECF No. 192; (2) Houlihan, ECF No. 200; (3) State Street, ECF No. 194; (4) Argent, ECF No. 198; (5) Reliance, ECF No. 195; and (6) Stout, ECF No. 202. Each motion to dismiss is fully briefed and ready for disposition. For each defendant group, I will summarize the relevant factual background and allegations, explain my conclusions, and then recommend a disposition on the motion.

5

# I.    The Directors[2] & Officers[3] (Ds&Os)

## A.  Factual Background

In general, the SAC alleges two categories of wrongful conduct by the Ds&Os. First, several Ds&Os allegedly ran a fraudulent scheme to inflate the sale price of Appvion when it sold to the ESOP, incentivized by bonuses that would rise in proportion to the price. Second, after the sale happened, the Ds&Os allegedly continued the fraudulent scheme to inflate PDC's stock price, similarly incentivized by compensation packages tied to the stock price. As the court recognized in the original dismissal order, ECF No. 186, the date of November 26, 2012 is significant. Because the original complaint in this case was filed on November 26, 2018, conduct occurring before November 26, 2012 is subject to ERISA's six-year statute of repose. Accordingly, my analysis will separate the allegations based on whether they arise out of conduct before or after that date.

### 1.  Conduct Before November 26, 2012

*Buth*. Douglas Buth was the CEO, president and chairman of the board of directors for Appvion from 1998–2001. SAC ¶ 38. In 2001, Buth became the chairman of the board of directors of PDC, CEO, and president. *Id.* According to Lyon, Buth concealed Houlihan's contingency fee and the extent to which Houlihan controlled all aspects of the 2001 transaction. *Id.* ¶¶ 83, 714. In fact, several of Lyon's allegations concerning Buth's fiduciary breaches and other unlawful conduct stem from his relationship (and how he concealed the true nature of that relationship) with the investment banking firm Houlihan. For example, the SAC contains specific allegations that Buth authored a prospectus on July 23, 2001 that failed

---

[2] Susan Scherbel, Ronald Pace, Stephen Carter, Kathi Seifert, Andrew Reardon, Terry Murphy, and Mark Suwyn

[3] Douglas Buth, Paul Karch, Mark Richards, Tom Ferree, Rick Fantini, Dale Parker, Angela Tyczkowski, Kerry Arent, Kent Willetts, and Kevin Gilligan

to disclose Houlihan's conflict of interest and affirmatively indicated that Houlihan was "independent." *Id.* ¶¶ 94, 106, 113, 714. On July 25, 2001, Buth authored a letter to the employees stating that both Houlihan and State Street would provide "[i]ndependent validation of the deal," even though he knew that Houlihan did not qualify as independent. *Id.* ¶¶ 94–96, 122. The SAC contains other allegations of breach and concealment stemming from the relationship between Buth and Houlihan. *See e.g., id.* ¶¶ 125–26, 81, 141, 715. Ultimately, Lyon alleges that Buth's fraudulent behavior induced reliance by the ESOP and led to the sale of PDC's stock to the ESOP.

According to Lyon, Buth's fiduciary breaches and acts of concealment continued after the sale. For example, Buth, as an ESOP committee member, reviewed, approved, and released seven stock valuations that dramatically overvalued the company. *Id.* ¶¶ 192, 195, 197–202, 336, 348. The effect of this overvaluation was to mislead employees and induce them to purchase more company stock. *Id.* Buth also oversaw other forms of corporate filings from 2001 through 2005 that, according to Lyon, misrepresented the value of the company's balance sheet concerning redeemable stock and acted to conceal from employees that Buth's previous representations regarding PDC's stock value had been false. *Id.* 356–67, 718–19. Buth left Appvion in July 2005. *Id.* ¶ 38.

*Karch*. Paul Karch was Appvion's general counsel and an ESOP committee member. *Id.* ¶ 4, 739. Many of the allegations against Karch echo those against Buth. For example, Karch was also responsible for the allegedly fraudulent communications from Buth to the employees about Houlihan's independence. *Id.* ¶¶ 736, 737, 752. After the sale, Karch is also alleged to have participated in fraudulent overvaluations of stock, directing purchases of overpriced stock by the ESOP, approving corporate filings that relied upon the fraudulent

7

stock price, and communicating soothing, but misleading messages to employees that PDC's stock value was accurate. *Id.* ¶¶ 154–63, 197–246, 358, 745–47, 760. Karch left Appvion on March 2, 2007. *Id.* ¶ 768.

*Parker and Fantini*. Dale Parker was Appvion's CFO and board member from 2001 to 2006. Rick Fantini was Appvion's VP of operations and chair of the ESOP committee from 2001 to 2005. Lyon alleges that both Parker and Fantini breached their fiduciary duty to the ESOP by misrepresenting PDC's stock price. *Id.* ¶¶ 7, 100, 106. Further, Lyon alleges that both Parker and Fantini took several steps to conceal their breaches, including that they withheld information about the valuation process from employees by failing to tell the employees about how the control premium and pension debt were used to value PDC's stock. *Id.* ¶¶ 373–443, 778, 802, 806, 808. Lyon alleges that both Parker and Fantini issued a series of semi-annual stock values from 2001 to 2005 that published the fraudulently inflated stock values in an effort to conceal the fraudulent ESOP closing price. *Id.* 798, 607–07. Fantini allegedly gained over $575,000 on his ESOP investment while Parker allegedly gained approximately $110,000 worth of PDC stock for his role in 2001 sale, which Parker cashed out in 2005 for nearly $300,000. *Id.* ¶¶ 814, 793.

*Richards*. Richards followed Buth as Appvion's CEO and was on the ESOP committee from 2005 to 2015. Lyon alleges that Richards was responsible for much of the same fraudulent conduct as was Buth. *See* ECF No. 212 at 14. Specifically, Lyon alleges that Richards breached his fiduciary duty by reviewing and approving fraudulent PDC stock valuations, authoring and approving communications to employees about the integrity of the stock price, and encouraging employees to purchase more PDC stock. *Id.* (citing SAC ¶¶ 348,

428–560, 818, 820–21, 825, 1246–50). Lyon further alleges that beyond these fiduciary breaches, Richards engaged in a pattern of behavior to conceal his breaches.

As evidence that Richards concealed his fiduciary breaches from Appvion employees, Lyon points to the company's purchase of a company called BemroseBooth. In 2003, Appvion's board of directors approved the purchase of the English company for $63.5 million. According to the SAC, BemroseBooth quickly became worthless, in large part because its fair market value was reduced, dollar-for-dollar, by the amount of its pension liability. SAC ¶ 24. Richards, among others, knew that BemroseBooth was misvalued because of its pension debt, but he failed to translate this knowledge to Appvion's own, sizeable pension debt ($154.9 million, or 69% of the ESOPs equity in PDC in 2008). *Id.* ¶ 24–25. In other words, Richards should have known that Appvion was worth much less than its stated valuation due to the high pension debt of both BemroseBooth and Appvion itself.

*Ferree, Arent, Tyczkowski, Willets and Gilligan.* The SAC alleges generally that corporate officers Ferree, Arent, Tyczkwoski, Willets, and Gilligan breached their fiduciary duty by participating in fraudulent valuation of stocks, authoring misleading communications to employees about those valuations, and concealing their fraud by withholding critical information about how pension debt was factored into the stock price. *See e.g.,* SAC ¶¶ 24–26 and 473–88 (pension debt), 359–62 (Ferree), 513–60 (Arent), 452–78 (Tyczkowski), 479–548 (Willetts), 949–54 (Gilligan).

*Carter, Seifert, Reardon, Murphy, Suwyn, Scherbel, Pace.* The allegations against these defendants stem from their roles as members of the board of directors. ECF No. 212 at 19. These directors were responsible for appointing members to the ESOP committee, appointing the ESOP trustee, and for controlling and monitoring the ESOP committee and the ESOP

trustee in the performance of their fiduciary duties. *Id.* The SAC alleges that each director breached his or her fiduciary duty by failing to monitor the ESOP committee and ESOP trustees, who were responsible for publishing stock prices that each director either knew or should have known were fraudulently inflated. *See, e.g.,* SAC ¶¶ 975 (Carter failed to demand that every PDC valuation be corrected and that the ESOP committee members and ESOP trustee responsible for the fraudulent stock prices be terminated), 996–97 (Seifert signed corporate filings designed to conceal her failure to monitor), 1013 (Reardon, same), 1029 (Murphy, same), 1044 (Suwyn, same), 1058 (Scherbel, same), 1062 (Pace, same). Further, Lyon alleges that these directors concealed their fiduciary breaches by hiding from employees that they were not treating pension debt for BemroseBooth and Appvion in the same manner. *Id.* ¶ 26. The directors were allegedly receiving compensation packages with "phantom stock units" which conflicted them and incentivized them to inflate PDC's stock price, or to look the other way while others did. *See, e.g.,* SAC ¶¶ 1050–57 (detailing how Susan Scherbel participated).

### 2. Conduct After November 26, 2012

The SAC accuses Richards, Ferree, Arent, Willetts, Gilligan, Carter, Seifert, Reardon, Murphy, and Suwyn of breaching a fiduciary duty, engaging in prohibited transactions, and knowingly participating in co-fiduciary breaches after November 26, 2012. The specifics of the fraud are the same as the pre-2012 allegations. In essence, the Ds&Os are accused of communicating to the ESOP that PDC's financial health and viability were in good shape, thereby inducing employees to continue to invest in the ESOP. This communication is alleged to have occurred while the Ds&Os were aware of several red flags signaling that the opposite

was true. *See* SAC ¶¶ 19–26. All the while, these defendants were allegedly benefitting from PDC's inflated stock price. *See id.* Thus, they fraudulently conspired to keep the price up.

### B. Summary of the Legal Claims

Based on the above factual allegations, Lyon's legal claims against the Ds&Os can be separated into four general categories. First, Lyon alleges 17 counts—Counts 4–20—of breach of fiduciary duty against Buth, Karch, Parker, Fantini, Richards, Ferree, Arent, Tyczkowski, Willetts, Gilligan, Carter, Seifert, Reardon, Murphy, Suwyn, Scherbel, and Pace. These allegations are actionable under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). Second, Lyon alleges two counts—Counts 21 and 25—of engaging in prohibited transactions against Buth and Karch (Counts 21 and 25) and against Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan (Count 25). These counts are actionable under ERISA § 406(a)(1) and 29 U.S.C. § 1106(b). Third, Lyon alleges two counts—Counts 26 and 27—of co-fiduciary liability against Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert (Count 26) and against Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan (Count 27). These allegations are actionable under ERISA § 405 and 29 U.S.C. § 1105. Finally, Lyon alleges two counts—Counts 33 and 34—for federal securities fraud against Richards, Arent, Ferree, and Gilligan (Count 33) and against Carter, Murphy, Reardon, Suwyn, and Seifert (Count 34). These counts are actionable under the Securities Exchange Act of 1934, § 10(B), 15 U.S.C. § 78J and SEC Rule 10b-5, 17 C.F.R 240.10b-5.

### C. The Alleged ERISA Violations Occurring Before November 26, 2012 are Time-Barred (Counts 4–17, 19–21, and 25–27).

ERISA's statute of repose says, in relevant part, that an ERISA claim arising from a fiduciary's breach of any responsibility, duty, or obligation is time-barred after six years. 29 U.S.C. § 1113. The statute of repose is the starting point for determining the timeliness of an

ERISA claim, but the time limit may be tolled "in the case of fraud or concealment." *Id.* The fraud or concealment exception requires the Plaintiff to specially plead an action taken to conceal wrongdoing that is separate and apart from the underlying fiduciary breach. "[F]raud claims do not receive the benefit of ERISA's six year statute of repose simply because they are fraud claims. There must be actual concealment—i.e., 'some trick or contrivance intended to exclude suspicion and prevent inquiry.'" *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1094 (7th Cir. 1992) (quoting *Wood v. Carpenter*, 101 U.S. 135, 143 (1879)). To rely on ERISA's fraud or concealment exception and reach conduct more than six years old, a successful complaint must show "steps taken by fiduciaries to cover their tracks." *Id.* at 1095.

It was against this legal backdrop that the court dismissed much of the FAC, concluding that Lyon failed "to allege facts from which the court can infer that each Director and Committee Member Defendant 'engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing.'" ECF No. 186 at 19 (citing *Martin*, 966 F.2d at 1093). Now, I recommend that the allegations set forth above should meet the same fate as those alleged in the original amended complaint. This is because the SAC does not add any new, material factual allegations. The essence of the SAC is that the Ds&Os fraudulently inflated PDC's stock price (the underlying fraud) and then published a series of company valuations over the years that essentially repeated that inflated price (the concealment). The problem with this reasoning (as the court's original dismissal order recognized) is that these two actions are part of the same fraud. It is the very nature of fraud that one expects it to be perpetuated and repeated; merely repeating or restating the same fraud is not a separate "concealment" of that original fraud. That's why the caselaw requires something *more*—something additional to throw people off the scent. As the Seventh Circuit has recognized, "[f]raudulent

12

concealment . . . is distinct from fraud that is concealed. . . . Otherwise the statute of limitations would not start to run in a fraud case until the fraud was exposed, even if the defendant had made no effort to conceal it beyond *what is implicit in committing fraud. . .*" *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 851 (7th Cir. 1996), *disapproved of on other grounds by Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) (citations omitted) (emphasis added). Here, the SAC fails to plausibly allege concealment. On this basis, I conclude that ERISA statute of repose should not be tolled, and therefore all ERISA claims against the Ds&Os for conduct prior to November 26, 2012 are time-barred.

### D. Lyon's ERISA Claims for Conduct After November 26, 2012 Fail to Meet Rule 9(b)'s Heightened Pleading Standard

Lyon's *post*-2012 ERISA claims allege fiduciary breach (aspects of Counts 4 – 20), prohibited transactions (aspects of Counts 21 and 25), and co-fiduciary liability (aspects of Counts 26 and 27). The Ds&Os argue that Lyon's post-2012 ERISA allegations rely on impermissible group pleading and flunk Rule 9(b) by failing to differentiate among the Ds&Os or attribute specific alleged misconduct to each defendant. In response to this argument, Lyon counters that this cannot possibly be true because his complaint alleged "breach of fiduciary duty counts against the individuals [that] are each separate counts specific to each defendant that each state claims for fiduciary breach." ECF No. 212 at 23. The Ds&Os further argue that Lyon has failed to plead an ERISA fiduciary breach because the SAC's allegations rest on purely ministerial or administrative ESOP functions such as preparing employee communication materials, preparing required financial disclosures, and authoring reports concerning participants' benefits. ECF No. 225 at 6–7.

"In order to state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary

duty; and (3) that the breach resulted in harm to the plaintiff.'" *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quoting *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010)). This is not a particularly rigid pleading standard on its own, but "where the plaintiff alleges that a defendant's breach of fiduciary duty took the form of a fraudulent act," the plaintiff must meet the heightened pleading standard of Rule 9(b). *Rogers v. Baxter Int'l, Inc.*, 717 F. Supp 2d 974, 984 (N.D. Ill 2006), *aff'd*, 521 F.3d 702 (7th Cir. 2008). That is true in this case, where Lyon's entire theory of the Ds&Os' breaches sounds in fraud.[4]

To state a claim for prohibited transactions, a plaintiff must plausibly allege that a plan fiduciary caused the plan to engage in a transaction that violates ERISA § 406(a)(1) by being a "sale or exchange . . . of any property between the plan and a party in interest" and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(A), (D). To violate § 406(b), a plan fiduciary must "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). Lyon protests that his prohibited transaction claims do not involve fraud, but it's hard to see how. Lyon's entire theory of the case is that the Ds&Os committed fraud for over a decade. The transactions at issue were in furtherance of this fraud, and only made possible because of it. Just because ERISA does not list fraud as an element of a prohibited transactions claim does not mean that Lyon can side-step his own theory of the case. Thus, I conclude that the prohibited transactions claims in the SAC, like those in the FAC, must meet the heightened standard of Rule 9(b).

---

[4] In contrast to my conclusion for Argent, *infra* pp. 56–60, Lyon does not develop an argument that any of the Ds&Os were imprudent because they had a "pure heart but an empty head." *See Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983). Rather, Lyon's theory against the Ds&Os is *entirely* premised on their knowing and self-motivated participation in fraud. There is no other way to read the allegations against the Ds&Os. Accordingly my analysis for the Ds&Os' duty of prudence claims must proceed under Rule 9(b) whereas my analysis for Argent's duty of prudence claims proceeds under Rule 8(a).

14

It was against this legal backdrop that the court dismissed the FAC, holding that Lyon's complaint made general allegations against all the Ds&Os, "asserting that the defendants were connected to or engaged in fraudulent misconduct based on their role as a director or committee member." ECF No. 186 at 21. The court determined that Lyon's claims failed for two reasons. First, Lyon failed to allege what each specific defendant did and how each defendant's misconduct violated ERISA, instead offering conclusory group-pled allegations that the defendants uniformly violated their fiduciary duties. *Id.* Second, Lyon failed to plausibly allege the "who, what, when, where, and how" of the fraud to satisfy the heightened pleading standard of Rule 9(b). *Id.*

I cannot conclude that the SAC states the "who, what, when, where, and how" of the fraud in such a way that it makes the entire fraud plausible. Simply put, the sprawling and conspiratorial nature of the proposed fraud (the when and the how of the fraud) remains implausible on its face. The Ds&Os are correct when they argue that most of Lyon's claims simply track ERISA's language and conclude that each actor violated the law, based on a factual background that already came up short in the FAC. ECF No. 225 at 9. The biggest hole in Lyon's theory is that to perpetuate this 16-year fraud, the Ds&Os would have needed to have the participation, loyalty, silence, and dereliction of duty from several outside actors who had nothing to gain and everything to lose. As with almost any conspiracy, it's *conceivable* that it could have occurred. But a plaintiff must provide a plausible story explaining the "how," and the SAC does not.[5]

---

[5] Confusingly, rather than explaining how his post-2012 ERISA claims meet Rule 9(b)'s standard, Lyon only argues that the Ds&Os "do not [] argue these counts are insufficiently pled" and concludes that the Ds&Os have somehow conceded this point. ECF No. 212 at 23. However, the defendants explicitly argue that Lyon's post-2012 ERISA claims must be dismissed because "'where the plaintiff alleges that a defendant's breach of fiduciary duty took the form of a fraudulent act, such a claim is . . . subject to Rule 9(b), and so must be pleaded with particularity.'" ECF No. 193 at 13–15 (quoting *Studio & Partners, s.r.l. v. KI*, no. 06-C-0628, 2006 WL 3813697,

Finally, Lyon submitted a recent decision in a case that stems from the same factual background as this case. *See* ECF No. 229. In *Halperin v. Richards*, the issue was whether two former Appvion employees can sue the Ds&Os under state law or whether ERISA preempted those claims. 7 F.4th 534, 539 (7th Cir. 2021). The Seventh Circuit held that that the plaintiffs' state-law claims are not preempted by ERISA. *Id.* Lyon suggests that this adverse decision against the Ds&Os on the issue of ERISA preemption is probative of the plausibility of Lyon's ERISA fiduciary breach claims. ECF No. 229 at 3–4. I conclude that it is not. The *Halperin* court certainly made no such conclusion; indeed, merely concluding that a federal statute does not preempt certain claims does not mean that those claims would necessarily survive scrutiny under Rule 9(b). *Id.* at 550 ("Our holding as to the directors and officers is limited to the plaintiffs' particular claims in this case.").

In sum, I recommend that Counts 4–20 (for fiduciary breach) and Counts 21 and 25 (for prohibited transactions) be dismissed for failure to state a claim as to any post-2012 conduct.[6]

### E. Co-Fiduciary Liability

To state a claim for co-fiduciary liability a plaintiff must plausibly allege that a fiduciary (1) participated knowingly in, or undertook knowingly to conceal, an act or

---

at *2 (E.D. Wis. Dec. 27, 2006)). In fact, failure to comply with Rule 9(b) was the basis for the original dismissal order. ECF No. 186 at 21.

[6] For what it's worth, I agree with Lyon that the second amended complaint is no longer inappropriately grouped. I believe any singular defendant has adequate notice of the allegations against themselves to satisfy the Twombly pleading standard. For example, Mark Richards is alleged to have breached his fiduciary duties of loyalty and prudence on June 30, 2014 when he approved, adopted, and disseminated a PDC stock valuation at $17.55 despite his knowledge that the stock price did not account for the sizeable pension obligation. SAC ¶¶ 816–28; 843. Furthermore, he did this for his own financial benefit, allegedly. Id. This is a short and plain statement of an actionable claim against Richards. The SAC is full of allegations like this, and any defendant can understand the grounds upon which they rest. Lyon accuses Richards, based on a specific and articulable course of conduct, of putting his financial interests in front of the ESOP, to whom he owed a fiduciary duty. This allegation is specific to Richards, and it is not alleged solely because of his title as CEO, or premised on a theory that he should have known better because he was the CEO. In this sense, Lyon has cured one defect, the group pleading problem.

16

omission that he knows is a breach; (2) failed to follow his fiduciary duties, thereby enabling another fiduciary to commit a breach; or (3) had knowledge of the breach committed by another fiduciary and made no reasonable efforts to remedy that breach. 29 U.S.C. § 1105(a)(1)–(3). Where a plaintiff fails to allege an underlying fiduciary breach, a claim for co-fiduciary liability will necessarily fail. *See White v. Marhsall & Isley Corp.*, No. 10-CV-311, 2011 WL 2471736, at *12 (E.D. Wis. June 21, 2011), *aff'd*, 714 F.3d 980 (7th Cir. 2013).

I conclude in Section V below that Lyon has sufficiently pled a fiduciary breach of the duty of prudence against Argent. Accordingly, some of the Ds&Os could be liable as co-fiduciaries if the pleadings can support an inference that they had "actual knowledge" of Argent's breach of the duty of prudence. *See Keach v. U.S. Tr. Co.*, 240 F. Supp. 2d 840, 844 (C.D. Ill. 2002) (citations omitted). "[C]onstructive knowledge will not do." *See id.* "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to a presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

I conclude Lyon's claims for co-fiduciary liability must fail because the second amended complaint does not contain any facts that suggest "actual knowledge" by the Ds&Os that Argent was acting imprudently; instead, one can merely find allegations of "constructive knowledge." For example, Lyon accuses Kevin Gilligan (an officer) of "failing to prudently monitor Argent in its determinations of each of the stock prices. Despite direct review of the valuation reports and working with Argent on the valuations, Gilligan failed to require that Argent accurately value the PDC stock and instead accepted, approved and disseminated stock prices that *he knew to be inflated*." SAC ¶ 955 (emphasis added). This paragraph, emblematic of the allegations against several others Ds&Os, asserts facts suggesting

17

"constructive knowledge," such as direct access to valuation reports and facetime with the trustee, but does not substantiate its conclusion that Gilligan *knew* that the stock prices were inflated. Lyon's theory is that Gilligan, and other Ds&Os knew about red flags such as BemroseBooth's pension debt, or the fraudulent control premium. Thus, Lyon's theory requires an inferential step between knowing about certain red flags, and "actually knowing" that Argent was violating its duty of prudence. From this allegation, and from the others like it in the SAC, I cannot conclude that Lyon has met his burden of alleging "actual knowledge" by and Ds&Os that Argent was imprudent. Thus, I recommend Counts 26 and 27 be dismissed.

### F. The SAC Still Fails to State a Claim for Any Federal Securities Violations

I conclude that Lyon has not cured the pleading defects identified in the first amended complaint with respect to Counts 33 and 34 for federal securities fraud. Lyon argues that Count 34 is subject to more relaxed pleading standards than those set forth in the PSLRA. It is not. The court dismissed the precursor to this claim in the FAC—Count 14 alleging securities fraud against the Ds&Os—because it failed to meet the pleading standards of the PSLRA. ECF No. 186 at 21–25. This time around, hoping for a more favorable pleading standard, Lyon argues that Count 34 states a federal securities fraud claim under the "control person liability" theory, which would avoid the heightened pleading standard of the PSLRA. ECF No. 212 at 28 (citing *Chu v. Sabratek Corp.*, 100 F.Supp 2d 827, 843 (N.D. Ill. 2000) (no heightened pleading standard for control person claims); see also *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 958 (N.D. Ill. 2003).

Section 20(a) of Securities Exchange Act of 1934 says that "[e]very person who, directly or indirectly, controls any person under any provision of this chapter or of any rule

or regulation thereunder shall also be liable jointly and severally with and to the same extent as the controlled person." The test for "control person liability" is two-pronged: First, the "control person" needs to have *actually* exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911–12 (7th Cir. 1994). A precursor to the application of this two-pronged test is a plausible allegation that the controlled party committed a predicate securities fraud violation.

Specifically in this case, Lyon argues that "[i]f Plaintiff has stated claims for underlying violations against the [sic] Reliance, Argent, or the D&O Defendants (Counts XXXI–XXXIII), it has stated a claim for control person liability." ECF No 212 at 28. Lyon has not stated a claim for federal securities fraud against any of the trustee defendants or against the Ds&Os, however. See infra pp. 20 (Ds&Os), 53–54 (Reliance), 64 (Argent). Accordingly, Lyon cannot use a "control person liability" theory because he has failed even to allege that any of the "controlled" parties committed a predicate securities fraud violation. Therefore, Lyon cannot maintain a theory of "control person liability" and both his federal securities claims against the Ds&Os, Counts 33 and 34, must meet the heightened pleading standards of the PSLRA.

Neither Count 33 nor Count 34 can survive the heightened pleading requirements of Rule 9(b) and the PSLRA. To state a claim for federal securities fraud, the plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). In dismissing the FAC, this court determined that Lyon had not sufficiently plead scienter. ECF No. 186 at 24.

In general, a plaintiff must allege facts that give rise to a strong inference that each defendant acted with the required state of mind—"an intent to deceive"—demonstrated by "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2006); *Pugh*, 521 F.3d at 693. Scienter has been pled if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 310. Also, Rule 9(b)'s particularity requirements apply. *See* ECF No. 186 at 23.

Lyon contends that the SAC allows for strong inferences that the Ds&Os acted with reckless disregard of a substantial risk that various corporate filings were false. ECF No. 212 at 28–30. And yet, other than listing each defendant by name instead of as a group, the SAC does not provide any new, material facts upon which I could base such an inference. Rather, the SAC simply reasserts the same exact factual background, and Lyon argues that "[s]cienter does not have to be pled with particularity." ECF No. 212 at 29. True enough; Rule 9(b) says "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, the PSLRA also controls this claim and requires that complaints alleging a claim of securities fraud "state *with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). Accordingly, Lyon's claim that he need not plead particularity is incorrect. Because his federal securities fraud claims were already dismissed for lacking particularity as to scienter, and because he has not changed them in the SAC, I recommend that Counts 33 and 34 be dismissed.

## II.    The Houlihan Defendants[7]

### A. Factual Background

PDC retained Houlihan as a financial advisor in February 2001 to help PDC acquire Appvion and sell 100% of its common stock to the ESOP. SAC ¶ 2. PDC paid Houlihan $100,000 to issue a fairness opinion and further agreed to pay a contingency fee worth 1% of the final sale. *Id.* ¶¶ 3, 77. PDC acquired Appvion from AWA for $810 million. *Id.* ¶ 71. The employees funded the purchase with $106 million from their 401(k) retirement accounts and the remaining balance from outside funding. *See id.* ¶¶ 74–75. 100% of PDC's common stock flowed to the ESOP, where it was held in trust. *Id.* ¶ 71. Lyon alleges that Houlihan's contingency fee was intentionally concealed. *Id.* ¶ 81. The SAC highlights six elements of Houlihan's retainer agreement with PDC as evidence of impropriety. First, Houlihan would structure the transaction and make strategic use of "Pension Plans over-funded balances." *Id.* ¶ 79. Second, Houlihan would advise management on how to negotiate the price and terms regarding the purchase of Appvion from its corporate parent AWA. *Id.* Third, Houlihan would assist in selecting the "ESOP Team" including its independent trustee, counsel, financial advisor, and communications specialist. *Id.* Fourth, Houlihan would prepare materials to present to employees and make presentations to the employee base regarding its participation in the transaction. *Id.* Fifth, Houlihan would "quarterback" process flow and coordination of ESOP related activities. *Id.* Finally, Houlihan would assist in solicitation and structure of employee-based equity capital investment for transaction purposes. *Id.* From this

---

[7] They are Houlihan Lokey Capital, Inc. (k/k/a Houlihan Lokey Howard & Zukin Capital, Inc.) and Houlihan Lokey Financial Advisors, Inc. (f/ka/Houlihan Lokey Howard & Zukin Financial Advisors, Inc.) Much of Houlihan's activity in this case was performed by its director, James Waldo, and by Lou Paone, an investment banker for Houlihan.

factual background, Lyon concludes that Houlihan was both conflicted—because of its concealed contingency fee—and "responsible to the ESOP" because of the high level of control it was granted by contract. *Id.* ¶ 79–80.

Leading up to the transaction, Houlihan selected State Street to act as the ESOP's trustee, issued a fairness opinion, prepared documents for the ESOP, and participated in employee road shows. *Id.* ¶¶ 69–85. Houlihan also prepared, authorized, and circulated a prospectus dated July 23, 2001 to Appvion's employees, stating that "Houlihan has rendered its preliminary opinion to [PDC's] board of directors that the purchase price that [PDC] is paying for us in the acquisition is fair, to the ESOP, as the sole shareholder of [PDC] . . . [Houlihan's] preliminary fairness opinion was rendered to the board of directors of [PDC] and may not be relied upon by any other person." *Id.* ¶¶ 100, 106–08.

PDC achieved both of its objectives with Houlihan. PDC obtained the sizeable investment from Appvion's employees and purchased Appvion from AWA. Even though Houlihan's explicit and formal relationship was with PDC and not with the ESOP, Lyon asserts that the ESOP was entitled to rely on Houlihan's opinions. *Id.* ¶¶ 129–133.

### B. Summary of Lyon's Claims Against Houlihan

In the SAC, Lyon alleges three ERISA violations against Houlihan. First, in Count 21, Lyon alleges that Houlihan violated ERISA by engaging in prohibited transactions, contrary to 29 U.S.C. § 1106(a)–(b). SAC ¶¶ 1072–97. (This allegation was brought against other defendants in the FAC, but not against Houlihan.) Second, in Count 36, Lyon alleges that Houlihan violated ERISA by breaching its fiduciary duty to the ESOP, contrary to 29 U.S.C. § 1104(a)(1). *See id.* ¶¶ 1314–33. Third, in Count 37, Lyon alleges that Houlihan violated ERISA by knowingly participating in the fiduciary breaches of others, contrary to 29

U.S.C. § 1106(a)(1)(A), (D), (E), and § 1106(b)(1). *Id.* ¶¶ 1334–42. Both the second and third allegations were brought against Houlihan in the FAC, and both were summarily dismissed. ECF No. 186 at 28–29. For the following reasons, I will recommend that all three counts against Houlihan be dismissed.

## C. The Claims are Untimely

The court previously dismissed the ERISA allegations in the FAC against Houlihan as untimely. ECF No. 186 at 28–29. Lyon's ERISA claims against Houlihan were time-barred because the FAC failed to allege a course of conduct by Houlihan that satisfied ERISA's statue of repose exception for fraud or concealment. *Id.* The allegations in the SAC have been repackaged, but they rely on a substantially similar set of facts. Most importantly, all are based on conduct that occurred in relation to the 2001 sale of Appvion to its employees.

A claim for breach of fiduciary duty is constrained by ERISA's 6-year statute of repose.[8] Moreover, Lyon assumes the burden of pleading the fraudulent concealment tolling exception pursuant to Rule 9(b). *See Fiene v. V & J Foods, Inc.*, 962 F. Supp. 1172, 1183–84 (E.D. Wis. 1997). To meet this exacting standard, Lyon must allege the circumstances of the fraud with factual particularity. *See United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021). This burden requires Lyon to describe the "who, what, when, where, and how of the fraud." *Id.* (citations omitted). Rule 9(b) requires more than "on information and belief" to support a fraud allegation; in general, it is "essential to show a false

---

[8] Lyon briefly argues that he need not address affirmative defenses, such as the statute of limitations in his complaint. ECF No. 211 17–18. However, dismissal on statute of limitations grounds "is appropriate only where the allegations of the complaint set forth everything necessary to satisfy the affirmative defense." *Sidney Hillman Health Ctr. v. Abbot Labs., Inc.,* 782 F.3d 922, 928 (7th Cir. 2105). In this case, as Houlihan points out, all allegations of wrongful conduct by Houlihan are nearly 20 years old. Thus, this is quintessentially the kind of case where the complaint sets forth everything necessary to trigger the affirmative defense.

statement" or "particularized factual allegations that give rise to a plausible inference of fraud." *Id.* (citations omitted).

As set forth earlier, "[a]n ERISA fiduciary commits fraud or concealment by delaying a wronged beneficiary's discovery of his claim either by misrepresenting the significance of facts the beneficiary is aware of (fraud) or by hiding facts so that the beneficiary does not become aware of them (concealment)." *Laskin v. Siegel*, 728 F.3d 731, 735 (7th Cir. 2013) (citation omitted). Lyon alleges five acts of fraud and concealment by Houlihan. ECF No. 211 at 22–25. Each of these allegations, at their hearts, is premised on Houlihan concealing its conflict of interest while inducing reliance from employees or not correcting the misstatements of others when they identified Houlihan as "independent." *See id.* Lyon alleges that Houlihan concealed its conflict twice via prospectus, once in a July 25, 2001, letter from Buth to Appvion employees, once in its fairness opinion, once during an August 2, 2001 employee road show, and in various SEC filings. *Id.* at 24–27. But these allegations were also present in the FAC and the court dismissed the claim because "the ESOP Committee knew about Houlihan's role and compensation at the time of the 2001 Transaction, and the ESOP investors were told that Houlihan acted as PDC's advisor, Houlihan prepared a fairness opinion solely for PDC's benefit, and the ESOP was represented by a trustee and its own advisor." ECF No. 186 at 28. Simply put, the pleadings did not support Lyon's conclusory allegations that Houlihan misrepresented or concealed anything. Lyon was given leave to cure the defects of the FAC, but here, he only repeated the same allegations that the court previously found lacking.

Lyon suggests that the six-year statute of repose need not apply to Count 37 because the statute applies only for breach-of-fiduciary claims, and Count 37 alleges is that Houlihan

merely participated in the breaches of *others*. The statute makes no such distinction, however—it broadly applies to any action "*with respect to* a fiduciary's breach." 29 U.S.C. § 1113. *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). And even if Lyon were correct, the limitations statute it proposes (Wis. Stat. § 893.57) is triggered at the time the injury is discoverable, or discovered. There's no plausible allegation that Houlihan's conduct was not discoverable until more than a decade after the ESOP transaction. Accordingly, I conclude that all claims against Houlihan are untimely.

### D. Houlihan was not a Fiduciary (Counts 21, 36)

Even if Counts 21 and 36 were timely, they would fail to state a claim. In general, a fiduciary to an ERISA plan engages in prohibited transactions if he self-deals or receives consideration for his role in a transaction involving plan assets. *See* 29 U.S.C. § 1106(b)(1), (3). Lyon alleges that the 2001 sale of Appvion to the ESOP was a prohibited transaction by Houlihan. SAC ¶¶ 1082–91. Specifically, Lyon alleges that Houlihan accepted compensation (its $8.1 million contingency fee) from plan assets (the $107 million down payment from the employees' 401(k) accounts) despite functioning as a fiduciary to the purchaser (the ESOP). *See id*. Houlihan argues that it was not a fiduciary because it had an explicit, public, formal relationship with PDC, the entity across the table from the ESOP during the 2001 transaction. *See* ECF No. 227 at 2–5.

Even though the FAC did not contain this allegation, it treads on old, settled ground. In fact, the court already considered whether Houlihan was a fiduciary to the ESOP and concluded that it was not. ECF No. 186 at 30 ("Again, the Houlihan Defendants were retained by PDC to advise PDC, not the ESOP. . . . The FAC contains no allegations that there was a formal commitment or there were special circumstances present to support an

inference that the Houlihan Defendants had a fiduciary duty to the ESOP."). In this regard, the SAC is no different from the complaint the court already dismissed.

> ERISA provides that a person is a fiduciary
>
> to the extent (i) he exercises any discretionary authority or discretionary control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Under this definition, the term "fiduciary" may be defined functionally without requiring a formal relationship between the parties. *Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1040 (W.D. Wis. 2012), *aff'd sub nom. Chesemore v. Fenkell*, 829 F.3d 803 (7th Cir. 2016) (citing *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262 (1993)). But for a person to become a "functional fiduciary" (as is alleged here), he must do more than "play some role" in the decision; he must exercise "final authority" over the decision. *Id.* (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 584 (7th Cir. 2009). A fiduciary "exercises any power of control, management or disposition with respect to monies or other property of an employee benefit fund, or has the authority or responsibility to do so." *Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.,* 884 F.2d 288, 292 (7th Cir.1989) (quoting H.R.Rep. No. 533, 93rd Cong., 2d Sess. 11, *reprinted* in 1974 U.S.C.C.A.N. 4639, 4649). The general ERISA principle is that "influence" over a plan does not rise to the level of fiduciary control. *Reich v. Lancaster*, 55 F.3d 1034, 1048 (6th Cir. 1995).

Lyon suggests that Houlihan became a functional fiduciary when it "quarterbacked" the entire ESOP purchase, presented itself as "independent when it was not," formulated a fairness opinion despite being conflicted, and controlled all communications between Appvion, its trustees, its outside evaluators, and its employees. ECF No. 211 at 4–6 (citing

SAC ¶¶ 83, 1317, 79, 76). But the real issue is whether these allegations, and the inferences they support when accepted as true, are enough to overcome the acknowledged fact that Houlihan had an explicit, public, and formal relationship with PDC, not with the ESOP. While Rule 12(b)(6) requires courts to make all reasonable inferences in favor of the non-moving party, it does not require courts to bury their heads in the sand and ignore the facts that are unfavorable to the plaintiff. In a series of letters, attached as exhibits, that are both referred to in and central to Lyon's complaint, Houlihan's formal role in the 2001 transaction is explicit. SAC ¶ 79 (citing ECF No. 111-1–3). Overall, these exhibits do illustrate that Houlihan had a high level of influence over the structured deal, but they also contain unambiguous loyalty statements indicating that Houlihan owed its duty exclusively to PDC. ECF No. 111-1 ¶ 5, -2 at 2 (stating that Houlihan's opinion will be "furnished solely for [PDC's] benefit and may not be relied upon by any other person without express, prior written consent."). At best, Houlihan is only an advisor. The formal relationship between Houlihan and PDC allowed for recommendations, opinions, and control over certain aspects of the transaction. However, from nowhere in the pleadings can I infer that Houlihan had *discretionary* authority to say whether the deal could be completed.

To support his claim that Houlihan transcended the role of mere advisor to become an ESOP fiduciary, Lyon analogizes to an Eighth Circuit case, *Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992) and a Sixth Circuit case, *Reich v. Lancaster*, 55 F.3d 1034 (6th Cir. 1995). In *Martin*, the court found that an outside accounting firm breached its fiduciary duties under ERISA when it engaged in complex financial transactions that wiped out the employees' stock ownership plan. *Martin*, 965 F.2d at 663. Like Houlihan in this case, the accounting firm in *Martin* had the formal role of advisor, but the court found that the relationship went far beyond

27

that. *See id*. at 668–70. The accounting firm had two owners, one of whom was related to principals at the company, and both owners were "corporate insiders" with personal interests in the transaction and special "positions of trust and confidence" (they held stock and were the only corporate insiders with an expertise in accounting and employee benefits law). *Id*. at 669. Specifically, the two stock-holding accountants fused their unique positions as tax experts and stockholders to recommend transactions, structure deals, and provide investment advice to such an extent that they exercised effective control over the ESOP's assets. *See id.*

In *Reich*, the Sixth Circuit affirmed a trial court's finding that a fund had purchased certain life insurance policies due to the confusing and misleading advice given by an outside party. 55 F.3d at 1042. The outside advisor was conflicted because his sons received commissions for the policies he recommended. *Id*. The trial judge further found that the outside party obviously bamboozled the unsophisticated purchaser, as evidenced by the fact that the purchaser spent "nearly $1,000,000.00 in premiums on life insurance when the Fund only had $750,000.00 in assets [and] over $550,000.00 went to [the outside party] in the form of commissions." *See id*. at 1048. The Sixth Circuit agreed with the trial court, reasoning that the "record supports the determination that [the outside party] usurped the Trustee's independent discretion and effectively exercised authority and control over management and administration of the plan." *Id.* As such, he "was the decision maker" and hence, a fiduciary. *Id.* at 1048–49.

This case is different. Notably, in *Martin* the advisors had formal relationships with both sides. Here, by contrast, Houlihan had a formal relationship with only one side, PDC. It's true that the pleadings allege that Houlihan nonetheless had influence over the ESOP, but that's a far cry from control. The alleged encouragement took the form of (1) negotiating the

28

price and terms of the purchase of Appvion from AWA, (2) assisting in selection of the "ESOP Team" including its independent trustee, ESOP counsel, ESOP financial advisor, and communications specialist, and (3) preparing materials to be presented to employees and making presentations to the employee base regarding their participation. SAC ¶ 79.[9] But these allegations rise only to the level of influence; they fail to allow for an inference that Houlihan exercised control or authority to make decisions on behalf of the ESOP.

As for *Reich*, the outside party there became a functional fiduciary because he went beyond merely giving advice—he became the decision-maker himself. In this case, the retaining agreement between PDC and Houlihan surely allowed for high levels of access to the ESOP, and the goal of that access certainly appears to be to influence the ESOP to participate in the sale. But, simply put, the SAC does not allege that Houlihan ultimately had control over whether the sale happened. In fact, Houlihan established its loyalties to PDC via its retaining letter, it rendered professional services according to industry standard, and it influenced, but did not control, the ESOP's final decision to move ahead with the sale. Ultimately, Lyon's allegations are self-defeating. That is, if Houlihan truly had "discretionary authority or discretionary control" respecting the disposition of plan assets, then it would not have needed to engage in a public relations campaign to convince others to complete the sale. It could have just accomplished the sale on its own.

Accordingly, the court was correct in its prior determination that Houlihan was not a fiduciary to the ESOP because Houlihan did not have "any discretionary authority or discretionary control" over the plan, as is required by ERISA. For that reason, the SAC fails

---

[9] The same allegations were in the FAC, *see e.g.,* FAC ¶¶ 8, 57, 223, and were rejected as insufficient to establish a fiduciary relationship. ECF No. 186 at 30–31.

to make out a *prima facie* case that Houlihan engaged in any prohibited transactions, and I therefore recommend that Count 21 be dismissed. For the same reason, the breach-of-fiduciary claim (Count 36) should also be dismissed.

### E. Count 37 Should be Dismissed

In the second amended complaint, Lyon once again alleges that Houlihan knowingly participated in the fiduciary breaches of others in violation of ERISA § 502(a)(3), which permits a cause of action against a non-fiduciary for "appropriate equitable relief" to redress ERISA violations. SAC ¶¶ 1334–1342. Specifically, Lyon alleges that Houlihan engaged in prohibited transactions in violation of § 406. *Id.* ¶ 1335. The Supreme Court has explicitly held that such an allegation may be actionable. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000). Even if Count 37 were timely, it fails to state a claim.

ERISA establishes that a "fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . use by or for the benefit of a party in interest[] of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). The party on the receiving end of the prohibited transaction may be liable if it "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." 530 U.S. at 251. Premised on concepts from trust law, *Harris Trust* makes it clear that non-fiduciaries under ERISA are only liable for "ill-gotten" trust assets, and remedies are limited to equitable relief (*i.e.*, restitution, constructive trust, etc.). *Id.* Thus, a prima facie case against a non-fiduciary like Houlihan must plausibly allege: (1) an underlying fiduciary breach, (2) knowing participation by the party, and (3) receipt of "ill-gotten" trust property.

Lyon argues that he has plausibly alleged enough wrongful conduct by Houlihan to survive dismissal. Lyon's theory of the case is that: (1) Buth and Karch caused the ESOP to engage in prohibited transactions by accepting bonus payments in connection with the 2001 transaction, (2) Houlihan—"[b]ecause it had extensive experience with ERISA and ESOPs"—knew or should have known that these bonus payments were prohibited, but nonetheless participated by structuring the transaction, and (3) Houlihan was compensated for its participation by PDC, an entity entirely owned by the ESOP, meaning that the $8.1 million payment to Houlihan was an "ill-gotten" ESOP asset. SAC ¶¶ 1335–38; *see* ECF No. 211 at 14–16.

Houlihan argues that this allegation is legally insufficient because Lyon did not plausibly allege that (1) Houlihan received traceable ESOP assets, or (2) that Houlihan had knowledge of the underlying fiduciary breaches. ECF No. 201 at 27–30.

### 1. PDC's Payment to Houlihan Did Not Involve ESOP Assets

In dismissing the FAC, the court already determined that "executive compensation-related transactions did not involve any Plan assets." ECF No. 186 at 43. In a similar vein, Houlihan argues that, even though the ESOP purchased 100% of PDC's common stock, it does not follow that all PDC assets are therefore ESOP assets. Thus, Houlihan argues, when Houlihan accepted $8.1 million from PDC, Houlihan was not accepting an "ill-gotten" plan asset.

"Plan assets" are defined in the federal regulations. 29 C.F.R. § 25.3-101. "Generally, when a plan invests in another entity the plan's assets include its investments, but do not, solely by reason of such investment, include any of the underlying assets of the entity." 29 C.F.R. § 25.3-101(a)(2). The regulations then significantly narrow this general rule by

providing that investment in an equity interest *does* give a plan an interest in the entity's underlying assets *unless* the entity falls within four listed categories. *See id.*

The relevant listed category in this case is "operating company." The regulations say that if a plan acquires an interest in an "operating company," then the plan does not have an interest in the operating company's assets. *Id.* But if the plan acquires an interest in a "holding company," then the plan does take an interest in the holding company's assets. Helpfully, the regulations define "operating company" as "an entity that is primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital." 29 C.F.R. § 25.3.101(c).

Lyon argues that PDC is a holding company, but I conclude that the regulations would define PDC as an operating company. PDC owned the subsidiary Appvion. Appvion produced and sold paper products. Therefore, PDC is "an entity that is primarily engaged . . . through a majority owned subsidiary . . . in the production or sale of a product." The ESOP does not have an interest in PDC's assets, despite owning 100% of its stock. ECF Nos. 201 at 25–26, 227 at 14–15. Accordingly, when Houlihan received payment from PDC, it does not follow that that payment was an ESOP asset. On this basis, I recommend that Count 37 be dismissed.[10]

### F. The Parties Present Several Other Arguments, None of Which Compels a Different Conclusion

#### 1. Lyon's Pleadings Do Not Violate Federal Rule of Civil Procedure 8(a)

---

[10] While I conclude that Count 37 should be dismissed, I do not agree with Houlihan that it should be dismissed because Lyon failed to plausibly allege that Houlihan knowingly participated in the fiduciary breaches of others. The SAC plausibly alleges that Houlihan possessed a tremendous amount of knowledge about the 2001 transaction. Lyon has alleged that Buth and Karch made material misrepresentations to Appvion employees, to whom they owed a fiduciary duty. Second, Lyon has alleged that on several occasions, Houlihan was aware of those material representations. Lyon's allegations support an inference of "actual knowledge," especially in light of Houlihan's access to information and control over communications.

Houlihan argues that Lyon's complaint violates FRCP 8(a)[11] because it forces "judges and adverse parties to fish a gold coin from a bucket of mud," "imposes an undue burden on the judge," and further argues that "it is nearly impossible to read the SAC in one sitting, and it would take legions of attorneys if the defendants were forced to draft an answer to it." ECF No. 201 at 3–4. Houlihan cites several cases in which shorter complaints than the SAC have been dismissed. *Id.*

While Rule 8(a) states that a pleading must contain a short and plain statement of the claim, this case is also controlled by Federal Rule of Civil Procedure 9(b), which states that, in alleging fraud, a party must state with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b). As Lyon points out, "undue length alone ordinarily does not justify the dismissal of an otherwise valid complaint." ECF No. 211 at 30 (quoting *Standard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011)). Moreover, the FAC was dismissed for not pleading with enough specificity enough facts to meet Rule 9(b)'s heightened pleading standard. Accordingly, Lyon should be afforded some leeway in his efforts to meet that standard. I therefore do not recommend that the SAC be dismissed pursuant to Rule 8(a).

## 2. **Lyon Has Standing**

Houlihan argues that Lyon lacks standing because he changed the caption of the case between the FAC and the SAC. In the FAC, Lyon describes the plaintiff as "Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon in his capacity as the ESOP Administrative Committee of Appvion, Inc." In the SAC, it's "Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon." ECF No. 201 at 5–7. I disagree that this change precludes Lyon's standing[.

---

[11] The Ds&Os present a similar argument. ECF No. 225 at 17. My conclusion that the complaint does not violate Rule 8(a) resolves the Ds&Os' argument as well.

Under ERISA, a plan fiduciary has statutory standing to sue. ERISA §§ 502(a)(2), 502(a)(3), 502(c). As discussed above, ERISA also defines a fiduciary as someone who exercises discretionary authority or control over plan management, administration, or assets. 29 U.S.C. §§ 1002(21)(A). In this case, Lyon was appointed as the sole member and fiduciary to the ESOP committee in 2017. SAC ¶ 194. Houlihan accuses Lyon of "bad faith gamesmanship" in changing the caption, asserting that Lyon did so to avoid "this Court's determination that Lyon must plead fraudulent concealment *upon the ESOP Committee* in order to toll ERISA's statute of repose." ECF No. 201 at 7. Lyon responds that he changed the caption simply to avoid unnecessary confusion, and that both the FAC and the SAC have always been brought "by and through Grant Lyon" in his capacity as a fiduciary of the ESOP Committee to restore the ESOP's losses. ECF No. 211 at 28. Regardless, I conclude that Lyon—as the only member of the ESOP Committee—has statutory standing as a fiduciary. Accordingly, I do not recommend that Lyon's claims against Houlihan be dismissed on this basis.

### 3. The Adverse Domination Doctrine Does Not Salvage Lyon's Untimely Claims

Lyon argues that the adverse domination doctrine can salvage his untimely ERISA claims. "Adverse domination" is an equitable doctrine that tolls the statutes of limitations for claims by corporations against its officers, directors, lawyers, and accountants for so long as corporation is controlled by those acting against its interests. George L. Blum, Annotation, *Application of Doctrine of Adverse Domination* 13 A.L.R. 7th Art. 3 (2016). Equitable suspension—for a period of "adverse domination" of the injured corporation by wrongdoers—may be appropriate, provided there was full, complete, and exclusive control by the wrongdoers. *See id*; *see also Peabody v. Davis*, 636 F.3d 368, 380 (7th Cir. 2011) (affirming a trial court's determination to reject the adverse domination doctrine because the alleged

defendants were third parties, not officers or directors of the corporation bringing suit, and therefore did not "dominate" the entity). Lyon argues that "adverse domination doctrine applies with full force here" because "Houlihan's wrongdoing was only made possible by its corporate co-conspirators. Houlihan should not now be allowed to claim that the statute of limitations has run because *its co-conspirators* knew of its conflict." ECF No. 211 at 27–28 (emphasis in the original).

The problem with Lyon's argument is twofold. First, as described above, Houlihan did not possess full, complete, and exclusive control over the corporation and therefore did not dominate the ESOP. Rather, Houlihan had access and influence, not control. Second, the doctrine covers claims by corporations against its own officers and directors, not against their outside co-conspirators. *See Peabody*, 636 F.3d at 380. Lyon does not cite any legal authority to show that the doctrine has been used to hold third parties accountable because of the actions of an allegedly compromised board. Accordingly, I do not recommend that the court employ this equitable doctrine to salvage Lyon's untimely claims against Houlihan.

In sum, I recommend that Counts 21, 36, and 37 against Houlihan be dismissed on three independent bases. First, I conclude that all three claims cannot survive ERISA's statute of repose because Lyon has failed to carry his burden to show that the statute of repose should be tolled. Second, I conclude that Houlihan was not a fiduciary to the ESOP as is required for a prima facie case in Counts 21 and 36. Finally, I conclude that Count 37 should be dismissed because Lyon failed to plausibly allege that Houlihan received traceable ESOP assets.

### III.    State Street[12]

---

[12] State Street Bank and Trust Company is a nationally chartered trust company with its principal place of business in Boston, MA. State Street also has a division called State Street Global Advisors. SAC ¶ 56.

### A. Factual Background

The ESOP hired State Street in 2001 at the behest of Buth, Karch, Houlihan, and other stakeholders, to be an independent trustee. SAC ¶ 84–96. In this role, State Street was to have two primary responsibilities. First, State Street was supposed to represent the sole interests of the ESOP during the sale of PDC's stock to the ESOP. Second, State Street was responsible for setting the price of PDC's stock, biannually, using a prudent process. State Street carried out both responsibilities until March of 2013, when it sold its ESOP-related business to Reliance. Now, Lyon accuses State Street of unlawful conduct connected to both of its responsibilities to the ESOP.

#### 1. The 2001 Transaction

According to Lyon, the ESOP hired State Street to "make sure the transaction was fair from a financial perspective to the ESOP," SAC ¶ 465, and to negotiate a fair purchase price on behalf of the ESOP, *id.* ¶ 676. State Street was also required to certify that the ESOP had "all necessary information," and that "clearly false or misleading information has not been provided to the eligible participants." ECF No. 111-3 at 92. From these facts, Lyon asserts that State Street became subject to ERISA's fiduciary duties of prudence and loyalty. ECF No. 210 at 4.

Lyon alleges three specific acts by State Street that constituted a fiduciary breach in connection with the 2001 ESOP transaction. First, State Street was imprudent in its valuation because it wrongly considered the 15% control premium and failed to account for Appvion's debts, including $73.1 million in pension and post-retirement debt. SAC ¶¶ 145–48, 643. As such, State Street allowed the ESOP to purchase PDC's stock for more than fair market value. *Id.* ¶ 647. Second, State Street knew about the loyalty bonuses owed to Appvion's corporate

36

officers and the contingency fee owed to Houlihan but allowed these two groups of stakeholders to drive the ESOP transaction, negotiate the purchase price, structure the financing, and control all communications to Appvion's employees about the sale. *Id.* ¶ 639. Finally, State Street set the stock price at $10/share at the time of the 2001 transaction without following a proper and prudent process to value the stock. *Id.* ¶ 643.

### 2. State Street's Biannual Stock Valuations

After the sale and $10 initial stock valuation, State Street continued to serve as the ESOP's trustee. State Street issued biannual stock valuations based on valuations made by an "Independent Appraiser." *Id.* ¶ 648. State Street retained Willamette (2001–2004) and SRR (2004–2012) for this role. *Id.* ¶ 651–53. Lyon alleges that State Street "failed to properly scrutinize the financial projections provided by Appvion management, which both Willamette and [SRR] relied on in valuating PDC stock." *Id.* ¶ 654. Specifically, Lyon alleges that State Street should have detected that Appvion executives directly benefitted from increased stock prices and were therefore incentivized to lie about the company's projections. *Id.* ¶ 655. Furthermore, State Street failed to require that the stock valuations subtract Appvion's debt, even though State Street agreed to subtract retirement debt in its valuations of another company. *Id.* ¶¶ 656–58. State Street also failed, according to Lyon, to prudently consider executive compensation, other interest-bearing debt, failed corporate mergers, and the aforementioned control premium during its time as trustee. *Id.* ¶¶ 658–69. State Street issued its final stock valuation on December 31, 2012. *Id.* ¶ 670.

### B. Summary of the Claims

Lyon alleges that the conduct described above supports three legal claims. First, in Count 3, Lyon alleges that State Street breached its fiduciary duties of prudence, loyalty, and

disclosure by allowing the ESOP to purchase 100% of PDC's stock for more than fair market value and by imprudently valuing PDC's stock from 2001 until 2013. Count 3 is brought under ERISA § 404(A)(1), 29 U.S.C. § 1104(a)(1). Second, in Counts 21 and 22, Lyon alleges that State Street engaged in prohibited transactions by allowing the ESOP to purchase PDC's shares for more than fair market value (Count 21) and by continuing to authorize the purchase of more shares from 2001 until 2013 (Count 22). SAC ¶¶ 1072–1109. Counts 21 and 22 are brought under ERISA § 406(a)(1). Third, in Count 28, Lyon alleges that State Street is liable for the breaches of its co-fiduciaries because it knowingly participated in the fiduciary breaches of the ESOP committee against the ESOP. SAC ¶¶ 1160–67.

### C. Both Allegations in Count 3 for Conduct Before November 26, 2012, Are Time-Barred

Lyon accuses State Street of two breaches of fiduciary duty for conduct occurring before November 26, 2012. ECF No. 210 at 4–8 (sale), 8–23 (stock valuations). In its Order dismissing the FAC entirely, the court held that the "FAC [did] not allege facts that support Lyon's contention that the State Street Defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing or prevent Lyon from discovering the facts relevant to his claims." ECF No. 186 at 34. The fatal pleading flaw in the FAC was Lyon's failure to allege with particularity that State Street "engaged in a course of conduct designed to conceal evidence of [its] alleged wrongdoing." *See Martin*, 966 F.2d at 1093–94. I now conclude that the second amended complaint fails to cure that defect because Lyon has still not pleaded sufficient facts to establish that State Street engaged in a course of conduct designed to conceal its alleged wrongdoing.

Lyon first alleges that State Street misrepresented the fair market value of Appvion to its employees and that "State Street's misrepresentations served to conceal its own lack of

prudence and conflicts of interest." ECF No. 210 at 5. This allegation fails because, as with other claims discussed herein, it conflates the act of concealment with the underlying breach itself. This is the precise defect that the SAC was meant to remedy. Second, Lyon alleges that State Street breached its fiduciary duties via its relationship with Houlihan, and concealed this breach in a July 25, 2001 letter, in an August 2, 2001 road show (through silent assent), in a July 23, 2001 prospectus, and in a November 19, 2001 prospectus. *See id.* at 5–7. However, each of these factual allegations has already been considered and rejected by the court. *See* ECF No. 186 at 37–40. As such, I cannot conclude that Lyon cured the defects of the FAC.

Third, Lyon alleges that State Street's original valuation of PDC's stock price at $10 per share was imprudent. ECF No. 210 at 7–8. Even assuming *arguendo* that this is a different argument from Lyon's first argument, it once again conflates the underlying breach with a purported act of concealment. Perhaps State Street was imprudent for its reliance on a third party to issue a starting stock price for the newly formed PDC at $10 per share, but its valuation cannot be both the underlying breach and the subsequent, independent act of concealment. Accordingly, even if State Street's opening valuation, its treatment of pension debt and the control premium, and its relationship with Houlihan were fiduciary breaches, nothing in the SAC suggests separate acts of concealment that would warrant tolling of the statute of repose.

As for the ongoing stock valuations, Lyon simply repeats the allegations that State Street was imprudent, disloyal, and improperly withheld information, *see* ECF No. 210 at 8–23, before concluding that State Street's stock valuations "served to conceal the process failures," *id.* at 19. Once again, Lyon conflates the underlying breach with the requisite affirmative conduct to conceal. Valuing a stock a given amount does not cover the tracks of

39

an underlying fraud years earlier. Thus, because I conclude that the SAC repeats the FAC's deficiencies, I recommend that Count 3 be dismissed as to all conduct prior to November 26, 2012.

**D. Lyon's Timely Allegations for Breach of Prudence, Loyalty, and Duty to Disclose in Count 3 Fail to State a Claim**

State Street issued one valuation[13] that falls within ERISA's statute of repose. Count 1 in the FAC also alleged that this single valuation was a fiduciary breach by State Street, and it was dismissed because the FAC did "not contain any allegations from which the court [could] infer that [State Street] acted imprudently." ECF No. 186 at 38. To state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff. *Allen*, 835 F.3d at 678. The allegations must only "provide sufficient detail to present a story that holds together." *Id.* (quoting *Alexander v. United States*, 721 F.3d 418, 422 (7th Cir. 2013)). Lyon alleges that State Street breached its duty of prudence and loyalty when it failed to adequately review the third-party stock valuation. SAC ¶ 663–68.[14]

State Street protests that Lyon "merely rehashes the allegations" that he already made in the FAC. ECF No. 223 at 7. I agree. The SAC concludes that State Street was imprudent, but also concedes that State Street hired reliable independent experts, relied on those experts, and followed the ESOP plan documents. None of those factors mandates a finding that State Street was prudent, but each makes it less plausible that it acted imprudently. The SAC

---

[13] Lyon argues that State Street's penultimate stock valuation—on July 16, 2012—should also be considered timely because the ESOP used this valuation to purchase stock until December when a new price was set. *See* ECF No. 210 at 24. I disagree with this line of reasoning and recommend that this court consider allegations against State Street for the July 16, 2012, to be untimely.

[14] Unlike Lyon's fiduciary breach claims based on the duties of loyalty and disclosure, Lyon's claim that State Street acted imprudently does not rest on allegations of fraud. Accordingly, to survive this motion to dismiss, Lyon need only aver facts that plausibly infer that State Street was imprudent. *See infra* pp. 56–60. However, I still conclude that Lyon has failed to amend his duty of prudence claim against State Street.

concludes that State Street was disloyal but fails to allege any incentive for disloyalty besides

fee collection, and that incentive was already rejected as insufficient by the court. Ultimately,

the SAC tells no more plausible a story than the FAC, and so in the absence of any material

new factual allegations, I recommend that Count 3 be dismissed entirely.

### E. State Street Did Not Cause the ESOP to Engage in Prohibited Transactions (Counts 21 and 22)

Section 406(a)(1) of ERISA provides that a plan fiduciary shall not cause the plan to

engage in a transaction if he knows or should know that the transaction constitutes a direct

or indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the

plan" or "acquisition, on behalf of the plan, of any employer security or employer real

property in violation of section 1107(a)." 29 U.S.C. §§ 1106(a)(1)(D), (E).

This same allegation was dismissed from the FAC because, under ERISA, no one can

*cause* a prohibited transaction unless he or she exercises discretionary authority or control over

whether the plan enters the transaction. ECF No. 186 at 42. Simply put, although State Street

exercised significant influence over purchasing decisions by setting the stock price, the FAC

failed to allege discretionary control.

In the SAC, Lyon once again fails to state a claim against State Street for prohibited

transactions. First, as to the 2001 transaction (Count 21), Lyon alleges that State Street could

"purchase shares of PDC pursuant to the direction of the ESOP Committee (at the time, Buth,

Parker, Karch, and Fantini), but only 'if the ESOP trustee, in its sole discretion, determines

that it is permissible under ERISA to accept the direction of eligible participants with regard

to investment in common stock.'" SAC ¶ 1083 (quoting a prospectus). This was the precise

allegation considered by the court in the FAC. The SAC repeats this line of argument,

suggesting that State Street's actions were *necessary* to complete the transaction, but once again

it cannot support an inference that State Street's own actions were *sufficient* to complete the sale. It was an advisor, plain and simple.

Second, as to the ongoing stock valuations and purchases (Count 22), Lyon alleges that the trust agreement between State Street and Appvion said that State Street "shall purchase Company Stock with the assets contained in the Participants' ESOP Account upon the direction of the Committee, unless the Trustee determines that such purchase is prohibited by ERISA." *Id.* ¶ 1103. Because of this arrangement, Lyon alleges that State Street caused the ESOP to purchase PDC stock within the meaning of ERISA because it had the "discretion and responsibility" to determine whether the purchases were fair. *Id.* ¶ 1104. But again, having the discretion and responsibility to determine whether a purchase is fair does not equate to the power to effectuate that purchase. The structure and relationship alleged in the SAC do not imbue State Street with the requisite levels of discretionary control to be held accountable under ERISA.

Lyon cites to *Chesemore v. Alliance Holdings, Inc.*, for the proposition that a trustee defendant can cause an ESOP to engage in prohibited transactions when a trustee permits a stock purchase for more than fair market value. In *Chesemore*, the court held that a trustee caused the transaction because "the transaction would not have occurred without their choice to accept Alliance's improper orchestration and Alpha's improper direction." 886 F.Supp.2d at 1047. State Street argues that *Chesemore* doesn't apply because it dealt with trustees who were also officers of the company in which the ESOP owned shares. This is true, and there are other factual differences between this case and *Chesemore*. For example, the bad actor in *Chesemore* held the ESOP stock personally, did so for a relatively short amount of time and for the express purpose of turning a profit by reselling it at an inflated price, and took

42

calculated steps to ensure that no fiduciaries protected the employees' interest. *Chesemore,* 886 F.Supp.2d 1007 at 1012. This case is different because State Street never held any stock, was retained by the ESOP for over a decade, and had no incentive—other than administrative fee collection—to misrepresent the fair market value of PDC's stock.

However, even if *Chesemore* had similar facts, I would conclude that the type of causation found by the *Chesemore* court is without support in case law or ERISA itself. The *Chesemore* court employed "but for" causation—that is, it seemed to find that because the trustee's action was *a* required step in the process, that was enough to conclude that it controlled the process. Other courts have required a higher level of discretionary control before finding causation. In *Fish v. Greatbanc Tr. Co.*, for example, the court commented on ERISA's ambiguity about causation, saying "the statute does not say what it means by 'cause.' How near a cause of the ESOP's participation in the Transaction need defendants have been? Defendant's actions were not the sole or even nearest cause of the transaction, but they were undeniably a 'but for' cause of the transaction." *See* No. 09 C 1668, 2016 WL 5923448, at *60 (N.D. Ill. Sept. 1, 2016) (dismissing prohibited transactions allegations for other reasons but indicating a willingness to look for discretionary control, rather than simply for "but for" causation). And in *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan*, the Fifth Circuit reasoned that a trustee can only "cause" a plan to enter a prohibited transaction insofar as that trustee exercised discretionary authority over the decision to carry out the transaction. *See* 883 F.2d 345, 352 (5th Cir. 1989). Here, State Street as an adviser lacked the requisite level of discretionary authority over the decision to purchase or not purchase PDC's stock. The power to give advice, and even to *prevent* something from happening, is not the same as the discretionary authority or control. Here, that's especially true in light of the plan

43

language compelling State Street to act only *after* direction from the ESOP Committee. SAC ¶ 1103. ("The Trustee shall purchase Company Stock with the assets contained in the Participants' ESOP Account upon the direction of the Committee, unless the Trustee determines that such purchase is prohibited by ERISA."). For these reasons, I recommend that Count 22 be dismissed.

### F. State Street is Not Liable for the Breaches of Others

A plan fiduciary shall be liable for breaches of their co-fiduciaries with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach

ERISA § 405, 29 U.S.C. § 1105(a)(1)–(3). This court dismissed the co-fiduciary claim in the FAC because it failed to allege the "actual knowledge" requirement in both the first and third circumstances, Sections 1105(a)(1) and (3). *See* ECF No. 186 at 41–42. In the SAC, Lyon focuses on the second clause, Section 1105(a)(2), which does not require "actual knowledge." ECF No. 210 at 26–27. Specifically, Lyon's co-fiduciary liability theory is that "State Street breached its fiduciary duties by failing to act prudently in setting the stock price (SAC ¶¶ 647–668), thereby enabling the ESOP Committee Defendants' own breaches of fiduciary duty in, e.g., supplying inflated projections that boosted the stock value, approving the inflated stock values, and communicating those inflated stock values to the Employee Owners." *Id.* at 27. However, as explained above, the SAC does not state a plausible claim that State Street

breached its fiduciary duty of prudence. Because Lyon's theory is derivative of that precondition, I recommend that it be rejected.

Lyon's backup argument is that he has indeed alleged "actual knowledge" both of State Street's knowing participation in the breaches and knowledge that the co-fiduciaries were committing breaches of fiduciary duty. *Id.* To meet his burden of pleading "actual knowledge," Lyon presents the following allegations and arguments. First, State Street "knew, from the face of the valuations, that they were inflated." *Id.* at 28. This is at best a conclusory allegation. Second, the ESOP Committee prepared projections that were consistently higher than Appvion's performance, excluded debt, and contained a fraudulent control premium. *Id.* This is a clear repetition of the arguments the court already rejected in considering the FAC, however. Third, Lyon argues that the BemroseBooth valuations "are strong evidence that State Street knew pension liability should be deducted from the valuations." This too is a mirror-image of Count 7 of the FAC, in which Lyon alleged that State Street was liable as a co-fiduciary because it artificially inflated the stock price by excluding pension debt and supplied key information about their decision to fiduciaries who used it to sell their personal stock in breach of their fiduciary duties. FAC ¶¶ 618–619; 540–572. This court has already rejected these allegations as insufficient to support claims of co-fiduciary liability.

Finally, Lyon alleges that "State Street met in-person with the ESOP Committee to discuss valuation and allowed the ESOP Committee to communicate the stock value to the employees." ECF No. 210 at 28. This allegation also appeared in the FAC, *e.g.,* FAC ¶ 484, and does little to suggest that State Street had "actual knowledge" of co-fiduciary breaches. It is not reasonable to infer, based on a bare allegation that two parties had meetings, that one

side told the other about how it was systematically defrauding its employees. Accordingly, I conclude that the SAC repeats the same arguments and deficiencies found in the FAC.

In sum, I recommend that all counts (3, 21, 22, and 28) against State Street be dismissed. I conclude that most allegations in Count 3 are time-barred, while the timely allegations fail to state a claim. I conclude that Counts 21 and 22 fail because the SAC does not plausibly allege that State Street caused the supposedly prohibited transactions. Finally, I conclude that Count 28 fails to plausibly allege the "actual knowledge" element or that State Street acted imprudently.

## IV.    Reliance[15]

### A.  Factual Background

Reliance took over for State Street as the ESOP trustee from April 1, 2013, until June 30, 2014. *See* SAC ¶¶ 573, 579. Reliance retained SRR to conduct valuations of the plan. *Id.* ¶ 580. The relationship between Reliance and the ESOP was governed by a trust agreement. ECF No. 195-1. Reliance presented two of SRR's valuations to Appvion, as was required by the trust agreement, and those valuations were used to purchase PDC stock. *See* SAC ¶ 574.

### B.  Summary of the Allegations

Lyon alleges four counts of unlawful conduct against Reliance. In Count 1, Lyon alleges that Reliance breached its fiduciary duties of prudence, loyalty, and disclosure when it adopted SRR's stock valuations. SAC ¶¶ 572–593. Second, in Count 23, Lyon alleges that Reliance engaged in a prohibited transaction because it caused the ESOP to purchase PDC stock for an inflated value, in violation of ERISA § 406(a)(1). SAC ¶¶ 1110–19. Third, in Count 29, Lyon alleges that Reliance is liable as a co-fiduciary for the breaches of the ESOP

---

[15] Reliance Trust Company is a Georgia corporation with its principal place of business in Atlanta, Georgia. SAC ¶ 57.

Committee and SRR. SAC ¶¶ 1168–73. Finally, in Count 31, Lyon alleges that Reliance committed securities fraud because Reliance made or omitted alleged misstatement regarding the value of the company stock. SAC ¶¶ 1180–1205.

## C. Count 1 Fails to State a Claim that Reliance Breached Any Fiduciary Duty

### 1. Reliance Did Not Breach Its Duty of Prudence

Count 1 alleges that Reliance breached its duty of prudence under ERISA because it relied on SRR's valuations without properly investigating those valuations. Specifically, Lyon alleges that Reliance acted imprudently when it adopted SRR's valuations based on inflated projections, improper treatment of executive compensation plans, improper treatment of debt, and improper treatment of the control premium. SAC ¶¶ 582–86; ECF No. 209 at 7–15. In plain language, Lyon argues that SRR was doing shoddy work and Reliance should have discovered it. The court has already rejected these factual allegations as insufficient to state a claim. ECF No. 186 at 38.

As for what's new, Lyon presents two fresh factual allegations. First, that Reliance failed to detect and prudently account for SRR's rounding errors, SAC ¶ 587, which inflated the share price by between $0.14 and $0.25 per share, ECF No. 209 at 14. And second, that Reliance failed to conduct a reasonable investigation into SRR's valuation process, complete with documentation and direct communication with the ESOP. SAC ¶¶ 590, 592. Lyon alleges that proper documentation would have (1) identified individuals responsible for providing projections and an inquiry into any conflicts of interest; (2) required an opinion on the reasonableness of projections; and (3) required an analysis of the valuations, specifically addressing marketability discounts, control premiums, projections, and overall methodology contributed to the share price. *Id.* As a threshold matter, I conclude that this second allegation

47

is not new at all, but merely a repeat of the same prudence allegations found in the FAC. Lyon has added a process-based allegation of fiduciary breach—that Reliance failed to properly document its oversight—but the substance of what Lyon wanted Reliance to document has already been considered and rejected by this court. Further, Reliance points out that the SAC admits that Reliance discussed the valuation methodology with SRR and kept minutes of a meeting approving the methodology. SAC ¶ 584. Thus, it is questionable whether the allegation is true. Regardless, because this argument is a re-hash of what has already been found lacking in the FAC, I will focus on whether Lyon's novel rounding allegations can support a claim for a breach of fiduciary duty of prudence.

When an ESOP trustee fails to investigate a stock valuator's rounding techniques, it may breach its duty of prudence. *See Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 640 (E.D. Va. 2017), *aff'd*, 919 F.3d 763 (4th Cir. 2019). In *Brundle*, the court reasoned that an ESOP fiduciary should attempt to achieve the lowest possible purchase price for its client and should therefore be wary of arbitrary "rounding up." *Id.* The court concluded that the trustee did not reasonably rely on a valuator (coincidentally, the valuator was also SRR) who "rounded up" to achieve a median per share value of $4,235.00 when in fact it was $4,232.50. *Id.* ("Given the highly approximate nature of these valuations, it does seem natural that some rounding would take place. What does not make sense is why, given this latitude, SRR would round up, rather than down, when representing the buyer.").

In *Brundle*, the rounding error was just one practice among many that were suggestive of imprudence. *See id.* at 634–640. For example, the trustee was involved in determining the original ESOP share price and agreed to do so in a very short time period of less than three

months. *Id.* at 642. Under these time constraints, the rounding seemed much less prudent and much more suggestive of a rush-job. *See id.* The record in *Brundle* also brought to light some eleventh-hour negotiations in which the stock price swung between $4,350 per share down to $4,100 before settling at $4,235 per share. *Id.* at 622–23. Based on all of these factors, the *Brundle* court saw several red flags suggesting imprudence and concluded that the use of rounded numbers was due to time constraints and a desire to keep business moving rather than prudence.

But the allegations in this case are different. In fact, the pleadings show that SRR rounded in both directions—up and down—and the SAC does not explain how rounding is *ipso facto* indicative of imprudence. *See* SAC ¶ 587 (citing "[SRR's] practice of rounding numbers up or down throughout the valuation process . . ."). Lyon now argues that it doesn't matter that the rounding occurred in both directions, because it resulted in appraisals that were inflated by between fourteen and twenty-five cents per share. Even if true, that is roughly just one percent of the appraised price of the shares during the period in question. SAC ¶ 191. Given that appraisals are inherently an imperfect science, it's hard to see how such a small deviation due to rounding could be suggestive of imprudent oversight on Reliance's part. In sum, I conclude that Lyon's new allegation regarding rounding does not transform his pleading from implausible to plausible, and I therefore recommend that Count 1, for breach of the duty of prudence, be dismissed.

Finally, Lyon's allegations that Reliance be held liable for its failure to remedy the breaches of previous fiduciaries is conclusory and unsupported. *See* SAC ¶¶ 594–599. Lyon does not meaningfully develop this argument in his brief, instead choosing to cite two non-precedential cases and a Department of Labor opinion that support the proposition that such

49

a claim is *possible*. ECF No. 209 at 17–18. But Lyon merely concludes that "Reliance would have recognized from the face of the valuation" that it was incorrect, and therefore it should be liable for the failure to fix it. *Id.* I also recommend that this allegation be dismissed.

### 2. Reliance Did Not Breach Any Duties of Loyalty or Disclosure

A breach of the duty of loyalty exists when a fiduciary has "substantial conflicts of interest" and does not act "with an eye single to the interests of the participants and beneficiaries." *Chesemore* 886 F.Supp.2d at 1041. A breach of the duty to disclose may occur when a fiduciary makes statements to participants that are inaccurate, incomplete, or misleading. *See Hill v. The Trib. Co.*, No. 05 C 2602, 2006 WL 2861016, at *20 (N.D. Ill. Sept. 29, 2006), *aff'd sub nom. Pugh v. Trib. Co.*, 521 F.3d 686 (7th Cir. 2008). But for "plans involving investment in the employer's stock, there is not a general duty to continuously disclose information about the financial condition on the employer." *Id.*

In the FAC, Lyon alleged that Reliance was disloyal for the purpose of gaining a steady stream of administrative fees, and this court rejected that rationale as inadequate to support a claim. ECF No. 186 at 38–39. This time around, Lyon has not added any new, substantive allegations about any potential motivation to be disloyal. Instead, Lyon repeats his same allegations and cites case law from district courts in New York and New Jersey that he believes support his position. ECF No. 209 at 16. Because this allegation is clearly repetitive and substantively unchanged, I recommend that it be dismissed.

The same holds true for the disclosure claim. In the FAC, Lyon alleged that Reliance failed to disclose material information to Appvion's employees because Reliance had the chance to correct misinformation from Appvion and the ESOP committee to its employees. The court rejected that claim. ECF No. 186 at 40. Now, Lyon reasserts the same factual

50

background and argues that the "Seventh Circuit has held that a failure to disclose material information will trigger a breach of fiduciary duties where the fiduciary's silence is misleading." ECF No. 209 at 16 (citing *Adamczyk v. Lever Bros. Co., Div. of Conopco*, 991 F. Supp. 931, 939 (N.D. Ill. 1997)). But the SAC does not allege any facts suggesting that Reliance's silence was misleading. Rather, as alleged, Reliance and the ESOP Committee were in lockstep about the value of the company and the stock price. Thus, it is unclear what Lyon thinks Reliance would have communicated to the employees if only it had broken its silence. If Lyon's argument is that Reliance was imprudent and did not know that PDC's stock was seriously misvalued, then Reliance could not have communicated information about the incorrect valuation to the employees. Conversely, if Lyon's argument is that Reliance was fraudulently colluding with the ESOP Committee and Appvion to dupe the employees about the financial condition of the company, then this allegation cannot survive the heightened pleading standard required by Rule 9(b). It is not pled with particularity. Thus, I conclude that Lyon has essentially regurgitated the same factual background that he alleged in the FAC, and the claim should therefore be dismissed.

### D. Count 23 Fails to State a Prohibited Transaction Claim

For the same reasons that I concluded that State Street did not engage in prohibited transactions when it purchased PDC stock at the direction of the ESOP Committee, I also conclude that Reliance did not engage in prohibited transactions. Specifically, the SAC does not allege that Reliance had the requisite level of autonomy or control to cause the transaction.[16]

---

[16] Reliance also argues that the alleged stock sales and purchases do not fall under 29 U.S.C. § 1106 because they are "routine stock sales and purchases made pursuant to the requirements of the Plan when, for example, an employee made a contribution subject to matching, or was terminated . . . [they] posed absolutely no risk of harm to the ESOP, and are therefore not the type of transactions that are 'potentially harmful to the plan' and

51

### E. Count 29 is Identical to Count 20 Against State Street and Should be Dismissed for the Same Reasons

Lyon's argument for co-fiduciary liability for Reliance is legally and factually identical to his argument for co-fiduciary liability against State Street. *Compare* ECF No. 209 at 22–24 *with* ECF No. 210 at 26–28. My conclusion is identical as well: Reliance is not responsible for the breaches of its co-fiduciaries because the SAC fails to plead "actual knowledge" or that Reliance breached any fiduciary duty to the ESOP. *See* 29 U.S.C. § 1105(a)(1)–(3).

### F. Count 31, for Federal Securities Fraud, Fails to Plausibly Plead Scienter

In Count 31, Lyon claims that Reliance committed federal securities fraud. As explained above, a claim for federal securities fraud must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh*, 521 F.3d at 693. Lyon made an identical allegation in the FAC, and this court dismissed it for two reasons. ECF No. 186 at 45. First, the court found that Lyon did not identify the particular fraudulent or untrue statements each defendant made. *Id.* Second, Lyon did not allege any facts from which the court could plausibly infer scienter. The court further explained that the FAC failed to explain what Reliance stood to gain from its alleged actions. *Id.*

"The PSLRA provides that the complaint in a securities-fraud action must, with respect to each act or omission alleged to violate this chapter, state with particularity facts

---

thus prohibited by Section 1106. *Lockheed Corp. v. Spink*, 517 U.S. 882, 892–93 (1996)." ECF No. 195 at 11. I disagree. If Lyon's allegations were limited to stock buy-backs from retired employees, then perhaps Reliance would have a better argument. But the bulk of the alleged transactions were biannual purchases of stock by the trustee on behalf of the ESOP from PDC. The allegations support the inference that the biannual purchases were not at arm's length, but of the type that posed risks because they were between insiders. More importantly, when deciding if transactions are prohibited, "ERISA is a 'remedial statute to be liberally construed in favor of employee benefit fund participants.'" *Allen*, 835 F.3d at 677 (quoting *Kross v. W. Elec. Co., Inc.*, 701 F.2d 1238, 1242 (7th Cir. 1983)).

giving rise to a strong inference that the defendant acted with the required state of mind. That required state of mind is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756 (internal quotation marks and citations omitted). The Seventh Circuit has noted that "[t]he Supreme Court has directed us to dismiss the complaint unless 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Pugh,* 521 F.3d at 693 (quoting *Tellabs, Inc.* 551 U.S. 308). "Accordingly, we must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Id.*

Here, as this court has already found, there is no cogent or compelling reason to conclude that Reliance possessed the intent to deceive. ECF No. 186 at 45. The court's focus was motivation: *why would Reliance lie about the stock price?* In the FAC, Lyon said it was because of the allure of ongoing administrative fees. The Court rejected this argument. That's not surprising—simply hoping to continue generating fees is the kind of generalized motivation that exists in every case. "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001). The SAC, however, fares no better. We are simply told that Reliance participated in a fraud but not given any plausible reason for it to have done so. Accordingly, I recommend that Count 31 be dismissed for failure to plead scienter.

**V.     Argent[17]**

---

[17] Argent Trust Company, N.A. is a Tennessee corporation with its principal place of business in Ruston, Louisiana.

### A. Factual Background

Argent purchased Reliance's ESOP business unit in 2014 and took over its role as the ESOP trustee from July 1, 2014 until Appvion filed for bankruptcy in October 2017. *See* SAC ¶ 57–58; 602–03. Argent continued to use SRR as its outside valuator. *Id.* ¶ 603.

Because Argent is largely in the same position as the other trustee defendants, the issues mostly echo those addressed earlier. I will therefore focus on the facts that distinguish Argent from the other trustees. First, in 2015, Argent served as a discretionary trustee with the authority to vote on the sale of Appvion's most profitable asset, a unit of its company called Encapsys. SAC ¶¶ 333–34. The Encapsys sale helped Appvion pay off some of its debt, but also, allegedly, damaged its long-term prospects. *See id.* Furthermore, Argent's trust agreement with Appvion specifically allowed that "[Argent], in its sole discretion, may enter into purchase and sale transactions of any form or structure from time to time, but shall not enter into a non-exempt 'prohibited transactions.'" *Id.* ¶ 1128. The details of this "purchase and sale" clause were not alleged in the FAC.

Second, Argent was in charge at the time of the company's bankruptcy. When Argent took over in 2014, PDC's stock price was $16.25 per share. *Id.* ¶ 348. The SAC alleges that Argent imprudently failed to run a process for selecting a valuation firm and simply kept SRR because it had been around for so long and knew the company. *Id.* ¶ 611. Argent's first valuation increased to $16.30 per share, but then dropped precipitously to $11.00—a figure around which it hovered until it bottomed out on June 30, 2017, at $6.85 per share. *See id.* All this information was considered by the court in the FAC.

What's novel in the SAC is the allegation that in 2015 and 2016, the ESOP distributed $19.6 million despite receiving only $3.5 million. *Id.* ¶ 619. According to Lyon, Argent was

54

aware of this mismatch, raised it with SRR, but ultimately failed to appropriately account for it. *Id.* ¶¶ 619–22. Rather, with Argent at the helm, the ESOP continued to purchase PDC stock until June 2017. SAC-1 at 7. This allegation was hinted at in the FAC, *see* FAC ¶ 499, but it was not plausibly pled with the specificity found in the SAC. The SAC makes specific and particular allegations about Argent's supervisory knowledge that go beyond the conclusory allegations made against the other trustee defendants. For instance, Lyon alleges that he interviewed Steve Martin, an Argent Trust Company employee, who admitted (1) Appvion had never achieved its business projections during Argent's tenure as trustee, but that Argent and SRR never required Appvion to adjust the projections; (2) Argent discussed SRR's valuation methodology, specifically raising concerns about its method of accounting for Appvion's debt, but ultimately never insisted on a change; and (3) Argent questioned SRR about its discount for limited marketability because it seemed low, at $3.8 to $5 million. SAC ¶¶ 269, 614–20.

## B. Summary of the Allegations

Lyon levies four counts of unlawful conduct against Argent. First, in Count 2, Lyon alleges that Argent breached its fiduciary duties of prudence, loyalty, and disclosure when it adopted SRR's stock valuations. SAC ¶¶ 601–34. Second, in Count 24, Lyon alleges that Argent engaged in a prohibited transaction because it caused the ESOP to purchase PDC stock for an inflated value. SAC ¶¶ 1110–19. Third, in Count 30, Lyon alleges that Argent is liable as a co-fiduciary for the breaches of the ESOP Committee and SRR. SAC ¶¶ 1168–73. Fourth, in Count 32, Lyon alleges that Argent committed securities fraud because Argent made or omitted alleged misstatements regarding the value of the company stock. SAC ¶¶ 1180–1205.

### C. The SAC Pleads Sufficient Facts to Support a Claim that Argent Breached its Fiduciary Duty of Prudence

#### 1. The Appropriate Pleading Standard for this Claim is Rule 8(a), Not Rule 9(b)

Throughout the SAC, Lyon makes intertwined allegations of both fraudulent and non-fraudulent breaches of fiduciary duties. As Argent points out, "[t]he word 'fraud or one of its forms—fraudulent, fraudulently—appear *745* times in the SAC." ECF No. 222 at 4. And several of those allegations of fraud are directed at Argent. All allegations concerning fraud must be subjected to a heightened pleading standard. But Rule 9(b) "applies to fraud and mistake and nothing else." *Kennedy v. Venrock Assocs.,* 348 F.3d 584, 593 (7th Cir. 2003). In this case, I conclude that Lyon's allegation that Argent breached its fiduciary duty of prudence does not rely on fraud. Although the allegations are part of an overall mosaic that relies in part on allegations of fraud, the substance of the specific allegations against Argent is suggestive of imprudence rather than fraud (i.e., deception). Thus, unlike the allegations against the other trustees, which are inextricably intertwined with fraud allegations (likely as a vehicle to circumvent the statute of repose), the allegations against Argent can be extracted from the rest of the fraud allegations to be considered as stand-alone allegations of imprudence. That means the claim should not be subject to Rule 9(b)'s heightened pleading standards. "No heightened pleading standard applies here; it is enough to provide the context necessary to show a plausible claim for relief." *Allen v. GreatBanc Tr. Co.,* 835 F.3d 670, 674 (7th Cir. 2016) (addressing ERISA prohibited-transaction and fiduciary claims).

"[T]he standard of the prudent man is an objective standard, and good faith is not a defense to a claim of imprudence." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F.Supp.2d 511, 548 (S.D. Tex. 2003). The standard is objective and therefore independent of a fiduciary's lack of bad faith. *La Scala v. Scrufari*, 479 F.3d 213, 219–20 (2d Cir. 2007). 29

U.S.C. § 1104(a)(1)(B) "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 143, n. 10 (1985)). 29 U.S.C. § 1104(a)(1)(D) "makes clear that the duty of prudence trumps the instructions of a plan document." *Id.* at 421. The *Dudenhoeffer* court, conscious of the potential for meritless claims, explained that district courts, under "the pleading standard discussed in *Twombly* and *Iqbal*" should be able to conduct the appropriate, context-specific inquiry when an ESOP fiduciary faces a duty-of-prudence claim. *Id.* at 425–26. Thus, for a duty-of-prudence claim, the plaintiff must plausibly allege that a prudent fiduciary in the defendant's position would not have acted as the defendant did. *See id*; *see also Ret. Plans Comm. of IBM v. Jander*, 140 S. Ct. 592, 594 (2020) (directing the Second Circuit to answer, "what it takes to plausibly allege an alternative action 'that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than help it.'") In cases like this, where the company is privately held, "[a]ll the plaintiff must do is plead the breach of a fiduciary duty, such as prudence, and explain how this was accomplished." *Allen*, 835 F.3d at 679.

## 2. The SAC's New Factual Allegations Against Argent Support a Plausible Inference That Argent Was Imprudent

The duty of prudence mandates that a fiduciary's actions with respect to a plan must be performed "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). To state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff. *Allen*, 835 F.3d at 678.

57

Here, I conclude that Lyon has plausibly stated a prima facie case. Based on the factual allegations above, the SAC supports at least a plausible inference that Argent acted imprudently. For example, the complaint alleges that Argent accepted Appvion's business projections at face value despite a lengthy history of failing to meet such projections. SAC ¶ 612. That resulted in an overly rosy valuation, particularly when such projections were "critical to the resulting valuations." *Id.* The complaint further alleges that Argent's Steve Martin was aware of a valuation problem resulting from the failure to subtract certain debt; the matter was discussed with SRR but no immediate change occurred. SAC ¶ 614. Argent protests and points to the conversation with SRR as evidence that it was *not* imprudent—after all, it flagged the issue and discussed it with the valuator, SRR. That's all fine, but that gets into the merits of the dispute when at this stage all we're concerned with is whether the pleading states a claim. A single conversation with the valuator does not allow a judge to conclude, as a matter of law, that Argent acted prudently. "'The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits.' In reviewing a motion to dismiss under Rule 12(b)(6), 'we must accept as true all the plaintiff's well-pleaded factual allegations and the inferences reasonably drawn from them." *Gibson v. City of Chicago,* 910 F.2d 1510, 1520–21 (7th Cir. 1990) (citations omitted). Ultimately, Argent's defense does not challenge the sufficiency of the *pleading*; the question at this stage is simply whether the SAC sets forth a claim that meets the limited plausibility standard of *Iqbal* and *Twombly.* It does. Argent, of course, will "remain[ ] free to move for summary judgment after discovery on the grounds that [their] process for conducting a valuation of the stock was adequate." *Allen,* 835 F.3d at 679.

58

The SAC also states that Argent imprudently failed to challenge the control premium SRR applied, which ended up accounting for something like half of the total equity ascribed to the company. Argent argues that a control premium *was* justified, but again that is a conclusion not appropriate for consideration via a motion to dismiss. The question is simply whether the SAC states a claim. For example, in *Eckelkamp v. Beste* the parties debated whether it made sense to employ a control premium in an ESOP, but that exchange occurred at the summary judgment stage after expert witnesses had filed competing reports. The court found "[i]n a controlled ESOP situation wherein no changes are expected to enhance cash flow . . . the application of a control premium may not be prudent." *Eckelkamp v. Beste,* 201 F. Supp. 2d 1012, 1029 (E.D. Mo. 2002). The court further noted one expert's view that a control premium would be inappropriate because it "presupposes a sale of the company which he considers to be directly contrary to the goals of employee-ownership." *Id.* at 1030. Regardless of whether or not a control premium made sense in *this* case, the discussion in *Eckelkamp* demonstrates that the question is unresolvable at the pleadings stage unless the allegation is so implausible as to flunk the standard of *Iqbal* and *Twombly*.[18] Again, the allegation is not facially implausible—as the court in *Ecklekamp* found, using a control premium might indeed prove imprudent.

Finally, the SAC supports a plausible inference that Argent's imprudence harmed the ESOP in that Argent used the ESOP's money to buy PDC's stock for millions more than fair market value. ECF No. 213 at 21. Argent responds that the SAC "contains no specific and plausible allegations that tied Appvion's bankruptcy to any conduct by Argent." ECF No. 222 at 13. Argent also asserts that, according to Lyon, PDC was worthless long before Argent

---

[18] The case was affirmed, 315 F.3d 863 (8th Cir. 2012))

59

ever arrived on the scene. *Id.* at 14. Once again, however, these are arguments about the merits that do not demonstrate the SAC fails to state a claim. In sum, the SAC plausibly alleges that a prudent trustee in Argent's position would have done better, and that its actions or inactions caused financial harm. The allegations also do not rely on fraud. Given the lower pleading standard, I conclude that Lyon has asserted a plausible claim that Argent's imprudence caused harm to the ESOP. Count 2 should therefore survive the motion to dismiss.[19]

### D. The SAC Fails to Plead Sufficient Facts to Support a Claim that Argent Breached its Fiduciary Duties of Loyalty or Disclosure

For all the reasons that I concluded that Lyon has failed to state a claim for fiduciary breaches of either loyalty or disclosure against State Street and Reliance, I also conclude that Lyon has failed to make either of these claims against Argent. The SAC does not add any new and material facts that change the analysis.

### E. The SAC Supports an Inference that Argent Caused the ESOP to Engage in Prohibited Transactions

As with the other trustee defendants, Lyon alleges that Argent's purchases of PDC stock were prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106, and that they are not exempt because they were not for adequate consideration. Section 406(a)(1) provides that a plan fiduciary shall not cause the plan to engage in a transaction if he knows or should know that the transaction constitutes a direct or indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" or "acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a)." §§

---

[19] The original dismissal order found that "the FAC contains conclusory allegations against the Trustee Defendants as a group and fails to explain how each trustee engaged in conduct that would have been imprudent at the time of the valuation or how each trustee's reliance on a particular assessment was unreasonable." ECF No. 186 at 38. I conclude that the SAC has cured this defect as to Argent. The allegations are now disaggregated against the three different trustee defendants. Although Lyon was still only able to plead conclusory (or time-barred) allegations against State Street and Reliance, its claims against Argent are noticeably different..

60

406(a)(1)(D), (E). "A person cannot 'cause' a prohibited transaction unless he or she 'exercise[s] discretionary authority or control' over whether the plan enters into the transaction." *Fish*, 2016 WL 5923448, at *60 (quoting *Corrigan*, 883 F.2d at 352 ("The jury's finding that the defendants did not exercise discretionary authority or control over the trustees' decision to sell the trust stock is also a finding that they did not 'cause' the plan to enter into such a transaction.")). The court already dismissed an identical allegation against Argent in the FAC. ECF No. 186 at 42–43.

Above, I recommended that the prohibited transactions claims against State Street and Reliance be dismissed because the SAC failed to allege that either of these trustees "caused" the transactions. Reliance and State Street were both directed trustees; they needed authorization and direction from the ESOP committee to purchase PDC stock. By contrast, Argent had the power to cause the transactions all by itself, and the SAC creates a plausible inference that it did so. As described above, the trust agreement between Argent and the ESOP was different than the alleged trust agreements between Reliance, State Street, and the ESOP. Where Reliance and State Street's actions were a necessary but incomplete step required to complete purchases of PDC stock, Argent could act to complete the stock purchases on its own. *See* SAC ¶¶ 1125–29. Thus, based on the allegations in the SAC, one may reasonably infer that Argent was a discretionary trustee who had the power to "cause" a prohibited transaction. Ultimately, although the original amended complaint failed to explain how Argent possessed this discretionary power, the SAC cures that defect.

Second, I conclude that the allegations in the SAC set forth a prohibited transaction, namely, a purchase of the company's stock. SAC ¶¶ 1126 – 1131. *See Neil v. Zell,* 677 F. Supp. 2d 1010, 1025 (N.D. Ill. 2009), as amended Mar. 11, 2010, (plaintiff alleged prohibited

transaction when ESOP purchased company stock). Argent cites two cases to support its argument that the alleged transactions are outside ERISA's scope. The first case is *Lockheed*. 517 U.S. at 882. *Lockheed* held that "a plan administrator's payment of benefits to plan participants and beneficiaries pursuant to the terms of an otherwise lawful plan is wholly outside the scope of § 406(a)(1)(D)" because such an action is not a "commercial bargain[] that present[s] a special risk of underfunding because [it is] struck with plan insiders, presumably not at arm's length." *Id.* at 892–93. Here, however, the relevant transactions are the biannual purchases of PDC stock by Argent on behalf of the ESOP and based on valuations approved by Argent. The alleged facts give rise to an inference that these purchases were not at arm's length and presented a risk.

The second case is *Armstrong v. Amsted Indus.*, No. 01-cv-2963, 2004 WL 1745774 (N.D. Ill. July 30, 2004). There, a district court held that benefits payments to retired employees who opted for a cash payout on their ESOP holdings did not fall under Section 1106 of ERISA. *Id.* at *9. That's obviously not what's alleged here. Instead, the SAC simply alleges that Argent purchased company stock at inflated values. In 2016, in *Allen v. Greatbanc Trust Co.*, the Seventh Circuit held that "a purchase of employer stock by the Plan" is "indisputably [a] prohibited transaction within the meaning of section 406." *Allen*, 835 F.3d at 675; *Henry v. U.S. Tr. Co. of California,* 569 F.3d 96, 97–98 (2d Cir. 2009) ("Section 406 of ERISA . . . generally prohibits an employee plan's fiduciaries from causing the plan to engage in transactions with a 'party in interest,' including purchases of the employer's securities.") Accordingly, I conclude that Argent's alleged transactions qualify as prohibited transactions. I therefore recommend that Count 24 should survive the motion to dismiss.

**F. Argent's Co-Fiduciary Liability**

The SAC cannot maintain a claim under either 29 U.S.C. §§ 1105(a)(1) or (3) (co-fiduciary liability) because those sections require that Argent would have had "actual knowledge" about breaches by any other fiduciaries. The SAC does not plausibly allege actual knowledge. Lyon argues that a claim under 29 U.S.C. § 1105(a)(2) may be asserted without pleading "actual knowledge," however. That section states that a fiduciary may be liable for the breaches of his co-fiduciaries "if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach." *Id.*

Even if a § 1104(a)(2) claim does not require actual knowledge, it does require enabling another fiduciary to commit a breach. As set forth herein, Lyon has failed to plausibly allege an actionable breach by any other fiduciary. Thus, given that no other fiduciary breach claim can survive, I recommend that Lyon's claim for co-fiduciary liability, Count 30, also be dismissed.

### G. Count 31, for Federal Securities Fraud, Fails to Plausibly Plead Scienter

As with the other trustee defendants, Lyon has not adequately plead scienter to support a federal securities fraud claim. Lyon's argument to the contrary does not differ from his argument against the other two trustee defendants. Neither does my analysis. Simply put, Lyon fails to allege what Argent might have stood to gain from intentionally deceiving the ESOP. I recommend, therefore, that Count 31 be dismissed.

### VI.  SRR[20]

### A. Factual Background

---

[20] Stout Risius Ross, Inc. is a Michigan limited liability company. SAC ¶ 60. Scott D. Levine is a United States Citizen and served as Stout's Director in 2004 and its Managing Director from 2005 to the present. *Id.* ¶ 61. Aziz El-Tahch is a United States Citizen and served as a Manager of Stout from 2004 to 2007. *Id.* ¶ 62. El Tahch returned to Stout in 2008 and was thereafter promoted to Managing Director. *Id.* Collectively they are "SRR."

SRR took over stock valuations for PDC in December 2004 and issued semi-annual evaluations until 2017. SAC ¶¶ 60, 154. Lyon alleges that from December 31, 2013 until June 30, 2017, SRR falsely represented the fair market value of PDC's stock. *Id.* ¶ 1289. Lyon repeats all the allegations of fiduciary imprudence that he levied against every other defendant (i.e., inexplicable control premium, unfunded pension debt, rounding, unreasonable reliance on internal projections, an unreasonable discount for marketability, flawed methodology, etc.). *Id.* ¶¶ 1299–1307. Lyon concludes that SRR's valuations with these flaws amounted to "misrepresentations and omissions." *Id.* Lyon also alleges that SRR's misrepresentations and omissions were made in connection with the purchase of a security, that they harmed the ESOP, and that the ESOP relied on them. *Id.* ¶¶ 1308–11.

## B. Summary of the Claims

In Count 35, Lyon accuses SRR of federal securities fraud. SAC ¶¶ 1288–1313. Count 35 is brought under the Securities Exchange Act of 1934, § 10(B), 15 U.S.C. § 78J and SEC Rule 10B-5, 17 C.F.R 240.10b-5. Procedurally, Lyon also requests that the court convert Stout's motion to dismiss to one for summary judgment because Lyon believes SRR improperly raised arguments beyond the pleadings. ECF No. 216 at 2–4. For example, SRR argued that "each of the 'errors' [SRR] is alleged to have committed are not errors at all, but reasonable exercises of [SRR's] professional judgment that are grounded in, and supported by, valuation texts and treatises and relevant case law." *Id.* (citing ECF No. 204 at 12–27). According to Lyon, this is but one example of SRR trying to influence the court with facts and authority beyond the pleadings. *See id.*

## C. The Court Need Not Convert SRR's Motion to One for Summary Judgment

If matters outside the pleadings are presented to—and not excluded—by the court, the motion must be treated as one for summary judgment. But in this case, the court does need to consider the extra facts or authority presented by SRR, whatever they may be. That is because the scope of SRR's motion to dismiss is quite narrow. The court need not decide whether SRR engaged in sound valuation methodology. Rather, the court must decide, as explained below, whether the SAC pleads facts from which the court can infer scienter: that SRR had the intent to deceive. Because this question can be answered within the four corners of the complaint, I do not recommend that SRR's motion be converted to one for summary judgment.

### D. The Sole Count Against SRR, For Federal Securities Fraud, Should Be Dismissed Because the SAC Does Not Contain Facts From Which the Court Can Infer Scienter

As explained elsewhere, to survive dismissal, a claim for federal securities fraud must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh*, 521 F.3d at 963. The same allegation against SRR was brought in the FAC, and it was dismissed because the FAC failed to plead scienter. ECF No. 186 at 50. Now, Lyon argues that the SAC pleads facts that support a plausible and compelling inference that SRR intended to deceive. ECF No. 216 at 4–26.

A plaintiff must allege facts that give rise to a strong inference that each defendant acted with scienter, defined as "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pugh*, 521 F.3d at 693. Scienter has been pled if "a reasonable person would deem the inference of scienter cogent and at least as compelling as

65

any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 310. That is an "[e]xacting pleading requirement[]" by design; Congress intended to curb "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers." *Id.* at 313, 320 (internal quotation marks and citations omitted). Most notably, under the heightened pleading standard that governs this allegation, the court must take into account plausible opposing inferences, and not restrict itself to the typical leniency afforded to the non-moving party. *See id.* Thus, the plaintiff must allege facts that give rise to a *strong* inference of scienter, not merely a possible one. *Id.* For purposes of fraud, scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst,* 425 U.S. at n. 12. "Typically, an accountant's interest in fees, standing alone, will not suffice to establish fraudulent intent." *Tricontinental Indus., Ltd., v. PricewaterhouseCoopers, LLP,* 475 F.3d 824, 841 (7th Cir. 2007); *see also Fidel v. Farley,* 392 F.3d 220, 232–33 (6th Cir. 2004) (overruled on other grounds by *Tellabs,* 551 U.S. at 324) ("allegations that [an] auditor earned and wished to continue earning fees from a client do not raise an inference that the auditor acted with requisite scienter.").

Lyon asks this court to draw several inferences from the SAC. For example, Lyon argues that "it is plausible that Stout inflated the valuations to protect against liability, curry favor with management, and protect its revenue." ECF No. 216 at 5. Why else, asks Lyon, would SRR have treated BemroseBooth's unfunded pension debt so differently than it treated Appvion's? *Id.* at 7–11. And what else could explain why SRR used financial projections of future cash that were inflated above historical results? *Id.* at 12. The problem with this line of reasoning is that it does not address the court's specific concern and documented reason for dismissal. As with other defendants, we are simply told that SRR participated in a fraud

66

without any plausible motivation for SRR to do so. The reasons now asserted (e.g., currying favor with management, etc.) are the kinds of assertions that may be made against almost anyone who earns fees by providing services. Scienter requires more. Lyon forcefully reasserts his position from the FAC—that SRR did a bad job of evaluating PDC's stock—but he does not include any significant and new allegations suggesting that they did so for fraud-based reasons. Lyon's answer to why SRR supposedly did this is the same as it was in the FAC: to earn fees and position itself to continue to earn fees. This rationale is not enough to support a claim under the rigid pleading standards. For that reason, I recommend that Count 35 be dismissed.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND** that Counts 2 and 24 against Argent should survive the motion to dismiss; all other claims should be **DISMISSED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Civ. P. 72(b)(2), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this Recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated in Milwaukee, Wisconsin, this 17th day of March, 2022.

_____
STEPHEN C. DRIES

United States Magistrate Judge