**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| APPVION, INC. RETIREMENT SAVINGS AND EMPLOYEE STOCK OWNERSHIP PLAN, BY AND THROUGH GRANT LYON IN HIS CAPACITY AS THE ESOP ADMINISTRATIVE COMMITTEE OF APPVION, INC., | ) ) ) ) ) ) | Case No.: 1:18-cv-01861-WCG |
| Plaintiff, | ) ) | **ARGENT TRUST COMPANY'S ANSWER TO PLAINTIFF'S** |
| v. | ) ) | **SECOND AMENDED COMPLAINT** |
| ARGENT TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |

For its Answer to Plaintiff's Second Amended Complaint ("Complaint"), Defendant Argent Trust Company ("Argent") states as follows:

<u>ANSWER</u>

The numbered paragraphs below correspond to the paragraph numbers contained in Plaintiff's Complaint. The headings used match those chosen by Plaintiff – they are included for ease of reference only and do not constitute any admission. Argent generally denies all allegations contained in the Complaint not expressly and specifically admitted, including all allegations contained in the headings, footnotes, and prayer for relief.

I.  **INTRODUCTION**

A.  **AWA Could Not Sell Appvion at an Acceptable Price.**

1.  At the beginning of 2001, Appleton Papers, Inc. ("Appvion"),[1] a Wisconsin-based paper products Company, was owned by French conglomerate Arjo Wiggins Appleton ("AWA"). AWA had been trying, without success, to sell Appvion for several years because its

---

[1] Appleton Papers, Inc. changed its name to Appvion in May 2013. For simplicity, it is referred to throughout this Complaint as Appvion.

paper products business was declining from the increasing use of computers. Finally, on 12 February 2001, AWA contracted with Appvion's CEO, Douglas Buth, promising that if he could sell Appvion for more than $700 million, AWA would pay him a contingent fee bonus of up to $10 million that he could divide among himself and other senior management that helped him with the sale. If Buth were unable to sell Appvion for at least $700 million, he would get no bonus.

> **ANSWER:** **Argent states that the allegations in Paragraph 1 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1.**

2.      Unable to find a third-party buyer willing to pay more than $700 million Buth pitched a plan to sell Appvion to its employees as part of an employee stock ownership plan, or ESOP. The sale was structured as a sale of 100% of Paperweight Development Corp.'s ("PDC") stock to the ESOP. PDC[2] would then purchase Appvion from AWA and would become Appvion's parent holding company.

> **ANSWER:** **Argent states that the allegations in Paragraph 2 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2.**

---

[2] PDC was the holding company that owned Appvion. Appvion and PDC are referred to interchangeably throughout this SAC because their finances were consolidated and Appvion was the primary employer.

**B.** **Houlihan Quarterbacked the ESOP Transaction For a Contingent Fee.**

3.      Buth had no experience with ESOPs and so he engaged the international investing banking firm Houlihan Lokey to "quarterback" the entire ESOP process, agreeing to pay a contingent fee of 1% of the total sales price (ultimately $8.1 million), $100,000 for a fairness opinion, and additional amounts Houlihan would receive directly from AWA.

> **ANSWER:**    Argent states that the allegations in Paragraph 3 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3.

4.      Both Buth and Houlihan were badly conflicted because if they did not sell PDC's stock to the ESOP they would get no contingent fee. Also, if the sale went through, Buth, Karch (Appvion's general counsel) and others would receive the financial benefits from remaining in control of Appvion. Therefore, Houlihan needed to carefully exercise its contractual right to direct the hiring of the ESOP Trustee and the valuation firm that would value the PDC stock. The selected firms needed to be willing to collude with Houlihan, Buth and Karch by supporting the ESOP's purchase of PDC stock for more than fair market value. Houlihan selected State Street to be the ESOP fiduciary and Willamette to value the PDC stock. Buth and Karch agreed.

> **ANSWER:**    Argent states that the allegations in Paragraph 4 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4.

5.      Houlihan, Buth, Karch and State Street also had to carefully monitor and control all communications between Appvion and the employees.[3]  In those communications, Buth, Karch, Houlihan, State Street, and Willamette all assured the Employee Fiduciaries that at $10 per share, the ESOP was not paying more than fair market value. But in fact, at the date of the ESOP closing (9 November 2001) the PDC stock had no equity or positive fair market value.

> **ANSWER:   Argent states that the allegations in Paragraph 5 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5.**

6.      The Appvion Employee Fiduciaries had to be so convinced that the ESOP was not paying more than fair market value for PDC stock, that they would be willing to not only overlook managements' conflict of interest, but take money from their diversified, liquid, debt free 401(k) plans and move it to the ESOP, where their investment would be undiversified, illiquid and heavily encumbered by debt.

> **ANSWER:   Argent states that the allegations in Paragraph 6 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

---

[3] The prospectus designated the Appvion employees as "Employee Fiduciaries" for purposes of their decision whether to fund the ESOP purchase of PDC stock. Therefore, the SAC will refer to them as such through the 9 November 2001 ESOP Transaction.

**Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6.**

C.  **Buth, Karch, Houlihan and State Street Engaged in a Course of Conduct to Fraudulently Conceal that the ESOP Would be Paying More than Fair Market Value at Closing.**

7.  In order to conceal from the ESOP, through its Employee Fiduciaries, that it would be actually paying more than fair market value for each purchase of PDC stock, Buth, Karch, Houlihan and State Street engaged in a course of conduct to fraudulently conceal their misrepresentations and fiduciary breaches in order to "cover their tracks." This course of conduct included the following affirmative acts that were separate and independent from their fraudulent misrepresentations that the ESOP would pay no more than fair market value for the PDC stock and the related fiduciary breaches of the duty of prudence, loyalty and disclosure:

- They each participated in a course of conduct of fraudulent communications with the Employee Fiduciaries falsely representing that Houlihan was "independent," for the purpose of persuading the Employee Fiduciaries, that Houlihan's independence was able to compensate for any bias that Buth, Karch and other Appvion management had resulting from their contingent fee. Believing that the ESOP was being endorsed by an independent, international investment banking firm with Houlihan's stature, the Employee Fiduciaries were dissuaded from further investigation into the transaction, into Appvion's true fair market value and into potential fiduciary breaches.

- In order to make it appear that the PDC stock had a positive equity value (when it did not), Buth, Karch, State Street and Willamette participated together in

fraudulently inflating PDC stock's fair market value. They did this by subtracting only a portion of PDC's balance sheet debt in arriving at PDC's fair market value. Specifically, they fraudulently failed to subtract PDC's pension and post-retirement debt and "Other" material liabilities that totaled $98.3 million as of 31 December 2001, just 52 days after the ESOP transaction closed. They also added (or agreed to add) a fifteen percent control premium, even though the ESOP documents made clear that the ESOP Trustee controlled neither Appvion nor its Board of Directors. As of 31 December 2001, the control premium equaled $83.6 million. Both of these actions violated basic valuation theory.

**ANSWER:** **Argent states that the allegations in Paragraph 7 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7.**

8. Absent these fraudulent manipulations to PDC's fair market value, Buth, Karch, State Street and Willamette would have been required to report a negative fair market value both at 31 December 2001 and at the 9 November 2001 ESOP closing. Further, these fraudulent manipulations to the stock price demonstrate the entire valuation process was not reliable.

**ANSWER:** **Argent states that the allegations in Paragraph 8 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

> **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.**

9.      Neither of these two manipulations, that raised PDC's equity value from a negative to a purported positive number, could reasonably be considered the result of a mere disagreement over proper valuation methods. As described later, there is no valuation theory that justifies not subtracting balance sheet debt that, for example, reached as high as $207.4 million in 2012. And Willamette, the very firm that did the valuations from 9 November 2001 through mid-2004, has published an article stating that the present value of retirement debt must be subtracted dollar-for- dollar from fair market value.

> **ANSWER:    Argent states that the allegations in Paragraph 9 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.**

10.     In fact, the Restatement 2nd of Torts specifically uses the example of disclosing some debt but omitting other debt in a prospectus, as an example of a fraudulent misrepresentation: "Thus a prospectus that accurately states the assets, bonded indebtedness and net earnings of a manufacturing corporation but omits any reference to its floating debt is a false representation of the financial position of the company." That is exactly what happened in every PDC stock valuation from 9 November 2001 through mid-2016.

> **ANSWER:    Argent admits that Paragraph 10 purports to cite the Restatement of Torts, Second, refers to that source for its exclusive terms, and denies all**

7

**allegations in Paragraph 10 inconsistent with its complete terms. Argent denies that it breached any fiduciary duty, made any fraudulent misrepresentation, or violated any provision of ERISA.**

11.     Likewise, there is simply no legitimate or good faith justification for sophisticated valuation professionals, investment bankers and highly educated company executives to add a "control premium" where all the ESOP documents (that they created to keep control) demonstrated the ESOP Trustee had no meaningful control. That is because Buth, Karch and others intentionally sold 100% of the PDC stock to the ESOP, while keeping control for themselves.

> **ANSWER:    Argent states that the allegations in Paragraph 11 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.**

12.     Buth, Karch, Houlihan, and State Street convinced Appvion's Employee Fiduciaries to vote in favor of contributing their 401(k) savings in order to come up with the $107 million down payment needed to buy one hundred percent of the PDC stock. In doing so, Buth and Karch received bonuses from the seller totaling over $1.7 million and $850,000, respectively; Houlihan received a more than $8.1 million in selling bonus; and State Street received the ESOP's ongoing business and strengthened its relationship with Houlihan.

> **ANSWER:    Argent states that the allegations in Paragraph 12 are not directed to it but instead to defendants who have been dismissed from the case, and**

therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13. The transaction closed on 9 November 2001, for a total purchase price of $810 million plus $25 million in transaction fees.

> **ANSWER:** **Argent states that the allegations in Paragraph 13 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13.**

### D. The Course of Conduct to Fraudulently Conceal PDC Stock's Fraudulently Inflated Value (and Related Fiduciary Breaches) Continued After the 9 November 2001 ESOP Transaction and Until Appvion's 2017 Bankruptcy.

14. After the close, Buth, Karch, and State Street (and additional defendants) by necessity, continued their course of conduct to conceal the fraud, and the related fiduciary breaches and that, contrary to what been represented, the ESOP had paid more than fair market value for the PDC stock in the 9 November 2001 ESOP transaction.

> **ANSWER:** **Argent states that the allegations in Paragraph 14 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated ERISA.**

9

15.     The ESOP documents required PDC's stock to be valued semi-annually by the ESOP Trustee with the assistance of an independent appraiser. Each of those valuations for the next 16 years had to likewise fraudulently inflate the PDC stock price in order to conceal that the PDC stock price had been fraudulently inflated since the 9 November 2001 ESOP transaction and the related fiduciary breaches.

> **ANSWER:    Argent admits that Paragraph 15 purports to cite various ESOP documents, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 15 inconsistent with their complete terms. Argent further denies that it breached any fiduciary duty or violated ERISA.**

16.     Each of the following 31 semi-annual valuations therefore served the separate and independent purpose of concealing the initial ESOP transaction fraud as well as the ongoing fraud, concealing that the ESOP was purchasing, and had purchased, every share of PDC stock for more than fair market value at fraudulently inflated stock values. Had, for example, if any of those valuations had properly deducted the pension/post-retirement debt and "Other Material Liabilities"[4] reported on Appvion's audited financial statements, and removed the fraudulent control premium, the ESOP, through its Employee Owners,[5] would have learned that Buth, Karch, Houlihan, State Street and Willamette had fraudulently misrepresented that $10 per share was fair market value for the PDC stock on 9 November 2001, the date of the ESOP transaction.

---

[4] These three balance sheet debt entries will be referred to at times as the "Excluded Debt" because they were excluded (not deducted) from every PDC stock valuation.
[5] After the ESOP Transaction closed, this SAC refers to the participating employees as the "Employee Owners" as a result of their ESOP ownership.

**ANSWER:** Argent states that the allegations in Paragraph 16 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated ERISA.

17.     For example, as of 31 December 2001 (the date of the PDC stock's first semi-annual valuation), Buth, Karch, Fantini, Parker and State Street fraudulently represented to the Employee Owners, that the ESOP was paying fair market value for the purchase of PDC stock, by creating and disseminating a PDC stock price that again purported to be fair market value. Each of the 31 semi-annual PDC stock prices (beginning with 31 December 2001) released to the ESOP, through the Employee Owners, again was furtherance of a course of conduct to fraudulently conceal that was separate and independent from the underlying wrongdoing—the 31 December 2001 fraud and related fiduciary breaches. And the same pattern of semi-annual fraud and the subsequent course of conduct of disseminating later fraudulent PDC stock prices, to conceal the earlier fraud and fiduciary breaches, continued through Appvion's bankruptcy.

**ANSWER:** Argent states that the allegations in Paragraph 17 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated ERISA.

18.     This course of conduct of fraudulent concealment, is well demonstrated by the following chart that comes from the April 2006 newsletter to the ESOP Employee Owners. The ESOP Committee (Richards, Karch, Parker) authorized its release:

**Figure 1: The Ownership Update, April 2006, PDC Stock Performance**



Source: The Ownership Update, April 2006, p. 2.

> **ANSWER:** Argent states that the allegations in Paragraph 18 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18.

19. As the chart demonstrates, each PDC stock price is separate and independent and sets the price for PDC stock prices for that respective period. But, at the same time, each stock price builds on stock prices from previous periods, thus acting to convince the Employee Owners that the earlier stock prices must have been correct because they form part of a consistent pattern. As a result, the Employee Owners were prevented from discovering the previous misrepresentations and breaches of fiduciary duty.

> **ANSWER:** Argent states that the allegations in Paragraph 19 are not directed to it but instead to defendants who have been dismissed from the case, and

**therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated ERISA.**

20.     The course of conduct of fraudulent concealment also included the following additional acts that were separate and independent from each of the semiannual valuation frauds from the earlier periods and which were also separate and independent because they were released pursuant to Appvion's SEC duties and not ERISA-imposed duties:

- Each year Appvion released its 10-K to the public, including to the ESOP, through its Employee Owners. The Notes to each of the audited financial statements that were part of the 10-K, beginning with 2002, reported the fraudulently inflated PDC stock price for that year, thereby again concealing that the previous years' stock prices had also been fraudulently inflated and the related fiduciary breaches. Each 10-K was signed to by Appvion's CEO and CFO (who also signed attestations) and the members of Appvion's Board of Directors.

- Each annual 10-K also contained a balance sheet entry entitled "Redeemable Common Stock" whose amount was calculated as a function of that year's fraudulently inflated stock price. This balance sheet entry was consistent with earlier years' fraudulent entries and therefore, also fraudulently concealed the preceding year's fraudulently inflated valuations and the related fiduciary breaches.

- Each annual 10-K balance sheet included the balance sheet from the previous year, thus validating that earlier year's stock price and concealing that the

"Redeemable Common Stock" value from the prior year had been fraudulently overstated.

- Each 10-K also included an audit opinion either signed by PricewaterhouseCoopers (2001 – 2014) or RSM McGladrey (2015 – 2016) representing that the annual financial statements were audited pursuant to the applicable auditing standard and that they were presented in accordance with generally accepted auditing standards. Because none of these audited financial statements corrected prior years' fraudulently inflated PDC stock prices, they likewise served to conceal the prior years' fraud and fiduciary breaches.[6]

- After each quarter, Appvion filed with the SEC and released 10-Qs that, like the 10-Ks, concealed that earlier periods' stock prices had been fraudulently inflated and related fiduciary breaches. These 10-Qs contained balance sheets likewise reporting the Redeemable Common Stock balance that incorporated PDC's most recent stock price, thus validating that year's stock price and fraudulently concealing that each earlier valuation had been fraudulently inflated and the related fiduciary breaches.

**ANSWER:**   **No response to Paragraph 20 is required because the Court has dismissed all claims relating to alleged concealment. (*See* Doc. 235). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in Paragraph 20 and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

---

[6] Neither PwC nor RSM are Defendants in this SAC. They are Defendants in a separate action filed in the State of Wisconsin Circuit Court, Outagamie County.

21.     The course of conduct of fraudulent concealment also included the following acts designed to conceal that earlier PDC stock prices were fraudulently inflated and the related fiduciary breaches, but that were separate and independent from the fraudulently inflated stock price of the earlier periods:

- The Defendants who were members of the ESOP Committee released a series of communications informing the ESOP Employee Owners of the stock price and purporting to describe the valuation processes. These communications continued to confirm the earlier fraudulent misrepresentations and misrepresented that the prior and current processes of valuing the PDC stock were reliable.

- Appvion held regular road shows that confirmed and perpetuated the prior year's fraud. Appvion's CEOs, Buth and Richards, conducted these road shows along with representatives from State Street, Willamette or Stout, and Appvion's Board of Directors.

- Throughout the ESOP's history, certain of the PDC valuations included additional fraudulent adjustments or inclusions that likewise served to conceal preceding years of fraud by reaffirming PDC's positive equity value.

- The ESOP Trustee sent regular account statements to the Employee Owners, affirming the stock values and their purchase price.

- The ESOP continued to redeem stock at the current fraudulently inflated values, thus concealing that the PDC stock, and prior years' PDC stock was being and had been purchased for more than fair market value, and giving assurance that the PDC stock had been accurately valued.

**ANSWER:** No response to Paragraph 21 is required because the Court has dismissed all claims relating to alleged concealment. (*See* Doc. 235). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in Paragraph 21 and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

22. This SAC details each Defendant's participation (with particularity) in this course of conduct of fraudulently representing that the ESOP would not pay more than fair market value as reflected by the PDC stock price, and then their participation in the subsequent course of separate and independent conduct to conceal the fraud from earlier years and the related breaches of fiduciary duty.

**ANSWER:** No response to Paragraph 22 is required because the Court has dismissed all claims relating to alleged concealment. (*See* Doc. 235). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in Paragraph 22 and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

23. This SAC also details each ERISA Defendants' underlying breaches of fiduciary duties that the Defendants' course of fraudulent concealment masked and prevented the ESOP, through its Employee Owners, from discovering.

**ANSWER:** No response to Paragraph 23 is required because the Court has dismissed all claims relating to alleged concealment. (*See* Doc. 235). To the

**extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in Paragraph 23 and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

### E. The BemroseBooth Transaction Provides Conclusive Evidence of an Intent to Commit Fraud.

24.     Of critical significance to this chronology of fraud and fraudulent concealment (and conclusive evidence of scienter) is the Defendants' 2007 and 2008 treatment of Appvion subsidiary BemroseBooth. In 2003, Appvion's board of directors approved and touted the purchase of an English company, BemroseBooth, for $63.5 million. The acquisition was a disaster. In 2007 and 2008, ESOP Committee members (Richards, Ferree, Tyczkowski, Willetts and Arent) explained in a series of written communications with the ESOP's Employee Owners, in at least one road show, and in the audited financial statements included in Appvion's 2008 10-K, that an important reason that BemroseBooth had so quickly become worth nothing, was that its fair market value had been reduced, dollar-for-dollar, by $15.3 million – the present value of its pension liability.

**ANSWER:     Argent states that the allegations in Paragraph 24 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24.**

25.     Yet, remarkably, and in furtherance of the course of conduct of fraudulent concealment, the defendants involved during those years, and those who followed, failed to deduct even one dollar of Appvion's much larger pension and post-retirement debt in calculating PDC's fair market value. Those combined retirement debts grew to an astounding $154.9 million in 2008 (69% of the ESOP's purported equity in PDC) and then by 2012 reached a high of $175.6 (115% of the ESOP's purported equity in PDC).

> **ANSWER:     No response to Paragraph 25 is required because the Court has dismissed all claims relating to alleged concealment. (*See* Doc. 235). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in Paragraph 25 and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

26.     The reduction in BemroseBooth's fair market value as a result of its pension debt, was approved by Stout, State Street and the ESOP committee at the time (Richards, Ferree, Arent and Willetts). It was also approved by Appvion's board members (Richards, Carter, Murphy, Pace, Reardon, Seifert, Scherbel) who signed the 2008 BemroseBooth 10-K disclosure. Therefore, they each admitted that retirement debt must be subtracted to arrive at fair market value, but did nothing to deduct Appvion's much larger retirement debt or to correct the earlier fraudulent PDC stock prices.  While it served their purpose to blame BemroseBooth's decline in value on its pension liability, to likewise deduct Appvion's retirement debt would have exposed both their participation in the ongoing fraud and that Appvion had no equity value.

**ANSWER:** Argent states that the allegations in Paragraph 26 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26.

### F. Grant Lyon Discovered that Each of PDC's Stock Valuations Were Fraudulently Overvalued Dating Back to 9 November 2001.

27. In August 2017, Grant Lyon was appointed as an ERISA fiduciary, replacing the entire ESOP Committee. He began an analysis of Appvion's financial statements and PDC's stock valuations. From his investigation, he learned, for the first time, that each of the valuations – which had never been made public or otherwise released to the Employee Owners – fraudulently overvalued PDC's stock value and misrepresented Appvion's true financial condition.

**ANSWER:** Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.

28. Resulting from the valuation irregularities Lyon ultimately identified, each of the fraudulent appraisals, 10-Ks and 10-Qs from 2001 through 2017 masked and concealed the fundamental weaknesses in Appvion's true financial condition and prevented the ESOP, through its Employee Owners, from being able to understand the PDC stock's true value. Therefore, the ESOP overpaid for PDC stock from the beginning of the ESOP through bankruptcy. Lyon reported his preliminary findings to Appvion's Board of Directors on or about 1 September 2017 and recommended that all ESOP purchases of PDC stock be suspended.

**ANSWER:** Argent denies that it breached any fiduciary duty or violated any provision of ERISA. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28.

29. In the fall of 2018, Lyon for the first time discovered that Houlihan was not "independent" as had been fraudulently represented by Buth, Karch, Houlihan (Paone) and State Street (Driscoll), but in fact stood to gain a contingent fee if the 2001 Transaction closed.

**ANSWER:** Argent states that the allegations in Paragraph 29 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

30. Any knowledge of ESOP Committee members or the other defendants is not attributable to the ESOP trust or the plaintiff because they were active participants in the fraud.

**ANSWER:** Argent states that the allegations in Paragraph 30 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in Paragraph 30 and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

31.     This SAC seeks to recover damages suffered by the ESOP (and indirectly by its Employee Owners), including those resulting from the ESOP's purchase of PDC stock at fraudulently inflated prices.  It also seeks to recover all fees paid to Houlihan.

      **ANSWER:     Argent admits that Plaintiff challenges certain purchases of PDC stock. Argent denies that Plaintiff is entitled to relief, denies any factual allegations of wrongdoing against Argent asserted in Paragraph 31 and denies any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## II.    <u>NATURE OF THE ACTION</u>

32.     This action arises in part under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. and is brought by the ESOP to restore losses to the ESOP, obtain equitable relief to remedy violations of ERISA and/or breaches of fiduciary duty, and to obtain damages.

      **ANSWER:     Argent admits that Plaintiff attempts to bring this action under the cited ERISA sections in Paragraph 32 but denies any and all alleged breaches of fiduciary duty or violations of ERISA and denies that Plaintiff is entitled to any relief.**

33.     This action seeks relief against the fiduciary Defendants for violations of ERISA's statutory and fiduciary provisions, including recovery to the ESOP of any losses resulting from the breaches, disgorgement of profits of any fiduciary which have been made through the use of assets of the ESOP, and other appropriate equitable and remedial relief

pursuant to ERISA § 502(a)(2) (29 U.S.C. § 1143(a)(2)), ERISA § 502(a)(3) (29 U.S.C. § 1132(a)(3)), ERISA § 404 (20 U.S.C. § 1104), ERISA § 405 (20 U.S.C. § 1105), ERISA § 406 (20 U.S.C. § 1106), and ERISA § 410 (29 U.S.C. § 1110).

> **ANSWER:**   **Argent admits that Plaintiff attempts to bring this action under the cited ERISA sections in Paragraph 33 but denies any and all alleged breaches of fiduciary duty or violations of ERISA and denies that Plaintiff is entitled to any relief.**

34.     This action also seeks relief against certain Defendants for federal securities fraud.

> **ANSWER:**   **Argent states that no response to Paragraph 34 is required because the Court has dismissed all claims that relate to federal fsecurities fraud. (*See* Doc. 262). To the extent a response is required, Argent denies any allegation that Argent committed federal securities fraud.**

## III.   PARTIES, JURISDICTION, AND VENUE

35.     Non-Party Appvion, Inc. (f/k/a Appleton Papers, Inc.) ("Appvion") is a Delaware corporation with its principal place of business in Appleton, Wisconsin. Appvion established and maintained the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP") to provide retirement benefits for its eligible employees. The ESOP is an employee benefit plan within the meaning of ERISA § 3(3) (29 U.S.C. § 1002(3)) consisting of an employee stock ownership component and a 401(k) component. This lawsuit is brought only on behalf of the ESOP component and does not address the 401(k) component.

**ANSWER:** **Argent admits that Appvion established and maintained the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan. Argent further admits that Paragraph 35 purports to cite to ERISA, refers to that act for its exclusive terms, and denies all allegations in Paragraph 35 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35.**

36. The ESOP Non-Party Paperweight Development Corp. ("PDC") is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin. PDC is Appvion's parent company, and the ESOP was the sole shareholder of PDC.

**ANSWER:** **Argent admits that PDC is the parent company of Appvion and that the ESOP was PDC's sole shareholder. Argent states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 36.**

37. Plaintiff Grant Lyon is a resident of the state of Florida. Lyon is bringing this action as an ERISA fiduciary on behalf of the ESOP, for the benefit of its beneficiaries. Lyon is the sole member of the ESOP Administrative Committee of Appvion, Inc. (the "ESOP Committee"). He is authorized to bring this action as an ERISA fiduciary and pursuant to the order of the Bankruptcy Court of the District of Delaware, which states:

> ESOP Reservation of Rights. Nothing in the Plan or Plan Confirmation Order shall operate as a waiver or release or otherwise impair in any respect (i) **any Claim held by the ESOP, the ESOP Committee or its members, or ESOP participants (as legal or beneficial Holders of Interests in any Debtor**),

arising from or relating to the ESOP or any Interest in any Debtor, against any Person other than the Debtors (the "ESOP Preserved Claims")…**Grant Lyon, in his capacity as an ESOP Committee member, shall have standing to prosecute the ESOP Claims** and other ESOP Preserved Claims….

*Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, In re Oldapco*, No. 17-12082 (Bankr. Del., Aug 14, 2018) [Dkt. 970]; emphasis added. Similarly, the Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation attached to the Bankruptcy Court's order states:

> **Any direct ESOP Claims held by the Holders of beneficial interests** in the ESOP on account of their beneficial interest in the ESOP **will be asserted by the ESOP Committee**, in its discretion, **on behalf of all Holders of beneficial interests in the ESOP**.

*Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, In re Oldapco,* No. 17-12082 (Bankr. D. Del., Aug 14, 2018) [Dkt. 970-1]; emphasis added.

> **ANSWER:    Argent denies that Plaintiff is entitled to relief, denies any and all alleged wrongdoing or violations of ERISA, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37.**

A.    **The ESOP Committee Defendants**

38.    Defendant Douglas P. Buth ("Buth") is a United States citizen who currently resides in Appleton, Wisconsin. Buth was a CPA and formerly worked for Pricewaterhouse, Saks Fifth Avenue, and BATUS prior to working for Appvion. Buth served as CEO, President and Chairman of the Board of Directors of Appvion since 1998 and Chairman of the Board of Directors of PDC, CEO, and President from before the 2001 Transaction until he retired in mid-

2005. Buth was a member of the ESOP Committee from 2001 to May 2005. Buth left Appvion in July 2005.

> **ANSWER:** **Argent states that the allegations in Paragraph 38 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38.**

39. Defendant Paul Karch ("Karch") is a United States citizen who currently resides in Madison, Wisconsin. Karch is a lawyer who graduated from Harvard Law School in 1982. From 2001 to 2007, Karch served as Vice President of Human Services and Law, Secretary, General Counsel and Vice President of Administration of Appvion. Karch was a member of the ESOP Committee from 2001 to late 2006. Karch also served on the Board from 2001 to 2006. Karch left Appvion in March 2007.

> **ANSWER:** **Argent states that the allegations in Paragraph 39 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39.**

40. Defendant Mark Richards ("Richards") is a United States citizen who currently resides in Appleton, Wisconsin. Richards earned an MBA from Northwestern University's Kellogg Graduate School of Management. Richards was CEO and Chairman of the Board from mid-2005 to late 2015; Richards retired as CEO on 4 August 2015 and stepped down as

Chairman of the Board on 31 December 2015. Richards was a member of the ESOP Committee from approximately April 2005-December 2015.

> **ANSWER:** Argent states that the allegations in Paragraph 40 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Mr. Richards was a member of the ESOP Committee. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 40.

41. Defendant Tom Ferree ("Ferree") is a United States citizen who, upon information and belief, currently resides in Solon, Iowa. Ferree was CFO of Appvion from October 2006 to 30 June 2017 and was a member (and chair) of the ESOP Committee from December 2006-May 2017. Ferree has a master's degree in finance from the University of Iowa.

> **ANSWER:** Argent states that the allegations in Paragraph 41 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Mr. Ferree was a member of the ESOP Committee. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 41.

42. Defendant Rick Fantini ("Fantini") is a United States citizen who, upon information and belief, currently resides in in Denver, Colorado. Fantini has a master's degree in labor and industrial relations from Michigan State University and an MBA from

Northwestern University's Kellogg Graduate School of Management. During his tenure at Appvion, Fantini served as Vice President of Operations. Fantini was the Chair of the ESOP Committee from 2001 to 2005. He left Appvion in December 2005.

> **ANSWER:** **Argent states that the allegations in Paragraph 42 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42.**

43. Defendant Dale E. Parker ("Parker") is a United States citizen who currently resides in Rocky Mount, North Carolina. Parker has an MBA from Xavier University and is a CPA. Prior to joining Appvion, Parker served as the Vice President of Finance of Black Clawson Companies. Parker served as Vice President of Finance and CFO of Appvion from 2001-June 2006. Parker was a member of the ESOP Committee from 2001 to April 2006. Parker also served on the Board from 2001 to 2006. He left Appvion in June 2006.

> **ANSWER:** **Argent states that the allegations in Paragraph 43 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43.**

44. Defendant Angela Tyczkowski ("Tyczkowski") is a United States citizen who currently resides in Appleton, Wisconsin. Tyczkowski went to law school at Marquette University. Tyczkowski's highest title was served as Secretary, General Counsel and Chief

Compliance Officer of Appvion. Tyczkowski was a member of the ESOP Committee from September 2006 to April 2008.  She left Appvion on 15 August 2008.

> **ANSWER:**   **Argent states that the allegations in Paragraph 44 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.**

45.     Kerry Arent ("Arent") is a United States citizen who currently resides in Grand Chute, Wisconsin. Arent received her bachelor's degree from the University of Wisconsin-Oshkosh and holds a Senior Professional Human resources certification since 2005. Arent's highest title was Vice President, Executive Director and Senior VP Human Resources. Arent was secretary of the ESOP Committee from 2001-2006 and was a member of the ESOP Committee from July 2008-2015.  She left Appvion on 31 December 2015.

> **ANSWER:**   **Argent states that the allegations in Paragraph 45 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no responsibe is required. To the extent a response is required, Argent admits Ms. Arent was a member of the ESOP Committee until 2015 but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 45.**

46.     Kent Willetts ("Willetts") is a United States citizen who currently resides in Appleton, Wisconsin. Willetts has an MBA from Northwestern University's Kellogg Graduate School of Management. Willetts highest title was Senior Vice President. Willetts was a member

of the ESOP Committee from July 2008-September 2012. He left Appvion on 14 December 2012.

> **ANSWER:** **Argent states that the allegations in Paragraph 46 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.**

47.     Kevin Gilligan ("Gilligan") is a United States citizen who currently resides in Appleton, Wisconsin. Gilligan has an MBA from Indiana University and previously worked as an executive with H.B. Fuller Company. Gilligan was a Director of Appvion and PDC 2016 and 2017 and served as President and CEO beginning in August 2015. Gilligan was a member of the ESOP Committee from April 2015 until 8 August 2017.

> **ANSWER:** **Argent states that the allegations in Paragraph 47 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Kevin Gilligan began serving as Appvion CEO in 2015 and states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47.**

### B.     The Outside Director Defendants

48.     Susan Scherbel ("Scherbel") is a United States citizen who currently resides in Hancock, Maine. Scherbel has a bachelor's degree from Harvard and Juris Doctor and a Master of Law degrees from Georgetown University. She previously held an advisory position at the

U.S. Department of Treasury relating to ESOP legislation and regulation. Scherbel was on the Board as an Outside Director from 2002-March 2011. Scherbel served on the Board's Audit Committee from 2002-March 2011 and the Compensation Committee from 2002-2006.

> **ANSWER:** **Argent states that the allegations in Paragraph 48 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48.**

49. Ronald Pace ("Pace") is a United States citizen who currently resides in Cedarburg, Wisconsin. Pace has an MBA from the University of Connecticut and held a management position with Kohler Company from 1995-2015. Pace was on the Board as an Outside Director from 2003- July 2011. Pace served on the Board's Audit Committee from 2003-2008.

> **ANSWER:** **Argent states that the allegations in Paragraph 49 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49.**

50. Stephen Carter ("Carter") is a United States citizen who currently resides in Rockford, Illinois. Carter has a bachelor's degree from Brigham Young University and is a CPA. Carter was on the Board as an Outside Director from 2004-2016. Carter served on the

Board's Audit Committee from July 2004-2016 and served as Chair of the Audit Committee from 2006- 2011 and in 2016. He left Appvion in December 2016.

> **ANSWER:** **Argent states that the allegations in Paragraph 50 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50.**

51. Kathi Seifert ("Seifert") currently resides in Appleton, Wisconsin. Seifert was an executive with Kimberly-Clark Corporation and has served as a director of several other large companies, including Eli Lilly and Company and Revlon Consumer Products. Seifert was on the Board as an Outside Director from July 2004-October 2017. She was on the Board's Audit Committee from 2004-2006 and the Compensation Committee from 2012-2017.

> **ANSWER:** **Argent states that the allegations in Paragraph 51 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51.**

52. Andrew Reardon ("Reardon") is a United States citizen who currently resides in Marco Island, Florida. Reardon has a law degree from the University of Cincinnati and an LLM in taxation from the Washington University Law School. Reardon was on the Board as an Outside Director from June 2007-2014. Reardon served on the Board's Audit Committee from

2009-2011 and the Compensation Committee from 2012-2015. He left Appvion in December 2015.

>ANSWER: **Argent states that the allegations in Paragraph 52 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52.**

53. Terry Murphy ("Murphy") is a United States citizen who currently resides in Naples, Florida. Murphy has a master's degree in business administration from Marquette, a Juris Doctor degree from Seton Hall University School of Law, and is a CPA. Murphy was on the Board as an Outside Director from June 2007–October 2017. Murphy served on the Board's Audit Committee from 2012-2017, was Chair of the Audit Committee in 2012-2015, and was identified as an Audit Committee Financial Expert.

>ANSWER: **Argent states that the allegations in Paragraph 53 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.**

54. Mark Suwyn ("Suwyn") is a United States citizen who currently resides in Bonita Springs, Florida. Suwyn has a doctorate degree in inorganic chemistry and has a background working in the coated paper industry. Suwyn was on the Board as an Outside

Director from July 2011-October 2017. Suwyn served on the Board's Compensation Committee in 2012-2015 and the Audit Committee 2016-2017.

> **ANSWER:** **Argent states that the allegations in Paragraph 54 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Mark Suwyn began serving on the Board in July 2011. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54.**

### C. The Investment Banker Defendant

55. Defendants Houlihan Lokey Capital, Inc., f/k/a Houlihan Lokey Howard & Zukin Capital, Inc. and Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (together with Houlihan Lokey Capital, Inc., "Houlihan") are California corporations with their principal place of business in Los Angeles, California.

> **ANSWER:** **Argent states that the allegations in Paragraph 55 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55.**

### D. The ESOP's Trustee Defendants

56. Defendant State Street Bank and Trust Company ("State Street") is a nationally chartered trust company with its principal place of business in Boston, Massachusetts. State Street was the trustee of the ESOP from 2001-31 March 2013. In its dealings with Appvion,

State Street sometimes went by the name State Street Global Advisors, which is a division of State Street.

> **ANSWER:    Argent states that the allegations in Paragraph 56 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56.**

57.    Defendant Reliance Trust Company ("Reliance") is a Georgia corporation with its principal place of business in Atlanta, Georgia. Reliance was the trustee of the ESOP from 1 April 2013-30 June 2014.  Reliance was purchased by Argent in 2014.

> **ANSWER:    Argent states that the allegations in Paragraph 57 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that it purchased Reliance's ESOP unit on June 30, 2014 and states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57.**

58.    Defendant Argent Trust Company, N.A. ("Argent") is a Tennessee corporation with its principal place of business in Ruston, Louisiana. Argent became the trustee of the ESOP effective 1 July 2014.

> **ANSWER:    Argent admits that it purchased Reliance's ESOP unit on June 30, 2014 and that it was subsequently appointed ESOP trustee. Argent further**

**admits that it is a Tennessee corporation. Argent denies that its principal place of business is in Ruston, Louisiana.**

### E.    The Valuation Defendants

59.    Non-Party Willamette Management Associates, Inc. ("Willamette") served as financial advisor to State Street as ESOP Trustee and valued the share price of PDC stock from 2001 through 30 June 2004. Under the Court's Order dated 27 July 2020, Plaintiff's claims against Willamette are preempted and Plaintiff does not replead those claims here. However, Plaintiff does not intend to waive those claims.

**ANSWER:    Argent states that the allegations in Paragraph 59 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits the Court's July 27, 2020 Order dismissed Plaintiff's claims against Willamette Management Associates, Inc. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 59.**

60.    Defendant Stout Risius Ross, Inc. is or was a Michigan corporation with offices around the United States. Defendant Stout Risius Ross, LLC (with Stout, Risius Ross, Inc., referred to herein as "Stout") is a Michigan limited liability company with offices around the United States. Stout served as financial advisor to the ESOP Trustee and valued the share price of PDC stock from 31 December 2004-2017.[7]

---

[7] Plaintiff does not waive claims dismissed for legal reasons by the Court's 27 July 2020 ruling that are not reasserted in the SAC.

**ANSWER:** **Argent states that the allegations in Paragraph 60 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits Stout served as financial advisor to Argent and valued the share price of PDC stock. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 60.**

61.    Scott D. Levine ("Levine") is a United States citizen who currently resides in Oakton, Virginia. Levine served as a Principal of Willamette from 1995-2004 and as Director of Stout in 2004 and Managing Director from 2005-present.

**ANSWER:** **Argent states that the allegations in Paragraph 61 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Mr. Levine has served as a Managing Director of Stout, though is without knowledge as to specific titles or roles at specific times. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 61.**

62.    Aziz El-Tahch ("El-Tahch") is a United States citizen who currently resides in New York, New York. El-Tahch served as an Associate of Willamette from at least 2002-2004. El- Tahch also served as a Manager of Stout from 2004-June 2007 and returned to Stout in 2008 as Manager and later promoted to Managing Director.

**ANSWER:** **Argent states that the allegations in Paragraph 62 are not directed to it but instead to a defendant who has been dismissed from the case, and**

therefore no response is required. To the extent a response is required, Argent admits that Mr. El-Tahch has served as a Managing Director of Stout, though is without knowledge as to specific titles or roles at specific times. Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62.

63.     Plaintiff is uncertain of the true names and capacities of certain individuals or entities that may be liable for the damages alleged herein and therefore sues them by fictitious names of Does 1-50, ABC Corporations 1-5, DEF Partnerships 1-5, GHI Limited Partnerships 1- 5, and JKL Limited Liability Companies 1-5. Plaintiff will amend its SAC by asserting their true names, capacities, and appropriate charging allegations when they are ascertained.

**ANSWER:     Argent states that the allegations in Paragraph 63 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that the Second Amended Complaint purports to bring claims against the individuals or entities listed in Paragraph 63. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63.**

64.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for jurisdiction of actions brought under Title I of ERISA.

**ANSWER:     Argent denies that this Court has subject matter jurisdiction over this action because Plaintiff has not personally suffered an injury in fact.**

65.     This Court also has diversity jurisdiction over claims against the out-of-state Defendants because they did or are doing business in the State of Wisconsin, the acts complained of herein occurred in the State of Wisconsin, the ESOP is based in Wisconsin, and the amount in controversy herein exceeds $75,000.

**ANSWER:    Argent denies that this Court has subject matter jurisdiction over this action because Plaintiff has not personally suffered an injury in fact.**

## IV.    FACTUAL BACKGROUND

66.     Appvion was formed in 1907 in Appleton as The Appleton Coated Paper Company. It has historically had two primary business lines—carbonless paper and thermal paper.

**ANSWER:    Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66.**

67.     Carbonless paper is a type of coated paper designed to transfer information written on the top sheet onto sheets beneath it. Appvion invented carbonless paper in 1954. While Appvion had approximately 60% of the carbonless paper market in the late 1990s, by 2001 the market was declining by 8% to 9% per year due to increasing computerization.

**ANSWER:    Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67.**

68.     Appvion invented thermal paper in 1969. Thermal paper is used for receipts, lottery tickets, and other similar applications.

**ANSWER:** Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68.

**B.** **Buth, Karch, Houlihan, and State Street Fraudulently Convinced Appvion's Employees (who were ESOP Fiduciaries) to Fund the 2001 Transaction by Misrepresenting Appvion's Fair Market Value and Houlihan's Independence.**

**1.** **AWA and Buth Agreed to An Employee Buyout Because They Could Not Sell Appvion.**

69. In the 1990s, Appvion (then Appleton Papers) was part of a French conglomerate, Arjo Wiggins Appleton ("AWA").

**ANSWER:** Argent states that the allegations in Paragraph 69 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69.

70. By 1998, AWA was seeking to sell Appvion. Then-CEO Richard Curwen had attempted to find a third-party buyer but stepped down as CEO when he was unsuccessful. Buth was named as Appvion's CEO to succeed Curwen.

**ANSWER:** Argent states that the allegations in Paragraph 70 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70.

71.    In about November 2000, with AWA threatening to sell Appvion to a venture capital firm, Buth presented AWA with the idea of an employee buyout.  AWA agreed, signing a letter of intent on 12 February 2001 to sell Appvion to PDC for $843,000,000 (later adjusted to $810,000,000).  In turn, the PDC stock would be held in trust by the ESOP Trustee and participating employees would have beneficial interests in the PDC stock. This transaction, which closed on 9 November 2001, is referred to herein as the "2001 Transaction."

> **ANSWER:    Argent states that the allegations in Paragraph 71 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71.**

### 2.    Buth, Karch, and other Appvion Management Would Only Receive Their Contingent Fee Only if the 2001 Transaction Closed.

72.    Also on 12 February 2001, AWA signed a letter agreeing to pay Buth and other key Appvion executives bonuses if they were able to complete a sale of Appvion in 2001. The bonuses consisted of two main components:

- A "Value Related Completion Bonus" (sales incentive) which created a bonus pool of up to $10 million depending on the "Value Achieved" for the seller. If the ultimate sale price were $700 million or less, there would be no bonus pool. According to the prospectus, the sales incentive was ultimately $2.46 million, with 40% of it allocated to Buth and the rest to be distributed to other employees at his discretion.

- "Loyalty Payments" totaling $4.403 million, payable only if the sale price was greater than $759.4 million. Each individual who would receive a Loyalty Payment agreed to defer 30% of the payment for between 5 and 10 years to the New Deferred Compensation Plan. The value of the deferred portion of this payment was then tied to the increase in the value of stock. According to the prospectus, the loyalty payments ultimately totaled $4.1 million, with $1.2 million of it deferred.

**ANSWER:**  **Argent states that the allegations in Paragraph 72 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72.**

73.     Buth and Karch were, therefore, highly incentivized (and conflicted) to complete a deal that met these targets, something they had been unable to do in the open market.

**ANSWER:**  **Argent states that the allegations in Paragraph 73 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73.**

**3.      PDC Retained Houlihan Because of Its Vast ESOP Experience.**

74.     Because Appvion, its executives, the ESOP and Appvion's employees had no experience in ESOP buyouts, Buth retained Houlihan on behalf of PDC to "quarterback" the

employee buyout process, claiming that Houlihan had extensive experience in ESOP transactions. Appvion's General Counsel, Karch, explained the reliance on Houlihan's ESOP-related experience at a Road Show presentation to the employees on 2 August 2001:

> The first person who's going to provide an **independent** view and validation of our deal here is **Lou Paone**, our investment banker from **Houlihan Lokey Howard & Zukin**. Lou has been in the investment banking business for 20 years and he **has specialized in doing ESOP transactions** and has helped many ESOP plans buy companies. Lou's role in this transaction has helped to **structure the deal**. He came up with the original – and the idea of how to do our ESOP and **how to do the transaction**. He helped convince AWA that it was possible. He helped us **negotiate with AWA and arrange the financing**. So, one sort of unique perspective that I think Lou brings that the rest of us don't have, is **this is the only deal like this we're likely to do in our lifetimes, whereas Lou is in the business of doing deals** and so he's going to talk about our transaction from his perspective. Lou.

Future of Appleton Papers Road Show, 2 Aug 01.

> **ANSWER:** **Argent states that the allegations in Paragraph 74 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74.**

a. <u>**Houlihan Agreed to a Contingent Fee to "Quarterback" the ESOP Transaction.**</u>

75.    According to Houlihan's 14 February 2001 engagement letter, signed by Paone, Houlihan was to act as PDC's "exclusive financial advisor with respect to the possible acquisition … by a to-be-formed Employee Stock Ownership Plan ('ESOP') …." Doug Buth signed the letter on behalf of PDC and Paul Karch signed on behalf of Appvion.

> **ANSWER:** **Argent states that the allegations in Paragraph 75 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75.**

76.     Although Houlihan's contract was with PDC, Houlihan agreed to perform duties that had a direct impact on the ESOP and its Employee Fiduciaries. Further, Buth, Karch and Houlihan individually took specific actions described below to encourage the ESOP, through the Employee Fiduciaries, to rely directly upon Houlihan, it purported independence and its extensive ESOP experience. They did this because they knew Houlihan's reputation, experience and strong endorsement of the ESOP was critical to persuade the Employee Fiduciaries to participate.

> **ANSWER:** **Argent states that the allegations in Paragraph 76 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76.**

77.     According to that letter, Houlihan was to receive a transaction fee at "Transaction closing equal to 1.0% of the 'Aggregate Consideration' paid for the stock of the Company with respect to an ESOP Acquisition." But Houlihan would only get this fee if the transaction closed.

**ANSWER:** Argent states that the allegations in Paragraph 77 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 77 purports to cite to a certain engagement letter, refers to that document for its exclusive terms, and denies all allegations in Paragraph 77 inconsistent with its complete terms. Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77.

Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77.

78.    Houlihan would also be entitled to additional contingent compensation from AWA:

> **Houlihan Lokey will also become entitled to compensation pursuant to section 8(d)(i) of the Letter of Intent**, dated February 12, 2001, by and between Arjo Wiggins Appleton PLC and PDC.

Houlihan Engagement Ltr., 14 Feb 01, p. 4.

**ANSWER:** Argent states that the allegations in Paragraph 78 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78.

44

79.     An addendum to that letter indicates that Houlihan was to complete two phases of work that encompassed virtually all aspects of the process leading up to the ESOP transaction. Addendum A is set forth below in its entirety:

**Phase I**

**Transaction Structuring**

- Corporate Due Diligence

- Transaction Value Parameters

- ESOP Transaction Model Construction

- Financing Assessment and Capital Tranche Sources and Terms

- Strategic Use of Employee Participation

  - o Management Deferred Compensation and Option/Stock Rollovers

  - ▪ Investment of Existing Benefit Plan Assets (401K and Pension Plans)

  - ▪ "S Corp" ESOP Application Consideration

  - ▪ Unionized Employee Participation

  - ▪ **Use of Pension Plans over-funded balances**

- Management Bonus Participation as ongoing investment tool

- Strategic use of Existing Benefit Plan Contributions

- Investor Exit Strategy Recapitalization Alternatives in Future Years

- Presentation(s) as required to reach a consensus on the form and structure of a proposed Transaction.

**Phase II**

**ESOP Change of Control Transaction Execution**

Upon acceptance of the Transaction and the execution of a Letter of Intent ("LOI") by AWA and the Appleton Papers Inc. Executive Management Team,

Houlihan Lokey will assist Management in negotiations regarding a purchase of the Company. Upon reaching LOI transaction terms, we will advise management and coordinate activities in the following areas:

- **Negotiate the price and terms regarding the purchase of Appleton Papers Inc. from its corporate parent AWA.**

- **Assist in selection of the "ESOP Team" including Independent Trustee, ESOP Counsel, ESOP Financial Advisor and Communications Specialist, and negotiate engagement terms**.

- **Prepare materials to be presented to employees and make presentations to the employee base regarding their participation, investment solicitation, potential wage or benefit restructuring programs and overall transaction parameters**.

- Make presentations to Union Representatives (if appropriate) regarding their potential participation and negotiation of such terms.

- Finalize financial forecast models for management and related parties to the transaction.

- Structure Management performance warrants as part of bonus/incentive plan.

- Assist in the documentation of transaction terms.

- Quarterback process flow and coordination of ESOP related activities.

**Financing Assistance**

- Assist in the renegotiations and restructuring of existing interest- bearing debt and/or capital lease obligations (if appropriate).

- Develop information packages and management presentations for prospective capital sources of acquisition financing.

- Source and negotiate the terms of new senior credit or bank related financing for transaction and working capital purposes.

- Source and negotiate the terms of mezzanine capital for transaction purposes.

- Source and negotiate the terms of junior subordinated capital and/or equity capital for transaction purposes.

- **Assist in solicitation and structure of employee-based equity capital investment for transaction purposes.**

Houlihan Engagement Ltr., 14 Feb 01, Addendum A; emphasis added.

> **ANSWER:** **Argent states that the allegations in Paragraph 79 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79.**

80.     Notable in this list is Houlihan's control of communications with the ESOP's Employee Fiduciaries. Because of these contractual commitments, Houlihan was responsible to the ESOP, through its Employee Fiduciaries, for the accuracy and truthfulness of those communications.

> **ANSWER:** **Argent states that the allegations in Paragraph 80 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80.**

> **b.      Houlihan's Contingent Fee Created Conflicts in Critical Areas of its Involvement.**

81.     Buth, Karch, Houlihan and State Street did not give the engagement letter between Houlihan and Buth to the Employees Fiduciaries or otherwise disclose Houlihan's contingent transaction fee and resulting conflict.  In fact, they actively concealed the conflict.

> **ANSWER:** **Argent states that the allegations in Paragraph 81 are not directed to it but instead to defendants who have been dismissed from the case, and**

**therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81.**

82. Houlihan's plan was to use at least $100 million from the employees' 401(k) retirement plans to fund the down payment needed for the buyout, with the rest of the sale price coming from bank loans, bonds and seller financing.

**ANSWER:** **Argent states that the allegations in Paragraph 82 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82.**

83. Houlihan's contingent fee created an undisclosed conflict of interest in at least the following four critical areas:

- Negotiation of the Purchase Price: "Negotiate the price and terms regarding the purchase of Appleton Papers, Inc. from its parent AWA:"

    **Conflict**: Houlihan's contingent fee motivated it to make sure that a purchase price was agreed upon, regardless of how high, because if no deal was struck, Houlihan would receive no fee. Further, the higher the price, the bigger Houlihan's contingent fee.

- Selection of the ESOP Team: "Assist in the selection of the "ESOP Team" including Independent Trustee, ESOP Counsel, ESOP Financial Advisor and Communications Specialist, and negotiate engagement terms:"

  **Conflict**: **Houlihan's** contingent fee motivated it to select an "ESOP Team" that Houlihan knew would do Houlihan's and management's bidding to make sure the ESOP transaction closed above the required minimum price. Further, Houlihan even had the authority to negotiate favorable "engagement terms."

- Communications with the Employee Fiduciaries: "Prepare materials to be presented to employees and make presentations to the employee base regarding their participation, investment solicitation, potential wage or benefit restructuring programs and overall transaction parameters:"

  **Conflict:** Houlihan's contingent fee motivated it to carefully control all communications with the ESOP, through its Employee Fiduciaries, to persuade them to take the money they had saved in their 401(k) plans and use it to purchase their interest in the ESOP at a price that, unknown to the Employee Fiduciaries, was above its fair market value. Even though the Houlihan engagement letter was with PDC, both PDC and Houlihan agreed that Houlihan would play the central role in controlling communications with the ESOP Fiduciaries to persuade them to contribute the more than $100 million needed to close the ESOP transaction. Because of both Houlihan's and management's conflict, the ESOP Fiduciaries would not be receiving Houlihan's advice from an

independent source, as had been represented to them, but from a deal promoter motivated to earn its contingent fee.

- Quarterback the ESOP Transaction: "Quarterback process flow and coordination of ESOP related activities:"

> **Conflict:** Houlihan had broad contractual authority to "quarterback" the coordination of the "ESOP related activities" to make sure that the ESOP employees contributed their 401(k) life savings so that the ESOP transaction closed, and so that both Houlihan and management received their contingent fees.

**ANSWER:** Argent states that the allegations in Paragraph 83 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83.

### c. Houlihan Selected State Street to Act as the "Independent" ERISA Trustee.

84. Acting under its conflict of interest, Houlihan advised to select State Street to act as the "Independent" ERISA trustee.

**ANSWER:** Argent states that the allegations in Paragraph 84 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84.

85.     But, State Street was not independent at all because it knew it was beholden to Houlihan for its selection.  Because Houlihan was an ongoing source of business referrals, State Street was conflicted and motivated to work with Houlihan to make sure the deal closed and keep silent concerning Houlihan's conflict.

**ANSWER:**     **Argent states that the allegations in Paragraph 85 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85.**

### 4.     <u>Buth Announced the 2001 Transaction to the ESOP Employees.</u>

86.     After agreeing to the employee buyout in February 2001, Buth then announced the plan to the Employee Fiduciaries. Buth, Karch, Houlihan and State Street had to convince enough of the Employee Fiduciaries to participate so that collectively they would contribute the more than $100 million needed for the ESOP transaction to close.

**ANSWER:**     **Argent states that the allegations in Paragraph 86 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86.**

### 5. State Street Agreed to Conduct Due Diligence, Review All Relevant Documents, and Sign Off on the Prospectus.

87.     In March 2001, Buth, Parker, and Karch (Appvion's three directors) appointed State Street as the ESOP Trustee. As trustee, State Street's role was to act on the ESOP's behalf in negotiating the final purchase price and terms for the 2001 transaction. State Street was also responsible for making sure that the transaction complied with ERISA – ensuring, among other things, that it was prudent and not for more than fair market value.

> **ANSWER:    Argent states that the allegations in Paragraph 87 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87.**

88.     Resulting from Houlihan's endorsement, on 1 June 2001, State Street entered into a retainer letter agreement with Appvion, signed by Karch. Among other things, State Street agreed to "review the Proposed [ESOP] Transaction," "conduct due diligence" and "review all relevant documents":

> Engagement of State Street
>
> The Company hereby engages State Street to **review the Proposed Transaction** and, to the extent it deems advisable, to participate in discussions with management of PDC and HLHX [Houlihan] in **structuring and financial the Proposed Transaction**. State Street **will conduct a due diligence review of the Company and the Proposed Transaction** and determine whether it is **permissible under ERISA** to accept the direction of participants to invest all or a portion of their defined contribution account balances in common stock of PDC….

* * *

> In connection with the engagement, **State Street shall review all relevant documents, analyze all relevant financial reports** and opinions rendered by third parties, and **shall make the ultimate determination of the appropriateness** of the terms and conditions of the Proposed Transaction (the "Determination") in light of the requirements of **Section 408(e) of ERISA**. In this regard, it is understood that in exercising its fiduciary responsibilities pursuant to this Agreement, State Street will rely on the written opinion of its financial advisor whether (i) the consideration to be paid for the common stock of PDC is not greater than the fair market value (within the meaning of section 3(18)(B) of ERISA) and, (ii) the Proposed Transaction is fair to the ESOP and its participants from a financial point of view (collectively the "Financial Opinions").

State Street Retainer Ltr., 1 Jun 01, p. 2; emphasis added.

> **ANSWER:** Argent states that the allegations in Paragraph 88 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 88 purports to cite to a June 2001 retainer letter between State Street and Appvion, refers to that document for its exclusive terms, and denies all allegations in Paragraph 88 inconsistent with its complete terms.

89. Because of its review of "all relevant documents" State Street knew about Houlihan's contingent fee retainer agreement.

> **ANSWER:** Argent states that the allegations in Paragraph 89 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 89 purports to cite to a June 2001 retainer letter between State Street and Appvion, refers to that document for its

**exclusive terms, and denies all allegations in Paragraph 89 inconsistent with**

**its complete terms.**

90.    State Street also insisted that it be given the opportunity to review and give is "prior written approval" to the prospectus:

Disclosure to Participants

[Appvion] agrees that the **offering memorandum** to be provided to the participants of the Company's defined contribution plans with respect to the Proposed Transaction, as well as any other disclosure documents or presentation materials to be provided or otherwise communicated to participants, **shall be subject to the prior review and written approval of State Street**, and shall provide a **complete and accurate disclosure** of the Proposed Transaction and the investment risks to participants attendant thereto, including the lack of diversification under the ESOP. **The Company shall provide such materials to State Street in draft form sufficiently in advance of any proposed distribution to plan participants such that State Street will have a reasonable period of time in which to conduct its review and propose any revisions to such materials that it deems appropriate**. The Company further agrees that State Street shall be afforded the opportunity to have a **representative present** at any meeting of, or presentation to, the participants regarding the Proposed Transaction.

*Id*, p. 4; emphasis added.

**ANSWER:    Argent states that the allegations in Paragraph 90 are not directed**

**to it but instead to defendants who have been dismissed from the case, and**

**therefore no response is required. To the extent a response is required,**

**Argent admits that Paragraph 90 purports to cite to a June 2001 retainer**

**letter between State Street and Appvion, refers to that document for its**

**exclusive terms, and denies all allegations in Paragraph 90 inconsistent with**

**its complete terms.**

91.     State Street therefore had veto power over the contents of the prospectus.

**ANSWER:    Argent states that the allegations in Paragraph 91 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91.**

6.      **Houlihan, Buth, Karch and State Street Colluded to Fraudulently Represent Houlihan as Being "Independent."**

a.      **Houlihan Agreed to Issue a Fairness Opinion it was Not Qualified to Give.**

92.     On 20 July 2001, Houlihan director James Waldo and Buth executed a second retainer agreement, which engaged Houlihan to "render an opinion as to the fairness to the Shareholder of the Company, from a financial point of view of the consideration to be paid by the Company … in connection with the Transaction and that such consideration is not more than the fair market value of Appleton."  Houlihan charged a $100,000 fee for this fairness opinion.

**ANSWER:    Argent states that the allegations in Paragraph 92 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 92 purports to cite to a July, 20 2001 retainer agreement, refers to that document for its exclusive terms, and denies all allegations in Paragraph 92 inconsistent with its complete terms.**

b. **Houlihan Insisted on Reviewing all Materials that Referenced its Name, which Included the Prospectus.**

93.   Paragraph 2 of the 20 July 2001 engagement letter gave Houlihan the right to review and approve any materials referencing its name or fairness opinion:

> Any summary of, or **reference to, the Opinion**, any verbal presentation with respect thereto, **or other references to Houlihan Lokey in connection with the Transaction, will in each instance be subject to Houlihan Lokey's prior review and written approval (which shall not be unreasonably withheld).** The Opinion will not be in, summarized or referred to in any manner in any materials distributed to the public or the securityholders of the Company, or filed with or submitted to any governmental agency, without Houlihan Lokey's express, prior written consent (which shall not be unreasonably withheld). Neither Houlihan Lokey's verbal conclusions nor the Opinion will be used for any purpose other than in connection with the Transaction.

Emphasis added.

> **ANSWER:   Argent states that the allegations in Paragraph 93 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 93 purports to cite to a July 20, 2001 retainer letter, refers to that document for its exclusive terms, and denies all allegations in Paragraph 93 inconsistent with its complete terms.**

c. **Buth, Karch, Houlihan and State Street Knew That Houlihan's Conflict Disqualified It from Giving a Fairness Opinion.**

94.   Buth and Houlihan signed this engagement letter just four months after Appvion's 26 March 2001 newsletter warned that those issuing fairness opinions must have no conflicts that might "impair independence":

**Who is Qualified To Issue ESOP Fairness Opinions?**

\* \* \*

1. <u>**No conflicts of interest**</u> and/or <u>**fee arrangements based on contingencies**</u>, both of which would <u>**impair the independence of the financial advisor**</u>.

The Ownership Update, Issue 4, 26 Mar 01, p. 2.

> **ANSWER:   Argent states that the allegations in Paragraph 94 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 94 purports to cite to a March 26, 2001 Appvion newsletter, refers to that document for its exclusive terms, and denies all allegations in Paragraph 94 inconsistent with its complete terms.**

95.    That Houlihan acted as "quarterback" of the ESOP process and assumed the specific responsibility to "prepare materials to be presented to employees," compels the conclusion that Houlihan formulated the strategy (with Buth, Karch and State Street's agreement and active participation) to present Houlihan as being "independent," even though they all knew that Houlihan's contingent fee disqualified it from issuing an independent fairness opinion and that Houlihan was badly conflicted.

> **ANSWER:   Argent states that the allegations in Paragraph 95 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95.**

96.     When Houlihan and Buth signed the 20 July 2001 fairness opinion engagement letter, Buth, Karch, State Street and Houlihan knew that Houlihan's contingent fee conflict disqualified Houlihan from giving a fairness opinion. They also knew that they had to fraudulently present Houlihan as being independent to counteract the impact of management's disclosed conflict. Houlihan, State Street, Buth and Karch knew that a truly independent investment banking firm could not be trusted to endorse this ESOP transaction together with the assumption of almost $700 million in debt. Because of Appvion's financial weakness, an independent investment banking firm would discover that the ESOP would be buying fully leveraged PDC stock with no equity value. Therefore, Buth, Karch, Houlihan and State Street had to fraudulently pass Houlihan off to the ESOP's Employee Fiduciaries as independent to persuade them to make the needed investment at the fraudulently inflated price so that Buth, Karch and Houlihan would get paid their contingent fees and so that Buth, Karch and others would remain in control of Appvion.

> **ANSWER:     Argent states that the allegations in Paragraph 96 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96.**

### 7.     Appvion Management Pitched the Buy Out to Appvion Employees.

97.     The Appleton Papers Retirement Savings Plan was established effective 1 January 1985. This plan consisted primarily of a 401(k) component. As of July 2001, Appvion employees had approximately $155 million in their 401(k) accounts through the original Plan.

**ANSWER:** **Argent admits that the Appleton Papers Retirement Savings Plan was established on January 1, 1985. Argent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 97.**

98.     In anticipation of the buyout transaction, the Appleton Papers Retirement Savings Plan document was amended and restated as of 1 January 2001 and renamed the Appleton Papers Retirement Savings and Employee Stock Ownership Plan (the "Plan"), which added the ESOP component to the existing 401(k) investment options.

**ANSWER:** **Argent admits that the Appleton Papers Retirement Savings Plan was amended and restated effective January 1, 2001 and renamed at that time. Argent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98.**

99.     Buth, Karch, Houlihan, and State Street had to pitch the ESOP transaction to employees and convince them to invest more than $100 million of their 401(k) funds in the ESOP.

**ANSWER:** **Argent states that the allegations in Paragraph 99 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99.**

### 8. Houlihan, State Street, Buth, Karch, Parker, and Fantini Prepared the Prospectus.

100. Appvion management (including Buth, Karch, Parker and Fantini), State Street, and Houlihan authorized and circulated a prospectus dated 23 July 2001 to employees.

>   **ANSWER:** **Argent states that the allegations in Paragraph 100 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100.**

101. The prospectus reported that the 401(a) and 401(k) plans had been amended to designate the Appvion employees who were eligible to participate in the ESOP as ESOP fiduciaries for the purpose of approving the 2001 Transaction. Therefore, any representations by Buth, Karch, Houlihan and State Street made to the Employee Fiduciaries were made to the ESOP (as further set forth below). This SAC is not attempting to recover for the employees as individuals, but is attempting to recover for losses to the ESOP.

>   **ANSWER:** **Argent states that the allegations in Paragraph 101 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that the Second Amended Complaint is purportedly brought on behalf of the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 101.**

102.    Because the employees were either ESOP Fiduciaries (pre-closing) or ESOP Owners (post-closing), any representations or omissions made to them were also made to the ESOP.

**ANSWER:    Argent states that the allegations in Paragraph 102 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102.**

103.    The prospectus identified the "CEO Team" responsible for the 2001 Transaction:

**Figure 2: Appvion's CEO Team**

| MANAGEMENT | | |
|---|---|---|

**Directors and Executive Officers**

The following table presents information regarding our executive officers as of July 1, 2001, whom we refer to as the CEO team.

| Name | Age | Position |
|---|---|---|
| Douglas Buth | 46 | Chief Executive Officer and Director |
| Jerry Wallace | 55 | Executive Vice President, Operations |
| Paul Karch | 45 | Vice President, Law & Public Affairs, Secretary, General Counsel and Director |
| Dale Parker | 50 | Vice President, Finance and Chief Financial Officer and Director |
| George Bureau | 42 | Vice President, Carbonless Marketing and International Business |
| John Depies | 44 | Vice President and General Manager, Thermal |
| Rick Fantini | 46 | Vice President, Human Resources and Procurement |

Source: Appleton Papers Inc., Prospectus, 23 Jul 01, p. 67; emphasis added.

**ANSWER:** Argent states that the allegations in Paragraph 103 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 103 purports to cite to a July 2001 prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 103 inconsistent with its complete terms.

104. Buth, Karch, Parker and Fantini were on the CEO team and the ESOP Committee, and all four of them were to receive contingent fee payments if the ESOP transaction closed.

**ANSWER:** Argent states that the allegations in Paragraph 104 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104.

105. At the 2 August 2001 road show, Buth fraudulently misrepresented that "The prospectus has all the details for you to make a decision."

**ANSWER:** Argent states that the allegations in Paragraph 105 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105.

9. **The Prospectus was Fraudulently Incomplete because it Concealed Houlihan's Conflict of Interest from the ESOP Employee Fiduciaries.**

106.    The prospectus included the following reference to the fairness opinion:

> Houlihan has rendered its **preliminary opinion** to Paperweight Development's board of directors **that the purchase price that Paperweight Development is paying for us in the acquisition is fair**, from a financial point of view, to the ESOP, as the sole shareholder of Paperweight Development. **Houlihan's preliminary fairness** opinion was based on a number of facts and assumptions, including financial information through the end of April 1, 2001. Its preliminary opinion was rendered to the board of directors of Paperweight Development and may not be relied upon by any other person. Houlihan has been asked to **render a fairness opinion** to the Board of Directors of Paperweight Development effective as of the closing of the transaction to the effect described above.

Source: *Id* Prospectus at p. 91; emphasis added.

**ANSWER:    Argent states that the allegations in Paragraph 106 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent states that Paragraph 106 purports to cite to a prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 106 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106.**

107.    Although the ESOP employees were told that they could not rely on the fairness opinion given to the board (which they did not see), they did rely on the fact that because Houlihan was rendering the fairness opinion, they must have been independent. Or put another way, the Employee Fiduciaries took comfort in the fact that an independent international

investment banking firm was willing to issue a fairness opinion. In fact, one purpose of that paragraph is to give the ESOP, through its Employee Fiduciaries, comfort and to prevent their suspicion and inquiry.

> **ANSWER:** **Argent states that the allegations in Paragraph 107 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107.**

108. Separate and apart from the fairness opinion given to the board, Houlihan opined directly to the ESOP Fiduciaries that the purchase price was fair, even though Buth, Karch, Parker, Fantini and others had a contingent fee conflict:

> The AWA incentive programs created a **conflict of interest** for the management team by giving them an **incentive to agree to a higher purchase price. Paperweight Development's financial advisor, Houlihan Lokey Howard & Zukin, and the CEO team believe that the purchase price as negotiated is** fair to the buyers.

Source: *Id* Prospectus at p. 75; emphasis added.

> **ANSWER:** **Argent states that the allegations in Paragraph 108 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 108 purports to cite to a July 2001 prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 108 inconsistent with its complete terms.**

109.     Further, Paone himself directly addressed the Employee Fiduciaries at the 2 August 2001 Road show. After Karch introduced him as the ESOP's independent investment banker. Paone told employees "Paul had mentioned that one of the things that I'm going to do this evening is help validate the purchase price of the transaction and the financial aspects as to why they are so attractive and why **you're getting such a good deal**." (emphasis added)

> **ANSWER:**     Argent states that the allegations in Paragraph 109 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109.

110.     The prospectus contained no reliance disclaimer relating to this direct Houlihan opinion to the ESOP Employee Fiduciaries.

> **ANSWER:**     Argent states that the allegations in Paragraph 110 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 110 purports to cite to a July 2001 prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 110 inconsistent with its complete terms.

111.     Further, it was strategically critical that Houlihan's representation to the ESOP employees of the fairness of the purchase price comes immediately after the sentence discussing managements' conflict. This demonstrates an intentionally conceived strategy of overcoming the impact of managements' conflict with what was being represented as being Houlihan's

independent opinion. Because the ESOP Fiduciaries had been told that to be qualified to issue a fairness opinion, Houlihan had to be independent.

> **ANSWER:** **Argent states that the allegations in Paragraph 111 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111.**

112. And the February 2001 engagement letter instructs that Houlihan was responsible for generating and coordinating this communication strategy among Buth, Karch, and State Street.

> **ANSWER:** **Argent states that the allegations in Paragraph 112 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 112 purports to cite to a February 2001 engagement letter, refers to that document for its exclusive terms, and denies all allegations in Paragraph 112 inconsistent with its complete terms.**

113. That Buth, Karch, Houlihan and State Street intentionally omitted any reference to Houlihan's conflict in order to deceive the Employee Fiduciaries is further demonstrated by the fact that the "Risk Factors" section of the prospectus disclosed managements' conflict but was silent on Houlihan's conflict. This intentional omission would also cause the Employee Fiduciaries to understand that Houlihan was independent and had no contingent fee conflict:

In addition, i**n 2000 AWA agreed to provide financial incentives to our management**, including our management negotiating team, to provide assistance and support in connection with any sale of Appleton Papers which will be payable upon completion of the acquisition, including a sales incentive component which will be greater if the purchase price is higher. **These incentives create a conflict of interest which may have increased the risk that the purchase price is too high**.

Source: *Id*, Prospectus at p. 21, emphasis added.

> **ANSWER:** **Argent states that the allegations in Paragraph 113 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 113 purports to cite to a July 2001 prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 113 inconsistent with its complete terms.**

114. The prospectus (Buth, Karch, Houlihan and State Street) fraudulently failed to disclose that Houlihan's fees were contingent on the deal closing, that their contingent fee would increase the larger the purchase price was, and that Houlihan was not independent and not qualified to give a fairness opinion.

> **ANSWER:** **Argent states that the allegations in Paragraph 114 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 114 purports to cite to a July 2001 prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 114 inconsistent with its complete terms.**

115.    That failure to disclose Houlihan's conflict while disclosing management's conflict, makes the prospectus disclosures fraudulent as a misleading partial disclosure, because "[a] representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation. Restatement (Second) Torts §529.

>        **ANSWER:    Argent states that the allegations in Paragraph 115 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 115 purports to cite the Restatement of Torts, Second, refers to that source for its exclusive terms, and denies all allegations in Paragraph 115 inconsistent with its complete terms.**

116.    In contrast to the failure to disclose Houlihan's contingent fees, the prospectus did explain that Willamette was receiving a flat fee of $200,000 for the fairness opinion it was issuing to State Street. Again, this disclosure of Willamette's fees, while concealing Houlihan's much larger contingent fee, further served to intentionally conceal (Buth, Karch, Houlihan and State Street) Houlihan's conflict and resulting lack of independence.

>        **ANSWER:    Argent states that the allegations in Paragraph 116 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 116 purports to cite to a July 2001 prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 116 inconsistent with its complete terms.**

68

117. At the 2 August 2001 road show, Buth represented that the fees that would be paid to advisors were explained in the prospectus: "We got to pay some of these advisors. The fact is we have some fees to pay and it's highlighted in the prospectus." However, other than Willamette's fees the prospectus did not reference fee payments to specific parties.

**ANSWER:** **Argent states that the allegations in Paragraph 117 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 117 purports to cite to a July 2001 prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 117 inconsistent with its complete terms.**

118. In its role as "quarterback" of the process flow, with the responsibility to "prepare materials to be presented to the employees" and from its insistence that it review all references to its name or opinion, Houlihan necessarily reviewed the prospectus and advised on its contents. Therefore, Houlihan was integrally involved with Buth, Karch and State Street in the strategy of fraudulently portraying Houlihan as being independent.

**ANSWER:** **Argent states that the allegations in Paragraph 118 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118.**

119. The course of conduct by Buth, Karch, Houlihan and State Street to fraudulently conceal Houlihan's contingent fee and related conflicts and misrepresent Houlihan's

independence infected virtually every aspect of the ESOP transaction. It also served as a course of conduct to fraudulently conceal that the ESOP was paying more than fair market value for the PDC stock and that Buth and Karch were fraudulently representing to the ESOP's Employee Fiduciaries that Houlihan was independent to keep control of Appvion and earn their contingent fees.

> **ANSWER:** **Argent states that the allegations in Paragraph 119 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119.**

120. Because of State Street's comprehensive due diligence and requirement that it "review all relevant documents," State Street knew from its review of Houlihan's engagement letter (clearly a relevant document) that Houlihan was not independent. Further, State Street had veto rights over the content of the Prospectus and had the right to propose changes. Therefore, State Street is also responsible for the Prospectus' contents including the fraudulent portrayal of Houlihan as being independent. State Street's participation goes far beyond "mere silence" because, among other reasons, it affirmatively approved the Prospectus knowing that Houlihan was not qualified to give a fairness opinion and was not disclosed as being conflicted under circumstances that required that disclosure so that the remainder of the prospectus was not materially misleading.

> **ANSWER:** **Argent states that the allegations in Paragraph 120 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required,**

> **Argent admits that Paragraph 120 purports to cite to a July 2001 prospectus, refers to that document for its exclusive terms, and denies all allegations in Paragraph 120 inconsistent with its complete terms.**

121.     As CEO and general counsel, members of the CEO team and the ESOP Committee, and Directors of PDC, Buth and Karch were also heavily involved in drafting and review of the prospectus and approved its release and therefore are responsible for its contents.

> **ANSWER:    Argent states that the allegations in Paragraph 121 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121.**

## 10.    Buth, Karch, Houlihan and State Street Continued to Misrepresent Houlihan's Independence.

122.     In a 25 July 2001 letter to employees, Buth again represented that the ESOP buyout "offers all employees not only a unique ownership opportunity, but also the potential for extraordinary rewards for initial investors and greater control of our company's future." Consistent with the planned course of conduct that Houlihan quarterbacked, Buth fraudulently represented to the Employee Fiduciaries that both Houlihan and State Street would provide "independent validation of the deal": "I also encourage you to attend a KSOP Road Show meeting where I will discuss our KSOP opportunity. You will also receive independent validation of the deal from Lou Paone, our investment banker, and Kelly Driscoll, the ESOP

Trustee." For the same reasons explained above, Houlihan and State Street are also responsible for this fraudulent misrepresentation.

> **ANSWER:** **Argent states that the allegations in Paragraph 122 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 122 purports to cite to a July 25, 2001 letter, refers to that document for its exclusive terms, and denies all allegations in Paragraph 122 inconsistent with its complete terms.**

123.     In order to convince the Employee Fiduciaries to contribute to the needed down payment, Appvion executives Buth, Karch, and Arent, along with State Street's Driscoll, Houlihan's Paone, and Willamette's Braun, held a series of road shows to present the buyout to Appvion's employees. As disclosed in the 14 February 2001 engagement letter, Houlihan prepared and directed the content of these communications as well.

> **ANSWER:** **Argent states that the allegations in Paragraph 123 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 123 purports to cite to a certain engagement letter, refers to that document for its exclusive terms, and denies all allegations in Paragraph 123 inconsistent with its complete terms. Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123.**

124.     The road shows included at least two visits to each of Appvion's major facilities.

**ANSWER:** Argent states that the allegations in Paragraph 124 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124.

125. At the 2 August 2001 Road Show, Karch again continued the agreed-upon strategy of fraudulently and intentionally representing Houlihan as being independent:

> The first person who's going to provide **an independent view and validation** of our deal here is **Lou Paone**, our investment banker from **Houlihan, Lokey**, Howard & Zukin.

**ANSWER:** Argent states that the allegations in Paragraph 125 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125.

126. Buth, Houlihan (Paone), and State Street (Kelly Driscoll) were all present when Karch (as spokesperson for the group) represented Houlihan as independent. Even though they each knew about the secret contingent fee, they said nothing. Accordingly, their action of remaining silence is conduct that constitutes a misrepresentation. *See* Restatement (Second) of Torts § 525, cmt. b.

**ANSWER:** Argent states that the allegations in Paragraph 126 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,

**Argent admits that Paragraph 126 purports to cite the Restatement of Torts, Second, refers to that source for its exclusive terms, and denies all allegations in Paragraph 126 inconsistent with its complete terms.**

127.    The written invitation for the Employee Fiduciaries to attend the road show presentation similarly listed "Independent Validation of Deal Terms" next to Paone's name.

> **ANSWER:    Argent states that the allegations in Paragraph 127 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127.**

128.    As part of the pitch to convince the Employee Fiduciaries to transfer their 401(k) funds to the ESOP, they were told that the buyout was necessary or the company would be sold to an equity firm and be sold off for scrap, or, alternatively that an equity firm would bleed the company dry and run it into the ground.

> **ANSWER:    Argent states that the allegations in Paragraph 128 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128.**

**11.  The ESOP's Employee Fiduciaries, Were Entitled to Rely on Houlihan's Road Show Presentation and Earlier Representations Because They Were Told That Houlihan was Independent.**

129.  Houlihan's Paone made a forceful Road Show presentation to the ESOP Fiduciaries presenting facts in support of the deal and giving his opinion strongly endorsing the transaction.

> **ANSWER:  Argent states that the allegations in Paragraph 129 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129.**

130.  Even if portions of Paone's presentation constituted opinions, the ESOP, through its Employee Fiduciaries, was entitled to rely on those opinions (and the underlying facts) because they "reasonably believed [Houlihan] to be disinterested":

> § 543.  Opinion of Apparently Disinterested Person
>
> The recipient of a fraudulent misrepresentation of opinion is justified in relying upon it if the opinion is that of a person whom the recipient reasonably believes to be disinterested an if the fact that such person holds the opinion is material.

Restatement (Second) of Torts,§ 543.

> **ANSWER:  Argent states that the allegations in Paragraph 130 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 130 purports to cite the Restatement of**

Torts, Second, refers to that source for its exclusive terms, and denies all allegations in Paragraph 130 inconsistent with its complete terms.

131.   Further, the fact that Houlihan's 14 February 2001 engagement letter was with PDC does not prevent the ESOP, through its Employee Fiduciaries, from reasonably relying because the engagement letter specifically authorized Houlihan to "make presentations to the employee base regarding their participation, investment solicitation …"

ANSWER:   Argent states that the allegations in Paragraph 131 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 131 purports to cite a February 14, 2001 engagement letter, refers to that letter for its exclusive terms, and denies all allegations in Paragraph 131 inconsistent with its complete terms.

132.   Far from warning the Employee Fiduciaries that they could not rely on Houlihan, Buth, Karch, Houlihan and State Street encouraged reliance, even by fraudulently misrepresenting Houlihan's independence and actively concealing Houlihan's contingent fee.

ANSWER:   Argent states that the allegations in Paragraph 132 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132.

133.    Even though the Employee Fiduciaries were told that State Street and Willamette were their advisors, Buth, Karch, Houlihan and State Street understood that Houlihan was the 800 pound gorilla in the room. As demonstrated by their collective willingness to lie, each understood that Houlihan's "independent" endorsement was critical to push the fraudulent ESOP transaction over the finish line, thus ensuring that Buth, Karch and Houlihan would receive their contingent fees and Buth and Karch would remain in control of Appvion. The endorsement was particularly important because the Employee Fiduciaries were on notice that the management team had a personal stake in the transaction and were not independent themselves.

> **ANSWER:    Argent states that the allegations in Paragraph 133 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133.**

> **12.    Buth, Karch, Houlihan, and State Street Engaged in a Course of Conduct to Conceal Houlihan's Conflicts of Interest and the Fact that Appvion was Priced Above Fair Market Value.**

134.    At least the following communications fraudulently representing Houlihan as being independent, constituted a separate and independent course of conduct designed to conceal the underlying fraud that the ESOP was paying more than fair market value for the PDC stock and the related fiduciary breaches. Instead, PDC would pay a fraudulently inflated price of $810 million (plus transaction fees) so that Buth, Karch and others could personally benefit from maintaining control of Appvion. These communications also constituted "steps taken by wrongdoing fiduciaries to cover their tracks." They include:

- 23 July 2001 Prospectus: Fraudulent half-truth regarding Houlihan's role, concealing that Houlihan was not independent and not qualified to give a fairness opinion either to the board or directly to the Employee Fiduciaries.

- 25 July 2001 Letter: Buth wrote to the Employee Fiduciaries fraudulently representing that Houlihan would provide an "independent validation of the deal."

- Road Show Program: Again representing that Houlihan was independent: "Independent Validation of Deal Terms – Lou Paone."

- 2 August 2001 Road Show: Karch introduced Paone as being independent and Paone strongly endorses the ESOP transaction.

**ANSWER:** **Argent states that the allegations in Paragraph 134 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 134 purports to cite various sources, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 134 inconsistent with their complete terms.**

135. By participating together to represent Houlihan as being independent, Buth, Karch, Houlihan and State Street dissuaded ESOP employees from conducting further investigation into the ESOP transaction, the PDC stock fair market value and any impact on the ESOP transaction caused by management's and Houlihan's contingent fee conflict and fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 135 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135.

136.    Further, by working together in a course of conduct to portray Houlihan as independent, Buth, Karch, State Street and Houlihan concealed from the ESOP Employee Fiduciaries, that Houlihan was deeply conflicted in its many roles in quarterbacking the ESOP transaction.

**ANSWER:** Argent states that the allegations in Paragraph 136 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 136.

137.    State Street's willingness to participate with and support Buth, Karch and Houlihan in representing Houlihan as being independent, after Houlihan recommended State Street as trustee, is convincing evidence of the kind of relationship described by United States District Court Judge Brinkema:

> Wilmington's lack of engagement and willingness to negotiate so favorably with CSG may have been **motivated by its significant business relationships** with CSG, which **refers more ESOP business** to Wilmington than **all other firms combined**. … As Smith acknowledged, "the ESOP world … [is] a **very incestuous community** [.] … Given the **extensive relationships** that these parties shared, it is hardly surprising that Golden could not

identify a single occasion when Wilmington had declined to approve an ESOP transaction after it was formally engaged to act as trustee."

*Brundle v. Wilmington Trust, N.A.*, 241 F.Supp.3d 610, 643 (E.D. Va. 2017).

> **ANSWER:** **Argent states that the allegations in Paragraph 137 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137.**

138. The Employee Fiduciaries voted in favor of the ESOP Transaction and contributed the $107 million down payment. The ESOP Transaction closed on 9 November 2001.

> **ANSWER:** **Argent states that the allegations in Paragraph 138 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138.**

139. The ESOP Committee members (Buth, Karch, Parker and Fantini) received the following contingent fee payments:

**Table 1: Loyalty Payment/Related Completion Bonus**

|  | Loyalty Payment | Value Related Completion Bonus* | Total |
|---|---|---|---|
| Buth | $780,000 | $994,868 | $1,774,868 |
| Karch | $306,000 | $562,706 | $868,706 |
| Parker | $368,000 | $363,113 | $731,113 |

| Fantini | $250,000 | | $250,558 | $500,558 |
|---|---|---|---|---|

*Estimated from 10-K

Sources: AWA Ltr to Doug Buth, 12 Feb 2001, pp. 4, 5, 6; Appleton Papers Inc., Prospectus, 23 Jul 01, p. 74; 2002-10-K, p. 102.

> **ANSWER:** Argent states that the allegations in Paragraph 139 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139.

140. Houlihan received its contingent fee of at least $8.1 million.

> **ANSWER:** Argent states that the allegations in Paragraph 140 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140.

141. After the transaction closed, Appvion and PDC issued a Prospectus Supplement to the ESOP employee owners dated 19 November 2001. This supplement described the completed transaction, which differed slightly from the transaction described in the prospectus. The supplement listed transaction fees including "$16 million in bank fees, $8 million in investment banking fees and $1 million in other various costs." Presumably the $8 million referenced in this supplement was the fees paid to Houlihan; however, the supplement does not reference Houlihan and does not describe the fees as contingent. In addition, communications

to employees, including a 28 May 2001 Ownership Update newsletter to Employee Owners, had also identified Bear, Stearns & Co. as investment banker for the deal causing further misdirection.

> **ANSWER:** **Argent states that the allegations in Paragraph 141 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141.**

142. This fraudulently incomplete supplement was yet an additional step in furtherance of Buth, Karch, Houlihan and State Street's course of conduct to fraudulently conceal that the ESOP paid more than fair market value for the PDC stock in order to earn contingent fees and order to keep Buth, Karch and others in control of Appvion for their financial gain.

> **ANSWER:** **Argent states that the allegations in Paragraph 142 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142.**

**13. State Street Signed a Security Holder's Agreement Which Allowed Buth to Retain Control of the Company.**

143. On 9 November 2001, State Street (on behalf of the ESOP) entered into a Security Holders Agreement with PDC which severely limited the ESOP Trustee's ability to

control the Board. Under this agreement, the Trustee only had the right to independently nominate or remove a minority of the members of the Board until 2004 (it could independently nominate three directors in 2001/2002, two directors in 2003, and only one director in 2004). After 1 January 2005, the Trustee could only jointly nominate directors in conjunction with Appvion/PDC's CEO – it could not independently nominate any directors. The Trustee also did not have the independent authority to remove any directors after 1 January 2005.

> **ANSWER:** **Argent states that the allegations in Paragraph 143 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that the extent of its powers are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 143 inconsistent with their complete terms.**

144. The Security Holder's Agreement was not disclosed in the Prospectus. The terms first appeared in the Prospectus Supplement dated 19 November 2001. The terms of the ESOP Plan and the Security Holders Agreement severely limited the ESOP's ability to control the affairs of PDC or Appvion and left control with CEO Buth.

> **ANSWER:** **Argent states that the allegations in Paragraph 144 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 144 purports to various documents, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 144 inconsistent with their complete terms.**

### 14. The 31 December 2001 PDC Stock Valuation ($12.81) Demonstrates the 9 November 2001 Valuation ($10) was Fraudulently Inflated.

145.     As of 31 December 2001, 52 days after the 9 November 2001 ESOP transaction, Willamette valued the PDC stock at $12.81 a share. When multiplied by the number of shares outstanding (10,684,373) the resulting equity value of the PDC stock was fraudulently calculated to be approximately $136.9 million.

> **ANSWER:     Argent states that the allegations in Paragraph 145 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145.**

146.     However, the combined pension and post-retirement debt reported on the Appvion audited balance sheet as of 31 December 2001 totaled $73.1 million. The "Other Material Liabilities" reported on that date totaled $7.3 million. This combined debt, (never subtracted from PDC's enterprise value to arrive at fair market value) totaled $80.4 million, or 58.76% of PDC's reported equity as of 31 December 2001. In addition, as of that date, a 15% control premium totaled $83.6 million, a full 60% of PDC's reported equity value.

> **ANSWER:     Argent states that the allegations in Paragraph 146 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146.**

147.    Combined, the unsubtracted debt of $80.4 million and the fraudulent control premium of $83.6 million totaled $164 million.   Adjusting for just these two items by subtracting $164 million from PDC's reported equity value of $136.9 million, results in negative equity of $27.1 million, or negative $2.54 per share of PDC stock.

**ANSWER:    Argent states that the allegations in Paragraph 147 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147.**

148.    Just 52 days earlier, it is certainly reasonable to conclude that the PDC equity value was certainly not higher, and should likewise have been reported as being negative. Therefore, the representations of Buth, Karch, Houlihan, State Street and Willamette that the $10 per share purchase price was fair, and not more than fair market value is demonstrably false. The only way that Buth, Karch, Houlihan and State Street were able to fabricate a positive equity value at the ESOP transaction date was by colluding together to fraudulently fail to deduct the pension, post- retirement and other liabilities and by adding a fraudulent control premium.

**ANSWER:    Argent states that the allegations in Paragraph 148 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 148.**

## B.    Appvion's Employees Became Employee Owners.

149.    After the transaction was approved, the trustee used the invested funds to purchase shares of common stock of PDC, but only "if the ESOP trustee, in its sole discretion, determines that it is permissible under ERISA to accept the direction of eligible participants with regard to the investment in common stock." The ESOP Trustees (State Street, Reliance, and Argent) held record title to the shares of PDC stock on behalf of the ESOP, holding PDC's stock in trust for the Employee Owners who were the beneficial shareholders.

> **ANSWER:**    **Argent admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 149 inconsistent with their complete terms.**

150.    After the initial election, the Employee Owners could elect to contribute a portion of their wages on an ongoing basis to the ESOP, which the ESOP would use to purchase additional stock from PDC in approximately June and December of each year and then allocate to accounts of Employee Owners. Withdrawals from a participant's ESOP account were limited to the following circumstances: (1) retirement, disability, death, or termination or employment; hardship distributions; (3) loans to employees; and (4) statutory diversification of up to 10% of ESOP accounts per year (required by ERISA to be offered to employees over 55 years of age); and (5) additional diversification of up to 10% of ESOP accounts per year (as allowed by the ESOP Committee). The ESOP therefore repurchased shares from both current and former

employees throughout the life of the ESOP. The purchase and sale activity is listed in Apendices A and B.

> **ANSWER:** **Argent admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 150 inconsistent with their complete terms.**

151. In theory, the share repurchase obligations would be funded from employee contributions to the ESOP, along with matching contributions from Appvion. If net repurchases exceeded contributions to the ESOP, repurchases were funded through a loan from Appvion to PDC, which PDC loaned to the ESOP.

> **ANSWER:** **Argent admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 151 inconsistent with their complete terms.**

152. Share repurchases reduced the total number of shares in circulation. For example, if there were 10,000,000 shares issued and the ESOP repurchased 1,000,000, the total share count would be reduced to 9,000,000. After the initial buyout transaction, 10,684,373 shares of PDC stock were issued. By July 2017, only 5,823,112 shares remained outstanding.

> **ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 152.**

153.     Any sales or purchases of PDC stock were required to be for fair market value under the Plan and under ERISA.

> **ANSWER:   Argent admits that Paragraph 153 purports to cite to ERISA and the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 153 inconsistent with their complete terms.**

### C.     The Defendants Analyzed and Reviewed the Stock Price Valuations and Authorized Their Release.

#### 1.     Willamette and Stout Were Responsible for Creating the Valuations.

154.     Starting 31 December 2001, the Trustee was required to begin conducting semi-annual valuations of PDC stock.

> **ANSWER:   Argent states that the allegations in Paragraph 154 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154.**

155.     At an 8 January 2002 meeting, the ESOP Committee recommended that that the Trustee retain Willamette as the valuation firm for the 31 December 2001 and 30 June 2002 valuations. Accordingly, State Street retained Willamette to act as appraiser. Willamette continued in that position through mid-2004.

**ANSWER:** Argent states that the allegations in Paragraph 155 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155.

156. In late 2004, Willamette's Scott Levine, Bob Socol, and others who worked on the Appvion account left Willamette and went to work for Stout.

**ANSWER:** Argent states that the allegations in Paragraph 156 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 156.

157. At the 14 January 2005 meeting of the ESOP Committee, the Committee recommended that the Trustee retain Stout "as the valuation firm for conducting the December, 2004 interim valuation (for loan issuance) and subsequent valuations."

**ANSWER:** Argent states that the allegations in Paragraph 157 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157.

158.     In a 24 February 2005 email, Appvion management reassured employees that many of the same professionals who had performed the Willamette valuations would stay on at Stout:

> The latest valuation of Paperweight Development Corporation was conducted by Stout Risius Ross (SSR [sic]), not Willamette Management Associates as I reported below. **Many key members of the Willamette Management ESOP valuation team including Bob Socol and Scott Levine have joined SRR.**
>
> Our trustee, State Street Global Advisors (SSGA), selects the firm to conduct the appraisal that helps SSGA determine the value of PDC stock. **SSGA chose Stout Risius Ross because of the qualifications and experience of Socol, Levine and their colleagues as well as their knowledge of our company.** The Willamette team had conducted all of our company's prior valuations.

Emphasis added.

> **ANSWER:**     **Argent states that the allegations in Paragraph 158 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 158 purports to cite a February 24, 2005 email, refers to that email for its exclusive terms, and denies all allegations in Paragraph 158 inconsistent with its complete terms.**

159.     Stout conducted the valuations from late 2004 through 2017.

> **ANSWER:**     **Argent states that the allegations in Paragraph 159 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Stout conducted the valuations from 2014 through 2017.**

2. **The Trustees Were Responsible for Reviewing and Approving the Final Stock Price.**

160. The ESOP Trustee was at all times fiduciary to the ESOP and had an obligation to act in the best interests of the ESOP and its Employee Owners.

**ANSWER: Argent admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 160 inconsistent with their complete terms.**

161. Under the applicable trust agreements, the ESOP Trustee (State Street from 2001- 2013, Reliance from 2013-2014, and Argent from 2014-2017) were the primary party responsible for determining PDC's stock value.

**ANSWER: Argent admits that Paragraph 161 purports to cite to various trust agreements, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 161 inconsistent with their complete terms.**

162. The trust agreements required them to retain an "Independent Appraiser," as described by Section 401(a)(28)(C) of the Internal Revenue Code, to value PDC stock. However, the Trustee Defendants were ultimately responsible for reviewing and finalizing the valuation in accordance with ERISA, which requires the trustee to determine fair market value in good faith.

**ANSWER: Argent states that the allegations in Paragraph 162 are not directed exclusively to it but also to defendants who have been dismissed from the**

**case, and therefore no response is required as to certain of the allegations. With respect to trust agreements applicable to Argent, Argent refers to those documents for their exclusive terms, and denies all allegations in Paragraph 162 inconsistent with its complete terms. Portions of Paragraph 162 contain legal conclusions to which no response is required. Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 162.**

163. While they were entitled to rely on the advice of a financial advisor, the trustees were required to investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice was reasonably justified under the circumstances. This required the trustees to make an honest, objective effort to read the valuation, understand it and the underlying assumptions, and question the methods and assumptions that do not make sense.

**ANSWER: Argent admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 163 inconsistent with their complete terms.**

164. State Street, Reliance, and Argent therefore necessarily read, critically reviewed and understood each of the valuation reports they approved as well as the underlying methodology and assumptions they were based on.

**ANSWER:** Argent admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 164 inconsistent with their complete terms.

### 3. The ESOP Committee Members Were ESOP Fiduciaries Responsible for Reviewing and Approving the Valuations.

165. The Plan authorized the creation of the ESOP Committee, which was to consist of at least three members appointed by Appvion's Board of Directors. This committee was "the named fiduciary with respect to the financial management of the ESOP Plan and the control or management of the assets of the Plan[.]"

**ANSWER:** Argent states that the allegations in Paragraph 165 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 165.

166. A 2006 KSOP Guide distributed to employees titled "Take Ownership of your Future" confirmed the ESOP Committee's fiduciary status, stating "Because the committee exercises discretionary authority with respect to the management of the ESOP and provides direction to the ESOP Trustee, its members also have a fiduciary obligation to act in the best interest of the ESOP."

**ANSWER:** Argent states that the allegations in Paragraph 166 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 166 purports to cite to a 2006 KSOP Guide, refers to that source for its exclusive terms, and denies all allegations in Paragraph 166 inconsistent with its complete terms.

### a. The ESOP Committee Members Reviewed, Approved and Disseminated Each Semi-Annual PDC Stock Price.

167. From 31 December 2001 forward, the ESOP Committee members received, reviewed, and approved the semi-annual PDC stock valuations, then disseminated the stock price through communications to the Employee Owners that the ESOP Committee members authored, reviewed, and approved (*see* ¶¶ 373-560 for discussion of these communications). The fact that the ESOP Committee reviewed the valuations is confirmed by the content of the ESOP Committee communications with the Employee Owners, which discussed the valuation techniques and selectively described factors that impacted the valuations. Further, the stock price was a crucial factor to induce the Employee Owners to continue to fund the ESOP.

**ANSWER:** Argent states that the allegations in Paragraph 167 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 167.

168.     In addition, Buth (and others) went on road shows to present the valuations to employees. For example, he went on a road show in March 2002 along with Stout's Levine to present the valuation to the Employee Owners, in order to "explain the valuation process, how it differs from the fairness opinion issued at the deal closing, and how it determines stock value." Buth again went on a road show in September 2002 to explain the 30 June 2002 valuation, and continued to hold road shows approximately twice a year to present the share price to employees and discuss company performance.

> **ANSWER:**    **Argent states that the allegations in Paragraph 168 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 168.**

169.     In a September 2003 newsletter, State Street's Driscoll reported that she would "typically call Doug Buth and inform him and Appleton of the new value of PDC stock."

> **ANSWER:**    **Argent states that the allegations in Paragraph 169 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 169.**

170.     Further, the ESOP Trustee was not authorized to buy any PDC stock without the ESOP Committee's prior direction.

ARTICLE 3

Provisions Related to Investment in Company Stock

3.1 Investment of Cash. The primary purpose of the Plan is to acquire an ownership interest in the Company either from the Company or its shareholders and to provide deferred compensation benefits to Participants, Beneficiaries and Alternate Payees in the form of share of Company Stock. **Accordingly the ESOP portion of the Plan has been established to provide for investment primarily in shares of Company Stock**. The Trustee shall purchase Company Stock with the assets contained in the Participants' ESOP Account **upon the direction of the Committee**, unless the Trustee determines that such purchase is prohibited by ERISA. The Trustee shall purchase Company Stock from the Company or from any shareholder, **if the Trustee is directed by the Committee**, and such stock may be outstanding, newly issued or treasury stock. All such purchases must be at a price **not in excess of fair market value**, as determined by an independent Appraiser where such stock is not publicly traded.

Source: Appleton Papers Inc., Employee Stock Ownership Trust, 1 Jun 2001 pp. 8-9; emphasis added.

**ANSWER:** **Argent states that the allegations in Paragraph 170 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 170 purports to cite to a June 1, 2001 trust agreement, refers to that source for its exclusive terms, and denies all allegations in Paragraph 170 inconsistent with its complete terms.**

171.    Similar language was in the operative trust agreements until August 2015.

**ANSWER:** **Argent admits that Paragraph 171 purports to cite to various trust agreements—including the August 3, 2015 agreement to which Argent is a**

party—refers to those agreements for their exclusive terms, and denies all allegations in Paragraph 171 inconsistent with their complete terms.

### b. Minutes Beginning in 2008 Confirm the ESOP Committee's Detailed Review of the PDC Stock Valuations.

172. In January 2008, the ESOP Committee adopted a Charter. The Charter confirmed that one of the ESOP Committee's duties was to "review stock price calculations. Its duties included:

- "To oversee the administration and enforcement of the Appleton Employee Stock Ownership Plan;"

- "To direct the activities of the Trustee of the ESOP Plan;"

- "Appoint Trustee or Trustees to hold the assets of the ESOP Plan;"

- "**Review stock price calculations** as soon as practical after the Trustee establishes the stock price;"

- "Review current/forecasted company financial performance and covenant compliance;"

- Review status of the ESOP Plan in relation to ERISA to ensure compliance;

- Review performance of the record keeper for the ESOP;

**ANSWER:** Argent states that the allegations in Paragraph 172 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 172.

173.    However, communications from the ESOP Committee to the Employee Owners before 2008 demonstrate that the ESOP Committee reviewed each PDC stock valuation before they released the PDC stock price to the Employee Owners.

**ANSWER:    Argent states that the allegations in Paragraph 173 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 173.**

174.    A 13 May 2015 presentation to Appvion's Board also described the ESOP Committee's responsibilities, including:

- "Semi-annual review and approval of stock price calculations with Trustee and Stout Risius Ross"

- "Regular reviews of company financial performance and regulatory filings"

- "Regular interaction with the Trustee on all significant ESOP-related matters"

- **ANSWER:    Argent states that the allegations in Paragraph 174 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 174.**

175.    For example, at the 10 January 2008 ESOP Committee meeting, Stout's Levine participated in the meeting telephonically and explained the valuation "as prepared by Stout Risius Ross and approved by State Street Global Advisors." The ESOP Committee requested

detailed edits to Stout's valuation presentation to State Street, including removing a reference to insurance settlement litigation and adding additional carbonless competitors to the presentation. This example demonstrates the ESOP Committee's detailed level of PDC valuation review:

> The first item on the agenda was to 2 review **the December 31, 2007 stock valuation work as prepared by Stout Risius Ross and approved by State Street** Global Advisors. Mr. Levine **described the process used to arrive at the December 31, 2007 valuation**.
>
> Following a general discussion of the valuation, **a few edits were requested to be made** to SRR's presentation to State Street Bank and Trust Company. Ms. Tyczkowski requested that SRR **removed references to the insurance litigation settlement as being imminent** on page 16, item 3. and Schedule M of the presentation. Mr. Ferree also requested that **Glatfelter and Nekoosa be added to the list of carbonless competitors** on pages 7 and 25 of the presentation documents.
>
> The ESOP Committee was comfortable with the valuation work and there being no further questions or discussion, Messrs. Levine and Williams and Ms. Marzeotti departed the meeting.

Minutes of a Meeting, ESOP Committee, Appleton Papers Inc. Retirement and Employee Stock Ownership Plan, 10 Jan 08.

> **ANSWER:** **Argent states that the allegations in Paragraph 175 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 175.**

176. Similarly, the 7 July 2008 minutes of the ESOP Committee show that the ESOP Committee "accepted the valuation" after discussion with Stout and State Street.

**ANSWER:** Argent states that the allegations in Paragraph 176 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 176.

177.     In a 7 July 2009 ESOP Committee Meeting, the ESOP Committee reviewed the 30 June 2009 stock valuation prepared by Stout and approved by State Street, and requested adjustments to the share price. Again, this represents the ESOP Committee's detailed level of review:

> The Committee reviewed the June 30, 2009 stock valuation prepared by Stout Risius Ross and approved by state Street Global Advisors. Mr. Levine described the process used to arrive at the June 30, 2009 valuation. **Following a detailed discussion, it was determined that the stock price needed to be adjusted. The ESOP Committee accepted the adjusted valuation**. A revised valuation report will be forwarded to the ESOP Committee.

Emphasis added.

**ANSWER:** Argent states that the allegations in Paragraph 177 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 177.

178.    ESOP Committee meeting minutes documented that representatives from Stout and the trustees participated in ESOP Committee meetings to review each of their valuations with the ESOP Committee from January 2008 to July 2017.

**ANSWER:    Argent states that the allegations in Paragraph 178 are not directed exclusively to it but also to defendants who have been dismissed from the case, and therefore no response is required as to those allegations. With respect to ESOP Committee meeting minutes applicable to Argent, Argent refers to those documents for their exclusive terms, and denies all allegations in Paragraph 178 inconsistent with its complete terms. Argent generally admits that it participated in some ESOP Committee meetings.**

**4.    The Directors Were Responsible for Monitoring the ESOP Committee and the Trustee as Well as Appvion's Financial Statements and Performance.**

179.    The Board was responsible for appointing the ESOP Trustee and the members of the ESOP Committee, as well as selecting a chair and secretary for the ESOP Committee.

**ANSWER:    Argent states that the allegations in Paragraph 179 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 179.**

180.    The Board consisted of inside directors and the Outside Directors. The inside directors were officers of Appvion and members of Appvion's ESOP Committee – this included the CEOs (Buth, Richards, and Gilligan) as well as Parker and Karch.  These individuals'

knowledge of and involvement in the valuations is therefore addressed above, but their role as directors is also relevant to their knowledge.

> **ANSWER:** **Argent states that the allegations in Paragraph 180 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 180.**

181. The Outside Directors (Scherbel, Pace, Carter, Murphy, Reardon, Suwyn, and Seifert) were not otherwise employed by Appvion.

> **ANSWER:** **Argent states that the allegations in Paragraph 181 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 181.**

182. One of the Board's primary functions was, as Richards stated in a 6 December 2007 email, "to oversee and control the company." This included extensive knowledge of Appvion and PDC's financial condition. The ESOP's valuations directly impacted Appvion's financial condition in at least the following ways:

- When an employee left Appvion or otherwise redeemed shares, their shares were sold back to the ESOP through a put option. Appvion relied on continued investment from employees to fund the redemptions from the ESOP, but redemptions in excess of contributions had to be paid from Appvion's cash flow

(via loans to PDC). Since redemptions exceeded contributions every year after 2002, this was a large drain on Appvion's cash flow. Appvion had to monitor this repurchase obligation at all times and the repurchase obligation was disclosed in each 10-K.

- Further, Appvion's loan covenants restricted the amount the ESOP could pay out in excess of contributions, so this repurchase liability had to be monitored for compliance with loan covenants.

- The value of PDC's stock directly impacted Appvion's balance sheet through at least the Redeemable Common Stock entry, which was a function of the appraised stock value. This was part of Appvion's audited financial statements that were incorporated into 10-Ks.

**ANSWER:** **Argent states that the allegations in Paragraph 182 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 182.**

183. Because the ESOP and the ESOP valuations were so central to Appvion's financial condition, in order to effectively understand or control Appvion's finances, the Directors had to understand the valuations in order to exercise any kind of effective control over the company and to fulfill their oversight function.

**ANSWER:** **Argent states that the allegations in Paragraph 183 are not directed to it but instead to defendants who have been dismissed from the case, and**

therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 183.

184. Further, the Board recognized that it owed a fiduciary duty to the ESOP as a shareholder without regard to ERISA. However, since the shareholder here was an ERISA plan, the Board had additional fiduciary obligations to appoint fiduciaries to manage the ESOP and monitor those fiduciaries (the ESOP Committee and the ESOP Trustee).

**ANSWER:** **Argent states that the allegations in Paragraph 184 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 184.**

185. To that end, the Board received reports on the valuations on an ongoing basis from the ESOP Trustee, the ESOP Committee, and the appraisal firms (Willamette and Stout). The Directors met with the ESOP Trustee and the appraisers twice per year to discuss the valuations. For example, Willamette's Braun represented that he would meet with the Board twice a year:

> **[W]e will come in twice a year in order to … provide a full report to** the trustee and will also **provide management and the board of directors** with enough information so they understand what it is we did, why it makes sense, at least why we think it made sense and how we feel that is a supportable value for purposes of determining what your value is going forward.

The Future of Appleton Papers Road show, 2 Aug 2001.

**ANSWER:** Argent states that the allegations in Paragraph 185 are not directed exclusively to it but also to defendants who have been dismissed from the case, and therefore no response is required as to certain of the allegations. Argent generally admits it produced certain reports that included valuations of PDC stock.. Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 185.

186. Similarly, a September 2003 employee newsletter authored by State Street's Driscoll stated that "A State Street representative attends at least one Appleton board meeting each year and conducts meetings with the outside directors that serve on Appleton's board." This practice continued throughout the life of the ESOP; as evidenced by at least emails from 2008 and 2012 stating that the Board to review the valuations at its regular meetings.

**ANSWER:** Argent states that the allegations in Paragraph 186 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 186.

187. Further, as part of monitoring Appvion's financial performance, the Board reviewed the financial projections prepared by management – these were the same projections that formed the basis for the valuations.

**ANSWER:** Argent states that the allegations in Paragraph 187 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,

> **Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 187.**

188.    The Directors also reviewed and signed each of PDC and Appvion's 10-K filings that was filed while they were directors. Each 10-K filing reported and relied upon the stock price.

> **ANSWER:    Argent states that the allegations in Paragraph 188 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 188.**

189.    The Board had an Audit Committee which had even greater responsibility for oversight of Appvion's audited financial statements and accounting practices than the rest of the Board. According to numerous 10-K filings, the Audit Committee was tasked with "provid[ing] assistance to the Board of Directors in fulfilling its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of Paperweight Development financial reports." Further, the Audit Committee reviewed and approved Appvion's quarterly 10-Q filings, which also relied upon and incorporated the stock values.

> **ANSWER:    Argent states that the allegations in Paragraph 189 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 189.

190.    The Board's Compensation Committee (Seifert, Murphy, Suwyn and Reardon) was "responsible for authorizing the compensation of the Chief Executive Officer subject to ratification by the board of directors, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers." This included the power to award grants of LTIP units and RSUs (defined and discussed below in Paragraphs 297-305) which were directly tied to the stock price. This required the Compensation Committee to understand the stock price and the potential movement of the stock price in order to understand how much compensation they were awarding.

      **ANSWER:    Argent states that the allegations in Paragraph 190 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 190.**

**D.     PDC's Stock Was Fraudulently Overvalued from 9 November 2001 Through Bankruptcy.**

      **1.    After the 2001 Transaction, the Share Price Increased Dramatically.**

191.    Because PDC's stock was not publicly traded, its value was based entirely on valuations conducted by Willamette and Stout and approved by the ESOP Trustee and the ESOP Committee as described above. These stock values are below:

**Table 2: PDC's Reported Stock prices 9 November 2001 to 30 June 2017**

| Valuation Date | Share Price |
|---|---|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |
| 12/31/2004 | $ 26.36 |
| 06/30/2005 | $ 27.77 |
| 12/31/2005 | $ 28.56 |
| 06/30/2006 | $ 31.27 |
| 12/31/2006 | $ 33.62 |
| 06/30/2007 | $ 32.89 |
| 12/31/2007 | $ 33.41 |
| 06/30/2008 | $ 26.64 |
| 12/31/2008 | $ 21.43 |
| 06/30/2009 | $ 18.87 |
| 12/31/2009 | $ 13.26 |
| 06/30/2010 | $ 12.03 |
| 12/31/2010 | $ 12.84 |
| 06/30/2011 | $ 14.10 |
| 12/31/2011 | $ 15.01 |
| 06/30/2012 | $ 16.45 |
| 12/31/2012 | $ 17.55 |
| 06/30/2013 | $ 17.85 |
| 12/31/2013 | $ 16.25 |
| 06/30/2014 | $ 16.30 |
| 12/31/2014 | $ 11.00 |
| 06/30/2015 | $ 12.90 |
| 12/31/2015 | $ 12.30 |
| 06/30/2016 | $ 13.70 |
| 12/31/2016 | $ 10.35 |
| 06/30/2017 | $  6.85 |

**ANSWER:** **Argent admits that, for the years of 2014-2017, the share prices in Table 2 align with the valuations issued by Stout Risius Ross. Argent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 191.**

192.    The valuations were never disclosed to the Employee Owners or the public. However, the ESOP Committee and the ESOP Trustee at all times fraudulently misrepresented that the stock was being set at fair market value.

> **ANSWER:    Argent denies that it breached any fiduciary duty, violated any provision of ERISA, or engaged in any fraudulent misrepresentation. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 192.**

193.    Since PDC and Appvion were 100% employee-owned, these stock values were a key factor underlying all aspects of the business. High level executives at Appvion (including the ESOP Committee and the Board) were at all times aware of the stock price and the valuation process. Further, because they needed employees to continue investing in the ESOP to continue providing funds to the ESOP and Appvion, they had to continually pitch the ESOP to employees through the stock value communications discussed here in, regular road show presentations, and other communications and marketing materials.

> **ANSWER:    Argent states that the allegations in Paragraph 193 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 193.**

### 2.    Plaintiff Grant Lyon First Discovered in 2017 that the PDC Stock Valuations had been Fraudulently Inflated.

194.    Lyon was appointed as the sole member of the ESOP Committee in August 2017. Before his appointment, Lyon was independent of Appvion and the ESOP, and had no prior knowledge of the PDC stock valuations.

**ANSWER:    Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 194.**

195.    Lyon began conducting an investigation into the valuations. Based primarily upon his review of Appvion's audited financial statements and the Stout-authored PDC stock valuations, Lyon concluded that Stout's valuations overstated the fair market value of PDC stock because of, among other things, the following deficiencies:

- Each valuation failed to deduct the Excluded Debt which appeared on Appvion's balance sheets in arriving at PDC's fair market value.

- The valuations failed to deduct all interest-bearing debt.

- The valuations included a control premium that substantially inflated the valuations.  He could find no factual support for the control premium.

- The valuations relied heavily on financial projections of future cash flow created by Appvion's management, even though that Appvion consistently missed these projections.

- The valuations failed to appropriately consider the impact on the discounted cash flow of the ongoing need to repurchase PDC stock.

- The valuations artificially manipulated their methodology to inflate the PDC stock even further during periods of low earnings.

110

- The valuations inappropriately used the perpetuity model to capitalize a declining income stream in violation of valuation theory. A declining income stream cannot continue into perpetuity.

- The valuations failed to include all overhead costs in the projections by breaking Appvion out into business segments, thus failing to account for overhead costs not allocated to individual business segments.

- The valuations failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

- The valuations failed to stress test Appvion's projections, thus failing to consider the risk of misstatement.

**ANSWER:** **Argent states that the allegations in Paragraph 195 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 195.**

196. Lyon has not had access to the Willamette valuation reports or to their original fairness opinion. However, because they were done by the same key personnel and because the reported PDC stock values were consistent with the later Stout valuations, he has reasonably concluded they were similarly flawed.

**ANSWER:** Argent states that the allegations in Paragraph 196 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 196.

### 3. Each Valuation Fraudulently Failed to Subtract Debt Recorded on Appvion's Audited Financial Statements.

#### a. Valuation Theory Uniformly Requires that All Debts be Subtracted.

197.    At the 2 August 2001 Road Show, Karch admitted that debt was the driving factor in PDC's fair market value: The PDC stock value "is primarily driven by, or almost all, is driven by a reduction in debt. The way the model works, the value of Appleton Papers remains pretty flat over the five years and it's the reduction of debt that drives the return to the participants." The Future of Appleton Papers Road show, 2 Aug 01.

**ANSWER:** Argent states that the allegations in Paragraph 197 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 197.

198.    Willamette's Rick Braun also explained that equity value equals enterprise value (or total invested capital) minus debt, using the simple example of mortgage debt on a home:

> If you want to think about it what is the value of the company as a whole which is sometimes total invested capital "TIC" – **so if the company didn't have any debt on it what was it worth and**

**if from that value you subtract debt that's a pretty good approximation of what the value of the equity is**. So, go back to Lou's example of the $80,000 house. That's an $80,000 house and you have a $70,000 mortgage against it. You have $10,000 worth of equity. And remember Doug's chart where he showed you that over the next few years – **four years the debt going to be repaid by over $500 million dollars**. So all of the things being equal, if the company is worth approximately $800 million now and that value does not change; but, the **value of the debt declines very substantially over that period of time the value of your equity should also increase over that time and that is what drives that very attractive 37 plus percent rate of return**.

The Future of Appleton Papers Road show, 2 Aug 2001; emphasis added.

> **ANSWER:** **Argent states that the allegations in Paragraph 198 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 198.**

199. To arrive at the fair market value of PDC's equity (or of any enterprise) it was necessary to first calculate PDC's enterprise value and then to subtract PDC's debt. The 2005 Stout appraisal explains: "The term 'asset,' … reflects the combined tangible and intangible assets of a company as components of a going concern business enterprise [enterprise value], and also gives consideration to all known liabilities." Stout Valuation, 11 Aug 05, p. 3; emphasis added. For example, if PDC were to incur $10 million in additional debt, that debt must be subtracted from PDC's enterprise value, causing a dollar for dollar reduction in its fair market value.

> **ANSWER:** **Argent states that the allegations in Paragraph 199 are not directed to it but instead to defendants who have been dismissed from the case, and**

**therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 199.**

200.     However, the valuations of PDC from 2001 to 2017 fraudulently reduced PDC's enterprise value by only a portion of PDC's audited balance sheet debt.

> **ANSWER:     Argent denies that it engaged in any fraudulent conduct, breached any fiduciary duty, or violated any provision of ERISA.**

201.     As described above, the two largest debts not deducted from every appraisal were entitled, "Postretirement benefits other than pension" and "Accrued pension." These amounts represent the present value of the future payments Appvion was required to make to cover its employee retirement benefits and they represent a loan from the pension beneficiaries to Appvion. A third debt, though not as large, that was never deducted was entitled "Other long-term liabilities," which included compensation obligations, workers compensation, accrued insurance obligations, accrued tax obligations, and amounts due on accounts receivable securitization.

> **ANSWER:     Argent admits that Paragraph 201 purports to cite to various appraisals, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 201 inconsistent with their complete terms. Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

202.     Valuation literature addressing retirement debt confirms it must be subtracted to determine fair market value. Willamette authored the following article agreeing with this in 2015:

> Once the funded status of pension and postretirement liabilities is known, the valuation analyst can determine the pension liability for valuation purposes.
>
> * * *
>
> **Adjusting a company's market value of equity for underfunded pension and postretirement liabilities is typically done by determining the amount of underfunding**, adjusting for tax benefits on pension contributions available to the corporation, and **subtracting the underfunded pension liability, net of tax, in determining the market value of equity**.
>
> When applying a **market approach** to a subject company with **underfunded pension and postretirement liabilities**, guideline public company **multiples should be adjusted** to account for **underfunded pension and postretirement liabilities**.
>
> Although pension plans are **slowly fading away** as companies continue to freeze pension plan obligations or terminate pension plans each year, **the need to consider pension assets and liabilities as part of the business valuation process will continue for the foreseeable future**.

*Willamette Business Valuation Insights*, "Adjusting for Underfunded Pension and Postretirement Liabilities," Christopher W. Peifer, Summer 2015, pp. 69, 71; emphasis added.

**ANSWER: Argent states that the allegations in Paragraph 202 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 202 purports to cite to a certain article, refers to that article for its exclusive terms, and denies all allegations in Paragraph 202 inconsistent with its complete terms. Argent lacks**

**knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202.**

      **b.    The Excluded Debts are Plainly Displayed on Appvion's Balance Sheets.**

203.    PDC's audited financial statements subtracted the Excluded Debt when calculating Appvion's shareholders' equity, each of the PDC stock valuations did not. For example, the 2005 PwC-audited balance sheet contained in PDC's and Appvion's publicly filed 10-K (which is similar to and representative of every other year's balance sheet) prominently showed $118.4 million in total debt included in the three entries - "Post-retirement debt other than pension," "Accrued Pension," and "Other long-term liabilities":

**Figure 3: PDC's Consolidated Balance Sheets, 2005 and 2004**



Source: PDC's, 10-K (2005), p. 50; emphasis added.

**ANSWER:** Argent states that the allegations in Paragraph 203 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 203.

        c.      **The Key Summary Page of Each Stout Appraisal Plainly Displays that Only "Interest-bearing Debt" is Being Subtracted.**

204.    In conducting its valuations, Willamette and Stout would analyze of Appvion's divisions using a discounted cash flow method (which relied on projections of future earnings) and a guideline company method (which analyzes comparable companies to determine price multiples). Willamette and Stout would determine an enterprise value for each division using each method, then average the values together to determine the enterprise value for each division. The valuations then added all of those values together to reach the enterprise value of Appvion as a whole under the heading "Conclusion of Value." Below is the Conclusion of Value from Stout's 31 December 2005 valuation, which subtracts only "interest-bearing debt" ($574,011,000) from Appvion's enterprise value ($942,000,000):

**Figure 4: Stout's Conclusion of Value as of 31 December 2005**



| | | Source | | Indicated Value |
|---|---|---|---|---|
| | **Conclusion of Value** | | | |
| | **Indicated Enterprise Values:** | | | |
| 1 | Carbonless | Exhibit 1 (B) | $ | 518,000,000 |
| 2 | Thermal | Exhibit 1 (B) | $ | 211,000,000 |
| 3 | Performance Packaging | Exhibit 1 (B) | $ | 135,000,000 |
| 4 | BemroseBooth | Exhibit 1 (B) | $ | 78,000,000 |
| | **Indicated Enterprise Value for Appleton Papers, Inc.** | | $ | 942,000,000 |
| 5 | Less: Potential Fox River Environmental Liability | | $ | (20,000,000) |
| 6 | Less: Cap on Other Potential Liabilities | | $ | (5,000,000) |
| 7 | Less: Net Litigation Liability | | $ | (100,000) |
| 8 | Plus: Cash | Exhibit 6 (A) | $ | 18,422,000 |
| 9 | Adjusted Enterprise Value for Appleton Papers, Inc. | | $ | 935,000,000 |
| 10 | Less: Book Value of Interest-Bearing Debt | Exhibit 9 | $ | (574,011,000) |
| 11 | Indicated Equity Value for Appleton Papers, Inc., Marketable | | $ | 361,000,000 |
| 12 | Less: Discount for Lack of Marketability @ 5% of Equity Value | | | (18,000,000) |
| 13 | Indicated Equity Value for Appleton Papers, Inc., Non-Marketable (Rounded) | | $ | 343,000,000 |
| 14 | Less: Phantom Stock Adjustment [a] | | $ | (2,322,598) |
| 15 | Concluded Equity Value for Appleton Papers, Inc., Non-Marketable (Rounded) | | $ | 341,000,000 |
| 16 | Divided by: Number of Shares | | | 11,938,060 |
| 17 | **Concluded Per Share Equity Value for Appleton Papers, Inc. (Rounded)** | | $ | 28.56 |

**Footnotes:**
[a] Calculated as: (1) the concluded price per share less the weighted average grant price of $23.54 per share, times (2) the 771,115 phantom shares issued and outstanding, and (3) adjusted for an effective tax rate of 40 percent.

Source: Stout Valuation, 31 Dec 05, p. 92; emphasis added.

> **ANSWER:** Argent states that the allegations in Paragraph 204 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 204.

205. If there were any doubt about what constitutes "interest-bearing debt," an exhibit to the valuation lists the debts that make up the $574 million total:

**Figure 5: Stout's Chart of Fair Market Value of Interest-Bearing Debt**

| Appleton Papers, Inc. |  | Exhibit 9 |
|---|---|---|
| **Fair Market Value of Interest-Bearing Debt** |  |  |
|  | **Book Value ($000s)** | **Fair Market Value ($000s)** |
| 1  Term Loan B | 231,309 | 231,309 |
| 2  Revolving Line of Credit | 2,000 | 2,000 |
| 3  High Yield Bonds | 7,000 | 7,000 |
| 4  Senior Secured Notes [a] | 172,000 | 163,400 |
| 5  Senior Subordinated Notes [a] | 150,000 | 147,750 |
| 6  Existing Third Party Debt - Industrial Revenue Bonds | 8,650 | 8,650 |
| 7  Capital Lease Obligations | 3,052 | 3,052 |
| 8  **Total Interest-Bearing Debt:** | **574,011** | **563,161** |

Footnote:
[a]  Based on current market pricing for the Company's publicly traded Senior Secured Notes and Senior Subordinated Notes from *Bloomberg*.

*Id.* at Appendix B, Ex. 9; emphasis added.

> **ANSWER:** **Argent states that the allegations in Paragraph 205 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 205.**

206.     A comparison of the debts reported on the audited balance sheet with the "interest- bearing debt" demonstrates that at least the following audited balance sheet debts were fraudulently omitted from the calculation of the PDC stock's 2005 equity or fair market value:

**Table 3: Audited Balance Sheet Debts Fraudulent Omitted from Stout's Valuation**

| Balance Sheet Description | Amount |
|---|---|
| "Post-retirement benefits other than pension": | $ 58,928 |
| "Accrued Pension": | $ 55,211 |
| "Other long-term liabilities": | $ 4,267 |
| TOTAL | $ 118.406        **Million** |

Source: PDC, 2005 10-K, p. 50; emphasis added.

> **ANSWER:** **Argent states that the allegations in Paragraph 206 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 206.**

207. Because the valuation failed to reduce Appvion's enterprise value by these liabilities, the fair market value of the PDC stock as of 31 December 2005 was fraudulently overstated by at least $118.41 million. Rather than the equity value of $341 million that Stout reported for 31 December 2005, the revised fair market value (with just this debt adjustment) was $222.6 million, reducing the PDC stock price from $28.56 a share to $18.98 a share. Every valuation from 9 November 2001 until Appvion's bankruptcy perpetuated (and thus fraudulently concealed) the same flaw.

> **ANSWER:** **Argent states that the allegations in Paragraph 207 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

**Argent denies that it breached any fiduciary duty, engaged in any fraudulent concealment, or violated any provision of ERISA.**

> ### d. The Combination of the Appvion Balance Sheet and the PDC Stock Valuations Shows Intent.

208. The fact that every Appvion balance sheet so clearly lists the Excluded Debts and that every PDC stock valuation so clearly discloses only a portion of Appvion's debt (interest- bearing) is being subtracted when calculating fair market value, is strong evidence of an intent to fraudulently inflate the PDC stock price. Even a cursory review of the PDC stock valuations reveals this hugely material error.

**ANSWER: Argent denies that it engaged in any fraudulent conduct, breached any fiduciary duty, or violated any provision of ERISA.**

> ### e. The BemroseBooth Transaction is Conclusive Proof that the PDC Stock Price was Intentionally Overstated by Excluding Retirement-Related Debt.

209. In 2003, Appvion's Board approved the $63.5 million purchase of BemroseBooth, a United Kingdom-based printing business. The acquisition was a complete failure. By late 2007, Appvion was seeking to unload BemroseBooth.

**ANSWER: Argent states that the allegations in Paragraph 209 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 209.**

i. **Stout's 30 December 2007 PDC Stock Valuation admitted retirement-related debt must be subtracted.**

210.     Stout's 31 December 2007 valuation is the only one that actually deducts retirement debt; however, it only deducted BemroseBooth's $15.3 million retirement debt, not Appvion's debt as a whole.  The valuation explained:

> *BemroseBooth Pension Payments*
>
> - **We subtracted $15.3 million** [from Appvion's enterprise value] to account for annual payments the Company is expected to make to fund **BemroseBooth's underfunded pension obligation** over the next five years. Based on any **discussions with Company management** and our understanding of ongoing negotiations with the **pension fund's trustee**, annual installments of approximately **$3.6 million** are expected after **accounting for the resulting tax benefit**. The amount was then **discounted back to the Valuation Date** at a 6.0 percent rate to **estimate the amount of the liability**.

Source: Stout Valuation, 31 Dec 07, p. 57; emphasis added; *id.* at pp. 15-16.

**ANSWER:     Argent states that the allegations in Paragraph 210 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 210.**

211.     In addition to its subtraction of interest-bearing debt, Stout's "Conclusion of Value" calculation made a $15.3 million dollar-for-dollar reduction to Appvion's enterprise value ($936 million) in arriving at fair market value:

**Figure 6:  Stout's Conclusion of Value as of 31 December 2007**





"Less: Present Value of BemroseBooth's Pension Payments    $      (15,300,000)"

Source: Stout Valuation, 31 Dec 07, p. 61; emphasis added.

> **ANSWER:**   **Argent states that the allegations in Paragraph 211 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 211.**

212.    This subtraction of BemroseBooth's pension debt to arrive at Appvion's fair market value is an absolute admission that the retirement debt must be subtracted from enterprise value when calculating fair market value. Stout prepared this valuation, which was approved by State Street on or before 10 January 2008.

> **ANSWER:**   **Argent states that the allegations in Paragraph 212 are not directed to it but instead to defendants who have been dismissed from the case, and**

therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 212.

213. On 10 January 2008, Stout's Levine and State Street's Syd Marzeotti and Lee Williams presented this valuation the ESOP Committee (Richards, Ferree and Tyczkowski) who reviewed it and approved it. Arent and Willetts also attended this meeting even though they were not members. Therefore, they all knew and admitted that retirement-related debt must be subtracted dollar-for-dollar from enterprise value in arriving at fair market value.

ANSWER: Argent states that the allegations in Paragraph 213 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 213.

ii. **Richards, Ferree and Tyczkowski Admitted Retirement Debt Must be Subtracted.**

214. An 11 January 2008 internal Appvion communication approved by the ESOP Committee (Richards, Ferree and Tyczkowski) to its employees explained what caused the decline in PDC's stock price, attributing a significant portion of the decline to the increase in BemroseBooth's unfunded pension liability:

**Figure 7: Appvion Internal Communication Relating to the PDC Stock Price As of 31 December 2007**



Source: Internal Company Communication, "KSOP Company Stock Value Increases 1.6 Percent for Second Half of 2007," 11 Jan 08.

ANSWER:    Argent states that the allegations in Paragraph 214 are not directed

to it but instead to defendants who have been dismissed from the case, and

therefore no response is required. To the extent a response is required,

Argent lacks knowledge or information sufficient to form a belief as to the

allegations in Paragraph 214.

215.    The critical portion of this memo made the following admission:

Along with the rest of the industry, our performance packaging business struggled throughout the year. Those results were reflected in a **negative impact on [PDC's] share value**. The years was even tougher for **BemroseBooth** and its results in the second half of 2007 along with **increased pension liabilities** for the company **produced a significant decrease in [PDC's] share value**.

*Id.*; emphasis added.

**ANSWER:** Argent states that the allegations in Paragraph 215 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 215.

216.     Appvion's unfunded pension and post-retirement liabilities (separate from BemroseBooth's unfunded pension liability for year-end 2007) totaled $64,293,000. Stout, State Street, Richards, Ferree, and Tyczkowski did not require that PDC's enterprise value be reduced by even one dollar of the $64.3 million, to arrive at the PDC stock's fair market value, even though this debt was clearly displayed on Appvion's audited balance sheet:

**Figure 8: PDC's Consolidated Balance Sheet, 2008 and 2007.**



PDC's 10-K (2008), p. 46; emphasis added.

**ANSWER:** Argent states that the allegations in Paragraph 216 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 216.

217. The ESOP Committee's (Richards, Ferree and Tyczkowski) and State Street's adoption of Stout's valuation and release of the 11 January 2008 communication is an additional complete admission by State Street, Stout, Richards, Ferree and Tyczkowski that retirement debt must be subtracted from enterprise value in arriving at fair market value.

**ANSWER:** Argent states that the allegations in Paragraph 217 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 217.

### iii.    The 30 June 2008 PDC Stock Valuation Again Admitted Retirement Debt Must be Subtracted.

218. In its 3 June 2008 valuation, Stout reported that Appvion had received bids valuating BemroseBooth at zero, again blaming reductions in its value on its "assumption of debt" and its "unfunded pension liability":

> As of the Valuation Date, the Company has received two non-binding bids, with two bids from interested parties still outstanding. Both bids effectively value Bemrose Booth at an equity **value of zero** after considering the **assumption of debt and the Company's unfunded pension liability** which exceeds £18 million, or $36 million, based on current estimates.

Source: Stout Valuation, 30 Jun 08, p. 10; emphasis added.

      **ANSWER:** **Argent states that the allegations in Paragraph 218 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 218.**

219.    Stout blamed PDC's stock price drop from $33.41 per share to $26.62 per share partly on BemroseBooth's "equity value of zero." *Id*. at pp. 15-16; emphasis added.

      **ANSWER:** **Argent states that the allegations in Paragraph 219 are not directed to it but instead to defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 219.**

220.    Because State Street and the ESOP Committee (Richards, Ferree, Arent, Willetts) reviewed the 30 June 2008 valuation, they again knew and admitted (together with Stout) that retirement debt must be subtracted from enterprise value to arrive at fair market value.

      **ANSWER:** **Argent states that the allegations in Paragraph 220 are not directed to it but instead to defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 220.**

221.    In explaining the 30 June 2008 valuation to employees, the ESOP Committee (Richards, Ferree, Arent and Willetts) sent a memo the ESOP Employee Owners blaming a significant portion of PDC stock's decline in fair market value on BemroseBooth's unfunded pension liability.  The critical portion of this memo states:

> **Analysis**
>
> There are two reasons for the **drop in value of PDC stock**. The primary reason has to do with the **performance and market value of Bemrose Booth**.
>
> **Significant value and pension concerns for BemroseBooth**
>
> **BemroseBooth** has struggled with difficult economic conditions and tough markets for its products. The company also has a **big pension liability with future funding requirements**.
>
> Those **two factors** have **hampered Appleton's efforts to sell BemroseBooth and have resulted in a dramatic write down of its value**. Based on a professionally managed auction process for the **sale of BemroseBooth**, the current market value is much less than what was originally paid. **That loss of value had a significant negative impact on our stock value**.

Source: Internal Company Communication, "KSOP Company Stock Value Decreases 20% for First Half of 2008," 7 Jul 08; emphasis added.

> **ANSWER:    Argent states that the allegations in Paragraph 221 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 221.**

129

222.     Because the ESOP Committee (Richards, Ferree, Willetts, and Arent) authorized and disseminated the communication, they again admitted that retirement debt must be subtracted from enterprise value.

**ANSWER:    Argent states that the allegations in Paragraph 222 are not directed to it but instead to defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 222.**

223.     But again, Stout's 30 June 2008 PDC stock valuation did not deduct any of PDC's retirement debt even though State Street and ESOP Committee members Richards, Ferree, Willetts and Arent knew and admitted that it should have been.

**ANSWER:    Argent states that the allegations in Paragraph 223 are not directed to it but instead to defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 223.**

**v.     The Directors Knew That Retirement Debt Had to Be Subtracted.**

224.     Consistent with its practice of reviewing the valuations, the Board's Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel), necessarily reviewed the 31 December 2007 and the 30 June 2008 valuations that both discussed the BemroseBooth pension issue. In addition, multiple communications from that time frame explained that Carter would

be going on a road show in the first quarter of 2008 along with Richards, Ferree, Willetts, Syd Marzeotti from State Street, and Scott Levine from Stout in order to discuss the ESOP, the valuation process and the stock value. BemroseBooth was a critical factor in the most valuation that would be discussed during those road shows.

> **ANSWER:** **Argent states that the allegations in Paragraph 224 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 224.**

225.    Appvion filed its 2007 10-K on 11 March 2008, signed by the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel) as well as Richards, and Ferree. The 10-K reported and relied on the 30 December 2007 stock value. This is further evidence that they conducted due diligence regarding the valuations.

> **ANSWER:** **Argent states that the allegations in Paragraph 225 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 225.**

226.    That 2008 10-K filing also notes that Appvion had classified BemroseBooth as discontinued operations and separated out BemroseBooth's assets and liabilities. This included BemroseBooth's pension liability, which had previously been included as part of Appvion's overall pension liability in its audited financial statements.

131

**ANSWER:** Argent states that the allegations in Paragraph 226 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 226.

227. On 6 and 7 August 2008, the Board held its regularly scheduled meetings. According to a "Richards Report" email to the Employee Owners describing this meeting, State Street's Syd Marzeotti attended the meeting and participated in discussions about Appvion's financials and projections. Further, the Board received an update on the BemroseBooth sale, which had closed on 1 August 2008. The email states:

> Tom **Ferree**, chief financial officer, **and Syd Marzeotti from State Street joined us** for the board meeting on August 7. **Tom presented an operations updated and projections for the third quarter and full-year financials.** The second half of the year will be challenging because we anticipate continued weakness in the economy. Our estimates assume some improvements to international and domestic sheet volume, but continued inflationary pressure on our operations….

> Tom **reviewed with the board the completed sale of BemroseBooth and matters related to that transaction.**

**ANSWER:** Argent states that the allegations in Paragraph 227 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 227.

228.    This communications confirms the Board's regular process of reviewing the valuations with the ESOP Trustee (in this case, State Street) and confirms that the Board reviewed the valuation as of 30 June 2008, which was finalized only a few weeks before that meeting.

> **ANSWER:    Argent states that the allegations in Paragraph 228 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 228.**

229.    Because the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel), Richards, and Ferree reviewed the 31 December 2007 and 30 June 2008 valuations and knew the terms of BemroseBooth's sale, they knew that retirement debt must be subtracted from enterprise value to arrive at fair market value.

> **ANSWER:    Argent states that the allegations in Paragraph 229 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 229.**

### vi.    The 2008 audited financial statements again admitted that retirement debt must be subtracted.

230.    Management's discussion from the 31 December 2008 Appvion 10-K blamed BemroseBooth's pension liability for causing a decline in BemroseBooth's fair market value

but fraudulently concealed that Appvion's separate and much larger retirement liabilities had

not been deducted in arriving at PDC stock's fair market value:

> **Late in 2007**, Appleton committed to a formal plan to **sell Bemrose Group Limited ("Bemrose")**, its secure and specialized print services business based in Derby, England. On August 1, 2008, Appleton completed the sale of Bemrose receiving $3.9 million of cash and $6.4 million of notes receivable to be settled within 75 and 180 days after closing. In anticipation of the sale transaction and as a result of a **decline in value** of the business arising primarily as a result of deteriorating economic conditions and tougher markets for Bemrose products, **as well as increased funding requirements of the Bemrose pension plan arising from negotiations with the plan trustees, Appleton recorded impairment charges aggregating $43.7 million, related to goodwill and other long-lived assets, during 2008**.

Source:  PDC, 10-K (2008), p. 24; emphasis added.

> **ANSWER:**    **Argent states that the allegations in Paragraph 230 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 230.**

231.    The Notes to the audited financial statements contained in the 30 December 2008

10-K made a similar disclosure:

> **3.    DISCONTINUED OPERATIONS**
>
> * * *
>
> On August 1, 2008, Appleton completed the sale of Bemrose receiving $3.9 million of cash and $6.4 million of notes receivable to be settled with 75 and 180 days after closing. In anticipation of the sale transaction and as a result of a decline in value of the business arising primarily as the result of deteriorating economic conditions and tougher markets for

Bemrose products, **as well as increased funding requirements of the Bemrose pension plan arising from negotiations with the plan trustees, Appleton recorded impairment charges aggregating $43.7 million, related goodwill and other long-lived assets, during 2008.** The first tranche of notes receivable was paid in November 2008, however, due to continuing difficult business conditions in Bemrose markets. Appvion established a $1.5 million valuation reserve against the $3.0 million remaining principal and interest of the notes receivable.

Source: PDC, 10-K (2008), p. 56; emphasis added.

> **ANSWER:** Argent states that the allegations in Paragraph 231 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 231.

232. These audited financial statements were signed by ESOP Committee members Richards (as Chairman, President, CEO, and a director) and Ferree (as CFO and Treasurer). They were also signed by the Outside Directors (Scherbel, Pace, Carter, Murphy, Reardon, and Seifert). All of the signors thus agreed to the accuracy of the financial statements, including the requirement to subtract retirement debt when calculating fair market value and the disclosure of the 31 December 2008 PDC stock price together with the related entry for Redeemable Common Stock.

> **ANSWER:** Argent states that the allegations in Paragraph 232 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 232.

233.    GAAP accounting would not have allowed the 10-K disclosure regarding the impact of BemroseBooth's pension plan and the write-down for asset impairment if the disclosure were not required and accurate.

> **ANSWER:**    **Argent states that the allegations in Paragraph 233 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 233.**

234.    These 10-K BemroseBooth disclosures constitute conclusive admissions by Stout, State Street, the ESOP Committee (Richards, Ferree, Arent and Willetts), and Appvion directors (Richards, Ferree, Carter, Murphy, Reardon and Seifert) that retirement liabilities must be subtracted from enterprise value when calculating fair market value.

> **ANSWER:**    **Argent states that the allegations in Paragraph 234 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 234.**

235.    Yet, inexplicably, none of them required that Appvion's fair market value for year- end 2008 be reduced by Appvion's $154.9 million in retirement debt. Nor did they require that any prior period's PDC stock valuations or financial statements (10-Ks or 10-Qs) be amended to reflect their failure to subtract Appvion's retirement-related debt.

**ANSWER:** Argent states that the allegations in Paragraph 235 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 235.

236. Further, they, and the Defendants who followed, continued to value the PDC stock without deducting a single dollar of Appvion's retirement debt.

**ANSWER:** Argent states that the allegations in Paragraph 236 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent d lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 236.

> **f.** **The 10-Ks Highlight the Serious Nature of Appvion's Pension- Related Debt Further Admitting that it Should Have Been Deducted from PDC's Enterprise Value.**

237. Recognizing the risk posed by the unfunded pension plan in 2008, Appvion began disclosing the resulting risk under "Item 1A. Risk Factors":

> *Appleton's underfunded pension plans require future pension contributions which could limit flexibility in managing the Company.*
>
> **Due to the negative investment returns in 2008, the total projected benefit obligation of Appleton's defined benefit pension plans exceeded the fair value of the plan assets by $109.8 million at January 3, 2009**. The Company contributed $10.0 million to the pension plan in 2008 and is forecasting contributions of $10.0 million and $15.0 million in 2009 and 2010, respectively. Among the key assumptions inherent in the

actuarially calculated pension plan obligation and pension plan expense **are the discount rate and the expected rate of return on plan assets**. If interest rates and actual rates of return on invested plan assets were to decrease significantly, **the pension plan obligation could increase materially**. The size of future required pension contributions could result in Appleton **dedicating a substantial portion of its cash flow from operations to making the contributions which would negatively impact flexibility in managing the Company**.

Source: PDC, 10-K (2008), p. 17; bold emphasis added, italic emphasis in original.

> **ANSWER:** **Argent states that the allegations in Paragraph 237 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 237.**

238. Similar disclosures continued through the 2016 10-Ks, providing even further evidence that each of the defendants involved, for those periods, knew that these debts should have been subtracted from enterprise value to arrive at PDC's equity value.

> **ANSWER:** **Argent admits that Paragraph 238 purports to cite various 10-Ks, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 238 inconsistent with their complete terms. Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

239.    While Stout's valuations consistently failed to deduct Appvion's pension and post-retirement liabilities, it did deduct some others (much smaller) non-interest-bearing debt such as environmental liability and litigation reserves.

> **ANSWER:    Argent states that the allegations in Paragraph 239 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 239.**

240.    For example, the 2005 10-K states that Appvion had a potential $25 million liability relating to litigation about environmental contamination of the lower Fox River; the actual potential liability was much higher, but Appvion's share of the liability was capped through an indemnification agreement with AWA. Appvion's audited balance sheet showed this as a $82.3 million liability, offset by a $57.3 million indemnification receivable.

> **ANSWER:    Argent states that the allegations in Paragraph 240 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 240.**

241.    Stout's 31 December 2005 valuation made an adjustment for this liability, discounting it to $20 million based on the present value and subtracting it from PDC's enterprise

139

value it determine fair market value. Stout also deducted $5 million for other environmental liabilities in that report, even though they had not been quantified.

> **ANSWER:** **Argent states that the allegations in Paragraph 241 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 241.**

242. There is no justification for subtracting the smaller debt for these environmental liabilities while ignoring Appvion's much larger retirement debt.

> **ANSWER:** **Argent states that the allegations in Paragraph 242 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 242.**

### h. The Valuations Fraudulently Ignored "Other Long-Term Liabilities."

243. Stout's valuations also failed to include "Other long-term liabilities" that were listed on every Appvion balance sheet. This debt category included compensation obligations, workers compensation obligations, accrued insurance obligations, accrued tax obligations, amounts due on accounts receivable securitization, and other obligations. These debts reached as high as $30-40 million in some years and would have had a material negative impact on the PDC stock valuations. Those amounts were as follows:

**Table 4: Other Long-Term Liabilities from PDC's Audited Financial Statements, 2001-2016**

| Valuation Date | Other |
|----------------|-------|
| 31 Dec 01 | ($7,285) |
| 31 Dec 02 | ($9,548) |
| 31 Dec 03 | ($8,419) |
| 31 Dec 04 | ($5,181) |
| 31 Dec 05 | ($4,267) |
| 31 Dec 06 | ($6,511) |
| 31 Dec 07 | ($5,483) |
| 31 Dec 08 | ($13,309) |
| 31 Dec 09 | ($9,294) |
| 31 Dec 10 | ($5,716) |
| 31 Dec 11 | ($7,389) |
| 31 Dec 12 | ($32,165) |
| 31 Dec 13 | ($36,243) |
| 31 Dec 14 | ($43,753) |
| 31 Dec 15 | ($35,354) |
| 31 Dec 16 | ($30,536) |

*In thousands.

Sources: Appvion, Inc., 10-Ks, 2002 p. 45; 2003, p. 49; 2004, p. 49; 2005 p. 50; 2006 p. 42; 2007 p. 40; 2008 p. 46; 2009 p. 50; 2010 p. 50; 2011 p. 50; 2012 p. 45; 2013 p. 46; 2013 10-K (A), p. 48; 2014 p. 42; 2015 p. 38; 2016 p. 33; 2016 10-K (A), p. 6.

**ANSWER:** **Argent states that the allegations in Paragraph 243 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

### i. The Valuations Did Not Include Substantial Costs from Restructuring the West Carrollton Facility.

244. In 2012, Appvion ceased papermaking operations at its West Carrollton, Ohio facility and moved its production to Appleton. This eliminated nearly 250 jobs and caused Appvion to incur substantial losses from decommissioning equipment and terminating

employees. Appvion's 2012 financial statements recorded $19.2 million in employee severance and related benefits and pension costs, of which $18 million was included in "Other long-term liabilities" on PDC's balance sheet. Stout did not subtract this amount from enterprise value in its valuation.

> **ANSWER:** Argent states that the allegations in Paragraph 244 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 244.

## j. The Excluded Debt Constituted a Huge Percentage of PDC's Equity Value.

245. The Excluded Debt was a material percentage of PDC's appraised stock value. In fact, from 2009 through 2016, it constituted more than 100% of PDC's reported fair market value:

**Table 5: Pension, Post-Retirement and Other Liabilities as a Percentage of the Total PDC Stock Value**

| Valuation Date | Total Reported PDC Shareholder's Equity Value (in thousands) | Excluded Debt (in thousands) | Percentage of Shareholder's Equity Value |
|---|---|---|---|
| 31 Dec 01 | *$136,867 | ($80,417) | 58.76% |
| 31 Dec 02 | *$253,992 | ($78,769) | 31.01% |
| 31 Dec 03 | *$283,235 | ($107,584) | 37.98% |
| 31 Dec 04 | $307,000 | ($113,686) | 37.03% |
| 31 Dec 05 | $341,000 | ($118,406) | 34.72% |
| 31 Dec 06 | $391,000 | ($108,149) | 27.66% |
| 31 Dec 07 | $368,000 | ($69,776) | 18.96% |
| 31 Dec 08 | $223,000 | ($168,205) | 75.43% |
| 31 Dec 09 | $130,000 | ($161,215) | 124.01% |
| 31 Dec 10 | $124,000 | ($139,432) | 112.45% |

142

| | | | |
|---|---|---|---|
| 31 Dec 11 | $139,000 | ($174,245) | 125.36% |
| 31 Dec 12 | $153,000 | ($207,686) | 135.74% |
| 31 Dec 13 | $129,600 | ($132,991) | 102.62% |
| 31 Dec 14 | $80,700 | ($168,409) | 208.69% |
| 31 Dec 15 | $83,000 | ($163,685) | 197.21% |
| 31 Dec 16 | $64,900 | ($163,341) | 251.68% |

*Calculated from PDC's audited consolidated balance sheets and Willamette's valuation of PDC stock fair market value.

Sources: Appvion, Inc., 10-Ks, 2002 pp. 45, 103; 2003, pp. 49, 115; 2004, p. 49; 2005 p. 50; 2006 p. 42; 2007 p. 40; 2008 p. 46; 2009 p. 50; 2010 p. 50; 2011 p. 50; 2012 p. 45; 2013 p. 46; 2013 10-K (A), p. 48; 2014 p. 42; 2015 p. 38; 2016 p. 33; 2016 10-K (A), p. 6; Stout Valuations, 30 Jun 2005, p. 21; 31 Dec 2005, p. 16; 31 Dec 2006, pp. 16, 20; 31 Dec 2007, p. 18; 31 Dec 2008, p. 60; 31 Dec 2009, p. 55; 31 Dec 2010, p. 46; 31 Dec 2011, p. 43; 31 Dec 2012, p. 44; 31 Dec 2013, p. 51; 31 Dec 2014, p. 57; 31 Dec 2015, p. 52; 31 Dec 2016, p. 36.

> **ANSWER:** Argent states that the allegations in Paragraph 245 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it violated any fiduciary duty or breached any provision of ERISA.

246. The sheer magnitude of the Excluded Debt is further powerful evidence that their exclusion from the calculation of PDC's equity value was intentional.

> **ANSWER:** Argent states that the allegations in Paragraph 246 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it violated any fiduciary duty or breached any provision of ERISA.

### 4. The Valuations Fraudulently Failed to Reduce the Enterprise Value by Material Amounts of Interest-Bearing Debt.

247.     In certain of its valuations, Stout also failed to subtract material amounts drawn against Appvion's revolving line of credit as part of Appvion's "interest-bearing debt," even though the revolving line of credit was indisputably interest-bearing debt and the revolving line of credit was listed on Stout's schedule of interest-bearing debt. Stout claimed it did not subtract the debt because it was part of Appvion's working capital, a position inconsistent with Stout's admission that "all liabilities" must be considered. Failing to subtract this debt was also inconsistent with Stout's methodology in all other PDC appraisals and resulted in materially and fraudulently overstating the value of Appvion's equity in the affected valuations, as shown below:

**Table 6: Amount of Revolving Line of Credit Excluded from Interest-Bearing Debt in Stout's Valuations**

| Valuation Date | Revolving Line of Credit - total Debt (in thousands) | Amount of Revolver Excluded from Valuation (in thousands) | Share Price per Stout Valuation | Share Price If Revolver Included | Share Price Impact |
|---|---|---|---|---|---|
| 16 Jun 12 | $32,150 | $32,150 | $16.45 | $12.84 | ($3.61) |
| 30 Jun 13 | $34,600 | $24,600 | $17.85 | $14.88 | ($2.97) |
| 31 Dec 15 | $9,600 | $9,600 | $12.30 | $11.79 | ($0.51) |
| 30 Jun 16 | $27,000 | $27,000 | $13.70 | $9.47 | ($4.23) |
| 31 Dec 16 | $31,920 | $16,898 | $10.35 | $7.65 | ($2.70) |
| 30 Jun 17 | $19,500 | $8,484 | $6.85 | $5.39 | ($1.45) |

Sources: Stout Valuations, 16 Jul 2012, pp. 29,31,63; 30 June 2013, pp. 46,48,82; 31 Dec 2015, pp. 50,52,83; 30 Jun 2016, pp. 46,48,79; 31 Dec 2016, pp. 34,36,64; 30 Jun 2017, pp. 34,36,64.

**ANSWER:**     Argent states that the allegations in Paragraph 247 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required,

> Argent denies that it violated any fiduciary duty or breached any provision
> of ERISA.

248.    In December 2013, Stout also began reducing PDC's interest-bearing debt by certain "unamortized discounts," further causing them to overstate PDC's fair market value.

**Table 7: Amount of Unamortized Discounts Excluded from Interest-Bearing Debt in Stout's Valuations**

| Valuation Date | Amount of Unamortized Discount Excluded from Valuation (in thousands) | Share Price per Stout Valuation | Share Price If Unamortized Discounts Included | Share Price Impact |
|---|---|---|---|---|
| 31 Dec 13 | $6,803 | $16.25 | $15.39 | ($0.86) |
| 30 Jun 14 | $6,333 | $16.30 | $15.48 | ($0.82) |
| 31 Dec 14 | $5,843 | $11.00 | $10.20 | ($0.80) |
| 30 Jun 15 | $5,342 | $12.90 | $12.12 | ($0.78) |
| 31 Dec 15 | $3,761 | $12.30 | $11.74 | ($0.56) |
| 30 Jun 16 | $3,371 | $13.70 | $13.16 | ($0.54) |
| 31 Dec 16 | $2,966 | $10.35 | $9.89 | ($0.46) |
| 30 Jun 17 | $3,242 | $6.85 | $6.28 | ($0.57) |

Appvion, 2013 10-K, p. 59; Jul 2014 10-Q, p. 23; 2014 10-K, p. 57; Jul 2015 10-Q, p. 15; 2015 10-K, p. 53; Jul 2016 10-Q, p. 17; 2016 10-K, p. 48; Jul 2017 10-Q, p. 14. Stout Valuations: 31 Dec 2013, p. 86; 30 Jun 2014, p. 87; 31 Dec 2014, p. 92; 30 Jun 2015, p. 83; 31 Dec 2015, p. 83; 30 Jun 2016, p. 79; 31 Dec 2016, p. 64; 30 Jun 2017, p. 64; Stout Valuations: 31 Dec 2013, p. 86; 30 Jun 2014, p. 87; 31 Dec 2014, p. 92; 30 Jun 2015, p. 83; 31 Dec 2015, p. 83; 30 Jun 2016, p. 79; 31 Dec 2016, p. 64; 30 Jun 2017, p. 64.

> **ANSWER:**    Argent states that the allegations in Paragraph 248 are not directed
> to it but instead to a defendant who has been dismissed from the case, and
> therefore no response is required. To the extent a response is required,
> Argent denies that it violated any fiduciary duty or breached any provision
> of ERISA.

145

## 5. The Valuations Included a Fraudulent Control Premium.

### a. The Fraudulent Control Premium Made up from 30% to 60% of PDC's Reported Equity.

249.    For its guideline company method analysis, Willamette and Stout would determine each division's enterprise value and then add a control premium to value it on a controlling-interest basis. For example, if the enterprise value was $300 million and the control premium was 15%, the enterprise value on a controlling-interest basis would be $345 million ($300 million plus 15% of $300 million). Below is the guideline company method analysis of Appvion's Thermal division from Stout's 31 December 2012 valuation, which applied added a $30 million control premium:

**Figure 9: Stout's Guideline Company Method Analysis of Thermal as of 31 December 2012**



## IV. GUIDELINE COMPANY METHOD

**Indication of Value - Thermal**

*In Thousands of U.S. Dollars*

| | Thermal Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
| | | Low | High | Mean | Median | | |
|---|---|---|---|---|---|---|---|
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $ 59,539 | 4.3x | 7.1x | 6.1x | 6.2x | 5.0x | $ 298,000 |
| Revenue | 459,225 | 0.56x | 1.22x | 0.81x | 0.72x | 0.65x | 298,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 49,188 | 4.2x | 7.9x | 6.2x | 5.9x | 6.0x | 295,000 |
| Revenue | 400,871 | 0.56x | 1.14x | 0.81x | 0.80x | 0.75x | 301,000 |

| | |
|---|---|
| Indicated Enterprise Value, Minority Interest | 300,000 |
| Plus: Control Premium @ 10.0% | 30,000 |
| Enterprise Value, Controlling Interest Basis (Rounded) | $ 330,000 |

Source

**ANSWER:**    Argent states that the allegations in Paragraph 249 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required,

---

[8] This page has an arithmetic error – the average of the four indicated values should be $298 million, not $300 million. This should have been apparent to anyone reviewing this in good faith.

Argent states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 249.

250.    Stout applied a control premium of 15% to its valuations from 2005 through 2011 and a premium of 10% to its valuations between 30 June 2012 and 31 December 2014. Beginning with its 30 June 2015 valuation, Stout stopped adding the control in its guideline company method analysis, though it continued to list the enterprise value as being on a controlling-interest basis.

ANSWER:    Argent states that the allegations in Paragraph 250 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it violated any fiduciary duty or breached any provision of ERISA.

251.    For the discounted cash flow analysis, the control premium was incorporated into the EBITDA multiples Stout applied. Stout did not explain how much the control premium influenced the multiples. Stout's valuations always indicated it was performing its discounted cash flow analysis on a control-interest basis.

ANSWER:    Argent states that the allegations in Paragraph 251 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it violated any fiduciary duty or breached any provision of ERISA.

252.     After determining the enterprise values for each division, Stout added the values together to reach the enterprise value of Appvion as a whole.  In its Conclusion of Value, Stout started with this concluded enterprise value, made various adjustments, then divided by the outstanding number of shares to determine the per share value as follows:

**Figure 10:  Stout's Conclusion of Value as of 31 December 2012**

| Conclusion of Value | | |
|---|---|---|
| In Thousands of U.S. Dollars | | Indicated Value as of 12/31/2012 |
| Carbonless | $ | 259,000 |
| Thermal | | 324,000 |
| Encapsys | | 121,000 |
| **Concluded Enterprise Value** | $ | 704,000 |
| Add:  Cash and Cash Equivalents | | 1,851 |
| **Adjusted Enterprise Value** | $ | 706,000 |
| Less:  Interest-Bearing Debt | | (537,273) |
| **Marketable, Controlling-Interest Value of Equity** | $ | 169,000 |
| Less:  Discount for Limited Marketability | 5.0% | (8,500) |
| **Fair Market Value of Equity (Rounded)** | $ | 161,000 |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (8,064) |
| **Fair Market Value of Equity (Rounded)** | $ | 153,000 |
| Divided by:  Shares Outstanding | | 8,730.143 |
| **Fair Market Value of Equity per Share** | $ | 17.55 |

Source:  Stout Valuation, 31 Dec 12, p. 44.

> **ANSWER:     Argent states that the allegations in Paragraph 252 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it violated any fiduciary duty or breached any provision of ERISA.**

253.     Because the fraudulently included control premium percentage was applied to the enterprise value before deducting debts and non-shareholder equity, it caused a dollar-for-

dollar inflation in the shareholder's equity and resulting stock price. The control premium alone accounted for approximately 29.51% to 69.15% of the total shareholder's equity value:

**Table 8: The Control Premium as a Percentage of the Total PDC Shareholder Equity**

| Valuation Date | Total Reported PDC Shareholder Equity (in thousands) | Control Premium (in thousands) | Percentage of PDC's Shareholder Equity |
|---|---|---|---|
| 31 Dec 01 | *$136,867 | *($83,570) | 61.06% |
| 31 Dec 02 | *$253,992 | *($75,058) | 29.55% |
| 31 Dec 03 | *$283,235 | *($83,576) | 29.51% |
| 31 Dec 04 | $307,000 | *($114,196) | 37.20% |
| 31 Dec 05 | $341,000 | ($115,950) | 34.00% |
| 31 Dec 06 | $391,000 | ($117,450) | 30.04% |
| 31 Dec 07 | $368,000 | ($120,450) | 32.73% |
| 31 Dec 08 | $223,000 | ($97,000) | 43.50% |
| 31 Dec 09 | $130,000 | ($84,000) | 64.62% |
| 31 Dec 10 | $124,000 | ($76,000) | 61.29% |
| 31 Dec 11 | $139,000 | ($67,000) | 48.20% |
| 31 Dec 12 | $153,000 | ($54,000) | 35.29% |
| 31 Dec 13 | $129,600 | ($54,000) | 41.67% |
| 31 Dec 14 | $80,700 | ($49,000) | 60.72% |

*15% control premium and equity value calculated from PDC's audited consolidated balance sheets.

Sources: Stout Valuations, 30 Jun 2005, p. 21; 31 Dec 2005, pp. 69, 71, 73, 92; 31 Dec 2006, pp. 80, 82, 84, 103; 31 Dec 2007, pp. 38, 40, 42, 44, 61; 31 Dec 2008, pp. 40, 42, 45, 55; 31 Dec 2009, pp. 35, 37, 40, 52; 31 Dec 2010, pp. 31, 33, 43; 31 Dec 2011, pp. 28, 30, 40; 31 Dec 2012, pp. 29, 31, 41; 31 Dec 2013, pp. 34, 36, 48; 31 Dec 2014, pp. 40, 42, 54.

**ANSWER:** **Argent states that the allegations in Paragraph 253 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it violated any fiduciary duty or breached any provision of ERISA.**

### b. There Was No Factual Record that would support a Control Premium, thus demonstrating the PDC stock price was intentionally overstated.

254. However, there was no factual basis for the control premium because the agreements in place from 2001 forward gave the Trustee very limited authority.

**ANSWER:** **Argent admits that the extent of its authority is outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 254 inconsistent with their complete terms.**

255. Stout's appraisals themselves explain that only if the ESOP Trustee holds an interest that includes the ability to control its affairs, that control adds value (a control premium) to the stock. For example, the 2005 appraisal states:

> **Control rights are one of the most important variables affecting the value of a company. The appropriate premium for control depends on the controlling shareholders' ability to exercise any or all of the various rights typically associated with control.** As a result, the value of a minority ownership interest investment in a company is not necessarily a pro rata percentage of the value of the entire enterprise, and vice versa. **One of the primary benefits of control is the ability to change the capital structure of the firm to achieve efficiencies in the cost of capital to the company.** This factor was considered in our selection of the appropriate control premium.

Source: Stout Valuation, 31 Dec 12, p. 84; emphasis added.

**ANSWER:** **Argent states that the allegations in Paragraph 255 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it violated any fiduciary duty or breached any provision of ERISA.**

256.     As the legal shareholder, the ESOP Trustees (State Street, Reliance, and Argent) were theoretically entitled to elect the Board of Appvion and PDC.  However as described above in Paragraphs 143-44, effective 9 November 2001, State Street signed a Security Holder's Agreement which severely limited the Trustee's ability to control the board.

> **ANSWER:     Argent states that the allegations in Paragraph 253 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that the extent of its authority is outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 256 inconsistent with their complete terms.**

257.     The Plan also only gave limited voting rights to the ESOP and its Employee Owners, allowing voting only on a limited number of corporate matters that involved extraordinary transactions such as the sale of the company. The Plan provided that "In all other circumstances, the Trustee shall vote all shares of Company Stock as directed by the Committee."

> **ANSWER:     Argent admits that Paragraph 257 purports to cite ESOP documents, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 257 inconsistent with their complete terms.**

258. With these constraints, even though the ESOP owned 100 % of the PDC stock, the ESOP Trustee lacked the ability to control Appvion and could not "change its capital structure" – instead, Appvion's CEO retained control.

> **ANSWER:** **Argent admits that the extent of its authority is outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 259 inconsistent with their complete terms.**

259. In a recently-filed appellate brief, Argent admitted that the right to control the board and the ability to decide how to vote on shares are key indicia of control, and that the ability to appoint the majority of the board indicates control. Because it had the right to vote its shares however Argent decided in that case, Argent had control:

> Fourth, the selling shareholders in *Brundle* retained specific powers that enabled them to control the company, namely "the power to appoint a majority of the [company's] board, a key indicator of control[,]" and "the ESOP governing plan document and the ESOP trust agreement each required Wilmington [the trustee] to vote its shares as the [company's] board (not the ESOP) directed." *Brundle*, 919 F.3d at 777. Not only do those facts not exist here, the ESOP document makes clear that Argent (as trustee for the ESOP) may vote its shares however Argent decides. Neither the Selling Shareholders nor management has control over ESOP voting. See JA077 at 2.3(d), JA084 at 3.3(a), (b).

Brief of Appellees, *Lee v. Argent Trust Company, et al.,* No. 19-2845 (4th Cir., 18 May 20), at pp. 37-38; italics in original, bold emphasis added. In contrast, Argent has affirmatively (and successfully) argued in this case that it had no duty to monitor the Board because it had no appointment or removal powers over the Directors. Reply Memorandum in Support of Argent Trust Company's Motion to Dismiss, 20 Jun 19, Dkt. 139, p. 5. State Street and Reliance made

similar arguments in this case arguing they had no duty to monitor the Board because they had no control over its composition. Memorandum in Support of the State Street Defendants' Motion to Dismiss the First Amended Complaint, 28 Feb 19, Dkt. 97, pp. 14-15; Memorandum in Support of Motion to Dismiss Reliance Defendants, 28 Feb 19, Dkt. 115, p. 18.

>    **ANSWER:**     **Argent admits that Paragraph 259 purports to cite to a court filing in a separately captioned case and refers to that filing for its complete terms.**

260.    Further, Stephen Martin, who worked for Reliance and later Argent testified in a deposition in an unrelated matter in 2013 that Reliance Trust did not typically take an active role in overseeing the board of directors in any of its ESOP engagements, such as exercising its voting power of the common shares to elect new directors. *See* Deposition of Stephen Martin, *The Antioch Litigation Trust v. Morgan*, No. 3:09-CV-218 (S.D. Ohio Apr. 9, 2013).

>    **ANSWER:**     **Argent states that the allegations in Paragraph 260 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that the extent of its services and fiduciary obligations are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 260 inconsistent with their complete terms.**

261.    Therefore, all three trustees have admitted that they (as the legal shareholder of PDC's stock) had no control over the Board – and therefore no control that would justify a control premium. State Street, Reliance, and Argent therefore breached their fiduciary duties of prudence, disclosure and loyalty by approving and adopting valuations that applied a control

premium inflating the value of PDC's stock. They also committed fraud by making the ultimate determination of value which included a control premium they knew had no factual basis.

> **ANSWER:** **Argent admits that the extent of its authority is outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 261 inconsistent with their complete terms. Argent denies that it engaged in any fraudulent conduct, breached any fiduciary duty, or violated any provision of ERISA.**

262. Further, because only relatively small amounts of Appvion stock were sold at a time as part of the regular purchases and sales of stock by the ESOP, valuing the stock on a control basis for purposes of each annual valuation was inconsistent with the purpose of the valuation.

> **ANSWER:** **Argent admits that the extent of its services and fiduciary obligations are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 262 inconsistent with their complete terms. Argent denies that it engaged in any fraudulent conduct, breached any fiduciary duty, or violated any provision of ERISA.**

263. All of the defendants knew that the ESOP Trustee did not have actual control and that the control premium was therefore inappropriate.

> **ANSWER:** **Argent states that the allegations in Paragraph 263 are not directed to it but instead to a defendant who has been dismissed from the case, and**

therefore no response is required. To the extent a response is required, Argent admits that the extent of its authority is outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 263 inconsistent with their complete terms.

6.     <u>**The Valuations Relied Upon Fraudulently Inflated Financial Projections.**</u>

264.     In connection with each semi-annual PDC stock valuation, Appvion management provided Willamette and Stout with five-year projections of Appvion's earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Included in this management group were at least the CEOs (Buth, Richards and Gilligan) and the CFOs (Parker, Ferree and Richards (acting as interim CFO)). These projections were critical to the results of both the valuation's discounted cash flow analysis and guideline company method analysis. The discounted cash flow method was based entirely on these projections, and the guideline company method relied upon a mixture of the last twelve months of EBITDA and revenue and the projections for the next year.

ANSWER:     **Argent states that the allegations in Paragraph 264 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 264.**

265.    Therefore, any review of the PDC stock valuations would require an analysis of the reliability of the projections.  However, these projections were consistently inflated.

**ANSWER:    Argent states that the allegations in Paragraph 265 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 265.**

266.    Of particular concern was that out of the five years of EBITDA projections that management provided for each valuation, Stout used the fifth-year projection to calculate what it called the Terminal Enterprise Value as part of its discounted cash flow analysis. The Terminal Enterprise Value was calculated by assuming the fifth year EBITDA would remain constant in perpetuity. That hypothetical income stream would then be discounted to present value. This Terminal Enterprise Value would then be added to the present value of the years 1 through 5 EBITDA projections to arrive at the discounted cash flow enterprise value.

**ANSWER:    Argent states that the allegations in Paragraph 266 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 266.**

267.    Therefore, an inflated fifth year EBITDA value would materially inflate the discounted cash flow enterprise value.

**ANSWER:**    Argent states that the allegations in Paragraph 267 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 267.

268.    The fifth-year projections used in the discounted cash flow analysis were consistently and unrealistically inflated, causing the Terminal EBITDA Value to be consistently inflated. For example, below is a chart with the projected Year 5 EBITDA used in the mid-year and year-end valuations, compared with the actual year-end EBITDA for that fifth year:

**Table 9:  EBITDA Year 5 Projections Compared to Actual EBITDA**

| | Thermal | | Carbonless | |
|---|---|---|---|---|
| | Year 5 Projected EBITDA (in thousands) | Actual EBITDA (in thousands) | Year 5 Projected EBITDA (in thousands) | Actual EBITDA (in thousands) |
| 2010 | $ 26,092 | $ 20,032 | $ 62,431 | $ 59,387 |
| | $ 29,191 | | $ 66,410 | |
| 2011 | $ 61,101 | $ 33,306 | $ 81,784 | $ 49,731 |
| 2012 | $ 55,479 | $ 48,968 | $ 83,964 | $ 51,102 |
| 2013 | $ 52,000 | $ 41,929 | $ 62,000 | $ 50,828 |
| | $ 52,600 | | $ 60,500 | |
| 2014 | $ 40,200 | $ 26,826 | $ 54,800 | $ 42,171 |
| | $ 50,500 | | $ 53,200 | |
| 2015 | $ 52,483 | $ 8,139 | $ 51,042 | $ 47,191 |
| | $ 51,941 | | | |
| 2016 | $ 58,200 | $ 28,769 | $ 42,000 | $ 32,739 |
| | $ 80,866 | | $ 50,837 | |

Sources: 2010 Projections: Stout Valuation 31 Dec 05, pp. 80-81, Stout Valuation 30 Jun 06, pp. 84; 2011 Projections: Stout Valuation 20 Dec 06, pp. 91-92, Stout Valuation 29 Jun 07, pp. 77-78; 2012 Projections: Stout Valuation 31 Dec 07, pp. 50-51, Stout Valuation 30 Jun 08, pp. 46-47; 2013 Projections: Stout Valuation 31 Dec 08, pp. 51-52, Stout Valuation 30 Jun 09, pp. 48-49; 2014 Projections: Stout Valuation 31 Dec 09, pp. 46-47, Stout Valuation 30 Jun 10, pp. 40, 41; 2015 Projections: Stout Valuation 31 Dec 10, pp. 38-30, Stout Valuation 30 Jun 11, pp. 35-36; 2016 Projections: Stout Valuation 31 Dec 11, pp. 35-36, Stout Valuation 17 Jul 12, pp.

23-24; Actual EBITDA 2010-2013: Stout Valuation, 31 Dec 15, pp. 63, 68; Actual EBITDA 2014-2016: Stout Valuation, 30 Jun 17, pp. 44, 49.

> **ANSWER:** **Argent states that the allegations in Paragraph 268 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 268.**

269. When he was interviewed by Mr. Lyon, Steve Martin (an Argent Trust Company employee) admitted that Appvion had never hit its business projections during Argent's tenure as trustee from 2014 to 2017. Martin admitted that Stout and Argent both reviewed the projections because of the history of Appvion failing to hit them, but that they had not required Appvion to adjust the projections; instead, Stout claimed to have made adjustments to its discount rates to account for the higher projections.

> **ANSWER:** **Argent admits that Appvion had not met various business plans during the time Argent served as trustee. Argent further states that adjusting for possible risks of not meeting business projections through the discount rate is a common and appropriate valuation technique and that by doing so, Stout and Argent were engaging in diligent and proper conduct. Argent denies that it breached any fiduciary duty.**

270. Members of Appvion's ESOP Committee were involved in preparing these projections, particularly the CEOs (Buth, Richards and Gilligan) and the CFOs (Parker, Ferree and Richards (acting as interim CFO)). The ESOP Committee also regularly reviewed the

158

projections against actual results and knew how important the projections were to the valuations. Accordingly, they knew that the inflated projections were inflating the share value.

> **ANSWER:** **Argent states that the allegations in Paragraph 270 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 269.**

### 7. The Valuations Fraudulently Manipulated the Valuation Methodology.

271. Mr. Lyon discovered that the valuations fraudulently manipulated the valuation methodology, for example by changing the discount rates and EBITDA multiples or excluding actual results in favor of projections.

> **ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 271. Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

272. For example, Stout dramatically changed the discount rate it used for Appvion's Thermal division dramatically from 10.5% to 14% from its valuations as of 31 December 2011 and as of 16 July 2012; the 2011 valuation is purportedly based on Appvion's actual (10.5%) cost of debt and an assumption of 35% equity and 65% debt, while the 2012 valuation is based on "estimated senior lending rates" (6%) instead of Appvion's actual interest rates and an assumption of 65% equity and 35% debt. This raises the question of whether the 16 July 2012

valuation was for purposes of ESOP administration or for the purpose of selling Appvion to a third party.

> **ANSWER:** **Argent states that the allegations in Paragraph 272 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 272.**

273. Further, the reason Stout's mid-2012 valuation was as of 16 July 2012 instead of 30 June 2012 was because Stout had to fix an error – its original valuation improperly assumed that Appvion would merge with a third company soon after the valuation date and built in value from that merger, but the merger fell through. The improper valuation and the change in methodology for the 16 July 2012 valuation were additional red flags that Stout was not applying proper and consistent methods.

> **ANSWER:** **Argent states that the allegations in Paragraph 273 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 273.**

274. As a further example, Stout's 30 June 2015 valuation also used inconsistent methods from its prior reports. 2015 was a rough year for Appvion. Its Thermal division only achieved an EBITDA of $8 million (down from $77 million projected as of 30 June 2013 and even the mid-year 2015 projection of $20 million), and Appvion sold its most profitable

division, the Encapsys division, which materially lowered the overall value of the company. Further, not only did Appvion incur significant employee-termination costs relating to the Encapsys sale, Appvion long-time CEO Mark Richards retired and was (improperly) paid $1.2 million, for total compensation that year of over $5 million. Stout changed methodologies in order to compensate for the lower EBITDA and extra expenses.

> **ANSWER:** **Argent states that the allegations in Paragraph 274 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

275. Stout's discounted cash flow analysis always relied on five years of projected EBITDA. However, the 30 June 2015 valuation used six years of data, which artificially increased the valuation even though the projections used for that year actually decreased. Including a sixth year in the analysis increased the enterprise value derived from the analysis without explanation or justification.

> **ANSWER:** **Argent states that the allegations in Paragraph 275 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

276. Stout's 30 June 2015 valuation report did not explain why it used six years of data instead of five, and this was the only valuation that used six years. While it may be

permissible to use more than five years of projections for a discounted cash flow analysis (and may have even been preferable considering Appvion's declining revenues), adding an extra year of data for this one report inflated the value of Appvion's stock by approximately $2.00 a share and increased the stock price valuation from $11.00 a share in the 31 December 2014 valuation to $12.90 a share in the 30 June 2015 valuation, even though the sale of Encapsys was devastating to Appvion's future ability to grow its cash flow.

> **ANSWER:** **Argent states that the allegations in Paragraph 276 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

277. Stout also changed its methodology for its guideline company method analysis in its 30 June 2015 valuation report. This analysis involved looking at "guideline companies" in order to determine a range of pricing multiples; Stout would then choose a pricing multiple from that range, and apply it to (1) actual revenue and EBITDA for the twelve months prior to the valuation; and (2) Appvion management's projected EBITDA and revenue for the next fiscal year. However, presumably in response to Thermal's shockingly low 2015 EBITDA, Stout changed its methodology in the following ways:

- Stout ignored the last twelve months EBITDA value;

- Instead of using the projected EBITDA for fiscal year 2015, Stout used projected EBITDA for 2016, which was inconsistent with all of Stout's other valuations;

- For the first time, Stout added a third component to its guideline company method analysis for the Thermal division only, a three-year historical average of EBITDA and revenue. This had the effect of inflating Thermal's valuation and therefore the overall value of PDC's stock;

- Combined, these and other manipulations allowed Stout to mask dramatic declines in actual results by relying more heavily on the inflated projections; and

- Starting with its 31 December 2015 valuation report, Stout completely disregarded both the three-year historical average, last twelve months, and projected EBITDA numbers and relied solely on revenue multipliers (without reference to gross margin or profitability) in its valuation of the Thermal segment. This allowed Stout to ignore periods of low profits.

**ANSWER:** **Argent states that the allegations in Paragraph 277 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

### 8. The Valuations Fraudulently Failed to Include a Large Enough Discount for the Lack of Liquidity and Marketability.

278. When stock is publicly traded, sellers can find other buyers on the open market. However, PDC's stock was restricted and could only be owned by the ESOP; since the ESOP had no assets other than the shares itself, this practically meant that Appvion had to supply the cash needed to satisfy any redemptions. Because Appvion or PDC was obligated to repurchase stock when employees were entitled to distributions or diversification, this put a strain on

163

Appvion's overall cash flow. This was exacerbated by the fact that redemptions exceeded contributions to the ESOP by many millions of dollars over the life of the ESOP – between 2001 and 2016, redemptions from the plan totaled $248.5 million while employee contributions (not including company matches) totaled only $75.2 million.

> **ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 278.**

279. The appraisals included a 5% discount to the value of ESOP's equity as a discount for limited marketability to reflect this strain and the risk of Appvion not being able to meet its repurchase obligations. Lyon concluded this was not sufficient to account for the barriers to selling PDC stock and PDC's large repurchase obligation and it failed to adequately consider actual data about the age of ESOP participants and Appvion's and PDC's actual ability to pay.

> **ANSWER:** **Argent admits that Paragraph 279 purports to cite to various appraisals, refers to those appraisals for their exclusive terms, and denies all allegations in Paragraph 279 inconsistent with their complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to Mr. Lyon's conclusions.**

280. For example, in the 30 June 2011 valuation, Stout recognized that the burden of the repurchase obligation "has contributed to the Company's decision to monetize certain assets and explore the sale of the Company in total." However, Stout only estimated the impact of this financial strain at 5% of PDC's equity value, or $7 million, which was insufficient to account for the substantial repurchase obligation. As another example, in 2015 and 2016 alone,

distributions totaled $19.6 million while contributions to the ESOP were only $3.5 million; however, each of Stout's valuations put the discount for limited marketability at only $3.8 to $5 million.

> **ANSWER:** **Argent states that the allegations in Paragraph 280 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

### 9.    The Valuations Were Otherwise Unreliable.

281.    In addition to the issues with the valuations discussed above, the valuations contained the following material flaws:

> **ANSWER:** **Argent states that the allegations in Paragraph 281 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 281.**

282.    Management always knew Appvion was a declining business. In the 23 April 2001 "Ownership Update," release of which was authorized by Buth, Karch, Parker and Fantini, stated that it believed AWA wanted to sell Appvion "because public investors want to buy companies with growing earnings and will not value highly a company with steady but declining earning." Still, certain of the valuations used a perpetuity model to capitalize a

declining income stream, which was inappropriate. This relates to the terminal enterprise value, which is intended to represent the present value of future cash flows from the business beyond the five-year EBITDA projections. Stout based this calculation on the fifth year of projections used for its discounted cash flow analysis – which, as discussed above, was heavily inflated. Stout compounded this problem by assuming that the fifth year EBITDA projection would continue at the same level into perpetuity, applying the same discount number to the terminal enterprise value as it did to the year five discount number. Stout's valuation reports used this method from at least 30 June 2005 until 30 June 2010, which was inappropriate since Appvion (especially its Carbonless division) was a declining business.

> **ANSWER:** **Argent states that the allegations in Paragraph 282 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 282.**

283.     This caused the terminal enterprise value to be heavily inflated and to represent a disproportionately high percentage of Appvion's total enterprise value, thereby concealing PDC's true financial condition. Beginning with its 31 December 2010 valuation report, Stout changed methods and began reducing the discount number for the terminal enterprise value – however, this change was not enough to compensate for the inflated projections.

> **ANSWER:** **Argent states that the allegations in Paragraph 283 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required,**

166

**Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 283.**

284.     The valuations' EBITDA projections failed to include all overhead costs by including only overhead costs associated with each of the individual business segments. This method excluded from EBITDA the general overhead costs not allocated to the individual business segments thus fraudulently overstating the PDC stock's fair market value and concealing PDC's and Appvion's true financial condition.

**ANSWER:     Argent states that the allegations in Paragraph 284 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

285.     The valuations manipulated the choice of publicly traded companies to compare with Appvion and failed to make appropriate and consistent adjustments to compensate for differences in the companies.

**ANSWER:     Argent states that the allegations in Paragraph 285 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

286.     Stout's valuations used number rounded up or down to the nearest million at all stages of its valuation instead of using precise numbers, which could and did result in inflated valuations. This practice served to inflate PDC's share value in all but two valuations, and sometimes by $0.25 or more. Stout undoubtedly created its valuations as part of a spreadsheet that calculated the full number and then rounded it, so the rounding did not save any time or effort and merely introduced a potential source of error to the calculation.

ANSWER:     Argent states that the allegations in Paragraph 286 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.

287.     At least three of Stout's valuation reports seem to have arithmetic errors, where the report purports to average numbers together but the result is higher than the average. Nothing in the report indicates that Stout was weighting the numbers differently. This type of error would have been apparent if the ESOP Trustee had done even proper review of the valuations.

ANSWER:     Argent denies that its reviews of valuations were not proper, that it breached any fiduciary duty, or that it violated any provision of ERISA. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 287.

### E. The PDC Stock Price was Negative for Much of the ESOP's Existence, Including When the ESOP was Created.

288. The following chart summarizes the impact on the PDC stock valuations just subtracting the Excluded Debts and removing the fraudulent control premium:

**Table 10: Adjusted Equity Value and PDC Stock Price**

| Valuation Date | Equity Value* | Reported PDC Stock Price | Excluded Debt | | Control Premium* | Adjusted Equity Value* | Adjusted PDC Stock Price |
| | | | Pension/Post-Retirement Debt* | "Other Long-Term" Debt* | | | |
|---|---|---|---|---|---|---|---|
| 31-Dec-01 | **$136,867 | $12.81 | ($73,132) | ($7,285) | **($83,570) | ($27,120) | ($2.54) |
| 30-Jun-02 | **$202,827 | $18.58 | ($76,001) | ($19,570) | **($82,700) | $24,556 | $2.25 |
| 31-Dec-02 | **$253,992 | $21.92 | ($69,221) | ($9,548) | **($75,058) | $100,165 | $8.64 |
| 30-Jun-03 | **$263,800 | $22.42 | ($70,756) | ($8,919) | **($80,495) | $103,630 | $8.81 |
| 31-Dec-03 | **$283,235 | $23.36 | ($99,165) | ($8,419) | **($83,576) | $92,075 | $7.59 |
| 30-Jun-04 | **$305,000 | $26.09 | ($101,777) | ($9,064) | **($118,400) | $75,759 | $6.46 |
| 31-Dec-04 | $307,000 | $26.36 | ($108,505) | ($5,181) | **($114,196) | $79,118 | $6.79 |
| 30-Jun-05 | $328,000 | $27.77 | ($108,910) | ($4,705) | ($104,100) | $110,285 | $9.34 |
| 31-Dec-05 | $341,000 | $28.56 | ($114,139) | ($4,267) | ($115,950) | $106,644 | $8.93 |
| 30-Jun-06 | $363,000 | $31.27 | ($111,227) | ($6,593) | ($117,300) | $127,880 | $11.02 |
| 31-Dec-06 | $391,000 | $33.62 | ($101,638) | ($6,511) | ($117,450) | $165,401 | $14.22 |
| 30-Jun-07 | $362,000 | $32.89 | ($97,355) | ($4,314) | ($124,050) | $136,281 | $12.38 |
| 31-Dec-07 | $368,000 | $33.41 | ($64,293) | ($5,483) | ($120,450) | $177,774 | $16.14 |
| 30-Jun-08 | $289,000 | $26.64 | ($60,260) | ($5,168) | ($113,100) | $110,472 | $10.19 |
| 31-Dec-08 | $223,000 | $21.43 | ($154,896) | ($13,309) | ($97,000) | ($42,205) | ($4.06) |
| 30-Jun-09 | $189,000 | $18.87 | ($157,332) | ($9,284) | ($92,000) | ($69,616) | ($6.95) |
| 31-Dec-09 | $130,000 | $13.26 | ($151,921) | ($9,294) | ($84,000) | ($115,215) | ($11.75) |
| 30-Jun-10 | $117,000 | $12.03 | ($153,904) | ($5,744) | ($75,000) | ($117,648) | ($12.10) |
| 31-Dec-10 | $124,000 | $12.84 | ($133,716) | ($5,716) | ($76,000) | ($91,432) | ($9.47) |
| 30-Jun-11 | $133,000 | $14.10 | ($122,321) | ($7,320) | ($77,000) | ($73,641) | ($7.87) |
| 31-Dec-11 | $139,000 | $15.01 | ($166,856) | ($7,389) | ($67,000) | ($102,245) | ($11.04) |
| 16-Jul-12 | $146,000 | $16.45 | ($150,197) | ($28,764) | ($51,000) | ($83,961) | ($9.47) |
| 31-Dec-12 | $153,000 | $17.55 | ($175,521) | ($32,165) | ($54,000) | ($108,686) | ($12.45) |
| 30-Jun-13 | $155,000 | $17.85 | ($166,303) | ($33,721) | ($54,000) | ($99,024) | ($11.94) |
| 31-Dec-13 | $129,600 | $16.25 | ($96,748) | ($36,243) | ($54,000) | ($57,391) | ($7.19) |
| 30-Jun-14 | $127,100 | $16.30 | ($85,303) | ($38,834) | ($53,000) | ($50,037) | ($6.41) |
| 31-Dec-14 | $80,700 | $11.00 | ($124,656) | ($43,753) | ($49,000) | ($136,709) | ($18.62) |
| 30-Jun-15 | $89,400 | $12.90 | ($124,427) | ($46,169) | unknown | ($81,196) | ($11.71) |
| 31-Dec-15 | $83,000 | $12.30 | ($128,331) | ($35,354) | unknown | ($80,685) | ($11.95) |
| 30-Jun-16 | $87,600 | $13.70 | ($129,444) | ($34,093) | unknown | ($75,937) | ($11.87) |
| 31-Dec-16 | $64,900 | $10.35 | ($132,805) | ($30,536) | unknown | ($98,441) | ($15.72) |
| 30-Jun-17 | $40,500 | $6.85 | ($132,598) | ($28,975) | unknown | ($121,073) | ($20.41) |

*In thousands
**15% control premium and equity value calculated from PDC's consolidated balance sheets.
Source: Appvion 2002 10-K, p. 45, 103; Jun 2002 10-Q, p. 1; 2003 10-K, p. 45, 115; Jun 2003
10-Q, p. 1; 2004 10-K, p. 49, 107; Jul 2004 10-Q, p. 1; 2005 10-K, p. 50; Jul 2005 10-Q, p. 3;

2006 10-K, p. 42; Jul 2006 10-Q, p. 3; 2007 10-K, p. 40; Jul 2007 10-Q, p. 1; 2008 10-K, p. 46; Jun 2008 10-Q, p. 3; 2009 10-K, p. 50; Jul 2009 10-Q, p. 3; 2010 10-K, p. 50; Jul 2010 10-Q, p. 3; 2011 10-K, p. 50; Jul 2011 10-Q, p. 3; 2012 10-K, p. 45; Jul 2012 10-Q, p. 3; 2013 10-K, p. 46; Jun 2013 10-Q, p. 3; 2014 10-K, p. 42; Jun 2014 10-Q, p. 3; 2015 10-K, p. 38; Jul 2015 10-Q, p. 3; 2016 10-K, p. 33; Jul 2016 10-Q, p. 3; Jul 2017 10-Q, p. 2; Stout valuations 30 Jun 2005, p. 21, 30 Jun 2005, p. 108, 94,96, 98; 31 Dec 2005, p. 92, 69, 71, 73; 30 Jun 2006, p. 94, 72, 74, 76; 31 Dec 2006, p. 103, 80, 82, 84; 30 Jun 2007, p. 88, 65, 67, 69, 71; 31 Dec 2007, p. 61, 38, 40, 42, 44; 30 Jun 2008, p. 56, 37, 39, 41; 31 Dec 2008, p. 60, 40, 42, 45; 30 Jun 2009, p. 58, 37, 39, 42; 31 Dec 2009, p. 55, 35, 37, 40; 30 Jun 2010, p. 48, 33, 35; 31 Dec 2010, p. 46, 31, 33; 30 Jun 2011, p. 43, 28, 30; 31 Dec 2011, p. 43, 28, 30; 16 Jul 2012, p. 31, 16, 18; 31 Dec 2012, p. 44, 29, 31; 30 Jun 2013, p. 48, 32, 34; 31 Dec 2013, p. 51, 34, 36; 30 Jun 2014, p. 52, 35, 37; 31 Dec 2014, p. 57, 40, 42; 30 Jun 2015, p. 52; 31 Dec 2015, p. 52; 30 Jun 2016, p. 48; 31 Dec 2016, p. 36; 30 Jun 2017, p. 36.

> **ANSWER:** **Argent states that the allegations in Paragraph 288 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 288.**

289.    With just these deductions, Appvion had a negative equity of $27.1 million as of 31 December 2001, just 52 days after the ESOP Transaction. Because the $106 million that the ESOP employees had paid to the ESOP as the down payment on the PDC stock had negative equity value as of 31 December 2001 (as opposed to the fraudulently reported valuation of $12.38 a share), it likewise had no value 52 days earlier at a fraudulently reported share price of $10 a share.

> **ANSWER:** **Argent states that the allegations in Paragraph 289 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 289.**

290.    With just these adjustments, the redeemable common stock value for all years other than 2002 through 2007 would have been zero. And for years 2002 through 2007, the stock price would have, on average, been 37% of the reported stock price.

**ANSWER:    Argent states that the allegations in Paragraph 290 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 290.**

291.    The massive impact of just these indisputably required adjustments, is compelling evidence that each of the defendants acted intentionally.

**ANSWER:    Argent states that the allegations in Paragraph 291 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

F.    **The Inflated Share Price Caused the ESOP to Purchase Shares for More Than Fair Market Value.**

292.    The PDC semi-annual valuations were used to set the share price which the ESOP then used in numerous transactions.

**ANSWER:    Argent states that the allegations in Paragraph 292 are not exclusively directed to it but instead to defendants who have been dismissed**

**from the case, and therefore no response is required as to those allegations. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

293.   In reliance upon accurate semi-annual PDC stock valuations, the Employee Owners continued to divert portions of their paychecks to fund the ESOP; the ESOP used these contributions (along with matching contributions from Appvion) to purchase shares of PDC stock from PDC. These purchases were made twice a year, soon after the valuation was completed, "using the Company Stock value as of the Valuation Date preceding or following the conversion (whichever is lower)" under § 6.4(a)(1) of the Plan.

**ANSWER:   Argent admits that Paragraph 293 purports to cite to ESOP plan documents, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 293 inconsistent with their exclusive terms.**

294.   For example, the ESOP purchased shares from PDC after the 30 June 2013 valuation as follows:

**Table 11:  Purchases of Stock from PDC as of 30 June 2013**

| Date | Amount | Shares | Stock Price | Description |
|------|--------|--------|-------------|-------------|
| Jun 13 | $1,405,199.41 | 80,068.3417 | $17.55 | Employee deferrals into company stock (January 1, 2013 - June 30, 2013) |
| Jun 13 | $130,776.35 | 7,451.6439 | $17.55 | Employee rollovers into company stock (January 1, 2013 - June 30, 2013) |
| Jun 13 | $114,786.40 | 6,540.5358 | $17.55 | Employee loan payments into company stock (January 1, 2013 - |

| Date | Amount | Shares | Stock Price | Description |
|---|---|---|---|---|
|  |  |  |  | June 30, 2013) received from State Street in June 2013 |
| Jun 13 | $116.59 | 6.6411 | $17.55 | Purchase from Interest (January 1, 2013 - June 30, 2013) |
| Jun 13 | $1,432,042.26 | 81,597.8494 | $17.55 | Company match on employee deferrals (January 1, 2013 - June 30, 2013) |

**ANSWER:** **Argent states that the allegations in Paragraph 294 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 294.**

295. The ESOP also repurchased shares from current and former employees as a result of employee terminations, diversifications, hardship withdrawals, and employee loans. For example, the ESOP recorded the following repurchases after the 30 June 2013 valuation:

**Table 12: Repurchases of Stock from Current and Former Employees as of 30 June 2013**

| Date | Amount | Shares | Stock Price | Description |
|---|---|---|---|---|
| Jun 13 | ($4,103,267.72) | (233,804.4308) | $17.55 | Stock in suspense - diversification |
| Jun 13 | ($75,700.00) | (4,313.3906) | $17.55 | Stock in suspense - loans |
| Jun 13 | ($22,508.46) | (1,282.5333) | $17.55 | Hardships |
| Jun 13 | ($825.00) | (47.0084) | $17.55 | Loan Fees |
| Jun 13 | ($6,502,239.12) | (370,497.9654) | $17.55 | Employee terminations |

**ANSWER:** Argent states that the allegations in Paragraph 295 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 295.

296. As a result of the fraudulently inflated valuations from 9 November 2001 forward, the ESOP repeatedly purchased shares from PDC and repurchased shares from current and former employees at a price above their fair market value. These purchases are listed in Appendices A and B.

**ANSWER:** Argent denies that it engaged in any fraudulent conduct, breached any fiduciary duty, or violated any provision of ERISA.

**G.** **ESOP Committee Member Defendants and the Director Defendants Had Conflicts of Interest Because they Each Received Incentive Compensation Tied to PDC's Stock Price.**

297. While the terms of the ESOP restricted when employees could get paid for their investments in the ESOP, Appvion implemented incentive plans for Appvion management which were tied to the stock price but not subject to the withdrawal constraints of the ESOP, including:

**ANSWER:** Argent states that the allegations in Paragraph 297 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 297.

298.	The New Deferred Compensation Plan, effective 1 July 2000: Under the 12 February 2001 letter between Buth and AWA, the CEO Team was required to defer 30% of the Loyalty Payments to this plan, to be tied to the stock price. This plan was terminated and paid out to the participants in the first quarter of 2005 because the Board's Compensation Committee "viewed the crediting of the loyalty payment portions of the Plan based on increases in PDC common stock as an expensive form of company capital."

ANSWER:	Argent states that the allegations in Paragraph 298 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 298.

299.	The Long-Term Incentive Plan ("LTIP"), effective 1 December 2001: This plan allowed the Board to award executives with phantom stock units equal to 3% of total stockholders' equity in the company each year. These units vested over 3 years and expired after 10 years, or upon leaving the company. On exercise of the LTIP units, participants would receive a cash bonus equal to the increase in the value of the stock from the date of issue until the exercise date.

ANSWER:	Argent states that the allegations in Paragraph 299 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 299.

300.     The Non-Employee Director Deferred Compensation Plan, established in 2006: This plan awarded non-employee members of the Board of Directors with phantom stock units based on the value of PDC stock, paid out in five equal annual cash installments following a director's conclusion of service on the board of directors. By 31 December 2015, there were nearly 122,000 phantom units outstanding under this plan, valued at $1.5 million.

**ANSWER:     Argent states that the allegations in Paragraph 300 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 300.**

301.     The Long-Term Restricted Stock Unit ("RSU") Plan, effective 3 January 2010: when the share price went down in 2009, it rendered the LTIP phantom stock units worthless until the share price went back up. In order to continue providing incentive payments to senior executives, the Board's Compensation Committee adopted this plan which awarded RSUs to executives. All units vested three years after the award date and the cash value of the stock was paid to the executive on the vesting date, based on the valuation as of the vesting date times the number of RSUs..

**ANSWER:     Argent states that the allegations in Paragraph 301 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 301.**

302.     The Encapsys Long Term Performance Cash Plan: This plan document is referenced in a separate document filed with the SEC on 8 May 2015 (after Appvion was well into negotiations to sell its Encapsys division) but was not itself filed or otherwise explained. This plan may have provided Appvion management with incentive compensation from the sale of Appvion's Encapsys division.

> **ANSWER:    Argent admits that Paragraph 302 purports to cite to a May 8, 2015 SEC filing, refers to that filing for its exclusive terms, and denies all allegations in Paragraph 302 inconsistent with its complete terms.**

303.     Appvion management also received annual bonuses and other incentives based on Appvion's overall financial performance, which would have been impacted had the share price been adjusted to reflect Appvion's true value.

> **ANSWER:    Argent states that the allegations in Paragraph 303 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 303.**

304.     While PDC was theoretically 100% owned by the ESOP, the LTIP, Non-Employee Director Deferred Compensation Phantom Stock Units, and Restricted Stock Units all served to create synthetic equity owned by executives and directors. By the end of 2014, Stout calculated that this synthetic equity accounted for 25.3% of the equity ownership of Appvion. Stout's valuation analysis estimated a valuation for this synthetic equity and subtracted it from the equity value of the company.

**ANSWER:** Argent states that the allegations in Paragraph 304 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 304.

305. These incentive plans directly benefited the senior executives at Appvion who were responsible for preparing Appvion's projections that formed the basis of the valuations and for approving PDC's stock price. In particular, the ESOP Committee members included Appvion's top level executives and frequently were in the top five mostly highly compensated officers at Appvion in part because of these incentive plans.

**ANSWER:** Argent states that the allegations in Paragraph 305 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 305.

**H.** **Appvion's Finances Became Increasingly Dire.**

**1.** **Management Launched a Disastrous Acquisition for Growth Strategy that Artificially Increased the Stock Price in 2003-2008.**

306. In mid-2002, Buth announced a new strategy to increase revenue and EBITDA targets by acquiring other businesses. These acquisitions proved to be disastrous for Appvion; however, these additional divisions directly drove up the stock values because they relied on inflated projections and disregarded liabilities and actual performance.

**ANSWER:** Argent states that the allegations in Paragraph 306 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 306.

### a. Stout Overvalued BemroseBooth.

307. In December 2003, Appvion acquired BemroseBooth for $63.5 million. In order to make the purchase, Appvion refinanced $83.3 million and borrowed an additional $56.7 million to make the BemroseBooth acquisition. After the Company bought BemroseBooth, Buth represented that Appvion would raise its stock price to $100 share by buying other businesses.

**ANSWER:** Argent states that the allegations in Paragraph 307 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 307.

308. In September 2005, Appvion announced layoffs and a restructuring of both its U.S. business and of BemroseBooth as BemroseBooth exited the printing and binding portions of its business and eliminated some employees. Despite these struggles, Stout continued to place a high value on BemroseBooth because of Appvion's inflated projections, valuing it at $67 million as of 30 June 2005, $78 million as of 31 December 2005, and $77 million in December

2005, above the purchase price of BemroseBooth. This was added directly onto Appvion's overall enterprise value and therefore directly impacted share value.

> **ANSWER:** **Argent states that the allegations in Paragraph 308 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 308.**

309. Appvion had decided to sell BemroseBooth by the end of 2007 but Stout still valued the division at $61 million, nearly the original purchase price – even though by that point Appvion had classified BemroseBooth as discontinued operations for purposes of its 10-K and recorded a goodwill impairment of $7 million and a $1 million impairment of intangible assets. As discussed in Paragraphs 209-236, just six months later, Stout's valuation could no longer attribute any value to BemroseBooth because of the pension liability.

> **ANSWER:** **Argent states that the allegations in Paragraph 309 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 309.**

> b. <u>Stout Overvalued Performance Packaging.</u>

310. In April 2003 Appvion acquired C&H Packaging and American Plastics Company, Inc. for a total of $50.6 million. In January 2005, Appvion acquired New England

Extrusion, Inc. for $68.6 million. These entities were combined into Appvion's Performance Packaging division, which was valued as a separate division by Stout.

> **ANSWER:** **Argent states that the allegations in Paragraph 310 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 310.**

311. However, the Performance Packaging division lagged behind expectations for years. By the end of 2007, Stout noted that Appvion was exploring a sale of Performance Packaging, though it was hoping sales would improve in order to maximize the sales price.

> **ANSWER:** **Argent states that the allegations in Paragraph 311 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 311.**

312. Despite these struggles, Stout relied on Appvion's projections to value it well above the combined purchase price of $119.2 million, valuing the division as high as $140 million as of 31 December 2006. For example, Stout's valuations from 31 December 2006 to 30 June 2008 used the following projections for the performance packaging division, which were drastically inflated over actual EBITDA:

| Report Date | Projection Year | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/2007 | 12/31/2008 | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 |
| 12/31/2006 | $ 17,339 | $ 18,559 | $ 22,214 | $ 25,221 | $ 31,458 | N/A |
| 6/30/2007 | $ 16,699 | $ 18,559 | $ 22,214 | $ 25,221 | $ 31,458 | N/A |
| 12/31/2007 | N/A | $ 15,533 | $ 19,142 | $ 23,206 | $ 27,436 | $ 30,794 |
| 6/30/2008 | N/A | $ 15,529 | $ 19,142 | $ 23,206 | $ 27,436 | $ 30,794 |
| Actual EBITDA | $ 12,178 | $ 12,500 | $ 10,200 | N/A - Appvion sold the division at a loss | | |

Sources: Stout Valuations, 31 Dec 06, p. 93; 30 Jun 06, Ex. E, p. 21; 31 Dec 07, Ex. E, p. 21; 30 Jun 08, Ex. E, p. 19,21; 30 Jun 09, p. 10; 30 Jun 10, p. 10.

> **ANSWER:** **Argent states that the allegations in Paragraph 312 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 312.**

313. However, in the third and fourth quarters of 2008, Appvion was forced to record $39.6 million in goodwill impairment charges for Performance Packaging following a separate valuation of the performance packaging division:

> **During third quarter 2008, an impairment analysis was performed on the performance packaging business due to the depressed economic future outlook and revised future cash flow projections. As a result of this impairment analysis, a $17.7 million goodwill impairment** charge was recorded. Appleton performed its annual goodwill impairment analysis during fourth quarter 2008. In accordance with SFAS 142, a Step One analysis was done to compare the fair value of the reporting unit to the carrying value. **In Step One, the fair value of the reporting unit was estimated using a weighting of the "market" and "income" valuation approach. The "income" valuation approach estimates the enterprise value using a net**

**present value model, which discounts projected free cash flows of the business at a computed weighted average cost of capital as the discount rate. The "market" approach is based on the market multiple of guideline companies**. As a result of performing Step One, the carrying value of the reporting unit exceeded the fair value. Having failed Step One, Step Two was performed to allocate the fair value of the business to all assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit, as determined in the first step of the goodwill impairment test, was the price paid to acquire the reporting unit. The excess of the fair value of the reporting unit, over the amount assigned to its assets and liabilities is the implied fair value of goodwill. **The carrying value of the performance packaging goodwill exceeded the implied fair value of the goodwill and therefore, an impairment loss was recognized to the extent of the excess of $21.9 million in the fourth quarter of 2008.**

Source: PDC, 2008 10-K, p. 29; see also *id.* at p. 22.

> **ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 313.**

314. Appvion recognized an additional $6.3 million goodwill impairment for Performance Packaging in 2009, for a total of $45.9 million in goodwill impairment.

> **ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 314.**

315. This substantial impairment of goodwill confirms what Stout's reports and the 10- Ks had noted before – that Performance Packaging was a struggling business. It also confirms that the projections Stout used in its prior reports were inflated.

> **ANSWER:** **Argent states that the allegations in Paragraph 315 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required,**

**Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 315.**

316.    However, Stout's valuations lagged in recognizing this goodwill impairment:

**Table 13: Performance Packaging's Enterprise Values in 2008 and 2009**

| Valuation Date | Enterprise Value |
|---|---|
| 30 Jun 08 | $ 126,000,000 |
| 31 Dec 08 | $ 103,000,000 |
| 30 Jun 09 | $ 97,000,000 |
| 31 Dec 09 | $ 58,000,000 |

Source: Stout Valuations, 30 Jun 08, p. 56; 31 Dec 08, p. 55; 30 Jun 09, p. 54; 31 Dec 09, p. 52.

**ANSWER:    Argent states that the allegations in Paragraph 316 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 316.**

317.    Stout's 31 December 08 and 30 June 09 valuations noted the impairment, but they "removed this one-time expense from our calculation of Performance Packaging's adjusted EBITDA" so that they did not impact the valuations. And in its valuation as of 30 June 2009, Stout also noted that it was ignoring Performance Packaging's last twelve months of EBITDA because of this goodwill impairment, instead basing its valuation on only the last twelve months of revenue and on projections.

**ANSWER:    Argent states that the allegations in Paragraph 317 are not directed to it but instead to a defendant who has been dismissed from the case, and**

**therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 317.**

318.     In late 2009, Appvion sold C&H for $16.6 million. In 2010, Appvion sold the remaining Performance Packaging division for $58 million – indicating that Stout's valuation as of 31 December 2009 was finally correct. In total, Appvion lost $44.6 million on its Performance Packaging division (nearly identical to the goodwill impairment), not accounting for any capital investments Appvion made. However, Stout's overvaluation of this division in at least 2008 and 2009 helped to artificially drive up Appvion's stock price.

> **ANSWER:     Argent states that the allegations in Paragraph 318 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 318.**

### 2.     Appvion Unsuccessfully (Again) Tried to Find A Buyer.

319.     The repurchase obligation was a massive drain on Appvion's cash flow, as it loaned funds to the ESOP to repurchase shares. By the end of 2009, Stout noted in its valuation that "the repurchase obligation has contributed to the Company's decision to monetize certain assets and explore the sale of the Company in total."

> **ANSWER:     Argent states that the allegations in Paragraph 319 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required,**

185

**Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 319.**

320.     In early 2012, Appvion explored a merger with Hicks Acquisition Company II, Inc. ("HAC II"), valued at $675 million, excluding debt. Under the terms proposed, Hicks would contribute cash and other assets in exchange for a majority interest in the combined company, and PDC would retain a minority interest.  The cash contribution would be between $36 million and $110 million, depending on how many HAC II shareholders chose to go through with the deal. The combined company would be traded on the NASDAQ under the name Appvion.

**ANSWER:     Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 320.**

321.     The merger required a vote by the employees under the terms of the Plan. Appvion executives went on road shows to convince employees to sell the company. Management stressed that this was a chance for employees to get their money back out of the company. Employees ultimately voted in favor of the Hicks transaction.

**ANSWER:     Argent states that the allegations in Paragraph 321 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 321.**

322.    On 2 July 2012, the ESOP Committee (Richards, Ferree, Willetts, and Arent) announced that the stock price had been valued at $18.80 per share as of 30 June 2012, up 25% from $15.01 in the December 2011 valuation. . However, the communication acknowledged that this share price would not be used to purchase PDC stock or for company match contributions – because the Plan requires purchases to be made at the lower of the preceding or following valuation, the 31 December 2011 stock price would be used.

> **ANSWER:    Argent states that the allegations in Paragraph 322 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 322.**

323.    However, had the Hicks transaction been completed, it would have triggered change in control clauses in the RSU and LTIP plans that would have paid at the $18.80 share price, earning the ESOP Committee members (Richards, Ferree, Willetts, and Arent) millions of dollars in compensation:

|  | RSUs | Value at $18.80/share |
|---|---|---|
| Richards | 105,000 | $1,947,000 |
| Ferree | 35,500 | $667,400 |
| Willetts | 20,000 | $376,013 |
| Arent | 14,000 | $263,200 |

|  | LTIP Units | Value at $18.80/share |
|---|---|---|
| Richards | 395,000 | $2,093,800 |
| Ferree | 133,500 | $701,265 |
| Willetts | 55,500 | $291,720 |
| Arent | 51,500 | $274,390 |

**ANSWER:** **Argent states that the allegations in Paragraph 323 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 323.**

324. However, Richards and Ferree had negotiated terms where would exchange their LTIP units for restricted shares worth approximately $4 million in the new entity that would be created by the transaction. This was in addition to a February 2012 Retention Plan that would have paid out to $2 million if the deal closed, with most of it going to the top five executives (including Richards, Ferree, Willetts, Arent).

**ANSWER:** **Argent states that the allegations in Paragraph 324 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 324.**

325. Despite the vote by employees, on 13 July 2012, Appvion and HAC II announced that they had agreed to terminate the proposed business combination. According to Company management, the volatile market conditions prevented a transaction size from being reached that was acceptable to both Appvion and HAC II. The adjusted sale price would not have provided enough near-term liquidity and may not have allowed the combined company to be traded on the NASDAQ stock exchange.

**ANSWER:** **Argent states that the allegations in Paragraph 325 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 325.**

326.     After the transaction fell through, Appvion's ESOP Committee sent an email to employees on 7 August 2012 stating that they were ordering a special valuation of PDC's shares because "the June 30 price no longer represented Fair Market Value." According to the email, the ESOP Committee "subsequently learned that Stout Risius Ross included some (but not all) of the incremental value of the proposed transaction [with Hicks] in the share price announced on June 30." In other words, the $18.80 per share valuation had been artificially inflated by including the benefits of the merger that had not yet taken place and was not guaranteed, even though the valuation was supposed to be for normal ESOP administration purposes.

**ANSWER:** **Argent states that the allegations in Paragraph 326 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 326.**

327.     This inflated share price demonstrated that Stout's valuations were not reliable. Further, State Street and the ESOP Committee (Richards, Ferree, Willetts, and Arent) either approved the valuation without proper review to identify that the valuations were inflated by incorporating the Hicks transaction or they knew the valuation was inflated and approved it

anyway, especially for the benefit of Richards, Ferree, Willetts, and Arent who would directly benefit from a higher share price.

> **ANSWER:** **Argent states that the allegations in Paragraph 327 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 327.**

### 3. Appvion Sold its Most Profitable Unit.

328. Appvion's Encapsys segment encompassed Appvion's chemical microencapsulation activities; microencapsulation is the process of putting a microscopic wall around a core substance. This process was developed in the 1950's and was part of Appvion's carbonless paper process, but Appvion had worked to develop other applications for the process.

> **ANSWER:** **Claims relating to the Encapys sale have been dismissed by the Court and therefore no response is required. To the extent a response is necessary, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 328.**

329. By 2010, Encapsys was a driving factor in Stout's valuations. According to a January 2011 employee communication, "The rapid and consistent growth of the Encapsys business was the single biggest contributor to share price growth in H2 2010. The Encapsys division continues to increase its contribution to shareholder value with each recent valuation."

> **ANSWER:** **Claims relating to the Encapys sale have been dismissed by the Court and therefore no response is required. To the extent a response is**

necessary, Argent states that the allegations in Paragraph 329 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a further response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 329.

330. Encapsys had room for significant growth going forward and was Appvion's most profitable division.

> **ANSWER:** **Claims relating to the Encapys sale have been dismissed by the Court and therefore no response is required. To the extent a response is necessary, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 330.**

331. In April 2015, a third party submitted a proposal to acquire the Encapsys unit and related assets for $205 million, which was later revised to $208 million. Appvion agreed to sell the Encapsys unit, and the sale was completed in August 2015.

> **ANSWER:** **Claims relating to the Encapys sale have been dismissed by the Court and therefore no response is required. To the extent a response is necessary, Argent admits Encapsys was sold in August 2015. Answering further, Argent is aware that various proposals were submitted, refers to those proposals for the exclusive terms thereof, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 331.**

332.     On 8 May 2015, Appvion amended its Executive Nonqualified Excess Plan to allow deferral of compensation received under The Encapsys Long Term Performance Cash Plan. This Encapsys Long Term Performance Cash Plan is not described in any of the 10-K filings and it was not filed with the SEC. On information and belief, Appvion management may have received compensation from this plan as part of the sale of Encapsys.

> **ANSWER:    Claims relating to the Encapys sale have been dismissed by the Court and therefore no response is required.  Answering further, Argent refers to the documents referred to in Paragraph 332 for the exclusive terms thereof, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 332.**

333.     In May 2015, Appvion made Argent a discretionary trustee with the authority to vote on the Encapsys sale. Argent and the Board of Directors approved the sale, which was completed in August 2015, without a vote by employees.

> **ANSWER:    Claims relating to the Encapys sale have been dismissed by the Court and therefore no response is required. To the extent a response is necessary, Argent admits that it was engaged by Appvion on May 26, 2015 to serve as discretionary trustee. Argent admits that the extent of its services and fiduciary responsibilities are outlined in the engagement agreement, the Trust Agreement, and ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 333 inconsistent with their complete terms. Argent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 333.**

334.    While the sale of Encapsys allowed Appvion to pay off some debt, the loss of its most profitable unit impaired Appvion's overall value and its ability to function as a going concern.

>    **ANSWER:    Claims relating to the Encapys sale have been dismissed by the Court and therefore no response is required. To the extent a response is necessary, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 334.**

**I.    Appvion Filed for Bankruptcy Protection In 2017.**

335.    On 1 October 2017, Appvion and certain of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

>    **ANSWER:    Argent admits the allegations in Paragraph 335.**

**J.    The ESOP, Including Through its Employee Owners, Relied Upon the Defendants' Representations of Fair Market Value.**

336.    Each representation of stock value (the stock value itself, the communications to the Employee Owners in emails/press releases and at road shows, and the 10-K and 10-Q filings) misled the ESOP (including through its Employee Owners) and allowed Appvion to conceal its true financial condition. These representations acted to conceal that for much (if not all) of the ESOP's existence, PDC had no equity value. The fraudulent stock prices prevented inquiry into the true value of PDC's stock, concealed the ESOP fiduciaries' earlier breaches of fiduciary duty and concealed that certain management and directors were acting in their own

self-interest. They also caused the employees to continue to make deferrals from their paychecks and for the ESOP to overpay every time it bought PDC stock.

> **ANSWER:** **Argent states that the allegations in Paragraph 336 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies that it breached any fiduciary duty or violated any provision of ERISA. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 336.**

337. The Employee Owners who paid a portion of their paycheck into the ESOP for the purpose of funding the PDC stock purchases did so in reliance on the integrity of the PDC stock price. Because Appvion's Employee Owners were denied access to the PDC stock valuations, they had to rely on the accuracy of the stock prices set by the defendants.

> **ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 337.**

338. The ESOP, including through its Employee Owners, reasonably believed that each of the stock price representations were true and relied on the accuracy of these stock prices in making the ongoing decision to contribute a portion of their paychecks to invest in the ESOP.

> **ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 338.**

339. Had the defendants been truthful to the ESOP, including through its Employee Owners, the Employee Owners would have recognized Appvion's true financial condition and

194

would have ceased contributing to the ESOP. Also, the ESOP Plan would have been prohibited from purchasing PDC stock for more than its true fair market value.

> **ANSWER:   Argent denies that it breached any fiduciary duty or violated any provision of ERISA. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 339.**

**K.    From 9 November 2001 Until Bankruptcy, Each Defendant Took Separate and Independent Steps To Fraudulently Conceal Earlier Overstatements of the PDC Stock Price and Earlier Fiduciary Breaches.**

340.    Each year from 9 November 2001 until bankruptcy, each defendant took steps in furtherance of the course of conduct to fraudulently conceal that each previous PDC stock had been overvalued and that the ESOP fiduciaries had breached their fiduciary duties. Steps taken in the defendants' course of conduct of fraudulent concealment included:

- The release of 32 fraudulently inflated semi-annual PDC stock prices each of which concealed that each previous PDC stock price had been fraudulently inflated;

- The release of 17 Appvion 10-Ks which reported and confirmed the fraudulent PDC stock price and included the fraudulently inflated "Redeemable Common Stock value," thereby concealing that each previous PDC stock price and "Redeemable Common Stock value" had been fraudulently inflated and that the ESOP fiduciaries had breached their fiduciary duties;

- The release of 46 10-Qs, each of which reported and confirmed the fraudulently inflated Redeemable Common Stock value, thereby concealing that each

previous PDC stock price and Redeemable Common Stock value had been fraudulently inflated and that the ESOP Fiduciaries had breached their fiduciary duties; and

- The release of other communications which confirmed, among other things, that the PDC stock was being properly valued, thereby concealing that each previous PDC stock price and Redeemable Common Stock entry had been fraudulently inflated and that the ESOP fiduciaries had breached their fiduciary duties.

**ANSWER: Argent states that the allegations in Paragraph 340 are not exclusively directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required as to those allegations. Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

341. Upon the release of each subsequent PDC stock price, the newly-released price would then serve to separately and independently set the PDC stock purchase price for that respective period. Therefore, each released PDC stock price constituted a separate and independent breach of fiduciary duty and act of fraud or concealment from each earlier release.

**ANSWER: Argent states that the allegations in Paragraph 341 are not exclusively directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required as to those allegations. Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

342.     However, the release of each semi-annual PDC stock price also perpetuated the previous acts of fraudulently inflating each earlier reported PDC stock price and Redeemable Common Stock, concealing the fraudulently overstated PDC stock prices reported in connection with each earlier valuation and the related breaches of fiduciary duty.

> **ANSWER:   Argent states that the allegations in Paragraph 342 are not exclusively directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required as to those allegations. Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

343.     If each PDC stock price release had not perpetuated the fraudulent practices of the past, the Employee Owners would have learned that the PDC stock was inflated at the time of the 2001 Transaction and at all times thereafter. It would have notified the ESOP, through the Employee Owners, of the history of the fraudulent PDC stock inflation, the Defendants' role in the fraud and the ESOP fiduciaries' breaches.

> **ANSWER:   Argent states that the allegations in Paragraph 343 are not exclusively directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required as to those allegations. Argent denies that it breached any fiduciary duty or violated any provision of ERISA. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 343.**

344.     As described in Section IV.C., the members of the ESOP Committee, the ESOP

Trustee, the valuation firms and Appvion's directors each played a critical role in creating,

authorizing, disseminating and misrepresenting the fraudulently overstated semi-annual PDC

share price to the ESOP, through its Employee Owners.

**ANSWER:     Argent denies that it engaged in any fraudulent conduct, breached**

**any fiduciary duty or violated any provision of ERISA.**

345.     This annual and ongoing course of conduct concealed that the ESOP Committee

members and the ESOP Trustee were not acting prudently or in the ESOP's best interest and

were breaching their fiduciary duties to the ESOP. Instead, they were fraudulently inflating

PDC's stock price for the purpose of prolonging Appvion and the ESOP's existence for their

persona benefit.

**ANSWER:     Argent denies that it engaged in any fraudulent conduct, breached**

**any fiduciary duty or violated any provision of ERISA.**

346.     This course of conduct also concealed Houlihan's original conflict of interest

that infested every aspect of the initial ESOP transaction, the role that Buth, Karch and State

Street played in concealing the conflict, the inflated PDC stock price at 9 November 2001 and

the related breaches of fiduciary duties.

**ANSWER:     Argent states that the allegations in Paragraph 346 are not directed**

**to it but instead to defendants who have been dismissed from the case, and**

**therefore no response is required. To the extent a response is required,**

**Argent states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 346.**

347.    Each step in this curse of conduct prevented the ESOP, through the Employee Owners, from timely discovering the wrong it had suffered. These steps also constituted a misleading, deceptive and contrived action and scheme that was designed to mask the existence of the ESOP's cause of action, cover the Defendants' tracks and the tracks of their predecessors.

**ANSWER:    Argent states that the allegations in Paragraph 347 are not exclusively directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required as to those allegations. Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

      **1.**      <u>Steps Taken in Furtherance of the Course of Conduct of Fraudulent Concealment Included the Release of 32 Fraudulently Inflated Semi-Annual PDC Stock Prices.</u>

348.    The following chart includes the date of each PDC semi-annual stock valuation, the reported PDC stock price and the PDC stock price as adjusted by just the subtracting of the Excluded Debt and the fraudulent control premium. It also identifies the defendants who were members of the ESOP Committee, were the ESOP Trustee and were the valuation firms responsible for each of the thirty-two (32) PDC stock price releases:

**Table 14:  Defendants Responsible for Each Stock Price**

| | Valuation Date | Reported PDC Stock Price | Adjusted PDC Stock Price* | ESOP Committee Members Who Reviewed and Released the PDC Stock Price | ESOP Trustee | Valuation Firm |
|---|---|---|---|---|---|---|
| 1 | 31-Dec-01 | $12.81 | ($2.54) | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 2 | 30-Jun-02 | $18.58 | $2.25 | Buth, Karch, Parker, Fantini | State Street | Willamette |

| | Valuation Date | Reported PDC Stock Price | Adjusted PDC Stock Price* | ESOP Committee Members Who Reviewed and Released the PDC Stock Price | ESOP Trustee | Valuation Firm |
|---|---|---|---|---|---|---|
| 3 | 31-Dec-02 | $21.92 | $8.64 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 4 | 30-Jun-03 | $22.42 | $8.81 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 5 | 31-Dec-03 | $23.36 | $7.59 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 6 | 30-Jun-04 | $26.09 | $6.46 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 7 | 31-Dec-04 | $26.36 | $6.79 | Buth, Karch, Parker, Fantini | State Street | Stout |
| 8 | 30-Jun-05 | $27.77 | $9.34 | Richards, Karch, Parker, Fantini | State Street | Stout |
| 9 | 31-Dec-05 | $28.56 | $8.93 | Richards, Karch, Parker | State Street | Stout |
| 10 | 30-Jun-06 | $31.27 | $11.02 | Richards, Karch | State Street | Stout |
| 11 | 31-Dec-06 | $33.62 | $14.22 | Richards, Ferree, Tyczkowski | State Street | Stout |
| 12 | 30-Jun-07 | $32.89 | $12.38 | Richards, Ferree, Tyczkowski | State Street | Stout |
| 13 | 31-Dec-07 | $33.41 | $16.14 | Richards, Ferree, Tyczkowski | State Street | Stout |
| 14 | 30-Jun-08 | $26.64 | $10.19 | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 15 | 31-Dec-08 | $21.43 | ($4.06) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 16 | 30-Jun-09 | $18.87 | ($6.95) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 17 | 31-Dec-09 | $13.26 | ($11.75) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 18 | 30-Jun-10 | $12.03 | ($12.10) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 19 | 31-Dec-10 | $12.84 | ($9.47) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 20 | 30-Jun-11 | $14.10 | ($7.87) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 21 | 31-Dec-11 | $15.01 | ($11.04) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 22 | 16-Jul-12 | $16.45 | ($9.47) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 23 | 31-Dec-12 | $17.55 | ($12.45) | Richards, Ferree, Arent | State Street | Stout |
| 24 | 30-Jun-13 | $17.85 | ($12.78) | Richards, Ferree, Arent | Reliance | Stout |
| 25 | 31-Dec-13 | $16.25 | ($7.19) | Richards, Ferree, Arent | Reliance | Stout |
| 26 | 30-Jun-14 | $16.30 | ($6.41) | Richards, Ferree, Arent | Argent | Stout |
| 27 | 31-Dec-14 | $11.00 | ($18.62) | Richards, Ferree, Arent | Argent | Stout |
| 28 | 30-Jun-15 | $12.90 | ($11.71) | Richards, Ferree, Arent, Gilligan | Argent | Stout |
| 29 | 31-Dec-15 | $12.30 | ($11.95) | Ferree, Gilligan | Argent | Stout |
| 30 | 30-Jun-16 | $13.70 | ($11.87) | Ferree, Gilligan | Argent | Stout |
| 31 | 31-Dec-16 | $10.35 | ($15.72) | Ferree, Gilligan | Argent | Stout |
| 32 | 30-Jun-17 | $6.85 | ($20.41) | Gilligan | Argent | Stout |

**ANSWER:** Argent admits that it served as ESOP trustee for the valuation dates listed on Table 14. Argent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 348.

### 2. Steps Taken in Furtherance of the Course of Conduct of Fraudulent Concealment Included the Release of 17 of Appvion's Annual 10-Ks.

#### a. The 17 10-Ks Confirmed and Released the Fraudulently Inflated PDC Stock Price to the Employee Owners.

349.    Each year Appvion filed a 10-K with the SEC. It contained Appvion's audited financial statements. From 2002 to 2017, Appvion released fifteen (15) 10-K's during this period.

> **ANSWER:    Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 349.**

350.    With the exception of the 2002 10-K, each subsequent 10-K reported and confirmed the fraudulently inflated PDC stock price in the Notes to the audited financial statements, thus attesting to its accuracy to the ESOP Owners. The following is an example of this 10-K disclosure of the PDC stock price, which was similar to the disclosure in each 10-K:

> The Compensation Committee of the board establishes the number of units granted each year under these plans in accordance with the Compensation Committee's stated goals and policies. … The units are valued at the most recent PDC stock price as determined by the semi-annual ESOP valuation. **As of December 31, 2011, the fair market value of one share of PDC common stock was $15.01**.

Source:  PDC, 2011 10-K Form, p. 86; emphasis added.

> **ANSWER:    Argent admits that Paragraph 350 purports to cite to a 2011 10-K, refers to that document for its exclusive terms, and denies any allegations in Paragraph 350 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 350.**

### b. The 10-K Balance Sheet Entry "Redeemable Common Stock" Confirmed the PDC Stock Price.

351.    The liabilities section of each of Appvion's balance sheets included an entry entitled "Redeemable Common Stock." This number represented the present value of Appvion's obligation to repurchase PDC stock when it became subject to redemption. For example, this redemption could occur when an ESOP Employee Owner retired or otherwise left Appvion.

> **ANSWER:    Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 351.**

352.    Because the Redeemable common stock entry was calculated as a function of the PDC stock price, it was fraudulently inflated in every 10-K released to the SEC and to the ESOP Employee Owners from 2002 (which also included the 2001 balance sheet) through 2016.

> **ANSWER:    Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 352.**

353.    The following is a representative excerpt from one of Appvion's 10-Ks which explains the Redeemable common stock entry and confirms that it is calculated as a function of the PDC stock's fair market value.  Each 10-K contains a similar explanation:

> ***Redeemable Common Stock***. Redeemable equity securities are required to accreted (i.e., increased) so the amount on the balance sheet reflects the estimated amount redeemable at the earlier redemption dated based upon the redemption value at each period end. … **The fair value of redeemable common stock is determined by an independent, third party appraiser selected**

**by the ESOP Trustee as required by law and the ESOP**. Based upon the estimated fair market value of the redeemable common stock currently outstanding, an ultimate redemption amount of approximately $307 million has been determined. This accretion is being charged to retained earnings because redeemable common stock is the only class of shares outstanding.

**ANSWER:** **Argent admits that Paragraph 353 purports to cite to a Form 10-K, refers to that filing for its exclusive terms, and denies all allegations in Paragraph 353 inconsistent with its complete terms.**

354. For example, the Redeemable Common Stock entry included in the 2009 10-K balance sheet was $122.1 million. Because the PDC stock fair market value as adjusted for just the Excluded Debt and the fraudulent control premium was negative, this reported liability should have been reported as zero.

**ANSWER:** **Argent states that the allegations in Paragraph 354 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 354.**

355. The release of each of the 17 10-Ks with the reported, but fraudulent, PDC stock value and "Redeemable Common Stock" value, constituted a separate and independent act in furtherance of the course of conduct of fraudulent concealment.

**ANSWER:** **Argent states that the allegations in Paragraph 355 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 355.

        c.     **Each 10-K Was Signed and Attested to by the CEO (Buth, Richards or Gilligan), the CFO (Parker or Ferree) and was Signed by the Directors.**

356.     Each 10-K was signed by the CEO (Buth, Richards or Gilligan) and by the CFO (either Parker or Ferree). Each CEO and CFO also signed a separate attestation as follows:

**Figure 11: Douglas P. Buth's Attestation to the 2003 10-K.**



Source: Exhibit 31.1 to PDC's 10-K (2003).

        **ANSWER:**     Argent states that the allegations in Paragraph 356 are not directed to it but instead to defendants who have been dismissed from the case, and

**therefore no response is required. To the extent a response is required, Argent admits that Paragraph 356 purports to cite to a 2003 10-K, refers to that document for its exclusive terms, and denies all allegations in Paragraph 356 inconsistent with its complete terms.**

357.    The critical language from this attestation is:

1.      I have reviewed this annual report on Form 10-K of Appleton Papers Inc.;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

**ANSWER:    Argent states that the allegations in Paragraph 357 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 357 purports to cite to a 2003 10-K, refers to that document for its exclusive terms, and denies all allegations in Paragraph 357 inconsistent with its complete terms.**

358.    The Directors signed each 10-K, further attesting to the reliability of the information contained therein including the PDC stock price and the Redeemable Common

Stock entry. The signature page for the directors looked similar in each 10-K. The following are representative examples of signature pages from the 2004, 2009 and 2015 10-Ks:

Case 1:18-cv-01861-WCG     Filed 10/20/22     Page 206 of 376     Document 275

**Figure 12: Signature Page, 2004 10-K**



**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

APPLETON PAPERS INC.

By:  /s/ DOUGLAS P. BUTH

Douglas P. Buth
President and Chief Executive Officer
Date: March 24, 2005

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
|---|---|---|
| /s/ DOUGLAS P. BUTH<br>Douglas P. Buth | Chairman, President, Chief Executive Officer and a Director (Principal Executive Officer) | March 24, 2005 |
| /s/ DALE E. PARKER<br>Dale E. Parker | Vice President, Chief Financial Officer and a Director (Principal Financial Officer) | March 24, 2005 |
| /s/ STEPHEN G. KULA<br>Stephen G. Kula | Controller (Principal Accounting Officer) | March 24, 2005 |
| /s/ STEPHEN P. CARTER<br>Stephen P. Carter | Director | March 24, 2005 |
| /s/ RONALD A. PACE<br>Ronald A. Pace | Director | March 24, 2005 |
| /s/ KATHI P. SEIFERT<br>Kathi P. Seifert | Director | March 24, 2005 |
| /s/ SUSAN SCHERBEL<br>Susan Scherbel | Director | March 24, 2005 |
| /s/ PAUL J. KARCH<br>Paul J. Karch | Director | March 24, 2005 |

Source: PDC, 10-K (2004), p. 115.

## Figure 12: Signature Page, 2009 10-K

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

APPLETON PAPERS INC.

By: /s/ Mark R. Richards

Mark R. Richards
President and Chief Executive Officer
Date: March 1, 2010

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
|------|-------|------|
| /s/ MARK R. RICHARDS<br>Mark R. Richards | Chairman, President, Chief Executive Officer and a Director (Principal Executive Officer) | March 1, 2010 |
| /s/ THOMAS J. FERREE<br>Thomas J. Ferree | Senior Vice President Finance, Chief Financial Officer and Treasurer (Principal Financial Officer) | March 1, 2010 |
| /s/ JEFFREY J. FLETCHER<br>Jeffrey J. Fletcher | Controller (Principal Accounting Officer) | March 1, 2010 |
| /s/ STEPHEN P. CARTER<br>Stephen P. Carter | Director | March 1, 2010 |
| /s/ TERRY M. MURPHY<br>Terry M. Murphy | Director | March 1, 2010 |
| /s/ RONALD A. PACE<br>Ronald A. Pace | Director | March 1, 2010 |
| /s/ ANDREW F. REARDON<br>Andrew F. Reardon | Director | March 1, 2010 |
| /s/ KATHI P. SEIFERT<br>Kathi P. Seifert | Director | March 1, 2010 |
| /s/ SUSAN SCHERBEL<br>Susan Scherbel | Director | March 1, 2010 |

**Figure 14: Signature Page, 2015 10-K**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

PAPERWEIGHT DEVELOPMENT CORP.

By: /s/ Kevin M. Gilligan
    Kevin M. Gilligan
    President and Chief Executive Officer
Date: March 25, 2016

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
|---|---|---|
| /s/ Kevin M. Gilligan<br>Kevin M. Gilligan | President, Chief Executive Officer and a Director<br>(Principal Executive Officer) | March 25, 2016 |
| /s/ Thomas J. Ferree<br>Thomas J. Ferree | Senior Vice President Finance, Chief Financial Officer and Treasurer<br>(Principal Financial Officer) | March 25, 2016 |
| /s/ Terry M. Murphy<br>Terry M. Murphy | Chairman of the Board | March 25, 2016 |
| /s/ Stephen P. Carter<br>Stephen P. Carter | Director | March 25, 2016 |
| /s/ Kathi P. Seifert<br>Kathi P. Seifert | Director | March 25, 2016 |
| /s/ Mark A. Suwyn<br>Mark A. Suwyn | Director | March 25, 2016 |
| /s/ George W. Wurtz<br>George W. Wurtz | Director | March 25, 2016 |

Source: PDC, 10-K (2015), p. 112.

> **ANSWER:** Argent states that the allegations in Paragraph 358 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 358 purports to cite to a 10-Ks for various years, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 358 inconsistent with their complete terms.

> **d.** <u>**The Defendants who Signed the 10-Ks Knew They Were Being Provided to and Relied Upon by the Employee Owners.**</u>

359. Each defendant who signed Appvion's 10-Ks also knew that they would become publicly available and, that it would be provided to the Employee Owners.

> **ANSWER:** Argent states that the allegations in Paragraph 359 are not directed to it but instead to defendants who have been dismissed from the case, and

209

therefore no response is required. To the extent a response is required, Argent states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 359.

360.     In fact, the annual 10-K was specifically offered to the Employee Owners to help them make the ongoing decision of whether to invest their paycheck savings in the ESOP. Appvion did this by giving its employees the link to the Appvion website where employees could review the 10-K and also told employees they could ask for and receive a hard copy.

**ANSWER:     Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 360.**

361.     The June 2003 Ownership Update newsletter confirmed that the ESOP Committee made both the 10-Ks and 10-Qs available to the Employee Owners:

> **All Appleton's 10-Qs and our first 10-K are posted on the Appleton Web site** at ww.appletonideas.com/investors. **We will continue to post our SEC filings to the Web site**. The 10-K is posted in March while the 10-Qs will usually appear near the end of the 45-day reporting deadline. **These reports are also available on the SEC Web** site at www.sec.gov – check under filings and forms (EDGAR). **KSOP plan participants who would like copies** of SEC filings but do not have Internet access **may request them** from our Employee Services, 800-832-1718.

**ANSWER:     Argent states that the allegations in Paragraph 361 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 361.**

362.    The following chart lists the date of each 10-K, the fraudulent Redeemable Common Stock value the 10-K reported, the stock price adjusted by subtracting just the Excluded Debt and the fraudulent control premium, and the ESOP Committee member defendants who signed and attested to each 10-K. It also lists the Outside Directors who signed the 10-Ks for the years this SAC is stating claims against those directors:

**Table 15:  Signatories for Each 10-K**

| | 10-K | Date | Redeemable Common Stock (in thousands) | Adjusted PDC Stock Price* | Attesting ESOP Committee Member Who Signed | Outside Directors Who Signed |
|---|---|---|---|---|---|---|
| 1 | 2002 10-K | 18-Mar-03 | $133,581 | $8.64 | Buth, Parker | |
| 2 | 2003 10-K | 31-Mar-04 | $158,279 | $7.59 | Buth, Parker | |
| 3 | 2004 10-K | 24-Mar-05 | $159,329 | $6.79 | Buth, Parker | |
| 4 | 2005 10-K | 17-Mar-06 | $185,292 | $8.93 | Richards, Parker | |
| 5 | 2006 10-K | 06-Mar-07 | $190,466 | $14.22 | Richards, Ferree | |
| 6 | 2007 10-K | 11-Mar-08 | $182,040 | $16.14 | Richards, Ferree | Carter, Murphy, Pace, Reardon, Seifert, Scherbel |
| 7 | 2008 10-K | 27-Mar-09 | $147,874 | ($4.06) | Richards, Ferree | Carter, Murphy, Pace, Reardon, Seifert, Scherbel |
| 8 | 2009 10-K | 01-Mar-10 | $122,087 | ($11.75) | Richards, Ferree | Carter, Murphy, Pace, Reardon, Seifert, Scherbel |
| 9 | 2010 10-K | 11-Mar-11 | $110,045 | ($9.47) | Richards, Ferree | Carter, Murphy, Pace, Reardon, Seifert, Scherbel |
| 10 | 2011 10-K | 23-Mar-12 | $97,615 | ($11.04) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 11 | 2012 10-K | 7-Mar-13 | $81,704 | ($12.45) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 12 | 2013 10-K | 12-Mar-14 | $63,322 | ($7.19) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 13 | 2013 10-K/A | 14 Nov 14 | $157,445 | ($7.19) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |

| | 10-K | Date | Redeemable Common Stock (in thousands) | Adjusted PDC Stock Price* | Attesting ESOP Committee Member Who Signed | Outside Directors Who Signed |
|---|---|---|---|---|---|---|
| 14 | 2014 10-K | 13-Mar-15 | $121,017 | ($18.62) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 15 | 2015 10-K | 25-Mar-16 | $114,749 | ($11.95) | Gilligan, Ferree | Carter, Seifert, Murphy, Suwyn |
| 16 | 2016 10-K | 15-Mar-17 | $100,641 | ($15.72) | Gilligan, Ferree | Seifert, Murphy Suwyn |
| 17 | 2016-10-K/A | 28-Mar-17 | $100,641 | ($15.72) | Gilligan, Ferree | |

*Adjusted by subtracting the Excluded Debt and the fraudulent control premium. *See* Table 10.

Appvion, 2002 10-K, pp. 45, 111; 2003 10-K, pp. 49, 124; 2004 10-K, pp. 49, 115; 2005 10-K, pp. 50, 115; 2006 10-K, pp. 42, 113; 2007 10-K, pp. 40, 106; 2008 10-K, p. 121; 2009 10-K, pp. 50, 132; 2010 10-K, pp. 50; 135; 2011 10-K, pp. 50, 142; 2012 10-K, pp. 45, 136; 2013 10-K, pp. 46, 119; 2013 10-K/A, pp. 48, 123; 2014 10-K, pp. 42, 117; 2015 10-K, pp. 38, 112; 2016 10-K, pp. 33, 104; 2016 10-K(A), pp. 6, 48. Attestations, 2002 10-K, exhibits 99.1-99.4; 2003–2012 10-Ks, exhibits. 31.1-31.4, 32.1-32.4, 2013–2016 10-Ks, exhibits 31.1-31.2, 32.1-32.2.

**ANSWER:** **Argent states that the allegations in Paragraph 362 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 362.**

**3.** **Steps Taken in Furtherance of the Course of Conduct of Fraudulent Concealment Included the Release of 48 Quarterly 10-Qs.**

363. Each quarter Appvion filed a 10-Q containing its quarterly unaudited financial statements with the SEC and made it available to the Employee Owners. Each of these forty-eight (48) 10-Q balance sheets reported the fraudulently inflated Redeemable Common Stock value.

**ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 363.**

364.     Appvion's CEOs (either Buth, Richards or Gilligan) and CFOs (either Parker, Richards (interim CFO) or Ferree) attested to and the CFOs (either Parker, Richards (interim CFO) or Ferree) signed each of the forty-eight (48) 10-Qs released under their respective periods of employment, with the following certification language:

**Figure 13:  Douglas P. Buth Attestation to 10-Q, 11 Aug 03**

Exhibit 31.1

I, Douglas P. Buth, Chairman, President and Chief Executive Officer of Appleton Papers Inc., certify that:

1. I have reviewed this quarterly report on Form 10-Q of Appleton Papers Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control.

Date: August 11, 2003

/s/ Douglas P. Buth

Douglas P. Buth
Chairman, President and Chief Executive Officer

Source: Exhibit 31.1 to 10-Q, filed 11 Aug 03.

**ANSWER:** **Argent states that the allegations in Paragraph 364 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 364 purports to cite to various 10-Qs, refers**

**to those documents for their exclusive terms, and denies all allegations in**

**Paragraph 364 inconsistent with their complete terms.**

365.    The critical language is:

1.      I have reviewed this quarterly report on Form 10-Q of Appleton Papers Inc.;

2.      Based on my knowledge, **this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made**, in light of the circumstances under which such statements were made, **not misleading** with respect to the period covered by this report;

3.      Based on my knowledge, **the financial statements**, and other financial information included in this report, **fairly present in all material respects the financial condition**, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

**ANSWER:    Argent states that the allegations in Paragraph 365 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 365 purports to cite to various 10-Qs, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 365 inconsistent with their complete terms.**

366.    The "Ownership Update" newsletter to the ESOP Employee Owners dated 9 December 2002, describes to the ESOP Owners that the CEO (Buth) and CFO (Parker) made 10-Q certifications thus giving them comfort regarding the 10-Q's accuracy and truthfulness:

Prior to Appleton filing its 10-Q report on November 13, the committee reported to Buth and Parker as to its activities and any issues relevant to the preparation of the 10-Q report under review. After completing their personal review of the quarterly report and

report of the disclosure committee, **Buth and Parker each signed written certifications of the accuracy of the information contained in the 10-Q**.

ANSWER:    Argent states that the allegations in Paragraph 366 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 366.

367.    The following chart includes the date of each 10-Q, the fraudulent Redeemable Common Stock balance sheet entry and the names of the CFO who signed them and CEO and CFO who attested to their accuracy:

**Table 16: Attestor and Signers for Each 10-Q**

| | Date of 10-Q | Reported Redeemable Common Stock (in thousands) | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 1 | 30-Jun-02 | $112,108 | Buth, Parker |
| 2 | 29-Sep-02 | $133,820 | Buth, Parker |
| 3 | 30-Mar-03 | $143,981 | Buth, Parker |
| 4 | 29-Jun-03 | $138,095 | Buth, Parker |
| 5 | 28-Sep-03 | $160,466 | Buth, Parker |
| 6 | 4-Apr-04 | $168,868 | Buth, Parker |
| 7 | 4-Jul-04 | $163,295 | Buth, Parker |
| 8 | 3-Oct-04 | $163,753 | Buth, Parker |
| 9 | 3-Apr-05 | $162,485 | Richards, Parker |
| 10 | 3-Jul-05 | $169,578 | Richards, Parker |
| 11 | 2-Oct-05 | $175,331 | Richards, Parker |
| 12 | 2-Apr-06 | $188,298 | Richards* |
| 13 | 2-Jul-06 | $183,382 | Richards* |
| 14 | 1-Oct-06 | $189,281 | Richards, Ferree |
| 15 | 1-Apr-07 | $194,126 | Richards, Ferree |
| 16 | 1-Jul-07 | $184,490 | Richards, Ferree |
| 17 | 30-Sep-07 | $172,224 | Richards, Ferree |
| 18 | 30-Mar-08 | $185,127 | Richards, Ferree |
| 19 | 29-Jun-08 | $170,079 | Richards, Ferree |
| 20 | 28-Sep-08 | $169,344 | Richards, Ferree |

| | Date of 10-Q | Reported Redeemable Common Stock (in thousands) | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 21 | 5-Apr-09 | $143,392 | Richards, Ferree |
| 22 | 5-Jul-09 | $135,579 | Richards, Ferree |
| 23 | 4-Oct-09 | $133,653 | Richards, Ferree |
| 24 | 4-Apr-10 | $120,320 | Richards, Ferree |
| 25 | 4-Jul-10 | $114,378 | Richards, Ferree |
| 26 | 3-Oct-10 | $112,624 | Richards, Ferree |
| 27 | 3-Apr-11 | $108,622 | Richards, Ferree |
| 28 | 3-Jul-11 | $102,524 | Richards, Ferree |
| 29 | 2-Oct-11 | $101,062 | Richards, Ferree |
| 30 | 1-Apr-12 | $96,431 | Richards, Ferree |
| 31 | 1-Jul-12 | $89,845 | Richards, Ferree |
| 32 | 30-Sep-12 | $85,518 | Richards, Ferree |
| 33 | 31-Mar-13 | $80,458 | Richards, Ferree |
| 34 | 30-Jun-13 | $71,940 | Richards, Ferree |
| 35 | 29-Sep-13 | $70,853 | Richards, Ferree |
| 36 | 30-Mar-14 | $61,635 | Richards, Ferree |
| 37 | 30-Mar-14 | **$157,429 | Richards, Ferree |
| 38 | 29-Jun-14 | $55,628 | Richards, Ferree |
| 39 | 29-Jun-14 | **$151,140 | Richards, Ferree |
| 40 | 28-Sep-14 | $151,139 | Richards, Ferree |
| 41 | 5-Apr-15 | $121,017 | Richards, Ferree |
| 42 | 5-Jul-15 | $121,020 | Gilligan, Ferree |
| 43 | 4-Oct-15 | $121,020 | Gilligan, Ferree |
| 44 | 3-Apr-16 | $114,749 | Gilligan, Ferree |
| 45 | 3-Jul-16 | $112,761 | Gilligan, Ferree |
| 46 | 2-Oct-16 | $112,760 | Gilligan, Ferree |
| 47 | 2-Apr-17 | $100,641 | Gilligan, Ferree |
| 48 | 2-Jul-17 | $91,760 | Gilligan |

*Signed and attested as both CEO and CFO.
**Amended

Source: Appvion, 10-Qs, Jun 02, pp. 1, 34; Sep 02, pp. 1, 39, 40; Mar 03, pp. 1, 37, 38; Jun 03, pp. 1, 40, 41; Sep 03, pp. 1, 42, 43; Apr 04, pp. 4, 39, 40; Jul 04, pp. 1, 43, 44; Oct 04, pp. 1, 46; Apr 05, pp. 1, 40; Jul 05, pp. 3, 46, 47; Oct 05, pp. 1, 43; Apr 06, pp. 3, 42, 43; Jul 06, pp. 3, 48, 49; Oct 06, pp. 1, 40, 41; Apr 07, pp. 1, 32, 33; Jul 07, pp. 1, 38, 39; Sep 07, pp. 3, 40, 41; Mar 08, pp. 1, 32, 33; Jun 08, pp. 3, 40, 41; Sep 08, pp. 3, 40, 41; Apr 09, pp. 3, 39, 40; Jul 09, pp. 3, 45, 46; Oct 09, pp. 3, 47, 48; Apr 10, pp. 3, 33, 34; Jul 10, pp. 3, 44, 45; Oct 10, pp. 3, 47, 48; Apr 11, pp. 3, 37; 38; Jul 11, pp. 3, 43, 44: Oct 11, pp. 3, 44, 45; Apr 12, pp. 3, 41, 42; Jul 12, pp. 3, 45, 46; Oct 12, pp. 3, 46, 47; Mar 13, pp. 3, 41, 42; Jun 13, pp. 3, 49, 50; Sep 13, pp. 3, 51, 52; Mar 14, pp. 5, 36; Mar 14(A), pp. 5, 42; Jun 14, pp. 3, 33; Jun 14(A), 5, 42; Sep 14, pp. 5, 39; Apr 15, pp. 3, 29; Jul 15, pp. 3, 32; Oct 15, pp. 3, 34; Apr 16, pp. 3, 29; Jul 16, pp. 3, 30; Oct 16, pp. 3, 33; Apr 17, pp. 3, 27; Jul 17, pp. 2; Attestations: 2002 10-Qs, exhibits, 99.1-99.4; Mar 03 10-Q, exhibits, 99.1-99.4; Jun 03 – Oct 05 10-Qs, exhibits, 31.1-

31.4, 32.2-32.4; Apr – Jul 06 10-Qs, exhibits, 31.1-31.2, 32.1-32.2; Oct 06 – Sep 13 10-Qs exhibits, 31.1-31.4, 32.1-32.4; Mar 14 – Jul 17 10-Qs, exhibits, 31.1-31.2,32.1-32.2.

> **ANSWER:** **Argent states that the allegations in Paragraph 367 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 367.**

### 4. Steps Taken in Furtherance of the Course of Conduct of Fraudulent Concealment Included the Annual Filing of 16 Form 5500s.

368. Each year, Appvion was required to file a Form 5500 with the Department of Labor each year. According to the Department of Labor's website, this is intended to be a key disclosure document for the protection of the Employee Owners' interests:

> The Form 5500 Series is **an important compliance, research, and disclosure tool** for the Department of Labor, **a disclosure document for plan participants and beneficiaries**, and a source of information and data for use by other Federal agencies, Congress, and the private sector in assessing employee benefit, tax, and economic trends and policies. The Form 5500 Series is **part of ERISA's overall reporting and disclosure framework**, which is **intended to assure that** employee benefit plans are operated and managed in accordance with certain prescribed standards and that **participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries** under employee benefit plans.

Source: U.S. Department of Labor, EBSA, Reporting and Filing, Form 5500 Series.

> **ANSWER:** **Argent admits that Paragraph 368 purports to cite to the U.S. Department of Labor's website, refers to that source for its exclusive terms, and denies all allegations in Paragraph 368 inconsistent with its complete terms.**

369.    The Form 5500 requires that the administrator of qualified employee benefit plan report the total plan assets at the beginning and end of each year. The Form 5500 must be true and accurate and signed under penalty of perjury. Appvion, as the plan administrator, filed the following Form 5500s which attested to the value of PDC's stock and the total market of the employer securities held by the ESOP based on that value:

|  | Year | Date Signed | Defendants who Signed | Reported Value of Employer Securities (Start of Year) | Reported Value of Employer Securities (Year-End) |
|---|---|---|---|---|---|
| 1 | 2001 | 10 Oct 2002 | Paul Karch | $0 | $137,518,892 |
| 2 | 2002 | 10 Oct 2003 | Paul Karch | $137,518,892 | $254,978,678 |
| 3 | 2003 | 12 Oct 2004 | Paul Karch | $254,978,678 | $284,873,363 |
| 4 | 2004 | 12 Oct 2004 | Paul Karch | $284,873,363 | $309,272,898 |
| 5 | 2005 | 11 Oct 2006 | Paul Karch | $309,272,898 | $337,343,349 |
| 6 | 2006 | 15 Oct 2007 | Thomas Ferree | $337,343,349 | $391,025,949 |
| 7 | 2007 | 15 Oct 2008 | Thomas Ferree | $391,025,949 | $375,522,369 |
| 8 | 2008 | 13 Oct 2009 | Thomas Ferree | $375,522,369 | $231,347,332 |
| 9 | 2009 | 18 Aug 2010 | Thomas Ferree | $231,347,332 | $135,854,254 |
| 10 | 2010 | 14 Oct 2011 | Thomas Ferree | $135,854,254 | $125,644,210 |
| 11 | 2011 | 11 Oct 2012 | Thomas Ferree | $125,644,210 | $140,503,114 |
| 12 | 2012 | 18 July 2013 | Thomas Ferree | $140,503,114 | $156,527,589 |
| 13 | 2013 | 4 Sep 2014 | Thomas Ferree | $156,527,589 | $134,872,305 |
| 14 | 2014 | 30 Sep 2015 | Thomas Ferree | $134,872,305 | $85,215,116 |
| 15 | 2015 | 22 Aug 2016 | Thomas Ferree | $85,215,116 | $86,423,915 |
| 16 | 2016 | 31 Aug 2017 |  | $86,423,915 | $67,177,046 |

Source:  Compiled from Form 5500s.

**ANSWER:    Argent states that the allegations in Paragraph 369 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 369 purports to cite to various Form 5500s, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 369 inconsistent with their complete terms.**

370. The Form 5500 required the plan administrator to report any non-exempt party-in- interest transactions defined consistent with – prohibited transactions defined consistent with ERISA § 406 (See Counts XXI-XXV below). Each of Appvion's Form 5500s from 2001 to 2017 reported that there were no such transactions.

> **ANSWER:** **Argent states that the allegations in Paragraph 370 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 370 purports to cite to various Form 5500s, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 370 inconsistent with their complete terms. Argent further denies that it engaged in a prohibited transaction under ERISA § 406.**

371. None of the Form 5500s report any investigations or corrective action. In particular, none of them report any investigation or corrective action after the treatment of BemroseBooth in the 2007/2008 valuations. Further, each Form 5500 reports that there were no losses as a result of any dishonest or fraudulent acts.

> **ANSWER:** **Argent states that the allegations in Paragraph 371 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 371 purports to cite to various Form 5500s, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 371 inconsistent with their complete terms.**

372.     These Form 5500s represent steps taken in furtherance of the course of conduct of fraudulent concealment. Each one reaffirmed the prior stock prices and the value of the stock held by the ESOP. Further, while these were signed by Karch and Ferree and not the entire ESOP Committee, they were official filings that would necessarily have been approved by the ESOP Committee.

> **ANSWER:    Argent states that the allegations in Paragraph 372 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 372.**

> **5.      In 2002 Buth, Karch, Parker, Fantini, and State Street Collectively Took at Least 9 Separate Steps to Fraudulently Conceal that Each Earlier PDC Stock Price Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

>> **a.      Step 1: Buth, Karch, Parker and Fantini Fraudulently Represented that State Street Had Control.**

373.     On 14 January 2002, on behalf of the ESOP Committee (Buth, Karch, Parker and Fantini), Karch wrote to the ESOP, through its Employee Owners, fraudulently misrepresenting that as 100% shareholder, the ESOP Trustee had "control of the company:"

> Our ESOP holds 100 percent of the company's stock. Our ESOP trustee, as the legal shareholder, is the sole shareholder and thus has control of the company. In Enron's case, their qualified plan held less than 10 percent of the company's total outstanding stock, so the trustee was a minority shareholder who could not influence or affect the governance structure and protect participants' holdings.

**ANSWER:** Argent states that the allegations in Paragraph 373 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 373.

374. The ESOP Trustee had no such control.

**ANSWER:** Argent states that the allegations in Paragraph 374 are not directed to it but instead to a defendant (State Street) who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 374.

375. This misrepresentation was a step taken in furtherance of Buth, Karch, Parker, Fantini and State Street's course of fraudulent concealment to conceal that on 9 November 2001, the ESOP's $10 per share purchase of 100% of the PDC stock was for more than fair market value. It also concealed that Buth, Karch, Houlihan and State Street had participated together in the fraud, had breached their fiduciary duties to the ESOP, had misrepresented Houlihan's independence and that the ESOP transaction should not have gone forward.

**ANSWER:** Argent states that the allegations in Paragraph 375 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 375.

**b.** **Step 2: Buth, Karch, Parker, and Fantini Fraudulently Represented that Appvion's Executive's Interests Were Aligned with the ESOP's Employee Owners' Interests.**

376. In the same 14 January 2002 email, Karch, on behalf of the ESOP Committee (Buth, Karch, Parker and Fantini), also misrepresented that Appvion company executives could not sell their stock sooner than the employees:

> Our plan design prevents company executives or other employee group from selling their stock sooner than any other employee since all our stock is in the ESOP. In Enron's situation, company executives owned stock that was not held in their qualified plans. The stock was not subject to the same restrictions on sales as the stock in the qualified plans.

**ANSWER:** **Argent states that the allegations in Paragraph 376 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 376 purports to cite to a January 14, 2002 correspondence, refers to that correspondence for its exclusive terms, and denies all allegations in Paragraph 376 inconsistent with its complete terms.**

377. This representation was false and fraudulently incomplete, because Buth, Karch, Parker and Fantini knew that the PDC stock had been fraudulently overvalued at the 9 November 2001 acquisition and, with that inside information, could strategically determine when to leave the company and liquidate their interest in the ESOP. In fact, this is exactly what each of them did.

**ANSWER:** **Argent states that the allegations in Paragraph 377 are not directed to it but instead to defendants who have been dismissed from the case, and**

222

therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 377.

378.     This misrepresentation was an additional step in furtherance of their course of conduct of fraudulent concealment. This misrepresentation caused the Employee Owners to believe that the senior executives' interests were aligned with the ESOP's, thus covering their tracks and masking the existence of a cause of action regarding the 9 November 2001 transaction.

ANSWER:     Argent states that the allegations in Paragraph 378 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 378.

c.     Step 3: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented That PDC Stock Was Being Properly Valued.

379.     In the same 14 January 2002 email, Karch, on behalf of the ESOP Committee (Buth, Karch, Parker and Fantini), again took the step of fraudulently misrepresenting that the PDC stock price was being carefully scrutinized and was being properly valued:

> The value of our company stock will be determined twice per year by an independent, third party appraiser according to the methodology established by the Department of Labor. **This valuation process provides another level of scrutiny of the company's accounting practices**. Enron stock is publicly traded and its value, including its overvalue, was and is determined by speculators in the stock market.

**The fundamental soundness of Appleton Papers' business and ESOP structure and the potential for extraordinary returns if we achieve our plans have not changed** because of the Enron collapse.

**ANSWER:** Argent states that the allegations in Paragraph 379 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 379.

380. This misrepresentation was an additional step in furtherance of Buth, Karch, Parker and Fantini's course of conduct to fraudulently conceal their misrepresentation that the ESOP's 9 November 2001 $10 purchase of PDC stock was at no more than fair market value because it advised the ESOP, through the Employee Owners, that stock had been properly valued. This masked their earlier fraud, dissuaded the Employee Owners from questioning the 9 November 2001 $10 PDC stock valuation and hid their previous breaches of fiduciary duty.

**ANSWER:** Argent states that the allegations in Paragraph 380 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 380.

**d.    Step 4:  Buth, Karch, Fantini and State Street Fraudulently Represented that PDC's Stock Price Had Increased from $10 to $12.81 as of 31 December 2001.**

381.    In late February or early March 2002, State Street reported that the fair market value of PDC's stock was $12.81 per share as of 31 December 2001. On 12 March 2002, the ESOP Committee (Buth, Karch, Parker, and Fantini) reported this stock price in an email to the Employee Owners. The ESOP Committee reported this was a 28 percent jump over the $10 a share valuation at 9 November 2001, just 52 days earlier:

> **PDC Stock Value Jumps Over 28 Percent**
>
> Willamette Management Associates has completed its first valuation of Paperweight Development Corp. stock and determined that the per share value increased from $10.00 per share to $12.81 per share or 28.1 percent for the period Nov. 9, 2001, through Dec. 31, 2001.

**ANSWER:    Argent states that the allegations in Paragraph 381 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 381.**

382.    The email fraudulently represented that $12.81 was PDC stock's fair market value:

> The Willamette's valuation considers such factors as the purchase price we paid, company performance in November and December 2001 and comparable market factors to determine our company's fair market value and, in turn, the stock value.

**ANSWER:    Argent states that the allegations in Paragraph 382 are not directed to it but instead to defendants who have been dismissed from the case, and**

**therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 382.**

383.    The stock price and the ESOP Committee's fraudulent representations about the stock price and the valuation were affirmative acts by the ESOP Committee (Buth, Karch, Parker and Fantini) and State Street that fraudulently concealed their breaches of fiduciary duty in connection with both the 2001 Transaction (by reaffirming the initial purchase price and share value) and the 31 December 2001 valuation (by representing that they had applied a proper process and that the $12.81 share price was fair market value).

**ANSWER:    Argent states that the allegations in Paragraph 383 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 383.**

384.    The ESOP Committee (Buth, Karch, Parker, and Fantini) and State Street knew that $12.81 was not the fair market value of the PDC stock because that price was inflated at least by (1) the failure to deduct $73.1 million in pension and post retirement debt, and $7.3 million in "Other" debt (Excluded Debt totaling $80.4 million) which Buth, Karch, Parker, Fantini, and State Street knew about; and (2) a fraudulent control premium of approximately $83.6 million. With adjustments for just these two items, PDC's actual fair market value as of 31 December 2001, was negative $27.1 million resulting in a PDC stock price of negative $2.54. But had Buth, Karch, Parker, Fantini and State Street disclosed this negative value, it would

226

have revealed that the $10 PDC stock value at the 9 November 2001 ESOP closing had also been fraudulently inflated and that Appvion had no equity value. It would also have disclosed that Appvion's true, but undisclosed, financial condition did not justify and did not support the ESOP 9 November 2001 ESOP transaction and that Buth, Karch, State Street and Houlihan had breached their fiduciary duties to the ESOP.

> **ANSWER:** **Argent states that the allegations in Paragraph 384 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 384.**

> **e.** **Step 5: Buth, Karch and Fantini Fraudulently Represented that the $12.81 Million Valuation Validated the ESOP Purchase Price.**

385. In the same 12 March 2002 email, Buth fraudulently represented that the $12.81 valuation validated the ESOP purchase price:

> Doug Buth, chief executive officer, said that this jump in stock value is good news for employees who invested in PDC stock on Nov. 8 and confirms the transaction team's belief that the ESOP bought the company for an attractive price.

> **ANSWER:** **Argent states that the allegations in Paragraph 385 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 385.**

386.     Buth also explained that PDC's debt drove the valuations:

> "We got a good deal, we arranged a strong financing package and we were able to keep the cash at closing so we borrowed less than we expected," said Buth, "Those were foundations of the appraiser's valuation."

> Buth emphasized that future valuations primarily will reflect our repayment of debt, which depends on our earnings and cash flow, and any changes in valuation as we grow and transform our company.

**ANSWER:**     **Argent states that the allegations in Paragraph 386 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 386.**

387.     These representations constituted further steps taken by the ESOP Committee (Buth, Karch, Parker and Fantini) to cover their tracks because they knew that $12.81 was not the fair market value of the PDC stock.

**ANSWER:**     **Argent states that the allegations in Paragraph 387 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 387.**

**f.  Step 6: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented That PDC Stock Value Had Increased to $18.58 as of 30 June 2002.**

388.     In early August, State Street reported that the fair market value of PDC's stock was $18.58 as of 30 June 2002. After its valuation review, the ESOP Committee (Buth, Karch, Parker and Fantini) took the step of releasing this fraudulently inflated PDC stock price to the ESOP, through its Employee Owners.

> **ANSWER:    Argent states that the allegations in Paragraph 388 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 388.**

389.     Buth, Karch, Parker, Fantini and State Street again knew this valuation was fraudulent for the same reasons described in connection with the 31 December 2001 stock price release of $12.81. Had the 30 June 2002 valuation subtracted just the Excluded Debt and the fraudulent control premium, it would have likewise reported dramatic decline in the PDC stock price and would have alerted the Employee Owners that the 9 November 2001 and the 31 December 2001 valuations had, likewise, been fraudulently inflated.

> **ANSWER:    Argent states that the allegations in Paragraph 389 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 389.**

390.     By perpetuating the same errors that were contained in the earlier valuations, the $18.58 stock price fraudulently masked and concealed that both the 9 November 2001 stock price of $10 and the 31 December 2001 stock price of $12.81 had been fraudulently inflated and did not reflect fair market value.  It also masked and concealed the earlier fiduciary breaches.

**ANSWER:**     **Argent states that the allegations in Paragraph 390 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 390.**

**g.     Step 7: Buth, Karch, Parker and Fantini Fraudulently Represented That PDC Was Being Properly Valued.**

391.     On 13 August 2002, the ESOP Committee (Buth, Karch, Parker and Fantini) took the step of releasing an email to the ESOP, through its Employee Owners, with the subject "Calculating the stock value," which fraudulently explained how the 30 June 2002 stock price had been calculated. The email emphasized that State Street "conducts the valuation" while relying upon Willamette:

> Some employees have wondered how the June 30 stock value was calculated.
>
> Remember that ou**r trustee, State Street Global Advisors, conducts the valuation. SSGA relies upon Willamette Management Associates to perform an appraisal** of Appleton Papers and PDC to assist in determining the value of PDC stock. Willamette considers both income and market factors to determine stock value. **The stock value is the product of a rigorous and complicated process that ultimately requires professional judgment to complete**. As you know, the

performance of the U.S. economy and the stock markets have not helped most publicly traded companies.

**ANSWER:** **Argent states that the allegations in Paragraph 391 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 391.**

392. The email went on to explain the impact of interest-bearing debt and various non- cash charges on the valuation, while omitting, among other things, that the 30 June 2002 valuation failed to subtract the Excluded Debt and added a fraudulent control premium and had not been properly prepared.

**ANSWER:** **Argent states that the allegations in Paragraph 392 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 392.**

393. This representation by Buth, Karch, Parker and Fantini was an additional step in furtherance of their course of conduct of fraudulent concealment that the previous $10, $12.81 and $18.58 PDC stock valuations had also been fraudulently inflated and were not fair market value. It also masked and concealed earlier fiduciary breaches by assuring the ESOP, through its Employee Owners, that the previous stock prices resulted from a rigorous and reliable

process that arrived at the "value of PDC stock" and thus prevented suspicion and further investigation.

> **ANSWER:** **Argent states that the allegations in Paragraph 393 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 393.**

> **h.** **Steps 8 and 9: Buth and Parker Attested to and Parker Signed Two 10-Q's That Concealed That Each of the Previous Valuations Had Been Fraudulently Inflated.**

394. In 2002, Buth and Parker attested to and Parker signed two (2) 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the earlier valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 30 Jun 02 | 13 Aug 02 | $112.1 million | Buth, Parker |
| 29 Sep 02 | 12 Nov 02 | $133.8 million | Buth, Parker |

> **ANSWER:** **Argent states that the allegations in Paragraph 394 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 394.**

395. Because the stock value was inflated, each of these representations was fraudulent and in furtherance of Buth and Parker's course of conduct to fraudulently conceal

that each earlier PDC stock price had been fraudulently inflated and that Buth and Parker were breaching their fiduciary duties in connection with those valuations.

> **ANSWER:** **Argent states that the allegations in Paragraph 395 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 395.**

**6.** **In 2003, Buth, Karch, Fantini and State Street Collectively Took at Least 9 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

> **a.** **Step 1: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented that PDC's Fair Market Value was $21.92 as of 31 December 2002.**

396. In February 2003, State Street reported that the fair market value of PDC's stock was $21.92 as of 31 December 2002. After its review of the valuation, on 19 February 2003, the ESOP Committee (Buth, Karch, Parker and Fantini) released the 31 December 2002 PDC stock price to the ESOP, through its Employee Owners. The reported (but fraudulent) stock price purportedly increased 18 percent to $21.92:

> **Company Stock Value Rises 18 Percent**
>
> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of December 31, 2002 and **determined the per share value to be $21.92**. That means the **share value increased 18 percent for the period July 1, 2002, through December 31, 2002. The previous value of PDC stock was $18.58 per share.**
>
> As a result, $50,000 invested in PDC stock by an Appleton employee on the day we purchased the company is now worth

$109,600, an increase of nearly 120 percent since the November 2001 buyout of the company.

**SSGA relied upon Willamette Management Associates** to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock.

Willamette uses both a market approach and an income approach to value stock. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions. The income approach considers our past and projected earnings, cash flow and debt repayment.

**ANSWER:** **Argent states that the allegations in Paragraph 396 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 396.**

397. This email was an additional step in furtherance of Buth, Karch, Parker, Fantini and State Street's course of conduct to fraudulently conceal that each of the previously released PDC stock prices (9 November 2001, 31 December 2001 and 30 June 2002) and Redeemable Common Stock entries had been fraudulently inflated and did not reflect fair market value. It also masked and concealed earlier fiduciary breaches.

**ANSWER:** **Argent states that the allegations in Paragraph 397 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 397.**

398.     Had just the Excluded Debt ($78.8 million) and the fraudulent control premium ($75.1 million) been subtracted, the adjusted stock value would have been $100.2 million, or $8.64 a share as opposed to the fraudulently reported $21.92 per share, and it would have disclosed to the Employee Owners that each of the earlier PDC stock valuations had been fraudulently inflated. It would also have disclosed the earlier fiduciary breaches.

**ANSWER:**     **Argent states that the allegations in Paragraph 398 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 398.**

**b.     Steps 2 and 3: In March and September 2003, Buth, Karch, Fantini and Parker Fraudulently Represented a Progression of Stock Increases.**

399.     ESOP Committee members Buth, Karch, Fantini and Parker authorized the release of the March 2003 and September 2003 edition of the "Ownership Update" newsletter to the Employee Owners.  The March 2003 edition contained a graphic showing a progression of fraudulently inflated PDC stock prices:

**Figure 14: The Ownership Update, March 2003, PDC Stock Value Up 18 Percent**



Source: The Ownership Update, March 2003, p. 1

**ANSWER:** Argent states that the allegations in Paragraph 399 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 399.

400. The September 2003 edition contained a similar graphic:

**Figure 17: The Ownership Update, September 2003, PDC Stock History**



Source: The Ownership Update, September 2003, p.1.

**ANSWER:** **Argent states that the allegations in Paragraph 400 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 400.**

401.    These graphics further demonstrate the role each fraudulent stock price played in concealing that the previous stock prices had been fraudulently inflated and constituted a further representation that the series of stock prices had been properly calculated.

**ANSWER:** **Argent states that the allegations in Paragraph 401 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 401.**

402.    Buth, Karch, Fantini and Parker's release of these graphics to the Employee Owners, were additional steps in furtherance of their course of conduct of fraudulent concealment that each earlier stock price had likewise been fraudulently inflated. They also masked and concealed their earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 402 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 402.

          **c.**    **Step 4: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented That PDC's Fair Market Value was $22.42 as of 30 June 2003.**

403.    In August 2003, State Street reported to the ESOP Committee (Buth, Karch, Parker and Fantini) that the fair market value of PDC's stock was $22.42 as of 30 June 2003. After its review of the valuation with State Street and Willamette, on 13 August 2003, the ESOP Committee (Buth, Karch, Parker and Fantini) released the 30 June 2003 PDC stock price to the ESOP, through its Employee Owners.

**Company Stock Value Rises Two Percent**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of June 30, 2003 and determined the per share value to be $22.42. That means the share value increased 2.2 percent for the period January 1, 2003, through June 30, 2003. The previous value of PDC stock was $21.92 per share.

As a result, $50,000 invested in PDC stock by an Appleton employee on the day we purchased the company is now worth $112,100, an increase of nearly 124 percent since the November 2001 buyout.

**SSGA relied upon Willamette Management Associates** to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock.

Willamette uses both a market approach and an income approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded

companies and recent mergers and acquisitions. It appears **the new stock price reflects the performance of our core businesses offset by our debt repayment in the first half of the year and the improved valuations of comparable publicly traded companies**.

ANSWER:    Argent states that the allegations in Paragraph 403 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 403.

404.    This email and stock price release was an additional step in furtherance of Buth's, Karch's, Parker's, Fantini's and State Street's course of conduct to fraudulently conceal that each of the previously disclosed PDC stock prices had been fraudulently inflated and did not reflect fair market value.  It also masked and concealed their earlier fiduciary breaches.

ANSWER:    Argent states that the allegations in Paragraph 404 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 404.

> d.    <u>Step 5: State Street Authored a Newsletter to Employees that Fraudulently Represented That It Was Fully Investigating the Valuations.</u>

In a September 2003 "Ownership Update" newsletter distributed to employees and approved by the ESOP Committee (Buth, Karch, Parker, and Fantini), Driscoll described State Street's goal of providing "the highest quality fiduciary services" by being a "knowledgeable

and proactive fiduciary acting on behalf of the ESOP." Driscoll also described the valuation process, including meetings with members of the Board of Directors:

> We hired Willamette Management Associates, a well-known and respected firm, as our financial advisor **to assist us with our responsibilities for overseeing the plan's investment in PDC stock** and for determining the appropriate value for the stock.

> With the help of our financial advisors, **our oversight of PDC stock includes frequent monitoring of Appleton's financial condition and the stock's performance**. To that end, Willamette and State Street perform due diligence meetings with Appleton management during the year. **A State Street representative attends at least one Appleton board meeting each year and conducts meetings with the outside directors that serve on Appleton's board.**

> Throughout this oversight process, **State Street and Willamette build a greater understanding of Appleton's business operations, the basis for your company's financial projections, and the risks and likelihood of meeting those projections.**

> Twice per year, as of June 30 and December 31, State Street determines the value of PDC stock. In its role as financial advisor, **Willamette performs an extensive analysis that calculates Appleton's value based on approaches they believe are appropriate** for Appleton's business….

Source: The Ownership Update, September 2003; emphasis added.

> **ANSWER:** **Argent states that the allegations in this unnumbered paragraph are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

405. This was in furtherance of the course of conduct to fraudulently represent the stock values as being the result of a prudent process and accurately representing the fair market

value, even though State Street and the ESOP Committee (Buth, Karch, Parker, and Fantini) knew the stock prices were at all times inflated.

> **ANSWER:** **Argent states that the allegations in Paragraph 405 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 405.**

> e. **Steps 6, 7, 8, and 9: Buth, Karch and Parker Signed the 10-Ks, Buth and Parker Attested to and Parker Signed the 10-Qs that Fraudulently Concealed that Each of the Previous PDC Stock Prices had been Fraudulently Inflated.**

> f. **Buth, Karch and Parker Signed the 2002 10-K.**

406. On 8 March 2003, Buth, Karch, and Parker signed Appvion's 2002 10-K which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value of $22.42; and (2) listed the value of PDC's Redeemable Common Stock as $104.6 million, which incorporated and relied upon the year-end stock value. Because the stock value was inflated, each of these representations was fraudulent and in furtherance of Buth, Karch, and Parker's course of conduct to fraudulently conceal that each earlier PDC stock price had been fraudulently inflated and that Buth, Karch, and Parker were breaching their fiduciary duties in connection with those valuations.

> **ANSWER:** **Argent states that the allegations in Paragraph 406 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 406.

### g. Buth and Parker Attested to and Parker Signed Three 10-Qs in 2003.

407. In 2003, Buth and Parker attested to and Parker signed three (3) 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock | Attesting CEO and CFO Who |
|---|---|---|---|
| 30 Mar 03 | 12 May 03 | $144 million | Buth, Parker |
| 29 Jun 03 | 11 Aug 03 | $138.1 million | Buth, Parker |
| 28 Sep 03 | 7 Nov 03 | $160.5 million | Buth, Parker |

**ANSWER:** Argent states that the allegations in Paragraph 407 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 407.

408. Because the stock value was inflated, each of these representations was fraudulent and in furtherance of Buth and Parker's course of conduct to fraudulently conceal that each earlier PDC stock price had been fraudulently inflated and that Buth and Parker had breached their fiduciary duties in connection with those valuations.

**ANSWER:** Argent states that the allegations in Paragraph 408 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,

**Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 408.**

**7.    In 2004, Buth, Karch, Parker, Fantini and State Street Collectively Took at Least 9 Steps to Fraudulently Conceal Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated.**

**h.    Step 1: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented the PDC Stock Price Increased to $23.36 as of 30 December 2003.**

409.    In February 2004, State Street reported to the ESOP Committee that the share price was $23.36 per share as of 31 December 2003. The ESOP Committee (Buth, Karch, Parker and Fantini) reviewed and then released this fraudulently inflated PDC stock price:

> **Company Stock Value Rises Four Percent**
>
> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of December 31, 2003 and determined the per share value to be $23.36. That means the share value increased 4.2 percent for the period July 1, 2003, through December 31, 2003. The previous value of PDC stock was $22.42 per share.
>
> As a result, $50,000 invested in PDC stock by an Appleton employee on the day we purchased the company is now worth $116,800, an increase of over 133.6 percent since the November 2001 buyout.
>
> SSGA relied upon Willamette Management Associates to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock. Willamette uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

Source: Internal communication, "Company Stock Value Rises Four Percent," 24, Feb 04.

**ANSWER:    Argent states that the allegations in Paragraph 409 are not directed to it but instead to defendants who have been dismissed from the case, and**

therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 409.

410. Adjusting for just the Excluded Debt ($107.6 million) and the fraudulent control premium ($83.6 million), the adjusted fair market value would have been reported at $92.1 million, or $7.59 per share as opposed to the fraudulently reported $23.36 per share.

**ANSWER: Argent states that the allegations in Paragraph 410 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 410.**

411. The fraudulent representations was an additional step in furtherance as part of Buth, Karch, Parker, Fantini and State Street's course of conduct to fraudulently conceal that each of the previously reported PDC stock prices (and Redeemable Common Stock entries) had been fraudulently inflated and did not reflect fair market value. It also masked and concealed their earlier fiduciary breaches.

**ANSWER: Argent states that the allegations in Paragraph 411 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 411.**

**b.** **Step 2 and 3: Buth, Karch, Fantini and Parker Fraudulently Represented a Progression of Increasing Stock Prices.**

412.     Buth, Karch, Fantini and Parker authorized the release of the March 2004 edition of the Ownership Update newsletter. The March 2004 edition contained a graphic showing a progressive of fraudulently inflated PDC stock prices:

**Figure 15: The Ownership Update, March 2004, PDC Stock History**



Source:  The Ownership Update, March 2003, p. 1.

> **ANSWER:**   Argent states that the allegations in Paragraph 412 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 412.

413.    The November 2004 edition contained a similar graphic:

**Figure 16: The Ownership Update, November 2004, PDC Stock History**



Source:  The Ownership Update, November 2004, p. 2.

> **ANSWER:    Argent states that the allegations in Paragraph 413 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 413.**

414.    Again, these graphics fraudulently represented a continuing stream of increasing stock prices, thus fraudulently concealing that each earlier stock price had been fraudulently overstated.  It also masked and concealed earlier fiduciary breaches.

> **ANSWER:    Argent states that the allegations in Paragraph 414 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 414.**

c. **Step 4: Buth, Karch, Parker and Fantini Fraudulently Represented the Reason for Buth's Departure.**

415.    On 3 May 2004, Karch, on behalf of the ESOP Committee (Buth, Karch, Parker and Fantini), addressed the Employee Owners concerns regarding the departure of 49-year old CEO and Chairman of the Board, Doug Buth:

> Thank you for the feedback you have given to members of our executive team regarding the announcement of Doug Buth's retirement plans. Following are answers to the most commonly asked questions from employees.
>
> **Does Doug's announcement signal the company is not doing well?**
>
> No. Our first quarter results were strong across all our businesses. Doug is giving the board of directors' ample notice so they can find the best qualified individual to succeed him in an effective transition and so we can continue our growth efforts during that process. If Doug had given two weeks' notice, there might be reason for concern.
>
> **Why is Doug leaving at such a young age?**
>
> Young is a relative term, but after serving as CEO for nearly six years, Doug has the desire and resources to begin a new phase in his life.

**ANSWER:    Argent states that the allegations in Paragraph 415 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 415.**

416.    This announcement is fraudulent incomplete and fails to state additional or qualifying matter. (Restatement 2nd Torts, §529) It fails to disclose that Buth knew that the PDC

stock values (and Redeemable Common Stock entries) had been fraudulently misrepresented from the ESOP's initial 9 November 2001 transaction, that the acquisitions Buth orchestrated after that date were proving disastrous and were incapable of causing Appvion to grow out of its undisclosed financial hole and, that only by leaving at that date, could Buth benefit from his participation in the ongoing fraud and course of fraudulent concealment.

> **ANSWER:** **Argent states that the allegations in Paragraph 416 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 416.**

417.   This announcement constitutes an additional step in Buth, Karch, Parker and Fantini's course of fraudulent concealment.

> **ANSWER:** **Argent states that the allegations in Paragraph 417 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 417.**

> **d.** **Step 5: Buth, Karch, Parker, Fantini and State Street Fraudulently Misrepresented that PDC's Stock Price Had Risen to $26.09 as of 30 June 2004.**

418.   In July or August 2004, State Street reported to the ESOP Committee that the stock was valued at $26.09 per share as of 30 June 2004. After a review of the valuation, on 9 August 2004, the ESOP Committee (Buth, Karch, Parker and Fantini) released the stock price

to the ESOP, through its Employee Owners. The reported but fraudulent stock price purported to increase 11.7 percent to $26.09:

### Company Stock Value Up Over 11 Percent

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of June 30, 2004 and determined the per share value to be $26.09. That means the share value increased 11.7 percent for the period January 1, 2004, through June 30, 2004. The previous value of PDC stock was $23.36 per share.

As a result, $50,000 invested in PDC stock by an Appleton employee on the day we purchased the company is now worth $130,450, an increase of nearly 160.9 percent since the November 2001 buyout.

SSGA relied upon Willamette Management Associates to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock.

Willamette uses both a market approach and an income approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

**ANSWER:** **Argent states that the allegations in Paragraph 418 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 418.**

419.    Had just the Excluded Debt ($110.8 million) and the fraudulent control premium ($118.4 million) been subtracted, the adjusted stock value would have been $75.8 million, or $6.46 a share as opposed to the fraudulently reported $26.09 per share. And it would have disclosed that each of the earlier PDC stock valuations had been fraudulently inflated.

**ANSWER:** Argent states that the allegations in Paragraph 419 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 419.

420.     This release of the PDC stock price was an additional step in furtherance of Buth, Karch, Parker, Fantini and State Street's course of conduct to fraudulently conceal that each of the previously released PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated and did not reflect fair market value. It also masked and concealed earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 420 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 420.

e.     **Steps 6, 7, 8, and 9: Buth and Parker Attested to and Parker Signed Three 10-Qs and Buth, Karch and Parker Signed a 10-K that Fraudulently Concealed that Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

421.     On 24 March 2004, Buth, Parker, and Karch signed Appvion's 2003 10-K which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value OF $26.36; and (2) listed the value of PDC's

Redeemable Common Stock as $159.3 million, which incorporated and relied upon the year-end stock value.

> **ANSWER:** **Argent states that the allegations in Paragraph 421 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 421.**

422. In 2004, Buth and Parker also attested to and Parker signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 4 Apr 04 | 17 May 04 | $168.9 million | Buth, Parker |
| 4 July 04 | 16 Aug 04 | $163.2 million | Buth, Parker |
| 3 Oct 04 | 11 Nov 04 | $165.8 million | Buth, Parker |

> **ANSWER:** **Argent states that the allegations in Paragraph 422 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 422.**

423. Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Buth, Parker, and Karch's course of conduct to fraudulently conceal that each earlier PDC stock price and

Redeemable Common Stock entry had been fraudulently inflated and that Buth Parker, and Karch were breaching their fiduciary duties in connection with those disclosures.

> **ANSWER:** **Argent states that the allegations in Paragraph 423 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 423.**

**8.** **In 2005, Richards, Buth, Karch, Parker and State Street Collectively Took at Least 7 Steps to Fraudulently Conceal That Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

> **a.** **Step 1: Buth, Karch, Parker and State Street Fraudulently Represented that PDC's Stock Price had risen to $26.36 as of 30 December 2004.**

424. After reviewing the valuation, on 24 February 2005, the ESOP Committee (Buth, Karch and Parker) released the fraudulently inflated PDC stock price for 30 December 2004 of $26.36 per share:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of December 31, 2004 and determined the per share value to be $26.36. That means the share value increased 1 percent for the period of June 30, 2004 through December 31, 2004. The previous value of PDC stock was $26.09 per share. The percent increase for full-year 2004 was 12.8%.

> **ANSWER:** **Argent states that the allegations in Paragraph 424 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

**Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 424.**

425. As described in Paragraphs 156-158, Willamette's key valuation personnel responsible for the Appvion valuations, including Bob Socol and Scott Levine, had left Willamette and joined Stout and continued their work on the PDC stock valuations.

> **ANSWER:** **Argent states that the allegations in Paragraph 425 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Scott Levine worked on PDC stock valuations for Stout. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 425.**

426. The 31 December 2004 valuation of $26.36 is completely consistent with the prior Willamette-prepared stock valuations and, further demonstrates that Willamette had employed the same fraudulent appraisal methods as Stout.

> **ANSWER:** **Argent states that the allegations in Paragraph 426 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 426.**

427. This stock price release was in furtherance of Both, Karch, Parker and State Street's court of conduct to fraudulently conceal that each of the previously disclosed PDC

stock prices had been fraudulently inflated and did not reflect fair market value. It also masked and concealed their earlier fiduciary breaches.

> **ANSWER:** **Argent states that the allegations in Paragraph 427 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 427.**

### b. Step 2: Richards, Karch, Parker and State Street Fraudulently Represented PDC's Stock Price Had Risen to $27.77 as of 30 June 2005.

428. On 23 August 2005, the ESOP Committee (Richards, Karch, Parker, and Fantini) sent an email to the ESOP's Employee owners releasing the 30 June 2005 PDC fraudulent stock price of $27.77:

> **Company Stock Value Increases Five Percent**
>
> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2005 and determined the per share value to be $27.77. That means the share value increased 5.3 percent for the period January 1, 2005, through June 30, 2005. The previous value of PDC stock was $26.36 per share.
>
> As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $138,850, an increase of nearly 177.7 percent since the November 2001 buyout.
>
> SSGA relied upon Stout Risius Ross to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock.
>
> Stout Risius Ross uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The

market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

> **ANSWER:** **Argent states that the allegations in Paragraph 428 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 428 purports to cite to an August 23, 2005 email, refers to that email for its exclusive terms, and denies all allegations in Paragraph 428 inconsistent with its complete terms.**

429. The release of the fraudulently inflated 30 June 2005 valuation, was a step in furtherance of Richards, Karch, Parker, Fantini and State Street's course of conduct to fraudulently conceal that each of the prior PDC stock valuations and Redeemable Common Stock entries had likewise been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

> **ANSWER:** **Argent states that the allegations in Paragraph 429 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 429.**

430. It also constituted an independent and separate fraudulent misrepresentation by Richards, Karch, Parker, Fantini and State Street that the fair market value of PDC's stock at 30 June 2005 was $27.77.

256

**ANSWER:** Argent states that the allegations in Paragraph 430 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 430.

      c.     **Step 3: Richards, Karch, Fantini and Parker Fraudulently Represented a Pattern of Increasing PDC Stock Prices.**

431. Richards, Karch, Fantini and Parker authorized the release of the April 2005 edition of the Ownership Update newsletter that included a graphic showing a progression of fraudulently inflated PDC stock prices:

**Figure 17: The Ownership Update, April 2005, PDC Stock History**



Source: Source: The Ownership Update, April 2005, p. 2.

**ANSWER:** Argent states that the allegations in Paragraph 431 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 431 purports to cite to an April 2005 newsletter, refers to that newsletter for its exclusive terms, and denies all allegations in Paragraph 431 inconsistent with its complete terms.

257

432.     This graphic is an additional step in furtherance of their course of conduct to fraudulently conceal that each earlier valuation had been fraudulently inflated.

> **ANSWER:**    **Argent states that the allegations in Paragraph 432 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 432.**

> ### d.    Steps 4, 5, 6 and 7: In 2005, Buth, Richards, Karch and Parker Signed a 10-K and Buth, Richards and Parker Attested to and Parker Signed Three 10-Qs that Fraudulently Concealed that Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.

433.     On 31 March 2005, Buth, Karch, and Parker signed Appvion's 2004 10-K filed which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value of $26.36; and (2) listed the value of PDC's Redeemable Common Stock as $159.3 million for 2004 and $158.3 million for 2003.

> **ANSWER:**    **Argent states that the allegations in Paragraph 433 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 433 purports to cite to a 2004 Form 10-K, refers to that document for its exclusive terms, and denies all allegations in Paragraph 433 inconsistent with its complete terms.**

434.    In 2005, Richards and Parker attested to and Parker signed 10-Qs for the quarters ending 3 April 2005, 3 July 2005 and 2 October 2005. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 3 Apr 05 | 18 May 05 | $162.5 million | Richards, Parker |
| 3 Jul 05 | 15 Aug 05 | $169.6 million | Richards, Parker |
| 2 Oct 05 | 14 Nov 05 | $175.3 million | Richards, Parker |

**ANSWER:    Argent states that the allegations in Paragraph 434 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 434 purports to cite to 2005 Form 10-Qs, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 434 inconsistent with their complete terms.**

435.    Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards, Parker, and Karch's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had been fraudulently inflated and that Richards, Parker, and Karch were breaching their fiduciary duties in connection with those valuations.

**ANSWER:    Argent states that the allegations in Paragraph 435 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 435 purports to cite to a 2004 Form 10-K and 2005 Form 10-Qs, refers to those documents for their exclusive terms,**

and denies all allegations in Paragraph 435 inconsistent with their complete terms.

9. **In 2006, Richards, Karch, Parker and State Street Collectively Took at Least 9 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated.**

   a. **Step 1: Richards, Karch, Parker and State Street Fraudulently Represented that the ESOP Trustee Could Replace Appvion's Board.**

436.    In January 2006, with approval and authorization of the ESOP Committee (Richards, Karch, Parker and State Street), Appvion released an edition of the ESOP Newsletter entitled the Ownership Update. The ESOP Committee posited the following question:

> Enron executives were able to sell their stock and pay themselves large bonuses even when the company was failing, and the employees were not able to sell their stock. Can that happen to us?

**ANSWER:    Argent states that the allegations in Paragraph 436 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 436 purports to cite to a January 2006 newsletter, refers to that document for its exclusive terms, and denies all allegations in Paragraph 436 inconsistent with its complete terms.**

437.    The ESOP Committee responded as follows:

> No. Our executives are able to own company stock only through the ESOP, so they are not able to sell it any sooner or at a different price than any other participant.
>
> Our company's board of directors has a legal obligation to company shareholders (in our case, the ESOP is the sole

shareholder) to prevent the kind of fraud that occurred at Enron. In the event the board of directors does not act, our trustee, State Street Global Advisors, in its capacity as the sole shareholder, could vote to replace the entire board with directors who would act to prevent fraud. At Enron, the ESOP was a minority shareholder and did not control the board.

**ANSWER:** **Argent states that the allegations in Paragraph 437 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 437 purports to cite to a January 2006 newsletter, refers to that document for its exclusive terms, and denies all allegations in Paragraph 437 inconsistent with its complete terms.**

438. These representations were fraudulent for the same reason discussed above (State Street could not vote to replace the board) and constituted an additional step to conceal that each of the earlier PDC stock valuations had been fraudulently inflated by continuing to advise the ESOP, through the Employee Owners, that Appvion's executives, directors and ESOP Trustee (State Street) were protecting their interests.

**ANSWER:** **Argent states that the allegations in Paragraph 438 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 438.**

439. After review of the valuation, on 3 March 2006, the ESOP Committee (Richards, Karch and Parker) released the PDC stock price for 31 December 2005, of $28.56 per share:

**Company Stock Value Increased Nearly 3 Percent for Second Half 2005**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2005 and determined the per share value to be $28.65. That means the share value increased 2.8 percent for the period July 1, 2005, through December 31, 2005. The previous value of PDC stock was $27.77 per share. The percent increase for full-year 2005 was 8.3 percent

As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $142,800, an increase of nearly 185.6 percent since the November 2001 buyout.

SSGA relied upon Stout Risius Ross to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock. Stout uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions. We will provide more information about the stock valuation process later this year.

**ANSWER:** **Argent states that the allegations in Paragraph 439 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 439.**

440.     This stock price was fraudulently inflated because, among other defects, it failed to deduct the Excluded Debt totaling $118.4 million and included a fraudulent control premium of $115.9 million. Making just these adjustments, PDC fair market value equaled $106.6 million and its adjusted stock price was $8.93, as opposed to the $28.56 that was reported.

> **ANSWER:     Argent states that the allegations in Paragraph 440 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 440.**

441.     The release of the $28.56 stock price was independently fraudulent and it also constituted an additional step to fraudulently conceal that each preceding PDC stock valuation (and Redeemable Common Stock entry) had been fraudulently inflated. Because the 31 December 2005 valuation was consistent with all earlier valuations, it prevented the ESOP, through the Employee Owners, from investigating the earlier valuations and understanding that they had been fraudulently inflated. The responsible defendants include Richards, Karch, Parker and State Street.

> **ANSWER:     Argent states that the allegations in Paragraph 441 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 441.**

> **c.** **Step 3: Richards, Karch and Parker Fraudulently Represented a Pattern of Increasing PDC Stock Prices.**

442.     Richards, Karch, and Parker authorized the release of the April 2006 edition of the Ownership Update newsletter that contained a graphic showing a progressive of fraudulently inflated PDC stock prices:

**Figure 21: The Ownership Update, April 2006 PDC Stock Performance**



Source: The Ownership Update, April 2006, p. 2.

> **ANSWER:** **Argent states that the allegations in Paragraph 442 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 442 purports to cite to an April 2006 newsletter, refers to that newsletter for its exclusive terms, and denies all allegations in Paragraph 442 inconsistent with its complete terms.**

443.     By releasing this graphic, Richards, Karch and Parker fraudulently reaffirmed each earlier PDC stock valuation and thus constituted an additional step of fraudulent concealment.

**ANSWER:** Argent states that the allegations in Paragraph 443 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 443.

### d. Step 4: Richards and Karch Fraudulently Represented State Street and Stout's Careful Analysis

444. The May 2006 Ownership Update newsletter was sent to the ESOP, through its Employee Owners, and was prepared under the direction and authorization of the ESOP Committee (Richards, Karch), it emphasized State Street and Stout's careful analysis of the valuations:

> Issuing an opinion
>
> To determine the value to be recommended to State Street, Stout Risius Ross weighs the values from all the factors they believe are appropriate and arrives at the final value. Stout Risius Ross makes a presentation of its analysis to State Street's fiduciary committee, which is comprised of senior investment and other professionals at State Street. The committee reviews findings from Stout Risius Ross and then determines the current price of PDC stock. Stout Risius Ross then issues an opinion to State Street confirming the fair market value of PDC stock.

**ANSWER:** Argent states that the allegations in Paragraph 444 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 444.

445.    In the same newsletter, acknowledged the obvious dollar for dollar impact that debt has on PDC's fair market value:

> Debt reduction adds value
>
> We reduced the book value of our net debt by $15 million during the valuation period. The $15 million reduction in debt results in a $15 million increase in equity value due to positive cash flow, which was used to repay debt.

**ANSWER:    Argent states that the allegations in Paragraph 445 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 445.**

446.    The release of this Ownership Update to the ESOP, through its Employee Owners, constituted an additional step to fraudulently conceal that each previous PDC stock valuation and Redeemable Common Stock entry had been fraudulently inflated, by causing the ESOP, through its Employee Owners to believe that each valuation had been carefully and accurately prepared, that it reflected fair market value and that Appvion's debt was being properly deducted to arrive at fair market value.

**ANSWER:    Argent states that the allegations in Paragraph 446 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

**Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 446.**

e. **Step 5: Richards, Karch, and State Street Fraudulently Represented that PDC's Stock Price Had Risen to $31.27 as of 30 June 2006.**

447. On 8 August 2006, the ESOP Committee (Richards, Karch) reviewed the valuation and released the fraudulently inflated PDC stock price for 30 June 2006 of $31.27 per share:

**Company Stock Value Increases Over 9% for First Half 2006**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2006 and determined the per share value to be $31.27. That means the share value increased 9.5% for the period January 1, 2006, through June 30, 2006. The previous value of PDC stock was $28.56 per share.

As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $156,500, an increase of 213% since November.

SSGA relies upon Stout Risius Ross to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock. Stout Risius Ross uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions. We will provide more information about this stock valuation as it becomes available to us.

**ANSWER:** **Argent states that the allegations in Paragraph 447 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

**Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 447.**

448. This release constituted an additional step of fraudulent concealment.

**ANSWER:** **Argent states that the allegations in Paragraph 448 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 448.**

f. **Steps 6, 7, 8 and 9: In 2006, Richards, Karch and Parker Signed a 10-K and Richards and Ferree Attested to and Ferree Signed Three 10-Qs that Fraudulently Concealed that Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

449. On 17 March 2006, Richards, Parker, and Karch signed Appvion's 2005 10-K which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value of $28.56; and (2) listed the value of PDC's Redeemable Common Stock as $185.3 million for 2005 and $159.3 million for 2004.

**ANSWER:** **Argent states that the allegations in Paragraph 449 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 449 purports to cite to a 2005 10-K, refers to**

that document for its exclusive terms, and denies all allegations in

Paragraph 449 inconsistent with its complete terms.

450.  In 2006, Richards (acting as CEO and as interim CFO) signed and attested to 10-Qs for the quarters ending 2 April 2006, 2 July 2006 and Richards and Ferree attested to and Ferree signed the 1 October 2006 10-Q. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 2 Apr 06 | 12 May 06 | $188.3 million | Richards (CEO and CFO) |
| 2 Jul 06 | 14 Aug 06 | $183.4 million | Richards (CEO and CFO) |
| 1 Oct 06 | 13 Nov 06 | $189.3 million | Richards, Ferree |

**ANSWER:** **Argent states that the allegations in Paragraph 450 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 450 purports to cite to 2006 10-Qs, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 450 inconsistent with their complete terms.**

451.  Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards, Parker, Karch, and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated and that Richards, Parker, Karch, and Ferree were breaching their fiduciary duties in connection with those valuations.

**ANSWER:** **Argent states that the allegations in Paragraph 451 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

**Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 451.**

> **10.** **In 2007, Richards, Ferree, Tyczkowski and State Street Took at least 10 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**
>
> > **a.** **Step 1: Richards, Ferree, Tyczkowski and State Street Fraudulently Represented that PDC's Stock Price Had Risen 17.7 percent in 2006.**

452.     After reviewing the valuation, on 2 January 2007, the ESOP Committee (Richards, Ferree and Tyczkowski) emailed the ESOP, fraudulently representing to its Employee Owners, that the fair market value of the PDC stock rose 17.7 percent in value in 2006, outperforming the stock market indices:

> Last Friday, the blue-chip Dow Jones industrial average closed at 12,463.15 – up 16.3 percent for 2006.
>
> The Standard & Poor's 500 Index ended at 1,418.30 – up 13.6 percent for 2006.
>
> The Nasdaq Composite Index finished at 2,415.29 – up 9.5 percent for 2006. PDC stock rose 17.7 percent for 2006.

**ANSWER:     Argent states that the allegations in Paragraph 452 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 452.**

453.     This release constituted an additional step of fraudulent concealment.

**ANSWER:** Argent states that the allegations in Paragraph 453 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 453.

b.   **Step 2: Richards, Ferree, Tyczkowski and State Street Fraudulently Represented that PDC's Stock Price Had Risen to $33.61 as of 31 December 2006.**

454.    After review of the valuation, on 2 January 2007, the ESOP Committee (Richards, Ferree and Tyczkowski) released the 31 December 2006 PDC stock price of $33.62 to the ESOP, through its Employee Owners:

> Company Stock Value Increases 7.5 Percent for Second Half 2006
>
> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2006 and determined the per share value to be $33.62. The value of PDC stock on June 30, 2006, was $31.27 per share. That means the share value increased 7.5 percent for the period July 1, 2006, through December 31, 2006.

**ANSWER:** Argent states that the allegations in Paragraph 454 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 454.

455.     Had the stock price been adjusted by subtracting just the Excluded Debt ($108.1 million) and eliminating the fraudulent control premium ($117.5 million), the reported PDC stock price would have been $14.22 not the $33.62 that was reported.

**ANSWER:     Argent states that the allegations in Paragraph 455 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 455.**

456.     The release of the $33.62 PDC stock price constituted an additional step in furtherance of Richards', Ferree's and Tyczkowski's course of conduct to mask and conceal that each of the prior PDC stock valuations had been fraudulently overstated and to mask and conceal their earlier fiduciary breaches.

**ANSWER:     Argent states that the allegations in Paragraph 456 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 456.**

c. **Step 3: Richards, Ferree, Tyczkowski and State Street Fraudulently Represented that PDC's Stock Price was $32.89 per share.**

457. After review of the valuation, on 10 July 2007, the ESOP Committee (Richards, Ferree and Tyczkowski) emailed the ESOP, through its Employee Owners, reporting the fraudulently inflated 3 June 2007 stock price of $32.89:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2007 and determined the per share value to be $32.89. **The value of PDC stock on December 31, 2006, was $33.62 per share**. That means the share value decreased 2.2 percent for the period January 1 through June 30, 2007.
>
> As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $164,500, an increase of approximately 229 percent since the November 2001 buyout. During the same period the Dow Jones Industrial Average and the NASDAQ each rose approximately 39 percent, while S&P 500 was up approximately 33 percent.
>
> **SSGA relied upon Stout Risius Ross, an independent valuation firm, to conduct an appraisal** of Appleton and PDC to assist in determining the value of PDC stock. Stout Risius Ross uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.
>
> **Representatives from Stout Risius Ross indicated that a general softening in market conditions especially for our thermal and performance packaging business negatively affected our company's performance** and caused our share price to fall from the previous valuation. However, Stout Risius Ross also stated that they see no major changes in the fundamentals of our company.

**ANSWER:** **Argent states that the allegations in Paragraph 457 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

**Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 457.**

458.     Richards, Ferree, Tyczkowski and State Street knew this valuation was fraudulent and misleadingly described the valuation process. Had the stock price been adjusted by subtracting just the Excluded Debt and by eliminating the fraudulent control premium, the reported PDC stock price would have been vastly lower.

> **ANSWER:     Argent states that the allegations in Paragraph 458 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 458.**

459.     The release of this fraudulent valuation by Richards, Ferree, Tyczkowski and State Street constituted an additional step in furtherance of their course of conduct to fraudulently conceal that each previous PDC stock valuation and Redeemable Common Stock entries had also been fraudulently inflated and concealed their earlier fiduciary breaches.

> **ANSWER:     Argent states that the allegations in Paragraph 459 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 459.**

460.    On 9 November 2007, on behalf of the ESOP Committee (Richards, Ferree and Tyczkowski) Richards emailed the ESOP, through its Employee Owners, marking Appvion's anniversary and highlighting the large gains in stock value:

> Today marks the sixth anniversary of our company becoming employee owned. During that time we have increased our equity stake in the company by $263 million and the value of PDC stock has grown by over 200%. We have made strong progress during our six years as employee owners….

**ANSWER:    Argent states that the allegations in Paragraph 460 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 460.**

461.    This representation was fraudulent and constituted an additional step by Richards, Ferree and Tyczkowski to fraudulently conceal.

**ANSWER:    Argent states that the allegations in Paragraph 461 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 461.**

     **d.**    <u>Steps 4, 5, 6 and 7: In 2007, Richards and Ferree Attested to</u>
          <u>and Ferree Signed Three 10-Qs and a 10-K That</u>
          <u>Fraudulently Concealed That Each of the Previous PDC</u>
          <u>Stock Valuations Had Been Fraudulently Inflated.</u>

462. On 6 March 2007, Richards and Ferree signed Appvion's 2006 10-K which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value of $33.62; and (2) listed the value of PDC's Redeemable Common Stock as $190.5 million for 2006 and $185.3 million for 2005.

> **ANSWER:** **Argent states that the allegations in Paragraph 462 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 462 purports to cite to a 2006 10-K, refers to that document for its exclusive terms, and denies all allegations in Paragraph 462 inconsistent with its complete terms.**

463. In 2007, Richards and Ferree attested to and Ferree signed 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 2 Apr 07 | 14 May 07 | $194.1 million | Richards, Ferree |
| 1 Jul 07 | 15 Aug 07 | $184.4 million | Richards, Ferree |
| 30 Sep 07 | 12 Nov 07 | $172.2 million | Richards, Ferree |

> **ANSWER:** **Argent states that the allegations in Paragraph 463 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

> **Argent admits that Paragraph 463 purports to cite to various 2007 10-Qs, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 463 inconsistent with their complete terms.**

464.     Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had likewise been fraudulently inflated and that Richards and Ferree were breaching their fiduciary duties in connection with those valuations.

> **ANSWER:     Argent states that the allegations in Paragraph 464 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 464.**

> **e.     Step 8:     Appvion Published a Book Praising the 2001 Transaction.**

465.     In 2007, Appvion published a book titled "Appleton: Applying Technology for Performance." The book quotes Karch as saying about the prospectus; "we had our legal and financial advisors there to make sure everything we disclosed was appropriate and in compliance." The book also quoted Driscoll as stating that State Street was "appointed the fiduciary to make sure the transaction was fair from a financial perspective to the ESOP. And

it was. Employees would not be paying more than the fair market value to buy Appleton Papers."

> **ANSWER:** **Argent states that the allegations in Paragraph 465 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 465.**

466.    This publication served to reaffirm the purchase price for the 2001 Transaction and fraudulently concealed that State Street, Karch, Buth, Parker, and Fantini had breached their fiduciary duties in connection with that transaction and each subsequent valuation.

> **ANSWER:** **Argent states that the allegations in Paragraph 466 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 466.**

> f.    **Step 9: Richards and Willetts went on a Road Show Presenting the Valuation to Employees.**

467.    On 6 December 2007, Richards emailed the ESOP's Employee Owners, announcing an upcoming employee road show to be held during the first quarter of 2008 to, among other things, answer questions about "the valuation process and the stock price:"

278

**Employee road shows to roll out strategic initiatives**

During the first quarter of next year, Walter Schonfeld, Tom Ferree and Kent Willetts will join me in conducting employee road shows to share key strategic initiatives our board approved at its November meeting. **We also plan to discuss our ESOP, the valuation process and our stock value**. I've asked **Steve Carter, a member of the board of directors and chair of our audit committee, Syd Marzeotti from State Street** Global Advisors – our ESOP trustee, **and Scott Levine from Stout** Risius Ross, the company that conducts the semiannual valuations of our company, **to accompany us to answer your questions**. We look forward to seeing you at those meetings.

ANSWER:    **Argent states that the allegations in Paragraph 467 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 467.**

468.    This planned road show presentation was also referenced in at least a 9 November 2007 road show.  The road show itself took place in first quarter 2008 and would have discussed the valuation as of 31 December 2007 – which, as discussed above in Paragraphs 209-236, deducted BemroseBooth's pension liability from Appvion's value.

ANSWER:    **Argent states that the allegations in Paragraph 468 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 468.**

469.     This email demonstrates Ferree, Richards, Willetts, and Carter's in-depth knowledge of the valuation process and the PDC stock value.

**ANSWER:     Argent states that the allegations in Paragraph 469 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 469.**

**11.     In 2008, Richards, Ferree, Tyczkowski and State Street Collectively Took at Least 8 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

**a.     Step 1: Richards, Ferree, Tyczkowski and State Street Fraudulently Represented PDC's Stock Price to be $33.41 per share.**

470.     On 10 January 2008, the ESOP Committee (Richards, Ferree and Tyczkowski) met with State Street (Marzeotti and Williams) and Stout (Levine). Together, they reviewed the 31 December 2007 PDC stock valuation. In addition, Stout's Levine described the valuation process. Of critical importance is the fact that the ESOP Committee had studied the valuation at such depth that they requested highly detailed adjustments. This level of review demonstrates the ESOP Committee's level of valuation review:

> The first item on the agenda was to review the December 31, 2007 stock valuation work as prepared by Stout Risius Ross and approved by State Street Global Advisors. Mr. Levine described the process he used to arrive at the December 31, 2007 valuation.

Following a general discussion of valuation, a few edits were requested to be made to SSR's presentation to State Street Bank and Trust Company. Ms. Tyczkowski requested that SSR remove references to the insurance litigation settlement as being imminent on page 16, item 3, and Schedule M of the presentation. Mr. Ferree also requested that Glatfelter and Nekoosa be added to the list of carbonless competitors on pages 7 and 25 of the presentation document.

The ESOP Committee was comfortable with the valuation work and there being no further question or discussion, Messrs. Levine and Williams and Ms. Marzeotti departed the meeting.

Source: Appleton Papers Inc, ESOP Committee meeting minutes, 10 Jan 08.

**ANSWER:** **Argent states that the allegations in Paragraph 470 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 470.**

471. After its review, on 11 January 2008, the ESOP Committee (Richards, Ferree and Tyczkowski) emailed the ESOP, through its Employee Owners, releasing the 31 December 2007 PDC stock price of $33.41 per share:

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2007. SSGA relied upon Stout Risius Ross (SRR), an independent valuation firm, to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock. Our ESOP Administrative Committee has reviewed and approved communication of the new share price.

SSGA has determined the new per share value to be $33.41. The value of PDC stock on June 30, 2007, was $32.89 per share. That means the share value increased 1.6 percent for the period June 30, 2007 through December 31, 2007.

**ANSWER:** Argent states that the allegations in Paragraph 471 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 471.

472. This release constituted an additional step in Richards, Ferree, Tyczkowski and State Street's course of conduct to fraudulently conceal.

**ANSWER:** Argent states that the allegations in Paragraph 472 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 472.

**b.** **Step 2: Richards, Ferree and Tyczkowski Fraudulently Disclosed the Impact of BemroseBooth's Pension Liability While Concealing Appvion's Retirement Debt.**

473. In the same email, the ESOP Committee (Richards, Ferree and Tyczkowski) disclosed that BemroseBooth's performance negatively affected the PDC stock price, blaming, in large part, its "increased pension liabilities:"

> Along with the rest of the industry, our performance packaging business struggled throughout the year. Those results were reflected in a negative impact on share value. The year was even tougher for BemroseBooth and its results in the second half of 2007 along with increased pension liabilities for the company produced a significant decrease in share value.

Source: Internal communication, "Company Stock Value Increases 1.6 Percent for Second Half 2007," 11 Jan 08.

**ANSWER:** Argent states that the allegations in Paragraph 473 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 473.

474.    The reported stock price of $33.41 per share was fraudulent because, among other reasons, it failed to deduct the Excluded Debt ($69.8 million) and it included the fraudulent control premium ($120.4 million). Had just these amounts been deducted, the PDC reported fair market value would have been $177.8 million and the PDC share price would have been $16.14, not the $33.41 that had been reported.

**ANSWER:** Argent states that the allegations in Paragraph 474 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 474.

475.    This fraudulent PDC stock valuation was an additional step in furtherance of the course of conduct of Richards, Ferree, Tyczkowski and State Street to fraudulently conceal that each of the previous valuations and Redeemable Common Stock entries had been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 475 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,

**Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 475.**

476.     This email also confirms Richards, Ferree, Tyczkowski and State Street's actual knowledge of and agreement with the undisputed principal that an increase in retirement-related debt causes an equal decrease in fair market value.

    **ANSWER:   Argent states that the allegations in Paragraph 476 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 476.**

477.     Yet with this knowledge, none of these defendants required that Appvion's retirement related debt totaling $64.3 million be subtracted from the PDC stock's fair market value for the 31 December 2007 valuation. Further, they did not require the restatement of earlier PDC stock valuations or 10-K or 10-Q disclosures to reduce the PDC stock price (and Redeemable Common Stock entry) as a result of the retirement related debt reported on Appvion's balance sheets for earlier periods.

    **ANSWER:   Argent states that the allegations in Paragraph 477 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 477.**

478.     This disclosure that BemroseBooth's increase in pension debt resulted in a decline in the PDC stock value, reasonably caused the ESOP, through its Employee Owners, to conclude that the PDC stock valuations had likewise appropriately reduced PDC's fair market value by the amount of Appvion's pension and post-retirement debt. Thus, it constituted an additional step of fraudulent concealment by Richards, Ferree and Tyczkowski, that each of the earlier PDC stock price and Redeemable Common Stock entries had been fraudulently overstated. It also masked and concealed earlier fiduciary breaches.

> **ANSWER:**    **Argent states that the allegations in Paragraph 478 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 478.**

### c.    Step 3:  Richards, Ferree, Willetts and Arent Fraudulently Represented the Fair Market Value of PDC's Stock to be $26.64 per share.

479.     On 7 July 2008, the ESOP Committee (Richards, Ferree, Willetts and Arent) met with State Street (Marzeotti) and Stout (Levine) to review the 30 June 2008 PDC stock valuation:

> The Committee reviewed the June 30, 2008 stock valuation prepared by Stout Risius Ross and approved by State Street Global Advisors. Mr. Levin described the process used to arrive at the June 30, 2008 valuation. Following a general discussion, the ESOP Committee accepted the valuation and Mr. Levine and Ms. Marzeotti departed the meeting.
>
> The share price announcement was discussed and a few edits were suggested…

Source:  Appleton Papers Inc. ESOP Administrative Committee minutes, 7 Jul 08.

**ANSWER:** Argent states that the allegations in Paragraph 479 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 479.

480. On 7 July 2008, the ESOP Committee (Richards, Ferree, Willetts and Arent) emailed the ESOP, through its Employee Owners, and released the fraudulently inflated 30 June 2008 PDC stock price of $26.64 per share:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2008. SSGA has determined the new per share value to be $26.64. The value of PDC stock on December 31, 2007 was $33.41 per share. That means the share value decreased 20.3% for the period December 31, 2007 through June 30, 2008.
>
> The value of PDC stock has increased approximately 166% since the November 2001 buyout.
>
> During the same period, the Dow Jones industrial average rose approximately 18%, the NASDAQ was up 25% and S&P 500 rose approximately 14%. The S&P Index for paper companies declined 17%.

**ANSWER:** Argent states that the allegations in Paragraph 480 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 480.

481.    The ESOP Committee (Richards, Ferree, Willetts and Arent) placed primary blame for the 20.3% decline in the PDC stock price on BemroseBooth. One of the two reasons for BemroseBooth's decline in fair market value was its "big pension liability with future funding requirements:"

### Analysis

There are two reasons for the drop in value of PDC stock. The primary reason has to do with the performance and market value of BemroseBooth.

### Significant value and pension concerns for BemroseBooth

BemroseBooth has struggled with difficult economic conditions and tough markets for its products. The company also has a big pension liability with future funding requirements.

Those two factors have hampered Appleton's efforts to sell BemroseBooth and have resulted in a dramatic write down of its value. Based on a professionally managed auction process for the sale of BemroseBooth, the current market value is much less than what was originally paid. That loss of value had a significant negative impact on our stock value.

Source: Internal communication, "Company Stock Value Decreases 20% for First Half 2008," 7 Jul 08.

**ANSWER:    Argent states that the allegations in Paragraph 481 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 481.**

482.    Again, this disclosure conclusively shows actual knowledge and agreement on the part of Richards, Ferree, Willetts, Arent and State Street of the obvious proposition that retirement related debt causes a dollar for dollar decline in fair market value.

**ANSWER:** Argent states that the allegations in Paragraph 482 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 482.

483.     Yet from 31 December 2007 through 31 December 2008, Appvion's separate retirement debt rose from $64.3 million to $154.9 million (an increase of $90.6 million) and yet not a single dollar of the $154.9 million in post-retirement and pension debt was subtracted from PDC's stock's fair market value for that (or any other) year.

**ANSWER:** Argent states that the allegations in Paragraph 483 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 483.

484.     While the ESOP Committee (Richards, Ferree, Willetts and Arent) and State Street were willing to blame BemroseBooth's decline in value on its pension liability (in order to divert inquiry from Appvion's disastrous $64 million purchase just five years earlier) they intentionally refused to disclose their own failure to reduce PDC's fair market value resulting from its much larger retirement debt. Because to do so, together with the required reduction for "Other Material Liabilities" debt and the fraudulent control premium, would have required them to report a stock price of negative $4.06.

**ANSWER:** Argent states that the allegations in Paragraph 484 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 484.

485. And this disclosure would have alerted the ESOP, through its Employee Owners, that each prior PDC stock valuation back to 9 November 2001, had, likewise, been fraudulently inflated and that Appvion's financial condition, from the ESOP's formation, could not support the ESOP. It would also have disclosed earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 485 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 485.

486. Therefore, the release of the fraudulently inflated 30 June 2008 PDC stock price of $26.64 was a critical step in furtherance of Richards', Ferree's, Arent's and State Street's course of conduct to fraudulently conceal that each prior PDC stock price had been fraudulently inflated.

**ANSWER:** Argent states that the allegations in Paragraph 486 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,

Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 486.

### d. Step 4: Richards Fraudulently Represented that the Board was Monitoring PDC's Valuations and State Street.

487.    On 15 August 2008, Richards issued a "Richards Report" communication discussing the August 2008 Board meeting. The communication states that State Street's Marzeotti attended the meeting, which indicates the Board reviewed the valuation as of 30 June 2008. In addition, Ferree and Marzeotti discussed Appvion's financial projections and results with the Board and Ferree "reviewed with the Board the completed sale of BemroseBooth and matters related to that transaction." *See* ¶ 227. The communication also stated that the "audit committee reviewed and approved the quarterly 10-Q filing and earnings release and discussed the oversight and control measures we have in place for the company" and stressed the Board's efforts to understand Appvion's business and work on "best practices for corporate governance, audit and compensation functions." This communication as a whole indicated that the Board was monitoring State Street and the ESOP Committee as well as Appvion's financial performance, which included the stock value.

ANSWER:    Argent states that the allegations in Paragraph 487 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 487.

488.    The Board (Richards, Carter, Murphy, Pace, Reardon, Seifert, and Scherbel) knew that the valuations were improperly failing to deduct the Excluded Debt and they knew that the valuations should be deducting the Excluded Debt – or at a minimum the retirement-related debt as discussed in Paragraphs 197-246. This communication therefore fraudulently concealed the Board's failure to monitor State Street and the ESOP Committee (Richards, Ferree, Arent, and Willetts) and ensure that the valuations represented the fair market value of PDC's stock.

> **ANSWER:**    **Argent states that the allegations in Paragraph 488 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 488.**

> e.    **Steps 5, 6, 7 and 8: In 2008, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K That Fraudulently Concealed That Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

489.    On 11 March 2008, Appvion filed its 2007 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel). The audited financial statements in the 10-K contained (1) a representation of PDC's year-end stock value of $33.41; and (2) listed the value of PDC's Redeemable Common Stock as $69.8 million.

> **ANSWER:**    **Argent states that the allegations in Paragraph 489 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 489 purports to cite to a 2007 10-K, refers to**

**that document for its exclusive terms, and denies all allegations in Paragraph 489 inconsistent with its complete terms.**

490.    This 10-K also discusses the fact that Appvion was seeking a buyer for BemroseBooth and that it had classified BemroseBooth as discontinued operations, which required separating BemroseBooth's pension liability from Appvion's larger pension liability in its financial statements. Each of the signers of this 10-K had reviewed the 31 December 2007 valuation which deducted BemroseBooth's pension liability from Appvion's overall enterprise value but not Appvion's pension liability. They therefore knew that the valuations should be deducting retirement debt but were not. This 10-K and each subsequent 10-K affirming the valuation therefore concealed the fact that the valuations were improperly excluding Appvion's retirement debt.

> **ANSWER:    Argent states that the allegations in Paragraph 490 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 490 purports to cite to a 2007 10-K, refers to that document for its exclusive terms, and denies all allegations in Paragraph 490 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 490.**

491.    In 2008, Richards and Ferree attested to and Ferree signed 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated

entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 30 Mar 08 | 12 May 08 | $185.1 million | Richards, Ferree |
| 29 Jun 08 | 11 Aug 08 | $170.1 million | Richards, Ferree |
| 28 Sep 08 | 10 Nov 08 | $169.3 million | Richards, Ferree |

> **ANSWER:** **Argent states that the allegations in Paragraph 491 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 491 purports to cite to 2008 10-Qs, refers to those documents for their exclusive terms, and denies all allegations in Paragraph 491 inconsistent with their complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 491.**

492.    These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter, Scherbel, and Pace).

> **ANSWER:** **Argent states that the allegations in Paragraph 492 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 492.**

493.    Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted steps in furtherance of Richards and Ferree's course of

conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated the breaches of fiduciary duties in connection with those valuations.

> **ANSWER:** **Argent states that the allegations in Paragraph 493 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 493.**

**12. <u>In 2009, Richards, and Ferree and State Street took at Least 6 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations has been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.</u>**

> **a. <u>Step 1: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented PDC's Stock Price to be $21.43 per Share as of 31 December 2008.</u>**

494. On 8 January 2009, the ESOP Committee (Richards, Ferree, Willetts and Arent) met for the purpose of reviewing the 31 December 2008 PDC stock price valuation with both Stout (Levine) and State Street (Marzeotti and Williams).

> **ANSWER:** **Argent states that the allegations in Paragraph 494 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 494.**

495. Levine reviewed the December 31, 2008 stock price valuation with the committee using the materials previously distributed to committee members. The committee

asked questions which were answered by either Mr. Levine or Ms. Marzeotti. Based on the discussion, the committee approved the communication to plan participants of the December 31, 2008 stock price.

> **ANSWER:** **Argent states that the allegations in Paragraph 495 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 495.**

496.     On 9 January 2009, the ESOP Committee (Richards, Ferree, Willetts and Arent) released by email the 31 December 2008 PDC stock price of $21.43 to the ESOP, through its Employee Owners:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2008. SSGA has determined the new per share value to be $21.43. The value of PDC stock on June 30, 2008 was $26.64 per share. That means the share value decreased 19.5% for the period July 1, 2008 through December 31, 2008.

> **Analysis**
> The drop in PDC stock value was caused by poor company performance that resulted from the country's worst financial crisis since the 1930s. Manufacturing sector performance, in particular, has plunged worldwide. Banks are reluctant to lend money, and businesses and consumers aren't spending.

> All of Appleton's major business segments were directly affected by unprecedented increases in raw material, energy, and transportation costs.

> **2008 Performance**
> The full-year 2008, the value of PDC stock dropped from $33.41 to $21.43, a decline of 35.8%. By comparison, the Dow Jones Industrial Average **dropped** 33.8% during 2008. The NASDAQ was down 40.5%, and S&P 500 declined 38.5%. The Dow Jones

Index for the paper industry was down 66.59% in the U.S. and 50.09% worldwide. The value of PDC stock has increased approximately 114% since the November 2001 employee buyout of the company.

**ANSWER:** **Argent states that the allegations in Paragraph 496 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 496 purports to cite to a January 9, 2009 email, refers to that email for its exclusive terms, and denies any allegations in Paragraph 496 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 496.**

497. This representation made by the ESOP Committee (Richards, Ferree, Willetts and Arent) State Street was fraudulent because the $21.43 was not the PDC stock's fair market value. Among other things, the Stout valuation did not deduct $168 million in Excluded Debt and included a fraudulent control premium of $76 million.

**ANSWER:** **Argent states that the allegations in Paragraph 497 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 497.**

498. With just these adjustments, PDC's reported equity value would have been negative $91.4 million and the PDC stock price would have been negative $9.41.

**ANSWER:** Argent states that the allegations in Paragraph 498 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 498.

499. The release of the fraudulently inflated $21.43 PDC stock price constituted an additional step in furtherance of Richards, Ferree, Willamette, Arent and State Street's course of conduct to fraudulently conceal that each prior PDC stock valuation had, likewise, been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 499 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 499.

b. **Step 2: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented PDC's Stock price to be $18.87 as of 30 June 2009.**

500. On 7 July 2009, the ESOP Committee (Richards, Ferree, Willetts and Arent) met for the purpose of reviewing the 30 June 2009 PDC stock valuation with both Stout (Levine and Aziz El-Tahch) and State Street (Marzeotti).

**ANSWER:** Argent states that the allegations in Paragraph 500 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,

297

**Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 500.**

501. The minutes documenting this meeting are again instructive because they demonstrate the ESOP Committee's practice of reviewing the valuations at a level of detail that allowed them to determine that specific adjustments needed to be made:

> The Committee reviewed the June 30, 2009 stock valuation prepared by Stout Risius Ross and approved by State Street Global Advisors. Mr. Levine described the process used to arrive at the June 30, 2009 valuation. Following a detailed discussion, it was determined that the stock price needed to be adjusted. The ESOP Committee accepted the adjusted valuation. A revised valuation report will be forwarded to the ESOP Committee. Mr. Levine, Mr. El-Tahch and Ms. Marzeotti departed the meeting.

**ANSWER:    Argent states that the allegations in Paragraph 501 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 501 purports to cite to minutes from a July 7, 2009 ESOP Committee meeting, refers to those minutes for their exclusive terms, and denies any allegations in Paragraph 501 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 501.**

502. On 14 July 2009, the ESOP Committee (Richards, Ferree, Willetts and Arent) released the 30 June 2009 PDC stock price of $18.87.

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of

2009. SSGA has determined the new per share value to be $18.87. The value of PDC stock on December 31, 2008 was $21.43 per share. That means the share value decreased 11.9% for the period January 1, 2009 through June 30, 2009.

**Analysis**

The first half of 2009 saw several extraordinary events occurring at the same time: unprecedented government efforts to rescue our financial system, skyrocketing unemployment, dismal corporate earnings, a depressed housing market plagued by defaults and foreclosures, and reduced consumer spending.

**ANSWER:** **Argent states that the allegations in Paragraph 502 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 502.**

503. This representation made by the ESOP Committee (Richards, Ferree, Willetts and Arent) State Street was fraudulent because the $18.87 was not the PDC stock's fair market value. Among other things, the Stout Valuation did not deduct the Excluded Debt and included a fraudulent control premium.

**ANSWER:** **Argent states that the allegations in Paragraph 503 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 503.**

504. With just these adjustments, PDC's reported equity value and stock would also have been negative.

**ANSWER:** Argent states that the allegations in Paragraph 504 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 504.

505. The release of the fraudulently inflated $18.87 PDC stock price constituted an additional step in furtherance of Richards, Ferree, Willamette, Arent and State Street's course of conduct to fraudulently conceal that each prior PDC stock valuation had, likewise, been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 505 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 505.

506. The $18.87 PDC stock price, together with its fair market value representation also constituted a separate and independent fraud that set the price for the ESOP's PDC stock purchases until the ESOP released the 31 December 2009 PDC stock price.

**ANSWER:** Argent states that the allegations in Paragraph 506 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 506.

c. **Steps 3, 4, 5 and 6: In 2009, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K that Fraudulently Concealed that Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

507.     On 27 March 2009, Appvion filed its 2008 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel). The audited financial statements in the 10-K contained (1) a representation of PDC's year-end stock value of $21.43 a share; and (2) listed the value of PDC's Redeemable Common Stock as $147.9 million as of 3 January 2009 and $182 million as of 29 December 2007.

**ANSWER:     Argent states that the allegations in Paragraph 507 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 507 purports to cite to a 2008 10-K, refers to that document for its exclusive terms, and denies any allegations in Paragraph 507 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 507.**

508.     The 2008 10-K also contained an important disclosure regarding BemroseBooth that again conclusively demonstrated the knowledge of Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel) that retirement related debt must be subtracted in calculating fair market value:

> Late in 2007, Appleton committed to a formal plan to sell
> Bemrose Group Limited ("Bemrose"), its secure and specialized
> print services business based in Derby, England. On August 1,

301

2008, Appleton completed the sale of Bemrose receiving $3.9 million of cash and $6.4 million of notes receivable to be settled with in 75 and 180 days after closing. In anticipation of the sale transaction and as a result of a decline in the value of the business arising primarily as the result of deteriorating economic conditions and tougher markets for Bemrose products, **as well as increased funding requirements of the Bemrose pension plan arising from negotiations with the plan trustee. Appleton recorded impairment charges aggregating $43.7 million, related to goodwill and other long-lived assets, during 2008.**

**ANSWER:      Argent states that the allegations in Paragraph 508 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 508 purports to cite to a 2008 10-K, refers to that document for its exclusive terms, and denies any allegations in Paragraph 508 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 508.**

509.    As described above, the decline in Bemrose's business was directly attributed to, among other difficulties, the "increased funding requirements of the Bemrose pension plan." And yet, for 2008, the 10-K audited balance sheet reported combined pension and post retirement debt of $154.9 million and "Other" debt of $13.3 million, none of which the ESOP Committee (Richards, Ferree, Willetts and Arent) or State Street required to be subtracted from the PDC stock's fair market value.

**ANSWER:      Argent states that the allegations in Paragraph 509 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

**Argent admits that Paragraph 509 purports to cite to a 2008 10-K, refers to that document for its exclusive terms, and denies any allegations in Paragraph 509 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 509.**

510.    In 2009, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 5 Apr 09 | 13 May 09 | $147.4 million | Richards, Ferree |
| 5 Jul 09 | 07 Aug 09 | $135.6 million | Richards, Ferree |
| 4 Oct 09 | 06 Nov 09 | $133.7 million | Richards, Ferree |

**ANSWER:    Argent states that the allegations in Paragraph 510 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 510 purports to cite to 2009 10-Qs, refers to those documents for their exclusive terms, and denies any allegations in Paragraph 510 inconsistent with their complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 510.**

511.    These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter, Reardon, and Scherbel).

> **ANSWER:**    **Argent states that the allegations in Paragraph 511 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 511.**

512.    Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had likewise been fraudulently inflated and that Richards and Ferree were breaching their fiduciary duties in connection with those valuations.

> **ANSWER:**    **Argent states that the allegations in Paragraph 512 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 512.**

13.    <u>**In 2010, Richards, Ferree, Willetts, Arent and State Street Collectively Took At Least 6 Steps to Fraudulently Conceal That**</u>

**Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

a. **Step 1: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented PDC's Stock Price to be $13.26 as of 30 December 2009.**

513.    On 11 January 2010, the ESOP Committee (Richards, Ferree, Willetts and Arent) met for the purpose of reviewing the 31 December 2009 PDC stock price valuation with both Stout (Levine and El-Tahch) and State Street (Marzeotti).

> **ANSWER:**    Argent states that the allegations in Paragraph 513 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 513.

514.    Scott Levine reviewed the December 31, 2009 stock price valuation with the committee using the materials previously distributed to committee members. The committee asked questions which were answered by either Mr. Levine or Ms. Marzeotti.

> **ANSWER:**    Argent states that the allegations in Paragraph 514 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 514.

515.    On 15 January 2010, the ESOP Committee (Richards, Ferree, Willetts and Arent) released by email the 31 December 2009 PDC stock price of $13.26 to the ESOP, through its Employee Owners:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2009. SSGA has determined the new per share value to be $13.26.
>
> The value of PDC stock on June 30, 2009 was $18.87 per share. That means the share value decreased 29.7% for the period July 1, 2009 through December 31, 2009.
>
> **Analysis**
> A combination of difficult economic conditions worldwide and weak demand for our carbonless, thermal and packaging products resulted in the company missing its 2009 business forecast. Missing the forecast included a drop in earnings that caused a subsequent decrease in share value. Specifically, the performance of our core paper business resulted in a $3.16 drop in share value. That decrease in value includes the positive contribution of the increase in value of our Encapsys business. The performance and decrease in value of our packaging division resulted in a $3.98 decrease in share value.
>
> Additional offsets to the decreases were a $.95 increase in share value for debt reduction and a $.58 increase for a reduction in the number of outstanding shares and related valuation matters. The December sale of C&H Packaging had no net impact on share value.

**ANSWER:    Argent states that the allegations in Paragraph 515 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 515 purports to cite to a January 15, 2010 email, refers to that email for its exclusive terms, and denies any allegations in Paragraph 515 inconsistent with its complete terms. Argent further states**

**that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 515.**

516.    This representation made by the ESOP Committee (Richards, Ferree, Willetts and Arent) and State Street was fraudulent because the $13.26 was not the PDC stock's fair market value. Among other things, the Stout valuation did not deduct $161.2 million in Excluded Debt and included a fraudulent control premium of $84 million.

**ANSWER:    Argent states that the allegations in Paragraph 516 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 516.**

517.    With just these adjustments, PDC's reported equity value would have been negative $115.2 million and the PDC stock price would have been negative $11.75.

**ANSWER:    Argent states that the allegations in Paragraph 517 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 517.**

518.    The release of the fraudulently inflated $13.26 PDC stock price constituted an additional step in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each prior PDC stock valuation and Redeemable Common

Stock entry had been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

> **ANSWER:** **Argent states that the allegations in Paragraph 518 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 518.**

> b. **Step 2: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented PDC's Stock price to be $12.03 as of 30 June 2009.**

519. On 12 July 2010, the ESOP Committee (Richards, Ferree, Willetts and Arent) met for the purpose of reviewing the 30 June 2010 PDC stock valuation with both Stout (Levine and Aziz El-Tahch) and State Street (Marzeotti):

> The Committee reviewed the June 30, 2010 stock valuation prepared by Stout Risius Ross and approved by State Street Global Advisors. Mr. El- Tahch described the process used to arrive at the June 30, 2010 valuation. Committee members asked questions which were answered by Mr. Levine and Mr. El-Tahch. Mr. Levine, Mr. El-Tahch and Ms. Marzeotti then departed the meeting.

Source: Appleton Papers Inc. ESOP Committee meeting minutes, 12 Jul 10.

> **ANSWER:** **Argent states that the allegations in Paragraph 519 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 519.**

520.    On 15 July 2010, the ESOP Committee (Richards, Ferree, Willetts and Arent) released the 30 June 2010 PDC stock price of $12.03.

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2010. SSGA has determined the new per share value to be $12.03
>
> The value of PDC stock on December 31, 2009, was $13.26 per share so the share value decreased 9.3% for the period January 1 through June 30, 2010 (H1 2010).
>
> **Valuation Process**
> SSGA relies upon Stout Risius Ross, an independent valuation firm, to conduct appraisals of Appleton and PDC to assist in determining the value of PDC stock. Stout Risius Ross uses an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

**ANSWER:    Argent states that the allegations in Paragraph 520 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 520.**

521.    This representation made by the ESOP Committee (Richards, Ferree, Willetts, Arent) and State Street were fraudulent because the $12.03 was not the PDC stock's fair market value. Among other things, the Stout Valuation did not deduct $159.6 million in Excluded Debt and included a fraudulent control premium of $75 million.

**ANSWER:    Argent states that the allegations in Paragraph 521 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 521.

522. With just these adjustments, PAC's reported equity value would have been negative $117.6 million and the PDC stock price would have been negative $12.10.

**ANSWER:** **Argent states that the allegations in Paragraph 522 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 522.**

523. The release of the fraudulently inflated $12.03 PDC stock price constituted an additional step in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each prior PDC stock valuation and Redeemable Common Stock entry had, likewise, been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**ANSWER:** **Argent states that the allegations in Paragraph 523 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 523.**

**c.** **Steps 3, 4, 5 and 6: In 2010, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K that Fraudulently Concealed That Each of the**

310

**Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

524.     On 1 March 2010, Appvion filed its 2009 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel). The audited financial statements contained (1) a representation of PDC's year-end stock value of $13.26; and (2) listed the value of PDC's Redeemable Common Stock as $122.1 million as of 2 January 2010 and $147.9 million as of 3 January 2009.

> **ANSWER:**     Argent states that the allegations in Paragraph 524 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 524 purports to cite to a 2009 10-K, refers to that document for its exclusive terms, and denies any allegations in Paragraph 524 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 524.

525.     In 2010, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 4 Apr 10 | 7 May 10 | $120.3 million | Richards, Ferree |
| 4 Jul 10 | 9 Aug 10 | $114.4 million | Richards, Ferree |
| 3 Oct 10 | 8 Nov 10 | $122.6 million | Richards, Ferree |

**ANSWER:** Argent states that the allegations in Paragraph 525 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 525 purports to cite to 2010 10-Qs, refers to those documents for their exclusive terms, and denies any allegations in Paragraph 525 inconsistent with their complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 525.

526.    These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter, Reardon, and Scherbel).

**ANSWER:** Argent states that the allegations in Paragraph 526 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 526.

527.    Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had been fraudulently inflated.   It also concealed earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 527 are not directed to it but instead to defendants who have been dismissed from the case, and

therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 527.

**14.    In 2011, Richards, Ferree, Willetts, Arent and State Street Collectively Took at Least 6 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

**a.    Step 1:  Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that the PDC Stock's Fair Market Value was $12.84 as of 31 December 2010.**

528.    On 18 January 2011, the ESOP Committee (Richards, Ferree, Willetts and Arent) Richards, Ferree, Willetts and Arent met with State Street (Marzeotti and William) and Stout (El- Tahch) to review the 31 December 2010 PDC stock valuation. In an email with the same date, the ESOP Committee (Richards, Ferree, Willetts and Arent) released the 31 December 2010 PDC stock price of $12.84 to the ESOP, through its Employee Owners:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. (PDC) stock for the second half of 2010. SSGA has determined the new share value to be $12.84.

> The value of PDC stock on June 30, 2010, was $12.03 per share, so the share value increased 6.7% for the period June 30, 2010 through December 31, 2010 (H2 2010).

**ANSWER:    Argent states that the allegations in Paragraph 528 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 528 purports to cite to a January 18, 2011 email, refers to that correspondence for its exclusive terms, and denies any allegations in Paragraph 528 inconsistent with its complete terms. Argent**

**further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 528.**

529. By just deducting the Excluded Debt ($139.4 million), PDC's adjusted equity value would have been negative $91.4 million and its reported stock price would have been negative $9.47 as opposed to $12.84.

    **ANSWER:** **Argent states that the allegations in Paragraph 529 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 529.**

530. This stock price release constituted an additional step in furtherance of Richards, Ferree, Willetts, Arent, and State Street's course of fraudulent concealment.

    **ANSWER:** **Argent states that the allegations in Paragraph 530 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 530.**

    b.    **Step 2: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that the PDC Stock's Fair Market Value as of 30 June 2011 was $14.10.**

531. On 14 July 2011, the ESOP Committee (Ferree, Willetts and Arent) reviewed the 30 June 2011 PDC stock valuation with State Street (Marzeotti) and Stout (Levine and El-

314

Tahch). Levine "described the process used to arrive at the June 30, 2011 valuation" and the ESOP Committee members "asked questions which were answered by Mr. Levine." On 18 July 2011, the ESOP Committee (Richards, Ferree, Willetts and Arent) released, by email, the 30 June 2011 PDC stock price of $14.10 to the ESOP, through the Employee Owners:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. (PDC) stock for the second half of 2011. SSGA has determined the new share value to be $14.10
>
> The value of PDC stock on December 31, 2010, was $12.84 per share, so the share value increased 9.8% for the period January 1, 2011 through June 30, 2011 (H1 2011). The increase in share value since employees purchased the company in November 2001 is 41.0%.

**ANSWER:     Argent states that the allegations in Paragraph 531 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 531 purports to cite to a July 18, 2011 email, refers to that correspondence for its exclusive terms, and denies any allegations in Paragraph 531 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 531.**

532.     By just deducting the Excluded Debt ($129.6 million) and the fraudulent control premium ($77 million), PDC's resulting equity value would have been negative $73.6 million and the reported PDC stock price would have been negative $7.87 not $14.10.

**ANSWER:     Argent states that the allegations in Paragraph 532 are not directed to it but instead to defendants who have been dismissed from the case, and**

therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 532.

533. This stock price release constituted an additional step in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of fraudulent concealment.

ANSWER: Argent states that the allegations in Paragraph 533 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 533.

c. **Steps 3, 4, 5 and 6: In 2011, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K that Fraudulent Concealed that Each of the Previous Stock Prices had been Fraudulently Inflated.**

534. On 11 March 2011, Appvion filed its 2010 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel). The audited financial statements in the 10-K contained 1) a representation of PDC's year-end stock value of $12.84; and 2) listed the value of PDC's Redeemable Common Stock as $110 million.

ANSWER: Argent states that the allegations in Paragraph 534 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 534 purports to cite to a 2010 10-K, refers to that document for its exclusive terms, and denies any allegations in

316

**Paragraph 534 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 534.**

535.     In 2011, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 3 Apr 11 | 12 May 11 | $108.6 million | Richards, Ferree |
| 3 Jul 11 | 11 Aug 11 | $102.5 million | Richards, Ferree |
| 2 Oct 11 | 10 Nov 11 | $101 million | Richards, Ferree |

**ANSWER:     Argent states that the allegations in Paragraph 535 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 535 purports to cite to 2011 10-Qs, refers to those documents for their exclusive terms, and denies any allegations in Paragraph 535 inconsistent with their complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 535.**

536.     These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter and Reardon).  Scherbel also approved the first quarter 10-Q but left Appvion in March 2011.

**ANSWER:** Argent states that the allegations in Paragraph 536 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 536.

537. Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated and that Richards and Ferree were breaching their fiduciary duties in connection with those valuations. Further, they concealed that the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel) were failing to properly monitor the ESOP Committee and the ESOP Trustee and ensure that the valuations represented the fair market value of PDC's stock.

**ANSWER:** Argent states that the allegations in Paragraph 537 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 537.

15. **In 2012, Richards, Ferree, Willetts, Arent and State Street Collectively Took at Least 9 Steps to Fraudulently Conceal that Each**

**of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

a.      **Step 1: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that PDC's Fair Market Value was $15.01/share as of 31 December 2011.**

538.      After its review of the valuation with State Street and Stout, on 12 January 2012, the ESOP Committee (Richards, Ferree, Willetts, Arent) approved and released the 31 December 2011 PDC stock price to the ESOP, through its Employee Owners.

> **ANSWER:**      **Argent states that the allegations in Paragraph 538 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 538.**

539.      This email constituted an additional step taken in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each of the previously released PDC stock prices (9 November 2001 through 30 June 2011) had been fraudulently inflated and did not reflect fair market value.

> **ANSWER:**      **Argent states that the allegations in Paragraph 539 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 539.**

540.    Had just the Excluded Debt ($174.2 million) and the fraudulent control premium ($67 million) been subtracted, the adjusted stock value would have been negative $102.2 million, or negative $11.04 per share as opposed to the fraudulently reported $15.01 per share, and it would have disclosed to the Employee Owners that each of the earlier PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated.

**ANSWER:    Argent states that the allegations in Paragraph 540 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 540.**

### b.    Step 2: Richards Fraudulently Represented that the Board was Monitoring PDC's Valuations and State Street.

541.    214. On 21 March 2012, Richards issued a "Richards Report Communication" discussing the 7 and 8 March 2012 Board meeting. Richards stated that the "board meeting included a review of our 2011 performance [and] the December stock valuation…" The communication claimed improvements in Appvion's financials despite "the continued decline in demand for carbonless paper" and touted the 6.5% increase in share price from $14.10 per share to $15.01 per share.

**ANSWER:    Argent states that the allegations in Paragraph 541 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 541.**

542.    This communication as a whole indicated that the Board (Carter, Murphy, Reardon, Seifert, and Suwyn) was monitoring State Street and the ESOP Committee (Richards, Ferree, Arent, and Willetts) as well as Appvion's financial performance, which included the stock value. It also served to fraudulently conceal that the share price was inflated by, among other things, the failure to deduct the Excluded Debt.

>    **ANSWER:    Argent states that the allegations in Paragraph 542 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 542.**

>    c.    **Step 3:  Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that PDC's Fair Market Value was $18.80/share as of 30 June 2012.**

543.    After its review of the valuation, the ESOP Committee (Richards, Ferree, Arent, Willetts) approved and released the 30 June 2012 PDC stock price to the ESOP, through its Employee Owners. State Street had arrived at its conclusion of value after reviewing the valuation with Stout and had provided it to the ESOP Committee to be disseminated to the ESOP, through its Employee Owners.

>    Company Stock Value **Increased 25.2%**

>    State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2012. SSGA has determined the new per share value to be $18.80.

>    **The value of PDC stock on December 31, 2011, was $15.01 per share, so the share value increased 25.2%** for the period

January 1, 2012, through June 30, 2012. The increase in share price **marks the fourth consecutive valuation period in which the value has increased.** The increase in share value since employees purchased the company in November 2001 is 88%.

The pending transaction between Appleton Papers Inc. (Appleton) and Paperweight Development Corp (ODC) and Hicks Acquisition Company II, Inc (HACII) creates a unique situation for this valuation. …

If the transaction does not close prior to the next distribution payments, then the June 30 value of $18.80 will be used for those payments, and the other rights listed above will not apply to the shares that will be distributed.

Source: Internal communication, "Company Stock Value Increases 25.2% after first half 2012," 2 Jul 12.

> **ANSWER:** Argent states that the allegations in Paragraph 543 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 543.

544. This email constituted an additional step taken in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each of the previously disclosed PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated and did not reflect fair market value.

> **ANSWER:** Argent states that the allegations in Paragraph 544 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 544.

545.    Had just the Excluded Debt and the fraudulent control premium been deducted, the resulting PDC stock price would have been vastly lower than reported, and it would have disclosed that each of the earlier PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated.  It also would have disclosed earlier fiduciary breaches.

**ANSWER:    Argent states that the allegations in Paragraph 545 are not are not exclusively directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required as to those allegations.. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 545. Argent denies that it breached any fiduciary duty.**

> **d.    Steps 4 and 5: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that PDC's Fair Market Value was $16.45 as of 16 July 2012.**

546.    On 13 July 2012, Richards emailed the ESOP, through its Employee Owners, that Appleton and Hicks Acquisition Company II had discontinued their proposed business transaction citing volatile market conditions and claiming that Appvion's business was strong:

> During the six weeks that Tom Ferree and I spent talking to numerous investment professionals around the country, we received positive feedback about the fundamental strength of our company, the way we do business and outlook for success. In general, the investment community likes Appleton and our business model. They are just reluctant to pursue this transaction under current market conditions.

**ANSWER:    Argent states that the allegations in Paragraph 546 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 546 purports to cite to a July 13, 2012 email,**

**refers to that correspondence for its exclusive terms, and denies any allegations in Paragraph 546 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 546.**

547. On 7 August 2012, the ESOP Committee (Richards, Ferree, Willetts, Arent) reviewed the special valuation with State Street (Williams) and Stout (Levine and El-Tahch) and on the same day released the fraudulently inflated PDC stock price for 16 July 2012 of $16.45, while noting that State Street had value PDC at $18.80 per share as of 30 June 2012:

> State Street Global Advisors (SSGA) has completed its special valuation of Paperweight Development Corp. (PDC) stock for July 16, 2012. SSGA has determined the new par share value to be $16.45. The June 30, 2012, share price was $18.80 ….

> ERISA requires that the share price be valued once per year. Our plan has chosen to conduct valuations twice per year. However, the ESOP Administrative Committee has the right to request a special valuation at any time.

> Why we requested an additional valuation

> When the June 30 share price was announced the ESOP Administrative Committee believed that the closing of the Appleton/HACII transaction would necessitate a new valuation to accurately reflect the post-transaction Fair Market Value of PDC stock.

> The Committee subsequently learned that Stout Risius Ross included some (but not all) of the incremental value of the proposed transaction in the share price announced on June 30. On July 13, Appleton and HACII announced that they agreed to discontinue the proposed transaction.

> The ESOP Administrative Committee determined it had a fiduciary obligation to request a new share price since discontinuing the Appleton/HACII transaction was a material event and the June 30 price likely no longer represented Fair Market Value …

**ANSWER:** Argent states that the allegations in Paragraph 547 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 547.

548.     Had just the Excluded Debt ($179 million) and the fraudulent control premium ($51 million) been subtracted, the reported PDC stock price would have been negative $9.47.

**ANSWER:** Argent states that the allegations in Paragraph 548 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 548.

549.     Both the $16.45 share value and the $18.80 share value constituted additional steps in the course of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had been fraudulently inflated.  It also fraudulently concealed earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 549 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 549.

e.   **Steps 6, 7, 8 and 9: In 2012, Richards and Ferree Attested to and Ferree Signed 3 10-Qs and Richards and Ferree Signed a 10-K that Fraudulently Concealed that Each of the Previous PDC Stock Prices Had Been Fraudulently Inflated.**

550.   On 23 March 2012, Appvion filed its 2011 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Reardon, Seifert, and Suwyn). The audited financial statements in the 10-K contained (1) a representation of PDC's year-end stock value of $15.01; and (2) listed the value of PDC's Redeemable Common Stock as $97.6 million for 2011 and $110.1 million for 2010.

**ANSWER:   Argent states that the allegations in Paragraph 550 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 550 purports to cite to a 2011 10-K, refers to that document for its exclusive terms, and denies any allegations in Paragraph 550 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 550.**

551.   In 2012, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 1 Apr 12 | 10 May 12 | $96.4 million | Richards, Ferree |
| 1 Jul 12 | 9 Aug 12 | $89.9 million | Richards, Ferree |
| 30 Sep 12 | 9 Nov 12 | $85.5 million | Richards, Ferree |

**ANSWER:** Argent states that the allegations in Paragraph 551 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 551 purports to cite to 2012 10-Qs, refers to those documents for their exclusive terms, and denies any allegations in Paragraph 551 inconsistent with their complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 551.

552. These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter, and Murphy).

**ANSWER:** Argent states that the allegations in Paragraph 552 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 552.

553. Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated and that Richards and Ferree were breaching their fiduciary duties in connection with those valuations. Further, they concealed that the Outside Directors (Carter, Murphy, Reardon, Seifert, and Suwyn) were failing to properly monitor the ESOP Committee

and the ESOP Trustee and ensure that the valuations represented the fair market value of PDC's stock.

> **ANSWER:** Argent states that the allegations in Paragraph 553 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 553.

**16.** **In 2013, Richards, Ferree, Arent, State Street and Reliance Collectively Took at Least 6 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

> **a.** **Step 1: Richards, Ferree, Arent and State Street Fraudulently Represented the PDC Stock Price Increased to $17.55 as of 31 December 2012.**

554. In February 2013, State Street reported that the fair market value of PDC's stock was $17.55 as of 31 December 2012. On 5 February 2013, the ESOP Committee (Richards, Ferree, Arent) met with State Street (Marzeotti) and Stout (Levine and El-Tahch) and reviewed the 31 December 2012 PDC stock valuation. Richards then "motion to approve the stock valuation communication.  Ms. Arent seconded the motion; all were in favor…."

> **ANSWER:** Argent states that the allegations in Paragraph 554 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 554.

555.     On the same day, the ESOP Committee (Richards, Ferree, Arent) emailed the

ESOP through its Employee Owners, releasing the fraudulently inflated PDC stock price for 31

December 2012 of $17.55 per share:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. (PDC) stock and determined the new per share value to be $17.55 as of December 31, 2012.
>
> The previous value of PDC stock was $16.45 per share, so the share value has increased 6.7% for the period July 16, 2012, through December 31, 2012. The increase in share value for full year 2012 is 16.9%. The increase in share value since employees purchased the company in November 2001 is 75.5%.
>
> SSGA relies upon Stout Risius Ross, an independent valuation firm, to conduct appraisals of Appleton and PDC to assist in determining the value of PDC stock. Stout Risius Ross uses an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.
>
> **Income analysis**
> Key contributors to the increase in share price were strong sales and earnings growth from our thermal papers segment, saving s delivered by the strategic supply agreement with Domtar, a significant reduction in working capital, and strong improvement in adjusted operating income.

Source: Internal communication, "Company stock Value increases 6.7% after second half 2012 valuation," 5 Feb 13.

> **ANSWER:    Argent states that the allegations in Paragraph 555 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 555 purports to cite to a February 5, 2013 email, refers to that correspondence for its exclusive terms, and denies any allegations in Paragraph 555 inconsistent with its complete terms. Argent**

**further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 555.**

556.     Subtracting just the Excluded Debt ($207.7 million) and the fraudulent control premium ($54 million), the reported fair market value would have been negative $108.7 million, or negative $12.45 per share as opposed to the fraudulently reported $17.55 per share.

> **ANSWER:     Argent states that the allegations in Paragraph 556 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 556.**

557.     This fraudulent representation was an additional step in furtherance of Richards, Ferree, Arent and State Street's course of conduct to fraudulently conceal that each of the previously reported PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated.  It also concealed their earlier fiduciary breaches.

> **ANSWER:     Argent states that the allegations in Paragraph 557 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 557.**

**b.**   **Step 2: Richards, Ferree, Arent and Reliance Fraudulently Represented the PDC Stock Price Increased to $17.85 as of 30 June 2013.**

558.   After reviewing the valuation, on 17 July 2013, the ESOP Committee (Richards, Ferree, Arent) approved and then released the fraudulently inflated PDC stock price for 30 June 2013 of $17.85 per share:

> Reliance Trust Company (RTC) has completed is valuation of Paperweight Development Corp. (PDC) and determined the new per share value to be $17.85 as of June 30, 2013.
>
> The previous value of PDC stock was 17.55 per share, so the share value increased 1.7% for the period January 1, 2013, through June 30, 2013. The increase in share value since employees purchased the company in November 2001 is 78.5%
>
> **Valuation process**
> RTC relies on Stout Risius Ross (SRR), an independent valuation firm, to conduct appraisals of Appvion and PDC to assist in determining the value of PDC stock. SRR uses an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data and publicly traded companies and recent mergers and acquisitions.
>
> **Income analysis**
> SRR's income analysis derived a value that is essentially unchanged from the previous valuation primarily because the performance of the business is fundamentally the same. The earnings of each of businesses adjusted for any one-time impacts from the Domtar supply agreement did not change from the calendar year 2012 to the trailing 12 month period ending at June 2013.

Source: Internal Communication, "Company stock value increases 1.7% after first half 2013 valuation," 18 Jul 13.

**ANSWER:**   **Argent states that the allegations in Paragraph 558 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,**

> Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 558.

559.    Had the stock price been adjusted by just subtracting the Excluded Debt ($200 million) and eliminating the fraudulent control premium ($54 million), the reported PDC stock price would have been negative $12.78 as opposed to $17.85.

> **ANSWER:   Argent states that the allegations in Paragraph 559 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 559.**

560.    The release of the $17.85 PDC stock price was an additional step in furtherance of Richards, Ferree, Arent and Reliance's fraudulent course of conduct to conceal that each of the earlier PDC stock valuations and earlier Redeemable Common Stock entry had been fraudulently overstated.  It also fraudulently concealed the earlier fiduciary breaches.

> **ANSWER:   Argent states that the allegations in Paragraph 560 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 560.**

> c.    **Step 3, 4, 5 and 6: In 2013, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K That Fraudulently Concealed That Each of the**

332

**Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

561.    On 13 March 2013, Appvion filed its 2012 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Reardon, Seifert, and Suwyn). The audited financial statements in the 10-K contained (1) a representation of PDC's year-end stock value of $17.55; and (2) listed the value of PDC's Redeemable Common Stock as $81.7 million for 2012 and $97.6 million for 2011.

> **ANSWER:    Argent states that the allegations in Paragraph 561 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 561 purports to cite to a 2012 10-K, refers to that document for its exclusive terms, and denies any allegations in Paragraph 561 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 561.**

562.    In 2013, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 31 Mar 13 | 9 May 13 | $80.5 million | Richards, Ferree |
| 30 Jun 13 | 8 Aug 13 | $72 million | Richards, Ferree |
| 29 Sep 13 | 5 Nov 13 | $71 million | Richards, Ferree |

**ANSWER:** Argent states that the allegations in Paragraph 562 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent admits that Paragraph 562 purports to cite to 2013 10-Qs, refers to those documents for their exclusive terms, and denies any allegations in Paragraph 562 inconsistent with their complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 562.

563. These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter and Murphy).

**ANSWER:** Argent states that the allegations in Paragraph 563 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 563.

564. Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated. It also concealed the earlier fiduciary breaches.

**ANSWER:** Argent states that the allegations in Paragraph 564 are not directed to it but instead to defendants who have been dismissed from the case, and therefore no response is required. To the extent a response is required,

Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 564.

### L. The Defendants Continued to Engage in Fraudulent Concealment After 2013.

565. The Defendants (Reliance, Argent, Richards, Ferree, Arent, and Gilligan) continued to engage in fraudulent concealment after 2013. However, Plaintiff's claims for breaches of fiduciary duty during this time frame are timely without regard to the fraud or concealment exception to ERISA § 413 (29 U.S.C. § 1113).

**ANSWER:** Argent denies that it engaged in any fraudulent concealment. Argent further states that Paragraph 565 purports to cite to 29 U.S.C. § 1113, refers to that statute for its exclusive terms, and denies any allegations in Paragraph 565 inconsistent with its complete terms. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 565.

### M. The Knowledge of Prior ESOP Fiduciaries is Not Imputed to Mr. Lyon or the ESOP.

566. The PDC stock valuations were not disclosed to the Employee Owners. Rather, they were only shared with the ESOP Trustee, the ESOP Committee members, and the Board of Directors.

**ANSWER:** Argent admits that PDC stock valuations were shared with it. Argent lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 566.

567.     As described above, the fact that the valuations were inflated was not discovered until after Mr. Lyon was appointed as an independent, impartial fiduciary who could investigate the valuations.  Mr. Lyon discovered that the valuations were inflated and brought these claims.

> **ANSWER:    Argent denies that it breached any fiduciary duty or violated any provision of ERISA. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 567.**

568.     Because, among other reasons, the ESOP's fiduciaries were acting in bad faith and adversely to the ESOP, their knowledge is not imputed to Mr. Lyon, to the ESOP, or to its Employee Owners.

> **ANSWER:    Argent denies that it breached any fiduciary duty or violated any provision of ERISA. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 568.**

569.     Defendants knew they were acting adversely to the ESOP by inflating the stock price. Because the Defendants were not acting in good faith, they cannot rely on imputation of knowledge to shield them from their bad acts.

> **ANSWER:    Argent denies that it inflated the PDC stock price, breached any fiduciary duty, or violated any provision of ERISA. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 569.**

570.   Knowledge of the culpable ESOP fiduciaries also cannot be imputed to the ESOP trust because, unlike a corporation, the ESOP trust is not a separate legal entity. Further, imputation does not serve any equitable purpose.

**ANSWER:   Argent denies the allegations in Paragraph 570.**

571.   As a fiduciary, Mr. Lyon is acting for the benefit of the ESOP trust itself, which is innocent of any wrongdoing, and is seeking to recover on behalf of the ESOP for the benefit of the Employee Owners. In his role as an ERISA fiduciary, Mr. Lyon shares no blame for the wrongdoing of the prior ERISA fiduciaries and has standing to bring these claims.

**ANSWER:   Argent admits that, through this lawsuit, Mr. Lyon purportedly seeks to recover on behalf of the ESOP. Argent denies that Mr. Lyon is entitled to any relief and denies that Mr. Lyon has standing to bring these claims. Argent further states that it lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 571.**

## V.   CLAIMS.

### COUNT I
### BREACH OF FIDUCIARY DUTY AGAINST RELIANCE TRUST COMPANY

572.   All previous averments are incorporated herein.

Paragraphs 572-600.

**ANSWER:   No response to Paragraphs 572-600 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against**

**Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT II
## BREACH OF FIDUCIARY DUTY AGAINST ARGENT TRUST COMPANY

601.    All previous averments are incorporated herein.

**ANSWER:    Argent incorporates by reference and fully restates its responses to the preceding paragraphs of the Second Amended Complaint.**

### Argent Owed Fiduciary Duties in Connection with the Valuations

602.    Argent was an ESOP fiduciary as trustee from 1 July 2014 until at least 1 October 2017 when Appvion filed for bankruptcy. Argent therefore owed fiduciary duties of prudence and loyalty under ERISA § 404(A)(1) (29 U.S.C. § 1104(a)(1)). Where an ERISA fiduciary is responsible for setting the price of stock, the duties of loyalty and prudence require a fiduciary to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts This requires the fiduciary to determine the value of the stock in good faith using a prudent process.

**ANSWER:    Argent admits that Paragraph 602 purports to cite 29 U.S.C. § 1104(a)(1). Argent refers to that statute for its exclusive terms, denies all allegations in Paragraph 602 that are inconsistent with the full text of 29 U.S.C. § 1104(a)(1), and denies that it breached any fiduciary duties or provisions of ERISA. To the extent Paragraph 602 contains factual**

**allegations of wrongdoing against Argent, Argent denies the allegations in Paragraph 602.**

603.    Argent became the ESOP Trustee effective 1 July 2014 after it purchased Reliance's ESOP business unit. Argent continued to operate under the Amended and Restated Trust Agreement for the Appleton Papers Inc. Employee Stock Ownership Trust, dated 1 April 2013, until approximately August 2015. Under § 3.4(j) of that trust agreement, "all valuations of shares of Company Stock will originally be made by an independent appraiser (as described in Code § 401(a)(28)(C)) retained by the Trustee and reviewed and finalized by the Trustee in accordance with ERISA § 3(18)(B)." Argent continued to retain Stout as its independent appraiser.

> **ANSWER:    Argent admits that it purchased Reliance's ESOP business unit on or around July 1, 2014 and that Stout served as independent financial advisor. Argent further admits that Paragraph 603 purports to cite to an April 1, 2013 Amended and Restated Trust Agreement for the Appleton Papers Inc. Employee Stock Ownership Trust, refers to that agreement for its exclusive terms, and denies all allegations in Paragraph 603 inconsistent with its complete terms.**

604.    Argent and Appvion signed a new trust agreement, effective 3 August 2015. Under that agreement, Argent had sole discretion to determine the fair market value of PDC's stock:

> 2.6. Trust Fund Powers. **The Trustee shall be a discretionary trustee with respect to all the assets of the Trust Fund**, including, but not limited to, purchases, holding, and sales of

Company Stock, as well as voting shares of Company Stock. Subject to the provisions of Sections 2.8 2.9, and 2.10, **the Trustee shall have the following powers, rights, and duties with respect to the Trust Fund**, in addition to, and not limited to, those provided elsewhere in this Trust Agreement or by Applicable Law:

* * *

(k) To invest in Company Stock (as set forth in Section 2.3) and to select an independent appraiser to assist the Trustee to determine the fair market value of the Company Stock and the Valuation Date. In addition, **the Trustee shall determine the fair market value of the Company Stock and the other assets of the Trust Fund as of each Valuation Date**, or, in the absence of readily ascertainable market values, **at such values as the Trustee shall, in its sole discretion, determine with consideration being given to methods consistently followed and uniformly applied**.

**ANSWER:     Argent admits that it signed the Appvion, Inc. Employee Stock Ownership Trust Agreement (the "Trust Agreement") with an effective date of August 3, 2015. Argent further admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and Argent's Engagement Agreement, as well as ERISA. Argent refers to the Trust Agreement and ERISA for their exclusive terms and denies all allegations in Paragraph 604 inconsistent with the complete terms of the Trust Agreement and ERISA. Answering further, Argent admits that Paragraph 604 purports to cite to the Trust Agreement, refers to the Trust Agreement for its exclusive terms, and denies all allegations in Paragraph 604 inconsistent with its complete terms. Argent denies all allegations of wrongdoing and that it breached any fiduciary duties or provisions of ERISA and denies the remaining allegations in Paragraph 604.**

340

605. The ESOP documents were consistent with the trust agreements and ERISA, requiring the stock to be valued on a semi-annual basis by an independent appraiser in accordance with ERISA § 3(18). Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

> **ANSWER:** **Argent admits that Paragraph 605 purports to cite to various trust agreements and ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 605 inconsistent with their complete terms.**

606. Therefore, Argent was required to retain an independent appraiser to value PDC's stock, but Argent was ultimately responsible for determining the stock value.

> **ANSWER:** **Argent admits that it was required to engage an independent financial advisor of its choosing. Argent further admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 606 inconsistent with their complete terms.**

607. Reliance was responsible for the 31 December 2013 valuation of PDC's stock, which valued PDC's stock at $16.25 per share. However, Argent approved the use of this stock value in connection with purchases of stock as of June 2013. Argent therefore had a duty of

prudence and loyalty to review the valuation as of 31 December 2013 and determine whether reliance on that valuation was reasonably justified under the circumstances.

> **ANSWER:** The allegations in Paragraph 607 include allegations against Reliance Trust, a defendant that has been dismissed from the case, and therefore no response is required by Argent as to those allegations. Other allegations in Paragraph 607 contain legal conclusions to which no response is required. Argent admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 607 inconsistent with their complete terms.

608. As ESOP Trustee, Argent reached the following determinations of share value:

| Valuation Date | Share Price |
|----------------|-------------|
| 06/30/2014 | $ 16.30 |
| 12/31/2014 | $ 11.00 |
| 06/30/2015 | $ 12.90 |
| 12/31/2015 | $ 12.30 |
| 06/30/2016 | $ 13.70 |
| 12/31/2016 | $ 10.35 |
| 06/30/2017 | $  6.85 |

> **ANSWER:** Argent admits that, for the years of 2014-2017, the share prices listed in Paragraph 608 align with the valuations issued by Stout Risius Ross.

609. Stout acted as independent appraiser and gave opinions on the fair market value of PDC's stock for these valuation dates, which Argent adopted in full. In doing so, Argent had

a fiduciary duty of prudence and loyalty to determine whether reliance on those valuations was reasonably justified under the circumstances.

> **ANSWER:** **Argent admits that Stout served as independent financial advisor. Argent further admits that the extent of its services and fiduciary responsibilities are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 609 inconsistent with their complete terms.**

### Argent Breached its Fiduciary Duties in Connection with the Valuations

610.    In connection with its use of the 31 December 2013 stock price and its determination of the stock price for PDC beginning in July 2014, Argent breached its duty of prudence and loyalty by in relying on Stout's valuations. Reliance on Stout's advice was not reasonably justified under the circumstances because of, among other things, the following facts:

> **ANSWER:** **Argent denies that it breached any fiduciary duty. Argent further denies that it was not entitled to rely upon Stout's advice.**

611.    Argent failed to run a process for selecting a valuation firm and simply used Stout as the appraiser because Stout had been acting as the appraiser for so long and knew the company.  As part of this process, Argent failed to evaluate Stout's past performance and related PDC stock valuations. Argent also failed to identify that Stout had subtracted BemroseBooth's pension debt but never deducted Appvion's retirement related debt in arriving at fair market value.

**ANSWER:** **Argent denies the allegations in Paragraph 611.**

612.     Argent's Steve Martin admitted to Mr. Lyon that Appvion had never met its business plans in Argent's history as trustee. Martin stated that Argent reviewed the projections because of the history of Appvion failing to meet the projections, but instead of requiring Appvion to make the projections more realistic Argent allowed Stout to adjust for the riskiness of the projections in the discount rate. Allowing the use of projections that Argent knew were inflated was a clear breach of its fiduciary duty of prudence and loyalty, especially where the projections were critical to the resulting valuations. Further, Argent breached its duty of prudence and loyalty by failing to question the objectivity and prudence of those preparing the projections in light of their willingness to consistently inflate them.

> **ANSWER:** **Argent admits that Appvion had not met various business plans during the time Argent served as trustee. Argent further states that adjusting for possible risks of not meeting business projections through the discount rate is a common and appropriate valuation technique and that by doing so, Stout and Argent were engaging in diligent and proper conduct. Argent denies that it breached any fiduciary duty.**

613.     By the end of 2014, Stout calculated that the synthetic equity created by various executive compensation plans that were tied to the stock price, accounted for approximately 25% of the "fully diluted ownership value" of PDC. This created a key conflict of interest among the individuals responsible for preparing the projections, which Argent failed to identify or address even though Argent knew the projections were inflated. These conflicts of interest were, at a minimum, a red flag that the projections (and therefore the valuations based on those

projections) were not reliable. *See Brundle v. Wilmington Trust, NA*, 919 F.3d 763 (4th Cir. 2019).

> **ANSWER:** **Argent states that the allegations in Paragraph 613 are not directed to it but instead to a defendant who has been dismissed from the case, and therefore no response is required. To the extent a response is required, Argent denies the allegations in Paragraph 613.**

614. Argent failed to require that the valuations subtract the Excluded Debt, which exceeded the value of the shareholder's equity every year that Argent was trustee. *See* ¶¶ 197-246, 288. In September 2017, Argent's Steve Martin admitted that it had discussed this issue with Stout and that they may need to start including a portion of it in determining equity value but had failed to insist on the change. This failure is particularly disturbing in light of the fact that Stout had subtracted pension liability from fair market value. Although Argent was not the trustee at the time, that issue certainly should have stood out in its review of earlier valuations and particularly the question raised of retirement related debt. Further, because of the sheet magnitude of the Excluded Debt, Argent should have fully understood it and required that it be subtracted in arriving at fair market value.

> **ANSWER:** **Argent refers to its and Stout's valuation documents for the exclusive terms thereof and denies any characterization inconsistent with the same. Argent further states that by "discuss[ing]" a valuation with Stout and resolving to monitor the issue in future valuations, that Argent (and Stout) were being diligent and proper. Argent denies that it breached any fiduciary duty.**

615. Argent failed to insist that the valuations include all interest-bearing debt. *See* ¶¶ 247-48. This included (1) "unamortized discounts" which were excluded from all of the valuations approved by Argent even though they were unquestionably interest-bearing; and (2) portions of Appvion's revolving line of credit which were excluded from the 31 December 2015, 30 June 2016, 31 December 2016, and 30 June 2017 valuations. Excluding these debts had material impacts on PDC's share value:

| Valuation Date | Impact of Excluding Unamortized Discounts | Impact of Excluding Revolving Line of Credit |
|---|---|---|
| 30 Jun 14 | $0.82/share | N/A |
| 31 Dec 14 | $0.80/share | N/A |
| 30 Jun 15 | $0.78/share | N/A |
| 31 Dec 15 | $0.56/share | $0.51/share |
| 30 Jun 16 | $0.54/share | $4.23/share |
| 31 Dec 16 | $0.46/share | $2/70/share |
| 30 Jun 16 | $0.57/share | $1.45/share |

**ANSWER:** **Argent refers to its and Stout's valuation documents for the exclusive terms thereof and denies any characterization inconsistent with the same. Argent denies that it breached any fiduciary duty.**

616. Argent failed to challenge the application of the 10% control premium to the 30 June 2014 and 31 December 2014 valuations, which added approximately $53 million in equity to the 30 June 2014 valuation (42% of total equity) and $49,000 million to the 31 December 2014 valuation (61% of the total equity). Starting with the 30 June 2015 valuation, Stout stopped including an explicit control premium, but it continued to value PDC on a controlling-interest basis; on information and belief it still incorporated a control premium through the use of multipliers that Stout selected. This control premium was inappropriate in light of the fact that Argent (as the shareholder supposedly acting for the ESOP) was a directed trustee from 1 July

2015 until mid-2015, and it at all times lacked the ability to control the Board of Directors under the Security Holder's Agreement. *See* ¶¶ 143-44, 254-63.

> **ANSWER: Argent refers to its and Stout's valuation documents for the exclusive terms thereof and denies any characterization inconsistent with the same. Argent denies that it breached any fiduciary duty.**

617. Argent adopted the valuations despite Stout's practice of rounding numbers throughout the valuation process. *See* ¶ 286. This increased the value of PDC's stock for all of the valuations that Argent adopted, some of them by material amounts. Argent also adopted the 31 December 2014 valuation despite an apparent arithmetic error; combined with the rounding practices, that inflated PDC's stock value by approximately $0.37/share.

> **ANSWER: Argent refers to its and Stout's valuation documents for the exclusive terms thereof and denies any characterization inconsistent with the same. Argent denies that it breached any fiduciary duty.**

618. Argent approved the 30 June 2015 valuation even though Stout significantly changed its methodology that year, adding a sixth year of data to its discounted cash flow analysis for that valuation only and adding an additional category to its guideline company method analysis of Thermal. Argent also approved the 31 December 2015 valuation even though Stout again changed its methodology, choosing to disregard previous and projected EBITDA numbers in favor of only revenue numbers without reference to profitability. These changes both substantially increased the valuations, covering up the effect of the fact that Appvion sold Encapsys (its most profitable division) that year and despite Thermal's low earnings. *See* ¶¶ 274-77. This was also inconsistent with the 30 August 2015 trust agreement

which required Argent to determine fair market value "with consideration being given to methods consistently followed and uniformly applied."

> **ANSWER:** **Argent refers to its and Stout's valuation documents for the exclusive terms thereof and denies any characterization inconsistent with the same. Argent denies that it breached any fiduciary duty.**

619. Argent allowed Stout to apply a very small discount for limited marketability which did not reflect the real repurchase obligation. In 2015 and 2016 alone, distributions from the ESOP totaled $19.6 million while contributions to the ESOP were only $3.5 million; however, each of Stout's valuations put the discount for limited marketability at $3.8 to $5 million. *See* ¶¶ 278-79. Argent's Steve Martin admitted that Argent had questioned the low discount for limited marketability but Stout had failed to change it.

> **ANSWER:** **Argent denies that it allowed Sout to apply a very small discount for limited marketability.**

620. As discretionary trustee, Argent approved the Encapsys sale on behalf of the ESOP. This sale was not in the best interests of the ESOP because the loss of this unit it impaired Appvion's ability to function as a going concern. Further, to the extent any of Appvion management may have received compensation from this plan as part of the sale, it was a breach of Argent's fiduciary duties to allow those payments.

> **ANSWER:** **Argent denies that it breached any fiduciary duty or violated any provision of ERISA.**

621.    Argent failed to understand and question Stout's methodology, including the selected guideline companies and Stout's calculation of the weighted average cost of capital and multipliers used in its valuation methods.

**ANSWER:    Argent denies the allegations in Paragraph 621.**


622.    Argent allowed Stout to break Appvion's business out into segments, thus failing to account for all overhead costs not allocated to individual business segments.

**ANSWER:    Argent denies the allegations in Paragraph 622.**


623.    Argent failed to document, in writing, its oversight of the appraisers, the appraisal process, and its analysis and review of the final valuation reports, including, among other things, failing to ensure that either the appraiser or the trustee conducted and documented the following:

- The identification of the individuals responsible for providing projections reflected in the valuation report and a reasonable inquiry as to whether those individuals have conflicts of interest;

- An opinion as to the reasonableness of any projections considered and explanation why and to what extent the projections are or are not reasonable, including, at a minimum, an analysis of how the projections compare to and whether they are reasonable in light of the company's five-year historical averages.

- The Trustee's analysis of the final valuation reports, including consideration of the topics, such as, but not limited to, the following:

- Marketability discounts;

- Minority interests and control premiums;

- Projections of the company's future economic performance and the reasonableness or unreasonableness of such projections, including, if applicable, the bases for assuming that the company's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

- Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

- The comparability of the companies chosen as part of any analysis based on comparable companies; and

- Whether the methodologies employed were standard and accepted methodologies and the bases for any departures from standard and accepted methodologies.

**ANSWER:    Argent denies the allegations in Paragraph 623.**

624.    In sum, Argent failed to prudently investigate the value of PDC's stock and therefore breached its duty of prudence under ERISA § 404 (29 U.S.C. § 1104).

**ANSWER:    Argent denies that it acted imprudently or violated any fiduciary duty or provision of ERISA.**

625.    A fiduciary's duty of loyalty and its duty of prudence § 404(a)(1)(A) and (B) includes a duty to disclose and inform.  However, Argent failed to communicate directly with the Employee Owners about Appvion's true financial condition or the valuation process, instead allowing Appvion's ESOP Committee to take the lead in communications. In doing so, Agent allowed Appvion's ESOP Committee to issue misleading communications that reported an inflated PDC stock price, selectively described the valuation process and omitted key

350

information about the valuations necessary to render their communications not misleading. This was a breach of Argent's duty of disclosure.

> **ANSWER:    Argent admits that Paragraph 625 purports to cite to § 404(a) of ERISA, refers to that provision for its exclusive terms, and denies all allegations in Paragraph 625 inconsistent with its complete terms.**

626.    Argent is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from its breaches of fiduciary duty. These damages include, but are not limited to, the ESOP's losses from overpaying for stock.

> **ANSWER:    Argent denies that it is liable for any violation of ERISA and denies that Plaintiff is entitled to damages.**

## Argent is Liable for Failure to Remedy the Breaches of the Predecessor Fiduciaries

627.    A fiduciary has a continuing duty to remedy breaches of predecessor fiduciaries.

> **ANSWER:    Argent denies that it breached any fiduciary duty, including by failing to remedy any breaches by predecessor fiduciaries.**

628.    The duty of prudence required Argent to review and understand prior valuations of Appvion when it became trustee. At a minimum, in order to meet its duty of prudence and comply with its obligation not to allow purchase stock for more than adequate consideration, Argent had to review and approve the 31 December 2013 valuation.

> **ANSWER:    The allegations in Paragraph 628 contain legal conclusions to which no response is required. Argent denies that it breached any fiduciary duty.**

629.     Further, Reliance employees who had worked on the prior Appvion valuations (Stephen Martin, Howard Kaplan, and David Williams) continued to work for Argent after Argent purchased Reliance's ESOP business unit; their knowledge is therefore imputed to Argent.

> **ANSWER:**     **The allegations in Paragraph 629 contain a legal conclusion to which no response is required. Answering further, Argent admits that Messrs. Martin and Williams continued to work for Argent after Argent purchased Reliance's ESOP business unit but denies that Mr. Kaplan did so.**

630.     A review of earlier valuations would also have brought the BemroseBooth treatment to Argent's attention.

> **ANSWER:**     **Argent denies the allegations in Paragraph 630.**

631.     Argent therefore was aware that its predecessor trustee fiduciaries (State Street and Reliance), and predecessor ESOP Committee member fiduciaries (at least Richards, Ferree, Arent, and Willetts) had breached their fiduciary duties in connection with those prior valuations.

> **ANSWER:**     **Argent denies the allegations in Paragraph 631.**

632.     Argent breached its fiduciary duties by failing to take adequate steps to remedy their predecessors' breaches of fiduciary duty in connection with the prior valuations. Such steps should have included correcting the stock values and adjusting accounts of ESOP holders, as well as litigation against its predecessor fiduciaries to remedy the overpayments for stock.

Instead, Argent failed to take any action and potentially allowed the statute of limitations to expire for breaches of fiduciary duty within six years prior to Argent's appointment.

> **ANSWER:** **Argent denies the allegations in Paragraph 632.**

633. As a result of Argent's failure to remedy breaches of its predecessor fiduciaries, the ESOP lost tens of millions of dollars.

> **ANSWER:** **Argent denies the allegations in Paragraph 633.**

### Plaintiff's Claims Against Argent are Timely

634. Plaintiff did not have actual knowledge of Argent's breaches of fiduciary duty prior to at least August 2017 when Plaintiff became a fiduciary of the ESOP and then had an opportunity to investigate the facts. Accordingly, Plaintiff's claims against Argent are timely because they were filed within six years after the date of the last action which constituted a part of the breach or the violation, since Argent did not become trustee until 1 July 2014 and Plaintiff's claims were filed 26 November 2018.

> **ANSWER:** **Argent lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 634.**

### COUNT III
### BREACH OF FIDUCIARY DUTY AGAINST STATE STREET BANK AND TRUST COMPANY

Paragraphs 635-678.

> **ANSWER:** **No response to Paragraphs 635-678 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against**

Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT IV
## <u>BREACH OF FIDUCIARY DUTY AGAINST BUTH</u>

Paragraphs 679-728.

**ANSWER:**     **No response to Paragraphs 679-728 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT V
## <u>BREACH OF FIDUCIARY DUTY AGAINST KARCH</u>

Paragraphs 729-768.

**ANSWER:**     **No response to Paragraphs 729-768 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT VI
## BREACH OF FIDUCIARY DUTY AGAINST PARKER

Paragraphs 769-793.

**ANSWER:** **No response to Paragraphs 769-793 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT VII
## BREACH OF FIDUCIARY DUTY AGAINST FANTINI

Paragraphs 794-814.

**ANSWER:** **No response to Paragraphs 794-818 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT VIII
## BREACH OF FIDUCIARY DUTY AGAINST RICHARDS

Paragraphs 815-844.

**ANSWER:** **No response to Paragraphs 815-844 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT IX
## BREACH OF FIDUCIARY DUTY AGAINST FERREE

Paragraphs 845-874.

**ANSWER:** **No response to Paragraphs 845-874 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT X
## BREACH OF FIDUCIARY DUTY AGAINST ARENT

Paragraphs 875-899.

**ANSWER:** **No response to Paragraphs 875-899 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against**

356

Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XI
## BREACH OF FIDUCIARY DUTY AGAINST TYCZKOWSKI

Paragraphs 900-922.

**ANSWER:** No response to Paragraphs 900-922 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XII
## BREACH OF FIDUCIARY DUTY AGAINST WILLETTS

Paragraphs 923-945.

**ANSWER:** No response to Paragraphs 923-945 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XIII
### BREACH OF FIDUCIARY DUTY AGAINST GILLIGAN

Paragraphs 946-964.

**ANSWER:** **No response to Paragraphs 946-964 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT XIV
### BREACH OF FIDUCIARY DUTY AGAINST CARTER

Paragraphs 965-980.

**ANSWER:** **No response to Paragraphs 965-980 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT XV
### BREACH OF FIDUCIARY DUTY AGAINST SEIFERT

Paragraphs 981-997.

**ANSWER:** **No response to Paragraphs 981-997 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is**

required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XVI
## BREACH OF FIDUCIARY DUTY AGAINST REARDON

Paragraphs 998-1013.

**ANSWER:** No response to Paragraphs 998-1013 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XVII
## BREACH OF FIDUCIARY DUTY AGAINST MURPHY

Paragraphs 1014-1029.

**ANSWER:** No response to Paragraphs 1014-1029 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

359

## COUNT XVIII
## BREACH OF FIDUCIARY DUTY AGAINST SUWYN

Paragraphs 1030-1044.

**ANSWER:** **No response to Paragraphs 1030-1044 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**


## COUNT XIX
## BREACH OF FIDUCIARY DUTY AGAINST SCHERBEL

Paragraphs 1045-1058.

**ANSWER:** **No response to Paragraphs 1045-1058 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**


## COUNT XX
## BREACH OF FIDUCIARY DUTY AGAINST PACE

Paragraphs 1059-1071.

**ANSWER:** **No response to Paragraphs 1059-1071 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is**

required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXI
### ENGAGING IN PROHIBITED TRANSACTIONS AGAINST STATE STREET, BUTH, KARCH, AND HOULIHAN

Paragraphs 1072-1097.

**ANSWER:** No response to Paragraphs 1072-1097 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXII
### ENGAGING IN PROHIBITED TRANSACTIONS AGAINST STATE STREET

Paragraphs 1098-1109.

**ANSWER:** No response to Paragraphs 1098-1109 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXIII
## ENGAGING IN PROHIBITED TRANSACTIONS AGAINST RELIANCE TRUST COMPANY

Paragraphs 1110-1119.

**ANSWER:     No response to Paragraphs 1110-1119 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**


## COUNT XXIV
## ENGAGING IN PROHIBITED TRANSACTIONS AGAINST ARGENT TRUST COMPANY

1120.   All previous averments are incorporated herein.

**ANSWER:     Argent incorporates by reference and fully restates its responses to the preceding paragraphs of the Second Amended Complaint.**


1121.   ERISA § 406(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, or any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest;… (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or; (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title."

362

**ANSWER:** **Argent admits that Paragraph 1121 purports to cite to ERISA § 406(a)(1), refers to that provision for its exclusive terms, and denies all allegations in Paragraph 121 inconsistent with its complete terms.**

1122.   Argent was a fiduciary to the ESOP Trustee from 1 July 2014 to October 2017.

**ANSWER:** **Argent admits that the extent of its services and fiduciary obligations are outlined in the Trust Agreement and engagement agreement, as well as ERISA, refers to those sources for their exclusive terms, and denies all allegations in Paragraph 1122 inconsistent with their complete terms.**

1123.   PDC was a party in interest as Appvion's parent company. ERISA § 3(14)(E), 29 U.S.C. § 1002(14)(E); ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

**ANSWER:** **Argent admits that Paragraph 1123 purports to cite to 29 U.S.C. § 1002(14), refers to that provision for its exclusive terms, and denies all allegations in Paragraph 1123 inconsistent with its complete terms.**

1124.   Employees of the sponsoring company (Appvion) are parties in interest. ERISA § 3(14)(C) (29 U.S.C. § 1002(14)(C)).

**ANSWER:** **Argent admits that Paragraph 1124 purports to cite to 29 U.S.C. § 1002(14)(C), refers to that provision for its exclusive terms, and denies all allegations in Paragraph 1124 inconsistent with its complete terms.**

1125.   Argent was ESOP Trustee from 1 July 2014 until Appvion filed for bankruptcy in October 2017. Since Argent purchased Reliance, it continued operating under the Reliance

363

Trust Agreement from 1 July 2014 until August 2015. The Trust Agreement between Reliance and Appvion stated that: "The Trustee will purchase Company Stock with the assets contained in the Participants' accounts under the Plan on the Committee's direction, unless the Trustee determines that such purchase is prohibited by ERISA. The Trustee will purchase Company Stock from the Company or from any shareholder, if the Trustee is directed by the Committee to do so, and such stock may be outstanding, newly issued or treasury stock. All such purchases must be at a price not in excess of fair market value, as determined by an Independent Appraiser and approved by the Trustee, if such stock is not publicly traded."

> **ANSWER:** **Argent admits that Paragraph 1125 purports to cite to a Trust Agreement between Reliance and Appvion, refers to that agreement for its exclusive terms, and denies all allegations in Paragraph 1125 inconsistent with its complete terms.**

1126.    Argent therefore caused the ESOP to purchase PDC stock within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a) because it had a responsibility to determine whether the purchases were for adequate consideration and a duty not to purchase stock if it was for more than adequate consideration.

> **ANSWER:** **The allegations in Paragraph 1126 contain legal conclusions to which no response is required. To the extent a response is required, Argent denies the allegations in Paragraph 1126.**

1127.    While operating under this Trust Agreement between 1 July 2014 and August 2015, Argent caused the ESOP to purchase stock from PDC at least twice a year as listed in Appendix A. Argent also caused the ESOP to repurchase stock from Appvion's employees

through diversifications and loans as listed in Appendix B. This includes purchases listed for June 2014; these were made in July 2014 after the valuation was completed, but the purchases were retroactive to June. Therefore the actual purchase of stock was directed by Argent after it took over as trustee on 1 July 2014.

> **ANSWER:** **Argent admits that Paragraph 1127 purports to records of certain transactions and refers to those documents agreement for their exclusive terms, and denies all allegations in Paragraph 1127 inconsistent with its complete terms.**

1128. On 26 May 2015, Argent and Appvion entered into a letter agreement stating that Argent would serve as a discretionary trustee in connection with the sale of Encapsys. On 3 August 2015, Argent entered into a new Trust Agreement with Appvion which also named Argent a discretionary trustee. This Trust Agreement stated:

> Investment of Trust Fund. Assets held by the Trustee in the Trust Fund shall be invested by the Trustee primarily in Company Stock, to the extent consistent with ERISA…. **Company Stock shall be purchased by the Trustee only at prices which do not exceed the fair market value of the shares purchased, as determined by the Trustee, in its sole discretion**, based upon an appropriate valuation performed by an independent appraiser to support the Trustee's decision on establishing the fair market value of such Company Stock on the Valuation Date.

> Purchase and Sale Transactions. The Trustee, in its sole discretion, may enter into purchase and sale transactions of any form or structure from time to time, but **shall not enter into a non-exempt "prohibited transaction**," as that term is defined in Section 4975(c) of the Code and Section 406 of ERISA.

* * *

365

2.6. <u>Trust Fund Powers</u>. **The Trustee shall be a discretionary trustee with respect to all the assets of the Trust Fund, including, but not limited to, purchases, holding, and sales of Company Stock, as well as voting shares of Company Stock**…This explicitly gave Argent discretion to purchase PDC stock at fair market value, as determined by the Trustee in its sole discretion. Accordingly, Argent caused the ESOP to purchase stock within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a).

> **ANSWER:** **Argent admits that it entered into an engagement agreement with Appvion effective May 26, 2015, under which Argent performed certain trustee services. Argent further admits that Paragraph 1128 purports to cite to a Trust Agreement between Argent and Appvion, refers to that agreement for its exclusive terms, and denies all allegations in Paragraph 1128 inconsistent with its complete terms.**

1129.  While operating under this Trust Agreement with discretion on whether to buy stock, Argent caused the ESOP to purchase stock from PDC at least twice a year as listed in Appendix A. Argent also caused the ESOP to repurchase stock from Appvion's employees through diversifications and loans as listed in Appendix B.

> **ANSWER:** **The allegations in Paragraph 1129 contain legal conclusions to which no response is required. To the extent a response is required, Argent denies the allegations in Paragraph 1129.**

1130. These transactions constituted prohibited transactions under ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), which are not exempt under ERISA § 408, 29 U.S.C. § 1108, because the purchases were not for adequate consideration. The purchases of PDC stock by the ESOP also constitute prohibited transactions under ERISA §

366

406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E); the shares of PDC stock were not qualified employer securities under ERISA § 407(a), 29 U.S.C. § 1107(a), because the appraisals of PDC stock were not qualified appraisals.

> **ANSWER:** **Argent denies the allegations in Paragraph 1130.**

1131. There is a per se ban on violations of ERISA § 406 (29 U.S.C. § 1106) regardless of whether they caused harm to the plan. However, the transactions above were for more than fair market value, which harmed the ESOP because it overpaid for PDC stock. Accordingly, the ESOP was damaged.

> **ANSWER:** **Argent admits that Paragraph 1131 purports to cite to 29 U.S.C. § 1106, refers to that provision for its exclusive terms, and denies all allegations in Paragraph 1131 inconsistent with its complete terms. Argent denies the remaining allegations in Paragraph 1131.**

## COUNT XXV
## ENGAGING IN PROHIBITED TRANSACTIONS AGAINST THE ESOP COMMITTEE MEMBERS (BUTH, PARKER, KARCH, FANTINI, RICHARDS, FERREE, TYCZKOWSKI, ARENT, WILLETTS, AND GILLIGAN)

Paragraphs 1132-1142.

> **ANSWER:** **No response to Paragraphs 1132-1142 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

367

## COUNT XXVI
## CO-FIDUCIARY LIABILITY AGAINST CARTER, MURPHY, REARDON, SCHERBEL, PACE, SUWYN, AND SEIFERT

Paragraphs 1143-1151.

**ANSWER:** No response to Paragraphs 1143-1151 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXVII
## CO-FIDUCIARY LIABILITY AGAINST BUTH, KARCH, PARKER, FANTINI, RICHARDS, FERREE, TYCZKOWSKI, ARENT, WILLETTS, AND GILLIGAN

Paragraphs 1152-1159.

**ANSWER:** No response to Paragraphs 1152-1159 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXVIII
## CO-FIDUCIARY LIABILITY AGAINST STATE STREET

Paragraphs 1160-1167.

**ANSWER:** No response to Paragraphs 1160-1167 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXIX
### CO-FIDUCIARY LIABILITY AGAINST RELIANCE TRUST COMPANY

Paragraphs 1168-1173.

**ANSWER:** No response to Paragraphs 1168-1173 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXX
### CO-FIDUCIARY LIABILITY AGAINST ARGENT TRUST COMPANY

Paragraphs 1174-1179.

**ANSWER:** No response to Paragraphs 1174-1179 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent

369

breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXXI
### FEDERAL SECURITIES FRAUD AGAINST RELIANCE

Paragraphs 1180-1205.

**ANSWER:** **No response to Paragraphs 1180-1205 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT XXXII
### FEDERAL SECURITIES FRAUD AGAINST ARGENT

Paragraphs 1206-1228.

**ANSWER:** **No response to Paragraphs 1206-1228 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## COUNT XXXIII
## <u>FEDERAL SECURITIES FRAUD AGAINST RICHARDS, ARENT, FERREE, AND GILLIGAN</u>

Paragraphs 1229-1274.

**ANSWER:** No response to Paragraphs 1229-1274 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXXIV
## <u>FEDERAL SECURITIES FRAUD AGAINST CARTER, MURPHY, REARDON, SUWYN, AND SEIFERT</u>

Paragraphs 1275-1287.

**ANSWER:** No response to Paragraphs 1275-1287 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXXV
## <u>FEDERAL SECURITIES FRAUD AGAINST STOUT, LEVINE AND EL-TAHCH</u>

Paragraphs 1288-1313.

371

**ANSWER:** No response to Paragraphs 1288-1313 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXXVI
## BREACH OF FIDUCIARY DUTY AGAINST HOULIHAN

Paragraphs 1314-1333.

**ANSWER:** No response to Paragraphs 1314-1333 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.

## COUNT XXXVII
## KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY AGAINST HOULIHAN

Paragraphs 1334-1342.

**ANSWER:** No response to Paragraphs 1334-1342 is required because the Court has dismissed this claim. (*See* Doc. 262). To the extent a response is required, Argent denies any factual allegations of wrongdoing against Argent asserted in these paragraphs and any allegations that Argent

**breached any fiduciary duties or ERISA provisions or otherwise acted improperly or inconsistent in any way with its duties.**

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgement to be entered against Defendants on all claims, and request that the Court order the following relief:

A.    With respect to Plaintiffs' ERISA claims:

    1.    Declare that each of the above fiduciary Defendants breached his, her or its fiduciary duties under ERISA, and/or knowingly participated in a fiduciary's breach.

    2.    Require each fiduciary found to have breached his/her/its fiduciary duties to the ESOP to jointly and severally pay such amount to the ESOP as necessary to make the ESOP whole for any losses resulting from said breaches of fiduciary duties, or by virtue of liability pursuant to ERISA § 405.

    3.    An order requiring the forfeiture of any interest in the ESOP of any fiduciary found to have breached his or her fiduciary duty to the ESOP to the extent necessary after any recovery for the ESOP to make whole the innocent participants of the ESOP.

    4.    Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

    5.    Award pre-judgment and post-judgment interest.

6.      Award any such other relief that the Court determines that Plaintiff is entitled pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.

B.      With respect to the non-ERISA claims, an award of damages in an amount to be proven at trial, along with punitive damages and such other and further relief as the Court deems just and proper.

**ANSWER:     Argent denies that Plaintiff is entitled to any of the relief requested in the Prayer for Relief.**

## AFFIRMATIVE DEFENSES

Argent incorporates by reference and fully restates its responses to the preceding paragraphs of the Second Amended Complaint. For its Affirmative Defneses, Argent further states as follows.

### FIRST AFFIRMATIVE DEFENSE
### ERISA § 408 Exemptions

Plaintiff's ERISA prohibited transaction claim (Count XXIV) fails in whole or in part because the exemptions set forth in ERISA section 408(e) and/or 408(b)(12) are satisfied.

### SECOND AFFIRMATIVE DEFENSE
### Lack of Standing and/or Subject Matter Jurisdiction

Plaintiff's claims against Argent are barried in whole or in part because Plaintiff has not suffered an injury in fact. Absent an injury in fact, Plaintiff lacks standing to sue for harm to the ESOP, and the Court therefore lacks subject matter jurisdiction.

### THIRD AFFIRMATIVE DEFENSE
### Lack of Intent

374

Plaintiff's ERISA prohibited transaction claim (Count XXIV) fails because a prohibited use of plan assets for the benefit of a party in interest requires a "subjective intent to benefit" a party in interest. Plaintiff has not alleged and cannot establish that Argent had any "subjective intent to benefit" any party in interest, and therefore the ERISA section 406 prohibited transaction claim fails in whole or in part.

## FOURTH AFFIRMATIVE DEFENSE
### Lack of Intent

Plaintiff's claims against Argent fail in whole or in part for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## FIFTH AFFIRMATIVE DEFENSE
### Additional Defenses

Argent reserves the right to assert any additional affirmative defenses that may be discovered or disclosed during the course of additional investigation and discovery.

Dated: October 20, 2022

By: */s/ William P. McKinley*
    William P. McKinley SBN # 1072959
    MENN LAW FIRM, LTD.
    2501 E. Enterprise Ave.
    Appleton, Wisconsin 54912
    Email: William-Mckinley@mennlaw.com
    Tel: (920) 731-6631
    Fax (920) 560 4757

    -and-

By: */s/ Michael L. Scheier*
    Michael L. Scheier
    Brian P. Muething
    Jacob D. Rhode
    KEATING MUETHING & KLEKAMP PLL
    One East Fourth Street, Suite No. 1400
    Cincinnati, Ohio 45202
    Email: mscheier@kmklaw.com
    bmuething@kmklaw.com
    jrhode@kmklaw.com
    Tel: (513) 579-6400
    Fax: (513) 579-6457

    *Counsel for Argent Trust Company*

## CERTIFICATE OF SERVICE

I certify that on October 20, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Michael L. Scheier*