| | | |
|---|---|---|
| Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 1:18-cv-1861-WCG |
| | ) | |
| Douglas P. Buth; Paul J. Karch; Mark Richards; Tom Ferree; Rick Fantini; Dale E. Parker; Angela Tyczkowski; Kerry Arent; Kent Willetts; Susan Scherbel; Ronald Pace; Stephen Carter; Kathi Seifert; Andrew Reardon; Terry Murphy; Mark Suwyn; Kevin Gilligan; Houlihan Lokey Capital, Inc. (f/k/a Houlihan Lokey Howard & Zukin Capital), a California corporation; Houlihan Lokey Financial Advisors, Inc. (f/k/a Houlihan Lokey Howard & Zukin Financial Advisors, Inc.), a California corporation; State Street Bank and Trust Company, a nationally chartered trust company; Argent Trust Company, N.A., a Tennessee corporation; Reliance Trust Company, a Georgia corporation; Scott D. Levine; Aziz El-Tahch; Stout Risius Ross, Inc., a Michigan corporation; Stout Risius Ross, LLC, an Michigan limited liability company, DOES 1 through 50, ABC Corporations 1-5, DEF Partnerships 1-5, GHI Limited Partnerships 1-5, and JKL Limited Liability Companies 1-5, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**DEFENDANT RELIANCE TRUST COMPANY'S ANSWER AND**
**AFFIRMATIVE DEFENSES TO THE SECOND AMENDED COMPLAINT**

Defendant Reliance Trust Company ("Reliance Trust") submits the following Answer and

Affirmative Defenses to the Second Amended Complaint ("Complaint").

Reliance Trust submits this answer on behalf of Reliance Trust only, and is not required to answer allegations against any other defendant. *See* Fed. R. Civ. P. 8(b)(1)(B). Unless stated otherwise, Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other defendants. Any statement of a lack of knowledge or information sufficient to form a belief as to the truth of an allegation has the same effect of a denial. *See* Fed. R. Civ. P. 8(b)(5). In addition, this answer is based on present knowledge and information, and Reliance Trust reserves all rights to supplement or otherwise amend this answer, including to add affirmative defenses, as discovery proceeds and as otherwise may be appropriate during the course of litigation.

Any allegations not expressly admitted shall be deemed denied. *See* Fed. R. Civ. P. 8(b)(3). Unless stated otherwise, Reliance Trust's answer to any subpart or footnote in the Complaint is included in the answer to the paragraph that contains the subpart or footnote. The headings, sub-headings, and appendices in the Complaint are not allegations to which an answer is required. *See* Fed. R. Civ. P. 10(b). To the extent that these items are intended as allegations, and unless stated otherwise, Reliance Trust denies them.

Nothing in this answer should be viewed as waiving or limiting Reliance Trust's ability to argue the Court dismissed claims to the extent they seek recovery for conduct taking place before November 26, 2012.

## I.    **INTRODUCTION**

### A.    **AWA Could Not Sell Appvion at an Acceptable Price.**

**COMPLAINT NO. 1:** At the beginning of 2001, Appleton Papers, Inc. ("Appvion")[1] a Wisconsin-based paper products Company, was owned by French conglomerate Arjo Wiggins Appleton ("AWA"). AWA had been trying, without success, to sell Appvion for several years

---

[1] Appleton Papers, Inc. changed its name to Appvion in May 2013. For simplicity, it is referred to throughout this Complaint as Appvion.

because its paper products business was declining from the increasing use of computers. Finally, on 12 February 2001, AWA contracted with Appvion's CEO, Douglas Buth, promising that if he could sell Appvion for more than $700 million, AWA would pay him a contingent fee bonus of up to $10 million that he could divide among himself and other senior management that helped him with the sale. If Buth were unable to sell Appvion for at least $700 million, he would get no bonus.

**RESPONSE TO COMPLAINT NO. 1:** Reliance Trust admits that Appleton Papers, Inc. changed its name to Appvion Inc., and that Plaintiff refers to it as Appvion throughout the Complaint. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1.

**COMPLAINT NO. 2:** Unable to find a third-party buyer willing to pay more than $700 million Buth pitched a plan to sell Appvion to its employees as part of an employee stock ownership plan, or ESOP. The sale was structured as a sale of 100% of Paperweight Development Corp.'s ("PDC") stock to the ESOP. PDC[2] would then purchase Appvion from AWA and would become Appvion's parent holding company.

**RESPONSE TO COMPLAINT NO. 2:** Reliance Trust admits that PDC owned Appvion Inc., and that Plaintiff refers to the two entities interchangeably throughout the Complaint. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 2.

### B.    Houlihan Quarterbacked the ESOP Transaction For a Contingent Fee.

**COMPLAINT NO. 3:** Buth had no experience with ESOPs and so he engaged the international investing banking firm Houlihan Lokey to "quarterback" the entire ESOP process, agreeing to pay a contingent fee of 1% of the total sales price (ultimately $8.1 million), $100,000 for a fairness opinion, and additional amounts Houlihan would receive directly from AWA.

**RESPONSE TO COMPLAINT NO. 3:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3.

**COMPLAINT NO. 4:** Both Buth and Houlihan were badly conflicted because if they did not sell PDC's stock to the ESOP they would get no contingent fee. Also, if the sale went through, Buth, Karch (Appvion's general counsel) and others would receive the financial benefits from

---

[2] PDC was the holding company that owned Appvion. Appvion and PDC are referred to interchangeably throughout this SAC because their finances were consolidated and Appvion was the primary employer.

remaining in control of Appvion. Therefore, Houlihan needed to carefully exercise its contractual right to direct the hiring of the ESOP Trustee and the valuation firm that would value the PDC stock. The selected firms needed to be willing to collude with Houlihan, Buth and Karch by supporting the ESOP's purchase of PDC stock for more than fair market value. Houlihan selected State Street to be the ESOP fiduciary and Willamette to value the PDC stock. Buth and Karch agreed.

**RESPONSE TO COMPLAINT NO. 4:** Reliance Trust lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 4.

**COMPLAINT NO. 5:** Houlihan, Buth, Karch and State Street also had to carefully monitor and control all communications between Appvion and the employees.[3] In those communications, Buth, Karch, Houlihan, State Street, and Willamette all assured the Employee Fiduciaries that at $10 per share, the ESOP was not paying more than fair market value. But in fact, at the date of the ESOP closing (9 November 2001) the PDC stock had no equity or positive fair market value.

**RESPONSE TO COMPLAINT NO. 5:** Reliance Trust lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 5.

**COMPLAINT NO. 6:** The Appvion Employee Fiduciaries had to be so convinced that the ESOP was not paying more than fair market value for PDC stock, that they would be willing to not only overlook managements' conflict of interest, but take money from their diversified, liquid, debt free 401(k) plans and move it to the ESOP, where their investment would be undiversified, illiquid and heavily encumbered by debt.

**RESPONSE TO COMPLAINT NO. 6:** Reliance Trust lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 6.

C.     **Buth, Karch, Houlihan and State Street Engaged in a Course of Conduct to Fraudulently Conceal that the ESOP Would be Paying More than Fair Market Value at Closing.**

**COMPLAINT NO. 7:** In order to conceal from the ESOP, through its Employee Fiduciaries, that it would be actually paying more than fair market value for each purchase of PDC stock, Buth, Karch, Houlihan and State Street engaged in a course of conduct to fraudulently conceal their misrepresentations and fiduciary breaches in order to "cover their tracks." This course of conduct included the following affirmative acts that were separate and independent from

---

[3] The prospectus designated the Appvion employees as "Employee Fiduciaries" for purposes of their decision whether to fund the ESOP purchase of PDC stock. Therefore, the SAC will refer to them as such through the 9 November 2001 ESOP Transaction.

their fraudulent misrepresentations that the ESOP would pay no more than fair market value for the PDC stock and the related fiduciary breaches of the duty of prudence, loyalty and disclosure:

- They each participated in a course of conduct of fraudulent communications with the Employee Fiduciaries falsely representing that Houlihan was "independent," for the purpose of persuading the Employee Fiduciaries, that Houlihan's independence was able to compensate for any bias that Buth, Karch and other Appvion management had resulting from their contingent fee. Believing that the ESOP was being endorsed by an independent, international investment banking firm with Houlihan's stature, the Employee Fiduciaries were dissuaded from further investigation into the transaction, into Appvion's true fair market value and into potential fiduciary breaches.

- In order to make it appear that the PDC stock had a positive equity value (when it did not), Buth, Karch, State Street and Willamette participated together in fraudulently inflating PDC stock's fair market value. They did this by subtracting only a portion of PDC's balance sheet debt in arriving at PDC's fair market value. Specifically, they fraudulently failed to subtract PDC's pension and post-retirement debt and "Other" material liabilities that totaled $98.3 million as of 31 December 2001, just 52 days after the ESOP transaction closed. They also added (or agreed to add) a fifteen percent control premium, even though the ESOP documents made clear that the ESOP Trustee controlled neither Appvion nor its Board of Directors. As of 31 December 2001, the control premium equaled $83.6 million. Both of these actions violated basic valuation theory.

**RESPONSE TO COMPLAINT NO. 7:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7.

**COMPLAINT NO. 8:** Absent these fraudulent manipulations to PDC's fair market value, Buth, Karch, State Street and Willamette would have been required to report a negative fair market value both at 31 December 2001 and at the 9 November 2001 ESOP closing. Further, these fraudulent manipulations to the stock price demonstrate the entire valuation process was not reliable.

**RESPONSE TO COMPLAINT NO. 8:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

**COMPLAINT NO. 9:** Neither of these two manipulations, that raised PDC's equity value from a negative to a purported positive number, could reasonably be considered the result of a mere disagreement over proper valuation methods. As described later, there is no valuation theory that justifies not subtracting balance sheet debt that, for example, reached as high as $207.4 million in 2012. And Willamette, the very firm that did the valuations from 9 November 2001 through mid-2004, has published an article stating that the present value of retirement debt must be subtracted dollar-for-dollar from fair market value.

5

**RESPONSE TO COMPLAINT NO. 9:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

**COMPLAINT NO. 10:** In fact, the Restatement 2nd of Torts specifically uses the example of disclosing some debt but omitting other debt in a prospectus, as an example of a fraudulent misrepresentation: "Thus a prospectus that accurately states the assets, bonded indebtedness and net earnings of a manufacturing corporation but omits any reference to its floating debt is a false representation of the financial position of the company." That is exactly what happened in every PDC stock valuation from 9 November 2001 through mid-2016.

**RESPONSE TO COMPLAINT NO. 10:** To the extent the allegations in paragraph 10 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10.

**COMPLAINT NO. 11:** Likewise, there is simply no legitimate or good faith justification for sophisticated valuation professionals, investment bankers and highly educated company executives to add a "control premium" where all the ESOP documents (that they created to keep control) demonstrated the ESOP Trustee had no meaningful control. That is because Buth, Karch and others intentionally sold 100% of the PDC stock to the ESOP, while keeping control for themselves.

**RESPONSE TO COMPLAINT NO. 11:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11.

**COMPLAINT NO. 12:** Buth, Karch, Houlihan, and State Street convinced Appvion's Employee Fiduciaries to vote in favor of contributing their 401(k) savings in order to come up with the $107 million down payment needed to buy one hundred percent of the PDC stock. In doing so, Buth and Karch received bonuses from the seller totaling over $1.7 million and $850,000, respectively; Houlihan received a more than $8.1 million in selling bonus; and State Street received the ESOP's ongoing business and strengthened its relationship with Houlihan.

**RESPONSE TO COMPLAINT NO. 12:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12.

**COMPLAINT NO. 13:** The transaction closed on 9 November 2001, for a total purchase price of $810 million plus $25 million in transaction fees.

**RESPONSE TO COMPLAINT NO. 13:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13.

6

**D.** **The Course of Conduct to Fraudulently Conceal PDC Stock's Fraudulently Inflated Value (and Related Fiduciary Breaches) Continued After the 9 November 2001 ESOP Transaction and Until Appvion's 2017 Bankruptcy.**

**COMPLAINT NO. 14:** After the close, Buth, Karch, and State Street (and additional defendants) by necessity, continued their course of conduct to conceal the fraud, and the related fiduciary breaches and that, contrary to what been represented, the ESOP had paid more than fair market value for the PDC stock in the 9 November 2001 ESOP transaction.

**RESPONSE TO COMPLAINT NO. 14:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14.

**COMPLAINT NO. 15:** The ESOP documents required PDC's stock to be valued semi-annually by the ESOP Trustee with the assistance of an independent appraiser. Each of those valuations for the next 16 years had to likewise fraudulently inflate the PDC stock price in order to conceal that the PDC stock price had been fraudulently inflated since the 9 November 2001 ESOP transaction and the related fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 15:** To the extent the allegations in paragraph 15 refer to Reliance Trust, Reliance Trust admits it reviewed semi-annual valuations prepared by an independent appraiser during its time as trustee, but otherwise denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15.

**COMPLAINT NO. 16:** Each of the following 31 semi-annual valuations therefore served the separate and independent purpose of concealing the initial ESOP transaction fraud as well as the ongoing fraud, concealing that the ESOP was purchasing, and had purchased, every share of PDC stock for more than fair market value at fraudulently inflated stock values. Had, for example, if any of those valuations had properly deducted the pension/post-retirement debt and "Other Material Liabilities"[4] reported on Appvion's audited financial statements, and removed the fraudulent control premium, the ESOP, through its Employee Owners,[5] would have learned that Buth, Karch, Houlihan, State Street and Willamette had fraudulently misrepresented that $10 per share was fair market value for the PDC stock on 9 November 2001, the date of the ESOP transaction.

---

[4] These three balance sheet debt entries will be referred to at times as the "Excluded Debt" because they were excluded (not deducted) from every PDC stock valuation.

[5] After the ESOP Transaction closed, this SAC refers to the participating employees as the "Employee Owners" as a result of their ESOP ownership.

**RESPONSE TO COMPLAINT NO. 16:** Reliance Trust admits that Plaintiff refers to

"pension/post-retirement debt" and "Other Materials Liabilities" as the "Excluded Debt" and refers

to ESOP participants as "Employee Owners" following the ESOP's purchase of all PDC stock. To

the extent the remaining allegations in paragraph 16 refer to Reliance Trust, denied. Reliance Trust

lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 16.

**COMPLAINT NO. 17:** For example, as of 31 December 2001 (the date of the PDC
stock's first semi-annual valuation), Buth, Karch, Fantini, Parker and State Street fraudulently
represented to the Employee Owners, that the ESOP was paying fair market value for the purchase
of PDC stock, by creating and disseminating a PDC stock price that again purported to be fair
market value. Each of the 31 semi-annual PDC stock prices (beginning with 31 December 2001)
released to the ESOP, through the Employee Owners, again was furtherance of a course of conduct
to fraudulently conceal that was separate and independent from the underlying wrongdoing—the
31 December 2001 fraud and related fiduciary breaches. And the same pattern of semi-annual
fraud and the subsequent course of conduct of disseminating later fraudulent PDC stock prices, to
conceal the earlier fraud and fiduciary breaches. And the same patterns of semi-annual fraud and
the subsequent course of conduct of disseminating later fraudulent PDC stock prices, to conceal
the earlier fraud and fiduciary breaches, continued through Appvion's bankruptcy.

**RESPONSE TO COMPLAINT NO. 17:** To the extent the allegations in paragraph 17

refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form

a belief as to the truth of the remaining allegations in paragraph 17.

**COMPLAINT NO. 18:** This course of conduct of fraudulent concealment, is well
demonstrated by the following chart that comes from the April 2006 newsletter to the ESOP
Employee Owners. The ESOP Committee (Richards, Karch, Parker) authorized its release:

**Figure 1: The Ownership Update, April 2006, PDC Stock Performance**



Source: The Ownership Update, April 2006, p. 2.

**RESPONSE TO COMPLAINT NO. 18:** Reliance Trust lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 18.

**COMPLAINT NO. 19:** As the chart demonstrates, each PDC stock price is separate and independent and sets the price for PDC stock prices for that respective period. But, at the same time, each stock price builds on stock prices from previous periods, thus acting to convince the Employee Owners that the earlier stock prices must have been correct because they form part of a consistent pattern. As a result, the Employee Owners were prevented from discovering the previous misrepresentations and breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 19:** Reliance Trust lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 19.

**COMPLAINT NO. 20:** The course of conduct of fraudulent concealment also included the following additional acts that were separate and independent from each of the semiannual valuation frauds from the earlier periods and which were also separate and independent because they were released pursuant to Appvion's SEC duties and not ERISA-imposed duties:

- Each year Appvion released its 10-K to the public, including to the ESOP, through its Employee Owners. The Notes to each of the audited financial statements that were part of the 10-K, beginning with 2002, reported the fraudulently inflated PDC stock price for that year, thereby again concealing that the previous years' stock prices had also been fraudulently inflated and the related fiduciary breaches. Each 10-K was signed to by Appvion's CEO and CFO (who also signed attestations) and the members of Appvion's Board of Directors.

- Each annual 10-K also contained a balance sheet entitled "Redeemable Common Stock" whose amount was calculated as a function of that year's fraudulently inflated stock price. This balance sheet entry was consistent with earlier years' fraudulent entries and therefore, also fraudulently concealed the preceding year's fraudulently inflated valuations and the related fiduciary breaches.

- Each annual 10-K balance sheet included the balance sheet from the previous year, thus validating that earlier year's stock price and concealing that the "Redeemable Common Stock" value from the prior year had been fraudulently overstated.

- Each 10-K also included an audit opinion either signed by PricewaterhouseCoopers (2001 – 2014) or RSM McGladrey (2015 – 2016) representing that the annual financial statements were audited pursuant to the applicable auditing standard and that they were presented in accordance with generally accepted auditing standards. Because none of these audited financial statements prior years' fraudulently

inflated PDC stock prices, they likewise served to conceal the prior years' fraud and fiduciary breaches.[6]

- After each quarter, Appvion filed with the SEC and released 10-Qs that, like the 10-Ks, concealed that earlier periods' stock prices had been fraudulently inflated and related fiduciary breaches. These 10-Qs contained balance sheets likewise reporting the Redeemable Common Stock balance that incorporated PDC's most recent stock price, thus validating that year's stock price and fraudulently concealing that each earlier valuation had been fraudulently inflated and the related fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 20:** It is unclear whether paragraph 20 refers to Appvion Inc.'s or PDC's Form 10-Ks. To the extent the allegations in paragraph 20 refer to Reliance Trust, Reliance Trust states as follows:

- As to Appvion Inc., Reliance Trust denies that Appvion Inc. filed a Form 10-K for the fiscal year ending December 28, 2013, and denies that Appvion Inc. filed a Form 10-Q for the first and second quarters of 2014. Reliance Trust admits that Appvion Inc. filed a Form 10-Q for the first, second, and third quarters of 2013 and that these Form 10-Qs contained balance sheets, but denies that the valuation as of June 30, 2013 is inflated or overstated, denies it fraudulently concealed any purportedly inflated valuations or fiduciary breaches, denies it breached any fiduciary duties, and denies any remaining allegations as to Appvion Inc.'s 2013 Form 10-Qs.

- As to PDC's 2013 Form 10-K, Reliance Trust admits that PDC filed a Form 10-K for the fiscal year ending December 28, 2013, which appears to be signed by Mark R. Richards, Thomas J. Ferree, and directors, attached certifications which appear to be signed by Mark R. Richards and Thomas J. Ferree, included balance sheets,

---

[6] Neither PwC nor RSM are Defendants in this SAC. They are Defendants in a separate action filed in the State of Wisconsin Circuit Court, Outagamie County.

and included an audit opinion that appears to be signed by PricewaterhouseCoopers LLP, but denies that the valuations as of June 30, 2013 and as of December 31, 2013 are inflated or overstated, denies it fraudulently concealed any purportedly inflated valuations or fiduciary breaches, denies it breached any fiduciary duties, denies any balance sheet in the Form 10-K is entitled "Redeemable Common Stock," and denies any remaining allegations as to PDC's 2013 Form 10-K.

- As to PDC's 2013 Form 10-Qs and PDC's Form 10-Qs for the first and second quarters of 2014, Reliance Trust admits that PDC filed a Form 10-Q for the first, second, and third quarters of 2013, and for the first and second quarters of 2014, and that these Form 10-Qs include balance sheets, but denies that the valuations as of June 30, 2013 and as of December 31, 2013 are inflated or overstated, denies it fraudulently concealed any purportedly inflated valuations or fiduciary breaches, denies it breached any fiduciary duties, and denies any remaining allegations as to PDC's 2013 Form 10-Qs and PDC's Form 10-Qs for the first and second quarters of 2014.

Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 20.

**COMPLAINT NO. 21:** The course of conduct of fraudulent concealment also included the following acts designed to conceal that earlier PDC stock prices were fraudulently inflated and the related fiduciary breaches, but that were separate and independent from the fraudulently inflated stock price of the earlier periods:

- The Defendants who were members of the ESOP Committee released a series of communications informing the ESOP Employee Owners of the stock price and purporting to describe the valuation processes. These communications continued to confirm the earlier fraudulent misrepresentations and misrepresented that the prior and current processes of valuing the PDC stock were reliable.

- Appvion held regular road shows that confirmed and perpetuated the prior year's fraud. Appvion's CEOs, Buth and Richards, conducted these road shows along with

representatives from State Street, Willamette or Stout, and Appvion's Board of Directors.

- Throughout the ESOP's history, certain of the PDC valuations included additional fraudulent adjustments or inclusions that likewise served to conceal preceding years of fraud by reaffirming PDC's positive equity value.

- The ESOP Trustee sent regular account statements to the Employee Owners, affirming the stock values and their purchase price.

- The ESOP continued to redeem stock at the current fraudulently inflated values, thus concealing that the PDC stock, and prior years' PDC stock was being and had been purchased for more than fair market value, and giving assurance that the PDC stock had been accurately valued.

**RESPONSE TO COMPLAINT NO. 21:** To the extent the allegations in paragraph 21 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 21.

**COMPLAINT NO. 22:** This SAC details each Defendant's participation (with particularity) in this course of conduct of fraudulently representing that the ESOP would not pay more than fair market value as reflected by the PDC stock price, and then their participation in the subsequent course of separate and independent conduct to conceal the fraud from earlier years and the related breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 22:** To the extent the allegations in paragraph 22 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22.

**COMPLAINT NO. 23:** This SAC also details each ERISA Defendants' underlying breaches of fiduciary duties that the Defendants' course of fraudulent concealment masked and prevented the ESOP, through its Employee Owners, from discovering.

**RESPONSE TO COMPLAINT NO. 23:** To the extent the allegations in paragraph 23 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23.

### E. The BemroseBooth Transaction Provides Conclusive Evidence of an Intent to Commit Fraud.

**COMPLAINT NO. 24:** Of critical significance to this chronology of fraud and fraudulent concealment (and conclusive evidence of the scienter) is the Defendants' 2007 and 2008 treatment of Appvion subsidiary BemroseBooth. In 2003, Appvion's board of directors approved and touted the purchase of an English company, BemroseBooth, for $63.5 million. The acquisition was a disaster. In 2007 and 2008, ESOP Committee members (Richards, Ferree, Tyczkowski, Willetts and Arent) explained in a series of written communications with the ESOP's Employee Owners, in at least one road show, and in the audited financial statements included in Appvion's 2008 10-K, that an important reason that BemroseBooth had so quickly become worth nothing, was that its fair market value had been reduced, dollar-for-dollar, by $15.3 million – the present value of its pension liability.

**RESPONSE TO COMPLAINT NO. 24:** To the extent the allegations in paragraph 24 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 24.

**COMPLAINT NO. 25:** Yet, remarkably, and in furtherance of the course of conduct of fraudulent concealment, the defendants involved during those years, and those who followed, failed to deduct even one dollar of Appvion's much larger pension and post-retirement debt in calculating PDC's fair market value. Those combined retirement debts grew to an astounding $154.9 million in 2008 (69% of the ESOP's purported equity in PDC) and then by 2012 reached a high of $175.6 (115% of the ESOP's purported equity in PDC).

**RESPONSE TO COMPLAINT NO. 25:** To the extent the allegations in paragraph 25 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25.

**COMPLAINT NO. 26:** The reduction in BemroseBooth's fair market value as a result of its pension debt, was approved by Stout, State Street and the ESOP committee at the time (Richards, Ferree, Arent and Willetts). It was also approved by Appvion's Board members (Richards, Carter, Murphy, Pace, Reardon, Seifert, Scherbel) who signed the 2008 BemroseBooth 10-K disclosure. Therefore, they each admitted that retirement debt must be subtracted to arrive at fair market value, but did nothing to deduct Appvion's much larger retirement debt or to correct the earlier fraudulent PDC stock prices. While it served their purpose to blame BemroseBooth's decline in value on its pension liability, to likewise deduct Appvion's retirement debt would have exposed both their participation in the ongoing fraud and that Appvion had no equity value.

**RESPONSE TO COMPLAINT NO. 26:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26.

**F.**    **Grant Lyon Discovered that Each of PDC's Stock Valuations Were Fraudulently Overvalued Dating Back to 9 November 2001.**

**COMPLAINT NO. 27:** In August 2017, Grant Lyon was appointed as an ERISA fiduciary, replacing the entire ESOP Committee. He began an analysis of Appvion's financial statements and PDC's stock valuations. From his investigation, he learned, for the first time, that each of the valuations – which had never been made public or otherwise released to the Employee Owners – fraudulently overvalued PDC's stock value and misrepresented Appvion's true financial condition.

**RESPONSE TO COMPLAINT NO. 27:** Reliance Trust denies that it fraudulently overvalued PDC's stock value or misrepresented Appvion's true financial condition. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 27.

**COMPLAINT NO. 28:** Resulting from the valuation irregularities Lyon ultimately identified, each of the fraudulent appraisals, 10-Ks and 10-Qs from 2001 through 2017 masked and concealed the fundamental weaknesses in Appvion's true financial condition and prevented the ESOP, through its Employee Owners, from being able to understand the PDC stock's true value. Therefore, the ESOP overpaid for PDC stock from the beginning of the ESOP through bankruptcy. Lyon reported his preliminary findings to Appvion's Board of Directors on or about 1 September 2017 and recommended that all ESOP purchases of PDC stock be suspended.

**RESPONSE TO COMPLAINT NO. 28:** Reliance Trust denies that it fraudulently appraised PDC's stock value, masked or concealed Appvion Inc.'s financial condition, or prevented the ESOP from being able to understand PDC's stock value. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28.

**COMPLAINT NO. 29:** In the fall of 2018, Lyon for the first time discovered that Houlihan was not "independent" as had been fraudulently represented by Buth, Karch, Houlihan (Paone) and State Street (Driscoll), but in fact stood to gain a contingent fee if the 2001 Transaction closed.

**RESPONSE TO COMPLAINT NO. 29:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29.

**COMPLAINT NO. 30:** Any knowledge of ESOP Committee members or the other defendants is not attributable to the ESOP trust or the plaintiff because they were active participants in the fraud.

**RESPONSE TO COMPLAINT NO. 30:** To the extent the allegations in paragraph 30 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 30.

**COMPLAINT NO. 31:** This SAC seeks to recover damages suffered by the ESOP (and indirectly by its Employee Owners), including those resulting from the ESOP's purchase of PDC stock at fraudulently inflated prices. It also seeks to recover all fees paid to Houlihan.

**RESPONSE TO COMPLAINT NO. 31:** Reliance Trust admits that Plaintiff purports to seek relief for the ESOP, but denies Plaintiff is entitled to any relief and denies that the valuations as of June 30, 2013 and as of December 31, 2013 are fraudulently inflated. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31.

## II. NATURE OF THE ACTION

**COMPLAINT NO. 32:** This action arises in part under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. and is brought by the ESOP to restore losses to the ESOP, obtain equitable relief to remedy violations of ERISA and/or breaches of fiduciary duty, and to obtain damages.

**RESPONSE TO COMPLAINT NO. 32:** To the extent the allegations in paragraph 32 refer to Reliance Trust, Reliance Trust admits that Plaintiff sued under ERISA and that Plaintiff purports to seek relief for the ESOP, but denies that Plaintiff is entitled to any relief, denies any violations of ERISA, denies any losses to the ESOP, and denies any breaches of fiduciary duty. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32.

**COMPLAINT NO. 33:** This action seeks relief against the fiduciary Defendants for violations of ERISA's statutory and fiduciary provisions, including recovery to the ESOP of any losses resulting from the breaches, disgorgement of profits of any fiduciary which have been made through the use of assets of the ESOP, and other appropriate equitable and remedial relief pursuant

to ERISA § 502(a)(2) (29 U.S.C. § 1143(a)(2)), ERISA § 502(a)(3) (29 U.S.C. § 1132(a)(3)), ERISA § 404 (20 U.S.C. § 1104), ERISA § 405 (20 U.S.C. § 1105), ERISA § 406 (20 U.S.C. § 1106), and ERISA § 410 (29 U.S.C. § 1110).

**RESPONSE TO COMPLAINT NO. 33:** To the extent the allegations about "fiduciary Defendants" in paragraph 33 refer to Reliance Trust, Reliance Trust admits that Plaintiff brought this action under ERISA and that Plaintiff purports to seek relief for the ESOP, but denies that Plaintiff is entitled to any relief, denies any losses to the ESOP, denies any violations of ERISA, and denies any breaches of fiduciary duty. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 33.

**COMPLAINT NO. 34:** This action also seeks relief against certain Defendants for federal securities fraud.

**RESPONSE TO COMPLAINT NO. 34:** To the extent the allegations about "certain Defendants" in paragraph 34 refer to Reliance Trust, Reliance Trust admits that Plaintiff purported to seek relief for federal securities fraud, but denies that Plaintiff is or was entitled to any relief, and denies it committed any federal securities fraud. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34.

## III.    PARTIES, JURISDICTION, AND VENUE

**COMPLAINT NO. 35:** Non-Party Appvion, Inc. (f/k/a Appleton Papers, Inc.) ("Appvion") is a Delaware corporation with its principal place of business in Appleton, Wisconsin. Appvion established and maintained the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP") to provide retirement benefits for its eligible employees. The ESOP is an employee benefit plan within the meaning of ERISA § 3(3) (29 U.S.C. § 1002(3)) consisting of an employee stock ownership component and a 401(k) component. This lawsuit is brought only on behalf of the ESOP component and does not address the 401(k) component.

**RESPONSE TO COMPLAINT NO. 35:** Reliance Trust admits that Plaintiff purports to bring this action on behalf of the employee stock ownership component of the ESOP. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35.

**COMPLAINT NO. 36:** The ESOP Non-Party Paperweight Development Corp. ("PDC") is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin. PDC is Appvion's parent company, and the ESOP was the sole shareholder of PDC.

**RESPONSE TO COMPLAINT NO. 36:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36.

**COMPLAINT NO. 37:** Plaintiff Grant Lyon is a resident of the state of Florida. Lyon is bringing this action as an ERISA fiduciary on behalf of the ESOP, for the benefit of its beneficiaries. Lyon is the sole member of the ESOP Administrative Committee of Appvion, Inc. (the "ESOP Committee"). He is authorized to bring this action as an ERISA fiduciary and pursuant to the order of the Bankruptcy Court of the District of Delaware, which states:

> ESOP Reservation of Rights. Nothing in the Plan or Plan Confirmation Order shall operate as a waiver or release or otherwise impair in any respect (i) **any Claim held by the ESOP, the ESOP Committee or its members, or ESOP participants (as legal or beneficial Holders of Interests in any Debtor)**, arising from or relating to the ESOP or any Interest in any Debtor, against any Person other than the Debtors (the "ESOP Preserved Claims")…**Grant Lyon, in his capacity as an ESOP Committee member, shall have standing to prosecute the ESOP Claims** and other ESOP Preserved Claims….

*Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, In re Oldapco*, No. 17-12082 (Bankr. D. Del., Aug 14, 2018) [Dkt. 970]; emphasis added. Similarly, the Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation attached to the Bankruptcy Court's order states:

> **Any direct ESOP Claims held by the Holders of beneficial interests** in the ESOP on account of their beneficial interest in the ESOP **will be asserted by the ESOP Committee**, in its discretion, **on behalf of all Holders of beneficial interests in the ESOP**.

*Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, In re Oldapco*, No. 17-12082 (Bankr. D. Del., Aug 14, 2018) [Dkt. 970-1]; emphasis added.

**RESPONSE TO COMPLAINT NO. 37:** Reliance Trust admits that Plaintiff quotes portions from an order and documents from *In re Oldapco*, and that Plaintiff purports to bring this action on behalf of the ESOP, but denies that this quotation or Plaintiff's characterizations of the cited sources provide a full and accurate summary of the relevant legal principles. Reliance Trust

lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37.

## A.     The ESOP Committee Defendants

**COMPLAINT NO. 38:** Defendant Douglas P. Buth ("Buth") is a United States citizen who currently resides in Appleton, Wisconsin. Buth was a CPA and formerly worked for Pricewaterhouse, Saks Fifth Avenue, and BATUS prior to working for Appvion. Buth served as CEO, President and Chairman of the Board of Directors of Appvion since 1998 and Chairman of the Board of Directors of PDC, CEO, and President from before the 2001 Transaction until he retired in mid-2005. Buth was a member of the ESOP Committee from 2001 to May 2005. Buth left Appvion in July 2005.

**RESPONSE TO COMPLAINT NO. 38:**     Reliance     Trust     lacks     knowledge     and information sufficient to form a belief as to the truth of the allegations in paragraph 38.

**COMPLAINT NO. 39:** Defendant Paul Karch ("Karch") is a United States citizen who currently resides in Madison, Wisconsin. Karch is a lawyer who graduated from Harvard Law School in 1982. From 2001 to 2007, Karch served as Vice President of Human Services and Law, Secretary, General Counsel and Vice President of Administration of Appvion. Karch was a member of the ESOP Committee from 2001 to late 2006. Karch also served on the Board from 2001 to 2006. Karch left Appvion in March 2007.

**RESPONSE TO COMPLAINT NO. 39:**     Reliance     Trust     lacks     knowledge     and information sufficient to form a belief as to the truth of the allegations in paragraph 39.

**COMPLAINT NO. 40:** Defendant Mark Richards ("Richards") is a United States citizen who currently resides in Appleton, Wisconsin. Richards earned an MBA from Northwestern University's Kellogg Graduate School of Management. Richards was CEO and Chairman of the Board from mid-2005 to late 2015; Richards retired as CEO on 4 August 2015 and stepped down as Chairman of the Board on 31 December 2015. Richards was a member of the ESOP Committee from approximately April 2005-December 2015.

**RESPONSE TO COMPLAINT NO. 40:**     Reliance     Trust     lacks     knowledge     and information sufficient to form a belief as to the truth of the allegations in paragraph 40.

**COMPLAINT NO. 41:** Defendant Tom Ferree ("Ferree") is a United States citizen who, upon information and belief, currently resides in Solon, Iowa. Ferree was CFO of Appvion from October 2006 to 30 June 2017 and was a member (and chair) of the ESOP Committee from December 2006-May 2017. Ferree has a master's degree in finance from the University of Iowa.

**RESPONSE TO COMPLAINT NO. 41:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 41.

**COMPLAINT NO. 42:** Defendant Rich Fantini ("Fantini") is a United States citizen who, upon information and belief, currently resides in in Denver, Colorado. Fantini has a master's degree in labor and industrial relations from Michigan State University and an MBA from Northwestern University's Kellogg Graduate School of Management. During his tenure at Appvion, Fantini served as Vice President of Operations. Fantini was the Chair of the ESOP Committee from 2001 to 2005. He left Appvion in December 2005.

**RESPONSE TO COMPLAINT NO. 42:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 42.

**COMPLAINT NO. 43:** Defendant Dale E. Parker ("Parker") is a United States citizen who currently resides in Rocky Mount, North Carolina. Parker has an MBA from Xavier University and is a CPA. Prior to joining Appvion, Parker served as the Vice President of Finance of Black Clawson Companies. Parker served as Vice President of Finance and CFO of Appvion from 2001-June 2006. Parker was a member of the ESOP Committee from 2001 to April 2006. Parker also served on the Board from 2001 to 2006. He left Appvion in June 2006.

**RESPONSE TO COMPLAINT NO. 43:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 43.

**COMPLAINT NO. 44:** Defendant Angela Tyczkowski ("Tyczkowski") is a United States citizen who currently resides in Appleton, Wisconsin. Tyczkowski went to law school at Marquette University. Tyczkowski's highest title was served as Secretary, General Counsel and Chief Compliance Officer of Appvion. Tyczkowski was a member of the ESOP Committee from September 2006 to April 2008. She left Appvion on 15 August 2008.

**RESPONSE TO COMPLAINT NO. 44:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 44.

**COMPLAINT NO. 45:** Kerry Arent ("Arent") is a United States citizen who currently resides in Grand Chute, Wisconsin. Arent received her bachelor's degree from the University of Wisconsin-Oshkosh and holds a Senior Professional Human resources certification since 2005. Arent's highest title was Vice President, Executive Director and Senior VP Human Resources. Arent was secretary of the ESOP Committee from 2001-2006 and was a member of the ESOP Committee from July 2008-2015. She left Appvion on 31 December 2015.

**RESPONSE TO COMPLAINT NO. 45:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 45.

**COMPLAINT NO. 46:** Kent Willetts ("Willetts") is a United States citizen who currently resides in Appleton, Wisconsin. Willetts has an MBA from Northwestern University's Kellogg Graduate School of Management. Willetts highest title was Senior Vice President. Willetts was a member of the ESOP Committee from July 2008-September 2012. He left Appvion on 14 December 2012.

**RESPONSE TO COMPLAINT NO. 46:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 46.

**COMPLAINT NO. 47:** Kevin Gilligan ("Gilligan") is a United States citizen who currently resides in Appleton, Wisconsin. Gilligan has an MBA from Indiana University and previously worked as an executive with H.B. Fuller Company. Gilligan was a Director of Appvion and PDC 2016 and 2017 and served as President and CEO beginning in August 2015. Gilligan was a member of the ESOP Committee from April 2015 until 8 August 2017.

**RESPONSE TO COMPLAINT NO. 47:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 47.

### B. The Outside Director Defendants

**COMPLAINT NO. 48:** Susan Scherbel ("Scherbel") is a United States citizen who currently resides in Hancock, Maine. Scherbel has a bachelor's degree from Harvard and Juris Doctor and a Master of Law degrees from Georgetown University. She previously held an advisory position at the U.S. Department of Treasury relating to ESOP legislation and regulation. Scherbel was on the Board as an Outside Director from 2002-March 2011. Scherbel served on the Board's Audit Committee from 2002-March 2011 and the Compensation Committee from 2002-2006.

**RESPONSE TO COMPLAINT NO. 48:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 48.

**COMPLAINT NO. 49:** Ronald Pace ("Pace") is a United States citizen who currently resides in Cedarburg, Wisconsin. Pace has an MBA from the University of Connecticut and held a management position with Kohler Company from 1995-2015. Pace was on the Board as an Outside Director from 2003- July 2011. Pace served on the Board's Audit Committee from 2003-2008.

**RESPONSE TO COMPLAINT NO. 49:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 49.

**COMPLAINT NO. 50:** Stephen Carter ("Carter") is a United States citizen who currently resides in Rockford, Illinois. Carter has a bachelor's degree from Brigham Young University and is a CPA. Carter was on the Board as an Outside Director from 2004-2016. Carter served on the

Board's Audit Committee from July 2004-2016 and served as Chair of the Audit Committee from 2006- 2011 and in 2016. He left Appvion in December 2016.

**RESPONSE TO COMPLAINT NO. 50:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 50.

**COMPLAINT NO. 51:** Kathi Seifert ("Seifert") currently resides in Appleton, Wisconsin. Seifert was an executive with Kimberly-Clark Corporation and has served as a director of several other large companies, including Eli Lilly and Company and Revlon Consumer Products. Seifert was on the Board as an Outside Director from July 2004-October 2017. She was on the Board's Audit Committee from 2004-2006 and the Compensation Committee from 2012-2017.

**RESPONSE TO COMPLAINT NO. 51:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 51.

**COMPLAINT NO. 52:** Andrew Reardon ("Reardon") is a United States citizen who currently resides in Marco Island, Florida. Reardon has a law degree from the University of Cincinnati and an LLM in taxation from the Washington University Law School. Reardon was on the Board as an Outside Director from June 2007-2014. Reardon served on the Board's Audit Committee from 2009-2011 and the Compensation Committee from 2012-2015. He left Appvion in December 2015.

**RESPONSE TO COMPLAINT NO. 52:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 52.

**COMPLAINT NO. 53:** Terry Murphy ("Murphy") is a United States citizen who currently resides in Naples, Florida. Murphy has a master's degree in business administration from Marquette, a Juris Doctor degree from Seton Hall University School of Law, and is a CPA. Murphy was on the Board as an Outside Director from June 2007–October 2017. Murphy served on the Board's Audit Committee from 2012-2017, was Chair of the Audit Committee in 2012-2015, and was identified as an Audit Committee Financial Expert.

**RESPONSE TO COMPLAINT NO. 53:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 53.

**COMPLAINT NO. 54:** Mark Suwyn ("Suwyn") is a United States citizen who currently resides in Bonita Springs, Florida. Suwyn has a doctorate degree in inorganic chemistry and has a background working in the coated paper industry. Suwyn was on the Board as an Outside Director from July 2011-October 2017. Suwyn served on the Board's Compensation Committee in 2012-2015 and the Audit Committee 2016-2017.

**RESPONSE TO COMPLAINT NO. 54:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 54.

### C. The Investment Banker Defendant

**COMPLAINT NO. 55:** Defendants Houlihan Lokey Capital, Inc., f/k/a Houlihan Lokey Howard & Zukin Capital, Inc. and Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (together with Houlihan Lokey Capital, Inc., "Houlihan") are California corporations with their principal place of business in Los Angeles, California.

**RESPONSE TO COMPLAINT NO. 55:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 55.

### D. The ESOP's Trustee Defendants

**COMPLAINT NO. 56:** Defendant State Street Bank and Trust Company ("State Street") is a nationally chartered trust company with its principal place of business in Boston, Massachusetts. State Street was the trustee of the ESOP from 2001-31 March 2013. In its dealings with Appvion, State Street sometimes went by the name State Street Global Advisors, which is a division of State Street.

**RESPONSE TO COMPLAINT NO. 56:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 56.

**COMPLAINT NO. 57:** Defendant Reliance Trust Company ("Reliance") is a Georgia corporation with its principal place of business in Atlanta, Georgia. Reliance was the trustee of the ESOP from 1 April 2013-30 June 2014. Reliance was purchased by Argent in 2014.

**RESPONSE TO COMPLAINT NO. 57:** Admitted as to the first and second sentences. Denied as to the third sentence.

**COMPLAINT NO. 58:** Defendant Argent Trust Company, N.A. ("Argent") is a Tennessee corporation with its principal place of business in Ruston, Louisiana. Argent became the trustee of the ESOP effective 1 July 2014.

**RESPONSE TO COMPLAINT NO. 58:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 58.

### E. The Valuation Defendants

**COMPLAINT NO. 59:** Non-Party Willamette Management Associates, Inc. ("Willamette") served as financial advisor to State Street as ESOP Trustee and valued the share

price of PDC stock from 2001 through 30 June 2004. Under the Court's Order dated 27 July 2020, Plaintiff's claims against Willamette are preempted and Plaintiff does not replead those claims here. However, Plaintiff does not intend to waive those claims.

**RESPONSE TO COMPLAINT NO. 59:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 59.

**COMPLAINT NO. 60:** Defendant Stout Risius Ross, Inc. is or was a Michigan corporation with offices around the United States. Defendant Stout Risius Ross, LLC (with Stout, Risius Ross, Inc., referred to herein as "Stout") is a Michigan limited liability company with offices around the United States. Stout served as financial advisor to the ESOP Trustee and valued the share price of PDC stock from 31 December 2004-2017.[7]

**RESPONSE TO COMPLAINT NO. 60:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 60.

**COMPLAINT NO. 61:** Scott D. Levine ("Levine") is a United States citizen who currently resides in Oakton, Virginia. Levine served as a Principal of Willamette from 1995-2004 and as Director of Stout in 2004 and Managing Director from 2005-present.

**RESPONSE TO COMPLAINT NO. 61:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 61.

**COMPLAINT NO. 62:** Aziz El-Tahch ("El-Tahch") is a United States citizen who currently resides in New York, New York. El-Tahch served as an Associate of Willamette from at least 2002-2004. El-Tahch also served as a Manager of Stout from 2004-June 2007 and returned to Stout in 2008 as Manager and later promoted to Managing Director.

**RESPONSE TO COMPLAINT NO. 62:** Reliance Trust lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 62.

**COMPLAINT NO. 63:** Plaintiff is uncertain of the true names and capacities of certain individuals or entities that may be liable for the damages alleged herein and therefore sues them by fictitious names of Does 1-50, ABC Corporations 1-5, DEF Partnerships 1-5, GHI Limited Partnerships 1- 5, and JKL Limited Liability Companies 1-5. Plaintiff will amend its SAC by asserting their true names, capacities, and appropriate charging allegations when they are ascertained.

---

[7] Plaintiff does not waive claims dismissed for legal reasons by the Court's 27 July 2020 ruling that are not reasserted in this SAC.

**RESPONSE TO COMPLAINT NO. 63:** Reliance Trust admits that Plaintiff purports to sue certain individuals or entities using the fictitious names listed. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 63.

**COMPLAINT NO. 64:** This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for jurisdiction of actions brought under Title I of ERISA.

**RESPONSE TO COMPLAINT NO. 64:** Admitted.

**COMPLAINT NO. 65:** This Court also has diversity jurisdiction over claims against the out-of-state Defendants because they did or are doing business in the State of Wisconsin, the acts complained of herein occurred in the State of Wisconsin, the ESOP is based in Wisconsin, and the amount in controversy herein exceeds $75,000.

**RESPONSE TO COMPLAINT NO. 65:** Denied.

## IV. FACTUAL BACKGROUND

**COMPLAINT NO. 66:** Appvion was formed in 1907 in Appleton as The Appleton Coated Paper Company. It has historically had two primary business lines—carbonless paper and thermal paper.

**RESPONSE TO COMPLAINT NO. 66:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66.

**COMPLAINT NO. 67:** Carbonless paper is a type of coated paper designed to transfer information written on the top sheet onto sheets beneath it. Appvion invented carbonless paper in 1954. While Appvion had approximately 60% of the carbonless paper market in the late 1990s, by 2001 the market was declining by 8% to 9% per year due to increasing computerization.

**RESPONSE TO COMPLAINT NO. 67:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67.

**COMPLAINT NO. 68:** Appvion invented thermal paper in 1969. Thermal paper is used for receipts, lottery tickets, and other similar applications.

**RESPONSE TO COMPLAINT NO. 68:** Reliance Trust admits thermal paper can be used for receipts, lottery tickets, and other similar applications, but denies the allegations in

paragraph 68 to the extent they suggest these are its only applications. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 68.

### A. Buth, Karch, Houlihan, and State Street Fraudulently Convinced Appvion's Employees (who were ESOP Fiduciaries) to Fund the 2001 Transaction by Misrepresenting Appvion's Fair Market Value and Houlihan's Independence.

#### 1. AWA and Buth Agreed to An Employee Buyout Because They Could Not Sell Appvion.

**COMPLAINT NO. 69:** In the 1990s, Appvion (then Appleton Papers) was part of a French conglomerate, Arjo Wiggins Appleton ("AWA").

**RESPONSE TO COMPLAINT NO. 69:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69.

**COMPLAINT NO. 70:** By 1998, AWA was seeking to sell Appvion. Then-CEO Richard Curwen had attempted to find a third-party buyer but stepped down as CEO when he was unsuccessful. Buth was named as Appvion's CEO to succeed Curwen.

**RESPONSE TO COMPLAINT NO. 70:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70.

**COMPLAINT NO. 71:** In about November 2000, with AWA threatening to sell Appvion to a venture capital firm, Buth presented AWA with the idea of an employee buyout. AWA agreed, signing a letter of intent on 12 February 2001 to sell Appvion to PDC for $843,000,000 (later adjusted to $810,000,000). In turn, the PDC stock would be held in trust by the ESOP Trustee and participating employees would have beneficial interests in the PDC stock. This transaction, which closed on 9 November 2001, is referred to herein as the "2001 Transaction".

**RESPONSE TO COMPLAINT NO. 71:** Reliance Trust admits that the Complaint refers to the transaction described in paragraph 71 as the "2001 Transaction." Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 71.

### 2. Buth, Karch, and other Appvion Management Would Only Receive Their Contingent Fee Only if the 2001 Transaction Closed.

**COMPLAINT NO. 72:** Also on 12 February 2001, AWA signed a letter agreeing to pay Buth and other key Appvion executives bonuses if they were able to complete a sale of Appvion in 2001. The bonuses consisted of two main components:

- A "Value Related Completion Bonus" (sales incentive) which created a bonus pool of up to $10 million depending on the "Value Achieved" for the seller. If the ultimate sale price were $700 million or less, there would be no bonus pool. According to the prospectus, the sales incentive was ultimately $2.46 million, with 40% of it allocated to Buth and the rest to be distributed to other employees at his discretion.

- "Loyalty Payments" totaling $4.403 million, payable only if the sale price was greater than $759.4 million. Each individual who would receive a Loyalty Payment agreed to defer 30% of the payment for between 5 and 10 years to the New Deferred Compensation Plan. The value of the deferred portion of this payment was then tied to the increase in the value of stock. According to the prospectus, the loyalty payments ultimately totaled $4.1 million, with $1.2 million of it deferred.

**RESPONSE TO COMPLAINT NO. 72:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72.

**COMPLAINT NO. 73:** Buth and Karch were, therefore, highly incentivized (and conflicted) to complete a deal that met these targets, something they had been unable to do in the open market.

**RESPONSE TO COMPLAINT NO. 73:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73.

### 3. PDC Retained Houlihan Because of Its Vast ESOP Experience.

**COMPLAINT NO. 74:** Because Appvion, its executives, the ESOP and Appvion's employees had no experience in ESOP buyouts, Buth retained Houlihan on behalf of PDC to "quarterback" the employee buyout process, claiming that Houlihan had extensive experience in ESOP transactions. Appvion's General Counsel, Karch, explained the reliance on Houlihan's ESOP-related experience at a Road Show presentation to the employees on 2 August 2001:

> The first person who's going to provide an **independent** view and validation of our deal here is **Lou Paone**, our investment banker from **Houlihan Lokey Howard & Zukin**. Lou has been in the investment banking business for 20 years and he **has specialized in doing ESOP transactions** and has helped many ESOP plans buy companies. Lou's role in this transaction has helped to **structure the deal**. He came up with the

original – and the idea of how to do our ESOP and **how to do the transaction**. He helped convince AWA that it was possible. He helped us **negotiate with AWA and arrange the financing**. So, one sort of unique perspective that I think Lou brings that the rest of us don't have, is **this is the only deal like this we're likely to do in our lifetimes, whereas Lou is in the business of doing deals** and so he's going to talk about our transaction from his perspective. Lou.

Future of Appleton Papers Road Show, 2 Aug 01.

**RESPONSE TO COMPLAINT NO. 74:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74.

a.     **Houlihan Agreed to a Contingent Fee to "Quarterback" the ESOP Transaction.**

**COMPLAINT NO. 75:** According to Houlihan's 14 February 2001 engagement letter, signed by Paone, Houlihan was to act as PDC's "exclusive financial advisor with respect to the possible acquisition … by a to-be-formed Employee Stock Ownership Plan ('ESOP') …." Doug Buth signed the letter on behalf of PDC and Paul Karch signed on behalf of Appvion.

**RESPONSE TO COMPLAINT NO. 75:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75.

**COMPLAINT NO. 76:** Although Houlihan's contract was with PDC, Houlihan agreed to perform duties that had a direct impact on the ESOP and its Employee Fiduciaries. Further, Buth, Karch and Houlihan individually took specific actions described below to encourage the ESOP, through the Employee Fiduciaries, to rely directly upon Houlihan, it purported independence and its extensive ESOP experience. They did this because they knew Houlihan's reputation, experience and strong endorsement of the ESOP was critical to persuade the Employee Fiduciaries to participate.

**RESPONSE TO COMPLAINT NO. 76:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76.

**COMPLAINT NO. 77:** According to that letter, Houlihan was to receive a transaction fee at "Transaction closing equal to 1.0% of the 'Aggregate Consideration' paid for the stock of the Company with respect to an ESOP Acquisition." But Houlihan would only get this fee if the transaction closed.

**RESPONSE TO COMPLAINT NO. 77:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77.

**COMPLAINT NO. 78:** Houlihan would also be entitled to additional contingent compensation from AWA:

> Houlihan Lokey will also become entitled to compensation pursuant to section 8(d)(i) of the Letter of Intent, dated February 12, 2001, by and between Arjo Wiggins Appleton PLC and PDC.

Houlihan Engagement Ltr., 14 Feb 01, p. 4.

**RESPONSE TO COMPLAINT NO. 78:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78.

**COMPLAINT NO. 79:** An addendum to that letter indicates that Houlihan was to complete two phases of work that encompassed virtually all aspects of the process leading up to the ESOP transaction. Addendum A is set forth below in its entirety:

**Phase I**

**Transaction Structuring**

- Corporate Due Diligence

- Transaction Value Parameters

- ESOP Transaction Model Construction

- Financing Assessment and Capital Tranche Sources and Terms

- Strategic Use of Employee Participation

  - Management Deferred Compensation and Option/Stock Rollovers

  - Investment of Existing Benefit Plan Assets (401K and Pension Plans)

  - "S Corp" ESOP Application Consideration

  - Unionized Employee Participation

  - Use of Pension Plans over-funded balances

- Management Bonus Participation as ongoing investment tool

- Strategic use of Existing Benefit Plan Contributions

- Investor Exit Strategy Recapitalization Alternatives in Future Years

- Presentation(s) as required to reach a consensus on the form and structure of a proposed Transaction.

**Phase II**

**ESOP Change of Control Transaction Execution**

Upon acceptance of the Transaction and the execution of a Letter of Intent ("LOI") by AWA and the Appleton Papers Inc. Executive Management Team, Houlihan Lokey will assist Management in negotiations regarding a purchase of the Company. Upon reaching LOI transaction terms, we will advise management and coordinate activities in the following areas:

- **Negotiate the price and terms regarding the purchase of Appleton Papers Inc. from its corporate parent AWA.**

- **Assist in selection of the "ESOP Team" including Independent Trustee, ESOP Counsel, ESOP Financial Advisor and Communications Specialist, and negotiate engagement terms.**

- **Prepare materials to be presented to employees and make presentations to the employee base regarding their participation, investment solicitation, potential wage or benefit restructuring programs and overall transaction parameters.**

- Make presentations to Union Representatives (if appropriate) regarding their potential participation and negotiation of such terms.

- Finalize financial forecast models for management and related parties to the transaction.

- Structure Management performance warrants as part of bonus/incentive plan.

- Assist in the documentation of transaction terms.

- **Quarterback process flow and coordination of ESOP related activities.**

**Financing Assistance**

- Assist in the renegotiations and restructuring of existing interest-bearing debt and/or capital lease obligations (if appropriate).

- Develop information packages and management presentations for prospective capital sources of acquisition financing.

- Source and negotiate the terms of new senior credit or bank related financing for transaction and working capital purposes.

- Source and negotiate the terms of mezzanine capital for transaction purposes.

- Source and negotiate the terms of junior subordinated capital and/or equity capital for transaction purposes.

- **Assist in solicitation and structure of employee-based equity capital investment for transaction purposes.**

Houlihan Engagement Ltr., 14 Feb 01, Addendum A; emphasis added.

**RESPONSE TO COMPLAINT NO. 79:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79.

**COMPLAINT NO. 80:** Notable in this list is Houlihan's control of communications with the ESOP's Employee Fiduciaries. Because of these contractual commitments, Houlihan was responsible to the ESOP, through its Employee Fiduciaries, for the accuracy and truthfulness of those communications.

**RESPONSE TO COMPLAINT NO. 80:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80.

### b. Houlihan's Contingent Fee Created Conflicts in Critical Areas of its Involvement.

**COMPLAINT NO. 81:** Buth, Karch, Houlihan and State Street did not give the engagement letter between Houlihan and Buth to the Employees Fiduciaries or otherwise disclose Houlihan's contingent transaction fee and resulting conflict. In fact, they actively concealed the conflict.

**RESPONSE TO COMPLAINT NO. 81:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81.

**COMPLAINT NO. 82:** Houlihan's plan was to use at least $100 million from the employees' 401(k) retirement plans to fund the down payment needed for the buyout, with the rest of the sale price coming from bank loans, bonds and seller financing.

**RESPONSE TO COMPLAINT NO. 82:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82.

**COMPLAINT NO. 83:** Houlihan's contingent fee created an undisclosed conflict of interest in at least the following four critical areas:

- Negotiation of the Purchase Price: "Negotiate the price and terms regarding the purchase of Appleton Papers, Inc. from its parent AWA:"

   **Conflict**: Houlihan's contingent fee motivated it to make sure that a purchase price was agreed upon, regardless of how high, because if no deal was struck, Houlihan would receive no fee. Further, the higher the price, the bigger Houlihan's contingent fee.

- Selection of the ESOP Team: "Assist in the selection of the "ESOP Team" including Independent Trustee, ESOP Counsel, ESOP Financial Advisor and Communications Specialist, and negotiate engagement terms:"

   **Conflict**: **Houlihan's** contingent fee motivated it to select an "ESOP Team" that Houlihan knew would do Houlihan's and management's bidding to make sure the ESOP transaction closed above the required minimum price. Further, Houlihan even had the authority to negotiate favorable "engagement terms."

- Communications with the Employee Fiduciaries: "Prepare materials to be presented to employees and make presentations to the employee base regarding their participation, investment solicitation, potential wage or benefit restructuring programs and overall transaction parameters:"

   **Conflict:** Houlihan's contingent fee motivated it to carefully control all communications with the ESOP, through its Employee Fiduciaries, to persuade them to take the money they had saved in their 401(k) plans and use it to purchase their interest in the ESOP at a price that, unknown to the Employee Fiduciaries, was above its fair market value. Even though the Houlihan engagement letter was with PDC, both PDC and Houlihan agreed that Houlihan would play the central role in controlling communications with the ESOP Fiduciaries to persuade them to contribute the more than $100 million needed to close the ESOP transaction. Because of both Houlihan's and management's conflict, the ESOP Fiduciaries would not be receiving Houlihan's advice from an independent source, as had been represented to them, but from a deal promoter motivated to earn its contingent fee.

- Quarterback the ESOP Transaction: "Quarterback process flow and coordination of ESOP related activities:"

> **Conflict:** Houlihan had broad contractual authority to "quarterback" the coordination of the "ESOP related activities" to make sure that the ESOP employees contributed their 401(k) life savings so that the ESOP transaction closed, and so that both Houlihan and management received their contingent fees.

**RESPONSE TO COMPLAINT NO. 83:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83.

### c. Houlihan Selected State Street to Act as the "Independent" ERISA Trustee.

**COMPLAINT NO. 84:** Acting under its conflict of interest, Houlihan advised to select State Street to act as the "Independent" ERISA trustee.

**RESPONSE TO COMPLAINT NO. 84:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84.

**COMPLAINT NO. 85:** But, State Street was not independent at all because it knew it was beholden to Houlihan for its selection. Because Houlihan was an ongoing source of business referrals, State Street was conflicted and motivated to work with Houlihan to make sure the deal closed and keep silent concerning Houlihan's conflict.

**RESPONSE TO COMPLAINT NO. 85:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85.

### 4. Buth Announced the 2001 Transaction to the ESOP Employees.

**COMPLAINT NO. 86:** After agreeing to the employee buyout in February 2001, Buth then announced the plan to the Employee Fiduciaries. Buth, Karch, Houlihan and State Street had to convince enough of the Employee Fiduciaries to participate so that collectively they would contribute the more than $100 million needed for the ESOP transaction to close.

**RESPONSE TO COMPLAINT NO. 86:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86.

**5.** **State Street Agreed to Conduct Due Diligence, Review All Relevant Documents, and Sign Off on the Prospectus.**

**COMPLAINT NO. 87:** In March 2001, Buth, Parker, and Karch (Appvion's three directors) appointed State Street as the ESOP Trustee. As trustee, State Street's role was to act on the ESOP's behalf in negotiating the final purchase price and terms for the 2001 transaction. State Street was also responsible for making sure that the transaction complied with ERISA – ensuring, among other things, that it was prudent and not for more than fair market value.

**RESPONSE TO COMPLAINT NO. 87:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87.

**COMPLAINT NO. 88:** Resulting from Houlihan's endorsement on 1 June 2001, State Street entered into a retainer letter agreement with Appvion, signed by Karch. Among other things, State Street agreed to "review the Proposed [ESOP] Transaction," "conduct due diligence" and "review all relevant document":

> Engagement of State Street
>
> The Company hereby engages State Street to **review the Proposed Transaction** and, to the extent it deems advisable, to participate in discussions with management of PDC and HLHX [Houlihan] in **structuring and financial the Proposed Transaction**. State Street **will conduct a due diligence review of the Company and the Proposed Transaction** and determine whether it is **permissible under ERISA** to accept the direction of participants to invest all or a portion of their defined contribution account balances in common stock of PDC….
>
> * * *
>
> In connection with the engagement, **State Street shall review all relevant documents, analyze all relevant financial reports** and opinions rendered by third parties, and **shall make the ultimate determination of the appropriateness** of the terms and conditions of the Proposed Transaction (the "Determination") in light of the requirements of **Section 408(e) of ERISA**. In this regard, it is understood that in exercising its fiduciary responsibilities pursuant to this Agreement, State Street will rely on the written opinion of its financial advisor whether (i) the consideration to be paid for the common stock of PDC is not greater than the fair market value (within the meaning of section 3(18)(B) of ERISA) and, (ii) the Proposed Transaction is fair to the ESOP and its participants from a financial point of view (collectively the "Financial Opinions").

State Street Retainer Ltr., 1 Jun 01, p. 2; emphasis added.

**RESPONSE TO COMPLAINT NO. 88:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88.

**COMPLAINT NO. 89:** Because of its review of "all relevant documents" State Street knew about Houlihan's contingent fee retainer agreement.

**RESPONSE TO COMPLAINT NO. 89:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89.

**COMPLAINT NO. 90:** State Street also insisted that it be given the opportunity to review and give is "prior written approval" to the prospectus:

> Disclosure to Participants
>
> [Appvion] agrees that the **offering memorandum** to be provided to the participants of the Company's defined contribution plans with respect to the Proposed Transaction, as well as any other disclosure documents or presentation materials to be provided or otherwise communicated to participants, **shall be subject to the prior review and written approval of State Street**, and shall provide a **complete and accurate disclosure** of the Proposed Transaction and the investment risks to participants attendant thereto, including the lack of diversification under the ESOP. **The Company shall provide such materials to State Street in draft form sufficiently in advance of any proposed distribution to plan participants such that State Street will have a reasonable period of time in which to conduct its review and propose any revisions to such materials that it deems appropriate**. The Company further agrees that State Street shall be afforded the opportunity to have a **representative present** at any meeting of, or presentation to, the participants regarding the Proposed Transaction.

*Id*, p. 4; emphasis added.

**RESPONSE TO COMPLAINT NO. 90:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90.

**COMPLAINT NO. 91:** State Street therefore had veto power over the contents of the prospectus.

**RESPONSE TO COMPLAINT NO. 91:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91.

6. **Houlihan, Buth, Karch and State Street Colluded to Fraudulently Represent Houlihan as Being "Independent."**

     a. **Houlihan Agreed to Issue a Fairness Opinion it was Not Qualified to Give.**

**COMPLAINT NO. 92:** On 20 July 2001, Houlihan director James Waldo and Buth executed a second retainer agreement, which engaged Houlihan to "render an opinion as to the fairness to the Shareholder of the Company, from a financial point of view of the consideration to be paid by the Company … in connection with the Transaction and that such consideration is not more than the fair market value of Appleton." Houlihan charged a $100,000 fee for this fairness opinion.

**RESPONSE TO COMPLAINT NO. 92:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92.

     b. **Houlihan Insisted on Reviewing all Materials that Referenced its Name, which Included the Prospectus.**

**COMPLAINT NO. 93:** Paragraph 2 of the 20 July 2001 engagement letter gave Houlihan the right to review and approve any materials referencing its name or fairness opinion:

> Any summary of, or **reference to, the Opinion**, any verbal presentation with respect thereto, **or other references to Houlihan Lokey in connection with the Transaction, will in each instance be subject to Houlihan Lokey's prior review and written approval (which shall not be unreasonably withheld)**. The Opinion will not be in, summarized or referred to in any manner in any materials distributed to the public or the securityholders of the Company, or filed with or submitted to any governmental agency, without Houlihan Lokey's express, prior written consent (which shall not be unreasonably withheld). Neither Houlihan Lokey's verbal conclusions nor the Opinion will be used for any purpose other than in connection with the Transaction.

Emphasis added.

**RESPONSE TO COMPLAINT NO. 93:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93.

c. **Buth, Karch, Houlihan and State Street Knew That Houlihan's Conflict Disqualified It from Giving a Fairness Opinion.**

**COMPLAINT NO. 94:** Buth and Houlihan signed this engagement letter just four months after Appvion's 26 March 2001 newsletter warned that those issuing fairness opinions must have no conflicts that might "impair independence":

**Who is Qualified To Issue ESOP Fairness Opinions?**

\* \* \*

1. **No conflicts of interest** and/or **fee arrangements based on contingencies**, both of which would **impair the independence of the financial advisor**.

The Ownership Update, Issue 4, 26 Mar 01, p. 2.

**RESPONSE TO COMPLAINT NO. 94:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94.

**COMPLAINT NO. 95:** That Houlihan acted as "quarterback" of the ESOP process and assumed the specific responsibility to "prepare materials to be presented to employees," compels the conclusion that Houlihan formulated the strategy (with Buth, Karch and State Street's agreement and active participation) to present Houlihan as being "independent," even though they all knew that Houlihan's contingent fee disqualified it from issuing an independent fairness opinion and that Houlihan was badly conflicted.

**RESPONSE TO COMPLAINT NO. 95:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95.

**COMPLAINT NO. 96:** When Houlihan and Buth signed the 20 July 2001 fairness opinion engagement letter, Buth, Karch, State Street and Houlihan knew that Houlihan's contingent fee conflict disqualified Houlihan from giving a fairness opinion. They also knew that they had to fraudulently present Houlihan as being independent to counteract the impact of management's disclosed conflict. Houlihan, State Street, Buth and Karch knew that a truly independent investment banking firm could not be trusted to endorse this ESOP transaction together with the assumption of almost $700 million in debt. Because of Appvion's financial weakness, an independent investment banking firm would discover that the ESOP would be buying fully leveraged PDC stock with no equity value. Therefore, Buth, Karch, Houlihan and State Street had to fraudulently pass Houlihan off to the ESOP's Employee Fiduciaries as independent to persuade them to make the needed investment at the fraudulently inflated price so that Buth, Karch and Houlihan would get paid their contingent fees and so that Buth, Karch and others would remain in control of Appvion.

**RESPONSE TO COMPLAINT NO. 96:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96.

### 7.    Appvion Management Pitched the Buy Out to Appvion Employees.

**COMPLAINT NO. 97:** The Appleton Papers Retirement Savings Plan was established effective 1 January 1985. This plan consisted primarily of a 401(k) component. As of July 2001, Appvion employees had approximately $155 million in their 401(k) accounts through the original Plan.

**RESPONSE TO COMPLAINT NO. 97:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97.

**COMPLAINT NO. 98:** In anticipation of the buyout transaction, the Appleton Papers Retirement Savings Plan document was amended and restated as of 1 January 2001 and renamed the Appleton Papers Retirement Savings and Employee Stock Ownership Plan (the "Plan"), which added the ESOP component to the existing 401(k) investment options.

**RESPONSE TO COMPLAINT NO. 98:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98.

**COMPLAINT NO. 99:** Buth, Karch, Houlihan, and State Street had to pitch the ESOP transaction to employees and convince them to invest more than $100 million of their 401(k) funds in the ESOP.

**RESPONSE TO COMPLAINT NO. 99:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99.

### 8.    Houlihan, State Street, Buth, Karch, Parker, and Fantini Prepared the Prospectus.

**COMPLAINT NO. 100:** Appvion management (including Buth, Karch, Parker and Fantini), State Street, and Houlihan authorized and circulated a prospectus dated 23 July 2001 to employees.

**RESPONSE TO COMPLAINT NO. 100:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100.

**COMPLAINT NO. 101:** The prospectus reported that the 401(a) and 401(k) plans had been amended to designate the Appvion employees who were eligible to participate in the ESOP as ESOP fiduciaries for the purpose of approving the 2001 Transaction. Therefore, any representations by Buth, Karch, Houlihan and State Street made to the Employee Fiduciaries were

made to the ESOP (as further set forth below). This SAC is not attempting to recover for the employees as individuals, but is attempting to recover for losses to the ESOP.

**RESPONSE TO COMPLAINT NO. 101:** Reliance Trust admits that the Complaint purports to seek relief for the ESOP and not employees as individuals. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 101.

**COMPLAINT NO. 102:** Because the employees were either ESOP Fiduciaries (pre-closing) or ESOP Owners (post-closing), any representations or omissions made to them were also made to the ESOP.

**RESPONSE TO COMPLAINT NO. 102:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102.

**COMPLAINT NO. 103:** The prospectus identified the "CEO Team" responsible for the 2001 Transaction:

**Figure 2: Appvion's CEO Team**

| MANAGEMENT | | |
|---|---|---|
| **Directors and Executive Officers** | | |
| The following table presents information regarding our executive officers as of July 1, 2001, whom we refer to as the CEO team. | | |
| **Name** | **Age** | **Position** |
| Douglas Buth | 46 | Chief Executive Officer and Director |
| Jerry Wallace | 55 | Executive Vice President, Operations |
| Paul Karch | 45 | Vice President, Law & Public Affairs, Secretary, General Counsel and Director |
| Dale Parker | 50 | Vice President, Finance and Chief Financial Officer and Director |
| George Bureau | 42 | Vice President, Carbonless Marketing and International Business |
| John Depies | 44 | Vice President and General Manager, Thermal |
| Rick Fantini | 46 | Vice President, Human Resources and Procurement |

Source: Appleton Papers Inc., Prospectus, 23 Jul 01, p. 67; emphasis added.

**RESPONSE TO COMPLAINT NO. 103:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103.

**COMPLAINT NO. 104:** Buth, Karch, Parker and Fantini were on the CEO team and the ESOP Committee, and all four of them were to receive contingent fee payments if the ESOP transaction closed.

**RESPONSE TO COMPLAINT NO. 104:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104.

**COMPLAINT NO. 105:** At the 2 August 2001 road show, Buth fraudulently misrepresented that "The prospectus has all the details for you to make a decision."

**RESPONSE TO COMPLAINT NO. 105:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105.

### 9. The Prospectus was Fraudulently Incomplete because it Concealed Houlihan's Conflict of Interest from the ESOP Employee Fiduciaries.

**COMPLAINT NO. 106:** The prospectus included the following reference to the fairness opinion:

> Houlihan has rendered its **preliminary opinion** to Paperweight Development's board of directors **that the purchase price that Paperweight Development is paying for us in the acquisition is fair**, from a financial point of view, to the ESOP, as the sole shareholder of Paperweight Development. **Houlihan's preliminary fairness** opinion was based on a number of facts and assumptions, including financial information through the end of April 1, 2001. Its preliminary opinion was rendered to the board of directors of Paperweight Development and may not be relied upon by any other person. Houlihan has been asked to **render a fairness opinion** to the Board of Directors of Paperweight Development effective as of the closing of the transaction to the effect described above.

Source: *Id* Prospectus at p. 91; emphasis added.

**RESPONSE TO COMPLAINT NO. 106:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106.

**COMPLAINT NO. 107:** Although the ESOP employees were told that they could not rely on the fairness opinion given to the board (which they did not see), they did rely on the fact that because Houlihan was rendering the fairness opinion, they must have been independent. Or put another way, the Employee Fiduciaries took comfort in the fact that an independent international investment banking firm was willing to issue a fairness opinion. In fact, one purpose of that paragraph is to give the ESOP, through its Employee Fiduciaries, comfort and to prevent their suspicion and inquiry.

**RESPONSE TO COMPLAINT NO. 107:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107.

**COMPLAINT NO. 108:** Separate and apart from the fairness opinion given to the board, Houlihan opined directly to the ESOP Fiduciaries that the purchase price was fair, even though Buth, Karch, Parker, Fantini and others had a contingent fee conflict:

> The AWA incentive programs created a **conflict of interest** for the **management team** by giving them an **incentive to agree to a higher purchase price. Paperweight Development's financial advisor, Houlihan Lokey Howard & Zukin, and the CEO team believe that the purchase price as negotiated is** fair to the buyers.

Source: *Id* Prospectus at p. 75; emphasis added.

**RESPONSE TO COMPLAINT NO. 108:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108.

**COMPLAINT NO. 109:** Further, Paone himself directly addressed the Employee Fiduciaries at the 2 August 2001 Road show. After Karch introduced him as the ESOP's independent investment banker. Paone told employees "Paul had mentioned that one of the things that I'm going to do this evening is help validate the purchase price of the transaction and the financial aspects as to why they are so attractive and why **you're getting such a good deal**." (emphasis added)

**RESPONSE TO COMPLAINT NO. 109:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109.

**COMPLAINT NO. 110:** The prospectus contained no reliance disclaimer relating to this direct Houlihan opinion to the ESOP Employee Fiduciaries.

**RESPONSE TO COMPLAINT NO. 110:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110.

**COMPLAINT NO. 111:** Further, it was strategically critical that Houlihan's representation to the ESOP employees of the fairness of the purchase price comes immediately after the sentence discussing managements' conflict. This demonstrates an intentionally conceived strategy of overcoming the impact of managements' conflict with what was being represented as being Houlihan's independent opinion. Because the ESOP Fiduciaries had been told that to be qualified to issue a fairness opinion, Houlihan had to be independent.

**RESPONSE TO COMPLAINT NO. 111:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111.

**COMPLAINT NO. 112:** And the February 2001 engagement letter instructs that Houlihan was responsible for generating and coordinating this communication strategy among Buth, Karch, and State Street.

**RESPONSE TO COMPLAINT NO. 112:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112.

**COMPLAINT NO. 113:** That Buth, Karch, Houlihan and State Street intentionally omitted any reference to Houlihan's conflict in order to deceive the Employee Fiduciaries is further demonstrated by the fact that the "Risk Factors" section of the prospectus disclosed managements' conflict but was silent on Houlihan's conflict. This intentional omission would also cause the Employee Fiduciaries to understand that Houlihan was independent and had no contingent fee conflict:

> In addition, i**n 2000 AWA agreed to provide financial incentives to our management**, including our management negotiating team, to provide assistance and support in connection with any sale of Appleton Papers which will be payable upon completion of the acquisition, including a sales incentive component which will be greater if the purchase price is higher. **These incentives create a conflict of interest which may have increased the risk that the purchase price is too high**.

Source: *Id*, Prospectus at p. 21, emphasis added.

**RESPONSE TO COMPLAINT NO. 113:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 113.

**COMPLAINT NO. 114:** The prospectus (Buth, Karch, Houlihan and State Street) fraudulently failed to disclose that Houlihan's fees were contingent on the deal closing, that their contingent fee would increase the larger the purchase price was, and that Houlihan was not independent and not qualified to give a fairness opinion.

**RESPONSE TO COMPLAINT NO. 114:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114.

**COMPLAINT NO. 115:** That failure to disclose Houlihan's conflict while disclosing management's conflict, makes the prospectus disclosures fraudulent as a misleading partial disclosure, because "[a] representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation. Restatement (Second) Torts §529.

**RESPONSE TO COMPLAINT NO. 115:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115.

**COMPLAINT NO. 116:** In contrast to the failure to disclose Houlihan's contingent fees, the prospectus did explain that Willamette was receiving a flat fee of $200,000 for the fairness opinion it was issuing to State Street. Again, this disclosure of Willamette's fees, which concealing Houlihan's much larger contingent fee, further served to intentionally conceal (Buth, Karch, Houlihan and State Street) Houlihan's conflict and resulting lack of independence.

**RESPONSE TO COMPLAINT NO. 116:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 116.

**COMPLAINT NO. 117:** At the 2 August 2001 road show, Buth represented that the fees that would be paid to advisors were explained in the prospectus: "We got to pay some of these advisors. The fact is we have some fees to pay and it's highlighted in the prospectus." However, other than Willamette's fees the prospectus did not reference fee payments to specific parties.

**RESPONSE TO COMPLAINT NO. 117:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117.

**COMPLAINT NO. 118:** In its role as "quarterback" of the process flow, with the responsibility to "prepare materials to be presented to the employees" and from its insistence that it review all references to its name or opinion, Houlihan necessarily reviewed the prospectus and advised on its contents. Therefore, Houlihan was integrally involved with Buth, Karch and State Street in the strategy of fraudulently portraying Houlihan as being independent.

**RESPONSE TO COMPLAINT NO. 118:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118.

**COMPLAINT NO. 119:** The course of conduct by Buth, Karch, Houlihan and State Street to fraudulently conceal Houlihan's contingent fee and related conflicts and misrepresent Houlihan's independence infected virtually every aspect of the ESOP transaction. It also served as a course of conduct to fraudulently conceal that the ESOP was paying more than fair market value for the PDC stock and that Buth and Karch were fraudulently representing to the ESOP's Employee Fiduciaries that Houlihan was independent to keep control of Appvion and earn their contingent fees.

**RESPONSE TO COMPLAINT NO. 119:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 119.

**COMPLAINT NO. 120:** Because of State Street's comprehensive due diligence and requirement that it "review all relevant documents," State Street knew from its review of

Houlihan's engagement letter (clearly a relevant document) that Houlihan was not independent. Further, State Street had veto rights over the content of the Prospectus and had the right to propose changes. Therefore, State Street is also responsible for the Prospectus' contents including the fraudulent portrayal of Houlihan as being independent. State Street's participation goes far beyond "mere silence" because, among other reasons, it affirmatively approved the Prospectus knowing that Houlihan was not qualified to give a fairness opinion and was not disclosed as being conflicted under circumstances that required that disclosure so that the remainder of the prospectus was not materially misleading.

**RESPONSE TO COMPLAINT NO. 120:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 120.

**COMPLAINT NO. 121:** As CEO and general counsel, members of the CEO team and the ESOP Committee, and Directors of PDC, Buth and Karch were also heavily involved in drafting and review of the prospectus and approved its release and therefore are responsible for its contents.

**RESPONSE TO COMPLAINT NO. 121:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 121.

### 10. Buth, Karch, Houlihan and State Street Continued to Misrepresent Houlihan's Independence.

**COMPLAINT NO. 122:** In a 25 July 2001 letter to employees, Buth again represented that the ESOP buyout "offers all employees not only a unique ownership opportunity, but also the potential for extraordinary rewards for initial investors and greater control of our company's future." Consistent with the planned course of conduct that Houlihan quarterbacked, Buth fraudulently represented to the Employee Fiduciaries that both Houlihan and State Street would provide "independent validation of the deal": "I also encourage you to attend a KSOP Road Show meeting where I will discuss our KSOP opportunity. You will also receive independent validation of the deal from Lou Paone, our investment banker, and Kelly Driscoll, the ESOP Trustee." For the same reasons explained above, Houlihan and State Street are also responsible for this fraudulent misrepresentation.

**RESPONSE TO COMPLAINT NO. 122:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122.

**COMPLAINT NO. 123:** In order to convince the Employee Fiduciaries to contribute to the needed down payment, Appvion executives Buth, Karch, and Arent, along with State Street's Driscoll, Houlihan's Paone, and Willamette's Braun, held a series of road shows to present the buyout to Appvion's employees. As disclosed in the 14 February 2001 engagement letter, Houlihan prepared and directed the content of these communications as well.

**RESPONSE TO COMPLAINT NO. 123:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123.

**COMPLAINT NO. 124:** The road shows included at least two visits to each of Appvion's major facilities.

**RESPONSE TO COMPLAINT NO. 124:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124.

**COMPLAINT NO. 125:** At the 2 August 2001 Road Show, Karch again continued the agreed-upon strategy of fraudulently and intentionally representing Houlihan as being independent:

> The first person who's going to provide **an independent view and validation** of our deal here is **Lou Paone**, our investment banker from **Houlihan, Lokey**, Howard & Zukin.

**RESPONSE TO COMPLAINT NO. 125:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125.

**COMPLAINT NO. 126:** Buth, Houlihan (Paone), and State Street (Kelly Driscoll) were all present when Karch (as spokesperson for the group) represented Houlihan as independent. Even though they each knew about the secret contingent fee, they said nothing. Accordingly, their action of remaining silence is conduct that constitutes a misrepresentation. *See* Restatement (Second) of Torts § 525, cmt. b.

**RESPONSE TO COMPLAINT NO. 126:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126.

**COMPLAINT NO. 127:** The written invitation for the Employee Fiduciaries to attend the road show presentation similarly listed "Independent Validation of Deal Terms" next to Paone's name.

**RESPONSE TO COMPLAINT NO. 127:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127.

**COMPLAINT NO. 128:** As part of the pitch to convince the Employee Fiduciaries to transfer their 401(k) funds to the ESOP, they were told that the buyout was necessary or the company would be sold to an equity firm and be sold off for scrap, or, alternatively that an equity firm would bleed the company dry and run it into the ground.

**RESPONSE TO COMPLAINT NO. 128:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128.

> ### 11. The ESOP's Employee Fiduciaries, Were Entitled to Rely on Houlihan's Road Show Presentation and Earlier Representations Because They Were Told That Houlihan was Independent.

**COMPLAINT NO. 129:** Houlihan's Paone made a forceful Road Show presentation to the ESOP Fiduciaries presenting facts in support of the deal and giving his opinion strongly endorsing the transaction.

**RESPONSE TO COMPLAINT NO. 129:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129.

**COMPLAINT NO. 130:** Even if portions of Peone's presentation constituted opinions, the ESOP, through its Employee Fiduciaries, was entitled to rely on those opinions (and the underlying facts) because they "reasonably believed [Houlihan] to be disinterested":

> § 543. Opinion of Apparently Disinterested Person
>
> The recipient of a fraudulent misrepresentation of opinion is justified in relying upon it if the opinion is that of a person whom the recipient reasonably believes to be disinterested an if the fact that such person holds the opinion is material.

Restatement (Second) of Torts, § 543.

**RESPONSE TO COMPLAINT NO. 130:** Reliance Trust admits that paragraph 130 quotes portions of the Restatement (Second) of Torts, but denies that this quotation or Plaintiff's characterizations of the cited source provide a full and accurate summary of the relevant legal principles. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 130.

**COMPLAINT NO. 131:** Further, the fact that Houlihan's 14 February 2001 engagement letter was with PDC does not prevent the ESOP, through its Employee Fiduciaries, from reasonably relying because the engagement letter specifically authorized Houlihan to "make presentations to the employee base regarding their participation, investment solicitation …"

**RESPONSE TO COMPLAINT NO. 131:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131.

**COMPLAINT NO. 132:** Far from warning the Employee Fiduciaries that they could not rely on Houlihan, Buth, Karch, Houlihan and State Street encouraged reliance, even by fraudulently misrepresenting Houlihan's independence and actively concealing Houlihan's contingent fee.

**RESPONSE TO COMPLAINT NO. 132:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132.

**COMPLAINT NO. 133:** Even though the Employee Fiduciaries were told that State Street and Willamette were their advisors, Buth, Karch, Houlihan and State Street understood that Houlihan was the 800 pound gorilla in the room. As demonstrated by their collective willingness to lie, each understood that Houlihan's "independent" endorsement was critical to push the fraudulent ESOP transaction over the finish line, thus ensuring that Buth, Karch and Houlihan would receive their contingent fees and Buth and Karch would remain in control of Appvion. The endorsement was particularly important because the Employee Fiduciaries were on notice that the management team had a personal stake in the transaction and were not independent themselves.

**RESPONSE TO COMPLAINT NO. 133:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133.

> **12. Buth, Karch, Houlihan, and State Street Engaged in a Course of Conduct to Conceal Houlihan's Conflicts of Interest and the Fact that Appvion was Priced Above Fair Market Value.**

**COMPLAINT NO. 134:** At least the following communications fraudulently representing Houlihan as being independent, constituted a separate and independent course of conduct designed to conceal the underlying fraud that the ESOP was paying more than fair market value for the PDC stock and the related fiduciary breaches. Instead, PDC would pay a fraudulently inflated price of $810 million (plus transaction fees) so that Buth, Karch and others could personally benefit from maintaining control of Appvion. These communications also constituted "steps taken by wrongdoing fiduciaries to cover their tracks." They include:

- 23 July 2001 Prospectus: Fraudulent half-truth regarding Houlihan's role, concealing that Houlihan was not independent and not qualified to give a fairness opinion either to the board or directly to the Employee Fiduciaries.

- 25 July 2001 Letter: Buth wrote to the Employee Fiduciaries fraudulently representing that Houlihan would provide an "independent validation of the deal."

- Road Show Program: Again representing that Houlihan was independent: "Independent Validation of Deal Terms – Lou Paone."

- 2 August 2001 Road Show: Karch introduced Paone as being independent and Paone strongly endorses the ESOP transaction.

**RESPONSE TO COMPLAINT NO. 134:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134.

**COMPLAINT NO. 135:** By participating together to represent Houlihan as being independent, Buth, Karch, Houlihan and State Street dissuaded ESOP employees from conducting further investigation into the ESOP transaction, the PDC stock fair market value and any impact on the ESOP transaction caused by management's and Houlihan's contingent fee conflict and fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 135:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135.

**COMPLAINT NO. 136:** Further, by working together in a course of conduct to portray Houlihan as independent, Buth, Karch, State Street and Houlihan concealed from the ESOP Employee Fiduciaries, that Houlihan was deeply conflicted in its many roles in quarterbacking the ESOP transaction.

**RESPONSE TO COMPLAINT NO. 136:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136.

**COMPLAINT NO. 137:** State Street's willingness to participate with and support Buth, Karch and Houlihan in representing Houlihan as being independent, after Houlihan recommended State Street as trustee, is convincing evidence of the kind of relationship described by United States District Court Judge Brinkema:

> Wilmington's lack of engagement and willingness to negotiate so favorably with CSG may have been **motivated by its significant business relationships** with CSG, which **refers more ESOP business** to Wilmington than **all other firms combined**. … As Smith acknowledged, "the ESOP world … [is] a **very incestuous community** [.] … Given the **extensive relationships** that these parties shared, it is hardly surprising that Golden could not identify a single occasion when Wilmington had declined to approve an ESOP transaction after it was formally engaged to act as trustee."

*Brundle v. Wilmington Trust, N.A.*, 241 F.Supp.3d 610, 643 (E.D. Va. 2017).

**RESPONSE TO COMPLAINT NO. 137:** Reliance Trust admits that paragraph 137 quotes portions from an opinion from *Brundle v. Wilmington Trust, N.A.*, but denies that this quotation or Plaintiff's characterizations of the cited source provide a full and accurate summary of the relevant legal principles and denies that the quoted language contained any bolded language.

The correct quoted language is "significant business relationship," not "significant business relationships." Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 137.

**COMPLAINT NO. 138:** The Employee Fiduciaries voted in favor of the ESOP Transaction and contributed the $107 million down payment. The ESOP Transaction closed on 9 November 2001.

**RESPONSE TO COMPLAINT NO. 138:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 138.

**COMPLAINT NO. 139:** The ESOP Committee members (Buth, Karch, Parker and Fantini) received the following contingent fee payments:

**Table 1: Loyalty Payment/Related Completion Bonus**

|        | Loyalty Payment | Value Related Completion Bonus* | Total |
|--------|-----------------|-------------------------------|-------|
| Buth   | $780,000        | $994,868                      | $1,774,868 |
| Karch  | $306,000        | $562,706                      | $868,706 |
| Parker | $368,000        | $363,113                      | $731,113 |
| Fantini| $250,000        | $250,558                      | $500,558 |

*Estimated from 10-K

Sources: AWA Ltr to Doug Buth, 12 Feb 2001, pp. 4, 5, 6; Appleton Papers Inc., Prospectus, 23 Jul 01, p. 74; 2002-10-K, p. 102.

**RESPONSE TO COMPLAINT NO. 139:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 139.

**COMPLAINT NO. 140:** Houlihan received its contingent fee of at least $8.1 million.

**RESPONSE TO COMPLAINT NO. 140:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 140.

**COMPLAINT NO. 141:** After the transaction closed, Appvion and PDC issued a Prospectus Supplement to the ESOP employee owners dated 19 November 2001. This supplement described the completed transaction, which differed slightly from the transaction described in the prospectus. The supplement listed transaction fees including "$16 million in bank fees, $8 million in investment banking fees and $1 million in other various costs." Presumably the $8 million referenced in this supplement was the fees paid to Houlihan; however, the supplement does not

reference Houlihan and does not describe the fees as contingent. In addition, communications to employees, including a 28 May 2001 Ownership Update newsletter to Employee Owners, had also identified Bear, Stearns & Co. as investment banker for the deal causing further misdirection.

**RESPONSE TO COMPLAINT NO. 141:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 141.

**COMPLAINT NO. 142:** This fraudulently incomplete supplement was yet an additional step in furtherance of Buth, Karch, Houlihan and State Street's course of conduct to fraudulently conceal that the ESOP paid more than fair market value for the PDC stock in order to earn contingent fees and order to keep Buth, Karch and others in control of Appvion for their financial gain.

**RESPONSE TO COMPLAINT NO. 142:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 142.

### 13. <u>State Street Signed a Security Holder's Agreement Which Allowed Buth to Retain Control of the Company.</u>

**COMPLAINT NO. 143:** On 9 November 2001, State Street (on behalf of the ESOP) entered into a Security Holders Agreement with PDC which severely limited the ESOP Trustee's ability to control the Board. Under this agreement, the Trustee only had the right to independently nominate or remove a minority of the members of the Board until 2004 (it could independently nominate three directors in 2001/2002, two directors in 2003, and only one director in 2004). After 1 January 2005, the Trustee could only jointly nominate directors in conjunction with Appvion/PDC's CEO — it could not independently nominate any directors. The Trustee also did not have the independent authority to remove any directors after 1 January 2005.

**RESPONSE TO COMPLAINT NO. 143:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 143.

**COMPLAINT NO. 144:** The Security Holder's Agreement was not disclosed in the Prospectus. The terms first appeared in the Prospectus Supplement dated 19 November 2001. The terms of the ESOP Plan and the Security Holders Agreement severely limited the ESOP's ability to control the affairs of PDC or Appvion and left control with CEO Buth.

**RESPONSE TO COMPLAINT NO. 144:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 144.

### 14. The 31 December 2001 PDC Stock Valuation ($12.81) Demonstrates the 9 November 2001 Valuation ($10) was Fraudulently Inflated.

**COMPLAINT NO. 145:** As of 31 December 2001, 52 days after the 9 November 2001 ESOP transaction, Willamette valued the PDC stock at $12.81 a share. When multiplied by the number of shares outstanding (10,684,373) the resulting equity value of the PDC stock was fraudulently calculated to be approximately $136.9 million.

**RESPONSE TO COMPLAINT NO. 145:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 145.

**COMPLAINT NO. 146:** However, the combined pension and post-retirement debt reported on the Appvion audited balance sheet as of 31 December 2001 totaled $73.1 million. The "Other Material Liabilities" reported on that date totaled $7.3 million. This combined debt, (never subtracted from PDC's enterprise value to arrive at fair market value) totaled $80.4 million, or 58.76% of PDC's reported equity as of 31 December 2001. In addition, as of that date, a 15% control premium totaled $83.6 million, a full 60% of PDC's reported equity value.

**RESPONSE TO COMPLAINT NO. 146:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 146.

**COMPLAINT NO. 147:** Combined, the unsubtracted debt of $80.4 million and the fraudulent control premium of $83.6 million totaled $164 million. Adjusting for just these two items by subtracting $164 million from PDC's reported equity value of $136.9 million, results in negative equity of $27.1 million, or negative $2.54 per share of PDC stock.

**RESPONSE TO COMPLAINT NO. 147:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 147.

**COMPLAINT NO. 148:** Just 52 days earlier, it is certainly reasonable to conclude that the PDC equity value was certainly not higher, and should likewise have been reported as being negative. Therefore, the representations of Buth, Karch, Houlihan, State Street and Willamette that the $10 per share purchase price was fair, and not more than fair market value is demonstrably false. The only way that Buth, Karch, Houlihan and State Street were able to fabricate a positive equity value at the ESOP transaction date was by colluding together to fraudulently fail to deduct the pension, post- retirement and other liabilities and by adding a fraudulent control premium.

**RESPONSE TO COMPLAINT NO. 148:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 148.

### B.  Appvion's Employees Became Employee Owners.

**COMPLAINT NO. 149:** After the transaction was approved, the trustee used the invested funds to purchase shares of common stock of PDC, but only "if the ESOP trustee, in its sole discretion, determines that it is permissible under ERISA to accept the direction of eligible participants with regard to the investment in common stock." The ESOP Trustees (State Street, Reliance, and Argent) held record title to the shares of PDC stock on behalf of the ESOP, holding PDC's stock in trust for the Employee Owners who were the beneficial shareholders.

**RESPONSE TO COMPLAINT NO. 149:**  Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 149.

**COMPLAINT NO. 150:** After the initial election, the Employee Owners could elect to contribute a portion of their wages on an ongoing basis to the ESOP, which the ESOP would use to purchase additional stock from PDC in approximately June and December of each year and then allocate to accounts of Employee Owners. Withdrawals from a participant's ESOP account were limited to the following circumstances: (1) retirement, disability, death, or termination of employment; (2) hardship distributions; (3) loans to employees; and (4) statutory diversification of up to 10% of ESOP accounts per year (required by ERISA to be offered to employees over 55 years of age); and (5) additional diversification of up to 10% of ESOP accounts per year (as allowed by the ESOP Committee). The ESOP therefore repurchased shares from both current and former employees throughout the life of the ESOP. The purchase and sale activity is listed in Apendices A and B.

**RESPONSE TO COMPLAINT NO. 150:**  Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150.

**COMPLAINT NO. 151:** In theory, the share repurchase obligations would be funded from employee contributions to the ESOP, along with matching contributions from Appvion. If net repurchases exceeded contributions to the ESOP, repurchases were funded through a loan from Appvion to PDC, which PDC loaned to the ESOP.

**RESPONSE TO COMPLAINT NO. 151:**  Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 151.

**COMPLAINT NO. 152:** Share repurchases reduced the total number of shares in circulation. For example, if there were 10,000,000 shares issued and the ESOP repurchased 1,000,000, the total share count would be reduced to 9,000,000. After the initial buyout transaction, 10,684,373 shares of PDC stock were issued. By July 2017, only 5,823,112 shares remained outstanding.

**RESPONSE TO COMPLAINT NO. 152:**  Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 152.

**COMPLAINT NO. 153:** Any sales or purchases of PDC stock were required to be for fair market value under the Plan and under ERISA.

**RESPONSE TO COMPLAINT NO. 153:** Reliance Trust admits that, during its time as trustee, ERISA required the valuation of PDC stock to be based on a fair market value. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 153.

C. **The Defendants Analyzed and Reviewed the Stock Price Valuations and Authorized Their Release.**

1. **Willamette and Stout Were Responsible for Creating the Valuations.**

**COMPLAINT NO. 154:** Starting 31 December 2001, the Trustee was required to begin conducting semi- annual valuations of PDC stock.

**RESPONSE TO COMPLAINT NO. 154:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154.

**COMPLAINT NO. 155:** At an 8 January 2002 meeting, the ESOP Committee recommended that that the Trustee retain Willamette as the valuation firm for the 31 December 2001 and 30 June 2002 valuations. Accordingly, State Street retained Willamette to act as appraiser. Willamette continued in that position through mid-2004.

**RESPONSE TO COMPLAINT NO. 155:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155.

**COMPLAINT NO. 156:** In late 2004, Willamette's Scott Levine, Bob Socol, and others who worked on the Appvion account left Willamette and went to work for Stout.

**RESPONSE TO COMPLAINT NO. 156:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156.

**COMPLAINT NO. 157:** At the 14 January 2005 meeting of the ESOP Committee, the Committee recommended that the Trustee retain Stout "as the valuation firm for conducting the December, 2004 interim valuation (for loan issuance) and subsequent valuations."

**RESPONSE TO COMPLAINT NO. 157:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157.

**COMPLAINT NO. 158:** In a 24 February 2005 email, Appvion management reassured employees that many of the same professionals who had performed the Willamette valuations would stay on at Stout:

> The latest valuation of Paperweight Development Corporation was conducted by Stout Risius Ross (SSR [sic]), not Willamette Management Associates as I reported below. **Many key members of the Willamette Management ESOP valuation team including Bob Socol and Scott Levine have joined SRR.**
>
> Our trustee, State Street Global Advisors (SSGA), selects the firm to conduct the appraisal that helps SSGA determine the value of PDC stock. **SSGA chose Stout Risius Ross because of the qualifications and experience of Socol, Levine and their colleagues as well as their knowledge of our company.** The Willamette team had conducted all of our company's prior valuations.

Emphasis added.

**RESPONSE TO COMPLAINT NO. 158:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158.

**COMPLAINT NO. 159:** Stout conducted the valuations from late 2004 through 2017.

**RESPONSE TO COMPLAINT NO. 159:** Reliance Trust admits that Stout prepared the valuations as of June 30, 2013 and as of December 31, 2013. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 159.

## 2. The Trustees Were Responsible for Reviewing and Approving the Final Stock Price.

**COMPLAINT NO. 160:** The ESOP Trustee was at all times fiduciary to the ESOP and had an obligation to act in the best interests of the ESOP and its Employee Owners.

**RESPONSE TO COMPLAINT NO. 160:** To the extent the allegations about the "ESOP Trustee" in paragraph 160 refer to Reliance Trust, Reliance Trust admits it was a fiduciary to the ESOP with respect to its work as a trustee for parts of 2013 and 2014 and was required to discharge any fiduciary duties according to ERISA's standards, but denies the allegations in paragraph 160 to the extent they suggest Reliance Trust owed any duties beyond what is described in its trust

agreement or ERISA. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 160.

**COMPLAINT NO. 161:** Under the applicable trust agreements, the ESOP Trustee (State Street from 2001-2013, Reliance from 2013-2014, and Argent from 2014-2017) were the primary party responsible for determining PDC's stock value.

**RESPONSE TO COMPLAINT NO. 161:** To the extent the allegations in paragraph 161 refer to Reliance Trust, Reliance Trust admits it was trustee for parts of 2013 and 2014 and that its trust agreement reflected duties with respect to determining PDC's stock value, but otherwise denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 161.

**COMPLAINT NO. 162:** The trust agreements required them to retain an "Independent Appraiser," as described by Section 401(a)(28)(C) of the Internal Revenue Code, to value PDC stock. However, the Trustee Defendants were ultimately responsible for reviewing and finalizing the valuation in accordance with ERISA, which requires the trustee to determine fair market value in good faith.

**RESPONSE TO COMPLAINT NO. 162:** To the extent the allegations in the first sentence of paragraph 162 refer to Reliance Trust, Reliance Trust admits its trust agreement for the ESOP required retention of an independent appraiser in certain circumstances, but otherwise denied. To the extent the allegations about "Trustee Defendants" in the second sentence refer to Reliance Trust, Reliance Trust admits it had responsibilities relating to reviewing and finalizing valuations during its time as trustee in accordance with ERISA, and that ERISA requires good-faith determinations of fair market value in certain circumstances, but denies that Plaintiff's characterization of ERISA provides a full and accurate summary of the relevant legal principles. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 162.

**COMPLAINT NO. 163:** While they were entitled to rely on the advice of a financial advisor, the trustees were required to investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice was

reasonably justified under the circumstances. This required the trustees to make an honest, objective effort to read the valuation, understand it and the underlying assumptions, and question the methods and assumptions that do not make sense.

**RESPONSE TO COMPLAINT NO. 163:** To the extent the allegations in paragraph 163 refer to Reliance Trust, Reliance Trust admits that, during its time as trustee, it was entitled to rely on the advice of a financial advisor and required to review, assess, and finalize the valuations prepared by any retained expert, but otherwise denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 163.

**COMPLAINT NO. 164:** State Street, Reliance, and Argent therefore necessarily read, critically reviewed and understood each of the valuation reports they approved as well as the underlying methodology and assumptions they were based on.

**RESPONSE TO COMPLAINT NO. 164:** Admitted as to Reliance Trust, except to the extent "critically reviewed" means something other than review in compliance with ERISA and its trust agreement. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 164.

### 3. The ESOP Committee Members Were ESOP Fiduciaries Responsible for Reviewing and Approving the Valuations.

**COMPLAINT NO. 165:** The Plan authorized the creation of the ESOP Committee, which was to consist of at least three members appointed by Appvion's Board of Directors. This committee was "the named fiduciary with respect to the financial management of the ESOP Plan and the control or management of the assets of the Plan[.]"

**RESPONSE TO COMPLAINT NO. 165:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165.

**COMPLAINT NO. 166:** A 2006 KSOP Guide distributed to employees titles "Take Ownership of your Future" confirmed the ESOP Committee's fiduciary status, stating "Because the committee exercises discretionary authority with respect to the management of the ESOP and provides direction to the ESOP Trustee, its members also have a fiduciary obligation to act in the best interest of the ESOP."

**RESPONSE TO COMPLAINT NO. 166:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 166.

**The ESOP Committee Members Reviewed, Approved and Disseminated Each Semi-Annual PDC Stock Price.**

**COMPLAINT NO. 167:** From 31 December 2001 forward, the ESOP Committee members received, reviewed, and approved the semi-annual PDC stock valuations, then disseminated the stock price through communications to the Employee Owners that the ESOP Committee members authored, reviewed, and approved (*see* ¶¶ 373-560 for discussion of these communications). The fact that the ESOP Committee reviewed the valuations is confirmed by the content of the ESOP Committee communications with the Employee Owners, which discussed the valuation techniques and selectively described factors that impacted the valuations. Further, the stock price was a crucial factor to induce the Employee Owners to continue to fund the ESOP.

**RESPONSE TO COMPLAINT NO. 167:**    Reliance    Trust    lacks    knowledge    or

information sufficient to form a belief as to the truth of the allegations in paragraph 167.

**COMPLAINT NO. 168:** In addition, Buth (and others) went on road shows to present the valuations to employees. For example, he went on a road show in March 2002 along with Stout's Levine to present the valuation to the Employee Owners, in order to "explain the valuation process, how it differs from the fairness option issued at the deal closing, and how it determines stock value." Buth again went on a road show in September 2002 to explain the 30 June 2002 valuation, and continued to hold road shows approximately twice a year to present the share price to employees and discuss company performance.

**RESPONSE TO COMPLAINT NO. 168:**    Reliance    Trust    lacks    knowledge    or

information sufficient to form a belief as to the truth of the allegations in paragraph 168.

**COMPLAINT NO. 169:** In a September 2003 newsletter, State Street's reported that she would "typically call Doug Buth and inform him and Appleton of the new value of PDC stock."

**RESPONSE TO COMPLAINT NO. 169:**    Reliance    Trust    lacks    knowledge    or

information sufficient to form a belief as to the truth of the allegations in paragraph 169.

**COMPLAINT NO. 170:** Further, the ESOP Trustee was not authorized to buy any PDC stock without the ESOP Committee's prior direction.

ARTICLE 3

Provisions Related to Investment in Company Stock

3.1 Investment of Cash. The primary purpose of the Plan is to acquire an ownership interest in the Company either from the Company or its shareholders and to provide deferred compensation benefits to Participants, Beneficiaries and Alternate Payees in the form of share of Company Stock. **Accordingly the ESOP portion of the Plan has been established to**

**provide for investment primarily in shares of Company Stock**. The Trustee shall purchase Company Stock with the assets contained in the Participants' ESOP Account **upon the direction of the Committee**, unless the Trustee determines that such purchase is prohibited by ERISA. The Trustee shall purchase Company Stock from the Company or from any shareholder, **if the Trustee is directed by the Committee**, and such stock may be outstanding, newly issued or treasury stock. All such purchases must be at a price **not in excess of fair market value**, as determined by an independent Appraiser where such stock is not publicly traded.

Source: Appleton Papers Inc., Employee Stock Ownership Trust, 1 Jun 2001 pp. 8-9; emphasis added.

**RESPONSE TO COMPLAINT NO. 170:** To the extent the allegations about the "ESOP Trustee" in the first sentence of paragraph 170 refer to Reliance Trust, admitted. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 170.

**COMPLAINT NO. 171:** Similar language was in the operative trust agreements until August 2015.

**RESPONSE TO COMPLAINT NO. 171:** Reliance Trust admits that similar language to what is quoted in paragraph 170 appears in its trust agreement, except for the added bold font for emphasis. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 171.

> **b.** **Minutes Beginning in 2008 Confirm the ESOP Committee's Detailed Review of the PDC Stock Valuations.**

**COMPLAINT NO. 172:** In January 2008, the ESOP Committee adopted a Charter. The Charter confirmed that one of the ESOP Committee's duties was to "review stock price calculations. Its duties included:

- "To oversee the administration and enforcement of the Appleton Employee Stock Ownership Plan;"

- "To direct the activities of the Trustee of the ESOP Plan;"

- "Appoint Trustee or Trustees to hold the assets of the ESOP Plan;"

- "**Review stock price calculations** as soon as practical after the Trustee establishes the stock price;"

- "Review current/forecasted company financial performance and covenant compliance;"

- Review status of the ESOP Plan in relation to ERISA to ensure compliance;

- Review performance of the record keeper for the ESOP;

**RESPONSE TO COMPLAINT NO. 172:** Reliance Trust lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 172.

**COMPLAINT NO. 173:** However, communications from the ESOP Committee to the Employee Owners before 2008 demonstrate that the ESOP Committee reviewed each PDC stock valuation before they released the PDC stock price to the Employee Owners.

**RESPONSE TO COMPLAINT NO. 173:** Reliance Trust lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 173.

**COMPLAINT NO. 174:** A 13 May 2015 presentation to Appvion's Board also described the ESOP Committee's responsibilities, including:

- "Semi-annual review and approval of stock price calculations with Trustee and Stout Risius Ross"

- "Regular reviews of company financial performance and regulatory filings"

- "Regular interaction with the Trustee on all significant ESOP-related matters"

**RESPONSE TO COMPLAINT NO. 174:** Reliance Trust lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 174.

**COMPLAINT NO. 175:** For example, at the 10 January 2008 ESOP Committee meeting, Stout's Levine participated in the meeting telephonically and explained the valuation "as prepared by Stout Risius Ross and approved by State Street Global Advisors." The ESOP Committee requested detailed edits to Stout's valuation presentation to State Street, including removing a reference to insurance settlement litigation and adding additional carbonless competitors to the presentation. This example demonstrates the ESOP Committee's detailed level of PDC valuation review:

> The first item on the agenda was to 2 review **the December 31, 2007 stock valuation work as prepared by Stout Risius Ross and approved by State**

**Street Global Advisors**. Mr. Levine described the process used to arrive at the December 31, 2007 valuation.

Following a general discussion of the valuation, **a few edits were requested to be made** to SRR's presentation to State Street Bank and Trust Company. Ms. Tyczkowski requested that SRR **removed references to the insurance litigation settlement as being imminent** on page 16, item 3. and Schedule M of the presentation. Mr. Ferree also requested that **Glatfelter and Nekoosa be added to the list of carbonless competitors** on pages 7 and 25 of the presentation documents.

The ESOP Committee was comfortable with the valuation work and there being no further questions or discussion, Messrs. Levine and Williams and Ms. Marzeotti departed the meeting.

Minutes of a Meeting, ESOP Committee, Appleton Papers Inc. Retirement and Employee Stock Ownership Plan, 10 Jan 08.

**RESPONSE TO COMPLAINT NO. 175:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 175.

**COMPLAINT NO. 176:** Similarly, the 7 July 2008 minutes of the ESOP Committee show that the ESOP Committee "accepted the valuation" after discussion with Stout and State Street.

**RESPONSE TO COMPLAINT NO. 176:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 176.

**COMPLAINT NO. 177:** In a 7 July 2009 ESOP Committee Meeting, the ESOP Committee reviewed the 30 June 2009 stock valuation prepared by Stout and approved by State Street, and requested adjustments to the share price. Again, this represents the ESOP Committee's detailed level of review:

The Committee reviewed the June 30, 2009 stock valuation prepared by Stout Risius Ross and approved by state Street Global Advisors. Mr. Levine described the process used to arrive at the June 30, 2009 valuation. **Following a detailed discussion, it was determined that the stock price needed to be adjusted. The ESOP Committee accepted the adjusted valuation**. A revised valuation report will be forwarded to the ESOP Committee.

Emphasis added.

**RESPONSE TO COMPLAINT NO. 177:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 177.

**COMPLAINT NO. 178:** ESOP Committee meeting minutes documented that representatives from Stout and the trustees participated in ESOP Committee meetings to review each of their valuations with the ESOP Committee from January 2008 to July 2017.

**RESPONSE TO COMPLAINT NO. 178:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 178.

4. **The Directors Were Responsible for Monitoring the ESOP Committee and the Trustee as Well as Appvion's Financial Statements and Performance.**

**COMPLAINT NO. 179:** The Board was responsible for appointing the ESOP Trustee and the members of the ESOP Committee, as well as selecting a chair and secretary for the ESOP Committee.

**RESPONSE TO COMPLAINT NO. 179:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 179.

**COMPLAINT NO. 180:** The Board consisted of inside directors and the Outside Directors. The inside directors were officers of Appvion and members of Appvion's ESOP Committee – this included the CEOs (Buth, Richards, and Gilligan) as well as Parker and Karch. These individuals' knowledge of and involvement in the valuations is therefore addressed above, but their role as directors is also relevant to their knowledge.

**RESPONSE TO COMPLAINT NO. 180:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 180.

**COMPLAINT NO. 181:** The Outside Directors (Scherbel, Pace, Carter, Murphy, Reardon, Suwyn, and Seifert) were not otherwise employed by Appvion.

**RESPONSE TO COMPLAINT NO. 181:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 181.

**COMPLAINT NO. 182:** One of the Board's primary functions was, as Richards stated in a 6 December 2007 email, "to oversee and control the company." This included extensive knowledge of Appvion and PDC's financial condition in at least the following ways:

- When an employee left Appvion or otherwise redeemed shares, their shares were sold back to the ESOP through a put option. Appvion relied on continued investment from employees to fund the redemptions from the ESOP, but redemptions from the ESOP, but redemptions in excess of contributions has to be paid from Appvion's cash flow (via loans to PDC). Since redemptions exceeded contributions every year after 2002, this was a large drain on Appvion's cash flow.

Appvion had to monitor this repurchase obligation at all times and the repurchase obligation was disclosed in each 10-K.

- Further, Appvion's loan covenants restricted the amount the ESOP could pay out in excess of contributions, so this repurchase liability had to be monitored for compliance with loan covenants.

- The value of PDC's stock directly impacted Appvion's balance sheet through at least the Redeemable Common Stock entry, which was a function of the appraised stock value. This was part of Appvion's audited financial statements that were incorporated into 10-Ks.

**RESPONSE TO COMPLAINT NO. 182:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 182.

**COMPLAINT NO. 183:** Because the ESOP valuations were so central to Appvion's financial condition, in order to effectively understand or control Appvion's finances, the Directors had to understand the valuations in order to exercise any kind of effective control over the company and to fulfill their oversight function.

**RESPONSE TO COMPLAINT NO. 183:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 183.

**COMPLAINT NO. 184:** Further, the Board recognized that it owed a fiduciary duty to the ESOP as a shareholder without regard to ERISA. However, since the shareholder here was an ERISA plan, the Board had additional fiduciary obligations to appoint fiduciaries to manage the ESOP and monitor those fiduciaries (the ESOP Committee and the ESOP Trustee).

**RESPONSE TO COMPLAINT NO. 184:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 184.

**COMPLAINT NO. 185:** To that end, the Board received reports on the valuations on an ongoing basis from the ESOP Trustee, the ESOP Committee, and the appraisal firms (Willamette and Stout). The Directors met with the ESOP Trustee and the appraisers twice per year to discuss the valuations. For example, Willamette's Braun represented that he would meet with the Board twice a year:

> **[W]e will come in twice a year in order to … provide a full report to** the trustee and will also **provide management and the board of directors** with enough information so they understand what it is we did, why it makes sense, at least why we think it made sense and how we feel that is a supportable value for purposes of determining what your value is going forward.

The Future of Appleton Papers Road show, 2 Aug 2001.

**RESPONSE TO COMPLAINT NO. 185:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 185.

**COMPLAINT NO. 186:** Similarly, a September 2003 employee newsletter authored by State Street's Driscoll stated that "A State Street representative attends at least one Appleton board meeting each year and conducts meetings with the outside directors that serve on Appleton's board." This practice continued throughout the life of the ESOP; as evidenced by at least emails from 2008 and 2012 stating that the Board to review the valuations at its regular meetings.

**RESPONSE TO COMPLAINT NO. 186:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 186.

**COMPLAINT NO. 187:** Further, as part of monitoring Appvion's financial performance, the Board reviewed the financial projections prepared by management – these were the same projections that formed the basis for the valuations.

**RESPONSE TO COMPLAINT NO. 187:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 187.

**COMPLAINT NO. 188:** The Directors also reviewed and signed each of PDC and Appvion's 10-K filings that was filed while they were directors. Each 10-K filing reported and relied upon the stock price.

**RESPONSE TO COMPLAINT NO. 188:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 188.

**COMPLAINT NO. 189:** The Board had an Audit Committee which had even greater responsibility for oversight of Appvion's audited financial statements and accounting practices than the rest of the Board. According to numerous 10-K filings, the Audit Committee was tasked with "provid[ing] assistance to the Board of Directors in fulfilling its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of Paperweight Development financial reports." Further, the Audit Committee reviewed and approved Appvion's quarterly 10-Q filings, which also relied upon and incorporated the stock values.

**RESPONSE TO COMPLAINT NO. 189:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 189.

**COMPLAINT NO. 190:** The Board's Compensation Committee (Seifert, Murphy, Suwyn and Reardon) was "responsible for authorizing the compensation of the Chief Executive

Officer subject to ratification by the board of directors, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers." This included the power to award grants of LTIP units and RSUs (defined and discussed below in Paragraphs 297-305) which were directly tied to the stock price. This required the Compensation Committee to understand the stock price and the potential movement of the stock price in order to understand how much compensation they were awarding.

**RESPONSE TO COMPLAINT NO. 190:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 190.

### D. PDC's Stock Was Fraudulently Overvalued from 9 November 2001 Through Bankruptcy.

#### 1. After the 2001 Transaction, the Share Price Increased Dramatically.

**COMPLAINT NO. 191:** Because PDC's stock was not publicly traded, its value was based entirely on valuations conducted by Willamette and Stout and approved by the ESOP Trustee and the ESOP Committee as described above. These stock values are below:

**Table 2: PDC's Reported Stock prices 9 November 2001 to 30 June 2017**

| Valuation Date | Share Price |
|----------------|-------------|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |
| 12/31/2004 | $ 26.36 |
| 06/30/2005 | $ 27.77 |
| 12/31/2005 | $ 28.56 |
| 06/30/2006 | $ 31.27 |
| 12/31/2006 | $ 33.62 |
| 06/30/2007 | $ 32.89 |
| 12/31/2007 | $ 33.41 |
| 06/30/2008 | $ 26.64 |
| 12/31/2008 | $ 21.43 |
| 06/30/2009 | $ 18.87 |
| 12/31/2009 | $ 13.26 |
| 06/30/2010 | $ 12.03 |
| 12/31/2010 | $ 12.84 |
| 06/30/2011 | $ 14.10 |
| 12/31/2011 | $ 15.01 |

| Valuation Date | Share Price |
|---|---|
| 06/30/2012 | $ 16.45 |
| 12/31/2012 | $ 17.55 |
| 06/30/2013 | $ 17.85 |
| 12/31/2013 | $ 16.25 |
| 06/30/2014 | $ 16.30 |
| 12/31/2014 | $ 11.00 |
| 06/30/2015 | $ 12.90 |
| 12/31/2015 | $ 12.30 |
| 06/30/2016 | $ 13.70 |
| 12/31/2016 | $ 10.35 |
| 06/30/2017 | $6.85 |

**RESPONSE TO COMPLAINT NO. 191:** Reliance Trust admits the chart accurately reflects the value calculation for PDC's stock for the valuations as of June 30, 2013 and December 31, 2013. For those two valuations, Reliance Trust admits Stout conducted the valuations and Reliance Trust finalized. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 191.

**COMPLAINT NO. 192:** The valuations were never disclosed to the Employee Owners or the public. However, the ESOP Committee and the ESOP Trustee at all times fraudulently misrepresented that the stock was being set at fair market value.

**RESPONSE TO COMPLAINT NO. 192:** To the extent the allegations about "ESOP Trustee" in paragraph 192 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 192.

**COMPLAINT NO. 193:** Since PDC and Appvion were 100% employee-owned, these stock values were a key factor underlying all aspects of the business. High level executives at Appvion (including the ESOP Committee and the Board) were at all times aware of the stock price and the valuation process. Further, because they needed employees to continue investing in the ESOP to continue providing funds to the ESOP and Appvion, they had to continually pitch the ESOP to employees through the stock value communications discussed here in, regular road show presentations, and other communications and marketing materials.

**RESPONSE TO COMPLAINT NO. 193:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 193.

## 2. Plaintiff Grant Lyon First Discovered in 2017 that the PDC Stock Valuations had been Fraudulently Inflated.

**COMPLAINT NO. 194:** Lyon was appointed as the sole member of the ESOP Committee in August 2017. Before his appointment, Lyon was independent of Appvion and the ESOP, and had no prior knowledge of the PDC stock valuations.

**RESPONSE TO COMPLAINT NO. 194:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 194.

**COMPLAINT NO. 195:** Lyon began conducting an investigation into the valuations. Based primarily upon his review of Appvion's audited financial statements and the Stout-authored PDC stock valuations, Lyon concluded that Stout's valuations overstated the fair market value of PDC stock because of, among other things, the following deficiencies:

- Each valuation failed to deduct the Excluded Debt which appeared on Appvion's balance sheets in arriving at PDC's fair market value

- The valuations failed to deduct all interest-bearing debt.

- The valuations included a control premium that substantially inflated the valuations. He could find no factual support for the control premium.

- The valuations relied heavily on financial projections of future cash flow created by Appvion's management, even though that Appvion consistently missed these projections.

- The valuations failed to appropriately consider the impact on the discounted cash flow of the ongoing need to repurchase PDC stock.

- The valuations artificially manipulated their methodology to inflate the PDC stock even further during periods of low earnings.

- The valuations inappropriately used the perpetuity model to capitalize a declining income stream in violation of valuation theory. A declining income stream cannot continue into perpetuity.

- The valuations failed to include all overhead costs in the projections by breaking Appvion out into business segments, thus failing to account for overhead costs not allocated to individual business segments.

- The valuations failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

- The valuations failed to stress test Appvion's projections, thus failing to consider the risk of misstatement.

**RESPONSE TO COMPLAINT NO. 195:** Reliance Trust denies that its work as trustee was deficient or that it violated any duties under ERISA or otherwise. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 195.

**COMPLAINT NO. 196:** Lyon has not had access to the Willamette valuation reports or to their original fairness opinion. However, because they were done by the same key personnel and because the reported PDC stock values were consistent with the later Stout valuations, he has reasonably concluded they were similarly flawed.

**RESPONSE TO COMPLAINT NO. 196:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 196.

3.     **Each Valuation Fraudulently Failed to Subtract Debt Recorded on Appvion's Audited Financial Statements.**

a.     **Valuation Theory Uniformly Requires that All Debts be Subtracted.**

**COMPLAINT NO. 197:** At the 2 August 2001 Road Show, Karch admitted that debt was the driving factor in PDC's fair market value: The PDC stock value "is primarily driven by, or almost all, is driven by a reduction in debt. The way the model works, the value of Appleton Papers remains pretty flat over the five years and it's the reduction of debt that drives the return to the participants." The Future of Appleton Papers Road show, 2 Aug 01.

**RESPONSE TO COMPLAINT NO. 197:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 197.

**COMPLAINT NO. 198:** Willamette's Rick Braun also explained that equity value equals enterprise value (or total invested capital) minus debt, using the simple example of mortgage debt on a home:

> If you want to think about it what is the value of the company as a whole which is sometimes total invested capital "TIC" – **so if the company didn't have any debt on it what was it worth and if from that value you subtract debt that's a pretty good approximation of what the value of the equity is**. So, go back to Lou's example of the $80,000 house. That's an $80,000 house and you have a $70,000 mortgage against it. You have $10,000 worth of equity. And remember Doug's chart where he showed you

that over the next few years – **four years the debt going to be repaid by over $500 million dollars**. So all of the things being equal, if the company is worth approximately $800 million now and that value does not change; but, the **value of the debt declines very substantially over that period of time the value of your equity should also increase over that time and that is what drives that very attractive 37 plus percent rate of return**.

The Future of Appleton Papers Road show, 2 Aug 2001; emphasis added.

**RESPONSE TO COMPLAINT NO. 198:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 198.

**COMPLAINT NO. 199:** To arrive at the fair market value of PDC's equity (or of any enterprise) it was necessary to first calculate PDC's enterprise value and then to subtract PDC's debt. The 2005 Stout appraisal explains: "The term 'asset,' … reflects the combined tangible and intangible assets of a company as components of a going concern business enterprise [enterprise value], and also gives consideration to all known liabilities." Stout Valuation, 11 Aug 05, p. 3; emphasis added. For example, if PDC were to incur $10 million in additional debt, that debt must be subtracted from PDC's enterprise value, causing a dollar for dollar reduction in its fair market value.

**RESPONSE TO COMPLAINT NO. 199:** Denied as to the first sentence and the last sentence. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 199.

**COMPLAINT NO. 200:** However, the valuations of PDC from 2001 to 2017 fraudulently reduced PDC's enterprise value by only a portion of PDC's audited balance sheet debt.

**RESPONSE TO COMPLAINT NO. 200:** To the extent the allegations in paragraph 200 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 200.

**COMPLAINT NO. 201:** As described above, the two largest debts not deducted from every appraisal were entitled, "Postretirement benefits other than pension" and "Accrued pension." These amounts represent the present value of the future payments Appvion was required to make to cover its employee retirement benefits and they represent a loan from the pension beneficiaries to Appvion. A third debt, though not as large, that was never deducted was entitled "Other long-term liabilities," which included compensation obligations, workers compensation, accrued insurance obligations, accrued tax obligations, and amounts due on accounts receivable securitization.

**RESPONSE TO COMPLAINT NO. 201:** To the extent the allegations in paragraph 201 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 201.

**COMPLAINT NO. 202:** Valuation literature addressing retirement debt confirms it must be subtracted to determine fair market value. Willamette authored the following article agreeing with this in 2015:

> Once the **funded status** of **pension** and **postretirement liabilities is known**, the valuation analyst can determine the **pension liability for valuation purposes**.
>
> * * *
>
> **Adjusting a company's market value of equity for underfunded pension and postretirement liabilities** is typically done by determining the amount of underfunding, adjusting for tax benefits on pension contributions available to the corporation, and subtracting the underfunded pension liability, net of tax, in determining the market value of equity.
>
> When applying a **market approach** to a subject company with **underfunded pension and postretirement liabilities**, guideline public company **multiples should be adjusted** to account for **underfunded pension and postretirement liabilities**.
>
> Although pension plans are **slowly fading away** as companies continue to freeze pension plan obligations or terminate pension plans each year, **the need to consider pension assets and liabilities as part of the business valuation process will continue for the foreseeable future**.

*Willamette Business Valuation Insights*, "Adjusting for Underfunded Pension and Postretirement Liabilities," Christopher W. Peifer, Summer 2015, pp. 69, 71; emphasis added.

**RESPONSE TO COMPLAINT NO. 202:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 202.

### b. The Excluded Debts are Plainly Displayed on Appvion's Balance Sheets.

**COMPLAINT NO. 203:** PDC's audited financial statements subtracted the Excluded Debt when calculating Appvion's shareholders' equity, each of the PDC stock valuations did not. For example, the 2005 PwC-audited balance sheet contained in PDC's and Appvion's publicly filed 10-K (which is similar to and representative of every other year's balance sheet) prominently

showed $118.4 million in total debt included in the three entries – "Post-retirement debt other than pension," "Accrued Pension," and "Other long-term liabilities":

**Figure 3: PDC's Consolidated Balance Sheets, 2005 and 2004**



Source: PDC's, 10-K (2005), p. 50; emphasis added.

**RESPONSE TO COMPLAINT NO. 203:** To the extent the allegations in paragraph 203 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 203.

c.      **The Key Summary Page of Each Stout Appraisal Plainly Displays that Only "Interest-bearing Debt" is Being Subtracted.**

**COMPLAINT NO. 204:** In conducting its valuations, Willamette and Stout would analyze of Appvion's divisions using a discounted cash flow method (which relied on projections of future earnings) and a guideline company method (which analyzes comparable companies to determine price multiples). Willamette and Stout would determine an enterprise value for each division using each method, then average the values together to determine the enterprise value for each division. The valuations then added all of those values together to reach the enterprise value of Appvion as a whole under the heading "Conclusion of Value." Below is the Conclusion of Value from Stout's 31 December 2005 valuation, which subtracts only "interest-bearing debt" ($574,011,000) from Appvion's enterprise value ($942,000,000):

**Figure 4: Stout's Conclusion of Value as of 31 December 2005**



| | | Source | Indicated Value |
|---|---|---|---|
| | **Indicated Enterprise Values:** | | |
| 1 | Carbonless | Exhibit 1 (B) | $ 518,000,000 |
| 2 | Thermal | Exhibit 1 (B) | $ 211,000,000 |
| 3 | Performance Packaging | Exhibit 1 (B) | $ 135,000,000 |
| 4 | BemroseBooth | Exhibit 1 (B) | $ 78,000,000 |
| | **Indicated Enterprise Value for Appleton Papers, Inc.** | | $ 942,000,000 |
| 5 | Less: Potential Fox River Environmental Liability | | $ (20,000,000) |
| 6 | Less: Cap on Other Potential Liabilities | | $ (5,000,000) |
| 7 | Less: Net Litigation Liability | | $ (100,000) |
| 8 | Plus: Cash | Exhibit 6 (A) | $ 18,422,000 |
| 9 | Adjusted Enterprise Value for Appleton Papers, Inc. | | $ 935,000,000 |
| 10 | Less: Book Value of Interest-Bearing Debt | Exhibit 9 | $ (574,011,000) |
| 11 | Indicated Equity Value for Appleton Papers, Inc., Marketable | | $ 361,000,000 |
| 12 | Less: Discount for Lack of Marketability @ 5% of Equity Value | | (18,000,000) |
| 13 | Indicated Equity Value for Appleton Papers, Inc., Non-Marketable (Rounded) | | $ 343,000,000 |
| 14 | Less: Phantom Stock Adjustment [a] | | $ (2,322,598) |
| 15 | Concluded Equity Value for Appleton Papers, Inc., Non-Marketable (Rounded) | | $ 341,000,000 |
| 16 | Divided by: Number of Shares | | 11,938,060 |
| 17 | **Concluded Per Share Equity Value for Appleton Papers, Inc. (Rounded)** | | $ 28.56 |

Footnotes:
[a] Calculated as: (1) the concluded price per share less the weighted average grant price of $23.54 per share, times (2) the 771,115 phantom shares issued and outstanding, and (3) adjusted for an effective tax rate of 40 percent.

Source: Stout Valuation, 31 Dec 05, p. 92; emphasis added.

**RESPONSE TO COMPLAINT NO. 204:** To the extent the allegations in paragraph 204 refer to Reliance Trust, Reliance Trust admits that Stout utilized a discounted cash flow method and a guideline company method for the valuations as of June 30, 2013 and as of December 31, 2013, but otherwise denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 204.

**COMPLAINT NO. 205:** If there were any doubt about what constitutes "interest-bearing debt", an exhibit to the valuation lists the debts that make up the $574 million total:

**Figure 5: Stout's Chart of Fair Market Value of Interest-Bearing Debt**



| | | Book Value ($000s) | Fair Market Value ($000s) |
|---|---|---|---|
| | **Appleton Papers, Inc.** | | **Exhibit 9** |
| | **Fair Market Value of Interest-Bearing Debt** | | |
| 1 | Term Loan B | 231,309 | 231,309 |
| 2 | Revolving Line of Credit | 2,000 | 2,000 |
| 3 | High Yield Bonds | 7,000 | 7,000 |
| 4 | Senior Secured Notes [a] | 172,000 | 163,400 |
| 5 | Senior Subordinated Notes [a] | 150,000 | 147,750 |
| 6 | Existing Third Party Debt - Industrial Revenue Bonds | 8,650 | 8,650 |
| 7 | Capital Lease Obligations | 3,052 | 3,052 |
| 8 | **Total Interest-Bearing Debt:** | **574,011** | **563,161** |

Footnote:
[a] Based on current market pricing for the Company's publicly traded Senior Secured Notes and Senior Subordinated Notes from *Bloomberg*.

*Id.* at Appendix B, Ex. 9; emphasis added.

**RESPONSE TO COMPLAINT NO. 205:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 205.

**COMPLAINT NO. 206:** A comparison of the debts reported on the audited balance sheet with the "interest-bearing debt" demonstrates that at least the following audited balance sheet debts were fraudulently omitted from the calculation of the PDC stock's 2005 equity or fair market value:

**Table 3: Audited Balance Sheet Debts Fraudulent Omitted from Stout's Valuation**

| Balance Sheet Description | Amount |
|---|---|
| "Post-retirement benefits other than pension": | $ 58,928 |
| "Accrued Pension": | $ 55,211 |
| "Other long-term liabilities": | $ 4,267 |
| **TOTAL** | **$ 118,406** **Million** |

Source: PDC, 2005 10-K, p. 50; emphasis added.

**RESPONSE TO COMPLAINT NO. 206:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 206.

**COMPLAINT NO. 207:** Because the valuation failed to reduce Appvion's enterprise value by these liabilities, the fair market value of the PDC stock as of 31 December 2005 was fraudulently overstated by at least $118.41 million. Rather than the equity value of $341 million that Stout reported for 31 December 2005, the revised fair market value (with just this debt adjustment) was $222.6 million, reducing the PDC stock price from $28.56 a share to $18.98 a share. Every valuation from 9 November 2001 until Appvion's bankruptcy perpetuated (and thus fraudulently concealed) the same flaw.

**RESPONSE TO COMPLAINT NO. 207:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 207.

### d. The Combination of the Appvion Balance Sheet and the PDC Stock Valuations Shows Intent.

**COMPLAINT NO. 208:** The fact that every Appvion balance sheet so clearly lists the Excluded Debts and that every PDC stock valuation so clearly discloses only a portion of Appvion's debt (interest-bearing) is being subtracted when calculating fair market value, is strong evidence of an intent to fraudulently inflate the PDC stock price. Even a cursory review of the PDC stock valuations reveals this hugely material error.

**RESPONSE TO COMPLAINT NO. 208:** To the extent the allegations in paragraph 208 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 208.

### e. The BemroseBooth Transaction is Conclusive Proof that the PDC Stock Price was Intentionally Overstated by Excluding Retirement-Related Debt.

**COMPLAINT NO. 209:** In 2003, Appvion's Board approved the $63.5 million purchase of BemroseBooth, a United Kingdom-based printing business. The acquisition was a complete failure. By late 2007, Appvion was seeking to unload BemroseBooth.

**RESPONSE TO COMPLAINT NO. 209:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 209.

### i. Stout's 30 December 2007 PDC Stock Valuation admitted retirement-related debt must be subtracted.

**COMPLAINT NO. 210:** Stout's 31 December 2007 valuation is the only one that actually deducts retirement debt; however, it only deducted BemroseBooth's $15.3 million retirement debt, not Appvion's debt as a whole. The valuation explained:

*BemroseBooth Pension Payments*

- **We subtracted $15.3 million** [from Appvion's enterprise value] to account for annual payments the Company is expected to make to fund **BemroseBooth's underfunded pension obligation** over the next five years. Based on any **discussions with Company management** and our understanding of ongoing negotiations with the **pension fund's trustee**, annual installments of approximately **$3.6 million** are expected after **accounting for the resulting tax benefit**. The amount was then **discounted back to the Valuation Date** at a 6.0 percent rate to **estimate the amount of the liability**.

Source: Stout Valuation, 31 Dec 07, p. 57; emphasis added; *id.* at pp. 15-16.

**RESPONSE TO COMPLAINT NO. 210:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 210.

**COMPLAINT NO. 211:** In addition to its subtraction of interest-bearing debt, Stout's "Conclusion of Value" calculation made a $15.3 million dollar-for-dollar reduction to Appvion's enterprise value ($936 million) in arriving at fair market value:

**Figure 6: Stout's Conclusion of Value as of 31 December 2007**



| VIII. CONCLUSION OF VALUE | Source | Indicated Value |
|---|---|---|
| **Indicated Enterprise Values:** | | |
| Carbonless | Exhibit B | $ 517,000,000 |
| Thermal | Exhibit B | $ 229,000,000 |
| Performance Packaging | Exhibit B | $ 129,000,000 |
| BemroseBooth | Exhibit B | $ 61,000,000 |
| **Indicated Enterprise Value for Appleton Papers, Inc.** | | $ 936,000,000 |
| **Less: Present Value of BemroseBooth's Pension Payments** | | **$ (15,300,000)"** |
| Plus: Cash [a] | Exhibit G | $ 15,000,000 |
| Plus: Chemical Division Value [b] | | $ 6,013,000 |
| Adjusted Enterprise Value for Appleton Papers, Inc. | | $ 932,000,000 |
| Less: Adjusted Book Value of Interest-Bearing Debt [a] [c] | Exhibit K | $ (543,125,000) |
| Indicated Equity Value for Appleton Papers, Inc., Marketable | | $ 389,000,000 |
| Less: Discount for Limited Marketability @ 5% of Equity Value | | (19,000,000) |
| Indicated Equity Value for Appleton Papers, Inc., Controlling Interest Basis (Rounded) | | $ 370,000,000 |
| Less: Phantom Stock Adjustment [d] | | $ (2,455,801) |
| Concluded Equity Value for Appleton Papers, Inc., Controlling Interest Basis (Rounded) | | $ 368,000,000 |
| Divided by: Number of Shares | | 11,013,906 |
| **Concluded Per Share Equity Value for Appleton Papers, Inc. (Rounded)** | | **$ 33.41** |

Footnotes:
[a] Based on the Company's forecasted December 31, 2007 balance sheet.
[b] Calculated the value of the chemical division by multiplying the projected 2007 EBITDA of $859,000 by a 7 times multiple.
[c] We removed $7.6 million from the Company's interest-bearing debt because part of the Ohio State loan is offset by an asset held as restricted cash.
[d] Calculated as: (1) the concluded price per share less the weighted average grant price of $29.12 per share, times (2) the 953,567 phantom shares issued and outstanding, and (3) adjusted for an effective tax rate of 40 percent.

Source: Stout Valuation, 31 Dec 07, p. 61; emphasis added.

**RESPONSE TO COMPLAINT NO. 211:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 211.

**COMPLAINT NO. 212:** This subtraction of BemroseBooth's pension debt to arrive at Appvion's fair market value is an absolute admission that the retirement debt must be subtracted from enterprise value when calculating fair market value. Stout prepared this valuation, which was approved by State Street on or before 10 January 2008.

**RESPONSE TO COMPLAINT NO. 212:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 212.

**COMPLAINT NO. 213:** On 10 January 2008, Stout's Levine and State Street's Syd Marzeotti and Lee Williams presented this valuation the ESOP Committee (Richards, Ferree and Tyczkowski) who reviewed it and approved it. Arent and Willetts also attended this meeting even though they were not members. Therefore, they all knew and admitted that retirement-related debt must be subtracted dollar-for-dollar from enterprise value in arriving at fair market value.

**RESPONSE TO COMPLAINT NO. 213:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 213.

ii.  **Richards, Ferree and Tyczkowski Admitted Retirement Debt Must be Subtracted.**

**COMPLAINT NO. 214:** An 11 January 2008 internal Appvion communication approved by the ESOP Committee (Richards, Ferree and Tyczkowski) to its employees explained what caused the decline in PDC's stock price, attributing a significant portion of the decline to the increase in BemroseBooth's unfunded pension liability:

### Figure 7: Appvion Internal Communication Relating to the PDC Stock Price As of 31 December 2007



Source: Internal Company Internal Company Communication, "KSOP Company Stock Value Increases 1.6 Percent for Second Half of 2007," 11 Jan 08.

**RESPONSE TO COMPLAINT NO. 214:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 214.

**COMPLAINT NO. 215:** The critical portion of this memo made the following admission:

> Along with the rest of the industry, our performance packaging business struggled throughout the year. Those results were reflected in a **negative impact on** [PDC's] **share value**. The years was even tougher for **BemroseBooth** and its results in the second half of 2007 along with **increased pension liabilities** for the company **produced a significant decrease in** [PDC's] **share value**.

*Id.*; emphasis added.

**RESPONSE TO COMPLAINT NO. 215:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 215.

**COMPLAINT NO. 216:** Appvion's unfunded pension and post-retirement liabilities (separate from BemroseBooth's unfunded pension liability for year-end 2007) totaled $64,293,000. Stout, State Street, Richards, Ferree, and Tyczkowski did not require that PDC's enterprise value be reduced by even one dollar of the $64.3 million, to arrive at the PDC stock's fair market value, even though this debt was clearly displayed on Appvion's audited balance sheet:

**Figure 8: PDC's Consolidated Balance Sheet, 2008 and 2007.**



| PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES | | |
|---|---|---|
| CONSOLIDATED BALANCE SHEETS | | |
| (dollars in thousands, except share data) | | |
| | January 3, 2009 | December 29, 2007 |
| **LIABILITIES, REDEEMABLE COMMON STOCK, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE (LOSS) INCOME** | | |
| Current liabilities | | |
| Current portion of long-term debt | $ 5,455 | $ 3,138 |
| Accounts payable | 62,538 | 82,621 |
| Accrued interest | 3,628 | 4,688 |
| Other accrued liabilities | 84,142 | 81,348 |
| Liabilities of discontinued operations | - | 21,685 |
| Total current liabilities | 155,763 | 193,480 |
| Long-term debt | 598,598 | 539,105 |
| Postretirement benefits other than pension | 45,364 | 47,436 |
| Accrued pension | 109,532 | 16,857 |
| Environmental liability | 114,300 | 173,353 |
| Other long-term liabilities | 13,309 | 6,794 |
| Liabilities of discontinued operations | - | 20,750 |
| Commitments and contingencies (Note 17) | - | - |
| Redeemable common stock; $0.01 par value, | | |
| shares authorized: 30,000,000; shares issued and | | |
| outstanding: 10,643,894 and 11,116,751, respectively | 147,874 | 182,040 |
| Accumulated deficit | (159,650) | (80,086) |
| Accumulated other comprehensive (loss) income | (95,169) | 3,679 |
| Total liabilities, redeemable common stock, accumulated deficit and accumulated other comprehensive (loss) income | $ 929,921 | $ 1,103,408 |

$154.9 M ← (pointing to Postretirement benefits / Accrued pension 2009)

$64.3 M ← (pointing to Postretirement benefits / Accrued pension 2007)

PDC's 10-K (2008), p. 46; emphasis added.

**RESPONSE TO COMPLAINT NO. 216:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 216.

**COMPLAINT NO. 217:** The ESOP Committee's (Richards, Ferree and Tyczkowski) and State Street's adoption of Stout's valuation and release of the 11 January 2008 communication is an additional complete admission by State Street, Stout, Richards, Ferree and Tyczkowski that retirement debt must be subtracted from enterprise value in arriving at fair market value.

**RESPONSE TO COMPLAINT NO. 217:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 217.

iii. **The 30 June 2008 PDC Stock Valuation Again Admitted Retirement Debt Must be Subtracted.**

**COMPLAINT NO. 218:** In its 3 June 2008 valuation, Stout reported that Appvion had received bids valuing BemroseBooth at zero, again blaming reductions in its value on its "assumption of debt" and its "unfunded pension liability":

> As of the Valuation Date, the Company has received two non-binding bids, with two bids from interested parties still outstanding. Both bids effectively value Bemrose Booth at an equity **value of zero** after considering the

76

**assumption of debt and the Company's unfunded pension liability** which exceeds £18 million, or $36 million, based on current estimates.

Source: Stout Valuation, 30 Jun 08, p. 10; emphasis added.

**RESPONSE TO COMPLAINT NO. 218:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 218.

**COMPLAINT NO. 219:** Stout blamed PDC's stock price drop from $33.41 per share to $26.62 per share partly on BemroseBooth's "equity value of zero." *Id.* at pp. 15-16; emphasis added.

**RESPONSE TO COMPLAINT NO. 219:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 219.

**COMPLAINT NO. 220:** Because State Street and the ESOP Committee (Richards, Ferree, Arent, Willetts) reviewed the 30 June 2008 valuation, they again knew and admitted (together with Stout) that retirement debt must be subtracted from enterprise value to arrive at fair market value.

**RESPONSE TO COMPLAINT NO. 220:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 220.

iv. **The 30 June 2008 communication to the Employee Owners again admitted retirement debt must be subtracted.**

**COMPLAINT NO. 221:** In explaining the 30 June 2008 valuation to employees, the ESOP Committee (Richards, Ferree, Arent and Willetts) sent a memo the ESOP Employee Owners blaming a significant portion of PDC stock's decline in fair market value on BemroseBooth's unfunded pension liability. The critical portion of this memo states:

**Analysis**

There are two reasons for the **drop in value of PDC stock**. The primary reason has to do with the **performance and market value of Bemrose Booth**.

**Significant value and pension concerns for BemroseBooth**

**BemroseBooth** has struggled with difficult economic conditions and tough markets for its products. The company also has a **big pension liability with future funding requirements**.

> Those **two factors** have **hampered Appleton's efforts to sell BemroseBooth and have resulted in a dramatic write down of its value**. Based on a professionally managed auction process for the **sale of BemroseBooth**, the current market value is much less than what was originally paid. **That loss of value had a significant negative impact on our stock value**.

Source: Internal Company Communication, "KSOP Company Stock Value Decreases 20% for First Half of 2008," 7 July 08; emphasis added.

**RESPONSE TO COMPLAINT NO. 221:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 221.

**COMPLAINT NO. 222:** Because the ESOP Committee (Richards, Ferree, Willetts, and Arent) authorized and disseminated the communication, they again admitted that retirement debt must be subtracted from enterprise value.

**RESPONSE TO COMPLAINT NO. 222:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 222.

**COMPLAINT NO. 223:** But again, Stout's 30 June 2008 PDC stock valuation did not deduct any of PDC's retirement debt even though State Street and ESOP Committee members Richards, Ferree, Willetts and Arent knew and admitted that it should have been.

**RESPONSE TO COMPLAINT NO. 223:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 223.

**v.      The Directors Knew That Retirement Debt Had to Be Subtracted.**

**COMPLAINT NO. 224:** Consistent with its practice of reviewing the valuations, the Board's Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel), necessarily reviewed the 31 December 2007 and the 30 June 2008 valuations that both discussed the BemroseBooth pension issue. In addition, multiple communications from that time frame explained that Carter would be going on a road show in the first quarter of 2008 along with Richards, Ferree, Willetts, Syd Marzeotti from State Street, and Scott Levine from Stout in order to discuss the ESOP, the valuation process and the stock value. BemroseBooth was a critical factor in the most valuation that would be discussed during those road shows.

**RESPONSE TO COMPLAINT NO. 224:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 224.

**COMPLAINT NO. 225:** Appvion filed its 2007 10-K on 11 March 2008, signed by the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel) as well as Richards, and Ferree. The 10-K reported and relied on the 30 December 2007 stock value. This is further evidence that they conducted due diligence regarding the valuations.

**RESPONSE TO COMPLAINT NO. 225:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 225.

**COMPLAINT NO. 226:** That 2008 10-K filing also notes that Appvion had classified BemroseBooth as discontinued operations and separated out BemroseBooth's assets and liabilities. This included BemroseBooth's pension liability, which had previously been included as part of Appvion's overall pension liability in its audited financial statements.

**RESPONSE TO COMPLAINT NO. 226:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 226.

**COMPLAINT NO. 227:** On 6 and 7 August 2008, the Board held its regularly scheduled meetings. According to a "Richards Report" email to the Employee Owners describing this meeting. State Street's Syd Marzeotti attended the meeting and participated in discussions about Appvion's financials and projections. Further, the Board received an update on the BemroseBooth sale, which had closed on 1 August 2008. The email states:

> Tom **Ferree**, chief financial officer, **and Syd Marzeotti from State Street joined us** for the board meeting on August 7. **Tom presented an operations updated and projections for the third quarter and full-year financials**. The second half of the year will be challenging because we anticipate continued weakness in the economy. Our estimates assume some improvements to international and domestic sheet volume, but continued inflationary pressure on our operations….
>
> Tom **reviewed with the board the completed sale of BemroseBooth and matters related to that transaction**.

**RESPONSE TO COMPLAINT NO. 227:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 227.

**COMPLAINT NO. 228:** This communications confirms the Board's regular process of reviewing the valuations with the ESOP Trustee (in this case, State Street) and confirms that the Board reviewed the valuation as of 30 June 2008, which was finalized only a few weeks before that meeting.

**RESPONSE TO COMPLAINT NO. 228:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 228.

**COMPLAINT NO. 229:** Because the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel), Richards, and Ferree reviewed the 31 December 2007 and 30 June 2008 valuations and knew the terms of BemroseBooth's sale, they knew that retirement debt must be subtracted from enterprise value to arrive at fair market value.

**RESPONSE TO COMPLAINT NO. 229:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 229.

### vi. The 2008 audited financial statements again admitted that retirement debt must be subtracted.

**COMPLAINT NO. 230:** Management's discussion from the 31 December 2008 Appvion 10-K blamed BemroseBooth's pension liability for causing a decline in BemroseBooth's fair market value but fraudulently concealed that Appvion's separate and much larger retirement liabilities had not been deducted in arriving at PDC stock's fair market value:

> **Late in 2007**, Appleton committed to a formal plan to **sell Bemrose Group Limited ("Bemrose")**, its secure and specialized print services business based in Derby, England. On August 1, 2008, Appleton completed the sale of Bemrose receiving $3.9 million of cash and $6.4 million of notes receivable to be settled within 75 and 180 days after closing. In anticipation of the sale transaction and as a result of a **decline in value** of the business arising primarily as a result of deteriorating economic conditions and tougher markets for Bemrose products, **as well as increased funding requirements of the Bemrose pension plan arising from negotiations with the plan trustees, Appleton recorded impairment charges aggregating $43.7 million, related to goodwill and other long-lived assets, during 2008**.

Source: PDC, 10-K (2008), p. 24; emphasis added.

**RESPONSE TO COMPLAINT NO. 230:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 230.

**COMPLAINT NO. 231:** The Notes to the audited financial statements contained in the 30 December 2008 10-K made a similar disclosure:

### 3. DISCONTINUED OPERATIONS

* * *

> On August 1, 2008, Appleton completed the sale of Bemrose receiving $3.9 million of cash and $6.4 million of notes receivable to be settled with 75 and 180 days after closing. In anticipation of the sale transaction and as a result of a decline in value of the business arising primarily as the result of

deteriorating economic conditions and tougher markets for Bemrose products, **as well as increased funding requirements of the Bemrose pension plan arising from negotiations with the plan trustees, Appleton recorded impairment charges aggregating $43.7 million, related goodwill and other long-lived assets, during 2008.** The first tranche of notes receivable was paid in November 2008, however, due to continuing difficult business conditions in Bemrose markets. Appvion established a $1.5 million valuation reserve against the $3.0 million remaining principal and interest of the notes receivable.

Source: PDC, 10-K (2008), p. 56; emphasis added.

**RESPONSE TO COMPLAINT NO. 231:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 231.

**COMPLAINT NO. 232:** These audited financial statements were signed by ESOP Committee members Richards (as Chairman, President, CEO, and a director) and Ferree (as CFO and Treasurer). They were also signed by the Outside Directors (Scherbel, Pace, Carter, Murphy, Reardon, and Seifert). All of the signors thus agreed to the accuracy of the financial statements, including the requirement to subtract retirement debt when calculating fair market value and the disclosure of the 31 December 2008 PDC stock price together with the related entry for Redeemable Common Stock.

**RESPONSE TO COMPLAINT NO. 232:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 232.

**COMPLAINT NO. 233:** GAAP accounting would not have allowed the 10-K disclosure regarding the impact of BemroseBooth's pension plan and the write-down for asset impairment if the disclosure were not required and accurate.

**RESPONSE TO COMPLAINT NO. 233:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 233.

**COMPLAINT NO. 234:** These 10-K BemroseBooth disclosures constitute conclusive admissions by Stout, State Street, the ESOP Committee (Richards, Ferree, Arent and Willetts), and Appvion directors (Richards, Ferree, Carter, Murphy, Reardon and Seifert) that retirement liabilities must be subtracted from enterprise value when calculating fair market value.

**RESPONSE TO COMPLAINT NO. 234:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 234.

**COMPLAINT NO. 235:** Yet, inexplicably, none of them required that Appvion's fair market for year-end 2008 be reduced by Appvion's $154.9 million in retirement debt. Nor did they

require that any prior period's PDC stock valuations or financial statements (10-Ks or 10-Qs) be amended to reflect their failure to subtract Appvion's retirement-related debt.

**RESPONSE TO COMPLAINT NO. 235:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 235.

**COMPLAINT NO. 236:** Further, they, and the Defendants who followed, continued to value the PDC stock without deducting a single dollar of Appvion's retirement debt.

**RESPONSE TO COMPLAINT NO. 236:** To the extent the allegations about "Defendants who followed" in paragraph 236 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 236.

> **f.** **The 10-Ks Highlight the Serious Nature of Appvion's Pension-Related Debt Further Admitting that it Should Have Been Deducted from PDC's Enterprise Value.**

**COMPLAINT NO. 237:** Recognizing the risk posed by the unfunded pension plan in 2008, Appvion began disclosing risk under "Item 1A. Risk Factors":

> ***Appleton's underfunded pension plans require future pension contributions which*** could ***limit flexibility in managing the Company***.
>
> **Due to the negative investment returns in 2008, the total projected benefit obligation of Appleton's defined benefit pension plans exceeded the fair value of the plan assets by $109.8 million at January 3, 2009**. The Company contributed $10.0 million to the pension plan in 2008 and is forecasting contributions of $10.0 million and $15.0 million in 2009 and 2010, respectively. Among the key assumptions inherent in the actuarially calculated pension plan obligation and pension plan expense are the **discount rate and the expected rate of return on plan assets**. If interest rates and actual rates of return on invested plan assets were to decrease significantly, **the pension plan obligation could increase materially**. The size of future required pension contributions could result in Appleton **dedicating a substantial portion of its cash flow from operations to making the contributions which would negatively impact flexibility in managing the Company**.

Source: PDC, 10-K (2008), p. 17; bold emphasis added, italic emphasis in original.

**RESPONSE TO COMPLAINT NO. 237:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 237.

**COMPLAINT NO. 238:** Similar disclosures continued through the 2016 10-Ks, providing even further evidence that each of the defendants involved, for those periods, knew that these debts should have been subtracted from enterprise value to arrive at PDC's equity value.

**RESPONSE TO COMPLAINT NO. 238:** To the extent the allegations about "defendants" in paragraph 238 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 238.

> **g.** **Stout Deducted Certain Other Non-Interest-Bearing Debt from Its Valuations Thereby Admitting Non-Interest-Bearing Debt Must be Subtracted.**

**COMPLAINT NO. 239:** While Stout's valuations consistently failed to deduct Appvion's pension and post-retirement liabilities, it did deduct some others (much smaller) non-interest-bearing debt such as environmental liability and litigation reserves.

**RESPONSE TO COMPLAINT NO. 239:** To the extent the allegations in paragraph 239 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 239.

**COMPLAINT NO. 240:** For example, the 2005 10-K states that Appvion had a potential $25 million liability relating to litigation about environmental contamination of the lower Fox River; the actual potential liability was much higher, but Appvion's share of the liability was capped through an indemnification agreement with AWA. Appvion's audited balance sheet showed this as a $82.3 million liability, offset by a $57.3 million indemnification receivable.

**RESPONSE TO COMPLAINT NO. 240:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 240.

**COMPLAINT NO. 241:** Stout's 31 December 2005 valuation made an adjustment for this liability, discounting it to $20 million based on the present value and subtracting it from PDC's enterprise value it determine fair market value. Stout also deducted $5 million for other environmental liabilities in that report, even though they had not been quantified.

**RESPONSE TO COMPLAINT NO. 241:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 241.

**COMPLAINT NO. 242:** There is no justification for subtracting the smaller debt for these environmental liabilities while ignoring Appvion's much larger retirement debt.

**RESPONSE TO COMPLAINT NO. 242:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 242.

### h. The Valuations Fraudulently Ignored "Other Long-Term Liabilities."

**COMPLAINT NO. 243:** Stout's valuations also failed to include "Other long-term liabilities" that were listed on every Appvion balance sheet. This debt category included compensation obligations, workers compensation obligations, accrued insurance obligations, accrued tax obligations, amounts due on accounts receivable securitization, and other obligations. These debts reached as high as $30-40 million in some years and would have had a material negative impact on the PDC stock valuations. Those amounts were as follows:

**Table 4: Other Long-Term Liabilities from PDC's Audited Financial Statements, 2001-2016**

| Valuation Date | Other Liabilities* |
|----------------|--------------------|
| 31 Dec 01 | ($7,285) |
| 31 Dec 02 | ($9,548) |
| 31 Dec 03 | ($8,419) |
| 31 Dec 04 | ($5,181) |
| 31 Dec 05 | ($4,267) |
| 31 Dec 06 | ($6,511) |
| 31 Dec 07 | ($5,483) |
| 31 Dec 08 | ($13,309) |
| 31 Dec 09 | ($9,294) |
| 31 Dec 10 | ($5,716) |
| 31 Dec 11 | ($7,389) |
| 31 Dec 12 | ($32,165) |
| 31 Dec 13 | ($36,243) |
| 31 Dec 14 | ($43,753) |
| 31 Dec 15 | ($35,354) |
| 31 Dec 16 | ($30,536) |

*In thousands.

Sources: Appvion, Inc., 10-Ks, 2002 p. 45; 2003, p. 49; 2004, p. 49; 2005 p. 50; 2006 p. 42; 2007 p. 40; 2008 p. 46; 2009 p. 50; 2010 p. 50; 2011 p. 50; 2012 p. 45; 2013 p. 46; 2013 10-K (A), p. 48; 2014 p. 42; 2015 p. 38; 2016 p. 33; 2016 10-K (A), p. 6.

**RESPONSE TO COMPLAINT NO. 243:** To the extent the allegations in paragraph 243 refer to Reliance Trust, Reliance Trust admits that PDC's Form 10-K for the fiscal year ending December 28, 2013 reports "Other long-term liabilities" of approximately $36,243,000 on page 46 of the Form 10-K and page 49 of Amendment No. 1 to the Form 10-K, but otherwise denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 243.

### i. The Valuations Did Not Include Substantial Costs from Restructuring the West Carrollton Facility.

**COMPLAINT NO. 244:** In 2012, Appvion ceased papermaking operations at its West Carrollton, Ohio facility and moved its production to Appleton. This eliminated nearly 250 jobs and caused Appvion to incur substantial losses from decommissioning equipment and terminating employees. Appvion's 2012 financial statements recorded $19.2 million in employee severance and related benefits and pension costs, of which $18 million was included in "Other long-term liabilities" on PDC's balance sheet. Stout did not subtract this amount from enterprise value in its valuation.

**RESPONSE TO COMPLAINT NO. 244:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 244.

### j. The Excluded Debt Constituted a Huge Percentage of PDC's Equity Value.

**COMPLAINT NO. 245:** The Excluded Debt was a material percentage of PDC's appraised stock value. In fact, from 2009 through 2016, it constituted more than 100% of PDC's reported fair market value:

**Table 5: Pension, Post-Retirement and Other Liabilities as a Percentage of the Total PDC Stock Value**

| Valuation Date | Total Reported PDC Shareholder's Equity Value (in thousands) | Excluded Debt (in thousands) | Percentage of Shareholder's Equity Value |
|---|---|---|---|
| 31 Dec 01 | *$136,867 | ($80,417) | 58.76% |
| 31 Dec 02 | *$253,992 | ($78,769) | 31.01% |
| 31 Dec 03 | *$283,235 | ($107,584) | 37.98% |

| Valuation Date | Total Reported PDC Shareholder's Equity Value (in thousands) | Excluded Debt (in thousands) | Percentage of Shareholder's Equity Value |
|---|---|---|---|
| 31 Dec 04 | $307,000 | ($113,686) | 37.03% |
| 31 Dec 05 | $341,000 | ($118,406) | 34.72% |
| 31 Dec 06 | $391,000 | ($108,149) | 27.66% |
| 31 Dec 07 | $368,000 | ($69,776) | 18.96% |
| 31 Dec 08 | $223,000 | ($168,205) | 75.43% |
| 31 Dec 09 | $130,000 | ($161,215) | 124.01% |
| 31 Dec 10 | $124,000 | ($139,432) | 112.45% |
| 31 Dec 11 | $139,000 | ($174,245) | 125.36% |
| 31 Dec 12 | $153,000 | ($207,686) | 135.74% |
| 31 Dec 13 | $129,600 | ($132,991) | 102.62% |
| 31 Dec 14 | $80,700 | ($168,409) | 208.69% |
| 31 Dec 15 | $83,000 | ($163,685) | 197.21% |
| 31 Dec 16 | $64,900 | ($163,341) | 251.68% |

*Calculated from PDC's audited consolidated balance sheets and Willamette's valuation of PDC stock fair market value.

Sources: Appvion, Inc., 10-Ks, 2002 pp. 45, 103; 2003, pp. 49, 115; 2004, p. 49; 2005 p. 50; 2006 p. 42; 2007 p. 40; 2008 p. 46; 2009 p. 50; 2010 p. 50; 2011 p. 50; 2012 p. 45; 2013 p. 46; 2013 10-K (A), p. 48; 2014 p. 42; 2015 p. 38; 2016 p. 33; 2016 10-K (A), p. 6; Stout Valuations, 30 Jun 2005, p. 21; 31 Dec 2005, p. 16; 31 Dec 2006, pp. 16, 20; 31 Dec 2007, p. 18; 31 Dec 2008, p. 60; 31 Dec 2009, p. 55; 31 Dec 2010, p. 46; 31 Dec 2011, p. 43; 31 Dec 2012, p. 44; 31 Dec 2013, p. 51; 31 Dec 2014, p. 57; 31 Dec 2015, p. 52; 31 Dec 2016, p. 36.

**RESPONSE TO COMPLAINT NO. 245:** Reliance Trust admits that page 46 of PDC's Form 10-K for the fiscal year ending December 29, 2012 reports approximately $207,686,000 of "Postretirement benefits other than pension," "Accrued pension," and "Other long-term liabilities" on page 46, admits that PDC's Form 10-K for the fiscal year ending December 28, 2013 reports approximately $132,991,000 for the same on page 46 of the Form 10-K and page 49 of Amendment No. 1 to the Form 10-K, and admits the valuation report for PDC stock as of December 31, 2013 reports a fair market value of equity at approximately $129,600,000 after discounts and adjustments. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 245.

**COMPLAINT NO. 246:** The sheer magnitude of the Excluded Debt is further powerful evidence that their exclusion from the calculation of PDC's equity value was intentional.

**RESPONSE TO COMPLAINT NO. 246:** To the extent the allegations in paragraph 246 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 246.

### 4. The Valuations Fraudulently Failed to Reduce the Enterprise Value by Material Amounts of Interest-Bearing Debt.

**COMPLAINT NO. 247:** In certain of its valuations, Stout also failed to subtract material amounts drawn against Appvion's revolving line of credit as part of Appvion's "interest-bearing debt," even though the revolving line of credit was indisputably interest-bearing debt and the revolving line of credit was indisputably interest-bearing debt and the revolving line of credit was listed on Stout's schedule of interest-bearing debt. Stout claimed it did not subtract the debt because it was part of Appvion's working capital, a position inconsistent with Stout's admission that "all liabilities" must be considered. Failing to subtract this debt was also inconsistent with Stout's methodology in all other PDC appraisals and resulted in materially and fraudulently overstating the value of Appvion's equity in the affected valuations, as shown below:

**Table 6: Amount of Revolving Line of Credit Excluded from Interest-Bearing Debt in Stout's Valuations**

| Valuation Date | Revolving Line of Credit - total Debt (in thousands) | Amount of Revolver Excluded from Valuation (in thousands) | Share Price per Stout Valuation | Share Price If Revolver Included | Share Price Impact |
|---|---|---|---|---|---|
| 16 Jun 12 | $32,150 | $32,150 | $16.45 | $12.84 | ($3.61) |
| 30 Jun 13 | $34,600 | $24,600 | $17.85 | $14.88 | ($2.97) |
| 31 Dec 15 | $9,600 | $9,600 | $12.30 | $11.79 | ($0.51) |
| 30 Jun 16 | $27,000 | $27,000 | $13.70 | $9.47 | ($4.23) |
| 31 Dec 16 | $31,920 | $16,898 | $10.35 | $7.65 | ($2.70) |
| 30 Jun 17 | $19,500 | $8,484 | $6.85 | $5.39 | ($1.45) |

Sources: Stout Valuations, 16 Jul 2012, pp. 29,31,63; 30 June 2013, pp. 46,48,82; 31 Dec 2015, pp. 50,52,83; 30 Jun 2016, pp. 46,48,79; 31 Dec 2016, pp. 34,36,64; 30 Jun 2017, pp. 34,36,64.

**RESPONSE TO COMPLAINT NO. 247:** To the extent the allegations in paragraph 247 refer to Reliance Trust, Reliance Trust admits that PDC's share price per Stout's valuation as of June 30, 2013 was $17.85, but otherwise denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 247.

**COMPLAINT NO. 248:** In December 2013, Stout also began reducing PDC's interest-bearing debt by certain "unamortized discounts," further causing them to overstate PDC's fair market value.

**Table 7: Amount of Unamortized Discounts Excluded from Interest-Bearing Debt in Stout's Valuations**

| Valuation Date | Amount of Unamortized Discount Excluded from Valuation (in thousands) | Share Price per Stout Valuation | Share Price If Unamortized Discounts Included | Share Price Impact |
|---|---|---|---|---|
| 31 Dec 13 | $6,803 | $16.25 | $15.39 | ($0.86) |
| 30 Jun 14 | $6,333 | $16.30 | $15.48 | ($0.82) |
| 31 Dec 14 | $5,843 | $11.00 | $10.20 | ($0.80) |
| 30 Jun 15 | $5,342 | $12.90 | $12.12 | ($0.78) |
| 31 Dec 15 | $3,761 | $12.30 | $11.74 | ($0.56) |
| 30 Jun 16 | $3,371 | $13.70 | $13.16 | ($0.54) |
| 31 Dec 16 | $2,966 | $10.35 | $9.89 | ($0.46) |
| 30 Jun 17 | $3,242 | $6.85 | $6.28 | ($0.57) |

Appvion, 2013 10-K, p. 59; Jul 2014 10-Q, p. 23; 2014 10-K, p. 57; Jul 2015 10-Q, p. 15; 2015 10-K, p. 53; Jul 2016 10-Q, p. 17; 2016 10-K, p. 48; Jul 2017 10-Q, p. 14. Stout Valuations: 31 Dec 2013, p. 86; 30 Jun 2014, p. 87; 31 Dec 2014, p. 92; 30 Jun 2015, p. 83; 31 Dec 2015, p. 83; 30 Jun 2016, p. 79; 31 Dec 2016, p. 64; 30 Jun 2017, p. 64; Stout Valuations: 31 Dec 2013, p. 86; 30 Jun 2014, p. 87; 31 Dec 2014, p. 92; 30 Jun 2015, p. 83; 31 Dec 2015, p. 83; 30 Jun 2016, p. 79; 31 Dec 2016, p. 64; 30 Jun 2017, p. 64.

**RESPONSE TO COMPLAINT NO. 248:** To the extent the allegations in paragraph 248 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 248.

5. **The Valuations Included a Fraudulent Control Premium.**

a. **The Fraudulent Control Premium Made up from 30% to 60% of PDC's Reported Equity.**

**COMPLAINT NO. 249:** For its guideline company method analysis, Willamette and Stout would determine each division's enterprise value and then add a control premium to value it on a controlling-interest basis. For example, if the enterprise value was $300 million and the control premium was 15%, the enterprise value on a controlling-interest basis would be $345 million ($300 million plus 15% of $300 million). Below is the guideline company method analysis of Appvion's Thermal division from Stout's 31 December 2012 valuation, which applied added a $30 million control premium:



Source: Stout Valuation, 31 Dec 12, p. 31.[8]

**RESPONSE TO COMPLAINT NO. 249:**   Reliance   Trust   lacks   knowledge   or

information sufficient to form a belief as to the truth of the allegations in paragraph 249.

**COMPLAINT NO. 250:** Stout applied a control premium of 15% to its valuations from 2005 through 2011 and a premium of 10% to its valuations between 30 June 2012 and 31 December 2014. Beginning with its 30 June 2015 valuation, Stout stopped adding the control in its guideline company method analysis, though it continued to list the enterprise value as being on a controlling-interest basis.

**RESPONSE TO COMPLAINT NO. 250:**   Reliance   Trust   lacks   knowledge   or

information sufficient to form a belief as to the truth of the allegations in paragraph 250.

**COMPLAINT NO. 251:** For the discounted cash flow analysis, the control premium was incorporated into the EBITDA multiples Stout applied. Stout did not explain how much the control premium influenced the multiples. Stout's valuations always indicated it was performing its discounted cash flow analysis on a control-interest basis.

**RESPONSE TO COMPLAINT NO. 251:**   Reliance   Trust   lacks   knowledge   or

information sufficient to form a belief as to the truth of the allegations in paragraph 251.

---

[8] This page has an arithmetic error – the average of the four indicated values should be $298 million, not $300 million. This should have been apparent to anyone reviewing this in good faith.

**COMPLAINT NO. 252:** After determining the enterprise values for each division, Stout added the values together to reach the enterprise value of Appvion as a whole. In its Conclusion of Value, Stout started with this concluded enterprise value, made various adjustments, then divided by the outstanding number of shares to determine the per share value as follows:

**Figure 10: Stout's Conclusion of Value as of 31 December 2012**

| Conclusion of Value | | |
|---|---|---|
| *In Thousands of U.S. Dollars* | | Indicated Value as of 12/31/2012 |
| Carbonless | $ | 259,000 |
| Thermal | | 324,000 |
| Encapsys | | 121,000 |
| **Concluded Enterprise Value** | $ | 704,000 |
| Add: Cash and Cash Equivalents | | 1,851 |
| **Adjusted Enterprise Value** | $ | 706,000 |
| Less: Interest-Bearing Debt | | (537,273) |
| **Marketable, Controlling-Interest Value of Equity** | $ | 169,000 |
| Less: Discount for Limited Marketability | 5.0% | (8,500) |
| **Fair Market Value of Equity (Rounded)** | $ | 161,000 |
| Less: Synthetic Equity, RSU, and Phantom Stock Adjustment | | (8,064) |
| **Fair Market Value of Equity (Rounded)** | $ | 153,000 |
| Divided by: Shares Outstanding | | 8,730,143 |
| **Fair Market Value of Equity per Share** | $ | 17.55 |

Source: Stout Valuation, 31 Dec 12, p. 44.

**RESPONSE TO COMPLAINT NO. 252:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 252.

**COMPLAINT NO. 253:** Because the fraudulently included control premium percentage was applied to the enterprise value before deducting debts and non-shareholder equity, it caused a dollar-for-dollar inflation in the shareholder's equity and resulting stock price. The control premium alone accounted for approximately 29.51% to 69.15% of the total shareholder's equity value:

**Table 8: The Control Premium as a Percentage of the Total PDC Shareholder Equity**

| Valuation Date | Total Reported PDC Shareholder Equity (in thousands) | Control Premium (in thousands) | Percentage of PDC's Shareholder Equity |
|---|---|---|---|
| 31 Dec 01 | *$136,867 | *($83,570) | 61.06% |
| 31 Dec 02 | *$253,992 | *($75,058) | 29.55% |
| 31 Dec 03 | *$283,235 | *($83,576) | 29.51% |
| 31 Dec 04 | $307,000 | *($114,196) | 37.20% |

| | | | |
|---|---|---|---|
| 31 Dec 05 | $341,000 | ($115,950) | 34.00% |
| 31 Dec 06 | $391,000 | ($117,450) | 30.04% |
| 31 Dec 07 | $368,000 | ($120,450) | 32.73% |
| 31 Dec 08 | $223,000 | ($97,000) | 43.50% |
| 31 Dec 09 | $130,000 | ($84,000) | 64.62% |
| 31 Dec 10 | $124,000 | ($76,000) | 61.29% |
| 31 Dec 11 | $139,000 | ($67,000) | 48.20% |
| 31 Dec 12 | $153,000 | ($54,000) | 35.29% |
| 31 Dec 13 | $129,600 | ($54,000) | 41.67% |
| 31 Dec 14 | $80,700 | ($49,000) | 60.72% |

*15% control premium and equity value calculated from PDC's audited consolidated balance sheets.

Sources: Stout Valuations, 30 Jun 2005, p. 21; 31 Dec 2005, pp. 69, 71, 73, 92; 31 Dec 2006, pp. 80, 82, 84, 103; 31 Dec 2007, pp. 38, 40, 42, 44, 61; 31 Dec 2008, pp. 40, 42, 45, 55; 31 Dec 2009, pp. 35, 37, 40, 52; 31 Dec 2010, pp. 31, 33, 43; 31 Dec 2011, pp. 28, 30, 40; 31 Dec 2012, pp. 29, 31, 41; 31 Dec 2013, pp. 34, 36, 48; 31 Dec 2014, pp. 40, 42, 54.

**RESPONSE TO COMPLAINT NO. 253:** Reliance Trust admits the valuation report for PDC stock as of December 31, 2013 reflects a fair market value of equity at approximately $129,600,000 after discounts and adjustments. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 253.

b.    **There Was No Factual Record that would support a Control Premium, thus demonstrating the PDC stock price was intentionally overstated.**

**COMPLAINT NO. 254:** However, there was no factual basis for the control premium because the agreements in place from 2001 forward gave the Trustee very limited authority.

**RESPONSE TO COMPLAINT NO. 254:** To the extent the allegations in paragraph 254 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 254.

**COMPLAINT NO. 255:** Stout's appraisals themselves explain that only if the ESOP Trustee holds an interest that includes the ability to control its affairs, that control adds value (a control premium) to the stock. For example, the 2005 appraisal states:

Control rights are one of the most important variables affecting the value of a company. The appropriate premium for control depends on the controlling

shareholders' ability to exercise any or all of the various rights typically associated with control. As a result, the value of a minority ownership interest investment in a company is not necessarily a pro rata percentage of the value of the entire enterprise, and vice versa. One of the primary benefits of control is the ability to change the capital structure of the firm to achieve efficiencies in the cost of capital to the company. This factor was considered in our selection of the appropriate control premium.

Source: Stout Valuation, 31 Dec 12, p. 84; emphasis added.

**RESPONSE TO COMPLAINT NO. 255:** Reliance Trust admits the valuations as of June 30, 2013 and as of December 31, 2013 contain language similar to that purportedly quoted above from the "2005 appraisal." Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 255.

**COMPLAINT NO. 256:** As the legal shareholder, the ESOP Trustees (State Street, Reliance, and Argent) were theoretically entitled to elect the Board of Appvion and PDC. However as described above in Paragraphs 143-44, effective 9 November 2001, State Street signed a Security Holder's Agreement which severely limited the Trustee's ability to control the board.

**RESPONSE TO COMPLAINT NO. 256:** To the extent the allegations in paragraph 256 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 256.

**COMPLAINT NO. 257:** The Plan also only gave limited voting rights to the ESOP and its Employee Owners, allowing voting only on a limited number of corporate matters that involved extraordinary transactions such as the sale of the company. The Plan provided that "In all other circumstances, the Trustee shall vote all shares of Company Stock as directed by the Committee."

**RESPONSE TO COMPLAINT NO. 257:** To the extent the allegations in paragraph 257 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 257.

**COMPLAINT NO. 258:** With these constraints, even though the ESOP owned 100 % of the PDC stock, the ESOP Trustee lacked the ability to control Appvion and could not "chance its capital structure" – instead, Appvion's CEO retained control.

**RESPONSE TO COMPLAINT NO. 258:** To the extent the allegations in paragraph 258 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 258.

**COMPLAINT NO. 259:** In a recently-filed appellate brief, Argent admitted that the right to control the board and the ability to decide how to vote on shares are key indicia of control, and that the ability to appoint the majority of the board indicates control. Because it had the right to vote its shares however Argent decided in that case, Argent had control:

> Fourth, the selling shareholders in *Brundle* retained specific powers that enabled the, to control the company, namely "the power to appoint a majority of the [company's] board, a key indicator of control[,]" and "the ESOP governing plan document and the ESOP trust agreement each required Wilmington [the trustee] to vote its shares as the [company's] board (not the ESOP) directed." *Brundle*, 919 F.3d at 777. Not only do those facts not exist here, the ESOP document makes clear that Argent (as trustee for the ESOP) may vote its shares however Argent decides. Neither the Selling Shareholders nor management has control over ESOP voting. See JA077 at 2.3(d), JA084 at 3.3(a), (b).

Brief of Appellees, *Lee v. Argent Trust Company, et al.,* No. 19-2845 (4th Cir., 18 May 20), at pp. 37-38; italics in original, bold emphasis added. In contrast, Argent has affirmatively (and successfully) argued in this case that it had no duty to monitor the Board because it had no appointment or removal powers over the Directors. Reply Memorandum in Support of Argent Trust Company's Motion to Dismiss, 20 Jun 19, Dkt. 139, p. 5. State Street and Reliance made similar arguments in this case arguing they had no duty to monitor the Board because they had no control over its composition. Memorandum in Support of the State Street Defendants' Motion to Dismiss the First Amended Complaint, 28 Feb 19, Dkt. 97, pp. 14-15; Memorandum in Support of Motion to Dismiss Reliance Defendants, 28 Feb 19, Dkt. 115, p. 18.

**RESPONSE TO COMPLAINT NO. 259:** To the extent the allegations in paragraph 259 refer to Reliance Trust, denied. Reliance Trust's arguments on a motion to dismiss are not admissions because it must assume the truth of Plaintiff's allegations in presenting those arguments. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 259.

**COMPLAINT NO. 260:** Further, Stephen Martin, who worked for Reliance and later Argent testified in a deposition in an unrelated matter in 2013 that Reliance Trust did not typically take an active role in overseeing the board of directors in any of its ESOP engagements, such as exercising its voting power of the common shares to elect new directors. *See* Deposition of Stephen Martin, *The Antioch Litigation Trust v. Morgan*, No. 3:09-CV-218 (S.D. Ohio Apr. 9, 2013).

**RESPONSE TO COMPLAINT NO. 260:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 260.

**COMPLAINT NO. 261:** Therefore, all three trustees have admitted that they (as the legal shareholder of PDC's stock) had no control over the Board – and therefore no control that would justify a control premium. State Street, Reliance, and Argent therefore breached their fiduciary duties of prudence, disclosure and loyalty by approving and adopting valuations that applied a control premium inflating the value of PDC's stock. They also committed fraud by making the ultimate determination of value which included a control premium they knew had no factual basis.

**RESPONSE TO COMPLAINT NO. 261:** To the extent the allegations in paragraph 261 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 261.

**COMPLAINT NO. 262:** Further, because only relatively small amounts of Appvion stock were sold at a time as part of the regular purchases and sales of stock by the ESOP, valuing the stock on a control basis for purposes of each annual valuation was inconsistent with the purpose of the valuation.

**RESPONSE TO COMPLAINT NO. 262:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 262.

**COMPLAINT NO. 263:** All of the defendants knew that the ESOP Trustee did not have actual control and that the control premium was therefore inappropriate.

**RESPONSE TO COMPLAINT NO. 263:** To the extent the allegations in paragraph 263 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 263.

### 6.   The Valuations Relied Upon Fraudulently Inflated Financial Projections.

**COMPLAINT NO. 264:** In connection with each semi-annual PDC stock valuation, Appvion management provided Willamette and Stout with five-year projections of Appvion's earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Included in this management group were at least the CEOs (Buth, Richards and Gilligan) and the CFOs (Parker, Ferree and Richards (acting as interim CFO)). These projections were critical to the results of both the valuation's discounted cash flow analysis and guideline company method analysis. The discounted cash flow method was based entirely on these projections, and the guideline company method relied upon a mixture of the last twelve months of EBITDA and revenue and the projections for the next year.

**RESPONSE TO COMPLAINT NO. 264:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 264.

**COMPLAINT NO. 265:** Therefore, any review of the PDC stock valuations would require an analysis of the reliability of the projections. However, these projections were consistently inflated.

**RESPONSE TO COMPLAINT NO. 265:** To the extent the allegations in paragraph 265 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 265.

**COMPLAINT NO. 266:** Of particular concern was that out of the five years of EBITDA projections that management provided for each valuation, Stout used the fifth-year projection to calculate what it called the Terminal Enterprise Value as part of its discounted cash flow analysis. The Terminal Enterprise Value was calculated by assuming the fifth year EBITDA would remain constant in perpetuity. That hypothetical income stream would then be discounted to present value. This Terminal Enterprise Value would then be added to the present value of the years 1 through 5 EBITDA projections to arrive at the discounted cash flow enterprise value.

**RESPONSE TO COMPLAINT NO. 266:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 266.

**COMPLAINT NO. 267:** Therefore, an inflated fifth year EBITDA value would materially inflate the discounted cash flow enterprise value.

**RESPONSE TO COMPLAINT NO. 267:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 267.

**COMPLAINT NO. 268:** The fifth-year projections used in the discounted cash flow analysis were consistently and unrealistically inflated, causing the Terminal EBITDA Value to be consistently inflated. For example, below is a chart with the projected Year 5 EBITDA used in the mid-year and year-end valuations, compared with the actual year-end EBITDA for that fifth year:

**Table 9: EBITDA Year 5 Projections Compared to Actual EBITDA**

| | Thermal | | Carbonless | |
|---|---|---|---|---|
| | **Year 5 Projected EBITDA** (in thousands) | **Actual EBITDA** (in thousands) | **Year 5 Projected EBITDA** (in thousands) | **Actual EBITDA** (in thousands) |
| 2010 | $ 26,092 | $ 20,032 | $ 62,431 | $ 59,387 |
| | $ 29,191 | | $ 66,410 | |

| | Thermal | | Carbonless | |
|---|---|---|---|---|
| | Year 5 Projected EBITDA (in thousands) | Actual EBITDA (in thousands) | Year 5 Projected EBITDA (in thousands) | Actual EBITDA (in thousands) |
| 2011 | $ 61,101 | $ 33,306 | $ 81,784 | $ 49,731 |
| 2012 | $ 55,479 | $ 48,968 | $ 83,964 | $ 51,102 |
| 2013 | $ 52,000 | $ 41,929 | $ 62,000 | $ 50,828 |
| | $ 52,600 | | $ 60,500 | |
| 2014 | $ 40,200 | $ 26,826 | $ 54,800 | $ 42,171 |
| | $ 50,500 | | $ 53,200 | |
| 2015 | $ 52,483 | $ 8,139 | $ 51,042 | $ 47,191 |
| | $ 51,941 | | | |
| 2016 | $ 58,200 | $ 28,769 | $ 42,000 | $ 32,739 |
| | $ 80,866 | | $ 50,837 | |

Sources: 2010 Projections: Stout Valuation 31 Dec 05, pp. 80-81, Stout Valuation 30 Jun 06, pp. 83-84; 2011 Projections: Stout Valuation 20 Dec 06, pp. 91-92, Stout Valuation 29 Jun 07, pp. 77-78; 2012 Projections: Stout Valuation 31 Dec 07, pp. 50-51, Stout Valuation 30 Jun 08, pp. 46-47; 2013 Projections: Stout Valuation 31 Dec 08, pp. 51-52, Stout Valuation 30 Jun 09, pp. 48-49; 2014 Projections: Stout Valuation 31 Dec 09, pp. 46-47, Stout Valuation 30 Jun 10, pp. 40, 41; 2015 Projections: Stout Valuation 31 Dec 10, pp. 38-30, Stout Valuation 30 Jun 11, pp. 35-36; 2016 Projections: Stout Valuation 31 Dec 11, pp. 35-36, Stout Valuation 17 Jul 12, pp. 23-24; Actual EBITDA 2010-2013: Stout Valuation, 31 Dec 15, pp. 63, 68; Actual EBITDA 2014-2016: Stout Valuation, 30 Jun 17, pp. 44, 49.

**RESPONSE TO COMPLAINT NO. 268:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 268.

**COMPLAINT NO. 269:** When he was interviewed by Mr. Lyon, Steve Martin (an Argent Trust Company employee) admitted that Appvion had never hit its business projections during Argent's tenure as trustee from 2014 to 2017. Martin admitted that Stout and Argent both reviewed the projections because of the history of Appvion failing to hit them, but that they had not required Appvion to adjust the projections; instead, Stout claimed to have made adjustments to its discount rates to account for the higher projections.

**RESPONSE TO COMPLAINT NO. 269:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 269.

**COMPLAINT NO. 270:** Members of Appvion's ESOP Committee were involved in preparing these projections, particularly the CEOs (Buth, Richards and Gilligan) and the CFOs (Parker, Ferree and Richards (acting as interim CFO)). The ESOP Committee also regularly reviewed the projections against actual results and knew how important the projections were to the valuations. Accordingly, they knew that the inflated projections were inflating the share value.

**RESPONSE TO COMPLAINT NO. 270:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 270.

### 7. The Valuations Fraudulently Manipulated the Valuation Methodology.

**COMPLAINT NO. 271:** Mr. Lyon discovered that the valuations fraudulently manipulated the valuation methodology, for example by changing the discount rates and EBITDA multiples or excluding actual results in favor of projections.

**RESPONSE TO COMPLAINT NO. 271:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 271.

**COMPLAINT NO. 272:** For example, Stout dramatically changed the discount rate it used for Appvion's Thermal division dramatically from 10.5% to 14% from its valuations as of 31 December 2011 valuation is purportedly based on Appvion's actual (10.5%) cost of debt and an assumption of 35% equity and 65% debt, while the 2012 valuation is based on "estimated senior lending rates" (6%) instead of Appvion's actual interest rates and an assumption of 65% equity and 35% debt. This raises the question of whether the 16 July 2012 valuation was for purposes of ESOP administration or for the purpose of selling Appvion to a third party.

**RESPONSE TO COMPLAINT NO. 272:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 272.

**COMPLAINT NO. 273:** Further, the reason Stout's mid-2012 valuation was as of 16 July 2012 instead of 30 June 2012 was because Stout had to fix an error – its original valuation improperly assumed that Appvion would merge with a third company soon after the valuation date and built in value from that merger, but the merger fell through. The improper valuation and the change in methodology for the 16 July 2012 valuation were additional red flags that Stout was not applying proper and consistent methods.

**RESPONSE TO COMPLAINT NO. 273:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 273.

**COMPLAINT NO. 274:** As a further example, Stout's 30 June 2015 valuation also used inconsistent methods from its prior reports. 2015 was a rough year for Appvion. Its Thermal division only achieved an EBITDA of $8 million (down from $77 million projected as of 30 June 2013 and even the mid-year 2015 projection of $20 million), and Appvion sold its most profitable division, the Encapsys division, which materially lowered the overall value of the company. Further, not only did Appvion incur significant employee-termination costs relating to the Encapsys sale, Appvion long-time CEO Mark Richards retired and was (improperly) paid $1.2 million, for total compensation that year of over $5 million. Stout changed methodologies in order to compensate for the lower EBITDA and extra expenses.

97

**RESPONSE TO COMPLAINT NO. 274:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 274.

**COMPLAINT NO. 275:** Stout's discounted cash flow analysis always relied on five years of projected EBITDA. However, the 30 June 2015 valuation used six years of data, which artificially increased the valuation even though the projections used for that year actually decreased. Including a sixth year in the analysis increased the enterprise value derived from the analysis without explanation or justification.

**RESPONSE TO COMPLAINT NO. 275:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 275.

**COMPLAINT NO. 276:** Stout's 30 June 2015 valuation report did not explain why it used six years of data instead of five, and this was the only valuation that used six years. While it may be permissible to use more than five years of projections for a discounted cash flow analysis (and may have even been preferable considering Appvion's declining revenues), adding an extra year of data for this one report inflated the value of Appvion's stock by approximately $2.00 a share and increased the stock price valuation from $11.00 a share in the 31 December 2014 valuation to $12.90 a share in the 30 June 2015 valuation, even though the sale of Encapsys was devastating to Appvion's future ability to grow its cash flow.

**RESPONSE TO COMPLAINT NO. 276:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 276.

**COMPLAINT NO. 277:** Stout also changed its methodology for its guideline company method analysis in its 30 June 2015 valuation report. This analysis involved looking at "guideline companies" in order to determine a range of pricing multiples; Stout would then choose a pricing multiple from that range, and apply it to (1) actual revenue and EBITDA for the twelve months prior to the valuation; and (2) Appvion management's projected EBITDA and revenue for the next fiscal year. However, presumably in response to Thermal's shockingly low 2015 EBITDA, Stout changed its methodology in the following ways:

- Stout ignored the last twelve months EBITDA value;

- Instead of using the projected EBITDA for fiscal year 2015, Stout used projected EBITDA for 2016, which was inconsistent with all of Stout's other valuations;

- For the first time, Stout added a third component to its guideline company method analysis for the Thermal division only, a three-year historical average of EBITDA and revenue. This has the effect of inflating Thermal's valuation and therefore the overall value of PDC's stock;

- Combined, these and other manipulations allowed Stout to mask dramatic declines in actual results by relying more heavily on the inflated projections; and

- Starting with its 31 December 2015 valuation report, Stout completely disregarded both the three-year historical average, last twelve months, and projected EBITDA numbers and relied solely on revenue multipliers (without reference to gross margin or profitability) in its valuation of the Thermal segment. This allowed Stout to ignore periods of low profits.

**RESPONSE TO COMPLAINT NO. 277:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 277.

### 8. The Valuations Fraudulently Failed to Include a Large Enough Discount for the Lack of Liquidity and Marketability.

**COMPLAINT NO. 278:** When stock is publicly traded, sellers can find other buyers on the open market. However, PDC's stock was restricted and could only be owned by the ESOP; since the ESOP had no assets other than the shares itself, this practically meant that Appvion had to supply the cash needed to satisfy any redemptions. Because Appvion or PDC was obligated to repurchase stock when employees were entitled to distributions or diversification, this put a strain on Appvion's overall cash flow. This was exacerbated by the fact that redemptions exceeded contributions to the ESOP by many millions of dollars over the life of the ESOP – between 2001 and 2016, redemptions from the plan totaled $248.5 million while employee contributions (not including company matches) totaled only $75.2 million.

**RESPONSE TO COMPLAINT NO. 278:** Reliance Trust admits the allegations in the first sentence in paragraph 278. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 278.

**COMPLAINT NO. 279:** The appraisals included a 5% discount to the value of ESOP's equity as a discount for limited marketability to reflect this strain and the risk of Appvion not being able to meet its repurchase obligations. Lyon concluded this was not sufficient to account for the barriers to selling PDC stock and PDC's large repurchase obligation and it failed to adequately consider actual data about the age of ESOP participants and Appvion's and PDC's actual ability to pay.

**RESPONSE TO COMPLAINT NO. 279:** Reliance Trust admits the valuations as of June 30, 2013 and as of December 31, 2013 reflect 5% discounts for limited marketability. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 279.

**COMPLAINT NO. 280:** For example, in the 30 June 2011 valuation, Stout recognized that the burden of the repurchase obligation "has contributed to the Company's decision to monetize certain assets and explore the sale of the Company in total." However, Stout only

estimated the impact of this financial strain at 5% of PDC's equity value, or $7 million, which was insufficient to account for the substantial repurchase obligation. As another example, in 2015 and 2016 alone, distributions totaled $19.6 million while contributions to the ESOP were only $3.5 million; however, each of Stout's valuations put the discount for limited marketability at only $3.8 to $5 million.

**RESPONSE TO COMPLAINT NO. 280:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 280.

### 9. The Valuations Were Otherwise Unreliable.

**COMPLAINT NO. 281:** In addition to the issues with the valuations discussed above, the valuations contained the following material flaws:

**RESPONSE TO COMPLAINT NO. 281:** To the extent the allegations in paragraph 281 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 281.

**COMPLAINT NO. 282:** Management always knew Appvion was a declining business. In the 23 April 2001 "Ownership Update," release of which was authorized by Buth, Karch, Parker and Fantini, stated that it believed AWA wanted to sell Appvion "because public investors want to buy companies with growing earnings and will not value highly a company with steady but declining earning." Still, certain of the valuations used a perpetuity model to capitalize a declining income stream, which was inappropriate. This relates to the terminal enterprise value, which is intended to represent the present value of future cash flows from the business beyond the five-year EBITDA projections. Stout based this calculation on the fifth year of projections used for its discounted cash flow analysis – which, as discussed above, was heavily inflated. Stout compounded this problem by assuming that the fifth year EBITDA projection would continue at the same level into perpetuity, applying the same discount number to the terminal enterprise value as it did to the year five discount number. Stout's valuation reports used this method from at least 30 June 2010, which was inappropriate since Appvion (especially its Carbonless division) was a declining business.

**RESPONSE TO COMPLAINT NO. 282:** To the extent the allegations in paragraph 282 refer to Reliance Trust, Reliance Trust denies that valuation methods used during the time when it was the trustee were "inappropriate" and otherwise denies the allegations. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 282.

**COMPLAINT NO. 283:** This caused the terminal enterprise value to be heavily inflated and to represent a disproportionately high percentage of Appvion's total enterprise value, thereby concealing PDC's true financial condition. Beginning with its 31 December 2010 valuation report, Stout changed methods and began reducing the discount number for the terminal enterprise value – however, this change was not enough to compensate for the inflated projections.

**RESPONSE TO COMPLAINT NO. 283:** To the extent the allegations in paragraph 283 refer to Reliance Trust, Reliance Trust denies that projections were "inflated" and otherwise denies the allegations. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 283.

**COMPLAINT NO. 284:** The valuations' EBITDA projections failed to include all overhead costs by including only overhead costs associated with each of the individual business segments. This method excluded from EBITDA the general overhead costs not allocated to the individual business segments thus fraudulently overstating the PDC stock's fair market value and concealing PDC's and Appvion's true financial condition.

**RESPONSE TO COMPLAINT NO. 284:** To the extent the allegations in paragraph 284 refer to Reliance Trust, Reliance Trust denies that projections were "fraudulently overstat[ed]" and otherwise denies the allegations. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 284.

**COMPLAINT NO. 285:** The valuations manipulated the choice of publicly traded companies to compare with Appvion and failed to make appropriate and consistent adjustments to compensate for differences in the companies.

**RESPONSE TO COMPLAINT NO. 285:** To the extent the allegations in paragraph 285 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 285.

**COMPLAINT NO. 286:** Stout's valuations used number rounded up or down to the nearest million at all stages of its valuation instead of using precise numbers, which could and did result in inflated valuations. This practice served to inflate PDC's share value in all but two valuations, and sometimes by $0.25 or more. Stout undoubtedly created its valuations as part of a spreadsheet that calculated the full number and then rounded it, so the rounding did not save any time or effort and merely introduced a potential source of error to the calculation.

**RESPONSE TO COMPLAINT NO. 286:** To the extent the allegations in paragraph 286 refer to Reliance Trust, Reliance Trust denies that valuations were "inflated" and otherwise denies the allegations. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 286.

**COMPLAINT NO. 287:** At least three of Stout's valuation reports seem to have arithmetic errors, where the report purports to average numbers together but the result is higher than the average. Nothing in the report indicates that Stout was weighting the numbers differently. This type of error would have been apparent if the ESOP Trustee had done even proper review of the valuations.

**RESPONSE TO COMPLAINT NO. 287:** To the extent the allegations about the "ESOP Trustee" in paragraph 287 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 287.

E. **The PDC Stock Price was Negative for Much of the ESOP's Existence, Including When the ESOP was Created.**

**COMPLAINT NO. 288:** The following chart summarizes the impact on the PDC stock valuations just subtracting the Excluded Debts and removing the fraudulent control premium:

**Table 10: Adjusted Equity Value and PDC Stock Price**

| Valuation Date | Equity Value* | Reported PDC Stock Price | Excluded Debt | | Control Premium* | Adjusted Equity Value* | Adjusted PDC Stock Price |
| | | | Pension/Post-Retirement Debt* | "Other Long-Term" Debt* | | | |
|---|---|---|---|---|---|---|---|
| 31-Dec-01 | **$136,867 | $12.81 | ($73,132) | ($7,285) | **($83,570) | ($27,120) | ($2.54) |
| 30-Jun-02 | **$202,827 | $18.58 | ($76,001) | ($19,570) | **($82,700) | $24,556 | $2.25 |
| 31-Dec-02 | **$253,992 | $21.92 | ($69,221) | ($9,548) | **($75,058) | $100,165 | $8.64 |
| 30-Jun-03 | **$263,800 | $22.42 | ($70,756) | ($8,919) | **($80,495) | $103,630 | $8.81 |
| 31-Dec-03 | **$283,235 | $23.36 | ($99,165) | ($8,419) | **($83,576) | $92,075 | $7.59 |
| 30-Jun-04 | **$305,000 | $26.09 | ($101,777) | ($9,064) | **($118,400) | $75,759 | $6.46 |
| 31-Dec-04 | $307,000 | $26.36 | ($108,505) | ($5,181) | **($114,196) | $79,118 | $6.79 |
| 30-Jun-05 | $328,000 | $27.77 | ($108,910) | ($4,705) | ($104,100) | $110,285 | $9.34 |
| 31-Dec-05 | $341,000 | $28.56 | ($114,139) | ($4,267) | ($115,950) | $106,644 | $8.93 |
| 30-Jun-06 | $363,000 | $31.27 | ($111,227) | ($6,593) | ($117,300) | $127,880 | $11.02 |
| 31-Dec-06 | $391,000 | $33.62 | ($101,638) | ($6,511) | ($117,450) | $165,401 | $14.22 |
| 30-Jun-07 | $362,000 | $32.89 | ($97,355) | ($4,314) | ($124,050) | $136,281 | $12.38 |
| 31-Dec-07 | $368,000 | $33.41 | ($64,293) | ($5,483) | ($120,450) | $177,774 | $16.14 |
| 30-Jun-08 | $289,000 | $26.64 | ($60,260) | ($5,168) | ($113,100) | $110,472 | $10.19 |
| 31-Dec-08 | $223,000 | $21.43 | ($154,896) | ($13,309) | ($97,000) | ($42,205) | ($4.06) |
| 30-Jun-09 | $189,000 | $18.87 | ($157,332) | ($9,284) | ($92,000) | ($69,616) | ($6.95) |

| Valuation Date | Equity Value* | Reported PDC Stock Price | Excluded Debt | | Control Premium* | Adjusted Equity Value* | Adjusted PDC Stock Price |
| | | | Pension/Post-Retirement Debt* | "Other Long-Term" Debt* | | | |
|---|---|---|---|---|---|---|---|
| 31-Dec-09 | $130,000 | $13.26 | ($151,921) | ($9,294) | ($84,000) | ($115,215) | ($11.75) |
| 30-Jun-10 | $117,000 | $12.03 | ($153,904) | ($5,744) | ($75,000) | ($117,648) | ($12.10) |
| 31-Dec-10 | $124,000 | $12.84 | ($133,716) | ($5,716) | ($76,000) | ($91,432) | ($9.47) |
| 30-Jun-11 | $133,000 | $14.10 | ($122,321) | ($7,320) | ($77,000) | ($73,641) | ($7.87) |
| 31-Dec-11 | $139,000 | $15.01 | ($166,856) | ($7,389) | ($67,000) | ($102,245) | ($11.04) |
| 16-Jul-12 | $146,000 | $16.45 | ($150,197) | ($28,764) | ($51,000) | ($83,961) | ($9.47) |
| 31-Dec-12 | $153,000 | $17.55 | ($175,521) | ($32,165) | ($54,000) | ($108,686) | ($12.45) |
| 30-Jun-13 | $155,000 | $17.85 | ($166,303) | ($33,721) | ($54,000) | ($99,024) | ($11.94) |
| 31-Dec-13 | $129,600 | $16.25 | ($96,748) | ($36,243) | ($54,000) | ($57,391) | ($7.19) |
| 30-Jun-14 | $127,100 | $16.30 | ($85,303) | ($38,834) | ($53,000) | ($50,037) | ($6.41) |
| 31-Dec-14 | $80,700 | $11.00 | ($124,656) | ($43,753) | ($49,000) | ($136,709) | ($18.62) |
| 30-Jun-15 | $89,400 | $12.90 | ($124,427) | ($46,169) | unknown | ($81,196) | ($11.71) |
| 31-Dec-15 | $83,000 | $12.30 | ($128,331) | ($35,354) | unknown | ($80,685) | ($11.95) |
| 30-Jun-16 | $87,600 | $13.70 | ($129,444) | ($34,093) | unknown | ($75,937) | ($11.87) |
| 31-Dec-16 | $64,900 | $10.35 | ($132,805) | ($30,536) | unknown | ($98,441) | ($15.72) |
| 30-Jun-17 | $40,500 | $6.85 | ($132,598) | ($28,975) | unknown | ($121,073) | ($20.41) |

*In thousands
**15% control premium and equity value calculated from PDC's consolidated balance sheets. Source: Appvion 2002 10-K, p. 45, 103; Jun 2002 10-Q, p. 1; 2003 10-K, p. 45, 115; Jun 2003 10-Q, p. 1; 2004 10-K, p. 49, 107; Jul 2004 10-Q, p. 1; 2005 10-K, p. 50; Jul 2005 10-Q, p. 3; 2006 10-K, p. 42; Jul 2006 10-Q, p. 3; 2007 10-K, p. 40; Jul 2007 10-Q, p. 1; 2008 10-K, p. 46; Jun 2008 10-Q, p. 3; 2009 10-K, p. 50; Jul 2009 10-Q, p. 3; 2010 10-K, p. 50; Jul 2010 10-Q, p. 3; 2011 10-K, p. 50; Jul 2011 10-Q, p. 3; 2012 10-K, p. 45; Jul 2012 10-Q, p. 3; 2013 10-K, p. 46; Jun 2013 10-Q, p. 3; 2014 10-K, p. 42; Jun 2014 10-Q, p. 3; 2015 10-K, p. 38; Jul 2015 10-Q, p. 3; 2016 10-K, p. 33; Jul 2016 10-Q, p. 3; Jul 2017 10-Q, p. 2; Stout valuations 30 Jun 2005, p. 21, 30 Jun 2005, p. 108, 94,96, 98; 31 Dec 2005, p. 92, 69, 71, 73; 30 Jun 2006, p. 94, 72, 74, 76; 31 Dec 2006, p. 103, 80, 82, 84; 30 Jun 2007, p. 88, 65, 67, 69, 71; 31 Dec 2007, p. 61, 38, 40, 42, 44; 30 Jun 2008, p. 56, 37, 39, 41; 31 Dec 2008, p. 60, 40, 42, 45; 30 Jun 2009, p. 58, 37, 39, 42; 31 Dec 2009, p. 55, 35, 37, 40; 30 Jun 2010, p. 48, 33, 35; 31 Dec 2010, p. 46, 31, 33; 30 Jun 2011, p. 43, 28, 30; 31 Dec 2011, p. 43, 28, 30; 16 Jul 2012, p. 31, 16, 18; 31 Dec 2012, p. 44, 29, 31; 30 Jun 2013, p. 48, 32, 34; 31 Dec 2013, p. 51, 34, 36; 30 Jun 2014, p. 52, 35, 37; 31 Dec 2014, p. 57, 40, 42; 30 Jun 2015, p. 52; 31 Dec 2015, p. 52; 30 Jun 2016, p. 48; 31 Dec 2016, p. 36; 30 Jun 2017, p. 36.

**RESPONSE TO COMPLAINT NO. 288:** Reliance Trust admits the chart in paragraph

288 purports to list each valuation date, reported stock price, Plaintiff's alleged "Excluded Debt,"

Plaintiff's alleged "Control Premium," Plaintiff's alleged "Adjusted Equity Value," and Plaintiff's

alleged "Adjusted PDC Stock Price." Reliance Trust admits the reported stock price for the

valuations as of June 30, 2013 and as of December 31, 2013 was $17.85 and $16.25, respectively.

Reliance Trust admits that the reported fair market value of equity after some, but not all, listed

discounts and adjustments was approximately $155,000,000 for the valuation as of June 30, 2013.

Reliance Trust admits that the reported fair market value of equity after listed discounts and

adjustments was approximately $129,600,000 for the valuation as of December 31, 2013. It is

unclear why Plaintiff utilized different metrics for reported equity value across the two valuations,

and so Reliance Trust lacks knowledge and information sufficient to form a belief as to whether

Plaintiff purports to list the "equity value" within its chart.

Reliance Trust admits PDC's Form 10-K for the fiscal year ending December 28, 2013

reports approximately $96,748,000 for "Postretirement benefits other than pension" and "Accrued

pension," and approximately $36,243,000 for "Other long-term liabilities" on page 46 of the Form

10-K and page 49 of Amendment No. 1 to the Form 10-K. Reliance Trust admits PDC's Form

10-Q for the quarter ending June 30, 2013 reports approximately $166,303,000 for "Postretirement

benefits other than pension" and "Accrued pension," and approximately $33,721,000 for "Other

long-term liabilities" on page 46. Reliance Trust lacks knowledge or information sufficient to form

a belief as to the truth of the remaining allegations in paragraph 288.

**COMPLAINT NO. 289:** With just these deductions, Appvion had a negative equity of $27.1 million as of 31 December 2001, just 52 days after the ESOP Transaction. Because the $106 million that the ESOP employees had paid to the ESOP as the down payment on the PDC stock had negative equity value as of 31 December 2001 (as opposed to the fraudulently reported valuation of $12.38 a share), it likewise had no value 52 days earlier at a fraudulently reported share price of $10 a share.

**RESPONSE TO COMPLAINT NO. 289:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 289.

**COMPLAINT NO. 290:** With just these adjustments, the redeemable common stock value for all years other than 2002 through 2007 would have been zero. And for years 2002 through 2007, the stock price would have, on average, been 37% of the reported stock price.

**RESPONSE TO COMPLAINT NO. 290:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 290.

**COMPLAINT NO. 291:** The massive impact of just these indisputably required adjustments, is compelling evidence that each of the defendants acted intentionally.

**RESPONSE TO COMPLAINT NO. 291:** To the extent the allegations in paragraph 291 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 291.

F. **The Inflated Share Price Caused the ESOP to Purchase Shares for More Than Fair Market Value.**

**COMPLAINT NO. 292:** The PDC semi-annual valuations were used to set the share price which the ESOP then used in numerous transactions.

**RESPONSE TO COMPLAINT NO. 292:** Reliance Trust admits that semi-annual valuations in 2013 were used to determine the share price for PDC's stock for certain periods of time. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 292.

**COMPLAINT NO. 293:** In reliance upon accurate semi-annual PDC stock valuations, the Employee Owners continued to divert portions of their paychecks to fund the ESOP; the ESOP used these contributions (along with matching contributions from Appvion) to purchase shares of PDC stock from PDC. These purchases were made twice a year, soon after the valuation was completed, "using the Company Stock value as of the Valuation Date preceding or following the conversion (whichever is lower)" under § 6.4(a)(1) of the Plan.

**RESPONSE TO COMPLAINT NO. 293:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 293.

**COMPLAINT NO. 294:** For example, the ESOP purchased shares from PDC after the 30 June 2013 valuation as follows:

**Table 11: Purchases of Stock from PDC as of 30 June 2013**

| Date | Amount | Shares | Stock Price | Description |
|---|---|---|---|---|
| Jun 13 | $1,405,199.41 | 80,068.3417 | $17.55 | Employee deferrals into company stock (January 1, 2013 - June 30, 2013) |
| Jun 13 | $130,776.35 | 7,451.6439 | $17.55 | Employee rollovers into company stock (January 1, 2013 - June 30, 2013) |
| Jun 13 | $114,786.40 | 6,540.5358 | $17.55 | Employee loan payments into company stock (January 1, 2013 - June 30, 2013) received from State Street in June 2013 |
| Jun 13 | $116.59 | 6.6411 | $17.55 | Purchase from Interest (January 1, 2013 - June 30, 2013) |
| Jun 13 | $1,432,042.26 | 81,597.8494 | $17.55 | Company match on employee deferrals (January 1, 2013 - June 30, 2013) |

**RESPONSE TO COMPLAINT NO. 294:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 294.

**COMPLAINT NO. 295:** The ESOP also repurchased shares from current and former employees as a result of employee terminations, diversifications, hardship withdrawals, and employee loans. For example, the ESOP recorded the following repurchases after the 30 June 2013 valuation:

**Table 12: Repurchases of Stock from Current and Former Employees as of 30 June 2013**

| Date | Amount | Shares | Stock Price | Description |
|---|---|---|---|---|
| Jun 13 | ($4,103,267.72) | (233,804.4308) | $17.55 | Stock in suspense - diversification |
| Jun 13 | ($75,700.00) | (4,313.3906) | $17.55 | Stock in suspense - loans |
| Jun 13 | ($22,508.46) | (1,282.5333) | $17.55 | Hardships |
| Jun 13 | ($825.00) | (47.0084) | $17.55 | Loan Fees |

| Date | Amount | Shares | Stock Price | Description |
|---|---|---|---|---|
| Jun 13 | ($6,502,239.12) | (370,497.9654) | $17.55 | Employee terminations |

**RESPONSE TO COMPLAINT NO. 295:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 295.

**COMPLAINT NO. 296:** As a result of the fraudulently inflated valuations from 9 November 2001 forward, the ESOP repeatedly purchased shares from PDC and repurchased shares from current and former employees at a price above their fair market value. These purchases are listed in Appendices A and B.

**RESPONSE TO COMPLAINT NO. 296:** Reliance Trust denies that the valuations as of June 30, 2013 and as of December 31, 2013 are inflated. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 296.

G. **ESOP Committee Member Defendants and the Director Defendants Had Conflicts of Interest Because they Each Received Incentive Compensation Tied to PDC's Stock Price.**

**COMPLAINT NO. 297:** While the terms of the ESOP restricted when employees could get paid for their investments in the ESOP, Appvion implemented incentive plans for Appvion management which were tied to the stock price but not subject to the withdrawal constraints of the ESOP, including:

**RESPONSE TO COMPLAINT NO. 297:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 297.

**COMPLAINT NO. 298:** The New Deferred Compensation Plan, effective 1 July 2000: Under the 12 February 2001 letter between Buth and AWA, the CEO Team was required to defer 30% of the Loyalty Payments to this plan, to be tied to the stock price. This plan was terminated and paid out to the participants in the first quarter of 2005 because the Board's Compensation Committee "viewed the crediting of the loyalty payment portions of the Plan based on increases in PDC common stock as an expensive form of company capital."

**RESPONSE TO COMPLAINT NO. 298:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 298.

**COMPLAINT NO. 299:** The Long-Term Incentive Plan ("LTIP"), effective 1 December 2001: This plan allowed the Board to award executives with phantom stock units equal to 3% of total stockholders' equity in the company each year. These units vested over 3 years and expired

after 10 years, or upon leaving the company. On exercise of the LTIP units, participants would receive a cash bonus equal to the increase in the value of the stock from the date of issue until the exercise date.

**RESPONSE TO COMPLAINT NO. 299:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 299.

**COMPLAINT NO. 300:** The Non-Employee Director Deferred Compensation Plan, established in 2006: This plan awarded non-employee members of the Board of Directors with phantom stock units based on the value of PDC stock, paid out in five equal annual cash installments following a director's conclusion of service on the board of directors. By 31 December 2015, there were nearly 122,000 phantom units outstanding under this plan, valued at $1.5 million.

**RESPONSE TO COMPLAINT NO. 300:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 300.

**COMPLAINT NO. 301:** The Long-Term Restricted Stock Unit ("RSU") Plan, effective 3 January 2010: when the share price went down in 2009, it rendered the LTIP phantom stock units worthless until the share price went back up. In order to continue providing incentive payments to senior executives, the Board's Compensation Committee adopted this plan which awarded RSUs to executives. All units vested three years after the award date and the cash value of the stock was paid to the executive on the vesting date, based on the valuation as of the vesting date times the number of RSUs.

**RESPONSE TO COMPLAINT NO. 301:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 301.

**COMPLAINT NO. 302:** The Encapsys Long Term Performance Cash Plan: This plan document is referenced in a separate document filed with the SEC on 8 May 2015 (after Appvion was well into negotiations to sell its Encapsys division) but was not itself filed or otherwise explained. This plan may have provided Appvion management with incentive compensation from the sale of Appvion's Encapsys division.

**RESPONSE TO COMPLAINT NO. 302:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 302.

**COMPLAINT NO. 303:** Appvion management also received annual bonuses and other incentives based on Appvion's overall financial performance, which would have been impacted had the share price been adjusted to reflect Appvion's true value.

**RESPONSE TO COMPLAINT NO. 303:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 303.

**COMPLAINT NO. 304:** While PDC was theoretically 100% owned by the ESOP, the LTIP, Non-Employee Director Deferred Compensation Phantom Stock Units, and Restricted Stock Units all served to create synthetic equity owned by executives and directors. By the end of 2014, Stout calculated that this synthetic equity accounted for 25.3% of the equity ownership of Appvion. Stout's valuation analysis estimated a valuation for this synthetic equity and subtracted it from the equity value of the company.

**RESPONSE TO COMPLAINT NO. 304:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 304.

**COMPLAINT NO. 305:** These incentive plans directly benefited the senior executives at Appvion who were responsible for preparing Appvion's projections that formed the basis of the valuations and for approving PDC's stock price. In particular, the ESOP Committee members included Appvion's top level executives and frequently were in the top five mostly highly compensated officers at Appvion in part because of these incentive plans.

**RESPONSE TO COMPLAINT NO. 305:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 305.

### H.    Appvion's Finances Became Increasingly Dire.

#### 1.    Management Launched a Disastrous Acquisition for Growth Strategy that Artificially Increased the Stock Price in 2003-2008.

**COMPLAINT NO. 306:** In mid-2002, Buth announced a new strategy to increase revenue and EBITDA targets by acquiring other businesses. These acquisitions proved to be disastrous for Appvion; however, these additional divisions directly drove up the stock values because they relied on inflated projections and disregarded liabilities and actual performance.

**RESPONSE TO COMPLAINT NO. 306:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 306.

##### a.    Stout Overvalued BemroseBooth.

**COMPLAINT NO. 307:** In December 2003, Appvion acquired BemroseBooth for $63.5 million. In order to make the purchase, Appvion refinanced $83.3 million and borrowed an additional $56.7 million to make the BemroseBooth acquisition. After the Company bought BemroseBooth, Buth represented that Appvion would raise its stock price to $100 share by buying other businesses.

**RESPONSE TO COMPLAINT NO. 307:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 307.

**COMPLAINT NO. 308:** In September 2005, Appvion announced layoffs and a restructuring of both its U.S. business and of BemroseBooth as BemroseBooth exited the printing and binding portions of its business and eliminated some employees. Despite these struggles, Stout continued to place a high value on BemroseBooth because of Appvion's inflated projections, valuing it at $67 million as of 30 June 2005, $78 million as of 31 December 2005, and $77 million in December 2005, above the purchase price of BemroseBooth. This was added directly onto Appvion's overall enterprise value and therefore directly impacted share value.

**RESPONSE TO COMPLAINT NO. 308:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 308.

**COMPLAINT NO. 309:** Appvion had decided to sell BemroseBooth by the end of 2007 but Stout still valued the division at $61 million, nearly the original purchase price - even though by that point Appvion had classified BemroseBooth as discontinued operations for purposes of its 10-K and recorded a goodwill impairment of $7 million and a $1 million impairment of intangible assets. As discussed in Paragraphs 209-236, just six months later, Stout's valuation could no longer attribute any value to BemroseBooth because of the pension liability.

**RESPONSE TO COMPLAINT NO. 309:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 309.

### b. Stout Overvalued Performance Packaging.

**COMPLAINT NO. 310:** In April 2003 Appvion acquired C&H Packaging and American Plastics Company, Inc. for a total of $50.6 million. In January 2005, Appvion acquired New England Extrusion, Inc. for $68.6 million. These entities were combined into Appvion's Performance Packaging division, which was valued as a separate division by Stout.

**RESPONSE TO COMPLAINT NO. 310:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 310.

**COMPLAINT NO. 311:** However, the Performance Packaging division lagged behind expectations for years. By the end of 2007, Stout noted that Appvion was exploring a sale of Performance Packaging, though it was hoping sales would improve in order to maximize the sales price.

**RESPONSE TO COMPLAINT NO. 311:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 311.

**COMPLAINT NO. 312:** Despite these struggles, Stout relied on Appvion's projections to value it well above the combined purchase price of $119.2 million, valuing the division as high as $140 million as of 31 December 2006. For example, Stout's valuations from 31 December 2006

to 30 June 2008 used the following projections for the performance packaging division, which were drastically inflated over actual EBITDA:

| Report Date | Projection Year | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/2007 | 12/31/2008 | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 |
| 12/31/2006 | $ 17,339 | $ 18,559 | $ 22,214 | $ 25,221 | $ 31,458 | N/A |
| 6/30/2007 | $ 16,699 | $ 18,559 | $ 22,214 | $ 25,221 | $ 31,458 | N/A |
| 12/31/2007 | N/A | $ 15,533 | $ 19,142 | $ 23,206 | $ 27,436 | $ 30,794 |
| 6/30/2008 | N/A | $ 15,529 | $ 19,142 | $ 23,206 | $ 27,436 | $ 30,794 |
| Actual EBITDA | $ 12,178 | $ 12,500 | $ 10,200 | N/A - Appvion sold the division at a loss | | |

Sources: Stout Valuations, 31 Dec 06, p. 93; 30 Jun 06, Ex. E, p. 21; 31 Dec 07, Ex. E, p. 21; 30 Jun 08, Ex. E, p. 19,21; 30 Jun 09, p. 10; 30 Jun 10, p. 10.

**RESPONSE TO COMPLAINT NO. 312:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 312.

**COMPLAINT NO. 313:** However, in the third and fourth quarters of 2008, Appvion was forced to record $39.6 million in goodwill impairment charges for Performance Packaging following a separate valuation of the performance packaging division:

**During third quarter 2008, an impairment analysis was performed on the performance packaging business due to the depressed economic future outlook and revised future cash flow projections. As a result of this impairment analysis, a $17.7 million goodwill impairment** charge was recorded. Appleton performed its annual goodwill impairment analysis during fourth quarter 2008. In accordance with SFAS 142, a Step One analysis was done to compare the fair value of the reporting unit to the carrying value. **In Step One, the fair value of the reporting unit was estimated using a weighting of the "market" and "income" valuation approach. The "income" valuation approach estimates the enterprise value using a net present value model, which discounts projected free cash flows of the business at a computed weighted average cost of capital as the discount rate. The "market" approach is based on the market multiple of guideline companies.** As a result of performing Step One, the carrying value of the reporting unit exceeded the fair value. Having failed Step One, Step Two was performed to allocate the fair value of the business to all assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit, as determined in the first step of the goodwill impairment test, was the price paid to acquire the reporting unit. **The excess of the fair value of the reporting unit, over the amount assigned to its assets and liabilities is the implied fair value of goodwill. The carrying value of the performance packaging goodwill exceeded the implied fair value of the**

**goodwill and therefore, an impairment loss was recognized to the extent of the excess of $21.9 million in the fourth quarter of 2008.**

Source: PDC, 2008 10-K, p. 29; see also id. at p. 22.

**RESPONSE TO COMPLAINT NO. 313:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 313.

**COMPLAINT NO. 314:** Appvion recognized an additional $6.3 million goodwill impairment for Performance Packaging in 2009, for a total of $45.9 million in goodwill impairment.

**RESPONSE TO COMPLAINT NO. 314:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 314.

**COMPLAINT NO. 315:** This substantial impairment of goodwill confirms what Stout's reports and the 10-Ks had noted before - that Performance Packaging was a struggling business. It also confirms that the projections Stout used in its prior reports were inflated.

**RESPONSE TO COMPLAINT NO. 315:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 315.

**COMPLAINT NO. 316:** However, Stout's valuations lagged in recognizing this goodwill impairment:

### Table 13: Performance Packaging's Enterprise Values in 2008 and 2009

| Valuation Date | Enterprise Value |
|---|---|
| 30 Jun 08 | $ 126,000,000 |
| 31 Dec 08 | $ 103,000,000 |
| 30 Jun 09 | $ 97,000,000 |
| 31 Dec 09 | $ 58,000,000 |

Source: Stout Valuations, 30 Jun 08, p. 56; 31 Dec 08, p. 55; 30 Jun 09, p. 54; 31 Dec 09, p. 52.

**RESPONSE TO COMPLAINT NO. 316:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 316.

**COMPLAINT NO. 317:** Stout's 31 December 08 and 30 June 09 valuations noted the impairment, but they "removed this one-time expense from our calculation of Performance Packaging's adjusted EBITDA" so that they did not impact the valuations. And in its valuation as of 30 June 2009, Stout also noted that it was ignoring Performance Packaging's last twelve months

of EBITDA because of this goodwill impairment, instead basing its valuation on only the last twelve months of revenue and on projections.

**RESPONSE TO COMPLAINT NO. 317:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 317.

**COMPLAINT NO. 318:** In late 2009, Appvion sold C&H for $16.6 million. In 2010, Appvion sold the remaining Performance Packaging division for $58 million - indicating that Stout's valuation as of 31 December 2009 was finally correct. In total, Appvion lost $44.6 million on its Performance Packaging division (nearly identical to the goodwill impairment), not accounting for any capital investments Appvion made. However, Stout's overvaluation of this division in at least 2008 and 2009 helped to artificially drive up Appvion's stock price.

**RESPONSE TO COMPLAINT NO. 318:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 318.

### 2. Appvion Unsuccessfully (Again) Tried to Find A Buyer.

**COMPLAINT NO. 319:** The repurchase obligation was a massive drain on Appvion's cash flow, as it loaned funds to the ESOP to repurchase shares. By the end of 2009, Stout noted in its valuation that "the repurchase obligation has contributed to the Company's decision to monetize certain assets and explore the sale of the Company in total."

**RESPONSE TO COMPLAINT NO. 319:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 319.

**COMPLAINT NO. 320:** In early 2012, Appvion explored a merger with Hicks Acquisition Company II, Inc. ("HAC II"), valued at $675 million, excluding debt. Under the terms proposed, Hicks would contribute cash and other assets in exchange for a majority interest in the combined company, and PDC would retain a minority interest. The cash contribution would be between $36 million and $110 million, depending on how many HAC II shareholders chose to go through with the deal. The combined company would be traded on the NASDAQ under the name Appvion.

**RESPONSE TO COMPLAINT NO. 320:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 320.

**COMPLAINT NO. 321:** The merger required a vote by the employees under the terms of the Plan. Appvion executives went on road shows to convince employees to sell the company. Management stressed that this was a chance for employees to get their money back out of the company. Employees ultimately voted in favor of the Hicks transaction.

**RESPONSE TO COMPLAINT NO. 321:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 321.

**COMPLAINT NO. 322:** On 2 July 2012, the ESOP Committee (Richards, Ferree, Willetts, and Arent) announced that the stock price had been valued at $18.80 per share as of 30 June 2012, up 25% from $15.01 in the December 2011 valuation. . However, the communication acknowledged that this share price would not be used to purchase PDC stock or for company match contributions - because the Plan requires purchases to be made at the lower of the preceding or following valuation, the 31 December 2011 stock price would be used.

**RESPONSE TO COMPLAINT NO. 322:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 322.

**COMPLAINT NO. 323:** However, had the Hicks transaction been completed, it would have triggered change in control clauses in the RSU and LTIP plans that would have paid at the $18.80 share price, earning the ESOP Committee members (Richards, Ferree, Willetts, and Arent) millions of dollars in compensation:

|  | **RSUs** | **Value at $18.80/share** |
|---|---|---|
| Richards | 105,000 | $1,947,000 |
| Ferree | 35,500 | $667,400 |
| Willetts | 20,000 | $376,013 |
| Arent | 14,000 | $263,200 |

|  | **LTIP Units** | **Value at $18.80/share** |
|---|---|---|
| Richards | 395,000 | $2,093,800 |
| Ferree | 133,500 | $701,265 |
| Willetts | 55,500 | $291,720 |
| Arent | 51,500 | $274,390 |

**RESPONSE TO COMPLAINT NO. 323:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 323.

**COMPLAINT NO. 324:** However, Richards and Ferree had negotiated terms where would exchange their LTIP units for restricted shares worth approximately $4 million in the new entity that would be created by the transaction. This was in addition to a February 2012 Retention Plan that would have paid out to $2 million if the deal closed, with most of it going to the top five executives (including Richards, Ferree, Willetts, Arent).

**RESPONSE TO COMPLAINT NO. 324:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 324.

**COMPLAINT NO. 325:** Despite the vote by employees, on 13 July 2012, Appvion and HAC II announced that they had agreed to terminate the proposed business combination. According to Company management, the volatile market conditions prevented a transaction size from being reached that was acceptable to both Appvion and HAC II. The adjusted sale price would not have provided enough near-term liquidity and may not have allowed the combined company to be traded on the NASDAQ stock exchange.

**RESPONSE TO COMPLAINT NO. 325:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 325.

**COMPLAINT NO. 326:** After the transaction fell through, Appvion's ESOP Committee sent an email to employees on 7 August 2012 stating that they were ordering a special valuation of PDC's shares because "the June 30 price no longer represented Fair Market Value." According to the email, the ESOP Committee "subsequently learned that Stout Risius Ross included some (but not all) of the incremental value of the proposed transaction [with Hicks] in the share price announced on June 30." In other words, the $18.80 per share valuation had been artificially inflated by including the benefits of the merger that had not yet taken place and was not guaranteed, even though the valuation was supposed to be for normal ESOP administration purposes.

**RESPONSE TO COMPLAINT NO. 326:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 326.

**COMPLAINT NO. 327:** This inflated share price demonstrated that Stout's valuations were not reliable. Further, State Street and the ESOP Committee (Richards, Ferree, Willetts, and Arent) either approved the valuation without proper review to identify that the valuations were inflated by incorporating the Hicks transaction or they knew the valuation was inflated and approved it anyway, especially for the benefit of Richards, Ferree, Willetts, and Arent who would directly benefit from a higher share price.

**RESPONSE TO COMPLAINT NO. 327:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 327.

### 3. Appvion Sold its Most Profitable Unit.

**COMPLAINT NO. 328:** Appvion's Encapsys segment encompassed Appvion's chemical microencapsulation activities; microencapsulation is the process of putting a microscopic wall around a core substance. This process was developed in the 1950's and was part of Appvion's carbonless paper process, but Appvion had worked to develop other applications for the process.

**RESPONSE TO COMPLAINT NO. 328:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 328.

**COMPLAINT NO. 329:** By 2010, Encapsys was a driving factor in Stout's valuations. According to a January 2011 employee communication, "The rapid and consistent growth of the Encapsys business was the single biggest contributor to share price growth in H2 2010. The Encapsys division continues to increase its contribution to shareholder value with each recent valuation."

**RESPONSE TO COMPLAINT NO. 329:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 329.

**COMPLAINT NO. 330:** Encapsys had room for significant growth going forward and was Appvion's most profitable division.

**RESPONSE TO COMPLAINT NO. 330:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 330.

**COMPLAINT NO. 331:** In April 2015, a third party submitted a proposal to acquire the Encapsys unit and related assets for $205 million, which was later revised to $208 million. Appvion agreed to sell the Encapsys unit, and the sale was completed in August 2015.

**RESPONSE TO COMPLAINT NO. 331:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 331.

**COMPLAINT NO. 332:** On 8 May 2015, Appvion amended its Executive Nonqualified Excess Plan to allow deferral of compensation received under The Encapsys Long Term Performance Cash Plan. This Encapsys Long Term Performance Cash Plan is not described in any of the 10-K filings and it was not filed with the SEC. On information and belief, Appvion management may have received compensation from this plan as part of the sale of Encapsys.

**RESPONSE TO COMPLAINT NO. 332:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 332.

**COMPLAINT NO. 333:** In May 2015, Appvion made Argent a discretionary trustee with the authority to vote on the Encapsys sale. Argent and the Board of Directors approved the sale, which was completed in August 2015, without a vote by employees.

**RESPONSE TO COMPLAINT NO. 333:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 333.

**COMPLAINT NO. 334:** While the sale of Encapsys allowed Appvion to pay off some debt, the loss of its most profitable unit impaired Appvion's overall value and its ability to function as a going concern.

**RESPONSE TO COMPLAINT NO. 334:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 334.

### I.    <u>Appvion Filed for Bankruptcy Protection In 2017.</u>

**COMPLAINT NO. 335:** On 1 October 2017, Appvion and certain of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

**RESPONSE TO COMPLAINT NO. 335:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 335.

### J.    <u>The ESOP, Including Through its Employee Owners, Relied Upon the Defendants' Representations of Fair Market Value.</u>

**COMPLAINT NO. 336:** Each representation of stock value (the stock value itself, the communications to the Employee Owners in emails/press releases and at road shows, and the 10-K and 10-Q filings) misled the ESOP (including through its Employee Owners) and allowed Appvion to conceal its true financial condition. These representations acted to conceal that for much (if not all) of the ESOP's existence, PDC had no equity value. The fraudulent stock prices prevented inquiry into the true value of PDC's stock, concealed the ESOP fiduciaries' earlier breaches of fiduciary duty and concealed that certain management and directors were acting in their own self-interest. They also caused the employees to continue to make deferrals from their paychecks and for the ESOP to overpay every time it bought PDC stock.

**RESPONSE TO COMPLAINT NO. 336:** To the extent the allegations in paragraph 336 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 336.

**COMPLAINT NO. 337:** The Employee Owners who paid a portion of their paycheck into the ESOP for the purpose of funding the PDC stock purchases did so in reliance on the integrity of the PDC stock price. Because Appvion's Employee Owners were denied access to the PDC stock valuations, they had to rely on the accuracy of the stock prices set by the defendants.

**RESPONSE TO COMPLAINT NO. 337:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 337.

**COMPLAINT NO. 338:** The ESOP, including through its Employee Owners, reasonably believed that each of the stock price representations were true and relied on the accuracy of these stock prices in making the ongoing decision to contribute a portion of their paychecks to invest in the ESOP.

**RESPONSE TO COMPLAINT NO. 338:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 338.

**COMPLAINT NO. 339:** Had the defendants been truthful to the ESOP, including through its Employee Owners, the Employee Owners would have recognized Appvion's true financial condition and would have ceased contributing to the ESOP. Also, the ESOP Plan would have been prohibited from purchasing PDC stock for more than its true fair market value.

**RESPONSE TO COMPLAINT NO. 339:** To the extent the allegations about "defendants" in paragraph 339 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 339.

### K. From 9 November 2001 Until Bankruptcy, Each Defendant Took Separate and Independent Steps To Fraudulently Conceal Earlier Overstatements of the PDC Stock Price and Earlier Fiduciary Breaches.

**COMPLAINT NO. 340:** Each year from 9 November 2001 until bankruptcy, each defendant took steps in furtherance of the course of conduct to fraudulently conceal that each previous PDC stock had been overvalued and that the ESOP fiduciaries had breached their fiduciary duties. Steps taken in the defendants' course of conduct of fraudulent concealment included:

- The release of 32 fraudulently inflated semi-annual PDC stock prices each of which concealed that each previous PDC stock price had been fraudulently inflated;

- The release of 17 Appvion 10-Ks which reported and confirmed the fraudulent PDC stock price and included the fraudulently inflated "Redeemable Common Stock value," thereby concealing that each previous PDC stock price and "Redeemable Common Stock value" had been fraudulently inflated and that the ESOP fiduciaries had breached their fiduciary duties;

- The release of 46 10-Qs, each of which reported and confirmed the fraudulently inflated Redeemable Common Stock value, thereby concealing that each previous PDC stock price and Redeemable Common Stock value had been fraudulently inflated and that the ESOP Fiduciaries had breached their fiduciary duties; and

- The release of other communications which confirmed, among other things, that the PDC stock was being properly valued, thereby concealing that each previous PDC stock price and Redeemable Common Stock entry had been fraudulently inflated and that the ESOP fiduciaries had breached their fiduciary duties.

**RESPONSE TO COMPLAINT NO. 340:** To the extent the allegations about "each defendant" in paragraph 340 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 340.

**COMPLAINT NO. 341:** Upon the release of each subsequent PDC stock price, the newly-released price would then serve to separately and independently set the PDC stock purchase price for that respective period. Therefore, each released PDC stock price constituted a separate and independent breach of fiduciary duty and act of fraud or concealment from each earlier release.

**RESPONSE TO COMPLAINT NO. 341:** To the extent the allegations in paragraph 341 refer to Reliance Trust, Reliance Trust admits that semi-annual valuations in 2013 were used to determine the share price for PDC's stock for certain periods of time, but otherwise denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 341.

**COMPLAINT NO. 342:** However, the release of each semi-annual PDC stock price also perpetuated the previous acts of fraudulently inflating each earlier reported PDC stock price and Redeemable Common Stock, concealing the fraudulently overstated PDC stock prices reported in connection with each earlier valuation and the related breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 342:** To the extent the allegations in paragraph 342 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 342.

**COMPLAINT NO. 343:** If each PDC stock price release had not perpetuated the fraudulent practices of the past, the Employee Owners would have learned that the PDC stock was inflated at the time of the 2001 Transaction and at all times thereafter. It would have notified the ESOP, through the Employee Owners, of the history of the fraudulent PDC stock inflation, the Defendants' role in the fraud and the ESOP fiduciaries' breaches.

**RESPONSE TO COMPLAINT NO. 343:** To the extent the allegations in paragraph 343 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 343.

**COMPLAINT NO. 344:** As described in Section IV.C., the members of the ESOP Committee, the ESOP Trustee, the valuation firms and Appvion's directors each played a critical

role in creating, authorizing, disseminating and misrepresenting the fraudulently overstated semi-annual PDC share price to the ESOP, through its Employee Owners.

**RESPONSE TO COMPLAINT NO. 344:** To the extent the allegations about "the ESOP Trustee" in paragraph 344 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 344.

**COMPLAINT NO. 345:** This annual and ongoing course of conduct concealed that the ESOP Committee members and the ESOP Trustee were not acting prudently or in the ESOP's best interest and were breaching their fiduciary duties to the ESOP. Instead, they were fraudulently inflating PDC's stock price for the purpose of prolonging Appvion and the ESOP's existence for their persona benefit.

**RESPONSE TO COMPLAINT NO. 345:** To the extent the allegations about "the ESOP Trustee" in paragraph 345 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 345.

**COMPLAINT NO. 346:** This course of conduct also concealed Houlihan's original conflict of interest that infested every aspect of the initial ESOP transaction, the role that Buth, Karch and State Street played in concealing the conflict, the inflated PDC stock price at 9 November 2001 and the related breaches of fiduciary duties.

**RESPONSE TO COMPLAINT NO. 346:** To the extent the allegations in paragraph 346 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 346.

**COMPLAINT NO. 347:** Each step in this curse of conduct prevented the ESOP, through the Employee Owners, from timely discovering the wrong it had suffered. These steps also constituted a misleading, deceptive and contrived action and scheme that was designed to mask the existence of the ESOP's cause of action, cover the Defendants' tracks and the tracks of their predecessors.

**RESPONSE TO COMPLAINT NO. 347:** To the extent the allegations in paragraph 347 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 347.

1. **Steps Taken in Furtherance of the Course of Conduct of Fraudulent Concealment Included the Release of 32 Fraudulently Inflated Semi-Annual PDC Stock Prices.**

**COMPLAINT NO. 348:** The following chart includes the date of each PDC semi-annual stock valuation, the reported PDC stock price and the PDC stock price as adjusted by just the subtracting of the Excluded Debt and the fraudulent control premium. It also identifies the defendants who were members of the ESOP Committee, were the ESOP Trustee and were the valuation firms responsible for each of the thirty-two (32) PDC stock price releases:

**Table 14: Defendants Responsible for Each Stock Price**

| | Valuation Date | Reported PDC Stock Price | Adjusted PDC Stock Price* | ESOP Committee Members Who Reviewed and Released the PDC Stock Price | ESOP Trustee | Valuation Firm |
|---|---|---|---|---|---|---|
| 1 | 31-Dec-01 | $12.81 | ($2.54) | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 2 | 30-Jun-02 | $18.58 | $2.25 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 3 | 31-Dec-02 | $21.92 | $8.64 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 4 | 30-Jun-03 | $22.42 | $8.81 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 5 | 31-Dec-03 | $23.36 | $7.59 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 6 | 30-Jun-04 | $26.09 | $6.46 | Buth, Karch, Parker, Fantini | State Street | Willamette |
| 7 | 31-Dec-04 | $26.36 | $6.79 | Buth, Karch, Parker, Fantini | State Street | Stout |
| 8 | 30-Jun-05 | $27.77 | $9.34 | Richards, Karch, Parker, Fantini | State Street | Stout |
| 9 | 31-Dec-05 | $28.56 | $8.93 | Richards, Karch, Parker | State Street | Stout |
| 10 | 30-Jun-06 | $31.27 | $11.02 | Richards, Karch | State Street | Stout |
| 11 | 31-Dec-06 | $33.62 | $14.22 | Richards, Ferree, Tyczkowski | State Street | Stout |
| 12 | 30-Jun-07 | $32.89 | $12.38 | Richards, Ferree, Tyczkowski | State Street | Stout |
| 13 | 31-Dec-07 | $33.41 | $16.14 | Richards, Ferree, Tyczkowski | State Street | Stout |
| 14 | 30-Jun-08 | $26.64 | $10.19 | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 15 | 31-Dec-08 | $21.43 | ($4.06) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 16 | 30-Jun-09 | $18.87 | ($6.95) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 17 | 31-Dec-09 | $13.26 | ($11.75) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 18 | 30-Jun-10 | $12.03 | ($12.10) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 19 | 31-Dec-10 | $12.84 | ($9.47) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 20 | 30-Jun-11 | $14.10 | ($7.87) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 21 | 31-Dec-11 | $15.01 | ($11.04) | Richards, Ferree, Willetts, Arent | State Street | Stout |

121

| | Valuation Date | Reported PDC Stock Price | Adjusted PDC Stock Price* | ESOP Committee Members Who Reviewed and Released the PDC Stock Price | ESOP Trustee | Valuation Firm |
|---|---|---|---|---|---|---|
| 22 | 16-Jul-12 | $16.45 | ($9.47) | Richards, Ferree, Willetts, Arent | State Street | Stout |
| 23 | 31-Dec-12 | $17.55 | ($12.45) | Richards, Ferree, Arent | State Street | Stout |
| 24 | 30-Jun-13 | $17.85 | ($12.78) | Richards, Ferree, Arent | Reliance | Stout |
| 25 | 31-Dec-13 | $16.25 | ($7.19) | Richards, Ferree, Arent | Reliance | Stout |
| 26 | 30-Jun-14 | $16.30 | ($6.41) | Richards, Ferree, Arent | Argent | Stout |
| 27 | 31-Dec-14 | $11.00 | ($18.62) | Richards, Ferree, Arent | Argent | Stout |
| 28 | 30-Jun-15 | $12.90 | ($11.71) | Richards, Ferree, Arent, Gilligan | Argent | Stout |
| 29 | 31-Dec-15 | $12.30 | ($11.95) | Ferree, Gilligan | Argent | Stout |
| 30 | 30-Jun-16 | $13.70 | ($11.87) | Ferree, Gilligan | Argent | Stout |
| 31 | 31-Dec-16 | $10.35 | ($15.72) | Ferree, Gilligan | Argent | Stout |
| 32 | 30-Jun-17 | $6.85 | ($20.41) | Gilligan | Argent | Stout |

**RESPONSE TO COMPLAINT NO. 348:** Reliance Trust admits the chart in paragraph 348 purports to list the valuation date, reported stock price, sitting ESOP Committee Members who reviewed and released the stock price, the ESOP Trustee, the valuation firm for each semi-annual valuation, and Plaintiff's alleged "Adjusted PDC Stock Price." Reliance Trust admits the reported stock price for the valuations as of June 30, 2013 and as of December 31, 2013 was $17.85 and $16.25, respectively, and that Reliance Trust was the ESOP Trustee and Stout was the valuation firm for those two valuations. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 348.

### 2. Steps Taken in Furtherance of the Course of Conduct of Fraudulent Concealment Included the Release of 17 of Appvion's Annual 10-Ks.

#### a. The 17 10-Ks Confirmed and Released the Fraudulently Inflated PDC Stock Price to the Employee Owners.

**COMPLAINT NO. 349:** Each year Appvion filed a 10-K with the SEC. It contained Appvion's audited financial statements. From 2002 to 2017, Appvion released fifteen (15) 10-K's during this period.

**RESPONSE TO COMPLAINT NO. 349:** It is unclear whether paragraph 349 refers to Appvion Inc.'s or PDC's Form 10-Ks. Reliance Trust admits that PDC filed a Form 10-K for the

fiscal year ending December 28, 2013, but denies that Appvion Inc. filed a Form 10-K for that same fiscal year. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 349.

**COMPLAINT NO. 350:** With the exception of the 2002 10-K, each subsequent 10-K reported and confirmed the fraudulently inflated PDC stock price in the Notes to the audited financial statements, thus attesting to its accuracy to the ESOP Owners. The following is an example of this 10-K disclosure of the PDC stock price, which was similar to the disclosure in each 10-K:

> The Compensation Committee of the board establishes the number of units granted each year under these plans in accordance with the Compensation Committee's stated goals and policies. ... The units are valued at the most recent PDC stock price as determined by the semi-annual ESOP valuation. **As of December 31, 2011, the fair market value of one share of PDC common stock was $15.01.**

Source: PDC, 2011 10-K Form, p. 86; emphasis added.

**RESPONSE TO COMPLAINT NO. 350:** To the extent the allegations in paragraph 350 refer to Reliance Trust, Reliance Trust admits PDC's Form 10-K for the fiscal year ending December 28, 2013 contains language similar to the block quote in paragraph 350, stating the value of one share of PDC common stock was $16.25 as of year-end, except for the added bold font for emphasis, and otherwise denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 350.

> **b.** **The 10-K Balance Sheet Entry "Redeemable Common Stock" Confirmed the PDC Stock Price.**

**COMPLAINT NO. 351:** The liabilities section of each of Appvion's balance sheets included an entry entitled "Redeemable Common Stock." This number represented the present value of Appvion's obligation to repurchase PDC stock when it became subject to redemption. For example, this redemption could occur when an ESOP Employee Owner retired or otherwise left Appvion.

**RESPONSE TO COMPLAINT NO. 351:** It is unclear whether paragraph 351 refers to Appvion Inc.'s or PDC's Form 10-Ks. Reliance Trust admits that PDC's Form 10-K for fiscal year

ending December 28, 2013 refers to "Redeemable common stock" on page 46 under the section titled "Liabilities, Redeemable Common Stock, Accumulated Deficit And Accumulated Other Comprehensive Income." Reliance Trust denies Appvion Inc. filed a Form 10-K for that same fiscal year. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 351.

**COMPLAINT NO. 352:** Because the Redeemable common stock entry was calculated as a function of the PDC stock price, it was fraudulently inflated in every 10-K released to the SEC and to the ESOP Employee Owners from 2002 (which also included the 2001 balance sheet) through 2016.

**RESPONSE TO COMPLAINT NO. 352:** Reliance Trust denies that PDC's stock price from the valuations as of June 30, 2013 and as of December 31, 2013 was inflated, and denies it caused any Redeemable common stock entry in PDC's Form 10-K for the fiscal year ending December 28, 2013 to be inflated. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 352.

**COMPLAINT NO. 353:** The following is a representative excerpt from one of Appvion's 10-Ks which explains the Redeemable common stock entry and confirms that it is calculated as a function of the PDC stock's fair market value. Each 10-K contains a similar explanation:

> ***Redeemable Common Stock.*** Redeemable equity securities are required to accreted (i.e., increased) so the amount on the balance sheet reflects the estimated amount redeemable at the earlier redemption dated based upon the redemption value at each period end. ... **The fair value of redeemable common stock is determined by an independent, third party appraiser selected by the ESOP Trustee as required by law and the ESOP.** Based upon the estimated fair market value of the redeemable common stock currently outstanding, an ultimate redemption amount of approximately $307 million has been determined. This accretion is being charged to retained earnings because redeemable common stock is the only class of shares outstanding.

**RESPONSE TO COMPLAINT NO. 353:** It is unclear whether paragraph 353 refers to Appvion Inc.'s or PDC's Form 10-Ks. Reliance Trust admits that PDC's Form 10-K for fiscal year ending December 28, 2013 contains language similar to the block quote in paragraph 353 on pages

124

39 and 40, except that it does not contain any bolded language, but denies Appvion Inc. filed a Form 10-K for that same fiscal year. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 353.

**COMPLAINT NO. 354:** For example, the Redeemable Common Stock entry included in the 2009 10-K balance sheet was $122.1 million. Because the PDC stock fair market value as adjusted for just the Excluded Debt and the fraudulent control premium was negative, this reported liability should have been reported as zero.

**RESPONSE TO COMPLAINT NO. 354:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 354.

**COMPLAINT NO. 355:** The release of each of the 17 10-Ks with the reported, but fraudulent, PDC stock value and "Redeemable Common Stock" value, constituted a separate and independent act in furtherance of the course of conduct of fraudulent concealment.

**RESPONSE TO COMPLAINT NO. 355:** Reliance Trust denies that PDC's stock value from the valuations as of June 30, 2013 and as of December 31, 2013 was fraudulent, and denies it caused any "Redeemable Common Stock" value in PDC's Form 10-K for the fiscal year ending December 28, 2013 to be fraudulent. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 355.

      **c.**     **Each 10-K Was Signed and Attested to by the CEO (Buth, Richards or Gilligan), the CFO (Parker or Ferree) and was Signed by the Directors.**

**COMPLAINT NO. 356:** Each 10-K was signed by the CEO (Buth, Richards or Gilligan) and by the CFO (either Parker or Ferree). Each CEO and CFO also signed a separate attestation as follows:

**Figure 11: Douglas P. Buth's Attestation to the 2003 10-K.**



Exhibit 31.1

CERTIFICATION

I, Douglas P. Buth, Chairman, President and Chief Executive Officer of Appleton Papers Inc., certify that:

1. I have reviewed this annual report on Form 10-K of Appleton Papers Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2004

Signature:        /S/  DOUGLAS P. BUTH

                      Douglas P. Buth
          Chairman, President and Chief Executive Officer

Source: Exhibit 31.1 to PDC's 10-K (2003).

    **RESPONSE TO COMPLAINT NO. 356:** Reliance Trust admits that PDC's Form 10-K for fiscal year ending December 28, 2013 appears to have been signed by Mark R. Richards on page 120. Reliance Trust admits that certifications similar to the image in paragraph 356 appear to have been signed by Mark R. Richards and Thomas J. Ferree at Exhibits 31.1 and 31.2 to PDC's Form 10-K for fiscal year ending December 28, 2013. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 356.

    **COMPLAINT NO. 357:** The critical language from this attestation is:

    1.  I have reviewed this annual report on Form 10-K of Appleton Papers Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

**RESPONSE TO COMPLAINT NO. 357:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 357.

**COMPLAINT NO. 358:** The Directors signed each 10-K, further attesting to the reliability of the information contained therein including the PDC stock price and the Redeemable Common Stock entry. The signature page for the directors looked similar in each 10-K. The following are representative examples of signature pages from the 2004, 2009 and 2015 10-Ks:

## Figure 12: Signature Page, 2004 10-K

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

APPLETON PAPERS INC.

By: /s/ DOUGLAS P. BUTH

Douglas P. Buth
President and Chief Executive Officer
Date: March 24, 2005

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
|---|---|---|
| /s/ DOUGLAS P. BUTH<br>Douglas P. Buth | Chairman, President, Chief Executive Officer and a Director (Principal Executive Officer) | March 24, 2005 |
| /s/ DALE E. PARKER<br>Dale E. Parker | Vice President, Chief Financial Officer and a Director (Principal Financial Officer) | March 24, 2005 |
| /s/ STEPHEN G. KULA<br>Stephen G. Kula | Controller (Principal Accounting Officer) | March 24, 2005 |
| /s/ STEPHEN P. CARTER<br>Stephen P. Carter | Director | March 24, 2005 |
| /s/ RONALD A. PACE<br>Ronald A. Pace | Director | March 24, 2005 |
| /s/ KATIE P. SEIFERT<br>Kathi P. Seifert | Director | March 24, 2005 |
| /s/ SUSAN SCHERBEL<br>Susan Scherbel | Director | March 24, 2005 |
| /s/ PAUL J. KARCH<br>Paul J. Karch | Director | March 24, 2005 |

Source: PDC, 10-K (2004), p. 115.

## Figure 13: Signature Page, 2009 10-K



Source: PDC, 10-K (2009), p. 132.

## Figure 14: Signature Page, 2015 10-K

**RESPONSE TO COMPLAINT NO. 358:** Reliance Trust admits that PDC's Form 10-K for fiscal year ending December 28, 2013 contains a similar signature page to the images in paragraph 358 at page 120, and that it appears to have been signed by directors. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 358.

### d.    The Defendants who Signed the 10-Ks Knew They Were Being Provided to and Relied Upon by the Employee Owners.

**COMPLAINT NO. 359:** Each defendant who signed Appvion's 10-Ks also knew that they would become publicly available and, that it would be provided to the Employee Owners.

**RESPONSE TO COMPLAINT NO. 359:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 359.

**COMPLAINT NO. 360:** In fact, the annual 10-K was specifically offered to the Employee Owners to help them make the ongoing decision of whether to invest their paycheck savings in the ESOP. Appvion did this by giving its employees the link to the Appvion website where employees could review the 10-K and also told employees they could ask for and receive a hard copy.

**RESPONSE TO COMPLAINT NO. 360:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 360.

**COMPLAINT NO. 361:** The June 2003 Ownership Update newsletter confirmed that the ESOP Committee made both the 10-Ks and 10-Qs available to the Employee Owners:

> **All Appleton's 10-Qs and our first 10-K are posted on the Appleton Web site** at ww.appletonideas.com/investors. **We will continue to post our SEC filings to the Web site.** The 10-K is posted in March while the 10-Qs will usually appear near the end of the 45-day reporting deadline. **These reports are also available on the SEC Web** site at www.sec.gov - check under filings and forms (EDGAR). **KSOP plan participants who would like copies** of SEC filings but do not have Internet access **may request them** from our Employee Services, 800-832-1718.

**RESPONSE TO COMPLAINT NO. 361:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 361.

**COMPLAINT NO. 362:** The following chart lists the date of each 10-K, the fraudulent Redeemable Common Stock value the 10-K reported, the stock price adjusted by subtracting just the Excluded Debt and the fraudulent control premium, and the ESOP Committee member defendants who signed and attested to each 10-K. It also lists the Outside Directors who signed the 10-Ks for the years this SAC is stating claims against those directors:

### Table 15: Signatories for Each 10-K

| | 10-K | Date | Redeemable Common Stock (in thousands) | Adjusted PDC Stock Price* | Attesting ESOP Committee Member Who Signed | Outside Directors Who Signed |
|---|---|---|---|---|---|---|
| 1 | 2002 10-K | 18-Mar-03 | $133,581 | $8.64 | Buth, Parker | |
| 2 | 2003 10-K | 31-Mar-04 | $158,279 | $7.59 | Buth, Parker | |
| 3 | 2004 10-K | 24-Mar-05 | $159,329 | $6.79 | Buth, Parker | |
| 4 | 2005 10-K | 17-Mar-06 | $185,292 | $8.93 | Richards, Parker | |
| 5 | 2006 10-K | 06-Mar-07 | $190,466 | $14.22 | Richards, Ferree | |
| 6 | 2007 10-K | 11-Mar-08 | $182,040 | $16.14 | Richards, Ferree | Carter, Murphy, Pace, Reardon, Seifert, Scherbel |
| 7 | 2008 10-K | 27-Mar-09 | $147,874 | ($4.06) | Richards, Ferree | Carter, Murphy, Pace, Reardon, Seifert, Scherbel |
| 8 | 2009 10-K | 01-Mar-10 | $122,087 | ($11.75) | Richards, Ferree | Carter, Murphy, Pace, Reardon, Seifert, Scherbel |
| 9 | 2010 10-K | 11-Mar-11 | $110,045 | ($9.47) | Richards, Ferree | Carter, Murphy, Pace, Reardon, Seifert, Scherbel |
| 10 | 2011 10-K | 23-Mar-12 | $97,615 | ($11.04) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 11 | 2012 10-K | 7-Mar-13 | $81,704 | ($12.45) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 12 | 2013 10-K | 12-Mar-14 | $63,322 | ($7.19) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 13 | 2013 10-K/A | 14 Nov 14 | $157,445 | ($7.19) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 14 | 2014 10-K | 13-Mar-15 | $121,017 | ($18.62) | Richards, Ferree | Carter, Seifert, Murphy Reardon, Suwyn |
| 15 | 2015 10-K | 25-Mar-16 | $114,749 | ($11.95) | Gilligan, Ferree | Carter, Seifert, Murphy, Suwyn |
| 16 | 2016 10-K | 15-Mar-17 | $100,641 | ($15.72) | Gilligan, Ferree | Seifert, Murphy Suwyn |
| 17 | 2016-10-K/A | 28-Mar-17 | $100,641 | ($15.72) | Gilligan, Ferree | |

*Adjusted by subtracting the Excluded Debt and the fraudulent control premium. See Table 10.

Appvion, 2002 10-K, pp. 45, 111; 2003 10-K, pp. 49, 124; 2004 10-K, pp. 49, 115; 2005 10-K, pp. 50, 115; 2006 10-K, pp. 42, 113; 2007 10-K, pp. 40, 106; 2008 10-K, p. 121; 2009 10-K, pp. 50, 132; 2010 10-K, pp. 50; 135; 2011 10-K, pp. 50, 142; 2012 10-K, pp. 45, 136; 201310-K, pp. 46, 119; 2013 10-K/A, pp. 48, 123; 2014 10-K, pp. 42, 117; 2015 10-K, pp. 38, 112; 2016 10-K, pp. 33, 104; 2016 10-K(A), pp. 6, 48. Attestations, 2002 10-K, exhibits 99.1-99.4; 2003-2012 10-Ks, exhibits. 31.1-31.4, 32.1-32.4, 2013-2016 10-Ks, exhibits 31.1-31.2, 32.1-32.2.

**RESPONSE TO COMPLAINT NO. 362:** Reliance Trust admits the chart in paragraph 362 purports to list the date of each of Appvion Inc.'s Form 10-Ks, the "Redeemable Common Stock," the outside directors and ESOP Committee members who signed, and Plaintiff's alleged "Adjusted PDC Stock Price." Reliance Trust denies that Appvion Inc. filed any Form 10-K on March 12, 2014 or any amendment on November 14, 2014. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 362.

### 3.     Steps Taken in Furtherance of the Course of Conduct of Fraudulent Concealment Included the Release of 48 Quarterly 10-Qs.

**COMPLAINT NO. 363:** Each quarter Appvion filed a 10-Q containing its quarterly unaudited financial statements with the SEC and made it available to the Employee Owners. Each of these forty-eight (48) 10-Q balance sheets reported the fraudulently inflated Redeemable Common Stock value.

**RESPONSE TO COMPLAINT NO. 363:** It is unclear whether paragraph 363 refers to Appvion Inc.'s or PDC's Form 10-Qs. Reliance Trust admits that Appvion Inc. filed a Form 10-Q for the quarterly periods ending March 31, 2013, June 30, 2013, and September 29, 2013, but denies that Appvion Inc. filed a Form 10-Q for the first and second quarters of 2014. Reliance Trust admits that PDC filed a Form 10-Q for the quarterly periods ending March 31, 2013, June 30, 2013, September 29, 2013, March 30, 2014, and June 29, 2014. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 363.

**COMPLAINT NO. 364:** Appvion's CEOs (either Buth, Richards or Gilligan) and CFOs (either Parker, Richards (interim CFO) or Ferree) attested to and the CFOs (either Parker, Richards (interim CFO) or Ferree) signed each of the forty-eight (48) 10-Qs released under their respective periods of employment, with the following certification language:

**Figure 15: Douglas P. Buth Attestation to 10-Q, 11 Aug 03**



Source: Exhibit 31.1 to 10-Q, filed 11 Aug 03.

**RESPONSE TO COMPLAINT NO. 364:** Reliance Trust admits that Appvion Inc.'s Form 10-Q for the quarterly periods ending March 31, 2013, June 30, 2013, and September 29, 2013 appear to have been signed by Thomas J. Ferree on pages 41, 49, and 51 respectively. Reliance Trust admits that certifications similar to the image in paragraph 364 appear to have been signed by Mark R. Richards and Thomas J. Ferree at Exhibits 31.1 and 31.2 to Appvion Inc.'s Form 10-Q for the quarterly periods ending March 31, 2013, June 30, 2013, and September 29, 2013, but denies the certification language is identical. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 364.

**COMPLAINT NO. 365:** The critical language is:

1. I have reviewed this quarterly report on Form 10-Q of Appleton Papers Inc.;

2. Based on my knowledge, **this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made**, in light of the circumstances under which such statements were made, **not misleading** with respect to the period covered by this report;

3. Based on my knowledge, **the financial statements**, and other financial information included in this report, **fairly present in all material respects the financial condition**, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

**RESPONSE TO COMPLAINT NO. 365:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 365.

**COMPLAINT NO. 366:** The "Ownership Update" newsletter to the ESOP Employee Owners dated 9 December 2002, describes to the ESOP Owners that the CEO (Buth) and CFO (Parker) made 10-Q certifications thus giving them comfort regarding the 10-Q's accuracy and truthfulness:

Prior to Appleton filing its 10-Q report on November 13, the committee reported to Buth and Parker as to its activities and any issues relevant to the preparation of the 10-Q report under review. After completing their personal review of the quarterly report and report of the disclosure committee, **Buth and Parker each signed written certifications of the accuracy of the information contained in the 10-Q.**

**RESPONSE TO COMPLAINT NO. 366:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 366.

**COMPLAINT NO. 367:** The following chart includes the date of each 10-Q, the fraudulent Redeemable Common Stock balance sheet entry and the names of the CFO who signed them and CEO and CFO who attested to their accuracy:

**Table 16: Attestor and Signers for Each 10-Q**

| | Date of 10-Q | Reported Redeemable Common Stock (in thousands) | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 1 | 30-Jun-02 | $112,108 | Buth, Parker |
| 2 | 29-Sep-02 | $133,820 | Buth, Parker |
| 3 | 30-Mar-03 | $143,981 | Buth, Parker |
| 4 | 29-Jun-03 | $138,095 | Buth, Parker |
| 5 | 28-Sep-03 | $160,466 | Buth, Parker |
| 6 | 4-Apr-04 | $168,868 | Buth, Parker |

134

| | Date of 10-Q | Reported Redeemable Common Stock (in thousands) | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 7 | 4-Jul-04 | $163,295 | Buth, Parker |
| 8 | 3-Oct-04 | $163,753 | Buth, Parker |
| 9 | 3-Apr-05 | $162,485 | Richards, Parker |
| 10 | 3-Jul-05 | $169,578 | Richards, Parker |
| 11 | 2-Oct-05 | $175,331 | Richards, Parker |
| 12 | 2-Apr-06 | $188,298 | Richards* |
| 13 | 2-Jul-06 | $183,382 | Richards* |
| 14 | 1-Oct-06 | $189,281 | Richards, Ferree |
| 15 | 1-Apr-07 | $194,126 | Richards, Ferree |
| 16 | 1-Jul-07 | $184,490 | Richards, Ferree |
| 17 | 30-Sep-07 | $172,224 | Richards, Ferree |
| 18 | 30-Mar-08 | $185,127 | Richards, Ferree |
| 19 | 29-Jun-08 | $170,079 | Richards, Ferree |
| 20 | 28-Sep-08 | $169,344 | Richards, Ferree |
| 21 | 5-Apr-09 | $143,392 | Richards, Ferree |
| 22 | 5-Jul-09 | $135,579 | Richards, Ferree |
| 23 | 4-Oct-09 | $133,653 | Richards, Ferree |
| 24 | 4-Apr-10 | $120,320 | Richards, Ferree |
| 25 | 4-Jul-10 | $114,378 | Richards, Ferree |
| 26 | 3-Oct-10 | $112,624 | Richards, Ferree |
| 27 | 3-Apr-11 | $108,622 | Richards, Ferree |
| 28 | 3-Jul-11 | $102,524 | Richards, Ferree |
| 29 | 2-Oct-11 | $101,062 | Richards, Ferree |
| 30 | 1-Apr-12 | $96,431 | Richards, Ferree |
| 31 | 1-Jul-12 | $89,845 | Richards, Ferree |
| 32 | 30-Sep-12 | $85,518 | Richards, Ferree |
| 33 | 31-Mar-13 | $80,458 | Richards, Ferree |
| 34 | 30-Jun-13 | $71,940 | Richards, Ferree |
| 35 | 29-Sep-13 | $70,853 | Richards, Ferree |
| 36 | 30-Mar-14 | $61,635 | Richards, Ferree |
| 37 | 30-Mar-14 | **$157,429 | Richards, Ferree |
| 38 | 29-Jun-14 | $55,628 | Richards, Ferree |
| 39 | 29-Jun-14 | **$151,140 | Richards, Ferree |
| 40 | 28-Sep-14 | $151,139 | Richards, Ferree |
| 41 | 5-Apr-15 | $121,017 | Richards, Ferree |
| 42 | 5-Jul-15 | $121,020 | Gilligan, Ferree |
| 43 | 4-Oct-15 | $121,020 | Gilligan, Ferree |
| 44 | 3-Apr-16 | $114,749 | Gilligan, Ferree |
| 45 | 3-Jul-16 | $112,761 | Gilligan, Ferree |
| 46 | 2-Oct-16 | $112,760 | Gilligan, Ferree |
| 47 | 2-Apr-17 | $100,641 | Gilligan, Ferree |

| | Date of 10-Q | Reported Redeemable Common Stock (in thousands) | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 48 | 2-Jul-17 | $91,760 | Gilligan |

*Signed and attested as both CEO and CFO.
**Amended

Source: Appvion, 10-Qs, Jun 02, pp. 1, 34; Sep 02, pp. 1, 39, 40; Mar 03, pp. 1, 37, 38; Jun 03, pp. 1, 40, 41; Sep 03, pp. 1, 42, 43; Apr 04, pp. 4, 39, 40; Jul 04, pp. 1, 43, 44; Oct 04, pp. 1, 46; Apr 05, pp. 1, 40; Jul 05, pp. 3, 46, 47; Oct 05, pp. 1, 43; Apr 06, pp. 3, 42, 43; Jul 06, pp. 3, 48, 49; Oct 06, pp. 1, 40, 41; Apr 07, pp. 1, 32, 33; Jul 07, pp. 1, 38, 39; Sep 07, pp. 3, 40, 41; Mar 08, pp. 1, 32, 33; Jun 08, pp. 3, 40, 41; Sep 08, pp. 3, 40, 41; Apr 09, pp. 3, 39, 40; Jul 09, pp. 3, 45, 46; Oct 09, pp. 3, 47, 48; Apr 10, pp. 3, 33, 34; Jul 10, pp. 3, 44, 45; Oct 10, pp. 3, 47, 48; Apr 11, pp. 3, 37; 38; Jul 11, pp. 3, 43, 44: Oct 11, pp. 3, 44, 45; Apr 12, pp. 3, 41, 42; Jul 12, pp. 3, 45, 46; Oct 12, pp. 3, 46, 47; Mar 13, pp. 3, 41, 42; Jun 13, pp. 3, 49, 50; Sep 13, pp. 3, 51, 52; Mar 14, pp. 5, 36; Mar 14(A), pp. 5, 42; Jun 14, pp. 3, 33; Jun 14(A), 5, 42; Sep 14, pp. 5, 39; Apr 15, pp. 3, 29; Jul 15, pp. 3, 32; Oct 15, pp. 3, 34; Apr 16, pp. 3, 29; Jul 16, pp. 3, 30; Oct 16, pp. 3, 33; Apr 17, pp. 3, 27; Jul 17, pp. 2; Attestations: 2002 10-Qs, exhibits, 99.1-99.4; Mar 03 10-Q, exhibits, 99.1-99.4; Jun 03 - Oct 05 10-Qs, exhibits, 31.1-31.4, 32.2-32.4; Apr - Jul 06 10-Qs, exhibits, 31.1-31.2, 32.1-32.2; Oct 06 - Sep 13 10-Qs exhibits, 31.1-31.4, 32.1-32.4; Mar 14 - Jul 17 10-Qs, exhibits, 31.1-31.2,32.1-32.2.

**RESPONSE TO COMPLAINT NO. 367:** Reliance Trust admits the chart in paragraph 367 purports to list the date of each of Appvion Inc.'s Form 10-Qs, the reported redeemable common stock, and CEOs and CFOs who signed the attestations. Reliance Trust admits that Appvion Inc.'s Form 10-Q for the quarterly periods ending March 31, 2013, June 30, 2013, and September 29, 2013 list redeemable common stock at approximately $80,458,000, $71,940,000, and $70,853,000, respectively, on page 3 of each. Reliance Trust admits that Appvion Inc.'s Form 10-Q for the quarterly periods ending March 31, 2013, June 30, 2013, and September 29, 2013 attach certifications which appear to have been signed by Mark R. Richards and Thomas J. Ferree. Reliance Trust admits that Appvion Inc.'s Form 10-Q for the quarterly periods ending March 31, 2013, June 30, 2013, and September 29, 2013 appear to have been signed by Thomas J. Ferree on pages 41, 49, and 51, respectively. Reliance Trust denies Appvion Inc. filed any form 10-Qs for

the quarterly periods ending March 30, 2014 or June 29, 2014. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 367.

### 4. Steps Taken in Furtherance of the Course of Conduct of Fraudulent Concealment Included the Annual Filing of 16 Form 5500s.

**COMPLAINT NO. 368:** Each year, Appvion was required to file a Form 5500 with the Department of Labor each year. According to the Department of Labor's website, this is intended to be a key disclosure document for the protection of the Employee Owners' interests:

> The Form 5500 Series is **an important compliance, research, and disclosure tool** for the Department of Labor, **a disclosure document for plan participants and beneficiaries**, and a source of information and data for use by other Federal agencies, Congress, and the private sector in assessing employee benefit, tax, and economic trends and policies. The Form 5500 Series is **part of ERISA's overall reporting and disclosure framework**, which is **intended to assure that** employee benefit plans are operated and managed in accordance with certain prescribed standards and that **participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries** under employee benefit plans.

Source: U.S. Department of Labor, EBSA, Reporting and Filing, Form 5500 Series.

**RESPONSE TO COMPLAINT NO. 368:** Reliance Trust admits that as of June 28, 2024, the Department of Labor's website contained the language in the block quote, except that it does not contain any bolded language. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 368.

**COMPLAINT NO. 369:** The Form 5500 requires that the administrator of qualified employee benefit plan report the total plan assets at the beginning and end of each year. The Form 5500 must be true and accurate and signed under penalty of perjury. Appvion, as the plan administrator, filed the following Form 5500s which attested to the value of PDC's stock and the total market of the employer securities held by the ESOP based on that value:

|  | Year | Date Signed | Defendants who Signed | Reported Value of Employer Securities (Start of Year) | Reported Value of Employer Securities (Year End) |
|---|---|---|---|---|---|
| 1 | 2001 | 10 Oct 2002 | Paul Karch | $0 | $137,518,892 |
| 2 | 2002 | 10 Oct 2003 | Paul Karch | $137,518,892 | $254,978,678 |
| 3 | 2003 | 12 Oct 2004 | Paul Karch | $254,978,678 | $284,873,363 |
| 4 | 2004 | 12 Oct 2004 | Paul Karch | $284,873,363 | $309,272,898 |

137

| | Year | Date Signed | Defendants who Signed | Reported Value of Employer Securities (Start of Year) | Reported Value of Employer Securities (Year End) |
|---|---|---|---|---|---|
| 5 | 2005 | 11 Oct 2006 | Paul Karch | $309,272,898 | $337,343,349 |
| 6 | 2006 | 15 Oct 2007 | Thomas Ferree | $337,343,349 | $391,025,949 |
| 7 | 2007 | 15 Oct 2008 | Thomas Ferree | $391,025,949 | $375,522,369 |
| 8 | 2008 | 13 Oct 2009 | Thomas Ferree | $375,522,369 | $231,347,332 |
| 9 | 2009 | 18 Aug 2010 | Thomas Ferree | $231,347,332 | $135,854,254 |
| 10 | 2010 | 14 Oct 2011 | Thomas Ferree | $135,854,254 | $125,644,210 |
| 11 | 2011 | 11 Oct 2012 | Thomas Ferree | $125,644,210 | $140,503,114 |
| 12 | 2012 | 18 July 2013 | Thomas Ferree | $140,503,114 | $156,527,589 |
| 13 | 2013 | 4 Sep 2014 | Thomas Ferree | $156,527,589 | $134,872,305 |
| 14 | 2014 | 30 Sep 2015 | Thomas Ferree | $134,872,305 | $85,215,116 |
| 15 | 2015 | 22 Aug 2016 | Thomas Ferree | $85,215,116 | $86,423,915 |
| 16 | 2016 | 31 Aug 2017 | | $86,423,915 | $67,177,046 |

Source: Compiled from Form 5500s.

**RESPONSE TO COMPLAINT NO. 369:** Reliance Trust admits that Form 5500s typically report the total plan assets at the beginning and end of each year, and that Form 5500s may be signed under penalty of perjury. The chart in paragraph 369 purports to reflect the reported value of employer securities, rather than total plan assets. Reliance Trust admits that the Appleton Papers Retirement Savings and Employee Stock Ownership Plan Form 5500 for 2012 appears to have been signed by Thomas Ferree on July 18, 2013, and reports $140,503,113 as the value of employer securities at the start of the year and $156,527,589 at the end of the year. Reliance Trust admits that the Appvion Inc. Retirement Savings and Employee Stock Ownership Plan Form 5500 for 2013 appears to have been signed by Thomas Ferree on September 4, 2014, and reports $156,527,589 as the value of employer securities at the start of the year and $134,872,305 at the end of the year. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 369.

**COMPLAINT NO. 370:** The Form 5500 required the plan administrator to report any non-exempt party-in-interest transactions defined consistent with - prohibited transactions defined

consistent with ERISA § 406 (See Counts XXI-XXV below). Each of Appvion's Form 5500s from 2001 to 2017 reported that there were no such transactions.

**RESPONSE TO COMPLAINT NO. 370:** Reliance Trust admits that Form 5500s typically require a response to the question: "Were there any nonexempt transactions with any party-in-interest?" Reliance Trust admits the Appleton Papers Retirement Savings and Employee Stock Ownership Plan Form 5500 for 2012 and the Appvion Inc. Retirement Savings and Employee Stock Ownership Plan Form 5500 for 2013 each responded "No" to that question on page 4 of Schedule H of the Form 5500. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 370.

**COMPLAINT NO. 371:** None of the Form 5500s report any investigations or corrective action. In particular, none of them report any investigation or corrective action after the treatment of BemroseBooth in the 2007/2008 valuations. Further, each Form 5500 reports that there were no losses as a result of any dishonest or fraudulent acts.

**RESPONSE TO COMPLAINT NO. 371:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 371.

**COMPLAINT NO. 372:** These Form 5500s represent steps taken in furtherance of the course of conduct of fraudulent concealment. Each one reaffirmed the prior stock prices and the value of the stock held by the ESOP. Further, while these were signed by Karch and Ferree and not the entire ESOP Committee, they were official filings that would necessarily have been approved by the ESOP Committee.

**RESPONSE TO COMPLAINT NO. 372:** To the extent the allegations in paragraph 372 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 372.

5. **In 2002 Buth, Karch, Parker, Fantini, and State Street Collectively Took at Least 9 Separate Steps to Fraudulently Conceal that Each Earlier PDC Stock Price Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

   a. **Step 1: Buth, Karch, Parker and Fantini Fraudulently Represented that State Street Had Control.**

**COMPLAINT NO. 373:** On 14 January 2002, on behalf of the ESOP Committee (Buth, Karch, Parker and Fantini), Karch wrote to the ESOP, through its Employee Owners, fraudulently misrepresenting that as 100% shareholder, the ESOP Trustee had "control of the company:"

> Our ESOP holds 100 percent of the company's stock. Our ESOP trustee, as the legal shareholder, is the sole shareholder and thus has control of the company. In Enron's case, their qualified plan held less than 10 percent of the company's total outstanding stock, so the trustee was a minority shareholder who could not influence or affect the governance structure and protect participants' holdings.

**RESPONSE TO COMPLAINT NO. 373:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 373.

**COMPLAINT NO. 374:** The ESOP Trustee had no such control.

**RESPONSE TO COMPLAINT NO. 374:** To the extent the allegations about the "ESOP Trustee" in the first sentence of paragraph 374 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 374.

**COMPLAINT NO. 375:** This misrepresentation was a step taken in furtherance of Buth, Karch, Parker, Fantini and State Street's course of fraudulent concealment to conceal that on 9 November 2001, the ESOP's $10 per share purchase of 100% of the PDC stock was for more than fair market value. It also concealed that Buth, Karch, Houlihan and State Street had participated together in the fraud, had breached their fiduciary duties to the ESOP, had misrepresented Houlihan's independence and that the ESOP transaction should not have gone forward.

**RESPONSE TO COMPLAINT NO. 375:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 375.

### b.  Step 2: Buth, Karch, Parker, and Fantini Fraudulently Represented that Appvion's Executive's Interests Were Aligned with the ESOP's Employee Owners' Interests.

**COMPLAINT NO. 376:** In the same 14 January 2002 email, Karch, on behalf of the ESOP Committee (Buth, Karch, Parker and Fantini), also misrepresented that Appvion company executives could not sell their stock sooner than the employees:

> Our plan design prevents company executives or other employee group from selling their stock sooner than any other employee since all our stock is in the ESOP. In Enron's situation, company executives owned stock that was not held in their qualified plans. The stock was not subject to the same restrictions on sales as the stock in the qualified plans.

**RESPONSE TO COMPLAINT NO. 376:**  Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 376.

**COMPLAINT NO. 377:** This representation was false and fraudulently incomplete, because Buth, Karch, Parker and Fantini knew that the PDC stock had been fraudulently overvalued at the 9 November 2001 acquisition and, with that inside information, could strategically determine when to leave the company and liquidate their interest in the ESOP. In fact, this is exactly what each of them did.

**RESPONSE TO COMPLAINT NO. 377:**  Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 377.

**COMPLAINT NO. 378:** This misrepresentation was an additional step in furtherance of their course of conduct of fraudulent concealment. This misrepresentation caused the Employee Owners to believe that the senior executives' interests were aligned with the ESOP's, thus covering their tracks and masking the existence of a cause of action regarding the 9 November 2001 transaction.

**RESPONSE TO COMPLAINT NO. 378:**  Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 378.

### c.  Step 3: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented That PDC Stock Was Being Properly Valued.

**COMPLAINT NO. 379:** In the same 14 January 2002 email, Karch, on behalf of the ESOP Committee (Buth, Karch, Parker and Fantini), again took the step of fraudulently misrepresenting that the PDC stock price was being carefully scrutinized and was being properly valued:

The value of our company stock will be determined twice per year by an independent, third party appraiser according to the methodology established by the Department of Labor. **This valuation process provides another level of scrutiny of the company's accounting practices**. Enron stock is publicly traded and its value, including its overvalue, was and is determined by speculators in the stock market.

**The fundamental soundness of Appleton Papers' business and ESOP structure and the potential for extraordinary returns if we achieve our plans have not changed** because of the Enron collapse.

**RESPONSE TO COMPLAINT NO. 379:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 379.

**COMPLAINT NO. 380:** This misrepresentation was an additional step in furtherance of Buth, Karch, Parker and Fantini's course of conduct to fraudulently conceal their misrepresentation that the ESOP's 9 November 2001 $10 purchase of PDC stock was at no more than fair market value because it advised the ESOP, through the Employee Owners, that stock had been properly valued. This masked their earlier fraud, dissuaded the Employee Owners from questioning the 9 November 2001 $10 PDC stock valuation and hid their previous breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 380:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 380.

> d. **Step 4: Buth, Karch, Fantini and State Street Fraudulently Represented that PDC's Stock Price Had Increased from $10 to $12.81 as of 31 December 2001.**

**COMPLAINT NO. 381:** In late February or early March 2002, State Street reported that the fair market value of PDC's stock was $12.81 per share as of 31 December 2001. On 12 March 2002, the ESOP Committee (Buth, Karch, Parker, and Fantini) reported this stock price in an email to the Employee Owners. The ESOP Committee reported this was a 28 percent jump over the $10 a share valuation at 9 November 2001, just 52 days earlier:

**PDC Stock Value Jumps Over 28 Percent**

Willamette Management Associates has completed its first valuation of Paperweight Development Corp. stock and determined that the per share value increased from $10.00 per share to $12.81 per share or 28.1 percent for the period Nov. 9, 2001, through Dec. 31, 2001.

**RESPONSE TO COMPLAINT NO. 381:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 381.

**COMPLAINT NO. 382:** The email fraudulently represented that $12.81 was PDC stock's fair market value:

> The Willamette's valuation considers such factors as the purchase price we paid, company performance in November and December 2001 and comparable market factors to determine our company's fair market value and, in turn, the stock value.

**RESPONSE TO COMPLAINT NO. 382:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 382.

**COMPLAINT NO. 383:** The stock price and the ESOP Committee's fraudulent representations about the stock price and the valuation were affirmative acts by the ESOP Committee (Buth, Karch, Parker and Fantini) and State Street that fraudulently concealed their breaches of fiduciary duty in connection with both the 2001 Transaction (by reaffirming the initial purchase price and share value) and the 31 December 2001 valuation (by representing that they had applied a proper process and that the $12.81 share price was fair market value).

**RESPONSE TO COMPLAINT NO. 383:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 383.

**COMPLAINT NO. 384:** The ESOP Committee (Buth, Karch, Parker, and Fantini) and State Street knew that $12.81 was not the fair market value of the PDC stock because that price was inflated at least by (1) the failure to deduct $73.1 million in pension and post retirement debt, and $7.3 million in "Other" debt (Excluded Debt totaling $80.4 million) which Buth, Karch, Parker, Fantini, and State Street knew about; and (2) a fraudulent control premium of approximately $83.6 million. With adjustments for just these two items, PDC's actual fair market value as of 31 December 2001, was negative $27.1 million resulting in a PDC stock price of negative $2.54. But had Buth, Karch, Parker, Fantini and State Street disclosed this negative value, it would have revealed that the $10 PDC stock value at the 9 November 2001 ESOP closing had also been fraudulently inflated and that Appvion had no equity value. It would also have disclosed that Appvion's true, but undisclosed, financial condition did not justify and did not support the ESOP 9 November 2001 ESOP transaction and that Buth, Karch, State Street and Houlihan had breached their fiduciary duties to the ESOP.

**RESPONSE TO COMPLAINT NO. 384:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 384.

e. **Step 5: Buth, Karch and Fantini Fraudulently Represented that the $12.81 Million Valuation Validated the ESOP Purchase Price.**

**COMPLAINT NO. 385:** In the same 12 March 2002 email, Buth fraudulently represented that the $12.81 valuation validated the ESOP purchase price:

> Doug Buth, chief executive officer, said that this jump in stock value is good news for employees who invested in PDC stock on Nov. 8 and confirms the transaction team's belief that the ESOP bought the company for an attractive price.

**RESPONSE TO COMPLAINT NO. 385:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 385.

**COMPLAINT NO. 386:** Buth also explained that PDC's debt drove the valuations:

> "We got a good deal, we arranged a strong financing package and we were able to keep the cash at closing so we borrowed less than we expected," said Buth, "Those were foundations of the appraiser's valuation."

> Buth emphasized that future valuations primarily will reflect our repayment of debt, which depends on our earnings and cash flow, and any changes in valuation as we grow and transform our company.

**RESPONSE TO COMPLAINT NO. 386:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 386.

**COMPLAINT NO. 387:** These representations constituted further steps taken by the ESOP Committee (Buth, Karch, Parker and Fantini) to cover their tracks because they knew that $12.81 was not the fair market value of the PDC stock.

**RESPONSE TO COMPLAINT NO. 387:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 387.

f. **Step 6: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented That PDC Stock Value Had Increased to $18.58 as of 30 June 2002.**

**COMPLAINT NO. 388:** In early August, State Street reported that the fair market value of PDC's stock was $18.58 as of 30 June 2002. After its valuation review, the ESOP Committee (Buth, Karch, Parker and Fantini) took the step of releasing this fraudulently inflated PDC stock price to the ESOP, through its Employee Owners.

**RESPONSE TO COMPLAINT NO. 388:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 388.

**COMPLAINT NO. 389:** Buth, Karch, Parker, Fantini and State Street again knew this valuation was fraudulent for the same reasons described in connection with the 31 December 2001 stock price release of $12.81. Had the 30 June 2002 valuation subtracted just the Excluded Debt and the fraudulent control premium, it would have likewise reported dramatic decline in the PDC stock price and would have alerted the Employee Owners that the 9 November 2001 and the 31 December 2001 valuations had, likewise, been fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 389:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 389.

**COMPLAINT NO. 390:** By perpetuating the same errors that were contained in the earlier valuations, the $18.58 stock price fraudulently masked and concealed that both the 9 November 2001 stock price of $10 and the 31 December 2001 stock price of $12.81 had been fraudulently inflated and did not reflect fair market value. It also masked and concealed the earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 390:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 390.

g.      **Step 7: Buth, Karch, Parker and Fantini Fraudulently Represented That PDC Was Being Properly Valued.**

**COMPLAINT NO. 391:** On 13 August 2002, the ESOP Committee (Buth, Karch, Parker and Fantini) took the step of releasing an email to the ESOP, through its Employee Owners, with the subject "Calculating the stock value," which fraudulently explained how the 30 June 2002 stock price had been calculated. The email emphasized that State Street "conducts the valuation" while relying upon Willamette:

> Some employees have wondered how the June 30 stock value was calculated.
>
> Remember that our **trustee, State Street Global Advisors, conducts the valuation. SSGA relies upon Willamette Management Associates to perform an appraisal** of Appleton Papers and PDC to assist in determining the value of PDC stock. Willamette considers both income and market factors to determine stock value. **The stock value is the product of a rigorous and complicated process that ultimately requires professional judgment to complete**. As you know, the performance of the U.S. economy and the stock markets have not helped most publicly traded companies.

**RESPONSE TO COMPLAINT NO. 391:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 391.

**COMPLAINT NO. 392:** The email went on to explain the impact of interest-bearing debt and various non-cash charges on the valuation, while omitting, among other things, that the 30 June 2002 valuation failed to subtract the Excluded Debt and added a fraudulent control premium and had not been properly prepared.

**RESPONSE TO COMPLAINT NO. 392:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 392.

**COMPLAINT NO. 393:** This representation by Buth, Karch, Parker and Fantini was an additional step in furtherance of their course of conduct of fraudulent concealment that the previous $10, $12.81 and $18.58 PDC stock valuations had also been fraudulently inflated and were not fair market value. It also masked and concealed earlier fiduciary breaches by assuring the ESOP, through its Employee Owners, that the previous stock prices resulted from a rigorous and reliable process that arrived at the "value of PDC stock" and thus prevented suspicion and further investigation.

**RESPONSE TO COMPLAINT NO. 393:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 393.

### h. Steps 8 and 9: Buth and Parker Attested to and Parker Signed Two 10-Q's That Concealed That Each of the Previous Valuations Had Been Fraudulently Inflated.

**COMPLAINT NO. 394:** In 2002, Buth and Parker attested to and Parker signed two (2) 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the earlier valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 30 Jun 02 | 13 Aug 02 | $112.1 million | Buth, Parker |
| 29 Sep 02 | 12 Nov 02 | $133.8 million | Buth, Parker |

**RESPONSE TO COMPLAINT NO. 394:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 394.

**COMPLAINT NO. 395:** Because the stock value was inflated, each of these representations was fraudulent and in furtherance of Buth and Parker's course of conduct to

fraudulently conceal that each earlier PDC stock price had been fraudulently inflated and that Buth and Parker were breaching their fiduciary duties in connection with those valuations.

**RESPONSE TO COMPLAINT NO. 395:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 395.

> **6.** **In 2003, Buth, Karch, Fantini and State Street Collectively Took at Least 9 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**
>
> **a.** **Step 1: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented that PDC's Fair Market Value was $21.92 as of 31 December 2002.**

**COMPLAINT NO. 396:** In February 2003, State Street reported that the fair market value of PDC's stock was $21.92 as of 31 December 2002. After its review of the valuation, on 19 February 2003, the ESOP Committee (Buth, Karch, Parker and Fantini) released the 31 December 2002 PDC stock price to the ESOP, through its Employee Owners. The reported (but fraudulent) stock price purportedly increased 18 percent to $21.92:

> **Company Stock Value Rises 18 Percent**
>
> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of December 31, 2002 and **determined the per share value to be $21.92**. That means the **share value increased 18 percent for the period July 1, 2002, through December 31, 2002. The previous value of PDC stock was $18.58 per share**.
>
> As a result, $50,000 invested in PDC stock by an Appleton employee on the day we purchased the company is now worth $109,600, an increase of nearly 120 percent since the November 2001 buyout of the company.
>
> **SSGA relied upon Willamette Management Associates** to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock.
>
> Willamette uses both a market approach and an income approach to value stock. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions. The income approach considers our past and projected earnings, cash flow and debt repayment.

**RESPONSE TO COMPLAINT NO. 396:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 396.

**COMPLAINT NO. 397:** This email was an additional step in furtherance of Buth, Karch, Parker, Fantini and State Street's course of conduct to fraudulently conceal that each of the previously released PDC stock prices (9 November 2001, 31 December 2001 and 30 June 2002) and Redeemable Common Stock entries had been fraudulently inflated and did not reflect fair market value. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 397:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 397.

**COMPLAINT NO. 398:** Had just the Excluded Debt ($78.8 million) and the fraudulent control premium ($75.1 million) been subtracted, the adjusted stock value would have been $100.2 million, or $8.64 a share as opposed to the fraudulently reported $21.92 per share, and it would have disclosed to the Employee Owners that each of the earlier PDC stock valuations had been fraudulently inflated. It would also have disclosed the earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 398:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 398.

> **b.** **Steps 2 and 3: In March and September 2003, Buth, Karch, Fantini and Parker Fraudulently Represented a Progression of Stock Increases.**

**COMPLAINT NO. 399:** ESOP Committee members Buth, Karch, Fantini and Parker authorized the release of the March 2003 and September 2003 edition of the "Ownership Update" newsletter to the Employee Owners. The March 2003 edition contained a graphic showing a progression of fraudulently inflated PDC stock prices:

**Figure 16: The Ownership Update, March 2003, PDC Stock Value Up 18 Percent**



Source: The Ownership Update, March 2003, p. 1

**RESPONSE TO COMPLAINT NO. 399:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 399.

**COMPLAINT NO. 400:** The September 2003 edition contained a similar graphic:

**Figure 17: The Ownership Update, September 2003, PDC Stock History**



Source: The Ownership Update, September 2003, p.1.

**RESPONSE TO COMPLAINT NO. 400:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 400.

**COMPLAINT NO. 401:** These graphics further demonstrate the role each fraudulent stock price played in concealing that the previous stock prices had been fraudulently inflated and constituted a further representation that the series of stock prices had been properly calculated.

**RESPONSE TO COMPLAINT NO. 401:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 401.

**COMPLAINT NO. 402:** Buth, Karch, Fantini and Parker's release of these graphics to the Employee Owners, were additional steps in furtherance of their course of conduct of fraudulent concealment that each earlier stock price had likewise been fraudulently inflated. They also masked and concealed their earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 402:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 402.

c. **Step 4: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented That PDC's Fair Market Value was $22.42 as of 30 June 2003.**

**COMPLAINT NO. 403:** In August 2003, State Street reported to the ESOP Committee (Buth, Karch, Parker and Fantini) that the fair market value of PDC's stock was $22.42 as of 30 June 2003. After its review of the valuation with State Street and Willamette, on 13 August 2003, the ESOP Committee (Buth, Karch, Parker and Fantini) released the 30 June 2003 PDC stock price to the ESOP, through its Employee Owners.

**Company Stock Value Rises Two Percent**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of June 30, 2003 and determined the per share value to be $22.42. That means the share value increased 2.2 percent for the period January 1, 2003, through June 30, 2003. The previous value of PDC stock was $21.92 per share.

As a result, $50,000 invested in PDC stock by an Appleton employee on the day we purchased the company is now worth $112,100, an increase of nearly 124 percent since the November 2001 buyout.

**SSGA relied upon Willamette Management Associates** to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock.

Willamette uses both a market approach and an income approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions. It appears **the new stock price reflects the performance of our core businesses offset by our debt repayment in the first half of the year and the improved valuations of comparable publicly traded companies**.

**RESPONSE TO COMPLAINT NO. 403:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 403.

**COMPLAINT NO. 404:** This email and stock price release was an additional step in furtherance of Buth's, Karch's, Parker's, Fantini's and State Street's course of conduct to fraudulently conceal that each of the previously disclosed PDC stock prices had been fraudulently inflated and did not reflect fair market value. It also masked and concealed their earlier fiduciary breaches.

          **d.**    **Step 5: State Street Authored a Newsletter to Employees that Fraudulently Represented That It Was Fully Investigating the Valuations.**

In a September 2003 "Ownership Update" newsletter distributed to employees and approved by the ESOP Committee (Buth, Karch, Parker, and Fantini), Driscoll described State Street's goal of providing "the highest quality fiduciary services" by being a "knowledgeable and proactive fiduciary acting on behalf of the ESOP." Driscoll also described the valuation process, including meetings with members of the Board of Directors:

> We hired Willamette Management Associates, a well-known and respected firm, as our financial advisor **to assist us with our responsibilities for overseeing the plan's investment in PDC stock** and for determining the appropriate value for the stock.

> With the help of our financial advisors, **our oversight of PDC stock includes frequent monitoring of Appleton's financial condition and the stock's performance**. To that end, Willamette and State Street perform due diligence meetings with Appleton management during the year. **A State Street representative attends at least one Appleton board meeting each year and conducts meetings with the outside directors that serve on Appleton's board**.

> Throughout this oversight process, **State Street and Willamette build a greater understanding of Appleton's business operations, the basis for**

**your company's financial projections, and the risks and likelihood of meeting those projections.**

Twice per year, as of June 30 and December 31, State Street determines the value of PDC stock. In its role as financial advisor, **Willamette performs an extensive analysis that calculates Appleton's value based on approaches they believe are appropriate** for Appleton's business....

Source: The Ownership Update, September 2003; emphasis added.

**RESPONSE TO COMPLAINT NO. 404:** It is unclear whether the text following the header beginning "Step 5" is meant to be a separate numbered paragraph, and so Reliance Trust responds to it as if it were a part of paragraph 404. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 404.

**COMPLAINT NO. 405:** This was in furtherance of the course of conduct to fraudulently represent the stock values as being the result of a prudent process and accurately representing the fair market value, even though State Street and the ESOP Committee (Buth, Karch, Parker, and Fantini) knew the stock prices were at all times inflated.

**RESPONSE TO COMPLAINT NO. 405:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 405.

e.  **Steps 6, 7, 8, and 9: Buth, Karch and Parker Signed the 10-Ks, Buth and Parker Attested to and Parker Signed the 10-Qs that Fraudulently Concealed that Each of the Previous PDC Stock Prices had been Fraudulently Inflated.**

f.  **Buth, Karch and Parker Signed the 2002 10-K.**

**COMPLAINT NO. 406:** On 8 March 2003, Buth, Karch, and Parker signed Appvion's 2002 10-K which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value of $22.42; and (2) listed the value of PDC's Redeemable Common Stock as $104.6 million, which incorporated and relied upon the year-end stock value. Because the stock value was inflated, each of these representations was fraudulent and in furtherance of Buth, Karch, and Parker's course of conduct to fraudulently conceal that each earlier PDC stock price had been fraudulently inflated and that Buth, Karch, and Parker were breaching their fiduciary duties in connection with those valuations.

**RESPONSE TO COMPLAINT NO. 406:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 406.

g. **Buth and Parker Attested to and Parker Signed Three 10-Qs in 2003.**

**COMPLAINT NO. 407:** In 2003, Buth and Parker attested to and Parker signed three (3) 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 30 Mar 03 | 12 May 03 | $144 million | Buth, Parker |
| 29 Jun 03 | 11 Aug 03 | $138.1 million | Buth, Parker |
| 28 Sep 03 | 7 Nov 03 | $160.5 million | Buth, Parker |

**RESPONSE TO COMPLAINT NO. 407:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 407.

**COMPLAINT NO. 408:** Because the stock value was inflated, each of these representations was fraudulent and in furtherance of Buth and Parker's course of conduct to fraudulently conceal that each earlier PDC stock price had been fraudulently inflated and that Buth and Parker had breached their fiduciary duties in connection with those valuations.

**RESPONSE TO COMPLAINT NO. 408:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 408.

7. **In 2004, Buth, Karch, Parker, Fantini and State Street Collectively Took at Least 9 Steps to Fraudulently Conceal Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated.**

a. **Step 1: Buth, Karch, Parker, Fantini and State Street Fraudulently Represented the PDC Stock Price Increased to $23.36 as of 30 December 2003.**

**COMPLAINT NO. 409:** In February 2004, State Street reported to the ESOP Committee that the share price was $23.36 per share as of 31 December 2003. The ESOP Committee (Buth, Karch, Parker and Fantini) reviewed and then released this fraudulently inflated PDC stock price:

**Company Stock Value Rises Four Percent**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of December 31, 2003 and determined the per share value to be $23.36. That means the share value increased 4.2 percent for the period July 1, 2003, through December 31, 2003. The previous value of PDC stock was $22.42 per share.

153

> As a result, $50,000 invested in PDC stock by an Appleton employee on the day we purchased the company is now worth $116,800, an increase of over 133.6 percent since the November 2001 buyout.
>
> SSGA relied upon Willamette Management Associates to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock. Willamette uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

Source: Internal communication, "Company Stock Value Rises Four Percent," 24, Feb 04.

**RESPONSE TO COMPLAINT NO. 409:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 409.

**COMPLAINT NO. 410:** Adjusting for just the Excluded Debt ($107.6 million) and the fraudulent control premium ($83.6 million), the adjusted fair market value would have been reported at $92.1 million, or $7.59 per share as opposed to the fraudulently reported $23.36 per share.

**RESPONSE TO COMPLAINT NO. 410:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 410.

**COMPLAINT NO. 411:** The fraudulent representations was an additional step in furtherance as part of Buth, Karch, Parker, Fantini and State Street's course of conduct to fraudulently conceal that each of the previously reported PDC stock prices (and Redeemable Common Stock entries) had been fraudulently inflated and did not reflect fair market value. It also masked and concealed their earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 411:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 411.

      **b.**     **Step 2 and 3: Buth, Karch, Fantini and Parker Fraudulently Represented a Progression of Increasing Stock Prices.**

**COMPLAINT NO. 412:** Buth, Karch, Fantini and Parker authorized the release of the March 2004 edition of the Ownership Update newsletter. The March 2004 edition contained a graphic showing a progressive of fraudulently inflated PDC stock prices:

**Figure 18: The Ownership Update, March 2004, PDC Stock History**



Source: The Ownership Update, March 2003, p. 1.

**RESPONSE TO COMPLAINT NO. 412:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 412.

**COMPLAINT NO. 413:** The November 2004 edition contained a similar graphic:

**Figure 19: The Ownership Update, November 2004, PDC Stock History**



Source: The Ownership Update, November 2004, p. 2.

**RESPONSE TO COMPLAINT NO. 413:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 413.

**COMPLAINT NO. 414:** Again, these graphics fraudulently represented a continuing stream of increasing stock prices, thus fraudulently concealing that each earlier stock price had been fraudulently overstated. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 414:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 414.

    c.    **Step 4: Buth, Karch, Parker and Fantini Fraudulently Represented the Reason for Buth's Departure.**

**COMPLAINT NO. 415:** On 3 May 2004, Karch, on behalf of the ESOP Committee (Buth, Karch, Parker and Fantini), addressed the Employee Owners concerns regarding the departure of 49-year old CEO and Chairman of the Board, Doug Buth:

> Thank you for the feedback you have given to members of our executive team regarding the announcement of Doug Buth's retirement plans. Following are answers to the most commonly asked questions from employees.
>
> **Does Doug's announcement signal the company is not doing well?**
>
> No. Our first quarter results were strong across all our businesses. Doug is giving the board of directors' ample notice so they can find the best qualified individual to succeed him in an effective transition and so we can

continue our growth efforts during that process. If Doug had given two weeks' notice, there might be reason for concern.

**Why is Doug leaving at such a young age?**

Young is a relative term, but after serving as CEO for nearly six years, Doug has the desire and resources to begin a new phase in his life.

**RESPONSE TO COMPLAINT NO. 415:** Reliance Trust lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 415.

**COMPLAINT NO. 416:** This announcement is fraudulent incomplete and fails to state additional or qualifying matter. (Restatement 2nd Torts, §529) It fails to disclose that Buth knew that the PDC stock values (and Redeemable Common Stock entries) had been fraudulently misrepresented from the ESOP's initial 9 November 2001 transaction, that the acquisitions Buth orchestrated after that date were proving disastrous and were incapable of causing Appvion to grow out of its undisclosed financial hole and, that only by leaving at that date, could Buth benefit from his participation in the ongoing fraud and course of fraudulent concealment.

**RESPONSE TO COMPLAINT NO. 416:** Reliance Trust lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 416.

**COMPLAINT NO. 417:** This announcement constitutes an additional step in Buth, Karch, Parker and Fantini's course of fraudulent concealment.

**RESPONSE TO COMPLAINT NO. 417:** Reliance Trust lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 417.

> d. **Step 5: Buth, Karch, Parker, Fantini and State Street Fraudulently Misrepresented that PDC's Stock Price Had Risen to $26.09 as of 30 June 2004.**

**COMPLAINT NO. 418:** In July or August 2004, State Street reported to the ESOP Committee that the stock was valued at $26.09 per share as of 30 June 2004. After a review of the valuation, on 9 August 2004, the ESOP Committee (Buth, Karch, Parker and Fantini) released the stock price to the ESOP, through its Employee Owners. The reported but fraudulent stock price purported to increase 11.7 percent to $26.09:

**Company Stock Value Up Over 11 Percent**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of June 30, 2004 and determined the per share value to be $26.09. That means the share value increased 11.7

percent for the period January 1, 2004, through June 30, 2004. The previous value of PDC stock was $23.36 per share.

As a result, $50,000 invested in PDC stock by an Appleton employee on the day we purchased the company is now worth $130,450, an increase of nearly 160.9 percent since the November 2001 buyout.

SSGA relied upon Willamette Management Associates to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock.

Willamette uses both a market approach and an income approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

**RESPONSE TO COMPLAINT NO. 418:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 418.

**COMPLAINT NO. 419:** Had just the Excluded Debt ($110.8 million) and the fraudulent control premium ($118.4 million) been subtracted, the adjusted stock value would have been $75.8 million, or $6.46 a share as opposed to the fraudulently reported $26.09 per share. And it would have disclosed that each of the earlier PDC stock valuations had been fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 419:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 419.

**COMPLAINT NO. 420:** This release of the PDC stock price was an additional step in furtherance of Buth, Karch, Parker, Fantini and State Street's course of conduct to fraudulently conceal that each of the previously released PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated and did not reflect fair market value. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 420:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 420.

    e.     **Steps 6, 7, 8, and 9: Buth and Parker Attested to and Parker Signed Three 10-Qs and Buth, Karch and Parker Signed a 10-K that Fraudulently Concealed that Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

**COMPLAINT NO. 421:** On 24 March 2004, Buth, Parker, and Karch signed Appvion's 2003 10-K which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value OF $26.36; and (2) listed the value

of PDC's Redeemable Common Stock as $159.3 million, which incorporated and relied upon the year-end stock value.

**RESPONSE TO COMPLAINT NO. 421:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 421.

**COMPLAINT NO. 422:** In 2004, Buth and Parker also attested to and Parker signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 4 Apr 04 | 17 May 04 | $168.9 million | Buth, Parker |
| 4 July 04 | 16 Aug 04 | $163.2 million | Buth, Parker |
| 3 Oct 04 | 11 Nov 04 | $165.8 million | Buth, Parker |

**RESPONSE TO COMPLAINT NO. 422:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 422.

**COMPLAINT NO. 423:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Buth, Parker, and Karch's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had been fraudulently inflated and that Buth Parker, and Karch were breaching their fiduciary duties in connection with those disclosures.

**RESPONSE TO COMPLAINT NO. 423:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 423.

8. **In 2005, Richards, Buth, Karch, Parker and State Street Collectively Took at Least 7 Steps to Fraudulently Conceal That Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

   a. **Step 1: Buth, Karch, Parker and State Street Fraudulently Represented that PDC's Stock Price had risen to $26.36 as of 30 December 2004.**

**COMPLAINT NO. 424:** After reviewing the valuation, on 24 February 2005, the ESOP Committee (Buth, Karch and Parker) released the fraudulently inflated PDC stock price for 30 December 2004 of $26.36 per share:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock as of December 31, 2004 and

159

determined the per share value to be $26.36. That means the share value increased 1 percent for the period of June 30, 2004 through December 31, 2004. The previous value of PDC stock was $26.09 per share. The percent increase for full-year 2004 was 12.8%.

**RESPONSE TO COMPLAINT NO. 424:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 424.

**COMPLAINT NO. 425:** As described in Paragraphs 156-158, Willamette's key valuation personnel responsible for the Appvion valuations, including Bob Socol and Scott Levine, had left Willamette and joined Stout and continued their work on the PDC stock valuations.

**RESPONSE TO COMPLAINT NO. 425:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 425.

**COMPLAINT NO. 426:** The 31 December 2004 valuation of $26.36 is completely consistent with the prior Willamette-prepared stock valuations and, further demonstrates that Willamette had employed the same fraudulent appraisal methods as Stout.

**RESPONSE TO COMPLAINT NO. 426:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 426.

**COMPLAINT NO. 427:** This stock price release was in furtherance of Both, Karch, Parker and State Street's court of conduct to fraudulently conceal that each of the previously disclosed PDC stock prices had been fraudulently inflated and did not reflect fair market value. It also masked and concealed their earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 427:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 427.

b.      **Step 2: Richards, Karch, Parker and State Street Fraudulently Represented PDC's Stock Price Had Risen to $27.77 as of 30 June 2005.**

**COMPLAINT NO. 428:** On 23 August 2005, the ESOP Committee (Richards, Karch, Parker, and Fantini) sent an email to the ESOP's Employee owners releasing the 30 June 2005 PDC fraudulent stock price of $27.77:

**Company Stock Value Increases Five Percent**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2005 and determined the per share value to be $27.77. That means the share value

increased 5.3 percent for the period January 1, 2005, through June 30, 2005. The previous value of PDC stock was $26.36 per share.

As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $138,850, an increase of nearly 177.7 percent since the November 2001 buyout.

SSGA relied upon Stout Risius Ross to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock.

Stout Risius Ross uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

**RESPONSE TO COMPLAINT NO. 428:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 428.

**COMPLAINT NO. 429:** The release of the fraudulently inflated 30 June 2005 valuation, was a step in furtherance of Richards, Karch, Parker, Fantini and State Street's course of conduct to fraudulently conceal that each of the prior PDC stock valuations and Redeemable Common Stock entries had likewise been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 429:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 429.

**COMPLAINT NO. 430:** It also constituted an independent and separate fraudulent misrepresentation by Richards, Karch, Parker, Fantini and State Street that the fair market value of PDC's stock at 30 June 2005 was $27.77.

**RESPONSE TO COMPLAINT NO. 430:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 430.

c. **Step 3: Richards, Karch, Fantini and Parker Fraudulently Represented a Pattern of Increasing PDC Stock Prices.**

**COMPLAINT NO. 431:** Richards, Karch, Fantini and Parker authorized the release of the April 2005 edition of the Ownership Update newsletter that included a graphic showing a progression of fraudulently inflated PDC stock prices:

**RESPONSE TO COMPLAINT NO. 431:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 431.

**Figure 20: The Ownership Update, April 2005, PDC Stock History**

Source: Source: The Ownership Update, April 2005, p. 2.

**COMPLAINT NO. 432:** This graphic is an additional step in furtherance of their course of conduct to fraudulently conceal that each earlier valuation had been fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 432:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 432.

> d.   **Steps 4, 5, 6 and 7: In 2005, Buth, Richards, Karch and Parker Signed a 10-K and Buth, Richards and Parker Attested to and Parker Signed Three 10-Qs that Fraudulently Concealed that Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

**COMPLAINT NO. 433:** On 31 March 2005, Buth, Karch, and Parker signed Appvion's 2004 10-K filed which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value of $26.36; and (2) listed the value of PDC's Redeemable Common Stock as $159.3 million for 2004 and $158.3 million for 2003.

**RESPONSE TO COMPLAINT NO. 433:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 433.

**COMPLAINT NO. 434:** In 2005, Richards and Parker attested to and Parker signed 10-Qs for the quarters ending 3 April 2005, 3 July 2005 and 2 October 2005. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 3 Apr 05 | 18 May | $162.5 million | Richards, |
| 3 Jul 05 | 15 Aug | $169.6 million | Richards, |
| 2 Oct 05 | 14 Nov | $175.3 million | Richards, |

**RESPONSE TO COMPLAINT NO. 434:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 434.

**COMPLAINT NO. 435:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards, Parker, and Karch's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had been fraudulently inflated and that Richards, Parker, and Karch were breaching their fiduciary duties in connection with those valuations.

**RESPONSE TO COMPLAINT NO. 435:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 435.

9. **In 2006, Richards, Karch, Parker and State Street Collectively Took at Least 9 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated.**

a. **Step 1: Richards, Karch, Parker and State Street Fraudulently Represented that the ESOP Trustee Could Replace Appvion's Board.**

**COMPLAINT NO. 436:** In January 2006, with approval and authorization of the ESOP Committee (Richards, Karch, Parker and State Street), Appvion released an edition of the ESOP Newsletter entitled the Ownership Update. The ESOP Committee posited the following question:

> Enron executives were able to sell their stock and pay themselves large bonuses even when the company was failing, and the employees were not able to sell their stock. Can that happen to us?

**RESPONSE TO COMPLAINT NO. 436:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 436.

**COMPLAINT NO. 437:** The ESOP Committee responded as follows:

No. Our executives are able to own company stock only through the ESOP, so they are not able to sell it any sooner or at a different price than any other participant.

Our company's board of directors has a legal obligation to company shareholders (in our case, the ESOP is the sole shareholder) to prevent the kind of fraud that occurred at Enron. In the event the board of directors does not act, our trustee, State Street Global Advisors, in its capacity as the sole shareholder, could vote to replace the entire board with directors who would act to prevent fraud. At Enron, the ESOP was a minority shareholder and did not control the board.

**RESPONSE TO COMPLAINT NO. 437:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 437.

**COMPLAINT NO. 438:** These representations were fraudulent for the same reason discussed above (State Street could not vote to replace the board) and constituted an additional step to conceal that each of the earlier PDC stock valuations had been fraudulently inflated by continuing to advise the ESOP, through the Employee Owners, that Appvion's executives, directors and ESOP Trustee (State Street) were protecting their interests.

**RESPONSE TO COMPLAINT NO. 438:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 438.

    **b.**    **Step 2: Richards, Karch, Parker and State Street Fraudulently Represented that PDC's Stock Price had Risen to $28.56 as of 31 December 2005.**

**COMPLAINT NO. 439:** After review of the valuation, on 3 March 2006, the ESOP Committee (Richards, Karch and Parker) released the PDC stock price for 31 December 2005, of $28.56 per share:

**Company Stock Value Increased Nearly 3 Percent for Second Half 2005**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2005 and determined the per share value to be $28.65. That means the share value increased 2.8 percent for the period July 1, 2005, through December 31, 2005. The previous value of PDC was $27.77 per share. The percent increase for full-year 2005 was 8.3 percent.

As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $142,800, an increase of nearly 185.6 percent since the November 2001 buyout.

SSGA relied upon Stout Risius Ross to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock. Stout uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions. We will provide more information about the stock valuation process later this year.

**RESPONSE TO COMPLAINT NO. 439:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 439.

**COMPLAINT NO. 440:** This stock price was fraudulently inflated because, among other defects, it failed to deduct the Excluded Debt totaling $118.4 million and included a fraudulent control premium of $115.9 million. Making just these adjustments, PDC fair market value equaled $106.6 million and its adjusted stock price was $8.93, as opposed to the $28.56 that was reported.

**RESPONSE TO COMPLAINT NO. 440:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 440.

**COMPLAINT NO. 441:** The release of the $28.56 stock price was independently fraudulent and it also constituted an additional step to fraudulently conceal that each preceding PDC stock valuation (and Redeemable Common Stock entry) had been fraudulently inflated. Because the 31 December 2005 valuation was consistent with all earlier valuations, it prevented the ESOP, through the Employee Owners, from investigating the earlier valuations and understanding that they had been fraudulently inflated. The responsible defendants include Richards, Karch, Parker and State Street.

**RESPONSE TO COMPLAINT NO. 441:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 441.

c. **Step 3: Richards, Karch and Parker Fraudulently Represented a Pattern of Increasing PDC Stock Prices.**

**COMPLAINT NO. 442:** Richards, Karch, and Parker authorized the release of the April 2006 edition of the Ownership Update newsletter that contained a graphic showing a progressive of fraudulently inflated PDC stock prices:

**Figure 21: The Ownership Update, April 2006 PDC Stock Performance**



Source: The Ownership Update, April 2006, p. 2.

**RESPONSE TO COMPLAINT NO. 442:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 442.

**COMPLAINT NO. 443:** By releasing this graphic, Richards, Karch and Parker fraudulently reaffirmed each earlier PDC stock valuation and thus constituted an additional step of fraudulent concealment.

**RESPONSE TO COMPLAINT NO. 443:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 443.

> d. **Step 4: Richards and Karch Fraudulently Represented State Street and Stout's Careful Analysis**

**COMPLAINT NO. 444:** The May 2006 Ownership Update newsletter was sent to the ESOP, through its Employee Owners, and was prepared under the direction and authorization of the ESOP Committee (Richards, Karch), it emphasized State Street and Stout's careful analysis of the valuations:

> Issuing an opinion
>
> To determine the value to be recommended to State Street, Stout Risius Ross weighs the values from all the factors they believe are appropriate and arrives at the final value. Stout Risius Ross makes a presentation of its analysis to State Street's fiduciary committee, which is comprised of senior investment and other professionals at State Street. The committee reviews findings from Stout Risius Ross and then determines the current price of

166

PDC stock. Stout Risius Ross then issues an opinion to State Street confirming the fair market value of PDC stock.

**RESPONSE TO COMPLAINT NO. 444:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 444.

**COMPLAINT NO. 445:** In the same newsletter, acknowledged the obvious dollar for dollar impact that debt has on PDC's fair market value:

Debt reduction adds value

We reduced the book value of our net debt by $15 million during the valuation period. The $15 million reduction in debt results in a $15 million increase in equity value due to positive cash flow, which was used to repay debt.

**RESPONSE TO COMPLAINT NO. 445:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 445.

**COMPLAINT NO. 446:** The release of this Ownership Update to the ESOP, through its Employee Owners, constituted an additional step to fraudulently conceal that each previous PDC stock valuation and Redeemable Common Stock entry had been fraudulently inflated, by causing the ESOP, through its Employee Owners to believe that each valuation had been carefully and accurately prepared, that it reflected fair market value and that Appvion's debt was being properly deducted to arrive at fair market value.

**RESPONSE TO COMPLAINT NO. 446:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 446.

e.      **Step 5: Richards, Karch, and State Street Fraudulently Represented that PDC's Stock Price Had Risen to $31.27 as of 30 June 2006.**

**COMPLAINT NO. 447:** On 8 August 2006, the ESOP Committee (Richards, Karch) reviewed the valuation and released the fraudulently inflated PDC stock price for 30 June 2006 of $31.27 per share:

**Company Stock Value Increases Over 9% for First Half 2006**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2006 and determined the per share value to be $31.27. That means the share value

increased 9.5% for the period January 1, 2006, through June 30, 2006. The previous value of PDC stock was $28.56 per share.

As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $156,500, an increase of 213% since November.

SSGA relies upon Stout Risius Ross to conduct an appraisal of Appleton and PDC to assist in determining the value of PDC stock. Stout Risius Ross uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions. We will provide more information about this stock valuation as it becomes available to us.

**RESPONSE TO COMPLAINT NO. 447:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 447.

**COMPLAINT NO. 448:** This release constituted an additional step of fraudulent concealment.

**RESPONSE TO COMPLAINT NO. 448:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 448.

> **f.** **Steps 6, 7, 8 and 9: In 2006, Richards, Karch and Parker Signed a 10-K and Richards and Ferree Attested to and Ferree Signed Three 10-Qs that Fraudulently Concealed that Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

**COMPLAINT NO. 449:** On 17 March 2006, Richards, Parker, and Karch signed Appvion's 2005 10-K which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value of $28.56; and (2) listed the value of PDC's Redeemable Common Stock as $185.3 million for 2005 and $159.3 million for 2004.

**RESPONSE TO COMPLAINT NO. 449:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 449.

**COMPLAINT NO. 450:** In 2006, Richards (acting as CEO and as interim CFO) signed and attested to 10-Qs for the quarters ending 2 April 2006, 2 July 2006 and Richards and Ferree attested to and Ferree signed the 1 October 2006 10-Q. These 10-Qs reported fraudulently inflated

entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 2 Apr 06 | 12 May | $188.3 million | Richards (CEO and |
| 2 Jul 06 | 14 Aug | $183.4 million | Richards (CEO and |
| 1 Oct 06 | 13 Nov | $189.3 million | Richards, Ferree |

**RESPONSE TO COMPLAINT NO. 450:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 450.

**COMPLAINT NO. 451:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards, Parker, Karch, and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated and that Richards, Parker, Karch, and Ferree were breaching their fiduciary duties in connection with those valuations.

**RESPONSE TO COMPLAINT NO. 451:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 451.

10. **In 2007, Richards, Ferree, Tyczkowski and State Street Took at least 10 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

a. **Step 1: Richards, Ferree, Tyczkowski and State Street Fraudulently Represented that PDC's Stock Price Had Risen 17.7 percent in 2006.**

**COMPLAINT NO. 452:** After reviewing the valuation, on 2 January 2007, the ESOP Committee (Richards, Ferree and Tyczkowski) emailed the ESOP, fraudulently representing to its Employee Owners, that the fair market value of the PDC stock rose 17.7 percent in value in 2006, outperforming the stock market indices:

Last Friday, the blue-chip Dow Jones industrial average closed at 12,463.15 - up 16.3 percent for 2006.

The Standard & Poor's 500 Index ended at 1,418.30 - up 13.6 percent for 2006.

The Nasdaq Composite Index finished at 2,415.29 - up 9.5 percent for 2006.

PDC stock rose 17.7 percent for 2006.

**RESPONSE TO COMPLAINT NO. 452:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 452.

**COMPLAINT NO. 453:** This release constituted an additional step of fraudulent concealment.

**RESPONSE TO COMPLAINT NO. 453:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 453.

#### b. Step 2: Richards, Ferree, Tyczkowski and State Street Fraudulently Represented that PDC's Stock Price Had Risen to $33.61 as of 31 December 2006.

**COMPLAINT NO. 454:** After review of the valuation, on 2 January 2007, the ESOP Committee (Richards, Ferree and Tyczkowski) released the 31 December 2006 PDC stock price of $33.62 to the ESOP, through its Employee Owners:

> Company Stock Value Increases 7.5 Percent for Second Half 2006
>
> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2006 and determined the per share value to be $33.62. The value of PDC stock on June 30, 2006, was $31.27 per share. That means the share value increased 7.5 percent for the period July 1, 2006, through December 31, 2006.

**RESPONSE TO COMPLAINT NO. 454:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 454.

**COMPLAINT NO. 455:** Had the stock price been adjusted by subtracting just the Excluded Debt ($108.1 million) and eliminating the fraudulent control premium ($117.5 million), the reported PDC stock price would have been $14.22 not the $33.62 that was reported.

**RESPONSE TO COMPLAINT NO. 455:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 455.

**COMPLAINT NO. 456:** The release of the $33.62 PDC stock price constituted an additional step in furtherance of Richards', Ferree's and Tyczkowski's course of conduct to mask and conceal that each of the prior PDC stock valuations had been fraudulently overstated and to mask and conceal their earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 456:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 456.

**COMPLAINT NO. 457:** After review of the valuation, on 10 July 2007, the ESOP Committee (Richards, Ferree and Tyczkowski) emailed the ESOP, through its Employee Owners, reporting the fraudulently inflated 3 June 2007 stock price of $32.89:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2007 and determined the per share value to be $32.89. **The value of PDC stock on December 31, 2006, was $33.62 per share**. That means the share value decreased 2.2 percent for the period January 1 through June 30, 2007.

> As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $164,500, an increase of approximately 229 percent since the November 2001 buyout. During the same period the Dow Jones Industrial Average and the NASDAQ each rose approximately 39 percent, while S&P 500 was up approximately 33 percent.

> **SSGA relied upon Stout Risius Ross, an independent valuation firm, to conduct an appraisal** of Appleton and PDC to assist in determining the value of PDC stock. Stout Risius Ross uses both an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

> **Representatives from Stout Risius Ross indicated that a general softening in market conditions especially for our thermal and performance packaging business negatively affected our company's performance** and caused our share price to fall from the previous valuation. However, Stout Risius Ross also stated that they see no major changes in the fundamentals of our company.

**RESPONSE TO COMPLAINT NO. 457:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 457.

**COMPLAINT NO. 458:** Richards, Ferree, Tyczkowski and State Street knew this valuation was fraudulent and misleadingly described the valuation process. Had the stock price been adjusted by subtracting just the Excluded Debt and by eliminating the fraudulent control premium, the reported PDC stock price would have been vastly lower.

**RESPONSE TO COMPLAINT NO. 458:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 458.

**COMPLAINT NO. 459:** The release of this fraudulent valuation by Richards, Ferree, Tyczkowski and State Street constituted an additional step in furtherance of their course of conduct to fraudulently conceal that each previous PDC stock valuation and Redeemable Common Stock entries had also been fraudulently inflated and concealed their earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 459:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 459.

**COMPLAINT NO. 460:** On 9 November 2007, on behalf of the ESOP Committee (Richards, Ferree and Tyczkowski) Richards emailed the ESOP, through its Employee Owners, marking Appvion's anniversary and highlighting the large gains in stock value:

> Today marks the sixth anniversary of our company becoming employee owned. During that time we have increased our equity stake in the company by $263 million and the value of PDC stock has grown by over 200%. We have made strong progress during our six years as employee owners....

**RESPONSE TO COMPLAINT NO. 460:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 460.

**COMPLAINT NO. 461:** This representation was fraudulent and constituted an additional step by Richards, Ferree and Tyczkowski to fraudulently conceal.

**RESPONSE TO COMPLAINT NO. 461:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 461.

       d.     **Steps 4, 5, 6 and 7: In 2007, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and a 10-K That Fraudulently Concealed That Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

**COMPLAINT NO. 462:** On 6 March 2007, Richards and Ferree signed Appvion's 2006 10-K which contained Appvion's PwC-audited financial statements. The financial statements contained (1) a representation of PDC's year-end stock value of $33.62; and (2) listed the value of PDC's Redeemable Common Stock as $190.5 million for 2006 and $185.3 million for 2005.

**RESPONSE TO COMPLAINT NO. 462:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 462.

**COMPLAINT NO. 463:** In 2007, Richards and Ferree attested to and Ferree signed 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently

inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 2 Apr 07 | 14 May | $194.1 million | Richards, Ferree |
| 1 Jul 07 | 15 Aug | $184.4 million | Richards, Ferree |
| 30 Sep 07 | 12 Nov | $172.2 million | Richards, Ferree |

**RESPONSE TO COMPLAINT NO. 463:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 463.

**COMPLAINT NO. 464:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had likewise been fraudulently inflated and that Richards and Ferree were breaching their fiduciary duties in connection with those valuations.

**RESPONSE TO COMPLAINT NO. 464:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 464.

e.    **Step 8: Appvion Published a Book Praising the 2001 Transaction.**

**COMPLAINT NO. 465:** In 2007, Appvion published a book titled "Appleton: Applying Technology for Performance." The book quotes Karch as saying about the prospectus; "we had our legal and financial advisors there to make sure everything we disclosed was appropriate and in compliance." The book also quoted Driscoll as stating that State Street was "appointed the fiduciary to make sure the transaction was fair from a financial perspective to the ESOP. And it was. Employees would not be paying more than the fair market value to buy Appleton Papers."

**RESPONSE TO COMPLAINT NO. 465:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 465.

**COMPLAINT NO. 466:** This publication served to reaffirm the purchase price for the 2001 Transaction and fraudulently concealed that State Street, Karch, Buth, Parker, and Fantini had breached their fiduciary duties in connection with that transaction and each subsequent valuation.

**RESPONSE TO COMPLAINT NO. 466:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 466.

f. **Step 9: Richards and Willetts went on a Road Show Presenting the Valuation to Employees.**

**COMPLAINT NO. 467:** On 6 December 2007, Richards emailed the ESOP's Employee Owners, announcing an upcoming employee road show to be held during the first quarter of 2008 to, among other things, answer questions about "the valuation process and the stock price:"

**Employee road shows to roll out strategic initiatives**

During the first quarter of next year, Walter Schonfeld, Tom Ferree and Kent Willetts will join me in conducting employee road shows to share key strategic initiatives our board approved at its November meeting. **We also plan to discuss our ESOP, the valuation process and our stock value**. I've asked **Steve Carter, a member of the board of directors and chair of our audit committee, Syd Marzeotti from State Street** Global Advisors - our ESOP trustee, **and Scott Levine from Stout** Risius Ross, the company that conducts the semiannual valuations of our company, **to accompany us to answer your questions**. We look forward to seeing you at those meetings.

**RESPONSE TO COMPLAINT NO. 467:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 467.

**COMPLAINT NO. 468:** This planned road show presentation was also referenced in at least a 9 November 2007 road show. The road show itself took place in first quarter 2008 and would have discussed the valuation as of 31 December 2007 - which, as discussed above in Paragraphs 209-236, deducted BemroseBooth's pension liability from Appvion's value.

**RESPONSE TO COMPLAINT NO. 468:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 468.

**COMPLAINT NO. 469:** This email demonstrates Ferree, Richards, Willetts, and Carter's in-depth knowledge of the valuation process and the PDC stock value.

**RESPONSE TO COMPLAINT NO. 469:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 469.

**11.** **In 2008, Richards, Ferree, Tyczkowski and State Street Collectively Took at Least 8 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

    **a.** **Step 1: Richards, Ferree, Tyczkowski and State Street Fraudulently Represented PDC's Stock Price to be $33.41 per share.**

**COMPLAINT NO. 470:** On 10 January 2008, the ESOP Committee (Richards, Ferree and Tyczkowski) met with State Street (Marzeotti and Williams) and Stout (Levine). Together, they reviewed the 31 December 2007 PDC stock valuation. In addition, Stout's Levine described the valuation process. Of critical importance is the fact that the ESOP Committee had studied the valuation at such depth that they requested highly detailed adjustments. This level of review demonstrates the ESOP Committee's level of valuation review:

> The first item on the agenda was to review the December 31, 2007 stock valuation work as prepared by Stout Risius Ross and approved by State Street Global Advisors. Mr. Levine described the process he used to arrive at the December 31, 2007 valuation.

> Following a general discussion of valuation, a few edits were requested to be made to SSR's presentation to State Street Bank and Trust Company. Ms. Tyczkowski requested that SSR remove references to the insurance litigation settlement as being imminent on page 16, item 3, and Schedule M of the presentation. Mr. Ferree also requested that Glatfelter and Nekoosa be added to the list of carbonless competitors on pages 7 and 25 of the presentation document.

> The ESOP Committee was comfortable with the valuation work and there being no further question or discussion, Messrs. Levine and Williams and Ms. Marzeotti departed the meeting.

Source: Appleton Papers Inc, ESOP Committee meeting minutes, 10 Jan 08.

**RESPONSE TO COMPLAINT NO. 470:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 470.

**COMPLAINT NO. 471:** After its review, on 11 January 2008, the ESOP Committee (Richards, Ferree and Tyczkowski) emailed the ESOP, through its Employee Owners, releasing the 31 December 2007 PDC stock price of $33.41 per share:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2007. SSGA relied upon Stout Risius Ross (SRR), an independent valuation firm, to conduct an appraisal of Appleton and PDC to assist in determining the value

of PDC stock. Our ESOP Administrative Committee has reviewed and approved communication of the new share price.

SSGA has determined the new per share value to be $33.41. The value of PDC stock on June 30, 2007, was $32.89 per share. That means the share value increased 1.6 percent for the period June 30, 2007 through December 31, 2007.

**RESPONSE TO COMPLAINT NO. 471:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 471.

**COMPLAINT NO. 472:** This release constituted an additional step in Richards, Ferree, Tyczkowski and State Street's course of conduct to fraudulently conceal.

**RESPONSE TO COMPLAINT NO. 472:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 472.

**b.** **Step 2: Richards, Ferree and Tyczkowski Fraudulently Disclosed the Impact of BemroseBooth's Pension Liability While Concealing Appvion's Retirement Debt.**

**COMPLAINT NO. 473:** In the same email, the ESOP Committee (Richards, Ferree and Tyczkowski) disclosed that BemroseBooth's performance negatively affected the PDC stock price, blaming, in large part, its "increased pension liabilities:"

Along with the rest of the industry, our performance packaging business struggled throughout the year. Those results were reflected in a negative impact on share value. The year was even tougher for BemroseBooth and its results in the second half of 2007 along with increased pension liabilities for the company produced a significant decrease in share value.

Source: Internal communication, "Company Stock Value Increases 1.6 Percent for Second Half 2007," 11 Jan 08.

**RESPONSE TO COMPLAINT NO. 473:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 473.

**COMPLAINT NO. 474:** The reported stock price of $33.41 per share was fraudulent because, among other reasons, it failed to deduct the Excluded Debt ($69.8 million) and it included the fraudulent control premium ($120.4 million). Had just these amounts been deducted, the PDC reported fair market value would have been $177.8 million and the PDC share price would have been $16.14, not the $33.41 that had been reported.

**RESPONSE TO COMPLAINT NO. 474:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 474.

**COMPLAINT NO. 475:** This fraudulent PDC stock valuation was an additional step in furtherance of the course of conduct of Richards, Ferree, Tyczkowski and State Street to fraudulently conceal that each of the previous valuations and Redeemable Common Stock entries had been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 475:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 475.

**COMPLAINT NO. 476:** This email also confirms Richards, Ferree, Tyczkowski and State Street's actual knowledge of and agreement with the undisputed principal that an increase in retirement-related debt causes an equal decrease in fair market value.

**RESPONSE TO COMPLAINT NO. 476:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 476.

**COMPLAINT NO. 477:** Yet with this knowledge, none of these defendants required that Appvion's retirement related debt totaling $64.3 million be subtracted from the PDC stock's fair market value for the 31 December 2007 valuation. Further, they did not require the restatement of earlier PDC stock valuations or 10-K or 10-Q disclosures to reduce the PDC stock price (and Redeemable Common Stock entry) as a result of the retirement related debt reported on Appvion's balance sheets for earlier periods.

**RESPONSE TO COMPLAINT NO. 477:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 477.

**COMPLAINT NO. 478:** This disclosure that BemroseBooth's increase in pension debt resulted in a decline in the PDC stock value, reasonably caused the ESOP, through its Employee Owners, to conclude that the PDC stock valuations had likewise appropriately reduced PDC's fair market value by the amount of Appvion's pension and post-retirement debt. Thus, it constituted an additional step of fraudulent concealment by Richards, Ferree and Tyczkowski, that each of the earlier PDC stock price and Redeemable Common Stock entries had been fraudulently overstated. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 478:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 478.

c.    **Step 3: Richards, Ferree, Willetts and Arent Fraudulently Represented the Fair Market Value of PDC's Stock to be $26.64 per share.**

**COMPLAINT NO. 479:** On 7 July 2008, the ESOP Committee (Richards, Ferree, Willetts and Arent) met with State Street (Marzeotti) and Stout (Levine) to review the 30 June 2008 PDC stock valuation:

> The Committee reviewed the June 30, 2008 stock valuation prepared by Stout Risius Ross and approved by State Street Global Advisors. Mr. Levin described the process used to arrive at the June 30, 2008 valuation. Following a general discussion, the ESOP Committee accepted the valuation and Mr. Levine and Ms. Marzeotti departed the meeting.
>
> The share price announcement was discussed and a few edits were suggested...

Source: Appleton Papers Inc. ESOP Administrative Committee minutes, 7 Jul 08.

**RESPONSE TO COMPLAINT NO. 479:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 479.

**COMPLAINT NO. 480:** On 7 July 2008, the ESOP Committee (Richards, Ferree, Willetts and Arent) emailed the ESOP, through its Employee Owners, and released the fraudulently inflated 30 June 2008 PDC stock price of $26.64 per share:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2008. SSGA has determined the new per share value to be $26.64. The value of PDC stock on December 31, 2007 was $33.41 per share. That means the share value decreased 20.3% for the period December 31, 2007 through June 30, 2008.
>
> The value of PDC stock has increased approximately 166% since the November 2001 buyout.
>
> During the same period, the Dow Jones industrial average rose approximately 18%, the NASDAQ was up 25% and S&P 500 rose approximately 14%. The S&P Index for paper companies declined 17%.

**RESPONSE TO COMPLAINT NO. 480:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 480.

**COMPLAINT NO. 481:** The ESOP Committee (Richards, Ferree, Willetts and Arent) placed primary blame for the 20.3% decline in the PDC stock price on BemroseBooth. One of the two reasons for BemroseBooth's decline in fair market value was its "big pension liability with future funding requirements:"

**Analysis**

There are two reasons for the drop in value of PDC stock. The primary reason has to do with the performance and market value of BemroseBooth.

**Significant value and pension concerns for BemroseBooth**

BemroseBooth has struggled with difficult economic conditions and tough markets for its products. The company also has a big pension liability with future funding requirements.

Those two factors have hampered Appleton's efforts to sell BemroseBooth and have resulted in a dramatic write down of its value. Based on a professionally managed auction process for the sale of BemroseBooth, the current market value is much less than what was originally paid. That loss of value had a significant negative impact on our stock value.

Source: Internal communication, "Company Stock Value Decreases 20% for First Half 2008," 7 Jul 08.

**RESPONSE TO COMPLAINT NO. 481:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 481.

**COMPLAINT NO. 482:** Again, this disclosure conclusively shows actual knowledge and agreement on the part of Richards, Ferree, Willetts, Arent and State Street of the obvious proposition that retirement related debt causes a dollar for dollar decline in fair market value.

**RESPONSE TO COMPLAINT NO. 482:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 482.

**COMPLAINT NO. 483:** Yet from 31 December 2007 through 31 December 2008, Appvion's separate retirement debt rose from $64.3 million to $154.9 million (an increase of $90.6 million) and yet not a single dollar of the $154.9 million in post-retirement and pension debt was subtracted from PDC's stock's fair market value for that (or any other) year.

**RESPONSE TO COMPLAINT NO. 483:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 483.

**COMPLAINT NO. 484:** While the ESOP Committee (Richards, Ferree, Willetts and Arent) and State Street were willing to blame BemroseBooth's decline in value on its pension liability (in order to divert inquiry from Appvion's disastrous $64 million purchase just five years earlier) they intentionally refused to disclose their own failure to reduce PDC's fair market value resulting from its much larger retirement debt. Because to do so, together with the required reduction for "Other Material Liabilities" debt and the fraudulent control premium, would have required them to report a stock price of negative $4.06.

**RESPONSE TO COMPLAINT NO. 484:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 484.

**COMPLAINT NO. 485:** And this disclosure would have alerted the ESOP, through its Employee Owners, that each prior PDC stock valuation back to 9 November 2001, had, likewise, been fraudulently inflated and that Appvion's financial condition, from the ESOP's formation, could not support the ESOP. It would also have disclosed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 485:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 485.

**COMPLAINT NO. 486:** Therefore, the release of the fraudulently inflated 30 June 2008 PDC stock price of $26.64 was a critical step in furtherance of Richards', Ferree's, Arent's and State Street's course of conduct to fraudulently conceal that each prior PDC stock price had been fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 486:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 486.

      d.    **Step 4: Richards Fraudulently Represented that the Board was Monitoring PDC's Valuations and State Street.**

**COMPLAINT NO. 487:** On 15 August 2008, Richards issued a "Richards Report" communication discussing the August 2008 Board meeting. The communication states that State Street's Marzeotti attended the meeting, which indicates the Board reviewed the valuation as of 30 June 2008. In addition, Ferree and Marzeotti discussed Appvion's financial projections and results with the Board and Ferree "reviewed with the Board the completed sale of BemroseBooth and matters related to that transaction." *See* ¶ 227. The communication also stated that the "audit committee reviewed and approved the quarterly 10-Q filing and earnings release and discussed the oversight and control measures we have in place for the company" and stressed the Board's efforts to understand Appvion's business and work on "best practices for corporate governance, audit and compensation functions." This communication as a whole indicated that the Board was monitoring State Street and the ESOP Committee as well as Appvion's financial performance, which included the stock value.

**RESPONSE TO COMPLAINT NO. 487:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 487.

**COMPLAINT NO. 488:** The Board (Richards, Carter, Murphy, Pace, Reardon, Seifert, and Scherbel) knew that the valuations were improperly failing to deduct the Excluded Debt and they knew that the valuations should be deducting the Excluded Debt - or at a minimum the retirement-related debt as discussed in Paragraphs 197-246. This communication therefore

fraudulently concealed the Board's failure to monitor State Street and the ESOP Committee (Richards, Ferree, Arent, and Willetts) and ensure that the valuations represented the fair market value of PDC's stock.

**RESPONSE TO COMPLAINT NO. 488:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 488.

e. **Steps 5, 6, 7 and 8: In 2008, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K That Fraudulently Concealed That Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

**COMPLAINT NO. 489:** On 11 March 2008, Appvion filed its 2007 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel). The audited financial statements in the 10-K contained (1) a representation of PDC's year-end stock value of $33.41; and (2) listed the value of PDC's Redeemable Common Stock as $69.8 million.

**RESPONSE TO COMPLAINT NO. 489:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 489.

**COMPLAINT NO. 490:** This 10-K also discusses the fact that Appvion was seeking a buyer for BemroseBooth and that it had classified BemroseBooth as discontinued operations, which required separating BemroseBooth's pension liability from Appvion's larger pension liability in its financial statements. Each of the signers of this 10-K had reviewed the 31 December 2007 valuation which deducted BemroseBooth's pension liability from Appvion's overall enterprise value but not Appvion's pension liability. They therefore knew that the valuations should be deducting retirement debt but were not. This 10-K and each subsequent 10-K affirming the valuation therefore concealed the fact that the valuations were improperly excluding Appvion's retirement debt.

**RESPONSE TO COMPLAINT NO. 490:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 490.

**COMPLAINT NO. 491:** In 2008, Richards and Ferree attested to and Ferree signed 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 30 Mar | 12 May | $185.1 million | Richards, Ferree |
| 29 Jun | 11 Aug | $170.1 million | Richards, Ferree |

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 28 Sep | 10 Nov | $169.3 million | Richards, Ferree |

**RESPONSE TO COMPLAINT NO. 491:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 491.

**COMPLAINT NO. 492:** These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter, Scherbel, and Pace).

**RESPONSE TO COMPLAINT NO. 492:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 492.

**COMPLAINT NO. 493:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated the breaches of fiduciary duties in connection with those valuations.

**RESPONSE TO COMPLAINT NO. 493:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 493.

> 12. **In 2009, Richards, and Ferree and State Street took at Least 6 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations has been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**
>
> a. **Step 1: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented PDC's Stock Price to be $21.43 per Share as of 31 December 2008.**

**COMPLAINT NO. 494:** On 8 January 2009, the ESOP Committee (Richards, Ferree, Willetts and Arent) met for the purpose of reviewing the 31 December 2008 PDC stock price valuation with both Stout (Levine) and State Street (Marzeotti and Williams).

**RESPONSE TO COMPLAINT NO. 494:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 494.

**COMPLAINT NO. 495:** Levine reviewed the December 31, 2008 stock price valuation with the committee using the materials previously distributed to committee members. The committee asked questions which were answered by either Mr. Levine or Ms. Marzeotti. Based on the discussion, the committee approved the communication to plan participants of the December 31, 2008 stock price.

**RESPONSE TO COMPLAINT NO. 495:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 495.

**COMPLAINT NO. 496:** On 9 January 2009, the ESOP Committee (Richards, Ferree, Willetts and Arent) released by email the 31 December 2008 PDC stock price of $21.43 to the ESOP, through its Employee Owners:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2008. SSGA has determined the new per share value to be $21.43. The value of PDC stock on June 30, 2008 was $26.64 per share. That means the share value decreased 19.5% for the period July 1, 2008 through December 31, 2008.
>
> **Analysis**
> The drop in PDC stock value was caused by poor company performance that resulted from the country's worst financial crisis since the 1930s. Manufacturing sector performance, in particular, has plunged worldwide. Banks are reluctant to lend money, and businesses and consumers aren't spending.
>
> All of Appleton's major business segments were directly affected by unprecedented increases in raw material, energy, and transportation costs.
>
> **2008 Performance**
> The full-year 2008, the value of PDC stock dropped from $33.41 to $21.43, a decline of 35.8%. By comparison, the Dow Jones Industrial Average dropped 33.8% during 2008. The NASDAQ was down 40.5%, and S&P 500 declined 38.5%. The Dow Jones Index for the paper industry was down 66.59% in the U.S. and 50.09% worldwide. The value of PDC stock has increased approximately 114% since the November 2001 employee buyout of the company.

**RESPONSE TO COMPLAINT NO. 496:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 496.

**COMPLAINT NO. 497:** This representation made by the ESOP Committee (Richards, Ferree, Willetts and Arent) State Street was fraudulent because the $21.43 was not the PDC stock's fair market value. Among other things, the Stout valuation did not deduct $168 million in Excluded Debt and included a fraudulent control premium of $76 million.

**RESPONSE TO COMPLAINT NO. 497:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 497.

**COMPLAINT NO. 498:** With just these adjustments, PDC's reported equity value would have been negative $91.4 million and the PDC stock price would have been negative $9.41.

**RESPONSE TO COMPLAINT NO. 498:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 498.

**COMPLAINT NO. 499:** The release of the fraudulently inflated $21.43 PDC stock price constituted an additional step in furtherance of Richards, Ferree, Willamette, Arent and State Street's course of conduct to fraudulently conceal that each prior PDC stock valuation had, likewise, been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 499:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 499.

        **b.**    **Step 2: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented PDC's Stock price to be $18.87 as of 30 June 2009.**

**COMPLAINT NO. 500:** On 7 July 2009, the ESOP Committee (Richards, Ferree, Willetts and Arent) met for the purpose of reviewing the 30 June 2009 PDC stock valuation with both Stout (Levine and Aziz El-Tahch) and State Street (Marzeotti).

**RESPONSE TO COMPLAINT NO. 500:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 500.

**COMPLAINT NO. 501:** The minutes documenting this meeting are again instructive because they demonstrate the ESOP Committee's practice of reviewing the valuations at a level of detail that allowed them to determine that specific adjustments needed to be made:

> The Committee reviewed the June 30, 2009 stock valuation prepared by Stout Risius Ross and approved by State Street Global Advisors. Mr. Levine described the process used to arrive at the June 30, 2009 valuation. Following a detailed discussion, it was determined that the stock price needed to be adjusted. The ESOP Committee accepted the adjusted valuation. A revised valuation report will be forwarded to the ESOP Committee. Mr. Levine, Mr. El-Tahch and Ms. Marzeotti departed the meeting.

**RESPONSE TO COMPLAINT NO. 501:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 501.

**COMPLAINT NO. 502:** On 14 July 2009, the ESOP Committee (Richards, Ferree, Willetts and Arent) released the 30 June 2009 PDC stock price of $18.87.

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2009. SSGA has determined the new per share value to be $18.87. The value of PDC stock on December 31, 2008 was $21.43 per share. That means the share value decreased 11.9% for the period January 1, 2009 through June 30, 2009.

> **Analysis**
> The first half of 2009 saw several extraordinary events occurring at the same time: unprecedented government efforts to rescue our financial system, skyrocketing unemployment, dismal corporate earnings, a depressed housing market plagued by defaults and foreclosures, and reduced consumer spending.

**RESPONSE TO COMPLAINT NO. 502:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 502.

**COMPLAINT NO. 503:** This representation made by the ESOP Committee (Richards, Ferree, Willetts and Arent) State Street was fraudulent because the $18.87 was not the PDC stock's fair market value. Among other things, the Stout Valuation did not deduct the Excluded Debt and included a fraudulent control premium.

**RESPONSE TO COMPLAINT NO. 503:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 503.

**COMPLAINT NO. 504:** With just these adjustments, PDC's reported equity value and stock would also have been negative.

**RESPONSE TO COMPLAINT NO. 504:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 504.

**COMPLAINT NO. 505:** The release of the fraudulently inflated $18.87 PDC stock price constituted an additional step in furtherance of Richards, Ferree, Willamette, Arent and State Street's course of conduct to fraudulently conceal that each prior PDC stock valuation had, likewise, been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 505:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 505.

**COMPLAINT NO. 506:** The $18.87 PDC stock price, together with its fair market value representation also constituted a separate and independent fraud that set the price for the ESOP's PDC stock purchases until the ESOP released the 31 December 2009 PDC stock price.

**RESPONSE TO COMPLAINT NO. 506:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 506.

       **c.**     **Steps 3, 4, 5 and 6: In 2009, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K that Fraudulently Concealed that Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

**COMPLAINT NO. 507:** On 27 March 2009, Appvion filed its 2008 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel). The audited financial statements in the 10-K contained (1) a representation of PDC's year-end stock value of $21.43 a share; and (2) listed the value of PDC's Redeemable Common Stock as $147.9 million as of 3 January 2009 and $182 million as of 29 December 2007.

**RESPONSE TO COMPLAINT NO. 507:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 507.

**COMPLAINT NO. 508:** The 2008 10-K also contained an important disclosure regarding BemroseBooth that again conclusively demonstrated the knowledge of Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel) that retirement related debt must be subtracted in calculating fair market value:

> Late in 2007, Appleton committed to a formal plan to sell Bemrose Group Limited ("Bemrose"), its secure and specialized print services business based in Derby, England. On August 1, 2008, Appleton completed the sale of Bemrose receiving $3.9 million of cash and $6.4 million of notes receivable to be settled with in 75 and 180 days after closing. In anticipation of the sale transaction and as a result of a decline in the value of the business arising primarily as the result of deteriorating economic conditions and tougher markets for Bemrose products, **as well as increased funding requirements of the Bemrose pension plan arising from negotiations with the plan trustee. Appleton recorded impairment charges aggregating $43.7 million, related to goodwill and other long-lived assets, during 2008.**

**RESPONSE TO COMPLAINT NO. 508:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 508.

**COMPLAINT NO. 509:** As described above, the decline in Bemrose's business was directly attributed to, among other difficulties, the "increased funding requirements of the Bemrose pension plan." And yet, for 2008, the 10-K audited balance sheet reported combined pension and post retirement debt of $154.9 million and "Other" debt of $13.3 million, none of which the ESOP Committee (Richards, Ferree, Willetts and Arent) or State Street required to be subtracted from the PDC stock's fair market value.

**RESPONSE TO COMPLAINT NO. 509:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 509.

**COMPLAINT NO. 510:** In 2009, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 5 Apr 09 | 13 May | $147.4 million | Richards, Ferree |
| 5 Jul 09 | 07 Aug | $135.6 million | Richards, Ferree |
| 4 Oct 09 | 06 Nov | $133.7 million | Richards, Ferree |

**RESPONSE TO COMPLAINT NO. 510:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 510.

**COMPLAINT NO. 511:** These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter, Reardon, and Scherbel).

**RESPONSE TO COMPLAINT NO. 511:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 511.

**COMPLAINT NO. 512:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had likewise been fraudulently inflated and that Richards and Ferree were breaching their fiduciary duties in connection with those valuations.

**RESPONSE TO COMPLAINT NO. 512:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 512.

### 13. In 2010, Richards, Ferree, Willetts, Arent and State Street Collectively Took At Least 6 Steps to Fraudulently Conceal That Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.

#### a. Step 1: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented PDC's Stock Price to be $13.26 as of 30 December 2009.

**COMPLAINT NO. 513:** On 11 January 2010, the ESOP Committee (Richards, Ferree, Willetts and Arent) met for the purpose of reviewing the 31 December 2009 PDC stock price valuation with both Stout (Levine and El-Tahch) and State Street (Marzeotti).

**RESPONSE TO COMPLAINT NO. 513:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 513.

**COMPLAINT NO. 514:** Scott Levine reviewed the December 31, 2009 stock price valuation with the committee using the materials previously distributed to committee members. The committee asked questions which were answered by either Mr. Levine or Ms. Marzeotti.

**RESPONSE TO COMPLAINT NO. 514:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 514.

**COMPLAINT NO. 515:** On 15 January 2010, the ESOP Committee (Richards, Ferree, Willetts and Arent) released by email the 31 December 2009 PDC stock price of $13.26 to the ESOP, through its Employee Owners:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the second half of 2009. SSGA has determined the new per share value to be $13.26.
>
> The value of PDC stock on June 30, 2009 was $18.87 per share. That means the share value decreased 29.7% for the period July 1, 2009 through December 31, 2009.
>
> **Analysis**
> A combination of difficult economic conditions worldwide and weak demand for our carbonless, thermal and packaging products resulted in the company missing its 2009 business forecast. Missing the forecast included a drop in earnings that caused a subsequent decrease in share value. Specifically, the performance of our core paper business resulted in a $3.16 drop in share value. That decrease in value includes the positive contribution of the increase in value of our Encapsys business. The performance and decrease in value of our packaging division resulted in a $3.98 decrease in share value.

Additional offsets to the decreases were a $.95 increase in share value for debt reduction and a $.58 increase for a reduction in the number of outstanding shares and related valuation matters. The December sale of C&H Packaging had no net impact on share value.

**RESPONSE TO COMPLAINT NO. 515:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 515.

**COMPLAINT NO. 516:** This representation made by the ESOP Committee (Richards, Ferree, Willetts and Arent) and State Street was fraudulent because the $13.26 was not the PDC stock's fair market value. Among other things, the Stout valuation did not deduct $161.2 million in Excluded Debt and included a fraudulent control premium of $84 million.

**RESPONSE TO COMPLAINT NO. 516:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 516.

**COMPLAINT NO. 517:** With just these adjustments, PDC's reported equity value would have been negative $115.2 million and the PDC stock price would have been negative $11.75.

**RESPONSE TO COMPLAINT NO. 517:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 517.

**COMPLAINT NO. 518:** The release of the fraudulently inflated $13.26 PDC stock price constituted an additional step in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each prior PDC stock valuation and Redeemable Common Stock entry had been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 518:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 518.

    **b.**    **Step 2: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented PDC's Stock price to be $12.03 as of 30 June 2009.**

**COMPLAINT NO. 519:** On 12 July 2010, the ESOP Committee (Richards, Ferree, Willetts and Arent) met for the purpose of reviewing the 30 June 2010 PDC stock valuation with both Stout (Levine and Aziz El-Tahch) and State Street (Marzeotti):

The Committee reviewed the June 30, 2010 stock valuation prepared by Stout Risius Ross and approved by State Street Global Advisors. Mr. El-Tahch described the process used to arrive at the June 30, 2010 valuation.

Committee members asked questions which were answered by Mr. Levine and Mr. El-Tahch. Mr. Levine, Mr. El-Tahch and Ms. Marzeotti then departed the meeting.

Source: Appleton Papers Inc. ESOP Committee meeting minutes, 12 Jul 10.

**RESPONSE TO COMPLAINT NO. 519:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 519.

**COMPLAINT NO. 520:** On 15 July 2010, the ESOP Committee (Richards, Ferree, Willetts and Arent) released the 30 June 2010 PDC stock price of $12.03.

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2010. SSGA has determined the new per share value to be $12.03

The value of PDC stock on December 31, 2009, was $13.26 per share so the share value decreased 9.3% for the period January 1 through June 30, 2010 (H1 2010).

**Valuation Process**
SSGA relies upon Stout Risius Ross, an independent valuation firm, to conduct appraisals of Appleton and PDC to assist in determining the value of PDC stock. Stout Risius Ross uses an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.

**RESPONSE TO COMPLAINT NO. 520:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 520.

**COMPLAINT NO. 521:** This representation made by the ESOP Committee (Richards, Ferree, Willetts, Arent) and State Street were fraudulent because the $12.03 was not the PDC stock's fair market value. Among other things, the Stout Valuation did not deduct $159.6 million in Excluded Debt and included a fraudulent control premium of $75 million.

**RESPONSE TO COMPLAINT NO. 521:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 521.

**COMPLAINT NO. 522:** With just these adjustments, PAC's reported equity value would have been negative $117.6 million and the PDC stock price would have been negative $12.10.

**RESPONSE TO COMPLAINT NO. 522:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 522.

**COMPLAINT NO. 523:** The release of the fraudulently inflated $12.03 PDC stock price constituted an additional step in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each prior PDC stock valuation and Redeemable Common Stock entry had, likewise, been fraudulently inflated. It also masked and concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 523:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 523.

      c.      **Steps 3, 4, 5 and 6: In 2010, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K that Fraudulently Concealed That Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

**COMPLAINT NO. 524:** On 1 March 2010, Appvion filed its 2009 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel). The audited financial statements contained (1) a representation of PDC's year-end stock value of $13.26; and (2) listed the value of PDC's Redeemable Common Stock as $122.1 million as of 2 January 2010 and $147.9 million as of 3 January 2009.

**RESPONSE TO COMPLAINT NO. 524:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 524.

**COMPLAINT NO. 525:** In 2010, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 4 Apr 10 | 7 May | $120.3 million | Richards, Ferree |
| 4 Jul 10 | 9 Aug | $114.4 million | Richards, Ferree |
| 3 Oct 10 | 8 Nov | $122.6 million | Richards, Ferree |

**RESPONSE TO COMPLAINT NO. 525:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 525.

**COMPLAINT NO. 526:** These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter, Reardon, and Scherbel).

**RESPONSE TO COMPLAINT NO. 526:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 526.

**COMPLAINT NO. 527:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had been fraudulently inflated. It also concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 527:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 527.

14. **In 2011, Richards, Ferree, Willetts, Arent and State Street Collectively Took at Least 6 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

   a. **Step 1: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that the PDC Stock's Fair Market Value was $12.84 as of 31 December 2010.**

**COMPLAINT NO. 528:** On 18 January 2011, the ESOP Committee (Richards, Ferree, Willetts and Arent) Richards, Ferree, Willetts and Arent met with State Street (Marzeotti and William) and Stout (El-Tahch) to review the 31 December 2010 PDC stock valuation. In an email with the same date, the ESOP Committee (Richards, Ferree, Willetts and Arent) released the 31 December 2010 PDC stock price of $12.84 to the ESOP, through its Employee Owners:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. (PDC) stock for the second half of 2010. SSGA has determined the new share value to be $12.84.

> The value of PDC stock on June 30, 2010, was $12.03 per share, so the share value increased 6.7% for the period June 30, 2010 through December 31, 2010 (H2 2010).

**RESPONSE TO COMPLAINT NO. 528:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 528.

**COMPLAINT NO. 529:** By just deducting the Excluded Debt ($139.4 million), PDC's adjusted equity value would have been negative $91.4 million and its reported stock price would have been negative $9.47 as opposed to $12.84.

**RESPONSE TO COMPLAINT NO. 529:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 529.

**COMPLAINT NO. 530:** This stock price release constituted an additional step in furtherance of Richards, Ferree, Willetts, Arent, and State Street's course of fraudulent concealment.

**RESPONSE TO COMPLAINT NO. 530:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 530.

> **b.** **Step 2: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that the PDC Stock's Fair Market Value as of 30 June 2011 was $14.10.**

**COMPLAINT NO. 531:** On 14 July 2011, the ESOP Committee (Ferree, Willetts and Arent) reviewed the 30 June 2011 PDC stock valuation with State Street (Marzeotti) and Stout (Levine and El-Tahch). Levine "described the process used to arrive at the June 30, 2011 valuation" and the ESOP Committee members "asked questions which were answered by Mr. Levine." On 18 July 2011, the ESOP Committee (Richards, Ferree, Willetts and Arent) released, by email, the 30 June 2011 PDC stock price of $14.10 to the ESOP, through the Employee Owners:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. (PDC) stock for the second half of 2011. SSGA has determined the new share value to be $14.10
>
> The value of PDC stock on December 31, 2010, was $12.84 per share, so the share value increased 9.8% for the period January 1, 2011 through June 30, 2011 (H1 2011). The increase in share value since employees purchased the company in November 2001 is 41.0%.

**RESPONSE TO COMPLAINT NO. 531:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 531.

**COMPLAINT NO. 532:** By just deducting the Excluded Debt ($129.6 million) and the fraudulent control premium ($77 million), PDC's resulting equity value would have been negative $73.6 million and the reported PDC stock price would have been negative $7.87 not $14.10.

**RESPONSE TO COMPLAINT NO. 532:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 532.

**COMPLAINT NO. 533:** This stock price release constituted an additional step in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of fraudulent concealment.

**RESPONSE TO COMPLAINT NO. 533:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 533.

      c.      **Steps 3, 4, 5 and 6: In 2011, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K that Fraudulent Concealed that Each of the Previous Stock Prices had been Fraudulently Inflated.**

**COMPLAINT NO. 534:** On 11 March 2011, Appvion filed its 2010 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel). The audited financial statements in the 10-K contained 1) a representation of PDC's year-end stock value of $12.84; and 2) listed the value of PDC's Redeemable Common Stock as $110 million.

**RESPONSE TO COMPLAINT NO. 534:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 534.

**COMPLAINT NO. 535:** In 2011, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 3 Apr | 12 May | $108.6 million | Richards, Ferree |
| 3 Jul | 11 Aug | $102.5 million | Richards, Ferree |
| 2 Oct | 10 Nov | $101 million | Richards, Ferree |

**RESPONSE TO COMPLAINT NO. 535:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 535.

**COMPLAINT NO. 536:** These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter and Reardon). Scherbel also approved the first quarter 10-Q but left Appvion in March 2011.

**RESPONSE TO COMPLAINT NO. 536:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 536.

**COMPLAINT NO. 537:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated and that Richards and Ferree were breaching their fiduciary duties in connection with those valuations. Further, they concealed that the Outside Directors (Carter, Murphy, Pace, Reardon, Seifert, and Scherbel) were failing to properly monitor the ESOP Committee and the ESOP Trustee and ensure that the valuations represented the fair market value of PDC's stock.

**RESPONSE TO COMPLAINT NO. 537:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 537.

15. **In 2012, Richards, Ferree, Willetts, Arent and State Street Collectively Took at Least 9 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

    a. **Step 1: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that PDC's Fair Market Value was $15.01/share as of 31 December 2011.**

**COMPLAINT NO. 538:** After its review of the valuation with State Street and Stout, on 12 January 2012, the ESOP Committee (Richards, Ferree, Willetts, Arent) approved and released the 31 December 2011 PDC stock price to the ESOP, through its Employee Owners.

**RESPONSE TO COMPLAINT NO. 538:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 538.

**COMPLAINT NO. 539:** This email constituted an additional step taken in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each of the previously released PDC stock prices (9 November 2001 through 30 June 2011) had been fraudulently inflated and did not reflect fair market value.

**RESPONSE TO COMPLAINT NO. 539:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 539.

**COMPLAINT NO. 540:** Had just the Excluded Debt ($174.2 million) and the fraudulent control premium ($67 million) been subtracted, the adjusted stock value would have been negative $102.2 million, or negative $11.04 per share as opposed to the fraudulently reported $15.01 per share, and it would have disclosed to the Employee Owners that each of the earlier PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 540:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 540.

### b. Step 2: Richards Fraudulently Represented that the Board was Monitoring PDC's Valuations and State Street.

**COMPLAINT NO. 541:** 214. On 21 March 2012, Richards issued a "Richards Report Communication" discussing the 7 and 8 March 2012 Board meeting. Richards stated that the "board meeting included a review of our 2011 performance [and] the December stock valuation..." The communication claimed improvements in Appvion's financials despite "the continued decline in demand for carbonless paper" and touted the 6.5% increase in share price from $14.10 per share to $15.01 per share.

**RESPONSE TO COMPLAINT NO. 541:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 541.

**COMPLAINT NO. 542:** 215. This communication as a whole indicated that the Board (Carter, Murphy, Reardon, Seifert, and Suwyn) was monitoring State Street and the ESOP Committee (Richards, Ferree, Arent, and Willetts) as well as Appvion's financial performance, which included the stock value. It also served to fraudulently conceal that the share price was inflated by, among other things, the failure to deduct the Excluded Debt.

**RESPONSE TO COMPLAINT NO. 542:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 542.

### c. Step 3: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that PDC's Fair Market Value was $18.80/share as of 30 June 2012.

**COMPLAINT NO. 543:** After its review of the valuation, the ESOP Committee (Richards, Ferree, Arent, Willetts) approved and released the 30 June 2012 PDC stock price to the ESOP, through its Employee Owners. State Street had arrived at its conclusion of value after reviewing the valuation with Stout and had provided it to the ESOP Committee to be disseminated to the ESOP, through its Employee Owners.

Company Stock Value **Increased 25.2%**

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2012. SSGA has determined the new per share value to be $18.80.

**The value of PDC stock on December 31, 2011, was $15.01 per share, so the share value increased 25.2%** for the period January 1, 2012,

through June 30, 2012. The increase in share price **marks the fourth consecutive valuation period in which the value has increased**. The increase in share value since employees purchased the company in November 2001 is 88%.

The pending transaction between Appleton Papers Inc. (Appleton) and Paperweight Development Corp (ODC) and Hicks Acquisition Company II, Inc (HACII) creates a unique situation for this valuation....

If the transaction does not close prior to the next distribution payments, then the June 30 value of $18.80 will be used for those payments, and the other rights listed above will not apply to the shares that will be distributed.

Source: Internal communication, "Company Stock Value Increases 25.2% after first half 2012," 2 Jul 12.

**RESPONSE TO COMPLAINT NO. 543:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 543.

**COMPLAINT NO. 544:** This email constituted an additional step taken in furtherance of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each of the previously disclosed PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated and did not reflect fair market value.

**RESPONSE TO COMPLAINT NO. 544:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 544.

**COMPLAINT NO. 545:** Had just the Excluded Debt and the fraudulent control premium been deducted, the resulting PDC stock price would have been vastly lower than reported, and it would have disclosed that each of the earlier PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated. It also would have disclosed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 545:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 545.

d.  **Steps 4 and 5: Richards, Ferree, Willetts, Arent and State Street Fraudulently Represented that PDC's Fair Market Value was $16.45 as of 16 July 2012.**

**COMPLAINT NO. 546:** On 13 July 2012, Richards emailed the ESOP, through its Employee Owners, that Appleton and Hicks Acquisition Company II had discontinued their proposed business transaction citing volatile market conditions and claiming that Appvion's business was strong:

During the six weeks that Tom Ferree and I spent talking to numerous investment professionals around the country, we received positive feedback about the fundamental strength of our company, the way we do business and outlook for success. In general, the investment community likes Appleton and our business model. They are just reluctant to pursue this transaction under current market conditions.

**RESPONSE TO COMPLAINT NO. 546:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 546.

**COMPLAINT NO. 547:** On 7 August 2012, the ESOP Committee (Richards, Ferree, Willetts, Arent) reviewed the special valuation with State Street (Williams) and Stout (Levine and El-Tahch) and on the same day released the fraudulently inflated PDC stock price for 16 July 2012 of $16.45, while noting that State Street had value PDC at $18.80 per share as of 30 June 2012:

State Street Global Advisors (SSGA) has completed its special valuation of Paperweight Development Corp. (PDC) stock for July 16, 2012. SSGA has determined the new par share value to be $16.45. The June 30, 2012, share price was $18.80 ....

ERISA requires that the share price be valued once per year. Our plan has chosen to conduct valuations twice per year. However, the ESOP Administrative Committee has the right to request a special valuation at any time.

Why we requested an additional valuation

When the June 30 share price was announced the ESOP Administrative Committee believed that the closing of the Appleton/HACII transaction would necessitate a new valuation to accurately reflect the post-transaction Fair Market Value of PDC stock.

The Committee subsequently learned that Stout Risius Ross included some (but not all) of the incremental value of the proposed transaction in the share price announced on June 30. On July 13, Appleton and HACII announced that they agreed to discontinue the proposed transaction.

The ESOP Administrative Committee determined it had a fiduciary obligation to request a new share price since discontinuing the Appleton/HACII transaction was a material event and the June 30 price likely no longer represented Fair Market Value ...

**RESPONSE TO COMPLAINT NO. 547:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 547.

**COMPLAINT NO. 548:** Had just the Excluded Debt ($179 million) and the fraudulent control premium ($51 million) been subtracted, the reported PDC stock price would have been negative $9.47.

**RESPONSE TO COMPLAINT NO. 548:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 548.

**COMPLAINT NO. 549:** Both the $16.45 share value and the $18.80 share value constituted additional steps in the course of Richards, Ferree, Willetts, Arent and State Street's course of conduct to fraudulently conceal that each earlier PDC stock price and Redeemable Common Stock entry had been fraudulently inflated. It also fraudulently concealed earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 549:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 549.

> e.     **Steps 6, 7, 8 and 9: In 2012, Richards and Ferree Attested to and Ferree Signed 3 10-Qs and Richards and Ferree Signed a 10-K that Fraudulently Concealed that Each of the Previous PDC Stock Prices Had Been Fraudulently Inflated.**

**COMPLAINT NO. 550:** On 23 March 2012, Appvion filed its 2011 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Reardon, Seifert, and Suwyn). The audited financial statements in the 10-K contained (1) a representation of PDC's year-end stock value of $15.01; and (2) listed the value of PDC's Redeemable Common Stock as $97.6 million for 2011 and $110.1 million for 2010.

**RESPONSE TO COMPLAINT NO. 550:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 550.

**COMPLAINT NO. 551:** In 2012, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 1 Apr 12 | 10 May 12 | $96.4 million | Richards, Ferree |
| 1 Jul 12 | 9 Aug 12 | $89.9 million | Richards, Ferree |
| 30 Sep 12 | 9 Nov 12 | $85.5 million | Richards, Ferree |

**RESPONSE TO COMPLAINT NO. 551:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 551.

**COMPLAINT NO. 552:** These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter, and Murphy).

**RESPONSE TO COMPLAINT NO. 552:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 552.

**COMPLAINT NO. 553:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated and that Richards and Ferree were breaching their fiduciary duties in connection with those valuations. Further, they concealed that the Outside Directors (Carter, Murphy, Reardon, Seifert, and Suwyn) were failing to properly monitor the ESOP Committee and the ESOP Trustee and ensure that the valuations represented the fair market value of PDC's stock.

**RESPONSE TO COMPLAINT NO. 553:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 553.

16. **In 2013, Richards, Ferree, Arent, State Street and Reliance Collectively Took at Least 6 Steps to Fraudulently Conceal that Each of the Earlier PDC Stock Valuations Had Been Fraudulently Inflated and to Conceal Earlier Fiduciary Breaches.**

   a. **Step 1: Richards, Ferree, Arent and State Street Fraudulently Represented the PDC Stock Price Increased to $17.55 as of 31 December 2012.**

**COMPLAINT NO. 554:** In February 2013, State Street reported that the fair market value of PDC's stock was $17.55 as of 31 December 2012. On 5 February 2013, the ESOP Committee (Richards, Ferree, Arent) met with State Street (Marzeotti) and Stout (Levine and El-Tahch) and reviewed the 31 December 2012 PDC stock valuation. Richards then "motion to approve the stock valuation communication. Ms. Arent seconded the motion; all were in favor...."

**RESPONSE TO COMPLAINT NO. 554:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 554.

**COMPLAINT NO. 555:** On the same day, the ESOP Committee (Richards, Ferree, Arent) emailed the ESOP through its Employee Owners, releasing the fraudulently inflated PDC stock price for 31 December 2012 of $17.55 per share:

> State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. (PDC) stock and determined the new per share value to be $17.55 as of December 31, 2012.
>
> The previous value of PDC stock was $16.45 per share, so the share value has increased 6.7% for the period July 16, 2012, through December 31, 2012. The increase in share value for full year 2012 is 16.9%. The increase in share value since employees purchased the company in November 2001 is 75.5%.
>
> SSGA relies upon Stout Risius Ross, an independent valuation firm, to conduct appraisals of Appleton and PDC to assist in determining the value of PDC stock. Stout Risius Ross uses an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions.
>
> **Income analysis**
> Key contributors to the increase in share price were strong sales and earnings growth from our thermal papers segment, saving s delivered by the strategic supply agreement with Domtar, a significant reduction in working capital, and strong improvement in adjusted operating income.

Source: Internal communication, "Company stock Value increases 6.7% after second half 2012 valuation," 5 Feb 13.

**RESPONSE TO COMPLAINT NO. 555:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 555.

**COMPLAINT NO. 556:** Subtracting just the Excluded Debt ($207.7 million) and the fraudulent control premium ($54 million), the reported fair market value would have been negative $108.7 million, or negative $12.45 per share as opposed to the fraudulently reported $17.55 per share.

**RESPONSE TO COMPLAINT NO. 556:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 556.

**COMPLAINT NO. 557:** This fraudulent representation was an additional step in furtherance of Richards, Ferree, Arent and State Street's course of conduct to fraudulently conceal that each of the previously reported PDC stock prices and Redeemable Common Stock entries had been fraudulently inflated. It also concealed their earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 557:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 557.

        **b.**     **Step 2: Richards, Ferree, Arent and Reliance Fraudulently Represented the PDC Stock Price Increased to $17.85 as of 30 June 2013.**

**COMPLAINT NO. 558:** After reviewing the valuation, on 17 July 2013, the ESOP Committee (Richards, Ferree, Arent) approved and then released the fraudulently inflated PDC stock price for 30 June 2013 of $17.85 per share:

> Reliance Trust Company (RTC) has completed is valuation of Paperweight Development Corp. (PDC) and determined the new per share value to be $17.85 as of June 30, 2013.
>
> The previous value of PDC stock was 17.55 per share, so the share value increased 1.7% for the period January 1, 2013, through June 30, 2013. The increase in share value since employees purchased the company in November 2001 is 78.5%
>
> **Valuation process**
> RTC relies on Stout Risius Ross (SRR), an independent valuation firm, to conduct appraisals of Appvion and PDC to assist in determining the value of PDC stock. SRR uses an income approach and a market approach to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data and publicly traded companies and recent mergers and acquisitions.
>
> **Income analysis**
> SRR's income analysis derived a value that is essentially unchanged from the previous valuation primarily because the performance of the business is fundamentally the same. The earnings of each of businesses adjusted for any one-time impacts from the Domtar supply agreement did not change from the calendar year 2012 to the trailing 12 month period ending at June 2013.

Source: Internal Communication, "Company stock value increases 1.7% after first half 2013 valuation," 18 Jul 13.

**RESPONSE TO COMPLAINT NO. 558:** To the extent the allegations in paragraph 558 refer to Reliance Trust, Reliance Trust admits that the valuation of $17.85 per share as of June 30, 2013 was prepared by Stout and finalized by Reliance Trust, but denies the valuation was

fraudulently inflated. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 558.

**COMPLAINT NO. 559:** Had the stock price been adjusted by just subtracting the Excluded Debt ($200 million) and eliminating the fraudulent control premium ($54 million), the reported PDC stock price would have been negative $12.78 as opposed to $17.85.

**RESPONSE TO COMPLAINT NO. 559:** To the extent the allegations in paragraph 559 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 559.

**COMPLAINT NO. 560:** The release of the $17.85 PDC stock price was an additional step in furtherance of Richards, Ferree, Arent and Reliance's fraudulent course of conduct to conceal that each of the earlier PDC stock valuations and earlier Redeemable Common Stock entry had been fraudulently overstated. It also fraudulently concealed the earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 560:** To the extent the allegations in paragraph 560 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 560.

        c.      **Step 3, 4, 5 and 6: In 2013, Richards and Ferree Attested to and Ferree Signed Three 10-Qs and Richards and Ferree Signed a 10-K That Fraudulently Concealed That Each of the Previous PDC Stock Valuations Had Been Fraudulently Inflated.**

**COMPLAINT NO. 561:** On 13 March 2013, Appvion filed its 2012 10-K signed by Richards, Ferree, and the Outside Directors (Carter, Murphy, Reardon, Seifert, and Suwyn). The audited financial statements in the 10-K contained (1) a representation of PDC's year-end stock value of $17.55; and (2) listed the value of PDC's Redeemable Common Stock as $81.7 million for 2012 and $97.6 million for 2011.

**RESPONSE TO COMPLAINT NO. 561:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 561.

**COMPLAINT NO. 562:** In 2013, Richards and Ferree attested to and Ferree signed three 10-Qs which contained Appvion's unaudited financial statements. These 10-Qs reported fraudulently inflated entries for Redeemable Common Stock which incorporated and relied upon the most recent stock price, which served to reaffirm the valuations:

| Quarter End Date | Signature Date | Redeemable Common Stock Value | Attesting CEO and CFO Who Signed |
|---|---|---|---|
| 31 Mar | 9 May | $80.5 million | Richards, Ferree |
| 30 Jun | 8 Aug | $72 million | Richards, Ferree |
| 29 Sep | 5 Nov | $71 million | Richards, Ferree |

**RESPONSE TO COMPLAINT NO. 562:** It is unclear whether paragraph 562 refers to Appvion Inc.'s or PDC's Form 10-Qs. Reliance Trust admits that Appvion Inc.'s and PDC's Form 10-Qs for the quarterly periods ending March 31, 2013, June 30, 2013, and September 29, 2013 appear to have been signed by Thomas J. Ferree on May 9, 2013, August 8, 2013, and November 5, 2013 respectively. Reliance Trust admits that each of Appvion Inc.'s Form 10-Qs attach certifications which appear to have been signed by Mark R. Richards and Thomas J. Ferree at Exhibits 31.1 and 31.2, and each of PDC's Form 10-Qs attach certifications which appear to have been signed by Mark R. Richards and Thomas J. Ferree at Exhibits 31.3 and 31.4. Reliance Trust admits that Appvion Inc.'s and PDC's Form 10-Q for the quarterly periods ending March 31, 2013, June 30, 2013, and September 29, 2013 list redeemable common stock at approximately $80,458,000, $71,940,000, and $70,853,000 respectively on pages 3 of each. Reliance Trust denies that PDC's stock value from the valuations as of June 30, 2013 and as of December 31, 2013 was fraudulent, and denies it caused any "Redeemable Common Stock" value in Appvion Inc.'s or PDC's Form 10-Qs to be fraudulent. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 562.

**COMPLAINT NO. 563:** These 10-Qs were reviewed and approved by the Board's Audit Committee (Carter and Murphy).

**RESPONSE TO COMPLAINT NO. 563:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 563.

**COMPLAINT NO. 564:** Because the 10-K and 10-Qs supported and incorporated the fraudulently inflated stock value, they constituted additional steps in furtherance of Richards and

Ferree's course of conduct to fraudulently conceal that each earlier PDC stock valuation had likewise been fraudulently inflated. It also concealed the earlier fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 564:** To the extent the allegations in paragraph 564 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 564.

**L.**    **The Defendants Continued to Engage in Fraudulent Concealment After 2013.**

**COMPLAINT NO. 565:** The Defendants (Reliance, Argent, Richards, Ferree, Arent, and Gilligan) continued to engage in fraudulent concealment after 2013. However, Plaintiff's claims for breaches of fiduciary duty during this time frame are timely without regard to the fraud or concealment exception to ERISA § 413 (29 U.S.C. § 1113).

**RESPONSE TO COMPLAINT NO. 565:** To the extent the allegations in paragraph 565 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 565.

**M.**    **The Knowledge of Prior ESOP Fiduciaries is Not Imputed to Mr. Lyon or the ESOP.**

**COMPLAINT NO. 566:** The PDC stock valuations were not disclosed to the Employee Owners. Rather, they were only shared with the ESOP Trustee, the ESOP Committee members, and the Board of Directors.

**RESPONSE TO COMPLAINT NO. 566:**    Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 566.

**COMPLAINT NO. 567:** As described above, the fact that the valuations were inflated was not discovered until after Mr. Lyon was appointed as an independent, impartial fiduciary who could investigate the valuations. Mr. Lyon discovered that the valuations were inflated and brought these claims.

**RESPONSE TO COMPLAINT NO. 567:** To the extent the allegations in paragraph 567 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 567.

**COMPLAINT NO. 568:** Because, among other reasons, the ESOP's fiduciaries were acting in bad faith and adversely to the ESOP, their knowledge is not imputed to Mr. Lyon, to the ESOP, or to its Employee Owners.

**RESPONSE TO COMPLAINT NO. 568:** To the extent the allegations in paragraph 568 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 568.

**COMPLAINT NO. 569:** Defendants knew they were acting adversely to the ESOP by inflating the stock price. Because the Defendants were not acting in good faith, they cannot rely on imputation of knowledge to shield them from their bad acts.

**RESPONSE TO COMPLAINT NO. 569:** To the extent the allegations in paragraph 569 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 569.

**COMPLAINT NO. 570:** Knowledge of the culpable ESOP fiduciaries also cannot be imputed to the ESOP trust because, unlike a corporation, the ESOP trust is not a separate legal entity. Further, imputation does not serve any equitable purpose.

**RESPONSE TO COMPLAINT NO. 570:** To the extent the allegations in paragraph 570 refer to Reliance Trust, denied. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 570.

**COMPLAINT NO. 571:** As a fiduciary, Mr. Lyon is acting for the benefit of the ESOP trust itself, which is innocent of any wrongdoing, and is seeking to recover on behalf of the ESOP for the benefit of the Employee Owners. In his role as an ERISA fiduciary, Mr. Lyon shares no blame for the wrongdoing of the prior ERISA fiduciaries and has standing to bring these claims.

**RESPONSE TO COMPLAINT NO. 571:** Reliance Trust admits that Plaintiff is an ERISA fiduciary and purports to seek relief for the ESOP, but denies that Plaintiff is entitled to any relief and denies any wrongdoing. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 571.

**V.  CLAIMS.**

## COUNT I
## BREACH OF FIDUCIARY DUTY AGAINST RELIANCE TRUST COMPANY

**COMPLAINT NO. 572:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 572:** Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Reliance Owed Fiduciary Duties in Connection with the Valuations

**COMPLAINT NO. 573:** Reliance was an ESOP fiduciary as trustee from 1 April 2013 to 30 June 2014. Reliance therefore owed fiduciary duties of prudence and loyalty under ERISA § 404(A)(1) (29 U.S.C. § 1104(a)(1)). Where an ERISA fiduciary is responsible for setting the price of stock, the duties loyalty and prudence require a fiduciary to undertake an appropriate investigation to determine that the ESOP and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts. This requires the fiduciary to determine the value of the stock in good faith using a prudent process.

**RESPONSE TO COMPLAINT NO. 573:** Admitted as to the first and second sentences and admitted that ERISA requires certain determinations of fair market value of stock to be made, in good faith and using a prudent process, but otherwise denied.

**COMPLAINT NO. 574:** Under § 3.4(j) of the Amended and Restated Trust Agreement for the Appleton Papers Inc. Employee Stock Ownership Trust, 1 April 2013, Reliance agreed that "all valuations of shares of Company Stock will originally be made by an independent appraiser (as described in Code § 401(a)(28)(C)) retained by the Trustee and reviewed and finalized by the Trustee in accordance with ERISA § 3(18)(B)." In a separate letter agreement dated 22 March 2013, Reliance agreed that it would retain Stout as the independent appraiser.

**RESPONSE TO COMPLAINT NO. 574:** Admitted, except that the letter agreement is erroneously dated March 22, 2014, not 2013.

**COMPLAINT NO. 575:** The ESOP documents were consistent with the trust agreement and ERISA, requiring the stock to be valued on a semi-annual basis by an independent appraiser in accordance with ERISA § 3(18). Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

**RESPONSE TO COMPLAINT NO. 575:** Admitted as to the second sentence, except that Reliance Trust denies that Plaintiff's characterizations of ERISA provide a full and accurate summary of the relevant legal principles. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 575, including because the allegations do not clearly identify the "ESOP documents" they reference.

**COMPLAINT NO. 576:** Therefore Reliance was required to retain an independent appraiser to value PDC's stock, but Reliance was ultimately responsible for determining the stock value.

**RESPONSE TO COMPLAINT NO. 576:** Admitted that Reliance Trust was required to retain an independent appraiser to value PDC's stock, but otherwise denied.

**COMPLAINT NO. 577:** State Street was responsible for the 31 December 2012 valuation of PDC's stock, which valued PDC's stock at $17.55 per share. Reliance took over from State Street as trustee as of 1 April 2013. However, Reliance approved the use of the 31 December 2012 stock value in connection with purchases of stock in approximately June 2013. Reliance therefore had a fiduciary duty of prudence to review the valuation as of 31 December 2012 and determine whether reliance on that valuation was reasonably justified under the circumstances.

**RESPONSE TO COMPLAINT NO. 577:** Reliance Trust admits it became trustee as of April 1, 2013, and lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 577. Reliance Trust denies the remaining allegations in paragraph 577.

**COMPLAINT NO. 578:** Reliance reached the following determinations of share value:

**Table 17: Valuations Approved by Reliance**

| Valuation Date | Share Price |
|---|---|
| 06/30/2013 | $ 17.85 |
| 12/31/2013 | $ 16.25 |

**RESPONSE TO COMPLAINT NO. 578:** Reliance Trust admits it finalized the valuations listed in the chart in paragraph 578, but otherwise denied.

**COMPLAINT NO. 579:** Effective 1 July 2014, Argent purchased Reliance's ESOP business unit, and Appvion's Board appointed Argent as new trustee, also effective 1 July 2014. Stout issued its final report for the valuation as of 30 June 2014, valuing PDC stock at $16.30 per share, on 10 July 2014, just 10 days later. Reliance was responsible for retaining Stout for the 30 June 2014 valuation, and on information and belief, Reliance's employees were involved in the preparation and approval of this valuation while Reliance was trustee. To the extent Reliance was involved in the preparation and approval of this valuation, it had a duty of prudence and loyalty.

**RESPONSE TO COMPLAINT NO. 579:** Reliance Trust admits that Argent purchased Reliance Trust's ESOP business unit effective July 1, 2014, that Stout later issued a valuation as

of June 30, 2014, and that Reliance Trust retained Stout for preparing semi-annual valuations, but otherwise denied.

**COMPLAINT NO. 580:** Stout acted as independent appraiser and gave opinions on the fair market value of PDC's stock for these valuation dates, which Reliance adopted in full. In doing so, Reliance had a fiduciary duty of prudence and loyalty to determine whether reliance on those valuations was reasonably justified under the circumstances.

**RESPONSE TO COMPLAINT NO. 580:** Admitted as to the valuations as of June 30, 2013 and as of December 31, 2013 for the first sentence, and admitted that Reliance Trust owed fiduciary duties of prudence and loyalty with regard to those valuations, but otherwise denied.

**Reliance Breached its Fiduciary Duties in Connection with the Valuations**

**COMPLAINT NO. 581:** In connection with the use of the 31 December 2012 stock price, its determination of the 30 June 2013 and 31 December 2013 stock prices, and its involvement in determination of the 30 June 2014 stock price, Reliance breached its duty of prudence and loyalty and failed to determine the share value in good faith using a prudent process. Reliance on Stout's advice was not reasonably justified because of, among other things, the following facts:

**RESPONSE TO COMPLAINT NO. 581:** Denied.

**COMPLAINT NO. 582:** The valuations relied heavily on financial projections of Appvion's performance over a five-year period following the valuation. These financial projections formed the basis of Stout's discounted cash flow analysis and at least half of Stout's guideline company method analysis. However, these projections were at all times relevant to this count inflated, which caused the resulting valuations to be inflated. Reliance failed to require that inflated projections be corrected and properly scrutinize the financial projections provided by Appvion management, which Stout relied on in valuating PDC stock, even though Appvion had consistently failed to meet its projections.

**RESPONSE TO COMPLAINT NO. 582:** Denied.

**COMPLAINT NO. 583:** During Reliance's tenure as trustee, Stout calculated that the synthetic equity created by various executive compensation plans, all of which were tied to the stock price, accounted for approximately 21-22% of the "fully diluted ownership value" of PDC. These incentive compensation plans created a key conflict of interest with the individuals at Appvion who were responsible for creating the five-year financial projections that formed the basis of the valuations. Reliance failed to identify or address these conflicts of interest which were, at a minimum, a red flag that the projections (and therefore the valuations based on those projections) were not reliable. *See Brundle v. Wilmington Trust, NA*, 919 F.3d 763 (4th Cir. 2019).

**RESPONSE TO COMPLAINT NO. 583:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 583, but otherwise denied.

**COMPLAINT NO. 584:** Reliance failed to require that the valuations include the Excluded Debt. See ¶¶ 246, 288. Reliance's substantial pension and post-retirement liability excluded from all valuations exceeded the shareholder's equity value as determined by Stout at all times during Reliance's tenure as trustee. The sheer magnitude of these balance sheet liabilities required Reliance to thoroughly consider whether they had been properly subtracted in arriving at fair market value. Further, Reliance admits being aware of this pension liability because Reliance discussed it with Stout on at least one occasion, during a 31 December 2013 meeting approving the valuation as of the same date. The minutes of that meeting note that "Pension liability is down due to market performance" but fail to explain why it was not subtracted from the valuation like all debt must be. As proved by the BemroseBooth valuation, all debt, including retirement-related debt must be subtracted.

**RESPONSE TO COMPLAINT NO. 584:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last two sentences of paragraph 584, but otherwise denied.

**COMPLAINT NO. 585:** Reliance also failed to require that the valuations include even all the interest-bearing debt. The 30 June 2013 valuation excluded $24 million of Appvion's revolving line of credit, which inflated the share price by $2.97/share. The 31 December 2013 valuation excluded $6.8 million in unamortized discounts - these unamortized discounts were listed in Appvion's audited financial statements, and were listed in the financial statements prior to this date; however, this was the first valuation where Stout did not include these amounts in the interest-bearing debt. Failing to deduct the unamortized discounts in the 31 December 2013 valuation inflated the share price by $0.86/share. There was no justification for excluding this debt, which was clearly part of Appvion's outstanding interest-bearing loans.

**RESPONSE TO COMPLAINT NO. 585:** Denied, except that Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 585 about valuations or financial statements outside of Reliance Trust's time as trustee.

**COMPLAINT NO. 586:** Reliance allowed Stout to add a 10% control premium, which added approximately $54 million to the value of Appvion (35-40% of the equity value) for the three valuations listed above. This was fraudulent and inappropriate because Reliance (as the shareholder supposedly acting for the ESOP) was a directed trustee and also lacked the ability to control the Board of Directors under the Security Holder's Agreement. *See* ¶¶ 254-63. Reliance has admitted that it lacked control by arguing it had no ability to monitor the Board of Directors. *See* Memorandum in Support of Motion to Dismiss Reliance Defendants, 28 Feb 19, Dkt. 115, p.

18. In addition, Reliance's Stephen Martin testified in separate litigation that Reliance typically did not take an active role in overseeing the board of directors in its ESOP engagements. *See* Deposition of Stephen Martin, *The Antioch Litigation Trust v. Morgan*, No. 3:09-CV-218 (S.D. Ohio Apr. 9, 2013).

**RESPONSE TO COMPLAINT NO. 586:** Reliance Trust denies the allegations in the first, second, and third sentences in paragraph 586, except it admits it was a directed trustee. Reliance Trust's arguments on a motion to dismiss are not admissions because it must assume the truth of Plaintiff's allegations in presenting those arguments. Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 586.

**COMPLAINT NO. 587:** Reliance adopted the valuations despite Stout's practice of rounding numbers up or down throughout the valuation process in a manner which inflated the share values for the 31 December 2012, 31 June 2013, and 31 December 2013 appraisals by $0.14-$0.25 per share. The 31 December 2013 valuation report further contains an arithmetic error that Reliance would have identified had it prudently reviewed the valuations - Stout's guideline company method analysis of Appvion's Thermal division overstates the average of the underlying components by over $2 million. These arithmetic and rounding errors inflated the stock value and rendered the valuations unreliable, and indicate that Reliance failed to properly review and understand the valuations.

**RESPONSE TO COMPLAINT NO. 587:** Reliance Trust admits it finalized Stout's valuations as of June 30, 2013 and as of December 31, 2013, but otherwise denied.

**COMPLAINT NO. 588:** Reliance failed to understand and question Stout's methodology, including the selected guideline companies and Stout's calculation of the weighted average cost of capital and multipliers used in the valuations.

**RESPONSE TO COMPLAINT NO. 588:** Denied.

**COMPLAINT NO. 589:** Reliance failed to insist that the appraisals appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock. The valuations deducted a blanket 5% discount for limited marketability which was insufficient to account for the significant repurchase liability.

**RESPONSE TO COMPLAINT NO. 589:** Reliance Trust admits the valuations as of June 30, 2013 and as of December 31, 2013 included a 5% discount for limited marketability, but otherwise denied.

**COMPLAINT NO. 590:** Reliance failed to document, in writing, their oversight of the appraisers, the appraisal process, and their analysis and review of the final valuation reports, including, among other things, failing to ensure that either the appraiser or the trustee conducted and documented the following:

- The identification of the individuals responsible for providing projections reflected in the valuation report and a reasonable inquiry as to whether those individuals have conflicts of interest;

- An opinion as to the reasonableness of any projections considered and explanation why and to what extent the projections are or are not reasonable, including, at a minimum, an analysis of how the projections compare to and whether they are reasonable in light of the company's five-year historical averages;

- The Trustee's analysis of the final valuation reports, including consideration of the topics, such as, but not limited to, the following:

  o Marketability discounts;

  o Minority interests and control premiums;

  o Projections of the company's future economic performance and the reasonableness or unreasonableness of such projections, including, if applicable, the bases for assuming that the company's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

  o Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

  o The comparability of the companies chosen as part of any analysis based on comparable companies; and

  o Whether the methodologies employed were standard and accepted methodologies and the bases for any departures from standard and accepted methodologies.

**RESPONSE TO COMPLAINT NO. 590:** Denied.

**COMPLAINT NO. 591:** In sum, Reliance failed to prudently investigate the value of PDC's stock and therefore breached its duty of prudence and loyalty under ERISA § 404 (29 U.S.C. § 1104).

**RESPONSE TO COMPLAINT NO. 591:** Denied.

**COMPLAINT NO. 592:** A fiduciary's duties of loyalty and duty of prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform. However, Reliance failed to communicate directly with the Employee Owners about Appvion's true financial condition or the valuation process, instead allowing Appvion's ESOP Committee (Richards, Ferree, Willetts, and Arent) to take the lead in communications. In doing so, Reliance allowed Appvion's ESOP Committee to issue misleading communications that reported an inflated PDC stock price, selectively described the valuation process and omitted key information about the valuations necessary to render their communications not misleading. This was a breach of Reliance's duty of disclosure.

**RESPONSE TO COMPLAINT NO. 592:** Denied.

**COMPLAINT NO. 593:** Reliance is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from its breaches of fiduciary duty. These damages include, but are not limited to, the ESOP's losses from overpaying for stock at the stock values set by Reliance.

**RESPONSE TO COMPLAINT NO. 593:** Denied.

**Reliance is Liable for Its Failure to Remedy the Breaches of Predecessor Fiduciaries**

**COMPLAINT NO. 594:** A fiduciary has a continuing duty to remedy breaches of predecessor fiduciaries.

**RESPONSE TO COMPLAINT NO. 594:** Denied.

**COMPLAINT NO. 595:** The duty of prudence required Reliance to review and understand prior valuations of Appvion when it became trustee. At a minimum, in order to meet its duty of prudence and comply with its obligation not to purchase stock for more than adequate consideration, Reliance had to review and approve the 31 December 2012 valuation.

**RESPONSE TO COMPLAINT NO. 595:** Denied.

**COMPLAINT NO. 596:** Reliance therefore was aware that its predecessor fiduciaries (State Street and at least Richards, Ferree, Arent, and Willetts) had breached their fiduciary duties in connection with those prior valuations.

**RESPONSE TO COMPLAINT NO. 596:** Denied.

**COMPLAINT NO. 597:** A review of earlier valuations would also have brought the BemroseBooth treatment to Reliance's attention.

**RESPONSE TO COMPLAINT NO. 597:** Reliance Trust lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 597.

**COMPLAINT NO. 598:** Reliance breached its fiduciary duties by failing to take adequate steps to remedy their predecessors' breaches of fiduciary duty in connection with the prior

valuations. Such steps could have included correcting the stock values and adjusting accounts of ESOP holders, as well as litigation against predecessor fiduciaries to remedy the overpayments for stock. Instead, Reliance failed to take any action and potentially allowed the statute of limitations for breaches of fiduciary duty within six years prior to Reliance's appointment to expire.

**RESPONSE TO COMPLAINT NO. 598:** Denied.

**COMPLAINT NO. 599:** As a result of Reliance's breaches of fiduciary duty, the ESOP lost tens of millions of dollars.

**RESPONSE TO COMPLAINT NO. 599:** Denied.

### Plaintiff's Claims Against Reliance are Timely

**COMPLAINT NO. 600:** Plaintiff did not have actual knowledge of Reliance's breaches of fiduciary duty prior to at least August 2017 when Plaintiff became a fiduciary of the ESOP. Accordingly, Plaintiff's claims against Reliance are timely because they were filed within six years after the date of the last action which constituted a part of the breach or the violation, since Reliance did not become trustee until April 2013 and Plaintiff's claims were filed 26 November 2018.

**RESPONSE TO COMPLAINT NO. 600:** Denied.

### COUNT II
### BREACH OF FIDUCIARY DUTY AGAINST ARGENT TRUST COMPANY

**COMPLAINT NO. 601:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 601:** Because Count II is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Argent Owed Fiduciary Duties in Connection with the Valuations

**COMPLAINT NO. 602:** Argent was an ESOP fiduciary as trustee from 1 July 2014 until at least 1 October 2017 when Appvion filed for bankruptcy. Argent therefore owed fiduciary duties of prudence and loyalty under ERISA § 404(A)(1) (29 U.S.C. § 1104(a)(1)). Where an ERISA fiduciary is responsible for setting the price of stock, the duties of loyalty and prudence require a fiduciary to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts This requires the fiduciary to determine the value of the stock in good faith using a prudent process.

**RESPONSE TO COMPLAINT NO. 602:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 603:** Argent became the ESOP Trustee effective 1 July 2014 after it purchased Reliance's ESOP business unit. Argent continued to operate under the Amended and Restated Trust Agreement for the Appleton Papers Inc. Employee Stock Ownership Trust, dated 1 April 2013, until approximately August 2015. Under § 3.4(j) of that trust agreement, "all valuations of shares of Company Stock will originally be made by an independent appraiser (as described in Code § 401(a)(28)(C)) retained by the Trustee and reviewed and finalized by the Trustee in accordance with ERISA § 3(18)(B)." Argent continued to retain Stout as its independent appraiser.

**RESPONSE TO COMPLAINT NO. 603:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 604:** Argent and Appvion signed a new trust agreement, effective 3 August 2015. Under that agreement, Argent had sole discretion to determine the fair market value of PDC's stock:

> 2.6. Trust Fund Powers. **The Trustee shall be a discretionary trustee with respect to all the assets of the Trust Fund**, including, but not limited to, purchases, holding, and sales of Company Stock, as well as voting shares of Company Stock. Subject to the provisions of Sections 2.8 2.9, and 2.10, **the Trustee shall have the following powers, rights, and duties with respect to the Trust Fund**, in addition to, and not limited to, those provided elsewhere in this Trust Agreement or by Applicable Law:

> \* \* \*

> (k) To invest in Company Stock (as set forth in Section 2.3) and to select an independent appraiser to assist the Trustee to determine the fair market value of the Company Stock and the Valuation Date. In addition, **the Trustee shall determine the fair market value of the Company Stock and the other assets of the Trust Fund as of each Valuation Date**, or, in the absence of readily ascertainable market values, **at such values as the Trustee shall, in its sole discretion, determine with consideration being given to methods consistently followed and uniformly applied**.

**RESPONSE TO COMPLAINT NO. 604:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 605:** The ESOP documents were consistent with the trust agreements and ERISA, requiring the stock to be valued on a semi-annual basis by an independent appraiser in accordance with ERISA § 3(18). Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

**RESPONSE TO COMPLAINT NO. 605:** Because Count II is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 606:** Therefore, Argent was required to retain an independent appraiser to value PDC's stock, but Argent was ultimately responsible for determining the stock value.

**RESPONSE TO COMPLAINT NO. 606:** Because Count II is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 607:** Reliance was responsible for the 31 December 3013 valuation of PDC's stock, which valued PDC's stock at $16.25 per share. However, Argent approved the use of this stock value in connection with purchases of stock as of June 2013. Argent therefore had a duty of prudence and loyalty to review the valuation as of 31 December 2013 and determine whether reliance on that valuation was reasonably justified under the circumstances.

**RESPONSE TO COMPLAINT NO. 607:** Because Count II is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 608:** As ESOP Trustee, Argent reached the following determinations of share value:

| Valuation Date | Share Price |
|---|---|
| 06/30/2014 | $ 16.30 |
| 12/31/2014 | $ 11.00 |
| 06/30/2015 | $ 12.90 |
| 12/31/2015 | $ 12.30 |
| 06/30/2016 | $ 13.70 |
| 12/31/2016 | $ 10.35 |
| 06/30/2017 | $ 6.85 |

**RESPONSE TO COMPLAINT NO. 608:** Because Count II is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 609:** Stout acted as independent appraiser and gave opinions on the fair market value of PDC's stock for these valuation dates, which Argent adopted in full. In doing so, Argent had a fiduciary duty of prudence and loyalty to determine whether reliance on those valuations was reasonably justified under the circumstances.

**RESPONSE TO COMPLAINT NO. 609:** Because Count II is not asserted against

Reliance Trust, no response is required.

**Argent Breached its Fiduciary Duties in Connection with the Valuations**

**COMPLAINT NO. 610:** In connection with its use of the 31 December 2013 stock price and its determination of the stock price for PDC beginning in July 2014, Argent breached its duty of prudence and loyalty by in relying on Stout's valuations. Reliance on Stout's advice was not reasonably justified under the circumstances because of, among other things, the following facts:

**RESPONSE TO COMPLAINT NO. 610:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 611:** Argent failed to run a process for selecting a valuation firm and simply used Stout as the appraiser because Stout had been acting as the appraiser for so long and knew the company. As part of this process, Argent failed to evaluate Stout's past performance and related PDC stock valuations. Argent also failed to identify that Stout had subtracted BemroseBooth's pension debt but never deducted Appvion's retirement related debt in arriving at fair market value.

**RESPONSE TO COMPLAINT NO. 611:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 612:** Argent's Steve Martin admitted to Mr. Lyon that Appvion had never met its business plans in Argent's history as trustee. Martin stated that Argent reviewed the projections because of the history of Appvion failing to meet the projections, but instead of requiring Appvion to make the projections more realistic Argent allowed Stout to adjust for the riskiness of the projections in the discount rate. Allowing the use of projections that Argent knew were inflated was a clear breach of its fiduciary duty of prudence and loyalty, especially where the projections were critical to the resulting valuations. Further, Argent breached its duty of prudence and loyalty by failing to question the objectivity and prudence of those preparing the projections in light of their willingness to consistently inflate them.

**RESPONSE TO COMPLAINT NO. 612:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 613:** By the end of 2014, Stout calculated that the synthetic equity created by various executive compensation plans that were tied to the stock price, accounted for approximately 25% of the "fully diluted ownership value" of PDC. This created a key conflict of interest among the individuals responsible for preparing the projections, which Argent failed to identify or address even though Argent knew the projections were inflated. These conflicts of interest were, at a minimum, a red flag that the projections (and therefore the valuations based on those projections) were not reliable. *See Brundle v. Wilmington Trust, NA*, 919 F.3d 763 (4th Cir. 2019).

**RESPONSE TO COMPLAINT NO. 613:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 614:** Argent failed to require that the valuations subtract the Excluded Debt, which exceeded the value of the shareholder's equity every year that Argent was trustee. *See* ¶¶ 197-246, 288. In September 2017, Argent's Steve Martin admitted that it had discussed this issue with Stout and that they may need to start including a portion of it in determining equity value but had failed to insist on the change. This failure is particularly disturbing in light of the fact that Stout had subtracted pension liability from fair market value. Although Argent was not the trustee at the time, that issue certainly should have stood out in its review of earlier valuations and particularly the question raised of retirement related debt. Further, because of the sheet magnitude of the Excluded Debt, Argent should have fully understood it and required that it be subtracted in arriving at fair market value.

**RESPONSE TO COMPLAINT NO. 614:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 615:** Argent failed to insist that the valuations include all interest-bearing debt. *See* ¶¶ 247-48. This included (1) "unamortized discounts" which were excluded from all of the valuations approved by Argent even though they were unquestionably interest-bearing; and (2) portions of Appvion's revolving line of credit which were excluded from the 31 December 2015, 30 June 2016, 31 December 2016, and 30 June 2017 valuations. Excluding these debts had material impacts on PDC's share value:

| Valuation Date | Impact of Excluding Unamortized Discounts | Impact of Excluding Revolving Line of Credit |
|---|---|---|
| 30 Jun 14 | $0.82/share | N/A |
| 31 Dec 14 | $0.80/share | N/A |
| 30 Jun 15 | $0.78/share | N/A |
| 31 Dec 15 | $0.56/share | $0.51/share |
| 30 Jun 16 | $0.54/share | $4.23/share |
| 31 Dec 16 | $0.46/share | $2/70/share |
| 30 Jun 16 | $0.57/share | $1.45/share |

**RESPONSE TO COMPLAINT NO. 615:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 616:** Argent failed to challenge the application of the 10% control premium to the 30 June 2014 and 31 December 2014 valuations, which added approximately $53 million in equity to the 30 June 2014 valuation (42% of total equity) and $49,000 million to the 31 December 2014 valuation (61% of the total equity). Starting with the 30 June 2015 valuation, Stout stopped including an explicit control premium, but it continued to value PDC on a controlling-interest basis; on information and belief it still incorporated a control premium through the use of

218

multipliers that Stout selected. This control premium was inappropriate in light of the fact that Argent (as the shareholder supposedly acting for the ESOP) was a directed trustee from 1 July 2015 until mid-2015, and it at all times lacked the ability to control the Board of Directors under the Security Holder's Agreement. *See* ¶¶ 143-44, 254-63.

**RESPONSE TO COMPLAINT NO. 616:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 617:** Argent adopted the valuations despite Stout's practice of rounding numbers throughout the valuation process. *See* ¶ 286. This increased the value of PDC's stock for all of the valuations that Argent adopted, some of them by material amounts. Argent also adopted the 31 December 2014 valuation despite an apparent arithmetic error; combined with the rounding practices, that inflated PDC's stock value by approximately $0.37/share.

**RESPONSE TO COMPLAINT NO. 617:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 618:** Argent approved the 30 June 2015 valuation even though Stout significantly changed its methodology that year, adding a sixth year of data to its discounted cash flow analysis for that valuation only and adding an additional category to its guideline company method analysis of Thermal. Argent also approved the 31 December 2015 valuation even though Stout again changed its methodology, choosing to disregard previous and projected EBITDA numbers in favor of only revenue numbers without reference to profitability. These changes both substantially increased the valuations, covering up the effect of the fact that Appvion sold Encapsys (its most profitable division) that year and despite Thermal's low earnings. *See* ¶¶ 274-77. This was also inconsistent with the 30 August 2015 trust agreement which required Argent to determine fair market value "with consideration being given to methods consistently followed and uniformly applied."

**RESPONSE TO COMPLAINT NO. 618:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 619:** Argent allowed Stout to apply a very small discount for limited marketability which did not reflect the real repurchase obligation. In 2015 and 2016 alone, distributions from the ESOP totaled $19.6 million while contributions to the ESOP were only $3.5 million; however, each of Stout's valuations put the discount for limited marketability at $3.8 to $5 million. *See* ¶¶ 278-79. Argent's Steve Martin admitted that Argent had questioned the low discount for limited marketability but Stout had failed to change it.

**RESPONSE TO COMPLAINT NO. 619:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 620:** As discretionary trustee, Argent approved the Encapsys sale on behalf of the ESOP. This sale was not in the best interests of the ESOP because the loss of this unit it impaired Appvion's ability to function as a going concern. Further, to the extent any of Appvion management may have received compensation from this plan as part of the sale, it was a breach of Argent's fiduciary duties to allow those payments.

**RESPONSE TO COMPLAINT NO. 620:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 621:** Argent failed to understand and question Stout's methodology, including the selected guideline companies and Stout's calculation of the weighted average cost of capital and multipliers used in its valuation methods.

**RESPONSE TO COMPLAINT NO. 621:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 622:** Argent allowed Stout to break Appvion's business out into segments, thus failing to account for all overhead costs not allocated to individual business segments.

**RESPONSE TO COMPLAINT NO. 622:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 623:** Argent failed to document, in writing, its oversight of the appraisers, the appraisal process, and its analysis and review of the final valuation reports, including, among other things, failing to ensure that either the appraiser or the trustee conducted and documented the following:

- The identification of the individuals responsible for providing projections reflected in the valuation report and a reasonable inquiry as to whether those individuals have conflicts of interest;

- An opinion as to the reasonableness of any projections considered and explanation why and to what extent the projections are or are not reasonable, including, at a minimum, an analysis of how the projections compare to and whether they are reasonable in light of the company's five-year historical averages.

- The Trustee's analysis of the final valuation reports, including consideration of the topics, such as, but not limited to, the following:

  o Marketability discounts;

  o Minority interests and control premiums;

- o Projections of the company's future economic performance and the reasonableness or unreasonableness of such projections, including, if applicable, the bases for assuming that the company's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

- o Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

- o The comparability of the companies chosen as part of any analysis based on comparable companies; and

- o Whether the methodologies employed were standard and accepted methodologies and the bases for any departures from standard and accepted methodologies.

**RESPONSE TO COMPLAINT NO. 623:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 624:** In sum, Argent failed to prudently investigate the value of PDC's stock and therefore breached its duty of prudence under ERISA § 404 (29 U.S.C. § 1104).

**RESPONSE TO COMPLAINT NO. 624:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 625:** A fiduciary's duty of loyalty and its duty of prudence § 404(a)(1)(A) and (B) includes a duty to disclose and inform. However, Argent failed to communicate directly with the Employee Owners about Appvion's true financial condition or the valuation process, instead allowing Appvion's ESOP Committee to take the lead in communications. In doing so, Agent allowed Appvion's ESOP Committee to issue misleading communications that reported an inflated PDC stock price, selectively described the valuation process and omitted key information about the valuations necessary to render their communications not misleading. This was a breach of Argent's duty of disclosure.

**RESPONSE TO COMPLAINT NO. 625:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 626:** Argent is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from its breaches of fiduciary duty. These damages include, but are not limited to, the ESOP's losses from overpaying for stock.

**RESPONSE TO COMPLAINT NO. 626:** Because Count II is not asserted against Reliance Trust, no response is required.

**Argent is Liable for Failure to Remedy the Breaches of the Predecessor Fiduciaries**

**COMPLAINT NO. 627:** A fiduciary has a continuing duty to remedy breaches of predecessor fiduciaries.

**RESPONSE TO COMPLAINT NO. 627:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 628:** The duty of prudence required Argent to review and understand prior valuations of Appvion when it became trustee. At a minimum, in order to meet its duty of prudence and comply with its obligation not to allow purchase stock for more than adequate consideration, Argent had to review and approve the 31 December 2013 valuation.

**RESPONSE TO COMPLAINT NO. 628:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 629:** Further, Reliance employees who had worked on the prior Appvion valuations (Stephen Martin, Howard Kaplan, and David Williams) continued to work for Argent after Argent purchased Reliance's ESOP business unit; their knowledge is therefore imputed to Argent.

**RESPONSE TO COMPLAINT NO. 629:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 630:** A review of earlier valuations would also have brought the BemroseBooth treatment to Argent's attention.

**RESPONSE TO COMPLAINT NO. 630:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 631:** Argent therefore was aware that its predecessor trustee fiduciaries (State Street and Reliance), and predecessor ESOP Committee member fiduciaries (at least Richards, Ferree, Arent, and Willetts) had breached their fiduciary duties in connection with those prior valuations.

**RESPONSE TO COMPLAINT NO. 631:** Because Count II is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 632:** Argent breached its fiduciary duties by failing to take adequate steps to remedy their predecessors' breaches of fiduciary duty in connection with the prior valuations. Such steps should have included correcting the stock values and adjusting accounts of ESOP holders, as well as litigation against its predecessor fiduciaries to remedy the overpayments for stock. Instead, Argent failed to take any action and potentially allowed the statute of limitations to expire for breaches of fiduciary duty within six years prior to Argent's appointment.

**RESPONSE TO COMPLAINT NO. 632:** Because Count II is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 633:** As a result of Argent's failure to remedy breaches of its predecessor fiduciaries, the ESOP lost tens of millions of dollars.

**RESPONSE TO COMPLAINT NO. 633:** Because Count II is not asserted against

Reliance Trust, no response is required.

### Plaintiff's Claims Against Argent are Timely

**COMPLAINT NO. 634:** Plaintiff did not have actual knowledge of Argent's breaches of fiduciary duty prior to at least August 2017 when Plaintiff became a fiduciary of the ESOP and then had an opportunity to investigate the facts. Accordingly, Plaintiff's claims against Argent are timely because they were filed within six years after the date of the last action which constituted a part of the breach or the violation, since Argent did not become trustee until 1 July 2014 and Plaintiff's claims were filed 26 November 2018.

**RESPONSE TO COMPLAINT NO. 634:** Because Count II is not asserted against

Reliance Trust, no response is required.

### COUNT III
### BREACH OF FIDUCIARY DUTY AGAINST STATE STREET BANK AND TRUST COMPANY

**COMPLAINT NO. 635:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 635:** Because Count III is not asserted against

Reliance Trust, no response is required. To the extent a response is required, Reliance Trust

incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 636:** State Street was an ESOP fiduciary as trustee from March 2001 to 30 March 2013. State Street therefore owed fiduciary duties of prudence, loyalty, and disclosure under ERISA § 404(A)(1), 29 U.S.C. § 1104(a)(1).

**RESPONSE TO COMPLAINT NO. 636:** Because Count III is not asserted against Reliance Trust, no response is required.

### State Street Breached its Fiduciary Duties of Prudence, Loyalty, and Disclosure in Connection with the 2001 Transaction

**COMPLAINT NO. 637:** PDC's Board of Directors (Buth, Karch, and Parker) appointed State Street as the ESOP Trustee in March 2001. As trustee, State Street's role was to act on behalf of the ESOP in participating in the negotiation of the final purchase price and terms for the 2001 Transaction. State Street was also ultimately responsible for making sure that the transaction complied with ERISA - among other things, that it was a prudent investment and not for more than adequate consideration. In doing so, State Street was subject to the ERISA duties of prudence and loyalty.

**RESPONSE TO COMPLAINT NO. 637:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 638:** State Street breached its fiduciary duties of prudence, loyalty and disclosure in connection with the 2001 Transaction in at least the following ways:

**RESPONSE TO COMPLAINT NO. 638:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 639:** State Street breached its duty of prudence by failing to undertake an adequate and independent valuation of PDC prior to the 2001 Transaction. Because State Street reviewed all relevant documents in connection with the transaction, State Street knew that Buth and other executives were receiving loyalty bonuses based on the ultimate value of the transaction and that Houlihan was receiving a contingent fee based on the ultimate value of the transaction. State Street also understood Houlihan's expansive role in the ESOP Transaction. However, State Street allowed these conflicted parties to drive the ESOP Transaction, including to negotiate the purchase price and financing structure and to control the communications with the Employee Fiduciaries, including the contents of the prospectus and Houlihan's purported independence, and control the retention of State Street and Willamette, including even the terms of their compensation.

**RESPONSE TO COMPLAINT NO. 639:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 640:** State Street failed to disclose Houlihan's conflicts of interest, even when State Street's Driscoll was present while Houlihan's Paone was presented to employees as independent at the 2 August 2001 road show. Because State Street conducted due diligence and required and obtained the ability to review all relevant documents, State Street reviewed disclosure

documents and was given approval rights and also reviewed presentation materials communicated to participants. State Street reviewed Buth's 25 July 2001 letter which stated that Houlihan's Paone would provide "independent validation of the deal" and the road show agenda which said Paone would provide "Independent Validation of Deal Terms" but failed to correct these misrepresentations. This failure was a breach of State Street's duty of prudence, duty of disclosure and duty of loyalty. It demonstrated loyalty to management and Houlihan over loyalty to the ESOP and its Employee Fiduciaries.

**RESPONSE TO COMPLAINT NO. 640:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 641:** State Street reviewed and gave its required approval to the Prospectus that was distributed to employees. The prospectus disclosed Buth and other senior executives' conflicts of interest but failed to disclose Houlihan's conflict of interest even though State Street knew Houlihan was not qualified to give the fairness opinion to either the board or directly to the ESOP Fiduciaries. State Street breached its duty of prudence of disclosure and loyalty by failing to ensure that Houlihan's conflict was disclosed. State Street's failure to require this disclosure demonstrates their loyalty to management and Houlihan rather than to the ESOP.

**RESPONSE TO COMPLAINT NO. 641:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 642:** Because it reviewed all relevant disclosure documents and presentation materials that were communicated to the Employee Owners, it knew that Houlihan's conflict of interest was not otherwise disclosed in a context that required disclosure to not be fraudulently misleading.

**RESPONSE TO COMPLAINT NO. 642:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 643:** State Street had an obligation to determine whether the amount the ESOP was paying or the PDC stock was fair market value, and whether the ESOP would have an appropriate amount of equity after taking into account the liabilities that PDC would assume and the amount of debt that PDC was taking on in order to pay the $810 million purchase price. The ESOP invested approximately $107 million; according to the mortgage analysis that State Street's own advisor Willamette presented to Appvion employees, the ESOP should have had at least $107 million in equity immediately after the transaction, and that equity would grow as debts were paid down. However, inclusion of an inappropriate 15% control premium (*see* ¶¶ 143-44, 254-63) and the failure to subtract all debts (including $73.1 million in pension and post-retirement debt and "other material liabilities" reported on the balance sheet as of 31 December 2001 (*see* ¶ 288), less than two months after the transaction closed) meant that the ESOP actually had negative equity when the transaction closed. The transaction was not fair to the ESOP and caused the ESOP to take on excessive debt. PDC's stock was therefore not a prudent investment, and the purchase

was for more than adequate consideration. By allowing the transaction to close, State Street breached its duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 643:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 644:** State Street claimed to have relied on Willamette's opinion of fair market value even though reliance on Willamette's opinion was not justifiable under the circumstances because of at least the failure to consider the Excluded Debt and the inclusion of a fraudulent control premium. State Street's conclusion of fair market value violated its duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 644:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 645:** State Street failed to remedy the ESOP's overpayment for PDC stock at any time between the 2001 Transaction and when State Street resigned as trustee effective 31 March 2013. To the contrary, State Street approved ongoing PDC stock prices that perpetuated the valuation errors in order to conceal inflated valuation dating back to the ESOP Transaction. Again, this violated State Street's duty of prudence, disclosure and loyalty.

**RESPONSE TO COMPLAINT NO. 645:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 646:** The 2001 engagement letter between Appvion and State Street states that "If the proposed acquisition is consummated, it is also contemplated that ... State Street will be appointed as trustee of the ESOP." Therefore, State Street knew that if it approved the transaction it would be appointed as trustee for the ESOP on an ongoing basis and would continue to earn fees for acting as the trustee. State Street breached its duty of loyalty by failing to act solely in the interests of the participants and beneficiaries, but instead acting in the interest of conflicted Buth, Karch (and other executives) and in its own self-interests as described in Section IV.A.

**RESPONSE TO COMPLAINT NO. 646:** Because Count III is not asserted against Reliance Trust, no response is required.

### State Street Breached its Fiduciary Duties in Connection with the Valuations

**COMPLAINT NO. 647:** Where an ERISA fiduciary is responsible for setting the price of stock, the duties of loyalty and prudence require a fiduciary to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan. This requires the fiduciary to determine the value of the stock in good faith using a prudent process.

**RESPONSE TO COMPLAINT NO. 647:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 648:** Under § 2.4(j) of the Appleton Papers, Inc. Employee Stock Ownership Trust agreement dated 6 September 2001, State Street agreed that "all valuations of shares of Company Stock shall originally be made by an "Independent Appraiser" (as described in Section 401(a)(28)(C) of the Code) retained by the Trustee, and reviewed and finalized by the Trustee in accordance with Section 3(18)(B) of ERISA."

**RESPONSE TO COMPLAINT NO. 648:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 649:** The ESOP documents were consistent with the trust agreement and ERISA, requiring the stock to be valued on a semi-annual basis by an independent appraiser in accordance with ERISA § 3(18). Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

**RESPONSE TO COMPLAINT NO. 649:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 650:** Therefore State Street was required to retain an independent appraiser to value PDC's stock, but State Street was ultimately responsible for determining stock value.

**RESPONSE TO COMPLAINT NO. 650:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 651:** In January 2002, Appvion's ESOP Committee recommended that State Street retain Willamette to perform the 31 December 2001 and 30 June 2002 valuations. State Street adopted the following share prices after a review and analysis of Willamette's valuations:

| Valuation Date | Share Price |
|----------------|-------------|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |

**RESPONSE TO COMPLAINT NO. 651:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 652:** In January 2005, Appvion's ESOP Committee recommended that State Street retain Stout as the valuation firm to perform the valuations for the ESOP. State Street adopted the following share prices after a review and analysis of Stout's valuations:

| Valuation Date | Share Price |
|----------------|-------------|
| 12/31/2004 | $ 26.36 |
| 06/30/2005 | $ 27.77 |
| 12/31/2005 | $ 28.56 |
| 06/30/2006 | $ 31.27 |
| 12/31/2006 | $ 33.62 |
| 06/30/2007 | $ 32.89 |
| 12/31/2007 | $ 33.41 |
| 06/30/2008 | $ 26.64 |
| 12/31/2008 | $ 21.43 |
| 06/30/2009 | $ 18.87 |
| 12/31/2009 | $ 13.26 |
| 06/30/2010 | $ 12.03 |
| 12/31/2010 | $ 12.84 |
| 06/30/2011 | $ 14.10 |
| 12/31/2011 | $ 15.01 |
| 06/30/2012 | $ 16.45 |
| 12/31/2012 | $ 17.55 |

**RESPONSE TO COMPLAINT NO. 652:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 653:** In connection with the valuations from December 2001 through December 2012, State Street breached its duty of prudence, loyalty and disclosure in relying on Willamette and Stout's valuations. Reliance on Willamette and Stout's advice was not reasonably justified under the circumstances. Rather, State Street knew that its reliance was fraudulent. State Street breached its fiduciary duties by relying on the valuations in at least the following ways:

**RESPONSE TO COMPLAINT NO. 653:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 654:** State Street failed to properly scrutinize the financial projections provided by Appvion management, which both Willamette and Stout relied on in valuating PDC stock, even though Appvion had consistently failed to meet its projections.

**RESPONSE TO COMPLAINT NO. 654:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 655:** The various incentive compensation plans in place that allowed Appvion executives involved in preparing the projections to directly benefit from increased stock prices created conflicts of interest (*see* ¶¶ 297-305), and State Street failed to identify or put processes in plate to address these or compensate for these conflicts. In particular, the New Deferred Compensation Plan in effect from 2001 to 2005 allowed the senior executives involved in the 2001 transaction to defer a portion of the bonuses they received from that transaction, tied to the value of PDC stock; this plan provided a significant incentive to increase the projections and the overall share value until it was terminated in 2005 because it was "an expensive form of company capital." The LTIP and RSU plans also provided management with incentives to increase the stock price. These conflicts of interest were, at a minimum, a red flag that the projections were not reliable. .

**RESPONSE TO COMPLAINT NO. 655:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 656:** State Street failed to require that the valuations subtract the Excluded Debt. *See* ¶¶ 197-246, 288. The Excluded Debt was a material number during State Street's entire tenure as trustee, and it exceeded the fair market value of the shareholder's equity as reflected in the Stout valuation for at least 2009-2012 and in earlier years, the Excluded Debt constituted a high percentage of Appvion's alleged equity. In addition, State Street approved and adopted the 31 December 2007 Stout valuation which expressly deducted the present value of BemroseBooth's pension payments from PDC's fair market value; that same valuation report disregarded the rest of Appvion's much larger pension liability. *See* ¶¶ 209-36. Therefore, State Street also approved and adopted Stout's 30 June 2008 valuation which valued BemroseBooth at zero equity value because of its unfunded pension liability. State Street was therefore on notice by at least the end of 2007 (and agreed) that the valuations should have deducted Appvion's substantial pension/post-retirement liability; the failure to require this deduction made State Street's reliance on the valuations unjustified.

**RESPONSE TO COMPLAINT NO. 656:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 657:** The fact that State Street agreed to the subtraction of BemroseBooth's retirement debt shows that State Street knew that retirement-related debt must be subtracted to arrive at fair market value. Further, in light of the BemroseBooth treatment, State Street should have required all previous valuations to be adjusted and that all future valuations deduct the Excluded Debt. The failure to do so was a knowing breach of State Street's duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 657:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 658:** State Street failed to insist that the valuations include even all interest-bearing debt in the 31 December 2008 and 30 June 2009 valuations:

- The 31 December 2008 valuation discounted Appvion's interest-bearing debt from $602.1 million to $534.3 million because, according to Stout: (1) debt with a face value of over $250 million was trading at a discount to par value (discounted by $40 million); (2) Appvion intended to repurchase $30 million of publicly traded debt for $21 million; and (3) Appvion planned a "bulk receivables sale for $20 million, which will be used to reduce the outstanding revolver balance." There was no indication that Appvion was legally obligated to consummate any of these transactions, and Appvion did not complete them by the valuation date or soon thereafter. Further, Stout did not address whether Appvion was capable of buying the debt that was trading at a discount (it was not) or offset its reduction with expected financing costs. Discounting the interest-bearing debt inflated PDC's share price by approximately $6.15/share.

- When Stout conducted its valuation as of 30 June 2009 valuation, Appvion had still not refinanced the debt it discounted in its prior report. However, Stout again discounted Appvion's interest-bearing debt because it was trading at under par value, discounting it from a forecast $611.6 million to $553 million based on market value. Stout then added back $20 million as estimated costs to refinance its publicly-traded debt. There was no indication that Appvion was legally obligated to refinance its debt. Reducing the amount of interest-bearing debt considered in the valuation increased the share price by approximately $4.17/share.

- Appvion did not refinance until 30 September 2009. The 31 December 2009 valuation report that the refinancing had been completed and the interest-bearing debt forecast as of 31 December 2009 was $564.5 million. This reduction was not solely due to the refinancing because Stout noted it had also reduced the debt by $17 million from the proceeds of the planned sale of Appvion subsidiary C&H Packaging which would be used to repay debt (although Appvion's 10-K reported that it only used $8.1 million of the proceeds to repay its debt).

- On 8 February 2010, Appvion completed a refinancing of a significant amount of its debt, replacing approximately $219 million in loans that Stout included as interest-bearing debt in its 31 December 2009 valuation report with $305 million of debt. Unlike its treatment of potential refinancing in the 31 December 2008 and 30 June 2009 valuation reports, Stout did not include this higher debt number in its 31 December 2009 valuation and instead purported to use the forecast debt as of the valuation date even though Appvion would have been well into negotiations for this refinancing at the time.

**RESPONSE TO COMPLAINT NO. 658:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 659:** In sum, this treatment of interest-bearing debt was inconsistent and demonstrates that Stout's reduction of the interest-bearing debt in the prior valuation reports was not justified. This was especially important because debt directly impacted the share price.

**RESPONSE TO COMPLAINT NO. 659:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 660:** State Street (on behalf of the ESOP) signed the Security Holders Agreement with PDC. This agreement, combined with plan provisions requiring the trustee to vote as directed by the ESOP Committee and State Street's role as a directed trustee, severely limited State Street's right to control Appvion and PDC. *See* ¶¶ 143-44, 254-63. Despite this lack of control, State Street acted fraudulently and in breach of its duties of prudence, loyalty and disclosure allowing Stout to apply a control premium for which there was no factual basis, which Stout valued at 15% in its 2001 through 2011 valuations and 10% in the 2012 valuations. This control premium constituted a material portion of PDC's equity value for these years. The below chart shows the impact on the share value of dividing the shareholder equity:

**Table 18: Impact of Removing the Control Premium on State Street's Stock Values**

| Valuation Date | Total PDC Shareholder Equity per Stout | Control Premium | Shareholder Equity Without Control Premium | Impact on Share Price |
|---|---|---|---|---|
| 30 Jun 02 | *$202,827,000 | *$82,700,000 | $120,127,000 | ($7.58) |
| 31 Dec 02 | *$253,992,000 | *$75,058,000 | $178,934,000 | ($6.48) |
| 30 Jun 03 | *$263,800,000 | *$80,495,000 | $183,305,000 | ($6.84) |
| 31 Dec 03 | *$283,235,000 | *$83,576,000 | $199,659,000 | ($6.89) |
| 30 Jun 04 | *$305,000,000 | *$118,400,000 | $186,600,000 | ($10.18) |
| 31 Dec 04 | $307,000,000 | *$114,196,000 | $188,072,000 | ($9.81) |
| 30 Jun 05 | $328,000,000 | $104,100,000 | $223,900,000 | ($8.81) |
| 31 Dec 05 | $341,000,000 | $115,950,000 | $225,050,000 | ($9.71) |
| 30 Jun 06 | $363,000,000 | $117,300,000 | $245,700,000 | ($10.10) |
| 31 Dec 06 | $391,000,000 | $117,450,000 | $273,550,000 | ($10.10) |
| 30 Jun 07 | $362,000,000 | $124,050,000 | $237,950,000 | ($11.27) |
| 31 Dec 07 | $368,000,000 | $120,450,000 | $247,550,000 | ($10.94) |
| 30 Jun 08 | $289,000,000 | $113,100,000 | $175,900,000 | ($10.42) |
| 31 Dec 08 | $223,000,000 | $97,000,000 | $126,000,000 | ($9.32) |
| 30 Jun 09 | $189,000,000 | $92,000,000 | $97,000,000 | ($9.18) |
| 31 Dec 09 | $130,000,000 | $84,000,000 | $46,000,000 | ($8.57) |
| 30 Jun 10 | $117,000,000 | $75,000,000 | $42,000,000 | ($7.71) |
| 31 Dec 10 | $124,000,000 | $76,000,000 | $48,000,000 | ($7.87) |

| Valuation Date | Total PDC Shareholder Equity per Stout | Control Premium | Shareholder Equity Without Control Premium | Impact on Share Price |
|---|---|---|---|---|
| 30 Jun 11 | $132,000,000 | $77,000,000 | $55,000,000 | ($8.22) |
| 31 Dec 11 | $139,000,000 | $67,000,000 | $72,000,000 | ($7.24) |
| 16 Jul 12 | $146,000,000 | $51,000,000 | $95,000,000 | ($5.73) |
| 31 Dec 12 | $153,000,000 | $54,000,000 | $99,000,000 | ($6.21) |

*15% control premium and equity value calculated from PDC's consolidated balance sheets.

Sources: Stout Valuations, 30 Jun 05, pp. 94,96,98,108; 31 Dec 2005, pp. 69,71,73,92; 30 Jun 2006, pp. 72,74,76,94; 31 Dec 2006, pp. 80,82,84,103; 30 Jun 2007, pp. 65,67,69,71,88; 31 Dec 2007, pp. 38,40,42,44,61; 30 Jun 2008, pp. 37,39,41,56; 31 Dec 2008, pp. 40,42,45,60; 30 Jun 2009, pp. 37,39,42; 31 Dec 2009, pp. 35, 37, 40; 30 Jun 2010, pp. 33,35,48; 31 Dec 2010, pp. 31,33,46; 30 Jun 2011, pp. 28,30,43; 31 Dec 2011, pp. 28,30,43; 16 Jul 2006, pp. 16,18, 31; 31 Dec 2012, pp. 29, 31,44.

**RESPONSE TO COMPLAINT NO. 660:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 661:** State Street approved Stout's valuation as of 30 June 2012, even though it "included some (but not all) of the incremental value of the proposed transaction [with Hicks] in the share price announced." The $18.80/share price State Street adopted would have directly benefited the ESOP Committee members if the Hicks transaction closed. *See* ¶¶ 320-27. At a minimum, this valuation and the need for a special valuation to correct the share price should have put State Street on notice that Stout's valuation methods were not reliable and that it was not acting as an independent advisor.

**RESPONSE TO COMPLAINT NO. 661:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 662:** State Street retained Willamette and Stout to perform ongoing valuations at the request of the ESOP Committee. *See* ¶¶ 155-57. State Street breached its fiduciary duty of prudence and loyalty by failing to ensure that these financial advisors to State Street were truly independent.

**RESPONSE TO COMPLAINT NO. 662:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 663:** State Street violated its duty of prudence and loyalty by failing to properly investigate Willamette and Stout's methods for valuing PDC stock and adopting the valuations despite what State Street knew to be substantial flaws in the valuations that resulted in significant overvaluations of PDC stock.

**RESPONSE TO COMPLAINT NO. 663:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 664:** State Street violated its duty of prudence and loyalty to require that Stout deduct the value of phantom stock held by non-employee directors under the Non-Employee Director Deferred Compensation Agreement which was created in 2006. *See* ¶ 300. Stout did not deduct any portion of the compensation due under this plan from its valuations (which was based on the value of PDC's stock) until its 31 December 2011 valuation, even though the value of the phantom stock was close to or exceeded the value of other synthetic equity that Stout deducted during the same time period.

**RESPONSE TO COMPLAINT NO. 664:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 665:** State Street violated its duties of prudence and loyalty by allowing Stout to overvalue BemroseBooth and Performance Packaging despite numerous indications that the companies were worth less than the purchase price, including Appvion's recognition of goodwill impairments for these entities. *See* ¶¶ 307-18.

**RESPONSE TO COMPLAINT NO. 665:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 666:** State Street violated its duty of prudence and loyalty to understand and question Stout's methodology, including the selected guideline companies and Stout's calculation of the weighted average cost of capital and multipliers used in its valuation methods. State Street also approved valuations that improperly capitalized Appvion's declining income stream into perpetuity. *See* ¶¶ 282-284.

**RESPONSE TO COMPLAINT NO. 666:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 667:** State Street violated its duty of prudence and loyalty to document, in writing, their oversight of the appraisers, the appraisal process, and its analysis and review of the final valuation reports, including, among other things, failing to ensure that either the appraiser or the trustee conducted and documented the following:

- The identification of the individuals responsible for providing projections reflected in the valuation report and a reasonable inquiry as to whether those individuals have conflicts of interest;

- An opinion as to the reasonableness of any projections considered and explanation why and to what extent the projections are or are not reasonable, including, at a

minimum, an analysis of how the projections compare to and whether they are reasonable in light of the company's five-year historical averages.

- The Trustee's analysis of the final valuation reports, including consideration of the topics, such as, but not limited to, the following:

  o Marketability discounts;

  o Minority interests and control premiums;

  o Projections of the company's future economic performance and the reasonableness or unreasonableness of such projections, including, if applicable, the bases for assuming that the company's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

  o Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

  o The comparability of the companies chosen as part of any analysis based on comparable companies; and

  o Whether the methodologies employed were standard and accepted methodologies and the bases for any departures from standard and accepted methodologies.

**RESPONSE TO COMPLAINT NO. 667:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 668:** In sum, State Street failed to prudently investigate the value of PDC's stock and breached its duties of loyalty, prudence and disclosure under ERISA § 404 (29 U.S.C. § 1104). State Street also failed to disclose the valuation deficiencies in violation of its duties of disclosure.

**RESPONSE TO COMPLAINT NO. 668:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 669:** State Street is liable ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from its breaches of fiduciary duty. These damages include, but are not limited to, the ESOP's losses from overpaying for stock.

**RESPONSE TO COMPLAINT NO. 669:** Because Count III is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claim against State Street in Connection with the 2012 Valuation Is Timely Without Regard to Tolling**

**COMPLAINT NO. 670:** Plaintiff did not have actual knowledge of State Street's breaches of fiduciary duty until at least August 2017 when Plaintiff became an ESOP fiduciary and then had an opportunity to investigate the facts. Accordingly, Plaintiff's claims against State Street relating to the 31 December 2012 valuation are timely because they were filed within six years after the date of the last action which constituted a part of the breach or the violation, since Plaintiff's claims were filed 26 November 2018.

**RESPONSE TO COMPLAINT NO. 670:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 671:** In addition, State Street approved the use of the 16 July 2012 valuation to purchase shares from PDC and to repurchase shares from employees in December 2012. Accordingly, the last actions which constituted a breach of State Street's fiduciary duties in connection with that valuation occurred within the six-year statute of repose and Plaintiff's claims relating to that valuation are timely without regard to fraud or concealment.

**RESPONSE TO COMPLAINT NO. 671:** Because Count III is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claims Against State Street for Breaches of Fiduciary Duty Prior to 26 November 2012 are Tolled**

**COMPLAINT NO. 672:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation.

**RESPONSE TO COMPLAINT NO. 672:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 673:** For process-based claims relating to State Street's evaluation of the fairness of the transaction and State Street's valuations of PDC's stock, the duty of prudence requires consideration of both the substantive reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision. Accordingly, discovery for purposes of ERISA § 413 could not occur until the Plaintiff was aware of the process the trustees used to value PDC's stock. Here, that prudence of State Street's process hinges on the contents of the valuations themselves along with State Street's prudence and good faith in adopting those valuations. Since the valuations were confidential, it was not possible for a reasonably diligent plaintiff in Mr. Lyon's position to discover the breaches of fiduciary duty prior to August 2017.

**RESPONSE TO COMPLAINT NO. 673:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 674:** As more fully in Section IV.A., State Street engaged in a course of conduct of affirmative steps to conceal its breaches of fiduciary duty to conceal that it had misrepresented PDC's fair market value, to conceal that Buth, Karch (and other executives) and Houlihan were conflicted and acting for their own self-interest to conceal that State Street was retained as a result of Houlihan and managements' conflict and was wanting for further their interests over the interests of the ESOP. State Street took the following affirmative steps to conceal:

- State Street reviewed and gave its required approval to the 23 July 2001 Prospectus which misleadingly disclosed Buth and Karch's conflicts of interest but fraudulently failed to disclose Houlihan's conflicts of interest;

- State Street reviewed and approved Buth's 25 July 2001 Letter which stated that Houlihan would provide "Independent validation of the deal;"

- State Street reviewed and approved the program for the road show that said Houlihan's Paone would provide "Independent Validation of Deal Terms."

- State Street's Driscoll was present at the 2 August 2001 road show presentation when Karch introduced Paone as independent but failed to correct it, which is equivalent to a misrepresentation; and

- State Street reviewed and approved the 19 November 2001 Prospectus Update which described investment banking fees of $8 million but did not explain that those fees were contingent or identify who those fees were being paid to.

**RESPONSE TO COMPLAINT NO. 674:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 675:** By participating in the representation that Houlihan was independent and by failing to require the disclosure that Houlihan was not independent when failure to do so made the remaining disclosures misleading, State Street engaged in a misleading and deceptive action or scheme in the course of committing its fiduciary breaches that was designed to mask the existence of a cause of action. By believing that Houlihan was independent, the Employee Fiduciaries were misled into believing that the PDC stock price was not more than fair market value.

**RESPONSE TO COMPLAINT NO. 675:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 676:** With respect to the fairness of the purchase price, State Street's Driscoll fraudulently represented during the 2 August 2001 Road show that State Street had

extensively analyzed the investment, reviewed "reams of documents and financial statements," understood the risks, and determined the price, and that the ESOP would not be paying more than fair market value. State Street's Driscoll also represented that State Street was "very comfortable" with Willamette's valuation and relied on that opinion to make a preliminary determination that the price was fair to the ESOP. State Street also concealed that the valuation did not deduct the Excluded Debt and that it included a fraudulent control premium. State Street also concealed that neither management nor Houlihan were acting in the ESOP's best interests. And as explained above, the representations of Houlihan's independence further deceived the ESOP Fiduciaries into believing that the purchase price was for fair market value.

**RESPONSE TO COMPLAINT NO. 676:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 677:** After the 2001 Transaction, State Street continued to (unjustifiably and fraudulently) rely on Willamette's and later Stout's violations while representing that it was following a prudent process. Each stock valuation replicated the same issues as the initial opinion and served to affirmatively conceal State Street's breaches of fiduciary duty and fraudulent misrepresentations regarding the PDC stock value in connection with the 2001 Transaction and in connection with each of the ongoing valuations. *See* ¶¶ 348-49. Further, State Street communicated the share value knowing that the ESOP Committee was releasing the stock price through communications with employees and in the 10-Ks and 10-Qs. *See* ¶¶ 349-367.

**RESPONSE TO COMPLAINT NO. 677:** Because Count III is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 678:** State Street took the additional affirmative steps to conceal its breaches of fiduciary duty and each earlier misrepresentation as described in Paragraphs 373-557.

**RESPONSE TO COMPLAINT NO. 678:** Because Count III is not asserted against Reliance Trust, no response is required.

### COUNT IV
### BREACH OF FIDUCIARY DUTY AGAINST BUTH

**COMPLAINT NO. 679:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 679:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Buth Owed Fiduciary Duties of Prudence and Loyalty to the ESOP**

**COMPLAINT NO. 680:** Buth was CEO and Chairman of Appvion and PDC's Boards of Directors from 1998 to 31 May 2005. As CEO, Buth was responsible for nominating, either separately or jointly with the trustee, a majority of the Board, and he nominated himself to the Board until he retired in 2005. Buth was therefore both a member of the Board and was at all times able to control the composition of the majority of the Board. The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Buth was therefore a fiduciary because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties. Buth had a duty to prudently monitor the actions of the ESOP Trustee and the ESOP Committee.

**RESPONSE TO COMPLAINT NO. 680:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 681:** Buth was a fiduciary of the ESOP as a member of the ESOP Committee from July 2001 to May 2005 and owed fiduciary duties of loyalty, prudence, and disclosure under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

**RESPONSE TO COMPLAINT NO. 681:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 682:** Buth exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications about the stock price and the valuation process, and directing the purchase of PDC's stock. In doing so, he had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 682:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**Buth Breached his Fiduciary Duties to the ESOP in Connection with the 2001 Transaction**

**COMPLAINT NO. 683:** Buth breached his fiduciary duties of prudence, loyalty, and disclosure in connection with the 2001 Transaction as more fully described in Section IV.A. by at least the following:

**RESPONSE TO COMPLAINT NO. 683:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 684:** Buth breached his fiduciary duty of prudence, loyalty and disclosure by signing the engagement letter with Houlihan, agreeing to pay Houlihan a contingent fee of $8.1 million if the ESOP Transaction closed, which would be paid by PDC from plan assets.

**RESPONSE TO COMPLAINT NO. 684:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 685:** Because Buth (and his "CEO Team") had a conflict of interest with regards to the proposed ESOP transaction, it was not prudent or loyal to retain investment banker Houlihan, who also had a conflict of interest, and, at the same time, to give Houlihan broad responsibilities and discretion regarding virtually all critical elements of the ESOP transaction.

**RESPONSE TO COMPLAINT NO. 685:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 686:** Buth hired Houlihan on a contingent fee basis with broad responsibilities and discretion, ensuring that the 2001 Transaction (which Houlihan quarterbacked) would be infested with conflict.

**RESPONSE TO COMPLAINT NO. 686:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 687:** Buth and Houlihan's conflict was not sanitized by hiring State Street and Willamette, because Houlihan exercised its contractual authority to hand-pick both of these firms and both Buth and Houlihan continued with their pervasive ESOP-related duties. Houlihan chose Willamette and State Street because Houlihan knew they would support the ESOP transaction and that they were beholden to Houlihan because Houlihan was a source of their business, and the source of their engagement to work on the ESOP transaction and thereafter for the ESOP.

**RESPONSE TO COMPLAINT NO. 687:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 688:** Critical examples of how State Street and Willamette curried favor with Buth and Houlihan, in violation of their duties of prudence, loyalty and disclosure, include that neither of them made any objection when Karch introduced Houlihan as being independent at the road show, both agreed to the ongoing strategy to deduct only a portion of Appvion's debt in the calculation of the PDC stock's fair market value, and both agreed to the inclusion of the fraudulent control premium even though no facts supported it.

**RESPONSE TO COMPLAINT NO. 688:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 689:** In addition, neither objected to the disclosure in the prospectus of Houlihan's role in giving a fairness opinion to the board, nor the fairness opinion Houlihan expressed directly to the Shareholder Fiduciaries even though State Street knew Houlihan's conflict prevented it from giving any opinion. And neither objected to the prospectus' complete failure to disclose Houlihan's conflict even though Houlihan was being put forth as an important counterbalance to management's conflict.

**RESPONSE TO COMPLAINT NO. 689:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 690:** Being conflicted himself, Buth breached his duty of prudence, loyalty and disclosure by working together with conflicted Houlihan in negotiating the purchase price of the PDC stock acquisition; by granting Houlihan authority and discretion over all communications with the Employee Fiduciaries, including the contents of the prospectus; by granting Houlihan authority and discretion to assist in the selection of the ESOP team, including the negotiation of their engagement terms; by granting Houlihan discretion and authority over the "solicitation and structure of employee-based equity capital investment for transaction purposes;" by allowing Houlihan to "quarterback" the "coordination of the ESOP-related activities;" and by granting Houlihan authority and discretion regarding the "Use of Pension Plans over-funded balances."

**RESPONSE TO COMPLAINT NO. 690:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 691:** Buth violated is duty of prudence, loyalty and disclosure by participating himself and together with the CEO team in all aspects of the ESOP transaction while they all were conflicted by their contingent fee arrangement. Buth's participation in misrepresenting Houlihan to the Employee Fiduciaries as being independent destroyed any meaningful attempt at disclosure and further evidenced the true impact of Buth's conflict on his judgment and the ESOP transaction.

**RESPONSE TO COMPLAINT NO. 691:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 692:** In fact, Buth's personal involvement in completely and carefully preventing any disclosure of Houlihan's conflict, while at the same time putting Houlihan forth as being independent, demonstrates the pervasive and undisclosed impact of both Buth and Houlihan's combined conflict on their collective judgment and their purported loyalty to the ESOP.

**RESPONSE TO COMPLAINT NO. 692:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 693:** Buth breached his duty of prudence, loyalty and disclosure by juxtaposing Houlihan's opinion of fairness directly following a discussion of management's conflict, with no disclosure of Houlihan's conflict; and by specifically disclosing management's conflict in the prospectus while making no disclosure of Houlihan's conflict.

**RESPONSE TO COMPLAINT NO. 693:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 694:** Buth engaged Houlihan to give a fairness opinion and to present the opinion to the Employee Fiduciaries in both the prospectus and at the road shows, even though Buth knew that Houlihan was conflicted and therefore disqualified from giving any opinion. This is further evidence of a breach of his duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 694:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 695:** Buth breached his duty of prudence, loyalty and disclosure by presenting Houlihan as independent both in 25 July letter to employees, in the program for the 2 August 2001 Road show, and by remaining silent at the 2 August 2001 Road Show when Karch introduced Houlihan as independent. However, Buth knew of and approved the fraudulent strategy of communicating to the Employee Fiduciaries informing them that a conflict disqualified one from giving a fairness opinion, thus causing the Employee Fiduciaries to believe Houlihan was independent and that they could rely on Houlihan's opinions.

**RESPONSE TO COMPLAINT NO. 695:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 696:** Buth breached his duty of prudence, loyalty and disclosure by reviewing and approving the 23 July 2001 prospectus, which disclosed his own conflict of interest created by the AWA loyalty payments but covered up the impact of the conflict by representing to the Employee Fiduciaries that Houlihan believed the transaction price was fair in spite of Buth's conflicts. This fraudulent disclosure actively concealed Houlihan's conflict of interest, the true impact of Buth's conflict, and the fact that the transaction price was for more than fair market value.

**RESPONSE TO COMPLAINT NO. 696:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 697:** At the 2 August 2001 road show, Buth represented that "The prospectus has all the details for you to make a decision." He also represented that the fees that would be paid to advisors were explained in the prospectus: We got to pay some of these advisors. The fact is we have some fees to pay and it's highlighted in the prospectus." However, the prospectus only referenced "Transaction fees and expenses" of $30 million without identifying

who those fees were going to, and did not explain how much Houlihan would earn or that its fees were contingent.

**RESPONSE TO COMPLAINT NO. 697:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 698:** At the 2 August 2001 Road Show presentation, Buth was present while Paone described the $810 million purchase price as "attractive" and said employees were getting a good deal. He was also present while Driscoll represented that it was "a very good price," and that State Street had determined the price was fair to the ESOP, and that State Street was making sure that "we're not paying more than the fair market value." Buth knew these opinions and representations were fraudulent. Buth similarly represented that the independent validation from Paone and Driscoll shows that "We got a good deal." In fraudulently representing that the purchase price was fair or a good deal, Buth knew but failed to disclose that the ESOP would take on excessive debt at the proposed purchase price when the pension/postretirement liabilities and Other Material Liabilities were included. Buth also knew but failed to disclose that the initial valuation was overstated because it included a control premium, which had no factual basis.

**RESPONSE TO COMPLAINT NO. 698:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 699:** In his role as a member of the ESOP Committee, Buth breached his fiduciary duty of prudence, loyalty and disclosure by directing the ESOP Trustee to purchase PDC's stock even though Buth knew it was for more than fair market value.

**RESPONSE TO COMPLAINT NO. 699:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 700:** As a fiduciary with the ability to remove State Street as ESOP Trustee, Buth breached his duty of prudence and loyalty by failing to implement effective processes to monitor State Street as ESOP Trustee and ensure that State Street was complying with its fiduciary obligations under ERISA, in communicating with employees, negotiating the purchase price, approving the transaction, and determining that the purchase of PDC's stock was allowable under ERISA. Had Buth prudently monitored State Street, he would have required State Street to conduct an independent analysis of the purchase price and determine whether there would be sufficient shareholder equity after the transaction, if the control premium were not included and if the Excluded Debt had been subtracted. In fact, Buth would have retained a trustee who was independent of Houlihan's conflict.

**RESPONSE TO COMPLAINT NO. 700:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 701:** Buth's breaches of fiduciary duty damaged the ESOP by preventing the ESOP from benefitting from a truly independent financial team of advisors who: (1) would have presented the proposed 2001 Transaction in a fair, balanced, and impartial manner, (2) would have negotiated the terms of the PDC stock acquisition and engaged in the entire ESOP process while being free of conflict, (3) would have been qualified to give a fairness opinion, and (4) would have been free of conflict when selecting the trustee and the valuation firm and in communicating with the Employee Fiduciaries. As a result, Buth caused the ESOP to enter into a transaction that it otherwise would not have, or in the alternative, to overpay for the purchase of Appvion and the PDC stock. Buth is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 701:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

### Buth Breached his Fiduciary Duties to the ESOP in Connection with the Stock Valuations From 2001 to 2005

**COMPLAINT NO. 702:** Buth breached his fiduciary duties of prudence, loyalty, and disclosure in connection with the PDC stock valuations by at least the following:

**RESPONSE TO COMPLAINT NO. 702:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 703:** Buth approved and adopted the following PDC stock values even though he knew the valuations were fraudulently inflated:

| Valuation Date | Share Price |
|---|---|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |
| 12/31/2004 | $ 26.36 |

**RESPONSE TO COMPLAINT NO. 703:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 704:** In approving and adopting these stock values, Buth failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at these prices and failed to value the stock in good faith using a prudent process. He adopted these share prices despite the following facts that he knew caused the stock price to be materially overstated:

- Buth knew that the valuations added a fraudulent control premium even though he, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts that supported the control premium. This fraudulent control premium added a material amount to the stock value at all times while Buth was a fiduciary. *See* ¶¶ 143-44, 254-63, 288.

- Buth also knew that the valuations failed to subtract the Excluded Debt, which was at all times a material number and should have been subtracted in arriving at fair market value. *See* ¶¶ 197-246, 288.

**RESPONSE TO COMPLAINT NO. 704:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 705:** In his role as a member of the ESOP Committee, Buth breached his duty of prudence, loyalty and disclosure by directing the ESOP Trustee to purchase PDC's stock using these stock prices even though Buth knew they were for more than fair market value.

**RESPONSE TO COMPLAINT NO. 705:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 706:** Because of his incentive compensation tied to the stock price (*see* ¶¶ 139, 297-305), Buth further breached his duty of loyalty by putting his own financial interests above the ESOP's interest in approving an inflated stock price.

**RESPONSE TO COMPLAINT NO. 706:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 707:** Buth also breached his fiduciary duties of prudence, loyalty and disclosure by failing to prudently monitor State Street in its determination of the share value. Despite direct review of the valuation reports and working with State Street on the valuations, Buth failed to insist that State Street accurately value the PDC stock and instead accepted share prices that he knew to be fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 707:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 708:** Buth authored and/or approved communications to the Employee Owners informing them of the fraudulent stock prices and reassuring them that the current and all previous valuations were correct. *See* ¶¶ 373-427. These communications were fraudulently misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining the stock price's fair market value. This was a breach of Buth's duty of disclosure.

**RESPONSE TO COMPLAINT NO. 708:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 709:** Buth also went on road shows explaining the valuations to employees. Buth's presentations at these road shows, was imprudent and also failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining stock price. This was a breach of Buth's duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 709:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 710:** Buth also approved and signed PDC's 10-K and attested to the 10-Q filings during his time as CEO. *See* ¶¶ 349-67. These filings reported the fraudulently inflated share price and incorporated the share price into its financial statements. This was a breach of Buth's duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 710:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 711:** As a result of Buth's breaches of fiduciary duty, the ESOP lost tens of millions of dollars when it, for example, overpaid to purchase stock from PDC and to repurchase shares from current and former employees. *See* Appendix A and B. Buth is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 711:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**Plaintiff's Claims Against Buth for Breaches of Fiduciary Duty are Tolled**

**COMPLAINT NO. 712:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can include genuine acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 712:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 713:** Mr. Lyon was first named as an ESOP fiduciary in August 2017, so he was not aware of Buth's actions in connection with the 2001 Transaction or the subsequent

valuations until after that date and after he had an opportunity to investigate the valuations. He specifically did not know of Houlihan's contingent fee arrangement until he received a copy of the engagement letter in fall of 2018. Further, the valuations were kept confidential so it was not possible for a reasonably diligent plaintiff to discover the breaches of fiduciary duty related to the 2001 Transaction or the ongoing stock valuations prior to August 2017. In addition, discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock.

**RESPONSE TO COMPLAINT NO. 713:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**Buth Engaged in an Ongoing Series of Affirmative Steps to Conceal his Breaches of Fiduciary Duty and his Earlier Misrepresentations**

**COMPLAINT NO. 714:** As described more fully in Section IV.A. above, Buth took at least the following affirmative steps to conceal his breaches of fiduciary duty and earlier misrepresentations:

- Buth authored, reviewed and/or approved the 23 July 2001 Prospectus; specifically, at the 2 August 2001 road show presentation, Karch stated that Buth had spent 2025 days, 12-14 hours a day reviewing the content of the prospectus with lawyers and investment bankers. That prospectus was fraudulently misleadingly by disclosing Buth and Karch's conflicts of interest but by failing to disclose Houlihan's conflicts of interest in the context of affirmatively putting forth Houlihan as being independent and qualified to issue a fairness opinion to the board and directly to the ESOP Fiduciaries. The prospectus explained Willamette's fees for its fairness opinion to State Street and the risks of management's conflict but fraudulently failed to identify Houlihan's much larger contingent fees. It disclosed management's conflict but not Houlihan's.

- Buth fraudulently allowed the prospectus to disclose the risk of management's conflict while concealing Houlihan's. He also fraudulently allowed the prospectus to juxtapose disclosure of management's conflict with Houlihan's opinion of fairness, while concealing Houlihan's conflict.

- Buth authored the 25 July 2001 Letter to Appvion's employees which stated that Houlihan would provide "Independent validation of the deal," knowing that Houlihan was not independent.

- Buth reviewed and approved the program for the 2 August 2001 road show that fraudulently represented to the Employee Fiduciaries that Houlihan's Paone would provide "Independent Validation of Deal Terms," knowing that Houlihan was not independent.

- Buth was present at the 2 August 2001 road show presentation when Karch introduced Paone as independent but failed to correct it. This is equivalent to a representation and shows his active participation in the strategy.

- At the 2 August 2001 road show, Buth represented that, among other things, that:

  o "The prospectus has all the details for you to make a decision."

  o "We got to pay some of these advisors. The fact is we have some fees to pay and it's highlighted in the prospectus." However, the prospectus only referenced "Transaction fees and expenses" of $30 million without identifying who those fees were going to, and fraudulently concealed how much Houlihan would earn or that its fees were contingent.

- Buth reviewed and approved the 19 November 2001 Prospectus Supplement. This referenced investment banking fees of $8 million, concealing that those fees were contingent and to whom they were being paid.

**RESPONSE TO COMPLAINT NO. 714:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 715:** This course of conduct of taking steps to lie about Houlihan's independence while concealing the contingent nature of Houlihan's fees operated to conceal: (1) the fact that the purchase price for Appvion (as negotiated by conflicted Houlihan, Buth, Karch and State Street) was inflated and for more than fair market value; (2) the fact that Buth, Karch, Houlihan and State Street were breaching their fiduciary duties in negotiating and approving the purchase price and in communicating with the Employee Fiduciaries; (3) and that Houlihan was conflicted in at least four critical areas described in paragraph 83. These lies about Houlihan's independence served to mask Buth's actions and to divert any further investigation to the fair market value of PDC.

**RESPONSE TO COMPLAINT NO. 715:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 716:** After the 2001 Transaction, Buth took a series of steps to represent that the 2001 transaction was a good deal and for fair market value and that earlier valuations had been for fair market value, when he knew these representations were false. *See* Paragraphs ¶¶ 348-427.

**RESPONSE TO COMPLAINT NO. 716:** Because Count IV is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 717:** The share prices themselves constituted representations, especially when communicated to the Employee Owners through various communications Buth

authored or approved (*see* ¶¶ 340-49) and in each of Appvion's 10-K and 10-Q filings which Buth approved and attested to (*see* ¶¶ 349-67). Each one of these fraudulent representations of share price were steps taken that were separate and independent acts of fraud or concealment.

**RESPONSE TO COMPLAINT NO. 717:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 718:** Each 10-K and 10-Q included attestations signed by Buth that the filings complied with SEC reporting requirements, that the reports did not contain untrue statements of material fact or omit material facts necessary to make the statements made not misleading, and that the financial statements fairly presented the financial condition of the company. Further, the 10-Ks included audited financial statements which lent further credence to the valuations. Buth's certifications were fraudulent because he knew the stock price was at all times inflated and therefore the Redeemable Common Stock entry on the balance sheets (as well as related entries) was at all times misstated, and the 10-K and 10-Q filings operated to conceal the fact that Buth was breaching his fiduciary duty by causing the stock price and the value of PDC/Appvion to be inflated at the time of the 2001 Transaction and at all times thereafter and that Buth had fraudulently misrepresented each earlier PDC stock price.

**RESPONSE TO COMPLAINT NO. 718:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 719:** Each of Buth's fraudulent representations about the stock price and the value of Appvion also concealed Buth's breaches of his fiduciary duty and that each previous stock price and Redeemable Common Stock Entry was fraudulently inflated and that he was failing to properly monitor State Street in conducting its valuations as the ESOP Trustee or insist that the stock value be adjusted to take into account of, among other things, the ESOP's lack of control and the Excluded Debt.

**RESPONSE TO COMPLAINT NO. 719:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**Buth Intended to Conceal his Breaches of Fiduciary Duty**

**COMPLAINT NO. 720:** Buth intended for his actions to conceal from the ESOP, through its Employee Owners, the fact that Appvion's stock price was at all times overvalued. Evidence of Buth's intent includes at least the following:

**RESPONSE TO COMPLAINT NO. 720:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 721:** Buth has a business degree from Notre Dame, and was a CPA working with Pricewaterhouse before working for Appvion. He was therefore more than qualified

to understand both the financial statements and the basic issues that caused the valuations to be overstated.

**RESPONSE TO COMPLAINT NO. 721:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 722:** Buth himself signed the engagement letters with Houlihan and knew Houlihan was not independent, was conflicted and had a broad scope of responsibility, discretion, and authority, but directly represented to the Employee Fiduciaries that Houlihan was independent and was present while Karch presented Houlihan as independent. He also misrepresented the impact of his own conflict in the prospectus and the road show. This demonstrates that Buth was part of a concerted strategy created by Houlihan and joined in by Buth, Karch and State Street. The only reasonable inference is that Buth knew that only by hiring a conflicted investment banking firm to "quarterback" the ESOP transaction, and then by representing Houlihan as being independent, could he successfully close the ESOP transaction for more than fair market value.

**RESPONSE TO COMPLAINT NO. 722:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 723:** Buth clearly reviewed and understood the valuations because he authored and approved communications to the Employee Owners about them and presented them to the Employee Owners during road shows. His compensation also depended on the valuations and he took great interest in boasting to the Employee Owner's about the Stock Price's exceptional rise in value. He also reviewed and understood the 10-Ks and 10-Qs because he attested to each of them, and signed the 10-Ks. *See* ¶¶ 349-67, 394, 406-7, 421-23, 433. Buth understood financial statements from his CPA training and from his role as Appvion's CEO. The financial statements clearly listed the Excluded Debt on every balance sheet which debt was being subtracted to determine shareholder's equity, but which was not being deducted in the valuations. The magnitude of the Excluded Debt is also such that it is simply not reasonable to believe that a person in Buth's position with his understanding did not understand Excluded Debt had not been subtracted in arriving at fair market value. *See* ¶ 288.

**RESPONSE TO COMPLAINT NO. 723:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 724:** Buth also knew that the ESOP lacked control under the Security Holder's Agreement, because he retained control to himself while causing the sale of 100% of the PDC stock to the Employee Owners. However, he knew the valuations were fraudulently applying a substantial control premium premised on the ESOP's control in fact of PDC. *See* ¶¶ 143-44, 25463.

**RESPONSE TO COMPLAINT NO. 724:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 725:** At all times relating to the 2001 Transaction, Buth was conflicted because he stood to receive at least $1.7 million in bonuses if the transaction closed, which was contingent based on the purchase price (¶ 139). Buth was therefore motivated to act, and did act, in his own self-interest and not solely in the interests of the ESOP Fiduciaries by concealing Houlihan's conflicts of interest, his fiduciary breaches and the fact that the transaction was for more than fair market value. Buth fraudulently concealed the true nature of his conflict and ameliorated its impact by juxtaposing the disclosure of the conflict with Houlihan's purportedly independent opinion that the purchase price was fair despite the conflict.

**RESPONSE TO COMPLAINT NO. 725:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 726:** Buth's fraudulent actions also concealed that he was acting in his own self-interest in maintaining control over Appvion for his personal benefit and to the detriment of the ESOP.

**RESPONSE TO COMPLAINT NO. 726:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 727:** Buth was at all times motivated to inflate the value of PDC's stock for his own benefit. After the 2001 Transaction, approximately $234,000 of Buth's bonus from the 2001 Transaction was deferred and directly tied to the value of PDC's stock, equivalent to a grant of 23,400 additional shares at $10/share; this was worth over $600,000 when the deferred compensation plan was terminated in early 2005. *See* ¶¶ 139, 298. Buth also received incentive compensation under the LTIP that was tied to the value of PDC's stock, which gave him a motivation to increase the value of PDC's stock; his exercisable LTIP units were worth at least $500,000 when he retired.

**RESPONSE TO COMPLAINT NO. 727:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 728:** In addition, because Buth had inside knowledge that PDC's stock was inflated, he was able to strategically time his departure in order to liquidate his interest in the ESOP. In 2004, Buth announced that he would be retiring at the age of 49; he officially left in July 2005. Buth was paid for his shares on an installment basis. Because of the inflated share prices in place when he retired and in the following years, Buth had a gain of over $850,000 on his ESOP investment. The timing and terms of his departure are further evidence of Buth's intent.

**RESPONSE TO COMPLAINT NO. 728:** Because Count IV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COUNT V**
**BREACH OF FIDUCIARY DUTY AGAINST KARCH**

**COMPLAINT NO. 729:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 729:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Karch Owed Fiduciary Duties of Prudence and Loyalty to the ESOP**

**COMPLAINT NO. 730:** Karch was Appvion's general counsel and a member the Board from early 2001 to October 2006. The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Karch was therefore a fiduciary to the ESOP because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties. Karch had a duty to prudently monitor the actions of the ESOP Trustee and the ESOP Committee.

**RESPONSE TO COMPLAINT NO. 730:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 731:** Karch was a fiduciary of the ESOP as a member of the ESOP Committee from July 2001 to March 2007 and therefore owed fiduciary duties of loyalty, prudence, and disclosure under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

**RESPONSE TO COMPLAINT NO. 731:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 732:** Karch exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications about the stock price and the valuation process, and directing the purchase of PDC's stock. In doing so, he had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 732:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

251

**Karch Breached his Fiduciary Duties to the ESOP in Connection with the 2001 Transaction**

**COMPLAINT NO. 733:** Karch breached his fiduciary duties of prudence, loyalty, and disclosure in connection with the 2001 Transaction as described in Section IV.A. by at least the following:

**RESPONSE TO COMPLAINT NO. 733:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 734:** As a Director of PDC and its in-house lawyer, Karch approved or ratified and knew about the engagement letter to pay Houlihan a contingent fee of $8.1 million if the 2001 ESOP Transaction closed, which would be paid by PDC from plan assets. Karch also approved or ratified the engagement of Houlihan to provide a fairness opinion for the board and the prospectus opinion made directly to the Employee Fiduciaries, even though Karch knew that Houlihan was conflicted and could not give a fairness opinion or otherwise credibly opine about the ESOP Transaction.

**RESPONSE TO COMPLAINT NO. 734:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 735:** At the 2 August 2001 road show, Karch presented Houlihan's Paone as independent. *See* ¶ 125. Karch also approved or ratified Buth's 25 July letter to employees and the program for the 2 August 2001 road show that presented Houlihan as independent. *See* ¶ 122. However, Karch knew of and approved of the earlier communication to the Employee Fiduciaries informing them that one with a conflict was not qualified to give a fairness opinion.

**RESPONSE TO COMPLAINT NO. 735:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 736:** Karch was heavily involved in drafting the 23 July 2001 prospectus. The prospectus misleadingly described Buth and Karch's own conflicts of interest created by the AWA loyalty payments while juxtaposing that Houlihan believed the transaction price was fair despite those conflicts. *See* ¶¶ 106-21. This intentionally fraudulent disclosure strategy of concealing Houlihan's conflict of interest and representing Houlihan has being independent, concealed the true impact of Karch's conflict of interest on the ESOP Transaction, the fact that the transaction price was for more than fair market value and Karch's fiduciary breaches.

**RESPONSE TO COMPLAINT NO. 736:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 737:** Karch was present during the 2 August 2001 road show when Buth represented that the fees to be paid to advisors were "highlighted in the prospectus" even though Karch knew that the amount and contingent nature of Houlihan's fees was not explained in the prospectus. *See* ¶ 117.

**RESPONSE TO COMPLAINT NO. 737:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 738:** Karch was present during the 2 August 2001 road show while Paone described the $810 million purchase price as "attractive" and said employees were getting a good deal. He was also present while Driscoll represented that it was "a very good price," and that State Street had determined the price was fair to the ESOP, and that State Street was making sure that "we're not paying more than the fair market value." Buth similarly represented that the independent validation from Paone and Driscoll shows that "We got a good deal." Karch's silence during these statements is equivalent to a representation. However, Karch knew but failed to disclose that the ESOP would take on excessive debt at the proposed purchase price when the Excluded Debt was included. Karch also knew but failed to disclose that the initial valuation included a control premium, which had no factual basis.

**RESPONSE TO COMPLAINT NO. 738:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 739:** In his role as a member of the ESOP Committee, Karch directed the ESOP Trustee to purchase PDC's stock even though Karch knew it was for more than fair market value.

**RESPONSE TO COMPLAINT NO. 739:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 740:** As a fiduciary responsible for appointing State Street as ESOP Trustee, Karch failed to monitor State Street as ESOP Trustee and ensure that State Street was complying with its fiduciary obligations under ERISA and in communicating with employees, negotiating the purchase price, approving the transaction, and determining that the purchase of PDC's stock was permissible under ERISA.

**RESPONSE TO COMPLAINT NO. 740:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 741:** Karch's breaches of fiduciary duty damaged the ESOP by preventing the ESOP from benefitting from a truly independent set of financial advisors who (1) would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, (2) would have negotiated the terms of the PDC stock acquisition free of conflict, (3) would have been qualified to give a fairness opinion, and (4) would have been free of conflict when selecting the

trustee and the valuation firm As a result, Karch caused the ESOP to enter into a transaction that it otherwise would not have, or in the alternative, to overpay for the purchase of Appvion and PDC. Karch is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 741:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**Karch Breached his Fiduciary Duties to the ESOP in Connection with the Stock Valuations From 2001 to 2006**

**COMPLAINT NO. 742:** Karch breached his fiduciary duties of prudence, loyalty, and disclosure in connection with the PDC stock valuations by at least the following:

**RESPONSE TO COMPLAINT NO. 742:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 743:** Beginning with the valuation as of 31 December 2001, Karch approved and adopted the following valuations of PDC's stock that he knew were artificially inflated:

| Valuation Date | Share Price |
|:---:|:---:|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |
| 12/31/2004 | $ 26.36 |
| 6/30/2005 | $27.77 |
| 12/31/2005 | $28.56 |
| 6/30/2006 | $31.27 |
| 12/31/2006 | $33.62 |

**RESPONSE TO COMPLAINT NO. 743:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 744:** In approving and adopting these stock values, Karch failed to undertake an appropriate investigation to determine (and then take the appropriate action) that the ESOP received adequate consideration for the stock purchases at these prices. Karch failed to require that the stock be valued in good faith using a prudent process even though he knew it had

not been. He adopted these share prices despite the following facts that he knew caused the stock price to be materially overstated:

- Karch knew that the valuations added a fraudulent control premium even though he knew (because he signed the Security Holder's Agreement on behalf of PDC) that Buth, not the ESOP Trustee, retained control of Appvion and PDC and that there were not facts that supported the control premium. *See* ¶¶ 143-44, 154-63.

- Karch also knew that the valuations failed to subtract the Excluded Debt which should have been subtracted in arriving at fair market value. *See* ¶¶ 197-246.

**RESPONSE TO COMPLAINT NO. 744:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 745:** In his role as a member of the ESOP Committee, Karch breached his duty of prudence, loyalty and disclosure by directing the ESOP Trustee to purchase PDC's stock using these stock prices even though Karch knew they were for more than fair market value and by communicating them to the Employee Owners.

**RESPONSE TO COMPLAINT NO. 745:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 746:** Karch also breached his fiduciary duties by failing to prudently monitor State Street in its determination of the share value. Despite direct review of the valuation reports and working with State Street on the review of the valuations, Karch failed to insist that State Street accurately value the PDC stock and instead accepted share prices that he knew to be inflated.

**RESPONSE TO COMPLAINT NO. 746:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 747:** Karch authored and/or approved the communications to the Employee Owners informing them of the stock price communications and reassuring them that the valuations were correct. *See* ¶¶ 373-447. These communications were misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining stock price. This was a breach of Karch's duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 747:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 748:** Karch approved and signed PDC's 10-K filings and reviewed and approved PDC's 10-Q filings which reported the inflated share price and incorporated the

share price into its financial statements in the Redeemable Common Stock balance sheet entry. *See* ¶¶ 349-62, 4067, 421-23, 433-35, 449-51. This was a breach of Karch's duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 748:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 749:** As a result of Karch's breaches of fiduciary duty, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Karch is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from its breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 749:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

### Plaintiff's Claims Against Karch for Breaches of Fiduciary Duty are Tolled

**COMPLAINT NO. 750:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can include acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 750:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 751:** Mr. Lyon was first named as an ESOP fiduciary in August 2017, so he was not aware of Karch's actions in connection with the 2001 Transaction until after that date and an opportunity to investigate the valuations. He specifically did not know of Houlihan's contingent fee arrangement until he received a copy of the engagement letter in 2019. Further, the valuations were kept confidential from the Employee Owners so it was not possible for a reasonably diligent plaintiff to discover the breaches of fiduciary duty related to the 2001 Transaction or the ongoing stock valuations prior to August 2017. In addition, discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock.

**RESPONSE TO COMPLAINT NO. 751:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

## Karch Took Affirmative Steps to Conceal his Breaches of Fiduciary Duty and his Fraudulent Misrepresentations

**COMPLAINT NO. 752:** Karch took the following affirmative steps to conceal his breaches of fiduciary duty in connection with the 2001 Transaction as more fully described in Section IV.A.:

- Karch was heavily involved in drafting and approving the 23 July 2001 Prospectus. That prospectus misleadingly disclosed certain risks of Buth and Karch's conflicts of interest but fraudulently failed to disclose Houlihan's conflicts of interest while affirmatively putting Houlihan forth as being independent and qualified to issue the fairness opinion. The prospectus also explained Willamette's fees for its fairness opinion to State Street but fraudulently failed to identify Houlihan's much larger contingent fees.

- Karch approved or ratified the 25 July 2001 Letter to Appvion's employees which stated that Houlihan would provide "Independent validation of the deal," knowing that Houlihan was not independent.

- Karch reviewed and approved the program for the 2 August 2001 road show that said Houlihan's Paone would provide "Independent Validation of Deal Terms," knowing that Houlihan was not independent.

- At the 2 August 2001 road show presentation, Karch introduced Paone as independent even though Karch knew that Houlihan was conflicted.

- At the 2 August 2001 road show, Karch was present but remained silent while Buth represented that:

  o The prospectus has all the details for you to make a decision."

  o We got to pay some of these advisors. The fact is we have some fees to pay and it's highlighted in the prospectus." However, the prospectus only referenced "Transaction fees and expenses" of $30 million without identifying who those fees were going to and did not explain how much Houlihan would earn or that its fees were contingent.

**RESPONSE TO COMPLAINT NO. 752:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 753:** Karch authored, reviewed and/or approved the 19 November 2001 Prospectus Update which referenced investment banking fees of $8 million but did not explain that those fees were contingent on the deal price or identify who those fees were being paid to.

**RESPONSE TO COMPLAINT NO. 753:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 754:** Karch's course of conduct of taking steps to lie about Houlihan's independence while concealing the contingent nature of Houlihan's fees operated to conceal: (1) the fact that the purchase price for Appvion (as negotiated by conflicted Houlihan, Buth, Karch and State Street) was inflated and for more than fair market value; (2) the fact that Buth, Karch, Houlihan and State Street were breaching their fiduciary duties in negotiating and approving the purchase price and in communicating with the ESOP Fiduciaries; and (3) that Houlihan was conflicted in at least four critical areas described in Paragraph 83. These lies about Houlihan's independence also served to divert mask Karch's actions and any further investigation to the fair market value of PDC.

**RESPONSE TO COMPLAINT NO. 754:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 755:** After the 2001 Transaction, Karch took a series of steps to represent that the 2001 transaction was a good deal and for fair market value and that earlier valuations had been for fair market value, when he knew these representations were false. *See* ¶¶ 373-447.

**RESPONSE TO COMPLAINT NO. 755:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 756:** He also affirmatively and fraudulently represented to employees in a January 2002 email that the ESOP Trustee was in control and would prevent the kind of fraud that occurred at Enron, even though Karch knew that was not true. *See* ¶¶ 373-75.

**RESPONSE TO COMPLAINT NO. 756:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 757:** The share prices themselves constituted Karch's representations, especially when communicated to employees through various communications Karch authored or approved. *See* ¶¶ 373-447. Each one of these fraudulent representations of share price were steps taken that were separate and independent acts of fraud or concealment, because each one concealed the fact that Karch was breaching his fiduciary duty by, among other things causing the stock price and the value of PDC/Appvion to be inflated at the time of the 2001 Transaction and at all times thereafter and that Karch had fraudulently misrepresented each earlier PDC stock price.

**RESPONSE TO COMPLAINT NO. 757:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 758:** Karch signed the 10-K filings as a Director of Appvion, and he reviewed both the 10-Ks and 10-Qs in his role as General Counsel. *See* ¶¶ 349-367.

**RESPONSE TO COMPLAINT NO. 758:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 759:** Karch signed the Form 5500s filed with the Department of Labor under penalty of perjury in 2002 to 2006. These relied upon the fraudulent stock prices and and constituted further acts of concealment. *See* ¶¶ 368-72. None of these Form 5500s report any prohibited transactions, investigations, or corrective activity.

**RESPONSE TO COMPLAINT NO. 759:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 760:** Each of Karch's representations about the stock price and the value of Appvion fraudulently concealed that he was failing to properly monitor State Street in conducting its valuations as the ESOP Trustee or insist that the stock value be adjusted to take into account, among other things, the ESOP's lack of control and its Excluded Debt.

**RESPONSE TO COMPLAINT NO. 760:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

### Karch Intended to Conceal his Breaches of Fiduciary Duty

**COMPLAINT NO. 761:** Karch intended for his actions to conceal from the ESOP, through its Employee Owners, the fact that Appvion's stock price was at all times overvalued. Evidence of Karch's intent includes the following:

**RESPONSE TO COMPLAINT NO. 761:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 762:** Karch has an undergraduate degree in economics from Harvard and went to Harvard Law School. Karch worked as in-house counsel for Appvion beginning in approximately 1994. He was therefore more than qualified to understand the financial statements and the basic issues that caused the valuations to be overstated.

**RESPONSE TO COMPLAINT NO. 762:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 763:** Karch was on the Board of Directors of PDC at the time PDC engaged Houlihan and knew that Houlihan was not independent, but directly represented to the Employee Fiduciaries that Houlihan was independent. The only reasonable inference is that Karch

knew that only by hiring a conflicted investment banking firm to "quarterback" the ESOP transaction could he successfully close the ESOP transaction for more than fair market value, obtain his contingent fee and remain part of the group in control of Appvion.

**RESPONSE TO COMPLAINT NO. 763:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 764:** Karch clearly reviewed and understood the valuations because he authored or approved communications to the Employee Owners about them. Karch therefore knew about the Excluded Debt from signing and reviewing Appvion's financial statements and knew that the valuations were not subtracting it in determining PDC's fair market value.

**RESPONSE TO COMPLAINT NO. 764:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 765:** Karch also knew that the ESOP lacked control under the Security Holder's Agreement, but he knew the valuations were applying a substantial control premium premised on the ESOP's control in fact of PDC. He knew Houlihan had quarterbacked the strategy of selling the PDC stock to the ESOP while causing Buth to retain control.

**RESPONSE TO COMPLAINT NO. 765:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 766:** In addition, at all times relating to the 2001 Transaction, Karch was conflicted because he stood to receive a significant bonus from AWA if the transaction closed, to be contingent based on the purchase price. *See* ¶¶ 72-3, 139. Karch was therefore motivated to act, and did act, in his own self-interest and not solely in the interests of the ESOP Fiduciaries by concealing Houlihan's conflicts of interest, his fiduciary breaches and the fact that the transaction was for more than fair market value. Karch fraudulently concealed the true nature of his conflict and ameliorated its impact by juxtaposing the disclosure of the conflict with Houlihan's purportedly independent opinion that the purchase price was fair despite the conflict.

**RESPONSE TO COMPLAINT NO. 766:** Because Count V is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 767:** Karch was at all times motivated to increase the value of PDC's stock for his own benefit. After the 2001 Transaction, a portion of Karch's loyalty payment was deferred and directly tied to the value of PDC's stock; he earned over $240,000 when this plan was terminated in early 2005. *See* ¶ 139, 298. Karch also received incentive compensation under the LTIP that was tied to the value of PDC's stock, which was worth hundreds of thousands of dollars when he left Appvion.

**RESPONSE TO COMPLAINT NO. 767:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 768:** In addition, because Karch had inside knowledge that PDC's stock was inflated, he was able to strategically time his departure in order to liquidate his interest in the ESOP. Karch left Appvion on 2 March 2007 with a gain of over $300,000 from his investments.

**RESPONSE TO COMPLAINT NO. 768:** Because Count V is not asserted against Reliance Trust and has been dismissed, no response is required.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY AGAINST PARKER**

**COMPLAINT NO. 769:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 769:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Parker Owed Fiduciary Duties of Prudence and Loyalty to the ESOP**

**COMPLAINT NO. 770:** Parker was Appvion's CFO and a member of the Board from early 2001 to May 2006. The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Parker was therefore a fiduciary to the ESOP because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties. As such, Parker had a duty to prudently monitor the actions of the ESOP Trustee and the ESOP Committee.

**RESPONSE TO COMPLAINT NO. 770:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 771:** Parker was also a fiduciary of the ESOP as a member of the ESOP Committee from July 2001 to June 2006 and therefore owed fiduciary duties of loyalty, prudence, and disclosure under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)).

**RESPONSE TO COMPLAINT NO. 771:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 772:** Parker exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications to employees about the stock price and the valuation process, and directing the purchase of PDC's stock. He had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 772:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

### Parker Breached his Fiduciary Duties to the ESOP in Connection with the Stock Valuations from 2001 to 2006

**COMPLAINT NO. 773:** Parker breached his fiduciary duties of prudence, loyalty, and disclosure in connection with the PDC stock valuations by at least the following:

**RESPONSE TO COMPLAINT NO. 773:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 774:** Parker approved and adopted the following PDC stock valuations that he knew were artificially inflated:

| Valuation Date | Share Price |
|----------------|-------------|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |
| 12/31/2004 | $ 26.36 |
| 6/30/2005 | $27.77 |
| 12/31/2005 | $28.56 |

**RESPONSE TO COMPLAINT NO. 774:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 775:** In approving, adopting and disseminating these stock values, Parker failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at these prices and Parker failed to value the stock in good faith using a prudent process. He adopted these share prices despite the following facts that caused each stock price to be materially and fraudulently overstated:

**RESPONSE TO COMPLAINT NO. 775:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

- Parker knew that the valuations added a fraudulent control premium even though he knew Buth, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts that supported the control premium. *See* ¶¶ 143-44, 25463.

- Parker also knew that the valuations failed to subtract the Excluded Debt that should have been subtracted in arriving at fair market value. Parker knew about the Excluded Debt because it was included in the 10-K and 10-Q financial statements that he was responsible for, signed and attested to. *See* ¶¶ 197-246.

**COMPLAINT NO. 776:** In his role as a member of the ESOP Committee, Parker breached his duty of prudence, loyalty and disclosure with respect to each separate stock price release by directing the ESOP Trustee to purchase PDC's stock using these stock prices even though Parker knew they were for more than fair market value.

**RESPONSE TO COMPLAINT NO. 776:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 777:** Parker also breached his fiduciary duties by failing to prudently monitor State Street in its determination of the share value. Despite direct review of the valuation reports and working with State Street on the valuations, Parker failed to require that State Street accurately value the PDC stock in connection with each semi-annual valuation and instead accepted, approved and disseminated stock prices that he knew to be fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 777:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 778:** Parker authored reviewed and approved communications to the Employee Owners informing them of the fraudulent stock prices. These communications were misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting the Excluded Debt.

**RESPONSE TO COMPLAINT NO. 778:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 779:** In his role as CFO, Parker also approved, signed and attested to PDC's 10-K and 10-Q filings which reported the inflated share price and incorporated the share price into its financial statements.

**RESPONSE TO COMPLAINT NO. 779:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 780:** As a result of Parker's breaches of fiduciary duty, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Parker is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 780:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

### Plaintiff's Claims Against Parker for Breaches of Fiduciary Duty are Tolled

**COMPLAINT NO. 781:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can include acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 781:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 782:** Mr. Lyon was first named as an ESOP fiduciary in August 2017, so he was not aware of Parker's actions in connection with the valuations until after that date, when he was able to investigate the valuations. Further, the valuations were kept confidential from the Employee Owners so it was not possible for a reasonably diligent plaintiff to discover the breaches of fiduciary duty prior to August 2017. In addition, discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock.

**RESPONSE TO COMPLAINT NO. 782:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

### Parker Took Affirmative Steps to Conceal his Breaches of Fiduciary Duty and his Earlier Fraudulent Misrepresentations

**COMPLAINT NO. 783:** Beginning with the 9 November 2001 valuation and continuing through the 31 December 2006 valuation, Parker approved, adopted and disseminated each fraudulently inflated PDC stock prices that Parker knew were inflated. He also approved, signed and attested to the 10-K disclosures of the fraudulent PDC stock prices and the Redeemable Common Stock liability entries on Appvion's 10-K and 10-Q balance sheets as described in Paragraphs 349-67. Each one of these fraudulent representations of share price were separate and independent steps of fraud or concealment, because each either set the share price for that period or, in the case of the 10-Qs and 10-Ks was required by the SEC and not by ERISA. Each

representation was a separate act of fraud but also constituted a step in Parker's course of fraudulent concealment that concealed that each earlier valuation and related 10-K and 10-Q disclosure had also been fraudulent.

**RESPONSE TO COMPLAINT NO. 783:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 784:** Each 10-K and 10-Q filed from August 2002 until March 2005 included certifications signed by Parker that the filings complied with SEC reporting requirements, that the reports did not contain untrue statements of material fact or omit material facts necessary to make the statements made not misleading, and that the financial statements fairly presented the financial condition of the company.

**RESPONSE TO COMPLAINT NO. 784:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 785:** Each share price communication authored, approved and disseminated by Parker also affirmatively acted to conceal both the fact that the share price was inflated at the time of the 2001 Transaction and at each valuation thereafter. These communications are described above in Paragraphs 373-442.

**RESPONSE TO COMPLAINT NO. 785:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 786:** Each of Parker's representations about the stock price and Appvion's fair market value concealed his breaches of fiduciary duty in connection with each earlier stock price and concealed that he fraudulently misrepresented each earlier stock price.

**RESPONSE TO COMPLAINT NO. 786:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**Parker Intended to Conceal his Breaches of Fiduciary Duty and Misrepresentations**

**COMPLAINT NO. 787:** Parker intended for his actions to conceal the fact that Appvion's stock price was at all times overvalued. In addition to Parker's knowledge that the share price was inflated as alleged above, evidence of Parker's intent includes at least the following:

**RESPONSE TO COMPLAINT NO. 787:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 788:** Parker was a CPA and earned an MBA from Xavier University. He was Appvion's CFO and was therefore personally responsible for Appvion and PDC's financial statements and the financial projections that the valuations were based on.

**RESPONSE TO COMPLAINT NO. 788:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 789:** Parker clearly reviewed and understood the valuations since he authored, approved and disseminated communications to the Employee Owners about them.

**RESPONSE TO COMPLAINT NO. 789:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 790:** The share price themselves each constituted a separate fraudulent misrepresentation, especially when communicated to employees through various communications authored or approved by Parker (*see* ¶¶ 373-442) and in each of Appvion's 10-K and 10-Q filings (*see* ¶¶ 349-67).

**RESPONSE TO COMPLAINT NO. 790:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 791:** Each 10-K and 10-Q included attestations signed by Parker in his role as CFO that the filings complied with SEC reporting requirements, that the reports did not contain untrue statements of material fact or omit material facts necessary to make the statements made not misleading, and that the financial statements fairly presented the financial condition of the company. Further, the 10-Ks included audited financial statements which lent further credence to the valuations. Parker's certifications were fraudulent because the stock price was at all times inflated and therefore the Redeemable Common Stock entry on each balance sheet (as well as related entries) was at all times misstated, and the 10-K and 10-Q filings operated to conceal the fact that Parker was breaching his fiduciary duty and concealing that each stock price had been fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 791:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 792:** Parker's representations about the stock price and the value of Appvion also concealed that, in connection with each separate earlier valuation, he was failing to properly monitor State Street in conducting its valuations as the ESOP Trustee and failed to require that each earlier stock value be adjusted to take into account, among other things, the ESOP's lack of control and the Excluded Debt.

**RESPONSE TO COMPLAINT NO. 792:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 793:** Parker received a loyalty payment in connection with the 2001 Transaction, approximately $110,000 of which was deferred and tied to the value of PDC's stock; when this plan was terminated in 2005, Parker received nearly $300,000. Parker also received incentive compensation under the LTIP under the LTIP that was tied to the value of PDC's stock, which was worth hundreds of thousands of dollars when he left Appvion in 2006. Parker was therefore motivated to act in his own self-interest and not solely in the interests of the participants and beneficiaries at all times after the 2001 Transaction.

**RESPONSE TO COMPLAINT NO. 793:** Because Count VI is not asserted against Reliance Trust and has been dismissed, no response is required.

## COUNT VII
## BREACH OF FIDUCIARY DUTY AGAINST FANTINI

**COMPLAINT NO. 794:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 794:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Fantini Owed Fiduciary Duties of Prudence and Loyalty to the ESOP

**COMPLAINT NO. 795:** Fantini was Appvion's VP of Operations and the Chair of the ESOP Committee from 2001 to December 2005. Fantini was a fiduciary as a member of the ESOP Committee and owed fiduciary duties of loyalty, prudence, and disclosure under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)).

**RESPONSE TO COMPLAINT NO. 795:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 796:** Fantini exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications to employees about the stock price and the valuation process, and directing the purchase of PDC's stock. He had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 796:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Fantini Breached his Fiduciary Duties to the ESOP in Connection with the Stock Valuations from 2001 to 2005

**COMPLAINT NO. 797:** Fantini breached his fiduciary duties of prudence, loyalty, and disclosure in connection with the PDC stock valuations by at least the following:

**RESPONSE TO COMPLAINT NO. 797:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 798:** Fantini approved and adopted the following PDC stock valuations that he knew were artificially inflated:

| Valuation Date | Share Price |
|----------------|-------------|
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |
| 12/31/2004 | $ 26.36 |
| 6/30/2005 | $27.77 |

**RESPONSE TO COMPLAINT NO. 798:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 799:** In approving, adopting and disseminating these stock values, Fantini failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at these prices. Fantini failed to value the stock in good faith using a prudent process. He adopted these share prices despite the following facts that caused each stock price to be materially and fraudulently overstated:

- Fantini knew that the valuations added a fraudulent control premium even though he, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts that supported the control premium. *See* ¶¶ 143-44, 254-63.

- Fantini also knew that the valuations failed to subtract the Excluded Debt that should have been subtracted in arriving at fair market value. *See* ¶¶ 197-246.

**RESPONSE TO COMPLAINT NO. 799:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 800:** In his role as a member of the ESOP Committee, Fantini breached his duty of prudence, loyalty and disclosure with respect to each separate stock price release by directing the ESOP Trustee to purchase PDC's stock using these stock prices even though Fantini knew they were for more than fair market value.

**RESPONSE TO COMPLAINT NO. 800:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 801:** As Chair of the ESOP Committee, Fantini had authority to implement a review process to ensure that State Street was acting independently and in the best interests of the ESOP. Fantini breached his fiduciary duties by failing to prudently monitor State Street in its determination of the share value. Despite direct review of the valuation reports and working with State Street on the valuations, Fantini failed to insist that State Street accurately value the PDC stock in connection with each semi-annual valuation and instead accepted, approved and disseminated share prices that he knew to be fraudulently inflated.

**RESPONSE TO COMPLAINT NO. 801:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 802:** Fantini authored, reviewed and approved communications to the Employee Owners informing them of the fraudulent stock prices. These communications were misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting the Excluded Debt.

**RESPONSE TO COMPLAINT NO. 802:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 803:** As a result of Fantini's breaches of fiduciary duty, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Fantini is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 803:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Plaintiff's Claims Against Fantini for Breaches of Fiduciary Duty are Tolled

**COMPLAINT NO. 804:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can include acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 804:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 805:** Mr. Lyon was first named as an ESOP fiduciary in August 2017, so he was not aware of Fantini's actions in connection with the valuations until after that date, when he was able to investigate the valuations. Further, the valuations were kept confidential from the Employee Owners so it was not possible for a reasonably diligent plaintiff to discover the breaches of fiduciary duty prior to August 2017. In addition, discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock.

**RESPONSE TO COMPLAINT NO. 805:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Fantini Took Affirmative Steps to Conceal his Breaches of Fiduciary Duty

**COMPLAINT NO. 806:** Beginning with 9 November 2001 and continuing through the 30 June 2005 valuation, Parker approved, adopted and disseminated fraudulently inflated PDC stock prices that Fantini knew were inflated. Each one of these fraudulent representations of share price were separate and independent acts of fraud or concealment, because each either set the share price for that period of, in the case of the 10-Qs and 10-Ks was required by the SEC and not by ERISA. Each representation was a separate act of fraud but also constituted a step in Fantini's course of fraudulent concealment that concealed that each earlier valuation and related 10-K and 10-Q disclosure.

**RESPONSE TO COMPLAINT NO. 806:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 807:** The share prices themselves each constituted separate fraudulent misrepresentations, especially when communicated to employees through various communications authored or approved by Fantini. *See* ¶¶ 373-430.

**RESPONSE TO COMPLAINT NO. 807:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 808:** Fantini's representations about the stock price and the value of Appvion also concealed that in connection with each separate earlier valuation, he was failing to properly monitor State Street in conducting its valuations as the ESOP Trustee and failed to required that each earlier stock value be adjusted to take into account, among other things, the ESOP's lack of control and its unfunded pension and postretirement liabilities.

**RESPONSE TO COMPLAINT NO. 808:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Fantini Intended to Conceal his Breaches of Fiduciary Duty

**COMPLAINT NO. 809:** Fantini intended for his actions to conceal the fact that Appvion's stock price was at all times overvalued. In addition to Fantini's knowledge that the share price was inflated as alleged above, evidence of Fantini's intent includes at least the following:

**RESPONSE TO COMPLAINT NO. 809:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 810:** Fantini had a master's degree in labor and industrial relations and an MBA. He was therefore well qualified to understand PDC's financial statements and the valuations.

**RESPONSE TO COMPLAINT NO. 810:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 811:** Fantini clearly reviewed and understood the valuations since he authored, approved and disseminated communications to the Employee Owners about them. Fantini knew about the Excluded Debt because it was included in each financial statement balance sheet, and he knew that the valuations were not subtracting it in determining the PDC's fair market value. The magnitude of the Excluded Debt was so large and such a large percentage of PDC's reported equity value that it is simply not reasonable that a person in Fantini's position with his understanding did not discover the Excluded Debt had not been subtracted. *See* ¶¶ 197-246.

**RESPONSE TO COMPLAINT NO. 811:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 812:** Fantini knew that the ESOP lacked control under the Security Holder's Agreement, but he knew the valuations were applying a substantial control premium premised on the ESOP's control in fact of PDC. *See* ¶¶ 254-363.

271

**RESPONSE TO COMPLAINT NO. 812:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 813:** Fantini received a loyalty payment in connection with the 2001 Transaction, approximately $75,000 of which was deferred and tied to the value of PDC's stock; when the plan was terminated in 2005, Fantini received approximately $197,000 because of the increase in the value of PDC's stock. Fantini also received incentive compensation under the LTIP under the LTIP that was tied to the value of PDC's stock. Fantini was motivated to act in his own self-interest in inflating the value of PDC's stock and not solely in the interests of the participants and beneficiaries at all times after the 2001 Transaction.

**RESPONSE TO COMPLAINT NO. 813:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 814:** In addition, because Fantini had inside knowledge that PDC's stock was inflated, he was able to strategically time his departure in order to liquidate his interest in the ESOP. Fantini left Appvion in December 2005. Because of the inflated share price in place when he left and in the following years, Fantini had a gain of over $575,000 on his ESOP investment.

**RESPONSE TO COMPLAINT NO. 814:** Because Count VII is not asserted against Reliance Trust and has been dismissed, no response is required.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY AGAINST RICHARDS

**COMPLAINT NO. 815:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 815:** Because Count VIII is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Richards Owed Fiduciary Duties of Prudence and Loyalty to the ESOP

**COMPLAINT NO. 816:** Richards was named president and CFO effective 4 April 2005 and became Chairman of the Board on 31 May 2005. Richards retired as CEO on 4 August 2015 and stepped down as Chairman of the Board on 31 December 2015. At all times as CEO, Richards had control over the Board under the Security Holder's Agreement because no directors could be appointed or removed without his agreement; Richards was also responsible for nominating himself to the Board. The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Richards was therefore a fiduciary of the ESOP because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring

of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties. Richards had a duty to prudently monitor the actions of the ESOP Trustee and the ESOP Committee.

**RESPONSE TO COMPLAINT NO. 816:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 817:** Richards was also a fiduciary of the ESOP as a member of the ESOP Committee from April 2015 through October 2015 and therefore owed fiduciary duties of prudence, loyalty, and disclosure under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

**RESPONSE TO COMPLAINT NO. 817:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 818:** Richards exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications to employees about the stock price and the valuation process, and directing the purchase of PDC's stock. He had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 818:** Because Count VIII is not asserted against Reliance Trust, no response is required.

### Richards Breached his Fiduciary Duty to the ESOP In Connection with the Stock Valuations between April 2005 and 30 June 2015

**COMPLAINT NO. 819:** Richards breached his fiduciary duties of prudence, loyalty, and disclosure in connection with the PDC stock valuations by at least the following:

**RESPONSE TO COMPLAINT NO. 819:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 820:** Richards approved, adopted and disseminated the following PDC stock values even though he knew they were artificially inflated:

| Valuation Date | Share Price |
|---|---|
| 6/30/2005 | $27.77 |
| 12/31/2005 | $28.56 |
| 6/30/2006 | $31.27 |
| 12/31/2006 | $33.62 |
| 6/30/2007 | $32.89 |
| 12/31/2007 | $33.41 |

| Valuation Date | Share Price |
|----------------|-------------|
| 6/30/2008 | $26.64 |
| 12/31/2008 | $21.43 |
| 6/30/2009 | $18.87 |
| 12/31/2009 | $13.26 |
| 6/30/2010 | $12.03 |
| 12/31/2010 | $12.84 |
| 6/30/2011 | $14.10 |
| 12/31/2011 | $15.01 |
| 6/30/2012 | $16.45 |
| 12/31/2012 | $17.55 |
| 6/30/2013 | $17.85 |
| 12/31/2013 | $16.25 |
| 6/30/2014 | $16.30 |
| 12/31/2014 | $11.00 |
| 6/30/2015 | $12.90 |

**RESPONSE TO COMPLAINT NO. 820:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 821:** Richards understood, approved, and adopted the content of the valuation reports and the stock values. While Richards reviewed the valuations prior to 2008, beginning in January 2008 the minutes of the ESOP Committee began documenting that the ESOP Committee (including Richards) met (typically telephonically) with Stout and the ESOP Trustee to review and approve each of the valuation reports. *See* ¶¶ 167-78, 1242.

**RESPONSE TO COMPLAINT NO. 821:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 822:** In doing so, Richards failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at these prices. Richards failed to value the stock in good faith using a prudent process and determine that reliance on the valuation reports was reasonably justified under the circumstances. He adopted these stock prices despite the following facts that caused each stock price that he released to the ESOP through the Employee Owners, to be materially and fraudulently overstated:

- Richards knew that the valuations added a fraudulent control premium even though he, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts that supported the control premium. Richards controlled the composition of majority of the Board of Directors at all times he was CEO. *See* ¶¶ 254-63.

- Richards also knew that the valuations excluded substantial debt that should have been subtracted in arriving at fair market value. This Excluded Debt reached as high

as $207 million in 2012, in addition to a failure to include even all interest-bearing debt in certain valuations. *See* ¶¶ 197-248, 288.

- Richards was involved in preparing, approving and reviewing the underlying five-year projections that the valuations were based on and knew that they were consistently inflated. *See* ¶¶ 265-70.

- Richards approved the valuations despite the other facts that render them unreliable as alleged in Section IV.D. and Paragraphs 582-89, 611-22, 654-66.

**RESPONSE TO COMPLAINT NO. 822:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 823:** As a member of the ESOP Committee, Richards breached his duty of prudence, loyalty and disclosure by directing the ESOP Trustee to purchase PDC's stock using each of these stock prices for the respective time periods, even though Richards knew they were for more than fair market value.

**RESPONSE TO COMPLAINT NO. 823:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 824:** Richards also breached his fiduciary duties by failing to prudently monitor State Street, Reliance, and Argent in their determinations of the share value. Despite direct review of the valuation reports and working with Street, Reliance, and Argent on the valuations, Richards failed to require that State Street, Reliance, and Argent accurately value the PDC stock in connection with each semi-annual valuation and instead accepted, approved and disseminated stock prices that he knew to be inflated.

**RESPONSE TO COMPLAINT NO. 824:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 825:** Richards authored, approved and disseminated communications to the Employee Owners informing them of the fraudulent stock prices and went on road shows presenting the valuations reassuring them that the current and previous valuations were correct. *See* ¶¶ 428-560, 1246-50. These communications were misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting the Excluded Debt. This was a breach of Richards' duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 825:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 826:** Richards went on road shows explaining the valuations to employees. Richards's presentations at these road shows also failed to disclose the full valuation process, including the addition of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining stock price. This was also a breach of Richards's duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 826:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 827:** As described in Paragraphs 349-67, Richards approved, signed and attested to PDC's 10-K and attested to the 10-Q filings during his time as CEO. These filings separately reported the inflated share price and incorporated the share price into its financial statements. This was a breach of Richards's duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 827:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 828:** As a result of Richards's breaches of fiduciary duty, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Richards is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 828:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claims against Richards in Connection with the Valuations on or After 16 July 2012 Are Timely Without Regard to Tolling**

**COMPLAINT NO. 829:** Plaintiff did not have actual knowledge of Richards's breaches of fiduciary duty until at least August 2017 when Plaintiff became a fiduciary of the ESOP, and this action was first filed on 26 November 2018. Accordingly, Plaintiff's claims against Richards relating to the 31 December 2012 valuation and purchases of stock in December 2012 or January 2013 are timely because they were filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 829:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 830:** In addition, Richards approved the use of the 16 July 2012 valuation to purchase shares from PDC and to repurchase shares from employees in December 2012. Accordingly, the last actions which constituted a breach of Richards's fiduciary duties in connection with that valuation occurred within the six-year statute of repose and Plaintiff's claims relating to that valuation are timely without regard to fraud or concealment.

**RESPONSE TO COMPLAINT NO. 830:** Because Count VIII is not asserted against Reliance Trust, no response is required.

### Plaintiff's Claims Against Richards for Breaches of Fiduciary Duty Prior to 26 November 2012 are Tolled

**COMPLAINT NO. 831:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can include acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 831:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 832:** Discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock, which could not happen without access to the valuations. Further, Richards took affirmative steps to conceal his breaches of fiduciary duty in approving and adopting the stock prices as described below.

**RESPONSE TO COMPLAINT NO. 832:** Because Count VIII is not asserted against Reliance Trust, no response is required.

### Richards Took Affirmative Steps to Conceal his Breaches of Fiduciary Duty and Each of his Earlier Misrepresentations

**COMPLAINT NO. 833:** Beginning with the semi-annual valuation as of 30 June 2005 through the valuation as of 30 June 2015, Richards approved, adopted and disseminated each of the fraudulently inflated PDC stock prices that Richards knew were inflated. Each stock price constituted a separate representation, especially when each was separately communicated to employees through various communications that Richards authored or approved. *See* ¶¶ 340-48. He also approved, signed and attested to each 10-K and attested to each 10-Q filing. *See* ¶¶ 349-67. Each one of these fraudulent representations of share price were separate and independent steps of fraud or concealment, and each one concealed Richards' earlier breaches of fiduciary duty in connection with each earlier valuation.

**RESPONSE TO COMPLAINT NO. 833:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 834:** Each 10-K and 10-Q included certifications signed and attested to by Richards that the filings complied with SEC reporting requirements, that the reports did not contain untrue statements of material fact or omit material facts necessary to make the statements made not misleading, and that the financial statements fairly presented the financial condition of

the company. Further, each of the separate 10-Ks included audited financial statements which further supported the valuations. Richards' attestations were fraudulent because the stock price was at all times inflated and therefore the Redeemable Common Stock entry on the balance sheets (as well as related entries) was at all times misstated. Each of the separate 10-K and 10-Q filings operated separately and independently to mask and conceal the fact that Richards was breaching his fiduciary duty in connection with each of the earlier valuations.

**RESPONSE TO COMPLAINT NO. 834:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 835:** Each of Richards' separate representations about the stock price concealed that he was failing to properly monitor the ESOP Trustee in conducting each of their separate valuations and was failing to follow a proper process in reviewing each valuations and accepting each stock price despite knowing it was inflated.

**RESPONSE TO COMPLAINT NO. 835:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**Richards Intended to Conceal his Breaches of Fiduciary Duty and Stock Price Related Misrepresentations**

**COMPLAINT NO. 836:** Richards intended for his actions to conceal the fact that each of PDC's stock price had been overvalued. In addition to Richards's knowledge that the stock price was inflated as described earlier, evidence of Richards' intent includes at least the following:

**RESPONSE TO COMPLAINT NO. 836:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 837:** Richards has an MBA with concentrations in marketing and finance. He also served as Appvion's interim CFO in 2006, after Parker's employment was terminated and before Ferree was named as CFO. Richards was therefore well qualified to understand Appvion's financial statements and particularly the debt reflected on each balance sheet.

**RESPONSE TO COMPLAINT NO. 837:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 838:** Richards clearly reviewed and understood the valuations because (1) he authored or approved each separate communication to the Employee Owners about them, (2) he presented them to the Employee Owners during road shows, and (3) beginning in 2008 the ESOP Committee meeting minutes expressly begin recording that Stout presented each valuation at ESOP Committee meetings for review. He also reviewed and understood the 10-Ks and 10-Qs because he attested to each and also signed the 10-Ks, and because he understood

financial statements. The financial statements clearly listed the Excluded Debt on every balance sheet which was being subtracted to determine shareholder's equity, but which was not being deducted in the valuations. The magnitude of the Excluded Debt was so large and material and was such a large percentage of PDC's reported equity value, it is simply not reasonable that a person in Richards' position with his understanding could have simply missed that the Excluded Debt had not been subtracted in arriving at fair market value.

**RESPONSE TO COMPLAINT NO. 838:** Because Count VIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 839:** As described earlier, Richards was also on the ESOP Committee in 2007 and 2008 when the valuations discounted Appvion's fair market value because of BemroseBooth's unfunded pension liability; he therefore knew that each of the separate PDC valuations should have been subtracting unfunded pension liability but he did nothing to require amendments going backward, nor did he require a change in methodology going forward. *See ¶¶* 209-236.

**RESPONSE TO COMPLAINT NO. 839:** Because Count VIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 840:** Richards also knew that the ESOP lacked control under the Security Holder's Agreement at all times during his tenure as CEO, but he knew the valuations were applying a substantial control premium premised on the ESOP's control in fact of PDC.

**RESPONSE TO COMPLAINT NO. 840:** Because Count VIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 841:** Richards knew that each of the valuations were based on projections that he was responsible for approving in his role as CEO, and Richards knew the projections were inflated and that Appvion consistently missed the projections.

**RESPONSE TO COMPLAINT NO. 841:** Because Count VIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 842:** Richards was at all times motivated to increase the share value for his own benefit. Richards received LTIP units and RSUs which were tied to the value of PDC stock. *See ¶¶* 297305, 1266-70. He also received millions in addition incentive compensation based on Appvion's overall performance, which he would not have earned had Appvion's valuations and financial statements been corrected.

**RESPONSE TO COMPLAINT NO. 842:** Because Count VIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 843:** Richards was involved in approving the valuation as of 30 June 2012, which was heavily inflated because it included value from the proposed Hicks transaction which failed to close. *See* ¶¶ 320-327. In particular, the projections used in that valuation were heavily inflated. Had that transaction closed, Richards would have received millions in incentive compensation for his own account (to the detriment of the ESOP) based on that inflated valuation. This valuation is further evidence that Richards was acting intentionally by fraudulently approving and disseminating each inflated share price for his own purposes.

**RESPONSE TO COMPLAINT NO. 843:** Because Count VIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 844:** On 14 November 2014, Richards signed PDC's amended 2013 10-K which reported a material weakness relating to the calculation of the Redeemable Common Stock entry on the balance sheet. Appvion's management was failing to follow accounting guidance and was not correctly estimating how many shares were "redeemable" for purposes of the entry. The restatement merely recalculated the Redeemable Common Stock value without correcting the real underlying issue - that the stock value was inflated, causing the balance sheet to be inflated. While this was within the statute of limitations period, this action reaffirmed the prior stock values again and continued the course of concealment.

**RESPONSE TO COMPLAINT NO. 844:** Because Count VIII is not asserted against Reliance Trust, no response is required.

## COUNT IX
## BREACH OF FIDUCIARY DUTY AGAINST FERREE

**COMPLAINT NO. 845:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 845:** Because Count IX is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Ferree Owed Fiduciary Duties of Prudence and Loyalty to the ESOP

**COMPLAINT NO. 846:** Ferree was CFO of Appvion from October 2006 until May 2017, and was a member of (and Chair of) the ESOP Committee from December 2006 until April 2017. Ferree was a fiduciary as a member of the ESOP Committee and owed fiduciary duties of loyalty, prudence, and disclosure under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)).

**RESPONSE TO COMPLAINT NO. 846:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 847:** Ferree exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications to employees about the stock price and the valuation process, and directing the purchase of PDC's stock. He had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 847:** Because Count IX is not asserted against Reliance Trust, no response is required.

### Ferree Breached his Fiduciary Duty to the ESOP In Connection with Each of the Separate the Stock Valuations between October 2006 and July 2016

**COMPLAINT NO. 848:** Ferree breached his fiduciary duties of prudence, loyalty, and disclosure in connection with the separate and independent release of each of the PDC stock valuations by at least the following:

**RESPONSE TO COMPLAINT NO. 848:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 849:** Ferree approved and adopted each of the following PDC stock valuations even though he knew that each valuation was artificially inflated:

| Valuation Date | Share Price |
|----------------|-------------|
| 12/31/2006 | $33.62 |
| 6/30/2007 | $32.89 |
| 12/31/2007 | $33.41 |
| 6/30/2008 | $26.64 |
| 12/31/2008 | $21.43 |
| 6/30/2009 | $18.87 |
| 12/31/2009 | $13.26 |
| 6/30/2010 | $12.03 |
| 12/31/2010 | $12.84 |
| 6/30/2011 | $14.10 |
| 12/31/2011 | $15.01 |
| 6/30/2012 | $16.45 |
| 12/31/2012 | $17.55 |
| 6/30/2013 | $17.85 |
| 12/31/2013 | $16.25 |
| 6/30/2014 | $16.30 |
| 12/31/2014 | $11.00 |
| 6/30/2015 | $12.90 |
| 12/31/2015 | $12.30 |
| 6/30/2016 | $13.70 |

| Valuation Date | Share Price |
|---|---|
| 12/31/16 | $10.35 |

**RESPONSE TO COMPLAINT NO. 849:** Because Count IX is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 850:** Ferree understood, approved, and adopted the content of the valuation reports, disseminated the stock values to the ESOP Owners and used each stock price to purchase PDC stock for the respective period.

**RESPONSE TO COMPLAINT NO. 850:** Because Count IX is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 851:** While Ferree reviewed the valuations prior to 2008, beginning in January 2008 the minutes of the ESOP Committee began documenting that the ESOP Committee (including Ferree) met (typically telephonically) with Stout and the ESOP Trustee to review and approve each of the valuation reports. In doing so, Ferree failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at these prices. Ferree failed to value the stock in good faith using a prudent process and determine that reliance on the valuation reports was reasonably justified under the circumstances. He adopted these stock prices despite the following facts that caused each stock price that was released to the ESOP, through the Employee Owners, to be materially overstated:

- Ferree knew that the valuations added a fraudulent control premium even though Appvion's CEO, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts that supported the control premium. *See* ¶¶ 143-44, 25463.

- Ferree also knew that each of the valuations excluded substantial debt that should have been subtracted in arriving at fair market value. This Excluded Debt reached as high as $207 million in 2012, in addition to a failure to include all interest-bearing debt in certain valuations. *See* ¶¶ 197-248, 288.

- Ferree was involved in preparing and approving the underlying five-year projections each of the valuations based on and in discussing Appvion's actual performance at ESOP Committee meetings. Ferree knew that they were consistently inflated and he knew how that impacted the valuations. *See* ¶¶ 26570.

- Ferree approved the valuations despite the other facts that render them unreliable as alleged in Section IV.D. and Paragraphs 582-89, 611-22, 654-66.

**RESPONSE TO COMPLAINT NO. 851:** Because Count IX is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 852:** In his role as a member of the ESOP Committee, Ferree breached his duty of prudence by directing the ESOP Trustee to purchase PDC's stock using each of these stock prices for their respective periods even though Ferree knew they were for more than fair market value.

**RESPONSE TO COMPLAINT NO. 852:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 853:** Ferree clearly reviewed and understood the 10-Ks and 10-Qs because he signed and attested to them, and Ferree thoroughly understood each of the financial statements because of his role as CFO. *See* ¶¶ 349-67. The financial statements clearly listed the Excluded Debt on every balance sheet which was being subtracted to determine shareholder's equity, but which was not being subtracted in the valuations. The magnitude of the Excluded Debt is so material and such a large percentage of PDC's equity value that it is simply not reasonable that a person in Ferree's position with his understanding could have understood that the Excluded Debt had not been subtracted in arriving at fair market value in each valuation. *See* ¶ 288.

**RESPONSE TO COMPLAINT NO. 853:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 854:** As Chair of the ESOP Committee, Ferree had authority to implement a review process to ensure that State Street was acting independently and in the best interests of the ESOP. However, Ferree breached his fiduciary duties by failing to prudently monitor State Street, Reliance, and Argent in their determinations of the stock value. Despite direct review of the valuation reports and working with Street, Reliance, and Argent on each of the valuations, Ferree failed to require that State Street, Reliance, and Argent accurately value the PDC stock and instead accepted, approved and disseminated share prices that he knew to be inflated.

**RESPONSE TO COMPLAINT NO. 854:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 855:** Ferree authored, approved and disseminated communications to the Employee Owners informing them of the fraudulent stock prices and went on road shows presenting the valuations reassuring them that the current and each of the previous valuations were correct. *See* ¶¶ 449-560, 1246-1253. These communications were fraudulently misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining stock price.

**RESPONSE TO COMPLAINT NO. 855:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 856:** Ferree approved and signed each PDC's 10-K and 10-Q filings during his time as CFO. *See* ¶¶ 349-67. These filings reported the inflated share price and incorporated the share price into its financial statements. This violated Ferree's duty of prudence, loyalty and disclosure.

**RESPONSE TO COMPLAINT NO. 856:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 857:** As a result of Ferree's breaches of fiduciary duty, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Ferree is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 857:** Because Count IX is not asserted against Reliance Trust, no response is required.

### Plaintiff's Claims against Ferree in Connection with the Valuations on or After 16 July 2012 Are Timely Without Regard to Tolling

**COMPLAINT NO. 858:** Plaintiff did not have actual knowledge of Ferree's breaches of fiduciary duty until at least August 2017 when Plaintiff became a fiduciary of the ESOP, and this action was first filed on 26 November 2018. Accordingly, Plaintiff's claims against Ferree relating to the 31 December 2012 valuation and purchases of stock in December 2012 or January 2013 are timely because they were filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 858:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 859:** In addition, Ferree approved the use of the 16 July 2012 valuation to purchase shares from PDC and to repurchase shares from employees in December 2012. Accordingly, the last actions which constituted a breach of Ferree's fiduciary duties in connection with that valuation occurred within the six-year statute of repose and Plaintiff's claims relating to that valuation are timely without regard to fraud or concealment.

**RESPONSE TO COMPLAINT NO. 859:** Because Count IX is not asserted against Reliance Trust, no response is required.

### Plaintiff's Claims Against Ferree for Breaches of Fiduciary Duty Prior to 26 November 2012 are Tolled

**COMPLAINT NO. 860:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date

of discovery of the breach or violation. The fraud or concealment can include acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 860:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 861:** Discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock, which could not happen without access to the valuations. Further, Ferree took affirmative steps to conceal his breaches of fiduciary duty in approving and adopting the stock prices as described below.

**RESPONSE TO COMPLAINT NO. 861:** Because Count IX is not asserted against Reliance Trust, no response is required.

### Ferree Took Affirmative Steps to Conceal his Breaches of Fiduciary Duty and Each of his Earlier Misrepresentations

**COMPLAINT NO. 862:** As described earlier, beginning with the semi-annual valuation as of 31 December 2006 through the valuation as of 31 December 2016, Ferree approved, adopted and disseminated each of the fraudulently inflated PDC stock prices that Ferree knew were inflated. Each stock price constituted a separate representation, especially when each was separately communicated to the Employee Owners through various communications Ferree authored or approved. *See* ¶¶ 34048, 449-560, 1246-1253. He also approved, signed and attested to each of Appvion's 10-K and 10-Q filings. *See* ¶¶ 349-67. Each one of these fraudulent representations of share price were separate and independent steps of fraud or concealment, and each one concealed Ferree's earlier breaches of fiduciary duty and each misrepresentation in connection with that each earlier valuation.

**RESPONSE TO COMPLAINT NO. 862:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 863:** Each 10-K and 10-Q filed while Ferree was CFO included attestations signed by Ferree that the filings complied with SEC reporting requirements, that the reports did not contain untrue statements of material fact or omit material facts necessary to make the statements made not misleading, and that the financial statements fairly presented the financial condition of the company. Further, each of the 10-Ks included audited financial statements which lent further credence to the valuations. Each of Ferree's attestations were fraudulent because the stock price was at all times inflated and therefore the Redeemable Common Stock entry on each of the balance sheets (as well as related entries) was at all times misstated, and each of the separate 10-K and 10-Q filings operated as an additional step to mask and conceal the fact that Ferree was breaching his fiduciary duty in connection with the valuations and was misrepresenting each stock price.

**RESPONSE TO COMPLAINT NO. 863:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 864:** Ferree signed the Form 5500s filed with the Department of Labor under penalty of perjury in 2007 to 2016. These also relied upon the fraudulent stock prices and and constituted further acts of concealment. *See* ¶¶ 368-72. None of these Form 5500s report any prohibited transactions, investigations, or corrective activity.

**RESPONSE TO COMPLAINT NO. 864:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 865:** Ferree's representations about each stock price and the value of Appvion concealed that he was failing to properly monitor the ESOP Trustee in conducting each of their separate valuations and failing to follow a proper process in reviewing the valuations and accepting, approving and disseminating the stock price despite knowing it was inflated.

**RESPONSE TO COMPLAINT NO. 865:** Because Count IX is not asserted against Reliance Trust, no response is required.

### Ferree Intended to Conceal his Breaches of Fiduciary Duty

**COMPLAINT NO. 866:** Ferree intended for his actions to conceal the fact that each PDC stock price had been overvalued. In addition to Ferree's knowledge that the stock price was inflated as described above, evidence of Ferree's intent includes at least the following:

**RESPONSE TO COMPLAINT NO. 866:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 867:** Ferree has a master's degree in finance. In addition, he was Appvion's CFO and was therefore ultimately responsible for Appvion and PDC's financial statements and the financial projections that the valuations were based on. Ferree was therefore well qualified to understand Appvion's financial statements and particularly the debt reflected on each balance sheet.

**RESPONSE TO COMPLAINT NO. 867:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 868:** Ferree clearly reviewed and understood the valuations because (1) he authored or approved each separate communication to the Employee Owners about them and beginning in 2008 the ESOP Committee meeting minutes expressly document that Stout presented each valuation at ESOP Committee meetings. He also reviewed and understood the 10-Ks and 10-Qs because he signed and attested to each of them. In fact, Ferree was responsible for

the financial statement preparation. Each of the financial statements clearly listed the Excluded Debt on every balance sheet which was being subtracted to determine shareholder's equity, but which was not being deducted in each of the separate valuations. The magnitude of the Excluded Debt on every valuation and that material percentage of PDC's equity value it is simply not reasonable that a person in Ferree's position with his understanding could have simply missed that the Excluded Debt had not been subtracted in arriving at fair market value.

**RESPONSE TO COMPLAINT NO. 868:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 869:** Ferree was also on the ESOP Committee in 2007 and 2008 when the valuations discounted Appvion's fair market value because of BemroseBooth's unfunded pension liability. *See* ¶¶ 209-236. As described earlier, Ferree therefore knew each of the separate valuations should have been subtracting unfunded pension liability, but he did nothing to require amendments going backward nor did he require a change in the methodology going forward. Further, Ferree knew in May 2016 that the pension and postretirement liability still was not being deducted in the valuations; at a 26 May 2016 ESOP Committee meeting, Ferree led a discussion about Appvion's five year financial projections prepared for purposes of the valuation as of 30 June 2016 and "also discussed the need to fund our pension contributions going forward as it will become a statutory obligation beginning in 2017." The minutes of that meeting note that Ferree planned to discuss the issue with Stout and that "Ferree discussed the potential effects to the share price." Ferree therefore knew that this significant unfunded liability was impacting the stock price.

**RESPONSE TO COMPLAINT NO. 869:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 870:** Ferree also knew that the ESOP lacked control under the Security Holder's Agreement, but he knew that each valuation was applying a substantial control premium premised on the ESOP's control in fact of PDC.

**RESPONSE TO COMPLAINT NO. 870:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 871:** Ferree knew that the valuations were based on projections that he was responsible for approving in his role as CFO, and Ferree knew the projections were inflated and that Appvion had not been meeting its projections.

**RESPONSE TO COMPLAINT NO. 871:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 872:** Ferree was at all times motivated to increase the share value for his own benefit. Ferree received LTIP units and RSUs which were tied to the value of PDC stock, including a signing bonus of LTIP units when he joined Appvion. *See* ¶¶ 297-305, 1266-70. He

also received millions in addition incentive compensation which he would not have earned had Appvion's valuations and financial statements been corrected.

**RESPONSE TO COMPLAINT NO. 872:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 873:** Ferree was involved in approving the valuation as of 30 June 2012, which was heavily inflated because it included value from the proposed Hicks transaction which failed to close. In particular, the projections used in that valuation were heavily inflated. Had that transaction closed, Ferree would have received millions in incentive compensation for his own account (to the detriment of the ESOP) based on that inflated valuation. *See* ¶¶ 320-27. This valuation is further evidence that Ferree was acting intentionally in inflating the share price for his own purposes.

**RESPONSE TO COMPLAINT NO. 873:** Because Count IX is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 874:** On 14 November 2014, Ferree signed PDC's amended 2013 10-K which reported a material weakness relating to the calculation of the Redeemable Common Stock entry on the balance sheet. Appvion's management was failing to follow accounting guidance and was not correctly estimating how many shares were "redeemable" for purposes of the entry. The restatement merely recalculated the Redeemable Common Stock value for the years 2011 to 2013 without correcting the real underlying issue - that the stock value was inflated, causing the balance sheet to be inflated. While this was within the statute of limitations period, this action reaffirmed the prior stock values again and continued the course of concealment.

**RESPONSE TO COMPLAINT NO. 874:** Because Count IX is not asserted against Reliance Trust, no response is required.

## COUNT X
## BREACH OF FIDUCIARY DUTY AGAINST ARENT

**COMPLAINT NO. 875:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 875:** Because Count X is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Arent Owed Fiduciary Duties of Prudence and Loyalty to the ESOP

**COMPLAINT NO. 876:** Arent was head of Appvion's Human Resources and was employed with Appvion since 1982. She was a member of Appvion's ESOP Committee from July

2008 until the end of 2015; prior to that she was the ESOP Committee's secretary from 2001 to 2006 and attended meetings of the ESOP Committee in 2007.

**RESPONSE TO COMPLAINT NO. 876:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 877:** Arent was a fiduciary as a member of the ESOP Committee and owed fiduciary duties of loyalty, prudence, and disclosure under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)).

**RESPONSE TO COMPLAINT NO. 877:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 878:** Arent exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications to employees about the stock price and the valuation process, and directing the purchase of PDC's stock. She had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 878:** Because Count X is not asserted against Reliance Trust, no response is required.

### Arent Breached her Fiduciary Duty to the ESOP In Connection with Each Stock Valuation between October 2006 and July 2016

**COMPLAINT NO. 879:** Arent breached her fiduciary duties of prudence, loyalty, and disclosure in connection with the release of each PDC stock valuation by at least the following:

**RESPONSE TO COMPLAINT NO. 879:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 880:** Arent approved and adopted each of the following PDC stock valuations even though she knew that each valuation was artificially inflated:

| Valuation Date | Share Price |
|----------------|-------------|
| 6/30/2008 | $26.64 |
| 12/31/2008 | $21.43 |
| 6/30/2009 | $18.87 |
| 12/31/2009 | $13.26 |
| 6/30/2010 | $12.03 |
| 12/31/2010 | $12.84 |
| 6/30/2011 | $14.10 |

| Valuation Date | Share Price |
|---|---|
| 12/31/2011 | $15.01 |
| 6/30/2012 | $16.45 |
| 12/31/2012 | $17.55 |
| 6/30/2013 | $17.85 |
| 12/31/2013 | $16.25 |
| 6/30/2014 | $16.30 |
| 12/31/2014 | $11.00 |
| 6/30/2015 | $12.90 |

**RESPONSE TO COMPLAINT NO. 880:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 881:** Arent understood, approved, and adopted the content of the valuation reports, disseminated the stock prices to the Employee Owners and used each stock price to purchase PDC stock for the respective period.

**RESPONSE TO COMPLAINT NO. 881:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 882:** The minutes of the ESOP Committee clearly state that the ESOP Committee (including Arent) met (typically telephonically) with Stout and the ESOP Trustee to review and approve each of the valuation reports during Arent's tenure on the committee. In doing so, Arent failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at each of these prices. Arent failed to value the stock in good faith using a prudent process and determine that reliance on the valuation reports was reasonably justified under the circumstances. She adopted each these stock prices that was released to the ESOP, through the Employee Owners, despite the following facts that caused each of the stock prices to be materially overstated:

- o Arent knew that the valuations added a fraudulent control premium even though Appvion's CEO, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts that supported the control premium. *See* ¶¶ 143-44, 25463.

- o Arent also knew that each of the valuations excluded substantial debt that should have been subtracted in arriving at fair market value. This included Excluded Debt that reached as high as $207 million in 2012 in addition to a failure to include even all interest-bearing debt in certain valuations. *See* ¶¶ 197-246, 288.

- o Arent was involved in preparing and approving the underlying five-year projections that each of the valuations was based on and knew that they were consistently inflated. *See* ¶¶ 265-70.

o Arent approved the valuations despite the other facts that render them unreliable as alleged in Section IV.D. and Paragraphs 582-89, 611-22, 654-66.

**RESPONSE TO COMPLAINT NO. 882:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 883:** In her role as a member of the ESOP Committee, Arent breached her duty of prudence by directing the ESOP Trustee to purchase PDC's stock using each of these stock prices for their respective periods even though Arent knew they were for more than fair market value.

**RESPONSE TO COMPLAINT NO. 883:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 884:** Arent also breached her fiduciary duties by failing to prudently monitor State Street, Reliance, and Argent in their determinations of the share value. Despite direct review of each of the valuation reports and working with Street, Reliance, and Argent on each of the valuations, Arent failed to insist that State Street, Reliance, and Argent accurately value the PDC stock and instead accepted, approved and disseminated stock prices that she knew to be inflated.

**RESPONSE TO COMPLAINT NO. 884:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 885:** Arent authored and/or approved and disseminated communications to the Employee Owners informing them of each of the fraudulent stock prices and went on road shows presenting the valuations reassuring them that the current and previous valuations were correct. These communications were misleading and constituted steps to mask the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining stock price.

**RESPONSE TO COMPLAINT NO. 885:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 886:** As a result of Arent's breaches of fiduciary duty in connection with each separate stock valuation, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Arent is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from her breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 886:** Because Count X is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claims Against Arent in Connection with the Valuations on or After 16 July 2012 Are Timely Without Regard to Tolling**

**COMPLAINT NO. 887:** Plaintiff did not have actual knowledge of Arent's breaches of fiduciary duty until at least August 2017 when Plaintiff became a fiduciary of the ESOP, and this action was first filed on 26 November 2018. Accordingly, Plaintiff's claims against Arent relating to the 31 December 2012 valuation and purchases of stock in December 2012 or January 2013 are timely because they were filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 887:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 888:** In addition, Arent approved the use of the 16 July 2012 valuation to purchase shares from PDC and to repurchase shares from employees in December 2012. Accordingly, the last actions which constituted a breach of Arent's fiduciary duties in connection with that valuation occurred within the six-year statute of repose and Plaintiff's claims relating to that valuation are timely without regard to fraud or concealment.

**RESPONSE TO COMPLAINT NO. 888:** Because Count X is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claims Against Arent for Breaches of Fiduciary Duty Prior to 26 November 2012 are Tolled**

**COMPLAINT NO. 889:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can include acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 889:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 890:** Discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock, which could not happen without access to the valuations. Further, Arent took affirmative steps to conceal her breaches of fiduciary duty in approving and adopting the stock prices as described below.

**RESPONSE TO COMPLAINT NO. 890:** Because Count X is not asserted against Reliance Trust, no response is required.

**Arent Took Affirmative Steps to Mask and Conceal her Breaches of Fiduciary Duty and Each of her Earlier Misrepresentations**

**COMPLAINT NO. 891:** Beginning with the semi-annual valuation as of 30 June 2008 through the valuation as of 30 June 2015, Arent approved, adopted and disseminated each of the fraudulently inflated PDC stock prices that Arent knew were inflated. Each stock price constituted a separate representation, especially when each was separately communicated to Employee Owners through various communications authored, approved and disseminated by Arent. *See* ¶¶ 340-48.

**RESPONSE TO COMPLAINT NO. 891:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 892:** Arent's representations about the stock price and the value of Appvion concealed that she was failing to properly monitor the ESOP Trustee in conducting each of the earlier valuations or insist that the stock value be adjusted to take into account the ESOP's lack of control and Excluded Debt. It also masked and concealed each of her earlier stock price misrepresentations.

**RESPONSE TO COMPLAINT NO. 892:** Because Count X is not asserted against Reliance Trust, no response is required.

**Arent Intended to Conceal her Breaches of Fiduciary Duty**

**COMPLAINT NO. 893:** Arent intended for her actions to conceal the fact that each PDC stock price had been overvalued. In addition to Arent's knowledge that the stock price was inflated as described earlier, evidence of Arent's intent includes at least the following:

**RESPONSE TO COMPLAINT NO. 893:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 894:** Arent clearly reviewed and understood the valuations because she authored, approved and disseminated each separate communication to the Employee Owners about them and beginning in 2008 the ESOP Committee meeting minutes expressly record that Stout presented each valuation at ESOP Committee meetings for review. *See* ¶¶ 479-560.

**RESPONSE TO COMPLAINT NO. 894:** Because Count X is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 895:** As head of Appvion's Human Resources, Arent especially knew about Appvion's substantial unfunded pension and postretirement liability and knew that it was not being subtracted in each of the valuations. *See* ¶¶ 197-246, 288. Further, the financial statements clearly listed the Excluded Debt on every balance sheet which was being subtracted to

determine shareholder's equity, but which was not being deducted in each of the valuations. The magnitude of the Excluded Debt was material and was such a large percentage of equity, it is not reasonable that a person in Arent's position and long-standing association with Appvion and the ESOP could have simply missed that the Excluded Debt had not been subtracted in arriving at fair market value of every valuation.

**RESPONSE TO COMPLAINT NO. 895:** Because Count X is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 896:** Arent was not appointed to the ESOP Committee until mid-2008. However, she attended the 10 January 2008 meeting of the ESOP Committee in her role as Director of Human Resources, when Stout presented the valuation as of 31 December 2007 which discounted Appvion's fair market because of BemroseBooth's unfunded pension liability. Arent was on the committee by July 2008 when BemroseBooth's unfunded pension liability again reduced BemroseBooth's overall value, dollar-for-dollar and therefore Appvion's valuations. Arent therefore knew that each of the valuations should have been subtracting unfunded retirement-related debt but she did nothing to require amendments going backward nor did she require a change in methodology going forward. *See* ¶¶ 209-36.

**RESPONSE TO COMPLAINT NO. 896:** Because Count X is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 897:** Arent also knew that the ESOP lacked control under the Security Holder's Agreement at all times after the 2001 Transaction, but she knew that each of the valuations was applying a substantial control premium premised on the ESOP's control in fact of PDC.

**RESPONSE TO COMPLAINT NO. 897:** Because Count X is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 898:** Arent was at all times motivated to increase the share value for her own benefit. Arent received LTIP units and RSUs which were tied to the value of PDC stock. *See* ¶¶ 297-305, 1266-70. She also received addition incentive compensation which she would not have earned had Appvion's valuations and financial statements been corrected.

**RESPONSE TO COMPLAINT NO. 898:** Because Count X is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 899:** Arent was involved in approving the valuation as of 30 June 2012, which was heavily inflated because it included value from the proposed Hicks transaction which failed to close. *See* ¶¶ 320-327. In particular, the projections used in that valuation were heavily inflated. Had that transaction closed, Arent would have received for her own account (to

the detriment of the ESOP) based on that inflated valuation. This valuation is further evidence that Arent was acting intentionally in inflating the share price for her own purposes.

**RESPONSE TO COMPLAINT NO. 899:** Because Count X is not asserted against Reliance Trust, no response is required.

**COUNT XI**
**BREACH OF FIDUCIARY DUTY AGAINST TYCZKOWSKI**

**COMPLAINT NO. 900:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 900:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Tyczkowski was a Fiduciary of the ESOP**

**COMPLAINT NO. 901:** Tyczkowski was Appvion's general counsel beginning in August 2006, and was an attorney with Appvion since 1996. She was a fiduciary of the ESOP as a member of Appvion's ESOP Committee from September 2006 to June 2008 and therefore owed fiduciary duties of loyalty, prudence, and disclosure under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

**RESPONSE TO COMPLAINT NO. 901:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 902:** Tyczkowski exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications to employees about the stock price and the valuation process, and directing the purchase of PDC's stock. She had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 902:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**Tyczkowski Breached her Fiduciary Duties to the ESOP**

**COMPLAINT NO. 903:** Tyczkowski breached her duties of prudence, loyalty, and disclosure in connection with the separate and independent release of each PDC stock valuation by at least the following.

295

**RESPONSE TO COMPLAINT NO. 903:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 904:** Tyczkowski approved and adopted each of the following PDC stock values that she knew were artificially inflated:

| Valuation Date | Share Price |
|:---:|:---:|
| 12/31/2006 | $33.62 |
| 6/30/2007 | $32.89 |
| 12/31/2007 | $33.41 |

**RESPONSE TO COMPLAINT NO. 904:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 905:** Tyczkowski understood, approved, and adopted the content of the valuation reports disseminated the stock price to the Employee Owners and used each stock price to purchase PDC stock for the respective period.

**RESPONSE TO COMPLAINT NO. 905:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 906:** While Tyczkowski clearly reviewed the valuations prior to 2008, beginning in January 2008 the minutes of the ESOP Committee clearly state that the ESOP Committee met (typically telephonically) with Stout and the ESOP Trustee to review and approve each of the valuation reports. In doing so, Tyczkowski failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at each of these prices. Tyczkowski failed to value the stock in good faith using a prudent process and determine that reliance on the valuation reports was reasonably justified under the circumstances. She adopted each of these stock prices despite the following facts that caused the stock prices to be materially overstated:

- Tyczkowski knew that the valuations added a fraudulent control premium even though Appvion's CEO, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts that supported the control premium. *See* ¶¶ 14344, 254-63.

- Tyczkowski also knew that each of the valuations failed to subtract the Excluded Debt that should have been subtracted in arriving at fair market value. *See* ¶¶ 197-246, 288.

- Tyczkowski was involved in preparing and approving the underlying five-year projections that each of the valuations was based on and discussed them at Appvion's ESOP Committee meetings. Tyczkowski knew that these were consistently inflated and she knew how that impacted the valuations. *See* ¶¶ 26570.

296

- Tyczkowski approved the valuations despite other facts that render them unreliable as alleged in Section IV.D. and Paragraphs 654-657, 660-66.

**RESPONSE TO COMPLAINT NO. 906:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 907:** In her role as a member of the ESOP Committee, Tyczkowski breached her duty of prudence by directing the ESOP Trustee to purchase PDC's stock using these stock prices as listed in Appendix A even though Tyczkowski knew they were for more than fair market value.

**RESPONSE TO COMPLAINT NO. 907:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 908:** Tyczkowski also breached her fiduciary duties by failing to prudently monitor State Street in its determinations of the share value. Despite direct review of each of the valuation reports and working with State Street on each of the valuations, Tyczkowski failed to require that State Street accurately value the PDC stock and instead accepted, approved and disseminated stock prices that she knew to be inflated.

**RESPONSE TO COMPLAINT NO. 908:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 909:** Tyczkowski authored, approved and disseminated communications to the Employee Owners informing them of each of the fraudulent stock prices reassuring them that the current and previous valuations were correct. *See* ¶¶ 452-478. These communications were misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining stock price.

**RESPONSE TO COMPLAINT NO. 909:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 910:** As a result of Tyczkowski's breaches of fiduciary duty in connection with each separate stock valuation, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Tyczkowski is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from her breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 910:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

297

**Plaintiff's Claims Against Tyczkowski for Breaches of Fiduciary Duty are Tolled**

**COMPLAINT NO. 911:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can include acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 911:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 912:** Mr. Lyon was first named as an ESOP fiduciary in August 2017, so he was not aware of Tyczkowski's actions in connection with the valuations until after that date, when he was able to investigate the valuations. Further, the valuations were kept confidential from the Employee Owners so it was not possible for a reasonably diligent plaintiff to discover the breaches of fiduciary duty prior to August 2017. In addition, discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock.

**RESPONSE TO COMPLAINT NO. 912:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**Tyczkowski Took Affirmative Steps to Conceal her Breaches of Fiduciary Duty and Each of her Earlier Misrepresentations**

**COMPLAINT NO. 913:** Beginning with the semi-annual valuation as of 31 December 2006 through the valuation as of 31 December 2007, Tyczkowski approved, adopted and disseminated each of the fraudulently inflated PDC stock prices that Tyczkowski knew were inflated. Each stock price constituted a separate representation, especially when each was separately communicated to employees through various communications authored, approved and disseminated by Tyczkowski *See* ¶¶ 452-478. Each one of these fraudulent representations of share price was a separate and independent act of fraud or concealment, and each one concealed Tyczkowski's breaches of fiduciary duty and misrepresentations in connection with that valuation and the prior valuations. *See* ¶¶ 340-48.

**RESPONSE TO COMPLAINT NO. 913:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 914:** Further, in her role as Chief Compliance Officer, Tyczkowski was responsible for compliance with regulations (including securities regulations) and would have read and approved the 10-K and 10-Q filings between August 2006 and when she left Appvion in August 2008. Each of these 10-K and 10-Q incorporated and relied upon the share price and was a separate and independent act of fraud or concealment. *See* ¶¶ 349-67.

**RESPONSE TO COMPLAINT NO. 914:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 915:** Tyczkowski's representations about the stock price and the value of Appvion concealed that she was failing to properly monitor State Street in conducting each of the earlier valuations as the ESOP Trustee or insist that the stock value be adjusted to take into account the ESOP's lack of control and Excluded Debt. It also masked and concealed each of the earlier stock price misrepresentations.

**RESPONSE TO COMPLAINT NO. 915:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

### Tyczkowski Intended to Conceal her Breaches of Fiduciary Duty and Misrepresentations

**COMPLAINT NO. 916:** Tyczkowski intended for her actions to conceal the fact that each PDC stock price had been overvalued. In addition to Tyczkowski's knowledge that the share price was inflated as described earlier, evidence of Tyczkowski's intent includes at least the following:

**RESPONSE TO COMPLAINT NO. 916:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 917:** Tyczkowski has a law degree from Marquette University and was named as Appvion's Vice President and Secretary of PDC in January 2006 and Vice President, Secretary, General Counsel, and Chief Compliance Officer in August 2006.

**RESPONSE TO COMPLAINT NO. 917:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 918:** As Chief Compliance Officer, she was responsible for compliance with regulations (including securities regulations) and would have read and approved the 10-K and 10-Q filings between August 2006 and when she left Appvion in August 2008. *See* ¶¶ 349-67. The financial statements included in those filings clearly listed the Excluded Debt on every balance sheet and the fact that it was being subtracted to determine shareholder's equity, even though the same debt was not being deducted in each of the valuations. The magnitude of the Excluded Debt was so large and material and was such a large percentage of equity, it is simply not reasonable that a person in Tyczkowski's position with her understanding could have simply missed that the Excluded Debt had not been subtracted in arriving at fair market value of every valuation. *See* ¶¶ 197-248, 288.

**RESPONSE TO COMPLAINT NO. 918:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 919:** Tyczkowski clearly reviewed and understood the valuations because she authored or approved communications to the Employee Owners about them in 2007, and in January 2008 the ESOP Committee meeting minutes expressly record that Stout presented the 31 December 2007 valuation for review while Tyczkowski was present. *See* ¶¶ 175, 452-478.

**RESPONSE TO COMPLAINT NO. 919:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 920:** This valuation discounted Appvion's value based on BemroseBooth's unfunded pension liability while disregarding Appvion's much larger unfunded retirement-related debt.

**RESPONSE TO COMPLAINT NO. 920:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 921:** Tyczkowski therefore knew that the valuations should have been subtracting the unfunded retirement-related debt. *See* ¶¶ 209-36. Tyczkowski also knew that the ESOP lacked control under the Security Holder's Agreement at all times after the 2001 Transaction, but she knew that each of the valuations was applying a substantial control premium premised on the ESOP's control in fact of PDC. *See* ¶¶ 254-63.

**RESPONSE TO COMPLAINT NO. 921:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 922:** Tyczkowski was at all times motivated to increase the share value for her own benefit. Tyczkowski received LTIP units which were tied to the value of PDC stock. She also received addition incentive compensation which she would not have earned had Appvion's valuations and financial statements been corrected.

**RESPONSE TO COMPLAINT NO. 922:** Because Count XI is not asserted against Reliance Trust and has been dismissed, no response is required.

## COUNT XII
## BREACH OF FIDUCIARY DUTY AGAINST WILLETTS

**COMPLAINT NO. 923:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 923:** Because Count XII is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Willetts Owed Fiduciary Duties of Prudence and Loyalty to the ESOP**

**COMPLAINT NO. 924:** Willetts joined Appvion in 2005 and was Appvion's Vice President of Marketing and Strategy from November 2005 to January 2010, Vice President of Strategic Development from February 2010 to December 2011, and Senior Vice President of Appvion from January 2012 until he left Appvion in December 2012. Willetts was a fiduciary as a member of Appvion's ESOP Committee from July 2008 through December 2012 and therefore owed fiduciary duties of loyalty, prudence, and disclosure under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)).

**RESPONSE TO COMPLAINT NO. 924:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 925:** Willetts exercised discretion in reviewing and approving the valuations of PDC stock, authoring, reviewing, and approving communications to employees about the stock price and the valuation process, and directing the purchase of PDC's stock. He had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 925:** Because Count XII is not asserted against Reliance Trust, no response is required.

**Willetts Breached his Fiduciary Duties to the ESOP**

**COMPLAINT NO. 926:** Willetts breached his duties of prudence, loyalty, and disclosure in connection with the separate and independent release of each PDC stock valuation by at least the following.

**RESPONSE TO COMPLAINT NO. 926:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 927:** Willetts approved and adopted each of the following PDC stock valuations even though he knew that each valuation was artificially inflated:

| Valuation Date | Share Price |
|----------------|-------------|
| 6/30/2008 | $26.64 |
| 12/31/2008 | $21.43 |
| 6/30/2009 | $18.87 |
| 12/31/2009 | $13.26 |
| 6/30/2010 | $12.03 |
| 12/31/2010 | $12.84 |
| 6/30/2011 | $14.10 |
| 12/31/2011 | $15.01 |

| Valuation Date | Share Price |
|:---:|:---:|
| 6/30/2012 | $16.45 |

**RESPONSE TO COMPLAINT NO. 927:** Because Count XII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 928:** Willetts understood, approved, and adopted the content of the valuation reports, disseminated the stock prices to the Employee Owners and used each stock price to purchase PDC stock for the respective period.

**RESPONSE TO COMPLAINT NO. 928:** Because Count XII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 929:** The minutes of the ESOP Committee clearly state that the ESOP Committee met (typically telephonically) with Stout and the ESOP Trustee to review and approve each of the valuation reports during Willetts's tenure on the committee. In approving the stock prices, Willetts failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at each of these prices. Willetts failed to value the stock in good faith using a prudent process and determine that reliance on the valuation reports was reasonably justified under the circumstances. He adopted each of these stock prices despite the following facts that caused each of the stock prices to be materially overstated:

- Willetts knew that the valuations added a fraudulent control premium even though Appvion's CEO, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts that supported the control premium. *See* ¶¶ 143-44, 25463.

- Willetts also knew that each of the valuations excluded substantial debt that should have been subtracted in arriving at fair market value. This included Excluded Debt that reached as high as $207 million in 2012. *See* ¶¶ 197-246, 288.

- Willetts was involved in preparing and approving the underlying five-year projections that each of the valuations were based on and discussed them at Appvion's ESOP Committee meetings. Willetts knew that these were consistently inflated and he knew how that impacted the valuations. *See* ¶¶ 265-70.

- Willetts approved the valuations despite the other facts that render them unreliable as alleged in Section IV.D. and Paragraphs 654-666.

**RESPONSE TO COMPLAINT NO. 929:** Because Count XII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 930:** In his role as a member of the ESOP Committee, Willetts breached his duty of prudence by directing the ESOP Trustee to purchase PDC's stock using each

of these stock prices for their respective periods even though Willetts knew they were for more than fair market value.

**RESPONSE TO COMPLAINT NO. 930:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 931:** Willetts authored, approved and disseminated communications to the Employee Owners informing them of each of the fraudulent stock prices and went on road shows presenting the valuations reassuring them that the current and previous valuations were correct. These communications were misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining stock price.

**RESPONSE TO COMPLAINT NO. 931:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 932:** As a result of Willetts's breaches of fiduciary duty in connection with each separate stock valuation, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Willetts is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 932:** Because Count XII is not asserted against Reliance Trust, no response is required.

### Plaintiff's Claims Against Willetts in Connection with the Valuations on or After 16 July 2012 Are Timely Without Regard to Tolling

**COMPLAINT NO. 933:** Plaintiff did not have actual knowledge of Willetts's breaches of fiduciary duty until at least August 2017 when Plaintiff became a fiduciary of the ESOP, and this action was first filed on 26 November 2018. Willetts approved the use of the 16 July 2012 valuation to purchase shares from PDC and to repurchase shares from employees in December 2012. Accordingly, the last actions which constituted a breach of Willetts's fiduciary duties in connection with that valuation occurred within the six-year statute of repose and Plaintiff's claims relating to that valuation are timely without regard to fraud or concealment.

**RESPONSE TO COMPLAINT NO. 933:** Because Count XII is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claim Against Willetts for Breaches of Fiduciary Duty Prior to 26 November 2012 are Tolled**

**COMPLAINT NO. 934:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can include acts of concealment committed in the course of the underlying wrong and separate acts to fraudulently conceal underlying breaches.

**RESPONSE TO COMPLAINT NO. 934:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 935:** Discovery for purposes of ERISA § 413 could not occur until the Plaintiff could discover the process used to value PDC's stock, which could not happen without access to the valuations. Further, Willetts took affirmative steps to conceal his breaches of fiduciary duty in approving and adopting the stock prices as described below.

**RESPONSE TO COMPLAINT NO. 935:** Because Count XII is not asserted against Reliance Trust, no response is required.

**Willetts Took Affirmative Steps to Conceal his Breaches of Fiduciary Duty and Each of his Earlier Misrepresentations**

**COMPLAINT NO. 936:** Beginning with the semi-annual valuation as of 30 June 2008 through the valuation as of 30 June 2015, Willetts approved, adopted and disseminated each of the fraudulently inflated PDC stock prices that Willetts knew were inflated. Each stock price constituted a separate representation, especially when each was separately communicated to Employee Owners through various communications authored or approved by Willetts. *See* ¶¶ 470-549. Each one of these fraudulent representations of share price was a separate and independent act of fraud or concealment, and each one concealed Willetts's breaches of fiduciary duty and misrepresentation in connection with that valuation and the prior valuations.

**RESPONSE TO COMPLAINT NO. 936:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 937:** Willetts's representations about the stock price and the value of Appvion concealed that he was failing to properly monitor State Street in conducting each of the earlier valuations as the ESOP Trustee or insist that the stock value be adjusted to take into account the ESOP's lack of control and its Excluded Debt. It also masked and concealed each of the earlier stock price misrepresentations.

**RESPONSE TO COMPLAINT NO. 937:** Because Count XII is not asserted against Reliance Trust, no response is required.

**Willetts Intended to Conceal her Breaches of Fiduciary Duty and Misrepresentations**

**COMPLAINT NO. 938:** Willetts intended for his actions to conceal the fact that each PDC stock price had been overvalued. In addition to Willetts's knowledge that the share price was inflated as described earlier, evidence of Willetts's intent includes at least the following:

**RESPONSE TO COMPLAINT NO. 938:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 939:** Willetts had an MBA. He was therefore well qualified to understand PDC's financial statements.

**RESPONSE TO COMPLAINT NO. 939:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 940:** Willetts clearly reviewed and understood the valuations since she authored or approved communications to the Employee Owners about them and beginning in 2008 the ESOP Committee meeting minutes expressly record that Stout presented each valuation at ESOP Committee meetings. *See* ¶¶ 172-78, 470-549.

**RESPONSE TO COMPLAINT NO. 940:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 941:** The financial statements clearly listed the Excluded Debt on every balance sheet which was being subtracted to determine shareholder's equity, but which was not being deducted in the valuations. The magnitude of the Excluded Debt was so large and material and was such a large percentage of equity it is simply not reasonable that a person in Willetts's position with his understanding could have simply missed that the Excluded Debt had not been subtracted in arriving at fair market value of every valuation. *See* ¶ 288.

**RESPONSE TO COMPLAINT NO. 941:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 942:** Willetts was not appointed to the ESOP Committee until mid-2008. However, he attended the 10 January 2008 meeting of the ESOP Committee in his role as Vice President - Marketing and Strategy, when Stout presented the valuation as of 31 December 2007 which discounted Appvion's value based on BemroseBooth's unfunded pension liability. Willetts was on the committee by July 2008 when BemroseBooth's unfunded pension liability again had a dollar-for-dollar impact on BemroseBooth's overall value and therefore Appvion's valuations. Willetts therefore knew that the valuations should have been subtracting Appvion's retirement-related debt. *See* ¶¶ 209-36.

**RESPONSE TO COMPLAINT NO. 942:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 943:** Willetts also knew that the ESOP lacked control under the Security Holder's Agreement at all times after the 2001 Transaction, but he knew that each of the valuations were applying a substantial control premium premised on the ESOP's control in fact of PDC. *See* ¶¶ 254-63.

**RESPONSE TO COMPLAINT NO. 943:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 944:** Willetts was at all times motivated to increase the share value for his own benefit. Willetts received LTIP units and RSUs which were tied to the value of PDC stock, including a sign-on bonus of LTIP units when he joined Appvion in 2005. *See* ¶¶ 297-305. He also received addition incentive compensation which he would not have earned had Appvion's valuations and financial statements been corrected.

**RESPONSE TO COMPLAINT NO. 944:** Because Count XII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 945:** Willetts was involved in approving the valuation as of 30 June 2012, which was heavily inflated because it included value from the proposed Hicks transaction which failed to close. *See* ¶¶ 320-27. In particular, the projections used in that valuation were heavily inflated. Had that transaction closed, Willetts' incentive compensation for his own account (to the detriment of the ESOP) based on that inflated valuation. This valuation is further evidence that Willetts was acting intentionally in inflating the share price for his own purposes.

**RESPONSE TO COMPLAINT NO. 945:** Because Count XII is not asserted against Reliance Trust, no response is required.

## COUNT XIII
## BREACH OF FIDUCIARY DUTY AGAINST GILLIGAN

**COMPLAINT NO. 946:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 946:** Because Count XIII is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Gilligan Owed Fiduciary Duties of Prudence and Loyalty to the ESOP**

**COMPLAINT NO. 947:** Gilligan was CEO of Appvion from August 2015 until October 2017. At all times as CEO, Gilligan had control over the Board of Directors under the Security Holder's Agreement because no directors could be appointed or removed without his agreement, and Gilligan was responsible for nominating himself to the Board. The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Gilligan was therefore a fiduciary of the ESOP because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties. Gilligan had a duty to prudently monitor the actions of the ESOP Trustee and the ESOP Committee.

**RESPONSE TO COMPLAINT NO. 947:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 948:** Gilligan was also a fiduciary of the ESOP as a member of the ESOP Committee from April 2015 until October 2017 and therefore owed fiduciary duties of prudence, loyalty, and disclosure under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

**RESPONSE TO COMPLAINT NO. 948:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 949:** Gilligan exercised discretion in reviewing and approving the valuations of PDC stock, as well as directing the purchase of PDC's stock. He had a duty of prudence to undertake an appropriate investigation to determine that the Plan and its participants receive "adequate consideration" for the assets of the Plan and the participants' accounts in the Plan.

**RESPONSE TO COMPLAINT NO. 949:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**Gilligan Breached his Fiduciary Duties to the ESOP**

**COMPLAINT NO. 950:** Gilligan breached his duties of prudence, loyalty, and disclosure in connection with the separate and independent release of each PDC stock valuation by at least the following.

**RESPONSE TO COMPLAINT NO. 950:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 951:** Gilligan approved and adopted the following PDC stock valuations even though he knew that each valuation was artificially inflated:

| Valuation Date | Share Price |
|---|---|
| 6/30/2015 | $12.90 |
| 12/31/2016 | $10.35 |
| 6/30/2017 | $6.85 |

**RESPONSE TO COMPLAINT NO. 951:** Because Count XIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 952:** Gilligan understood, approved, and adopted the content of the valuation reports, disseminated the stock prices to the Employee Owners and used each stock price to purchase PDC stock for the respective period. Specifically, Gilligan attended ESOP Committee meetings on 11 July 2016, 18 January 2017, and 17 July 2017 where the respective valuations were reviewed and discussed; at the 17 July 2017 meeting, Gilligan also made a motion to approve the valuation after Stout's review.

**RESPONSE TO COMPLAINT NO. 952:** Because Count XIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 953:** In doing so, Gilligan failed to undertake an appropriate investigation to determine that the ESOP received adequate consideration for the stock purchases at each of these prices. Gilligan failed to value the stock in good faith using a prudent process and determine that reliance on the valuation reports was reasonably justified under the circumstances. He adopted each of these share prices despite the following facts that caused each of the stock prices to be materially overstated:

- Gilligan knew that the valuations were conducted on a controlling-interest basis even though he, not the ESOP Trustee, retained control of Appvion and PDC and that there were no facts supporting valuing it on a control-interest basis. *See* ¶¶ 254-63.

- Gilligan also knew that each of the valuations excluded substantial debt that should have been subtracted in arriving at fair market value. Each of the valuations Gilligan approved failed to subtract the Excluded Debt that exceeded the amount of shareholder's equity as calculated by Stout. In addition, each of these valuations excluded millions in interest-bearing debt because they failed to include portions of the revolving line of credit and they reduced Appvion's outstanding debt by unamortized discounts. *See* ¶¶ 197-248, 288.

- Gilligan was involved in reviewing, preparing and approving the underlying five-year projections that each of the valuations was based on and knew that they were inflated. The projections were also discussed during ESOP Committee meetings. *See* ¶¶ 264-70, 1264.

- Gilligan knew that Stout made significant changes to its methodology as part of its 30 June 2015 valuation, which inflated the valuation. *See* ¶¶ 274-77.

**RESPONSE TO COMPLAINT NO. 953:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 954:** Gilligan also knew that the valuations were excluding the pension liability because this issue was specifically discussed at a 26 May 2016 ESOP Committee meeting that Gilligan attended, where Ferree led a discussion about Appvion's five year financial projections prepared for purposes of the valuation as of 30 June 2016 and "also discussed the need to fund our pension contributions going forward as it will become a statutory obligation beginning in 2017." *See* ¶ 1264. The minutes of that meeting note that Ferree planned to discuss the issue with Stout and that "Ferree discussed the potential effects to the share price." Gilligan therefore knew that this significant unfunded liability would have impacted the stock price if it had been properly accounted for in each valuation.

**RESPONSE TO COMPLAINT NO. 954:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 955:** Gilligan also breached his fiduciary duties by failing to prudently monitor Argent in its determinations of each of the stock prices. Despite direct review of the valuation reports and working with Argent on the valuations, Gilligan failed to require that Argent accurately value the PDC stock and instead accepted, approved and disseminated stock prices that he knew to be inflated.

**RESPONSE TO COMPLAINT NO. 955:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 956:** Gilligan authored, approved and disseminated communications to the Employee Owners informing them of the fraudulent stock prices and went on road shows presenting the valuations reassuring them that the current and previous valuations were correct. *See* ¶ 1253. These communications were misleading and failed to disclose the full valuation process, including the application of a fraudulent control premium and the fact that the valuations were not subtracting all debt in determining stock price.

**RESPONSE TO COMPLAINT NO. 956:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 957:** Gilligan approved, signed and attested to PDC's 10-K and 10-Q filings which reported the inflated share price and incorporated the share price into its financial statements. *See* ¶¶ 349-362.

**RESPONSE TO COMPLAINT NO. 957:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 958:** As a result of Gilligan's breaches of fiduciary duty, the ESOP lost tens of millions of dollars when it overpaid to purchase stock from PDC and to repurchase shares from current and former employees. Gilligan is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 958:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**Gilligan is Liable for His Failure to Remedy the Breaches of Predecessor Fiduciaries**

**COMPLAINT NO. 959:** A fiduciary has a continuing duty to remedy breaches of predecessor fiduciaries.

**RESPONSE TO COMPLAINT NO. 959:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 960:** The duty of prudence required Gilligan to review and understand prior valuations of Appvion when he became CEO of Appvion and was appointed to the ESOP Committee. At a minimum, in order to meet his duty of prudence and comply with its obligation not to allow the purchase stock for more than adequate consideration, Gilligan had to review and approve the 31 December 2014 valuation since he directed the purchase of stock at that price in June 2015.

**RESPONSE TO COMPLAINT NO. 960:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 961:** Gilligan therefore was aware that his predecessor trustee fiduciaries (Argent, Reliance, and State Street), and predecessor ESOP Committee member fiduciaries (Richards, Ferree, Arent, and Willetts who were ESOP Committee members in 2010-2015) had breached their fiduciary duties in connection with those prior valuations.

**RESPONSE TO COMPLAINT NO. 961:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 962:** Gilligan breached his fiduciary duties by failing to take adequate steps to remedy his predecessors' breaches of fiduciary duty in connection with the prior valuations. Such steps could have included correcting the stock values and adjusting accounts of ESOP holders, as well as litigation against his predecessor fiduciaries to remedy the overpayments for stock. Instead, Gilligan failed to take any action and potentially allowed the statute of limitations to expire for breaches of fiduciary duty within six years prior to Gilligan's appointment as a fiduciary.

**RESPONSE TO COMPLAINT NO. 962:** Because Count XIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 963:** As a result of Gilligan's failure to take action against his predecessor fiduciaries, the ESOP lost tens of millions of dollars. Gilligan is liable under ERISA § 409 (29 U.S.C. § 1109) to make good any losses to the ESOP resulting from his breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 963:** Because Count XIII is not asserted against Reliance Trust, no response is required.

### Plaintiff's Claims against Gilligan Are Timely Without Regard to Tolling

**COMPLAINT NO. 964:** Plaintiff did not have actual knowledge of Gilligan's breaches of fiduciary duty until at least August 2017 when Plaintiff became a fiduciary of the ESOP, and this action was first filed on 26 November 2018. Since Plaintiff's claims against Gilligan are all based on actions after April 2015, they are timely because they were filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 964:** Because Count XIII is not asserted against Reliance Trust, no response is required.

### COUNT XIV
### BREACH OF FIDUCIARY DUTY AGAINST CARTER

**COMPLAINT NO. 965:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 965:** Because Count XIV is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Carter Was an ESOP Fiduciary from December 2007 to December 2016

**COMPLAINT NO. 966:** Carter was a member of the Board from July 2004 to 31 December 2016. The Board of Directors was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Carter was therefore a fiduciary to the ESOP because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties.

**RESPONSE TO COMPLAINT NO. 966:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 967:** Carter was on the Board's Audit Committee from July 2004 to 31 December 2016, was chair of the Audit Committee from 1 January 2016 to 31 December 2016, and was identified as an "audit committee financial expert" under the applicable rules of the SEC.

**RESPONSE TO COMPLAINT NO. 967:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 968:** As a member of the Board, Carter reviewed the valuations as described in Paragraphs 179-190.

**RESPONSE TO COMPLAINT NO. 968:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 969:** Carter reviewed and signed each of Appvion's 10-K filings for 2007-2015, which included Appvion's audited financial statements and reported the Excluded Debt. As described in paragraphs 349-62, the 10-Ks reported PDC's stock price, the financial statements relied upon and incorporated PDC's stock price into the Redeemable Common Stock liability entry, and the remaining information in the 10-K filing relied upon PDC's stock price. Carter also approved Appvion's quarterly SEC filings (10-Qs) as a member of the Audit Committee. *See* ¶¶ 189, 36367, 487.

**RESPONSE TO COMPLAINT NO. 969:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**Carter Breached his Duty to Monitor between December 2007 and December 2016**

**COMPLAINT NO. 970:** Carter violated his ERISA fiduciary duty of prudence and loyalty by failing to adequately monitor the performance of the ESOP Committee (Richards, Ferree, Tyczkowski, Willetts, Arent, and Gilligan) and the ESOP Trustees (State Street, Reliance, and Argent) between December 2007 and 31 December 2015.

**RESPONSE TO COMPLAINT NO. 970:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 971:** Carter was involved with the BemroseBooth debacle and learned that its pension liability caused a dollar-for-dollar reduction in Appvion's fair market value. As a signer of the 10-Ks and a member of the Audit Committee, he knew about Appvion's much larger retirement debt at the time. From his review of the valuations he knew that except for the BemroseBooth pension liability, only interest-bearing debt was being subtracted. *See* 197-246, 349-362.

**RESPONSE TO COMPLAINT NO. 971:** Because Count XIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 972:** Further, from his position on the Board and the Audit Committee, Carter knew that the ESOP Trustee did not control Appvion and, therefore, that there was no factual justification for the control premium that was being included in each valuation he reviewed while at Appvion. *See* ¶¶ 254-263.

**RESPONSE TO COMPLAINT NO. 972:** Because Count XIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 973:** From his position on the board and his review of Appvion's projections as compared with actual performance, he knew the projections were being consistently inflated. *See* ¶¶ 264-70.

**RESPONSE TO COMPLAINT NO. 973:** Because Count XIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 974:** On 14 November 2014, Carter signed PDC's amended 2013 10-K which reported a material weakness relating to the calculation of the Redeemable Common Stock entry on the balance sheet. Appvion's management was failing to follow accounting guidance and was not correctly estimating how many shares were "redeemable" for purposes of the entry. The restatement merely recalculated the Redeemable Common Stock value without correcting the real underlying issue - that the stock value was inflated, causing the balance sheet to be inflated. Especially as a member of the Audit Committee, Carter breached his fiduciary duty to monitor by take further action to correct the financial statements, especially after identifying a failure of internal controls the Redeemable Common Stock entry.

**RESPONSE TO COMPLAINT NO. 974:** Because Count XIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 975:** With this information, Carter breached his duties of prudence and loyalty by not demanding that every PDC valuation be corrected and that the ESOP Committee members and ESOP Trustee responsible be terminated.

**RESPONSE TO COMPLAINT NO. 975:** Because Count XIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 976:** His failure to take these actions demonstrates he was not being loyal to the ESOP and its Employee Owners but was protecting his own financial interests. Specifically, Carter received phantom stock units which were tied to the value of the stock. These

gave him an incentive to agree to a higher stock price. When Carter stepped down as a director on 31 December 2016, he held 27,986 shares of phantom stock.

**RESPONSE TO COMPLAINT NO. 976:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 977:** If Carter claims he did not know about these, and other, valuation irregularities and the related ESOP Committee and ESOP Trustee failures described herein, then he is admitting to a complete lack of prudence and loyalty for not knowing these basic, yet hugely material facts.

**RESPONSE TO COMPLAINT NO. 977:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 978:** As a direct and proximate result of these breaches of fiduciary duty, the ESOP lost tens of millions of dollars in retirement savings.

**RESPONSE TO COMPLAINT NO. 978:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claim against Carter for Breaches after 26 November 2012 Is Timely**

**COMPLAINT NO. 979:** Plaintiff did not have actual knowledge of Carter's breaches of fiduciary duty prior to at least August 2017 when Plaintiff became a fiduciary of the ESOP. Accordingly, Plaintiff's claim against Carter for breaches of his duty to monitor on or after 26 November 2012 is timely without regard to fraud or concealment because it was filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 979:** Because Count XIV is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claim against Carter for Breaches Prior to 26 November 2012 Is Tolled**

**COMPLAINT NO. 980:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The 10-Ks for 2007 through 2015 signed by Carter were affirmative acts of fraudulent concealment which concealed his failure to monitor the ESOP Trustee and the ESOP Committee. *See* ¶¶ 349-62. Carter acted intentionally since he knew about the treatment of BemroseBooth's pension liability but continued to sign off on 10-Ks - and therefore valuations - that ignored Appvion's much larger pension liability. *See* ¶¶ 224-236.

**RESPONSE TO COMPLAINT NO. 980:** Because Count XIV is not asserted against

Reliance Trust, no response is required.

**COUNT XV**
**BREACH OF FIDUCIARY DUTY AGAINST SEIFERT**

**COMPLAINT NO. 981:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 981:** Because Count XV is not asserted against

Reliance Trust, no response is required. To the extent a response is required, Reliance Trust

incorporates its answers to Plaintiff's prior allegations.

**Seifert Was an ESOP Fiduciary from December 2007 to October 2017**

**COMPLAINT NO. 982:** Seifert was a member of the Board of Directors of Appvion and
PDC from July 2004 until Appvion filed for bankruptcy in October 2017. The Board was
responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Seifert
was therefore a fiduciary to the ESOP because she exercised authority and control with respect to
appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP
Trustee in the performance of their fiduciary duties.

**RESPONSE TO COMPLAINT NO. 982:** Because Count XV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 983:** Seifert was also on the Board's Compensation Committee from
March 2012 until Appvion filed for bankruptcy in October 2017 and was chair of the
Compensation Committee from March 2012 until January 2016.

**RESPONSE TO COMPLAINT NO. 983:** Because Count XV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 984:** Seifert reviewed and signed each of Appvion's 10-K filings for
2007-2016 which included Appvion's audited financial statements and reported the Excluded
Debt. As described in Paragraphs 349-62, the 10-Ks reported PDC's stock price, the financial
statements relied upon and incorporated PDC's stock price into Redeemable Common Stock
liability entry, and the remaining information in the 10-K filing relied upon PDC's stock price.

**RESPONSE TO COMPLAINT NO. 984:** Because Count XV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 985:** As a member of the Board, Seifert reviewed the valuations as described in Paragraphs 179-90.

**RESPONSE TO COMPLAINT NO. 985:** Because Count XV is not asserted against Reliance Trust, no response is required.

### Seifert Breached the Duty to Monitor December 2007 and October 2017

**COMPLAINT NO. 986:** Seifert violated her ERISA fiduciary duty of prudence and loyalty by failing to adequately monitor the performance of the ESOP Committee (Richards, Ferree, Tyczkowski, Willetts, Arent, and Gilligan) and the ESOP Trustees (State Street, Reliance, and Argent) between December 2007 and October 2017.

**RESPONSE TO COMPLAINT NO. 986:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 987:** Seifert was personally involved with the BemroseBooth debacle and learned that its pension liability caused a dollar-for-dollar reduction in Appvion's fair market value. As a signer of the 10-Ks she knew about Appvion's much larger retirement debt at the time. From her review of the valuations, she knew that except for the BemroseBooth pension liability, only interest-bearing debt was being subtracted. *See* 197-246, 349-362.

**RESPONSE TO COMPLAINT NO. 987:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 988:** Further, from her position on the Board, Seifert knew that the ESOP Trustee did not control Appvion and, therefore, that there was no factual justification for the control premium that was being included in each valuation she reviewed while at Appvion. *See* ¶¶ 254-263.

**RESPONSE TO COMPLAINT NO. 988:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 989:** From her position on the board and her review of Appvion's projections as compared with actual performance, Seifert knew the projections were being consistently inflated.

**RESPONSE TO COMPLAINT NO. 989:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 990:** With this information, Seifert breached her duties of prudence and loyalty by not demanding that every PDC valuation be corrected and that the ESOP Committee members and ESOP Trustee responsible be terminated.

**RESPONSE TO COMPLAINT NO. 990:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 991:** On 14 November 2014, Seifert signed PDC's amended 2013 10-K which reported a material weakness relating to the calculation of the Redeemable Common Stock entry on the balance sheet. Appvion's management was failing to follow accounting guidance and was not correctly estimating how many shares were "redeemable" for purposes of the entry. The restatement merely recalculated the Redeemable Common Stock value without correcting the real underlying issue - that the stock value was inflated, causing the balance sheet to be inflated. Seifert breached her fiduciary duty to monitor by take further action to correct the financial statements, especially after identifying a failure of internal controls the Redeemable Common Stock entry.

**RESPONSE TO COMPLAINT NO. 991:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 992:** Her failure to take these actions demonstrates Seifert was not being loyal to the ESOP and its Employee Owners but was protecting her own financial interests. Specifically, Seifert received phantom stock units which were tied to the value of the stock. These gave her an incentive to agree to a higher stock price. Seifert held 27,986 shares of phantom stock as of 31 December 2016, and she likely received additional stock grants in 2017 which were not reported since PDC did not file a 10-K for 2017.

**RESPONSE TO COMPLAINT NO. 992:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 993:** If Seifert claims she did not know about these, and other, valuation irregularities and the related ESOP Committee and ESOP Trustee failures described herein, then she is admitting to a complete lack of prudence and loyalty for not knowing these basic, yet hugely material facts.

**RESPONSE TO COMPLAINT NO. 993:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 994:** As a direct and proximate result of these breaches of fiduciary duty, the ESOP lost tens of millions of dollars in retirement savings.

**RESPONSE TO COMPLAINT NO. 994:** Because Count XV is not asserted against Reliance Trust, no response is required.

### Plaintiff's Claim against Seifert for Breaches after 26 November 2012 Is Timely

**COMPLAINT NO. 995:** Plaintiff did not have actual knowledge of Seifert's breaches of fiduciary duty prior to at least August 2017 when Plaintiff became a fiduciary of the ESOP. Accordingly, Plaintiff's claim against Seifert for breaches of her duty to monitor on or after 26 November 2012 is timely without regard to fraud or concealment because it was filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 995:** Because Count XV is not asserted against Reliance Trust, no response is required.

### Plaintiff's Claim against Seifert for Breaches Prior to 26 November 2012 Is Tolled

**COMPLAINT NO. 996:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The 10-Ks for 2007 through 2016 signed by Seifert were affirmative acts of fraudulent concealment which concealed his failure to monitor the ESOP Trustee and the ESOP Committee. *See* ¶¶ 349-62. Seifert acted intentionally since she knew about the treatment of BemroseBooth's pension liability but continued to sign off on 10-Ks - and therefore valuations - that ignored Appvion's much larger pension liability. *See* ¶¶ 224-236.

**RESPONSE TO COMPLAINT NO. 996:** Because Count XV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 997:** Since the valuations were kept confidential, it was not possible for a reasonably diligent plaintiff to discover the breaches of fiduciary duty prior to August 2017 when Lyon was appointed as an independent fiduciary and was able to investigate the valuations.

**RESPONSE TO COMPLAINT NO. 997:** Because Count XV is not asserted against Reliance Trust, no response is required.

### COUNT XVI
### BREACH OF FIDUCIARY DUTY AGAINST REARDON

**COMPLAINT NO. 998:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 998:** Because Count XVI is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Reardon Was an ESOP Fiduciary from December 2007 to December 2015

**COMPLAINT NO. 999:** Reardon was a member of the Board from June 2007 to 31 December 2015. The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Reardon was therefore a fiduciary to the ESOP because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties.

**RESPONSE TO COMPLAINT NO. 999:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1000:** Reardon was on the Board's Audit Committee from 2009 to 2011. Reardon was also on the Board's Compensation Committee from in 2007 and 2008 and from March 2012 until 31 December 2015.

**RESPONSE TO COMPLAINT NO. 1000:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1001:** As a member of the Board, Reardon reviewed the valuations. *See* ¶¶ 179-90.

**RESPONSE TO COMPLAINT NO. 1001:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1002:** Reardon reviewed and signed each of Appvion's 10-K filings for 2007 to 2014, which included Appvion's audited financial statements and reported the Excluded Debt. As described in Paragraphs 349-62, the 10-Ks reported PDC's stock price, the financial statements relied upon and incorporated PDC's stock price, into the Redeemable Common stock entry, and the remaining information in the 10-K filing relied upon PDC's stock price.

**RESPONSE TO COMPLAINT NO. 1002:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**Reardon Breached the Duty to Monitor between December 2007 and December 2015**

**COMPLAINT NO. 1003:** Reardon violated his ERISA fiduciary duty of prudence and loyalty by failing to adequately monitor the performance of the ESOP Committee (Richards, Ferree, Tyczkowski, Willetts, Arent, and Gilligan) and the ESOP Trustees (State Street, Reliance, and Argent) between December 2007 and 31 December 2015.

**RESPONSE TO COMPLAINT NO. 1003:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1004:** Reardon was personally involved with the BemroseBooth debacle and learned that its pension liability caused a dollar-for-dollar reduction in Appvion's fair market value. As a signer of Appvion's audited financial statements, he knew about Appvion's much larger retirement debt at the time. From his review of the valuations he knew that except for the BemroseBooth pension liability, only interest-bearing debt was being subtracted. *See* 197-246, 349-362.

**RESPONSE TO COMPLAINT NO. 1004:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1005:** Further, from his position on the Board, Reardon knew that the ESOP Trustee did not control Appvion and, therefore, that there was no factual justification for the control premium that was being included in each valuation he reviewed while at Appvion. *See* ¶¶ 254-263.

**RESPONSE TO COMPLAINT NO. 1005:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1006:** From his position on the board and his review of Appvion's projections as compared with actual performance, Reardon knew the projections were being consistently inflated. *See* ¶¶ 264-70.

**RESPONSE TO COMPLAINT NO. 1006:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1007:** With this information, Reardon breached his duty of prudence and loyalty by not demanding that every PDC valuation be corrected and that the ESOP Committee members and ESOP Trustee responsible be terminated.

**RESPONSE TO COMPLAINT NO. 1007:** Because Count XVI is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1008:** On 14 November 2014, Reardon signed PDC's amended 2013 10-K which reported a material weakness relating to the calculation of the Redeemable Common Stock entry on the balance sheet. Appvion's management was failing to follow accounting guidance and was not correctly estimating how many shares were "redeemable" for purposes of the entry. The restatement merely recalculated the Redeemable Common Stock value without correcting the real underlying issue - that the stock value was inflated, causing the balance sheet to be inflated. Reardon breached his fiduciary duty to monitor by take further action to correct the financial statements, especially after identifying a failure of internal controls the Redeemable Common Stock entry.

**RESPONSE TO COMPLAINT NO. 1008:** Because Count XVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1009:** His failure to take these actions demonstrates he was not being loyal to the ESOP and its Employee Owners but was protecting his own financial interests. Specifically, Reardon received phantom stock units which were tied to the value of the stock. These gave him an incentive to agree to a higher stock price. When Reardon stepped down as a director on 31 December 2015, he held 22,050.7 shares of phantom stock.

**RESPONSE TO COMPLAINT NO. 1009:** Because Count XVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1010:** If Reardon claims he did not know about these, and other, valuation irregularities and the related ESOP Committee and ESOP Trustee failures, then he is admitting to a complete lack of prudence and loyalty for not knowing these basic, yet hugely material facts.

**RESPONSE TO COMPLAINT NO. 1010:** Because Count XVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1011:** As a direct and proximate result of these breaches of fiduciary duty, the ESOP lost tens of millions of dollars in retirement savings.

**RESPONSE TO COMPLAINT NO. 1011:** Because Count XVI is not asserted against

Reliance Trust, no response is required.

**Plaintiff's Claim against Reardon for Breaches after 26 November 2012 Is Timely**

**COMPLAINT NO. 1012:** Plaintiff did not have actual knowledge of Reardon's breaches of fiduciary duty prior to at least August 2017 when Plaintiff became a fiduciary of the ESOP. Accordingly, Plaintiff's claim against Reardon for breaches of his duty to monitor on or after 26 November 2012 is timely without regard to fraud or concealment because it was filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 1012:** Because Count XVI is not asserted against Reliance Trust, no response is required.

### Plaintiff's Claim against Reardon for Breaches Prior to 26 November 2012 Is Tolled

**COMPLAINT NO. 1013:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The 10-Ks for 2007 through 2014 signed by Reardon were affirmative acts of fraudulent concealment which concealed his failure to monitor the ESOP Trustee and the ESOP Committee. *See* ¶¶ 349-62. Reardon acted intentionally since he knew about the treatment of BemroseBooth's pension liability but continued to sign off on 10-Ks - and therefore valuations - that ignored Appvion's much larger pension liability. *See* ¶¶ 224-236.

**RESPONSE TO COMPLAINT NO. 1013:** Because Count XVI is not asserted against Reliance Trust, no response is required.

### COUNT XVII
### BREACH OF FIDUCIARY DUTY AGAINST MURPHY

**COMPLAINT NO. 1014:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1014:** Because Count XVII is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Murphy Was an ESOP Fiduciary from December 2007 to October 2017

**COMPLAINT NO. 1015:** Murphy was a member of the Board of Directors of Appvion and PDC from June 2007 until Appvion filed for bankruptcy in October 2017. Murphy was also Chair of the Board effective 1 January 2016 until Appvion filed for bankruptcy in October 2017. The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Murphy was therefore a fiduciary to the ESOP because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties.

**RESPONSE TO COMPLAINT NO. 1015:** Because Count XVII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1016:** Murphy was on the Board's Compensation Committee of the June 2007 to March 2012 and was on the Board's Audit Committee from March 2012 until Appvion filed bankruptcy in October 2017. Murphy was chair of the Audit Committee from March 2012 until January 2016.

**RESPONSE TO COMPLAINT NO. 1016:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1017:** As a member of the Board, Murphy reviewed the valuations as described in Paragraphs 179-190.

**RESPONSE TO COMPLAINT NO. 1017:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1018:** Murphy reviewed and signed each of Appvion's 10-K filings for 2007 to 2016 which included Appvion's audited financial statements and reported the Excluded Debt. As described in Paragraphs 349-62, the 10-Ks reported PDC's stock price, the financial statements relied upon and incorporated PDC's stock price into the Redeemable Common Stock liability entry, and the remaining information in the 10-K filing relied upon PDC's stock price. Murphy also approved Appvion's quarterly SEC filings (10-Qs) as a member of the Audit Committee from 2012 to 2017. *See* ¶¶ 189, 363-67, 487.

**RESPONSE TO COMPLAINT NO. 1018:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**Murphy Breached the Duty to Monitor between 26 November 2012 and October 2017**

**COMPLAINT NO. 1019:** Murphy violated his ERISA fiduciary duty of prudence and loyalty by failing to adequately monitor the performance of the ESOP Committee (Richards, Ferree, Tyczkowski, Willetts, Arent, and Gilligan) and the ESOP Trustees (State Street, Reliance, and Argent) between December 2007 and October 2017.

**RESPONSE TO COMPLAINT NO. 1019:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1020:** Murphy was involved with the BemroseBooth debacle and learned that its pension liability caused a dollar-for-dollar reduction in Appvion's fair market value. As a signer of the 10-Ks and a member of the Audit Committee during this time period, he knew about Appvion's much larger retirement debt at the time. From his review of the valuations he knew that except for the BemroseBooth pension liability, only interest-bearing debt was being subtracted. *See* ¶¶ 197-246, 349-362.

**RESPONSE TO COMPLAINT NO. 1020:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1021:** Further, from his position on the Board and the Audit Committee, Murphy knew that the ESOP Trustee did not control Appvion and, therefore, that there

was no factual justification for the control premium that was being included in each valuation he reviewed while at Appvion. *See* ¶¶ 254-263.

**RESPONSE TO COMPLAINT NO. 1021:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1022:** From his position on the board and his review of Appvion's projections as compared with actual performance, Murphy knew the projections were being consistently inflated. *See* ¶¶ 264-70.

**RESPONSE TO COMPLAINT NO. 1022:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1023:** With this information, Murphy breached his duties of prudence and loyalty by not demanding that every PDC valuation be corrected and that the ESOP Committee members and ESOP Trustee responsible be terminated.

**RESPONSE TO COMPLAINT NO. 1023:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1024:** On 14 November 2014, Murphy signed PDC's amended 2013 10-K which reported a material weakness relating to the calculation of the Redeemable Common Stock entry on the balance sheet. Appvion's management was failing to follow accounting guidance and was not correctly estimating how many shares were "redeemable" for purposes of the entry. The restatement merely recalculated the Redeemable Common Stock value without correcting the real underlying issue - that the stock value was inflated, causing the balance sheet to be inflated. Especially as a member of the Audit Committee, Murphy breached his fiduciary duty to monitor by take further action to correct the financial statements, especially after identifying a failure of internal controls the Redeemable Common Stock entry.

**RESPONSE TO COMPLAINT NO. 1024:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1025:** If Murphy claims he did not know about these, and other, valuation irregularities and the related ESOP Committee and ESOP Trustee failures described herein, then he is admitting to a complete lack of prudence and loyalty for not knowing these basic, yet hugely material facts.

**RESPONSE TO COMPLAINT NO. 1025:** Because Count XVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1026:** His failure to take these actions demonstrates he was not being loyal to the ESOP and its Employee Owners but was protecting his own financial interests. Specifically, Murphy received phantom stock units which were tied to the value of PDC's stock. These gave him an incentive to agree to a higher stock price. Murphy held 26,293.7 shares of phantom stock as of 31 December 2016, and he likely received additional stock grants in 2017 which were not reported since PDC did not file a 10-K for 2017.

**RESPONSE TO COMPLAINT NO. 1026:** Because Count XVII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1027:** As a direct and proximate result of these breaches of fiduciary duty, the ESOP lost tens of millions of dollars in retirement savings.

**RESPONSE TO COMPLAINT NO. 1027:** Because Count XVII is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claim against Murphy for Breaches after 26 November 2012 Is Timely**

**COMPLAINT NO. 1028:** Plaintiff did not have actual knowledge of Murphy's breaches of fiduciary duty prior to at least August 2017 when Plaintiff became a fiduciary of the ESOP. Accordingly, Plaintiff's claim against Murphy for breaches of his duty to monitor on or after 26 November 2012 is timely without regard to fraud or concealment because it was filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 1028:** Because Count XVII is not asserted against Reliance Trust, no response is required.

**Plaintiff's Claim against Murphy for Breaches Prior to 26 November 2012 Is Tolled**

**COMPLAINT NO. 1029:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The 10-Ks for 2007 through 2016 signed by Murphy were affirmative acts of fraudulent concealment which concealed his failure to monitor the ESOP Trustee and the ESOP Committee. *See* ¶¶ 349-62. Murphy acted intentionally since he knew about the treatment of BemroseBooth's pension liability but continued to sign off on 10-Ks - and therefore valuations - that ignored Appvion's much larger pension liability. *See* ¶¶ 224-236.

**RESPONSE TO COMPLAINT NO. 1029:** Because Count XVII is not asserted against Reliance Trust, no response is required.

## COUNT XVIII
## BREACH OF FIDUCIARY DUTY AGAINST SUWYN

**COMPLAINT NO. 1030:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1030:** Because Count XVIII is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

### Suwyn Was an ESOP Fiduciary 26 November 2012 and October 2017

**COMPLAINT NO. 1031:** Suwyn was a member of the Board from July 2011 until Appvion filed for bankruptcy in October 2017. The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Suwyn was therefore a fiduciary to the ESOP because he exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties.

**RESPONSE TO COMPLAINT NO. 1031:** Because Count XVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1032:** Suwyn was also on the Board's Audit Committee in 2016 and 2017, and he was chair of the Audit Committee in 2017. Suwyn was also on the Board's Compensation Committee from 2012 to 2016.

**RESPONSE TO COMPLAINT NO. 1032:** Because Count XVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1033:** As a member of the Board, Suwyn reviewed the valuations as described in Paragraphs 179-190.

**RESPONSE TO COMPLAINT NO. 1033:** Because Count XVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1034:** Suwyn reviewed and signed each of Appvion's 10-K filings for 2012- 2016, which included Appvion's audited financial statements and reported the Excluded Debt. As described in Paragraphs 349-62, the 10-Ks reported PDC's stock price, the financial statements relied upon and incorporated PDC's stock price into the Redeemable Common Stock liability entry, and the remaining information in the 10-K filing relied upon PDC's stock price.

**RESPONSE TO COMPLAINT NO. 1034:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**Suwyn Breached his Duty to Monitor between 26 November 2012 and October 2017**

**COMPLAINT NO. 1035:** Suwyn violated his ERISA fiduciary duty of prudence and loyalty by failing to adequately monitor the performance of the ESOP Committee (Richards, Ferree, Arent, and Gilligan) and the ESOP Trustees (State Street, Reliance, and Argent) between 26 November 2012 and October 2017.

**RESPONSE TO COMPLAINT NO. 1035:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1036:** From his review of the valuations and the 10-K, Suwyn knew that the valuations were not subtracting the Excluded Debt (¶¶ 197-346) and that they were not subtracting all interest-bearing debt (¶¶ 247-48).

**RESPONSE TO COMPLAINT NO. 1036:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1037:** From his position on the Board, Suwyn knew that the ESOP Trustee did not control Appvion therefore, that there was no factual justification for the control premium that was being included in each valuation.

**RESPONSE TO COMPLAINT NO. 1037:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1038:** From his position on the board and his review of Appvion's projections as compared with actual performance, he knew the projections were being consistently inflated.

**RESPONSE TO COMPLAINT NO. 1038:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1039:** With this information, Suwyn breached his duties of prudence and loyalty by not demanding that every PDC valuation be corrected and that the ESOP Committee members and ESOP Trustee responsible be terminated.

**RESPONSE TO COMPLAINT NO. 1039:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1040:** On 14 November 2014, Suwyn signed PDC's amended 2013 10-K which reported a material weakness relating to the calculation of the Redeemable Common Stock entry on the balance sheet. Appvion's management was failing to follow accounting guidance and was not correctly estimating how many shares were "redeemable" for purposes of the entry. The restatement merely recalculated the Redeemable Common Stock value without correcting the real underlying issue - that the stock value was inflated, causing the balance sheet to be inflated. Suwyn breached his fiduciary duty to monitor by take further action to correct the financial statements, especially after identifying a failure of internal controls the Redeemable Common Stock entry.

**RESPONSE TO COMPLAINT NO. 1040:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1041:** His failure to take these actions demonstrates he was not being loyal to the ESOP and its Employee Owners but was protecting his own financial interests. Suwyn received phantom stock units which were tied to the value of the stock. These gave him an incentive to agree to a higher stock price. Suwyn held 18,492.6 shares of phantom stock as of 31 December 2016, and he likely received additional stock grants in 2017 which were not reported since PDC did not file a 10-K for 2017.

**RESPONSE TO COMPLAINT NO. 1041:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1042:** If Suwyn claims he did not know about these, and other, valuation irregularities and the related ESOP Committee and ESOP Trustee failures described herein, then he is admitting to a complete lack of prudence and loyalty for not knowing these basic, yet hugely material facts.

**RESPONSE TO COMPLAINT NO. 1042:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1043:** As a direct and proximate result of these breaches of fiduciary duty, the ESOP lost tens of millions of dollars in retirement savings.

**RESPONSE TO COMPLAINT NO. 1043:** Because Count XVIII is not asserted against

Reliance Trust, no response is required.

**Plaintiff's Claim against Suwyn Is Timely**

**COMPLAINT NO. 1044:** This claim is limited to breaches of fiduciary duty on or after 26 November 2012. Plaintiff did not have actual knowledge of Suwyn's breaches of fiduciary duty prior to at least August 2017 when Plaintiff became a fiduciary of the ESOP. Accordingly,

Plaintiff's claim is timely because it was filed within six years after the date of the last action which constituted a part of the breach or the violation.

**RESPONSE TO COMPLAINT NO. 1044:** Because Count XVIII is not asserted against Reliance Trust, no response is required.

**COUNT XIX**
**BREACH OF FIDUCIARY DUTY AGAINST SCHERBEL**

**COMPLAINT NO. 1045:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1045:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Scherbel Was an ESOP Fiduciary from December 2007 to March 2011**

**COMPLAINT NO. 1046:** Scherbel was a member of the Board from 2002 until March 2011 and served on the Board's Audit Committee from 2002 until March 2011.

**RESPONSE TO COMPLAINT NO. 1046:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1047:** The Board was responsible for appointing the members of the ESOP Committee and the ESOP Trustee. Scherbel was therefore a fiduciary to the ESOP because she exercised authority and control with respect to appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustee in the performance of their fiduciary duties.

**RESPONSE TO COMPLAINT NO. 1047:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1048:** As a member of the Board, Scherbel reviewed the valuations as described in Paragraphs 179-190.

**RESPONSE TO COMPLAINT NO. 1048:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1049:** Relevant to this claim, Scherbel signed Appvion's 10-K filings for 2007, 2008, 2009, and 2010, which included Appvion's audited financial statements and reported the Excluded Debt. As described in Paragraphs 349-62, the 10-Ks reported PDC's stock

price, the financial statements relied upon and incorporated PDC's stock price into the Redeemable Common Stock liability entry, and the remaining information in the 10-K filing relied upon PDC's stock price.

**RESPONSE TO COMPLAINT NO. 1049:** Because Count XIX is not asserted against

Reliance Trust and has been dismissed, no response is required.

### Scherbel Breached the Duty to Monitor December 2007 and July 2011

**COMPLAINT NO. 1050:** Scherbel violated her ERISA fiduciary duty of prudence and loyalty by failing to adequately monitor the performance of the ESOP Committee (Richards, Ferree, Tyczkowski, Willets, and Arent) and the ESOP Trustees (State Street) between December 2007 and July 2011.

**RESPONSE TO COMPLAINT NO. 1050:** Because Count XIX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1051:** Scherbel was involved with the BemroseBooth debacle and learned that its pension liability caused a dollar-for-dollar reduction in Appvion's fair market value. As a signer of the 10-Ks and a member of the Audit Committee during this time period, she knew about Appvion's much larger retirement debt at the time. From her review of the valuations she knew that except for the BemroseBooth pension liability, only interest-bearing debt was being subtracted. *See* ¶¶ 197-246, 349-362.

**RESPONSE TO COMPLAINT NO. 1051:** Because Count XIX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1052:** Further, from her position on the Board and the Audit Committee, Scherbel knew that the ESOP Trustee did not control Appvion and, therefore, that there was no factual justification for the control premium that was being included in each valuation he reviewed while at Appvion. *See* ¶¶ 254-263.

**RESPONSE TO COMPLAINT NO. 1052:** Because Count XIX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1053:** From her position on the board and her review of Appvion's projections as compared with actual performance, she knew the projections were being consistently inflated. *See* ¶¶ 264-70.

**RESPONSE TO COMPLAINT NO. 1053:** Because Count XIX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1054:** With this information, Scherbel breached her duties of prudence and loyalty by not demanding that every PDC valuation be corrected and that the ESOP Committee members and ESOP Trustee responsible be terminated.

**RESPONSE TO COMPLAINT NO. 1054:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1055:** Her failure to take these actions demonstrates she was not being loyal to the ESOP and its Employee Owners but was protecting her own financial interests. Scherbel received phantom stock units which were tied to the value of the stock. These gave him an incentive to agree to a higher stock price. When Scherbel stepped down in March 2011, she held at least 7,923.8 shares of phantom stock, plus a pro-rated portion of stock she received in 2011.

**RESPONSE TO COMPLAINT NO. 1055:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1056:** If Scherbel claims she did not know about these, and other, valuation irregularities and the related ESOP Committee and ESOP Trustee failures described herein, then she is admitting to a complete lack of prudence and loyalty for not knowing these basic, yet hugely material facts.

**RESPONSE TO COMPLAINT NO. 1056:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1057:** As a direct and proximate result of these breaches of fiduciary duty, the ESOP lost tens of millions of dollars in retirement savings.

**RESPONSE TO COMPLAINT NO. 1057:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required.

**Plaintiff's Claim against Scherbel Is Tolled**

**COMPLAINT NO. 1058:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The 10-Ks for 2007 through 2010 signed by Scherbel were affirmative acts of fraudulent concealment which concealed his failure to monitor the ESOP Trustee and the ESOP Committee. *See* ¶¶ 349-62. Carter acted intentionally since he knew about the treatment of BemroseBooth's pension liability but continued to sign off on 10-Ks - and therefore valuations - that ignored Appvion's much larger pension liability. *See* ¶¶ 224-236.

**RESPONSE TO COMPLAINT NO. 1058:** Because Count XIX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COUNT XX**
**BREACH OF FIDUCIARY DUTY AGAINST PACE**

**COMPLAINT NO. 1059:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1059:** Because Count XX is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Pace Was a Fiduciary of the ESOP from December 2007 to July 2011**

**COMPLAINT NO. 1060:** Pace was a member of the Board from 2003 to July 2011 and served on the Board's Audit Committee from 2003-2008.

**RESPONSE TO COMPLAINT NO. 1060:** Because Count XX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1061:** As a member of the Board, Pace reviewed the valuations as described in Paragraphs 179-190.

**RESPONSE TO COMPLAINT NO. 1061:** Because Count XX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1062:** Pace reviewed and signed each of Appvion's 10-K filings for 2007-2011, which included Appvion's audited financial statements and reported the Excluded Debt. As described in Paragraphs 349-62, the 10-Ks reported PDC's stock price, the financial statements relied upon and incorporated PDC's stock price into the Redeemable Common Stock liability entry, and the remaining information in the 10-K filing relied upon PDC's stock price.

**RESPONSE TO COMPLAINT NO. 1062:** Because Count XX is not asserted against Reliance Trust and has been dismissed, no response is required.

**Pace Breached his Duty to Monitor December 2007 and July 2011**

**COMPLAINT NO. 1063:** Pace violated his ERISA fiduciary duty of prudence and loyalty by failing to adequately monitor the performance of the ESOP Committee (Richards, Ferree, Tyczkowski, Willetts, Arent, and Gilligan) and the ESOP Trustees (State Street, Reliance, and Argent) between December 2007 and July 2011.

332

**RESPONSE TO COMPLAINT NO. 1063:** Because Count XX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1064:** Pace was involved with the BemroseBooth debacle and learned that its pension liability caused a dollar-for-dollar reduction in Appvion's fair market value. As a signer of the 10-Ks and a member of the Audit Committee during this time period, he knew about Appvion's much larger retirement debt at the time. From his review of the valuations he knew that except for the BemroseBooth pension liability, only interest-bearing debt was being subtracted. *See* ¶¶ 197-246, 349-362.

**RESPONSE TO COMPLAINT NO. 1064:** Because Count XX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1065:** Further, from his position on the Board and the Audit Committee, Pace knew that the ESOP Trustee did not control Appvion and, therefore, that there was no factual justification for the control premium that was being included in each valuation he reviewed while at Appvion. *See* ¶¶ 254-263.

**RESPONSE TO COMPLAINT NO. 1065:** Because Count XX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1066:** From his position on the board and his review of Appvion's projections as compared with actual performance, he knew the projections were being consistently inflated. *See* ¶¶ 264-70.

**RESPONSE TO COMPLAINT NO. 1066:** Because Count XX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1067:** With this information, Pace breached his duties of prudence and loyalty by not demanding that every PDC valuation be corrected and that the ESOP Committee members and ESOP Trustee responsible be terminated.

**RESPONSE TO COMPLAINT NO. 1067:** Because Count XX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1068:** His failure to take these actions demonstrates he was not being loyal to the ESOP and its Employee Owners but was protecting his own financial interests. Specifically, Pace received phantom stock units which were tied to the value of the stock. These gave him an incentive to agree to a higher stock price. When Pace stepped down as a director in July 2011, he held 9,286.7 shares of phantom stock, plus a pro-rated portion of stock he received in 2011.

**RESPONSE TO COMPLAINT NO. 1068:** Because Count XX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1069:** If Pace claims he did not know about these, and other, valuation irregularities and the related ESOP Committee and ESOP Trustee failures described herein, then he is admitting to a complete lack of prudence and loyalty for not knowing these basic, yet hugely material facts.

**RESPONSE TO COMPLAINT NO. 1069:** Because Count XX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1070:** As a direct and proximate result of these breaches of fiduciary duty, the ESOP lost tens of millions of dollars in retirement savings.

**RESPONSE TO COMPLAINT NO. 1070:** Because Count XX is not asserted against Reliance Trust and has been dismissed, no response is required.

**Plaintiff's Claim against Pace Is Tolled**

**COMPLAINT NO. 1071:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The 10-Ks for 2007 through 2010 signed by Pace were affirmative acts of fraudulent concealment which concealed his failure to monitor the ESOP Trustee and the ESOP Committee. *See* ¶¶ 349-62. Pace acted intentionally since he knew about the treatment of BemroseBooth's pension liability but continued to sign off on 10-Ks - and therefore valuations - that ignored Appvion's much larger pension liability. *See* ¶¶ 224-236.

**RESPONSE TO COMPLAINT NO. 1071:** Because Count XX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COUNT XXI**
**ENGAGING IN PROHIBITED TRANSACTIONS AGAINST STATE STREET, BUTH, KARCH, AND HOULIHAN**

**COMPLAINT NO. 1072:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1072:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1073:** ERISA § 406(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, or any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest;... (D)transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or; (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title."

**RESPONSE TO COMPLAINT NO. 1073:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1074:** ERISA § 406(b), 29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

**RESPONSE TO COMPLAINT NO. 1074:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1075:** State Street, Buth, and Karch engaged in or caused the ESOP to engage in in transactions prohibited by ERISA § 406(a), 29 U.S.C. § 1106(a) and ERISA § 406(b), 29 U.S.C. § 1106(b) as described below.

**RESPONSE TO COMPLAINT NO. 1075:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**Fiduciaries**

**COMPLAINT NO. 1076:** State Street was a fiduciary to the ESOP as the ESOP Trustee.

**RESPONSE TO COMPLAINT NO. 1076:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1077:** Buth, and Karch were fiduciaries as the sole members of the Board of Directors of Appvion and PDC as of 9 November 2001, as the parties responsible for choosing the ESOP Committee members, and as members of the ESOP Committee as of 9 November 2001.

**RESPONSE TO COMPLAINT NO. 1077:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1078:** Houlihan was a fiduciary to the ESOP as alleged in Count XXXVI.

**RESPONSE TO COMPLAINT NO. 1078:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**Parties in Interest**

**COMPLAINT NO. 1079:** PDC was a party in interest as Appvion's parent company. ERISA § 3(14)(E) (29 U.S.C. § 1002(14)(E)); ERISA § 3(14)(H) (29 U.S.C. § 1002(14)(H)). In addition, PDC's assets all constituted assets of the plan within the meaning of ERISA § 406, 29 U.S.C. § 1106.

**RESPONSE TO COMPLAINT NO. 1079:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1080:** AWA was a party in interest as Appvion's parent company prior to and at the time of the 2001 Transaction. ERISA § 3(14)(E), 29 U.S.C. § 1002(14)(E); ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

**RESPONSE TO COMPLAINT NO. 1080:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1081:** Houlihan was a party in interest as fiduciaries for the ESOP and/or as service providers to the ESOP. ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

**RESPONSE TO COMPLAINT NO. 1081:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**The 2001 Transaction Was A Prohibited Transaction**

**COMPLAINT NO. 1082:** In 2001, after extensive pitches by Buth, Parker, Karch (as the sole members of the PDC Board of Directors and as members of the ESOP Committee), Fantini (as the chair of the ESOP Committee), the Houlihan, State Street/Driscoll, and Willamette, the Employee Fiduciaries voted to approve the ESOP buyout transaction, agreeing to transfer approximately $107 million from their 401(k) accounts to the ESOP to purchase shares of PDC.

**RESPONSE TO COMPLAINT NO. 1082:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1083:** According to the Prospectus, the ESOP Trustee (State Street and Driscoll) would use the funds transferred to the ESOP to purchase shares of PDC pursuant to the direction of the ESOP Committee (at the time, Buth, Parker, Karch, and Fantini), but only "if the ESOP trustee, in its sole discretion, determines that it is permissible under ERISA to accept the direction of eligible participants with regard to the investment in common stock." The Trust Agreement between State Street and Appvion dated September 6, 2001 contained similar language.

**RESPONSE TO COMPLAINT NO. 1083:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1084:** On November 9, 2001, State Street (as directed by the ESOP Committee) purchased 100% of the common stock of PDC (a party in interest) for approximately $107 million. After this transaction, the ESOP owned 10,684,373 shares of PDC stock, which constituted plan assets.

**RESPONSE TO COMPLAINT NO. 1084:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1085:** Buth, Parker, and Karch as the sole directors of PDC, then caused PDC to enter into transactions with AWA (a party in interest) to purchase Appvion for $810 million, using the $107 million received from the ESOP and additional financing. The $107 million constituted assets of the plan under ERISA § 406 (29 U.S.C. § 1106) and under 29 C.F.R. 2510.3-101.

**RESPONSE TO COMPLAINT NO. 1085:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1086:** This constituted a prohibited transaction under ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), which are not exempt under ERISA § 408, 29 U.S.C. § 1108, because the purchase was not for adequate consideration. The purchases of PDC stock by the ESOP also constitute prohibited transactions under ERISA § 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E); the shares of PDC stock were not qualified employer securities under ERISA § 407(a), 29 U.S.C. § 1107(a), because the appraisals of PDC stock were not qualified appraisals.

**RESPONSE TO COMPLAINT NO. 1086:** Because Count XXI is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1087:** This also constituted a prohibited transactions under ERISA § 406(b)(1) because Buth, Karch, and Houlihan dealt with the assets of the plan in their own interest and for their own accounts in negotiating the purchase price and convincing the Employee Fiduciaries to invest in the ESOP because of their conflicts of interest.

**RESPONSE TO COMPLAINT NO. 1087:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1088:** Buth and Karch, as ESOP Committee members caused the ESOP to engage in the transaction because they directed State Street to purchase the shares of PDC stock.

**RESPONSE TO COMPLAINT NO. 1088:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1089:** State Street caused the ESOP to purchase the shares because it was the party who purchased the shares in the name of the ESOP. State Street had "sole discretion" to determine whether the purchase was permissible under ERISA and it exercised that discretion to purchase the shares for more than fair market value.

**RESPONSE TO COMPLAINT NO. 1089:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1090:** There is a per se ban on violations of ERISA § 406 (29 U.S.C. § 1106) regardless of whether they caused harm to the plan. However, the 2001 Transaction caused the ESOP to pay more than fair market value for PDC stock, thereby damaging the ESOP.

**RESPONSE TO COMPLAINT NO. 1090:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1091:** Defendants fraudulently concealed the fact that the purchase of stock from PDC and PDC's purchase of Appleton Papers from AWA were not for adequate consideration as described in Section IV.A and Counts III-V and XXXVI. This action is therefore timely under the fraud or concealment exception to ERISA § 413 (29 U.S.C. §1113).

**RESPONSE TO COMPLAINT NO. 1091:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**The Payments to Houlihan Were Prohibited Transactions**

**COMPLAINT NO. 1092:** PDC also paid Houlihan approximately $8.1 million in fees in connection with this transaction. This payment constituted a prohibited transaction under ERISA

§ 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), as a transfer of plan assets to a fiduciary or a service provider to the ESOP.

**RESPONSE TO COMPLAINT NO. 1092:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1093:** Buth and Karch agreed to this payment and therefore caused the payment within the meaning of within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a).

**RESPONSE TO COMPLAINT NO. 1093:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1094:** The $8.1 million paid to Houlihan constituted plan assets under 29 C.F.R. 2510.3101 because it was paid by PDC and PDC was wholly-owned by the ESOP.

**RESPONSE TO COMPLAINT NO. 1094:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1095:** This payment also constituted a prohibited transaction under ERISA § 406(b), 29 U.S.C. § 1106(b)(3) if Houlihan was fiduciary to the ESOP, because Houlihan received consideration for its own account.

**RESPONSE TO COMPLAINT NO. 1095:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1096:** There is a per se ban on violations of ERISA § 406 (29 U.S.C. § 1106) regardless of whether they caused harm to the plan. However, this prohibited transaction harmed the ESOP by at least the $8.1 million in plan assets paid to Houlihan. In addition, the fee arrangement and Houlihan's conflicts of interest caused the overall transaction price to be higher than fair market value, further harming the ESOP.

**RESPONSE TO COMPLAINT NO. 1096:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1097:** Defendants (State Street, Buth, and Karch) fraudulently concealed the fact that Houlihan's fees were contingent on the transaction closing and structured as a percentage of the transaction price as described in Counts III - V. This action is therefore timely under the fraud or concealment exception to ERISA § 413 (29 U.S.C. §1113).

**RESPONSE TO COMPLAINT NO. 1097:** Because Count XXI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COUNT XXII**
**ENGAGING IN PROHIBITED TRANSACTIONS AGAINST STATE STREET**

**COMPLAINT NO. 1098:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1098:** Because Count XXII is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1099:** ERISA § 406(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, or any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest;... (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or; (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title."

**RESPONSE TO COMPLAINT NO. 1099:** Because Count XXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1100:** State Street was a fiduciary to the ESOP as trustee from 2001 until 31 March 2013. 1101.

**RESPONSE TO COMPLAINT NO. 1100:** Because Count XXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1101:** PDC was a party in interest as Appvion's parent company. ERISA §§ 3(14)(E) and (H) (29 U.S.C. § 1002(14)(E) and (H)).

**RESPONSE TO COMPLAINT NO. 1101:** Because Count XXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1102:** Employees of the sponsoring company (Appvion) are parties in interest. ERISA § 3(14)(C) (29 U.S.C. § 1002(14)(C)).

**RESPONSE TO COMPLAINT NO. 1102:** Because Count XXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1103:** The Trust Agreement between State Street and Appvion stated that: "The Trustee shall purchase Company Stock with the assets contained in the Participants' ESOP Account upon the direction of the Committee, unless the Trustee determines that such

340

purchase is prohibited by ERISA. The Trustee shall purchase Company Stock from the Company or from any shareholder, if the Trustee is directed by the Committee, and such stock may be outstanding, newly issued or treasury stock. All such purchases must be at a price not in excess of fair market value, as determined by an Independent Appraiser where such stock is not publicly traded."

**RESPONSE TO COMPLAINT NO. 1103:** Because Count XXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1104:** State Street caused the ESOP to purchase PDC stock within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a) because it had the discretion and responsibility to determine whether the purchases were for adequate consideration and a duty not to purchase stock if it was for more than adequate consideration.

**RESPONSE TO COMPLAINT NO. 1104:** Because Count XXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1105:** State Street caused the ESOP to purchase stock from PDC at least twice a year as listed in Appendix A. State Street also caused the ESOP to repurchase stock from Appvion's employees through diversifications and loans as listed in Appendix B.

**RESPONSE TO COMPLAINT NO. 1105:** Because Count XXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1106:** These transactions constituted prohibited transactions under ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), which are not exempt under ERISA § 408, 29 U.S.C. § 1108, because the purchases were not for adequate consideration. The purchases of PDC stock by the ESOP also constitute prohibited transactions under ERISA § 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E); the shares of PDC stock were not qualified employer securities under ERISA § 407(a), 29 U.S.C. § 1107(a), because the appraisals of PDC stock were not qualified appraisals.

**RESPONSE TO COMPLAINT NO. 1106:** Because Count XXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1107:** Plaintiff's claims are timely for all purchases of stock on or after 26 November 2012 because Plaintiff did not have actual knowledge that State Street caused the ESOP to engage in prohibited transactions prior to at least August 2017.

**RESPONSE TO COMPLAINT NO. 1107:** Because Count XXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

341

**COMPLAINT NO. 1108:** For all purchases of stock prior to 26 November 2012, State Street fraudulently concealed the fact that the purchases of stock from PDC were not for adequate consideration as described in Count III. This action is therefore timely under the fraud or concealment exception to ERISA § 413 (29 U.S.C. §1113).

**RESPONSE TO COMPLAINT NO. 1108:** Because Count XXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1109:** There is a per se ban on violations of ERISA § 406 (29 U.S.C. § 1106) regardless of whether they caused harm to the plan. However, the transactions above were for more than fair market value, which harmed the ESOP because it overpaid for PDC stock. Accordingly, the ESOP was damaged.

**RESPONSE TO COMPLAINT NO. 1109:** Because Count XXII is not asserted against Reliance Trust and has been dismissed, no response is required.

## COUNT XXIII
## ENGAGING IN PROHIBITED TRANSACTIONS AGAINST RELIANCE TRUST COMPANY

**COMPLAINT NO. 1110:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1110:** Because Count XXIII has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1111:** ERISA § 406(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, or any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest;... (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or; (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title."

**RESPONSE TO COMPLAINT NO. 1111:** Because Count XXIII has been dismissed, no response is required.

**COMPLAINT NO. 1112:** Reliance was a fiduciary to the ESOP as trustee from 1 April 2013 to 30 June 2014. 1113.

**RESPONSE TO COMPLAINT NO. 1112:** Because Count XXIII has been dismissed, no response is required.

**COMPLAINT NO. 1113:** PDC was a party in interest as Appvion's parent company. ERISA § 3(14)(E), 29 U.S.C. § 1002(14)(E); ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

**RESPONSE TO COMPLAINT NO. 1113:** Because Count XXIII has been dismissed, no response is required.

**COMPLAINT NO. 1114:** Employees of the sponsoring company (Appvion) are parties in interest. ERISA § 3(14)(C) (29 U.S.C. § 1002(14)(C)).

**RESPONSE TO COMPLAINT NO. 1114:** Because Count XXIII has been dismissed, no response is required.

**COMPLAINT NO. 1115:** The Trust Agreement between Reliance and Appvion stated that: "The Trustee will purchase Company Stock with the assets contained in the Participants' accounts under the Plan on the Committee's direction, unless the Trustee determines that such purchase is prohibited by ERISA. The Trustee will purchase Company Stock from the Company or from any shareholder, if the Trustee is directed by the Committee to do so, and such stock may be outstanding, newly issued or treasury stock. All such purchases must be at a price not in excess of fair market value, as determined by an Independent Appraiser and approved by the Trustee, if such stock is not publicly traded."

**RESPONSE TO COMPLAINT NO. 1115:** Because Count XXIII has been dismissed, no response is required.

**COMPLAINT NO. 1116:** Reliance therefore caused the ESOP to purchase PDC stock within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a) because it had a responsibility to determine whether the purchases were for adequate consideration and a duty not to purchase stock if it was for more than adequate consideration.

**RESPONSE TO COMPLAINT NO. 1116:** Because Count XXIII has been dismissed, no response is required.

**COMPLAINT NO. 1117:** Reliance caused the ESOP to purchase stock from PDC at least twice a year as listed in Appendix A. Reliance also caused the ESOP to repurchase stock from Appvion's employees through diversifications and loans as listed in Appendix B.

**RESPONSE TO COMPLAINT NO. 1117:** Because Count XXIII has been dismissed, no response is required.

**COMPLAINT NO. 1118:** Plaintiff's claims are timely without regard to fraud or concealment for all purchases of stock on or after 26 November 2012 because Plaintiff did not have actual knowledge that Reliance caused the ESOP to engage in prohibited transactions prior to at least August 2017.

**RESPONSE TO COMPLAINT NO. 1118:** Because Count XXIII has been dismissed, no response is required.

**COMPLAINT NO. 1119:** There is a per se ban on violations of ERISA § 406 (29 U.S.C. § 1106) regardless of whether they caused harm to the plan. However, the transactions above were for more than fair market value, which harmed the ESOP because it overpaid for PDC stock. Accordingly, the ESOP was damaged.

**RESPONSE TO COMPLAINT NO. 1119:** Because Count XXIII has been dismissed, no response is required.

**COUNT XXIV**
**ENGAGING IN PROHIBITED TRANSACTIONS AGAINST ARGENT TRUST COMPANY**

**COMPLAINT NO. 1120:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1120:** Because Count XXIV is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1121:** ERISA § 406(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, or any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest;... (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or; (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title."

**RESPONSE TO COMPLAINT NO. 1121:** Because Count XXIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1122:** Argent was a fiduciary to the ESOP Trustee from 1 July 2014 to October 2017. 1123.

**RESPONSE TO COMPLAINT NO. 1122:** Because Count XXIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1123:** PDC was a party in interest as Appvion's parent company. ERISA § 3(14)(E), 29 U.S.C. § 1002(14)(E); ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

**RESPONSE TO COMPLAINT NO. 1123:** Because Count XXIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1124:** Employees of the sponsoring company (Appvion) are parties in interest. ERISA § 3(14)(C) (29 U.S.C. § 1002(14)(C)).

**RESPONSE TO COMPLAINT NO. 1124:** Because Count XXIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1125:** Argent was ESOP Trustee from 1 July 2014 until Appvion filed for bankruptcy in October 2017. Since Argent purchased Reliance, it continued operating under the Reliance Trust Agreement from 1 July 2014 until August 2015. The Trust Agreement between Reliance and Appvion stated that: "The Trustee will purchase Company Stock with the assets contained in the Participants' accounts under the Plan on the Committee's direction, unless the Trustee determines that such purchase is prohibited by ERISA. The Trustee will purchase Company Stock from the Company or from any shareholder, if the Trustee is directed by the Committee to do so, and such stock may be outstanding, newly issued or treasury stock. All such purchases must be at a price not in excess of fair market value, as determined by an Independent Appraiser and approved by the Trustee, if such stock is not publicly traded."

**RESPONSE TO COMPLAINT NO. 1125:** Because Count XXIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1126:** Argent therefore caused the ESOP to purchase PDC stock within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a) because it had a responsibility to determine whether the purchases were for adequate consideration and a duty not to purchase stock if it was for more than adequate consideration.

**RESPONSE TO COMPLAINT NO. 1126:** Because Count XXIV is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1127:** While operating under this Trust Agreement between 1 July 2014 and August 2015, Argent caused the ESOP to purchase stock from PDC at least twice a year as listed in Appendix A. Argent also caused the ESOP to repurchase stock from Appvion's employees through diversifications and loans as listed in Appendix B. This includes purchases listed for June 2014; these were made in July 2014 after the valuation was completed, but the

purchases were retroactive to June. Therefore the actual purchase of stock was directed by Argent after it took over as trustee on 1 July 2014.

**RESPONSE TO COMPLAINT NO. 1127:** Because Count XXIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1128:** On 26 May 2015, Argent and Appvion entered into a letter agreement stating that Argent would serve as a discretionary trustee in connection with the sale of Encapsys. On 3 August 2015, Argent entered into a new Trust Agreement with Appvion which also named Argent a discretionary trustee. This Trust Agreement stated:

> 2.3. Investment of Trust Fund. Assets held by the Trustee in the Trust Fund shall be invested by the Trustee primarily in Company Stock, to the extent consistent with ERISA.... **Company Stock shall be purchased by the Trustee only at prices which do not exceed the fair market value of the shares purchased, as determined by the Trustee, in its sole discretion**, based upon an appropriate valuation performed by an independent appraiser to support the Trustee's decision on establishing the fair market value of such Company Stock on the Valuation Date.

> 2.4. Purchase and Sale Transactions. The Trustee, in its sole discretion, may enter into purchase and sale transactions of any form or structure from time to time, but **shall not enter into a non-exempt "prohibited transaction**," as that term is defined in Section 4975(c) of the Code and Section 406 of ERISA.

> \* \* \*

> 2.6. Trust Fund Powers. **The Trustee shall be a discretionary trustee with respect to all the assets of the Trust Fund, including, but not limited to, purchases, holding, and sales of Company Stock, as well as voting shares of Company Stock...**This explicitly gave Argent discretion to purchase PDC stock at fair market value, as determined by the Trustee in its sole discretion. Accordingly, Argent caused the ESOP to purchase stock within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a).

**RESPONSE TO COMPLAINT NO. 1128:** Because Count XXIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1129:** While operating under this Trust Agreement with discretion on whether to buy stock, Argent caused the ESOP to purchase stock from PDC at least twice a year as listed in Appendix A. Argent also caused the ESOP to repurchase stock from Appvion's employees through diversifications and loans as listed in Appendix B.

**RESPONSE TO COMPLAINT NO. 1129:** Because Count XXIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1130:** These transactions constituted prohibited transactions under ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), which are not exempt under ERISA § 408, 29 U.S.C. § 1108, because the purchases were not for adequate consideration. The purchases of PDC stock by the ESOP also constitute prohibited transactions under ERISA § 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E); the shares of PDC stock were not qualified employer securities under ERISA § 407(a), 29 U.S.C. § 1107(a), because the appraisals of PDC stock were not qualified appraisals.

**RESPONSE TO COMPLAINT NO. 1130:** Because Count XXIV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1131:** There is a per se ban on violations of ERISA § 406 (29 U.S.C. § 1106) regardless of whether they caused harm to the plan. However, the transactions above were for more than fair market value, which harmed the ESOP because it overpaid for PDC stock. Accordingly, the ESOP was damaged.

**RESPONSE TO COMPLAINT NO. 1131:** Because Count XXIV is not asserted against

Reliance Trust, no response is required.

**COUNT XXV**
**ENGAGING IN PROHIBITED TRANSACTIONS AGAINST THE ESOP COMMITTEE MEMBERS (BUTH, PARKER, KARCH, FANTINI, RICHARDS, FERREE, TYCZKOWSKI, ARENT, WILLETTS, AND GILLIGAN)**

**COMPLAINT NO. 1132:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1132:** Because Count XXV is not asserted against

Reliance Trust, no response is required. To the extent a response is required, Reliance Trust

incorporates its answers to Plaintiff's prior allegations

**COMPLAINT NO. 1133:** ERISA § 406(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, or any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest;... (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or; (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title."

**RESPONSE TO COMPLAINT NO. 1133:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1134:** Buth, Parker, Karch, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan were fiduciaries to the ESOP during their tenure on the ESOP Committee.

**RESPONSE TO COMPLAINT NO. 1134:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1135:** PDC was a party in interest as Appvion's parent company. ERISA § 3(14)(E), 29 U.S.C. § 1002(14)(E); ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

**RESPONSE TO COMPLAINT NO. 1135:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1136:** Employees of the sponsoring company (Appvion) are parties in interest. ERISA § 3(14)(C) (29 U.S.C. § 1002(14)(C)).

**RESPONSE TO COMPLAINT NO. 1136:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1137:** Under the trust agreements with State Street, Reliance, and Argent from 2001 to at least August 2015, the ESOP Committee was responsible for directing the trustees to purchase stock. The ESOP Committee therefore caused the ESOP to purchase PDC stock within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a).

**RESPONSE TO COMPLAINT NO. 1137:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1138:** The ESOP Committee Members directed the ESOP Trustee to purchase stock from PDC at least twice a year as listed in Appendix A. Argent also caused the ESOP to repurchase stock from Appvion's employees through diversifications and loans as listed in Appendix B.

**RESPONSE TO COMPLAINT NO. 1138:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1139:** These transactions constituted prohibited transactions under at least ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), which are not exempt under ERISA § 408, 29 U.S.C. § 1108, because the purchases were not for adequate consideration.

The purchases of PDC stock by the ESOP also constitute prohibited transactions under ERISA § 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E), because the shares of PDC stock were not qualified employer securities under ERISA § 407(a), 29 U.S.C. § 1107(a), because the appraisals of PDC stock were not qualified appraisals.

**RESPONSE TO COMPLAINT NO. 1139:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1140:** There is a per se ban on violations of ERISA § 406 (29 U.S.C. § 1106) regardless of whether they caused harm to the plan. However, the transactions above were for more than fair market value, which harmed the ESOP because it overpaid for PDC stock. Accordingly, the ESOP was damaged.

**RESPONSE TO COMPLAINT NO. 1140:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1141:** Plaintiff's claims are timely for all purchases of stock on or after 26 November 2012 because Plaintiff did not have actual knowledge of the prohibited transactions prior to at least August 2017.

**RESPONSE TO COMPLAINT NO. 1141:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1142:** This action is timely with respect to transactions on or before 26 November 2012 under the fraud or concealment exception to ERISA § 413 (29 U.S.C. §1113) because Defendants (Buth, Parker, Karch, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan) fraudulently concealed the fact that the purchases of stock from PDC were not for adequate consideration as described above in Counts IV - XIII.

**RESPONSE TO COMPLAINT NO. 1142:** Because Count XXV is not asserted against

Reliance Trust, no response is required.

**COUNT XXVI**
**CO-FIDUCIARY LIABILITY AGAINST CARTER, MURPHY, REARDON, SCHERBEL, PACE, SUWYN, AND SEIFERT**

**COMPLAINT NO. 1143:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1143:** Because Count XXVI is not asserted against

Reliance Trust, no response is required. To the extent a response is required, Reliance Trust

incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1144:** As fiduciaries of the ESOP, Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert assumed a duty to protect the ESOP from the improper actions of other ESOP fiduciaries.

**RESPONSE TO COMPLAINT NO. 1144:** Because Count XXVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1145:** ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

**RESPONSE TO COMPLAINT NO. 1145:** Because Count XXVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1146:** Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert were appointing fiduciaries who exercised authority and control with respect to the appointment, removal (if necessary) and monitoring of the ESOP Committee and the ESOP Trustees in the performance of their fiduciary duties.

**RESPONSE TO COMPLAINT NO. 1146:** Because Count XXVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1147:** Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert are liable as co-fiduciaries because they were aware of, participated in, enabled, concealed, and failed to remedy the other Defendants' breaches of fiduciary duty in connection with valuations of PDC stock and the purchase of PDC stock for more than fair market value. Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert knowingly participated in and enabled the other Defendants' breaches of fiduciary duty by reviewing the valuations and repeatedly signing off on PDC's financial statements and SEC filings that relied upon the stock value.

**RESPONSE TO COMPLAINT NO. 1147:** Because Count XXVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1148:** Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert signed the following 10-Ks as Directors:

| Name | Director Term | 10-Ks Signed |
|---|---|---|
| Carter | Jul 04-Dec 16 | 2007-2015 |

| Name | Director Term | 10-Ks Signed |
|------|---------------|--------------|
| Murphy | Jun 07-Oct 17 | 2007-2016 |
| Reardon | Jun 07-Dec 15 | 2007-2014 |
| Suwyn | Jul 11-Oct 17 | 2012-2016 |
| Seifert | Jul 2004-Oct 17 | 2007-2016 |
| Scherbel | 2002-Mar 11 | 2007-2010 |
| Pace | 2003-Jul 11 | 2007-2010 |

**RESPONSE TO COMPLAINT NO. 1148:** Because Count XXVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1149:** Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert received compensation for their role as members of the Board of Directors as well as phantom stock units under the Non-Employee Director Deferred Compensation Plan, which allowed Carter, Murphy, Reardon Suwyn, and Seifert to benefit from higher stock prices. They held the following number of phantom stock units as of the date they retired or December 31, 2016, whichever is later:

| Name | Phantom Stock Units |
|------|---------------------|
| Carter | 27,986.2 |
| Murphy | 26,293.7 |
| Reardon | 22,050.7 |
| Suwyn | 18,492.6 |
| Seifert | 27,986.2 |
| Scherbel | 7,923.8 |
| Pace | 9,286.7 |

These phantom stock units were to be paid at the appraised stock value in five equal cash installments when the director left the company or upon a change in control event. They therefore had incentive to participate in and enable their co-fiduciaries' breaches of fiduciary duty.

**RESPONSE TO COMPLAINT NO. 1149:** Because Count XXVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1150:** As a direct and proximate result of Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert's actions, the ESOP and its participants lost tens of millions of dollars. Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert are liable to restore all losses to the ESOP caused by the breaches of their co-fiduciaries.

**RESPONSE TO COMPLAINT NO. 1150:** Because Count XXVI is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1151:** To the extent it is based on actions on or after 26 November 2012, Plaintiff's claim for co-fiduciary liability against Carter, Murphy, Reardon, Scherbel, Pace, Suwyn, and Seifert is tolled by the fraud or concealment exception to ERISA § 413 (29 U.S.C. § 1113) for the reasons described in Counts XIV-XX.

**RESPONSE TO COMPLAINT NO. 1151:** Because Count XXVI is not asserted against Reliance Trust, no response is required.

**COUNT XXVII**
**CO-FIDUCIARY LIABILITY AGAINST BUTH, KARCH, PARKER, FANTINI, RICHARDS, FERREE, TYCZKOWSKI, ARENT, WILLETTS, AND GILLIGAN**

**COMPLAINT NO. 1152:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1152:** Because Count XXVII is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1153:** As fiduciaries of the ESOP, the ESOP Committee Members (Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan) assumed duties to protect the ESOP from the improper actions of other ESOP fiduciaries.

**RESPONSE TO COMPLAINT NO. 1153:** Because Count XXVII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1154:** ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

**RESPONSE TO COMPLAINT NO. 1154:** Because Count XXVII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1155:** Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan are liable as co-fiduciaries because they were aware of, participated in, concealed, enabled, and failed to remedy their co-fiduciaries' (the ESOP Trustees, Houlihan, and the other ESOP Committee Members') breaches of fiduciary duty as described earlier and in Counts I - XIII, XXXVI.

**RESPONSE TO COMPLAINT NO. 1155:** Because Count XXVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1156:** Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan knowingly participated in their co-fiduciary's breaches of fiduciary duty in connection by their actions as described earlier and in Counts IV - XIII, which includes at least the following:

- In connection with the 2001 Transaction, Buth and Karch presented Houlihan to the Employee Fiduciaries as independent even though they knew Houlihan was conflicted.

- In connection with the 2001 Transaction, Buth and Karch reviewed, authored, and approved the prospectus which affirmatively and fraudulently concealed Houlihan's conflicts of interest and presented the transaction as fair.

- In connection with the 2001 Transaction, Buth and Karch negotiated a purchase price that they knew was more than fair market value but presenting it to employees as a good deal;

- In connection with the 2001 Transaction, Buth and Karch directed State Street to purchase the PDC stock on behalf of the ESOP even though it was for more than fair market value.

- As part of the ongoing stock valuations beginning 31 December 2001, Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan knowingly approved and adopted inflated valuations that included an unwarranted control premium and failed to subtract the Excluded Debt.

- As part of the ongoing stock valuations beginning 31 December 2001, Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan prepared inflated projections to be used as the basis of the valuations.

- As part of the ongoing stock valuations beginning 31 December 2001, Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan authored, approved and disseminated communications to the Employee Owners that were misleading and failed to fully describe the valuations.

- As part of the ongoing stock valuations beginning 31 December 2001, Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan directed the purchase of stock from PDC and the repurchase of stock from current and former employees at inflated prices.

**RESPONSE TO COMPLAINT NO. 1156:** Because Count XXVII is not asserted against

Reliance Trust, no response is required.

**COMPLAINT NO. 1157:** Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan participated in and enabled these breaches of fiduciary duty for their own benefit, because they were at all times motivated to increase the value of PDC stock in order to benefit from incentive compensation plans and otherwise benefit as described Counts IV-XIII.

**RESPONSE TO COMPLAINT NO. 1157:** Because Count XXVII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1158:** As a direct and proximate result of Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan's actions, the ESOP and its participants lost tens of millions of dollars. Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan's are liable to restore all losses to the ESOP caused by the breaches of their co-fiduciaries.

**RESPONSE TO COMPLAINT NO. 1158:** Because Count XXVII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1159:** To the extent it is based on actions on or after 26 November 2012, Plaintiff's claim for co-fiduciary liability against Buth, Karch, Parker, Fantini, Richards, Ferree, Tyczkowski, Arent, Willetts, and Gilligan is tolled by the fraud or concealment exception to ERISA § 413 (29 U.S.C. § 1113) for the reasons described in Counts IV-XIII.

**RESPONSE TO COMPLAINT NO. 1159:** Because Count XXVII is not asserted against Reliance Trust, no response is required.

### COUNT XXVIII
### CO-FIDUCIARY LIABILITY AGAINST STATE STREET

**COMPLAINT NO. 1160:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1160:** Because Count XXVIII is not asserted against Reliance Trust, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1161:** As a fiduciary of the ESOP, State Street assumed a duty to protect the ESOP from the improper actions of other ESOP fiduciaries.

**RESPONSE TO COMPLAINT NO. 1161:** Because Count XXVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1162:** ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

**RESPONSE TO COMPLAINT NO. 1162:** Because Count XXVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1163:** State Street is liable as a co-fiduciary because it was aware of, participated in, concealed, enabled, and failed to remedy Buth, Karch, and Houlihan's breaches of fiduciary duty in connection with the 2001 Transaction as described earlier and in Counts III - V, XXXVI.

**RESPONSE TO COMPLAINT NO. 1163:** Because Count XXVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1164:** State Street knowingly participated in and enabled the ESOP Committee members' breaches of fiduciary duty as described in Count III, which includes at least the following:

- Approving and adopting inflated valuations that included an unwarranted control premium and that excluded material debt from the calculation of value;

- Allowing Willamette and Stout to base their valuations on inflated projections prepared by the ESOP Committee members, even though State Street knew they had conflicts of interest which motivated them to increase the share price;

- Allowing the ESOP Committee to control communications to the Employee Owners and misleadingly describe the valuations;

- Purchasing stock from PDC and repurchasing stock from current and former employees at inflated prices.

**RESPONSE TO COMPLAINT NO. 1164:** Because Count XXVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1165:** State Street participated in and enabled these breaches of fiduciary duty for its own benefit, in order to obtain ongoing fee business as the ESOP Trustee because its appointment as fiduciary was at all times controlled by Buth and Richards.

**RESPONSE TO COMPLAINT NO. 1165:** Because Count XXVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1166:** As a direct and proximate result of State Street and its co-fiduciaries' actions, the ESOP lost tens of millions of dollars. State Street is liable to restore all losses to the ESOP caused by the breaches of its co-fiduciaries.

**RESPONSE TO COMPLAINT NO. 1166:** Because Count XXVIII is not asserted against Reliance Trust, no response is required.

**COMPLAINT NO. 1167:** Plaintiff's claim for co-fiduciary liability against State Street is tolled by the fraud or concealment exception to ERISA § 413 (29 U.S.C. § 1113) for the reasons described above in Count III.

**RESPONSE TO COMPLAINT NO. 1167:** Because Count XXVIII is not asserted against Reliance Trust, no response is required.

**COUNT XXIX**
**CO-FIDUCIARY LIABILITY AGAINST RELIANCE TRUST COMPANY**

**COMPLAINT NO. 1168:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1168:** Reliance Trust incorporates and restates each and every response above as if fully set forth herein.

**COMPLAINT NO. 1169:** As a fiduciary of the ESOP, Reliance assumed a duty to protect the ESOP from the improper actions of other ESOP fiduciaries.

**RESPONSE TO COMPLAINT NO. 1169:** Denied.

**COMPLAINT NO. 1170:** ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

**RESPONSE TO COMPLAINT NO. 1170:** Reliance Trust admits that paragraph 1170 quotes portions of ERISA, but denies that this quotation or Plaintiff's characterizations of the cited

source provides a full and accurate summary of the relevant legal principles in this case. The correct quoted language is "knowing such act or omission is a breach," not "knowing such act or omission of such other fiduciary is a breach."

**COMPLAINT NO. 1171:** Reliance is liable as a co-fiduciary because it was aware of, participated in, concealed, enabled, and failed to remedy the ESOP Committee members' (Richards, Ferree, Willetts, and Arent) breaches of fiduciary duty in connection with the stock valuations from 30 June 2013 through 31 December 2013 as described in Count I, which includes:

- Reliance approved and adopted inflated valuations that included an unwarranted control premium and that excluded material debt from the calculation of value.

- Reliance allowed Stout to base its valuations on inflated projections prepared by the ESOP Committee members, even though Reliance knew they had conflicts of interest which motivated them to increase the share price.

- Reliance allowed the ESOP Committee to control communications to the Employee Owners and misleadingly describe the valuations.

- Reliance purchased stock from PDC and repurchasing stock from current and former employees at inflated prices;

- Reliance failed to remedy the breaches of its prior fiduciaries by insisting that the stock values be corrected and failed to bring suit against prior fiduciaries within the statute of limitations.

**RESPONSE TO COMPLAINT NO. 1171:** Denied.

**COMPLAINT NO. 1172:** Reliance participated in and enabled these breaches of fiduciary duty for its own benefit, in order to retain its role as the ESOP Trustee because its appointment as fiduciary was at all times controlled by Richards.

**RESPONSE TO COMPLAINT NO. 1172:** Denied.

**COMPLAINT NO. 1173:** As a direct and proximate result of Reliance and its co-fiduciaries' actions, the ESOP lost tens of millions of dollars. Reliance is liable to restore all losses to the ESOP caused by the breaches of its co-fiduciaries.

**RESPONSE TO COMPLAINT NO. 1173:** Denied.

**COUNT XXX**
**CO-FIDUCIARY LIABILITY AGAINST ARGENT TRUST COMPANY**

**COMPLAINT NO. 1174:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1174:** Because Count XXX is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1175:** As a fiduciary of the ESOP, Argent assumed a duty to protect the ESOP from the improper actions of other ESOP fiduciaries.

**RESPONSE TO COMPLAINT NO. 1175:** Because Count XXX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1176:** ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

**RESPONSE TO COMPLAINT NO. 1176:** Because Count XXX is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1177:** Argent is liable as a co-fiduciary because it was aware of, participated in, concealed, enabled, and failed to remedy the ESOP Committee members' (Richards, Ferree, Willetts, and Arent) breaches of fiduciary duty in connection with the stock valuations from 30 June 2014 through 30 June 2017 as described in Count II, which includes:

- Argent approved and adopted inflated valuations that included an unwarranted control premium and that excluded material debt from the calculation of value.

- Argent allowed Stout to base its valuations on inflated projections prepared by the ESOP Committee members, even though Argent knew they had conflicts of interest which motivated them to increase the share price. Argent's Steven Martin admitted that Argent knew Appvion had a history of failing to meet its projections but allowed Stout to adjust for the riskiness of the projections rather than requiring Appvion to provide more realistic projections.

- Argent allowed the ESOP Committee to control communications to the Employee Owners and misleadingly describe the valuations. Argent's Steve Martin admitted that it did not have a forum for explaining the valuations and allowed Appvion to lead.

- Argent purchased stock from PDC and repurchasing stock from current and former employees at inflated prices at the direction of the ESOP Committee.

- Argent failed to remedy the breaches of its prior fiduciaries by insisting that the stock values be corrected and failed to bring suit against prior fiduciaries within the statute of limitations.

**RESPONSE TO COMPLAINT NO. 1177:** Because Count XXX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1178:** Argent participated in and enabled these breaches of fiduciary duty for its own benefit, in order to retain its role as the ESOP Trustee because its appointment as fiduciary was at all times controlled by Richards and Gilligan.

**RESPONSE TO COMPLAINT NO. 1178:** Because Count XXX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1179:** As a direct and proximate result of Reliance and its co-fiduciaries' actions, the ESOP lost tens of millions of dollars. Argent is liable to restore all losses to the ESOP caused by the breaches of its co-fiduciaries.

**RESPONSE TO COMPLAINT NO. 1179:** Because Count XXX is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COUNT XXXI**
**FEDERAL SECURITIES FRAUD AGAINST RELIANCE**

**COMPLAINT NO. 1180:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1180:** Because Count XXXI has been dismissed,

no response is required. To the extent a response is required, Reliance Trust incorporates its

answers to Plaintiff's prior allegations.

**Reliance Made Material Misrepresentations and Omissions and Omitted Material Facts**

**COMPLAINT NO. 1181:** While it was acting as Trustee to the Plan in 2013 and 2014, Reliance falsely represented that value of PDC's stock was properly valued at $17.85 per share as of the 30 June 2013 valuation date and $16.25 per share as of the 31 December 2013 valuation date.

**RESPONSE TO COMPLAINT NO. 1181:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1182:** Reliance communicated these stock values to the ESOP and the Employee Owners directly or through its communications with the ESOP Committee while knowing that the ESOP Committee would report the stock value to the Employee Owners. Reliance also issued statements to employees that purported to represent the value of their stock. Reliance was aware that the ESOP Committee was communicating these stock values to the ESOP and its Employee Owners by providing limited information that purported to justify the stock values.

**RESPONSE TO COMPLAINT NO. 1182:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1183:** Reliance's representation of the stock price had an implied assertion that Reliance had (1) critically read and reviewed the valuations; (2) verified that the information that the valuations were based on was correct and that the projections that the valuations were based on were reasonable and appropriate; and (3) that Stout was applying consistent and appropriate methods in conducting its valuations.

**RESPONSE TO COMPLAINT NO. 1183:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1184:** At a minimum, Reliance's representation of the stock price had an implied assertion that Reliance had valued the stock in good faith using a reliable process.

**RESPONSE TO COMPLAINT NO. 1184:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1185:** However, Reliance did not value PDC's stock in good faith and did not critically read and review the valuations, ensure that the valuations were based on correct information and reasonable projections, or ensure that Stout was applying consistent and appropriate methods in conducting its valuations. Reliance therefore lacked a basis for its representations and committed securities fraud in violation of the Securities Exchange Act of 1934, § 10(B), 15 U.S.C. § 78J and SEC Rule 10B-5, 17 C.F.R. 240.10b-5.

**RESPONSE TO COMPLAINT NO. 1185:** Because Count XXXI has been dismissed, no response is required.

**Reliance Made the Misrepresentations Knowing that They Were False or Without Caring Whether They Were True or False Thus Evidencing an Intent to Defraud**

**COMPLAINT NO. 1186:** Because Reliance reviewed, approved, and adopted each valuation as well as the Reliance knew of the omitted facts about the valuations listed above because Reliance reviewed, approved, and adopted the valuations. Reliance therefore knew the following facts:

**RESPONSE TO COMPLAINT NO. 1186:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1187:** Stout was relying on consistently inflated projections of future earnings, which were prepared by individuals at Appvion with substantial conflicts of interest. Reliance knew that these valuations were inflated and knew that the inflated projections were causing the valuations to be inflated but accepted the valuations anyway.

**RESPONSE TO COMPLAINT NO. 1187:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1188:** Stout was omitting certain liabilities from its valuations, including but not limited to the Excluded Debt. Had just this debt been deducted from the valuations, PDC would have had negative or nearly negative equity for each of the valuations approved by Reliance.

**RESPONSE TO COMPLAINT NO. 1188:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1189:** Stout was improperly applying a 10% percent control premium to its valuations, even though the ESOP as the sole shareholder had no practical ability to control the affairs of PDC or Appvion. This added approximately $54 million to the value of Appvion (36.49% of the total equity for the 30 June 2013 valuation and 41.67% of the total equity for the 31 December 2013 valuation for the three valuations listed above. *See* ¶¶ 254-63, 288. Reliance knew that there was no factual support for this control premium because Reliance (as the shareholder supposedly acting for the ESOP) was a directed trustee and lacked the ability to control the Board of Directors under the Security Holder's Agreement. Reliance has admitted that it lacked control by arguing it had no ability to monitor the Board of Directors. *See* Memorandum in Support of Motion to Dismiss Reliance Defendants, 28 Feb 19, Dkt. 115, p. 18.

**RESPONSE TO COMPLAINT NO. 1189:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1190:** Stout failed to include all interest-bearing debt in valuations as of 30 June 2013 and 31 December 2013. This was important because Stout's valuation model was extremely sensitive to small changes in interest-bearing deb. This included the following:

- Stout excluded $24,600 of Appvion's revolving line of credit from its 30 June 2013 valuation; this line of credit bore interest at Appvion's option at either base rate plus 3.5% or LIBOR plus 4.5% so it was undoubtedly "interest-bearing debt" which the valuations purported to deduct. Excluding this interest-bearing debt increased PDC's share value by approximately $2.97/share. *See* ¶ 247.

- Stout excluded certain "unamortized discounts" from its 31 December 2013 valuation which reduced Appvion's interest-bearing debt by approximately $6.8 million. Excluding this interest-bearing debt increased PDC's share value by approximately $0.86/share. *See* ¶ 248.

**RESPONSE TO COMPLAINT NO. 1190:** Because Count XXXI has been dismissed,

no response is required.

**COMPLAINT NO. 1191:** Stout routinely rounded numbers up or down at all stages of its valuation instead of using precise numbers, even though there was no benefit to rounding the numbers since Stout was undoubtedly using spreadsheets that calculated the exact number before rounding. This practice inflated the 30 July 2013 valuation by approximately 0.22/share. The 31 December 2013 also has what appears to be an arithmetic error, which when combined with Stout's practice of rounding numbers caused the share price to be inflated by approximately $0.25/share. *See* ¶¶ 286-87.

**RESPONSE TO COMPLAINT NO. 1191:** Because Count XXXI has been dismissed,

no response is required.

**COMPLAINT NO. 1192:** The appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

**RESPONSE TO COMPLAINT NO. 1192:** Because Count XXXI has been dismissed,

no response is required.

**COMPLAINT NO. 1193:** The appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock. The valuations deducted a blanket 5% discount for limited marketability which was insufficient to account for the significant repurchase liability.

**RESPONSE TO COMPLAINT NO. 1193:** Because Count XXXI has been dismissed,

no response is required.

**COMPLAINT NO. 1194:** Stout failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

**RESPONSE TO COMPLAINT NO. 1194:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1195:** Reliance's failure to explain some or all of these facts also constitutes omissions necessary to render not misleading their representations relating to the value of PDC stock.

**RESPONSE TO COMPLAINT NO. 1195:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1196:** These issues caused the valuations to be drastically inflated. *See, e.g.,* ¶¶ 247-48, 288. Reliance therefore acted knowingly because it knew the stock values were an untrue statement of material fact and that it was failing to state material facts necessary to make their statements made not misleading to the ESOP and the Employee Owners.

**RESPONSE TO COMPLAINT NO. 1196:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1197:** At a minimum, these facts constituted "red flags" that the PDC stock valuations were fraudulently overstated which would have caused a reasonable person in Reliance's position to recognize a substantial risk that the valuations did not fairly represent PDC's stock value, and Reliance either consciously disregarded these facts or was reckless in adopting the stock valuations despite these facts.

**RESPONSE TO COMPLAINT NO. 1197:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1198:** The magnitude of the Excluded Debt is also such that it is simply not reasonable that a fiduciary in Reliance's position with his understanding could have understood that the Excluded Debt had not been subtracted in arriving at fair market value. Similarly, the control premium added such a large amount to the valuation that Reliance had to understand that it was being added and knew that it lacked the control necessary to support it.

**RESPONSE TO COMPLAINT NO. 1198:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1199:** At a minimum, Reliance was reckless in making its misrepresentations about the stock value despite the numerous flaws in the valuations discussed above in Paragraphs 1190-1202.

**RESPONSE TO COMPLAINT NO. 1199:** Because Count XXXI has been dismissed,

no response is required.

### The Misrepresentations and Omissions Were Made in Connection with the Purchase or Sale of a Security

**COMPLAINT NO. 1200:** The representations related to the value of the stock itself. These stock values were then used by the ESOP (acting through Reliance) in the following purchases stock from PDC and repurchases of shares from current and former employees as described in Appendices A and B.

**RESPONSE TO COMPLAINT NO. 1200:** Because Count XXXI has been dismissed,

no response is required.

**COMPLAINT NO. 1201:** The Plan also recorded losses and gains on plan transactions using the share prices set by Argent, which related to the loan from Appvion to PDC or the ESOP which was used to fund the repurchase obligation.

**RESPONSE TO COMPLAINT NO. 1201:** Because Count XXXI has been dismissed,

no response is required.

### The ESOP Relied on the Misrepresentations and Was Harmed

**COMPLAINT NO. 1202:** The ESOP, including through its Employee Owners, believed the representations were true and relied on Reliance's representations of fair market value as described above in Paragraphs 336-39 and was damaged thereby. It was reasonable for the ESOP, including through its Employee Owners, to rely on the integrity of Reliance's representations of fair market value.

**RESPONSE TO COMPLAINT NO. 1202:** Because Count XXXI has been dismissed,

no response is required.

### Plaintiff's Claims are Timely

**COMPLAINT NO. 1203:** Securities claims must be brought no later than two years after discovery of the facts constituting the violation or five years after the violation. Plaintiff was not appointed as a fiduciary to the ESOP until August 2017 and did not discover his claims until sometime thereafter. He therefore could not discover the claims until at least August 2017. Since Plaintiff filed his complaint in this action on 26 November 2018, his claims are timely.

**RESPONSE TO COMPLAINT NO. 1203:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1204:** The fraud was not discovered until after Plaintiff was appointed as an independent, impartial fiduciary who could investigate the valuations. Before then, the only persons who were in a position to bring the claims were involved in the fraud, and their knowledge should therefore not be imputed to Plaintiff. Further, the valuations themselves were not disclosed to the employee owners or the public and therefore the claims were not discoverable with reasonable due diligence.

**RESPONSE TO COMPLAINT NO. 1204:** Because Count XXXI has been dismissed, no response is required.

**COMPLAINT NO. 1205:** Further, Plaintiff's claims against Reliance relating to the 30 June 2013 valuation are timely because the purchases of stock that relied on this share price were not completed until approximately January 2014, with the purchases retroactive to December 2013. The claim therefore accrued within the five-year discovery period.

**RESPONSE TO COMPLAINT NO. 1205:** Because Count XXXI has been dismissed, no response is required.

**COUNT XXXII**
**FEDERAL SECURITIES FRAUD AGAINST ARGENT**

**COMPLAINT NO. 1206:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1206:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Argent Made Material Misrepresentations and Omissions and Omitted Material Facts**

**COMPLAINT NO. 1207:** While it was acting as Trustee to the Plan in 2014 through 2017, Argent falsely represented the value of PDC stock as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 30 June 2014 | $16.30 |
| 31 December 2014 | $11.00 |
| 30 June 2015 | $12.90 |
| 31 December 2015 | $12.30 |

| Valuation Date | PDC Stock Price |
|---|---|
| 30 June 2016 | $13.70 |
| 31 December 2016 | $10.35 |
| 30 June 2017 | $6.85 |

**RESPONSE TO COMPLAINT NO. 1207:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1208:** Argent communicated these stock values to the ESOP Committee while knowing that the ESOP Committee would report the stock value to the Employee Owners. Argent also issued statements to employees that purported to represent the value of their stock. Reliance was aware that the ESOP Committee was communicating these stock values to the ESOP and its Employee Owners by providing limited information that purported to justify the stock values.

**RESPONSE TO COMPLAINT NO. 1208:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1209:** Argent's representations of the stock price had implied assertions that Argent had (1) critically read and reviewed the valuations; (2) verified that the information that the valuations were based on was correct and that the projections that the valuations were based on were reasonable and appropriate; and (3) and that Stout was applying consistent and appropriate methods in conducting its valuations.

**RESPONSE TO COMPLAINT NO. 1209:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1210:** At a minimum, Argent's representations of the stock price had implied assertions that Argent had valued the stock in good faith using a reliable process.

**RESPONSE TO COMPLAINT NO. 1210:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1211:** However, Argent did not value PDC's stock in good faith and did not critically read and review the valuations, ensure that the valuations were based on correct information and reasonable projections, or ensure that Stout was applying consistent and appropriate methods in conducting its valuations. Argent therefore lacked a basis for its representations and committed securities fraud in violation of the Securities Exchange Act of 1934, § 10(B), 15 U.S.C. § 78J and SEC Rule 10B-5, 17 C.F.R. 240.10b-5.

**RESPONSE TO COMPLAINT NO. 1211:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Argent Made the Misrepresentations Knowing that They Were False or Without Caring Whether They Were True or False Thus Evidencing an Intent to Defraud

**COMPLAINT NO. 1212:** Argent knew the following facts that rendered the valuations, and their corresponding share values, unreliable.

**RESPONSE TO COMPLAINT NO. 1212:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1213:** Argent knew that the projections the valuations were based on were inflated, causing the valuations themselves to be inflated. Argent's Steve Martin admitted that Appvion had never met its business plans in Argent's history as trustee. Martin stated that Argent reviewed the projections because of the history of Appvion failing to meet the projections, but instead of requiring Appvion to make the projections more realistic Argent allowed Stout to adjust for the riskiness of the projections in the discount rate. Argent also knew that the individuals responsible for creating those projections had a substantial conflict of interest through the various executive compensation plans tied to the stock price. By the end of 2014, Stout's valuation report stated that this synthetic equity accounted for approximately 25% of the "fully diluted ownership value" of PDC and valued the units at nearly $5 million.

**RESPONSE TO COMPLAINT NO. 1213:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1214:** Argent knew that the valuations were not including material liabilities that were listed on PDC's audited financial statements such the Excluded Debt. *See ¶¶* 197-246. The amount of pension/postretirement liability exceeded the value of the shareholder's equity every year that Argent was trustee. In September 2017, Argent's Steve Martin admitted that it had discussed this issue with Stout and that they may need to start including a portion of it in determining equity value but had failed to insist on the change.

**RESPONSE TO COMPLAINT NO. 1214:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1215:** Argent knew that the valuations did not include all interest-bearing debt. This included (1) "unamortized discounts" which were excluded from all of the valuations approved by Argent even though they were unquestionably interest-bearing; and (2) portions of Appvion's revolving line of credit which were excluded from the 31 December 2015, 30 June 2016, 31 December 2016, and 30 June 2017 valuations. *See ¶¶* 247-48. Excluding these debts had material impacts on PDC's share value:

| Valuation Date | Impact of Excluding Unamortized | Impact of Excluding Revolving Line of Credit |
| --- | --- | --- |
| 30 Jun 14 | $0.82/share | N/A |
| 31 Dec 14 | $0.80/share | N/A |
| 30 Jun 15 | $0.78/share | N/A |
| 31 Dec 15 | $0.56/share | $0.51/share |
| 30 Jun 16 | $0.54/share | $4.23/share |
| 31 Dec 16 | $0.46/share | $2/70/share |
| 30 Jun 16 | $0.57/share | $1.45/share |

**RESPONSE TO COMPLAINT NO. 1215:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1216:** Argent knew that Stout was inappropriately applying a 10% control premium to the 30 June 2014 and 31 December 2014 valuations, which added approximately $53 million in equity to the 30 June 2014 valuation (42% of total equity) and $49,000 million to the 31 December 2014 valuation (61% of the total equity). *See* ¶¶ 254-63. Starting with the 30 June 2015 valuation, Stout stopped including an explicit control premium, but it continued to value PDC on a controlling-interest basis; on information and belief it still incorporated a control premium through the use of multipliers that Stout selected. This control premium was inappropriate in light of the fact that Argent (as the shareholder supposedly acting for the ESOP) was a directed trustee from 1 July 2015 until mid-2015, and it at all times lacked the ability to control the Board of Directors under the Security Holder's Agreement.

**RESPONSE TO COMPLAINT NO. 1216:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1217:** Argent knew that Stout's methods for valuing PDC stock were unreliable and inconsistent, and that Argent was adopting the valuations despite substantial flaws in the valuations that resulted in significant overvaluations of PDC stock. For example, Argent adopted the valuations despite Stout's practice of rounding numbers throughout the valuation process, which increased the value of PDC's stock for all of the valuations that Argent adopted, some of them by material amounts. Argent also adopted the 31 December 2014 valuation despite an apparent arithmetic error; combined with the rounding practices, that error inflated PDC's stock value by approximately $0.37/share. *See* ¶ 286-87.

**RESPONSE TO COMPLAINT NO. 1217:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1218:** Argent approved the 30 June 2015 valuation even though Argent knew that Stout significantly changed its methodology that year, adding a sixth year of data

to its discounted cash flow analysis for that valuation only and adding an additional category to its guideline company method analysis of Thermal. *See* ¶¶ 274-77.

**RESPONSE TO COMPLAINT NO. 1218:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1219:** Argent also approved the 31 December 2015 valuation even though it knew that Stout again changed its methodology, choosing to disregard previous and projected EBITDA numbers in favor of only revenue numbers without reference to profitability. These changes both substantially increased the valuations, covering up the effect of the fact that Appvion sold Encapsys (its most profitable division) that year and despite Thermal's low earnings. This was also inconsistent with the requirement in the 30 August 2015 trust agreement that the trustee determine fair market value "with consideration being given to methods consistently followed and uniformly applied."

**RESPONSE TO COMPLAINT NO. 1219:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1220:** Argent knew that Stout was applying a very small discount for limited marketability which did not reflect the real repurchase obligation. In 2015 and 2016 alone, distributions from the ESOP totaled $19.6 million while contributions to the ESOP were only $3.5 million; however, each of Stout's valuations put the discount for limited marketability at $3.8 to $5 million. *See* ¶¶ 278-80. Argent's Steve Martin admitted that Argent had questioned the low discount for limited marketability but Stout had failed to change it.

**RESPONSE TO COMPLAINT NO. 1220:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1221:** Argent knew that the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

**RESPONSE TO COMPLAINT NO. 1221:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1222:** Argent knew that Stout failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

**RESPONSE TO COMPLAINT NO. 1222:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1223:** Argent's representation of the share prices despite these known issues that affected the stock price render their representations fraudulent.

**RESPONSE TO COMPLAINT NO. 1223:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1224:** At a minimum, these facts constituted "red flags" that the PDC stock valuations were fraudulently overstated which would have caused a reasonable person in Argent's position to recognize a substantial risk that the valuations did not fairly represent PDC's stock value, and Argent either consciously disregarded these facts or was reckless in adopting the stock valuations despite these facts.

**RESPONSE TO COMPLAINT NO. 1224:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

### The Misrepresentations and Omissions Were Made in Connection with the Purchase or Sale of a Security

**COMPLAINT NO. 1225:** The representations related to the value of the stock itself. These stock values were then used by the ESOP (acting through Argent) in to purchase stock from PDC and to repurchase shares from current and former employees as described in Appendices A and B.

**RESPONSE TO COMPLAINT NO. 1225:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1226:** The Plan also recorded losses and gains on plan transactions using the share prices set by Argent, which related to the loan from Appvion to PDC or the ESOP which was used to fund the repurchase obligation.

**RESPONSE TO COMPLAINT NO. 1226:** Because Count XXXII is not asserted against Reliance Trust and has been dismissed, no response is required.

### The ESOP Relied on the Misrepresentations and Was Harmed

**COMPLAINT NO. 1227:** The ESOP, including through its Employee Owners, believed the representations were true and relied on Reliance's representations of fair market value as described above in Paragraphs 336-339 and was damaged thereby. It was reasonable for the ESOP, including through its Employee Owners, to rely on the integrity of Reliance's representations of fair market value.

**RESPONSE TO COMPLAINT NO. 1227:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**Plaintiff's Claim Is Timely**

**COMPLAINT NO. 1228:** Securities claims must be brought no later than two years after discovery of the facts constituting the violation or five years after the violation. Plaintiff was not appointed as a fiduciary to the ESOP until August 2017 and did not discover his claims until sometime thereafter. He therefore could not discover the claims until at least August 2017. Before then, the only persons who were in a position to bring the claims were involved in the fraud, and their knowledge should therefore not be imputed to Plaintiff. Further, the valuations themselves were not disclosed to the employee owners or the public and therefore the claims were not discoverable with reasonable due diligence. Since Plaintiff filed his complaint in this action on 26 November 2018, his claims are timely.

**RESPONSE TO COMPLAINT NO. 1228:** Because Count XXXII is not asserted against

Reliance Trust and has been dismissed, no response is required.

**COUNT XXXIII**
**FEDERAL SECURITIES FRAUD AGAINST RICHARDS, ARENT, FERREE, AND GILLIGAN**

**COMPLAINT NO. 1229:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1229:** Because Count XXXIII is not asserted

against Reliance Trust and has been dismissed, no response is required. To the extent a response

is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1230:** Richards was CEO and Chairman of the Board of Directors of Appvion and PDC from mid-2005 until late 2015 and a member of the ESOP Committee for the same time period; Richards retired as CEO on 4 August 2015 and stepped down as Chairman of the Board on 31 December 2015. Richards had day-to-day involvement in the operations of the company, including the preparation of the financial projections that formed the basis of the valuations.

**RESPONSE TO COMPLAINT NO. 1230:** Because Count XXXIII is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1231:** Ferree was CFO of Appvion from October 2006 to May 2007, and was a member of the ESOP Committee from December 2006 to April 2017. As CFO, Ferree had day-to-day involvement in the operations of the company, including the preparation of the financial projections that formed the basis of the valuations.

**RESPONSE TO COMPLAINT NO. 1231:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1232:** Arent's highest titled with Appvion was VP of HR. She was a member of the ESOP Committee from at least 7 July 2008 until October 2015.

**RESPONSE TO COMPLAINT NO. 1232:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1233:** Gilligan was CEO of Appvion from August 2015 until October 2017, and he was a member of the ESOP Committee from 15 April 2015 until October 2017. As CEO, Gilligan had day-to-day involvement in the operations of the company, including the preparation of the financial projections that formed the basis of the valuations.

**RESPONSE TO COMPLAINT NO. 1233:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1234:** Richards, Arent, Ferree, and Gilligan approved the fraudulent stock prices, the publication of fraudulent and misleading communications about the stock values, and the filing of 10-Ks, 10-Qs and Form 5500s that incorporated and relied upon the fraudulent stock prices as discussed earlier in Paragraphs 165-71, 340-372 and below. In doing so, Richards, Arent, Ferree, and Gilligan and committed securities fraud in violation of the Securities Exchange Act of 1934, § 10(B), 15 U.S.C. § 78J and SEC Rule 10B-5, 17 C.F.R. 240.10b-5.

**RESPONSE TO COMPLAINT NO. 1234:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Richards, Ferree, and Arent and Gilligan Made Material Misrepresentations about the Value of PDC's Stock

**COMPLAINT NO. 1235:** Richards, Arent, Ferree and Gilligan were ESOP Committee members responsible for the day-to-day administration of the ESOP, which included meeting with Stout and the ESOP Trustee to discuss the valuations, approving the stock price, and disseminating the stock price to the Employee Owners.

**RESPONSE TO COMPLAINT NO. 1235:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1236:** In connection with the valuations between 30 June 2013 and 30 June 2017, Richards, Arent, Ferree, and Gilligan falsely represented the value of PDC stock as follows:

| Valuation Date | PDC Stock Price | ESOP Committee Defendants |
|---|---|---|
| 30 June 2013 | $17.85 | Richards, Ferree, Arent |
| 31 December 2013 | $16.25 | Richards, Ferree, Arent |
| 30 June 2014 | $16.30 | Richards, Ferree, Arent |
| 31 December 2014 | $11.00 | Richards, Ferree, Arent |
| 30 June 2015 | $12.90 | Richards, Ferree, Arent |
| 31 Dec 15 | $12.30 | Ferree, Gilligan |
| 30 Jun 16 | $13.70 | Ferree, Gilligan |
| 31 Dec 16 | $10.35 | Ferree, Gilligan |
| 30 Jun 17 | $6.85 | Gilligan |

**RESPONSE TO COMPLAINT NO. 1236:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1237:** In approving the valuations, the ESOP Committee (Richards, Ferree, Arent, and Gilligan) met with Stout and Reliance to discuss the valuations, then adopted and approved the valuations either explicitly or by conveying the price to the ESOP's employee owners. They reviewed the valuations at issue in this count as follows:

| Valuation Date | Meeting Date | ESOP Committee Members Present | Attendees from Argent and Stout | Comments |
|---|---|---|---|---|
| 30 Jun 13 | 13 Jul 13 | Ferree, Richards, Arent, | Levine (Stout)  Martin and Kaplan (Reliance) | "Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine. Mr. Levine, Mr. Martin and Mr. Kaplan then departed the meeting." |
| 31 Dec 13 | 17 Jan 14 | Ferree, Richards, | Levine (Stout)  Martin and Kaplan (Reliance) | "Mr. Levine reviewed the December 31, 2013 stock price valuation with the committee using the materials distributed to committee members. The committee members asked questions regarding the stock valuation, which were answered by |

| Valuation Date | Meeting Date | ESOP Committee Members Present | Attendees from Argent and Stout | Comments |
|---|---|---|---|---|
| | | | | Mr. Levine, Mr. El-Tahch [of Stout], and Mr. Martin. Messrs. Levine, El-Tahch, Martin and Kaplan were then excused from the meeting." <br><br> "Mr. Richards made a motion to approve the stock valuation." |
| 30 Jun 14 | 15 Jul 14 | Ferree, Richards, | Levine (Stout) <br><br> Martin (Argent), Hansberger (Argent) | "'Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine and Mr. Martin. Mr. Levine, Mr. Martin and Mr. Hansberger then departed the meeting." |
| 31 Dec 14 | 14 Jan 15 | Ferree, Richards, Arent | Levine (Stout) <br><br> Martin (Argent), Hansberger (Argent) | "Mr. Levine reviewed the December 31, 2014 stock price valuation with the committee using the materials distributed to committee members. The committee members asked questions regarding the stock valuation, which were answered by Mr. Levine and Mr. Martin. Messrs. Levine, Martin and Hansberger were then excused from the meeting." |
| 30 Jun 15 | 4 Aug 15 | Ferree, Richards, Arent | Levine (Stout), Sinnathamby (Stout) <br><br> Martin (Argent), Hansberger (Argent) | "The Committee reviewed the June 30, 2015 stock valuation prepared by Stout Risius Ross and approved by Argent Trust Company. Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine and Mr. Martin. Messrs. Levine, Sinnathamby, |

| Valuation Date | Meeting Date | ESOP Committee Members Present | Attendees from Argent and Stout | Comments |
|---|---|---|---|---|
| | | | | Martin and Hansberger then departed the meeting." " |
| 31 Dec 15 | 15 Jan 16 | Ferree, Gilligan | Levine (Stout), Aguilar (Stout) Martin (Argent) | "Mr. Levine reviewed the December 31, 2015 stock price valuation with the committee using the materials distributed to committee members. The committee members asked questions regarding the stock valuation, which were answered by Mr. Levine and Mr. Martin. Messrs. Levine, Aguilar and Martin were then excused from the meeting." |
| 30 Jun 16 | 11 Jul 16 | Ferree, Gilligan | Levine (Stout), Aguilar (Stout) Martin (Argent), Hansberger (Argent) | "The Committee reviewed the June 30, 2016 stock valuation prepared by Stout Risius Ross and approved by Argent Trust Company. Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine. Messrs. Levine, Aguilar, Martin and Hansberger then departed the meeting." " |
| 31 Dec 16 | 18 Jan 17 | Ferree, Gilligan | Levine (Stout) Martin (Argent) | "Mr. Levine reviewed the December 31, 2016 stock price valuation with the committee using the materials distributed to committee members. The committee members asked questions regarding the stock valuation, which were answered by Mr. Levine. Messrs. Levine and Martin were then excused from the meeting." |
| 30 Jun 17 | 17 Jul 17 | Gilligan | Levine (Stout), Aguilar (Stout) | "Mr. Levine reviewed the June 30, 2016 stock valuation prepared by Stout Risius Ross and approved by |

| Valuation Date | Meeting Date | ESOP Committee Members Present | Attendees from Argent and Stout | Comments |
|---|---|---|---|---|
| | | | Hansberger (Argent) | Argent Trust Company. Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine. Mr. Macke made a motion to approve the valuation. Mr. Gilligan seconded the motion and all were in favor. Messrs. Levine, Aguilar and Hansberger then departed the meeting." "<br><br>"Mr. Macke [ESOP Committee member] made a motion to approve the valuation. Mr. Gilligan seconded the motion and all were in favor." |

**RESPONSE TO COMPLAINT NO. 1237:** Because Count XXXIII is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1238:** To the extent they were not present at meetings while they were on the ESOP Committee, Arent and Gilligan still approved and adopted the related share price and communication because they received the communication and failed to object.

**RESPONSE TO COMPLAINT NO. 1238:** Because Count XXXIII is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1239:** After review of the stock price in the meetings above, the ESOP Committee (Richards, Ferree, Arent, and Gilligan) issued communications to employees that reported the fraudulent share price. These communications were in the form of press releases, but they were discussed and approved by Richards, Ferree, Arent, and Gilligan either by vote during the ESOP Committee meetings, in writing soon after, or by ratification after they received the communication and remained silent. These communications were at all times understood to be communications from the ESOP Committee and its members.

**RESPONSE TO COMPLAINT NO. 1239:** Because Count XXXIII is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1240:** These communications contained misleading and incomplete representations about the valuations and the valuation process and omitted facts necessary to make them not misleading.

**RESPONSE TO COMPLAINT NO. 1240:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1241:** On 18 July 2013, the ESOP Committee's (Richards, Ferree, Arent) valuation communication informed the ESOP's employee owners that Reliance had valued the stock at $17.85 per share as of 30 June 2013. Appvion management indicated that Stout was being conservative, noting that the market analysis would produce a significant increase in stock value but that "Historically SRR has been cautious about immediately applying those changes in value (up or down) to PDC stock. SRR chose to discount the H1 2013 performances of comparable companies until the associated stock values prove to be sustainable." This communication was incomplete because it failed to disclose the following: (1) that this valuation was not reliable because it was not deducting the Excluded Debt, including $96.7 million of retirement debt and $36.2 million of other liabilities (*see* ¶ 288); (2) that the valuation was inflated by approximately $54 million from Stout's application of a control premium (*see* ¶ 288); and (3) that the valuation failed to include all interest-bearing debt (it excluded nearly $7 million in unamortized discounts) (*see* ¶ 248). Further, it omitted Stout's practice of cumulative rounding, combined with an arithmetic error, inflated the share value by approximately $0.22/share.

**RESPONSE TO COMPLAINT NO. 1241:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1242:** On 23 January 2014, the ESOP Committee's (Richards, Ferree, Arent) valuation communication announced that Reliance had valued PDC stock at $16.25 per share as of 31 December 2013 and purported to describe Stout's income and market analysis. This communication acknowledged that Appvion had failed to meet its projections, stating that "company performance against plan falling short of target by more than $20 million; however, the communication pointed to Stout's guideline company method analysis as offsetting this analysis. This communication was incomplete because it failed to disclose the following: (1) that this valuation was not reliable because it was not deducting the Excluded Debt, including $96.7 million of retirement debt and $36.2 million of other liabilities (*see* ¶ 288); (2) that the valuation was inflated by approximately $54 million from Stout's application of a control premium (*see* ¶ 288); and (3) that the valuation failed to include all interest-bearing debt (it excluded nearly $7 million in unamortized discounts) (*see* ¶ 248). Further, Stout's practice of cumulative rounding, along with an arithmetic error, inflated the share value by approximately $0.25/share.

**RESPONSE TO COMPLAINT NO. 1242:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1243:** On 16 July 2014 the ESOP Committee's (Richards, Ferree, Arent) valuation communication announced that Argent had valued PDC stock at $16.30 per share

and purported to describe Stout's income and market analysis. This communication was approved by Ferree and Richards during a meeting of the ESOP Committee on 15 July 2014. Arent was not present at the meeting but she ratified the communication and the stock price when she received it and failed to object. This communication admitted that both Carbonless and Thermal had "not met mid-year expectations" and that they were reducing forecasts. However, the communication emphasized offsetting factors that justified a share price that was higher than the prior valuation, including "efforts to leverage the full capabilities of our workforce and manufacturing assets" that helped the Carbonless valuation remain flat, the offsetting performance of the Encapsys division, and improvement in the market performance of publicly traded companies. This communication was incomplete because it omitted at least the following facts:

- While Appvion adjusted its projections to lower Carbonless's projected EBITDA for 2014 to 2015, it significantly increased the projections for 2016 to 2018 used in Stout's discounted cash flow analysis overall:

| | Year 1 12/31/2014 | Year 2 12/31/2015 | Year 3 12/31/2016 | Year 4 12/31/2017 | Year 5 12/31/2018 |
|---|---|---|---|---|---|
| EBITDA Projection – 30 Jun 14 Valuation | $43,776 | $43,594 | $49,923 | $53,219 | $52,181 |
| EBITDA Projection - 31 Dec 13 Valuation | $51,815 | $47,840 | $43,909 | $39,988 | $36,571 |
| Change | $ (8,039) | $ (4,246) | $6,014 | $13,231 | $15,610 |

- This was significant because the "Year 5" valuation accounted for a significant portion of the valuation, causing the Carbonless discounted cash flow analysis to actually be worth more than in the prior valuation despite the failure to meet projections. *See* ¶¶ 266-68. Stout added a 2% "Company-specific risk premium" to its calculating of the discount rate as compared to the prior valuation which mitigated some of the effect of this higher projection, but this was not an appropriate way to address inflated projections.

- This communication was also incomplete because it omitted (1) that this valuation was not deducting the Excluded Debt of approximately $124 million (*see* ¶ 288); (2) that the valuation was inflated by approximately $53 million from Stout's application of a control premium (*see* ¶ 288); and (3) that the valuation failed to include all interest-bearing debt (it excluded unamortized discounts) (*see* ¶ 247). Further, Stout's practice of cumulative rounding inflated the share value by approximately $0.35/share.

**RESPONSE TO COMPLAINT NO. 1243:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1244:** On 23 January 2015 the ESOP Committee's (Richards, Ferree, Arent) valuation communication announced that Argent had valued PDC stock at $11.00 per share and purporting to describe Stout's income and market analysis. This email identified the following support for the share price:

> The **income analysis** was affected by our company missing its 2014 earnings targets due primarily to poor operating results from the paper business. Encapsys had the best performance of our business segments and exceeded its 2014 performance targets.... **The performance of carbonless and specialty papers segment [sic] effectively offset the share value gain produced by Encapsys' performance.**

> The **performance of our thermal business reduced share value by approximately $4**.

> The funding agreement that the company entered into for the Fox River clean-up ...served to reduce the value of the company by $19 million and the share price by approximately $2.60.

Emphasis added.

**RESPONSE TO COMPLAINT NO. 1244:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1245:** This valuation communication was approved by Ferree, Arent, and Richards via email after the 14 January 2015 ESOP Committee discussing this valuation. This communication was misleading because it emphasized certain factors and exactly how much they empacted the share value, while failing to disclose the other much larger issues alleged herein, including that (1) that the valuation failed to deduct Excluded Debt of $168.4 million, which was greater than the $80.7 million in shareholder's equity as determined by Stout (*see* ¶ 288); (2) that the valuation was inflated by approximately $49 million from Stout's application of a control premium (*see* ¶ 288); (3) that the valuation failed to include all interest-bearing debt (*see* ¶¶ 247-48). Further, Stout's practice of cumulative rounding, combined with an arithmetic error, inflated the share value by approximately $0.37/share.

**RESPONSE TO COMPLAINT NO. 1245:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1246:** In August 2015, the ESOP Committee (Richards, Ferree, Arent, and Gilligan) released a communication reporting the 30 June 2015 valuation as $12.90 per share. This communication selectively disclosed the factors that affected the valuation:

> The sale of Encapsys and our receipt of net proceeds of approximately $200 million (minus the transaction fees) had a significant **positive impact on the share price of almost $5**. However poor performance by our thermal business **decreased per share value by approximately $4**.

The communication also pointed out additional factors that influenced share price, noting that revenues were down in the first half of 2015 but a reduction in selling, general and administrative expenses offset the decline and payment of Fox River liabilities had also improved share price. The communication did not disclose (1) that the 30 June 2015 valuation had significant methodology changes from the prior reports that made it unreliable, including the use of six years of projections instead of five and a new criteria for evaluating the Thermal division (*see* ¶¶ 27477); (2) that the valuation failed to deduct the Excluded Debt, including $124.4 million of retirement debt and $46 million of other liabilities (which was greater than shareholder equity of equity of $89.4 million) (*see* ¶ 288); (3) that the valuation failed to include all of Appvion's interest-bearing debt (*see* ¶¶ 247-48).

**RESPONSE TO COMPLAINT NO. 1246:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1247:** On 16 January 2016, the ESOP Committee's (Ferree and Gilligan) valuation communication announced that Argent had valued PDC stock at $12.30 per share and purported to describe Stout's income and market analysis. The communication blamed the decrease in share value on "volatile market conditions," and not Appvion's own performance stating:

> Appvion's business performance during the second half did not significantly alter the value of the company. Most of the decline in share value was the result of volatile market conditions and the negative performances of comparable companies and general market indices.

This communication omitted at least the following facts that Richards and Gilligan were aware of, which necessary to make it not misleading: (1) that the valuation failed to deduct the Excluded Debt, including $128 million of retirement debt and $35 million of other liabilities (*see* ¶ 288); (2) that the valuation failed to include all interest-bearing debt, excluding $9.6 million of Appvion's revolving line of credit and nearly $4 million in unamortized discounts (*see* ¶¶ 247-48); and (3) that Stout changed its methodology to ignore Thermal's actual and projected EBITDA numbers because Thermal had a very bad year and only achieved EBITDA of $8 (*see* ¶¶ 274-77) million; this allowed Stout to rely solely on revenue multiplies without regard to gross margin or profitability. This communication was approved by Richards and Ferree at or soon after the 15 January 2016 ESOP Committee meeting where the communication was discussed.

**RESPONSE TO COMPLAINT NO. 1247:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1248:** In July 2016, the ESOP Committee's (Ferree and Gilligan) valuation communication announced the increase in share value to $13.70 as of the 30 June 2016 valuation and share and purported to describe Stout's income and market analysis. The email attributed the share price increase to "Appvion's business performance, specifically the improved results from the thermal segment" and the reduced number of shares as a result of share repurchases." This communication omitted at least the following facts that Richards and Gilligan were aware of, which necessary to make it not misleading: (1) that the valuation failed to deduct the Excluded Debt, including $129.4 million of retirement debt and $34 million in other liabilities, even though the unfunded pension liability and whether it should be included in the valuations going forward was discussed at a 26 May 2016 ESOP Committee meeting attended by Ferree and Gilligan (*see* ¶¶ 288, 1264); (2) that the valuation excluded $27 million of Appvion's revolving line of credit and approximately $3.4 million of unamortized discounts (*see* ¶ 247-48).

**RESPONSE TO COMPLAINT NO. 1248:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1249:** On or around 18 July 2017, Appvion's ESOP Committee (Gilligan) released its communication describing the 30 June 2017 stock price of $6.85. The communication states that Stout's income and market analysis "did not materially change the enterprise valuation of Appvion from the last valuation." Rather, Gilligan pointed to an "increase in debt" as the reason that Appvion's stock price decreased. A 25 July 2017 communication to employees similarly identified the increased debt as the "principal impact[]" on share price. These communications again concealed (1) that Appvion's Excluded Debts of over $160 million significantly exceeded the $40.5 million of shareholder equity according to Stout (*see* ¶ 288); and 2) that the valuations excluded $8.4 million of Appvion's revolving line of credit and $3.1 million of unamortized discounts (*see* ¶247-48). The communication also concealed Appvion's precarious financial position by mid-2017, only a few months prior to Appvion's bankruptcy filing.

**RESPONSE TO COMPLAINT NO. 1249:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1250:** In addition to the specific facts discussed above, the valuation communications omitted the following information that materially affected all of the valuations:

- That Stout was relying on consistently inflated projections of future earnings, and that Appvion had consistently failed to meet those projections. *See* ¶¶ 264-70. Further, those projections were prepared at least in part by Richards, Arent, and Ferree - all of whom had significant conflicts of interest because of their interest in the incentive compensation plans that were tied to PDC's stock price. *See* ¶¶ 297-305.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact of Appvion's substantial repurchase obligation as part of its discount for limited market ability. *See* ¶¶ 278-80.

- That Stout failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

**RESPONSE TO COMPLAINT NO. 1250:** Because Count XXXIII is not asserted

against Reliance Trust and has been dismissed, no response is required.

### Richards, Ferree, and Gilligan Signed 10-Ks and Attested to 10-Qs Filed with the SEC Which Relied Upon and Incorporated the Fraudulent Stock Price

**COMPLAINT NO. 1251:** Richards, Ferree, and Gilligan signed Appvion and PDC's 10-K and attested to 10-Q filings, which included Appvion's financial statements. The financial statements relied upon and incorporated PDC's stock price. The 10-Ks and 10-Qs, and the attestations signed by Richards, Ferree, and Gilligan, are further described earlier in Paragraphs 349-367.

**RESPONSE TO COMPLAINT NO. 1251:** Because Count XXXIII is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1252:** In particular, Richards and Ferree signed PDC's amended 2013 10-K on 14 November 2014; this amended 10-K reported a material ess in internal controls in connection with the accounting for the value of Redeemable Common Stock. According to PDC's 2013 10-K filing, "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis." Paperweight Development Corp. (2013). *Form 10-K/A*, p. 88. Before 2013, Appvion management was underestimating the number of outstanding shares that were "redeemable." However, in 2013, the PDC's amended 10-K reported that accounting guidance for redeemable equity required them to consider the earliest date that shares could be redeemed - and because employees could redeem immediately upon termination, "a significant portion of the common stock was currently redeemable" so it needed to be reported at redemption value.

**RESPONSE TO COMPLAINT NO. 1252:** Because Count XXXIII is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1253:** In the amended 2013 financial statements, PDC admitted that it had failed to follow accounting guidelines, which state that if the redemption value is less than the original issuance cost, the carrying amount of the stock should not be less than the original issuance cost. However, PDC's financial statements did not reflect this requirement. This material

error meant PDC's financial statements were not in compliance with GAAP and required them to be restated.

**RESPONSE TO COMPLAINT NO. 1253:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1254:** The amendment merely recalculated the Redeemable Common Stock value without correcting the real underlying issue - that the stock value was inflated, causing the balance sheet entry to be inflated. The amended 2013 10-K therefore constituted an additional representation reaffirming the representation that the Redeemable Common Stock value entry (and therefore the underlying stock value) was correct.

**RESPONSE TO COMPLAINT NO. 1254:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Ferree Signed Form 5500s Filed with the Department of Labor which Relied Upon and Incorporated the Fraudulent Stock Prices

**COMPLAINT NO. 1255:** Ferree signed the Form 5500s filed with the Department of Labor under penalty of perjury in 2014, 2015, and 2016. These also relied upon the fraudulent stock prices and and constituted further misrepresentations. *See* ¶¶ 368-72. The other ESOP Committee members (Richards, Arent, Gilligan) approved or ratified these representations.

**RESPONSE TO COMPLAINT NO. 1255:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Richards, Ferree, and Arent Acted Knowingly

**COMPLAINT NO. 1256:** First, Richards, Ferree, and Arent knew about the irregularities with the valuations because they reviewed and approved the valuations.

**RESPONSE TO COMPLAINT NO. 1256:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1257:** Second, Richards, Ferree, and Arent knew that the valuations included a substantial control premium for the 30 June 2013-31 December 2014 valuations, and they knew that the ESOP lacked control that would justify a control premium. *See* ¶¶ 254-63.

**RESPONSE TO COMPLAINT NO. 1257:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1258:** Third, Richards, Ferree, Willetts, and Arent all knew that the valuations should be deducting for unfunded post-retirement liability because of their involvement with the BemroseBooth events described in Paragraphs 209-236.

**RESPONSE TO COMPLAINT NO. 1258:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1259:** This issue was raised again at an ESOP Committee meeting on 26 May 2016, where Ferree "discussed the need to fund our pension contributions going forward as it will become a statutory obligation beginning in 2017" and "the potential effects to the share price." Ferree and Gilligan agreed that the issue should be discussed with Stout. However, Stout never adjusted its valuation process to account for this pension contribution funding.

**RESPONSE TO COMPLAINT NO. 1259:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1260:** Fourth, Richards, Ferree, Arent, and Gilligan were all high-level executives at Appvion involved in preparing or approving the inflated projections, which they knew formed the basis of the valuations between 26 November 2013 and October 2017. Because they were repeatedly reviewing the valuations compared to Appvion's actual performance, they knew that the valuations were inflated. Their involvement in preparing or approving the projections is evident from the following facts:

- Ferree, as CFO, was involved in preparing the projections and ultimately responsible for their contents.

- Richards and Gilligan were CEOs and reviewed and approved the projections. In addition, the projections were provided to Appvion's Board of Directors, so Richards and Gilligan also reviewed the projections in their roles as Chairman of the Board and a member of the Board, respectively.

- In preparing each valuation, Stout met with high level employees to Appvion to discuss the projections. This would have necessarily included Richards, Ferree, Arent and Gilligan.

- The projections and Appvion's current financial performance were also expressly presented and discussed at meetings of the ESOP Committee, including on the following dates:

| Date | Prior ESOP Committee Members Present | Description from Minutes |
|---|---|---|
| 15 Apr 13 | Richards, Ferree, Arent | "Mr. Ferree led a discussion on the current and forecasted financial performance of the company." |

| Date | Prior ESOP Committee Members Present | Description from Minutes |
|---|---|---|
| 17 Jul 13 | Richards, Ferree, Arent | "Mr. Ferree led a discussion on the current and forecasted financial performance of the company." |
| 17 Jan 14 | Richards, Ferree | "Mr. Ferree then led a discussion on the current and forecasted financial performance of the company. There were no questions from the committee members." |
| 27 May 14 | Richards, Ferree, Arent | "The committee discussed **the 5 year due diligence projections updated from the December valuation**. Mr. Fletcher explained the comparison. The Committee and Messrs. Fletcher and Stockov (a Strategic Planning Analyst) engaged in discussion answering all questions from the Committee." |
| 15 Jul 14 | Richards, Ferree | "Mr. Ferree led a discussion on the current and forecasted financial performance of the company." |
| 3 Oct 14 | Richards, Ferree, Arent | "Mr. Ferree then led a discussion regarding financial review. The committee members asked questions which were answered by Mr. Ferree." |
| 14 Jan 15 | Richards, Ferree, Arent | "Review Current Company Financial Performance. Mr. Ferree then led a discussion on the current financial performance of the company." |
| 29 Apr 15 | Richards, Ferree, Arent, Gilligan | "2015 Financial Performance and Forecast. Mr. Ferree led a discussion on the current and forecasted financial performance of the company, including discussion regarding legal diversifications." |
| 5 Jun 15 | Richards, Ferree, Arent, Gilligan | "Review Stout Risius Ross Due Diligence Materials. Mr. Ferree **led a discussion regarding the methodology and process of the valuation**. The Committee **discussed the 5 year due diligence projections updated from the December valuation**. Mr. Ferree explained the comparison. The Committee and Mr. Fletcher engaged in discussion answering all questions from the Committee." |
| 4 Aug 15 | Richards, Ferree, Arent | "Mr. Ferree led a discussion on the current and forecasted financial performance of the company." |

| Date | Prior ESOP Committee Members Present | Description from Minutes |
|---|---|---|
| 21 Oct 15 | Richards, Ferree, Arent, Gilligan | "Mr. Ferree then led a discussion regarding financial review. The committee members asked questions which were answered by Mr. Ferree." |
| 24 Nov 15 | Ferree, Gilligan | "As this was the first meeting for the new committee members, Mr. Ferree began the meeting by reviewing the tasks that the committee is responsible for and **explaining the main points of the previous valuation report** from Stout Risius Ross.<br><br>Mr. Ferree then **led a discussion regarding the five year financial projections that were prepared for Stout Risius Ross to use in their December 31, 2015 share price analysis and the potential effects to the share price**. The committee members asked questions regarding the projections which were answered by Mr. Ferree." |
| 15 Jan 16 | Ferree, Gilligan | "Review Current Company Financial Performance. Mr. Ferree then led a discussion on the current financial performance of the company." |
| 19 Apr 16 | Ferree, Gilligan | "2016 Financial Performance and Forecast. Mr. Ferree led a discussion on the current and forecasted financial performance of the company, including discussion regarding legal diversifications. Mr. Ferree answered questions from the Committee." |
| 26 May 16 | Ferree, Gilligan | "Mr. Ferree called the meeting to order and led a discussion regarding **the five year financial projections that were prepared for Stout Risius Ross to use in their June 30, 2016 share price analysis**. An updated copy of the five year financial projections was handed out at the meeting. Mr. Ferree also discussed the need to fund our pension contributions going forward as it will become a statutory obligation beginning in 2017. **Mr. Ferree plans to discuss the pension contribution funding with Stout Risius Ross at the upcoming due diligence meeting on** June 6. Mr. Ferree discussed the potential effects to the share price. The committee members asked questions regarding the projections and pension contribution funding which were answered by Mr. Ferree. Ms. Vissers **made a motion that the** |

| Date | Prior ESOP Committee Members Present | Description from Minutes |
|---|---|---|
| | | **financial projections were ready to be sent to Stout Risius Ross** and the committee was in agreement of discussing the pension contribution funding with Stout Risius Ross. Mr. Macke seconded the motion and all were in favor."<br><br>The Five Year Financial Projections are also listed as an attachment to the minutes. |
| 11 Jul 16 | Ferree, Gilligan | "Mr. Ferree led a discussion on the current and forecasted financial performance of the company. There was no committee action." |
| 28 Nov 16 | Ferree, Gilligan | "Mr. Kelly called the meeting to order and led a discussion regarding the five year financial projections that were prepared for Stout Risius Ross to use in December 31, 2016 share price analysis and the potential effects to the share price. Meeting participants asked questions regarding the projections and pension contribution funding which were answered by Mr. Ferree and Mr. Kelly. **Mr. Gilligan made a motion that the financial projections were ready to be sent to Stout Risius Ross**. Mr. Macke seconded the motion and all were in favor."<br><br>The Five Year Financial Projections are also listed as an attachment to the minutes. |
| 18 Jan 17 | Ferree, Gilligan | "Review Current Company Financial Performance. Mr. Ferree then led a discussion regarding financial review. Committee members asked questions which were answered by Mr. Ferree." |
| 12 Apr 17 | Ferree, Gilligan | "2017 Financial Performance and Forecast. Mr. Ferree led a discussion on the current and forecasted financial performance of the company. Mr. Ferree answered questions from the Committee." |
| 25 May 17 | Ferree, Gilligan | "Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout Risius Ross to use in June 30, 2017 share price analysis. Meeting participants asked questions regarding the projections and pension contribution funding which were answered by Mr. Ferree and Mr. |

| Date | Prior ESOP Committee Members Present | Description from Minutes |
|---|---|---|
| | | Kelly. Mr. Gilligan made a motion that the financial **projections were ready to be sent to Stout Risius Ross** pending final review from finance. Mr. Macke seconded the motion and all were in favor." |
| | | The Five Year Financial Projections are also listed as an attachment to the minutes. |
| 17 Jul 17 | Gilligan | "Review Current/Forecasted Company Financial Performance. Mr. Kelly led a discussion on the current and forecasted financial performance of the company." |

**RESPONSE TO COMPLAINT NO. 1260:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1261:** Fifth, Richards, Ferree, Arent, and Gilligan all had motive to increase the stock value because they were receiving LTIPS and RSUs that were tied to the stock price but not subject to the constraints of the ESOP; the higher the stock price, the more they personally benefited. *See* ¶¶ 297-305.

**RESPONSE TO COMPLAINT NO. 1261:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1262:** LTIP units were granted to Richards, Ferree, Arent, and Gilligan effective as of approximately January 1 of each year and would vest three years after issue. Gilligan also received LTIP units as part of his compensation package when he joined Appvion as an employee in July 2014. Ferree and Arent both exercised a portion of their LTIP units as of 13 December 31, 2013, earning $51,150 and $61,380, respectively based on the exercise price of $16.25.

**RESPONSE TO COMPLAINT NO. 1262:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1263:** RSUs were similarly granted effective as of approximately January 1 of each year. They would vest three years after issue as a cash payment without the need to exercise the units. Richards, Ferree, and Arent received the following payments for RSUs during this time frame, which were paid as the stock value multiplied times the number of units:

| Name | Grant Date | Units | Vest Date | Vesting Price | Paid |
|------|-----------|-------|-----------|---------------|------|
| Arent | 1/1/2012 | 5,000 | 12/31/2014 | $11.00 | $55,000 |
| Arent | 1/1/2013 | 5,000 | 12/31/2015 | $12.30 | $65,500 |
| Richards | 1/1/2012 | 40,000 | 12/31/2014 | $11.00 | $440,000 |
| Richards | 1/1/2013 | 37,000 | 12/31/2015 | $12.30 | $455,100 |
| Ferree | 1/1/2012 | 14,500 | 12/31/2014 | $11.00 | $159,500 |
| Ferree | 1/1/2013 | 11,000 | 12/31/2015 | $12.30 | $135,300 |
| Ferree | 1/1/2014 | 12,000 | 12/31/2015 | $10.35 | $124,200 |

**RESPONSE TO COMPLAINT NO. 1263:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1264:** Gilligan was granted 8,000 RSUs as of 1 July 2014, which would have also vested as of 1 July 2017; if he was paid for these he would have received $54,800.

**RESPONSE TO COMPLAINT NO. 1264:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1265:** Richards and Arent both retired from Appvion effective 31 December 2015. In the event of retirement at least a year after the units were granted, RSU and LTIP units would be treated as 1/3 vested for each full year of employment after the grant date. In addition, retirement on December 31 was treated as a full year of employment for vesting purposes. Accordingly, when Richards and Arent left Appvion on 31 December 2015, Richards was paid $600,560 for his partially vested RSUs and Arent was paid $79,528. Richards also received $64,069 for vested LTIPs and Arent received $8,442. This compensation was in addition to the significant amounts that Richards and Arent received in salary, termination protection agreement payments, pension benefits, and other termination payments.

**RESPONSE TO COMPLAINT NO. 1265:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1266:** Ferree also may have received partial payment for RSUs granted effective 4 January 2015 when he left the company in May 2017.

**RESPONSE TO COMPLAINT NO. 1266:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**The Misrepresentations and Omissions Were Made in Connection with the Purchase or Sale of a Security**

**COMPLAINT NO. 1267:** The representations related to the value of the stock itself. These stock values were then used by the ESOP in the following purchases of stock from PDC and to repurchase shares from current and former employees as described in Appendices A and B.

**RESPONSE TO COMPLAINT NO. 1267:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1268:** The Plan also recorded losses and gains on plan transactions using these share prices, which related to the loan from Appvion to PDC or the ESOP which was used to fund the repurchase obligation.

**RESPONSE TO COMPLAINT NO. 1268:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**The ESOP Relied on the Misrepresentations and Was Harmed**

**COMPLAINT NO. 1269:** The ESOP, including through its Employee Owners, believed the representations were true and relied on Reliance's representations of fair market value as described above in Paragraphs 336-339 and was damaged thereby. It was reasonable for the ESOP, including through its Employee Owners, to rely on the integrity of Reliance's representations of fair market value.

**RESPONSE TO COMPLAINT NO. 1269:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**Richards and Gilligan are also Liable as Control Persons Under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t**

**COMPLAINT NO. 1270:** In his role as CEO, Richards had the right to control the membership of the Board of Directors pursuant to the Security Holder's Agreement between 26 November 2013 and Richards' retirement from his role as CEO on 4 August 2015. He was therefore able to exercise control over the ESOP Committee and the ESOP Trustee, who were appointed by the Board. Richards also had direct involvement in and the right to control the day-to-day operations of Appvion and PDC and had the ability to exercise control over the operations of PDC. Richards is therefore liable both directly as alleged above and jointly and severally as a control person to the same extent as the Trustee Defendants (Reliance and Argent) and the other ESOP Committee Defendants (Ferree, Arent, Gilligan) for actions between 2013 and 31 December 2015.

**RESPONSE TO COMPLAINT NO. 1270:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1271:** In his role as CEO, Gilligan had the right to control the membership of the Board pursuant to the Security Holder's Agreement from 4 August 2015 until Appvion filed for bankruptcy in October 2017, and was CEO from August 2015 until October 2017. Gilligan was also a member of the board. He was therefore able to exercise control over the ESOP Committee and the ESOP Trustee, who were appointed by the Board. Gilligan also had direct involvement in and the right to control the day-to-day operations of Appvion and PDC and had the ability to exercise control over the operations of PDC. Gilligan is therefore liable both directly as alleged above and jointly and severally as a control person to the same extent as the Argent and the other ESOP Committee Defendants (Richards, Ferree, Arent) for actions between August 2015 and October 2017.

**RESPONSE TO COMPLAINT NO. 1271:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Plaintiff's Claims are Timely

**COMPLAINT NO. 1272:** Securities claims must be brought no later than two years after discovery of the facts constituting the violation or five years after the violation. Plaintiff was not appointed as a fiduciary to the ESOP until August 2017 and did not discover his claims until sometime thereafter. He therefore could not discover the claims until at least August 2017. Since Plaintiff filed his complaint in this action on 26 November 2018, his claims are timely.

**RESPONSE TO COMPLAINT NO. 1272:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1273:** The fraud was not discovered until after Plaintiff was appointed as an independent, impartial fiduciary who could investigate the valuations. Prior to that date, the only persons who were in a position to bring the claims were involved in the fraud, and their knowledge should therefore not be imputed to Plaintiff.

**RESPONSE TO COMPLAINT NO. 1273:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1274:** The valuations themselves were not disclosed to the employee owners or the public and therefore the claims were not discoverable with reasonable due diligence. Further, the communications about the share price described above in Paragraphs 1246-1253 were misleading and acted to conceal the fact that the stock values as represented were inflated. They selectively disclosed certain information about the valuations while concealing the fact that, among other things, the valuations were not subtracting the Excluded Debt, were failing to subtract all interest-bearing debt, and were being valued on a controlling-interest basis.

**RESPONSE TO COMPLAINT NO. 1274:** Because Count XXXIII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COUNT XXXIV**
**FEDERAL SECURITIES FRAUD AGAINST CARTER, MURPHY, REARDON, SUWYN, AND SEIFERT**

**COMPLAINT NO. 1275:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1275:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1276:** Murphy was a member of the Board of Directors of Appvion beginning in June 2007, and he was Chairman of the Board of Directors from 1 January 2016 until Appvion filed for bankruptcy in October 2017. Murphy was also on PDC's Audit Committee from January 2009 to 31 December 2012, and was chair of the Audit Committee from March 2012 until January 2016. Murphy was therefore a control person within the meaning of § 20(a) of the Securities Exchange Act from 26 November 2013 until October 2017.

**RESPONSE TO COMPLAINT NO. 1276:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1277:** Carter was a member of the Board from July 2004 to 31 December 2016. He was also on PDC's audit committee from July 2004 to 31 December 2016, was chair of the audit committee from 1 January 2016 to 31 December 2016, and was identified as an "audit committee financial expert" under the applicable rules of the SEC. Carter was therefore a control person within the meaning of § 20(a) of the Securities Exchange Act from 26 November 2013 until 31 December 2016.

**RESPONSE TO COMPLAINT NO. 1277:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1278:** Reardon was a member of the Board from June 2007 to 31 December 2015. Reardon was therefore a control person within the meaning of § 20(a) of the Securities Exchange Act from 26 November 2013 until 31 December 2015.

**RESPONSE TO COMPLAINT NO. 1278:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1279:** Seifert was a member of the Board from July 2004 until Appvion filed for bankruptcy in October 2017. Seifert was therefore a control person within the meaning of § 20(a) of the Securities Exchange Act from 26 November 2013 until October 2017.

**RESPONSE TO COMPLAINT NO. 1279:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1280:** Suwyn was a member of the Board from July 2011 until Appvion filed for bankruptcy in October 2017. Suwyn was also on PDC's Audit Committee from January 2016 to 31 December October 2017, and he was chair of the Audit Committee from 1 January 2017 to October 2017. Suwyn was therefore a control person within the meaning of § 20(a) of the Securities Exchange Act from 26 November 2013 until October 2017.

**RESPONSE TO COMPLAINT NO. 1280:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1281:** Appvion and PDC's Board of Directors had appointment and removal powers over the ESOP Trustee and the members of the ESOP Committee. It was also responsible for monitoring Appvion's financial performance (including the audited financial statements), its projected financial performance, the stock valuations, and for reviewing and approving Appvion and PDC's 10-K filings. *See* ¶¶ 179-90, 349-62. The members of the Board therefore actually participated and exercised control over the operations of Appvion and PDC, and had the power and ability to control the events that give rise to this claim - the publication of the stock price and related communications.

**RESPONSE TO COMPLAINT NO. 1281:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1282:** The Board's Audit Committee consisted of outside directors and was responsible for helping the Board "fulfill its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of Paperweight Development financial reports." The Audit Committee had even greater oversight of Appvion and PDC's finances and reviewed and approved each of PDC's 10-Q filings. *See* ¶¶ 189, 363-67.

**RESPONSE TO COMPLAINT NO. 1282:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1283:** As described in Paragraphs 349-362, each of Appvion and PDC's 10-K filings incorporated PDC's stock price, which was at all times inflated. Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan also signed each of the following 10-K statements in their roles as directors and had control over the representations relating to the stock price contained therein:

| Year | Date Filed | Director Defendant Signatories |
|---|---|---|
| 2013 | 12 Mar 14 | Richards, Carter, Murphy, Reardon, Seifert, Suwyn |
| 2013 (Amended) | 14 Nov 14 | Richards, Carter, Murphy, Reardon, Seifert, Suwyn |
| 2014 | 13 Mar 15 | Richards, Carter, Murphy, Reardon, Seifert, Suwyn |
| 2015 | 25 Mar 16 | Gilligan, Carter, Murphy, Seifert, Suwyn |
| 2016 | 15 Mar 17 | Gilligan, Murphy, Seifert, Suwyn |

**RESPONSE TO COMPLAINT NO. 1283:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1284:** Carter, Murphy, Reardon, and Seifert were also directors at the time of the valuations relating to BemroseBooth discussed above in Paragraphs 209-246 and therefore specifically knew that the valuations should be subtracting retirement debt.

**RESPONSE TO COMPLAINT NO. 1284:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1285:** In connection with the 31 December 2013 through 30 June 2017 valuation dates, the Director Defendants (Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan), were control persons and are therefore jointly and severally liable under § 20(A) of the Securities Exchange Act, 15 U.S.C. § 78t, to the same extent ESOP Trustees and the ESOP Committee members for the conduct described above in Counts I-XIII.

**RESPONSE TO COMPLAINT NO. 1285:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**Plaintiff's Claims are Timely**

**COMPLAINT NO. 1286:** Securities claims must be brought no later than two years after discovery of the facts constituting the violation or five years after the violation. Plaintiff was not appointed as a fiduciary to the ESOP until August 2017 and did not discover his claims until sometime thereafter. He therefore could not discover the claims until at least August 2017. Since Plaintiff filed his complaint in this action on 26 November 2018, his claims are timely.

**RESPONSE TO COMPLAINT NO. 1286:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1287:** The fraud was not discovered until after Plaintiff was appointed as an independent, impartial fiduciary who could investigate the valuations. Before then, the only persons who were in a position to bring the claims were involved in the fraud, and their knowledge should therefore not be imputed to Plaintiff. Further, the valuations themselves were not disclosed to the employee owners or the public and therefore the claims were not discoverable with reasonable due diligence.

**RESPONSE TO COMPLAINT NO. 1287:** Because Count XXXIV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COUNT XXXV**
**FEDERAL SECURITIES FRAUD AGAINST STOUT, LEVINE AND EL-TAHCH**

**COMPLAINT NO. 1288:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1288:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**Stout Made Material Misrepresentations**

**COMPLAINT NO. 1289:** In connection with its appraisals for the 31 December 2013 through 30 June 2017 valuation dates, Stout (including Levine and El-Tahch to the extent they were responsible for preparing the valuations as indicated below) falsely represented that its fair market value of PDC stock was as follows:

| Valuation Date | PDC Stock Price | Individual Stout Defendant(s) |
|---|---|---|
| 31 Dec 2013 | $16.25 | Levine El-Tahch |
| 30 Jun 2014 | $16.30 | Levine El-Tahch |
| 31 Dec 2014 | $11.00 | Levine El-Tahch |
| 30 Jun 2015 | $12.90 | Levine |
| 31 Dec 2015 | $12.30 | Levine |
| 30 Jun 2016 | $13.70 | Levine |
| 31 Dec 2016 | $10.35 | Levine |
| 30 Jun 2017 | $6.85 | Levine |

**RESPONSE TO COMPLAINT NO. 1289:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1290:** Stout's opinions carried with them implied assertions that Stout knew facts that existed which supported their opinions. However, Stout lacked the basis for its opinions of value and the values stated above were at all times inflated for the reasons described below, in Section IV.A, and in Counts I-II. Stout therefore committed securities fraud in violation of the Securities Exchange Act of 1934, § 10(B), 15 U.S.C. § 78J and SEC Rule 10B-5, 17 C.F.R. 240.10b-5.

**RESPONSE TO COMPLAINT NO. 1290:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1291:** Stout informed the ESOP Trustee of its valuations. Stout also provided its valuation reports to Appvion's ESOP Committee and explained the valuations at the following meetings:

| Valuation Date | Meeting Date | Attendees from Argent and Stout | Comments |
|---|---|---|---|
| 30 Jun 13 | 17 Jul 13 | Levine (Stout)<br><br>Martin (Reliance), Kaplan (Reliance) | "Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine. Mr. Levine, Mr. Martin and Mr. Kaplan then departed the meeting." |
| 31 Dec 13 | 17 Jan 14 | Levine (Stout), El-Tahch (Stout)<br><br>Martin (Reliance), Kaplan (Reliance) | Mr. Levine reviewed the December 31, 2013 stock price valuation with the committee using the materials distributed to committee members. The committee members asked questions regarding the stock valuation, which were answered by Mr. Levine, Mr. El-Tahch [of Stout], and Mr. Martin. Messrs. Levine, El-Tahch, Martin and Kaplan were then excused from the meeting." |
| 30 Jun 14 | 15 Jul 14 | Levine (Stout) Martin (Argent), Hansberger (Argent) | "`Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine and Mr. Martin. Mr. Levine, Mr. Martin and Mr. Hansberger then departed the meeting." |
| 31 Dec 14 | 14 Jan 15 | Levine (Stout)<br><br>Martin (Argent), Hansberger (Argent) | "Mr. Levine reviewed the December 31, 2014 stock price valuation with the committee using the materials distributed to committee members. The committee members asked questions regarding the stock valuation, which were answered by Mr. Levine and Mr. Martin. Messrs. Levine, Martin and Hansberger were then excused from the meeting." |
| 30 Jun 15 | 4 Aug 15 | Levine (Stout), Sinnathamby (Stout) | "The Committee reviewed the June 30, 2015 stock valuation prepared by Stout Risius Ross and approved by Argent Trust Company. Mr. Levine described the process used to arrive at |

| Valuation Date | Meeting Date | Attendees from Argent and Stout | Comments |
|---|---|---|---|
| | | Martin (Argent), Hansberger (Argent) | the valuation. Committee members asked questions which were answered by Mr. Levine and Mr. Martin. Messrs. Levine, Sinnathamby, Martin and Hansberger then departed the meeting." " |
| 31 Dec 15 | 15 Jan 16 | Levine (Stout), Aguilar (Stout)<br><br>Martin (Argent) | "Mr. Levine reviewed the December 31, 2015 stock price valuation with the committee using the materials distributed to committee members. The committee members asked questions regarding the stock valuation, which were answered by Mr. Levine and Mr. Martin. Messrs. Levine, Aguilar and Martin were then excused from the meeting." |
| 30 Jun 16 | 11 Jul 16 | Levine (Stout), Aguilar (Stout)<br><br>Martin (Argent), Hansberger (Argent) | "The Committee reviewed the June 30, 2016 stock valuation prepared by Stout Risius Ross and approved by Argent Trust Company. Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine. Messrs. Levine, Aguilar, Martin and Hansberger then departed the meeting." " |
| 31 Dec 16 | 18 Jan 17 | Levine (Stout)<br><br>Margin (Argent) | "Mr. Levine reviewed the December 31, 2016 stock price valuation with the committee using the materials distributed to committee members. The committee members asked questions regarding the stock valuation, which were answered by Mr. Levine. Messrs. Levine and Martin were then excused from the meeting." |
| 30 Jun 17 | 17 Jul 17 | Levine (Stout), Aguilar (Stout)<br><br>Hansberger (Argent) | "Mr. Levine reviewed the June 30, 2016 stock valuation prepared by Stout Risius Ross and approved by Argent Trust Company. Mr. Levine described the process used to arrive at the valuation. Committee members asked questions which were answered by Mr. Levine. Mr. Macke made a motion to approve the valuation. Mr. Gilligan seconded the motion and all were in favor. Messrs. Levine, Aguilar and Hansberger then departed the meeting." " |

**RESPONSE TO COMPLAINT NO. 1291:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1292:** Stout knew that the valuations would then be conveyed to the ESOP's employee owners and that the stock values would be used in numerous purchases and sales of PDC stock. Stout's valuation reports also required it to approve any references to its opinions so it approved of the ESOP's communications discussing the valuations described in Count XXXIII:

> This opinion is solely for the use and benefit of the Trustee, and **any summary of or reference to the opinion or any reference to SRR by the Company will be subject to SRR's prior review and written approval**, which shall not be unreasonably withheld. The **opinion will not be included in, summarized, or referenced to in any manner** in materials distributed to the public or potential investors of the Company without SRR's prior written consent, which shall not be unreasonably withheld.

**RESPONSE TO COMPLAINT NO. 1292:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

### Stout Acted Knowingly or Recklessly

**COMPLAINT NO. 1293:** Stout lacked the basis for its opinions because of the following knowledge:

**RESPONSE TO COMPLAINT NO. 1293:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1294:** Appvion consistently failed to meet the projections that Stout relied upon in producing the valuations. Accordingly, Stout knew that the projections the valuations were based on were inflated, causing the valuations themselves to be inflated. Rather than requiring Appvion to provide more realistic projections, Stout relied on them for the purposes of its valuation in order to inflate the valuations.

**RESPONSE TO COMPLAINT NO. 1294:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1295:** Stout knew that the individuals at Appvion responsible for creating the projections had substantial conflicts of interest through the various executive compensation plans tied to the stock price. Stout's own valuation reports described these synthetic equity plans, calculated them as a percentage of ownership of Appvion/PDC, and subtracted the value of these plans from its determination of PDC's stock vale. By the end of 2014, Stout's valuation report stated that this synthetic equity accounted for approximately 25% of the "fully

diluted ownership value" of PDC and valued the units at nearly $5 million; the value of these units increased in 2015 and 2016.

**RESPONSE TO COMPLAINT NO. 1295:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1296:** Because Stout was reviewing PDC's audited and unaudited financial statements, Stout knew that the valuations did not deduct material liabilities that were listed on PDC's audited financial statements such as unfunded pension/post-retirement debt. The unfunded pension/post-retirement debt was material for all years relevant to this count and exceeded the fair market value of equity as calculated by Stout in at least 2014, 2015, and 2016. In particular, Stout's Levine was a preparer on the 31 December 2007 valuation that subtracted BemroseBooth's unfunded pension liability from the value of PDC's equity, and Levine and El-Tahch were preparers on the 7 July 2008 valuation that valued BemroseBooth at zero due to its outstanding debt and pension liability. Accordingly, Levine and El-Tahch agreed that PDC's valuations should have been adjusting for the value of Appvion's unfunded post-retirement liability. *See* ¶¶ 209-36.

**RESPONSE TO COMPLAINT NO. 1296:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1297:** Stout also knew that the valuations were not including other long-term liabilities which appeared on PDC's balance sheet, such as compensation obligations, accrued insurance obligations, and accrued tax obligations. *See* ¶ 243. Stout excluded these liabilities in order to inflate the valuations.

**RESPONSE TO COMPLAINT NO. 1297:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1298:** Stout knew that the valuations did not even include all interest-bearing debt, and Stout excluded this debt in order to inflate the valuations. *See* ¶¶ 247-48. This included (1) "unamortized discounts" which were excluded from all of the valuations approved by Argent even though they were unquestionably interest-bearing; and (2) portions of Appvion's revolving line of credit which were excluded from the 31 December 2015, 30 June 2016, 31 December 2016, and 30 June 2017 valuations. Excluding these debts had material impacts on PDC's share value:

| Valuation Date | Impact of Excluding Unamortized Discounts | Impact of Excluding Revolving Line of Credit |
|---|---|---|
| 30 Jun 13 | N/A | $2.97/share |
| 31 Dec 13 | $0.86/share | N/A |
| 30 Jun 14 | $0.82/share | N/A |

| 31 Dec 14 | $0.80/share | N/A |
|-----------|-------------|-----|
| 30 Jun 15 | $0.78/share | N/A |
| 31 Dec 15 | $0.56/share | $0.51/share |
| 30 Jun 16 | $0.54/share | $4.23/share |
| 31 Dec 16 | $0.46/share | $2/70/share |
| 30 Jun 16 | $0.57/share | $1.45/share |

**RESPONSE TO COMPLAINT NO. 1298:** Because Count XXXV is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1299:** Stout knew that it was applying a control premium of approximately 10% to the valuations between 30 June 2013 and 21 December 2014, and that it was still valuing PDC's shares on a controlling-interest basis after that date. However, Stout knew that there was no factual basis for the control premium because (1) the ESOP Trustee lacked the indicia of control that Stout listed in its own valuation report as a basis for applying the premium; and 2) the ESOP was using this valuation to buy and sell smaller amount of stock, not to sell a controlling interest in PDC. Stout included this control premium in order to inflate the valuations. *See* ¶¶ 254-63.

**RESPONSE TO COMPLAINT NO. 1299:** Because Count XXXV is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1300:** Stout knew that its practice of rounding up or down numbers at all stages of its valuation instead of using precise numbers could and did result in inflated valuations. Stout undoubtedly created its valuations as part of a spreadsheet that calculated the full number and then rounded it, so (1) the rounding did not save any time or effort and merely introduced a potential source of error to the calculation; and (2) Stout would have been able to verify the impact this rounding had on the share value and identify that it increased the share value, sometimes to a material degree. *See* ¶¶ 286-87.

**RESPONSE TO COMPLAINT NO. 1300:** Because Count XXXV is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1301:** Stout knew that its selection of comparison companies for its guideline company method analysis was inappropriate because the companies were not truly comparable, and that was failing to make appropriate and consistent adjustments to compensate for differences in the companies.

**RESPONSE TO COMPLAINT NO. 1301:** Because Count XXXV is not asserted

against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1302:** Stout knew that its practice of breaking out Appvion into business segments failed to account for all overhead costs not allocated to the individual business segments.

**RESPONSE TO COMPLAINT NO. 1302:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1303:** Stout knew that its application of a 5% discount for limited marketability was insufficient to account for the large repurchase obligation. *See* ¶¶ 278-80. Stout's own reports acknowledged the significance of repurchase obligation as early as 2008 and 2009, noting in the 31 December 2009 valuation report that "the repurchase obligation has contributed to the Company's decision to monetize certain assets and explore the sale of the Company in total."

**RESPONSE TO COMPLAINT NO. 1303:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1304:** Stout knew that it made significant changes to its methodology in 2015, using six years of projections for its 30 June 2015 valuation even though it had never used six years of projections before and did not use six years of projections in any subsequent reports.

**RESPONSE TO COMPLAINT NO. 1304:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1305:** Stout also knew that it was disregarding Thermal's EBITDA results and projections in its valuation reports beginning with the 31 December 2015 valuation because of Stout's low EBITDA in 2015. *See* ¶ 274-77.

**RESPONSE TO COMPLAINT NO. 1305:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1306:** Stout made these untrue statements and material omissions knowing that its representations of the fair market value of PDC stock would be communicated to the ESOP and the Employee Owners. Stout also knew that these stock prices would be used in connection with the offer, sale, or purchase of a security in this state.

**RESPONSE TO COMPLAINT NO. 1306:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1307:** Stout acted willfully because it knew or with the exercise of reasonable care could have known that its opinions of fair market value overstated the value of PDC stock. Stout also knew or with the exercise of reasonable care could have known that the

omissions described above were material and that they were necessary to make their representations of stock value not misleading to the ESOP and the Employee Owners.

**RESPONSE TO COMPLAINT NO. 1307:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

### The Misrepresentations and Omissions Were Made in Connection with the Purchase or Sale of a Security

**COMPLAINT NO. 1308:** The representations related to the value of the stock itself. These stock values were then used by the ESOP in the following purchases of stock from PDC and to repurchase shares from current and former employees as described in Appendices A and B.

**RESPONSE TO COMPLAINT NO. 1308:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1309:** The Plan also recorded losses and gains on plan transactions using these share prices, which related to the loan from Appvion to PDC or the ESOP which was used to fund the repurchase obligation.

**RESPONSE TO COMPLAINT NO. 1309:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

### The ESOP Relied on the Misrepresentations and Was Harmed

**COMPLAINT NO. 1310:** The ESOP, including through its Employee Owners, believed the representations were true and relied on Reliance's representations of fair market value as described above in Paragraphs 336-39 and was damaged thereby. It was reasonable for the ESOP, including through its Employee Owners, to rely on the integrity of Reliance's representations of fair market value.

**RESPONSE TO COMPLAINT NO. 1310:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

### The ESOP's Reliance on the Misrepresentations and Omissions Caused Harm to the ESOP

**COMPLAINT NO. 1311:** The inflated share values as represented by Stout caused the ESOP to overpay for stock from PDC and for repurchases of stock from current and former employees. This caused the ESOP to lose tens of millions of dollars in retirement savings.

**RESPONSE TO COMPLAINT NO. 1311:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

## Plaintiff's Claims are Timely

**COMPLAINT NO. 1312:** Securities claims must be brought no later than two years after discovery of the facts constituting the violation or five years after the violation. Plaintiff was not appointed as a fiduciary to the ESOP until August 2017 and did not discover his claims until sometime thereafter. He therefore could not discover the claims until at least August 2017. Since Plaintiff filed his complaint in this action on 26 November 2018, his claims are timely.

**RESPONSE TO COMPLAINT NO. 1312:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1313:** The fraud was not discovered until after Plaintiff was appointed as an independent, impartial fiduciary who could investigate the valuations. Before then, the only persons who were in a position to bring the claims were involved in the fraud, and their knowledge should therefore not be imputed to Plaintiff. The valuations themselves were not disclosed to the employee owners or the public and therefore the claims were not discoverable with reasonable due diligence.

**RESPONSE TO COMPLAINT NO. 1313:** Because Count XXXV is not asserted against Reliance Trust and has been dismissed, no response is required.

## COUNT XXXVI
## BREACH OF FIDUCIARY DUTY AGAINST HOULIHAN

**COMPLAINT NO. 1314:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1314:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

## Houlihan was a Fiduciary of the ESOP

**COMPLAINT NO. 1315:** Under ERISA §1002(21), 29 U.S.C. § 1002(21), "a person is a fiduciary with respect to the plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, [or] (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so..."

**RESPONSE TO COMPLAINT NO. 1315:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1316:** The definition of a fiduciary under ERISA is functional and does not depend on formal designations or labels.

**RESPONSE TO COMPLAINT NO. 1316:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1317:** Houlihan was an ERISA fiduciary because Houlihan "exercised any discretionary control respecting" the management of the ESOP and "exercised any authority or control respecting management or disposition of its assets" by engaging in the activities described in the addendum to the 14 February 2001 Engagement Letter. Those activities, as further described in Section IV.A., included the following:

- Houlihan exercised discretionary control or authority in formulating and implementing the plan that Houlihan would be represented to the Employee Owners as being independent;

- Houlihan exercised discretionary control or authority in formulating and implementing the plan that it would give a fairness opinion even though Houlihan was not independent and therefore, was not qualified;

- Houlihan exercised discretionary control or authority in formulating and implementing the plan to not include pension/post-retirement and other debt in calculating PDC's fair market value. For example, Houlihan was specifically tasked with "use of Pension Plans over-funded balances";

- Houlihan exercised discretionary control or authority in formulating and implementing the plan to add a control premium where the ESOP trust had no such control;

- Houlihan exercised discretionary control or authority in the selection and hiring of State Street and Willamette;

- Houlihan exercised discretionary control or authority in determining the content of the communications between Appvion, State Street, Willamette and the ESOP Committee on the one hand, and the Employee Owners on the other hand;

- Houlihan exercised discretionary control or authority in the "solicitation and structure of the employee-based equity capital investment for transaction purposes";

- Houlihan exercised discretionary control or authority over the "strategic use of Existing Benefit Plan Contributions."

**RESPONSE TO COMPLAINT NO. 1317:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1318:** Although Houlihan's engagement letters were with PDC, its duties arising therefrom, gave it authority to act with respect to the ESOP.

**RESPONSE TO COMPLAINT NO. 1318:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1319:** Further, Appvion's and the ESOP Committee's (Buth, Karch, Fantini and Parker) complete inexperience with ESOP plans, together with Houlihan's substantial experience in quarterbacking ESOP transactions is further compelling evidence that it exercised "any discretionary control" or "authority."

**RESPONSE TO COMPLAINT NO. 1319:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1320:** Accordingly, Houlihan was a ERISA fiduciary.

**RESPONSE TO COMPLAINT NO. 1320:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**Houlihan Breached its Fiduciary Duties in Connection with the 2001 Transaction**

**COMPLAINT NO. 1321:** Houlihan breached its fiduciary duties of prudence, loyalty, and disclosure in connection with the 2001 Transaction by at least the following:

**RESPONSE TO COMPLAINT NO. 1321:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1322:** Houlihan agreed to "quarterback" the ESOP transaction as described in Section IV.A. in exchange for a fee contingent on the ultimate transaction price. Houlihan then performed all of its work in connection with the ESOP transaction with a conflict of interest that caused it to be biased, partial and compromised. Houlihan's conflict of interest infested every aspect of the 2001 Transaction, including in at least the four ways described in Paragraph 83. This was a breach of Houlihan's duties of prudence and loyalty.

**RESPONSE TO COMPLAINT NO. 1322:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1323:** Houlihan then agreed to provide a fairness opinion even though it knew it was conflicted and Houlihan knew that it was inappropriate for Houlihan to issue a fairness opinion because of that conflict of interest. This was a breach of Houlihan's duties of prudence and loyalty.

**RESPONSE TO COMPLAINT NO. 1323:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1324:** Houlihan actively concealed its conflicts of interest as described in Paragraphs 10619, 134-35, in order to present itself as an independent advisor and convince the Employee Fiduciaries to invest the funds needed for the 2001 Transaction to close at the purchase price that Houlihan negotiated. This was a breach of Houlihan's duties of prudence, loyalty, and disclosure.

**RESPONSE TO COMPLAINT NO. 1324:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1325:** Houlihan reviewed and/or approved the 23 July 2001 Prospectus. *See* ¶¶ 106-19. That prospectus misleadingly disclosed Buth and Karch's conflicts of interest but fraudulently failed to disclose Houlihan's conflicts of interest while affirmatively representing Houlihan as being independent as a result of being qualified to issue the fairness opinion. As described earlier, the prospectus used Houlihan's direct opinion of fairness to the ESOP Fiduciaries to overcome the impact of management's conflict disclosed in the previous sentence. The prospectus explained Willamette's fees for its fairness opinion to State Street but failed to identify Houlihan's much larger contingent fees. Houlihan reviewed the prospectus as part of agreement to "prepare materials to be presented to employees" and to "assist in the solicitation and structure of employee-based equity capital investments for transaction purposes;" however, at a minimum, Houlihan reviewed and approved the references to Houlihan contained in the Prospectus. This was a breach of Houlihan's duties of prudence, loyalty, and disclosure.

**RESPONSE TO COMPLAINT NO. 1325:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1326:** Because Houlihan's 20 July 2001 engagement letter gave Houlihan the right to review and approve any materials referencing its name or fairness opinion, Houlihan reviewed and approved the 25 July 2001 letter to employees authored by Buth which represented that Houlihan would give provide "independent validation of the deal." *See* ¶ 122. Houlihan's approval of this letter was a breach of Houlihan's duties of prudence, loyalty, and disclosure.

**RESPONSE TO COMPLAINT NO. 1326:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1327:** Houlihan's Paone was present at the 2 August 2001 road show when Karch presented him as providing "an independent view and validation of our deal" when Paone knew that it was not independent and that that its conflict had not been disclosed to the Employee Fiduciaries. *See* ¶¶ 125. This is equivalent to a representation. Because Houlihan was required to review and approve references to Houlihan's opinion (including "any verbal

presentation with respect thereto"), Houlihan approved this characterization of its role. Houlihan breached its fiduciary duties of prudence, loyalty, and disclosure by not correcting Karch.

**RESPONSE TO COMPLAINT NO. 1327:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1328:** Houlihan's Paone was present at the 2 August 2001 road show when Buth represented that the prospectus "highlighted" the fees paid to advisors but knew that the prospectus did not disclose Houlihan's fees even though it disclosed Willamette's much smaller fees. Houlihan breached its fiduciary duties of prudence, loyalty, and disclosure by not correcting Buth.

**RESPONSE TO COMPLAINT NO. 1328:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1329:** Houlihan failed to inform the Plan and the Employee Participants that it was would receive up to an $8.1 million contingent fee only if the ESOP transaction closed, in breach of its duties of prudence, loyalty, and disclosure.

**RESPONSE TO COMPLAINT NO. 1329:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1330:** Houlihan acted in its own self-interest in negotiating the purchase price and in working with Buth, Karch, and State Street to present Houlihan as independent, in breach of its duty of loyalty. Houlihan breached its fiduciary duty of prudence, loyalty and disclosure by opining to both the Board of Directors and directly to the ESOP Fiduciaries that the ESOP Transaction was fair when it was not because the purchase price was inflated and was in excess of fair market value.

**RESPONSE TO COMPLAINT NO. 1330:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**Plaintiff's Claims Against Houlihan for Breaches of Fiduciary Duty are Tolled**

**COMPLAINT NO. 1331:** The actions described by Houlihan in Section IV.A. constituted a course of conduct of lying about Houlihan's independence while concealing the contingent nature of Houlihan's fees. This operated to mask and conceal: (1) the fact that the purchase price for Appvion (as negotiated by conflicted Houlihan and conflicted Buth and Karch) was inflated and for more than fair market value; (2) the fact that Buth, Karch, State Street and Houlihan were breaching their fiduciary duties in negotiating and approving the purchase price and concealing that Buth, Karch and Houlihan were acting in their own self-interest; (3) and that Houlihan was conflicted in at least four critical areas. These lies about Houlihan's independence also served to divert any further investigation to the fair market value of PDC and Houlihan's conflicted role.

**RESPONSE TO COMPLAINT NO. 1331:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1332:** Lyon was first named as an ESOP fiduciary in August 2017, so he was not aware of Houlihan's actions in connection with the 2001 Transaction until after that date and an opportunity to investigate the valuations. He specifically did not know of Houlihan's contingent fee arrangement until he received a copy of the engagement letter in 2019. Further, the contingent fee arrangement was kept confidential from the Employee Owners so it was not possible for a reasonably diligent plaintiff to discover the breaches of fiduciary duty related to the 2001 Transaction prior to the fall of 2018, when he learned of Houlihan's conflict.

**RESPONSE TO COMPLAINT NO. 1332:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1333:** Under ERISA § 413 (29 U.S.C. §1113), where the defendant engages in fraud or concealment, actions may be commenced not later than six years after the date of discovery of the breach or violation. The fraud or concealment can "include genuine acts of concealment committed in the course of the underlying wrong" and does not require acts of fraud or concealment separate from the fraud or breach of fiduciary duty. *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1095 (7th Cir. 1992). Because Houlihan engaged in fraud or concealment, Plaintiff's claim is timely.

**RESPONSE TO COMPLAINT NO. 1333:** Because Count XXXVI is not asserted against Reliance Trust and has been dismissed, no response is required.

## COUNT XXXVII
## KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY AGAINST HOULIHAN

**COMPLAINT NO. 1334:** All previous averments are incorporated herein.

**RESPONSE TO COMPLAINT NO. 1334:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required. To the extent a response is required, Reliance Trust incorporates its answers to Plaintiff's prior allegations.

**COMPLAINT NO. 1335:** State Street, Buth, and Karch, caused the ESOP to engage in prohibited transactions in violation of ERISA § 406(a)(1)(A), (D), (E) and § 406(b)(1) (29 U.S.C. § 1106(a)(1)(A), (D), (E), and § 1106(b)(1)) as alleged earlier in Count XXI and Section IV.A. Because it had extensive experience with ERISA and ESOPs, Houlihan knew that these transactions were prohibited for the reasons described in Count XXI.

**RESPONSE TO COMPLAINT NO. 1335:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1336:** Buth and Karch also received consideration for their own accounts in violation of ERISA § 406(b)(3) (29 U.S.C. § 1106(b)(3)). Houlihan knew about the bonus payments to Buth, Karch, and others because its responsibilities in connection with the transaction included "Management Bonus Participation as ongoing investment tool."

**RESPONSE TO COMPLAINT NO. 1336:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1337:** Despite this knowledge, Houlihan knowingly participated in the breaches by, among other things, the following:

- Issuing a fairness opinion that resulted in Houlihan receiving a contingent fee of up to $8.1 million;

- Representing to Appvion employees that it was preparing an independent validation of the buyout proposed in 2001, while failing to disclose that its fees were contingent on both the deal closing and were structured as a percentage of the purchase price;

- Representing to Appvion employees that the proposed buyout was a great deal for them; and

- Other acts as alleged above in Count XXXVI.

**RESPONSE TO COMPLAINT NO. 1337:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1338:** Houlihan's knowing participation assisted State Street, Buth, and Karch, Fantini, and Parker, and others' breaches of fiduciary duty in convincing Appvion's employees to agree to the buyout and be receiving its contingent fee, which was paid by PDC and therefore constituted assets of the plan under ERISA § 406 (29 U.S.C. § 1106) and under 29 C.F.R. 2510.3-101.

**RESPONSE TO COMPLAINT NO. 1338:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1339:** Plaintiff was harmed as a result of Houlihan's conduct.

**RESPONSE TO COMPLAINT NO. 1339:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1340:** Plaintiff is entitled to equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

**RESPONSE TO COMPLAINT NO. 1340:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required.

### Plaintiff's Claim against Houlihan for Knowing Participation is Timely

**COMPLAINT NO. 1341:** ERISA's statute of limitations (ERISA § 413, 29 U.S.C. § 1113) does not apply to claims for knowing participation under § 502(a)(3) (29 U.S.C. § 1132(a)(2)). Instead, the most analogous state law cause of action applies; here that is Wisconsin's statute of limitations for aiding and abetting breach of fiduciary duty or three years from the date the cause of action accrues. In Wisconsin, tort claims accrue when the injury is discovered or with reasonable diligence should be discovered, whichever occurs first. That discovery could not take place here until Mr. Lyon was appointed as an independent fiduciary and obtained a copy of Houlihan's engagement letters that revealed Houlihan's conflicts of interest, along with Mr. Lyon's review of the valuations.

**RESPONSE TO COMPLAINT NO. 1341:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required.

**COMPLAINT NO. 1342:** Alternatively, if ERISA § 413, 29 U.S.C. § 1113 applies Plaintiff's claims are tolled by the fraud or concealment exception for the reasons stated in Count XXXVI.

**RESPONSE TO COMPLAINT NO. 1342:** Because Count XXXVII is not asserted against Reliance Trust and has been dismissed, no response is required.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgement to be entered against Defendants on all claims, and request that the Court order the following relief:

A.    With respect to Plaintiffs' ERISA claims:

1.    Declare that each of the above fiduciary Defendants breached his, her or its fiduciary duties under ERISA, and/or knowingly participated in a fiduciary's breach.

2.    Require each fiduciary found to have breached his/her/its fiduciary duties to the ESOP to jointly and severally pay such amount to the ESOP as

necessary to make the ESOP whole for any losses resulting from said breaches of fiduciary duties, or by virtue of liability pursuant to ERISA § 405.

3. An order requiring the forfeiture of any interest in the ESOP of any fiduciary found to have breached his or her fiduciary duty to the ESOP to the extent necessary after any recovery for the ESOP to make whole the innocent participants of the ESOP.

4. Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

5. Award pre-judgment and post-judgment interest.

6. Award any such other relief that the Court determines that Plaintiff is entitled pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.

B. With respect to the non-ERISA claims, an award of damages in an amount to be proven at trial, along with punitive damages and such other and further relief as the Court deems just and proper.

**RESPONSE TO PRAYER FOR RELIEF:** To the extent the allegations in the Prayer for Relief refer to Reliance Trust, Reliance Trust admits that Plaintiff purports to seek the relief in its Prayer for Relief, but denies that Plaintiff is entitled to any relief.

## JURY DEMAND

Plaintiff demands a jury trial on all claims to which it is entitled a jury.

**RESPONSE TO JURY DEMAND:** Reliance Trust admits that Plaintiff purports to seek a jury trial, but denies that it is entitled to a jury trial, including because any claims that might entitle it to a jury trial have been dismissed.

## AFFIRMATIVE AND OTHER DEFENSES

Reliance Trust asserts the following affirmative and other defenses, without assuming any burden that would otherwise rest with Plaintiff (including Reliance Trust's fiduciary status with respect to any challenged conduct, a breach of fiduciary duty, causation, and damages). Reliance

Trust reserves the right to supplement, amend, or delete any of the following defenses, as warranted by discovery or other investigation, or as justice may require.

1.      The Complaint fails to plead sufficient factual allegations to state a claim against Reliance Trust upon which relief can be granted, including for the reasons stated in Reliance Trust's motions to dismiss.

2.      Plaintiff's claims against Reliance Trust are barred, in whole or in part, by the relevant statutes of limitations, including the limitations period in 29 U.S.C. § 1113.

3.      Plaintiff's claims against Reliance Trust are barred to the extent they are predicated on events that occurred before or after Reliance Trust served as trustee for the ESOP.

4.      Plaintiff's claims against Reliance Trust are barred to the extent Reliance Trust owed only limited fiduciary duties as a directed trustee.

5.      Plaintiff's claims against Reliance Trust are barred to the extent any losses were caused by Reliance Trust following a proper direction given by a named fiduciary.

6.      Plaintiff's claims against Reliance Trust are barred in whole or in part because Reliance Trust reasonably relied on the advice of independent financial advisors, including the valuation reports prepared by Stout.

7.      Plaintiff's claims against Reliance Trust are barred in whole or in part because Reliance Trust reasonably relied on information provided to it by other fiduciaries.

8.      Plaintiff's claims against Reliance Trust are barred in whole or in part because any valuations of PDC stock were objectively reasonable, or the product of an objectively prudent process.

9.      Plaintiff's claims against Reliance Trust are barred to the extent Plaintiff proximately caused, contributed to, or failed to mitigate any losses.

10.     Plaintiff's claims against Reliance Trust are barred to the extent Plaintiff cannot show a harm or loss.

11.     Plaintiff's claims against Reliance Trust are barred in whole or in part because any alleged damages were not caused by Reliance Trust, or were caused by persons or entities over which Reliance Trust had no responsibility or control.

12.     Reliance Trust is not jointly and severally liable for Plaintiff's alleged damages, including because Reliance Trust is not liable for any counts asserted against it.

13.     Plaintiff's claims against Reliance Trust are barred to the extent any damages are comprised of losses to the accounts of ESOP participants who executed a waiver or release of claims.

14.     Plaintiff's claims against Reliance Trust are barred to the extent any damages are comprised of losses to the accounts of ESOP participants who agreed to arbitrate any claims.

15.     Plaintiff's co-fiduciary liability claim against Reliance Trust is barred because Reliance Trust neither knew about nor participated in any other fiduciary's purported breaches.

16.     Reliance Trust adopts by reference any additional applicable defense pleaded by any other defendant not otherwise pleaded here.

WHEREFORE, Reliance Trust requests that judgment be entered in its favor and against Plaintiff, that Reliance Trust be awarded its costs and attorneys' fees, and that Reliance Trust be awarded any other appropriate relief.


Dated: June 28, 2024                              Respectfully submitted,

                                                  By: */s/ Eric S. Mattson*
                                                  Eric S. Mattson
                                                  IL State Bar No. 6225572
                                                  Caroline A. Wong
                                                  IL State Bar No. 6324863

Sudeep S. Dhanoa
IL State Bar No. 6343306
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
Main: (312) 853-7000
Fax: (312) 853-7036
emattson@sidley.com
caroline.wong@sidley.com
sdhanoa@sidley.com

Sherry D. Coley
State Bar No. 1038243
Amundsen Davis LLC
318 South Washington Street
Suite 300
Green Bay, Wisconsin 54301
Main: (920) 435-9378
Direct: (920) 431-2239
Fax: (920) 431-2279
scoley@amundsendavislaw.com

*Counsel for Defendant Reliance Trust Company*